COMPLAINT
Case No. A-23-875618-C

# EXHIBIT A

Electronically Filed
8/9/2023 3:11 PM
Steven D. Grierson
CLERK OF THE COURT

**COMP**
Kristofer Z. Riklis, Esq.
Nevada Bar No. 14754
Riklis Law, PLLC
871 Coronado Center Dr., Suite 200
Henderson, NV 89052
Telephone: (702) 720-6471
Kristofer@riklislaw.com

Attorneys for CHRISTOPHER J. HADNAGY
and SOCIAL-ENGINEER, LLC,

CASE NO: A-23-875618-C
Department 29

### DISTRICT COURT

### CLARK COUNTY, NEVADA

| | |
|---|---|
| CHRISTOPHER J. HADNAGY, an individual; and SOCIAL-ENGINEER, LLC, a Pennsylvania limited liability company, | Case No.: |
| Plaintiffs, | Dept. No.: |
| v. | |
| JEFF MOSS, an individual; DEF CON COMMUNICATIONS, INC., a Washington corporation; and DOES 1-10; and ROE ENTITIES 1-10, inclusive, | **COMPLAINT** |
| Defendants. | **DEMAND FOR JURY TRIAL**<br>**Exempt From Arbitration:**<br>Plaintiffs seek equitable relief and Amount in Controversy Greater Than $50,000 |

### COMPLAINT

For their Complaint (the, "COMPLAINT") against Defendants JEFF MOSS ("MOSS"), an

individual, and DEF CON COMMUNICATIONS, INC. ("DEF CON"), a Washington

corporation, (collectively, the "DEFENDANTS"); Plaintiffs CHRISTOPHER J. HADNAGY and

SOCIAL-ENGINEER, LLC ("PLAINTIFFS") hereby allege as follows:

002

# I.   JURISDICTION AND VENUE

1.     This is an action for damages and equitable relief resulting from defamation, tortious interference with contractual relations, and other breaches arising out of DEFENDANTS' conduct.

2.     Defendant MOSS is the founder of Defendant DEF CON and is registered as the corporation's governor.

3.     Defendant MOSS organized Defendant DEF CON for the purpose of conducting an annual conference in Las Vegas, Nevada (the "Event"), which is typically held each August.

4.     According to Defendant DEF CON's website, this year's Event will be held August 10, 2023 through August 13, 2023, at Caesars Forum, 3911 South Koval Lane, Las Vegas, Nevada 89109.

5.     Defendant MOSS has full power to decide which contributors will be allowed to attend the Event, and he regularly attends and conducts business at the Event.

6.     As of the filing of this Complaint, Defendant DEF CON's active Twitter Page provides the location of Las Vegas, NV as its only location.

7.     This Court has subject matter jurisdiction over this action under Article 6, Section 6 of the Nevada Constitution and based upon the DEFENDANTS' conduct in Clark County, Nevada.

8.     The amount in controversy is more than $15,000; therefore, this case is brought in the District Court of the Eighth Judicial District in and for the county of Clark, State of Nevada.

9.     This Court has jurisdiction over this action pursuant to NRS 14.065 and NRS 4.370(1).

10.     Personal jurisdiction over the DEFENDANTS in this matter is proper on the basis that PLAINTIFFS' causes of action arose in Clark County, Nevada. DEFENDANTS specifically availed themselves to the jurisdiction of Clark County, Nevada, by their conduct in relation to the annually reoccurring Event. Pursuant to their website, DEFENDANTS have targeted this forum every year for the past thirty years to solicit attendance at the Event. Pursuant to Defendant DEF CON's website, the Event is "one of the oldest continuously running hacker conventions around,

and also one of the largest."

11.     The defamation and tortious interference perpetrated by DEFENDANTS were expressly directed at the Event and other similar conferences which only occur in Clark County, Nevada and are governed by the rules of Clark County, Nevada.

12.     PLAINTIFFS are informed and believe, and based thereon, allege that venue is proper in the District Court of Nevada pursuant to NRS 13.010 and 13.040 because the Parties conducted significant business in Clark County, Nevada.

## II.     PARTIES

13.     PLAINTIFFS repeat and reallege the allegations contained in paragraphs 1 through 12, inclusive of this COMPLAINT and incorporate the same herein by reference, as though fully set forth herein.

14.     Plaintiff CHRISTOPHER J. HADNAGY ("HADNAGY") is, and at all times relevant herein was an adult individual who presently resides in Orange County, Florida.

15.     Plaintiff SOCIAL-ENGINEER, LLC ("SOCIAL-ENGINEER") is, and at all times relevant herein was a Limited Liability Company organized under the laws of the Commonwealth of Pennsylvania.

16.     Upon information and belief, Defendant Jeff Moss, ("MOSS"), who also refers to himself online as "The Dark Tangent", is and was, at all times relevant hereto an adult individual who presently resides in King County, Washington.

17.     Upon information and belief, Defendant DEF CON COMMUNICATIONS, INC., ("DEF CON"), is and was, at all times relevant hereto, a limited liability company organized under the laws of the state of Washington.

18.     Pursuant to Rule 10(a) of the Nevada Rules of Civil Procedure, *Nuremberger Hercules-Werker GMBH v. Virostek*, 107 Nev. 873, 822 P.2d 1100 (1991), and other applicable law, PLAINTIFFS sue the defendants designated herein as Doe Individuals and Roe Corporations, the true names and capacities of whom are unknown to PLAINTIFFS at this time. PLAINTIFFS are informed, believe, and thereon allege, that Defendants designated as Doe and/or Roe herein were in some manner involved in and/or are responsible for the acts, omissions, events,

happenings, and/or offenses alleged in this COMPLAINT and/or directly and proximately caused or are responsible for the damages and/or relief sought herein. PLAINTIFFS will seek leave of Court to amend this COMPLAINT to name the defendants designated as Doe or Roe herein when their true names and capacities are ascertained.

### III.    ALTER EGO ALLEGATIONS

19.    PLAINTIFFS repeat and reallege the allegations contained in paragraphs 1 through 18, inclusive of this COMPLAINT and incorporate the same herein by reference, as though fully set forth herein.

20.    PLAINTIFFS are further informed, believe, and thereon allege, that there now exists, and at all times material hereto, existed, such a unity of interest and ownership between DEFENDANTS that the individuality and separateness between the DEFENDANTS has ceased, and DEFENDANTS are merely alter egos of each other.

