1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**RIKLIS LAW, PLLC**
KRISTOFER RIKLIS
Nevada Bar No. 14754
871 Coronado Center Dr., Suite 200
Henderson, NV 89052
Telephone: (702) 720-6471
Kristofer@riklislaw.com

Attorney for CHRISTOPHER J. HADNAGY and
SOCIAL-ENGINEER, LLC

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CHRISTOPHER J. HADNAGY, an
individual; and SOCIAL-ENGINEER, LLC, a
Pennsylvania limited liability company,

        Plaintiffs,

    v.

JEFF MOSS, an individual; DEF CON
COMMUNICATIONS, INC., a Washington
corporation; and DOES 1-10; and ROE
ENTITIES 1-10, inclusive,

        Defendants.

Case No.:  2:23-cv-01345-CDS-BNW

**PLAINTIFFS' RESPONSE IN
OPPOSITION TO DEFENDANTS'
MOTION TO TRANSFER VENUE [ECF
NO. 15]**

**ORAL ARGUMENT REQUESTED**

1    Plaintiffs CHRISTOPHER J. HADNAGY and SOCIAL-ENGINEER, LLC (collectively,

2  "Plaintiffs") file this response to "DEFENDANTS' MOTION TO TRANSFER" [ECF No. 15]

3  (the, "Motion to Transfer"). This Response is supported by the concurrently filed Declaration of

4  Kristofer Riklis, Esq. (the "Riklis Decl."), the exhibits attached thereto, the concurrently filed

5  Declaration of Christopher Hadnagy, the exhibits attached thereto, the following Memorandum of

6  Points and Authorities, the papers and pleadings on file herein, and any oral argument the Court

7  may wish to consider.

8  Dated: October 30, 2023

RIKLIS LAW PLLC
9                                                    Attorneys at Law

10

11
                            By        /s/ Kristofer Riklis
12                                    KRISTOFER RIKLIS
                                      Nevada Bar No. 14754
13                                    871 Coronado Center Dr., Suite 200
                                      Henderson, Nevada 89052
14                                    Tel. 702 720 6471

15                                    Attorney for CHRISTOPHER J. HADNAGY and
16                                    SOCIAL-ENGINEER, LLC

17

18

19

20

21

22

23

24

25

26

27

28

ii

# TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................1

II.  PROCEDURAL BACKGROUND AND STATEMENT OF RELEVANT FACTS...2

A.  Procedural Background ........................................................................................2

B.  Defendants' Contacts with Nevada are Overwhelming and The Acts that Led to the Filing of this Action Occurred at the Event... ..........................................................3

    1.  Mr. Moss Formed DEF CON for the Purpose of Conducting the Event.........................................................................................................3

    2.  Def Con Collects Admissions in Cash Only at the Time of the Event.........................................................................................................4

    3.  Def Con Encourages Hackers to Visit Nevada to Attend and Contribute to the Event ...................................................................................4

    4.  The Parties Conduct  Significant Business in Clark County, Nevada ....................................................................................................................4

    5.  The Defamatory Statements Are Directed at Nevada. ...................5

    6.  The Defendants Even Mention the Other Major Nevada Convention, Black Hat, in Their Defamatory Statements ..................................6

    7.  Defendants Have at Least 100 Staff Members Who Conduct Work for Them in Nevada..........................................................................7

    8.  Defendants Have Not Provided Critical Details About The Extent of Their Contacts with Washington......................................................7

    9.  Defendants Provided Plaintiffs With Initial Disclosures in the Prior Action That Support Venue in Nevada ..........................................7

    10.  DEF CON's Footprint in Nevada is Vast and its Conduct is Disquieting. ...............................................................................................8

C.  The Website is an All-Encompassing Interactive Hub for Visitors to the Las Vegas Event.s .................................................................................................................9

    1.  The Website Hosts Hundreds of Interactive Forums Where Attendees and Def Con Staff Interact Year-Round and Plan Their Event Activity. ............................................................................................9

    2.  The Website Hosts "Calls" for Participation of Attendees. ...........10

3. The Website Hosts Links to Defendants' External Social Media Accounts Which Consistently Allow them to Interact with the Public and Address the Event ...................................................... 10

III. THE BALANCING OF THE CONVENIENCE FACTORS HEAVILY WEIGH IN FAVOR OF KEEPING THE ACTION IN NEVADA ................................ 12

A. Standard of Review. ............................................................................ 12

B. Nevada is a Proper Venue Under 28 U.S.C. § 1391(b)(2) ..................... 13

C. This Case Should Remain in Nevada Since Defendants Have Not Met Their Heavy Burden to "Justify the Necessity" of the Transfer to Washington. ......................... 14

1. No Agreements are Implicated in this Dispute. ............................. 14

2. Nevada is Most Familiar with the Governing Law and Nevada is Favored. ................................................................................ 15

3. The Plaintiffs' Choice of Forum Weighs in Favors of Nevada ....... 15

4. The Convenience of the Parties Weighs in Favor of Nevada ......... 18

5. The Parties' Contacts with the Forum Weigh Heavily in Favor of Nevada ................................................................................ 20

6. The Parties' Contacts with Nevada Relating to Plaintiffs' Causes of Action Weigh Heavily in Favor of Nevada .................................... 21

7. The Differences in the Costs of Litigation in the Two Forums Weighs in Favor of Nevada ............................................................ 21

8. The Availability of Compulsory Process to Compel Attendance of Unwilling Non-Party Witnesses Weighs Heavily in Favor of Nevada ................................................................................ 22

9. The Ease of Access to Sources of Proof Weighs Heavily in Favor of Nevada ................................................................................ 23

IV. CONCLUSION .......................................................................... 24

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*A.J. Industries v. U.S. District Court*,
503 F.2d 384, 386–87 (9th Cir.1974) ............................................................................... 22

4

5

*Amazon.com v. Cendant Corp.*,
404 F. Supp. 2d 1256, 1259 (W.D. Wash. 2005) ...............................................................13

6

7

*Ambrose v. Steelcase, Inc.*,
2002 WL 1447871, (N.D. Ill. 2002)................................................................................... 19

8

9

*Brackett v. Hilton Hotels Corp.*,
619 F.Supp.2d 810, 820 (N.D.Cal.2008) ...........................................................................21

10

*Commodity Futures Trading Comm'n v. Savage*,
611 F.2d 270, 279 (9th Cir. 1979)… ..................................................................................13

11

12

*Dariz v. Republic Airline Inc.*,
377 F. Supp. 3d 499, 502-503 (E.D. Pa. 2019)…..............................................................18

13

*Decker Coal Co. v. Commonwealth Edison Co.*,
805 F.2d 834, 843 (9th Cir. 1986). ............................................................................ 15, 17

14

15

*Denver & Rio Grande Western Ry. Co. v. Brotherhood of Railroad Trainmen*,
387 U.S. 556, 560 (1967) ...................................................................................................22

16

17

*GNLV, Corp. v. Se. Amusement, Inc.*,
No. 2:14-cv-00048-GMN-PAL, 2015 WL 13678048, at *3. (D. Nev. Mar. 27, 2015.)..............20

18

*Hadnagy v. Moss*, No. CV 22-3060,
2023 WL 114689 (E.D. Pa. Jan. 5, 2023) ..................................................................... 1, 19

19

20

*Heller Fin., Inc. v. Midwhey Powder Co.*,
883 F.2d 1286, 1293 (7th Cir.1989).................................................................................22

21

22

*IDACORP, Inc. v. Am. Fiber Sys., Inc.*,
No. 1:11-CV-00654-EJL, 2012 WL 4139925, at *1 (D. Idaho Sept. 19, 2012) ............................. 15

23

24

*Jones v. GNC Franchising Inc.*,
211 F. Supp. 3d 495, 498-499-(9th Cir.2000)........................................................... 14, 16

25

26

*Keeton v. Hustler Mag., Inc.*,
465 U.S. 770 (1984) ....................................................................................................16, 17

27

*Kida W. Holdings, LLC v. Mercedes–Benz of Laguna Niguel*,
No. 3:07–CV–00523, 2008 WL 217043, at *4 (D.Nev. Jan. 18, 2008) ........................................24

28

*Loya v. Starwood Hotels & Resorts Worldwide, Inc.*,
  583 F.3d 656 (9th Cir. 2009) ........................................................................ 15

