1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THE HONORABLE BRIAN A. TSUCHIDA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHRISTOPHER J. HADNAGY, an individual; and SOCIAL-ENGINEER, LLC, a Pennsylvania limited liability company,

Plaintiffs,

v.

JEFF MOSS, an individual; DEF CON COMMUNICATIONS, INC., a Washington corporation; and DOES 1-10; and ROE ENTITIES 1-10, inclusive,

Defendants.

Case No.:  2:23-cv-01932-BAT

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS [ECF NO. 37]**

**Noted For Consideration: February 23, 2024**

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................1

II.     PROCEDURAL BACKGROUND AND STATEMENT OF RELEVANT FACTS ...2

        A.  Procedural Background .........................................................................2

        B   In Granting The Order To Transfer Venue The Nevada Law Applies To Plaintiffs' Claims……………………………………………………………………2

III.    STATEMENT OF RELEVANT FACTS.

        A.  Moss Formed DEF CON for the Purpose of Conducting the Event in Las Vegas, Nevada. .................................................................................3

        B.  The Website is an All-Encompassing Interactive Resource for Event Participants 3

        C.  Plaintiffs' Involvement in the Cybersecurity Industry. ............................3

        D.  Plaintiffs' Standalone SEVillage Became a Threat to Defendants' Business. ........4

        E.  Defendants Issued the Ban on Their Website in the Form of a Defamatory Transparency Report that Implicated Violations of the Code of Conduct at the Event. ..........................................................................................5

        F.  Plaintiffs Lost Significant Business Opportunity as a Direct Result of the Defendants' Actions. ...............................................................................7

IV.     NEVADA LAW APPLIES TO THE FACTS OF THIS CASE ..................................8

        A.  The Nevada Court Held That Nevada Law Governs This Case And Defendants Should Be Estopped From Attempting To Relitigate This Issue. .........................8

        B.  A Change Of Venue For Convenience Should, With Respect To State Law, Only Entail A Change Of Courtrooms And Does Not Change The Prior Ruling Of The Nevada Court That Nevada Law Governs This Case.............................................9

        C.  Specific Personal Jurisdiction Is Readily Found In Nevada Given Defendants' Contact And "Substantial Relationship" With Nevada. ........................................10

                1.  Defendants Committed a Series of Intentional Transactions in Operating the Event, the Website, and Issuing the Defamatory Statements.. ...................................................................................11

                2.  The Acts are Expressly Aimed at Nevada.....................................12

                3.  Defendants Knew That Plaintiff's Harm Would Occur in Nevada.13

        D.  Nevada Has a Clear Interest. ..................................................................14

i

V.     **PLAINTIFFS' COMPLAINT IS PROPERLY PLEAD.**............................................14

    A. Standard of Review. .......................................................................14

    B. Plaintiffs Have Sufficiently Plead Defamation and Business Disparagement. .......15

        1. The Update Ratified the Public's Interpretation That the Ban Resulted From Sexual Misconduct. .................................................17

        2. Plaintiffs' Allegations Against Black Hat are Well-Plead.. ...........18

        3. Plaintiffs Properly Plead Business Disparagement. ........................18

    C. Plaintiffs Properly Plead Tortious Interference with Contractual Relations...........19

        1. Plaintiffs Sufficiently Pled Defendants' Knowledge and Interference with Plaintiffs' Existing Agreements with Black Hat.....................19

        2. Plaintiffs Sufficiently Pled that Defendants Interfered with Plaintiffs' Core Business Contracts and Knew of Plaintiffs' Paid Event Sponsors.. ...............................................................................20

        3. Plaintiffs Sufficiently Pled that Defendants' Attempted to Destroy Plaintiffs' Business Reputations Because they were Rising Competitors. ......................................................................................20

    D. Plaintiffs Properly Plead Tortious Interference with Prospective Contractual Relations................................................................................20

    E. Plaintiffs Sufficiently Plead Unjust Enrichment and Quantum Meruit..................21

    F. The Alter Ego Allegations are Well-Plead...............................................22

    G. If the Court Grants the Motion, Leave to Amend Should be Granted ...................22

VI.    CONCLUSION .......................................................................................24

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ashcroft v. Iqbal*
  556 U.S. 662 (2009)........................................................................................ 15, 18, 19

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*,
  874 F.3d 1064 (9th Cir. 2017) ............................................................................. 11

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ...........................................................................................15

*Brainerd v. Governors of the Univ. of Alberta,*
  873 F.2d 1257 (9th Cir. 1989)… ........................................................................10

*Branda v. Sanford,*
  97 Nev. 643… ....................................................................................................15

*Brayton Purcell LLP v. Recordon & Recordon,*
  606 F.3d 1124 (9th Cir. 2010) ............................................................................ 10

*Citicorp Int'l Trading Co. v. Western Oil & Refining Co.,*
  771 F.Supp. 600 (S.D.N.Y.1991) ......................................................................23

*Clark Cnty. Sch. Dist. v. Virtual Educ. Software, Inc.,*
  213 P.3d 496 (2009) ...........................................................................................19

*Conservation Force v. Salazar,*
  646 F.3d 1240 (9th Cir. 2011) ............................................................................15

*Foman v. Davis,*
  371 U.S. 178 (1962) ........................................................................................... 24

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.,*
  141 S. Ct. 1017 (2021) ....................................................................................... 11

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
  564 U.S. 915 (2011)............................................................................................10

*In re Wal–Mart Wage and Hour Emp't. Pract. Litig.,*
  490 F.Supp.2d. 1091 (D.Nev.2007) ...................................................................23

*J.J. Indus., LLC v. Bennett,*
  119 Nev. 269 ................................................................................................20, 21

*Laborers Combined Funds of Western Pennsylvania v. Ruscitto,*
  848 F.Supp. 598 (W.D.Pa.1994) .......................................................................23

*Leavitt v. Leisure Sports, Inc.,*
    103 Nev. 81 ........................................................................................................22

*Keeton v. Hustler Mag., Inc.,*
    465 U.S. 770 (1984) ..............................................................13, 14, 18, 22

*Korte Constr. Co. v. State on Rel. of Bd. of Regents of Nevada Sys. of Higher Educ.,*
    137 Nev. 378 ......................................................................................................23

*Lindora LLC v. Isagenix Int'l, LLC,*
    198 F.Supp.3d 1127 (S.D. Cal. 2016) ........................................................12

*Lubin v. Kunin,*
    117 Nev. 107 ................................................................................................16, 17

*Mavrix Photo, Inc. v. Brand Techs., Inc,*
    647 F.3d 1218 (9th Cir. 2011) ........................................................10, 12, 13

*Menken v. Emm,*
    503 F.3d 1050 (9th Cir. 2007) ................................................................................11

*Motogolf.com, LLC v. Top Shelf Golf, LLC,*
    528 F. Supp. 3d 1168 (D. Nev. 2021) *reconsideration denied*, No.
    220CV00674APGEJY, 2022 WL 834790 (D. Nev. Mar. 21, 2022) ..................22, 24

*Nevada Ind. Broadcasting v. Allen,*
    99 Nev. 404 ........................................................................................................15

*Pegasus v. Reno Newspapers, Inc.,*
    118 Nev. 706........................................................................................................15

*Posadas v. City of Reno,*
    109 Nev. 448 ........................................................................................................15

