1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHRISTOPHER J HADNAGY, SOCIAL
ENGINEER LLC,

                  Plaintiffs,

     v.

JEFF MOSS, DEF CON
COMMUNICATIONS INC,

                  Defendants.

CASE NO. 2:23-cv-01932-BAT

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS**

Defendants Jeff Moss ("Moss") and Def Con Communications, Inc. ("Def Con") move to dismiss the Complaint of Plaintiffs Christopher J. Hadnagy ("Hadnagy) and Social-Engineer LLC ("Social-Engineer"). Dkt. 37. Plaintiffs assert seven causes of action against Defendants. Dkt. 1-1.

For the reasons stated herein, the Court **grants** Defendants' motion to dismiss Plaintiffs' claims of Alter Ego, Business Disparagement; Unjust Enrichment, Quantum Meruit, and Injunction; **denies** Defendants' motion to dismiss Plaintiffs' Defamation claims (2/9/22 Transparency Report and 1/13/23 Update); and **grants** Defendants' motion to dismiss, **with leave to amend**, Plaintiffs' claims of Defamation ("Injurious Falsehoods" by Defendant Moss); Tortious Interference with Contractual Relations; and Prospective Business Relations.

FACTUAL AND PROCEDURAL BACKGROUND

A.     Plaintiffs' Allegations – Dkt. 1-1 Complaint

Defendants Moss and Def Con have held an annual hacker conference in Las Vegas, Nevada (the "Event") in August for the past thirty years. Dkt. 1-1 ¶¶ 32–36. The Event is one of the largest, is highly regarded in the industry, and is attended by members of law enforcement agencies and large corporations. *Id*. ¶¶ 37-38. In 2025, Def Con implemented an Event Code of Conduct ("Code of Conduct"). Dkt. 1-1, ¶ 60 (Dkt. 37, Ex. 1). The Code of Conduct prohibits "harassment," which includes "deliberate intimidation and targeting individuals in a manner that makes them feel uncomfortable, unwelcome, or afraid." *Id*. The Code of Conduct applies to "everyone," and Def Con reserves the "right to respond to harassment in the manner we deem appropriate, including but not limited to expulsion." *Id*. In 2017, Def Con began to publicly share a summary of incidents which occurred at the Event for a given year (the "Transparency Report").

The Event hosts a multitude of "villages," inviting smaller groups of attendees to participate in cybersecurity challenges and demonstrations related to different topics. *Id*. ¶ 40. In the past, Plaintiff Hadnagy hosted a village focused on social engineering (the "SEVillage"). *Id*. ¶¶ 45–46. In January 2022, Def Con informed Plaintiff Hadnagy that he could no longer attend the Event based on reported violations of the Code of Conduct. *Id*. ¶¶ 58–59. On February 9, 2022, Def Con published a Transparency Report announcing Plaintiffs' ban from future Events:

> We received multiple [Code of Conduct] reports about a DEF CON Village leader, Chris Hadnagy of the SE Village. After conversations with the reporting parties and Chris, we are confident the severity of the transgressions merits a ban from DEF CON.

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 2

*Id*. ¶ 58 (the "2/9/22 Transparency Report").[1] On July 28, 2022, Defendants published an Updated Transparency Report explaining treatment of Code of Conduct violations, including meeting with parties, witnesses, and victims; reviewing evidence; and determining permanent bans for repeat offenders and egregious offenses. Defendants based their safeguards on recommendations from the National Network to End Domestic Violence and the Violence Against Women Office at the US Department of Justice. Dkt. 37, Ex. 2 at 2-4 (7/28/22 Update).

Plaintiffs deny violating the Code of Conduct, meeting or discussing allegations of code violations with Defendants, and alleges Defendant Moss ignored his attempts to meet and provided no reason for the lifetime ban. Dkt. 1-1, ¶ 61, ¶ 62. Defendants ignited a firestorm within the information technology and security communities across social media platforms and prominent media outlets after posting the Transparency Report. These outlets quoted Defendants' statements and asserted Plaintiff Hadnagy was a sexual predator. *Id*. ¶ 66-72.

Defendants were aware that presenting the Transparency Report would lead the public to understand it in this manner as Defendants' past lifetime bans were exclusively due to extreme sexually predatory behavior. Dkt. 1-1, Compl. ¶¶ 100-101, 103-104, 107-108. False rumors about Plaintiff Hadnagy spread rapidly, tarnished his reputation, and he was likened to the "Harvey Weinstein" of the information security industry in a public post. *Id*. ¶ 108.

In January 2023, Plaintiffs sued Defendants in the Eastern District of Pennsylvania. Following dismissal of that lawsuit for lack of personal jurisdiction, Defendant Moss published an update to Def Con's website (the "Update"):

> "During our investigation we spoke directly with Mr. Hadnagy about claims of his violations of our Code of Conduct. He confirmed his behavior and agreed to stop. Unfortunately, the behavior did not stop [...] Our investigation also revealed

---

[1] Defendants refer to this publication as the Ban Announcement.

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 3

that DEF CON is not the only security conference to receive complaints about Mr.
Hadnagy's behavior. For example, Black Hat received complaints, conducted
their own investigation, and removed Mr. Hadnagy from their Review Board."

Id. ¶¶ 80, 98. Plaintiff Hadnagy denies Defendants ever spoke with him about the alleged Code

violations and he never "confirmed his behavior." *Id*. ¶¶ 61-62, 84. Most of Plaintiffs' business

associates in Las Vegas, including Black Hat, terminated their contracts with Plaintiffs based on

Defendants' statements in the Transparency Report. *Id.*, Compl. ¶¶ 42-43; ¶¶ 73-76. Defendant

Moss published these statements (and additional statements that Plaintiff's employment practices

were racially discriminatory and fostered a hostile work environment based on gender) in private

to "other industry leaders who host similar annual conventions in Las Vegas, Nevada, including

the organizers of Black Hat." *Id*. ¶ 113.

