THE HONORABLE BRIAN A. TSUCHIDA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHRISTOPHER J. HADNAGY, an individual;
and SOCIAL-ENGINEER, LLC, a
Pennsylvania limited liability company,

Plaintiffs,

v.

JEFF MOSS, an individual; DEF CON
COMMUNICATIONS, INC., a Washington
corporation; and DOES 1-10; and ROE
ENTITIES 1-10, inclusive,

Defendants.

No. 2:23-cv-01932-BAT

DECLARATION OF MARK CONRAD IN
SUPPORT OF PLAINTIFFS' MOTION
FOR LEAVE TO FILE AMENDED
COMPLAINT

I, Mark Conrad, declare under penalty of perjury under the laws of Washington State as follows:

1.       I am one of the attorneys representing Plaintiffs Christopher Hadnagy and Social-Engineer, LLC.

2.       I am over the age of 18, and competent to testify to the matters set forth herein; and make this declaration of my own personal knowledge.

3.       Attached hereto as **Exhibit A** is a true and correct copy of Proposed Amended Complaint.

4.       Through further investigation and discovery into this matter, we have learned that Defendants evidently recognized the need to provide clarity to the statements within the

DECLARATION OF MARK CONRAD IN SUPPORT
OF PLAINTIFFS' MOTION FOR LEAVE TO FILE
AMENDED COMPLAINT - Page 1

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

1  Transparency Reports after publishing them. The reports clearly left readers with the false

2  implication that Plaintiff Hadnagy was a sexual predator posing a danger to the community.

3  Despite this recognition, we are not aware that the Defendants ever provided any clarification on

4  the false implications and instead continued to provide updates.

5

6  I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF

7  WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT.

8

9  DATED this 28th day of June 2024 in Seattle, Washington.

10  FREY BUCK,

11

12  By: _____
    Mark Conrad, WSBA #48135

13

14

15

16

17

18

19

20

21

22

23

DECLARATION OF MARK CONRAD IN SUPPORT
OF PLAINTIFFS' MOTION FOR LEAVE TO FILE
AMENDED COMPLAINT - Page 2

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies under the penalty of perjury according to the laws of the United States and the State of Washington that on this date I caused to be served in the manner noted below a copy of this document entitled **DECLARATION OF MARK CONRAD IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINT** on the following individuals:

David Perez, WSBA #43959
Matthew J. Mertens (Pro Hac Vice)
Lauren A. Trambley (Pro Hac Vice)
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
dperez@perkinscoie.com
mmertens@perkinscoie.com
ltrambley@perkinscoie.com

[   ]   Via USPS
[X]   Via Electronic Mail
[   ]   Via Electronic Filing (CM/ECF)


DATED this 28th day of June 2024 at Seattle, Washington.


_____
Amber Holmes, Legal Assistant

DECLARATION OF MARK CONRAD IN SUPPORT
OF PLAINTIFFS' MOTION FOR LEAVE TO FILE
AMENDED COMPLAINT - Page 3

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

Exhibit A

1  COMP
Kristofer Z. Riklis, Esq.
2  Nevada Bar No. 14754
Riklis Law, PLLC
3  871 Coronado Center Dr., Suite 200
Henderson, NV 89052
4  Telephone: (702) 720-6471

5

Attorneys for CHRISTOPHER J. HADNAGY
6  and SOCIAL-ENGINEER, LLC,

7

8

9                                  THE HONORABLE BRIAN A. TSUCHIDA

10

11                          UNITED STATES DISTRICT COURT
12                       WESTERN DISTRICT OF WASHINGTON
                                    AT SEATTLE
13

14  CHRISTOPHER J. HADNAGY, an          Case No. 2:23-cv-01932-BAT
    individual; and SOCIAL-ENGINEER, LLC, a
15  Pennsylvania limited liability company,   **FIRST AMENDED COMPLAINT**

16           Plaintiffs,

17       v.

18  JEFF MOSS, an individual; DEF CON
    COMMUNICATIONS, INC., a Washington
19  corporation; and DOES 1-10; and ROE
    ENTITIES 1-10, inclusive,
20
             Defendants.
21

22

23                          CLARK COUNTY, NEVADA

24

25

26                   **FIRST AMENDED COMPLAINT**

27       For their First Amended Complaint (the, "COMPLAINTFAC") against Defendants JEFF

28  MOSS ("MOSS"), an individual, and DEF CON COMMUNICATIONS, INC. ("DEF CON"), a

1

1   Washington corporation, (collectively, the "DEFENDANTS"); Plaintiffs CHRISTOPHER J.

2   HADNAGY and SOCIAL-ENGINEER, LLC ("PLAINTIFFS") hereby allege as follows:

3   <u>**I.      JURISDICTION AND VENUE**</u>

4   1.  This is an action for damages and equitable relief resulting from defamation, tortious

5   interference with contractual relations, and other breaches arising out of DEFENDANTS' conduct.

6   2.  Defendant MOSS is the founder of Defendant DEF CON and is registered as the

7   corporation's governor.

8   3.  Defendant MOSS organized Defendant DEF CON for the purpose of conducting an

9   annual conference in Las Vegas, Nevada (the "Event"), which is typically held each August.

10  4.  According to Defendant DEF CON's website, this year's Event will be held August 10,

11  2023 through August 13, 2023, at Caesars Forum, 3911 South Koval Lane, Las Vegas, Nevada

12  89109.

13  5.  Defendant MOSS has full power to decide which contributors will be allowed to attend

14  the Event, and he regularly attends and conducts business at the Event.

15  6.  As of the filing of this ~~Complaint~~FAC, Defendant DEF CON's active Twitter Page

16  provides the location of Las Vegas, NV as its only location.

17  7.  This Court has subject matter jurisdiction over this action under Article 6, Section 6 of

18  the Nevada Constitution and based upon the DEFENDANTS' conduct in Clark County, Nevada.

19  8.  The amount in controversy is more than $15,000; therefore, this case is brought in the

20  District Court of the Eighth Judicial District in and for the county of Clark, State of Nevada.

21  9.  This Court has jurisdiction over this action pursuant to NRS 14.065 and NRS 4.370(1).

22  10.  Personal jurisdiction over the DEFENDANTS in this matter is proper on the basis that

23  PLAINTIFFS' causes of action arose in Clark County, Nevada. DEFENDANTS specifically

24  availed themselves to the jurisdiction of Clark County, Nevada, by their conduct in relation to the

25  annually reoccurring Event. Pursuant to their website, DEFENDANTS have targeted this forum

26  every year for the past thirty years to solicit attendance at the Event. Pursuant to Defendant DEF

27  CON's website, the Event is "one of the oldest continuously running hacker conventions around,

28  and also one of the largest."

1      11.  The defamation and tortious interference perpetrated by DEFENDANTS were

2  expressly directed at the Event and other similar conferences which only occur in Clark County,

3  Nevada and are governed by the rules of Clark County, Nevada.

4      12.  PLAINTIFFS are informed and believe, and based thereon, allege that venue is proper

5  in the District Court of Nevada pursuant to NRS 13.010 and 13.040 because the Parties conducted

6  significant business in Clark County, Nevada.

7  **II.**      **PARTIES**

8      13.  PLAINTIFFS repeat and reallege the allegations contained in paragraphs 1 through

9  12, inclusive of this ~~COMPLAINT~~FAC and incorporate the same herein by reference, as though

10  fully set forth herein.

11      14.  Plaintiff CHRISTOPHER J. HADNAGY ("HADNAGY") is, and at all times relevant

12  herein was an adult individual who presently resides in Orange County, Florida.

13      15.  Plaintiff SOCIAL-ENGINEER, LLC ("SOCIAL-ENGINEER") is, and at all times

14  relevant herein was a Limited Liability Company organized under the laws of the Commonwealth

15  of Pennsylvania.

16      16.  Upon information and belief, Defendant Jeff Moss, ("MOSS"), who also refers to

17  himself online as "The Dark Tangent", is and was, at all times relevant hereto an adult individual

18  who presently resides in King County, Washington.

