1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

THE HONORABLE BRIAN A. TSUCHIDA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHRISTOPHER J. HADNAGY, an
individual; and SOCIAL-ENGINEER,
LLC, a Pennsylvania limited liability
company,

               Plaintiffs,

    v.

JEFF MOSS, an individual; DEF
CON COMMUNICATIONS, INC., a
Washington corporation; and DOES 1-
10; and ROE ENTITIES 1-10,
inclusive,

               Defendants.

No. 2:23-cv-01932-BAT

**DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

**Noted For Consideration: March 21,
2025**

**ORAL ARGUMENT REQUESTED**

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT – 1 (No. 2:23-cv-01932-BAT)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1

**TABLE OF CONTENTS**

2    INTRODUCTION ................................................................................................ 5

3    STATEMENT OF MATERIAL FACTS .............................................................. 7

4        A.    Jeff Moss, Def Con, and the Code of Conduct ................................. 7

5        B.    Christopher Hadnagy ........................................................................ 8

6        C.    Maxie Reynolds's allegations .......................................................... 8

7        D.    Discussions with Hadnagy .............................................................. 10

8        E.    The Def Con Zoom call .................................................................. 11

9        F.    Def Con posts the Transparency Report and Transparency Update,
                and Black Hat independently bans Hadnagy. ................................. 16

10

11       G.    Discovery confirms widespread misconduct by Hadnagy ............. 18

12   PROCEDURAL HISTORY ............................................................................... 23

13   SUMMARY JUDGMENT STANDARD ........................................................... 24

14   ARGUMENT .................................................................................................... 25

15   I.    Hadnagy has not proven the falsity of any statement. ........................... 26

16       A.    The Transparency Report is true and thus not defamatory ............. 26

17       B.    The Transparency Update is true and thus not defamatory ............ 30

18       C.    Def Con's statements do not imply sexual misconduct, but even if
                they did, the implication would be accurate. ................................. 33

19   II.   Hadnagy has not shown negligence. ...................................................... 34

20   CONCLUSION .................................................................................................. 36

21

22

23

24

25

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................. 24

*Ernst Home Ctr., Inc. v. United Food & Com. Workers Int'l Union, AFL-CIO, Loc. 1001*,
   888 P.2d 1196 (Wash. App. 1995) ........................................ 28

*Haueter v. Cowles Pub. Co.*,
   811 P.2d 231 (Wash. App. 1991) ......................................... 34

*LaMon v. Butler*,
   770 P.2d 1027 (Wash. 1989) ................................................ 25

*Mark v. Seattle Times*,
   96 Wash.2d 473; 635 P.2d 1081 (1981) .............................. 25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ............................................................. 25

*Mohr v. Grant*,
   153 Wash.2d 812; 108 P.3d 768 (Wash. 2005) ..................... 25, 28, 30

*In re Oracle Corp. Sec. Litig.*,
   627 F.3d 376 (9th Cir. 2010) ................................................ 24

*Pardee v. Evergreen Shores Beach Club*,
   13 Wash. App. 2d 1111 (2020) ............................................. 26, 34

*Paterson v. Little, Brown & Co.*,
   502 F. Supp. 2d 1124 (W.D. Wash. 2007) ............................ 7, 26

*Schmalenberg v. Tacoma News, Inc.*,
   943 P.2d 350 (Wash. App. 1997) ......................................... 28

*Sisley v. Seattle Sch. Dist. No. 1*,
   286 P.3d 974 (Wash. App. 2012) ......................................... 26

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT – 3 (No. 2:23-cv-01932-BAT)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## FEDERAL RULES

Fed. R. Civ. P. 56 ...................................................................................................... 24

## OTHER AUTHORITIES

CollinsDictionary.com.................................................................................................. 30

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1

## INTRODUCTION

2  Jeff Moss is the founder of Def Con Communications, Inc., an organization that

3  hosts an annual cybersecurity and hacking conference in Las Vegas, Nevada. The

4  organization's Code of Conduct prohibits harassment and reserves the right to expel

5  participants for harassment.

6  In 2021, Moss was informed that Christopher Hadnagy had committed

7  shocking acts of harassment against many people over the course of years. The first

8  woman to raise concerns, Maxie Reynolds, explained that Hadnagy had retaliated

9  against her after she left his employment by, among other things, pressuring

10  prominent podcasters and other media figures to "drop" her and trashing her

11  reputation in the community. When Def Con confronted Hadnagy, he admitted his

12  actions and claimed only that they were justified. More than a dozen other people

13  then came forward to report, among other things, Hadnagy's inappropriate fixation

14  on the looks of his female employees and conference attendees and participants;

15  regular outbursts of anger in the workplace and while at the Def Con conference;

16  pattern of insulting employees; design of training exercises that prompted students

17  to ask strangers about things like penis circumcision, breast size, and feminine

18  hygiene products; and brandishing of a switchblade. All of these individuals,

19  including Reynolds, had attended Def Con conferences.

20  After hearing these distressing stories, Def Con banned Hadnagy from its

21  conferences with the following announcement:

22  We received multiple CoC [Code of Conduct] violation reports about a
DEF CON village leader, Chris Hadnagy of the SE Village. After

23  conversations with the reporting parties and Chris, we are confident
that the severity of the transgressions merits a ban from Def Con.

24

25

26

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT – 5 (No. 2:23-cv-01932-BAT)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1  Declaration of Matt Mertens ("Mertens Decl.") Exhibit 1 (the "Transparency
2  Report"). Def Con later issued an update to this report (Mertens Decl. Exhibit
3  2 "Transparency Update") conveying similar information in similar terms.

4      Citing the Transparency Report and Transparency Update, Hadnagy
5  and his company sued Moss and Def Con for defamation. The suit is meritless
6  for two overarching reasons:

7      **Hadnagy cannot prove the falsity of any statement.** A defamation
8  plaintiff bears the burden of proving that the challenged statement was neither
9  true nor substantially true. Hadnagy has not come anywhere close to meeting
10 his burden. The undisputed evidence shows beyond any doubt that Def Con
11 received multiple reports of behavior by Hadnagy that violated its Code of
12 Conduct; that Def Con had "conversations with the reporting parties and
13 [Hadnagy]"; and that "the severity of the transgressions merit[ed] a ban from
14 Def Con" under the organization's own standards, which it had the authority
15 to set in in its sole discretion. Every part of the Transparency Report and
16 related update is true or at least substantially true; there is no evidence to the
17 contrary. Indeed, discovery has only confirmed Hadnagy's extensive pattern of
18 misbehavior and reinforced the propriety of the ban. On this record, no rational
19 jury could find that defendants made any false statement.

20     **Hadnagy cannot prove negligence.** Moreover, even if Hadnagy could
21 prove that some part of the challenged statements was not substantially true—
22 which he cannot—he cannot possibly show that defendants were negligent in
23 making them. Hadnagy *admitted* to retaliating against a female former
24 subordinate (Reynolds) in ways that any reasonable person would find
25 disturbingly vindictive whatever Hadnagy's purported justifications (many of
26 which Hadnagy has since admitted were based on false assumptions). And the

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT – 6 (No. 2:23-cv-01932-BAT)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1   Transparency Report and Transparency Update were posted only after *more*
2   *than a dozen other individuals* had come forward to report experiences with
3   Hadnagy that made them feel uncomfortable, degraded, intimidated, and
4   afraid. Hadnagy has produced *no evidence* showing that Defendants knew or
5   should have known that the reports of severe harassment—made by more than
6   a dozen people—were false. To the contrary, discovery has confirmed their
7   truth.

8                                    *

9        Hadnagy complains that Def Con's statements harmed his reputation.
10  But a person *earns* their reputation, good or bad, through their actions. Here,
11  Hadnagy's *own actions*—including, ironically, his ruthless campaign to destroy
12  someone else's reputation—were his undoing. Defendants cannot be held liable
13  for truthfully reporting *Hadnagy's own misconduct*, as truth is an absolute
14  defense to defamation. *Paterson v. Little, Brown & Co.*, 502 F. Supp. 2d 1124,
15  1133 (W.D. Wash. 2007).