21.    PLAINTIFFS are further informed, believe, and thereon allege, that there now exists, and at all times material hereto, existed, such a unity of interest and ownership between DEFENDANTS and Defendant Doe individuals and Roe entities (the "Fictitious Defendants") that the individuality and separateness between the DEFENDANTS and the Fictitious Defendants has ceased, and they are merely alter egos of each other.

22.    Upon information and belief, adherence to the fiction of the separate existence of DEFENDANTS and the Fictitious Defendants would, under the circumstances, sanction a fraud and promote injustice.

23.    Upon information and belief, Defendant Moss has exercised such dominant control over Defendant DEF CON, so much so that Defendant DEF CON serves as the alter ego of Defendant Moss.

/ / /

/ / /

/ / /

/ / /

/ / /

24.     In point of fact, PLAINIFFS are informed, believe, and thereon allege that Defendant DEF CON:

    a.  Does not maintain sufficient corporate books or records nor does it have consistent corporate minutes;

    b.  Does not hold regular meetings for its members;

    c.  Has allowed Defendant MOSS to usurp, assert, and maintain responsibility of the financial control and day-to-day decision-making for Defendant DEF CON;

    d.  Was funded and continues to be funded utilizing personal assets of Defendant MOSS; and

    e.  Has disregarded such other and further corporate formalities as yet to be discovered.

25.     The lack of adherence to corporate formality in conjunction with the individual influence by Defendant MOSS perpetrated upon Defendant DEF CON has blurred the line between individual and corporation, and has henceforth subjected Defendant MOSS to personal liability for actions and/or inactions of Defendant DEF CON.

26.     In point of fact, it is believed and therefore averred that there became such unity of ownership and interest that any corporate separateness between Defendant DEF CON and Defendant Moss ceased and/or never existed.

27.     As such, Defendant MOSS is liable for the actions, inactions, omissions, commissions, debts, liabilities, and conduct of Defendant DEF CON, specifically for the events set forth and arising under this Complaint.

28.     To therefore adhere to the normal attributes of separate corporate existence between Defendants MOSS and DEF CON would sanction a fraud, promote injustice, and/or lead to evasion of legal and financial obligations.

29.     By reason of the aforesaid, as the alter ego of Defendant DEF CON, Defendant MOSS is liable for the obligations, debts, and liability of Defendant DEF CON arising under this Complaint.

/ / /

30.     Upon information and belief, and under the circumstances detailed above contained within this COMPLAINT, PLAINTIFFS should, therefore, be entitled to seek execution against the assets of all and/or any of the above-named defendants.

### IV.     FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

31.     PLAINTIFFS repeat and reallege the allegations contained in paragraphs 1 through 30, inclusive of this COMPLAINT and incorporate the same herein by reference, as though fully set forth herein.

### A.     Defendant DEF CON.

32.     Defendant DEF CON is organized for the purpose of conducting an annual hacker conference in Las Vegas, Nevada, which, according to their website, is held each August.

33.     For the purposes of the Complaint, the term "hacker" refers to a person who uses computers to gain unauthorized access to data. Despite the negative connotation surrounding the term "hacker", a hacker can also be defined as an individual utilizing computer, networking, and/or technology skills to address and/or overcome technical problems and/or to ensure that digital information remains secure in the custody of its owners.

34.     Since the founding of the Event, Defendant MOSS has been and continues to be known as the sole creator of the Event, and he regularly attends and conducts business at there.

35.     Defendant MOSS has the power to single-handedly dictate the subject matter, contributors, format, and other key terms for each scheduled gathering at the Event.

36.     As previously alleged, Defendant MOSS incorporated Defendant DEF CON for the purpose of conducting the annual Event.

37.     The Event is one of the world's largest hacker conventions, and typically hosts professionals to speak about IT-related and/or hacking-related subjects. The Event is highly regarded in the information security (infosec) and tech industries, the international business community, and by law enforcement agencies; its reputation and legitimacy have grown exponentially since its inception in 1993.

/ / /

/ / /

38.     The initial Event took place in 1993 and has annually recurred only in Las Vegas, Nevada. Attendance includes law enforcement agencies and representatives from large corporations attempting to identify security issues within their organizations, solutions thereto, and hire the appropriate businesses to consult and implement these solutions.

39.     Defendant DEF CON's website boasts that the Event itself "provides a forum for open discussion between participants, where radical viewpoints are welcome and a high degree of skepticism is expected."

40.     In addition to speakers, the Event also hosts a multitude of "villages" and/or workshops, i.e. break-out sessions that invite smaller groups of attendees for speeches on particular topics, and to participate in various cyber-security challenges, competitions, and/or demonstrations related to different topics.

41.     The Event also allows attendees to participate in hacking-related "games", such as Capture the Flag (CTF), which is a hacking competition where teams of hackers attempt to attack and defend computers and/or networks.

**B.      PLAINTIFFS and Their Contributions to the Event Throughout the Years.**

42.     Plaintiff HADNAGY is the founder and CEO of Plaintiff SOCIAL-ENGINEER.

43.     PLAINTIFFS regularly provide services to business entities in Nevada and nationwide including certain high-profile clientele that have terminated their contracts/relationships with Plaintiff SOCIAL-ENGINEER and have refused to do business with PLAINTIFFS as a direct result of DEFENDANTS' breaches as detailed herein.

44.     For years prior to February of 2022, DEFENDANTS encouraged the attendance and participation of PLAINTIFFS at the Event.

45.     PLAINTIFFS first actively participated in and acted as the host of a village at the Event starting in 2010 at DEF CON 18, and PLAINTIFFS essentially developed the popular Social-Engineer Capture the Flag ("SECTF") game.

46.     Accordingly, up until February of 2022, PLAINTIFFS were esteemed participants in the Event, and ended up hosting one of the most attended "villages" at the Event, ("the SEVillage"). From the inaugural year of the SEVillage, it was a stand-out event that attracted

1    participants in unrivaled fashion and remains the only "village" to receive the esteemed "black

2    badge" award in its first year. Defendant MOSS encouraged and supported PLAINTIFFS in their

3    development of the SEVillage as it considerably bolstered the promotional value of the Event.

4        47.    The SEVillage focused primarily on PLAINTIFFS' area of expertise in the tech

5    industry – human error and the threat it poses to information security as well as the application of

6    scientifically proven methodologies to uncover vulnerabilities, define risk, and provide

7    remediation. PLAINTIFFS invested countless hours and resources in attending the Event and

8    developing the SEVillage.