*Murphy v. Schneider Nat'l, Inc.*,
  362 F.3d 1133, 1137 (9th Cir. 2004) ............................................................. 13

*Operation: £Heroes, Ltd. v. Procter & Gamble Prods., Inc.*,
  903 F. Supp. 2d 1106, 1111 (D. Nev. 2012) ................................................. 13

*Pacific Car & Foundry Co. v. Pence*,
  403 F.2d 949, 954 (9th Cir.1968) .................................................................. 15

*Proximo Spirits, Inc. v. Green Lake Brewing Co., LLC*,
  No. 2:22-CV-02879-SPG-SK, 2022 WL 17224545, at *10 (C.D. Cal. Sept. 9, 2022) ................ 22

*Ricoh Co. v. Honeywell, Inc.*,
  817 F. Supp. 473, 485 (D.N.J. 1993) .............................................................. 18

*Rockwell automation, Inc., v. Beckhoff Automation LLC*,
  23 F. Supp. 3d 1236, 1247 (D. Nev. 2014) .................................................... 14

*Rodgers v. Stater Bros. Markets*,
  2017 WL 2268884 at *3 (S.D. Cal. 2017) ...................................................... 14

*Saleh v. Titan Corp.*,
  361 F.Supp.2d 1152, 1160 (S.D.Cal.2005) ..................................................... 22

*Santi v. Nat'l Bus. Recs. Mgmt., LLC*,
  722 F. Supp. 2d 602, 608 (D.N.J. 2010) ........................................................ 18

*Stewart Org., Inc. v. Ricoh Corp.*,
  487 U.S. 22, 23 (1988) .................................................................................. 12

*Strack v. Morris*,
  No. 3:15-CV-00123-LRH, 2015 WL 4647880, at *9 (D. Nev. Aug. 5, 2015) ............................ 21

*STX, Inc. v. Trik Stik, Inc.*,
  708 F.Supp. 1551, 1555–56 (N.D.Cal.1988) .......................................... 13, 14

*The Ipatt Group, Inc., v. The Scotts Miracle-Gro Co.*,
  No. 2:09-cv-02419-GMN-RJJ, 2010 WL 11579689, at *3 (D. Nev. Sept. 9, 2010) ..................... 14

*Van Dusen v. Barrack*,
  376 U.S. 612, 635 (1964) .............................................................................. 15

*Ventress v. Japan Airlines*,
  486 F.3d 1111, 1118 (9th Cir.2007) ............................................................... 16

**Statutes**

28 U.S.C. § 1391(b)(2).................................................................................... 13

28 U.S.C. § 1404(a).................................................................................. *passim*

F.R.C.P. 45(c)(1)(A) ........................................................................................23

F.R.C.P. 45(c)(1)(B) ........................................................................................23

F.R.C.P. 45(c)(2)(A) ........................................................................................23

F.R.C.P. 45(c)(2)(B)........................................................................................23

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      INTRODUCTION

This litigation arises out of a series of defamatory statements about Plaintiffs Christopher Hadnagy and Social-Engineer, LLC ("Social-Engineer") that were published to third parties by Defendants Jeff Moss and Def Con Communications, Inc. ("Def Con"). Mr. Moss is the sole creator of Def Con, the world's largest cybersecurity conference (the, "Event") that occurs annually **only** in Las Vegas; Mr. Moss is also a director of Black Hat USA, the second-largest cybersecurity conference that occurs annually in Las Vegas. The defamatory statements falsely suggested that Mr. Hadnagy violated the Event's code of conduct (the, "Code of Conduct") and did so by perpetrating predatory sexual behavior in Las Vegas at several of the cybersecurity industries largest conferences. Defendants posted the defamatory statements to their own website at defcon.org (the "Website") and also shared it within Defendants' vast online presence. Defendants' conduct towards Plaintiffs was intentionally directed at destroying their business goodwill, and the results have been devastating.

Plaintiffs originally filed a related lawsuit in the Eastern District of Pennsylvania, which is Social-Engineer's domicile. *Hadnagy v. Moss*, No. CV 22-3060, 2023 WL 114689 (E.D. Pa. Jan. 5, 2023)(the, "Prior Action"). In the Prior Action, Defendants moved to dismiss based on a lack of Personal Jurisdiction, and the Court agreed that Plaintiffs lacked the requisite contacts. *Id.* Defendants have filed a similar Rule 12 motion here and now supplement it with the instant Motion to Transfer wherein they claim that Nevada is not a convenient forum for them in which to litigate. However, every relevant factor under to be considered on a motion to transfer heavily favors Nevada as the most convenient forum.

Indeed, the parties' contacts with Nevada are vast and relate directly to the underlying actions. Moreover, Nevada has a very legitimate interest in adjudicating a defamation dispute arising out of acts in the Forum that continue to have devastating effects in Nevada. Additionally, the convenience of witnesses, perhaps the most important factor, weighs heavily in favor of keeping the matter in Nevada. Finally, if the matter was transferred to Washington, the parties would be precluded from utilizing compulsory process to obtain written discovery directed at local

Nevada organizations that Defendants' Code of Conduct claims can help remediate any violations thereof; such organizations include hotel security and local law enforcement. Similarly, if transferred to Washington, the parties would be precluded from utilizing compulsory process to compel witness testimony from Nevada residents and witnesses in adjacent states.

Defendants failed to provide evidence to support transfer. Indeed, the Declaration of Mr. Moss ("Moss Decl.") provides extremely vague statements that cannot support the transfer of this matter under applicable law. For instance, the Moss Decl. fails to identify a single witness to any facts underlying their defenses, the most important factor the Ninth Circuit considers when weighing these motions. Moreover, the Moss Decl. fails to mention that there are over 100 staff members at the Event (called, "Goons") that handle security.

Finally, Plaintiffs would be extremely prejudiced by a transfer of this matter. Mr. Hadnagy is the founder of Social-Engineer and he is currently in the fight to undo the damage that Defendants intentionally caused. Defendants are industry-leaders and have limitless resources. Indeed, Defendants were served with process in Las Vegas, where one of the various law firms that they retain accepted service. Accordingly, transferring the matter to Washington would only shift the burden to Plaintiffs and is thus not proper.

## II.    PROCEDURAL BACKGROUND AND STATEMENT OF RELEVANT FACTS

### A.  Procedural Background.

Plaintiffs filed this lawsuit in the Eighth Judicial District of Nevada, and promptly personally served Defendants' by and through their legal representative, Jeffrey McNamara, in Las Vegas, Nevada on August 10, 2023. ECF No. 11, pg. 2:7-8 at Ex. A. This lawsuit asserts the following causes of action against all Defendants: 1) Defamation; 2) Business Disparagement; 3) Tortious Interference with Contractual Relations; 4) Tortious Interference with Prospective Economic Advantage; 5) Unjust Enrichment; 6) Quantum Meruit; and 7) Injunctive Relief. See ECF No. 1. Defendants requested a 30-day extension of time to respond to the Complaint, which Plaintiffs granted and was reflected in the Joint Status Report. ECF No. 12, pg. 2:6-11. Thereafter, Defendants removed the Action to this Court.

/ / /

B. **Defendants' Contacts with Nevada are Overwhelming and The Acts that Led to the Filing of this Action Occurred at the Event.**

1. Mr. Moss Formed DEF CON for the Purpose of Conducting the Event.

Mr. Moss organized and founded Def Con for the purpose of conducting the annual Event in Las Vegas, Nevada every August for thirty years. Compl. ¶¶ 3, 36. The Event is exclusively held in Las Vegas and draws attendance from international and domestic government agencies and corporations seeking professional guidance on information security issues within their organizations. *Id.* ¶¶ 37, 38. Mr. Moss is the Governor of Def Con and its sole founder, he conducts business at the Event every year, and is known to exert unfettered control over key aspects of Def Con, including but not limited to subject matter, recruitment, contributors, format, and scheduling of the Event. Compl. ¶¶ 2, 5, 34-35. Mr. Moss started the event and deliberately chose the name "Def Con" to associate with Las Vegas through code language in a movie he liked, called "War Games." Riklis Decl., Ex. 1 at pg. 05.