*Rimini St., Inc. v. Oracle Int'l Corp,*
    No. 2:14-CV-1699-LRH-CWH, 2017 WL 4227939 (D. Nev. Sept. 22, 2017)........................22, 23

*Schwarzenegger v. Fred Martin Motor Co.,*
    374 F.3d 797 (9th Cir. 2004) ........................................................ 10, 12, 13

*Wealthy, Inc. v. Cornelia,*
    2023 WL 4803776 ..............................................................................................13

*Williams v. Gerber Prods. Co.,*
    552 F.3d 934, 938 (9th Cir. 2008)........................................................................15

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme,*
    433 F.3d 1199, 1207 (9th Cir. 2006) ..............................................................13

*Walden v. Fiore*,
  571 U.S. 277, 283 (2014) ............................................................................10, 11

**Statutes**

F.R.C.P. 8(a) ............................................................................................................23

F.R.C.P. 9(b) ...........................................................................................................23

F.R.C.P. 12(b)(6) .....................................................................................................15

F.R.C.P. 15(a) ..........................................................................................................24

Nev. Rev. Stat. § 14.065 ......................................................................................... 10

v

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      INTRODUCTION

Defendants Moss and Def Con Communications ("Def Con") published a series of defamatory statements about Plaintiffs Christopher Hadnagy and Social-Engineer, LLC ("Social-Engineer") to their website defcon.org (the "Website"). Mr. Moss is the sole creator of Def Con, the world's largest cybersecurity conference (the "Event") which occurs annually and only in Las Vegas.

When transferring this case for convenience, Judge Silva of the Federal District Court of Nevada had already determined that Nevada law governs it. *See* ECF No. 21 ("Transfer Order") at 7. Defendants' current motion fails to acknowledge this prior ruling and instead attempts to re-litigate the "choice-of-law" decision under the guise of a misplaced jurisdictional argument, seemingly to evade the punitive damages available under Nevada law. However, the Nevada Federal District Court unequivocally and correctly concluded that, according to both the Nevada and Washington substantial relationship tests for choice-of-law, Nevada law applies to this case. Defendants provide no legal basis to reconsider Judge Silva's order, which remains the law of the case. Their jurisdictional argument lacks merit, particularly considering their significant relationship and contact with Nevada.

Furthermore, Defendants seek to dismiss Plaintiffs' claims in a factual vacuum while simultaneously downplaying the defamatory nature of their statements. However, Defendants' statements regarding Plaintiffs are demonstrably false and aimed at exploiting the benefits of Plaintiffs' contributions to the Event while torpedoing their increasing success and competition within the cybersecurity industry. When this Court accepts as true the allegations in complaint, along with any reasonable inferences in the light most favorable to Mr. Hadnagy and Social-Engineer, Defendants' motion must be rejected.

/ / /

/ / /

/ / /

## II.   PROCEDURAL BACKGROUND AND STATEMENT OF RELEVANT FACTS

### A.  Procedural Background.

Plaintiffs originally filed a related lawsuit in the Eastern District of Pennsylvania, which is Social-Engineer's domicile. *See Hadnagy v Moss*, No. 2:22-cv-03060-WB, ECF No. 1. However, that court ruled that it lacked personal jurisdiction over Defendants and dismissed the lawsuit without prejudice. *Id.* Accordingly, Plaintiffs filed the current lawsuit in Nevada (the, "Action"). Defendants removed the Action to the Nevada federal court and filed a Motion to Transfer Venue based on convenience under U.S.C. 1404(a). The Nevada district court granted that motion based primarily on Defendants' claims that Washington is their domicile;[1] it did not rule that Nevada lacked personal jurisdiction. Defendants thereafter filed this Motion to Dismiss.

### B.  In Granting The Order To Transfer Venue The Nevada Law Applies To Plaintiffs' Claims.

In its order transferring the action to the present venue, the Nevada Federal District Court (Hon. Silva) necessarily determined  choice-of-law:  "To determine which state is most familiar with the law governing this case, the Court must first determine what state's law governs."  *See* Order Granting Motion to Transfer and Closing Case ("Transfer Order"), ECF 21, at 1:14-2:24 and 7:1-8:2. Judge Silva noted both Nevada and Washington apply the "most significant relationship" test under the Restatement § 145(1) in concluding Nevada law controlled:

> Although it has not been alleged that the alleged defamatory statements were made in Nevada, as discussed in the background section above, the parties' interactions are rooted in Def Con's conference held in Las Vegas, Nevada. Thus, of the two states, and based on the allegations in the complaint, Nevada has the most significant relationship. This factor only weighs slightly against transfer because '[t]he forums's familiarity with the governing law is typically to be accorded little weight on a motion to transfer venue because federal courts are deemed capable of applying the substantive law of other states.' *Liberty Mut. Ins. Co. v. Fairbanks Co.*, 17 F. Supp. 3d 385, 398 (S.D.N.Y. 2014) (internal citations and quotations omitted).

*Id.*, 7:19-8:2. Defendants' motion makes no mention of this ruling.

### III.   STATEMENT OF RELEVANT FACTS.

---

[1] Interestingly, Defendants recently revealed that Moss actually lives in Singapore and indicated that Plaintiffs will be required to seek an Order requiring Moss' in person deposition.

**A. <u>Moss Formed DEF CON for the Purpose of Conducting the Event in Las Vegas, Nevada.</u>**

Moss founded Def Con for the purpose of conducting the Event exclusively in Las Vegas every August for the last thirty years. Compl. ¶¶ 3, 36. The Event attracts international attendance from government agencies and corporations seeking professional guidance on information security. *Id.* ¶¶ 37, 38. Moss is Def Con's Governor/sole founder; he exerts unfettered control over the Event's subject matter, recruitment, contributors, format, and scheduling. *Id.* ¶¶ 2, 5, 34-35. As evidenced by his decision to cancel the Event during COVID, Moss has full power to regulate the Event. He is also responsible for various "transparency reports" and the "Code of Conduct." associated with the Event *Id.* ¶ 5; Motion, at Ex. 1:003, 004, 006; *Riklis Decl.*, Ex. 5 at pg. 41.

**B. <u>The Website is an All-Encompassing Interactive Resource for Event Participants.</u>**

Def Con's interactive website provides detailed instruction, interaction and archives regarding all aspects of the Event. There Def Con posted defamatory statements regarding Mr. Hadnagy and Social-Engineer. *See* Defendants' Motion to Dismiss, at Ex. 2. A visitor to the website can see that the upcoming two iterations of the Event (for 2024 and 2025) already have reserved room blocks at several Las Vegas hotels. *Riklis Decl.*, Ex. 3 at pp. 22-23; Ex. 1, pg. 09. The website also offers numerous forums and submissions pages for Event registrants to discuss all aspects of "DEF CON Conference Planning"; participants can discuss all issues pertaining to their physical presence at the Event. *Id.*, Ex. 2 at pp. 12-20. The website offers opportunities to vend and volunteer, and even provides advice on how to avoid heat-related sickness. *Id.* at pp. 06-08; Ex. 6, at pg. 44. In the "FAQ" section, Moss explains in first-person how he started the event, and that he deliberately chose the name "Def Con" to associate with Las Vegas through code language in the movie "War Games." *Id.*, Ex. 1 at pg. 05.