Around February of 2022, Black Hat representatives issued a ban of Plaintiffs from Black

Hat's conference, citing Defendants' Transparency Report. Dkt. 1-1, Compl. ¶¶ 73-76. Black

Hat's website lists Defendant Moss as a director of Black Hat. *Id.*, ¶ 77. Defendant Moss

continued to make disparaging and false statements to other Black Hat representatives, including

allegations that Plaintiff Hadnagy perpetrated repeated sexual harassment and admitted to these

acts. *Id*. ¶¶ 78-79. Defendant Moss intended to "entangle Plaintiffs in controversy and thwart

Plaintiffs' efforts to conduct a standalone version of the SEVillage, and benefit from Plaintiffs'

SEVillage by using a replica village (the "Social Engineering Community Village") meant to

attract the same audience and goodwill Plaintiffs had cultivated for years. *Id*. ¶¶ 94, 140.

B.   Procedural History

Plaintiffs sued Defendants in the Eastern District of Pennsylvania, and on January 5,

2023, Judge Wendy Beetlestone dismissed the case for lack of personal jurisdiction. *See*

*Hadnagy v. Moss*, No. CV 22-3060, 2023 WL 114689 (E.D. Pa. Jan. 5, 2023).

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 4

1    On August 9, 2023, Plaintiffs filed a Complaint in the Eighth Judicial District Court,

2   Clark County, Nevada. *See Christopher J. Hadnagy et al. v. Jeff Moss et al.*, Case No. A-23-

3   875618-C. Defendants removed the action to the Federal District Court of Nevada on August 29,

4   2023 (Dkt. 1) and thereafter, filed a motion to dismiss, or in the alternative, a motion to transfer

5   venue to the Western District of Washington. Dkt. 15. Judge Cristina D. Silva granted the motion

6   to transfer venue to this Court and did not reach the merits of Defendants' motion to dismiss.

7   Dkt. 21 at 1, n.1 ("Transfer Order").

8                                LEGAL STANDARD

9    Under Rule 12(b)(6), a court conducts a two-step inquiry to test the legal sufficiency of

10  the complaint. First, well-pleaded facts are accepted as true, while mere legal conclusions may

11  be disregarded. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Second, once the well-pleaded

12  factual allegations have been isolated, the court must determine whether they are sufficient to

13  show a "plausible claim for relief." *Id*. at 679. A claim "has facial plausibility when the plaintiff

14  pleads factual content that allows the court to draw the reasonable inference that the defendant is

15  liable for the misconduct alleged." *Id*. at 678. If a motion to dismiss is granted, a court should

16  normally grant leave to amend unless it determines the pleading cannot not possibly be cured by

17  allegations of other facts. *Cook, Perkiss & Liehe v. N. Cal. Collection Serv*., 911 F.2d 242, 247

18  (9th Cir.1990).

19   In deciding a motion to dismiss, courts generally consider only the allegations contained

20  in the complaint, exhibits attached to the complaint, and matters of public record. Courts may not

21  consider additional facts alleged in opposition to a motion to dismiss. *See Schneider v. California*

22  *Dep't of Corrections*, 151 F.3d 1194, 1197 n. 1 (9th Cir. 1998).

23

1    A court may consider a document whose contents are alleged in a complaint, so long as

2    no party disputes its authenticity. *See Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994),

3    *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir.

4    2002)." Attached to Defendants' motion to dismiss as Exhibits 1, 2, and 3 are the Code of

5    Conduct, Transparency Reports, and Update. Neither party raises concerns about these exhibits

6    and Plaintiffs' claims are based on these exhibits. Thus, the Court has considered the exhibits in

7    determining this motion.

8                                              DISCUSSION

9    A.    Personal Jurisdiction and Applicable Law

10    Following a transfer under 28 U.S.C. § 1404(a), the Court would ordinarily apply the law

11    of the transferor court. *See*, *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964). Where the

12    transferor court lacked personal jurisdiction over the defendant, however, the transferee court

13    must apply its own law regardless of whether the transfer is based on Section 1404(a) or Section

14    1406(a). *See Nelson v. Int'l Paint Co*., 716 F.2d 640, 643–44 (9th Cir. 1983); *Intertex, Inc. v.*

15    *Dri-Eaz Prod., Inc*., No. C13-165-RSM, 2013 WL 2635028, at *2 (W.D. Wash. June 11, 2013).

16    "While a transferor court need not have personal jurisdiction to transfer an action under §

17    1404(a), lack of personal jurisdiction precludes application of *Van Dusen* in the transferee

18    court." *Jaeger v. Howmedica Osteonics Corp*., No. 15-CV00164-HSG, 2016 WL 520985, at *7-

19    8 (N.D. Cal. Feb. 10, 2016).

20    Plaintiffs contend the Nevada District Court expressly ruled that personal jurisdiction

21    existed in Nevada. This is incorrect. The Nevada District Court ruled on Defendants' motion to

22    transfer venue and specifically did not reach the merits of Defendants' motion to dismiss. In

23    determining whether transfer to Washington was proper, Judge Silva weighed multiple factors,

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 6

1  including familiarity with governing law and, using the most significant relationship test,

2  concluded Nevada had the most significant relationship based primarily on the parties'

3  interaction at the Event in Nevada. *Id.* at 4-7. Judge Silva also noted, however, that this factor

4  "weighs slightly against transfer because "[t]he forums' familiarity with the governing law is

5  typically to be accorded little weight on a motion to transfer venue because federal courts are

6  deemed capable of applying the substantive law of other states." *Id.* at 7-8 (internal citations

7  omitted). Judge Silva did not address whether Nevada or Washington had personal jurisdiction

8  over Defendants.