19      17.  Upon information and belief, Defendant DEF CON COMMUNICATIONS, INC.,

20  ("DEF CON"), is and was, at all times relevant hereto, a limited liability company organized under

21  the laws of the state of Washington.

22      18.  Pursuant to Rule 10(a) of the Nevada Rules of Civil Procedure, *Nuremberger*

23  *Hercules-Werker GMBH v. Virostek*, 107 Nev. 873, 822 P.2d 1100 (1991), and other applicable

24  law, PLAINTIFFS sue the defendants designated herein as Doe Individuals and Roe Corporations,

25  the true names and capacities of whom are unknown to PLAINTIFFS at this time. PLAINTIFFS

26  are informed, believe, and thereon allege, that Defendants designated as Doe and/or Roe herein

27  were in some manner involved in and/or are responsible for the acts, omissions, events,

28  happenings, and/or offenses alleged in this ~~COMPLAINT~~FAC and/or directly and proximately

3

1 caused or are responsible for the damages and/or relief sought herein. PLAINTIFFS will seek

2 leave of Court to amend this ~~COMPLAINT~~FAC to name the defendants designated as Doe or Roe

3 herein when their true names and capacities are ascertained.

4 ~~**III.**~~     ~~**ALTER EGO ALLEGATIONS**~~

5 ~~19.  PLAINTIFFS repeat and reallege the allegations contained in paragraphs 1 through~~

6 ~~18, inclusive of this COMPLAINT and incorporate the same herein by reference, as though fully~~

7 ~~set forth herein.~~

8 ~~20.  PLAINTIFFS are further informed, believe, and thereon allege, that there now exists,~~

9 ~~and at all times material hereto, existed, such a unity of interest and ownership between~~

10 ~~DEFENDANTS that the individuality and separateness between the DEFENDANTS has ceased,~~

11 ~~and DEFENDANTS are merely alter egos of each other.~~

12 ~~21.  PLAINTIFFS are further informed, believe, and thereon allege, that there now exists,~~

13 ~~and at all times material hereto, existed, such a unity of interest and ownership between~~

14 ~~DEFENDANTS and Defendant Doe individuals and Roe entities (the "Fictitious Defendants") that~~

15 ~~the individuality and separateness between the DEFENDANTS and the Fictitious Defendants has~~

16 ~~ceased, and they are merely alter egos of each other.~~

17 ~~22.  Upon information and belief, adherence to the fiction of the separate existence of~~

18 ~~DEFENDANTS and the Fictitious Defendants would, under the circumstances, sanction a fraud~~

19 ~~and promote injustice.~~

20 ~~23.  Upon information and belief, Defendant Moss has exercised such dominant control~~

21 ~~over Defendant DEF CON, so much so that Defendant DEF CON serves as the alter ego of~~

22 ~~Defendant Moss.~~

23 ~~///~~

24 ~~///~~

25 ~~///~~

26 ~~///~~

27 ~~///~~

28 ~~24.  In point of fact, PLAINTIFFS are informed, believe, and thereon allege that Defendant~~

4

1   DEF CON:

2              a.   Does not maintain sufficient corporate books or records nor does it have

3                   consistent corporate minutes;

4              b.   Does not hold regular meetings for its members;

5              c.   Has allowed Defendant MOSS to usurp, assert, and maintain responsibility of

6                   the financial control and day-to-day decision-making for Defendant DEF CON;

7              d.   Was funded and continues to be funded utilizing personal assets of Defendant

8                   MOSS; and

9              e.   Has disregarded such other and further corporate formalities as yet to be

10                  discovered.

11       25.   The lack of adherence to corporate formality in conjunction with the individual

12   influence by Defendant MOSS perpetrated upon Defendant DEF CON has blurred the line

13   between individual and corporation, and has henceforth subjected Defendant MOSS to personal

14   liability for actions and/or inactions of Defendant DEF CON.

15       26.   In point of fact, it is believed and therefore averred that there became such unity of

16   ownership and interest that any corporate separateness between Defendant DEF CON and

17   Defendant Moss ceased and/or never existed.

18       27.   As such, Defendant MOSS is liable for the actions, inactions, omissions, commissions,

19   debts, liabilities, and conduct of Defendant DEF CON, specifically for the events set forth and

20   arising under this Complaint.

21       28.   To therefore adhere to the normal attributes of separate corporate existence between

22   Defendants MOSS and DEF CON would sanction a fraud, promote injustice, and/or lead to

23   evasion of legal and financial obligations.

24       29.   By reason of the aforesaid, as the alter ego of Defendant DEF CON, Defendant MOSS

25   is liable for the obligations, debts, and liability of Defendant DEF CON arising under this

26   Complaint.

27   ///

28       30.   Upon information and belief, and under the circumstances detailed above contained

165794241.3

1   within this COMPLAINT, PLAINTIFFS should, therefore, be entitled to seek execution against

2   the assets of all and/or any of the above-named defendants.

3   **IV.III. FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

4   31.19.  PLAINTIFFS repeat and reallege the allegations contained in paragraphs 1 through

5   30, inclusive of this COMPLAINTFAC and incorporate the same herein by reference, as though

6   fully set forth herein.

7   **A. Defendant DEF CON.**

8   32.20.  Defendant DEF CON is organized for the purpose of conducting an annual hacker

9   conference in Las Vegas, Nevada, which, according to their website, is held each August.

10   33.21.  For the purposes of the ComplaintFAC, the term "hacker" refers to a person who

11   uses computers to gain unauthorized access to data. Despite the negative connotation surrounding

12   the term "hacker", a hacker can also be defined as an individual utilizing computer, networking,

13   and/or technology skills to address and/or overcome technical problems and/or to ensure that

14   digital information remains secure in the custody of its owners.

15   34.22.  Since the founding of the Event, Defendant MOSS has been and continues to be

16   known as the sole creator of the Event, and he regularly attends and conducts business at there.

17   35.23.  Defendant MOSS has the power to single-handedly dictate the subject matter,

18   contributors, format, and other key terms for each scheduled gathering at the Event.

19   36.24.  As previously alleged, Defendant MOSS incorporated Defendant DEF CON for the

20   purpose of conducting the annual Event.

21   37.25.  The Event is one of the world's largest hacker conventions, and typically hosts

22   professionals to speak about IT-related and/or hacking-related subjects. The Event is highly

23   regarded in the information security (infosec) and tech industries, the international business

24   community, and by law enforcement agencies; its reputation and legitimacy have grown

25   exponentially since its inception in 1993.

26   ///

27   ///

28   38.26.  The initial Event took place in 1993 and has annually recurred only in Las Vegas,

165794241.3

1 Nevada. Attendance includes law enforcement agencies and representatives from large

2 corporations attempting to identify security issues within their organizations, solutions thereto, and

3 hire the appropriate businesses to consult and implement these solutions.

4 ~~39.~~27.  Defendant DEF CON's website boasts that the Event itself "provides a forum for

5 open discussion between participants, where radical viewpoints are welcome and a high degree of

6 skepticism is expected."

7 ~~40.~~28.  In addition to speakers, the Event also hosts a multitude of "villages" and/or

8 workshops, i.e. break-out sessions that invite smaller groups of attendees for speeches on

9 particular topics, and to participate in various cyber-security challenges, competitions, and/or

10 demonstrations related to different topics.

11 / / /

12 ~~41.~~29.  The Event also allows attendees to participate in hacking-related "games", such as

13 Capture the Flag (CTF), which is a hacking competition where teams of hackers attempt to attack

14 and defend computers and/or networks.

15 **B. PLAINTIFFS and Their Contributions to the Event Throughout the Years.**

16 ~~42.~~30.  Plaintiff HADNAGY is the founder and CEO of Plaintiff SOCIAL-ENGINEER.