16       In the end, Hadnagy has no one to blame but himself. Defendants
17  respectfully request that the Court grant them summary judgment and
18  dismiss this suit.

19                    **STATEMENT OF MATERIAL FACTS**

20       Unless otherwise noted, the following facts are undisputed.

21  **A.    Jeff Moss, Def Con, and the Code of Conduct**

22       Jeff Moss is the founder of Def Con, an organization that hosts an annual
23  cybersecurity and hacking conference in Las Vegas. Compl. ¶¶ 2–3. The conferences
24  include speaker presentations, workshops, and contests. *Id.* ¶¶ 38–41. They also
25  feature breakout sessions, called "villages," on particular topics. *Id.* ¶ 40.

26

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT – 7 (No. 2:23-cv-01932-BAT)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1    Def Con's Code of Conduct prohibits "harassment," which includes "deliberate
2    intimidation and targeting individuals in a manner that makes them feel
3    uncomfortable, unwelcome, or afraid." Mertens Decl. Exhibit 3. Def Con reserves the
4    "right to respond to harassment in the manner [it] deem[s] appropriate, including but
5    not limited to expulsion without refund and referral to the to the relevant
6    authorities." *Id.*

7    In 2017, Def Con began to publish transparency reports—i.e., summaries of
8    every incident that had occurred at the conference each year. The goal was to
9    discourage inappropriate behavior and to "encourage other conventions to duplicate
10   this reporting and share their data so collectively we can shed some light on the
11   challenge we face in creating more safe and inclusive events." *Id.* (typo fixed).

12   **B.    Christopher Hadnagy**

13   Chris Hadnagy is the founder of Social-Engineer, LLC, a company focused on
14   the "social-engineering" tactics—i.e., manipulation, influence, and deception—that
15   can be used to gain access to a victim's computer system or personal data. Compl. ¶
16   42. Hadnagy formerly hosted a social-engineering village at Def Con called
17   "SEVillage." *Id.* ¶¶ 45–46.

18   Hadnagy is also the founder of the Innocent Lives Foundation ("ILF"), a
19   nonprofit organization involved in identifying child predators online. Mertens Decl.
20   Exhibit 4.

21   **C.    Maxie Reynolds's allegations**

22   In January 2020, Hadnagy hired Maxie Reynolds to work at Social-Engineer.
23   Mertens Decl. Exhibit 5 ("Reynolds Dep.") 15:17–16:24, 19:8–19. Before hiring her,
24   Hadnagy pressed one of her references to confirm she was a real person, asking in a
25   LinkedIn message: "so she is that hot?" Mertens Decl. Exhibit 6 at SE_000405.
26   Written materials unearthed in discovery show that Hadnagy repeatedly described

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1    Reynolds in similar terms. *See* Mertens Decl. Exhibit 7 (she's "so hot it's dumb");
2    Mertens Decl. Exhibit 8 (looks like a "supermodel"); Mertens Decl. Exhibit 9 at
3    DENIS00000321 (the "hotness of maxie").

4        While at the company, Reynolds wrote a book about social engineering.
5    Hadnagy worked with her to edit each chapter as it was drafted. Mertens Decl.
6    Exhibit 10 ("Hadnagy Dep.") at 121:19–123:22.

7        On August 5, 2021, Reynolds resigned from Social-Engineer. Hadnagy then
8    took the following actions against her:

9    • Made accusations about her book. Hadnagy claimed that two images in the
10       book were from an active ILF case. Hadnagy Dep. 119:13–120:5. Hadnagy
11       called Reynolds's publisher, who removed the images, and contacted an
12       acquaintance at the FBI. *Id.* at 125:12–127:25.

13   • Canceled podcast interviews. Hadnagy pressured the hosts of five
14       prominent podcasts to cancel scheduled conversations with Reynolds; he
15       succeeded in canceling three of them. *Id.* at 139:1–23.

16   • Interfered with a potential TV show. Hadnagy pressured the producer of a
17       TV show to "drop her from the show." *Id.* at 144:9–146:1. In text messages,
18       Hadnagy claimed the project was illegal, that Reynolds is a liar, and that
19       she's "dangerous"; he urged the producer to "run the other way with haste."
20       Mertens Decl. Exhibit 11.

21   • Disparaged her character. Hadnagy texted Reynolds's reference: "She is a
22       train wreck. Stole IP. Took work with her. Quit. Lied. Started a
23       competitive company." *Id.* Exhibit 6 at SE_000408. Hadnagy later
24       admitted that Reynolds did *not* take work with her or start a competitive
25       company. Hadnagy Dep. 148:7–152:17.

26

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT – 9 (No. 2:23-cv-01932-BAT)

On August 23, 2021, Reynolds told Hadnagy's friend Neil Wyler—a senior member of Def Con's staff and also of Black Hat, an organization that hosts a security conference similar to Def Con's—about Hadnagy's actions. Mertens Decl. Exhibit 12; Reynolds Dep. 77:14–21; Mertens Decl. Exhibit 13 ("Wyler Dep.") at 39:10–18, 41:19–42:8. Reynolds also told Wyler that Hadnagy would often explode at people at work. Wyler Dep. 38:20–24. Wyler later testified that this rang true to him because he had personally experienced an outburst from Hadnagy at a Def Con conference in which Hadnagy screamed obscenities at him and called him a pedophile.[1] *Id.* at 21:5–25:4, 38:25–39:5; *id.* Hadnagy Dep. 191:2–192:6, 264:14–21.

### D.    Discussions with Hadnagy

On August 25, 2021, Wyler texted Moss about Reynolds's allegations. Mertens Decl. Exhibit 15. Wyler and Moss spoke via phone that same day; Wyler testified that Moss gave him permission to speak to Hadnagy on behalf of Def Con. Wyler Dep. 43:15–44:5.

On August 26, 2021, Wyler texted Hadnagy that a former employee had come forward with allegations of harassment. *Id.* Exhibit 14 at WYLER00000022. Wyler and Hadnagy spoke via telephone that night. Wyler Dep. 50:23–25. Hadnagy began by volunteering half a dozen names for who the former employee might be. *Id.* at 51:1–52:11. After Wyler began to describe the allegations, Hadnagy said, "Okay, it's Maxie then." *Id.* at 52:12–17. At each step of the conversation, Hadnagy confirmed his actions against Reynolds, offering only "yes, but" purported justifications for his conduct. *Id.* at 55:18–22 and 56:8–16. Hadnagy acknowledged he had called Reynolds's publisher (*id.* at 53:4–12); that he was pressuring a TV producer to drop her (*id.* at 55:22–56:7); and that he had pressured podcast hosts to cancel

---

[1] Hadnagy believed that Def Con was hosting an after-hours event involving strippers in the SE Village event space and was furious about this.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1   conversations with her (*id.* at 56:20–22). Hadnagy confirmed all this in his deposition.

2   Hadnagy Dep. 194:18–202:24. The conversation ended with Hadnagy agreeing he

3   would leave Reynolds alone. Wyler Dep. 65:8–25; Mertens Decl. Exhibit 15.

4          Hadnagy's stated willingness to leave Reynolds alone lasted less than 72 hours.

5   On August 30, 2021, Social-Engineer COO Ryan MacDougall texted Reynolds

6   apropos of nothing, "It must be so hard living so many different lies. I hope you find

7   true joy someday." Mertens Decl. Exhibit 16. That same day, someone at Social-

8   Engineer locked Reynolds out of her personal computer, which she had been using for

9   work purposes while employed at the company. Wyler Dep. 71:17–73:1. Reynolds

10  reported the text and the lock-out to Wyler, who asked Hadnagy what was going on.