9        48.    The SEVillage became extremely popular by and amongst attendees, with the

10   break-out session requiring a 13,000 square foot space to host all willing and eager participants,

11   who waited in a que spanning three flights of stairs and spilling out into the casino. The SEVillage

12   created substantial fanfare at the Event and was always the first "village" to open at the Event. .

13   Year after year, Defendant MOSS sought out and warmly welcomed PLAINTIFFS' attendance,

14   contributions and participation throughout the Event.

15       49.    One year of the Event, the Director of the National Security Administration

16   requested to attend the SEVillage and meet Plaintiff HADNAGY. After the meeting, the Director

17   of the National Security Administration awarded Plaintiff HADNAGY the "NSA Director Coin".

18       50.    Originally, DEFENDANTS prohibited any organizations, such as Plaintiff

19   SOCIAL-ENGINEER, from accepting monetary compensation in exchange for promoting other

20   brands (the "Sponsorships") during or in relation to a hosted "village" at the Event. However, in or

21   about 2012, DEFENDANTS changed that restrictive policy against Sponsorships in light of

22   PLAINTIFFS' lobbying for a change in the rule. PLAINTIFFS' lobbying was in large part due to

23   the success of the SEVillage. Accordingly, PLAINTIFFS garnered a lot of attention, exposure, and

24   income from Sponsorships during the operation of the SEVillage.

25   **C.     DEFENDANTS' Sudden Attempts to Destroy PLAINTIFFS' Business Reputations.**

26       51.    Due to the rise of COVID, the in-person portion of the Event was cancelled for

27   2020; the Event was held in a hybrid format in 2021. In order to create continuity for the

28   SEVillage, PLAINTIFFS successfully held portions of the SEVillage virtually in 2020 and 2021.

009

52.     Due to the overwhelmingly positive feedback over the years at SEVillage, PLAINTIFFS successfully hosted a standalone social engineering convention in February 2020 in Orlando, Florida.

53.     At or around September of 2021, Plaintiff HADNAGY was made aware that Defendant MOSS was considering false and disparaging allegations leveled against Plaintiff HADNAGY by a third party. On information and belief, said false allegations related to Plaintiff SOCIAL-ENGINEER's purported efforts to secure confidential personal identifiable information that was in the custody of a third party and prevent its wrongful redistribution. Plaintiff HADNAGY immediately attempted to schedule a meeting to discuss said false allegations with Defendant MOSS via text message; however, Defendant MOSS never granted Plaintiff HADNAGY a meeting to discuss the nature of the false and disparaging allegations.

54.     Plaintiff HADNAGY continued to attempt to confer with Defendant MOSS via text message regarding the false allegations up through January of 2022; however, Defendant MOSS never held a meeting with Plaintiff HADNAGY regarding the false allegations.

55.     Meanwhile, and during the time period from September 2021 through January 2022, Defendant DEF CON was receiving submissions for the 2022 Event contributors and villages, and it became increasingly evident to PLAINTIFFS that DEFENDANTS were delaying any meeting with PLAINTIFFS.

56.     Accordingly, PLAINTIFFS decided not to participate in the 2022 Event, and notified DEFENDANTS on or about January 22, 2022 that PLAINTIFFS would be taking the SEVillage to another convention and not holding it at the Event.

57.     Then, suddenly and without warning, on or around February 9, 2022, DEFENDANTS informed Plaintiff HADNAGY that neither he nor Plaintiff SOCIAL-ENGINEER could attend, contribute to, or participate at the Event moving forward.

58.     On or about February 9, 2022, even though PLAINTIFFS had not physically participated in Event since August of 2019 (the SEVILLAGE was virtual only in 2020 and 2021), Defendant MOSS authored and published a "Transparency Report" on Defendant DEF CON's website, which stated as follows:

"We received multiple CoC violation reports about a DEF CON Village leader, Chris Hadnagy of the SE Village. **After conversations with the reporting parties and Chris, we are confident the severity of the transgressions merits a ban from DEF CON.**"[1] (emphasis added).

59.     Per DEFENDANTS, this lifetime ban on PLAINTIFFS' attendance, contribution, and participation was allegedly based on unspecified violations of Defendant DEF CON's "Code of Conduct", and excluded PLAINTIFFS from the Event indefinitely. Notably, DEFENDANTS did not articulate any issues pertaining to PLAINTIFFS' alleged attempts to secure confidential personal identifiable information that was in the custody of a third party and prevent its wrongful redistribution.

60.     In or about 2015, Defendant MOSS published the "Code of Conduct" to Defendant DEF CON's website. The Code of Conduct is a short statement governing the Event and focuses on harassment: "harassment […] includes deliberate intimidation and targeting individuals in a manner that makes them feel uncomfortable, unwelcome, or afraid." The Code of Conduct also states that "[Event] staff will be happy to help participants contact hotel security, local law enforcement, or otherwise assist those experiencing harassment […]"

61.     PLAINTIFFS vehemently deny any violations of the Code of Conduct at any point in time.

62.     Plaintiff HADNAGY made multiple follow up requests to Defendant MOSS in order to address any allegations against him regarding the alleged Code of Conduct violations; however, DEFENDANTS ignored each such request. DEFENDANTS never provided any support or explanation of the allegations to PLAINTIFFS regarding their abrupt termination of Plaintiffs' attendance, contribution, and participation at the Event.

63.     According to a post credited to Defendant MOSS on Defendant DEF CON's website, the overarching policy underlying the "Transparency Report" clearly and falsely intimates that Plaintiff HADNAGY was a repeat perpetrator of egregious violations of the Code of

---

[1] https://defcon.org/html/links/dc-transparency.html.

1   conduct that were potentially criminal in nature. [2]

2       64.     Despite the foreseeable and not unreasonable reaction and interpretation of those in

3   the infosec industry - that the Plaintiff HADNAGY was being accused of sexual misconduct as

4   was the case when other individuals had been named in previous Transparency Reports -

5   DEFENDANTS never clarified in any format the fact that the false allegations they made against

6   PLAINTIFFS were in reference to conduct that was not in any way related to the Event.

7   Specifically, DEFENDANTS never clarified that the false allegations purportedly occurred in

8   connection with PLAINTIFFS' separate business endeavors and attempts to secure confidential

9   information by enforcing their contractual non-disclosure rights and remedies, completely separate

10   and apart from the Event, which PLAINTIFFS had not attended for the past two (2) years.