2. Def Con Collects Admissions in Cash Only at the Time of the Event.

Def Con only allows attendees of the Event to pay for their attendance in cash at the venue in Las Vegas, Nevada. Riklis Decl., Ex. 1 at pg. 02. Pursuant to the Def Con website, Def Con has collected annual cash admissions in Las Vegas, Nevada from 25,000-30,000 attendees. *Id.* pg. 03. At the current advertised price point of $440.00, that equals approximately $11,000,000 to over $13,200,000 in cash on admissions alone. Def Con also assembles "cash-only" alcohol vending stations inside of its own Events. Riklis Decl., Ex. 6, at pg. 44. Therefore, Defendants are required to visit Nevada in order to receive income from their main commercial activity, which is significant.

3. Def Con Encourages Hackers to Visit Nevada to Attend and Contribute to the Event.

Defendants provide endless resources for attendees on the Website. These include access to the room blocks for the upcoming two iterations of the Event (for 2024 and 2025) in Las Vegas. The room blocks are at Caesars Forum, Flamingo, Harrah's and Linq. Riklis Decl., Ex. 3 at pp. 22-23; *see also* Riklis Decl. at Ex. 1, pg. 09. The website houses multiple links to Caesars Forum,

1  where people may book their rooms for Def Con at six different Las Vegas hotels, via a pre-

2  inputted Event date range of August 3-August 10, 2024. Riklis Decl., Ex. 3 at pp. 24-30.

3       Defendants also recruit via the Website. In the "FAQ" section of the website, Def Con

4  provides a protocol for foreign nationals whereby they may receive a signed invitation for

5  submission to Government authorities. *Id.* at pg. 04. Where these foreign nationals "require

6  verification of housing, [Def Con] can put you in touch with someone to help you get your hotel

7  stay organized[.]" *Id.* The Website promotes setting up a vending booth at the Event, becoming a

8  staff member or so-called "Goon", and even provides advice on how to avoid heat-related

9  sickness. *Id.* at pp. 06-08; *See also* Riklis Decl., Ex. 6, at pg. 44.

10            4.   <u>The Parties Conduct  Significant Business in Clark County, Nevada.</u>

11      All the parties conducted significant business in Clark County, Nevada. Compl. ¶¶ 12, 34.

12  Mr. Hadnagy is the founder and CEO of Plaintiff Social-Engineer. Prior to the Defendants'

13  breaches, Plaintiffs regularly provided cybersecurity services to business entities in Nevada.

14  Compl. ¶¶ 42-43. In addition, Plaintiffs entered into annual business agreements that reached six-

15  figures of compensation from another industry leader in cybersecurity, Black Hat USA ("Black

16  Hat"). These agreements required Plaintiffs to host training sessions at Black Hat's annual 6-day

17  Cybersecurity conference in Las Vegas, also held every August. *Id.* ¶¶75, 136-137. Black Hat's

18  Las Vegas conference is the focal point of what it represents is the most respected information

19  security event series internationally. *Id.* ¶ 75. Mr. Moss has been listed as Black Hat's Director

20  since 2018, he met Mr. Hadnagy in Las Vegas every year at the Black Hat event itself, and he

21  knew of Plaintiff's repeat annual engagements with Black Hat's capstone conference in Las

22  Vegas. *Id.* ¶¶ 147-149.

23       Regarding Def Con, Mr. Moss personally encouraged Plaintiffs to attend the Event and

24  develop Def Con's most renowned events: the capture the flag game, and the unrivaled

25  "SEVillage". As alleged in the Complaint, the SEVillage was the flagship activity at the annual

26  Event: it won top awards from the National Security Administration, and achieved unrivaled draw

27  for the Event so much so that Def Con has replicated it since banning Plaintiffs. *Id.* ¶¶ 45-49, 94.

28  The SEVillage garnered such high demand that Mr. Moss changed the Event rules and granted

Plaintiffs permission to accept sponsorships for advertising within the SEVillage. *Id.* ¶ 50.

Moreover, Mr. Moss, given his unfettered control over all aspects of the Event, was aware of the

many commercial activities arising from the SEVillage that benefitted Plaintiffs, including but not

limited to displayed sponsorships and other contracts that Plaintiffs leveraged given the

SEVillage's successful programming. *Id.* ¶¶ 132-133.

Additionally, Plaintiffs still retain some commercial contacts in Las Vegas beyond certain

companies that they serve. Social-Engineer, LLC ("SE") set up a booth and other equipment at the

Event that weigh over two thousand (2,000) pounds. Hadnagy Decl., ¶ 4. SE leases a storage unit

in Clark County, Nevada that houses this equipment. *Id.* Said booth is still in Nevada where it

awaits its opportunity to be deployed again if Plaintiffs are able to clear their name from

Defendants' smear campaign.

>              5.   The Defamatory Statements Are Directed at Nevada.

The Event's Code of Conduct (the, "Code of Conduct") governs the Event and specifically

applies to the Event. It is authored by Mr. Moss and states in pertinent part:

> **This Code of Conduct applies to everyone participating at DEF CON** […] Anyone can
> report harassment. If you are being harassed, notice that someone else is being harassed, or
> have any other concerns, you can **contact a Goon, go to the registration desk, or info
> booth. Conference staff will be happy to help participants contact hotel security, local
> law enforcement, or otherwise assist those experiencing harassment to feel safe for
> the duration of DEF CON.**"

Compl. ¶ 60 (emphasis added).

The Defamatory transparency report (the, "Transparency Report") posted across

Defendants' Website on February 9, 2022 clearly claims that Plaintiffs violated the Code of

Conduct:

> "We received multiple [Code of Conduct] violation reports about a DEF CON Village
> leader, Chris Hadnagy of the SE Village. **After conversations with the reporting parties
> and Chris, we are confident the severity of the transgressions merits a ban from DEF
> CON.**" (emphasis added).

Compl. ¶ 58., fn. 1. (emphasis added.) Critically, Defendants' Transparency Report clarifies the

significance of lifetime bans from the Event, and also the bans that withhold identities of accusers

or details of accusations:

"Repeat offenders and those who commit more egregious offenses are permanently banned from our events. **In the case of the most troubling offenses or those who we feel may represent an ongoing risk to the community, we take the extra step of naming them publicly** […] If the report of harassment presents a risk of immediate or future retaliation, or at the request of the reporting individual, **we will take measures to protect their identity and/or details of the accusations. We've adopted these safeguards based on recommendations from the National Network to End Domestic Violence and the Violence Against Women Office at the US Department of Justice.**"

Compl. ¶¶ 58 fn. 1 and 63 fn. 2. (emphasis added.) Moreover, the Transparency report explains the investigatory process wherein the "event organizers" conduct an in-depth review of all allegations and consult with an attorney as needed. Compl. ¶¶ 58 fn. 1 and 63 fn. 2.

Finally, the Transparency report states:

"**the hotel can trespass individuals permanently banned from DEF CON**, creating a criminal and physical barrier between those individuals and the conference areas[…] A DEF CON ban is a prohibition against a person or group from attending future conventions due to bad behavior. DEF CON conveys the information to the hotel and if a banned person returns they will be 'trespassed' by Hotel security and possibly prosecuted."

Compl. ¶ 58 fn. 1. (emphasis added).

Plaintiffs vehemently deny any violations of the Code of Conduct at any point in time. Compl. ¶ 61. Defendants' previous lifetime bans from the Event have only been due to sexually predatory behavior. Compl. ¶¶ 100-101, 103-104, 107-108. Accordingly, the false statements of fact necessarily revolve around acts occurring in Nevada.

6.   <u>The Defendants Even Mention the Other Major Nevada Convention, Black Hat, in Their Defamatory Statements.</u>

On January 13, 2023, Defendants refreshed, ratified, and affirmatively confirmed their intent of the disparaging Transparency Report with an "update" on their website (the "Update"):

"During our investigation we spoke directly with Mr. Hadnagy about claims of his violations of our Code of Conduct. **He confirmed his behavior, and agreed to stop. Unfortunately, the behavior did not stop** […] Our investigation also revealed that DEF CON is not the only security conference to receive complaints about Mr. Hadnagy's behavior. **For example, Black Hat received complaints, conducted their own investigation and removed Mr. Hadnagy from their Review Board.**"

Compl. ¶¶ 80, 98. (emphasis added). These false statements of fact were expressly directed at the Event and the parties' continuous activities in Las Vegas. Compl. ¶ 11. The majority of Plaintiffs' prior business associates in Las Vegas, including Black Hat, have terminated their contracts with Plaintiffs and stated that they did so as a direct result of Defendants' statements. Compl. ¶¶ 42-43.