**C. <u>Plaintiffs' Involvement in the Cybersecurity Industry.</u>**

Plaintiffs, too, conducted significant business in Nevada. ¶¶ 12, 34. Mr. Hadnagy is the founder and CEO of Plaintiff Social-Engineer; Plaintiffs regularly provided cybersecurity services to business entities in Nevada. Compl. ¶¶ 42-43. Plaintiffs also signed six-figure annual business agreements with another industry leader in cybersecurity, Black Hat USA ("Black Hat"). These

agreements required Plaintiffs to host training sessions at Black Hat's annual six-day cybersecurity conference in Las Vegas. *Id.* ¶¶75, 136-137. Black Hat's conference is lauded as the most respected information security event series internationally. *Id.* ¶ 75. Moss has been a Black Hat director since 2018. Moss met Hadnagy every year at the Black Hat event; he was aware of Plaintiff's repeat annual engagements with Black Hat's conference. *Id.* ¶¶ 147-149.

Moss personally encouraged Plaintiffs to attend the Event and develop Def Con's most popular activities, including: the capture the flag game, and the unrivaled "SEVillage." SEVillage was the flagship activity at the Event: it won top awards from the National Security Administration, and achieved unrivaled attendance at the Event; Defendants have since replicated plaintiffs' "village" to take advantage of the goodwill Plaintiffs developed at the Event. *Id.* ¶¶ 45-49, 94. Indeed, Plaintiffs' SEVillage garnered such high demand that Moss changed the Event rules and granted Plaintiffs' permission to accept sponsorships for advertising within the SEVillage. *Id.* ¶ 50. Given his unfettered control over all aspects of the Event, Moss was aware of the many commercial activities arising from the SEVillage that benefitted Plaintiffs, including displayed sponsorships and other contracts that Plaintiffs leveraged given the SEVillage's success. *Id.* ¶¶ 132-133.

**D.   Defendants' Standalone SEVillage Became a Threat to Defendants' Business.**

In 2020, Moss cancelled the event, and Plaintiffs successfully held a standalone event to serve the public's overwhelming demand for the SEVillage, implementing Plaintiffs' substantive methodologies. *Id.* ¶¶ 51-52. It became increasingly clear that the SEVillage could be a direct competitor to Defendants, a result that Moss intended to prevent. *Id.* ¶ 138.

In August of 2021, the Event was held in hybrid form due to COVID restrictions, and Plaintiffs attended virtually. *Id.* ¶¶ 51, 64. Approximately one month later, Hadnagy discovered that Moss was considering false and disparaging allegations allegedly regarding Plaintiffs' separate business endeavors; Hadnagy discerned this effort arose from his effort to secure his third party non-profits' confidential information. *Id.* ¶¶ 53, 64. From September 2021 through January of 2022, Hadnagy sent Moss multiple messages attempting to schedule a meeting to discuss these false allegations, but Moss refused to meet and it became clear Defendants would not offer Plaintiffs access to the Event. *Id.* ¶ 53-55. Accordingly, on January 22, 2022, Plaintiffs notified Defendants

1   that they would be hosting the SEVillage at another location and not participating in the Event. *Id.*

2   ¶¶ 56.

3         On February 9, 2022, Defendants issued a false and defamatory assertions against Plaintiffs,

4   citing severe violations of the Event's code of conduct (the, "Code of Conduct") and banning them,

5   despite the fact that Plaintiffs did not participate in the Event. *Id.* ¶ 58. *See* Motion, Exhibit 1.

6       **E.**  **Defendants Issued the Ban on Their Website in the Form of a Defamatory**
        **Transparency Report that Implicated Violations of the Code of Conduct at the**

7           **Event.**

8         Defendants announced the ban in a "Transparency Report" published on February 9, 2022,

9   stating,

10        "We received multiple [Code of Conduct] violation reports about a DEF CON Village
      leader, Chris Hadnagy of the SE Village. After conversations with the reporting parties

11        and Chris, we are confident the severity of the transgressions merits a ban from DEF CON."

12  Motion, Ex. 1, at 006. Compl. ¶ 58., fn. 1. The Event's Code of Conduct is authored by Moss and

13  states in pertinent part:

14        This Code of Conduct applies to everyone participating at DEF CON […] Anyone can report

15        harassment. If you are being harassed, notice that someone else is being harassed, or have
      any other concerns, you can contact a Goon, go to the registration desk, or info booth.

16        Conference staff will be happy to help participants contact hotel security, local law
      enforcement, or otherwise assist those experiencing harassment to feel safe for the duration

17        of DEF CON.

18  Compl. ¶ 60, Motion, Exhibit 1 at 002.

19        Critically, Defendants' Transparency Report clarifies the significance of lifetime bans, and

20  the bans that withhold identities of accusers or details of accusations:

21        Repeat offenders and those who commit more egregious offenses are permanently banned
      from our events. In the case of the most troubling offenses or those who we feel may

22        represent an ongoing risk to the community, we take the extra step of naming them
      publicly […] If the report of harassment presents a risk of immediate or future retaliation,

23        or at the request of the reporting individual, we will take measures to protect their identity
      and/or details of the accusations. We've adopted these safeguards based on

24        recommendations from the National Network to End Domestic Violence and the Violence
      Against Women Office at the US Department of Justice.

25

26  Motion, Ex. 1 at 005. Compl. ¶¶ 58 fn. 1 and 63 fn. 2.

27        Moreover, the Transparency Report explains the investigatory process wherein the "event

28

                             5

organizers" conduct an in depth review of all allegations and consult with an attorney as needed. Motion, Ex. 1 at 005. Compl. ¶¶ 58 fn. 1 and 63 fn. 2.

Finally, the Transparency Report states:

"the hotel can trespass individuals permanently banned from DEF CON, creating a criminal and physical barrier between those individuals and the conference areas[…]
A DEF CON ban is a prohibition against a person or group from attending future conventions due to bad behavior. DEF CON conveys the information to the hotel and if a banned person returns they will be 'trespassed' by Hotel security and possibly prosecuted." Motion, Ex. at 008. Compl. ¶ 58 fn. 1.

Plaintiffs vehemently deny any violations of the Code of Conduct at any point in time. Compl. ¶ 61. Mr. Hadnagy attempted to address any issues with Moss following the Ban announcement, but Defendants ignored him, and never clarified the reasons for the Ban. *Id*. ¶ 62.

After posting the Transparency Report, Defendants ignited a firestorm within the information technology and security communities across social media platforms and prominent media outlets. These outlets quoted Defendants' statements and asserted that Mr. Hadnagy was a sexual predator of the worst degree. *Id*. ¶ 66-72. [2]  Furthermore, Defendants were aware that presenting the Transparency Report intentionally would lead the public to understand it in this manner. This understanding was reinforced by Defendants' past lifetime bans, which had been exclusively due to extreme sexually predatory behavior. Compl. ¶¶ 100-101, 103-104, 107-108.

False rumors about Mr. Hadnagy spread rapidly, amplifying the defamatory impact of the "Transparency Report" to the extent that Mr. Hadnagy's reputation was tarnished. In one notable instance, he was likened to the "Harvey Weinstein" of the information security industry in a public post, which interpreted the Transparency Report in a highly negative light. *Id*. ¶ 108. Consequently, many of Plaintiffs' business associates inferred that Mr. Hadnagy and Social-Engineer had been

---

[2] According to the article cited to in the Complaint, Plaintiff Hadnagy, "an influential figure at the DEF CON security conference, was permanently banned following allegations of misconduct at the annual Las Vegas gathering." Notably, the article specifically states that no specifics about the violations were provided by Defendants. *https://www.techtarget.com/searchsecurity/news/ 252513274/DEF-CON-bans-social- engineering- expert-Chris-Hadnagy.*

banned due to egregious findings, especially considering the Event's tolerance of extreme behavior. *Id.* ¶ 106.