9       Thus, this Court must "consider in the first instance whether personal jurisdiction

10  existed" in Nevada and which state's law applies.[2] *See Jaeger*, 2016 WL 520985, at *7. Plaintiff

11  is a resident of Florida and Defendants are citizens of Washington. Thus, to establish personal

12  jurisdiction in Nevada, Plaintiffs must show Defendants purposefully directed tortious action

13  toward Plaintiffs in Nevada. Plaintiffs submit allegations of their own business dealings in

14  Nevada, but it is the Defendants' "tortious actions" in Nevada that are relevant.

15      The parties agree the Ninth Circuit's "purposeful direction" test for personal jurisdiction[3]

16  requires a plaintiff to demonstrate that the defendant (1) committed an intentional act, (2)

17  expressly aimed at the forum state, (3) causing harm the defendant knows is likely to be suffered

18  in the forum state. *Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp.*, 905 F.3d 597, 605 (9th

19  Cir. 2018) (intentional torts, like defamation, are subject to the purposeful direction analysis).

---

20

21  [2] Defendants do not assert that Nevada has general jurisdiction over Defendants and in fact, none of the parties are based in Nevada.

22  [3] A purposeful availment analysis is most often used in suits sounding in contract. *See, e.g., Doe v. Unocal Corp.*, 248 F.3d 915, 924 (9th Cir.2001). A purposeful direction analysis, on the other hand, is most often used in suits sounding in tort. *See, e.g., Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir.2002).

23

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 7

1   The Court concludes personal jurisdiction is lacking in Nevada because Defendants did not

2   "expressly aim" their alleged tortious statements at Plaintiffs in Nevada.

3       For purposes of the personal jurisdictional analysis, an "intentional act" must be the one

4   giving rise to the tort claims at issue. *See Schwarzenegger v. Fred Martin Motor Co*., 374 F.3d

5   797, 806 (9th Cir. 2004) (describing the kinds of potentially tortious "intentional acts" that

6   satisfy the requirement). Here, the alleged tortious acts of Defendants are publishing the

7   Transparency Reports and Update on Def Con's website. According to a recent Nevada District

8   Court ruling, statements posted online with the intention of being globally accessible do not

9   create personal jurisdiction in Nevada. *Wealthy, Inc. v. Cornelia*, 2023 WL 4803776 (D. Nev.

10  July 27, 2023). Defendants rely on this case, arguing Def Con's "systemic" presence in Nevada

11  creates personal jurisdiction in Nevada. Dkt. 19 at 12-13.

12      In *Wealthy*, the plaintiff (not a resident of Nevada) sued the defendant (not a resident of

13  Nevada) for recording an allegedly defamatory YouTube video with a third person (a resident of

14  Nevada). 2023 WL 4803776, at *3–5. The court rejected personal jurisdiction over the defendant

15  because the video was posted online with the intention of being broadcast globally, and the

16  defendant did not specifically intend the statements to harm the plaintiff in Nevada. *Id*. at *3.

17  Had the plaintiff been a Nevada resident, the harm would have been felt in the state, but he was

18  not. *Id*. at *3–4. The court declined to "exercise jurisdiction over an action where the requisite

19  nexus was the fact that several defamatory statements had a proverbial layover in Nevada as they

20  awaited global publishing on the internet." *Id*. at *5.

21      Similarly, there is no personal jurisdiction here in Nevada – non-resident plaintiffs sued

22  non-resident defendants for statements published on a website with global access with nothing

23

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 8

1   more than an incidental connection to Nevada.[4] Plaintiff Hadnagy suggests Def Con "expressly

2   aimed" its conduct at Nevada and points to the nature and degree of interactivity of Def Con's

3   website and geographic scope of Def Con's economic ambitions. Dkt. 39 at 11-13. These facts

4   are outside of Plaintiffs' complaint and moreover, are not "intentional acts" giving rise to

5   Plaintiffs' claims.

6          Plaintiff's also point to Defendants' "systematic intentional acts directed at Nevada's

7   hospitality market for over thirty consecutive years", *i.e.*, event space, insurance, and

8   accommodations for attendees. Plaintiffs argue Defendants' website is "inextricably connected to

9   the Event and expressly applies to attendees of the Event in Nevada." Here again, business

10  contacts and dealings within the State of Nevada are not the type of "intentional act" giving rise

11  to the tort claims at issue.

12         Plaintiff Hadnagy also relies on *Mavrix Photo, Inc. v. Brand Techs., Inc*., 647 F.3d 1218

13  (9th Cir. 2011) for the proposition Defendants expressly aimed conduct at Nevada. *Mavrix*

14  involved an alleged copyright infringement of photographs by a celebrity gossip website where

15  the defendant made money by selling advertising space to third-party advertisers, many of which

16  targeted California residents. 647 F.3d at 1221–22. The court concluded this was part of the

17  defendant's "continuous and deliberate exploitation" of the California market for its website, and

18  the website's business model was core to the defendant's profitability, which supported

19

---

20  [4] Plaintiffs allege Defendant Moss's first offending comments occurred while Plaintiff Hadnagy
    participated in Defcon in 2021 "virtually" (Dkt. 39, Response at 10), ostensibly while Plaintiff
21  resided in Florida. Thereafter, Plaintiff told Defendant he would be "hosting" SEvillage at
    another location and not participating in Defcon. *Id*. at 11. In February 2022, Plaintiff alleges
22  Defendant issued defamatory statements against Plaintiff even though Plaintiff "did not
    participate in the event [Defcon]." *Id*.  Thus, by Plaintiff's own admission, Defendant Moss's
23  statements did not occur in Nevada and were directed towards Plaintiff while he resided in
    Florida.