17 ~~43.~~31.  PLAINTIFFS regularly provide services to business entities in Nevada and

18 nationwide including certain high-profile clientele that have terminated their

19 contracts/relationships with Plaintiff SOCIAL-ENGINEER and have refused to do business with

20 PLAINTIFFS as a direct result of DEFENDANTS' breaches as detailed herein.

21 ~~44.~~32.  For years prior to February of 2022, DEFENDANTS encouraged the attendance

22 and participation of PLAINTIFFS at the Event.

23 ~~45.~~33.  PLAINTIFFS first actively participated in and acted as the host of a village at the

24 Event starting in 2010 at DEF CON 18, and PLAINTIFFS essentially developed the popular

25 Social-Engineer Capture the Flag ("SECTF") game.

26 ~~46.~~34.  Accordingly, up until February of 2022, PLAINTIFFS were esteemed participants

27 in the Event, and ended up hosting one of the most attended "villages" at the Event, ("the

28 SEVillage"). From the inaugural year of the SEVillage, it was a stand-out event that attracted

7

1  participants in unrivaled fashion and remains the only "village" to receive the esteemed "black

2  badge" award in its first year. Defendant MOSS encouraged and supported PLAINTIFFS in their

3  development of the SEVillage as it considerably bolstered the promotional value of the Event.

4      47.35.  The SEVillage focused primarily on PLAINTIFFS' area of expertise in the tech

5  industry – human error and the threat it poses to information security as well as the application of

6  scientifically proven methodologies to uncover vulnerabilities, define risk, and provide

7  remediation. PLAINTIFFS invested countless hours and resources in attending the Event and

8  developing the SEVillage.

9      48.36.  The SEVillage became extremely popular by and amongst attendees, with the

10  break-out session requiring a 13,000 square foot space to host all willing and eager participants,

11  who waited in a que spanning three flights of stairs and spilling out into the casino. The SEVillage

12  created substantial fanfare at the Event and was always the first "village" to open at the Event. .

13  Year after year, Defendant MOSS sought out and warmly welcomed PLAINTIFFS' attendance,

14  contributions and participation throughout the Event.

15      49.37.  One year of the Event, the Director of the National Security Administration

16  requested to attend the SEVillage and meet Plaintiff HADNAGY. After the meeting, the Director

17  of the National Security Administration awarded Plaintiff HADNAGY the "NSA Director Coin".

18      50.38.  Originally, DEFENDANTS prohibited any organizations, such as Plaintiff

19  SOCIAL-ENGINEER, from accepting monetary compensation in exchange for promoting other

20  brands (the "Sponsorships") during or in relation to a hosted "village" at the Event. However, in or

21  about 2012, DEFENDANTS changed that restrictive policy against Sponsorships in light of

22  PLAINTIFFS' lobbying for a change in the rule. PLAINTIFFS' lobbying was in large part due to

23  the success of the SEVillage. Accordingly, PLAINTIFFS garnered a lot of attention, exposure, and

24  income from Sponsorships during the operation of the SEVillage.

25  **C. DEFENDANTS' Sudden Attempts to Destroy PLAINTIFFS' Business Reputations.**

26      51.39.  Due to the rise of COVID, the in-person portion of the Event was cancelled for

27  2020; the Event was held in a hybrid format in 2021. In order to create continuity for the

28  SEVillage, PLAINTIFFS successfully held portions of the SEVillage virtually in 2020 and 2021.

8

52.40.  Due to the overwhelmingly positive feedback over the years at SEVillage, PLAINTIFFS successfully hosted a standalone social engineering convention in February 2020 in Orlando, Florida.

53.41.  At or around September of 2021, Plaintiff HADNAGY was made aware that Defendant MOSS was considering false and disparaging allegations leveled against Plaintiff HADNAGY by a third party. On information and belief, said false allegations related to Plaintiff SOCIAL-ENGINEER's purported efforts to secure confidential personal identifiable information that was in the custody of a third party and prevent its wrongful redistribution. Plaintiff HADNAGY immediately attempted to schedule a meeting to discuss said false allegations with Defendant MOSS via text message; however, Defendant MOSS never granted Plaintiff HADNAGY a meeting to discuss the nature of the false and disparaging allegations.

54.42.  Plaintiff HADNAGY continued to attempt to confer with Defendant MOSS via text message regarding the false allegations up through January of 2022; however, Defendant MOSS never held a meeting with Plaintiff HADNAGY regarding the false allegations.

55.43.  Meanwhile, and during the time period from September 2021 through January 2022, Defendant DEF CON was receiving submissions for the 2022 Event contributors and villages, and it became increasingly evident to PLAINTIFFS that DEFENDANTS were delaying any meeting with PLAINTIFFS.

56.44.  Accordingly, PLAINTIFFS decided not to participate in the 2022 Event, and notified DEFENDANTS on or about January 22, 2022 that PLAINTIFFS would be taking the SEVillage to another convention and not holding it at the Event.

57.45.  Then, suddenly and without warning, on or around February 9, 2022, DEFENDANTS informed Plaintiff HADNAGY that neither he nor Plaintiff SOCIAL-ENGINEER could attend, contribute to, or participate at the Event moving forward.

58.46.  On or about February 9, 2022, even though PLAINTIFFS had not physically participated in Event since August of 2019 (the SEVILLAGE was virtual only in 2020 and 2021), Defendant MOSS authored and published a "Transparency Report" on Defendant DEF CON's website, which stated as follows:

"We received multiple CoC violation reports about a DEF CON Village leader, Chris Hadnagy of the SE Village. **After conversations with the reporting parties and Chris, we are confident the severity of the transgressions merits a ban from DEF CON.**"[1] (emphasis added).

~~59.~~47.   Per DEFENDANTS, this lifetime ban on PLAINTIFFS' attendance, contribution, and participation was allegedly based on unspecified violations of Defendant DEF CON's "Code of Conduct", and excluded PLAINTIFFS from the Event indefinitely. Notably, DEFENDANTS did not articulate any issues pertaining to PLAINTIFFS' alleged attempts to secure confidential personal identifiable information that was in the custody of a third party and prevent its wrongful redistribution.

~~60.~~48.   In or about 2015, Defendant MOSS published the "Code of Conduct" to Defendant DEF CON's website. The Code of Conduct is a short statement governing the Event and focuses on harassment: "harassment […] includes deliberate intimidation and targeting individuals in a manner that makes them feel uncomfortable, unwelcome, or afraid." The Code of Conduct also states that "[Event] staff will be happy to help participants contact hotel security, local law enforcement, or otherwise assist those experiencing harassment […]"

~~61.~~49.   PLAINTIFFS vehemently deny any violations of the Code of Conduct at any point in time.

~~62.~~50.   Plaintiff HADNAGY made multiple follow up requests to Defendant MOSS in order to address any allegations against him regarding the alleged Code of Conduct violations; however, DEFENDANTS ignored each such request. DEFENDANTS never provided any support or explanation of the allegations to PLAINTIFFS regarding their abrupt termination of Plaintiffs' attendance, contribution, and participation at the Event.

~~63.~~51.   According to a post credited to Defendant MOSS on Defendant DEF CON's website, the overarching policy underlying the "Transparency Report" clearly and falsely intimates that Plaintiff HADNAGY was a repeat perpetrator of egregious violations of the Code of

---

[1] https://defcon.org/html/links/dc-transparency.html.

165794241.3

1   conduct that were potentially criminal in nature. [2]

2       ~~64.~~52.  Despite the foreseeable and not unreasonable reaction and interpretation of those in

3   the infosec industry - that the Plaintiff HADNAGY was being accused of sexual misconduct as

4   was the case when other individuals had been named in previous Transparency Reports -

5   DEFENDANTS never clarified in any format the fact that the false allegations they made against

6   PLAINTIFFS were in reference to conduct that was not in any way related to the Event.

7   Specifically, DEFENDANTS never clarified that the false allegations purportedly occurred in

8   connection with PLAINTIFFS' separate business endeavors and attempts to secure confidential

9   information by enforcing their contractual non-disclosure rights and remedies, completely separate

10  and apart from the Event, which PLAINTIFFS had not attended for the past two (2) years.