11  Mertens Decl. Exhibit 14 at WYLER00000024. Hadnagy confirmed that MacDougall

12  had sent the text and that Social-Engineer had locked Reynold's laptop. *Id.* at

13  WYLER00000027–29.

14         On September 2, 2021, Reynolds contacted Def Con's "villages@defcon.org"

15  email address to say that she had 15 people willing to tell their stories of harassment

16  and misconduct by an unnamed village leader. Mertens Decl. Exhibit 17. Reynolds

17  asked to set up a video call with all willing participants so they would not have to put

18  their experiences into writing. *Id.* She wrote that "most people have expressed to me

19  that they fear his retaliation if [their] emails were shown to him." *Id.* Def Con

20  scheduled a Zoom call for September 7, 2021. Wyler Dep. 93:24–94:18.

21         **E.    The Def Con Zoom call**

22         Somewhere between 15 and 20 people attended the call, which lasted about

23  four hours. Reynolds Dep. 94:15–95:5; Wyler Dep. 97:11–15; Mertens Decl. Exhibit

24  18 ("Moss Dep.") at 137:10–14, 144:24–145:5. The participants shared experiences

25  that Moss contemporaneously described as "[b]rutal stories" of "vengeful" and

26  "abusive" behavior." Mertens Decl. Exhibit 19. Several participants have testified

about what they said on the call; Hadnagy has admitted many of their claims, as indicated below. *Hadnagy does not and cannot dispute that Def Con representatives (including Moss) were on the call and heard the participants' stories.*

### 1.    Michelle Fincher

Fincher was Social-Engineer's former COO and worked for Hadnagy from 2013 until 2017. Mertens Decl. Exhibit 20 ("Fincher Dep.") at 12:7–10; 28:16–18; 81:6–12. Fincher testified that "there was almost never a day in my entire four years working for Hadnagy that I was not either enraged or embarrassed due to something happening in the company or my interactions with him." *Id.* at 15:14–18.

Fixation on "hot Asians." Hadnagy repeatedly referred to Fincher as a "hot Asian," and he talked about her legs and how she should wear high heels. Fincher Dep. 18:16–19:2. Fincher found this uncomfortable and inappropriate. *Id.* at 19:11–21:16. Hadnagy "fairly regularly" commented on women he perceived as being "hot Asians." *Id.* at 32:24–33:2. For the Def Con village in 2017, Hadnagy overrode his team's assessment that an applicant was not qualified and selected her for a competition, saying, "She's hot and she's Asian. She's in." *Id.* at 29:14–31:16. Fincher was "furious" and thought it was appropriate for Hadnagy to be referring to a very young woman that way. *Id.* at 31:17–32:23.

Bullying employees and anger outbursts. Fincher testified that Hadnagy "was in the habit" of "berating people for various infractions, real or imagined." *Id.* at 24:10–12. Employees were afraid to take bathroom breaks or get food during the workday because Hadnagy would engage in "public humiliation" of employees who had stepped away from their computers. *Id.* at 24:13–28:7. Fincher witnessed Hadnagy insulting employees and testified that Hadnagy's conduct in "essentially screaming at someone over chat in a venue that the entire company can see is pretty inappropriate." *Id.* at 38:3–5. Hadnagy bullied an employee into resigning, which

1    upset Fincher. *Id.* at 38:21–39:8. Fincher regularly observed Hadnagy's anger-related

2    outbursts and difficulty controlling his anger. *Id.* at 54:8–19.

3        <u>Inappropriately sexualized trainings.</u> Fincher and Hadnagy jointly provided

4    trainings at Black Hat. *Id.* at 42:13–25. Hadnagy's trainings included "homework"

5    assignments that required trainees to ask strangers uncomfortable questions—e.g.,

6    for women to ask men if they had circumcised penises, and for men to ask women

7    about their bra size and use of feminine hygiene products. *Id.* at 45:9–46:6. Fincher

8    told Hadnagy that she "bitterly" disagreed with these training questions, as she

9    believed they put women in potentially unsafe situations. *Id.* at 45:3–46:6 and 48:6–

10   19. Students approached Fincher in "almost every class" she taught to tell her they

11   were uncomfortable with the questions. *Id.* at 48:20–49:2.

12       🔥    During his deposition, Hadnagy admitted that he referred to Fincher as

13   "the marketing Asian," Hadnagy Dep. 52:11-22; that his training sessions asked

14   participants to ask questions about things like circumcision, bra size, and feminine

15   hygiene products, *id.* at 74:14–78:11, 84:1–24, 111:3–113:6; that there were

16   complaints about the questions, *id.*; and that he yelled at people at Def Con

17   conferences, *id.* at 264:10–65:11. Further, in response to RFAs, Hadnagy admitted:

18   "female students of the course were asked to try to gain a subject's private

19   information on numerous topics, including thoughts on circumcision, boxers or briefs,

20   weight control products, birth control choices, and salary." Mertens Decl. Exhibit 21.

21                    **2.    Cat Murdock**

22       Murdock worked at Social-Engineer from October 2017 until March 2019.

23   Mertens Decl. Exhibit 22 ("Murdock Dep") at. 13:16–20.

24       <u>Explosive anger.</u> Murdock testified that the atmosphere at Social-Engineer

25   was that of "walking on eggshells" around Hadnagy; that any little thing could set off

26   him off; and his avatar in the company chat was the Hulk. Murdock Dep. 71:15–25,

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

78:11–79:7. One time Murdock was correcting the pronunciation of a Middle Eastern man's name, and Hadnagy became so angry he told Murdock to physically get away because he didn't know what he was going to do. *Id.* at 46:5–23. Murdock described Hadnagy as "scary" in that moment and said she cried in a bathroom afterwards. *Id.*

Violence and "jokes" of violence. Murdock testified that Hadnagy threw a phone at her, which she found "intimidating." *Id.* at 59:3–60:17. Hadnagy also regularly "joked" about shanking and throat-punching people, which Murdock found "definitely uncomfortable." *Id.* at 26:17–23; 27:9–13; 32:18–33:6. He would pull out his switchblade as part of these "jokes." *Id.* at 33:7–34:9; 87:13–22. It was "very common" for Hadnagy to pull out his knife and joke about shanking people while attending Def Con. *Id.* at 91:2–9.

Belittling of employees. Hadnagy commonly belittled his employees, referring to them as "stupid," "dumb," and "morons." *Id.* at 72:1–23. He yelled at every employee at some point. *Id.* at 74:11–23. Hadnagy's constant yelling made Murdock feel "definitely unwelcome" and "for sure disrespected." *Id.* at 74:1–10.

During his deposition, Hadnagy admitted that he "got very angry at" Murdock. Hadnagy Dep. 200:18–201:24. He also conceded that he owns a switchblade, *id.* at 16:16–17:5; did not dispute that he had threatened to "ball slap" a trainee with the switchblade, *id.*; and acknowledged that his work avatar is the Hulk, *id.* at 296:14–297:8. Written communications further confirm Hadnagy's anger toward Murdock and anger-issues generally.[2]

_____

[2] See Mertens Decl. Exhibit 24 (acknowledging in an email to Murdock that his "language and words were very strong and very harsh" towards her; that he had "freaked out" on her; and that his "reaction was so poor"); *Id.* Exhibit 25 at 84 ("I was harsh with Cat I truly was … I was harsh in times of stress … could I be called a jerk, yes."); *id.* Exhibit 26 ("I screwed up and chewed [Murdock] out bad"); *id.* Exhibit 27 (Murdock "had gotten me really angry many times and I was harsh with her … a bit of an Ahole a few times"); *id.* Exhibits 28 and 29 ("I've been a jerk a lot" and describing

### 3.    Jess Levine

Levine worked at Social-Engineer from November 2020 until March 2021; Hadnagy fired her because Hadnagy was unhappy that she had tweeted about mental health in the workplace. Mertens Decl. Exhibit 23 ("Levine Dep.") at 22:14–17; 53:6–22.[3] While Levine was unable to attend the call, she drafted a statement that Murdock read to the participants. Murdock Dep. 131:2–9; Levine Dep. 70:17–24.