11       65.     PLAINTIFFS are informed and believe that DEFENDANTS did not care about the

12   truth, nor did they attempt to investigate the allegations in question.  As such, the DEFENDANTS

13   became willing participants in a scheme to enrich itself and to damage PLAINTIFFS' reputations,

14   wrongly interfere with PLAINTIFFS' contractual relations, and prevent PLAINTIFFS from

15   _____

16   [2] The transparency report states:

17   "When we receive a report of a Code of Conduct violation, our leadership team
representing multiple functions and departments, conducts a review of the
18   substance in consultation with our attorney as needed. This usually involves
speaking with parties named in the report including potential witnesses, alleged
19   offender(s), and victim(s).

20   We then review all the evidence available to us through community reports, news
media, and internal investigations to determine whether the allegations are
21   substantiated. Most of the reports we receive are for minor violations that result in a
warning, but severe allegations may require a referral to hotel security and/or law
22   enforcement, especially if the report includes claims of criminal behavior.  […]

23   Repeat offenders and those who commit more egregious offenses are permanently
banned from our events. In the case of the most troubling offenses or those who we
24   feel may represent an ongoing risk to the community, we take the extra step of
naming them publicly. We believe we have an obligation to the community not to
25   provide cover for these individuals to quietly find new and unsuspecting victims
elsewhere. […] We've adopted these safeguards based on recommendations from
26   the National Network to End Domestic Violence and the Violence Against Women
Office at the US Department of Justice."

27

28

1   expanding their business and social engineering conference and/or taking the SEVillage to a

2   different conference, as demonstrated by PLAINTIFFS' unmerited ban, and false and defamatory

3   claims that they conducted an investigation and Plaintiff HADNAGY admitted to anything, which

4   he vehemently denies.

5   **D.      Predictable and Intentional Resulting Backlash.**

6          66.   DEFENDANTS' publication of the defamatory Transparency Report created an

7   immediate and foreseeable widespread firestorm of social media commentary, Twitter retweets

8   and comparable online posts, that include assumptions that Plaintiff Hadnagy was a sexual

9   predator and similar reactions to the news of Plaintiff Hadnagy's alleged violations and ban.

10         67.   DEFENDANTS had only ever named sexual predators in publications of lifetime

11  bans similar to the "Transparency Report". It was therefore likely and foreseeable that the infosec

12  industry and tech community at large, would note and respond to the Transparency Report, which

13  they did. Specifically, various false rumors spread rampantly across public forums and social

14  media pages alleging that Plaintiff HADNAGY had committed the worst of sexual crimes

15  individually and in conjunction with his operation of Plaintiff SOCIAL-ENGINEER.

16         68.   This online firestorm amplified the false and defamatory Transparency Report and

17  DEFENDANTS' false representations that Defendant HADNAGY admitted to any transgressions.

18         69.   For example, on February 10, 2022, an article entitled "DEF CON bans social

19  engineering expert Chris Hadnagy," authored by Shaun Nichols, was published via

20  TechTarget.com.[3]

21         70.   By way of background, TechTarget.com is a renowned and well-known news

22  source serving the tech community.

23         71.   According to that article, Plaintiff Hadnagy, "an influential figure at the DEF CON

24  security conference, was permanently banned following allegations of misconduct at the annual

25  Las Vegas gathering."

26

27         _____

         [3] *https://www.techtarget.com/searchsecurity/news/252513274/DEF-CON-bans-social-*
28  *engineering- expert-Chris-Hadnagy.*

-12-

72.     The article goes on to state that Plaintiff HADNAGY was accused of violations, but that no specifics regarding those violations were provided by DEFENDANTS.

73.     Immediately after the publication of the "Transparency Report" and the uproar in the business community, actual and potential clients of PLAINTIFFS began to terminate their relationships and contracts with PLAINTIFFS, specifically citing the "Transparency Report" published by DEFENDANTS. These engagements included but are not limited to teaching engagements, speaking engagements, and long-term business service agreements.

74.     A plethora of both PLAINTIFFS' clients and potential clients have refused to do business with PLAINTIFFS since the defamatory statements were published.

75.     The cancelled engagements include other Nevada-based Cybersecurity conferences such as a 6-day Cybersecurity conference hosted annually by Black Hat USA ("Black Hat") in Las Vegas, Nevada. Black Hat's Las Vegas convention is the focal point of what Black Hat's website represents is the most respected information security event series internationally. PLAINTIFFS were regular participants in Black Hat's conference at which they conducted classes for significant monetary compensation, sometimes reaching into the six-figure range.

76.     In or about February of 2022, Black Hat's representatives issued a ban of PLAINTIFFS from Black Hat's conference, specifically in light of DEFENDANTS' publishing of the "Transparency Report" and the online aftermath thereof.

77.     According to Black Hat's website, Defendant MOSS is a Director of Black Hat.

78.     Plaintiffs are informed and believe and thereby allege that Defendant MOSS published the defamatory statements to representatives of Black Hat in order to convince them to institute and maintain a ban on PLAINTIFFS, and to exact further damage on PLAINTIFFS' business and personal reputations. On information and belief, these false defamatory statements (the, "Injurious Falsehoods") included, but were not limited to, the following:

        a.   Plaintiff HADNAGY perpetrated repeated sexual harassment against various victims, as an individual, and as the Chief Executive Officer of Plaintiff SOCIAL-ENGINEER (the, "Acts").

        b.   The Acts were severe and repugnant.

014

     c.   DEFENDANTS determined that the Acts occurred based upon their purported investigation and evidence presented.

     d.   DEFENDANTS confronted Plaintiff HADNAGY with the subject allegations and he both admitted to the Acts, and stated that he would cease the Acts.

     e.   Despite his representations to the contrary, Plaintiff HADNAGY continued the Acts, and was thereon banned from the Event.

     f.   The "Transparency Report" published by Defendant MOSS to Defendant DEF CON's website on February 9, 2022.

     g.   The Update to the "Transparency Report" published by Defendant MOSS to Defendant DEF CON's website on January 13, 2023.

79.    As a direct result of DEFENDANTS' false, defamatory statements, Plaintiffs are informed, believe, and thereon allege that Black Hat removed Plaintiff HADNAGY from its prestigious Review Board, and banned PLAINTIFFS from the Black Hat convention in Las Vegas, Nevada.