6

7. <u>Defendants Have at Least 100 Staff Members Who Conduct Work for Them in Nevada.</u>

Defendants' operational structure is not limited to what the Moss Decl. states as nine employees. *See* Moss Decl., pg. 2:19-21. Pursuant to Defendants' Website, Defendants' Event staff consists of over approximately 100 "Goons". Riklis Decl., Ex. 10, at pp. 97-132. According to the Website, Goons: "are the staff at Def Con. They have many roles including safety, speaker coordination, vendor room coordination, network operations, et cetera…" *Id.*, Ex. 1, at pp. 07. Pursuant to the Website, "Once per year […the Goons] gather in Las Vegas to practice the arcane arts of drinking, socializing, debugging and crowd control. Without these core Goons™, DEF CON would not happen." *Id.,* Ex. 10, at pp. 98. Accordingly, while Defendants claim that they only have a small number of employees, it is clear that they have a mix of at least 100 additional laborers who attend the Event in the form of Goons. Since these Goons have many roles, "including safety," some of them are likely to be implicated as witnesses.

8. <u>Defendants Have Not Provided Critical Details About The Extent of Their Contacts with Washington.</u>

Although the Moss Decl. vaguely states that Def Con's physical documents are "located in Washington, at its principal place of business", Defendants fail to provide details on what documents are located there, and why they would be burdensome to transport. Moss Decl., pg. 2:22-23. In fact, according to the Washington Secretary of State's Database, Def Con's principal place of business is a law office bearing the the name of Defendants' Registered Agent for service of process, who was personally served in Las Vegas with the instant action. Riklis Decl., Ex. 11, pp. 134-137. Moreover, the Contact section of the Website has no mention of Washington. Riklis Decl., Ex. 12, pg. 141.

9. <u>Defendants Provided Plaintiffs With Initial Disclosures in the Prior Action That Support Venue in Nevada.</u>

In the Prior Action, Defendants, represented by some of the same Counsel, in *pro hac vice*, provided Plaintiffs with Defendants' initial Disclosures. *See* Hadnagy Decl., ¶ 8; *see also Id.* Ex. 1, pp. 147-154. Pursuant to the Disclosures, Defendants identified several witnesses with discoverable information. *Id.* They are: 1) Jeff Moss c/o Perkins Coie LLP in Portland, Oregon; 2)

7

1 Melanie Ensign, c/o Perkins Coie in Portland, Oregon; 3) Neil Wyler; 4) Maxie Reynolds; and 5)

2 "Unknown current and former employees of Plaintiffs."

3       Pursuant to the documentation, none of the foregoing witnesses outside of Mr. Moss claim

4 to be located in Washington. *See* Hadnagy Decl., ¶ 9; *see also Id.* Ex. 1, pp. 149-150; *see also*

5 Riklis Decl, Ex. 13, pp. 143-145. Instead, Plaintiffs are informed pursuant to online investigation

6 and personal knowledge that to the foregoing individuals are located in Florida, Utah, and

7 California. *See* Hadnagy Decl., ¶ 9; *see also* Riklis Decl, Ex. 13, pp. 143-145. Additionally, SE's

8 employees reside in Pennsylvania, Rhode Island, Florida, Texas, and Colorado. *See* Hadnagy

9 Decl., ¶ 5. The last time that SE had an employee who resided in Washington was approximately

10 2013. *Id.*, ¶ 6.

11           10. <u>DEF CON's Footprint in Nevada is Vast and its Conduct in the Forum is</u>

12 <u>Disquieting.</u>

13       The Event is one of the biggest annual conventions in Las Vegas, and it revolves around

14 the exhibition of how to gain unauthorized entry to electronically stored information. The Event

15 draws attendance from top U.S. government officials such as the DHS Secretary, the CISA

16 Director, and the Acting National Cyber Director. Compl. 37; *see also* Riklis Decl., Ex. 5 at pg.

17 43-44. In a nutshell, the Event hosts demonstrations and competitions that test the boundaries of

18 advanced hacking methods. Some of these demonstrations include hacking every day hardware,

19 including but not limited to taking over controls of cars; tricking ATMs into allowing

20 withdrawals; taking over insulin pump controls; and hacking satellites. *Id.*; *see also* Riklis Decl.,

21 Ex. 2 at pp. 14-20. Pursuant to one article linked on the Website, a White House staffer who was

22 granted anonymity to speak on the Event, stated that "he was advised to turn off Bluetooth and

23 Wi-Fi, to avoid bringing unnecessary devices, and, when possible, to use a Faraday bag – a pouch

24 made of conductive metal that can block wireless signals from hitting your phone." Riklis Decl.,

25 Ex. 5 at pg. 43-44. Accordingly, the presence of this Event in Nevada attracts a dubious crowd of

26 highly sophisticated individuals.

27 / / /

28 / / /

**C.** **The Website is an All-Encompassing Interactive Hub for Visitors to the Las Vegas Event.**

The Website is the nerve center for all of Defendants' online marketing activities for the Event. It also serves as Defendants' main hub of communications for their Nevada operations, which require visitors to arrive at the Event to participate and pay their cash fees. The Def Con Website is also where Def Con posted the at-issue Transparency Report, Code of Conduct, and Update. See Compl. ¶ 58 at fn. 1; *Id.* ¶ 63 at fn. 2; and *Id.* ¶ 80 at fn. 4. The Website hosts a plethora of links to other elements of Defendants' online presences, including their social media presence and other websites that Defendants publish. These other web pages and accounts cross-pollinate each other and refer visitors back to various portions of the Website. Certain exemplary portions of the Website are as follows:

1. The Website Hosts Hundreds of Interactive Forums Where Attendees and Def Con Staff Interact Year-Round and Plan Their Event Activity.

Perhaps the most germane marketing aspects of the Website that are directed at the Event and Nevada, are the thousands of interactive online forums and submissions pages for guests and members who have registered with Defcon.org to discuss all aspects, including "DEF CON Conference Planning". In Conference Planning, participants discuss a myriad of issues with Def Con staff (the "Goons") and others pertaining to their physical presence at the conference. Riklis Decl., Ex. 2 at pp. 12-20. For example, regarding Def Con 31, the 2023 iteration of the Event, there were approximately 713 separate topics. *Id.* at pg. 13. These 713 "Sub-Forums" cover logistics, questions about the physical event, and all related inquiries. *Id.* pp. 14-19. A review of these topics shows that they cover hotel recommendations, event administrative questions, and even poker tournaments scheduled for the Event. *Id.* Def Con 2024's Conference planning Forums have already begun to be populated with various topics. *Id.* at pg. 13.

In order to exemplify how the Website's sub-forums direct people to Las Vegas, an example is Def Con's sub-forum for the Def Con Shoot (the, "Shoot"). The Shoot is an event that Def Con arranges in Nevada a few days before the Event begins. Riklis Decl. Ex. 6 at pp. 56-57, and 59. The "Shoot" is an opportunity for the attendees to shoot guns at designated gun ranges in

Nevada. *Id.* Attendees are allowed to bring their own guns, and shoot others' guns as well. *Id.* This year, the Def Con Shoot was held in Boulder City, Nevada on the Wednesday before the Event. *Id.* The Website's visitors are able to access a plethora of information about the Shoot in the relevant Forums, in addition to other links providing descriptions from Goons and the ability to post media from the Shoot. *Id.* This information is provided and based on the assumption that the reader will also participate in the Event, or at least make a stop in Las Vegas. For example, one of these links provides information ***about how to covertly bring firearms onto Las Vegas Resorts***:

> "You're still *very* unlikely to get much scrutiny if your luggage doesn't look 'firearm-ish' […]stay in an AirBNB or a shitball place nearby like a Siegel Suites, the Circus Circus Motor Lodge, or a Travelodge. We're betting they don't care at all there…they just want their $56 per night and prefer you to not leave used heroin works in the potted plants outside."

Riklis Decl. Ex. 6 at pg. 60. Accordingly, it is clear that the Website's forums section is an all-inclusive interactive website that provides additional links and information for various suspicious activities at the Event.

> ### 2. The Website Hosts "Calls" for Participation of Attendees.