On January 13, 2023, Defendants refreshed, ratified, and confirmed their intent of the disparaging Transparency Report with an "update" on their website (the "Update"):

> "During our investigation we spoke directly with Mr. Hadnagy about claims of his violations of our Code of Conduct. He confirmed his behavior, and agreed to stop. Unfortunately, the behavior did not stop […] Our investigation also revealed that DEF CON is not the only security conference to receive complaints about Mr. Hadnagy's behavior. For example, Black Hat received complaints, conducted their own investigation and removed Mr. Hadnagy from their Review Board."

*Id.* ¶¶ 80, 98. These statements are again demonstrably false. Mr. Hadnagy never confirmed any alleged behavior, as Defendants refused to meet with him or provide him with any information regarding the allegations. *Id.* ¶¶ 61-62, 84. This defamation and intentional interference perpetrated by Defendants was expressly directed at and related to the Event and the parties' activities in Las Vegas. Compl. ¶ 11. The majority of Plaintiffs' prior business associates in Las Vegas, including Black Hat, terminated their contracts with Plaintiffs stating that they did so as a direct result of Defendants' statements. Compl. ¶¶ 42-43.

### F. Plaintiffs Lost Significant Business Opportunity as a Direct Result of the Defendants' Actions.

Immediately after the damning Transparency Report was posted, Plaintiffs' clients began to terminate their relationships with Plaintiffs specifically citing the Transparency Report. Compl. ¶¶ 73-76. Moss also published these defamatory statements in private to other industry leaders who host similar annual conventions in Las Vegas, Nevada. *Id.* ¶ 113. The Complaint alleges that Mr. Moss spread additional injurious falsehoods to organizers of Black Hat, including the false allegation that Plaintiffs' employment practices were racially discriminatory and that Mr. Hadnagy fosters a hostile work environment based on gender. *Id.* Again, these false statements were aimed at Plaintiffs' operations, services, business reputations, and clients.

Around February of 2022, Black Hat's representatives issued a ban of Plaintiffs from Black Hat's conference, again citing Defendants' publishing of the Transparency Report. Compl. ¶¶ 73-76. Mr. Moss also continued to make disparaging and false statements to other Black Hat

representatives, including allegations that Hadnagy perpetrated repeated sexual harassment and admitted to these acts. Compl. ¶¶ 78-79. This was done to continue to entangle Plaintiffs' in controversy and thwart Plaintiffs' efforts to conduct a standalone version of the SEVillage, and benefit from Plaintiffs' SEVillage by using a replica village meant to attract the same audience and goodwill Plaintiffs' cultivated for years; this replica is even called the "Social Engineering Community Village." *Id.* ¶¶ 94, 140.

## IV.   NEVADA LAW APPLIES TO THE FACTS OF THIS CASE

### A.   The Nevada Court Held That Nevada Law Governs This Case And Defendants Should Be Estopped From Attempting To Relitigate This Issue.

"As most commonly defined, the doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California,* 460 U.S. 605, 618, (1983) (dictum). "This rule of practice promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16, (1988). Federal courts routinely apply law-of-the-case principles to transfer decisions of coordinate courts. *Id.* at 816-17. "[T]he law of the case turns on whether a court previously 'decide[d] upon a rule of law' [...] not on whether, or how well, it explained the decision." *Id.* Additionally, issue preclusion prevents the rehashing of "issues of fact and law that were actually litigated and necessarily decided' in a prior proceeding." *Robi v. Five Platters, Inc*., 838 F.2d 318, 322 (9th Cir.1988). For such preclusion to apply, the issue "must have been 'actually decided' after a 'full and fair opportunity' for litigation." *Id*.

As set forth above, Nevada Federal District Court specifically ruled that Nevada law governs. The thirteen page transfer order sets forth an extensive recitation of relevant facts, applied the same "significant relationship test" applicable in both Nevada and Washington, and found that Nevada has the most significant relationship to the tort claims because "the parties' interactions are rooted in Def Con's conference held in Las Vegas, Nevada." Transfer Order, ECF 21, at 7:1-8:2.

In litigating the transfer issue, Defendants presented multiple arguments supporting their claims that Washington Law should apply, all of which were rejected by the Court. Defendants'

1    motion makes no mention of this procedural history and now attempts to evade the Nevada court's

2    choice of law ruling and the punitive damages available under Nevada law. However, both parties

3    had a full and fair opportunity to litigate this matter, and there is no basis to overturn the Hon. Silva's

4    holding.

**B.  A Change Of Venue For Convenience Should, With Respect To State Law,
Only Entail A Change Of Courtrooms And Does Not Change The Prior
Ruling Of The Nevada Court That Nevada Law Governs This Case.**

7    *Van Dusen* established that "where the defendants seek transfer [under 28 U.S.C. § 1404(a)],

8    the transferee district court must be obligated to apply the state law that would have been applied if

9    there had been no change of venue." *Van Dusen v. Barrack*, 376 U.S. 612, 639

10   (1964); *accord Ferens v. John Deere Co.*, 494 U.S. 516 (1990). This change of venue statute was

11   not intended to limit the venue privilege of the plaintiff or to undermine any state-law benefits that

12   might result from exercising venue privilege. Rather, its purpose was simply to address

13   inconveniences arising from venue statutes by allowing transfer to a convenient federal court. *Van

14   Dusen*, 376 U.S. at 639. In contrast, when the initial venue is improper, the Court orders transfer

15   under 28 U.S.C. § 1406(a). *Van Dusen*, 376 U.S. at 634; 15 Fed. Prac. & Proc. Juris. § 3844: "If

16   venue in the district court is improper, transfer...must be made under...§ 1406(a)").

17   Here, the court transferred the case pursuant to § 1404(a), not § 1406(a). The Federal

18   District Court of Nevada specifically determined that "Nevada has the most significant

19   relationship to the occurrence and the parties," leaving no doubt regarding the suitability of venue

20   and jurisdiction in Nevada. Indeed, Defendants' arguments for applying Washington state law

21   controvert the Supreme Court's reasoning in *Ferens v. John Deere Co,* which states:

> We reasoned in *Van Dusen* that, if the law changed following a transfer initiated by the
> defendant, a district court "would at least be reluctant to grant transfers, despite
> considerations of convenience, if to do so might conceivably prejudice the claim of a
> plaintiff." The court, to determine the prejudice, might have to make an elaborate survey of
> the law, including statutes of limitations, burdens of proof, presumptions, and the like. This
> would turn what is supposed to be a statute for convenience of the courts into one
> expending extensive judicial time and resources. Because this difficult task is contrary to
> the purpose of the statute, in *Van Dusen* we made it unnecessary by ruling that a transfer of
> venue by the defendant does not result in a change of law.

28   *Ferens v. John Deere Co.*, 494 U.S. 516, 528–29 (citation omitted).