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 9

1    jurisdiction in California. *Id*. The facts here are dissimilar to those in *Mavrix*. There is no

2    allegation or evidence the Def Con website "continuously and deliberately" exploits Nevadans

3    for commercial gain as Def Con does not sell advertising space on its website and its website

4    does not target Nevada residents with advertisements, or track visitors via IP address or

5    otherwise. Dkt. 15-1, Declaration of Jeff Moss in Support of Motion to Transfer at ¶ 6, 9.

6          Finally, Plaintiffs argue Def Con knew the harm would be caused in Nevada because it

7    "is the only place where the Event is held." Dkt. 39 at 13. The tortious activity alleged by

8    Plaintiffs is Defendants' publication of the Transparency Reports and Updates on Def Con's

9    website (and additional defamatory statements made by Defendant Moss to Black Hat

10   representatives) – which publications and statements are not alleged to have occurred in the State

11   of Nevada. Defendants' ban of Plaintiff Hadnagy and publication of the Transparency Reports is

12   presumably (although it is not entirely clear) based on Plaintiff Hadnagy's behavior at an earlier

13   Event, which presumably occurred in Nevada. However, the alleged defamation did not occur in

14   Nevada, nor was it directed at Plaintiffs in Nevada. Plaintiff Hadnagy offers no affidavit or other

15   evidence to support his claim he was harmed in Nevada. He does not identify any Nevada-

16   specific contracts with which Def Con tortiously interfered and/or that Def Con was aware of

17   any such contracts.

18         A court may exercise specific jurisdiction over a defendant only where "the defendant's

19   suit-related conduct" created a substantial connection with the forum [s]tate." *Williams v.*

20   *Yamaha Motor Co. Ltd*., 851 F.3d 1015, 1022-23 (9th Cir. 2017) (quoting *Walden v. Fiore*, 571

21   U.S. 277, 284-285 (2014). Defendants' allegedly defamatory statements on its globally

22   accessible website—were not targeted at Nevada residents, did not involve a Nevada resident,

23   did not encourage Nevada residents to read the statements, did not mention the state of Nevada,

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 10

1  and were not posted within the state of Nevada. The Court concludes there is no personal

2  jurisdiction in Nevada and therefore, applies Washington law to Plaintiffs' claims.

3  B.    Alter Ego Claims

4         Plaintiff Hadnagy alleges Mr. Moss is the alter ego of Def Con and is thus "liable for the

5  obligations, debts, and liability of Defendant DEF CON arising under this Complaint." Dkt. 1-1,

6  ¶¶ 19–29.

7         A request to pierce the corporate veil is only a means of imposing liability for an

8  underlying cause of action and not a cause of action in and of itself. *Local 159, 342, 343 & 444*

9  *v. Nor-Cal Plumbing, Inc*., 185 F.3d 978, 985 (9th Cir. 1999). The following two elements must

10 be proven before the equitable remedy of corporate-veil piercing applies: 1) the corporate form is

11 used to violate or evade a legal obligation, and 2) corporate-veil piercing is necessary to prevent

12 a loss to an innocent party. *See Chadwick Farms Owners Ass'n v. FHC, LLC*, 166 Wash.2d 178,

13 200, 207 P.3d 1251 (2009); *Meisel v. M & N Modern Hydraulic Press Co*., 97 Wash.2d 403,

14 410–11, 645 P.2d 689 (1982); *Washington v. Davies*, 176 Wash. 100, 114, 28 P.2d 322 (1934).

15        The first element (evasion of a legal obligation) requires "an abuse of corporate form" to

16 the abuser's benefit and to the innocent party's detriment. *Meisel*, 97 Wash.2d at 410, 645 P.2d

17 689. The second element is whether corporate-veil piercing is necessary to prevent a loss to an

18 innocent party. This element focuses on whether the innocent party was harmed by the alter-ego

19 conduct, fraud, bad faith, or other legal-responsibility-evading conduct. *Meisel*, 97 Wash.2d at

20 410, 645 P.2d 689; *Morgan v. Burks*, 93 Wash.2d 580, 587, 611 P.2d 751 (1980). The corporate

21 cloak is not lightly thrown aside. *Grayson v. Nordic Const. Co*., 92 Wash. 2d 548, 553 (1979)

22 (absent fraud or manifest injustice, "the corporation's separate entity should be respected").

23

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 11

1   Because "fraud is a necessary element of the alter ego doctrine" a party pleading alter ego

2   must satisfy the heightened pleading standard of Rule 9(b). *A. Darino & Sons, Inc. v. Dist.*

3   *Council of Painters No. 33*, 869 F.2d 514, 519 (9th Cir. 1989)); *see also Ferrie v. Woodford*

4   *Rsch., LLC*, No. 3:19-CV-05798-RBL, 2020 WL 3971343, at *6 n.4, *8 (W.D. Wash. July 14,

5   2020).  For such claims, "a party must state with particularity the circumstances constituting

6   fraud or mistake." Fed. R. Civ. P. 9(b).