11      ~~65.~~53.  PLAINTIFFS are informed and believe that DEFENDANTS did not care about the

12  truth, nor did they attempt to investigate the allegations in question.  As such, the DEFENDANTS

13  became willing participants in a scheme to enrich itself and to damage PLAINTIFFS' reputations,

14  wrongly interfere with PLAINTIFFS' contractual relations, and prevent PLAINTIFFS from

15  expanding their business and social engineering conference and/or taking the SEVillage to a

16

17  _____

[2] The transparency report states:

18      "When we receive a report of a Code of Conduct violation, our leadership team
         representing multiple functions and departments, conducts a review of the
19      substance in consultation with our attorney as needed. This usually involves
         speaking with parties named in the report including potential witnesses, alleged
20      offender(s), and victim(s).

21      We then review all the evidence available to us through community reports, news
         media, and internal investigations to determine whether the allegations are
22      substantiated. Most of the reports we receive are for minor violations that result in a
         warning, but severe allegations may require a referral to hotel security and/or law
23      enforcement, especially if the report includes claims of criminal behavior.  [...]

        Repeat offenders and those who commit more egregious offenses are permanently
24      banned from our events. In the case of the most troubling offenses or those who we
         feel may represent an ongoing risk to the community, we take the extra step of
25      naming them publicly. We believe we have an obligation to the community not to
         provide cover for these individuals to quietly find new and unsuspecting victims
26      elsewhere. [...] We've adopted these safeguards based on recommendations from
         the National Network to End Domestic Violence and the Violence Against Women
27      Office at the US Department of Justice."

28

                                           11

1    different conference, as demonstrated by PLAINTIFFS' unmerited ban, and false and defamatory

2    claims that they conducted an investigation and Plaintiff HADNAGY admitted to anything, which

3    he vehemently denies.

4    **D. Predictable and Intentional Resulting Backlash.**

5    66.54.   DEFENDANTS' publication of the defamatory Transparency Report created an

6    immediate and foreseeable widespread firestorm of social media commentary, Twitter retweets

7    and comparable online posts, that include assumptions that Plaintiff Hadnagy was a sexual

8    predator and similar reactions to the news of Plaintiff Hadnagy's alleged violations and ban.

9    67.55.   DEFENDANTS had only ever named sexual predators in publications of lifetime

10   bans similar to the "Transparency Report". It was therefore likely and foreseeable that the infosec

11   industry and tech community at large, would note and respond to the Transparency Report, which

12   they did. Specifically, various false rumors spread rampantly across public forums and social

13   media pages alleging that Plaintiff HADNAGY had committed the worst of sexual crimes

14   individually and in conjunction with his operation of Plaintiff SOCIAL-ENGINEER.

15   68.56.   This online firestorm amplified the false and defamatory Transparency Report and

16   DEFENDANTS' false representations that Defendant HADNAGY admitted to any transgressions.

17   69.57.   For example, on February 10, 2022, an article entitled "DEF CON bans social

18   engineering expert Chris Hadnagy," authored by Shaun Nichols, was published via

19   TechTarget.com.[3]

20   70.58.   By way of background, TechTarget.com is a renowned and well-known news

21   source serving the tech community.

22   71.59.   According to that article, Plaintiff Hadnagy, "an influential figure at the DEF CON

23   security conference, was permanently banned following allegations of misconduct at the annual

24   Las Vegas gathering."

25   72.60.   The article goes on to state that Plaintiff HADNAGY was accused of violations,

26

27   _____

     [3] *https://www.techtarget.com/searchsecurity/news/252513274/DEF-CON-bans-social-*
28   *engineering- expert-Chris-Hadnagy.*

                                                  12

1    but that no specifics regarding those violations were provided by DEFENDANTS.

2    ~~73.~~61.   Immediately after the publication of the "Transparency Report" and the uproar in

3    the business community, actual and potential clients of PLAINTIFFS began to terminate their

4    relationships and contracts with PLAINTIFFS, specifically citing the "Transparency Report"

5    published by DEFENDANTS. These engagements included but are not limited to teaching

6    engagements, speaking engagements, and long-term business service agreements.

7    ~~74.~~62.   A plethora of both PLAINTIFFS' clients and potential clients have refused to do

8    business with PLAINTIFFS since the defamatory statements were published.

9    ~~75.~~63.   The cancelled engagements include other Nevada-based Cybersecurity conferences

10   such as a 6-day Cybersecurity conference hosted annually by Black Hat USA ("Black Hat") in Las

11   Vegas, Nevada. Black Hat's Las Vegas convention is the focal point of what Black Hat's website

12   represents is the most respected information security event series internationally. PLAINTIFFS

13   were regular participants in Black Hat's conference at which they conducted classes for significant

14   monetary compensation, sometimes reaching into the six-figure range.

15   ~~76.~~64.   In or about February of 2022, Black Hat's representatives issued a ban of

16   PLAINTIFFS from Black Hat's conference, specifically in light of DEFENDANTS' publishing of

17   the "Transparency Report" and the online aftermath thereof.

18   ~~77.~~65.   According to Black Hat's website, Defendant MOSS is a Director of Black Hat.

19   ~~78.~~66.   Plaintiffs are informed and believe and thereby allege that Defendant MOSS

20   published the defamatory statements to representatives of Black Hat in order to convince them to

21   institute and maintain a ban on PLAINTIFFS, and to exact further damage on PLAINTIFFS'

22   business and personal reputations. On information and belief, these false defamatory statements

23   (the, "Injurious Falsehoods") included, but were not limited to, the following:

24              a.   Plaintiff HADNAGY perpetrated repeated sexual harassment against various

25                   victims, as an individual, and as the Chief Executive Officer of Plaintiff

26                   SOCIAL-ENGINEER (the, "Acts").

27              b.   The Acts were severe and repugnant.

28              c.   DEFENDANTS determined that the Acts occurred based upon their purported

13

1     investigation and evidence presented.

2         d.   DEFENDANTS confronted Plaintiff HADNAGY with the subject allegations

3              and he both admitted to the Acts, and stated that he would cease the Acts.

4         e.   Despite his representations to the contrary, Plaintiff HADNAGY continued the

5              Acts, and was thereon banned from the Event.

6         f.   The "Transparency Report" published by Defendant MOSS to Defendant DEF

7              CON's website on February 9, 2022.

8         g.   The Update to the "Transparency Report" published by Defendant MOSS to

9              Defendant DEF CON's website on January 13, 2023.

10    ~~79.~~67.  As a direct result of DEFENDANTS' false, defamatory statements, Plaintiffs are

11    informed, believe, and thereon allege that Black Hat removed Plaintiff HADNAGY from its

12    prestigious Review Board, and banned PLAINTIFFS from the Black Hat convention in Las

13    Vegas, Nevada.

14        ~~80.~~68.  In an update (the, "Update") posted to Defendant DEF CON's website on January

15    13, 2023, Defendant MOSS continued to author false and defamatory comments:

16        "During our investigation we spoke directly with Mr. Hadnagy about claims of his
          violations of our Code of Conduct. He confirmed his behavior, and agreed to stop.
17        Unfortunately, the behavior did not stop.

18        Before DEF CON finalized our response, Mr. Hadnagy informed us that his Social
          Engineering Village would not be returning to DEF CON.
19

20        Our investigation also revealed that DEF CON is not the only security conference
          to receive complaints about Mr. Hadnagy's behavior. For example, Black Hat
21        received complaints, conducted their own investigation and removed Mr. Hadnagy
          from their Review Board."[4]
22

23    ~~///~~

24        ~~81.~~69.  DEFENDANTS continued to willfully publish disparaging and defamatory

25

26    _____

27    [4] Defcon.org/html/links/dc-news.html. This update was in regard to the United States' District
      Court of Pennsylvania's dismissal without prejudice of PLAINTIFFS' initial lawsuit for
      defamation and tortious interference; that Court found a lack of personal jurisdiction in
28    Pennsylvania.