<u>Inappropriate behavior with a knife.</u> Levine attended a gathering in Hadnagy's hotel suit at Def Con in 2017. Levine Dep. 14:6–13. Hadnagy was playing with his knife; was intoxicated and slurring his words; and was making "jokes" about cutting people with his knife. *Id.* at 14:21–16:6. Hadnagy brandished his knife and "joked" about cutting people about 10 times in the three days of the conference. *Id.* at 17:7–12. At other times, Hadnagy brandished his knife while on video calls and at one point angrily stabbed his knife into his desk. *Id.* at 34:5–35:3. This made Levine feel "scared" and "intimidated." *Id.* at 45:12–46:1.

<u>Berating Levine and other employees, including his own son.</u> Hadnagy reduced Levine to tears in a conversation in which he said she was a "waste of money"; she had "taken advantage of his kindness"; she was being paid too much; she was a "liar"; and her work or performance was "worthless." *Id.* at 36:1–22. Hadnagy was equally withering in his criticisms of his son Colin, who was also a Social-Engineer employee. *Id.* at 60:17–61:3. Colin "often" confided in Levine about Hadnagy's degrading comments to him, including that he was an "idiot" and "incompetent." *Id.* at 61:4–18.

---

himself as "aggro"); *id.* Exhibit 9 at DENIS00000323 (describing himself as an "asshole").

[3]Defendants have redacted sensitive, nonessential information from Exhibit 23 in accordance with LCR 5(g)(1)(B).

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1
2

Levine witnessed Hadnagy calling Colin Hadnagy a "retard," an "idiot," and "stupid" on multiple occasions. *Id.* at 62:10–63:3.

3
4
5
6
7
8

Unlawfully withholding Levine's final paycheck. After Hadnagy fired Levine, Hadnagy withheld her final paycheck based on accusations that she had violated her employment contract and deleted company data; Levine had done neither. *Id.* at 57:2–58:13. Levine had to file a complaint with the North Carolina Department of Labor, which cited Social-Engineer for violating North Carolina state law by failing to timely pay Levine her final paycheck. *Id.* at 58:15–16; Mertens Decl. Exhibit 30.

9
10
11

During his deposition, Hadnagy admitted to unlawfully withholding Levine's final check, Hadnagy Dep. 303:9–304:11, and he did not otherwise deny his conduct per Ms. Levine's testimony.

12
13

**F.    Def Con posts the Transparency Report and Transparency Update, and Black Hat independently bans Hadnagy.**

14
15
16
17
18
19
20
21
22
23
24
25

Moss testified he believed the assertions against Hadnagy because (among other things) (1) they were firsthand accounts of people who had worked for him, and the stories supported one another; (2) on the call with Wyler, Hadnagy had immediately started volunteering names of former employees when guessing the identity of the initial complainant; (3) Hadnagy had not denied taking action against Reynolds and had instead attempted to justify his conduct; (4) Hadnagy did not have anything substantiating his side of the story, like a police report or lawsuit; and (5) Wyler had personally experienced Hadnagy's furious outburst at Def Con. Moss Dep. 167:24–171:25. Wyler likewise found the allegations credible because of the sheer number of people and the "very clear level of intimidation and just general fear around Chris and his behavior and what he would do if he knew that they were talking to us." Wyler Dep. 120:19–121:5.

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1    Between September 8, 2021, and January 9, 2022, Moss and Hadnagy

2  exchanged messages to try to schedule a call; Hadnagy was not available at the times

3  Moss offered. Mertens Decl. Exhibit 31. In an message to Moss on January 9, 2022,

4  Hadnagy reiterated his belief that Reynolds had stolen from him; rhetorically asked

5  Moss "what do we need to discuss?"; and told Moss that Hadnagy would not bring

6  SEVillage back to Def Con in 2022. *Id.* at DEFCON00000152. On January 16, 2022,

7  Hadnagy emailed Moss and Wyler about *different* allegations made against him by

8  people at Black Hat and attempted to refute those allegations. Mertens Decl. Exhibit

9  32.[4]

10    On February 9, 2022, Def Con posted the Transparency Report announcing

11  Hadnagy's ban as follows:

12        We received multiple CoC [Code of Conduct] violation reports about a
        DEF CON village leader, Chris Hadnagy of the SE Village. After
13        conversations with the reporting parties and Chris, we are confident
        that the severity of the transgressions merits a ban from Def Con.
14

15  *Id.* Exhibit 1. Other parts of the report not specific to Hadnagy said that "harassment
16
    encompasses any behavior that makes others feel uncomfortable"; that "[r]epeat
17
    offenders and those who commit more egregious offenses are permanently barred
18
    from our events"; and that "[i]n the case of the most troubling offenses or those who
19
    we feel may represent an ongoing risk to the community, we take the extra step of
20
    naming them publicly." *Id.*
21

22

23  ─────────────────

24  [4] In this email, Hadnagy attacks a former SEVillage competitor, Stephanie
    Carruthers, as "terrible, unethical, and a liar." Carruthers had started a competing
25  social engineering training at Black Hat. Hadnagy was incensed and complained
    about her to Black Hat. He also told his students that her class material was
26  unethical and illegal. Wyler had to intercede with Hadnagy to tell him to stop
    attacking Carruthers. Wyler Dep. 144:21-145:17; Wyler Dep. 148:14-151:8.

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT – 17 (No. 2:23-cv-01932-BAT)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

On February 10, 2022, Black Hat independently banned Plaintiff from future involvement at Black Hat as a trainer or review board member. Declaration of Steve Wylie ("Wylie Decl."), ¶ 4 and Ex. A. Black Hat made this decision on its own investigation, did not rely on Def Con's investigation, and did not make this decision based on public reaction to Def Con's ban of Plaintiff. *Id.* Black Hat removed Plaintiff solely based on its own investigation and the pattern of discriminatory and bullying allegations against Plaintiff. *Id.* ¶¶ 4–5.

After Hadnagy filed this suit, Def Con posted an update on the litigation. The January 13, 2023, Transparency Update said, in relevant part:

> During our investigation we spoke directly with Mr. Hadnagy about claims of his violations of our Code of Conduct. He confirmed his behavior, and agreed to stop. Unfortunately, the behavior did not stop.

Mertens Decl. Exhibit 33.

### G.    Discovery confirms widespread misconduct by Hadnagy

Discovery in this lawsuit has confirmed that Hadnagy has repeatedly harassed members of the infosec community. The following facts are only those that are *undisputed*, either because Hadnagy has admitted them or because they appear in written communications that Hadnagy cannot deny.

#### 1.    Pattern of retaliation and disparagement

Hadnagy continued his retaliation against Reynolds. On February 9, 2022—the day the Transparency Report was posted—Hadnagy contacted the accrediting body for the Offensive Security Certified Professional (OSCP) about Reynolds's certificate. Mertens Decl. Exhibit 34. He represented that he wanted to verify that "a student actually has the OSCP for employment verification." *Id.* Hadnagy has admitted that his representation was false and that he was "looking for dirt" on Reynolds. Hadnagy Dep. 161:14–165:2.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

In March 2022, Hadnagy repeatedly emailed a former client of Social-Engineer to allege that Reynolds had used her sexual allure to induce a male employee of the client to terminate its contract with Social-Engineer. Mertens Decl. Exhibit 35. The former client had to tell Hadnagy to stop contacting them and involved their legal team to make Hadnagy stop. *Id.*

Hadnagy's bad-mouthing of Reynolds has also continued. In texts to a colleague, Hadnagy has described Reynolds as "poison," Mertens Decl. Exhibit 36; called her a "psychopath," Mertens Decl. Exhibit 9; and suggested finding a "hit man" for her, Mertens Decl. Exhibit 37. He called Reynolds an "awful psycho bitch" in an email to his PR consultant. Mertens Decl. Exhibit 38. And he wrote the following email to a tech journalist:

> So much data on her, she is a con artist. Her and her "ex" are known for scamming people and stealing money then disappearing. She is pretty terrible. Lied about her dad dying. Started a company while on "sick leave" with her ex to compete with us, used corp email to divert contracts and sign contracts she had no right to sigh. Actively tried to sabotage employees here, female employees at that, they will testify to it. She, and this is no joke, is a psychopath. Joe Navarro has help me diagnose her. It will be an amazing book. She reported me for being into Child Porn. She illegally used pics from an ILF case in her book that I helped her write. She left SECOM 3 days before launch and removed my name from the book completely.