80.    In an update posted to Defendant DEF CON's website on January 13, 2023, Defendant MOSS continued to author false and defamatory comments:

> "During our investigation we spoke directly with Mr. Hadnagy about claims of his violations of our Code of Conduct. He confirmed his behavior, and agreed to stop. Unfortunately, the behavior did not stop.
>
> Before DEF CON finalized our response, Mr. Hadnagy informed us that his Social Engineering Village would not be returning to DEF CON.
>
> Our investigation also revealed that DEF CON is not the only security conference to receive complaints about Mr. Hadnagy's behavior. For example, Black Hat received complaints, conducted their own investigation and removed Mr. Hadnagy from their Review Board."[4]

/ / /

---

[4] Defcon.org/html/links/dc-news.html. This update was in regard to the United States' District Court of Pennsylvania's dismissal without prejudice of PLAINTIFFS' initial lawsuit for defamation and tortious interference; that Court found a lack of personal jurisdiction in Pennsylvania.

81.     DEFENDANTS continued to willfully publish disparaging and defamatory Injurious Falsehoods about PLAINTIFFS to a targeted group of industry professionals with the requisite intent to destroy PLAINTIFFS' businesses and reputations and interfere with PLAINTIFFS' various contracts. PLAINTIFFS' reputations are instrumental for their business models.

82.     As a result of DEFENDANTS' defamatory statements and the publishing of the Injurious Falsehoods to third parties, and wrongly interfering with various known contractual relations of PLAINTIFFS, including but not limited to representatives of Black Hat, PLAINTIFFS' business dealings have been decimated.

83.     DEFENDANTS' Transparency Reports, including the defamatory "Transparency Report" and update thereto, are and have been readily accessible via Defendant DEF CON'S website.

84.     DEFENDANTS have refused to communicate with Plaintiff HADNAGY, offering absolutely no further explanation, public or private, as to any allegations of his conduct constituted a violation of the Code of Conduct.

85.     As a result, PLAINTIFFS have suffered, and continue to suffer, detrimental harm to their reputations and business relationships as set forth herein.

86.     Several of PLAINTIFFS' longstanding clients, the largest of which have office(s) located in Las Vegas, Nevada, terminated their contract(s) with PLAINTIFFS and specifically stated their grounds for termination were the Injurious Falsehoods that DEFENDANTS posted in the form of the February 9, 2022 "Transparency Report" and the January 13, 2023 update thereto.

87.     DEFENDANTS' continuing actions cause irreversible damage to PLAINTIFFS' reputation and goodwill.

88.     DEFENDANTS were clearly motivated by ill-will, spite, malice, revenge, and envy of PLAINTIFFS due to PLAINTIFFS' stated intent to remove the SEVillage from the Event and conduct it in a different venue, thereby removing the benefits of the extremely successful SEVillage from DEFENDANTS.

/ / /

89.    Multiple of PLAINTIFFS' clients and prospective clients began to uncharacteristically terminate their contracts with PLAINTIFFS or reject deals for reasons that arise from their interpretations of the Injurious Falsehoods and the "Transparency Report" and update thereto.

90.    As of the filing of this COMPLAINT, various individuals within the industry and attendees of the Event have continued to contact PLAINTIFFS regarding the false defamatory statements and also to post publicly to various forums including but not limited to Twitter as to their misguided interpretations of the Injurious Falsehoods and to speculate as to the reason that PLAINTIFFS were banned from the Event.

91.    As a direct result of DEFENDANTS' conduct, PLAINTIFFS were forced to file this action. PLAINTIFFS would not have had to file and incur the cost of this legal proceeding if DEFENDANTS had not defamed PLAINTIFFS, wrongly interfered with various known contractual relations of PLAINTIFFS, and abided by standards of professionalism and decency.

92.    On information and belief, DEFENDANTS have continued to publish the Injurious Falsehoods as of the filing of this COMPLAINT.

93.    To date, PLAINTIFFS have already suffered monetary loss and other damage due to DEFENDANTS' breaches.

94.    PLAINTIFFS' longstanding participation in the Event by and through its substantial following of the SEVillage and other central operations in the Event created a reasonable expectation that PLAINTIFFS' extensive efforts to promote the Event and "villages" therein would be compensated for via a long and fruitful management of the SEVillage and related ventures. As a result of DEFENDANTS' conduct, PLAINTIFFS were deprived of these reasonable expectations and business opportunities which were effectively usurped by DEFENDANTS. Specifically, DEFENDANTS have replaced the SEVillage with another similar "village" that was meant to attract the same audience that attended the SEVillage prior to the DEFENDANTS' injurious breaches. This new village is even called the "Social Engineering Community Village".

/ / /

95.     PLAINTIFFS also seek injunctive relief regarding DEFENDANTS' publishing of the defamatory Injurious Falsehoods, the "Transparency Report" and "Update" thereto, and related defamatory information contained in private and public forums to be remove as it has prevented PLAINTIFFS from conducting their ordinary business and that DEFENDANTS must cease their defamatory publishing of statements regarding PLAINTIFFS, remove all public online posts, and issue a clarification or retraction. Instead of focusing on the growth and maintenance of its previously esteemed endeavors, PLAINTIFFS have been forced into addressing disdain and false controversies that DEFENDANTS have not hesitated to thrust into the public eye and targets the heart of PLAINTIFFS' business: their reputation.

96.     PLAINTIFFS also seek monetary damages for DEFENDANTS' breaches and to pay PLAINTIFFS' losses in full including, without limitation, lost business revenues, public relations expenses, legal expenses, and attorneys' fees.

## FIRST CAUSE OF ACTION

### (For Defamation against all DEFENDANTS)

97.     PLAINTIFFS repeat and re-allege the allegations in the preceding paragraphs of this COMPLAINT as if fully set forth herein.

98.     DEFENDANT MOSS published false and defamatory factual statements, including the Injurious Falsehoods regarding Plaintiff HADNAGY to third parties via various means, including but not limited to orally and in writings that were held out to the public at large and ratified in multiple posts made on Defendant DEF CON's website.

99.     DEFENDANT MOSS published false and defamatory factual statements, including the Injurious Falsehoods regarding Plaintiff HADNAGY in his capacity as the Chief Executive Officer of Plaintiff SOCIAL-ENGINEER and the operator of the SEVillage to third parties via various means, including but not limited to orally and in writings that were held out to the public at large and ratified in multiple posts made on Defendant DEF CON's website.