The main recruiting portion of the Website hosts an entire section of various "calls" for participation. Riklis Decl., Ex. 4 at pp. 34-38. These recruiting "calls" provide attendees with comprehensive instructions on how to apply for various different forms of participation in the Event. *Id.* The Website provides real-time information as to whether they are still accepting applications for calls. *Id.* The run the gamut of participation, including, but not limited to being a member of: press, exhibitors, musicians, party hosts, paper writers, workshop hosts, demo labs participants, trainers, contests participants, village hosts, and more. *Id.* This portion of the Website even provides a "style guide" for the Event. *Id.*

> ### 3. The Website Hosts Links to Defendants' External Social Media Accounts Which they Utilize to Cross-Pollinate their Marketing Efforts in Connection to the Event and Interact with the Public and Address the Event.

The Website provides links to Defendants' various Social Media Accounts and third-party forums and discussion boards including, but not limited to Reddit forums, Def Con's Discord server, and Def Con's Mastodon account. These are all linked to the Website's homepage and provide additional comprehensive information about the event. See Riklis Decl., Ex. 7, pg. 63.

10

Defendants' X accounts (formerly Twitter) exemplify how their social media presence portrays their substantial marketing and operational efforts in Nevada. Defendants' X accounts published the false defamatory statements and regularly administer matters for the Event and its marketing. See Riklis Decl., Ex. 8, pp. 64-83. Mr. Moss' X account links any visitor directly to the "Forums" section of the Website. *Id.* Def Con's X account is geolocated as a "community" in "Las Vegas". *Id.* Critically, Defendants' X accounts publicly educate attendees on various aspects of Nevada legal concerns, including but not limited to Nevada taxation, Las Vegas resorts' firearms policies, and Nevada law addressing vaccination status. See Riklis Decl., Ex. 8, pp. 65-66, 70-72. Probably most notably, Mr. Moss' personal X account publicly defended Def Con's policy to charge a minimum $1,000 vendor fee so that Def Con can comply with Nevada's sales tax provisions. When one of Def Con's participants called attention to the new fee in 2018, Mr. Moss provided his response:

> "Now that you have everyone stirred up..If you sell anything at all the state of Nevada demands their sales tax. The State makes DEF CON liable for it, unlike most all other states. That means we need to be sure all 'vendors' pay. If not they have a wide range of punishments [...] If we have an on site audit and you are found to be selling and yet you have not provided DEF CON with tax information (so we never forwarded it to Nevada) then DEF CON is in trouble. We are not going to risk the con over that."

See Riklis Decl., Ex. 8, pp. 65-66.

Additionally, Def Con's X account makes it clear that Defendants' entire marketing model is based off of its Event in Nevada:

- "Vegas is kind of part of what makes #defcon Def Con". See *Id.*, Ex. 8, pg. 75.
- "#DEFCON will always be in Las Vegas." See *Id.*, Ex. 8, pg. 76.
- "#defcon is always in Las Vegas." See *Id.*, Ex. 8, pg. 77.
- Def Con's theme in 2022 for its first fully in-person Event after the COVID-19 pandemic was "Hacker Homecoming": announcing "DEF CON 30[th] ANNIVERSARY WELCOME HOME!" *Id.*, Ex. 8, pg. 78.
- During one Event, Def Con's X account stated: "Confidential to hackers in the Las Vegas area: It's on." *Id.*, Ex. 8, pg. 81.
- Def Con's X account reminded attendees to "stay hydrated" because Las Vegas "steals

away your moisture." *Id.*, Ex. 8, pg. 80.

- In 2019, Def Con's X account clarified: "We have a con in Beijing at the end of the month before big Las Vegas." *Id.*, Ex. 8, pg. 79. When a hacker asked if it will be like the Las Vegas Event, Def Con stated: "Ha, nothing is like Las Vegas Def Con." *Id.*

- Def Con posted the Transparency Report, the Code of Conduct, the Update, and even the Court Docket in the Prior Action to its X account. *Id.*, Ex. 8, pg. 82-83.

Moreover, an examination of Mr. Moss' X account shows that he has business operations in Nevada even when the Event is not running, contrary to what Defendants' Motion to Transfer claims. For example, Mr. Moss goes to Las Vegas for a "#defcon pre-con site visit". *Id.*, Ex. 8, pg. 67. Mr. Moss also happens to be in Las Vegas when the Event is not occurring and when other similar trade shows occur such as Black Hat, or tangentially important trade shows such as the CES, billed as the "Most Powerful Tech Event in the World". *Id.*, Ex. 8, pg. 68-69. Moreover, Mr. Moss and Def Con have to "build every room" across multiple hotels at Def Con, which occurs at multiple Las Vegas resorts, as posted by Mr. Moss to his X account. *Id.*, Ex. 8, pg. 67. Accordingly, Defendants are in Nevada for significant activities even as shown on their social media accounts and other linked areas of the Website.

III.     **THE BALANCING OF THE CONVENIENCE FACTORS HEAVILY WEIGH IN FAVOR OF KEEPING THE ACTION IN NEVADA.**

A. **Standard of Review.**

For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Section 1404(a) "is intended to place discretion in the district court to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 23 (1988). A motion to transfer under Section 1404(a) "calls on the district court to weigh in the balance a number of case-specific factors." *Id.*

Section 1404(a) has two requirements: (1) that the district to which defendants seek to have the action transferred is one in which the action might have been brought, and (2) that the

1  transfer be for the convenience of parties and witnesses, and in the interest of justice. *Amazon.com*

2  *v. Cendant Corp.*, 404 F. Supp. 2d 1256, 1259 (W.D. Wash. 2005). The burden is on the moving

3  party to establish that a transfer will allow a case to proceed more conveniently and better serve

4  the interests of justice. See, e.g., *Commodity Futures Trading Comm'n v. Savage,* 611 F.2d 270,

5  279 (9th Cir. 1979); *STX, Inc. v. Trik Stik, Inc.,* 708 F.Supp. 1551, 1555–56 (N.D.Cal.1988) ("In

6  seeking to transfer a case to a different district, a defendant bears a heavy burden of proof to

7  justify the necessity of the transfer. The plaintiff's choice of forum should not be easily

8  overturned"); *see also Operation: £Heroes, Ltd. v. Procter & Gamble Prods., Inc.*, 903 F. Supp.

9  2d 1106, 1111 (D. Nev. 2012).

10        The Court may consider facts and evidence outside of the pleadings when determining

11  venue. *See Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1137 (9th Cir. 2004); *see also* Judge

12  Virginia A. Phillips & Judge Karen L. Stevenson, *Rutter Group Prac. Guide: Fed. Civ. Proc.*

13  *Before Trial, Calif. & 9th Cir. Editions*, Ch. 4-K "Convenience" Transfers (28 USC § 1404(a))

14  ("Affidavits or declarations are required to establish whatever facts are involved: e.g., the

15  residence of the parties, the location of witnesses, physical evidence, etc.").

16        Plaintiffs do not dispute that they could have brought this case in the Western District of

17  Washington on the single basis that Defendants reside there; however, Plaintiffs maintain that this

18  action is much more conveniently tried here since all of the alleged conduct occurred in Las

19  Vegas, and many of the known witnesses reside in or adjacent to Nevada.

20         **B.  Nevada is a Proper Venue Under 28 U.S.C. § 1391(b)(2).**

21       Defendants' actions directed at Las Vegas make venue proper under 28 U.S.C. §

22  1391(b)(2), which provides that a civil action may be brought in:

23        (2) a judicial district in which a substantial part of the events or omissions giving rise to the
      claim occurred, or a substantial part of property that is subject of the action is situated.

24
25  28 U.S.C. § 1391(b)(2). Venue is proper in this District because the Event only occurred in

26  Nevada, and Plaintiffs claims arise out of facts that allegedly occurred at the Event. See Compl. ¶¶

27  3, 36-38. As is set forth above, the defamatory statements of fact baldly claim that Mr. Hadnagy

28  violated the Event's Code of Conduct. Necessarily, any such violations occurred at the Event.

Moreover, the Website directed the defamatory statements at the Event, and other Las Vegas events such as Black Hat. Accordingly, the damages of the statements and resulting interference with Plaintiffs' business occurred in Las Vegas. Thus, a substantial part of the events giving rise to this action occurred here and venue is proper.

### C. This Case Should Remain in Nevada Since Defendants Have Not Met Their Heavy Burden to "Justify the Necessity" of the Transfer to Washington.