In *Intertex*, a case cited by Defendants, this Court explicitly declined to examine *Van Dusen* where it considered two related cases in different federal venues; one in the Western District of Washington, and the other in the Central District of California. *Intertex, Inc. v. Dri-Eaz Prod., Inc.*, No. C13-165-RSM, 2013 WL 2635028, at *2 (W.D. Wash. June 11, 2013). After the Western District of Washington determined that Washington law governs, the Central District of California lifted the stay and transferred the matter to this District for convenience. *Id.* at 1. This Court then specifically cited the Central District of California's transfer order that: "issued specific language that it 'agrees and accepts' substantive findings made by this Court." *Id.* The Western District of Washington explicitly declined to apply *Van Dusen* because "[d]oing so could potentially result in inconsistent judgments […]" *Id.* For these same reasons, this Court should not rewrite the Nevada Court's ruling regarding choice of law.[3]

### C. Specific Personal Jurisdiction Is Readily Found In Nevada Given Defendants' Contact And "Substantial Relationship" With Nevada.

"An exercise of personal jurisdiction in federal court must comport with both the applicable state's long-arm statute and the federal Due Process Clause." *Burri L. PA v. Skurla*, 35 F.4th 1207, 1212 (9th Cir. 2022). Nevada's long-arm statute grants jurisdiction "on any basis not inconsistent with" the U.S. Constitution thus the jurisdictional analyses under state and federal due process are identical. *See Id.*; . Specific personal jurisdiction may be exercised in Nevada, since the claims arise out of the Event as an "activity or an occurrence that takes place in [or is purposely directed at] the forum State and is therefore subject to the State's regulation." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). This is a "defendant-focused" inquiry. *Walden v. Fiore*, 571 U.S. 277, 283 (2014).

The 9th Circuit applies a three-part test to determine if a [non-resident] defendant has sufficient minimum contacts to be subject to specific personal jurisdiction:

"(1) The non-resident defendant must purposefully direct his activities or consummate

---

[3] Defendants also inaccurately cite, *Nelson v. Int'l Paint Co.*, for the erroneous claim that their arguments are supported by Federal policy against forum-shopping. See Motion at pg. 15:1-6. However, in *Nelson*, the Ninth Circuit expressly transferred the case under § 1406(a) "because there was no personal jurisdiction." Nelson v. Int'l Paint Co., 716 F.2d 640, 643 (9th Cir. 1983).

some transaction with the forum or resident thereof [. . .];
(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable."

*Schwarzenegger*, 374 F.3d at 802. If the plaintiff satisfies the first two prongs, the burden will shift to the defendant to show that exercising jurisdiction would be unreasonable. *Menken v. Emm*, 503 F.3d 1050, 1057 (9th Cir. 2007). Moreover, "[w]here, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011) (citing *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1127 (9th Cir. 2010)). Additionally, "uncontroverted allegations in the complaint must be taken as true." *Schwarzenegger*, 374 F.3d at   800 (internal citations and quotations omitted) and factual disputes must be resolved in favor of the plaintiff. *Id*.

1.   Defendants Committed a Series of Intentional Transactions in Operating the Event, the Website, and Issuing the Defamatory Statements.

Minimum contacts "must show that the defendant deliberately reached out beyond its home – by, for example, exploiting a market in the forum State or entering a contractual relationship centered there." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021) (internal citations and quotations omitted). Defendants have satisfied this requirement with systematic intentional acts directed at Nevada's hospitality market for over thirty consecutive years. These include Defendants' agreements with Nevada residents for Event space, insurance, and accommodations for Event attendees. Importantly, Defendants consummate at least 35,000 annual cash transactions in Las Vegas that total well over $13,000,000. The Website is inextricably connected to the Event and expressly applies to attendees of the Event in Nevada. This includes the Code of Conduct, the Transparency Report, and the Update which refer the readers to local authorities and law enforcement. Motion, Ex. 1 at 005-006, and 008.

2.   The Acts are Expressly Aimed at Nevada.

The court focuses on "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064,

11

1070 (9th Cir. 2017). Defendants' publishing the Transparency Report, the Code of Conduct, and the Update all had an effect in Nevada because they governed the Event.

"[O]perating 'a passive website alone cannot satisfy the express aiming prong,' but doing so in conjunction with 'something more—conduct directly targeting the forum—is sufficient.'" *Mavrix*, 647 F.3d at 1229. Courts consider 'the interactivity of the defendant's website, the geographic scope of the defendant's commercial ambitions, and whether the defendant individually targeted a plaintiff known to be a forum resident.'" *Lindora LLC v. Isagenix Int'l, LLC*, 198 F.Supp.3d 1127, 1139 (S.D. Cal. 2016). If, when considering these factors it can be said that Defendant "continuously and deliberately exploited the California market for its website," jurisdiction is proper. *Mavrix*, 647 F.3d at 1229.

The Website clearly targets and exploits the hospitality economy in Nevada. The Website is extremely interactive, assisting visitors with every aspect of the Event. Between hundreds of the Website's forums for visitors, to the recruitment sections on the Website, there is endless live information for attendees of the Event. The website provides a room block for the Event, and facilitates every conceivable aspect of the Event, even international Visa support for attendees.

The geographic scope of Defendants' main commercial ambitions is necessarily limited to Nevada because the only place where attendees can purchase their admission is in Las Vegas, Nevada. *Mavrix* found this to be the most salient factor in their "express direction" analysis: The Court stated:

> "[I]t is clear from the record that [defendant] operated a very popular website with a specific focus on the California—centered celebrity and entertainment industries. Based on the website's subject matter, as well as the size and commercial value of the California market, we conclude that Brand anticipated, desired, and achieved a substantial California viewer base. This audience is an integral component of Brand's business model and its profitability."

*Id.* at 1230. Defendants' commercial ambitions are to operate an annual convention in Nevada. As in *Mavrix*, attendees to the annual convention are the integral component of Defendants' business model and profitability. The Event is Defendants' main operation, it only happens in Nevada, and one can only purchase tickets in Nevada. Thus, the geographical ambitions of Def Con are limited to the hospitality and entertainment industries in Nevada.

Defendants' errantly claim that personal jurisdiction cannot be found since no party is domiciled in Nevada, and since the statements published online had "nothing more than an incidental connection in Nevada." However, this entirely ignores the controlling law. As a result, the Defendants have drawn a false equivalency with *Wealthy, Inc. v. Cornelia*, 2023 WL 4803776. In *Wealthy*, the Court examined statements recorded in Brazil and intended to be disseminated worldwide via YouTube. *Id.* at *3-4. The court in *Wealthy* noted that the defendant was never physically present in Nevada during the relevant time period. *Id.* To the contrary, the Defendants have been systematically present in Nevada and they published the disparaging statements on the Website. Indeed, the Court in *Wealthy* did not even need to examine the *Mavrix* factors, because the website was Youtube, a third-party site that is not specifically aimed at Nevada. *Mavrix*, 647 F.3d at 1229.

### 3.   Defendants Knew That Plaintiff's Harm Would Occur in Nevada.

Nevada is the only place where the Event is held. The Ninth Circuit follows *Keeton* in this context. See *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1207 (9th Cir. 2006); see also *Schwarzenegger*, 374 F.3d at 803 (describing *Keeton* as a purposeful direction case). In *Keeton*, a plaintiff resident of New York sued Hustler magazine, an Ohio corporation, for libel in New Hampshire based on the circulation in New Hampshire of copies of the magazine that contained the allegedly libelous material. *Keeton v. Hustler Mag., Inc.,* 465 U.S. 770, 772 (1984). Hustler circulated 10,000–15,000 copies per month in New Hampshire, but had no other contacts with the forum. *Id.* at 772. The *Keeton* Court stated that Hustler was "carrying on a 'part of its general business' in New Hampshire, and that is sufficient to support jurisdiction when the cause of action arises out of the very activity being conducted, in part, in New Hampshire." *Id.* at 779–80. Finally, the Court specified that "[Hustler] produces a national publication aimed at a nationwide audience. There is no unfairness in calling it to answer for the contents of that publication wherever a substantial number of copies are regularly sold and distributed." *Id.* at 781. The *Keeton* Court stated:

> "It is undoubtedly true that the bulk of the harm done to petitioner occurred outside New Hampshire. But that will be true in almost every libel action brought somewhere other than the plaintiff's domicile. There is no justification for restricting libel actions to the plaintiff's

1  home forum."