7           Plaintiffs repeat the elements of a veil-piercing claim and associated factors on

8   "information and belief" (*see*, *e.g.*, Dkt. 1-1, ¶¶ 20-28) but fail to allege sufficient facts to state a

9   prima facie case of alter ego liability under either Rule 8(a)'s notice standard or Rule 9(b)'s

10  heightened pleading standard applicable to this claim. *See Ferrie*, 2020 WL 3971343, at *8

11  (dismissing alter ego claim where the allegations are "conclusory" and "not [an] independent

12  cause[] of action"). In opposition, Plaintiffs contend the facts of fraud are within Def Con's

13  "exclusive control." However, Plaintiffs must still state the factual basis for their belief of

14  wrongdoing. Because alter ego is not an independent cause of action, Plaintiffs' claim is

15  dismissed insofar as they assert a separate cause of action under this theory.

16  C.    Defamation

17          "A defamation action consists of four elements: (1) a false statement, (2) publication, (3)

18  fault, and (4) damages." *Duc Tan v. Le*, 177 Wash.2d 649, 300 P.3d 356, 363 (Wash. 2013). A

19  plaintiff can allege the false statement prong by alleging facts showing that the statement is

20  provably false or "leaves a false impression due to omitted facts." *See Yeakey v. Hearst*

21  *Commc'ns, Inc.*, 156 Wash.App. 787, 234 P.3d 332, 335 (Wash. Ct. App. 2010) (citing *Mohr v.*

22  *Grant*, 153 Wash.2d 812, 108 P.3d 768, 773 (Wash. 2005)). "Defamation by implication occurs

23  when 'the defendant juxtaposes a series of facts so as to imply a defamatory connection between

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 12

1   them.'" *Corey v. Pierce Cty.*, 154 Wash.App. 752, 225 P.3d 367, 373 (Wash. Ct. App. 2010)

2   (quoting *Mohr*, 108 P.3d at 774). To proceed on a theory of defamation by implication, a

3   plaintiff must allege facts supporting all the elements of a defamation claim but may support the

4   first element by alleging that the statement is false or leaves a false impression. *See id.*; *see also*

5   *U.S. Mission Corp. v. Kiro TV, Inc.*, 172 Wash.App. 767, 292 P.3d 137, 141 (Wash. Ct. App.

6   2013).

7        Plaintiffs' defamation claim is based on false statements published on Defendants'

8   website in the 2/9/22 Transparency Report and the 1/13/23 Update, and additional statements

9   made by Defendant Moss to Black Hat representatives ("Injurious Falsehoods"). The Court

10  concludes Plaintiffs have sufficiently plead defamation as to the alleged false statements

11  published on Defendants' website but have not done so with regard to the Injurious Falsehoods.

12       1.    <u>2/9/22 Transparency Report</u>.  In the 2/8/22 Transparency Report, Defendants

13  announce Plaintiff Hadnagy's lifetime ban from the Event based on receipt of multiple code of

14  conduct violations. Defendants state they spoke to the reporting parties and to Plaintiff Hadnagy,

15  and thereafter concluded the severity of Plaintiff Hadnagy's "transgressions" merited a

16  permanent ban from Def Con. Defendants argue the statements contained in this publication are

17  mere non-actionable opinions. The Court disagrees. Defendants did not merely ban Plaintiffs

18  from the Event based on their right to associate with anyone they choose or based on an opinion.

19  Rather, Defendants clearly state they instituted the lifetime ban after receiving reports,

20  investigating reports, and confirming the severity of the reported transgressions. The omission of

21  details of the evidence and nature of the transgressions also leaves a false impression, leading to

22  the type of speculation alleged in Plaintiffs' Complaint. Plaintiffs allege Defendants' false

23  statements caused speculation and false rumors Plaintiff Hadnagy had committed the worst

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 13

1    sexual crimes, and that actual and potential clients began to terminate their relationships and

2    contracts with Plaintiffs following publication of the 2/9/22 Transparency Report. Plaintiffs

3    specifically point to an annual and lucrative teaching arrangement with Black Hat.

4           Plaintiffs contend the 7/28/22 Transparency Report further clarifies the defamatory

5    significance of the lifetime ban by stating: "[i]n the case of the most troubling offenses or those

6    who we feel may represent on ongoing risk to the community, we take the extra step of naming

7    them publicly." Plaintiff Hadnagy was named publicly so the logical inference is that he is an

8    "ongoing risk to the community." Defendants argue the 7/28/22 Transparency Report – which

9    was published months later – cannot be used to support a claim that the 2/9/22 Transparency

10   Report is defamatory, nor can it be considered the source of Plaintiffs' damages because it would

11   not have been considered by anyone before they cut ties with Plaintiff.

12          However, publications on Defendants' website are "refreshed" and repeated with each

13   later publication. Thus, the 2/9/22 Transparency Report is repeated in the 7/28/22 Transparency

14   Report and therefore, can, and conceivably were, read together. Dkt. 37, Ex. 1 at 4-6. Plaintiffs

15   allege both these publications exacted devasting damages on their business dealings. For

16   example, Plaintiffs allege that in February 2022, after publication of Plaintiffs' ban, Black Hat

17   also banned Plaintiffs from its conference where, Plaintiffs had received significant monetary

18   compensation for teaching classes. Plaintiff also allege they were damaged after publication of

19   the January 13, 2023 Update and that as of the filing of the Complaint, the defamatory

20   publications can still be seen on Defendants' website, which has over 400,000 followers.

21          2.    1/13/23 Update

22          In the January 13, 2023 Update, Defendants state that during their investigation, they

23   "spoke directly with Mr. Hadnagy about claims of his violations of our Code of Conduct. He

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 14

confirmed his behavior and agreed to stop. Unfortunately, the behavior did not stop." Dkt. 37, Ex. 3.