165794241.3

1   Injurious Falsehoods about PLAINTIFFS to a targeted group of industry professionals with the

2   requisite intent to destroy PLAINTIFFS' businesses and reputations and interfere with

3   PLAINTIFFS' various contracts. PLAINTIFFS' reputations are instrumental for their business

4   models.

5   82.70.  As a result of DEFENDANTS' defamatory statements and the publishing of the

6   Injurious Falsehoods to third parties, and wrongly interfering with various known contractual

7   relations of PLAINTIFFS, including but not limited to representatives of Black Hat,

8   PLAINTIFFS' business dealings have been decimated.

9   83.71.  DEFENDANTS' Transparency Reports, including the defamatory "Transparency

10  Report" and update thereto, are and have been readily accessible via Defendant DEF CON'S

11  website.

12  84.72.  DEFENDANTS have refused to communicate with Plaintiff HADNAGY, offering

13  absolutely no further explanation, public or private, as to any allegations of his conduct constituted

14  a violation of the Code of Conduct.

15  85.73.  As a result, PLAINTIFFS have suffered, and continue to suffer, detrimental harm

16  to their reputations and business relationships as set forth herein.

17  86.74.  Several of PLAINTIFFS' longstanding clients, the largest of which have office(s)

18  located in Las Vegas, Nevada, terminated their contract(s) with PLAINTIFFS and specifically

19  stated their grounds for termination were the Injurious Falsehoods that DEFENDANTS posted in

20  the form of the February 9, 2022 "Transparency Report" and the January 13, 2023 update thereto.

21  87.75.  DEFENDANTS' continuing actions cause irreversible damage to PLAINTIFFS'

22  reputation and goodwill.

23  88.76.  DEFENDANTS were clearly motivated by ill-will, spite, malice, revenge, and envy

24  of PLAINTIFFS due to PLAINTIFFS' stated intent to remove the SEVillage from the Event and

25  conduct it in a different venue, thereby removing the benefits of the extremely successful

26  SEVillage from DEFENDANTS.

27  ///

28  89.77.  Multiple of PLAINTIFFS' clients and prospective clients began to

15

1    uncharacteristically terminate their contracts with PLAINTIFFS or reject deals for reasons that

2    arise from their interpretations of the Injurious Falsehoods and the "Transparency Report" and

3    update thereto.

4         90.78.  As of the filing of this COMPLAINTFAC, various individuals within the industry

5    and attendees of the Event have continued to contact PLAINTIFFS regarding the false defamatory

6    statements and also to post publicly to various forums including but not limited to Twitter as to

7    their misguided interpretations of the Injurious Falsehoods and to speculate as to the reason that

8    PLAINTIFFS were banned from the Event.

9         91.79.  As a direct result of DEFENDANTS' conduct, PLAINTIFFS were forced to file

10   this action. PLAINTIFFS would not have had to file and incur the cost of this legal proceeding if

11   DEFENDANTS had not defamed PLAINTIFFS, wrongly interfered with various known

12   contractual relations of PLAINTIFFS, and abided by standards of professionalism and decency.

13        92.80.  On information and belief, DEFENDANTS have continued to publish the Injurious

14   Falsehoods as of the filing of this COMPLAINTFAC.

15        93.81.  To date, PLAINTIFFS have already suffered monetary loss and other damage due

16   to DEFENDANTS' breaches.

17        94.82.  PLAINTIFFS' longstanding participation in the Event by and through its

18   substantial following of the SEVillage and other central operations in the Event created a

19   reasonable expectation that PLAINTIFFS' extensive efforts to promote the Event and "villages"

20   therein would be compensated for via a long and fruitful management of the SEVillage and related

21   ventures. As a result of DEFENDANTS' conduct, PLAINTIFFS were deprived of these

22   reasonable expectations and business opportunities which were effectively usurped by

23   DEFENDANTS. Specifically, DEFENDANTS have replaced the SEVillage with another similar

24   "village" that was meant to attract the same audience that attended the SEVillage prior to the

25   DEFENDANTS' injurious breaches. This new village is even called the "Social Engineering

26   Community Village".

27   ///

28        95.83.  PLAINTIFFS also seek injunctive relief regarding DEFENDANTS' publishing of

16

the defamatory Injurious Falsehoods, the "Transparency Report" and "Update" thereto, and related defamatory information contained in private and public forums to be remove as it has prevented PLAINTIFFS from conducting their ordinary business and that DEFENDANTS must cease their defamatory publishing of statements regarding PLAINTIFFS, remove all public online posts, and issue a clarification or retraction. Instead of focusing on the growth and maintenance of its previously esteemed endeavors, PLAINTIFFS have been forced into addressing disdain and false controversies that DEFENDANTS have not hesitated to thrust into the public eye and targets the heart of PLAINTIFFS' business: their reputation.

96.84.  PLAINTIFFS also seek monetary damages for DEFENDANTS' breaches and to pay PLAINTIFFS' losses in full including, without limitation, lost business revenues, public relations expenses, legal expenses, and attorneys' fees.

## **FIRST CAUSE OF ACTION**

### **(For Defamation/Defamation by Implication against all DEFENDANTS)**

97.85.  PLAINTIFFS repeat and re-allege the allegations in the preceding paragraphs of this COMPLAINTFAC as if fully set forth herein.

98.86.  DEFENDANT MOSS published false and defamatory factual statements, including the Injurious FalsehoodsTransparency Report and Update regarding Plaintiff HADNAGY to third parties via various means, including but not limited to orally and in writings that were held out to the public at large and ratified in multiple posts made on Defendant DEF CON's website.

99.87.  DEFENDANT MOSS published false and defamatory factual statements, including the Injurious FalsehoodsTransparency Report and Update regarding Plaintiff HADNAGY in his capacity as the Chief Executive Officer of Plaintiff SOCIAL-ENGINEER and the operator of the SEVillage to third parties via various means, including but not limited to orally and in writings that were held out to the public at large and ratified in multiple posts made on Defendant DEF CON's website.

100.88.  Defendant DEF CON publicly instituted a lifetime ban against Plaintiff HADNAGY, individually and as Chief Executive Officer of Plaintiff SOCIAL-ENGINEER. The expressly stated grounds for Defendant DEF CON's lifetime ban include the Injurious

165794241.3

1  ~~Falsehoods~~Transparency Report and Update and references that would readily understood by the

2  public to infer that Plaintiff Hadnagy had committed acts of sexual misconduct.

3    ~~101.~~89.  Both on their face, and because of the facts and circumstances known to persons

4  who read or heard the statements, it was reasonably understood that DEFENDANTS meant to

5  convey that Plaintiff HADNAGY and Plaintiff SOCIAL-ENGINEER were the targets of the

6  ~~Injurious Falsehoods~~Transparency Report and Update, and the perpetrators of ~~the~~ egregious and

7  false acts.

8    ~~102.~~90.  DEFENDANTS' publication and dissemination of the statements of the ~~Injurious~~

9  ~~Falsehoods~~Transparency Report and Update exposed PLAINTIFFS to hatred, contempt, ridicule,

10 and shame, and discouraged others from associating or dealing with PLAINTIFFS.

11   ~~103.~~91.  DEFENDANTS knew, should have known, or intended that the dissemination of

12 information contained in the Transparency Report and Update would be widespread and reach

13 many, if not all of PLAINTIFFS' business associates and potential business associates.

14   ~~104.~~92.  Due to DEFENDANTS' position and status in the infosec and Cybersecurity

15 communities, DEFENDANTS knew, should have known, or intended that reasonable minds

16 digesting the DEFENDANTS' published ~~Injurious Falsehoods~~Transparency Report and Update on

17 their face would think the absolute worst of Plaintiff HADNAGY and his business endeavors,

18 including but not limited to Plaintiff SOCIAL-ENGINEER.