Mertens Decl. Exhibit 39. Hadnagy has since admitted that Reynolds did *not* take work from Social-Engineer or start a competing company. Hadnagy Dep. 148:7–152:17. He further admitted that neither he nor Joe Navarro are qualified to diagnose anyone with anything, let alone with psychopathy. Hadnagy Dep. 26:25–29:17.

Hadnagy engaged in similar retaliatory behavior toward Murdock and Samantha Gamble, a former ILF employee. After Murdock quit SE, Hadnagy made similar accusations against Murdock, claiming that she had started a competing business. Hadnagy sent her new employer (who was not a competitor, but a client) a

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1  cease-and-desist letter, despite the fact that the non-compete had already lapsed.

2  Murdock Dep. 113:6–115:3. He also made disparaging comments about Murdock to

3  the above tech journalist, calling her a "terrible person." Mertens Decl. Exhibit 39.

4  After Gamble quit ILF, Hadnagy tried to get Gamble blacklisted from industry

5  conferences and her talk at the National Child Protection Task Force Conference

6  cancelled. Mertens Decl. Exhibit 40 ("Gamble Dep.") 58:23–61:23. He even emailed a

7  conference organizer calling Gamble "trash" and "filth." Gamble Dep. 58:20–62:25;

8  Mertens Decl. Exhibit 50.

### 2. Collaboration on child-predator "bait" with young female colleague

Samantha Gamble begin working at ILF in 2019, when she was 21 years old.

Gamble Dep. 9:10-13, 75:18-20.

Plaintiff regularly commented on Gamble's appearance, telling her she was

"pretty," that "watching [her] grow up is like drinking a fine wine," and after she

gained some weight, that she "filled out and finally looked [her] age." *Id.* at 21:2–

22:15; Mertens Decl. Exhibit 41. Plaintiff's comments on her appearance made

Gamble feel "uncomfortable," and she thought they were "inappropriate." Gamble

Dep. 23:4-11. Plaintiff took Gamble alone on an October 2021 business trip, where he

told Gamble he is a "boob guy"; told Gamble about his sexual relationship with his

wife and about his wife's body; told Gamble that "he doesn't understand how men like

to fold women into pretzels"; and kissed her on the forehead outside her hotel room.

*Id.* at 25:5–27:11. Gamble again testified that Plaintiff's comments and actions were

"uncomfortable" and "inappropriate." *Id.* at 26:7–27:11.

As part of a purported "sting" operation, Hadnagy worked with Gamble on

creating "pretexts"—i.e., fake profiles of young girls—as "bait" for potential child

predators. To create the "pretexts," Hadnagy would talk to Gamble about the physical

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

characteristics of pre-pubescent girls—their bra size, underwear size, pubic hair, the age when they start shaving pubic hair, etc. Mertens Decl. Exhibit 42. While Hadnagy testified that the operation was Gamble's idea, Hadnagy Dep. 287:20–293:16,, Gamble testified that it was not her idea, Gamble Dep. 32:17–25, and that the questions were personal ones about her own experiences that made her uncomfortable, Gamble Dep. 31:25–32:9. It is undisputed that the operation was "not something [ILF staff] [could] do as citizens, so th[e] project went nowhere." Hadnagy Dep. 287:20–288:5.

### 3.    Comments about Asians

Plaintiff told an Asian-American colleague that "EVERYONE knows that" he has "Asian FEVER," adding, "Commie or not they are hot ;)" Mertens Decl. Exhibit 43. Hadnagy called his female subordinate "an adorable little Asian teapot." Mertens Decl. Exhibit 44. He referred to an Asian girl who had won a competition at his village as "the teenage one, that is tiny and small and really cute." Mertens Decl. Exhibit 45. And when Fincher circulated a video to work colleagues of a woman beatboxing, Hadnagy replied-all: "pretty cool[.] helps that she is a hot Asian;)" Mertens Decl. Exhibit 46. Hadnagy's own COO—himself an Asian-American man—told Hadnagy to stop the Asian-related commentary back in 2015. Mertens Decl. Exhibit 59 ("Chris, though we joke about it at times, all the Asian comments that come through aren't the best. It would be a 'human resources' issue in other companies.")

### 4.    Comments about women's appearances

Hadnagy regularly commented about the attractiveness, or perceived lack thereof, of his former employees, volunteers, and SEVillage contestants. *See,* e.g., Mertens Decl. Exhibit 47 (colleague Alethe Denis is "about 150% hotter than Whitney," referring to Whitney Maxwell, a former SEVillage contestant); Mertens Decl. Exhibit 7 ("Whitney is hot. She is so beautiful"); Mertens Decl. Exhibit 48

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT – 21 (No. 2:23-cv-01932-BAT)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1  ("Denis Dep.") 98:5–9, 105:3–13; Mertens Decl. Exhibit 7 ("████ is just not and

2  ████████ is just not," referring to Hadnagy's opinion of the attractiveness of former

3  SEVillage contestants ████████ and ████████████)[5]; Mertens Decl.

4  Exhibit 49 and Denis Dep. 99:7–19 ("not being a dick but i mean she's not even as hot

5  as maxie", referring to former SEVillage contestant Rachel Tobac); *see also* Mertens

6  Decl. Exhibits 51–53; Denis Dep. 97:22–98:9, 110:18–112:2 (calling Tobac a "complete

7  joke" and "awful" and agreeing that she's "such a piece of shit").

### 5.  Complaints about Hadnagy's trainings

9  Hadnagy has received complaints about his training sessions going back to

10  2015. *See* Mertens Decl. Exhibit 54 (2015 complaint that the training "forced a

11  subordinate to engage in sexually explicit conversation while at work"); Mertens Decl.

12  Exhibit 55 (2018 complaint that Black Hat trainings were sexualized and violated

13  Black Hat's code of conduct); Mertens Decl. Exhibit 56 (2021 email where Hadnagy

14  bemoans removing "the underwear homework" from his trainings because "too many

15  snowflakes got upset and called me out for being sexually abusive").

16  Notably, an attendee of Hadnagy's 2017 Derby Con training complained about

17  Hadnagy's repeated references to "hot wheels pornography" (pornography featuring

18  female amputees in wheelchairs); 1970s pornography; the comment "boobs have

19  super powers"; and discussion of "ball-slappping" and "hacking naked." Declaration

20  of Record Custodian of Security Innovation Ex. A; *see also* Hadnagy Dep. 11:19–16:15.

### 6.  DEI Report

22  A DEI assessment of Social-Engineer in May 2022 revealed significant

23  problems with Hadnagy's leadership. *See* Mertens Decl. Exhibit 57 at 406. It noted

24  that staff expressed offense at Hadnagy's communication style and felt disrespected

25

26  _____
[5] Defendants have redacted these names because of the nature of Hadnagy's ad hominem attacks against these women.

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT – 22 (No. 2:23-cv-01932-BAT)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1    and unappreciated; that "upper management tends to be hijacked by their emotions";

2    that interviewees reported it was "unsustainable to work with the offensive

3    treatment in the long-term"; that four female team members had left in the last two

4    months; and that "jokes of a sexual nature had been heard in the workplace as well

5    as commentary on employee appearance."[6] *Id.* The consultants cautioned that "these

6    staff perceptions could lead to *allegations of hostile work environment and*

7    *harassment*" and recommended that Hadnagy "implement behavioral changes

8    reflecting a significant break from past behavior." *Id.* at 407 (emphasis added).

9                              **PROCEDURAL HISTORY**

10        In August 2022, Hadnagy and Social-Engineer filed suit in the Eastern District

11   of Pennsylvania. Dkt. 44 at 4. After the suit was dismissed for lack of personal

12   jurisdiction, Plaintiffs refiled in Nevada state court. *Id.* Defendants removed the

13   action to the District of Nevada and then moved to transfer venue to the Western

14   District of Washington; that motion was granted. *Id.* at 4–5.

15        In January 2024, Defendants filed a motion to dismiss. The Court granted the

16   motion with respect to all claims except the claim for defamation based on the

17   Transparency Report and Transparency Update. *Id.* at 12–15, 23. The Court gave

18   Plaintiffs leave to replead certain claims—including an "injurious falsehoods"

19   defamation claim based on allegations related to Black Hat—but Plaintiffs never did.