100.    Defendant DEF CON publicly instituted a lifetime ban against Plaintiff HADNAGY, individually and as Chief Executive Officer of Plaintiff SOCIAL-ENGINEER. The expressly stated grounds for Defendant DEF CON's lifetime ban include the Injurious Falsehoods

and references that would readily understood by the public to infer that Plaintiff Hadnagy had committed acts of sexual misconduct.

101.     Both on their face, and because of the facts and circumstances known to persons who read or heard the statements, it was reasonably understood that DEFENDANTS meant to convey that Plaintiff HADNAGY and Plaintiff SOCIAL-ENGINEER were the targets of the Injurious Falsehoods, and the perpetrators of the egregious and false Acts.

102.     DEFENDANTS' publication and dissemination of the statements of the Injurious Falsehoods exposed PLAINTIFFS to hatred, contempt, ridicule, and shame, and discouraged others from associating or dealing with PLAINTIFFS.

103.     DEFENDANTS knew, should have known, or intended that the dissemination of information contained in the Transparency Report would be widespread and reach many, if not all of PLAINTIFFS' business associates and potential business associates.

104.     Due to DEFENDANTS' position and status in the infosec and Cybersecurity communities, DEFENDANTS knew, should have known, or intended that reasonable minds digesting the DEFENDANTS' published Injurious Falsehoods on their face would think the absolute worst of Plaintiff HADNAGY and his business endeavors, including but not limited to Plaintiff SOCIAL-ENGINEER.

105.     Plaintiffs are informed, believe, and thereupon allege that Defendant MOSS was aware of the negative impact the false allegations would have on the reputations of both PLAINTIFFS and that they would interfere with PLAINTIFFS' contracts and business.

106.     Due to DEFENDANTS' publishing of the Injurious Falsehoods, many business associates assumed that whatever Plaintiff HADNAGY, individually and as Chief Executive Officer of SOCIAL-ENGINEER, had been accused of must have been abhorrent, particularly because the Event typically condones extreme and/or unique behavior.

107.     DEFENDANTS' publishing of the Injurious Falsehoods has irreparably damaged the reputation of PLAINTIFFS since they falsely depicted them in an unfavorable light. Similar publicly stated lifelong bans before Plaintiff HADNAGY's were the result of allegations of sexual abuse and sexually predatory behavior on the part of former participants in the Event.

108.    Since the Injurious Falsehoods did not state with specificity how Plaintiff HADNAGY allegedly violated the "Code of Conduct", reasonable individuals viewing the Injurious Falsehoods interpreted them to mean that there were despicable facts underlying the ban and that Plaintiff HADNAGY was a sexual predator of the worst order. This false interpretation of the Injurious Falsehoods was proliferated online and quickly shrouded PLAINTIFFS in an irreversible scandal of the worst degree; in one exemplary post, Plaintiff HADNAGY was referred to as the "Harvey Weinstein" of the infosec community by an onlooker who interpreted the Injurious Falsehoods published by DEFENDANTS. This is just one of many examples of how Plaintiff HADNAGY suffered a tarnished reputation due to DEFENDANTS' foregoing conduct.

109.    As a result of DEFENDANTS' purposeful publishing the defamatory statements, DEFENDANTS have exacted devastating damages on the business dealings of Plaintiff HADNAGY as an individual.

110.    As a result of DEFENDANTS' publishing the defamatory statements, DEFENDANTS have exacted devastating damages on the business dealings of Plaintiff SOCIAL-ENGINEER due to Plaintiff HADNAGY being the face of Plaintiff SOCIAL-ENGINEER and his founding of Plaintiff SOCIAL-ENGINEER being the focus of his entire adult life.

111.    DEFENDANTS' defamatory statements and Injurious Falsehoods published to third parties were not privileged and they were published on a public forum that was viewable by anyone in the world, and linked to all of Defendant DEF CON's social media channels, including Defendant DEF CON's Twitter page, which currently has over four hundred thousand (400,000) followers.

112.    PLAINTIFFS are informed, believe, and thereon allege that DEFENDANT MOSS also published the Injurious Falsehoods to other key leaders in the Cybersecurity industry, including but not limited to the organizers of the annual Black Hat convention in Las Vegas, Nevada.

113.    PLAINTIFFS are informed, believe, and thereon allege that DEFENDANT MOSS published additional false and defamatory statements to other key leaders in the Cybersecurity industry including but not limited to organizers of Black Hat. These additional false and

defamatory statements include, but are not limited to:

        a.   PLAINTIFFS' employment practices are illegal and discriminatory against protected class members of specific races and genders.

        b.   Plaintiff SOCIAL-ENGINEER's employment practices are illegal and enable Plaintiff HADNAGY to perpetrate a hostile work environment against protected class members of specific genders.

114.    DEFENDANT MOSS undertook these efforts out of ill-will and spite for PLAINTIFFS and their desire to exact revenge against PLAINTIFFS for attempting to move the SEVillage to an alternative location.

115.    DEFENDANTS' defamatory statements have interfered with PLAINTIFFS' business and are aimed directly at PLAINTIFFS' goods, services, and reputations.

116.    DEFENDANTS' defamatory "Transparency Report", the "Update" thereto, and Injurious Falsehoods are false.

117.    DEFENDANTS made the defamatory statements and Injurious Falsehoods knowing they were false or had serious doubts about the truth of the statements or in the alternative were reckless or at least negligent in making the defamatory statements.

118.    As a result, PLAINTIFFS have suffered damages in an amount to be proven at trial according to proof, including but not limited to, harm to their reputation, emotional harm, exposure to contempt, ridicule, and shame, and threats to their businesses.

119.    DEFENDANTS have falsely and materially damaged PLAINTIFFS' reputations through unprivileged channels. PLAINTIFFS have suffered material loss of business exceeding the annual sum of one million dollars and incurred extensive damages as a result of DEFENDANTS' conduct.

120.    Through the week prior to the filing of this COMPLAINT, DEFENDANTS have allowed all of their posts to remain online, and PLAINTIFFS are still receiving inquiries and backlash as to DEFENDANTS' public statements, which PLAINTIFFS are informed, believe and allege will likely continue.

/ / /

121.    In making the defamatory statements referred to herein above, DEFENDANTS acted with malice, oppression, or fraud, and are thus responsible for punitive damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### (For Business Disparagement against all DEFENDANTS)

122.    PLAINTIFFS repeat and re-allege the allegations in the preceding paragraphs of this COMPLAINT as if fully set forth herein.