Defendants have not shouldered the "heavy burden of proof to justify the necessity of the transfer." *STX, Inc. v. Trik Stik, Inc.,* 708 F.Supp. at 1555–56. Moreover, "plaintiff's choice of forum should not be easily overturned." *Id.* As set forth below, it is clear that the case should remain in Nevada. The fact that defendant would prefer to litigate in another district does not satisfy its burden to demonstrate that transfer is justified pursuant to Section 1404(a). *Rodgers v. Stater Bros. Markets*, 2017 WL 2268884 at *3 (S.D. Cal. 2017), citing Wright & Miller. Moreover, the Moss Decl. is incredibly vague and thus Defendants failed to show with the necessary particularity that the location, importance, and difficulty of transporting evidence supports transfer; conclusory allegations do not suffice. 2017 WL 2268884 at *3.

In this Circuit, the general factors that courts consider in transferring a case based on convenience include: (1) the location where the relevant agreements were negotiated and executed; (2) the state that is most familiar with the governing law; (3) the plaintiff's choice of forum; (4) the respective parties' contacts with the forum; (5) the contacts relating to the plaintiff's cause of action in the chosen forum; (6) the differences in the costs of litigation in the two forums; (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses; and (8) the ease of access to sources of proof. *Jones v. GNC Franchising Inc.*, 211 F. Supp. 3d 495, 498-499 (9th Cir.2000); *Rockwell automation, Inc., v. Beckhoff Automation LLC*, 23 F. Supp. 3d 1236, 1247 (D. Nev. 2014).

#### 1. No Agreements are Implicated in this Dispute.

This defamation dispute does not implicate any breach of contract claims between the parties, which neutralizes this factor. Because there is no "agreement" involved in this dispute, this factor should be afforded no weight. *The Ipatt Group, Inc., v. The Scotts Miracle-Gro Co.*, No.

14

2:09-cv-02419-GMN-RJJ, 2010 WL 11579689, at *3 (D. Nev. Sept. 9, 2010).

2.   Nevada is Most Familiar with the Governing Law and Nevada is Favored.

"As a general rule, if questions of substantive state law are raised in a particular action, it is advantageous to have those issues decided in a federal court sitting in the state whose substantive law governs." *IDACORP v. American Fiber Systems, Inc.,* 2012 WL 4139925, at *4.

Defendants provide no reason why the general rule does not apply here. This case involves tort claims arising from annual trade shows that occur only in Las Vegas, Nevada. This case also prays for equitable relief and will seek to enjoin Defendants' defamatory conduct in Nevada. Accordingly, Nevada law will clearly apply, and Nevada State Courts have extensive experience with these issues as they pertain to Nevada. While Defendants make the claim that Washington law will apply, there is no cognizable basis for that claim. Thus, this factor weighs in favor of Nevada retaining jurisdiction.

3.   The Plaintiffs' Choice of Forum Weighs in Favors of Nevada.

The general rule in the Ninth Circuit is that is that a plaintiff's choice of forum receives deference in a motion to transfer venue. *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986). "Plaintiff's choice of forum should rarely be disturbed." *Loya v. Starwood Hotels & Resorts Worldwide, Inc.*, 583 F.3d 656 (9th Cir. 2009). Given that plaintiffs are ordinarily allowed to select whatever forum they consider most advantageous (consistent with jurisdictional and venue limitations), the Supreme Court has termed their selection the "plaintiff's venue privilege." *Van Dusen v. Barrack*, 376 U.S. 612, 635 (1964).

Defendants argue that Plaintiffs' choice of forum should be given no weight here since plaintiffs are not residents of Nevada and the case was removed from The Eighth Judicial District of Nevada to the United States District Court of Nevada. However, this argument completely ignores the law that states: "a defendant 'must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum.'" *Decker,* 805 F.2d at 843.

In the Ninth Circuit, courts consider the facts of the case in determining how much deference to give the plaintiff's choice. See *Pacific Car & Foundry Co. v. Pence,* 403 F.2d 949, 954 (9th Cir.1968) (considering whether "the operative facts" "occurred within the forum of

original selection" and whether that forum had any "particular interest in the parties or the subject

matter"). The Ninth Circuit directs courts to consider the relationship between the forum and the

plaintiff's claims when deciding whether to transfer a case under 28 U.S.C. § 1404. *Jones,* 211

F.3d at 498–99. The Ninth Circuit affirms transfers in cases where the district court finds "no

significant connection between [the forum] and the facts alleged in the complaint." *Ventress v.

Japan Airlines,* 486 F.3d 1111, 1118 (9th Cir.2007).

There is a clear interest by Nevada to discourage Defendants' underlying behavior aimed

at Nevada since this lawsuit involves defamation based on Defendants' continued statements in

connection with the Event. Defendants published defamatory statements of fact to the Website and

other online channels about Plaintiffs arising from the Event and implying that Mr. Hadnagy

committed despicable behavior at the same. Pursuant to *Keeton,* a state has a legitimate interest in

holding an out of state defendant responsible for defamation felt in that state:

> "This interest extends to libel actions brought by nonresidents. False statements of fact
> harm both the subject of the falsehood *and* the readers of the statement. New Hampshire
> may rightly employ its libel laws to discourage the deception of its citizens. There is 'no
> constitutional value in false statements of fact.'"

*Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 776 (1984)(emphasis in original.) Thus, Nevada has

an interest in adjudicating a business disparagement dispute that arises from commercial activities

in perhaps Nevada's most prominent industry. Indeed, Defendants have purposefully targeted

Nevada for the Event, and base their business model on Las Vegas' hospitality industry. See Riklis

Decl., Ex. 1 at pg. 05; see *Id.* Ex. 8. The Code of Conduct governs the activities at the Event and

explicitly refers attendees hotel security, local law enforcement, and the Goons. The Event only

occurs annually in Las Vegas and Mr. Hadnagy only attended the Event in Las Vegas. Thus,

Nevada has a clear interest in adjudicating a dispute that is based on facts that are localized

exclusively in Nevada.

Additionally, the damage to Plaintiffs is concentrated in Nevada. In fact, the only place in

the world where Defendants' ban could actually be enforced is in Nevada. To compound the

injury, Defendants further targeted other Nevada Cybersecurity Conventions when they explicitly

mentioned that Black Hat had banned Plaintiffs in the Update; Black Hat never issued any such

public and defamatory ban. It follows that any legal action that could be taken to alleviate the harm caused by Defendants' defamatory statements would reasonably have to be taken in Nevada. As in *Keeton*, Defendants are carrying on a "part of its general business" here and that provides Nevada with an interest in the defamatory effects of that business. *Id.* at 779–80.

Moreover, Nevada has a strong interest in adjudicating this dispute since it implicates the safety of Nevada citizens due to the nefarious conduct of attendees of the Event. Such conduct runs the gamut from hacking into other people's private information to covertly defeating local security checks by concealing firearms in Las Vegas resorts. This type of conduct clearly breaches public safety and Nevada has a clear interest in regulating its offshoots, in this case, defamation and related business torts.

Defendants are unable to make the requisite showing of inconvenience in order to override Plaintiffs' choice. Defendants cannot just demonstrate that Washington is a convenient forum; they must also show that Nevada is inconvenient. *Decker,* 805 F.2d at 843 (9th Cir.1986) By definition, this involves comparing the two forums—not just focusing on why Washington might be a convenient forum. *Id.* (transfer inappropriate where it "would merely shift rather than eliminate the inconvenience.") As discussed above, both parties have significant contacts with Nevada. Defendants quite often travel to Nevada, and have had significant and continuous contact with Nevada over at least the past thirty (30) years as a founder of Def Con and Black Hat and attendee of related trade shows.

Defendants commercial activities in Nevada are extensive, systematic, and continuous and there is no reasonable argument that it is unreasonable for them to litigate in Nevada. Defendants' most prominent Nevada contact is the fact that they only accept cash in return for admissions at the Event in Nevada. Additionally, Defendants set up various cash-only vending stations at the Event, including bars. This total income is estimated to likely exceed over $15,000,000 of cash that is received annually by Defendants on Las Vegas Boulevard. In order to operate the conference, Defendants utilize labor from over 100 individuals in this forum, and they even provide visa support for foreign nationals who would like to visit the Event. Importantly, Defendants have claimed in various instances that Las Vegas, Nevada is synonymous with

17

Defendants' operations, and they actively recruit people to come visit here and participate in the Event in various capacities. The overwhelming examples of Defendants' online activities clearly establish that Defendants expressly direct their operations toward Nevada and other similar Nevada-based conventions such as Black Hat. To boot, Defendants' online presence is an all-encompassing marketing web made up of various websites, social media accounts, and platforms that serve to shepherd individuals to the Event. Defendants used this online presence to defame Plaintiffs and decimate their business relations. Accordingly, it is clear that Defendants do not incur inconvenience in litigating in this forum that overrides the contacts of the case to the forum.