2  *Id.* at 780–81.

3   The ground zero of the devastating effects of Defendants' disparaging statements is Nevada

4  because defamatory statements were intended to be processed by all annual participants at the Event.

5  As such, the statements stem from the Event and the harm was likely to be felt there.

6  **D.  Nevada Has a Clear Interest.**

7   Defendants published defamatory statements to the Website about Plaintiffs relating to the

8  Event, implying that Mr. Hadnagy committed despicable behavior in Nevada. Defendants falsely

9  downplay Nevada's interest. However, per *Keeton*:

10  "This interest extends to libel actions brought by nonresidents. False statements of fact
    harm both the subject of the falsehood *and* the readers of the statement. New Hampshire
11  may rightly employ its libel laws to discourage the deception of its citizens. There is 'no
    constitutional value in false statements of fact.'" *Keeton v. Hustler Mag., Inc.*, 465 U.S.
12  770, 776 (1984)(emphasis in original.)

13  *Keeton* further states: "we have not to date required a plaintiff to have 'minimum contacts' with the

14  forum State before permitting that State to assert personal jurisdiction over a nonresident

15  defendant." *Id.* at 771.

16  **V.    PLAINTIFFS' COMPLAINT IS PROPERLY PLEAD.**

17    **A.  Standard of Review.**

18   "A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a

19  claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force*

20  *v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011). While a complaint need not contain detailed

21  factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to

22  relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

23  *Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court

24  to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[T]he

25  motion [to dismiss] is not a procedure for resolving a contest between the parties about the facts or

26  the substantive merits of the plaintiff's case." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th

27  Cir. 2008) (citation omitted).

28

**B.  <u>Plaintiffs Have Sufficiently Plead Defamation and Business Disparagement.</u>**

A defamation claim requires a plaintiff to plead: "(1) a false and defamatory statement by [a] defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages." *Pegasus v. Reno Newspapers, Inc.*, 118 Nev. 706, 718. A defamatory statement "would tend to lower the subject in the estimation of the community". *K-Mart Corporation v. Washington*, 109 Nev. 1180, 1191. The Court resolves the question of "whether a reasonable person would be likely to understand the remark as an expression of the source's opinion or as a statement of existing fact." *Pegasus v. Reno Newspapers, Inc.*, 118 Nev. 706, 715. Where a statement is susceptible of multiple interpretations, one of which is defamatory, the resolution of this ambiguity is left to the finder of fact. *Posadas v. City of Reno,* 109 Nev. 448, 453. The words must be reviewed in their entirety and in context to determine whether they are susceptible of defamatory meaning. *Branda v. Sanford*, 97 Nev. 643, 646-47 ("words do not exist in isolation.") The Complaint alleges that Defendants published various defamatory statements to third parties. They include: 1) the Transparency Report and Code of Conduct; 2) the Update, and 3) the injurious falsehoods.

First, the Transparency Report is defamatory. The Transparency report: i) claimed that the severity of the transgressions merits a lifetime ban of Plaintiffs; and ii) provided no detail regarding the allegations, a fact noted separately in the techtarget.com article. The Transparency Report clarifies the defamatory significance of this:

> "**Repeat offenders and those who commit more egregious offenses are permanently banned from our events. In the case of the most troubling offenses or those who we feel may represent an ongoing risk to the community, we take the extra step of naming them publicly.** […] If the report of harassment presents a risk of immediate or future retaliation, or at the request of the reporting individual, we will take measures to protect their identity and/or details of the accusations. **We've adopted these safeguards based on recommendations from the National Network to End Domestic Violence and the Violence Against Women Office at the US Department of Justice.**"

Motion, Ex. 1 at 005. Compl. ¶¶ 58 fn. 1 and 63 fn. 2. (emphasis added.)

The facts at bar are comparable to those in *Lubin v. Kunin*, 117 Nev. 107, 112. In *Lubin*, plaintiff Dr. Lubin was the director of a private Hebrew school; defendants were a parent coalition (the "Parents"). *Id.* at 109. The defamation claim arose from the Parents' distribution of a handout

describing a lawsuit filed against Dr. Lubin that involved child abuse, assault, battery, and negligence. Id. The handout stated:

> ***This is not a frivolous law suit there is an abundance of evidence as well as eye-witnesses.*** These parents never envisioned that anything of this nature could or would happen to their child. **IT DID!** It is time to protect our children.

*Id.*, at 110 (emphasis in original.) The Court concluded that the Parents' statement of "IT DID!" was susceptible of two interpretations, one which was defamatory. *Id.* The *Lubin* Court states that in "certain contexts, however, a statement may be ambiguous or a 'mixed type,' which is 'an opinion, which gives rise to the inference that the source has based the opinion on underlying, undisclosed defamatory facts.' [….] whether it is a fact or evaluative opinion is left to the jury.'" *Id*. at 112-113. *Lubin* focused on the Parents' statement that the lawsuit was "not frivolous" and was "supported by abundant evidence." *Id. Lubin* concluded: "the Parents were implying by their statements the existence of factual information rather than opinion that would prove the allegations against Lubin." *Id.*

This same rationale can be applied here. Defendants did not just "ban" Plaintiffs on their website, but claimed that they verified underlying allegations. Defendants "implied by their statements the existence of factual information rather than opinion". *Lubin*, 117 Nev. at 112. The Transparency Report confirmed discussions were held with all parties and Defendants were confident in the severity of the transgressions. The named ban is damning in conjunction with how Def Con **withheld all details about the allegations**. That clearly indicates that they followed "**recommendations from the National Network to End Domestic Violence and the Violence Against Women Office at the US Department of Justice.**" See Motion, Ex. 1 at 005. Compl. ¶¶ 58 fn. 1 and 63 fn. 2. (emphasis added.) Since Mr. Hadnagy was named, Defendants clearly indicate their position that he is an ongoing risk to the community. The Transparency Report touts Defendants' thorough investigations, including consulting attorneys, witnesses, "alleged offender(s), and victim(s)." Motion, Ex. 1 at 005; Compl. ¶¶ 58 fn. 1 and 63 fn. 2. As in *Lubin*, Defendants "were implying by their statements the existence of factual information rather than opinion that would prove the allegations against [Plaintiffs]" and thus the Court must deny the Motion to Dismiss.

        1.  <u>The Update Ratified the Public's Interpretation that the Ban Resulted from</u>

Sexual Misconduct.

Defendants published the Update one year after the Ban. Despite Defendants' knowledge of the public's interpretation of the Transparency Report, the Update did not clarify anything:

> "During our investigation we spoke directly with Mr. Hadnagy about claims of his violations of our Code of Conduct. He confirmed his behavior, and agreed to stop. Unfortunately, the behavior did not stop […] Our investigation also revealed that DEF CON is not the only security conference to receive complaints about Mr. Hadnagy's behavior. For example, Black Hat received complaints, conducted their own investigation and removed Mr. Hadnagy from their Review Board."