Defendants argue nothing in the Update is defamatory and because the language does not refer to sexual conduct or gender identifiers, it cannot reasonably be inferred Plaintiffs' ban from the Event was the result of sexual misconduct. This ignores Plaintiffs' allegations that the Update contains demonstrably false statements because Defendants refused to meet with Plaintiff Hadnagy and provide Plaintiff Hadnagy with information regarding the alleged "behavior"; perpetrators of rumors and online comments interpreted the ban was the result of sexual misconduct (*i.e.* referring to Plaintiff Hadnagy as the 'Harvey Weinstein of the infosec community'); and publication of the false statements damaged Plaintiffs' business dealings. This also ignores the plain implication of the statements in the Update, *i.e.*, that Plaintiff Hadnagy confirmed and admitted to committing acts that were so egregious, he had to be banned from the Event for the rest of his life – all statements Plaintiffs allege are demonstrably false.

### 3.   Allegations Regarding Black Hat

Plaintiffs allege they were regular participants at Black Hat's annual 6-day cybersecurity conference in Las Vegas, where Plaintiffs conducted classes for "significant monetary compensation, sometimes reaching into the six-figure range." Dkt. 1-1, ¶ 5. In February of 2022, Black Hat issued a ban of Plaintiffs from Black Hat's conference, "specifically in light of Defendants' publishing of the 'Transparency Report' and the online aftermath." *Id.* ¶76.

Plaintiffs further allege, on information and belief, that Defendant Moss, who is also a director of Black Hat, published false and defamatory statements, purportedly based on an investigation and evidence, to representatives of Black Hat to convince them to ban Plaintiffs from the Black Hat conference. *Id.* ¶78. These allegedly false and defamatory statements include

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 15

that Plaintiff Hadnagy perpetrated repeated severe and repugnant sexual harassment against various victims, Plaintiff Hadnagy admitted to perpetrating this harassment, and agreed to stop. (Referred to in Plaintiffs' Complaint as "Injurious Falsehoods"). Plaintiffs allege that because of these Injurious Falsehoods, coupled with publication of the 2/9/22 Transparency Report and 1/13/23 Update, Black Hat removed Plaintiff Hadnagy from its prestigious Review Board and banned Plaintiffs from the Black Hat Convention. *Id.* ¶¶78-80.

Plaintiffs allege facts sufficient to raise an inference that Defendant Moss, through his involvement in both Def Con and Black Hat, was involved in banning Plaintiffs from both events in the same month. However, the allegations of additional Injurious Falsehoods are without plausible factual content. To proceed on a claim of defamation, Plaintiffs must plausibly plead the alleged "false and defamatory" statements, *i.e.*, to whom, when, and where these statements were made.

In conclusion, the Court concludes Plaintiffs have sufficiently stated claims of defamation based on Defendants' publications of the 2/9/22 Transparency Report and the 1/13/23 Update on Def Con's website. The Court grants Defendants' motion to dismiss Plaintiffs' claims of "Injurious Falsehoods" by Defendant Moss to Black Hat representatives but also grants Plaintiffs leave to amend the Complaint to plead additional factual allegations to support this claim.

D.     Business Disparagement Claim

Plaintiffs allege that Defendants' disparaging remarks were intended to destroy Plaintiffs' reputations, which are paramount in the information security industry. Dkt. 1-1, Compl. ¶¶ 81, 88. Plaintiffs also allege Defendant Moss spread additional false and defamatory statements to Black Hat (*i.e.*, racially discriminatory employment practices and a gender-based hostile work

1  environment (*See id.*, ¶ 76). As explained above as to the Injurious Falsehoods, the "additional"

2  defamatory allegations are not properly plead as there are no facts explaining when, what, and to

3  whom the additional defamatory statements were made.

4         A statement may be published in circumstances that disparage the quality of the product

5  and at the same time imply the owner or vendor is dishonest, fraudulent, or incompetent, thus

6  affecting the owner or vendor's business reputation. In such circumstances, an action may be

7  brought for defamation as well as for disparagement. *Waechter v. Carnation Co.*, 5 Wash.App.

8  121, 126–27, 485 P.2d 1000 (1971). Here, the alleged defamatory statements are directed toward

9  Plaintiff Hadnagy's behavior and any damage to Plaintiffs' business interests flows directly from

10  that defamation. Although Plaintiffs believe and allege Defendants published the defamatory

11  statements about Plaintiff Hadnagy with the intent to harm Plaintiffs' reputation, there are no

12  allegations that Defendants disparaged the quality of Plaintiffs' products or services, *i.e.*

13  Plaintiffs' expertise in the tech industry – human error and the threat it poses to information

14  security as well as the application of scientifically proven methodologies to uncover

15  vulnerabilities, define risk, and provide remediation. Dkt. 1-1, ¶ 47.

16         Thus, Defendants' motion to dismiss Plaintiffs' disparagement claim is granted.

17  E.     Tortious Interference with Contractual Relations

18         To establish a cause of action for intentional interference with contractual relations, a

19  plaintiff must demonstrate: (1) the existence of a valid contract between the plaintiff and a third

20  party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed

21  to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of

22  the contractual relationship; and (5) resulting damage. *MP Med. Inc. v. Wegman*, 151 Wash.

23  App. 409, 425 (2009).

1     Plaintiffs allege that, prior to February 9, 2022, they had entered into several long-term

2 agreements for the provision of cybersecurity and IT services for various large national

3 corporations and law enforcement agencies, including Black Hat; defendants were aware of the

4 agreements; and many clients terminated their agreements based on the "Injurious Falsehoods".