19 ~~Plaintiffs are informed, believe, and thereupon allege that~~ / / /

20   ~~105.~~93.  Defendant MOSS was aware of the negative impact the false allegations would

21 have on the reputations of both PLAINTIFFS and that they would interfere with PLAINTIFFS'

22 contracts and business.

23   ~~106.~~94.  Due to DEFENDANTS' publishing of the ~~Injurious Falsehoods~~Transparency

24 Report and Update, many business associates assumed that whatever Plaintiff HADNAGY,

25 individually and as Chief Executive Officer of SOCIAL-ENGINEER, had been accused of must

26 have been abhorrent, particularly because the Event typically condones extreme and/or unique

27 behavior.

28   ~~107.~~95.  DEFENDANTS' publishing of the ~~Injurious Falsehoods~~Transparency Report and

1    Update has irreparably damaged the reputation of PLAINTIFFS since they falsely depicted them

2    in an unfavorable light. Similar publicly stated lifelong bans before Plaintiff HADNAGY's were

3    the result of allegations of sexual abuse and sexually predatory behavior on the part of former

4    participants in the Event.

5         108.96.  Since the ~~Injurious Falsehoods~~Transparency Report and Update did not state with

6    specificity how Plaintiff HADNAGY allegedly violated the "Code of Conduct,~~,~~," omitted

7    materials facts, and juxtaposed a series of facts so as to imply a defamatory connection between

8    them, reasonable individuals viewing ~~the Injurious Falsehoods~~them interpreted them to mean that

9    there were despicable facts underlying the ban and that Plaintiff HADNAGY was a sexual

10   predator of the worst order. This false interpretation of the ~~Injurious Falsehoods~~Transparency

11   Report and Update was proliferated online and quickly shrouded PLAINTIFFS in an irreversible

12   scandal of the worst degree; in one exemplary post, Plaintiff HADNAGY was referred to as the

13   "Harvey Weinstein" of the infosec community by an onlooker who interpreted the ~~Injurious~~

14   ~~Falsehoods~~Transparency Report and Update published by DEFENDANTS. This is just one of

15   many examples of how Plaintiff HADNAGY suffered a tarnished reputation due to

16   DEFENDANTS' foregoing conduct.

17        109.97.  As a result of DEFENDANTS' purposeful publishing the defamatory statements,

18   DEFENDANTS have exacted devastating damages on the business dealings of Plaintiff

19   HADNAGY as an individual.

20        110.98.  As a result of DEFENDANTS' publishing the defamatory statements,

21   DEFENDANTS have exacted devastating damages on the business dealings of Plaintiff SOCIAL-

22   ENGINEER due to Plaintiff HADNAGY being the face of Plaintiff SOCIAL-ENGINEER and his

23   founding of Plaintiff SOCIAL-ENGINEER being the focus of his entire adult life.

24        111.99.  DEFENDANTS' defamatory statements and ~~Injurious Falsehoods~~Transparency

25   Report and Update published to third parties were not privileged and they were published on a

26   public forum that was viewable by anyone in the world, and linked to all of Defendant DEF

27   CON's social media channels, including Defendant DEF CON's Twitter page, which currently has

28   over four hundred thousand (400,000) followers.

1      112.100. PLAINTIFFS are informed, believe, and thereon allege that DEFENDANT

2  MOSS also published the ~~Injurious Falsehoods~~Transparency Report and Update to other key

3  leaders in the Cybersecurity industry, including but not limited to the organizers of the annual

4  Black Hat convention in Las Vegas, Nevada.

5      113.101. PLAINTIFFS are informed, believe, and thereon allege that DEFENDANT

6  MOSS published additional false and defamatory statements to other key leaders in the

7  Cybersecurity industry including but not limited to organizers of Black Hat. ~~These additional false~~

8  ~~and defamatory statements include, but are not limited to:~~

9          ~~a.  PLAINTIFFS' employment practices are illegal and discriminatory against~~

10            ~~protected class members of specific races and genders.~~

11          ~~b.  Plaintiff SOCIAL-ENGINEER's employment practices are illegal and enable~~

12            ~~Plaintiff HADNAGY to perpetrate a hostile work environment against~~

13            ~~protected class members of specific genders.~~

14      114.102. DEFENDANT MOSS undertook these efforts out of ill-will and spite for

15  PLAINTIFFS and their desire to exact revenge against PLAINTIFFS for attempting to move the

16  SEVillage to an alternative location.

17      115.103. DEFENDANTS' defamatory statements have interfered with PLAINTIFFS'

18  business and are aimed directly at PLAINTIFFS' goods, services, and reputations.

19      116.104. DEFENDANTS' defamatory "Transparency Report", the "Update" thereto~~, and~~

20  ~~Injurious Falsehoods~~ are false.

21      117.105. DEFENDANTS made the defamatory statements and ~~Injurious Falsehoods~~

22  knowing they were false or had serious doubts about the truth of the statements or in the

23  alternative were reckless or at least negligent in making the defamatory statements.

24      118.106. As a result, PLAINTIFFS have suffered damages in an amount to be proven at

25  trial according to proof, including but not limited to, harm to their reputation, emotional harm,

26  exposure to contempt, ridicule, and shame, and threats to their businesses.

27      119.107. DEFENDANTS have falsely and materially damaged PLAINTIFFS' reputations

28  through unprivileged channels. PLAINTIFFS have suffered material loss of business exceeding

1  the annual sum of one million dollars and incurred extensive damages as a result of

2  DEFENDANTS' conduct.

3       120.108. Through the week prior to the filing of this COMPLAINTFAC, DEFENDANTS

4  have allowed all of their posts to remain online, and PLAINTIFFS are still receiving inquiries and

5  backlash as to DEFENDANTS' public statements, which PLAINTIFFS are informed, believe and

6  allege will likely continue.

7  ///

8       121.109. In making the defamatory statements referred to herein above, DEFENDANTS

9  acted with malice, oppression, or fraud, and are thus responsible for punitive damages in an

10 amount to be proven at trial.

11                          **SECOND CAUSE OF ACTION**

12              **(For ~~Business Disparagement~~Invasion of Privacy/False Light against all**

13                                **DEFENDANTS)**

14      122.110. PLAINTIFFS repeat and re-allege the allegations in the preceding paragraphs of

15 this COMPLAINTFAC as if fully set forth herein.

16      111.DEFENDANTS  DEFENDANTS' disclosure of the Transparency Report and the

17 Update were published the false and disparaging on Defendants' Website, which is accessible

18 globally. DEFENDANTS' statements have been widely publicized to the tech community as well

19 as the general public. This disclosure was thus a public disclosure.

20      112. DEFENDANTS' disclosure of the Transparency Report and Injurious Falsehoods

21 regardingthe Update put PLAINTIFFS on in a false light because they were defamatory

22 statements, as alleged above, which left false impressions on the public.

23      113. DEFENDANTS' disclosure of the Transparency Report and the Update were

24 expressly aimed at PLAINTIFFS since PLAINTIFF Mr. Hadnagy was explicitly named, as an

25 individual and as the leader of SOCIAL-ENGINEER's Village.

26      114. The false light that was perpetrated by DEFENDANTS' disclosure of the

27 Transparency Report and the Update is highly offensive to a reasonable person for the reasons

28 alleged above. These reasons include but are not limited to the defamation by implication that

1  PLAINTIFFS were guilty of predatory conduct discussed herein.

2      115. Defendants made the defamatory statements of the Transparency Report and the

3  Update knowing they were false or had serious doubts about the truth of the statements or in the

4  alternative were reckless or at least negligent in making the defamatory statements.

5      116. Defendant MOSS was aware of the negative impact the Transparency Report and the

6  Update would have on the reputations of both PLAINTIFFS and that they would interfere with

7  PLAINTIFFS' contracts and business.

8      117. DEFENDANTS did not care about the truth, nor did they attempt to investigate the

9  allegations in question.  As such, the DEFENDANTS became willing participants in a scheme to

10  enrich itself and to damage PLAINTIFFS' reputations, wrongly interfere with PLAINTIFFS'

11  contractual relations, and prevent PLAINTIFFS from expanding their business and social

12  engineering conference and/or taking the SEVillage to a different conference, as demonstrated by

13  PLAINTIFFS' unmerited ban, and false and defamatory claims that they conducted an

14  investigation and Plaintiff HADNAGY admitted to anything, which he vehemently denies.