20   *Id.* at 15–16, 23; *see also* Dkt. 53 at 2–3.

21        Months later, Plaintiffs moved to amend the complaint to add a claim for

22   invasion of privacy by false light. Dkt. 49. Plaintiffs' proposed amended complaint

23   attempted to add new allegations of "defamation by implication." Dkt. 49-2 at 17–21.

24

25   ───────────────
     [6] This feedback was consistent with feedback that Plaintiff's assistant gave him
26   directly on March 9, 2022, in which she told him he could be "a complete raging jerk";
     his behavior "absolutely qualifies as abusive in the business world; and his behavior
     "creates the definition of a toxic environment." Mertens Decl. Exhibit 58.

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT – 23 (No. 2:23-cv-01932-BAT)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1    In rejecting Plaintiffs' motion, the Court determined that it would be futile to allow

2    Plaintiffs to plead "defamation by implication":

> Plaintiffs allege the Transparency Report and Update are defamatory
> by implication because third parties on social media "interpreted them
> to mean that there were despicable facts underlying the ban and
> Plaintiff Hadnagy was a sexual predator of the worst order" and made
> "assumptions that Plaintiff Hadnagy was a sexual predator." But the
> fact third parties drew a negative conclusion (i.e., that Hadnagy is a
> sexual predator) from Def Con's ban cannot establish a defamation by
> implication claim as a matter of law. Nor can Plaintiffs' belief that Def
> Con should have included additional facts (i.e., clarified that the Code of
> Conduct violations were not sexual in nature) establish a defamation by
> implication claim.
> …
> Nothing in the Transparency Report or Update references or implies
> sexual misconduct. Therefore, "assumptions" by third parties or
> Plaintiffs' own "conclusions as the pleader" about the Transparency
> Report and Update are insufficient to plead a defamation by implication
> or false light claim.

Dkt. 53 at 10–11 (internal citations omitted). Plaintiffs moved for reconsideration but

"[did] not contest [the] Court's finding that the proposed Defamation by Implication

claim [was] unsupported." Dkt. 56 at 4 n.1.

## SUMMARY JUDGMENT STANDARD

Summary judgment is required where "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a). "Where the non-moving party bears the burden of proof at trial, the moving

party need only prove that there is an absence of evidence to support the non-moving

party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). "[T]he

burden then shifts to the non-moving party to designate specific facts demonstrating

the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.* A

mere "scintilla of evidence in support of the [non-movant's] position" is not sufficient,

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 266 (1986); neither is "some

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (cleaned up).

"[S]ummary judgment plays a particularly important role in defamation actions." *Mohr v. Grant*, 153 Wash. 2d 812, 821, 108 P.3d 768 (2005). "Serious problems regarding the exercise of free speech and free press guaranteed by the First Amendment are raised if unwarranted lawsuits are allowed to proceed to trial. The chilling effect of the pendency of such litigation can itself be sufficient to curtail the exercise of these freedoms." *Mark v. Seattle Times*, 96 Wash.2d 473, 486, 635 P.2d 1081 (1981) (cleaned up).

## ARGUMENT

"When a defendant in a defamation action moves for summary judgment, the plaintiff has the burden of establishing a prima facie case on all four elements of defamation: falsity, an unprivileged communication, fault, and damages." *LaMon v. Butler*, 770 P.2d 1027, 1029 (Wash. 1989). "The prima facie case must consist of specific, material facts, rather than conclusory statements, that would allow a jury to find that each element of defamation exists." *Id.*

Hadnagy has not introduced sufficient evidence to prove either falsity or fault. Hadnagy's conduct unequivocally violated the Code of Conduct; Def Con did not defame Hadnagy by truthfully saying so. And even there were a genuine dispute on falsity, Def Con was not negligent in making the challenged statements because Hadnagy admitted he had retaliated against Reynolds and Def Con reasonably believed the accounts of more than a dozen people describing Hadnagy's

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1    inappropriate behavior. Defendants are entitled to summary judgment on Hadnagy's

2    defamation claim and dismissal of this lawsuit.

3    **I.    Hadnagy has not proven the falsity of any statement.**

4        "To establish the falsity element of defamation, the plaintiff must show the

5    offensive statement was 'provably false.'" *Pardee v. Evergreen Shores Beach Club*, 13

6    Wash. App. 2d 1111 (2020). In analyzing a statement for falsity, "the question is not

7    whether the statement is literally true but, rather, whether the statement is

8    substantially true," or whether "the gist of the story, the portion that carries the

9    'sting,' is true." *Sisley v. Seattle Sch. Dist. No. 1*, 286 P.3d 974, 978 (Wash. App. 2012)

10   (cleaned up). "The party claiming defamation bears the burden of proving falsity, and

11   thus bears a burden of production at the summary judgment stage." *Id.* (cleaned up).

12   The truth is an *absolute defense* to a claim of defamation. *Paterson*, 502 F. Supp. 2d

13   at 1133.

14       Applying these standards here, Hadnagy has not carried his burden of proving

15   the falsity of any challenged statement.

16       **A.    The Transparency Report is true and thus not defamatory.**

17       The Transparency Report is true and thus not defamatory. For ease of

18   reference, here it is again:

19       We received multiple CoC [Code of Conduct] violation reports about a
         DEF CON village leader, Chris Hadnagy of the SE Village. After
20       conversations with the reporting parties and Chris, we are confident
         that the severity of the transgressions merits a ban from Def Con.
21

22   Mertens Decl. Exhibit 1.

23       *First,* it is indisputably true that Def Con "received multiple [Code of Conduct]

24   violation reports" about Hadnagy.

25       •   Reynolds reported that Hadnagy had retaliated against her by, among

26           other things, making accusations about her book; pressuring podcast hosts

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

to cancel scheduled conversations with her; pressuring a TV producer to drop her from the show; and maligning her character to influential members of her professional community.

- Fincher reported that Hadnagy had called her "hot Asian" and "marketing Asian"; had bullied employees; and had designed training exercises with questions about circumcision, bra size, and feminine hygiene products, which multiple participants found uncomfortable and offensive, including Fincher herself.

- Murdock reported Hadnagy's explosive anger in the workplace; comments about Asian women; and brandishing of a switchblade.

- Levine reported Hadnagy's "jokes" about cutting people with a switchblade; pattern of insulting employees; verbal abuse of his own son; and unlawful withholding of her final paycheck.

- And at least ten other people reported similar experiences on the Zoom call.

Hadnagy cannot plausibly claim, let alone prove, that Def Con did *not* receive multiple Code-of-Conduct reports about Hadnagy.

*Second*, it is true that Def Con "had conversations with the reporting parties and Hadnagy." There can be no dispute that Def Con had conversations with the *reporting parties*, of course. Nor is there a genuine dispute of material fact about whether Def Con had conversations with *Hadnagy*. The undisputed evidence shows that Wyler was a senior staff member at Def Con; Wyler had conversations with Hadnagy that he then relayed to Moss; and Hadnagy sent two emails to Moss directly, in addition to exchanging direct messages with Moss. [7] Hadnagy cannot possibly dispute that Moss, the founder of Def Con, represents Def Con.

---

[7] Wyler Dep. 47:14–49:25 (Hadnagy perceived Wyler as acting on behalf of Def Con and Black Hat); Mertens Decl. Exhibit 14 at WYLER00000030 and Wyler Dep.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1    Further, even if Hadnagy could prove that Def Con did not have any

2    conversation with him (he cannot), it wouldn't matter. "[W]here a report contains a

3    mixture of true and false statements, a false statement (or statements) affects the

4    'sting' of a report only when 'significantly greater opprobrium' results from the report

5    containing the falsehood than would result from the report without the falsehood."