123.    DEFENDANTS published the false and disparaging statements and Injurious Falsehoods regarding PLAINTIFFS on their online pages and in other channels to an extensive group of people, including, but not limited to any potential visitor to Defendant DEF CON's website or Social Media channels.

124.    DEFENDANTS' publishing of these Injurious Falsehoods has interfered with PLAINTIFFS' businesses and contractual relationships and are aimed directly at PLAINTIFFS' operations, services, reputations, and clients.

125.    DEFENDANTS conveyed these Injurious Falsehoods by unprivileged publication with requisite intent of malice and ill-will.

126.    As a direct and proximate result of DEFENDANTS' publishing of the Injurious Falsehoods against PLAINTIFFS, the DEFENDANTS have deprived PLAINTIFFS of the benefits of their normal business operations.

127.    DEFENDANTS' conduct entitles PLAINTIFFS to monetary damages, including special damages, interest, and costs pursuant to law.

128.    PLAINTIFFS' losses as a result of the DEFENDANTS' breaches are continuing and PLAINTIFFS reserve the right to seek the full and exact amount of their damages at the time of trial.

129.    In perpetrating the breaches referred to herein above, DEFENDANTS acted with malice, oppression, or fraud, and are thus responsible for punitive damages in an amount to be proven at trial according to proof.

/ / /

## THIRD CAUSE OF ACTION

**(For Intentional Interference with Contractual Relations against all DEFENDANTS)**

130.    PLAINTIFFS repeat and re-allege the allegations in the preceding paragraphs of this COMPLAINT as if fully set forth herein.

131.    Prior to February 9, 2022, PLAINTIFFS had entered into several long-term agreements for the provision of Cybersecurity and IT services for various large national corporations and law enforcement agencies.

132.    DEFENDANTS had knowledge of PLAINTIFFS' foregoing agreements for the provision of products and/or services related to the advancement of cybersecurity and IT.

133.    DEFENDANTS were aware of PLAINTIFFS' various clients and related agreements because a considerable portion of PLAINTIFFS' business agreements were secured through leads generated by way of their operation of the SEVillage.

134.    Defendant MOSS has historically single-handedly recruited and maintained relationships with contributors and attendees at the Event and was aware of PLAINTIFFS' clientele who attended the Event.

135.    Multiple of PLAINTIFFS' clients terminated their engagements with PLAINTIFFS and cited to the Injurious Falsehoods as the reason that they were voiding any and all business agreements.

136.    DEFENDANTS also sought out other Cybersecurity conventions who worked with PLAINTIFFS, such as Black Hat, in order to improperly interfere with any business arrangements that allowed PLAINTIFFS to attend or operate in conjunction with other Cybersecurity conventions, such as Black Hat's convention in Las Vegas, Nevada.

137.    PLAINTIFFS entered into annual agreements with Black Hat to be "Training Instructors" at their annual convention in Las Vegas, Nevada. DEFENDANTS were aware of these annual agreements because Defendant MOSS has been listed as a Director of Black Hat since 2018, and he also regularly attended Black Hat's annual conference and met Plaintiff HADNAGY there.

/ / /

138.   DEFENDANTS have intentionally and improperly acted with design to disrupt the aforementioned agreements in order to harm PLAINTIFFS' business operations and prevent them from fostering the SEVillage community, which would have directly competed with the Event.

139.   DEFENDANTS have in fact actually disrupted several of the aforementioned agreements and business arrangements.

140.   As a direct and proximate result of DEFENDANTS' intentional disruptions of the aforementioned agreements, the DEFENDANTS have benefited and deprived PLAINTIFFS of the benefits of various bargained-for exchanges, for which substantial amounts of PLAINTIFFS' services and monetary sums were invested.

141.   DEFENDANTS' conduct entitles PLAINTIFFS to monetary damages, including interest and costs pursuant to law.

142.   PLAINTIFFS' losses as a result of the DEFENDANTS' breaches are continuing and PLAINTIFFS reserve the right to seek the full and exact amount of its damages at the time of trial.

143.   In perpetrating the breaches referred to herein above, DEFENDANTS acted with malice, oppression, or fraud, and are thus responsible for punitive damages in an amount to be proven at trial according to proof.

## FOURTH CAUSE OF ACTION

### (For Intentional Interference with Prospective Economic Advantage
### against DEFENDANTS)

144.   PLAINTIFFS repeat and re-allege the allegations in the preceding paragraphs of this COMPLAINT as if fully set forth herein.

145.   PLAINTIFFS had been in negotiations with multiple corporations and government organizations for prospective provision of cybersecurity and related services in conjunction with business activities and operations.

146.   DEFENDANTS had knowledge of the prospective clientele base of PLAINTIFFS because a considerable portion of PLAINTIFFS' clients were secured through leads generated by way of their operation of the SEVillage.

1  147. DEFENDANTS had knowledge that PLAINTIFFS were annual participants in

2 Black Hat's capstone conference that takes place in Las Vegas, Nevada.

3  148. DEFENDANTS further spread the Injurious Falsehoods publicly in order to

4 prevent PLAINTIFFS' consummation of certain services contracts.

5  149. DEFENDANTS further spread the Injurious Falsehoods publicly and to

6 representatives from Black Hat in order to prevent PLAINTIFFS from continuing to negotiate

7 their annual agreements to be a "teaching instructor" at clinics that reoccur annually at the Black

8 Hat conference in Las Vegas, Nevada. DEFENDANTS were aware of these annual agreements

9 because Defendant MOSS has been listed as a Director of Black Hat since 2018, and he also

10 regularly attended Black Hat's annual conference and met Plaintiff HADNAGY there

11  150. In light of the "Transparency Report", the Injurious Falsehoods, and the lifetime

12 ban from Defendant DEF CON, these prospective clients stated that they could not continue

13 negotiations with PLAINTIFFS for said business arrangements.

14  151. In light of Defendant MOSS' publishing the Injurious Falsehoods to representatives

15 of Black Hat, Black Hat elected not to enter into agreement with PLAINTIFFS for its services at

16 Black Hat's annual conference in Las Vegas, Nevada.

17  152. DEFENDANTS did not have privilege to state the Injurious Falsehoods or other

18 defamatory statements publicly and to prospective clients of PLAINTIFFS.