        4.   The Convenience of the Parties Weighs in Favor of Nevada.

In considering the convenience of the parties on a motion to transfer venue, district courts should focus on the relative physical and financial condition of the parties. 28 U.S.C. § 1404(a); *Santi v. Nat'l Bus. Recs. Mgmt., LLC*, 722 F. Supp. 2d 602, 608 (D.N.J. 2010). Transferring venue in a case which in effect shifts the inconvenience from the defendant to the plaintiff will not be warranted. 28 U.S.C. § 1404(a); *Dariz v. Republic Airline Inc.*, 377 F. Supp. 3d 499, 502-503 (E.D. Pa. 2019). When a venue transfer would aid movant and would not disadvantage opponent, transfer is appropriate. 28 U.S.C. § 1404(a); *Ricoh Co. v. Honeywell, Inc.*, 817 F. Supp. 473, 485 (D.N.J. 1993).

Plaintiffs are less physically and financially equipped to handle a transfer of venue and any such transfer will impermissibly shift any burden to Plaintiffs. Plaintiffs generally reside in Pennsylvania and Florida; in fact, they previously attempted to litigate this matter in Pennsylvania over a year ago. Defendants did not file a motion to transfer venue in the Prior Action, and thus waived the credible basis for a transfer argument.

Further, Defendants have seemingly limitless resources to retain attorneys and travel to any forum necessary. For instance, this lawsuit was served on Defendants' attorney Jeffrey McNamara in Las Vegas on August 10, 2023. ECF No. 11, pg. 2:7-8 at Ex. A. Defendants have also retained multiple firms to litigate this action, including attorneys who practice in Oregon, Washington, and Nevada. Similarly, in the Prior Action in Pennsylvania, Defendants retained the same two attorneys from Perkins Coie to appear *pro hac vice* in the United States District Court for the

1  Eastern District of Pennsylvania. *See Hadnagy v. Moss*, No. CV 22-3060, 2023 WL 114689.

2  These attorneys are: Mr. Mertens, who practices in Oregon; and Mr. Perez, who practices in

3  Washington. Accordingly, Defendants have at least three (3) separate law firms retained for

4  various types of legal proceedings. This reflects the massive amount of resources possessed by

5  Defendants.

6        Defendants claim that they will have to incur additional litigation expenses if forced to

7  litigate this case in Nevada based on costs of travel, obtaining local counsel, and other expenses.

8  *See* Moss Decl., ¶ 14. However, Mr. Moss is in Nevada frequently for various conventions and

9  also for Event planning. See Riklis Decl., Ex. 8 at pp. 68-69. The Event planning requires

10  extensive logistical operations as well; for example, Mr. Moss and Def Con claim on their X

11  account that they have to "build every room" across multiple hotels at Def Con. See Riklis Decl.,

12  Ex. 8 at pg. 67. Accordingly, Defendants' contacts with Nevada are substantial and suggest that

13  they must have extensive operations in Nevada. While the Moss Decl. declares that Defendants

14  never "owned property in or lived in Nevada," he does not state whether he leases property in

15  Nevada or contracts with various entities in Nevada for Event-related services. See Moss Decl.,

16  pg. 2:7-8. Similarly, the Moss Decl. omits critical information such as the retention of over 100

17  named Goons that serve as staff members at the Event; instead the Moss Decl. merely states that

18  Def Con has 9 employees. Accordingly, the Moss Decl. is extremely vague and does not describe

19  any cognizable hardship that the Court may consider.

20        Plaintiffs, on the other hand, would encounter considerably more economic hardship if

21  forced to litigate these claims in Washington as opposed to Nevada. *See* Hadnagy Decl., ¶10.

22  Neither Plaintiff has business operations or dealings in Washington, and neither have been there

23  more than one time in the past 10 years. *Id.* Pursuant to the Local Rules of the United States

24  District Court for the Western District of Washington, Plaintiffs would need to retain local counsel

25  in Washington; they have no readily available legal counsel, and thus, would encounter additional

26  financial hardship. "If the convenience of counsel bears directly on the cost of litigation, it

27  becomes a factor to consider." *Ambrose v. Steelcase, Inc.*, 2002 WL 1447871, *2 n.3 (N.D. Ill.

28  2002).

1        Accordingly, this factor weighs heavily in favor of keeping the matter in Nevada since

2    transfer would "merely shift the inconvenience from one party to another." *GNLV, Corp. v. Se.*

3    *Amusement, Inc.*, No. 2:14-cv-00048-GMN-PAL, 2015 WL 13678048, at *3. (D. Nev. Mar. 27,

4    2015.)

5                    5.   The Parties' Contacts with the Forum Weigh Heavily in Favor of Nevada.

6        As discussed above, both parties have had significant contacts with Nevada. Defendants'

7    connections continue in Nevada sporadically during the year, and always during the Event. The

8    Event is the only annual event that Defendants conduct. All of Defendants' vast online materials

9    funnel people into Nevada for the singular purpose of attending the Event. Accordingly,

10   Defendants' online presence essentially serves to market the Event in all capacities. Defendants'

11   online presence addresses everything about Nevada and Las Vegas, including where to stay during

12   the Event, how to participate in the event, and even how to conceal guns in Las Vegas resorts.

13   Moreover, Defendants published the Transparency Report, the Code of Conduct, and the Update

14   on many of the same online platforms.

15       Mr. Moss' declaration essentially circumvents the true nature of Defendants' contacts with

16   Nevada; instead, he takes the curious position that the Website "does not target Nevada residents

17   to attend the Event." Moss Decl., pg. 3:11-2. Mr. Moss then goes on to support this claim by

18   discussing the fact that Defendants do not have mailing lists and do not send emails that target

19   Nevada residents. *Id.*, pg. 3:5-13. However, Def Con's customer base is a hacker network; these

20   are extremely sophisticated people who utilize computers to gain unauthorized access to data.

21   They utilize much more advanced platforms to coordinate commercial activities than the email list

22   option. Instead of using such generic methods, the attendees of the Event use the Def Con forums

23   hosted on the Website, Reddit forums, a Discord server, and other social media platforms. These

24   are all linked to the Website and funnel people into Nevada. Moreover, Defendants' extensive

25   contacts in Nevada are addressed more thoroughly in Sub Section 3 above. It is undeniable that

26   these are extensive and warrant keeping this action in Nevada.

27   / / /

28   / / /

6.   The Parties' Contacts with Nevada Relating to Plaintiffs' Causes of Action
Weigh Heavily in Favor of Nevada.

The parties' contacts in Nevada related to the defamation claims weigh heavily in favor of
keeping the litigation in Nevada as discussed more thoroughly in Sub Sections 3 and 4 above.
These contacts are far more prevalent in Nevada than Washington because any alleged Code of
Conduct violations occurred in Nevada. While some of Defendants' defamation of Plaintiffs was
likely felt in Washington and other parts of the world, the brunt of the damages is felt in Nevada.
These include key damages such as Black Hat also banning Mr. Hadnagy specifically because of
the Def Con ban. Additionally, the Update specifically called attention to Black Hat's ban, which
Black Hat never publicly stated. Thus, Defendants' defamatory statements had significant effects
in Nevada.

7.   The Differences in the Costs of Litigation in the Two Forums Weigh in Favor
of Nevada.

The costs of litigation weigh in favor of keeping the case in Nevada. In addition to the
foregoing argument in Sub Section 4 above, keeping the case in Nevada would eliminate more
extreme travel costs for the witnesses based in Utah and California; travel to an adjacent state is
not so burdensome as travel to other such states. *Strack v. Morris*, No. 3:15-CV-00123-LRH, 2015
WL 4647880, at *9 (D. Nev. Aug. 5, 2015). Accordingly, Washington does not have any
witnesses in an adjacent state. On the other hand, Nevada shares borders with the three witnesses
in California, and the one witness in Utah. See Riklis Decl., ¶ 17; see also Hadnagy Decl., ¶¶ 8-9.
Additionally, one of Plaintiffs' expected witnesses resides in Clark County, Nevada. See Riklis
Decl., ¶17. Furthermore, it is notable that Defendants have a superior financial position, and the
court can consider that as a factor in concluding that this factor does not outweigh Plaintiffs'
choice of forum. *See Brackett v. Hilton Hotels Corp.,* 619 F.Supp.2d 810, 820 (N.D.Cal.2008)
("[W]hile 'the parties' relative financial ability is not entitled to great weight,' it is a relevant
consideration."). Accordingly, this favor weighs in favor of keeping the matter in Nevada.