Motion, Ex. 3 at 018, Compl. ¶¶ 80, 98.

This Update is independently actionable given the timeline. Plaintiffs first discovered the defamatory rumblings in September 2021 and were banned the following February. *Id.* ¶ 51, 58, 64. Between September and February, there were no Events, and Plaintiffs did not have the chance to "not stop" whatever "behavior" they were being accused of at the Event. Defendants never provided Plaintiffs with an opportunity to discuss the allegations. *Id.* ¶¶ 61-62, 84. It is thus clear that the Update contained a false statement. Defendants also named Black Hat, which had never announced any ban. It is clear that they intended to validate the public uproar and further it across more cybersecurity conferences.

Defendants' meanderings about causation and first-amendment rights sanitize the facts from the actual statements. These arguments are dispelled by the Supreme Court's statements in *Keeton*: "There is 'no constitutional value in false statements of fact.'" *Keeton*, 465 U.S. at 776 (1984)(emphasis in original.)

Plaintiffs distinguish between the harm that Defendants caused as opposed to false rumors by alleging Defendants' attempts to spread the injurious falsehoods to "other key leaders in the Cybersecurity industry". Compl. ¶¶ 76-79, 82, 112-113, 136, 149, 151. The only culpable parties are Defendants, because no one else, not even Black Hat issued any alleged "public ban". The harm was solely based on Defendants' Transparency Report, and the Update.

    2.   Plaintiffs' Allegations Against Black Hat are Well-Pled.

Defendants used inapplicable law to claim that Black Hat allegations are implausible. Plaintiffs must provide "sufficient factual matter, accepted as true, to 'state a claim to relief that is

17

1    plausible on its face.'" *Ashcroft v. Iqbal*, supra, 556 U.S. at 678. "A claim has facial plausibility

2    when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

3    the defendant is liable for the misconduct alleged." *Id.* "Determining whether a complaint states a

4    plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw

5    on its judicial experience and common sense." *Id.* at 679.

6         The Transparency Report, the Code of Conduct, and the Update are the key facts.

7    "Information and belief" only fills gaps on the exact timeline. . Mr. Moss clearly published the

8    transparency report and other false reports to representatives of Black Hat in order to e prevent

9    Plaintiffs' their expansion of the SEVillage. Compl. ¶ 78. Since Black Hat never issued an alleged

10   "public ban", how else could have Plaintiffs discovered the rationale provided by Black Hat? Only

11   by Black Hat specifically stating this to them, as they did pursuant to the Complaint.

12        Defendants cite to cases involving pleadings that merely recite elements of claims "on

13   information and belief". Plaintiffs never set forth a "formulaic recitation of the elements" of the

14   claim. The *Miller* Court stated: "The Court recognizes that 'information and belief' pleading is

15   allowed—indeed, necessary at times." *Id.* Aside from the Defendants' Transparency Report and

16   Update thereto, the exact time of when Moss published the Injurious Falsehoods to Black Hat is not

17   entirely clear. However, the allegations are clearly plausible and the Motion must be denied.

18              3.   Plaintiffs Properly Plead Business Disparagement.

19        Plaintiffs properly plead a claim for Business Disparagement pursuant to *Clark Cnty. Sch.*

20   *Dist. v. Virtual Educ. Software, Inc.*, 213 P.3d 496, 504 (2009). To plead business disparagement, a

21   plaintiff must allege: "(1) a false and disparaging statement, (2) the unprivileged publication by the

22   defendant, (3) malice, and (4) special damages." The complaint specifically alleges that the

23   disparaging remarks that Defendants published were intended to destroy Plaintiffs' reputations,

24   which are paramount in the information security industry. Compl. ¶¶ 81, 88.The Complaint alleges

25   that Mr. Moss spread additional Injurious Falsehoods to Black Hat, including that Plaintiffs'

26   employment practices were racially discriminatory and that Mr. Hadnagy fosters a hostile work

27   environment based on gender. *Id.* ¶ 76.

28        **C.  Plaintiffs Properly Plead Tortious Interference with Contractual Relations.**

In an action for intentional interference with contractual relations, a plaintiff must establish: (1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage. *J.J. Indus., LLC v. Bennett*, 119 Nev. 269, 274. The plaintiff must plead defendant's knowledge of the existing contract, or establish "facts from which the existence of the contract can reasonably be inferred." *Id.* Moreover, "the inquiry usually concerns the defendant's ultimate purpose or the objective that he or she is seeking to advance." *J.J. Indus.* 119 Nev. at 275–76. The Complaint sufficiently pleads intentional interference with three (3) separate series of contractual relations: 1) Plaintiffs' agreement with Black Hat; 2) Plaintiffs' Sponsorship agreements at the Event; and 3) Plaintiffs' core business contracts which were interfered with due to the reach of Defendants' defamation.

1. Plaintiffs Sufficiently Pled Defendants' Knowledge and Interference with Plaintiffs' Existing Agreements with Black Hat.

Defendants pled their substantial annual agreements with Black Hat for training at Black Hat's conference in Las Vegas. Compl. ¶¶ 75, 136-137. Mr. Moss has been Black Hat's Director since 2018, he met Mr. Hadnagy in Las Vegas every year at the Black Hat capstone conference, and knew of Plaintiff's annual agreements with Black Hat. *Id.* ¶¶ 147-149. Given his directorship at Black Hat, it is implausible that Mr. Moss did not reasonably infer that Mr. Hadnagy consistently entered into contracts for the trainings. Moreover, Plaintiffs allege the publishing of the Injurious Falsehoods, , the Transparency Report, Code of Conduct, and Update. Compl. ¶¶ 78-79. To dispel any doubt as to their intent, Defendants disseminated the Transparency Report and Update on their X accounts (formerly known as "Twitter") to over four hundred thousand followers. Compl. ¶¶ 111-112.

2. Plaintiffs Sufficiently Pled that Defendants Interfered with Plaintiffs' Core Business Contracts and Knew of Plaintiffs' Paid Event Sponsors.

Mr. Moss exerts unfettered control over Def Con given his position. Compl. ¶¶ 2, 5, 34-35. Mr. Moss has immense exposure as a result of his leadership at Defcon and Black Hat. Given this influence, it follows that he must plausibly know the various business relationships that affect his key contributors. Defendants do not argue that Plaintiffs' contributions to the Event were without

19

comparison given Mr. Hadnagy's popularity. Compl. ¶¶ 45-50, 94. Mr. Moss, with complete authority over the Event would reasonably know about Mr. Hadnagy's key business partners given that one of the main purposes of hosting a convention is to create collaborative relationships that may result in business. At the least, Defendants were aware who Plaintiffs' advertised sponsors at the Event. *Id.* ¶¶ 50, 132-133.

        3.  <u>Plaintiffs Sufficiently Pled that Defendants' Attempted to Destroy Plaintiffs' Business Reputations Because they were Rising Competitors.</u>

Plaintiffs sufficiently allege facts as to motive pursuant to *J.J. Indus., LLC v. Bennett*, 119 Nev. 269 at 275–76. Compl. ¶¶ 44-49, 50, 94. For the five (5) months that Defendants disregarded Plaintiffs' attempts address any allegations, it became clear that Defendants' were not interested in Plaintiffs' side of any story. Accordingly, Plaintiffs notified Defendants that they would not be attending the Event. The Transparency Report was posted three weeks later. This timeline suggests that Defendants retaliated against Plaintiffs for pulling out of the Event.