5     Plaintiffs fail to state a plausible claim for tortious interference with contractual

6 relationships as they have failed to identify the existence of any valid contract in place at the

7 time the alleged defamation occurred. For example, Plaintiffs allege they enjoyed lucrative

8 annual contracts with Black Hat for training services at Black Hat's annual convention (Dkt. 1-1,

9 Compl. ¶¶ 75, 136-137) but do not allege they had a valid and existing contract with Black Hat

10 as of February 9, 2022, when the first alleged defamatory publication was made. Plaintiffs also

11 allege that "multiple of Plaintiffs' clients" terminated their agreements with Plaintiffs and cited

12 to the Injurious Falsehoods as the reason they were voiding the business agreements. *Id.*, ¶ 135.

13 However, Plaintiffs do not identify any clients or any existing contracts. In addition, and to the

14 extent Plaintiffs rely on the "Injurious Falsehoods" as the reason valid and existing contracts

15 were terminated, Plaintiffs have failed to properly plead those "Injurious Falsehoods".

16     Accordingly, the Court grants Defendants' motion to dismiss Plaintiffs' claim for tortious

17 interference with contractual relationships, with leave to amend for Plaintiffs to properly identify

18 existing contracts breached or disrupted because of Defendants' defamatory publications.

19 F.    Intentional Interference With Prospective Contractual Relations

20     To maintain this tortious interference with business relations claim, Plaintiffs must

21 establish: "(1) a prospective contractual relationship between the plaintiff and a third party; (2)

22 the defendant's knowledge of this prospective relationship; (3) the intent to harm the plaintiff by

23 preventing this relationship; (4) the absence of privilege or justification by the defendant; and (5)

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 18

actual harm to the plaintiff as a result." *Bombardier Inc. v. Mitsubishi Aircraft Corp*., 383 F. Supp. 3d 1169, 1188 (W.D. Wash. 2019) (citing *Evergreen Moneysource Mortg. Co. v. Shannon*, 167 Wash.App. 242, 274 P.3d 375, 383 (2012) (citing *Pleas v. City of Seattle*, 112 Wash.2d 794, 774 P.2d 1158, 1161 (1989)). Plaintiffs have failed to plausibly plead allegations to support this claim.

Plaintiffs allege they had been in negotiations with "multiple corporations and government organizations for prospective provision of cybersecurity and related services in conjunction with business activities and operations." Dkt. 1-1, Compl. ¶ 145. Plaintiffs also allege Defendants spread the "Injurious Falsehoods" to Black Hat representatives to prevent Plaintiffs from continuing to negotiate their annual teaching instructor agreements at the Black Hat conference.

As to the multiple corporations and government organizations, Plaintiffs' allegations are insufficient to state a claim for tortious interference with a business expectancy as Plaintiffs do not identify any third party with whom they had a prospective contractual relationship. Although an enforceable contract is not required to support a tortious interference action, there must be a relationship between parties contemplating a contract, with at least a reasonable expectancy of fruition. *Broten v. May*, 49 Wash.App. 564, 744 P.2d 1085, 1088 (1987). As to the Black Hat annual teaching instructor agreement, Plaintiffs allege Defendant Moss intentionally interfered with this prospective agreement by spreading the Injurious Falsehoods, which have not been properly plead.

Plaintiffs rely on *Motogolf.com, LLC v. Top Shelf Golf, LLC*, 528 F. Supp. 3d 1168 (D. Nev. 2021) for the proposition they can allege a "certain class" of prospective customers without identifying them specifically. *See* Dkt. 39 at 20. In *Motogolf.com*, however, the court predicted

1    the Supreme Court of Nevada would allow a plaintiff to allege a "certain class of prospective

2    customers without identifying them specifically" when the defendant's alleged wrongdoing had

3    prevented those customers from learning of the plaintiff's existence. *See id*. This does not

4    alleviate Plaintiffs' burden to identify the specific, known persons or entities with whom they

5    were allegedly negotiating.

6          The Court grants Defendants' motion to dismiss Plaintiffs' claim for tortious interference

7    with prospective business relationships, but grants Plaintiffs leave to amend their Complaint to

8    identify the third party or parties with whom they had prospective business arrangements and

9    allege facts supporting each element of this claim.

10   G.    Unjust Enrichment, Quantum Meruit, and Injunctive Relief Claims

11         1.    Unjust Enrichment

12         "Unjust enrichment is the method of recovery for the value of the benefit retained absent

13   any contractual relationship because notions of fairness and justice require it." *Young v. Young*,

14   164 Wash.2d 477, 484, 191 P.3d 1258 (2008). A claim for unjust enrichment consists of three

15   elements: (1) plaintiff conferred a benefit upon the defendant, (2) the defendant had knowledge

16   or appreciation of the benefit, and (3) the defendant's acceptance or retention of the benefit

17   without payment of its value is inequitable under the circumstances. *See Youn*g, 164 Wash.2d at

18   484, 191 P.3d 1258 (quoting *Bailie Commc'ns, Ltd. v. Trend Bus. Sys., Inc*., 61 Wash.App. 151,

19   159–60, 810 P.2d 12, 814 P.2d 699, *review denied*, 117 Wash.2d 1029, 820 P.2d 511 (1991)).