15      118. DEFENDANTS' publication of the defamatory Transparency Report created an

16  immediate and foreseeable widespread firestorm of social media commentary, Twitter retweets

17  and comparable online ~~pages and in other~~ posts, that include assumptions that Plaintiff Hadnagy

18  was a sexual predator and similar reactions to the news of Plaintiff Hadnagy's alleged violations

19  and ban. DEFENDANTS have refused to communicate with Plaintiff HADNAGY, offering

20  absolutely no further explanation, public or private, as to any allegations of his conduct constituted

21  a violation of the Code of Conduct.

22      119. Furthermore, when DEFENDANTS had the opportunity to clarify the firestorm, they

23  refused, and instead doubled down on the public outcry by and through the Update. The Update

24  was DEFENDANTS' second attempt to invade PLAINTIFFS' privacy and cast false light on

25  them.

26      120.DEFENDANTS were clearly motivated by ill-will, spite, malice, revenge, and envy of

27  PLAINTIFFS due to PLAINTIFFS' stated intent to remove the SEVillage from the Event and

28  conduct it in a different venue, thereby removing the benefits of the extremely successful

1 | SEVillage from DEFENDANTS.

2 | 121. As a result, PLAINTIFFS have suffered damages in an amount to be proven at trial

3 | according to proof, including but not limited to, harm to their reputation, emotional harm,

4 | exposure to contempt, ridicule, and shame, and threats to their businesses.

5 | 123.122. DEFENDANTS have falsely and materially damaged PLAINTIFFS' reputations

6 | through unprivileged channels to an. PLAINTIFFS have suffered material loss of business

7 | exceeding the annual sum of one million dollars and incurred extensive group of people,

8 | including, but not limited to any potential visitor to Defendant DEF CON's website or Social

9 | Media channels.damages as a result of DEFENDANTS' conduct.

10 | 124.DEFENDANTS' publishing of these Injurious Falsehoods has interfered with

11 | PLAINTIFFS' businesses and contractual relationships and are aimed directly at PLAINTIFFS'

12 | operations, services, reputations, and clients.

13 | 125.DEFENDANTS conveyed these Injurious Falsehoods by unprivileged publication

14 | with requisite intent of malice and ill-will.

15 | 126.As a direct and proximate result of DEFENDANTS' publishing of the Injurious

16 | Falsehoods against PLAINTIFFS, the DEFENDANTS have deprived PLAINTIFFS of the benefits

17 | of their normal business operations.

18 | 127.DEFENDANTS' conduct entitles PLAINTIFFS to monetary damages, including

19 | special damages, interest, and costs pursuant to law.

20 | 128.PLAINTIFFS' losses as a result of the DEFENDANTS' breaches are continuing and

21 | PLAINTIFFS reserve the right to seek the full and exact amount of their damages at the time of

22 | trial.

23 | 129.In perpetrating the breaches referred to herein above, DEFENDANTS acted with

24 | malice, oppression, or fraud, and are thus responsible for punitive damages in an amount to be

25 | proven at trial according to proof.

26 | ///

27 | **THIRD CAUSE OF ACTION**

28 | **(For Intentional Interference with Contractual Relations against all DEFENDANTS)**

23

1    130. PLAINTIFFS repeat and re-allege the allegations in the preceding paragraphs of this

2    COMPLAINT as if fully set forth herein.

3    131. Prior to February 9, 2022, PLAINTIFFS had entered into several long-term

4    agreements for the provision of Cybersecurity and IT services for various large national

5    corporations and law enforcement agencies.

6    132. DEFENDANTS had knowledge of PLAINTIFFS' foregoing agreements for the

7    provision of products and/or services related to the advancement of cybersecurity and IT.

8    133. DEFENDANTS were aware of PLAINTIFFS' various clients and related agreements

9    because a considerable portion of PLAINTIFFS' business agreements were secured through leads

10   generated by way of their operation of the SEVillage.

11   134. Defendant MOSS has historically single-handedly recruited and maintained

12   relationships with contributors and attendees at the Event and was aware of PLAINTIFFS'

13   clientele who attended the Event.

14   135. Multiple of PLAINTIFFS' clients terminated their engagements with PLAINTIFFS

15   and cited to the Injurious Falsehoods as the reason that they were voiding any and all business

16   agreements.

17   136. DEFENDANTS also sought out other Cybersecurity conventions who worked with

18   PLAINTIFFS, such as Black Hat, in order to improperly interfere with any business arrangements

19   that allowed PLAINTIFFS to attend or operate in conjunction with other Cybersecurity

20   conventions, such as Black Hat's convention in Las Vegas, Nevada.

21   137. PLAINTIFFS entered into annual agreements with Black Hat to be "Training

22   Instructors" at their annual convention in Las Vegas, Nevada. DEFENDANTS were aware of

23   these annual agreements because Defendant MOSS has been listed as a Director of Black Hat

24   since 2018, and he also regularly attended Black Hat's annual conference and met Plaintiff

25   HADNAGY there.

26   ///

27   138. DEFENDANTS have intentionally and improperly acted with design to disrupt the

28   aforementioned agreements in order to harm PLAINTIFFS' business operations and prevent them

24

1  from fostering the SEVillage community, which would have directly competed with the Event.

2      139. DEFENDANTS have in fact actually disrupted several of the aforementioned

3  agreements and business arrangements.

4      140. As a direct and proximate result of DEFENDANTS' intentional disruptions of the

5  aforementioned agreements, the DEFENDANTS have benefited and deprived PLAINTIFFS of the

6  benefits of various bargained-for exchanges, for which substantial amounts of PLAINTIFFS'

7  services and monetary sums were invested.

8      141. DEFENDANTS' conduct entitles PLAINTIFFS to monetary damages, including

9  interest and costs pursuant to law.

10      142. PLAINTIFFS' losses as a result of the DEFENDANTS' breaches are continuing and

11  PLAINTIFFS reserve the right to seek the full and exact amount of its damages at the time of trial.

12      143. In perpetrating the breaches referred to herein above, DEFENDANTS acted with

13  malice, oppression, or fraud, and are thus responsible for punitive damages in an amount to be

14  proven at trial according to proof.

15  **FOURTH CAUSE OF ACTION**

16  **(For Intentional Interference with Prospective Economic Advantage**

17  **against DEFENDANTS)**

18      144. PLAINTIFFS repeat and re-allege the allegations in the preceding paragraphs of this

19  COMPLAINT as if fully set forth herein.

20      145. PLAINTIFFS had been in negotiations with multiple corporations and government

21  organizations for prospective provision of cybersecurity and related services in conjunction with

22  business activities and operations.

23      146. DEFENDANTS had knowledge of the prospective clientele base of PLAINTIFFS

24  because a considerable portion of PLAINTIFFS' clients were secured through leads generated by

25  way of their operation of the SEVillage.

26      147. DEFENDANTS had knowledge that PLAINTIFFS were annual participants in Black

27  Hat's capstone conference that takes place in Las Vegas, Nevada.

28      148. DEFENDANTS further spread the Injurious Falsehoods publicly in order to prevent

1    PLAINTIFFS' consummation of certain services contracts.

2         149.DEFENDANTS further spread the Injurious Falsehoods publicly and to

3    representatives from Black Hat in order to prevent PLAINTIFFS from continuing to negotiate

4    their annual agreements to be a "teaching instructor" at clinics that reoccur annually at the Black

5    Hat conference in Las Vegas, Nevada. DEFENDANTS were aware of these annual agreements

6    because Defendant MOSS has been listed as a Director of Black Hat since 2018, and he also

7    regularly attended Black Hat's annual conference and met Plaintiff HADNAGY there

8         150.In light of the "Transparency Report", the Injurious Falsehoods, and the lifetime ban

9    from Defendant DEF CON, these prospective clients stated that they could not continue

10   negotiations with PLAINTIFFS for said business arrangements.