6    *Mohr*, 108 P.3d at 775; *see also Schmalenberg v. Tacoma News, Inc.*, 943 P.2d 350,

7    364 (Wash. App. 1997) ("A reasonable person could find that the story was false in

8    minor respects, but no reasonable person could find that falsity of this minor sort was

9    a factual cause of damage that would not have occurred anyway, due to the gist of the

10   story being true.") (footnote omitted). The "sting" of the Transparency Report, to the

11   extent one exists, is that multiple people had reported Hadnagy for serious Code-of-

12   Conduct violations. Whether Def Con had conversations with Hadnagy has no

13   significant effect on the level of "sting." Nor is the statement about conversations

14   itself "capable of a defamatory meaning." *Ernst Home Ctr., Inc. v. United Food &*

15   *Com. Workers Int'l Union, AFL-CIO, Loc. 1001*, 888 P.2d 1196, 1204 (Wash. App.

16   1995).

17    *Third,* it is true that Def Con was "confident that the severity of the

18   transgressions merit[ed] a ban from Def Con." Again, Reynolds reported that

19   Hadnagy had engaged in a vicious campaign of retaliation designed to destroy her

20   career and reputation. And Hadnagy acknowledged that he had, in fact, gone to great

21   lengths to cancel her media engagements and pressure people to drop her because

22   she was supposedly a liar and thief. Def Con representatives then heard the stories

23

24   73:5–16 (Hadnagy refers to Wyler as "mediator" between Social-Engineer and Def

25   Con); Wyler Dep. 43:15–44:5 (Moss deputized Wyler to speak to Hadnagy on behalf
     of Def Con); Wyler Dep. 84:19–87:4 (Wyler explaining that he is part of "core inner

26   circle of Def Con" and that Hadnagy's allegation of not having to spoken to anyone
     at Def Con "is a lie flat out").

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

of more than a dozen people on the Zoom call. They reported inappropriate comments about women and Asians; outbursts of explosive anger; a pattern of insulting employees; training exercises with painfully uncomfortable and sexualized questions; intimidating use of a switchblade: the list went on and on. [8] Naturally these individuals reported feeling "uncomfortable, unwelcome, and afraid"—precisely what Def Con's Code of Conduct aims to prevent. *See* Mertens Decl. Exhibit 1 ("'Harassment' encompasses any behavior that makes others feel uncomfortable or unsafe."). The information reported to Def Con amply justified its decision to ban Hadnagy from its conferences and to publicly name him to protect the community. *Id.*[9]

Moreover, information revealed in discovery has confirmed the "severity" of Hadnagy's "transgressions." *Id.* It is undisputed that Hadnagy has continued his efforts to malign Reynolds; that Hadnagy made a female subordinate uncomfortable with unsolicited comments about his sexual preferences and his sex life with his wife; that Hadnagy has made numerous comments about women (as hot or not) and about Asians; that Hadnagy has received at least three complaints about his intentionally "uncomfortable" training exercises; and that a DEI report found extensive issues with Hadnagy's leadership at Social-Engineer.

---

[8] *See* Exhibit A attached for a complete list of the testimony provided to Def Con about Hadnagy intimidating, targeting, and making people feel uncomfortable, unwelcome, or afraid.

[9] The Transparency Report explains that Def Con staff members "believe we have an obligation to the community not to provide cover for these individuals to quietly find new and unsuspecting victims elsewhere. When we disclose this information, we do so to protect the DEF CON community, not to act as a public trial." *Id.*

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT – 29 (No. 2:23-cv-01932-BAT)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1    In short, the evidence shows that Hadnagy is an unrepentant bully whose

2    penchant for cruelty is matched only by his appalling treatment of women as sexual

3    objects. He richly deserves his Def Con ban.

4    **B.    The Transparency Update is true and thus not defamatory.**

5    As with the Transparency Report, each aspect of Transparency Update is true

6    and thus not defamatory. Again, here it is for ease of reference:

7
8    During our investigation we spoke directly with Mr. Hadnagy about claims of his violations of our Code of Conduct. He confirmed his behavior, and agreed to stop. Unfortunately, the behavior did not stop.

9
10   Mertens Decl. Exhibit 33.

11   *First*, it is true that Def Con "spoke directly with Mr. Hadnagy about claims of

12   his violations of [its] Code of Conduct." Once more, the evidence shows that Wyler

13   spoke to Hadnagy about the allegations via text and phone call; that Wyler was a

14   senior staff member at Def Con; that Wyler related the substance of his conversations

15   to Moss; and that Hadnagy sent two emails to Moss in addition to exchanging direct

16   messages with him. Def Con thus "spoke" to Hadnagy about the claims. *See* Speak,

17   CollinsDictionary.com, https://bit.ly/4gqJTFW (the word "speak" can mean "to utter

18   words with the ordinary voice" or to otherwise "express or communicate opinions,

19   feelings, ideas, etc."). At the very least, this statement is at least *substantially true*,

20   and Hadnagy cannot prove otherwise. Moreover, the truth the statement is

21   immaterial because it doesn't meaningful affect the alleged "sting" of the

22   Transparency Update. *See Mohr*, 108 P.3d at 775.

23

24

25

26

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT – 30 (No. 2:23-cv-01932-BAT)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

*Second*, it is true that Hadnagy "confirmed his behavior." Again, Hadnagy confirmed to Wyler (aka "Grifter") that he had taken numerous retaliatory actions against Reynolds. The following screenshot is a page from Hadnagy's deposition describing the conversation:

```
                                                        Page 197
     1         Q   Did you tell Grifter about how you
     2    canceled -- about how you got pod casts canceled,
     3    book deals canceled -- not book deals -- publishing
     4    deals, and television production canceled, or
     5    tried to get them canceled?
     6         A   I told him -- I didn't get the publishing
     7    deal canceled.  It was paused until she rewrote it.
     8    But I did tell him that I pulled all of my support.
     9    Even though two pod casts didn't cancel her, I
    10    pulled my personal support.  I had my name removed
    11    from her book.  I had my company and my nonprofit
    12    removed from her book.  And that I had -- yeah, that
    13    I stopped supporting her on the pod casts and other
    14    things like that.
    15         Q   When you say I stopped supporting her,
    16    does that mean that you told Grifter that you
    17    reached out to the pod cast people to say I am
    18    pulling my support, don't have her on the pod cast?
    19         A   I think -- I think we did talk about that,
    20    if I recall, because I think I mentioned I had a
    21    conversation with Jack Rhysider, who is the owner of
    22    Dark Net Diaries.  I do -- I do think I recall
    23    telling him specifics that I had reached out to the
    24    people that I had introduced her to, and pulled my
    25    support verbally with them.
```

Hadnagy Dep. 197:1–25. Moreover, Hadnagy has since reaffirmed, both in his deposition and in response to RFAs, that he took the actions Reynolds complained of. *See id.* at 125:9–148:16; Mertens Decl. Exhibit 21 at 16–18, 20–23. While Hadnagy has argued that his actions were justified, he has never denied that he did the things Reynold alleged. Further, Hadnagy has admitted that he volunteered the names of other potential claimants on his call with Wyler, which confirmed he was aware of other potential issues. *See* Hadnagy Dep. 194:18–196:2 (recalling asking "[i]f it was Maxie and Cat. I believe Rachel Tobac was one I asked, Stephanie Carruthers for

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT – 31 (No. 2:23-cv-01932-BAT)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1  sure, and her husband JC. I think those were the people I mentioned at that time.").

2  The challenged statement is thus at least substantially true.

3      *Third*, it is true that Hadnagy "agreed to stop"—i.e., to stop taking actions

4  against Reynolds. There doesn't appear to be any dispute on that point.

```
12        Q    Ultimately on your call with Grifter, you
13    decided -- or had an agreement that both sides would
14    kind of go their separate ways or lay things to bed;
15    is that fair?
16        A    Yes.
```

Hadnagy Dep. 220:12–16.