19  153. DEFENDANTS have in fact actually prevented the consummation of several

20 prospective agreements by spreading the Injurious Falsehoods regarding PLAINTIFFS.

21  154. Defendant MOSS intends to disrupt additional agreements in this same manner and

22 utilizing the distribution channels of Defendant DEF CON.

23  155. As a direct and proximate result of DEFENDANTS' intentional disruptions of the

24 foregoing agreements, the DEFENDANTS have deprived PLAINTIFFS of the benefits of various

25 bargained-for exchanges.

26  156. DEFENDANTS' conduct entitles PLAINTIFFS to monetary damages, including

27 interest and costs pursuant to law.

28 / / /

157. PLAINTIFFS' losses as a result of the DEFENDANTS' breaches are continuing and PLAINTIFFS reserve the right to seek the full and exact amount of damages at the time of trial.

158. In perpetrating the breaches referred to herein above, DEFENDANTS acted with malice, oppression, or fraud, and are thus responsible for punitive damages in an amount to be proven at trial according to proof.

**FIFTH CAUSE OF ACTION**

**(For Unjust Enrichment against all DEFENDANTS)**

159. PLAINTIFFS repeat and re-allege the allegations in the preceding paragraphs of this COMPLAINT as if fully set forth herein.

160. PLAINTIFFS conferred material benefits upon DEFENDANTS by way of provision of extensive services in furtherance of the Event, including but not limited to operating the SEVillage, creating the SECTF competition, and investing substantial resources to the immense growth of the "villages" at the Event.

161. DEFENDANTS accepted the benefits of PLAINTIFFS' investment: DEFENDANTS amassed a robust following, skyrocketed attendance, and increased revenues.

162. DEFENDANTS received considerable following and attendance at the Event that was, at least in part, due to the draw of the SEVillage; DEFENDANTS did not provide PLAINTIFFS with any compensation for their activities.

163. Upon PLAINTIFFS' requests to be compensated for the foregoing, DEFENDANTS refused but allowed them to accept some Sponsorship compensation from third parties. DEFENDANTS thus retained the benefits of the PLAINTIFFS' investment into the SEVillage without compensating PLAINTIFFS for the same.

164. As a direct and proximate cause of DEFENDANTS' actions, PLAINTIFFS have suffered damages in excess of Fifteen Thousand Dollars ($15,000.00), plus interest, in an amount to be determined at the time of trial.

165. By virtue of DEFENDANTS' acts, and the damages suffered by PLAINTIFFS, PLAINTIFFS are entitled to pre-judgment interest at the highest rate allowed by law.

166.   Also, as a further direct and proximate result of DEFENDANTS' actions, PLAINTIFFS have been required to retain the services of an attorney to prosecute this action and have been damaged thereby; as such, PLAINTIFFS are entitled to an award of reasonable attorneys' fees and costs.

## SIXTH CAUSE OF ACTION

### (For Quantum Meruit against all DEFENDANTS)

167.   PLAINTIFFS repeat and re-allege the allegations in the preceding paragraphs of this COMPLAINT as if fully set forth herein.

168.   PLAINTIFFS conferred benefits on DEFENDANT in the form of promotional materials related to the SEVillage, travel expenses, and other monies paid for promoting the Event, the CTF game, and the SEVillage.

169.   DEFENDANTS accepted and received the benefits and value of payments made and PLAINTIFFS reasonably expected that the value would be returned pursuant to the long-term partnership with DEFENDANTS related to the Event. However, the lifetime ban and the related tortious behavior alleged herein created additional damages for PLAINTIFFS, and they never received the value of the invested costs in the promotion of the Event.

170.   PLAINTIFFS should be compensated in quantum meruit.

171.   PLAINTIFFS have sustained damages in excess of Fifteen Thousand Dollars ($15,000.00), due to DEFENDANTS' tortious conduct and lifetime ban.

172.   As a direct and proximate cause of DEFENDANTS' actions, PLAINTIFFS have suffered damages in excess of Fifteen Thousand Dollars ($15,000.00), plus interest, in an amount to be determined at the time of trial.

173.   By virtue of DEFENDANTS' acts, and the damages suffered by PLAINTIFFS, PLAINTIFFS are entitled to pre-judgment interest at the highest rate allowed by law.

174.   Also, as a further direct and proximate result of DEFENDANTS' actions, PLAINTIFFS have been required to retain the services of an attorney to prosecute this action and have been damaged thereby; as such, PLAINTIFFS are entitled to an award of reasonable attorneys' fees and costs.

**<u>SEVENTH CAUSE OF ACTION</u>**

**(For Injunctive Relief against DEFENDANTS)**

175.    PLAINTIFFS repeat and re-allege the allegations in the preceding paragraphs of this COMPLAINT as if fully set forth herein.

176.    The acts and omissions of DEFENDANTS as described in the preceding paragraphs have caused and will continue to cause irreparable harm to PLAINTIFFS.

177.    PLAINTIFFS enjoy a reasonable likelihood of success on the merits of its claims asserted in this COMPLAINT.

178.    A permanent injunction against DEFENDANTS is warranted to enjoin them from continuing their breaches, publicly disparaging and defaming PLAINTIFFS, and tortiously interfering with PLAINTIFFS' business contracts.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**PRAYER FOR RELIEF**

Wherefore, based on the foregoing, PLAINTIFFS pray that this Court provide the following relief as follows:

    a)  For actual, consequential, special, and incidental damages against the DEFENDANTS in an amount in excess of $15,000 for each of the above-mentioned causes of action;

    b)  For punitive damages;

    c)  For a temporary restraining order;

    d)  For preliminary injunctive relief

    e)  For permanent injunctive relief;

    f)  For reasonable attorneys' fees and costs incurred;

    g)  For prejudgment interest;

    h)  For such other relief at law or in equity to which the Court deems proper.

**<u>DEMAND FOR JURY TRIAL</u>**

PLAINTIFFS hereby demand a jury trial in accordance with Rule 38 of the Nevada Rules of Civil Procedure on all issues so triable.


August 9, 2023

                     RIKLIS LAW PLLC
                     Attorneys at Law


               By        /s/ Kristofer Riklis
                     KRISTOFER RIKLIS
                     Nevada Bar No. 14754
                     871 Coronado Center Dr., Suite 200
                     Henderson, Nevada 89052
                     Tel. 702 720 6471
                     Attorneys for CHRISTOPHER J. HADNAGY and
                     SOCIAL-ENGINEER, LLC