/ / /

/ / /

/ / /

21

8.   <u>The Availability of Compulsory Process to Compel Attendance of Unwilling Non-Party Witnesses Weighs Heavily in Favor of Nevada.</u>

The convenience of witnesses is often the most important factor in determining whether a transfer under § 1404 is appropriate. See, e.g., *Denver & Rio Grande Western Ry. Co. v. Brotherhood of Railroad Trainmen,* 387 U.S. 556, 560 (1967) ("[V]enue is primarily a matter of convenience of litigants and witnesses"); *A.J. Industries v. U.S. District Court,* 503 F.2d 384, 386–87 (9th Cir.1974);  *Saleh v. Titan Corp.,* 361 F.Supp.2d 1152, 1160 (S.D.Cal.2005) ("the convenience of non-party witnesses is a more important factor than the convenience of party witnesses").

"In support of a motion to transfer, a party must identify potential witnesses by name and describe their testimony." *Clark v. Sprint Spectrum L.P.,* 2010 WL 5173872, at *3, 2010 U.S. Dist. LEXIS 136510, at *11 (N.D.Cal.2010) (citing *Saleh,* 361 F.Supp.2d at 1161–65); *see also Bohara v. Backus Hosp. Med. Benefit Plan,* 390 F.Supp.2d 957, 963 (C.D.Cal.2005). The Courts within the Ninth Circuit have stated:

> "Courts have repeatedly held that the defendant must name the witnesses it wishes to call, describe the anticipated areas of their testimony, explain their relevance, and provide reasons why the present forum would present hardship to show that litigation in the forum state is inconvenient under this factor."

*Proximo Spirits, Inc. v. Green Lake Brewing Co., LLC*, No. 2:22-CV-02879-SPG-SK, 2022 WL 17224545, at *10 (C.D. Cal. Sept. 9, 2022)(collecting cases).

Defendants do not identify any witnesses that they will be calling; in their own words, Defendants claim, "While it is still early in the case to identify witnesses, Defendants anticipate that most witnesses will be located in Washington […]" Motion to Transfer, pg. 13:5-6. Defendants have asserted these non-party witness claims on vague conclusions and thus failed to specifically identify which witnesses would be inconvenienced by plaintiff's choice of forum; therefore, convenience of witnesses cannot weigh in favor of transfer. *Johnson v. Experian Information Solutions, Inc.*, 2012 WL 5292955, *3 (C.D. Cal. 2012). The Court requires a more specific showing before transferring this case to another district based on the convenience and availability of witnesses. *Cf. Heller Fin., Inc. v. Midwhey Powder Co.,* 883 F.2d 1286, 1293 (7th Cir.1989) (to support its contention that witnesses were beyond the trial court's reach, moving

1    party "obligated to clearly specify the key witnesses to be called and make at least a generalized

2    statement of what their testimony would have included").

3          Even if analyzing this factor under Defendants' Initial Disclosures (the, "Disclosures") in

4    the Prior Action, this factor falls in favor of keeping this action in Nevada. Setting aside party-

5    witnesses, the Disclosures name individuals who are located in California, Utah, and Florida.

6    Plaintiffs intend to call witnesses located in Nevada and California. These third party witnesses

7    cannot be compelled to testify by a Washington Court, however, most of them would be able to be

8    compelled to testify by a Nevada Court. *See* Fed. R. Civ. P. 45(c)(1)(A)-(B); *see also* Fed. R. Civ.

9    P. 45(c)(2)(A)-(B)(additionally, a court cannot serve a subpoena for documents upon a non-party

10    witness outside 100 miles of the district in which the court sits). The foregoing also precludes a

11    Washington Court from issuing a subpoena to any Nevada residences for relevant documents.

12    Accordingly, this factor heavily favors Nevada given that the third-party witnesses who reside in

13    California, Nevada, and Utah can be compelled to testify pursuant to the Federal Rules.

14          Notably, the Defendants and their agents and/or employees are parties to the case and must

15    appear for trial; thus, their convenience is not considered in this calculus. Accordingly, this factor

16    alone precludes the transfer of venue.

17          9.    <u>The Ease of Access to Sources of Proof Weighs Heavily in Favor of Nevada.</u>

18          This litigation implicates a Nevada Event, and it is highly likely that witnesses and

19    documents will be located in Nevada, or will return to Nevada for the Event. The defamation

20    claims will require the parties to seek evidence regarding to the veracity of the defamatory

21    statements which address Mr. Hadnagy's behavior in Las Vegas. In order to obtain such evidence,

22    discovery will need to be conducted in Nevada because the behavior occurred here. Discovery will

23    seek documentation from any of the hotels that hosted the Event or its attendees. Discovery will

24    also seek to obtain information from other local entities that similarly arise in the course and scope

25    of discovery. The Code of Conduct specifically names hotel security and local law enforcement.

26    Pursuant to the foregoing Sub Section 8, some of this discovery will be completely prevented by

27    transferring the case to Washington. Thus, the ease of access to sources of proof weighs heavily in

28    favor of Nevada.

1    The Moss Decl. is extremely vague on this point as well. The Moss Decl. claims that Def

2    Con's "physical documents" are in Washington. *See* Moss Decl., pg. 2:19-21. However,

3    Defendants have not shown why these documents are relevant to the litigation, or whether they are

4    difficult or costly to transport. *Cf. Kida W. Holdings, LLC v. Mercedes–Benz of Laguna*

5    *Niguel,* No. 3:07–CV–00523, 2008 WL 217043, at *4 (D.Nev. Jan. 18, 2008) ("much of the

6    evidence Defendants cite is easily transported to the District of Nevada and Defendants have not

7    shown that they would be significantly burdened by transporting the documents.") Additionally,

8    the initial disclosures from the Prior Action clearly show that the relevant documents, "some" of

9    which are "on the cloud", are limited to: "(1) email correspondence; (2) project management files

10   related to the Def Con conference; (3) correspondence on ephemeral messaging applications such

11   as Signal." These are all very easily movable documents. Thus, this favor weighs in favor of

12   Nevada.

13   **IV.    <u>CONCLUSION</u>**

14   The facts of this case heavily weigh in favor of keeping this action in Nevada. In fact,

15   transferring the case to Washington will preclude Plaintiffs and Defendants from multiple sources

16   of proof. These include various witnesses and sources of discoverable information that reside in

17   Nevada. Defendants' only cognizable claim to transfer the case is that they are domiciled in

18   Washington, and that does not overcome the heavy burden that they must set forth in order to

19   justify disturbing the Plaintiffs' choice of forum. Moreover, Defendants conduct business in

20   Nevada regularly and do not experience any clear inconvenience in litigating here. For the

21   foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' Motion to

22   Transfer Venue.

23   DATED: October 30, 2023             Respectfully submitted,

24                                       **RIKLIS LAW, PLLC**

25

26                                       By:    _Kristofer Riklis_____
                                                Kristofer Riklis
27                                              Attorney for CHRISTOPHER J. HADNAGY and
                                                SOCIAL-ENGINEER, LLC
28

**<u>CERTIFICATE OF SERVICE</u>**

I, Kristofer Riklis, hereby certify that the foregoing:

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER VENUE [ECF NO. 15]**

was submitted electronically for filing and/or service with the United States District Court, District of Nevada's e-filing system on the 30th day of October, 2023. Electronic service of the foregoing document was be made in accordance with the E-Service List as follows:

Robert J. Cassity
Erica C. Medley
**Holland & Hart LLP**
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
bcassity@hollandhart.com
ecmedley@hollandhart.com
*Attorneys for Defendants*

David A. Perez
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
dperez@perkinscoie.com
*Attorneys for Defendants*

Matthew J. Mertens
**PERKINS COIE LLP**
1120 N.W. Couch Street 10th Floor
Portland, OR 97209-4128
mmertens@perkinscoie.com

I further certify that I served a copy of this document by mailing a true and correct copy thereof, postage prepaid, addressed to: N/A


*/s/* Kristofer Riklis
KRISTOFER RIKLIS, Esq.

1