Even more disturbing is that the Update claims that Defendants spoke with Mr. Hadnagy, who allegedly confirmed his behavior, and agreed to stop. This is false and even impossible as discussed above, there were no Events in that period of time. Accordingly, the false nature of the Moss' intent to defame Plaintiffs and destroy their business is more than plausible.

**D.  <u>Plaintiffs Properly Plead Tortious Interference with Prospective Contractual Relations.</u>**

Pleading intentional interference with prospective economic advantage requires: (1) a prospective contractual relationship between the plaintiff and third party; (2) knowledge by defendant of the prospective relationship; (3) intent to harm plaintiff by preventing relationship; (4) the absence of privilege; and (5) actual harm to the plaintiff as a result of the defendant's conduct. *Leavitt v. Leisure Sports, Inc.,* 103 Nev. 81, 88. The difference in analysis of this claim and the prior one for interference is that the contractual relations with Plaintiffs need to be alleged as prospective versus already established. *Motogolf.com, LLC v. Top Shelf Golf, LLC*, 528 F. Supp. 3d 1168, 1178 (D. Nev. 2021), *reconsideration denied*, No. 220CV00674APGEJY, 2022 WL 834790 (D. Nev. Mar. 21, 2022)(stating "the Supreme Court of Nevada would find alleging a certain class of prospective customers without identifying them specifically is sufficient to state a claim for

intentional interference with prospective economic advantage."). Here, Plaintiffs identified groups of potential customers including, Black Hat, Plaintiffs' core business agreements, and agreements for sponsorships at the Event. Thus, they are sufficiently pled.

Defendants mistakenly claim that they had a first amendment privilege to ban Mr. Hadnagy pursuant to *Leavitt v. Leisure Sports, Inc.,* 103 Nev. 81, 88. In *Leavitt*, the conduct involved a party's announcement of a previously recorded claim at a trustee sale; the Court agreed that a party can have privilege where protecting a property interest that they acquired via valid contract. *Id.* at 85, 89. In this matter, however, Defendants argument that there was some privilege connected with a first amendment right to assemble related to "protecting their own business interests", is unsupported. *See Keeton*, *supra,* 465 U.S. 770, 776.

Finally, Defendants errantly invoke an unreported case to support their thought that Plaintiffs did not allege that they "would have been awarded the contract but for the defendant's interference." *Rimini St., Inc. v. Oracle Int'l Corp.,* No. 2:14-CV-1699-LRH-CWH, 2017 WL 4227939 (D. Nev. Sept. 22, 2017). However, it is clear that Plaintiffs allege in multiple different fashions that they were told the specific reason for ending negotiations was the Def Con ban.

### E.   Plaintiffs Sufficiently Plead Unjust Enrichment and Quantum Meruit.

To successfully plead unjust enrichment, a plaintiff needs to show that they conferred a benefit on the defendant, the defendant appreciated it, and there is retention by the defendant of such benefit under circumstances such that are inequitable without payment of the value thereof. *Certified Fire Prot., Inc. v. Precision Constr., Inc*., 128 Nev. 371, 381, 283 P.3d 250, 257 (2012). Benefit "denotes any form of advantage." *Korte Constr. Co. v. State on Rel. of Bd. of Regents of Nevada Sys. of Higher Educ.*, 137 Nev. 378, 381, (2021). Here, it is clear that Plaintiffs contributed greatly to the growth of the Event at the request of Defendants. Compl. ¶¶ 44-46, 50, 58, 94, 133, 140, 163. Defendants then stole the benefits and goodwill that Plaintiffs developed over the years through substantial efforts. *Id.* Plaintiffs business has been decimated. Accordingly, this alternative theory of relief was plead correctly. To succeed on a claim for quantum meruit, a plaintiff must show that it conveyed a benefit on the defendant who appreciated and retained the benefit under circumstances that would be inequitable to retain the benefit without paying. *In re Wal–Mart Wage and Hour*

1   *Emp't. Pract. Litig.,*490 F.Supp.2d. 1091, 1125 (D.Nev.2007).  The same analysis applies here and

2   the Motion should be denied.

3             **F.   The Alter Ego Allegations are Well-Plead.**

4          The alter ego allegations will not be held to the particularity requirement of Fed.R.Civ.P.

5   9(b), because there are no allegations of fraud imputed into them. *Laborers Combined Funds of*

6   *Western Pennsylvania v. Ruscitto,* 848 F.Supp. 598, 600–01 (W.D.Pa.1994) (Rule 8(a) applies

7   to alter ego allegations "unless fraud is a necessary element of the claim"). The Court can invoke

8   the exception to this standard because the alleged information is in the defendants' "exclusive

9   control." *Motogolf.com, LLC* 528 F. Supp. 3d at 1177.

10          **G.   If the Court Grants the Motion, Leave to Amend Should be Granted.**

11         The court should "freely give" leave to amend when there is no "undue delay, bad faith or

12  dilatory motive on the part of the movant ... undue prejudice to the opposing party by virtue of

13  allowance of the amendment, [or] futility of amendment." Fed.R.Civ.P. 15(a); *Foman v. Davis,* 371

14  U.S. 178, 182 (1962). While Plaintiffs maintain the Complaint was plead in accordance with Federal

15  standards, it was originally filed in the Eighth Judicial District Court and Plaintiffs did not include

16  certain identifying information pertaining to various agreements that were interfered with and

17  disparaging statements in order to avoid further harming any of Plaintiff's business relationships.

18  **VI.   CONCLUSION**

19         Plaintiffs respectfully request that this Court deny Defendants' Motion. If the Court grants

20  the Personal Jurisdiction argument, Plaintiffs request an evidentiary hearing regarding Personal

21  Jurisdiction.

22         I certify that this motion contains 8,376 words in compliance with the Local Civil Rules.

23    //

24    //

25    //

26    //

27    //

28    //

DATED: February 15, 2024                    Respectfully submitted,

                                            **RIKLIS LAW, PLLC**


                                            By:   _Kristofer Riklis_____
                                                  Kristofer Riklis
                                                  Attorney for CHRISTOPHER J. HADNAGY and
                                                  SOCIAL-ENGINEER, LLC

23

1

2

## CERTIFICATE OF SERVICE

3

The undersigned certifies under the penalty of perjury according to the laws of the United States and the State of Washington that on this date I caused to be served in the manner noted below a copy of this document entitled **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS** on the following individuals:

4

5

6

David Perez, WSBA #43959
Matthew J. Mertens (Pro Hac Vice)
Lauren A. Trambley (Pro Hac Vice)
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
dperez@perkinscoie.com
mmertens@perkinscoie.com
ltrambley@perkinscoie.com

7

8

9

10

11

[  ] Via USPS
[X]  Via Electronic Mail
[X]  Via Electronic Filing (CM/ECF)

12

13

Robert J. Cassity
Erica C. Medley
Holland & Hart LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
bcassity@hollandhart.com
ecmedley@hollandhart.com

14

15

16

17

18

19

[  ]  Via USPS
[X]  Via Electronic Mail
[X]  Via Electronic Filing (CM/ECF)

20

21

DATED this 15th day of February, 2024 at Seattle, Washington.

22

23

_____
Mark R. Conrad, Attorney

24

25

26

27

28

1