20         Plaintiffs argue their claim of unjust enrichment seeks payment for allegedly growing the

21   Event, instead of rendering services at the Event. Dkt. 39 at 21:22–23. However, for an

22   enrichment to be inequitable to retain, the person conferring the benefit must have a reasonable

23   expectation of payment and the circumstances are such that equity and good conscience require

payment for the conferred benefit. Plaintiffs do not allege Defendants induced them to provide the alleged benefits — the creation of the SEVillage (and associated capture-the-flag event) and "investing substantial resources" into the Event — or promised any kind of payment to Defendants for doing so. *See* Compl. ¶¶ 159–66. In fact, after Defendants rebuffed Plaintiffs' requests for payment requests in 2012, Plaintiffs continued to provide the SEVillage at the Event for years. Compare Compl. ¶¶ 50, 163 (Defendants rejected Mr. Hadnagy's requests for payment but changed Event rules in 2012 to allow Mr. Hadnagy to start accepting third-party sponsorship compensation), with *id*. ¶¶ 45, 46, 58 (Mr. Hadnagy hosted the SEVillage in person or virtually from 2010 to 2022). Therefore, Plaintiffs could have no "reasonable" expectation of payment.

Plaintiffs also allege they derived significant benefit from their involvement in the Event, including "a lot of attention, exposure, and income from Sponsorships during the operation of the SEVillage" (Dkt. 1-1, ¶ 50); the generation of "a considerable portion of Plaintiffs' business agreements . . . through their operation of the SEVillage" (*id*. ¶ 133); hosting a standalone social engineering convention in 2020 due to "the overwhelmingly positive feedback over the years at SEVillage" (*id*. ¶ 52); and even procuring a personal meeting with the director of the National Security Agency (*id*. ¶ 47).

Based on these allegations, the Court concludes Plaintiffs have failed to state a plausible claim for unjust enrichment and grant Defendants' motion to dismiss this claim.

### 2. Quantum Meruit

Quantum meruit is a specific equitable theory that falls within the broader category of "unjust enrichment." *Young v. Young*, 164 Wash.2d 477, 486, 191 P.3d 1258 (2008). Washington law distinguishes between quantum meruit claims and unjust enrichment claims. *Young*, 164 Wash.2d at 484–85, 191 P.3d 1258. Unjust enrichment refers to a method of recovery when,

1    without any direct contractual relationship between parties, one party retains a benefit it has not

2    paid for. *Id*. at 484, 191 P.3d 1258. Quantum meruit is a more specific subcategory of unjust

3    enrichment requiring a contract implied in fact between parties: The parties must show a "mutual

4    intention ... to contract with each other." *Id*. at 485, 191 P.3d 1258. Though the two concepts

5    have slightly different labels, both refer to the same general type of relief.

6      The concept of quantum meruit arises in two contexts: contract and restitution. In an

7    action based on a contract implied-in-fact (*i.e.*, when the parties intended to contract and

8    promises were exchanged, the general obligations for which must be sufficiently clear), quantum

9    meruit may be employed as a gap filler to supply absent terms. *Aegean Mar. Petroleum S.A. v.*

10    *KAVO Platanos M/V*, 646 F. Supp. 3d 1347, 1358 (W.D. Wash. 2022). Quantum meruit may

11    also provide restitution for unjust enrichment. *Id*. In this context, quantum meruit imposes

12    liability for the market value of services as a remedy for unjust enrichment. *Id*. (citing *Certified*

13    *Fire Prot. Inc.*, 128 Nev. at 380–81). The plaintiff must establish each element of unjust

14    enrichment to demonstrate entitlement to the remedy of quantum meruit. *Id*. at 1107 n.4.

15      Plaintiffs have not plead an implied-in-fact contract. There are no allegations the parties

16    intended to contract, exchanged promises, or created sufficient clear obligations pursuant to

17    promises to contract. Further, because Plaintiffs' unjust enrichment claim fails (as discussed

18    above), quantum meruit's application as a remedy for unjust enrichment also fails.

19      3.    <u>Injunctive Relief Claim</u>

20      Injunctive relief is a remedy, not a separate cause of action. *Iliescu, Tr. of John Iliescu,*

21    *Jr. & Sonnia Iliescu 1992 Fam. Tr. v. Reg'l Transp. Comm'n of Washoe Cnty.*, 522 P.3d 453,

22    457 (2022) (upholding dismissal of injunctive relief as an independent cause of action and

23    collecting cases); *McKee v. Gen. Motors Co.*, 601 F. Supp. 3d 901, 910 (W.D. Wash. 2022),

aff'd, 2023 WL 7318690 (9th Cir. Nov. 7, 2023). Plaintiffs do not dispute that injunctive relief is a remedy, not a separate cause of action. Dkt. 37 at 36:5–11.

Based on the foregoing, the Court grants Defendants' motion to dismiss Plaintiffs' claims of unjust enrichment, quantum meruit, and injunctive relief.

<u>CONCLUSION</u>

Accordingly, it is **ORDERED**:

1.      Defendants' motion to dismiss Plaintiffs' Alter Ego, Business Disparagement; Unjust Enrichment, Quantum Meruit, and Injunction claims is **GRANTED** and these claims are **dismissed**.

2.      Defendants' motion to dismiss Plaintiffs' Defamation claims as to the 2/9/22 Transparency Report and the 1/13/23 Update is **DENIED**.

3.      Defendants' motion to dismiss Plaintiffs' Defamation Claim (as to "Injurious Falsehoods" by Defendant Moss); and Tortious Interference with Contractual Relations and Prospective Business Relations Claims is **GRANTED, with leave to amend.**

4.      Plaintiffs may file an Amended Complaint consistent with this Order **on or before April 22, 2024.**

DATED this 28th day of March, 2024.

BRIAN A. TSUCHIDA
United States Magistrate Judge