11        151.In light of Defendant MOSS' publishing the Injurious Falsehoods to representatives of

12   Black Hat, Black Hat elected not to enter into agreement with PLAINTIFFS for its services at

13   Black Hat's annual conference in Las Vegas, Nevada.

14        152.DEFENDANTS did not have privilege to state the Injurious Falsehoods or other

15   defamatory statements publicly and to prospective clients of PLAINTIFFS.

16        153.DEFENDANTS have in fact actually prevented the consummation of several

17   prospective agreements by spreading the Injurious Falsehoods regarding PLAINTIFFS.

18        154.Defendant MOSS intends to disrupt additional agreements in this same manner and

19   utilizing the distribution channels of Defendant DEF CON.

20        155.As a direct and proximate result of DEFENDANTS' intentional disruptions of the

21   foregoing agreements, the DEFENDANTS have deprived PLAINTIFFS of the benefits of various

22   bargained-for exchanges.

23        156.DEFENDANTS' conduct entitles PLAINTIFFS to monetary damages, including

24   interest and costs pursuant to law.

25   ///

26        157.PLAINTIFFS' losses as a result of the DEFENDANTS' breaches are continuing and

27   PLAINTIFFS reserve the right to seek the full and exact amount of damages at the time of trial.

28        158.123. In perpetrating the breaches In making the defamatory statements referred to

                                              26

1   herein above, DEFENDANTS acted with malice, oppression, or fraud, and are thus responsible for

2   punitive damages in an amount to be proven at trial according to proof.

3   **FIFTH CAUSE OF ACTION**

4   **(For Unjust Enrichment against all DEFENDANTS)**

5   159. PLAINTIFFS repeat and re-allege the allegations in the preceding paragraphs of this

6   COMPLAINT as if fully set forth herein.

7   160. PLAINTIFFS conferred material benefits upon DEFENDANTS by way of provision

8   of extensive services in furtherance of the Event, including but not limited to operating the

9   SEVillage, creating the SECTF competition, and investing substantial resources to the immense

10   growth of the "villages" at the Event.

11   161. DEFENDANTS accepted the benefits of PLAINTIFFS' investment: DEFENDANTS

12   amassed a robust following, skyrocketed attendance, and increased revenues.

13   162. DEFENDANTS received considerable following and attendance at the Event that was,

14   at least in part, due to the draw of the SEVillage; DEFENDANTS did not provide PLAINTIFFS

15   with any compensation for their activities.

16   163. Upon PLAINTIFFS' requests to be compensated for the foregoing, DEFENDANTS

17   refused but allowed them to accept some Sponsorship compensation from third parties.

18   DEFENDANTS thus retained the benefits of the PLAINTIFFS' investment into the SEVillage

19   without compensating PLAINTIFFS for the same.

20   164. As a direct and proximate cause of DEFENDANTS' actions, PLAINTIFFS have

21   suffered damages in excess of Fifteen Thousand Dollars ($15,000.00), plus interest, in an amount

22   to be determined at the time of trial.

23   165. By virtue of DEFENDANTS' acts, and the damages suffered by PLAINTIFFS,

24   PLAINTIFFS are entitled to pre-judgment interest at the highest rate allowed by law.

25   166. Also, as a further direct and proximate result of DEFENDANTS' actions,

26   PLAINTIFFS have been required to retain the services of an attorney to prosecute this action and

27   have been damaged thereby; as such, PLAINTIFFS are entitled to an award of reasonable

28   attorneys' fees and costs.

1    SIXTH CAUSE OF ACTION

2    (For Quantum Meruit against all DEFENDANTS)

3    167. PLAINTIFFS repeat and re-allege the allegations in the preceding paragraphs of this

4    COMPLAINT as if fully set forth herein.

5    168. PLAINTIFFS conferred benefits on DEFENDANT in the form of promotional

6    materials related to the SEVillage, travel expenses, and other monies paid for promoting the

7    Event, the CTF game, and the SEVillage.

8    169. DEFENDANTS accepted and received the benefits and value of payments made and

9    PLAINTIFFS reasonably expected that the value would be returned pursuant to the long-term

10   partnership with DEFENDANTS related to the Event. However, the lifetime ban and the related

11   tortious behavior alleged herein created additional damages for PLAINTIFFS, and they never

12   received the value of the invested costs in the promotion of the Event.

13   170. PLAINTIFFS should be compensated in quantum meruit.

14   171. PLAINTIFFS have sustained damages in excess of Fifteen Thousand Dollars

15   ($15,000.00), due to DEFENDANTS' tortious conduct and lifetime ban.

16   172. As a direct and proximate cause of DEFENDANTS' actions, PLAINTIFFS have

17   suffered damages in excess of Fifteen Thousand Dollars ($15,000.00), plus interest, in an amount

18   to be determined at the time of trial.

19   173. By virtue of DEFENDANTS' acts, and the damages suffered by PLAINTIFFS,

20   PLAINTIFFS are entitled to pre-judgment interest at the highest rate allowed by law.

21   174. Also, as a further direct and proximate result of DEFENDANTS' actions,

22   PLAINTIFFS have been required to retain the services of an attorney to prosecute this action and

23   have been damaged thereby; as such, PLAINTIFFS are entitled to an award of reasonable

24   attorneys' fees and costs.

25   SEVENTH CAUSE OF ACTION

26   (For Injunctive Relief against DEFENDANTS)

27   175. PLAINTIFFS repeat and re-allege the allegations in the preceding paragraphs of this

28   COMPLAINT as if fully set forth herein.

165794241.3

1    ~~176.The acts and omissions of DEFENDANTS as described in the preceding paragraphs~~

2    ~~have caused and will continue to cause irreparable harm to PLAINTIFFS.~~

3    ~~177.PLAINTIFFS enjoy a reasonable likelihood of success on the merits of its claims~~

4    ~~asserted in this COMPLAINT.~~

5    ~~178.A permanent injunction against DEFENDANTS is warranted to enjoin them from~~

6    ~~continuing their breaches, publicly disparaging and defaming PLAINTIFFS, and tortiously~~

7    ~~interfering with PLAINTIFFS' business contracts.~~

8    ~~///~~

9    ~~///~~

10   ~~///~~

11   ~~///~~

12   ~~///~~

13   ~~///~~

14   ~~///~~

15   ~~///~~

16   ~~///~~

17   ~~///~~

18   ~~///~~

19   ~~///~~

20   ~~///~~

21   ~~///~~

22   ~~///~~

23   ~~///~~

24   ~~///~~

25                          **PRAYER FOR RELIEF**

26          Wherefore, based on the foregoing, PLAINTIFFS pray that this Court provide the

27   following relief as follows:

28          a)   For actual, consequential, special, and incidental damages against the DEFENDANTS

29

1        in an amount in excess of $15,000 for each of the above-mentioned causes of action;

2    b)  For punitive damages;

3    c)  For a temporary restraining order;

4    d)  For preliminary injunctive relief

5    e)  For permanent injunctive relief;

6    f)   For reasonable attorneys' fees and costs incurred;

7    g)  For prejudgment interest;

8    h)  For such other relief at law or in equity to which the Court deems proper.

9                                    **<u>DEMAND FOR JURY TRIAL</u>**

10       PLAINTIFFS hereby demand a jury trial in accordance with Rule 38 of the Nevada Rules

11   of Civil Procedure on all issues so triable.

12   **<u>Respectfully Submitted:</u>**

13   **<u>FREY BUCK, P.S.</u>**

14

15   _____
     Ted Buck, WSBA #22029

16   Mark Conrad, WSBA #48135
     *Attorneys for Plaintiffs*

17

18

19

20

21

22

23

24

25

26

27

28

165794241.3