      *Fourth*, it is true that "the behavior did not stop." Shortly after Hadnagy's

conversation with Wyler, Hadnagy reached out to Wyler about "new info." Mertens

Decl. Exhibit 14 at WYLER00000024. Then Hadnagy's close confidant (Ryan

MacDougall) texted Reynolds about her "lies," and Social-Engineer locked Reynolds

out of her laptop. Wyler then texted Hadnagy:



*Id.*

      Moreover, by the time Def Con posted the Transparency Report in January

2023, Hadnagy had taken further retaliatory action against Reynolds. He had tried

to dig up "dirt" on her under false pretenses; had disparaged her to the company

Capital Group; had called her an "awful psycho bitch" in an email to his PR

consultant; and had described her as a "con artist," a "psychopath," and a liar in an

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1    email to a tech journalist. Clearly Hadnagy's behavior "did not stop." The statement
2    is thus at least substantially true.

### C.    Def Con's statements do not imply sexual misconduct, but even if they did, the implication would be accurate.

The Court has already rejected Hadnagy's "defamation by implication" argument—i.e., the notion that the Transparency Report and Transparency Update somehow implied that Hadnagy had committed sexual misconduct. *See* Dkt. 53 at 11 ("Nothing in the Transparency Report or Update references or implies sexual misconduct.") And Plaintiffs did not move for reconsideration of the Court's determination, so they cannot challenge it now or otherwise attempt to resurrect the defamation-by-implication argument.

Any such attempt would fail regardless because the evidence shows that Hadnagy *did* engage in pervasive sexual misconduct. He regularly objectified and sexualized his female employees. He shared his sexual interest in Asian women. He engaged his 21-year-old female employee in conversations about pubic hair for a purported "sting" operation that would have been illegal. He told that same employee he was a "boob guy," talked to her about her body, her attractiveness, and her physical appearance, and gave her an unwanted kiss on the forehead. He designed training sessions in which women would ask men about circumcised penises, and men would ask women about bra sizes and feminine hygiene products. His third-party DEI consultants confirmed that employees reported commentary about employee appearance and sexual jokes in the workplace. And that's just the evidence that is *undisputed*. Discovery has unearthed evidence of even more troubling incidents that Def Con is prepared to present at trial.

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT – 33 (No. 2:23-cv-01932-BAT)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1    Accordingly, any implication about sexual misconduct that could be drawn

2  from the Transparency Report and Transparency Update would be true, or at least

3  not provably false.

4  **II.    Hadnagy has not shown negligence.**

5    Even if there were a genuine issue of material fact about the truthfulness of

6  the challenged statements (there is not), defamation is not a strict liability tort; the

7  plaintiff must prove fault. When the plaintiff is a private figure, he must prove

8  negligence—i.e., that "the defendant knew or, in the exercise of reasonable care,

9  should have known that the statement was false." *Haueter v. Cowles Pub. Co.*, 811

10 P.2d 231, 236 (Wash. App. 1991); *see also Pardee*, 13 Wash. App. 2d at *6 (same).

11   Hadnagy has not offered any evidence even suggesting, much less proving, that

12 Def Con knew or should have known that any statement in the Transparency Update

13 or Transparency Report was false. Def Con performed extensive due diligence before

14 posting the statements. When Reynolds first came forward, Def Con discussed her

15 allegations with Hadnagy, who *admitted* taking the alleged actions. While Hadnagy

16 offered "yes, but" justifications for his behavior, Def Con was rightly skeptical of those

17 justifications based on the facts and circumstances. Moreover, Def Con was entitled

18 to conclude that whatever Hadnagy claimed Reynolds did or didn't do, nothing could

19 justify his vindictive, mean-spirited, and highly personal campaign against her.

20   Moreover, Reynolds was far from the only accuser. More than a dozen people

21 came forward to share their experiences with Hadnagy and explain how he had made

22 them feel scared, humiliated, and demeaned. Their allegations were incredibly

23 disturbing; they accused Hadnagy of brandishing a switchblade; of violent outbursts

24 of anger; of speaking to employees in a sexualized manner; of fixating on his

25 employees' race; etc., etc. Moss testified he found the allegations credible because

26 (among other things) they were firsthand accounts of people who had worked for him;

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1  Hadnagy had volunteered a list of people who he suspected would have issues with

2  him; and the accounts comported with Wyler's own personal experience with

3  Hadnagy. Moss Dep. 167:24–171:25. Wyler likewise found the allegations credible

4  because of the sheer number of people and the "very clear level of intimidation and

5  just general fear around Chris and his behavior and what he would do if he knew that

6  they were talking to us." Wyler Dep. 120:19–121:5. Indeed, *the evidence of*

7  *misbehavior was overwhelming*.

8      Further, discovery has confirmed that Def Con was absolutely right about

9  Hadnagy. At least nine people have provided sworn testimony regarding the

10  substance of the Zoom call and/or their negative personal experiences with Hadnagy.

11  And in his deposition, Hadnagy repeatedly acknowledged that his behavior was

12  inappropriate or, at a minimum, that he could understand why others would find his

13  behavior inappropriate. *E.g.*, Hadnagy Dep. 11:19–13:23 (understood "how some

14  people might find that discussing Hot Wheels porn throughout a class would be

15  inappropriate"); *id.* at 13:24–14:24 (discussing '70s porn during class "would be

16  inappropriate"); *id.* at 16:16–17:23 (threatening to ball slap someone with a

17  switchblade would be inappropriate "[n]owadays"); *id.* at 18:4–19:9 ("references to

18  boobs having superpowers" would be inappropriate); *id.* at 24:4–25:21

19  (acknowledging "there are people who would be offended" by him calling a former

20  employee "an awful psycho bitch"); *id.* at 27:18–28:15 (acknowledging that "someone

21  might find it to be inappropriate to refer to someone as a full on psychopath who has

22  not been diagnosed as a psychopath); *id.* at 31:16–32:15 (in "this day and age,"

23  someone might feel it is inappropriate to refer to a female employee as a beautiful

24  woman); *id.* at 38:20–39:24 (calling a woman "stupid hot" might be seen as

25  inappropriate); *id.* at 46:10–47:9 (acknowledging it was "unprofessional to refer to a

26  former contestant as being hot and beautiful"); *id.* at 53:9–54:6 (saying he would

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT – 35 (No. 2:23-cv-01932-BAT)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1  change how he spoke about Asians today versus 2012); *id.* at 67:6–68:16 (calling a

2  female employee "an adorable little Asian teapot" was inappropriate and

3  unprofessional); *id.* at 80:23–81:24 (understands how people could find his training

4  questions inappropriate).

5      On this record, no reasonable juror could find that Def Con "knew or should

6  have known" that any of the statements in the Transparency Report or Transparency

7  Update were false. The evidence available at the time showed that Hadnagy had

8  committed multiple, severe acts of harassment, and Hadnagy has offered no evidence

9  to the contrary even with the benefit of extensive discovery.

10                        **CONCLUSION**

11     For the foregoing reasons, Defendants respectfully request that the Court

12 grant summary judgment and dismiss this suit with prejudice.

13

     DATED this 21st day of February 2025.

14

15                                     **PERKINS COIE LLP**

16
   I certify that this memorandum contains     *s/David A. Perez*
17 8,970 words, in compliance with the        David A. Perez
   Local Civil Rules.                         **Perkins Coie LLP**
18                                            1201 Third Avenue, Suite 4900
                                              Seattle, WA 98101-3099
19                                            Telephone: 206.359.8000
                                              Email: DPerez@perkinscoie.com
20

21                                            Matthew J. Mertens
                                              **Perkins Coie LLP**
22                                            1120 N.W. Couch Street 10th Floor
                                              Portland, OR 97209-4128
23                                            Telephone: 503.727.2000
                                              Email: MMertens@perkinscoie.com
24

25                                            Lauren A. Trambley
                                              **Perkins Coie LLP**
26

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT – 36 (No. 2:23-cv-01932-BAT)

505 Howard Street, Suite 1000
San Francisco, CA 94105-3204
Telephone: 415.344.7000
Email: LTrambley@perkinscoie.com

*Attorneys for Defendants Jeff Moss and*
*DEF CON Communications, Inc.*

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT – 37 (No. 2:23-cv-01932-BAT)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000