# Exhibit 1

11.14.2024
Wyler
**D9**
Buell Realtime Reporting

# TRANSPARENCY REPORT

Home

Recent News

Archives »

About »

Community »

Resources »

SUBMIT! »

POLICY HOME    TRANSPARENCY REPORT    WARRANT CANARY REPORT    PRIVACY POLICY    CODE OF CONDUCT    BLACK BADGE POLICY    CFP PRIVACY POLICY    DMCA INFORMATION    SPONSOR FAQ    VILLAGE FAQ

HACKERS WITH DISABILITITES INFORMATION

## DEF CON Conference Transparency Report

Since DEF CON 25, we have started to share a summary of incidents we are aware of that happened at the convention for a given year.

My hope is that by doing this DEF CON will encourage other conventions to duplicate this reporting and share their data so collectively we can shed some light on the challenge we face in creating more safe and inclusive events.

*- The Dark Tangent*

### Pre DEF CON 30

(Updates before DC 30) Transparency Report

**(2022 July 28)**
It has been a surreal and humbling experience to literally grow up with the community of hackers that developed over the last 30 years. It started with an inclusive call for hackers, lawyers, artists, feds, #hack, #phreak, basically everyone interested, to attend the first, small, DEF CON. As I grew up IRL, so did the convention. I learned to accept some hard truths such as "You can't please all people all of the time" and "Do what you can, when you can." I have always tried to stay true to the core of DEF CON and the Hacker Ethos, even when change is not comfortable or convenient.

In 2015, we introduced a formal Code of Conduct and in 2017, we began publishing post-event transparency reports with statistics about the incidents we are aware of. In 2018, we launched a hotline for attendees to anonymously report behavior violating our Code of Conduct or to connect with a trained and empathic ear. All of this has been a team effort made possible by incredibly smart, compassionate, and capable staff, volunteers, and community supporters.

### DEF CON Sites

 Forums

 Groups

 Media Server

 InfoCon.org

### The Goods

 Official Swag

Source of Knowledge — Conference Recordings

### Past Media

 Torrents Page

 DEF CON Media Server

 InfoCon.org








https://defcon.org/html/links/dc-transparency.html

SE_000657

As we prepare to celebrate three decades of DEF CON, we're constantly learning what it means to effectively support an evolving community with transparency and empathy. So today, we're publishing details about our escalation process when we receive reports of Code of Conduct violations.

## What does DEF CON do with Code of Conduct violation reports?

In the past, individual community members shouldered too much of the burden to protect each other using whatever means they could. We, the event organizers, must be better.

Our code of conduct is simple: "We do not condone harassment against any participant, for any reason. Harassment includes deliberate intimidation and targeting individuals in a manner that makes them feel uncomfortable, unwelcome, or afraid."

To be clear, the term "harassment" encompasses any behavior that makes others feel uncomfortable or unsafe.

When we receive a report of a Code of Conduct violation, our leadership team representing multiple functions and departments, conducts a review of the substance in consultation with our attorney as needed. This usually involves speaking with parties named in the report including potential witnesses, alleged offender(s), and victim(s).

We then review all the evidence available to us through community reports, news media, and internal investigations to determine whether the allegations are substantiated. Most of the reports we receive are for minor violations that result in a warning, but severe allegations may require a referral to hotel security and/or law enforcement, especially if the report includes claims of criminal behavior.

Please remember all DEF CON attendees are guests of both the conference and the hosting property, which has its own Code of Conduct and rules. The property will remove anyone that breaks their rules and will prevent you from attending the conference in the future.

## Does DEF CON publish report details?

Our transparency report includes the number and category of incidents that are reported during the DEF CON conference each year. We also respond to reports through the year and publish updates for the community about major incidents that occur between events. Repeat offenders and those who commit more egregious offenses are permanently banned from our events. In the case of the most troubling offenses or those who we feel may represent an ongoing risk to the community, we take the extra step of naming them publicly. We believe we have an obligation to the community not to provide cover for these individuals to quietly find new and unsuspecting victims elsewhere. When we disclose this information, we do so to protect the DEF CON community, not to act as a public trial.

If the report of harassment presents a risk of immediate or future retaliation, or at the request of the reporting individual, we will take measures to protect their identity and/or details of the accusations. We've adopted these safeguards based on recommendations from the National Network to End Domestic Violence and the Violence Against Women Office at the US Department of Justice.

When affected individuals feel safe and comfortable doing so, they may approach alleged offenders about inappropriate behavior and ask them to stop. However, disparity in power or status, fear of retaliation, or the nature of

https://defcon.org/html/links/dc-transparency.html

SE_000658

the behavior may make direct confrontation difficult, and therefore there is no requirement for such action to be taken before DEF CON begins our investigation. In fact, retaliation is itself a violation of our Code of Conduct, which states:

*"We do not condone harassment against any participant, for any reason. Harassment includes deliberate intimidation and targeting individuals in a manner that makes them feel uncomfortable, unwelcome, or afraid."*

As a private event and organization, we reserve the right to prioritize protecting the privacy of reporting individuals and victims of abusive behavior above other potential interests. Additionally, as private property, the hotel can trespass individuals permanently banned from DEF CON, creating a criminal and physical barrier between those individuals and the conference areas.

Anyone can report harassment. If you are at DEF CON and are being harassed, notice that someone else is being harassed, or have any other concerns, you can let us know by contacting any Goon, registration desk, or info booth, as well as by calling or texting the hotline at **725-222-0934**. As a reminder, you can also contact the hotline during the con if you just need someone supportive to talk to.

You can also file a report year-round by contacting **safety@defcon.org**. We encourage individuals to report CoC violations as soon as they're able to so we can begin our investigation before evidence is lost or destroyed, but it's never too late to make a report.

*- The Dark Tangent*

## Post DEF CON 29

(Updates between DC 29 and DC 30) Transparency Report

**(2022 Feb 9)**

1. We received multiple CoC violation reports about a DEF CON Village leader, Chris Hadnagy of the SE Village. After conversations with the reporting parties and Chris, we are confident the severity of the transgressions merits a ban from DEF CON.

2. We have also taken the rare action to disband the DEF CON Group DCG414. Code of Conduct violations by the group's primary Point of Contact and subsequent mishandling of the event left us without confidence in the group's leadership.

## DEF CON 29

(2021 August 5-8) Transparency Report
From our [closing ceremony] transparency report announcement:

## DEF CON 29 – Virtual

Of 95,562+ total messages the moderation team deleted 127 (0.13%)
We received 30 reports via "Report-a-violation feature."

Across the 34,321+ accounts on the DEF CON Discord, the moderation team:
* Warned 45 users (0.05%)
* Temporarily Muted 50 users (0.05%)
* Kicked 7 users (0.02%)
* Banned 6 users (0.017%)

https://defcon.org/html/links/dc-transparency.html

## DEF CON 29 – Physical

**Medical & Health:**
7 medical emergencies 4 requiring EMTs
4 mental health issues requiring specialist support
[we noticed a significant number of attendees struggling this year and asked
the community to have each others backs]

**Menstrual Products**
Now Provided in all convention area restrooms, regardless of gender.
Estimated 850+ of these were distributed

**Policy & Conduct**
1 lost passport
3 photo policy violations
3 suspicious packages
2 people removed for not masking
Approx 25 turned away for not being vaccinated
2 removed by security from Vaccination check

x

## DEF CON 27

Estimated number of people : 30k+
Announced at closing ceremonies August 11, 2019

```
# Description
6 Harassment
1 Sexual Assault
2 Theft/Loss
3 Bans/Trespasses
2 Falling Ceiling
2 Foiled Attacks on Casino
1 Biblical Grasshopper Plague
2 Warnings Issued to Our Staff
1 Staff Member Dismissed
5 Drunk and Disorderly
5 Photo Policy Complaints
1 Media Company Ejected
1 Hotel Safety-Security Issue
1 Failed Troll Attempt/ Self Own
```

**Support Line Stats**
Available each day of the conference rom 0800-0400
Completely anonymous
Trained community volunteers

```
# Description
29 Total Calls
12 Code of Conduct Reports
5 Referrals to Para-Professional Counseling
1 Legal Issue
1 Person Trapped Back of House
```

## DEF CON 26

Estimated number of people: 28,000+
Announced at closing ceremonies August 12th, 2018

https://defcon.org/html/links/dc-transparency.html

```
# Description
3 Harassment
7 Sexual Harassment
1 Sexual Assault

7 Medical Incidents
2 Theft
3 Vandalism
1 Tresspassing
1 Falling Ceiling
1 Badge Makers Exonerated
1 Attacks On Casino Foiled
1 Dust Storms / Flash Flood
1 Other Event's Attendees Claiming We Hacked Them
1 Warnings Issued To Our Staff
```

**Support Line Stats**
Available each day of the conference from 08:00 to 04:00
Completely anonymous
Trained community volunteers

```
# Description
62 Total Calls
42 General Information Calls
3 Harassment Calls
5 Sexual Harassment Calls
1 Medical Help Calls
1 Concern Over Drink Tampering
```

## DEF CON 25

Estimated number of people: 25,000+
Announced at closing ceremonies July 30th 2017

```
# Description
7 Harassment reports (Code of Conduct violations)
including:
2 People banned for life due to harassing women
1 Person banned for life for harassing hotel staff
1 Person fled before we could identify and ban them for
harassing a woman

9 Medical incidents leading to 4 hospital transports
3 Thefts
1 Vicious Dog report
3 Adorable Dog reports
3 Vandalism to DEF CON or hotel property
2 Trespass on hotel property
2 People un-banned for life by the hotel
```

**Notes:**
A DEF CON ban is a prohibition against a person or group from attending future conventions due to bad behavior. DEF CON conveys the information to the hotel and if a banned person returns they will be "trespassed" by hotel security and possibly prosecuted.

A hotel ban is a ban instituted by the hotel for bad behavior against the hotel or its interests and is outside of our control. You anger the hotel, you deal with the hotel.

**Other notable bans:**
DEF CON also monitors news reports and community forums for potential

https://defcon.org/html/links/dc-transparency.html

SE_000661

bad actors to exclude from our conventions, like we did with Jake
Applebaum, John Draper aka Captain Crunch, and Morgan Marquis-Boire,
who have all been banned.

© 1992-2022 DEF CON Communications, Inc. All Rights Reserved | DEF CON Policies | DMCA Information

https://defcon.org/html/links/dc-transparency.html

SE_000662

# Exhibit 2

11.14.2024
Wyler
**D10**
Buell Realtime Reporting

# Chris Hadnagy vs. DEF CON lawsuit DISMISSED

Posted 1.13.23

**Update:**
- Judge Beetlestone in PA dismissed the lawsuit without pre-trial discovery, ruling that it lacked personal jurisdiction.
- Because the case was dismissed without prejudice, Mr. Hadnagy can refile and attempt to litigate in another venue.



**Additional context:**
During our investigation we spoke directly with Mr. Hadnagy about claims of his violations of our Code of Conduct. He confirmed his behavior, and agreed to stop. Unfortunately, the behavior did not stop.

Before DEF CON finalized our response, Mr. Hadnagy informed us that his Social Engineering Village would not be returning to DEF CON.

Our investigation also revealed that DEF CON is not the only security conference to receive complaints about Mr. Hadnagy's behavior. For example, Black Hat received complaints, conducted their own investigation and removed Mr. Hadnagy from their Review Board.

We thank the DEF CON community for supporting our efforts to uphold our Code of Conduct.

All the court documents are available here:
https://lnkd.in/gsugqMyV

And as always, our code of conduct and transparency report are here:
https://defcon.org/html/links/dc-code-of-conduct.html
https://defcon.org/html/links/dc-transparency.html

SE_000485

# Exhibit 3

# CODE OF CONDUCT

Home

Recent News

Archives »

About »

Community »

Resources »

SUBMIT! »

POLICY HOME   TRANSPARENCY REPORT   WARRANT CANARY REPORT   PRIVACY POLICY   CODE OF CONDUCT   BLACK BADGE POLICY   CFP PRIVACY POLICY   DMCA INFORMATION   SPONSOR FAQ   VILLAGE FAQ

HACKERS WITH DISABILTITES INFORMATION

## Conference Code of Conduct

Last updated 3.6.15

DEF CON provides a forum for open discussion between participants, where radical viewpoints are welcome and a high degree of skepticism is expected. However, insulting or harassing other participants is unacceptable. We want DEF CON to be a safe and productive environment for everyone. It's not about what you look like but what's in your mind and how you present yourself that counts at DEF CON.

We do not condone harassment against any participant, for any reason. Harassment includes deliberate intimidation and targeting individuals in a manner that makes them feel uncomfortable, unwelcome, or afraid.

Participants asked to stop any harassing behavior are expected to comply immediately. We reserve the right to respond to harassment in the manner we deem appropriate, including but not limited to expulsion without refund and referral to the relevant authorities.

This Code of Conduct applies to everyone participating at DEF CON - from attendees and exhibitors to speakers, press, volunteers, and Goons.

Anyone can report harassment. If you are being harassed, notice that someone else is being harassed, or have any other concerns, you can contact a Goon, go to the registration desk, or info booth.

Conference staff will be happy to help participants contact hotel security, local law enforcement, or otherwise assist those experiencing harassment to feel safe for the duration of DEF CON.

Remember: The CON is what you make of it, and as a community we can create a great experience for everyone.

### DEF CON Sites


Forums


Groups


Media Server


InfoCon.org

### The Goods


Official Swag


Conference Recordings

### Past Media


Torrents Page


DEF CON Media Server


InfoCon.org










https://defcon.org/html/links/dc-code-of-conduct.html

SE_000922

- The Dark Tangent

https://www.defcon.org/html/links/dc-policy.html

© 1992-2021 DEF CON Communications, Inc. All Rights Reserved | DEF CON Policies | DMCA Information

https://defcon.org/html/links/dc-code-of-conduct.html

SE_000923

# Exhibit 4



About ⌄    Get Involved ⌄    Shop ⌄    Resources    Blog ⌄    Request a Speaker
Report A Case
Donate

# CHRIS HADNAGY

## Founder, Executive Director, & Board Member



About ⌄   Get Involved ⌄   Shop ⌄   Resources   Blog ⌄   Request a Speaker   Report A Case   Donate



Chris possesses over 13 years of experience as a practitioner and researcher in the security field. He is the author of 5 books and 3 different training courses taught around the globe. Chris is an Adjunct Professor of Social Engineering for the University of Arizona's NSA-designated Center of Academic Excellence in Cyber Operations (CAE-CO) and sits on The Information Technology Systems Technical Advisory Committee of Idaho State University. He has trained and taught various branches of the US Government in the art and science of social engineering, including the FBI, SOCOM, and others. Chris has been invited to the Pentagon to debrief 30+ general officers and government officials on social engineering and its effect on the United States.

Chris established the world's first social engineering penetration testing framework at www.social-engineer.org, providing an invaluable repository of information for security professionals and enthusiasts. That site grew into a dynamic web resource including a podcast and newsletter, which have become staples in the security industry and are referenced by large organizations around the world.

Chris specializes in understanding how malicious attackers exploit human communication and trust to obtain access to information and resources

About ⌄   Get Involved ⌄   Shop ⌄   Resources ⌄   Blog ⌄   Request a Speaker   Report A Case   Donate

through manipulation and deceit. His goal is to secure companies by educating them on the methods used by attackers, identifying vulnerabilities, and mitigating issues through appropriate levels of awareness and security. Learn more here.

# Shop

When you purchase through links on our site, we may earn an affiliate commission. Thank you for supporting the Innocent Lives Foundation.

## "This work is so important."

### AJ Cook

*Searchlight*

‹                                                                              ›



1  / 35

A Guide to Child Safety Online

Sext Education: How to Teach Your Teen the Dangers of Sexting

Everything You Need to Know About Online Grooming

What is sextortion?

Check Donation Matching

Get Involved

Report A Case

Donor Privacy

Contact Us

Impact Reports

2022-2023 990 Tax Form

2021-2022 990 Tax Form

2020-2021 990 Tax Form

2020 990 Tax Form



© 2025 The Innocent Lives Foundation. All Rights Reserved. EIN 82-1110116

   

# Exhibit 5

Maxie Reynolds                                      September 27, 2024

Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

---------------------------------------------------------
                             )
CHRISTOPHER J. HADNAGY;      )
SOCIAL-ENGINEER,             )
                             )
              Plaintiffs,    )
                             )
     vs.                     )   No. 2:23-cv-01932-BAT
                             )
JEFF MOSS; and DEF CON       )
COMMUNICATIONS, INC.,        )
                             )
              Defendants.    )
                             )
---------------------------------------------------------

VIDEOTAPED VIDEOCONFERENCE DEPOSITION UPON ORAL
                    EXAMINATION

                        OF

                MAXIE REYNOLDS

---------------------------------------------------------

           Los Angeles, California (Via Zoom)

DATE:    September 27, 2024

REPORTED REMOTELY BY:  Douglas Armstrong, RPR
                       Washington CCR No. 3444

Maxie Reynolds                                    September 27, 2024

Page 2

```
 1                A P P E A R A N C E S

 2

 3   For the Plaintiffs:

 4        MARK R. CONRAD
          Frey Buck, P.S.
 5        1200 Fifth Avenue, Suite 1900
          Seattle, Washington 98101
 6        (206) 486-8000
          mconrad@freybuck.com
 7        (Via Videoconference)

 8        KRISTOFER Z. RIKLIS
          Riklis Law, LLC
 9        401 Wilshire Boulevard, Floor 12
          Santa Monica, California 90401
10        (310) 895-2497
          kristofer@riklislaw.com
11        (Via Videoconference)

12

     For the Defendants:
13
          MATTHEW J. MERTENS
14        Perkins Coie, LLP
          1120 Northwest Couch, 10th Floor
15        Portland, Oregon 97209
          (503) 727-2199
16        mmertens@perkinscoie.com
          (Via Videoconference)
17

18   Also Present:

19        PATRICK NORTON
          Videographer
20        (Via Videoconference)

21        LAUREN ENGLISH
          Frey Buck
22        (Via Videoconference)

23        CHRIS HADNAGY
          (Via Videoconference)
24

25
```

Maxie Reynolds                                    September 27, 2024

Page 7

1    Los Angeles, California      Friday, September 27, 2024

2                      9:00 a.m. PDT

3         ------------------------------------

4         THE VIDEOGRAPHER:  We are on the record at

5    9:00 a.m. on September 27, 2024.  This is the

6    video-recorded deposition of Maxie Reynolds in the

7    matter of Christopher J. Hadnagy vs. Jeff Moss, et al.,

8    Number 2:23-cv-01932-BAT in the United States District

9    Court for the Western District of Washington.  This

10   deposition is being held virtually and was noticed by

11   defendant.

12        Counsel, please introduce yourselves and

13   state whom you represent.

14        ATTORNEY CONRAD:  Mark Conrad for plaintiffs.

15        ATTORNEY MERTENS:  And Matt Mertens for

16   defendants Jeff Moss and Def Con Communications.

17        THE VIDEOGRAPHER:  My name is Patrick Norton,

18   and I am the legal videographer.  The court reporter is

19   Doug Armstrong.  We are with Seattle Deposition

20   Reporters.  Would the reporter please swear in the

21   witness.

22

23   MAXIE REYNOLDS,         witness herein, having been

24                           duly sworn by the Certified

25                           Court Reporter, testified as

Maxie Reynolds                                    September 27, 2024

Page 8

 1                    follows:

 2

 3                E X A M I N A T I O N

 4  BY ATTORNEY MERTENS:

 5       Q.   Good morning, Ms. Reynolds.

 6       A.   Good morning.  How's it going?

 7       Q.   Good.  Good.  Thank you.

 8            We've met before off the record, but for the

 9  purposes of the record, I'll reintroduce myself.  I'm

10  Matt Martens.  I'm an attorney for Jeff Moss and Def

11  Con Communications in the lawsuit that Mr. Hadnagy and

12  Social-Engineer, LLC, have brought against Mr. Moss and

13  Def Con.

14            Ms. Reynolds, have you ever been deposed

15  before?

16       A.   No.

17       Q.   Okay.  So we'll just cover some basics here.

18            You understand that you are giving today

19  sworn testimony under oath just like you're sitting in

20  a courtroom?

21       A.   Yes.

22       Q.   And you understand that you are sworn to tell

23  the truth to the best of your ability?

24       A.   Yes.

25       Q.   Okay.  So some ground rules for today's

Maxie Reynolds                                     September 27, 2024

Page 15

1              And so I reached out to Chris on LinkedIn.  I

2    don't recall, like, the details of the conversation,

3    but it was just, again, looking for work.  And I

4    believe I was sort of naive at the time and that I

5    thought I could get contract work from Chris, and we

6    quickly discovered that wasn't possible.  And then I

7    went to work for him.

8         Q.   Who's Jake Williams?

9         A.   Jake Williams is sort of -- I would call him

10   like an industry titan.  He's very well known.  He's

11   well respected with regards to his work.  He was a DFIR

12   specialist, so digital forensic specialist.

13        Q.   And Mr. Williams is the one who connected you

14   to Mr. Hadnagy?

15        A.   Yeah.  Told me his name and, I think, maybe

16   even gave me his LinkedIn profile.

17        Q.   And can you describe the process that led up

18   to Mr. Hadnagy hiring you at his company,

19   Social-Engineer?

20        A.   I can try.  I got in touch with him.  We had

21   a conversation.  Like, I'm fairly sure Chris said,

22   like, sort of, "Maybe.  I might be looking for someone.

23   I'm going to be in" -- I think it was California in a

24   few weeks.

25              And I said, "Well, I'm going to come to

Maxie Reynolds                                    September 27, 2024

Page 16

 1    Florida, like, next week, sort of thing, and, like, can
 2    I come and see you?"
 3            And then I went down to see him, which I
 4    tried -- it was friendly, nice.  We talked about his
 5    work with ILF.  I said I wanted to join that too.  And
 6    I think I joined ILF, like, was onboarded to ILF before
 7    I was onboarded at Social-Engineer, but there was just
 8    a few weeks between them.
 9        Q.    And you referenced ILF in your answer,
10    Ms. Reynolds.
11        A.    Yeah.
12        Q.    What is ILF?
13        A.    Innocent Lives Foundation.  It's a
14    foundation, as far as I know, Chris created.  It
15    ostensibly looks into child sex offenders and tries to
16    help law enforcement arrest them, I suppose, is part of
17    the mission.
18        Q.    And approximately when did you start your
19    employment at Social-Engineer?
20        A.    So I'll preface this answer with saying from
21    COVID, like, my ability to recall dates, I just don't
22    have the same markers, but maybe like 2018 or '19.  I
23    think it was just before COVID.  It was like the year
24    before COVID, I think.
25        Q.    Okay.  So --

Maxie Reynolds                                    September 27, 2024

Page 19

1    agreement --

2         A.   Yeah.

3         Q.   -- with Social-Engineer.  I'm going to scroll

4    down to the bottom.  It's executed by you and

5    Mr. Hadnagy down at the bottom.

6              Do you see this?

7         A.   Yeah.

8         Q.   And it's not dated at the top.  It's

9    effective as of a blank date, but the month and year is

10   January 2020.

11             Does this refresh your recollection that you

12   may have started in January 2020?

13        A.   It doesn't refresh it, but I would believe

14   that over my ability to pick a date.

15        Q.   Okay.

16        A.   Yeah.

17        Q.   And approximately when did you leave

18   Social-Engineer?

19        A.   August of 2021, I think.  Yeah.

20        Q.   And while you were employed with

21   Social-Engineer --

22        A.   Uh-huh.

23        Q.   -- what was your experience working with

24   Mr. Hadnagy?

25        A.   It's colored now.  So I'm not entirely sure

Maxie Reynolds                                    September 27, 2024

1    we got her booted.  I won't let Kevin get hurt."

2              Have you ever seen this exchange before?

3         A.    No.

4              ATTORNEY CONRAD:  Object.  Form.

5         Q.    (By Attorney Mertens) Are you surprised that

6    Mr. Hadnagy got you booted from the NCPTF?

7         A.    No.  That's exactly his character.

8         Q.    How do you feel about Mr. Hadnagy leveraging

9    his influence with NCPTF to get you booted?

10        A.    That is exactly his character.  I feel

11   nothing about him doing that.  I don't care anymore.

12   He is who he is.  There is absolutely nothing I can do

13   about it.  In fact, I've done everything I can do about

14   it.

15             I feel, relative to that organization, that

16   he stood in the way of people who want to do good.  He

17   stood in the way of that, and, like, I hope it weighs

18   on him.  I really hope that weighs on his conscience.

19   I think that's a terrible thing to do.  That's how I

20   feel about the situation.  How I feel about him, I

21   don't care.

22        Q.    I want to summarize a list of what I've heard

23   you testify to, Ms. Reynolds, and --

24        A.    Uh-huh.

25        Q.    -- I want you to tell me if that list is

Maxie Reynolds                                    September 27, 2024

Page 74

1    comprehensive, okay?

2         A.    Uh-huh.

3         Q.    You testified that Mr. Hadnagy contacted

4    Mr. Minatel to try to stop the ongoing publication of

5    your book; is that correct?

6         A.    Correct.

7               ATTORNEY CONRAD:  Object.  Form.

8         Q.    (By Attorney Mertens) You testified that

9    Mr. Hadnagy contacted Mr. Fishman to try to stop the

10   creation of a television series with Mr. Fishman; is

11   that correct?

12              ATTORNEY CONRAD:  Object.  Form.

13        A.    That's correct.

14        Q.    (By Attorney Mertens) You testified that

15   Mr. Hadnagy reported you to the FBI for use of ILF

16   images that he -- for which he had approved the use in

17   your book; is that correct?

18              ATTORNEY CONRAD:  Object.  Form.

19        A.    Correct.

20        Q.    (By Attorney Mertens) You testified that

21   Mr. Hadnagy contacted Mr. Rhysider, the host of Darknet

22   Diaries, to ask Mr. Rhysider to pull the episodes that

23   he had recorded with you regarding the publication of

24   your book; is that correct?

25              ATTORNEY CONRAD:  Object.  Form.

Maxie Reynolds                                    September 27, 2024

Page 75

1        A.    Correct.

2        Q.    (By Attorney Mertens) You testified that you
3    learned from Mr. Williams, Mr. Rhysider, conversations
4    with two individuals at ILF, Mr. Klump, Grifter, and
5    conversations with Mr. Minatel and Mr. Fishman that
6    Mr. Hadnagy had been calling around in the information
7    security community claiming that you were starting a
8    competing business, that you stole intellectual
9    property, and that you were stealing clients from
10   Mr. Hadnagy; is that correct?

11              ATTORNEY CONRAD:  Object.  Form.

12       A.    That is correct.  Yes.

13       Q.    (By Attorney Mertens) And you testified that
14   a member from ILF reached out to your dad to check on
15   his health after you left ILF and represented that he
16   was still working with you at ILF when he did that; is
17   that correct?

18              ATTORNEY CONRAD:  Object.  Form.

19       A.    Correct.

20       Q.    (By Attorney Mertens) You testified that
21   Mr. Hadnagy remotely locked your computer in lieu of
22   wiping the data that you had on that computer and that
23   he backed up your personal information repeatedly from
24   that computer in lieu of wiping the data from your
25   computer; is that correct?

Maxie Reynolds                                    September 27, 2024

Page 76

1              ATTORNEY CONRAD:  Object.  Form.

2        A.    Correct.

3        Q.    (By Attorney Mertens) And Mr. Hadnagy

4   repeatedly --

5              ATTORNEY MERTENS:  Strike that.

6        Q.    (By Attorney Mertens) Mr. Hadnagy threatened

7   to sue you, although he did not?

8              ATTORNEY CONRAD:  Object.  Form.

9        A.    Correct.  Although, I -- he threatened to sue

10  me for something to do with NDAs.  I forgot that, but

11  it happened.  So there's that as well, just to let you

12  know.

13       Q.    (By Attorney Mertens) And you testified that

14  Mr. Hadnagy leveraged his influence with Kevin at the

15  NCPTF to boot you from involvement with NCPTF, and we

16  saw Mr. Hadnagy's message to that effect; is that

17  correct?

18             ATTORNEY CONRAD:  Object.  Form.

19       A.    Correct.

20       Q.    (By Attorney Mertens) Do you feel like this

21  constellation of actions by Mr. Hadnagy deliberately

22  targeted you?

23       A.    Yeah.

24             ATTORNEY CONRAD:  Object.  Form.

25       Q.    (By Attorney Mertens) Did they make you feel

Maxie Reynolds                                    September 27, 2024

Page 77

1    uncomfortable?

2              ATTORNEY CONRAD:  Object.  Form.

3         A.    They made me feel way more than

4    uncomfortable.  They made me feel extremely anxious and

5    nervous and like boxed in.  So it made me feel more

6    than uncomfortable.

7         Q.    (By Attorney Mertens) Did you feel afraid?

8         A.    Yeah.

9              ATTORNEY CONRAD:  Form.

10        A.    I did feel afraid.  I think he has a pattern

11   of intimidation, and people who were once good

12   employees are bad people, not just employees, bad

13   people as soon as they've left.  So, yeah, I did.

14        Q.    (By Attorney Mertens) Who is Neil Wyler?

15        A.    He is a well-known individual within the

16   cybersecurity industry.  I think he's mainly on the

17   defensive side of security.

18        Q.    And at some point in late August or early

19   September of 2021, did you reach out to Mr. Wyler

20   regarding Mr. Hadnagy's behavior towards you?

21        A.    I did.

22        Q.    Why?

23        A.    I'd heard that Neil or Grifter was fair and

24   professional and nice, and I found those things to be

25   true.  And I went to him because of those things, and

Maxie Reynolds                                    September 27, 2024

Page 94

1    A.    She was not on that call.

2    Q.    Alethe Denis?

3    A.    She was.

4    Q.    Who else, if anyone, was on the initial

5    outreach call to Def Con other than the people you have

6    just identified?

7    A.    Outside of that group, there was Jeff Moss

8    was on the call.  Neil Wyler or Grifter was on the

9    call.  And I'm not entirely sure who else from Def

10   Con's side was on the call.  I can't -- I can't

11   remember.

12   Q.    How about for the group of individuals who

13   were raising the concerns about Mr. Hadnagy?

14   A.    I also don't recall any more names.

15   Q.    You don't recall any more names because you

16   think that's the entirety of the list or because you

17   just -- there were others, but you don't recall their

18   names?

19   A.    Because I have a brain like a strainer, like,

20   I don't -- I don't recall the other names.  But, like,

21   to the best of my recollection, there were like 20

22   people on that call.  Not all of them are whisper

23   network, but there were more people on that call, as I

24   counted them.

25   Q.    How were you able to count the number of

Maxie Reynolds                                    September 27, 2024

Page 95

1    attendees on that call?

2        A.    So much like this Zoom session, there were

3    windows for people.  Not everyone was on camera, but

4    there were windows for people, and it gives you a

5    participant count at the bottom of the call.

6        Q.    And how did it -- how did that call get

7    scheduled with Def Con logistically?  Like, how did

8    that happen?

9        A.    I think it's just through our phones.  Like,

10   I don't remember being on a call to schedule.  I don't

11   know.

12       Q.    Do you -- did a calendar invite go out with

13   some kind of link to a dial-in?

14       A.    I don't think so, but I can't say for 100

15   percent certainty.

16       Q.    And I think I probably know the answer,

17   Ms. Reynolds, but I just have to nail this down.

18       A.    Uh-huh.

19       Q.    Sitting here today, you don't have any

20   recollection or memory of how the logistics of the call

21   with Def Con came to pass?

22       A.    I don't.  I don't.

23       Q.    Do you know, Ms. Reynolds, how the various

24   participants in the call knew how to attend?

25       A.    I assume there was a Zoom link passed around,

Maxie Reynolds                                    September 27, 2024

Page 106

1    some legal connection because then I heard the word

2    "judge" --

3         Q.   Okay.

4         A.   -- if that makes sense.  Yeah.

5         Q.   And I'm not trying to pick on you,

6    Ms. Reynolds.

7         A.   No.

8         Q.   It just makes a difference for how we're

9    talking about it.

10        A.   You're welcome to.  Like, I'm simply -- like,

11   I'll give you the information as I remember it and see

12   it.  And, like, if it's wrong, correct it.

13        Q.   Perfect.

14             Anything else you recall about Laurie's

15   information that she shared with Def Con on this call?

16        A.   She witnessed, I think, some of Chris' more,

17   like, volatile or intimidating moments.  I think she

18   was -- there was, like, talk.  She talked a lot about

19   Chris being anti -- or, I guess, homophobic and also --

20   like, so that's one side of it.

21             And then, also, that he was sort of unfair as

22   a boss.  Like, there were things like I think she

23   wasn't allowed to take a bathroom break at a

24   conference.  There was, like, those sort of things.  So

25   that was -- yeah.  That's the best of my memory.

Maxie Reynolds                                    September 27, 2024

                                                        Page 139

1    screenshot of a conversation between Ms. Denis and

2    Mr. Hadnagy.

3                 (Exhibit No. Defense 8 marked for

4                  identification.)

5         Q.    I'll represent to you, Ms. Reynolds that

6    Mr. Hadnagy --

7                 ATTORNEY MERTENS:  Strike that.

8         Q.    (By Attorney Mertens) Mr. Hadnagy writes, at

9    8:18 p.m. on March 16, 2022, "Not being a dick, but, I

10   mean, she's not even as hot as Maxie."

11                I'll represent to you that the "she"

12   Mr. Hadnagy is referring to in that statement is

13   Rachel Tobac.  Ms. Denis testified to that in her

14   deposition earlier this week.

15                I want to then direct your attention to the

16   continuation of the conversation where Ms. Denis

17   writes, "Maxie is hot AF.  I get why people just go

18   with whatever Maxie says.  LOL."

19                And Chris responds, "And, literally, Maxie is

20   so hot, it's dumb."

21                Do you see that?

22        A.    Yeah.

23        Q.    What's your reaction to that conversation

24   Mr. Hadnagy is having about your physical appearance

25   with Ms. Denis?

Maxie Reynolds                                    September 27, 2024

Page 140

1              ATTORNEY CONRAD:  Object.  Form.
2         A.    Again, I'm, like, disappointed because how
3    relevant could it be?  Like, how much does -- when you
4    initially meet someone, I think we all, like, you know,
5    look at them, and you register as attractive or
6    unattractive.  Fine.
7              But, like, after a few years of, like -- like
8    a more than a shallow relationship.  Like, I saw him
9    every day.  We talked every day.  I think it's --
10   there's a better word than "superficial," but it's
11   superficial.  And it's like -- it's demeaning.
12             It's irrelevant.  Like, what does it matter?
13   And why is that, like, the lens at which you look at me
14   through?  Like, why does -- why does it matter?  I
15   feel -- if it said, like, "Maxie's ugly AF," I'd feel
16   the same about it.  Like, what does it matter?  So
17   that's my only take.
18             And I would like to know who does exactly
19   what I say because of how I look because I will find
20   them, and I will hire them immediately to follow me
21   around.
22        Q.    (By Attorney Mertens) I'm sharing a document
23   with you, Ms. Reynolds.  This is Defense Exhibit 9.
24        A.    Yeah.
25        Q.    This document does not have a Bates stamp,

Maxie Reynolds                                    September 27, 2024

Page 147

 1              ATTORNEY CONRAD:  Object.  Form.

 2         A.   -- type of stories.  Yes, I'm aware of that.

 3         Q.   (By Attorney Mertens) Ms. Reynolds, how tall

 4    are you?

 5         A.   Five-seven and a half.

 6         Q.   And approximately, Ms. Reynolds -- I'm not

 7    asking for exactitude; that's rude -- how much do you

 8    weigh?

 9         A.   On a good way, 128.  On a bad day, 132.

10         Q.   Have you seen Mr. Hadnagy in person?

11         A.   Yeah.

12         Q.   How tall is Mr. Hadnagy, approximately?

13         A.   Six-two.

14         Q.   And do you know about how much he weighs, as

15    a guesstimate?

16         A.   Maybe, at the time that I knew him, probably

17    three times my weight.

18         Q.   Probably how much?

19         A.   He was, like, two to three times my weight.

20    He was large.

21         Q.   He's much bigger than you?

22         A.   He's much bigger than I am.

23         Q.   Do you think it's appropriate for a man twice

24    your size who professes hatred for you to joke about

25    hiring a hit man against you?

Maxie Reynolds                                    September 27, 2024

Page 148

1         ATTORNEY CONRAD:  Object.  Form.

2         A.   I don't think it's appropriate at all, even

3    if he was half my size.

4         Q.   (By Attorney Mertens) Is there any personal

5    benefit to you by bringing the assertions you've raised

6    against Mr. Hadnagy to Def Con?

7         A.   No.

8         Q.   Did Mr. Moss pay you?

9         A.   No.

10        Q.   Did Def Con pay you?

11        A.   No.

12        Q.   Did anyone pay you for bringing the

13   assertions you've brought against Mr. Hadnagy to Def

14   Con?

15        A.   No.

16        Q.   Did you get any professional benefit by doing

17   so?

18        A.   No.  This is a great, like, personal risk to

19   me.  I think there's only downsides for all of us in

20   this.

21        Q.   Has this entire situation caused you stress?

22        A.   Yes.

23        Q.   A lot of stress?

24             ATTORNEY CONRAD:  Object.  Form.

25        A.   Yes, a lot of stress, a lot of anxiety.  And

Maxie Reynolds                                    September 27, 2024

                                                          Page 150

 1   But, yeah, I'm scared of him that way.

 2           But I will say over the past sort of three

 3   years, I've developed a sort of, like, tolerance to

 4   him.  Like, that he's on this call, for me, is

 5   extremely -- it lacks self-awareness.  You're adding no

 6   value to this call.  Your lawyers don't need you on

 7   this call.  Like, there's no reason.  It just shows a,

 8   like, distinct lack of self-awareness.

 9           And so over the past few years, like, I look

10   at him differently so I'm not scared to sit on this

11   call with him.  But, physically, yes, like, he could

12   take me, unfortunately.

13           And, mentally, I think I'm in a better place

14   now.  So I'm not as scared of him.  Like, I could have

15   a conversation with him if someone else was there to

16   sort of guard me.  So it's changed over time, but,

17   yeah, I'm scared of him, and, yes, he's caused me a lot

18   of anxiety and fear.

19       Q.    (By Attorney Mertens) Are you even in the

20   social engineering employment space now?

21       A.    No.

22       Q.    Why did you approach Def Con with your

23   concerns about Mr. Hadnagy?

24       A.    So I think I kind of talked to this a little

25   bit earlier.  So there are a few reasons why I went to

Maxie Reynolds                                    September 27, 2024

Page 151

 1    Def Con.

 2            As an immigrant, I wasn't sure how to

 3    approach the police.  I can't -- like, one of the

 4    conditions of a visa is, you know, you're to stay out

 5    of trouble kind of thing.  You're to be a beneficial

 6    member of society.  So the fact that he'd been to the

 7    FBI made me really skittish.

 8            I didn't -- I wasn't sure about law

 9    enforcement.  I understand that system more now.  I

10    have the confidence to go to law enforcement now and

11    most likely will, but at the time, I just felt like he

12    might have the upper hand there.  And, just generally,

13    I was just trying to keep myself and my visa under the

14    radar.

15            And the other reason is that -- sorry.  The

16    "hit man" thing threw me a little bit.

17            The other thing is that the asymmetric power

18    he had over every female that worked for or with him

19    created an environment where, you know, unequal

20    dynamics lead to exploitation, as we saw with Sam,

21    bias, and, like, diminished opportunities.  And, for

22    me, that type of imbalance deserves attention because

23    it not only undermines the professional equity, but it

24    also perpetuates this systemic or these types of

25    inequalities that can harm the individuals and the

Maxie Reynolds                                    September 27, 2024

Page 152

1    organization.

2            So, again, we went to him because, like,

3    that's where he finds us.  That's where most of them

4    come from is conferences where he has a lot of cadence

5    and influence.  And he's very personable, and he's got

6    this warmth to him that you're like, "Oh, I can trust

7    you.  You're nice.  I'd love to work there."  And he

8    does have or at least he did have the market cornered.

9            So in that way, like, going to the main place

10   where he garnered credibility and status seemed like a

11   really effective way to solve the issue and stay away

12   from law enforcement.  And maybe I could have been,

13   like, slightly more succinct there.  And I assume you

14   read the letter I sent to Black Hat, but Black Hat and

15   Def Con are, like, cornerstones of the information

16   security community.  And I felt that they should have

17   the information that proved Chris sort of used those

18   conferences to meet women and men and then follow this

19   pattern of intimidation.  And so that's why.

20       Q.   I'm very nearly done, Ms. Reynolds.

21            You testified in the middle of that answer

22   that -- you paused.  You said, "Sorry.  The 'hit man'

23   thing threw me."

24       A.   Yeah.

25       Q.   What do you mean?

1                        C E R T I F I C A T E

2        UNITED STATES        )
                              )
3        DISTRICT COURT        )

4

5                I, a Reporter and Washington Certified Court
         Reporter, hereby certify that the foregoing videotaped
         videoconference deposition upon oral examination of
6        Maxie Reynolds was taken stenographically before me on
         September 27, 2024, and transcribed under my direction;

7

8                That the witness was duly sworn by me
         pursuant to RCW 5.28.010 to testify truthfully; that
         the transcript of the deposition is a full, true and
9        correct transcript to the best of my ability; that I am
         neither attorney for nor a relative or employee of any
10       of the parties to the action or any attorney or counsel
         employed by the parties hereto nor financially
11       interested in its outcome.

12               I further certify that in accordance with
         Washington Court Rule 30(e) the witness is given the
13       opportunity to examine, read and sign the deposition
         within thirty days upon its completion and submission
14       unless waiver of signature was indicated in the record.

15               IN WITNESS WHEREOF, I have hereunto set my
         hand this 3rd day of October, 2024.

16

17

18       Douglas Armstrong, RPR

19       _____

20       Washington Certified Court Reporter No. 3444
         License expires 11/26/2025

21

22

23

24

25

# Exhibit 6



New message                    ···  ◻  ⌐  ✕

Jacob Williams ✕

Search (Ctrl+E / Alt+Q)
Search your mailbox and
commands.

**Jacob Williams** (He/Him) · 1st
Enterprise Risk Management Expert

                    JAN 2, 2020

**Christopher Hadnagy** · 10:19 PM
Checking in

Can you ping me please

                    JAN 3, 2020

**Jacob Williams** (He/Him) · 10:10 AM
What's up?

**Christopher Hadnagy** · 11:03 AM
Do you know a Maxie renolds

Reynolds

---

New message                    ···  ◻  ⌐  ✕

Jacob Williams ✕

**Christopher Hadnagy** · 1:07 PM
Bro?

**Jacob Williams** (He/Him) · 1:51 PM
Yeah, I do. Sorry, it's been one of those days. Bouncing
between IR fires.

Five separate incident calls since i got up today.

**Christopher Hadnagy** · 1:53 PM
yikes bro
so sorry. rght after the holidays too.

her profile is so fake looking its terrible. she doesn't exist
anywhere and she through out your name as a reference to
me

**Jacob Williams** (He/Him) · 1:53 PM
She called last night asking about the advisability of
starting a pure play physical/SE pentest business. I told her
you were the #1 person in pure SE and Core was #1 in pure
physical.

SE_000404



**Jacob Williams** ✕

**Jacob Williams** (He/Him) · 1:53 PM

She called last night asking about the advisability of starting a pure play physical/SE pentest business. I told her you were the #1 person in pure SE and Core was #1 in pure physical.

Her profile does like totally fake. I've told her the same.

we've met IRL on three separate occasions. She is very real.

**Christopher Hadnagy** · 1:54 PM

Her name is linked to a british tv star
and the picture she uses is almost identical

just so sketchy

**Jacob Williams** (He/Him) · 1:56 PM

She probably IS that person. I know she did some film work years ago.

**Christopher Hadnagy** · 1:56 PM

interesting she never brought it up, when i said that to her just all seems so sketchy

lol sorry, nature of the field

**Jacob Williams** (He/Him) · 1:56 PM

Oh yeah, for real.

So she was supposed to interview with us some months ago then flaked out on the call (twice). My interviewing guy was just like "forget this" but said "I think we're being catfished - there's no way this profile is real"

If I hadn't met her IRL first, I would have thought the same thing.

**Christopher Hadnagy** · 1:58 PM

so she is that hot? and that person?
cause that is EXACTLY what i think

**Jacob Williams** (He/Him) · 1:58 PM

Yes, she is both.

Also, FYSA if you do ever talk to her, she has a THICK Scottish accent.

Like thick enough that I struggle to understand her when she talks fast.

**Christopher Hadnagy** · 2:00 PM

but lives in the uSA?

**Jacob Williams** (He/Him) · 2:00 PM

Yeah, last saw her IRL in LA in July.

SE_000405



**Christopher Hadnagy** • 2:01 PM

ok. sorry man for being so 007. just wanted to be sure. her opsec isn't great. to prove she knew you, she sent me a picture of your contact record with your phone number in plaintext

**Jacob Williams** (He/Him) • 2:01 PM

I can't speak to technical skill, but she is definitely likable.

**Christopher Hadnagy** • 2:01 PM

thank god i am one of the good guys

**Jacob Williams** (He/Him) • 2:01 PM

Wow. Unreal.

**Christopher Hadnagy** • 2:01 PM

📄 **image.png**
301 KB

**Jacob Williams** (He/Him) • 2:01 PM

That's... um.... I'm speechless.

**Christopher Hadnagy** • 2:01 PM

thats what she sent

**Jacob Williams** (He/Him) • 2:02 PM

well, they can't all be winners...

**Christopher Hadnagy** • 2:02 PM

ha. yah, so again, sorry just wanted to be sure bro

**Jacob Williams** (He/Him) • 2:03 PM

All good - I'd have reached out if some stranger was throwing your name around too.

Again, not vouching for technical acumen. But she is very real and that's really her.

**Christopher Hadnagy** • 2:03 PM

thank you

JAN 11, 2021



**Jacob Williams** (He/Him) • 5:53 PM

Hope things are going well (as well as any can given COVID craziness).

Not sure if you know Chloe Messdaghi or not, but she runs an infosec book club (meets in the evening on Zoom, don't remember which night) and was looking to use your new book. She always tries to get the authors on for one night to answer questions if possible. She asked if I had any way to contact you, so I figured I'd reach out.  If you're interested at all, her email is Messdaghi@gmail.com.



**Christopher Hadnagy** • 8:27 PM

Thank you

SEP 3, 2021



**Christopher Hadnagy** • 5:38 PM

hey bro



**Jacob Williams** (He/Him) • 6:18 PM

hey, what's up?



**Christopher Hadnagy** • 7:00 PM

Hey bro. I need to ask. How did the connection between you and Maxie then me and Maxie happen?



**Jacob Williams** (He/Him) • 7:06 PM

I met her in Sydney where she was taking a SANS class as a work study at the same conference I was at. We talked a bit about oil and gas work, which I have some exposure to, but she has way more experience in, but we hit it off talking about how crazy ICS security is.



about how crazy ICS security is.

We chatted a few times after that. I saw her again doing work study in Orlando for SANS (again, not my class). Later she was doing an interview in Atlanta and hopped over to Augusta (2 hour drive) and we did dinner. I actually wanted to hire her because I figured she'd be badass at SE and her tech skills were okay too. My former business partner (who was CEO) didn't like her so I dropped it.

I think I saw her briefly at one or two other industry events before you messaged me.

Also, that question sounds ominous.



**Christopher Hadnagy** • 7:23 PM

Can you tell me why your boss didn't like her?

And yah omnionous



**Jacob Williams** (He/Him) · 7:26 PM

please keep this off record, because not cool: he thought that she was going to be a distraction for a couple of our employees. Then she missed a tech interview with one of our folks and he was like "phew, something legally disqualifying." He's a Navy vet and we had a bunch of vets. Just male dominated and in particular Navy ship duty folks don't do as well with women.

**Christopher Hadnagy** · 7:28 PM

No I get it. And between us. She is a train wreck. Stole IP. Took work with her. Quit. Lied. Started a competitive company.

The list is extensive .... Your CEO saved your ass

**Jacob Williams** (He/Him) · 7:28 PM

Whoa, I thought she was still with you

holy crap

**Christopher Hadnagy** · 7:29 PM

No bro. She was lying to us for months. Stealing from us.

**Jacob Williams** (He/Him) · 7:30 PM

eek, that's screwed.

We dodged a bullet then.

**Christopher Hadnagy** · 7:30 PM

After I helped her write a book she quit 4 days before launch and is now threatening to tell the world I abuse women of I sue her.

Anyhow. I wouldn't recommend her again. Lol

**Jacob Williams** (He/Him) · 7:31 PM

noted. and yeah, holy hell.

**Christopher Hadnagy** · 7:31 PM

We can voice talk sometime

SE_000408



**Christopher Hadnagy** • 7:31 PM

We can voice talk sometime

But an unholy mess bro

**Jacob Williams** (He/Him) • 7:31 PM

I'm in Twitter jail right now, I don't even know if I can pull down the endorsement I gave her earlier this week.

I'm on signal at 706-339-6713. I'm free now, or reach out whenever.

**Christopher Hadnagy** • 7:32 PM

It's ok.

Oh. Didn't even see it.

SE_000409

# Exhibit 7



Confidential

DENIS00000385



5:29

**Chris Hadnagy**

amazing  8:21 PM    Mar 16, 2022

Girls with all the fillers and junk are a shame and I think LA just makes girls feel like they need the lashes and fillers.
8:21 PM

is just not

and                is just not  8:22 PM

After Whitney won she got super depressed and just kinda gave up. Last I saw her at derby she was Uber depressed.
8:22 PM

but Jeff doesnt care

OH NO

why?  8:22 PM

Nah Jeff likes people who worship him
8:22 PM

ah

yah  8:23 PM

I think she felt stuck at Rapid 7 but she's since moved over to Microsoft O365 redteam

We talk every so often  8:23 PM

Message

DENIS00000386

# Exhibit 8

# PLACEHOLDER

This document was produced natively

SE_17170

Potential titles:

1. Beyond the Implications: Lessons from the Front Lines of Insider Threat and Cancel Culture
2. The Unseen Assault: A Journey Through Insider Threats and the Maze of Cancel Culture
3. Shadow Battles: Surviving Insider Threats and the Ripple Effects of Cancel Culture
4. Cancelled but Not Conquered: Defying Insider Threats and the Specter of Cancel Culture
5. When Silence Speaks: Countering Insider Threats and the Unseen Forces of Cancel Culture
6. In the Eye of the Storm: Understanding Insider Threats and Surviving Cancel Culture
7. Cancelled but Not Conquered: Lessons from the Frontlines of Insider Threat and Cancel Culture

## Preface

- Introduction to my background and expertise.
- Brief overview of the event that sparked the book's creation.
- The book's objectives and who it aims to help.

## Chapter 1: The Unseen Insider Threat

- Introduction to insider threats: definitions and types.
- Personal story of betrayal by an employee with malicious intent.
- The psychological and emotional impact of betrayal.

## Chapter 2: The Ripple Effect

- Detailed account of how the betrayal unfolded.
- Exploration of the wider financial/brand/revenue impact on the company and employees. (use percentage not #'s)

## Chapter 3: The Anatomy of Cancel Culture

- Defining cancel culture and its relevance in today's society.
- Analyzing how cancel culture operates: mechanisms and motivations. (You can't cancel without cancel power) (think of this being a whole chapter)
  - Power and its role in this (Jeff's power) (the email asking for help when he rejected helping, using cancel power properly) Abuse of cancel power
- The intersection of insider threats (Maxie) and cancel culture. (Jeff/Def Con)

## Chapter 4: The Aftermath

- Personal and professional consequences of being targeted by cancel culture.
- Emotional and psychological toll on the author and those close to them.
- Reflections on public perception and the struggle for redemption.

## Chapter 5: Lessons Learned

- Key insights gained from the experience with insider threats.
- Understanding the importance of organizational culture and employee engagement.
- Strategies for preventing and detecting insider threats.

## Chapter 6: Building Resilience

- Developing personal, professional and organizational resilience in the face of challenges.
- Techniques for managing stress and maintaining mental health.
- The role of support networks and seeking professional help.

## Chapter 7: Navigating Cancel Culture

- Strategies for responding to cancel culture and managing its impact.
- The importance of risk assessment of those with cancel power over you, communication, transparency, and accountability.

## Chapter 8: Legal and Ethical Considerations

- Overview of legal protections against defamation and false accusations.
- Ethical considerations in addressing insider threats and cancel culture.

## Chapter 9: The Path Forward

- Turning adversity into opportunity: personal growth and professional development.
- Rebuilding reputation and career after being targeted by cancel culture.
- Future outlook on insider threats and cancel culture, with recommendations for individuals and organizations.

## Chapter 10: Conclusion

- Recap of the key messages and lessons from the book.
- Final thoughts on overcoming adversity and the importance of resilience.
- The courage to return.
- Call to action for readers to apply the lessons learned in their own lives and organizations. Outline to analyze those with cancel power in your life.

Reach out to academics about cancel culture

## Preface

- Introduction to my background and expertise.
- Brief overview of the event that sparked the book's creation.
- The book's objectives and who it aims to help.

My name is Christopher Hadnagy, I would imagine most people reading this book have no clue who I am.  This is why I want to start off telling you a bit about my history.  With out going into the details my childhood was an interesting one. Both of my parents had been abused as children, and sadly carried on the family legacy with their four children. My mom had a particular need to have babies around, so we were a foster family that had over 127 kids in and out of the house before I moved out.

Being raised in a volatile family meant I had to learn some interesting survival skills, ones that would inevitable help me with what was coming in my life.

Growing up I experimented with lots of alcohol and some drugs, but my passion was violence. I loved fighting, I loved punching things and people. Oddly enough, I didn't even mind losing a fight.

Nineteen year old me met the woman who would become my wife, my best friend and the woman who changed me for the better…. Or maybe better yet, who allowed me the freedom to change into the man she wanted.  She had a son from a previous marriage, who I fell in love with. I had to work hard to not duplicate my parents lessons on discipline. I was not always perfect at that, fortunately Colin and are close and we worked through any mistakes and he has turned into an amazing man.

When he was twelve we had a surprise, my beautiful daughter Amaya was born.  The day I found out Areesa was pregnant was the best day of my life. I read to her belly every night, I played games with amaya when she would push her hand up I would push it back.  The day was here, she was gonna be born.  But as she came out she choked herself to death on her umbilical cord. My world was shattered, I couldn't understand how this could happen.  The nurses and doctors worked on her for what seemed like an eternity.  I went over to her tiny blue body and I leaned down and I said, "Baby its daddy, you have to wake up so we can play our game and I can read to you." No lie, she open her eyes and reached her hand up to grab my finger.

That story still fills my eyes with tears. But having these two kids has changed my life. I became someone who doesn't love violence, I found peace in getting to know God, and having an amazing life partner that happens to be my best friend that I can laugh with and stare at even after 3 decades of marriage.

When I was in my late twenties early 30's I found myself unemployed. I was depressed, sitting at home, and I started to gain a lot of weight. I became pretty much lethargic.

I finally found a career in information security working for an amazing company that was on the cutting edge of hacking, education and understanding threats. We got paid to hack into companies, all legally, to show them their vulnerabilities and how to patch them.  I fell in love with this job.

It didn't help my health. I found myself staying up all hours of the night, sometimes 2-3-4 am, hacking into clients or writing exploits, researching. But I loved my job. As much as I loved it, there was something always nagging me telling me that I wasn't so good at the coding part. So I started to practice something called social engineering. It became famous with a very special hacker named Kevin Mitnick.

He used it to steal phone plans and to infiltrate the FBI and evade them for years.  When he was finally caught he was sent to prison. Upon his released, he reformed and became a champion in the industry to teach people hacking. We eventually became close friends. Sadly, only in his 50's Kevin passed away recently, but he left behind him a legacy that made my job possible.

In reading his books I wanted to practice these things legally, so we would ask clients if we can include phishing emails, or phishing calls and even physically breaking into their buildings.  Every time we did we succeeded. Then one day a client asked me, "Ok so you did it, how do I fix it?"

Blank stare…. "I don't know"

He said something that changed my life, "If I went to my auto mechanic and asked 'what is this sound?' and he said 'your brakes' then I said please fix it and he said 'don't know how', I would never use that mechanic again."

And he was 100% correct. That ignited a passion in me, I wanted to learn all I could. So I started to consume books on nonverbals, persuasion, influence, body language, neuroscience, decision making, communications and everything I could. I would document the things I read and speak to others who had more knowledge. In about ten months I had a framework for what I felt made up social engineering.

In doing so, I realized that the world's definition of social engineering, "….to the manipulation of individuals or groups into divulging confidential information, performing actions, or providing access to restricted areas, typically through psychological manipulation rather than technical means. It involves exploiting human psychology, trust, and social interactions to deceive people."

Really didn't fit my research, so I redefined it. It was now, "Any act that influences a person to take an action that may or may not be in their best interest." I felt that encompassed the positive and negative aspects of this tool.

I bought a domain, www.social-engineer.org and I built a website to put this out there. I thought to myself, "well, if one person can use this, lets do it."

I also enjoyed the research I did so much I started a podcast, I was going to interview people in different fields about an aspect of this framework and how they use it and how we can learn. So I had agents, magicians, psychologists, teachers, CEO's and all sorts of people on the show.

A few months after the frameworks release, I get a call from Kevin Mitnick's publisher, and she is asking me to write a book on the framework I put out. I told her I was a nobody and didn't think anyone would care. It took some convincing, but I wrote that book, Social Engineering: The Art of Human Hacking and it was released in 2010.

That book took the infosec world by storm. I was being called by global large companies to consult and work with them on social engineering. Companies that wanted me to help in crafting and attacking hundreds of thousands of people at once.  I quickly realized I needed to develop methodologies and systems that had never been created before.

It was around this time I had been attending a massive hacker conference called DEF CON.  One year they had a social engineering competition and thanks to the notoriety I had gotten I was asked to be a guest judge. But I was appalled at what was happening. In this open room people were making random

calls to people and getting their private info and even credit card numbers and it was all being broadcast over the speakers. I tried to get it to stop, and when they wouldn't I walked out. I went right up to the owner of the conference, Jeff Moss, and told him, "What is happening in there is illegal and immoral, it can't continue" He said, "Well then come up with something better and you can do it next year."

A little bit heated I said, "No problems I will."

**BITING OFF MORE THAN I CAN CHEW**

I went back to the office and started to think of ideas, and every idea I had seemed too unrealistic. I reached out to the EFF, and organization that gives legal advice to people in my industry and ran my idea through them. Once I knew I was above board in the legal department I began developing the world's first Social Engineering Capture the Flag. I presented to Jeff and he granted me to run what I called "The Social Engineering Village" or SEVillage.

My idea was I developed a series of "flags" (bits of information) that a contestant would have to try and find first through OSINT and then through a series of 25 min phone calls. Those who wrote the best report, got the most points and followed all the rules – and there were a ton – would win. They would sit in a soundproof booth, I would control all the calls so if someone broke a rule we can cut them off. And then we would assign contestants companies they had to use as their targets.

Year one, we were given a tiny room, maybe a couple hundred square feet. But the room was packed for all three days. It was floor filled, walls filled, it was amazing to see how many people were interested in this.

DEF CON has a very coveted prize called "the black badge" and it grants the winner of a competition free access to come to the conference for the rest of their lives. It is kind of legendary. It is never awarded to a first time competition in year one, but that year due to our success we were awarded it.

That turned the SECTF and the SEV into a new staple. Each year the competition grew and grew, eventually I helped start a kids competition, then a teens, then a few other events that kicked off. We made international news and we were bringing awareness to this threat in a way that no one got harmed. As a matter of fact, my business that I started was booking due to it. Many companies would send their security staff to our village to listen and learn and if they were a target they would hand me a card and ask to talk. One of few things I loved about the SEVillage was I got to bring my wife and two kids and they worked with me, and some of closest friends from around the globe came and we got to hang out, talk, eat and drink.

One more important fact before I tell you why this book must exist, is around 2017 I decided to start a non-profit that would use the greatest minds from infosec to hunt, geolocate and find people who traffic children and create child abuse material, The Innocent Lives Foundation. The work we do there saves lives and I am so proud to have that has part of my legacy.

I am going to stop my story there, because this is where I want to take some time to tell you why this book is so important, in case right now you are thinking, "So what?"

**THE REASON THIS BOOK EXISTS**

My company has employed dozens of people over the years. I know I am not the perfect boss, sheez, I have said some things I certainly regret.  I also am a very hard worker and demand the same from my people. But even though I can be a giant jerk at times I treat my people well. I pay good, have excellent benefits, am very lenient and I share everything with them. I mentor, teach and give my soul to them. It is not uncommon for employees to gather at my house and I cook for them.

I had an ex-employee that sold us her laptop for $1 so she can use it at work. This had to happen because she wanted to use a Mac but we are only Windows. And due to our contracts we have to have our back up software and our remote control software in every machine. She agreed in writing via email. During the peak of COVID she told us her father was dying and she needed some time off to care for family matters. We gave over two months of paid leave. I was also in the middle of a book deal with her to help her career. We were told the stress of the family illness has made her depressed and she couldn't work anymore.  She quit her job, we told her to mail her laptop back, we would take off our data and send it back to her.  She said, "this week".

We wish her well with her family and told her to stay in touch. One, Two, Three weeks went by and the excuses piled up as to why the laptop was not shipped and then finally we were told it was. But it never showed up, so we remotely locked the laptop.

That is when we realized shipping the laptop was a lie.  The book I had worked on with her was printed and I got my copy, in one chapter she used pictures from an active case from my nonprofit of how we geolocated a predator that was grooming a 13-year-old girl.

I went nuts, she could have killed this case. I texted, called, emailed, nothing, she was not budging. I called the publisher and told him those pictures could be considered a federal crime since the case was now in the hands of federal law enforcement.

I will give you more details throughout this book, but suffice it to say we found evidence that she has been lying, trying to subvert business and even signing contracts that she was not allowed to. She had tried to get Apple to unlock her laptop, which they couldn't and the drive got wiped.

Also learning about her methods I pulled all my support from all the marketing, podcasts and media we had planned for her book launch.

She was so angry she went and gathered all my ex-employees that didn't like me, and took them to Jeff Moss, the owner of DEF CON, and told them that he had empowered me to become a tyrant over women in infosec and I subjugate them and harass them when they want to leave.

I know all this because Neil Wylie, a person who I thought was my friend and a very close employee of Jeff at DEF CON, called me and told me that Maxie had brought this horde to DEF CON and demanded my head.

This was August of 2021 when it all started. I explained everything I said above to Neil, who is also in security, so I couldn't understand why he wasn't getting it. It seemed so odd to me. After trying to meet and speak with Jeff about these allegations from August to December and being told that he had already given my village to a couple folks who have hated me for years, I wrote an email telling him I was leaving DEF CON and taking my SEVillage elsewhere.  That was in Dec 2021.

In Feb of 2022, I get an email from Jeff stating I am being banned from DEF CON. That next day he posts, "We received multiple CoC violation reports about a DEF CON Village leader, Chris Hadnagy of the SE Village. After conversations with the reporting parties and Chris, we are confident the severity of the transgressions merits a ban from DEF CON."

These two sentences would cause a ripple effect in the industry and in my life that I was not prepared for.  Since the previous named banned people from DEF CON only were named for sexual misconduct people assumed I had sexually assaulted someone in my company or at DEF CON.  The backlash from this community that once loved me was unbelievable. I was called things like "serial sexual predator", "the Harvey Weinstein of infosec", "rapist", "child abuser", "thief", amongst other things I won't list in this book.  People who I thought were my closest friends ran from me like I had leprosy.

That is why this book must exist. All the people, men and women, who will be or have been falsely accused, cancelled and destroyed. They may not have had the means to fight back, or the will, so they gave in and either ended their own lives or slithered off into nothingness. This book is for you.

Do you want to understand the profound and utter nature of cancel culture and insider threat? This book is for you.

Do you want to understand how human vulnerability can lead to insider threat that can ruin a life and a company? This book is for you.

Are you just curious to see how this all turned out? This book is for you.

**What do I hope to accomplish and help with this book**

My career has been centered around helping other people. No, I am not perfect, and I have made a TON of mistakes, that is for sure. But my overarching theme of life, is helping others. (despite my imperfection) The question that remains, someone who loves their God, loves their family, loves their employees, loves their industry, creates jobs for people, creates a nonprofit to save kids – and they can get cancelled to the point they are a pariah, literally hated by the same people who lined up to take pics and sign book…. What can you do about it? How do you deal with it? How can you cope and manage?

I want to share with you the raw, unadulterated details of what I did wrong and right in coping.

I don't know if this will help, but I want to believe there is one person out there going through what I did and this guide can help you deal with insider threat and can help you deal with the aftermath of being cancelled, and how to come back from it, if there is even a way.

That is what I hope to accomplish in the pages of this book. So with that let's dive right in.

# Chapter 1: The Unseen Insider Threat

- Introduction to insider threats: definitions and types.
- Personal story of betrayal by an employee with malicious intent.
- The psychological and emotional impact of betrayal.

**Insider Threat and What is It Really?**

Insider thereat can be broken down into seven different categories in my opinion, Malicious, Negligent, Infiltrators, Exploited, Colluding, Third-Party, and Departing. Each of these has a different motive and reason for their reasons and it is important to understand. Some are controllable and some are not. Lets dive into each.

1.    **Malicious Insiders**: These are individuals who intentionally harm the organization through theft, sabotage, espionage, or fraud. They might steal proprietary information, intentionally leak sensitive data, or sabotage organizational systems. Their motivations can vary from financial gain to personal grievances against the organization.

This type of threat doesn't seem to care about the harm they cause or who they ruin in the path, they are just out to get revenge or a real or perceived offense.

2.    **Negligent Insiders**: These individuals inadvertently cause harm to the organization through carelessness or lack of awareness. This can include falling prey to phishing attacks, mismanaging data, using unsecured networks, or mishandling credentials. Though there's no malintent, their actions can still lead to significant security breaches.

There can be different reasons for this type of threat. Maybe the company is not doing enough to educate, so the employees are a threat. Or maybe the company is not using a positive reinforcement model, so employees are not motivated to report, due to fear. Or maybe the employee is just lazy and doesn't care. Any of these reasons are serious enough to make negligent threats a real problem.

3.    **Infiltrators**: These are external actors who gain inside access through deceptive means, such as identity theft or by obtaining employment with the sole purpose of conducting espionage or sabotage. Unlike traditional insiders, infiltrators enter the organization with the explicit intention of becoming an insider threat.

These types of threats are truly malicious, from the beginning they have a goal to destroy. Their only motive is to get in to hurt and take, these types of insider threats can be hard to detect depending on their skill and your company's needs/size. We will talk a lot about this kind of threat.

4.    **Exploited Insiders:** These insiders become threats because external attackers compromise their credentials or systems. The compromised insider might not even be aware that their access is being used maliciously. This category can overlap with negligent insiders, especially if the compromise was due to careless security practices.

Sometimes it is poor security practices, sometimes it is low pay, sometimes it is both… either way, these threats can be exploited by attackers to work with threat actors to compromise a company.

5.    **Colluding Insiders:** This involves two or more individuals within the organization conspiring to carry out an attack or leak information. This type can be especially difficult to detect and prevent, as the colluders can work together to bypass security measures and checks.

Kind of like the above insiders, these are similar but even worse. They are willingly working with the attackers to take your company down.

6.    **Third-party Insiders:** These are individuals from third-party organizations (vendors, contractors, partners) who have been granted access to the organization's systems and data. They can pose a threat due to the combination of having inside access and potentially less oversight and loyalty to the organization.

Now-a-days, we are seeing endless supply chain breaches, so this is a very important topic. Knowing if the vendors who have access to your network and breachable is very important.

7.    **Departing Insiders**: Employees who are leaving the organization but still have access to its resources can become insider threats if they decide to misuse that access before they go, either out of malice or in an attempt to take proprietary or sensitive information with them.

I read a report that there were 250,000 lay offs in infosec in 2023… that number is huge. Many with very little solid reasoning. Every time this happens there a chance of creating a departing insider threat.


**Back to my story….**

So here I am reading this resume from a person who seems fake. Her LinkedIn said not only was she a social engineer, but had a degree in quantum computing, was a stunt driver, and also had the elusive OSCP certification, and on top of that she looked like a super model. In my head I said, "this is a catfish" ( a popular attack where a beautiful looking woman is used to attract men into a conversation and get them to expose information.

So I replied to her request for mentorship with something like, "Maybe next time you try, make your resume not so fake…"

Her reply took my by shock, "I am sorry, should I clarify something. If I offended you let me know."

Hrrrmmmmm that is not what I expected.

So I continued to engage to the point where, still thinking she was fake, I said, "well I would interview you if you were in Orlando but you are in LA."

She said, "I can be in Orlando Wednesday…."

"Hrm, this is interesting, ok let me see if this catfish will go through", I thought. So I told her I would pick her up at the airport and we would interview at a local Starbucks then she could meet my wife and kids and go to dinner.


Arriving at MCO airport, she was there, and she looked just like her picture. That is not what I expected. We did the interview and she was amazing. Not what I had expected. I took her to meet my wife and daughter and they loved her. Not what I expected. All of it checked out.

None of it made sense in my head, and that was the problem. Logic said, "run away" but everything she said checked out. So I ignored the blaring alarm in my head.

When she told us that her father was dying, my wife, who is one of most giving people on earth, made her a care package of things from Scotland (her home country) and sent a card saying, "I know you can't get home so we sent home to you."

Part of that package was a beautiful cashmere shawl from Scottish sheep. When she was at the height of attack, she posted a picture of her dog tearing that shawl to pieces with a laughing emoji. It crushed my wife's heart.

I piece I haven't mentioned yet, as this is the first lesson for this book. When Maxie approached me she asked me to mentor her in starting a social engineering company. I rejected that and said if she was good I would hire her.

She got hired but, it seems her intent was to just use us to accomplish her goal. What threat does this make her to you?

For sure she is a Malicious or Infiltrator insider threat. To recap

**Malicious Insiders**: These are individuals who intentionally harm the organization through theft, sabotage, espionage, or fraud. They might steal proprietary information, intentionally leak sensitive data, or sabotage organizational systems. Their motivations can vary from financial gain to personal grievances against the organization.

This type of threat doesn't seem to care about the harm they cause or who they ruin in the path, they are just out to get revenge or a real or perceived offense.

OR

**Infiltrators**: These are external actors who gain inside access through deceptive means, such as identity theft or by obtaining employment with the sole purpose of conducting espionage or sabotage. Unlike traditional insiders, infiltrators enter the organization with the explicit intention of becoming an insider threat.

These types of threats are truly malicious, from the beginning they have a goal to destroy. Their only motive is to get in to hurt and take, these types of insider threats can be hard to detect depending on their skill and your company's needs/size. We will talk a lot about this kind of threat.

Maybe she fits both, either way, I feel for it. This is what I do for a living and I 100% feel for it.

Maybe it was halo effect, maybe it was confirmation bias, maybe it was something else. But either way I fell for it and it cost me dearly.

**The Emotional Impact of Betrayal**

I remember the day opened that book and saw a picture from ILF in there, I had this pain in the pit of my stomach. I couldn't understand why anyone would do this. We were saving a 13 year old girl, why would you risk that.

My emotions were anger, disappointment, disbelief, and disgust.

I remember the day Jeff announced my cancellation and I saw people calling me a rapist and sexual predator. A man I had worked with for close to 20 years and he knew me well.

My emotions were fear, sadness, anger, disgust and contempt.

I remember when I saw the announcement that Stephanie and JC were taking over the village and they claimed to find out in Dec but I knew they knew in July/Augst. I was shocked by the blatant lying from people who I thought were in the same community.

My emotions were anger, disgust, contempt, and complete disbelief.

When one of my best friends in the industry had a chance to support me, he knew me ( so I thought) better than most, but instead of support he tweeted, "I pulled my talk because it was the right thing to do … after discussing with other speakers at the event, the organizers should have at a minimum announced the speaker well ahead of the conference and published clearly on site for folks to make their own decision."

Ha, he was one of the organizers. I ate dinner and worked out with him the night before that speak. What a joke.

My emotions where intense pain, betrayal, disgust, and a complete disbelief that this was real.

I could literally go on for hundreds of pages of the people who physically or verbally spat in my face and how I felt, but I think you get the point. This taught me who was really my friend (Wayne, Layne, Domini, etc) and who was here just because I was popular (Dave, John, Brian).

At that time I didn't understand how powerful betrayal was, and it became an area of research for me.

**The Psychology and Emotional Impact of Betrayal**

The psychology of betrayal delves into the emotional and psychological ramifications of being betrayed, which is a complex process that can significantly impact individuals' mental health and interpersonal relationships. A betrayal occurs when there's a violation of the implicit or explicit trust between individuals, leading to emotional distress for the betrayed party.

Research and theories on betrayal highlight its evolutionary basis, where trust and cooperation are fundamental to human relationships. Betrayal disrupts these bonds, leading to significant emotional and sometimes physical consequences. According to a model presented at the Heterodox Psychology Conference, the aftermath of betrayal involves a process that could lead to forgiveness, depending on several factors including the betrayed individual's response to the betrayal (outrage), the betrayer's response (guilt or lack thereof), and the eventual possibility of forgiveness. This model underscores the evolutionary rationale behind our responses to betrayal, suggesting that moral emotions, such as outrage and guilt, have developed to manage the repercussions of betrayal and maintain social cohesion (Psychology Today).

Betrayal can significantly impact any kind of relationship, be it friendships, family ties, or romantic partnerships. The intensity of the betrayal often correlates with the depth of the relationship, where deeper relationships can lead to more profound feelings of betrayal and emotional stress. Trust is a cornerstone of all relationships, and its violation can lead to a wide range of emotional responses, from disappointment and grief to severe trust issues and avoidance of future emotional harm. People who have been betrayed might build emotional walls to protect themselves from future pain, but this can also isolate them and prevent the formation of new, meaningful relationships (Psychology Today).

Betrayal trauma specifically refers to the psychological distress that arises from betrayal, especially in contexts where the betrayed individual is dependent on the betrayer for emotional support or safety. This can include infidelity in romantic relationships, abuse by caregivers, or even institutional betrayals where organizations fail to protect or support their members. The impact of betrayal trauma can be profound, leading to issues like hypervigilance, a lack of foundational trust, and even generational trauma. Healing from betrayal trauma often involves acknowledging the hurt, accessing therapeutic support like cognitive behavioral therapy (CBT) or eye movement desensitization and reprocessing (EMDR), and, where appropriate, relational healing or building new support systems (MindBodyGreen).

Understanding the psychology of betrayal and its impacts is crucial for both prevention and healing. Recognizing the signs of betrayal trauma and seeking appropriate support can aid in recovery, helping individuals rebuild trust in relationships and improve their emotional well-being.

## Chapter 1: The Unseen Insider Threat

- Personal story of betrayal by an employee with malicious intent.
- The psychological and emotional impact of betrayal.

# Exhibit 9



5:23

**Chris Hadnagy**

Mar 4, 2022

True. Very true.

The closer I got to the middle of the defcon universe the more it seemed like a wizard of oz situation. All a charade.

This incident proves that    7:49 PM

i knew this for years. i guess my huberis got me. i thought i had jeff in my pocket

but then the hotness of maxie came around

and i lost    7:50 PM

She's much more awful than a hot mess
7:51 PM

yah on the chart of 30 indicators of a psychopath

she has 27    7:52 PM

Holy shit.

I'm probably not far off to be honest.

Functional Sociopath    7:53 PM

its really not. Joe Navarro and i worked on a profile

based on her book and the OSINT i have

Message

DENIS00000321



5:23

**Chris Hadnagy**

Mar 4, 2022

its really not. Joe Navarro and i worked on a profile

based on her book and the OSINT i have and what i know
7:53 PM

hahaha but I swear I only have empathy because of my kids.
7:53 PM

she is a psycopath

not even socio... full on psycopath
7:53 PM

She's not that great at SE imho
7:53 PM

no shes not

shes great at manipulation

using assistance requests
7:54 PM

👍

Oh and I meant Alethe is a functional sociopath
7:55 PM

HAHAHA you are not

not diagnosable

i have observed

you have so much empathy
7:55 PM

Message

Confidential



DENIS00000323

# Exhibit 10

Case 2:23-cv-01932-BAT    Document 84    Filed 02/26/25    Page 71 of 776

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE


CHRISTOPHER J. HADNAGY, an
individual; and SOCIAL-ENGINEER,
LLC, a Pennsylvania limited
liability company,
          Plaintiffs,
v.                                    NO. 2:23-cv-01932-BAT
JEFF MOSS, an individual, DEFCON
COMMUNICATIONS, INC., a Washington
corporation; and DOES 1-10; and
ROE ENTITIES 1-10, inclusive,
          Defendants.
_____/



    VIDEOTAPED DEPOSITION OF CHRISTOPHER HADNAGY


* PORTIONS OF TESTIMONY ARE DESIGNATED CONFIDENTIAL

  AND ARE SEALED UNDER SEPARATE COVER. *







DATE TAKEN:          January 28, 2025

TIME:                10:03 a.m. to 5:39 p.m.

PLACE:               Legal Realtime Reporting
                     1640 East Livingston Street
                     Orlando, Florida  32803

REPORTED BY:         TARA K. SLOCUM, RPR, CRR, CSR,
                     and Notary Public State of FL

Hadnagy, et al. v. Moss, et al.                     Christopher Hadnagy

Page 2

1    APPEARANCES:

2    MARK R. CONRAD, ESQUIRE
     OF:   FREY BUCK, P.S.
3          1200 Fifth Avenue
           Suite 1900
4          Seattle, Washington 98101
                APPEARING ON BEHALF OF THE PLAINTIFFS
5
     JAKE DEAN, ESQUIRE
6    OF:   PERKINS COIE, LLP
           700 13th Street NW
7          Suite 800
           Washington, D.C. 20005-3960
8                APPEARING ON BEHALF OF THE DEFENDANTS

9    ALSO PRESENT:  CHRIS RIKLAS, ESQUIRE (VIA ZOOM)
                     ANDREW CONTRERAS - VIDEOGRAPHER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

                                                    Page 4

1                  P R O C E E D I N G S
2                     *    *    *    *
3           THE VIDEOGRAPHER:  Good morning.  We are
4     now on the record for the video deposition of
5     Christopher Hadnagy taken in the matter of
6     Hadnagy v. Moss.  Today's date is
7     January 28th, 2025.  The time is 10:03 a.m.
8     This deposition is being conducted in Orlando,
9     Florida.  The court reporter is Tara Pino.  The
10    videographer is Drew Contreras.
11          Will counsel please introduce themselves,
12    and the court reporter will swear in the
13    witness.
14          MR. DEAN:  Jake Dean for defendants.
15          MR. CONRAD:  Mark Conrad for plaintiffs.
16          THE COURT REPORTER:  Anybody on ZOOM?
17          THE WITNESS:  Yes, Chris Riklas.  Last
18    name is R-i-k-l-a-s.  He is also on my legal
19    team.
20          THE COURT REPORTER:  Will you please raise
21    your right hand.  Do you solemnly swear that
22    the testimony you are about to give in this
23    deposition shall be the truth, the whole truth,
24    and nothing but the truth?
25          THE WITNESS:  I do.

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 11

1    that were referenced in this e-mail?

2        A    I remember Geoff talking to me at some of

3    these things in-person at DERBY CON, and we talked

4    it out.  But I did not know that there was a formal

5    complaint.

6        Q    What do you recall from your conversations

7    at DERBY CON?

8        A    That was 2016, so I will be honest, I

9    don't really remember a ton.  I remember him coming

10   and saying that he thought that some of the humor

11   used in class was inappropriate.  And I apologized

12   to him for any kind of discomfort that he had, and

13   then it seemed like it was good, and it was over

14   from what I remember.

15       Q    Okay.  I want to direct your attention to

16   I think it's -- do you see there is a day one, and

17   then two paragraphs down?

18       A    Yes.

19       Q    There is a sentence end of the second

20   line, it said this led to him tell stories about how

21   one time he stumbled on a page of videos labeled Hot

22   Wheels.  He then went on to describe that the term

23   did not refer to children's toys, but an extremely

24   explicit sexual fetish involving hot amputee women

25   in wheelchairs.  To my disgust, the Hot Wheels

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 12

1    reference was a recurring bell that rung throughout

2    the class whenever an inappropriate topic was

3    brought up; do you see that?

4         A    Yes.

5         Q    Do you recall these references to Hot

6    Wheels pornography?

7              MR. CONRAD:  Object, form.

8         A    I -- I don't -- I don't -- I know -- I

9    know it happened, but really 2016 I am recalling it

10   I think because of reading this, but I do know it

11   happened.

12        Q    (By Mr. Dean) Got it.  And do you think

13   it's appropriate or inappropriate to discuss Hot

14   Wheels porn in a class?

15             MR. CONRAD:  Object, form.

16        A    Well, in the setting of this class, we

17   were talking about something OSINT, Open Source

18   Intelligence.  And I was telling them a story of how

19   I was performing this class for a social media

20   company, and that we stumbled on this.  So I don't

21   feel that it was inappropriate to warn my students

22   that you can stumble upon things that are highly

23   inappropriate in a corporate setting.

24        Q    (By Mr. Dean) How about making repeated

25   references to Hot Wheels porn throughout the class;

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 13

1    is that appropriate or inappropriate?

2        A    I can't recall how it was used.  So I

3    can't honestly answer that question.

4        Q    Do you know if it's professional or

5    unprofessional to continue to talk about Hot Wheels

6    porn throughout a class?

7        A    Again, our industry is filled with kind of

8    dark humor, and in this type of class, you are

9    constantly stumbling on things that are -- would be

10   considered inappropriate in normal corporate

11   settings.  So I don't feel it was inappropriate to

12   talk about these things in a class of OSINT.

13       Q    Do you understand how some people might

14   find that discussing Hot Wheels porn throughout a

15   class would be inappropriate?

16       A    Yes, I do.

17       Q    And do you understand how some people

18   might find that discussing Hot Wheels porn

19   throughout a class might be unprofessional?

20       A    Yes.

21       Q    And do you understand how that might make

22   someone feel uncomfortable?

23       A    Yes.

24       Q    I want to go down right above day two.  It

25   says, throughout rest of the day, somehow the

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 14

1    instructor got fixated on the subject of '70s porn
2    and its music.  The reference continued almost
3    hourly for the two days of training; do you see
4    that?
5         A    I do.
6         Q    Do you recall making references to '70s
7    porn and '70s porn (sic) music?
8         A    I do not.
9         Q    Do you think that's appropriate or
10   inappropriate to discuss '70s porn every hour during
11   a two-day training?
12        A    I would say that would be inappropriate.
13        Q    What about professional; do you think that
14   would be professional or unprofessional?
15        A    Unprofessional.
16        Q    And you could understand how someone might
17   find that to be inappropriate?
18        A    I do.
19        Q    And you can understand how someone might
20   find that to be unprofessional?
21        A    I do.
22        Q    And you can understand how that might make
23   someone feel uncomfortable?
24        A    I do.
25        Q    If you go to day two, if you look at that

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 15

1    first paragraph, go ahead and read that to yourself,

2    and let me know when you are done.

3        A    Do you want me to read it out loud or

4    just --

5        Q    No, just read it to yourself.

6        A    Okay.  I read it.

7        Q    Mr. Vance (sic) is discussing references

8    to ball slapping that you were making in class; do

9    you see that?

10       A    I do.

11       Q    Do you recall making references to ball

12   slapping during this training?

13       A    I do not.

14       Q    Do you think it's appropriate or

15   inappropriate to discuss ball slapping in a training

16   class like this?

17       A    Since I don't recall the events, I can't

18   really answer that.  I am not sure.  It says that I

19   said the conference organizer hit me, and then

20   tweeted about it.  It does sound like something Dave

21   would do.

22       Q    So let's focus on the last part of that

23   sentence, this led to a day full of ball slapping

24   references.  Do you think it would be inappropriate

25   or appropriate for an instructor to discuss ball

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 16

1    slapping references throughout a full day?
2        A    Most likely inappropriate.
3        Q    What about professional; professional or
4    unprofessional?
5        A    I would say unprofessional.
6        Q    And can you understand how someone might
7    find that to be inappropriate discussing ball
8    slapping references all day long?
9        A    I do.
10       Q    And you can understand how someone might
11   find that to be unprofessional?
12       A    I do.
13       Q    And you can understand how that might make
14   someone uncomfortable?
15       A    I do.
16       Q    If you go to the next paragraph, it
17   states, the instructor's inability to match wits
18   with those remarks forced him to resort to pulling
19   out his switchblade in his hand, pointing the knife
20   at me, and saying one of you is getting ball slapped
21   with this; do you see that?
22       A    I do.
23       Q    Do you recall this event?
24       A    I do not.
25       Q    Do you have a knife or any type of

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 17

1  switchblade that you would carry on you around this
2  time?
3          A    I do.
4          Q    Is it a knife or switchblade?
5          A    It's a switchblade.
6          Q    Do you think it's appropriate or
7  inappropriate to pull a switchblade out during a
8  class and say, one of you is getting ball slapped
9  with this?
10         A    Nowadays, I would say it's inappropriate.
11         Q    What about professional or unprofessional?
12         A    I would say unprofessional.
13         Q    And you can understand how someone might
14  find it to be inappropriate to pull a switchblade,
15  point it at them and saying, one of you is going to
16  get slapped with this?
17         A    I do.
18         Q    You can see how that could -- someone
19  might perceive that as being unprofessional?
20         A    I do.
21         Q    And you can understand how that might make
22  someone feel uncomfortable, as well, right?
23         A    I do.
24         Q    I want to go to page two.  This is
25  Veritas2.  You will see after that first paragraph,

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 18

1    there is some -- I will call them -- dashes instead
2    of bullet points; do you see that?
3        A    Yes.
4        Q    These are some examples that Mr. Vaughan
5    made or wrote down regarding his experience in
6    class.  Let's go to the first one.  It says, boobs
7    have superpowers in reference to women in social
8    engineering; do you see that?
9            MR. CONRAD:  Object to form.
10       A    I do.
11           MR. CONRAD:  Let me object.
12       Q    (By Mr. Dean) Do you recall making
13   references to boobs having superpowers in reference
14   to women in social engineering?
15       A    I do not.
16       Q    Any reason sitting here today you can
17   dispute that?
18       A    I cannot.
19       Q    Okay.  Do you think it's appropriate or
20   inappropriate to make reference to womens' boobs and
21   having superpowers for social engineering?
22       A    Inappropriate.
23       Q    Would you say it's professional or
24   unprofessional?
25       A    Unprofessional.

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 19

1      Q    Can you understand how someone might find
2   that to be inappropriate?
3      A    Yes.
4      Q    Can you understand why someone might find
5   that to be offensive?
6      A    I do.
7      Q    Do you understand why that might make
8   someone feel uncomfortable?
9      A    I do.
10      Q    There is also a comment about frequent
11   references to ball size is the second dash; do you
12   see that?
13      A    I do.
14      Q    Do you recall making these references?
15      A    If I -- I don't actually recall that.
16      Q    Sitting here today, any reason you can
17   dispute that you made frequent references to ball
18   size?
19      A    The only thing I can think of at the time
20   we were using a tool called Maltego.  It's an open
21   source tool to find information on the Internet, and
22   it places balls of different size on the screen to
23   show you the weight of the information that it has
24   found.  And we would use that tool during this class
25   to teach.

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 24

1    A    That is not an argument?

2    Q    That is not an argument.

3    A    Yes.

4    Q    And it continues, and it says, cause this

5    week (not public) that awful psycho bitch Maxie

6    called Michelle Ward to check in; do you see that?

7    A    Yes.

8    Q    So you were referring to Maxie Reynolds as

9    an awful psycho bitch?

10   A    I was.

11   Q    Do you think that's appropriate or

12   inappropriate to refer to a former employee as an

13   awful psycho bitch?

14   A    In a private setting, I felt that at the

15   time, I felt it was appropriate at the time.

16   Q    Do you think that it was professional or

17   unprofessional to refer to an ex-employee as an

18   awful psycho bitch?

19   A    At the time, I felt it was appropriate.

20   Q    Can you understand how someone might find

21   that it's inappropriate to refer to a former

22   ex-employee as an awful psycho bitch?

23   A    I knew that Dave and Allie would not, so I

24   didn't think they would be offended by it.

25   Q    My question is different.  I am not asking

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 25

1  you what David or Allie might have thought.  I am

2  asking can you understand how someone might find

3  it's inappropriate to refer to a former employee as

4  an awful psycho bitch?

5      A    I am sure there are people who would be

6  offended by that, yes.

7      Q    Do you understand how there are people who

8  might find it to be unprofessional to refer to a

9  former employee as an awful psycho bitch?

10     A    I do.

11     Q    Do you understand how some people might

12 find it to be offensive when you refer to a former

13 employee as an awful psycho bitch?

14     A    I do.

15     Q    Do you understand how some people might

16 find it defamatory to refer to someone as an awful

17 psycho bitch?

18     A    I don't know if I understand the context

19 of defamation in this sense because it's not public.

20 But I do see how some people might think that.

21          MR. DEAN:  Understood.

22          Marked as Exhibit 3 are messages between

23     Chris Hadnagy and Alethe Denis Bates labeled

24     Denis 321 through 322.

25 ///

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hadnagy, et al. v. Moss, et al.                        Christopher Hadnagy

Page 26

1          (Exhibit No. 3 was marked for
2      identification.)
3      Q    Mr. Hadnagy, are these Signal messages, or
4  are these text messages?
5      A    These are Signal.
6      Q    You said Signal; is that right?
7      A    Yes, sir.
8      Q    Go to page two.  You write to Alethe
9  Denis, she is a psychopath, not even socio, full on
10  psychopath; do you see that?
11      A    I do.
12      Q    And you are referring to Maxie Reynolds;
13  is that right?
14      A    I am.
15      Q    Do you think it's appropriate or
16  inappropriate to refer to a former employee as a
17  psychopath?
18      A    In this case, I feel it's appropriate
19  because she mentions 27 out of the 30 indicators.
20      Q    Do you think it is professional or
21  unprofessional to describe a former employee as a
22  full on psychopath?
23      A    I was speaking truth.  So I don't find it
24  to be inappropriate or unprofessional.
25      Q    You said you were speaking truth.  Did you

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 27

1    diagnose Ms. Reynolds as a psychopath?

2        A    No.

3        Q    Did Joe Navarro diagnose Ms. Reynolds as a

4    psychopath?

5        A    No, sir.

6        Q    Do you have any training in mental health?

7        A    I do not.

8        Q    Do you have any training in psychiatry?

9        A    I do not.

10        Q    Are you licensed by any board to diagnose

11    someone not as a sociopath, but a full on

12    psychopath?

13        A    I do not.

14        Q    Are you aware of anyone diagnosing Ms.

15    Reynolds with a full on psychopath -- as a full on

16    psychopath?

17        A    I am not aware of that.

18        Q    But yet, you told Alethe Denis that she's

19    not even a socio, she's a full on psychopath?

20        A    I did.

21        Q    Do you believe that that was professional?

22        A    I do.

23        Q    And you believe that was appropriate?

24        A    I do.

25        Q    Can you see how someone might find it to

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 28

1  be inappropriate to refer to someone as a full on

2  psychopath who has not been diagnosed as a

3  psychopath?

4        A    I do.

5        Q    Do you see how someone might find it to be

6  unprofessional to refer to a former employee as a

7  full -- psychopath who has not been diagnosed as a

8  psychopath?

9        A    I do.

10       Q    Do you see how some might find that to be

11 offensive?

12       A    I do.

13       Q    And do you see how some might find that to

14 be defamatory?

15       A    I do.

16       Q    I think you mentioned that she had 25 out

17 of 27 of something; is that right?

18       A    Twenty-seven out of 30.

19       Q    And that was you that diagnosed her as a

20 psychopath because she had 27 out of 30 indicators?

21       A    I wouldn't say diagnosed.  It was using

22 Joe Navarro's book called Dangerous Personalities,

23 and he has a list of indicators of psychopathy.  And

24 to my assessment, she matched 27 out of the 30.

25       Q    And Joe Navarro is not trained to diagnose

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 29

1   someone as a psychopath, right?

2        A    I don't actually know Joe Navarro's

3   training in that sense.

4        Q    Did you sit in on his deposition?

5        A    I did.

6        Q    Did you hear him talk about how he was not

7   able to diagnose anyone as a psychopath?

8        A    I heard him say that, yes.

9        Q    Any reason to disagree with him?

10            MR. CONRAD:  Object to form.  Sorry, guys.

11       Q    (By Mr. Dean) Any reason to disagree with

12   him?

13       A    No reason.

14       Q    So your statement that she is a full on

15   psychopath is based off of a book written by someone

16   who is unable to diagnose someone as a psychopath?

17       A    Correct.

18            MR. DEAN:  Got it.

19            Marked as Exhibit 8 (sic) is a document

20       that is Bates labeled SE17173.  Marked for

21       purposes of this deposition because it was

22       not -- it was produced natively, we applied a

23       stamp to the bottom.  So we just have page

24       numbers to make it easier for the record.

25   ///

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 31

1      A    I do.

2      Q    Did you write this?

3      A    I did.

4      Q    And you wrote that you have minor level

5  celebrity status in this industry?

6      A    I had.

7      Q    Yet, at the time -- okay.  Let me ask

8  that.  You said had.  So when did you have celebrity

9  status?

10     A    Previous to DEFCON's defamatory statement.

11     Q    The day of the Transparency Report, did

12  you have celebrity status?

13     A    I did.

14     Q    You said in your industry, what industry?

15     A    Information security.

16     Q    You say that you had many beautiful women

17  working for you; is that right?

18     A    Correct.

19     Q    Do you think it's appropriate or

20  inappropriate to discuss the women working for you

21  as being beautiful women?

22     A    It's a fact.  So I don't find it

23  inappropriate.

24     Q    Do you think it's professional to refer to

25  the women working for you as beautiful women?

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 32

1    A    In this context, yes.

2    Q    Do you see how someone -- how a female who
3    is working for you might find it inappropriate to
4    refer to them as a beautiful woman?

5    A    I can't tell you how they feel.  I am
6    sorry.

7    Q    My question was a little bit different.  I
8    didn't ask you how they felt.  I asked if you can
9    understand how someone might feel that it is
10   inappropriate to refer to a female employee as a
11   beautiful woman?

12   A    In this day and age, yes, I can see that.

13   Q    And you can see how some might find it to
14   be unprofessional?

15   A    I do.

16   Q    And you can see how some might be -- might
17   find it to be offensive to refer to female employees
18   as beautiful women?

19   A    I do.

20   Q    You can understand how it might make
21   female employees uncomfortable to refer to them as
22   beautiful women?

23   A    I do.

24        I don't need this document anymore?

25        MR. DEAN:  You can set it aside.

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 38

1   find it to be inappropriate to communicate with

2   women like this?

3        A    I do.

4        Q    Do you understand how some people, it

5   might make them feel uncomfortable to communicate

6   with them like this?

7        A    I do.

8            MR. DEAN:  Marked as Exhibit 8 is a

9        document Bates labeled Denis 115.  This appears

10       to be a Signal exchange between Chris Hadnagy

11       and Alethe Denis dated December 28, 2021.

12            (Exhibit No. 8 was marked for

13       identification.)

14       Q    Mr. Hadnagy, does this appear to be an

15   accurate text message between you and Ms. Denis on

16   December 28, 2021?

17       A    Yes, sir.

18       Q    And you refer to Ms. Denis as being --

19   actually, let me rephrase that.

20            You say to Ms. Denis you are stupid hot;

21   do you see that?

22       A    I do.

23       Q    Do you think that's appropriate or

24   inappropriate?

25       A    Again, with Alethe being a good friend, I

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 39

1    also called her smart and talented.  I felt it was
2    appropriate.
3        Q    I am not asking about smart and talented.
4    I am asking about calling her stupid hot.  Do you
5    think that's appropriate or inappropriate?
6        A    Appropriate.
7        Q    Do you think it's professional or
8    unprofessional?
9        A    I do not find it to be unprofessional in
10   this setting.
11       Q    Do you understand how some people might
12   find calling a woman stupid hot might be offensive?
13       A    I do.
14       Q    Do you understand how some people might
15   find calling a woman stupid hot would be
16   inappropriate?
17       A    I do.
18       Q    Do you understand how some might find that
19   to be offensive?
20       A    I do.
21       Q    And do you understand that that might make
22   some people feel uncomfortable when you refer to
23   them as stupid hot?
24       A    I do.
25           MR. DEAN:  Marked as Exhibit 9 is a Signal

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 46

1        Q    And did she win?

2        A    Yes, she did actually.

3        Q    Is it fair to say that most of the women

4    that won the black badge competition were good

5    looking?

6             MR. CONRAD:  Object to form.

7        A    I mean, you are asking my opinion?

8        Q    (By Mr. Dean) Yeah.

9        A    I would say no.

10        Q    You say Whitney is hot.  She's beautiful,

11    correct?

12        A    Yes.

13        Q    Do you think it's professional or

14    unprofessional to refer to a former contestant as

15    being hot and beautiful?

16        A    Inappropriate.

17        Q    I asked that one about being professional.

18        A    Oh, sorry.

19        Q    But we have had a cadence of

20    inappropriate?

21        A    Yes, sorry.

22        Q    So we can clean that up.

23             You think it's inappropriate to refer to a

24    former contestant as being hot and beautiful?

25        A    I will agree to both, inappropriate and

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 47

1  unprofessional.

2      Q    And you can understand how that might make

3  someone feel uncomfortable, or they might be

4  offended by that?

5      A    Yes.

6      Q    And you can understand how other people

7  might find that to be inappropriate or

8  unprofessional?

9      A    Yes.

10     Q    And then going on to the next one says you

11 literally and -- you literally are so beautiful,

12 it's amazom.  I think what you are trying to say is

13 you are literally are so beautiful it's amazing,

14 right?

15     A    Yes, I think that's what I was trying to

16 say also.

17     Q    Do you know, were you drinking alcohol

18 when you were sending these to Ms. Denis?

19     A    I cannot remember 2022.

20     Q    That's fine.  All we can ask for is your

21 best recollection.

22         And you think it was appropriate to say

23 this to Ms. Denis?

24     A    I do.

25     Q    And you think it was professional?

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 52

1      A    Yes.

2      Q    -- dated 11/9/2012; do you see that?

3      A    I do.

4      Q    Who is Amanda Marchuck?

5      A    At -- she still works for me.  But at this

6    time, she was my EA.

7      Q    Executive assistant?

8      A    Yes.

9      Q    I just want to make sure I have a clear

10   record.

11        And you would write to Ms. Marchuck,

12   subject e-Intro.  You say Michele, aka the marketing

13   Asian, aka TMA; do you see that?

14     A    I do.

15     Q    And TMA is a shorthand reference for the

16   marketing Asian?

17     A    Yes.

18     Q    And in November 2012, you were referring

19   to Michele Fincher as the marketing Asian; is that

20   right?

21     A    I see that.  I do not recall it.  But I

22   see it there, yes.

23     Q    Do you think that it's appropriate or

24   inappropriate to refer to Asian employees as the

25   marketing Asian while at work?

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 53

1    A    That's a very broad question.  But in this
2    context, Michele oftentimes gave herself nicknames,
3    so I don't feel this is inappropriate.
4    Q    So you are saying Michele gave herself the
5    nickname the marketing Asian?
6    A    No, I am not saying that.  I don't
7    remember this.  I am saying that oftentimes there
8    would be nicknames that she would use her race in.
9    Q    So you think it's appropriate to refer to
10   Michele Fincher as the marketing Asian, and then
11   e-Intro to your executive assistant?
12   A    At this time, yes, I did.
13   Q    Okay.  Sitting here today, do you still
14   think that's appropriate?
15   A    No.
16   Q    Okay.  So today you think that's
17   inappropriate to refer to a female employee as the
18   marketing Asian?
19   A    Times have changed since 2012.  So yes, I
20   would say the sensitivities of people definitely
21   have increased.  And I would change the way I speak
22   from 2012 to 2025.
23   Q    Got it.  So 2012 you thought it was
24   appropriate to identify someone based on their race
25   or origin.  But now today in 2024, it's not

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 54

1    appropriate?

2            MR. CONRAD:  Object, form.

3        A    I am not saying that, no.  I am not saying

4    that I thought it was okay to identify every person

5    by their race or origin.  I am telling you that this

6    comment did not feel inappropriate at that time.

7        Q    (By Mr. Dean) What race or origin is

8    Amanda Marchuck?

9        A    She's Italian.

10       Q    You didn't call her the Italian assistant,

11   did you?

12       A    I did not.

13       Q    You just called her the assistant?

14       A    I did.

15       Q    Okay.  But with Michele Fincher, you

16   called her the marketing Asian?

17       A    I did.

18       Q    And she is Asian?

19       A    She is.  She's from Japan.

20       Q    Do you think it's professional or

21   unprofessional to refer to an Asian employee as the

22   marketing Asian and then e-Intro to your executive

23   assistant?

24       A    Are you asking that from 2012 or today?

25       Q    Why don't we take it in both time frames,

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 67

1       Q    Do you see that, Mr. Hadnagy?

2       A    Yes, sir.

3       Q    Does this appear to be a message between

4   you and Ms. Welton and Ms. Hansen?

5       A    It does.

6       Q    And you write, aren't you an adorable

7   little Asian teapot?

8       A    I appeared to have written that.

9       Q    Were you writing a message about an actual

10  Asian teapot, or were you referring to a woman as an

11  Asian teapot?

12      A    Most likely referencing Allie.

13      Q    Allie Hansen?

14      A    Yes.

15      Q    Your employee?

16      A    Yes.

17      Q    So you wrote an e-mail to your Asian

18  employee Allie on May 7, 2019, saying aren't you an

19  adorable little Asian teapot?

20      A    I am going to make that assumption because

21  Shayna is not Asian.  And this -- I don't see

22  anything else in the context of this e-mail.  I

23  don't remember it.  This is quite a few years ago.

24      Q    Do you think that that is inappropriate or

25  appropriate to refer to an Asian woman who works for

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 68

1   you as an adorable little Asian teapot?

2        A    Inappropriate.

3        Q    Professional or unprofessional?

4        A    Unprofessional.

5        Q    Do you understand why people would find

6   that to be inappropriate?

7        A    I do.

8        Q    Do you understand why people would find

9   that unprofessional?

10        A    I do.

11        Q    Do you understand why people would find

12   that offensive?

13        A    I do.

14        Q    And do you understand why that would make

15   women feel uncomfortable?

16        A    I do.

17        MR. DEAN:  Marked as Exhibit 17 is a

18   document Bates labeled SE_21610.  It's from Kaz

19   Nishi to Chris Hadnagy regarding chat room

20   comments dated December 10, 2015.

21        (Exhibit No. 17 was marked for

22   identification.)

23        Q    Do you see that Mr. Hadnagy?

24        A    I do.

25        Q    And does this appear to be an e-mail -- a

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 74

1  penis on her feet.  And Pat was part of the OSINT
2  work for that case.  So we were actually talking
3  about a legitimate thing that was happening.
4      Q    Got it.  So this is a reference to an
5  ongoing investigation?
6      A    Yes, it was.
7      Q    Understood.
8           I noticed that in a lot of the depositions
9  so far we have talked about the SECOM trainings.
10  Specifically questions that were part of the
11  homework assignment; do you recall those portions of
12  the depositions?
13      A    Yes.
14      Q    Is it fair to say that some of your SECOM
15  trainings had homework assignments where men were
16  required to go to women and ask about bra size or
17  their feminine product that they used?
18      A    No, it was not required.
19      Q    Is it fair to say that the homework asked
20  men to go ask women, as part of a homework
21  assignment, whether they use certain feminine
22  products or the size of their bras?
23      A    That's not really worded completely
24  honestly to define the homework.  The homework
25  had -- for both men and woman, had five different

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 75

1   options for them that they could ask.  And it wasn't
2   about asking that person about their personal size
3   or thing.  It was preference for like, do you have a
4   preference for a certain type of feminine hygiene
5   product?  I am getting some for my daughters, or
6   something you could recommend, or something like
7   that.  Those were the nature of the questions.  It
8   wasn't required you have to go out and ask a woman
9   these questions about herself.
10       Q     So using the feminine product, is the goal
11   to find what that person, what feminine product that
12   person uses?
13       A     The goal was to ask a very awkward
14   question that we normally wouldn't ask in a
15   nonsexual, nonthreatening way, and to get help or
16   information from the person to show you that asking
17   really uncomfortable questions can be done.
18       Q     So if you are asking an uncomfortable
19   question about feminine products, are you trying to
20   find out what feminine product that person uses, so
21   that that way you could use that information at some
22   other point in time?
23       A     No, no, the goal of the homework, so we
24   will use the feminine products one, the question was
25   phrased to ask for a recommendation on the best

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 76

1   brand of feminine hygiene products.  That was the
2   way it was phrased for the homework.  So oftentimes
3   men would go into a pharmacy, stand in the feminine
4   hygiene aisle.  And when a woman would come by, say
5   something like, hey, I am here to buy some stuff for
6   my wife.  I really don't know what brand to buy.
7   What is the best?  What do you recommend?  And
8   normally they would then make a recommendation.
9       Q    Were there questions, as part of the
10  homework assignment, that had men ask women about
11  bra sizes?
12      A    Yes.
13      Q    Okay.  And what was that question?
14      A    The question was posed about getting help
15  in picking out either a bra or swim suit for
16  somebody in your life, and you don't know how these
17  sizes work.  Will you help me understand what is a
18  C?  What is a 36?  That kind of thing.
19      Q    There was no goal to try to find out the
20  bra size of that person?
21      A    It was not about -- I mean, normally that
22  would happen, but that wasn't the goal.  It wasn't
23  go out and tell me your bra size.  It was all a
24  request in getting very odd information that was
25  awkward to ask for the goal of teaching people that

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 77

1   you can actually ask really awkward questions
2   because you are going to have to do that as part of
3   my job.
4       Q       Were there any questions regarding
5   female's pubic hair?
6       A       No, never.
7       Q       Were there any other questions other than
8   feminine products and bra sizes that were
9   uncomfortable?
10      A       Yes, weight loss products.  I have to
11  remember because we haven't done this homework since
12  2018.  Weight loss products, any type of fungal
13  creams, and it was bra, and it was feminine hygiene
14  products.
15      Q       And underwear?
16      A       No, underwear wasn't one of them.
17      Q       Are you sure?
18      A       Yeah, it was bra size.
19      Q       No snowflakes complained about underwear
20  assignments?
21      A       We had a complaint at Black Hat about the
22  bra size, and that's when we ended that homework.
23  But we didn't -- we didn't ask -- there was no
24  underwear.  I really can't remember the fifth one.
25  I would have to look back at my notes.  It was bra

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 78

1    size, feminine products, fungal creams, weight loss,
2    and -- I honestly can't remember.  I'm sorry.
3        Q    What type of questions did the men ask
4    women -- sorry, women ask men?
5        A    Their thoughts on circumcision, boxers or
6    briefs -- oh, thank you.  I remember the one for the
7    women, birth control, birth control recommendations
8    because that was also one for the women asking the
9    men, types of birth control, their salary, and any
10   products used for weight loss.  Those were the five
11   for each.
12       Q    And you believe that these questions were
13   appropriate as homework assignments?
14       A    I do.  I actually had help getting them
15   developed from an FBI agent.
16       Q    Who?
17       A    Robin Dreek (phonetic).
18       Q    Robin Dreek wrote these, or did you?
19       A    I actually can't remember.  This was 2010.
20   I think we worked on it together because at the
21   time, he was the director of the BAU for the FBI,
22   and he was helping me develop my homework
23   assignments.  And we can't do what the FBI does,
24   which is get social security numbers, date of birth
25   -- or social security numbers and bank information

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 80

1      A    Yes, that was between Michele and I
2  because at the time, we only had those five
3  questions for men.  And women were not coming to
4  this class.  And then all of a sudden we started
5  having an influx of women coming to this class.  And
6  at that time, Michele was working for me, and she
7  had mentioned it's really unfair to send women out
8  with these questions because it's too easy for them.
9  So I said, well, what do you want to do?  And she
10  said we need to come up with questions that are for
11  women.  So Michele and I are the ones who came up
12  with the five questions for women to ask men.
13      Q    Who proposed the circumcision question?
14      A    I don't actually remember.  I only
15  remember salary was the one I came up with because
16  she actually thought it was too weak.  And I said as
17  a man, that's actually the hardest one to answer in
18  front of a strange woman.  You are probably going to
19  lie about it.
20      Q    So sitting here today, you cannot recall
21  who came up with the circumcision question?
22      A    I can't.
23      Q    You said these are appropriate questions.
24  What about professional, do you think these are
25  professional questions?

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 81

1    A    At the time, yes, they taught a very
2  valuable lesson for my industry.
3    Q    You said at the time, how what about today
4  do you think these are appropriate questions?
5    A    Today, like I say, we had a complaint.
6  Somebody felt uncomfortable with the homework.  And
7  after that we changed it because we didn't want
8  people to -- we wanted discomfort in the sense that
9  it teaches you to step out of your comfort zone.
10 But we didn't want discomfort in someone feeling
11 like ashamed.
12   Q    You understand how people might find these
13 questions to be inappropriate?
14   A    Today, I do understand, yes.
15   Q    Do you understand how people might find
16 these questions to be unprofessional?
17   A    I do.
18   Q    And do you understand how people might
19 find these questions to be offensive?
20   A    I do, and that's why we changed the
21 homework in 2018.
22   Q    You understand that these questions can
23 make people feel uncomfortable, right?
24   A    I do.  That's why we changed it.
25   Q    People actually complained to you about

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 84

1      Q    Did Ms. Fincher tell you some of the
2  female students did not feel safe in asking these
3  questions?
4      A    I never -- I don't recall her ever using
5  the word safe.  I do recall her telling me students
6  that were uncomfortable in asking these questions.
7      Q    Got it.  So Ms. Fincher did raise concerns
8  with you that these questions were making women feel
9  uncomfortable?
10     A    Yes.
11     Q    Approximately how many times?
12     A    Oh, I can't tell you.  I don't know.
13     Q    She, to the best of my recollection,
14  testified that nearly every class she told you these
15  questions were making people feel uncomfortable.
16     A    It was the nature of the homework.  I
17  mean, it was to put people out of their comfort zone
18  to teach them how to do this job.  So the discomfort
19  was actually part of the design.
20     Q    Sitting here today, any reason to disagree
21  with Ms. Fincher that she told you several times
22  that these questions made people feel uncomfortable?
23          MR. CONRAD:  Object to form.
24     A    No.
25     Q    (By Mr. Dean) Do you recall Ms. Fincher

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 111

1   misrepresented the truth.  So, no, I will not agree
2   to that.
3        Q     (By Mr. Dean) You can't understand that
4   people who had a negative experience with your
5   conference and your homework assignments would come
6   forward and make a code of conduct violation?
7              MR. CONRAD:  Object, form.
8        A     In 2016, he did make a complaint, from my
9   understanding.  And we -- he also came to me and
10  personally talked to me about his feelings about the
11  inappropriate language in the class.  I apologized
12  to him, which he also noted in that e-mail that I
13  apologized to him.  And then it was over from 2016
14  to 2022 when he came out of the woodwork again
15  because the mob on the Internet went wild.
16       Q     (By Mr. Dean) So, yeah, I am not talking
17  about Mr. Vaughan.  I am talking about how other
18  individuals -- you can't understand how other
19  individuals -- let me back up.
20             Is Mr. Vaughan the only person to attend
21  your training?
22       A     No, I did anywhere from five to eight
23  trainings a year from 2010 until 2022.
24       Q     And we've already seen two people who have
25  complained about those trainings, right, the

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 112

1   homework assignments?

2        A     Uh-huh.

3        Q     And do you think it's fair to say that

4   there is probably more than two people who felt

5   offended by those conferences (sic)?

6             MR. CONRAD:  Object, form.

7        A     I would say that's fair because we don't

8   know.

9        Q     (By Mr. Dean) Could be more, could be

10  less -- or it couldn't be less -- could be more than

11  two?

12       A     I have no formal complaints issued to

13  anyone in my company about the homework.

14       Q     And you, sitting here today, can't

15  understand how people would complain to DEFCON about

16  homework assignments that involve the same exact

17  type of questions?

18            MR. CONRAD:  Object, form.

19       A     I do not understand why someone would go

20  to DEFCON when this homework was never performed

21  there, when the class was never taught there, when

22  DEFCON has nothing to do with my trainings, my

23  classes, or my employees.  I will -- I cannot agree

24  to how someone would feel compelled to go to a

25  conference.  If there is really this many workplace

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 113

1    complaints, why not go to the Labor Board?  Why not

2    get a lawyer?  Why not go to the police if I am

3    doing these things?  Why go to a conference, DEFCON.

4           Q     (By Mr. Dean) So that an easiest way to

5    say you can't understand it?

6           A     Can't understand it.

7           MR. DEAN:  Got it.  This is a good time to

8    take a break.

9           THE VIDEOGRAPHER:  We are off the record

10   at 12:10.

11          (Lunch recess taken.)

12          THE VIDEOGRAPHER:  We are back on the

13   record at 1:08.

14          Q     (By Mr. Dean) All right.  Mr. Hadnagy, I

15   want to switch gears a little bit.

16          Who is Maxie Reynolds?

17          A     She is an ex-employee of mine.

18          Q     And how did you meet Ms. Reynolds?

19          A     She contacted me on LinkedIn asking if I

20   would train her to start a social engineering

21   company.

22          Q     And then you ended up hiring her?

23          A     I did.  I ended up meeting her,

24   interviewing her, and then hiring her.

25          Q     When approximately did you hire her?

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 119

1  case.  Then I know there were more e-mails

2  back-and-forth in the subsequent days.

3      Q    So you said there were more e-mails

4  back-and-forth after the subsequent days.  What do

5  you recall happening next after you essentially

6  wished her well?

7      A    It was the laptop coming back, the promise

8  of that.  She promised she mailed it to Spencer that

9  week.  It never came.  We kept asking her for the

10 tracking number so we could track it if it got lost.

11 We were worried if it got lost with UPS.  She kept

12 promising to provide the tracking number, and

13 didn't.  Then and after the third time of her

14 promising that it was getting mailed back, her book

15 was released, a book that I worked with her on, The

16 Art of the Attack.  And in that book, were pictures

17 from an active federal case with ILF that would have

18 made that case nullified.  We would have lost

19 justice for a 13-year-old girl.  So I did freak out

20 at that point, and I asked Ryan to lock her laptop

21 because it was a corporate laptop with corporate

22 software on it.  So we locked it.  And that is when

23 e-mail exchanges got more heated because -- and

24 100 percent I could be missing little pieces in

25 there.  We are talking about 2021 here.  So I could

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 120

1    be missing little tidbits of pieces.  And I don't
2    have the timeline right in front of me.
3              And then we were e-mailing back-and-forth
4    about, you know, the picture.  I pulled my support
5    from all of her media that I had gotten her.  I
6    canceled all her interviews that I set up for her.
7    I had notified any conferences that we had
8    recommended her at that I was pulling my
9    recommendation.  And I threatened to report her
10   because she had Government data on her computer,
11   which was now stolen property since she no longer
12   worked for Social Engineer.
13        Q    Threatened to report her to who?
14        A    The client is Department of Energy, a
15   Federal Government client.  And she had over 1,200
16   e-mail addresses and phone numbers and names of the
17   targets that we were asked to audit on her desktop.
18        Q    Got it.  I want to kind of take this
19   piece-by-piece.
20             So your testimony is that you essentially
21   wished Ms. Reynolds well, and asked for her to
22   return her laptop?
23        A    Yes.
24        Q    And then Ms. Reynolds said she would?
25        A    Yes.

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 121

1    Q    And you followed up and said, hey, where
2    is the laptop?
3    A    Yes.
4    Q    And she said I will send it to you?
5    A    Yes.
6    Q    You followed up again saying give me the
7    tracking number, so that would be the third time?
8    A    Yes.
9    Q    And then she still didn't give it to you?
10   A    Correct.
11   Q    And then a couple days later her book was
12   released?
13   A    A book was released.
14   Q    And the book contained a picture from an
15   ongoing investigation?
16   A    From an investigation that we had handed
17   into the FBI.  So it wasn't ongoing, but not our
18   case, it was now a Federal case.
19   Q    Okay.  So let's kind of pause there.  I
20   want to talk about the book.
21        Did you help edit or review Ms. Reynolds'
22   book prior to it being released?
23   A    I did.  I helped her get the contract.  I
24   helped her with the ideas, a little bit of the
25   writing, and I was her editor.

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 122

1    Q    Talk to me about this editing process.
2    And what I mean by that is did you just get a Word
3    document kind of how your book is that we looked at
4    earlier, or was it the final book?
5    A    No, the way Wiley does it -- Wiley was the
6    editor that we worked with -- every time a chapter
7    is completed, it goes first to the -- what they
8    call -- the scientific editor, just the process,
9    that was me.  And then it goes from me back to
10   Maxie, and she can say I agree or disagree with any
11   of my edits.  And then it goes to English and
12   grammar editing, which is not me.  And then it goes
13   back to Maxie again.  She gets to fix anything that
14   is there.  And then it goes back to the publisher.
15   We did that chapter by chapter.
16   Q    Got it.  And what chapter had the picture
17   of the prior investigation?
18   A    I can't remember.  It was -- the chapter
19   was about something called meta data because that's
20   how we caught this guy.  He posted a picture on
21   Discord of his car.  And in the picture meta data
22   was his GPS location.  And that is how we located
23   him.  And she used those pictures as an example in
24   her book of how we can use meta data to catch bad
25   guys.

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 123

1       Q    Can you describe to me the picture?

2       A    Yeah, there was two -- I believe there

3   were two pictures, one was the dashboard of his car

4   as he was driving down the highway.  And then the

5   other was outside -- looking out the window of his

6   car at a billboard.  Nothing pornographic or

7   anything.  It was just of his car.

8       Q    And did the pictures identify who the

9   person was?

10      A    It did not.

11      Q    Did the book itself identify who the

12  person was?

13      A    It did not.

14      Q    Did anything in the picture book in any

15  way reveal the identity of either the perpetrator or

16  any of the victims?

17      A    It did not.

18      Q    And the edit -- the copy of the book that

19  you received to edit had a picture -- those pictures

20  in the book, correct?

21      A    It did not, no.  If it did, they would

22  have been removed before that book got printed.

23      Q    So your testimony is that you did not see

24  any of those pictures prior?

25      A    I did not.

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 125

1    that to the Board.  The Board would have shot me
2    down in a heartbeat, especially because my lawyer is
3    on the Board.  And we knew that case was getting
4    handed to the FBI.  That means every piece of
5    evidence inside that case is now Federal property.
6    We no longer own it.  I would not have permission to
7    give anyone permission to use it.  It is now Federal
8    property.
9         Q    Was Ms. Reynolds' book published?
10        A    Yes.
11        Q    Is the picture still in that book?
12        A    No, after calling her, texting her, trying
13   to get her to change it -- she ignored me -- I
14   called my friend who is -- Jim Minatel, who is the
15   publisher at Wiley that I worked with for years.
16   And I told him that he is producing a book of
17   Federal crime in it.  He then stopped the publishing
18   of the book, made her rewrite that chapter, and they
19   continued printing.
20        Q    So I am confused on the timeline a little
21   bit.  So you said the book was released, and you
22   found -- you then saw the picture for the first
23   time?
24        A    Yes.
25        Q    So what happened to the books that were

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 126

1   already printed and published?

2        A    I imagine like mine, so the one that my

3   book that has 3,000 -- I think 3,296 copies in the

4   world of Simon Cowell on them.  They -- I mean, I

5   can't locate each one of them.  Someone bought them.

6   So they are floating around the world somewhere.

7   But the deal with Cowell's publisher was we will

8   pull any non-sold remaining books off the shelf and

9   burn them, and we will rewrite that chapter, and he

10  accepted that.  The same thing happened with Maxie's

11  book.  They pulled any non-sold copies off.  She had

12  to rewrite that chapter.  And then they continued

13  publishing the book.

14       Q    You say you threatened to report her to

15  the Department of Energy.  Did you report her to the

16  Department of Energy?

17       A    I did not.

18       Q    Did you report her to the FBI?

19       A    I did -- not formally.  I told the person

20  who I would call my handler, who was taking the

21  cases from ILF for the FBI, I told him that the case

22  that we had handed in the pictures were in -- were

23  in the book.

24       Q    What was that person's name?

25       A    Chris Ford.

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 127

1    Q    And how did Mr. Ford respond?

2    A    Not very well.  He got very angry.  Told

3    me that this can ruin a case if this got out that a

4    lawyer would be able to use that to get the case

5    thrown away, said a few choice words to me.  And

6    then told me to get it fixed.

7    Q    Was this over the phone, or was this via

8    e-mail?

9    A    No, it was over the phone.

10   Q    Do you have any call logs or any records

11   showing you actually had this conversation with

12   Mr. Ford?

13   A    I mean, I would have to -- if I used my

14   cellphone, I probably would have a cellphone record

15   somewhere.  But I would not have any -- it would

16   just be like I called this number for this many

17   minutes on this date.  I wouldn't have any record of

18   the phone call.  I wouldn't -- I would never record

19   my phone calls with Federal agents.

20   Q    Did you have any followup conversation

21   with Mr. Ford about that picture?

22   A    Yes, after I called Jim Minatel, and he

23   told me he was going to take it -- the book down and

24   have her change it, I called Chris to tell him it

25   was resolved.

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 128

1      Q      And what did Mr. Ford say?

2      A      Good, that was basically it, just good.

3  Don't let -- and then he did make a comment about we

4  had another employee that also did some crap with

5  ILF too.  So he said you have to get your hiring

6  practices better.  You seem to have a lot of

7  problems.

8      Q      What crap did the ILF employee pull?

9      A      Cat Murdock outed this very same agent at

10 DEFCON, and he was undercover because she had worked

11 with me on a case with him, and also blew his cover.

12 And he was livid at me.

13     Q      Okay.  So you said the book was released.

14 What did you do after you saw the picture in the

15 book?  Tell me your next steps.

16     A      I first called the Board of ILF to tell

17 them what was happening.  They needed to know.  I

18 then sent Maxie e-mails or texts -- I sent messages

19 somehow telling her that had to come out, that it

20 was a Federal crime.  And I told her if I -- if I

21 get called by the FBI on this, I am not going to

22 take the heat.  I am going to tell them you did it

23 without any permission.  So I threatened that if I

24 get called on this, you are going down, not me.

25 When I didn't receive any response from her is when

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 129

1    I went to Jim Minatel.

2         Q     And then tell me about your conversation

3    with Jim Minatel.

4         A     Same thing.  I basically pulled all my

5    support for Maxie, said that -- I am going to say

6    something you are going to ask where that came in.

7              After we locked her laptop, we have a

8    practice in I think most security companies, we go

9    through her e-mail and things like that to see if

10   there is anything we need to take care of, any

11   business that was left undone, unmeted.  In that is

12   when we found evidence that she never went to

13   Scotland.  She was in Texas.  She actually filed for

14   starting a company in Texas during the months that

15   she told me she was in Scotland.  She had signed

16   contracts with a TV producer that broke her

17   employment contract.  She had sent e-mails from

18   Social Engineer e-mail to vendors sending work away

19   from Social Engineer to other companies.  And that

20   is when -- between the picture and those things is

21   when I realized that she was lying, and she was

22   dirty.  And so when I called Jim, I told him all of

23   that.  I said my support is pulled from her.  In

24   addition, if you don't remove this picture, again, I

25   am not going to get in trouble for this.  If the

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 130

1    Feds call me on this, and this case goes to Hell, I
2    am blaming Wiley and Maxie, and he said, well, we
3    don't want that.  He went to his lawyers.  The
4    lawyers came back, and they said, yeah, pull the
5    book and had her rewrite it.
6         Q    There is a lot to unpack there.
7         A    There is.
8         Q    You said you pulled support because you
9    found that she was trying to start a competing
10   business; is that right?
11        A    I did not say that here.  I have said that
12   in e-mails.  I said I pulled support -- what I said
13   just moments ago is that I pulled support because
14   once we went through her e-mails, we found that she
15   had broke her employment contract in three or four
16   different ways.  And she had lied about ILF, and
17   damaged the organization.
18        Q    Did you go through her e-mails before or
19   after the release of her book?
20        A    After.
21        Q    So when exactly did you pull your support
22   for her book?
23        A    It was after I saw the pictures.  This all
24   happened like within -- within hours, right?  So the
25   book comes out, and one of my ILF employees calls me

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 131

1    and says turn to this page.  I turn to the page, and
2    it's the pictures.  ILF is freaking out.  I tell
3    Ryan lock her laptop.  And when it was locked, then
4    Ryan, as he always does, as my COO at the time, he
5    went through all of her files and e-mails to see if
6    there was any evidence of insider threat, or any
7    work that we had to follow up on.  And that's when
8    we found all these things.  So that was happening
9    like within the same time frame.  And that is when I
10   pulled my support for every pod cast I had set up
11   for her, any interviews I had in magazines for her,
12   the support -- I actually asked Wiley to remove my
13   name from the book, and any mention of SECOM or ILF,
14   I did not want to be associated with her at all.
15   And then I pulled support publicly for her.
16        Q    You said the term insider threat.  What
17   does insider threat mean to you?
18        A    From a security standpoint, insider threat
19   is when you have someone who is granted access
20   inside your company who has actual authoritative or
21   administrative access that can create a threat -- a
22   security threat for your organization.  Like they
23   have the ability to take data, and you wouldn't
24   know.  They have the ability to wipe servers.  They
25   have the ability to create some kind of harm to the

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                Christopher Hadnagy

Page 132

1    company from a security perspective.

2        Q    How do you perform this insider threat

3    analysis?

4        A    For -- well, for my clients, what we do is

5    we first look at the network --

6        Q    I am going to pause you right there.

7        A    Okay.

8        Q    I want to focus on former employees.  We

9    were talking about employees who left.  I think your

10   testimony was you go look, and see if there is

11   outstanding work, and do analysis for insider

12   threats.  So with respect to former employees, let's

13   take that step-by-step.  How do you go to try to

14   determine what outstanding work that person might

15   have?

16       A    Yes, so first it is e-mail -- I mean, if

17   it's amicable, we say is there anything we need to

18   follow up on that you have left undone, right?  And

19   sometimes employees will say, yeah, you get to go

20   take care of these three things, or cancel this

21   stuff, or get rid of my credit card.  If it's not

22   amicable, then we will first go through their

23   e-mails and see if there is anything in the sent

24   folders or in the inbox that is pressing for us to

25   take care of.  And then we will go through any of

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 133

1    their Share Point files or things like that.  Ryan
2    would normally look for evidence of things that were
3    ex-filtrated, like if somebody took data because we
4    have logs of that, like so and so downloaded this
5    file, we will look for those types of things if we
6    suspect someone is a threat.  We don't do that on
7    every employee.
8         Q    So your testimony earlier was that you and
9    Maxie kind of ended the relationship amicably before
10   she left -- before she published her book?
11        A    Yeah.
12        Q    Did you ask her what outstanding work she
13   had?
14        A    Yes.
15        Q    And what did she say?
16        A    There was none.  She had been gone for
17   three -- I believe it was three months, so any work
18   that she had, it was already not done -- it was
19   already done by someone else.
20        Q    Got it.  So there was no reason to look at
21   her e-mail to see what outstanding items there would
22   be, right?
23        A    No.
24        Q    Right.  And you also said for insider
25   threat, and to do that, you just kind of run an

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 134

1    analysis to see what type of data shows up; is that

2    fair?

3        A    It's not -- it's not so much looking for

4    what type of data shows up.  It's evidence of foul

5    play in e-mail, or in chat history, or, again,

6    ex-filtration of data that she would not have needed

7    to take.

8        Q    And you could run a search of e-mails just

9    to see data that's sent, right?

10       A    Yes.

11       Q    Okay.  But you guys didn't do that; you

12   guys actually did a page-turnover e-mails, right?

13       A    I can't honestly tell you how Ryan did it

14   because I didn't do it.  Ryan did the analysis, and

15   then came back to me with the contracts with the TV

16   producer, with the e-mails to vendors from Social

17   Engineer with the business license for sub C that

18   she has in Texas.  So Ryan came back to me with all

19   of this evidence of things that we -- so I don't

20   know how exactly how -- I can't tell you the

21   process.

22       Q    And that's something you would typically

23   find if you did a page-turn of e-mail, right?

24       A    Yeah, I mean, I guess if you went through

25   each e-mail, yeah, would you find those things also.

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                          Christopher Hadnagy

Page 135

1      Q      Got it.  So after Maxie left, the book was
2    published.  And then Ryan went through and did a
3    page turn of her e-mails?
4             MR. CONRAD:  Object, form.
5      A      Again, I will not agree to that because I
6    do not know how Ryan did his actual search into her
7    e-mail.
8      Q      (By Mr. Dean) I guess I am not
9    understanding this insider threat analysis, how it's
10    performed.  Can you explain that one more time?
11      A      Sure.  So if somebody quits, and we feel
12    that they have presented themself as a threat to the
13    company, we will look through their files and their
14    e-mails to see if there is any evidence that they
15    were playing dirty when they worked for us.
16      Q      And by playing dirty, do you mean trying
17    to start their own business, try to create contracts
18    -- or try to take contracts?
19      A      Anything that would break their employment
20    contract or their NDAs.
21      Q      Got it.  So essentially if an employee
22    leaves that you think might be engaging in foul
23    play, you will then go look through their e-mails to
24    try to find if they breached their contracts, or
25    done anything that would not be okay with you?

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 136

1      A     Correct.

2      Q     Got it.  And prior to the book being

3   released, you had no reason to, nor did you, search

4   any of Ms. Reynolds' e-mails?

5      A     No, we never search e-mails of an active

6   employee.  And when she resigned, I had no --

7      Q     Sorry.  I asked that question wrong.

8           Prior to her book being released after she

9   resigned, you did not look through any of her

10  e-mails because you did not deem her a threat?

11     A     Did not, correct.  We did not look through

12  them.

13     Q     But after the book came out, and you saw a

14  picture, you then deemed her a threat, and had Ryan

15  go through, and look through her e-mails for a

16  threat assessment?

17     A     Yes, sir.

18     Q     To try to find any evidence of her

19  breaching the contract?

20     A     Yes.

21     Q     And did Ryan do that at your direction or

22  on his own?

23     A     At my direction.

24     Q     Okay.  So the only reason you went through

25  Maxie Reynolds' e-mails is because she released the

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 137

1    book with that picture?

2        A    Because she had a picture from an active

3    Federal case in it that she had no permission to

4    use.  She had stolen that picture from ILF and used

5    it illegally.  That it was why.  That was an illegal

6    use of a picture that was not her property.  It was

7    no longer ILF's property.  And it wasn't even her

8    case that she worked.

9        Q    And you said at that point in time, that's

10    when you decided to pull support?

11        A    Yes.

12        Q    And you contacted you said Jim -- and I am

13    going to butcher his last name --

14        A    Minatel.

15        Q    -- Minatel, and you said I am pulling my

16    support.  Take the picture out?

17        A    Yes, and I also contacted all the pod

18    casts I had set up for her.

19        Q    Let's stop right there.  You said all the

20    pod casts I had -- and great job listening -- all

21    the people -- pod casts I had set up.  Which pod

22    casts?

23        A    Okay.  So I had contacted -- the big one

24    was Dark Net Diaries.  That is with Jack Rhysider.

25    I can't remember the name of Perry Carpenter's pod

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 138

1    cast, but I contacted him.  Philip Wiley had a pod
2    cast.  I contacted him.  Layer Eight pod cast, I am
3    trying to think if there were any others because,
4    again, this is awhile ago.  I am not sure if I had
5    set her up with others.
6        Q    I heard about four or five pod casts; does
7    that sound right?
8        A    Yeah, it does.
9        Q    Okay.  So I want to make sure we are
10   getting this timeline right.  After you saw the
11   picture, you reached out to the publisher?
12       A    Yes.
13       Q    You said pull the picture.  This is an
14   investigation.  The publisher agreed we will pull
15   the picture and reprint?
16       A    Yes.
17       Q    After that, why did you go and get her pod
18   casts canceled if it was going to be reprinted
19   without that picture, if that was your concern?
20       A    Well, from what we found in her e-mail,
21   and from her lack of response to my begging to
22   remove the illegal picture, I deemed that she was a
23   threat, and I was not going to have my name or my
24   company's name supporting someone who could actually
25   put a 13-year-old child in harm.

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 139

1    Q    So these pod casts, four or five pod
2    casts, did Maxie schedule those on her own, or did
3    you schedule them for her?
4    A    I did all the introductions to those pod
5    casts for her.  I don't actually recall who did the
6    scheduling.  But I have been on all those pod casts.
7    So my -- the introductions to those people were
8    through me saying, hey, Maxie has got a book coming
9    out.  You may want to interview her.
10   Q    Got it.  And when you found out that she
11   was a threat to you, you called all four to five of
12   those pod casts and say take her off, don't put her
13   on?
14   A    Yes, and Paul.com was the fifth one by the
15   way.
16   Q    And did those five pod casts listen to you
17   and pull her pod cast?
18   A    Dark Net Diaries did.  Paul.com did.
19   Layer Eight did.  But Perry Carpenter and Philip
20   Wiley both still had her on.
21   Q    So you got three of the five pod casts
22   canceled?
23   A    Correct.
24   Q    You said you wanted her to have her pod
25   casts canceled because she breached your employment

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 140

1    contract?

2        A    Correct.

3        Q    When did you sue her for breach of

4    contract?

5        A    I have never sued her.

6        Q    Why not?

7        A    Because there was -- she attempted to

8    point vendors and other things away from us.  But

9    she never succeeded.  So there was nothing to sue

10   her for.  She signed a contract with a TV producer.

11   But she made no money from it, so there was no

12   reason to sue her.  So at the end, she broke her

13   employment contract, but none of it was successful.

14   And when I talked to Tim about suing her for lying

15   about being in Scotland and stuff, that was a no-go.

16   He was like this is a waste of time.

17       Q    Got it.  So there was no actual breach of

18   contract.  In your opinion, she was just thinking

19   of, or trying to start her own business?

20       A    No, signing those contracts was a breach

21   of her employment contract.  According to what she

22   signed, she was not allowed to sign contracts that

23   would be with another job, or any other moneymaking

24   opportunity without first checking with her

25   employer.  Starting a business, registering a

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 141

1   business while she's employed with me also breaks
2   her NDA and her employment contract.  Definitely --
3   and this is just an ethics thing -- sending e-mails
4   from her Social Engineer e-mail to vendors saying,
5   hey, I want to send some work your way.  I'm away
6   from Social Engineer, that is a breach of employment
7   contract.
8        Q    Then why didn't you sue her?
9        A    I actually can't answer that.  I am not a
10  lawyer.  I took all of this -- all of the things I
11  am telling you to my lawyer, and I listened to the
12  advice of my counsel.
13       Q    Got it.  So it's your understanding that
14  your counsel did not believe you actually had a
15  breach of contract case against Ms. Reynolds for
16  that conduct?
17       A    Oh, no, not at all.  He definitely --
18            MR. CONRAD:  I am going to caution you
19       against waiving attorney/client stuff.  So to
20       the extent the question calls for that
21       information, I am just going to caution you to
22       that.
23            MR. DEAN:  I think he has already kind of
24       waived it by talking about what Tim said, and
25       that would be a subject matter waiver on this

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 142

1    whole issue.  So I think you can answer this.
2         THE WITNESS:  Reask the question, please.
3         MR. DEAN:  Can you read that back?
4         (Record read.)
5    A    I do not agree with that.
6    Q    So it is your opinion that your counsel
7    thought that you should sue for breach of contract,
8    and you would have a claim?
9    A    That's not what I said.  Your question
10   didn't ask that.  Your question asked if my counsel
11   thought that she breached the contract.  I cannot
12   possibly tell you what Tim thinks.
13   Q    Why did you not sue Ms. Reynolds?
14   A    We just didn't.  We didn't sue her.  There
15   was nothing to sue.  No monetary value, what was I
16   going to do?
17   Q    So you decided not to sue her because you
18   thought there was no pot at the end of the rainbow?
19        MR. CONRAD:  Object, form.
20   A    No, that's not it.  It wasn't about suing
21   her for money.  It's just at the end of the day, she
22   was unsuccessful in all of her attempts to subvert,
23   so...
24   Q    (By Mr. Dean) So there would be no
25   damages?

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 143

1      A     Yeah.

2      Q     So we've talked about your conversations

3   with the book publisher.  We talked about pulling

4   the support and canceling the pod casts.  What else

5   did you do?

6      A     Okay.  Publisher, book, I held meetings

7   with both ILF and with SECOM to notify both teams,

8   employees at both companies what she had done to

9   kind of warn them that she may still be an insider

10  threat.  I mean, that's about it I think.

11     Q     What about any television producers?

12     A     Yeah, so R. Paul Wilson was one of the

13  contracts that she signed for a TV show, and he is a

14  good friend of mine.  She met him through me.  I did

15  call him and spoke to him also about all this

16  pulling my support, which he was shocked about

17  because he didn't know that she signed those

18  contracts without my permission.

19     Q     And did R. Paul Wilson pull that contract,

20  or that opportunity?

21     A     He did not.  It wasn't -- he was only one

22  out of, I think, two or three producers on the show.

23  So he expressed his disconcern with the contract.

24  He said he did not want to support it, but the other

25  producers did not cancel that contract at that time.

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 144

1   I believe it has gone nowhere since then.  But he

2   did not cancel it.

3           MR. DEAN:  Got it.  So I am going to mark

4       as Exhibit 22 a document Bates labeled

5       SE_001519.  This appears to be a conversation

6       between R. Paul Wilson and Chris Hadnagy.

7           (Exhibit No. 22 was marked for

8       identification.)

9       Q    Mr. Hadnagy, does this look to you to be

10  your conversation with R. Paul Wilson?

11      A    It does.

12      Q    Is this the conversation that you were

13  just referring to?

14      A    Yes.

15      Q    And you reached out on August 7th to

16  Mr. Wilson saying that you needed to talk to him; is

17  that fair?

18      A    Correct.

19      Q    You said it was kind of a touchy subject?

20      A    Yes.

21      Q    And you told him that you reviewed the

22  contract she signed with Mr. Wilson?

23      A    Yes.

24      Q    You and told him that it was not legal for

25  her to sign?

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 145

1      A      Correct.

2      Q      According to her employment agreement,

3   right?

4      A      Correct.

5      Q      And I think you said that R. Paul Wilson

6   agreed with you, but his company did not?

7      A      He was one, I think, of two or three

8   producers on the show.  So he brought -- once he

9   heard the whole story, he brought his desire to drop

10  her from the show.  But from what he said, the other

11  producers didn't agree.

12     Q      Got it.  They didn't agree with dropping

13  her, or didn't agree that she did anything to breach

14  her agreement?

15     A      Didn't agree with dropping her.

16     Q      If you go -- these aren't numbered the way

17  they were produced, so go to page two, three,

18  four -- go to page five.  It is the one that starts

19  apologies for the Spanish in the top left.

20     A      Oh, yes.

21     Q      Go about halfway down you write, we should

22  talk again sometime in the next two days.  It was

23  way worse than I actually thought.  Let me just say

24  between us I would run the other way with haste.

25  She is dangerous; is that right?

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 146

1       A    Yes.
2       Q    Do you think it was appropriate or
3   inappropriate to tell that to Mr. Wilson?
4            MR. CONRAD:  Object, form.  I need to get
5       objection in.
6       A    I feel it was 100 percent appropriate.  R.
7   Paul Wilson is a very close and longtime friend of
8   mine.  I introduced her to him, and put her in a
9   position to now be part of his life.  With what she
10  had done to me, I felt it very appropriate to warn
11  my friend that he was potentially in harm's way if
12  he ticks her off.
13      Q    (By Mr. Dean) Other than the book
14  publisher, the pod cast and the television producer
15  that we just talked about, did you reach out to
16  anyone else regarding Ms. Reynolds?
17      A    Yes.
18      Q    Who else?
19      A    Jake, what is his name?  I can't remember
20  his last name.  It was the guy who actually was a
21  reference for Maxie upon hiring her, and I cannot
22  remember his last name.  But I think it's -- I think
23  it's Jake.  I could be wrong.  I can see his face on
24  the LinkedIn profile.  But excuse me for not
25  remembering the name.  I already mentioned employees

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 147

1   of both companies.
2       Q    Let me pause you right there.  Is that
3   him?
4       A    Yes, Jacob.  It was Jacob.
5            MR. DEAN:  Let's have that as the next
6       exhibit.
7            (Exhibit No. 23 was marked for
8       identification.)
9       Q    I am marking Exhibit 3.  Is this a
10  LinkedIn message?
11      A    It is a LinkedIn.
12      Q    LinkedIn exchange between Chris Hadnagy
13  and Jacob Williams.  Mr. Hadnagy, does this refresh
14  your recollection of who the person was you reached
15  out to on LinkedIn?
16      A    It does.
17      Q    And what did you reach out to Mr. Williams
18  for?
19           MR. CONRAD:  What is this marked as?
20           THE WITNESS:  Twenty-three, yes, sir.
21           MR. CONRAD:  Thanks.
22      A    You are talking about after the book and
23  the resignment and all that, correct?
24      Q    (By Mr. Dean) Correct.
25      A    I reached out to find out if he actually

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 148

1    knew what she was really like because of what she
2    did to my company.
3        Q    And for some reason, the Bates label is
4    not on the other copy, but it's on this copy.  It is
5    Bates label SE_404 through 409.
6        A    407 is the page number I am referencing.
7        Q    Got it.  So go over to 408.  You told
8    Mr. Williams, and between us, she is a train wreck,
9    stole IP, took work with her, quit, lied, started a
10   competitive company; do you see that?
11       A    Yeah.
12       Q    And that's what you told Mr. Williams?
13       A    Correct.
14       Q    And you believe that Ms. Reynolds is a
15   train wreck?
16       A    I do.
17       Q    What IP did she steal from you?
18       A    At the time, she had, like I said, all of
19   the -- she had lots of Government e-mail addresses,
20   names.  Her computer ended up getting wiped.  But
21   she had a lot of data from our clients on her
22   desktop.  She also stole those pictures that were
23   illegal to take from ILF.  That was a Federal crime.
24       Q    What else did she steal?
25       A    I think that's about it.

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 149

1      Q     What work did she take with her?

2      A     This is where I was mistaken.  The -- it

3   was a vendor named Neon Century that was in her

4   e-mail that she had sent, and I thought she was

5   trying to get them to be a client.  But she was

6   actually sending work to them, instead of to us.  So

7   this was a mistaken reference to mine.

8      Q     Got you.  So she didn't take any work from

9   Social Engineering?

10     A     She did not.

11     Q     You said that she filed something for a

12  business.  But did Ms. Reynolds ever start a

13  company?

14     A     She did start a company, and ended up not

15  being competing with Social Engineer.

16     Q     Okay.  What was the company that she

17  started?

18     A     From my understanding -- I don't know

19  which version of it is -- it is sub C, and then it

20  is either seven or eight because she keeps starting

21  them and bankrupting them.  So I think this is

22  either seven or eight.  I can't remember which one.

23     Q     Okay.  And you thought that her company

24  that she was starting was a competitive business?

25     A     I did.

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 150

1    Q    But it was not a competitive business?

2    A    It was not.

3    Q    And you told, I believe, the publisher

4  that she was starting a competitive business?

5    A    I did.

6    Q    And that turned out not to be true?

7    A    It was not true.

8    Q    And you told the publisher that she took

9  work from Social Engineer, correct?

10    A    I don't remember exactly what I told him.

11  I don't remember the exact words that I used.  Did

12  we look at that?  Did we see that?  I can't

13  remember.

14    Q    I haven't shown you any exhibits.  We are

15  just talking right now.

16    A    Okay.  I don't remember -- again, this was

17  2021, and I was heated and angry.  I don't remember

18  my exact words I used.

19    Q    You testified earlier that you told the

20  pod cast folks that she stole work from you and

21  started a competing business, correct?

22    A    I did say -- yes, at the time -- again,

23  this was brand new before we figured out what sub C

24  was -- I had assumed the business she started was

25  competitive.  And the reason is her first LinkedIn

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 151

1   message to me was asking me to help her start a
2   social engineering company.  So when she went and
3   started the company while working for me, I had made
4   the assumption that it was a company to compete with
5   Social Engineer.
6        Q     And your assumption turned out to be
7   wrong?
8        A     It did.
9        Q     And you told that to her publisher; it
10  ended up being wrong?
11       A     That one thing out of the list was wrong,
12  yes.  Everything else was true.
13       Q     And you told the pod casters that she was
14  starting a company, and took work, and that turned
15  out to be wrong?
16       A     I don't remember exactly what I told Jack
17  Rhysider, I don't remember the exact words.  I
18  actually really don't remember the exact list of
19  things that I told.  I know the foremost thing on my
20  list was the stolen picture from ILF.  That was the
21  foremost thing because that was the most horrific.
22  The second thing was contracts that she signed.  And
23  then the third was her starting a company while
24  working for me, all breaching her employment
25  contract.

Hadnagy, et al. v. Moss, et al.                                    Christopher Hadnagy

Page 152

1     Q     What did Ms. Reynolds say when you
2   addressed the picture in the book?
3     A     Nothing.  I mean, she wouldn't answer me.
4   She didn't answer anything I tried to reach out to
5   her for.
6     Q     Did she fight the publisher and say
7   absolutely not.  We are keeping all the books in
8   publication as-is?
9           MR. CONRAD:  Object, form.
10    A     I don't know.  You would have to ask Jim.
11  All I know is I went to Jim with the complaint.  He
12  came back to me about a week later, and said she is
13  going to rewrite that chapter.  I am sure about the
14  conversations.
15    Q     (By Mr. Dean) Got it.  So she agreed to
16  rewrite the chapter?
17    A     I assume so.
18    Q     So your first book you published a picture
19  of Simon Cowell?
20    A     I did.
21    Q     And you got in trouble?
22    A     I did.
23    Q     And you agreed to rewrite the chapter?
24    A     I did.
25    Q     Ms. Reynolds wrote a book.  She published

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 161

1    I would be successful or not.  I am just telling you

2    the reasons I did not go forward because everything

3    got smoothed out.  So there was no reason for me.  I

4    figured she would go her way and run her submarine

5    company.  And I will go run my social engineering

6    company, and we probably will never see each other

7    again.

8         Q    (By Mr. Dean) That didn't happen that way,

9    did it?

10        A    It did not.

11             MR. CONRAD:  Object, form.

12             THE WITNESS:  You can slap me at some

13        point, if you want.

14        Q    (By Mr. Dean) Did you reach out to the

15   Offensive Security Order Registration Committee or

16   Board at any time about Ms. Reynolds?

17        A    I did.

18        Q    Why?

19        A    The OSCP, the Offensive Security Certified

20   Professional is one of the most coveted

21   certifications in our industry.  It is also one of

22   the most difficult certifications with a

23   64-something percent fail ratio on the first

24   attempt.  So when somebody has it, it's like a badge

25   of honor, and any of us who have it, like we like to

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 162

1    brag about it.  It goes in our bios.  Once I found
2    out that a lot of her resume was falsified, I wanted
3    to verify if she actually had the OSCP.  So I
4    reached out to them to see if they could give me her
5    student number.
6            MR. DEAN:  Marked as Exhibit 24 is a
7        document Bates labeled SE_015066, and this
8        appears to be a e-mail exchange between you,
9        Mr. Hadnagy, and Offensive Security Order
10       Registration Board.
11           (Exhibit No. 24 was marked for
12       identification.)
13   Q     Does that appear to be correct?
14   A     Yes.
15           MR. CONRAD:  Can you give me the Bates
16       real quick?
17           MR. DEAN:  Yeah, no problem.  It's
18       SE_015066.
19   Q     I want to go back to page four.  If you
20   look at the first -- the bottom, which this appears
21   to be, it says Chris Hadnagy.  This appears kind of
22   you filling out a message to verify information
23   that's dated February 9, 2022; do you see that?
24   A     Yes.
25   Q     Does that date ring any bells to you?

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 163

1    A    That is the date of my banned announcement
2    from DEFCON.
3    Q    After you got banned from DEFCON, you
4    reached out to OSCP for verifying whether a student
5    actually has the OSCP for employment verification;
6    do you see that?
7    A    Correct.
8    Q    Ms. Reynolds was not a student of yours on
9    February 9, 2022, right?
10   A    She was not.
11   Q    And you weren't reaching out to verify --
12   let me rephrase that.
13        Was Ms. -- did Ms. Reynolds apply for a
14   new job with SECOM, or ILF, or for you individually
15   on February 9th, 2022?
16   A    She did not.
17   Q    So you were reaching out to verify if a
18   student actually had OSCP for employment.  But Ms.
19   Reynolds was not a student for you, and was not
20   seeking employment from you?
21   A    I mean, that's what it looks like.  I
22   don't remember doing this -- I mean, I remember
23   doing this.  I don't remember every word.
24   Q    You wanted ammunition to go after Maxie,
25   right?

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 164

1      A    Yes, I was preparing for potential
2   litigation.
3      Q    You wanted to go after Maxie to prove that
4   she didn't have this verification?
5      A    Yes.
6      Q    You weren't reaching out for a student or
7   for employment verification?
8      A    I was not.
9      Q    Is this kind of the human hacking thing
10  right here?
11     A    No, I wouldn't call that human hacking.
12     Q    You weren't trying to check securities at
13  the -- let me make sure this is the right acronym --
14  OSOR?
15     A    At Offensive Security is the name of the
16  company, I was not checking their security, no.
17     Q    Got it.  You were just trying to get dirt
18  on Maxie?
19     A    I was trying to understand how many more
20  lies she told me.
21     Q    So you could use it against her?
22     A    Yes.
23     Q    So you could use it in litigation?
24     A    Yes.
25     Q    Essentially, you are looking for dirt?

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hadnagy, et al. v. Moss, et al.                Christopher Hadnagy

Page 165

1          MR. CONRAD:  Object, form.

2      A    Okay.  I will go with it.  Sure.

3      Q    (By Mr. Dean) Trying to create a dossier?

4          MR. CONRAD:  Object, form.

5      A    I was looking for information that could

6  potentially help us during litigation if we were

7  going to take action against her when I found out

8  she was the ring leader in the events with DEFCON.

9      Q    (By Mr. Dean) Did you ever decide to take

10  action against Ms. Reynolds?

11      A    We have not decided yet.

12      Q    Are you still considering it?

13      A    Right now --

14          MR. CONRAD:  Object, form.

15      A    Right now I just want to get through this

16  lawsuit and be done with it.  I think this has left

17  a very bad taste in my mouth for anything to do with

18  lawyers and the law system.  So I don't know how to

19  answer that question.  I really don't ever want to

20  sit through this kind of stuff again if I have a

21  choice.

22      Q    (By Mr. Dean) You regret your decision to

23  file the lawsuit?

24          MR. CONRAD:  Object, form.

25      A    I do not.

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 191

1   a danger to children.

2       Q    Got it.  So whoever decided to hold an

3   event at that location was a pedophile?

4           MR. CONRAD:  Object, form.

5       A    I mean, it's a -- it's a stupid statement

6   made in emotional moment.  So I don't know if I

7   would, you know, put my right hand on a Bible and

8   say definitely 100 percent someone who does this is

9   a pedophile.  It was an emotional statement.  I had

10  -- everything -- we had spent hours setting up the

11  room.  My team was exhausted and tired, and now they

12  come in and say I have to pick up everything, put

13  all of my stuff away, and there will be a couple

14  hundred hackers in the room watching girls from the

15  strip take their clothes off.  And I have to come

16  back early the next morning and reset up the whole

17  room for kids to crawl around on the floor.  So I

18  was upset, and I said something.

19      Q    (By Mr. Dean) Did you yell at Mr. Wyler?

20      A    I don't recall.  But I do recall maybe

21  raising my voice.

22      Q    So you raised your voice.  And you

23  referred to whoever wants to do this as a pedophile?

24      A    I did.  I made an emotional comment.

25      Q    Do you feel like that was appropriate or

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 192

1    inappropriate?

2            MR. CONRAD:  Object, form.

3        A    At the time moment, I was upset.  So I

4    think we all say some dumb things when we are

5    emotional.  I mean, right now in a calmer state of

6    mind, it wasn't the best usage of words.  But

7    Grifter came up to me maybe an hour later, pulled me

8    aside, told me he didn't appreciate me yelling at

9    him, and we hugged it out, and I apologized.  And

10   that was in, gees, 2016, '17 maybe.  And it never

11   came up again ever until all of this stuff.  So he

12   obviously had forgiven and forgot about it.

13       Q    (By Mr. Dean) Do you think it was

14   professional or unprofessional to act like that in

15   response to Neil telling you there was an event that

16   night?

17           MR. CONRAD:  Object, form.

18       A    If you have ever been to DEFCON, DEFCON is

19   not a professional environment.  So I don't even

20   know if that question fits.  Because there was not.

21   DEFCON is not a professional conference.  Very

22   little professional things happen at DEFCON.  It's

23   Sodom and Gomorrah.

24       Q    (By Mr. Dean) So you don't hold yourself

25   out to be professional no matter what environment

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 194

1    pedophile after that?

2        A    I don't -- I don't recall.  I think he

3    might have brought it up as a joke once or twice at

4    that event, but I don't recall joking with him about

5    that, no.  I don't recall that.

6        Q    So you think that Grifter might have

7    brought it and not you?

8        A    No, I am saying he could have.  I don't

9    know.  I don't recall times in a conversation where

10   we talked about it again outside of his deposition.

11       Q    I want to go to page 38.  If you can

12   recall, we were trying to discuss what happened on

13   that first call.  So I want to talk through this

14   text message on February 24th, so I am hoping that

15   would refresh your recollection a little bit, okay?

16            MR. CONRAD:  Objection, form.

17       A    Okay.

18       Q    (By Mr. Dean) If you go on the first

19   message, Grifter says to you on February 24, 2022,

20   but there were a lot of people that came forward

21   with accusations.  You and I discussed it.  You said

22   was it this person, or this person, or this person,

23   or this person, and I said, Chris, I don't know any

24   specific names, and I don't want to know.  But if it

25   was one or two people, that would be one thing.

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 195

1    This is over a dozen.  You just volunteered multiple

2    names yourself.  So you know this is an issue.  Do

3    you recall that conversation?  It was only a couple

4    days into us talking; do you see that?

5         A    Yes.

6         Q    And then you responded, I know people who

7    are making false accusations, yes, none at DEFCON,

8    just in business and life; do you see that?

9         A    Yes.

10        Q    So I want to know, does that refresh your

11   recollection regarding the initial conversations

12   that you had with Grifter regarding allegations that

13   were being made?

14        A    I wish I can say it brought everything

15   back to memory.  But from what it sounds like, is

16   that he was telling me that there was a dozen people

17   that were anonymous coming to DEFCON with complaints

18   about me.

19        Q    Do you recall asking Neil or Grifter, was

20   it this person, or this person, or that person?

21        A    Yes, I mean, I think like most people in

22   industries that have a name, I had enemies.

23        Q    And who were you asking Grifter if it was?

24        A    If it was Maxie and Cat.  I believe Rachel

25   Tobac was one I asked, Stephanie Carruthers for

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 196

1   sure, and her husband JC.  I think those were the
2   people I mentioned at that time.
3        Q     Did you offer your opinion on what had
4   happened in those situations, and why you felt like
5   there was nothing wrong?
6        A     Yes.
7        Q     What did you say with respect to Maxie?
8        A     I told him that Maxie wanted to use her
9   personal laptop.  Big mistake on our part by saying
10  yes.  But we had to own it, according to her
11  employment contract.  She can only use a machine
12  that we own.  She sold us her machine for one
13  dollar.  And then she willingly installed our
14  corporate software on it, allowing us to control
15  that laptop.  And that's all written in e-mail, all
16  that you were given.
17            Then I explained that she told us she was
18  going to Scotland to take care of her ailing father;
19  that ended up being a lie.  She signed multiple
20  contracts that broke her employment contract.  She
21  then stole a Federal property picture from ILF using
22  it in her book.  And when she took her laptop to
23  Apple, it got erased.  So I explained to him the
24  truth behind all the things that she had
25  misconstrued.

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 197

1    Q    Did you tell Grifter about how you
2  canceled -- about how you got pod casts canceled,
3  book deals canceled -- not book deals -- publishing
4  deals, and television production deals canceled, or
5  tried to get them canceled?
6    A    I told him -- I didn't get the publishing
7  deal canceled.  It was paused until she rewrote it.
8  But I did tell him that I pulled all of my support.
9  Even though two pod casts didn't cancel her, I
10 pulled my personal support.  I had my name removed
11 from her book.  I had my company and my nonprofit
12 removed from her book.  And that I had -- yeah, that
13 I stopped supporting her on the pod casts and other
14 things like that.
15   Q    When you say I stopped supporting her,
16 does that mean that you told Grifter that you
17 reached out to the pod cast people to say I am
18 pulling my support, don't have her on the pod cast?
19   A    I think -- I think we did talk about that,
20 if I recall, because I think I mentioned I had a
21 conversation with Jack Rhysider, who is the owner of
22 Dark Net Diaries.  I do -- I do think I recall
23 telling him specifics that I had reached out to the
24 people that I had introduced her to, and pulled my
25 support verbally with them.

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 198

1      Q     You also mentioned Rachel Tobar (sic) was

2  discussed on that conversation.  What did you say to

3  Mr. Wyler about Ms. Tobar?

4      A     Tobac.

5      Q     Tobac.

6      A     T-o-b-a-c.

7            Rachel is a very opportunistic person.  So

8  if you are riding high, she's right next to you

9  riding your tailcoat.  And when you are in the

10 gutter, she's willing to throw dirt on you.  So I

11 had made an assumption that if Maxie gathered a

12 bunch of people to go against me, that she might be

13 part of that group.  That was a wrong assumption

14 from what I understand from all these depositions

15 that she was not part of the group that Maxie got.

16     Q     And what did you say about Rachel Tobac to

17 Grifter?

18     A     Oh, I don't recall.  Probably what I just

19 told you.  But I don't actually remember my exact

20 words.  I think in this particular instance, I just

21 named people that I had assumed were part of the

22 enemy group.  So I didn't say anything about them.

23 I just named them saying, did Maxie get Cat?  Did

24 Maxie get Stephanie?  JC?  Rachel?  Those kind --

25 that was the list of people that I thought would be

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 199

1    part of the group that she could get to.

2        Q    You keep calling them the enemy group.

3    Why do you keep calling them the enemy group?

4        A    Have you seen what has happened to my

5    life?  That's the group of friends.

6        Q    Yeah, I have.  And I think everything that

7    was published was exactly true.  So if you want to

8    ask my opinions on that, you are not going to like

9    my answers.  But the best part is I don't have to

10   answer questions in depositions.  You do.

11       A    That's great.

12       Q    So what I want to know is why you keep

13   referring to them as the enemy group?

14            MR. CONRAD:  Object, form.

15       A    Once again, what has happened to my life

16   would not make them friendlies.  They have ruined my

17   nonprofit.  They have ruined my career.  They have

18   ruined my business.  I have had people tell me to

19   commit suicide and live stream it because of a

20   conference banning.  These people are -- I don't

21   know how else to refer to them.  They are the enemy

22   group.  They have single handedly gone out and tried

23   to destroy my life, not just from a business stance.

24       Q    (By Mr. Dean) So these people are the

25   enemy group because they made complaints about the

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 200

1   way you treated them?

2        A    They made lies.

3        Q    They are all lies?

4        A    Yes -- no, no, I wouldn't say they are all

5   lies.  A lot of the stories that I heard in

6   depositions -- in the depositions I sat through

7   have -- some of them have modicum of truth to them,

8   and then they are twisted.  So some of them have

9   some elements that were true, and then being

10  twisted.  And a lot of them flat out lies.

11       Q    What are the things that are true?

12       A    Well, I am sure we will get to them.  I

13  can't recall every single one of them.  I just

14  remember sitting through the depositions and taking

15  notes.

16       Q    To the best of your recollection, what was

17  true?

18       A    Let's talk about Cat's deposition.  She

19  claimed I yelled at her when she screwed up the MLSE

20  class, I did.  I got very angry at her.  But she

21  claimed I called her freaking stupid multiple times.

22  And as we saw when my Teams chat was pulled up, I

23  never used the words -- the phrase freaking stupid

24  any time with her.  So did I get angry when an

25  employee screwed up a $120,000-class for 16

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 201

1    students?  Yes, heck, yes, I got angry.  But did I
2    berate her?  Did I call her obscene names?  Did I
3    tell her that she was stupid?  No, lie.  So there is
4    some truth to the story where I got angry.  And I
5    was definitely upset with my company being hurt.
6    But then the rest of it just became false.
7          Q    Do you think you acted appropriately or
8    inappropriately in getting angry and yelling at, you
9    said, Cat?
10         A    Cat, yeah.
11              In that case, I don't know how to answer
12   that question because I don't think it's
13   inappropriate to be angry when -- I have been an
14   employee.  I haven't always been self-employed.  I
15   remember being in companies and screwing things up,
16   messing up a project.  And my boss would get angry
17   at me because I messed something up.  I think that's
18   an appropriate reaction to when you are being paid
19   to do a job, and you do it poorly.
20         Q    I think earlier you said you got angry,
21   and you yelled at her; is that right?
22         A    I mean, it was through Teams.  So it
23   wasn't a physical yell.  It was all caps on Teams.
24   That's considered yelling in text.
25         Q    You think that's appropriate?

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 202

1     A     In this instance, yes.  And I can give you
2   the reason why.  I was telling her what she did
3   wrong and saying we had to fix it.  And she kept
4   arguing with me that she was right.  That's not the
5   time.  That is a complete lack of humility.  It is
6   not the time to argue with the boss about what is
7   right and wrong when we had to fix this issue
8   because we were basically saying we were committing
9   fraud.  So I told her to frick'n shut up, and we got
10  to fix it, and that's what I did.  And I have
11  absolutely -- I would do it again.
12    Q     Do you think that's professional?
13    A     In that setting, yes.
14    Q     And you don't understand how someone could
15  find that to be offensive?
16          MR. CONRAD:  Object, form.
17    A     Someone, or Cat?
18    Q     (By Mr. Dean) Either.
19    A     I think if a person were to see the
20  context, and not just do what has been done this
21  whole court case taking things out of context, I
22  think if they were to see the whole context, that
23  any normal person would go, that's an appropriate
24  reaction to someone almost costing you 120K.
25    Q     I think everything's been in context in

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 220

1        MR. DEAN:  We've been going about an hour;
2    is that right?
3        THE VIDEOGRAPHER:  Fifty-one minutes.
4        MR. DEAN:  Let's just take a quick break.
5        (Recess taken.)
6        THE VIDEOGRAPHER:  We are back on the
7    record at 3:26.
8        Q    (By Mr. Dean) I want to go to page 24 of
9    Exhibit 25, which is the Wyler text messages.  Let
10   me know when you are there.
11       A    I am there.
12       Q    Ultimately on your call with Grifter, you
13   decided -- or had an agreement that both sides would
14   kind of go their separate ways or lay things to bed;
15   is that fair?
16       A    Yes.
17       Q    And you reached out on August 29th a few
18   days later, and you said, I know it's late to bed.
19   But I do have new info just in case it blows up
20   again, right?
21       A    I do.
22       Q    Right, you said that?
23       A    Yes, I did say that.
24       Q    What information did you get?
25       A    I really don't recall.

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 264

1       okay?

2       Q    We know that Maxie already made

3   complaints.  We already talked about that.  I don't

4   want to rehash that.  But I think it's fair to say

5   that we agree that Maxie made complaints to DEFCON?

6       A    Yes.

7       Q    You sat in on Michele Fincher's

8   deposition, right?

9       A    I did.

10      Q    And she testified that she saw you yell at

11  staff at DEFCON conferences?

12           MR. CONRAD:  Object, form.

13      A    She did.

14      Q    (By Mr. Dean) Do you disagree that you

15  yelled at staff at DEFCON conferences?

16      A    No, I don't disagree.

17      Q    I think actually in the discovery

18  responses here you said that you may have raised

19  your voice; is that fair?

20      A    Yeah, raising my voice, yelling, I think

21  they are about the same.

22      Q    And sitting here today, you don't have any

23  personal knowledge regarding whether Ms. Fincher

24  shared this type of conduct with DEFCON during their

25  call, do you?

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 265

1       A    Besides what she said at the deposition.

2       Q    You weren't on the call, right?

3       A    I was not on that call.

4       Q    So you don't know what was said or was not

5   said by Ms. Fincher?

6       A    I did not.

7       Q    And again, no reason to disagree or

8   dispute what she said about you yelling at people at

9   DEFCON events, right?

10           MR. CONRAD:  Objection, form.

11      A    No.

12      Q    (By Mr. Dean) I think we already talked

13  about your conversations regarding the homework

14  assignments with Ms. Fincher, so we can skip that.

15           My only question -- followup question

16  there is:  Sitting here today, you don't have any

17  personal knowledge regarding whether Ms. Fincher

18  shared those homework assignments with DEFCON during

19  the call with the 15-plus individuals, correct?

20      A    I do not.

21      Q    At any point in time, have you been an

22  employee of DEFCON?

23      A    No.

24      Q    Did Geoff Moss give you authority to

25  determine who or who cannot speak on behalf of

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                                      Christopher Hadnagy

Page 287

1    [ *CONFIDENTIAL TESTIMONY*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19      *CONFIDENTIAL TESTIMONY* ]

20          Q    What is Project Unicorn?

21          A    Project Unicorn was an idea that Samantha

22   had about potentially using fake pictures that

23   looked like they were of underage girls that are

24   erotica and pornography in order to bait predators

25   in chat rooms.  That was the idea, because in this

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 288

1    country child erotica is not illegal, and child
2    pornography is.  We had worked out some of the
3    details of it.  I presented it to law enforcement,
4    was told that it is not something we can do as
5    citizens, so that project went nowhere.
6        Q    Did you, at least, start the project?
7        A    The only thing that was started was
8    Samantha started a document in her Google Drive that
9    listed out what we called a pretext, which was like
10   the fake person that she would be, and a list of
11   questions for me to answer about what can and can't
12   be done.  And I listed some things in that document
13   about like no nude photos, some of the rules that I
14   had found that we could not -- that we could not do
15   if it went forward.
16       Q    So your testimony is that Sam Gamble came
17   up with all the questions in the document?
18       A    Yeah, the document is owned by her.
19       Q    So she came up with questions about her
20   boob size and pubic hair and periods?
21       A    The questions for that -- yes, actually,
22   if you look at the document, yes, she is the one who
23   created that.  She wrote -- the pretext was for this
24   one chat room we were in, it's terrible, it is
25   called Pedophile Support Community.  That was the

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 289

1    forum we were going to try to infiltrate with these
2    if we were allowed.  So they needed to have a
3    description of the child that you were with at the
4    time for this community.  And this was Samantha.
5    And then the bottom of that page is the one that I
6    wrote.  So the top one is the one that Samantha
7    wrote.  The bottom one -- if I recall, I think it is
8    two pages, if I am recalling properly, the bottom
9    one is the one I wrote.
10        Q    So you didn't ask Samantha to write down
11   when she started shaving her pubic hair?
12        A    No.
13        Q    So your testimony is Sam Gamble decided to
14   do all of that on her own?
15        A    No, no, no.  We had a conversation about
16   Project Unicorn.  And the concept was that since
17   child erotica is not illegal in this country, could
18   we use someone who looks very young, like Samantha,
19   to pose non-nude pictures on a form to get predators
20   to maybe trap themselves.  In that conversation, we
21   listed things that would need to be answered in
22   order to be real.
23        Q    And what did you list that needs to be
24   answered?
25        A    I can't recall which were Sam's and which

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 290

1   were mine.  I really can't.  It was a conversation
2   that we had.  We would do this often in ILF.  Sam
3   was my right hand.  So we would have conversations
4   like this constantly.
5        Q    Did you or Sam suggest that she identify
6   her bra size?
7        A    I don't know if we were talking about her
8   bra size.  I think it was the pretext.  Like you can
9   read mine.  I put what school -- what middle school
10  I was at.  Obviously I am not in middle school.  It
11  was the pretext I was going to be for the act if we
12  got approval to do this.
13       Q    Who proposed putting in the date that she
14  considered shaving her pubic hair?
15       A    I don't recall.
16       Q    Who proposed saying the date upon which
17  she began to grow pubic hair?
18       A    So I want to clarify because you are
19  asking these questions as if it was Sam.  The
20  answers to the questions are about the pretext, the
21  fake person that's listed on the page, Project
22  Unicorn.  It's not about Samantha.  The same way
23  that my pretext, you can obviously tell is not me
24  because I am not a 14-year-old girl.
25       Q    So you did not tell Samantha to provide

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 291

1    this information?

2         A    The information was about the pretext, not

3    about Samantha.

4         Q    So you wanted Sam to make up that

5    information, not provide her actual information?

6         A    Yeah, she's not 14.  So the pretext is

7    made up.  It's all fake.  But it had to have realism

8    because if we got approval to take the pictures, she

9    can't say she's -- you know -- I don't know what

10   size -- she can't say she is one size, and it is

11   obvious that she is not in the pictures.  So we

12   talked about if we get approval to take these

13   pictures, we are going to have models or people that

14   fit the descriptions we are writing.

15        Q    So you wanted the description of Sam's

16   breasts, the bra size to be pretty accurate on this

17   so it wouldn't raise any flags?

18        A    The way that question is worded, I

19   wouldn't agree.

20        Q    Why wouldn't you agree?

21        A    Because you are saying I wanted Sam's

22   breast to be accurate.  I wanted the pretext -- if

23   we got approval for this project, the pretext had to

24   be believable and proveable.  And if I was -- if the

25   picture was of me, and I am saying I am a

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 292

1   14-year-old girl, it's going to obvious I am not.

2   So we had to have believable specs for what a 13, 14

3   or 15-year-old girl would be that was going to be

4   able to infiltrate this form.

5        Q    Got it.  So you would expect Sam to kind

6   of use her own personal experiences to make it

7   believable about when she started to grow pubic

8   hair?

9        A    Well, I am not a female.  So, yes, we

10  would have those conversations about, you know, if

11  you are going to answer these questions honestly, I

12  mean, I can't tell when you a young girl does, so

13  you have to answer those questions.

14       Q    Got it.  And same with considering pubic

15  hair, right?

16       A    I don't remember that part of the

17  conversation.  But I do -- I do recall after hearing

18  some things in the deposition, things like would it

19  be -- because sadly and disgustingly this is one of

20  the questions that comes up on these forms is do you

21  shave or not?  So we would talk about what is the

22  normal age for girls to start doing that because if

23  we say that we are shaving at 13, it doesn't make

24  sense.  They are going to catch us in a lie.  These

25  conversations, as awful as they sound, they are

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 293

1  commonplace in ILF because of the nature of the work
2  that we were doing.
3      Q    Did you ever think about buying an anatomy
4  book to see when males and females start going
5  through puberty?
6      A    No, I didn't.
7      Q    You thought it would be appropriate to ask
8  Sam to kind of give us her experiences and put this
9  in a document?
10         MR. CONRAD:  Objection, form.
11     A    These conversations were commonplace
12  within ILF.  And Samantha would offer these things
13  up willingly not being forced.  And matter of fact,
14  many times she was the one bringing ideas to me
15  because she worked for ILF full time.  I did not.  I
16  am still a volunteer.
17     Q    (By Mr. Dean) Did you comment to Sam
18  Gamble about she's filled out and finally looking
19  her age?
20     A    I will give you context for that comment.
21  Yes, she had started a medicine out of depression
22  because her boyfriend was on drugs, and this
23  medicine made her lose weight, and she was down to,
24  I think, like 100 pounds.  And she was telling Shane
25  and I how she was really unhealthy.  She changed her

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 296

1  Areesa and her body?

2      A    No, no, not in the way she described in

3  the deposition.  If I did, it might have been like

4  my body image or something like that, but, no.

5      Q    Did you ever tell Maxie Reynolds that you

6  hate porn?

7      A    Yes.

8      Q    How did that come up?

9      A    Maxie also volunteered for ILF, so, again,

10  a lot of discussions about it.  And based on what we

11  have already read from my record, I have a very

12  distaste for pornography.  And after working at ILF,

13  I hate it even more.

14      Q    Has anyone ever referred to you as the

15  Hulk?

16      A    Yes.

17      Q    Or Hulking out?

18      A    Multiple times.

19      Q    Is that your reputation in the workplace?

20      A    For -- this is going back many, many

21  years, for the volunteers we had at DEFCON for the

22  SE Village, each person chose a Marvel character

23  that was their moniker on our website.  And mine was

24  the Hulk.  So everyone had their own Marvel

25  character, Batman, Spiderman, Valkyrie, things like

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 297

1  that.  So we all chose one that was their favorite

2  character, and that was mine.

3      Q    Did anyone ever refer you as the Hulk in

4  the way that you treated people at the office?

5      A    I don't recall being referred to it that

6  way.  Mostly it was the joke because of my moniker.

7  But I don't recall ever being referred to the Hulk

8  because of treatment of people.

9      Q    What happened to your Signal messages with

10  Ryan MacDougall prior to September 4th, 2003?

11      A    I had a Pixel 6, which unexpectedly died.

12  And Signal is the kind of system that if you don't

13  have regular backups of your messages, that you only

14  get to recover what is backed up.  So your last

15  backup is what you will have.  So when I moved to my

16  new phone after my old phone died, my last backup

17  was that date with Ryan.  So those are the messages

18  I have.

19      Q    Did your phone backup with respect to

20  other people?

21      A    No, no, Signal is -- you back it up.  You

22  don't back up individual.  You back up the whole

23  database or nothing.

24      Q    Are you aware that you have produced

25  Signal messages in this case with other people that

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 303

1  found to be false by just searching online.  Like I
2  can say with 100 percent certainty, that no one has
3  ever come to me with accusations of harassment or
4  discrimination; do you recall that?
5        A    I do.
6        Q    Has anyone ever come to you regarding
7  accusations regarding harassment and discrimination?
8        A    Yes.
9        Q    Who is Jessica Levine?
10       A    She is a former employee of Social
11  Engineer, and someone who would volunteer for me at
12  both DEFCON and DERBY CON Villages.
13       Q    Did she make a complaint to -- against you
14  to the North Carolina Department of Labor, Wage and
15  Hour Bureau for not paying her wages?
16       A    She did.
17       Q    Did you receive a citation for failing to
18  pay Ms. Levine in accordance with North Carolina
19  law?
20       A    I received a phone call and an e-mail.
21  And then the case was dropped because she was paid
22  just like we told her she would be.  I don't recall
23  receiving a citation.  But I could be wrong on the
24  wording.
25       Q    If North Carolina Department of Labor,

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 304

1   Wage and Hour Bureau found that you did violate
2   that, is there anything, sitting here today, that
3   you can say to contradict that you violated any laws
4   in not paying Jessica Levine?
5           MR. CONRAD:  I am going to object to form.
6       A    From my understanding after speaking with
7   the gentleman from the labor board, is our
8   employment contracts would state that your final
9   paycheck will be issued after the return of your
10  corporate equipment does not -- is compliant with
11  North Carolina law.
12      Q    (By Mr. Dean) Got it.  Who is Amanda
13  Marchuck?
14      A    She is a long-time family friend, but also
15  my No. 1 employee.  She is the first person I ever
16  hired.  She still works for me.
17      Q    Did you communicate with Ryan MacDougall
18  regarding deposition provided by Jessica Levine in
19  her deposition?
20      A    Yes, I did.
21      Q    What did you tell him?
22      A    I actually can't recall everything I told
23  him.  He was my COO for seven years.  And I had some
24  questions about facts because I can't remember
25  details sometimes.  So I know I told him some of the

Hadnagy, et al. v. Moss, et al.                    Christopher Hadnagy

Page 312

1                    CERTIFICATE OF OATH

2

3    STATE OF FLORIDA:
     COUNTY OF ORANGE:

4

5        I, TARA K. SLOCUM, CRR, RPR, CSR No. 8587, Notary
     Public, State of Florida, certify that CHRISTOPHER HADNAGY
6    personally appeared before me on January 18, 2025, and was
     duly sworn.
7        Signed this 20th day of February 2025.

8

9

10

11

12

13

14

15

16

17    _____

18    TARA K. SLOCUM

19    Certified Realtime Reporter

20    Registered Professional Reporter

21    California Certified Shorthand Reporter

22    Notary Public State of Florida

23    COMMISSION NO.: HH 201493

24    COMMISSION EXPIRES:

25    December 1, 2025

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Hadnagy, et al. v. Moss, et al.                          Christopher Hadnagy

Page 313

1                    C E R T I F I C A T E

2    STATE OF FLORIDA:

3    COUNTY OF ORANGE:

4

5        I, TARA K. SLOCUM, CRR, RPR, CSR No. 8587 and Notary
     Public, certify that I was authorized to and did
6    stenographically report the deposition of CHRISTOPHER
     HADNAGY; that a review of the transcript was requested, and
7    that the foregoing transcript is a true and accurate record
     of my stenographic notes.

8
         I FURTHER CERTIFY that I am not a relative, employee,
9    attorney, or counsel of any of the parties, nor am I a
     relative or employee of any of the parties' attorney or
10   counsel connected with the action, nor am I financially
     interested in the action.

11
         DATED this 20th day of February 2025.
12

13

14

15

16

17

18                           _Tara Slocum_

19

20        _____

21            TARA K. SLOCUM

22            Certified Realtime Reporter

23            Registered Professional Reporter

24            California Certified Shorthand Reporter

25

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

# Exhibit 11

# PLACEHOLDER

This document was produced natively



**R Paul Wilson**
last seen today at 12:26 PM

8/7/2021

We need to talk    7:03 PM

Whats up?    8:36 PM

We need to chat sometime when you are free. Maybe tomorrow when it's not so late there    8:49 PM

Whats the subject? Something up?    8:50 PM

Im up rught now    8:50 PM

Yah kinda touchy. Want me to call you?    8:51 PM

Y    8:51 PM

8/8/2021

Chris - can you send me that LinkedIn capture?    11:21 AM

Yes    11:21 AM

One sec    11:21 AM

https://www.linkedin.com/posts/maxiereynolds_attackermindset-mindset-netflix-activity-6803359132436041728-NXO8/    11:22 AM

and here is what is sucky. i reviewed the contract she signed with you    11:24 AM

and it was not legal for her to sign    11:24 AM

according to her employment agreement    11:24 A



**R Paul Wilson**

11:24 AM

according to her employment agreement
11:24 AM

with out her asking SECOM for written permission to sign this
11:24 AM

she never did, so this contract would be legally nullified sadly
11:24 AM

Might be good for us - if the agreement is invalid    11:24 AM

true    11:25 AM

Knowing all this means I'd be personally happy if our agreement with her is void
11:25 AM

my lawyer is reviewing    11:26 AM

so weird that she would sign an agreement with you to teach and test people in SE
11:26 AM

when 1 year ago she came to me to learn how to SE    11:26 AM

I have to maintain a "benefit of the doubt" for anyone but at least this means any future involvement can be properly reassessed - though cynicism tells me we already know not to get any deeper involved.
11:27 AM

also find that she signed this odd.. here is the first sentence in her resignation email
11:27 AM

i am pasting    11:28 AM

After a lot of back and forth and a tough few months, I've decided to take a different route and step back from social engineering as an industry.
11:28 AM



R Paul Wilson

After a lot of back and forth and a tough few months, I've decided to take a different route and step back from social engineering as an industry.
11:20 AM

weird she is "stepping back from the industry" but is in contract to run a show all about it
11:29 AM

Duplicity is never a good sign.
11:28 AM

no not at all
11:28 AM

and oyu can see the LinkedIn post
11:28 AM

that was just 2 months ago
11:29 AM

Anyway - I will convey all this to Harris (who you will hopefully meet on the untangled end of this)
11:29 AM

haha yah, again sorry.
11:29 AM

and thanks
11:29 AM

If it wasnt you we'd still be in the dark
11:30 AM

yah. still always sucks to be in the middle of these things
11:30 AM

8/10/2021

Lawyer reviewing everything now but looks like she also screwed you. Your contract with her states she can't sell her idea to other network for like 6 months. So if she has the show at Netflix in pre production she also lied to you guys. Wow
10:53 AM



**R Paul Wilson**
last seen today at 12:26 PM

production she also lied to you guys. Wow
10:03 AM

It's just so--- stupid. Could she be that foolish?
10:05 AM

I don't know bit from what I am seeing yes. She offered one of my employees a job. What the hell?
10:15 AM

FFS
10:17 AM

I'm literally lost for under standing
10:18 AM

Si, claro.
10:21 AM

8/11/2021

This seems well timed...
8:27 PM

"No other avenue is more valuable for social engineers than being able to meet the needs of another person."

– *Chris Hadnagy*

8:27 PM

Apologies for the Spanish - I'm between three languages over here...
8:27 PM



**R Paul Wilson**

Apologies for the Spanish - I'm between three languages over here...    8:27 PM

I translated    8:28 PM ✓✓

Have you spoken to her? She is very upset so I assume someone canelled something    8:28 PM ✓✓

We have not - as far as I know we haven't acted yet - I just asked my guys not to move forward until we understand more    8:33 PM

Yah me too. Lawyers reviewing    8:55 PM ✓✓

8/26/2021

We should talk again sometime in the next few days. It was way worse than i actually thought. let me just say between us, i would run the other way with haste.... she is dangerous    11:35 AM ✓✓

Sure - let me know when.    11:36 AM

i will try to get some time later today and hope its not to terribly late for you    11:37 AM ✓✓

8/27/2021

Still swamped?    4:18 PM

Let me know when you're free    4:32 PM ✓✓

Call me - was on a call.    5:03 PM

**R Paul Wilson**
last seen today at 12:26 PM

Call me - was on a call.    5:03 PM

Top Gear: Scots model bids to become show's...
RADIO and TV presenter Chris Evans has indicated he may
be joined by a female co-presenter after taking over as...
www.dailyrecord.co.uk

https://www.dailyrecord.co.uk/entertainment/celebrity/top-gear-
scots-model-bids-6084122    6:10 PM ✓✓

https://www.eveningtelegraph.co.uk/fp/stunt-woman-takes-a-dive-
into-new-chapter/    6:10 PM ✓✓

My bottle from SAS as a gift    6:39 PM ✓✓



6:39 PM

Very nice!    6:50 PM



**R Paul Wilson**
last seen today at 12:26 PM

6:54 PM

**Did you know** ✏️

**Trivia**
The leading actors Husband is the managing
director of an offshore ROV company and he
does not pay his employees.                    ›

6:55 PM

I looked her up on IMDB and she has one short film listed in 2014 and the
above is listed in "trivia" for the film.
6:56 PM

She also claims in that article to be in "House of Cards" which was a massive
Netflix show yet somehow NOT listed on her IMDB
6:57 PM

I know man. She's a serious liar    7:50 PM ✓✓

8/28/2021

a whole post about her and her husband on this    1:35 PM ✓✓

https://www.facebook.com/groups/ROVforum/
permalink/10156346180955738/?
comment_id=10156363248205738    1:35 PM ✓✓

What's his name?    2:57 PM

Oddgeir Ingvartsen    2:59 PM ✓✓

9/2/2021

bro    6:00 PM    ↓



**R Paul Wilson**
last seen today at 12:26 PM

i know this situation is tiring but i have something new you might want to know
8:11 PM

Sure - all intel is worth knowing     8:12 PM

can i call you a second     8:13 PM

Sure - call in one minute     6:13 PM

9/10/2021

Not sure of you heard but Maxie is introducing people to your producer     3:34 PM

Just fyi.     3:34 PM

I havent spoken to him directly yet - he's been in family stuff with new year etc but as we said, she said she knew people and I dont think its an issue if she intros people directly and doesnt place herself in the middle.     3:36 PM

I'm keeping one foot out the doot either way.     3:37 PM

*door     3:37 PM

Yah. Just keeping you in loop when people tell me stuff     3:19 PM

# Exhibit 12

DATE LEF`Aug 5th 2021

| | | | |
|---|---|---|---|
| **EVENT** | STALKED DAD ON LINKEDIN | Probes dad to see if really had heart attack | 8/9/2021 |
| **EVENT** | EMAIL FROM JACK RHYSIDER | Chris "no longer vouching" | 8/10/2021 |
| **EVENT** | CALL FROM JIM MINATEL - name removal | Chris no longer wants name on book | 8/11/2021 |
| **EVENT** | STATES SUING ME | Suing for signing NDAs | 8/13/2021 |
| **EVENT** | EMAIL FROM JIM MINATEL - images & FBI | Chris will not allow ILF images within the book. Has called FBI. | 8/23/2021 |
| **EVENT** | GRIFTER intro | Randoh | 8/23/2021 |
| **EVENT** | GRIFTER/ NEIL WYLAN CONTACTS CHRIS | Contacted for truce. Chris lies about clients | 8/25/2021 |
| **EVENT** | CONTACTS JAKE WILLIAMS | Contacts Jake Williams to harm reputation | 8/25/2021 |
| **EVENT** | SIGNAL MESSAGE FROM RYAN MACDOUGALL | "it must be so hard living so many different lies. I hope you find true joy someday." | 8/30/2021 |
| **EVENT** | COMPUTER LOCKED DOWN | | 8/30/2021 |
| **EVENT** | EMAIL FROM KAZ NITISHI - co. equipment | False claim about contact and owning machine | 9/2/2021 |
| **EVENT** | COUNSEL TELLS LAWYER THEY OWN MY COMPUTER | Have stated they paid me for it | 9/9/2021 |
| **EVENT** | COUNSEL DOES NOT COMMUNICATE WITH MY LAWYER | Email from Paul, titled "Apple Appointment" | 9/10/2021 |
| **EVENT** | CAPITAL GROUP | Asks Sam and Shelby to state I had an innapropriate relationship with client | |
| **EVENT** | SAMANTHA GAMBLE | Sam reports chris saying he had my "nudes" from my computer. | |
| **EVENT** | SAMANTHA GAMBLE | Sam reports chris saying I look hot when I cry. | |
| **EVENT** | SAMANTHA GAMBLE | Sam reports Chris saying I've made company in his name | |
| **EVENT** | EMAIL FROM RYAN MACDOUGAL | threatens to report me for stolen government data in email titled "Return of Company Equipment" | |
| **EVENT** | EMAIL FROM RYAN MACDOUGAL | State they have my personal data  in email titled "Return of Company Equipment" | |
| **EVENT** | HARRIS FISHMAN SAYS CHRIS IS URGING HIM NOT TO WORK WITH ME | | |
| **EVENT** | HAS ILF INVESTIGATED ME | pedophiles) | |
| **EVENT** | | Holds team meeting discussing findings | |
| **EVENT** | DEF CON | Files suit | |



Maxie Reynolds
9/27/2024

**Defense 3**

Douglas Armstrong, RPR

# Exhibit 13

Hadnagy, et al. v. Moss, et al.                                      Neil Wyler

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

CHRISTOPHER J. HADNAGY, an      )
individual; and                 )
SOCIAL-ENGINEER, LLC, a         )
Pennsylvania limited            )
liability company,              )
                                )
            Plaintiffs,          )
                                )
    vs.                         ) No. 2:23-cv-01932-BAT
                                )
JEFF MOSS, an individual;       )
DEF CON COMMUNICATIONS,         )
INC., a Washington              )
corporation; and DOES 1-10;     )
and ROE ENTITIES 1-10,          )
inclusive,                      )
                                )
            Defendants.          )
_____

VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION OF

NEIL WYLER

_____

9:03 a.m. (Pacific Time)

KAYSVILLE, UTAH

(All participants appeared via videoconference.)


DATE TAKEN:  NOVEMBER 14, 2024

REPORTED BY:  LORRIE R. CHINN, RPR,
Washington Certified Court Reporter No. 1902
Oregon Certified Court Reporter No. 97-0337

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 2

1              R E M O T E   A P P E A R A N C E S

2

3    FOR THE PLAINTIFFS (via videoconference):

4          MARK CONRAD
           Frey Buck
5          1200 Fifth Avenue, Suite 1900
           Seattle, Washington 98101
6          206.486.8000
           mconrad@freybuck.com
7

8    FOR THE DEFENDANTS (via videoconference):

9          JAKE DEAN (Pro Hac Vice)
           Perkins Coie LLP
10         700 13th Street, NW, Suite 800
           Washington, D.C. 20005-3960
11         202.654.6200
           jacobdean@perkinscoie.com
12

13   ALSO PRESENT (via videoconference):

14         CATHY ZAK, VIDEOGRAPHER
           LAUREN ENGLISH
15

16

17

18

19

20

21

22

23

24

25

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Hadnagy, et al. v. Moss, et al.                              Neil Wyler

Page 5

1           KAYSVILLE, UTAH; NOVEMBER 14, 2024

2                    9:03 a.m.

3                    --oOo--

4

5      (Deposition Exhibits 1 - 16 were premarked for

6   identification.)

7

8

9           THE VIDEOGRAPHER:  Good morning.  This

10   is the deposition of Neil Wyler in the matter of

11   Hadnagy, et al., v. Moss, et al., Civil Action No.

12   2:23-cv-01932-BAT, in the United States District Court,

13   for the Western District of Washington, and was noticed

14   by Perkins Coie, LLP.

15          The time now is approximately 9:03 a.m. on

16   this 14th day of November, 2024, and we are convening

17   via Buell virtual depositions.  My name is Cathy Zak

18   from Buell Realtime Reporting, LLC, located at 1325

19   Fourth Avenue, Suite 1840, in Seattle, Washington

20   98101.

21          Will counsel please identify themselves for

22   the record.

23               MR. DEAN:  Jake Dean for Defendants.

24               MR. CONRAD:  Mark Conrad for Plaintiffs.

25               THE VIDEOGRAPHER:  Thank you.  The court

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 6

1    reporter may now swear in the witness.

2

3     NEIL WYLER,      witness herein, having been first

4                      duly sworn under oath, was examined

5                      and testified as follows:

6

7                 E X A M I N A T I O N

8     BY MR. DEAN:

9        Q.  Good morning, Neil.  How is it going?

10       A.  It's going, man.  Yeah, it's not bad.  A

11    little chilly out here in Utah, but pretty good.

12       Q.  I hear you.  It's cold and rainy here in

13    Virginia, so no complaints.  It's actually pretty nice

14    and better than LA.

15            You also go by the name Grifter, right?

16       A.  Yeah.  Probably honestly more people in the

17    world know me as Grifter than know me as Neil.

18       Q.  And for the record, that's spelled

19    G-R-I-F-T-E-R?

20       A.  That's correct.

21       Q.  Perfect.  I will probably call you -- I'm not

22    sure today -- between Neil, Mr. Wyler, or Grifter.  If

23    you prefer one over the other, let me know.  But

24    otherwise I'll probably use it differently depending on

25    what documents we're looking at.

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Page 21

1    constantly tell him what a pain in my ass he was, but,

2    you know, with -- I guess it was with reason.  I think

3    it was that he wanted to make sure that things went

4    really well.

5         Q.  Did Chris ever call you any names that you

6    felt were uncalled for?

7         A.  Only once.  I think it was -- yeah, just the

8    one time.  And it was back at like DEF CON 20.  And we

9    had a disagreement about how the space that was the

10   room that was going to be used for his village was

11   going to be used.  And essentially like the room was

12   set up as the social engineering village during the

13   day.

14        But the way that we did parties at night was

15   we kind of set them up what we called like a pub crawl

16   style.  So we'd have a bunch of parties in different

17   rooms, and people could just move from party to party.

18   And so if a village wanted to have a party, they

19   could -- it's actually how the villages started was

20   because we made people like give us some type of

21   content for use of the room for a party at night.  It

22   was just kind of a trade-off.

23        And in this case the social engineering

24   village was not using that space at night.  And so we

25   had allowed for another group to have a party in there.

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 22

1    And what that meant was that the -- like Chris had a --
2    like a makeshift soundproof booth that he used for the
3    social engineering CTF.  So when they were making calls
4    and people were laughing and stuff, they wouldn't bleed
5    through and then also just a bunch of chairs, right,
6    and I think a very small stage, if I'm remembering
7    correctly.
8           And we were just going to move that stuff out,
9    and then the group would have a party in there at
10   night.  And then we would bring all of the stuff back
11   in.  And Chris took issue with that.  Like he was like
12   "I don't want that to happen because I've got so much
13   stuff that's in here.  And like what if they break the
14   booth when they move it into the QM," our quartermaster
15   area.
16          And I was like, "Well, we've already booked
17   the space with that, you know, group.  So like we're
18   going to use it.  You're not using it."
19          He's like "No, it's not going to be set up in
20   the morning.  It's not going to be set up correctly.  I
21   know it's going to get screwed up."
22          And, again, I know that like -- and this
23   wasn't out of the ordinary for Chris to be like, no,
24   like don't do a thing or I would rather that you didn't
25   or do it this way instead.  Because, again, I think to

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 23

1   his credit he just wanted it to go well.  He didn't
2   want to come in in the morning and then have everything
3   not set up and then have the hotel scrambling to set up
4   chairs and that kind of thing.
5           And I was just like, "Look, man, like this is
6   going to happen."
7           And he said, "No, it's not going to happen."
8           And I was like, "Yeah, it is going to happen."
9           And he's like, "No, it's absolutely not
10  happening."  And then he's like, "I know the kind of
11  parties that get thrown at DEF CON, and I'm not going
12  to have like strippers in a room that I am having the
13  social engineering village in."
14          And I was like, "Look, man, that's like" --
15  "like whatever is happening, whatever the group is
16  doing, like I don't know what their plans are for the
17  evening."  And I'm like, "But I'm not" -- "like we're
18  not discussing this.  Like it's already done.  They're
19  going to come in.  They're going to move the chairs.
20  Everything will be set up in the morning.  You have my
21  word on that."
22          And then he just kind of like -- I call it
23  flipping a bit where like, you know, he just flipped
24  like a switch.  And he just started screaming at me.
25  And he was like -- and now Chris normally never swears,

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 24

1   which is -- so this is pretty like shocking.  Like
2   normally if we're giving a talk or doing a panel
3   together or a podcast or whatever, he just doesn't
4   swear.
5            But then he was just like, "Fuck you,
6   Grifter."
7            And I was like, "What?"  Like it totally
8   caught me off guard.  He was like, "You're fucking me.
9   That's what you're doing."  And he was like, "I'm going
10  to end up with none of my stuff.  You're ruining it.
11  You're trying to sabotage my village.  I know what's
12  going to happen in here tonight.  We've got the SECTF
13  for kids in the morning, and they're going to be
14  walking around in stripper juices.  Is that what you
15  want?  Is that what you fucking want?  What are you
16  some kind of pedophile?  Are you a pedophile?  Does
17  that" -- "Is that something you like to think about,"
18  blah, blah, blah.
19           And I was like so taken aback by what was
20  happening.  It shocked me into essentially like
21  silence.  Like I was like is this really happening?
22  Like I was like is he saying these things?  And this
23  was like in front of some of his staff like for the
24  village, which were -- some of it was his like normal
25  company staff, and some were just volunteers.

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 25

1    And I was just like staring at him, like
2    dumbfounded as he continued to like scream at me and
3    was like, "You're fucking me," like just over and over
4    just repetitive.
5    And then -- and I just said, "Look" -- like
6    finally I came to my senses.  And I said, "Look, man,
7    this is happening.  And we're going to talk about this
8    later."  Because I was so mad that I just was like I
9    have to remove myself from this situation, right?
10    And so I left.  I went and I went about the
11    rest of my goon duties as the village lead and contest
12    lead and stuff.  And so about 90 minutes later or so
13    Chris ran up to me in the hall and was like, "Oh, my
14    gosh, like I am so sorry."  Like he's like, "I just" --
15    "I've been so stressed, and I've had a lot going on,
16    and I apologize.  You know that that -- I don't mean
17    that, like I'm so, so sorry."
18    And I was like, "Look, dude, like it's fine,"
19    right?  Like -- I was like, "But you can't -- you can't
20    react that way."
21    He's like, "I know.  I know."  He's like, "I'm
22    just really, really stressed out because I've been at
23    Black Hat all week with the -- like with the trainings
24    I've been -- you know, I've been really stressed out."
25    And I was like, "Me too, man.  Like I've been

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 38

1    into it, we can, but --
2         Q.  No.  That's --
3         A.  But I -- and I -- she said there are also --
4    you know, she's like, "I didn't want to" -- "I didn't
5    want to work there anymore.  I didn't leave.  He's
6    claiming that I'm trying to steal customers and that
7    I'm going to start my own company to like take his
8    clients."  And she's like, "And I'm not.  I'm not
9    interested in doing that.  I've never planned to like
10   start a company and try to take these customers from
11   him."
12        She's like -- but then basically he accused
13   her of those things, and she's like, "I just didn't
14   want to work there anymore."  Because like most of the
15   time it was fine, but then there were times where he
16   was like inappropriate or he would shout at them or
17   call them names, tell them they were stupid or that
18   they -- when they did something wrong or blah, blah,
19   blah.
20        And she's like it just wasn't a good
21   environment ultimately.  And she -- and she was like,
22   "Yeah, like most of the time he was like fine.  And
23   then every once in a while he would just have a -- he
24   would just explode and start yelling at people."
25        And honestly like if I had heard that without

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 39

1   having my own experience of that with Chris at DEF CON
2   20, I might not have believed it just because of how
3   Chris normally conducts himself in public.  But because
4   of my own experience, I was like, okay, like I've had
5   that before.  I've witnessed that before.
6           So she said, "You know, he's still doing these
7   things, and he's still coming after me.  And all I've
8   done is quit my job.  Like I didn't" -- "I haven't done
9   anything to him.  I just want him to leave me alone."
10          And she's like, "And so, you know, I went to
11  the work for him because of his station at DEF CON and
12  like the fact that he was like this village organizer
13  and like had like this reputation and all these
14  things."  She was like, "So he has influence over
15  people and who he hires based on his reputation due to
16  his involvement with DEF CON.  And so I just want DEF
17  CON to know like who the types of people they have who
18  are running their villages and stuff."
19          And I was like, "Okay.  I understand that."
20  And I was like, "Well, what do you want to do here?
21  Like is this like a -- like where you want him to not
22  be the village organizer?  You want him to" -- and she
23  was like, "No."  She's like, "Actually I just want this
24  to stop."  She's like, "I just want to be left alone."
25  And she's like, "I haven't done anything except leave

Page 41

1    is like higher up in Black Hat?  Because he's a trainer

2    there as well."

3           And I was like, "Well, it's funny that you

4    should say that, so that's also me.  I'm on the Black

5    Hat -- like I run the network operation center for

6    Black Hat.  I've been part of the staff at Black Hat

7    for, you know, at that point 20 years.  I'm on the CFP

8    review board, so I help particular the talks that go to

9    the stage at Black Hat.  And I'm on the training review

10   board, so I help pick the training classes at Black

11   Hat."

12          And she was like, "Oh, well, then this is

13   perfect.  Like can you talk to them as well?"

14          And I was like, "Yeah, I can do that."

15          And so, yeah, that's -- I'm sure I'm leaving

16   out some details somewhere.  If they come to me, I'll

17   throw them out there.  But that's the -- by and large

18   how that conversation -- that first conversation went.

19     Q.  Got it.  So if I'm understanding correctly,

20   Maxie and other people reached out to you because they

21   saw you as a senior member at DEF CON who could talk to

22   Maxie about her complaints with Chris; is that fair?

23     A.  Yeah.  I would say it's --

24             MR. CONRAD:  Object to form.

25     A.  Sorry, Mark.

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 42

1        Q.  You can answer.
2        A.  Oh, okay.  So I would say that it's two part.
3    So she -- there was two reasons that she reached out to
4    me.  One was because I was a senior member of the DEF
5    CON staff.  And, two, because multiple people had said
6    like Grifter is somebody that you can trust.  Like and
7    so it was my position within the organization, but also
8    kind of like my reputation within the community, so...
9        Q.  Got it.  And she reached out to you because
10   essentially she felt she was being harassed by Chris
11   Hadnagy?
12       A.  Correct.
13       Q.  I want to kind of nail done a little bit of a
14   timeline here, so I'm going to jump into some of the
15   exhibits and go back and forth.
16       A.  Sure.
17       Q.  So moving to Exhibit No. 4 -- give me one
18   second -- this is a document that you produced last
19   night that we have Bates stamped WYLER 178.  You'll see
20   at the top this is a message between Jeff Moss and
21   yourself dated August 25th, 2021.
22           To the best of your knowledge, Mr. Wyler, are
23   all of the documents that you produced to us true and
24   accurate copies of your communications with all of the
25   different individuals that you sent us pictures for?

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 43

1       A.  Yes.  That's everything that I have.

2       Q.  Got it.  And on August 25th, 2021, you

3   messaged Jeff Moss, correct?

4       A.  I did, that's correct.

5       Q.  And you told Mr. Moss that you've had

6   "...multiple people reach out to me today to talk about

7   a village and contest organizer that's threatening and

8   harassing a former employee.  It's Chris Hadnagy."

9           Did you write that?

10      A.  I did.

11      Q.  Got it.  And after you told this to Mr. Moss,

12  did you discuss at any point this information on a

13  phone call?

14      A.  Yes.

15      Q.  Okay.  And do you recall was that August 25th

16  that you had a phone call with Mr. Moss?

17      A.  Yes.

18      Q.  And what did you discuss with Mr. Moss during

19  that phone call?

20      A.  Essentially what we just discussed, you know,

21  the content of the call with Maxie, what the

22  accusations were, some of the things that were going

23  on.  And then I just asked him if it was okay if I

24  spoke on DEF CON's behalf, right?  And because I

25  didn't -- that was something I didn't want to speak,

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Hadnagy, et al. v. Moss, et al.                                Neil Wyler

Page 44

1  you know, for Jeff or for DEF CON without talking to
2  Jeff first, right?
3      Q.  Did Mr. Moss give you permission to speak with
4  Mr. Hadnagy on behalf of DEF CON?
5      A.  Yes.
6      Q.  Okay.  Did you talk to Black Hat at any point
7  about talking to Mr. Hadnagy about his claims?
8      A.  I did, yes.
9      Q.  Who did you talk to from Black Hat?
10     A.  So I talked to Steve Oldenbourg and -- excuse
11  me.  I think it was just Steve Oldenbourg, and then he
12  spoke to Steve Wylie.  So Steve Oldenbourg is like the
13  general manager of Black Hat, and then Steve Wylie is
14  over all of -- we call it like Informa Tech, which
15  encompasses several of their cyber -- their
16  cybersecurity event space essentially, so yeah.
17     Q.  And was that on or around August 25th, 2021?
18     A.  It was the same day, yeah.  Same day.
19     Q.  And did Black Hat give you permission to talk
20  to Mr. Hadnagy on behalf of Black Hat?
21     A.  They did, yes.
22     Q.  Okay.  I want to go to Exhibit 3.  And I just
23  have a couple of questions, and we'll take a break
24  since we're at the top of the hour, or close to it, and
25  then we'll jump into it.

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Hadnagy, et al. v. Moss, et al.                          Neil Wyler

Page 47

1      A.   Yeah.   I get it.

2      Q.   Okay.   So we just kind of finished up on the

3  timeline of the 25th to 26th.   I want to now go into

4  kind of your conversation with Chris.   So we'll go back

5  to Exhibit 3.

6           So you reached out to Chris Hadnagy on

7  August 26th, 2021, correct?

8      A.   Correct.

9      Q.   And Chris said that he would call you in five.

10  And what he really wanted to know was what Black Hat

11  and DEF CON were planning to do with this information;

12  is that right?

13      A.   That's correct.

14      Q.   Do you know why Chris said he wanted to know

15  what Black Hat and DEF CON would do with this

16  information?

17      A.   Well, really, I mean, I can only speculate.

18  Like obviously we didn't have the call.   You can see

19  there's no call record, so we were -- he said, you

20  know, we were going to talk in five, but we never

21  actually had the called until later that night.   So

22  obviously he had a few hours to think about what it

23  could have been about.

24           And then because I said, "Talk to you soon" at

25  11:20 a.m.   And, you know, seven and a half hours later

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 48

1   he was asking me what does Black Hat and DEF CON plan
2   to do with this info.  We hadn't had a call yet.  So he
3   was obviously like running through his mind like what
4   are the things that they could be coming to me about
5   and was like, "Well, what are you going to do," right?
6          The only thing that I had said up to this
7   point is exactly what you see in this first text
8   message, which is just "There's concerns from -- about
9   you and a former employee.  Are you free to chat?"
10  And -- because I wanted to get his side of the story.
11  And he's already asking, "What are Black Hat and DEF
12  CON planning to do with this info?"
13         Now, again, I know that in -- throughout this
14  entire process, like Chris has said that, "You know,
15  well, I didn't speak to anybody from DEF CON, and I
16  didn't" -- and, you know, or Black Hat or whatever.
17  But before we even had the first phone call, Chris is
18  asking me what DEF CON and Black Hat plan to do.
19         So I think within the first messages, it
20  establishes like that I am acting as mediator for both
21  Black Hat and DEF CON, even in Chris' view, without
22  ever having had a conversation with me.  Just from the
23  first message he knows what my station is at both DEF
24  CON and at Black Hat.  And so he's asking me
25  essentially what do these organizations plan to do

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Hadnagy, et al. v. Moss, et al.                              Neil Wyler

Page 49

1   about this.  And it's like, well, let's talk first, and
2   then we'll decide what that action is.
3           But I think that's -- I can tell you -- and
4   I'm sure we're going to get into it.  But that was a
5   very big point of frustration for me throughout the
6   last several years is the claim that nobody had ever
7   spoken to him about the allegations or about what was
8   going on and that he didn't know why this was
9   happening.
10          And you can see within the first couple of
11  messages before we had the first phone call, he's
12  asking me what Black Hat and DEF CON plan to do.  If I
13  was not a senior member of both of those organizations,
14  how would I have that information?  And if he didn't
15  believe me to be a senior member of those
16  organizations, why would he ask me that?
17      Q.  Got it.  So going into the call that you have
18  with Chris, you saw yourself as a representative of
19  both DEF CON and Black Hat?
20      A.  Yes.  That's why I called them first.  Like I
21  knew that it was important for me to have permission to
22  speak, you know, as a representative of both DEF CON
23  and Black Hat, that I should not get on the phone to
24  Chris without having discussed what I was going to talk
25  to Chris about with those organizations.

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Hadnagy, et al. v. Moss, et al.                                      Neil Wyler

                                                                    Page 50

1      Q.  And the first question that Chris asked you is
2   what is Black Hat and DEF CON planning to do with this
3   information?
4      A.  Correct.
5      Q.  And you understand that message to mean that
6   Chris himself saw you as acting on behalf of DEF CON
7   and Black Hat?
8      A.  Correct.
9      Q.  Okay.
10     A.  Mark, you're muted.
11              THE REPORTER:  Mark, you're muted.  I
12  did get your objection.
13              MR. CONRAD:  Object to form.  Appreciate
14  it.
15              THE WITNESS:  Yeah, no worries.  I saw
16  you --
17              MR. CONRAD:  Sorry, I had some
18  background noise.
19              THE WITNESS:  -- talking.
20              MR. CONRAD:  I appreciate it, Neil.
21  Sorry.  I had some background noise I was trying to cut
22  out.
23     Q.  BY MR. DEAN:  Then ultimately you had a call
24  with Chris Hadnagy at 20:06 on August 26th, correct?
25     A.  That's correct.

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 51

1      Q.  Tell me what happened during that conversation
2  with Chris.
3      A.  So initially I said like, "Hey, you know, I've
4  gotten a call from somebody who is a former employee of
5  yours who is saying that they are experiencing some --
6  you know, some bullying or some harassment."
7          And he said, "Who is it?"
8          And I was like, "Well, I don't want to discuss
9  names right now."  And then he was like, "Is it this
10  person?"
11          And I was like, "I'm not going to talk about
12  names."  And he was like, "Is it this person?"
13          And I was like, "Chris, we're not going to
14  talk about like who it is.  And I don't want, you know,
15  additional names."
16          And he was like, "Is it this person?"  And I'm
17  like, "Oh, my gosh."  And he was like, "Or it's
18  probably this person or this person."
19          And I was like, "Chris, stop."  And I was
20  like, "Holy, shit, man.  Like, I haven't even given you
21  a single name.  I said I don't want to talk about
22  names, and you've just volunteered a half a dozen names
23  to me.  And I haven't said a word."  I was like, "Don't
24  you think that that's a problem?"
25          And he's like, "No, man, no.  Because when you

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Page 52

1    get to my position in this industry, you -- you know,

2    you will attract haters like and people who want to see

3    you fall."

4           And I was like, "Okay.  But I am in a fairly

5    senior position in this community and industry.  And if

6    somebody came to me today and said, 'Grifter, we have

7    gotten a phone call and somebody is saying that you are

8    bullying and harassing them,' I would have no idea who

9    that person was.  I would have no idea."  And I was

10   like, "But you just volunteered a half dozen names to

11   me."

12          And he's like, "Yeah.  No, you don't get it.

13   You don't get it."  And I was like, "Okay.  Man, well,

14   here's what these things are about."  And I started to

15   kind of talk about the things that Maxie had told me.

16          And he goes, "Okay.  Okay.  It's Maxie then."

17   I was like, "All right.  So it's Maxie."  And I was

18   like, "Chris, like are you doing these things?"

19          And he was like, "Yeah, but...but you don't

20   understand the context like -- like here's what's going

21   on."  And he was like, "She's" -- "you know, she's

22   stolen data from me, from my company.  She has my

23   company's data on a laptop that is the company's

24   laptop, and she's using that information to try to

25   steal customers from me.  She's going to go start her

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 53

1   own business.  She's going to do this, like" -- and
2   he's like, "I've got evidence of this.  I've got
3   evidence of this, so" --
4          And I was like, "Okay.  Well, then are you" --
5   "Are you going after her publisher to try to stop the
6   book?  Like are you harassing her editor or publisher
7   or whatever?"
8          And he was like, "Yeah, but the" -- "But
9   here's the thing, it's -- like you don't get it.  It's
10  because the information that's in that book is things
11  that Maxie learned while she was working for me, so
12  that's my intellectual property."
13         And I was like, "Chris that is not" -- "like
14  that's not how that works.  Like that would mean that
15  every person who ever wrote -- who wrote a book after
16  they went to college, that information belongs to their
17  professor because like they learned it at school?  Like
18  you can't claim that because someone learned something
19  while they worked for you, that you then own any
20  like -- you know, anything they do after that, if they
21  create a class, if they write a book, if they put out a
22  white paper.  Like that's not your information."
23         He's like, "No, absolutely not.  It's my
24  information.  She learned it from me."
25         And I'm like, "Okay.  Well, that doesn't --

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 55

1          And like at every step we talked about things
2    that he just said, "Yeah, but."
3          And so now I thought of another thing that
4    Maxie had said.  Because I asked if there was anything
5    that was like sexual harassment or anything, and she
6    said no, outside of that he, you know, would make
7    comments here and there.  But they were things that
8    like she just blew off mostly.
9          But one thing that was said that was weird was
10   like that -- she was like, "Oh, you know, he would talk
11   about whether he was like a butt or a boob guy," or
12   blah, blah, blah.  Like and in talking to him about
13   that, he was just like, "Dude, it was just throwaway
14   comments.  They're not" -- and so I was like, okay, at
15   least we're not dealing with like sexual harassment
16   here.  At least that's what I had believed up to that
17   point.
18          And so, yeah, that's essentially how that
19   conversation went was it was a series of like yeah,
20   but; yeah, but.  Like everything that she had said he
21   was doing that was of some kind of harassing nature, he
22   agreed that he had done it, right?  So I was -- oh, one
23   of the things was a television show that she was -- had
24   just recently been hired to be like a technical
25   consultant for for the hacking side of things.

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 56

1    And she had said that he tried to get her
2 fired off of that show.  And I asked him about that.
3 And he said, "Yeah, but the producer of the show" -- I
4 can't recall his name -- "is a friend of mine.  And I
5 don't want, you know, thieves working for him or
6 whatever.  So, yes, I reached out to him and told him
7 like the kind of person she was."
8    And so, like I said, at everything that I had
9 just heard from Maxie, when I had the initial
10 discussion with Chris and started to like list off the
11 things that she was saying were harassing or bullying
12 behavior, he agreed that he had done them, but he just
13 thought that he was justified in doing them for one
14 reason or another.  And he would try to, you know,
15 justify that behavior by explaining why it was okay for
16 him to do it.
17    "Well, it's because she's a thief.  Well, it's
18 because that's really my intellectual property.  Well,
19 it's because I don't want my friends working with
20 whoever.  I got her off the podcast because, again, she
21 stole from me, and I don't want my friends having her
22 on a podcast or whatever."
23    And, again, the whole is like, "What did she
24 steal from?  And it was "Well, she's stealing my
25 customers, and she is stealing data from me.  She has

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Page 65

1    "I" -- he was like, "I'll burn it all to the ground

2    before I let somebody" -- he said, "I'll pull a Dave

3    Kennedy and burn it all to the ground before I let

4    somebody steal from me."

5           And I was like, "Dude, I'm telling you just

6    stop.  Like just stop."  And he's like -- and he just

7    said, "Well, I'm not doing anything wrong."

8           And I was like, "All right.  Well, like

9    I'll -- you know, I'll let her know or I'll talk to

10   her, whatever," blah, blah, blah.  Later that day a

11   couple of hours later he sent me a text -- or I think

12   it was a text.  And he said like, "All right.  I'll

13   drop it."

14          So I think maybe he had some time to like talk

15   to a lawyer or people at his company or something and

16   decided like ultimately like, "You know what?  I will

17   lose, and so this isn't a good idea."  And so he said,

18   "I'll just drop it all."

19          And I said, "Okay.  That's great to hear.

20   I'll let her know," or something to that effect.

21          And that's what I did is I let her know that

22   he said he would stop.  And she was like that's great.

23   And she was really, really happy with that.  She was

24   like, "I hope that that's true."  And then that was

25   that.

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 71

1    weren't new emails, right?  These were emails that he
2    said had taken place while she still worked for him,
3    but I guess they had potentially like come to light.  I
4    don't think Chris is allowed to comment.  I don't know
5    if I'm remembering 100 percent correct --
6         Q.  No.
7         A.  -- of that call.  Okay.
8         Q.  It's just us.
9         A.  It's just us, just you and me.  Eyes locked.
10   So, yeah, like I said, I think that that call was
11   specifically about the fact that he had new evidence
12   that she was, in fact, going to start a security
13   company and try to take his clients.
14        Q.  Essentially he didn't believe that she would
15   truly leave this alone?
16        A.  Correct.
17        Q.  Yeah.  So what did Chris do the very next day
18   after this call?
19        A.  So --
20              MR. CONRAD:  Object to form.
21        A.  Yeah.  So the -- so I got a call from Maxie
22   where she said, "Hey, it hasn't stopped.  Like I got a
23   message from Ryan, who is the COO for Social-Engineer,
24   saying like something to the effect of like, 'Good luck
25   with all your lies or I hope you can keep all your lies

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 72

1   straight,'" something -- again, something to that
2   effect and like, you know, "Wish you luck in your
3   future endeavors," like in some snarky kind of like
4   way.
5        And then she was like, "And also I am in
6   Washington, D.C. for a meeting, and I am locked out of
7   my computer.  And I called Apple and they said that
8   it's been reported stolen."
9        And I -- so I reached out to Chris and was
10  like, "Dude, did you lock her out of her computer?"
11  And he said no.  He was like, "No, I didn't do that."
12       And I was like and Ryan is sending her stuff
13  saying that, you know, you -- that calling her a liar
14  and things.  And was just like, "No, he wouldn't do
15  that," right?  But then, yeah, so I brought it up on
16  the screen, the screenshot.  You can see that he does,
17  in fact, say -- he says, "It must be so hard living so
18  many lies.  I hope you find true joy some day."
19       And then -- you know, so Chris is adamant that
20  Ryan wouldn't do that because he's the least aggressive
21  person.  And then he comes back later, and he's like,
22  "Yeah, okay.  Yeah, he did say it, which it's super out
23  of character for him, so -- but he did do it."
24       And so the -- and then the locking her out of
25  the computer, he said, "No, we didn't do that."  But in

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 73

1   reality he did exactly that, and he admits to that

2   later.  Again, so, see, there's another thing up top

3   that I can call attention to.  "First i am again sorry

4   you are somehow the SECOM corp mediator."

5         So Chris does believe and states himself

6   multiple times in our conversations that I am acting

7   like as a mediator between Social-Engineer and DEF CON,

8   right?  And so, yeah, it is -- again, that was one of

9   my frustrations when all of this stuff became public

10  was that he was like, "I never spoke to anybody at DEF

11  CON.  No one ever spoke to me.  I spoke to someone

12  close to DEF CON, but I didn't speak to anybody at DEF

13  CON."

14        And so, you know --

15  Q.  Got it.  So --

16  A.  He calls me a mediator several times.

17  Q.  So on August 29th Chris reaches out to you and

18  says, "Hey, I have some information to share about

19  Maxie in case this blows up again," right?

20  A.  Correct.

21  Q.  And then the next day SE Corp, or

22  Social-Engineer, locks Maxie out of her computer?

23  A.  Yes.

24  Q.  And Ryan, who works for SE Corp sends a

25  message to Maxie saying, "I hope you can keep all your

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 84

1    You -- I knew what you were going to lose.  I told you

2    that was going to happen, and you chose it anyway.  And

3    that is what is the saddest and most frustrating part

4    of this is that it never had to happen.  It just -- the

5    behavior just needed to stop.  But everything was yeah,

6    but; yeah, but; yeah, but.

7          And it just -- like I said, I went from

8    disappointed to then getting pissed off.  Because I was

9    like you're just not being honest here.  And I hate

10   this.  I hate this situation.  I miss my friend or who

11   I thought my friend was.  And yet here we sit like

12   dealing with this absolute bullshit that never had to

13   happen.

14       Q.  And we're going to get into the whole, you

15   know, are you DEF CON, not DEF CON thing as we go

16   through the text messages.  But you did touch on it

17   briefly, so I want to touch on it now for a second.

18       A.  Right.

19       Q.  If I'm hearing you correctly, you're

20   essentially saying that you are a representative of DEF

21   CON.  You've been given authority to speak on behalf of

22   DEF CON.  You make decisions on behalf of DEF CON, but

23   you yourself are not DEF CON entity.  Is that what

24   you're saying?

25       A.  Yes, of course.

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 85

1              MR. CONRAD:  Object to form.

2         A.  No one -- no one is DEF CON.  Like, I mean, in

3    the sense DEF CON is a corporation, right?  It is a

4    conference.  It is not a human person.  Like there

5    are -- there is a -- like we have goons who are our

6    staff.  And there are somewhere between -- honestly

7    it's got to be between 300 and 400 different staff

8    members of DEF CON or the DEF CON goons.  There are

9    probably 20 some-odd, mid 20s, high 20s department

10   heads.  There are many departments at DEF CON now.  As

11   the conference has scaled, we've had to split out into

12   different, you know, groups.  And there are department

13   heads for all of those different departments.

14              But then there is also kind of like the core

15   inner circle of DEF CON, and there are maybe less than

16   a dozen of us who Jeff looks at as the people who help

17   shape kind of the look and feel and spirit of DEF CON,

18   the direction of DEF CON.  And we get together a couple

19   of times a year like in person, whether in Las Vegas or

20   in Seattle, to have that discussion over several days

21   where we talk about like how is DEF CON going to move

22   and look and feel and what's that -- what's the vibe

23   going to be, what is the theme going to be for this

24   year, just those kinds of things.

25              And that, again, inner circle might be ten

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Page 86

1   people, and I am one of those people, right?  Like I am
2   one of those people who are part of that group.  So to
3   say that you didn't speak to somebody at DEF CON is
4   just not true.  It's just absolutely, patently untrue.
5   And no one would believe that that was true if Chris
6   mentioned me by name.
7           Now, DEF CON told me that I was not allowed to
8   speak, right?  Like DEF CON as an organization, so the
9   group came together and had a discussion about how we
10  were going to handle these things and whatever.  And
11  they just said, "Grifter, do us a favor.  Keep your
12  mouth shut.  Like he's already threatened a lawsuit.
13  Just stay silent."  And we'll get into that, I'm sure.
14  We've got so many hours, and we'll get into that.
15          But the thing about it is if Chris would have
16  said at any point, "I didn't speak to anybody at DEF
17  CON.  The only person I spoke to was Grifter," there is
18  no scenario that exists in this world where anyone
19  would believe that Chris didn't speak to somebody at
20  DEF CON.  If you say my name, or my handle I should
21  say, in any room, probably the word that would be
22  associated immediately would be DEF CON.  And so to
23  say, "I didn't speak to somebody at DEF CON" is false.
24  It has been false from the beginning.  And every time
25  he has said it, he has lied about it.  It is not true.

Hadnagy, et al. v. Moss, et al.                                Neil Wyler

Page 87

1          Like I am --  I live and breathe DEF CON.  It
2     has been part of my life for over 20 years.  It will be
3     part of my life until my last breath.  The statement "I
4     didn't speak to anyone at DEF CON" is a lie flat out.
5          Q.  Understood.  And just one clarification.  You
6     said DEF CON said don't speak.  Is that in reference to
7     making public statements after --
8          A.  Correct.
9          Q.  -- Chris Hadnagy threatened legal action
10     against DEF CON?
11          A.  Correct.
12               MR. CONRAD:  Object to form.
13          Q.  That would have been after February 9th, 2022?
14          A.  No.
15               MR. CONRAD:  Object to form.
16          A.  This was -- this was prior to that even.  So
17     prior -- he had made references to potentially taking
18     legal action almost from the start.  Like if DEF CON
19     did something, he was going to take legal action.  And
20     so Jeff and Wednesday and CJ, and I believe it was just
21     like just don't talk about it.  We don't know where
22     this is going to go.  We don't know -- and honestly I
23     didn't want to talk about it.
24          Like, again, this is one of my friends.  This
25     is a situation that we're trying to figure out.  If we

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Hadnagy, et al. v. Moss, et al.                                          Neil Wyler

Page 93

1      A.  Correct, yeah.

2      Q.  Do you recall what you discussed with Jeff

3  during that call?

4      A.  So, yeah, that was where we discussed that

5  there were -- well, again, the locking out of the

6  laptop and that it didn't end, right?  It lasted a

7  couple of days or the next day or whatever it was when

8  it was like, okay, yeah, we'll leave it alone.  And

9  then it turned into, yeah, I guess we'll go ahead and

10  lock her out of her machine.

11          In this case that's what we talked about, and

12  then we talked about like what was going to happen

13  moving toward.  Because, again, that was kind of

14  Maxie's thing was she was like, "Look, I'm not the only

15  one here.  Like if he just leaves me alone, I'll drop

16  this.  But if he doesn't, then I will go find the other

17  women that he has said things to."

18          And I shouldn't say women, if I can correct

19  that.  The other people because it wasn't just women.

20  It was by and large, but there were men on the call

21  with DEF CON as well, so -- who had run-ins with Chris.

22  And then, like I said, I have had my own.  And I am a

23  man, or claim to be.

24      Q.  So going down on that same Exhibit 4 to page

25  WYLER 181, it says September 5th, Jeff says, "Any dates

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 94

1  for the call?"  You respond Tuesday, "I'll send details

2  out tonight.  Want me to send the Zoom info at

3  jm@defcon.org?"  And Jeff says, "Yes, please."

4      Do you see that?

5  A.  Yes.

6  Q.  So is this reference to the call, is this the

7  Zoom call with the accusers?

8  A.  Correct.

9  Q.  Got it.  So it was the Tuesday after

10  September 5th is approximately when the call took

11  place?

12  A.  Right, which would be September 7.

13  Q.  September 7th?

14  A.  Correct.

15  Q.  Got it.  So to the best of your recollection,

16  the call with the accusers happened on September 7th;

17  is that right?

18  A.  Correct.

19      MR. CONRAD:  Object to form.

20  Q.  Okay.  Then going now to Exhibit 3, this is

21  the messages with Chris Hadnagy, WYLER 31, you'll see

22  on September 8th you get a message saying, "Interesting

23  how I hear through the grapevine about these huge

24  meetings."

25      Is that right?

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 97

1   just want to put this behind me.  I don't want to get
2   on his radar, again, because they were intimidated and
3   scared of him.  And so -- but even with that, we still
4   had -- outside of DEF CON folks on the call, there were
5   16 different people who joined that Zoom call who all
6   had stories that they wanted to share about run-ins
7   with Chris where he had either crossed a line of some
8   type or had intimidated them and shouted at them and
9   called them names, had said something inappropriate or
10  whatever.
11          And so, again, 16 folks outside of DEF CON who
12  were there and then additionals that were on the phone
13  with other people who were there.  So the actual
14  number, I don't have a specific number, but I would say
15  between roughly 15 to 20 different accusers, you know.
16      Q.  Got it.  Couple of questions before we get
17  into some of the stories.
18      A.  Yeah.
19      Q.  Was it concerning to you that so many people
20  were scared for Chris to find out who they were?
21      A.  Yes, it was --
22          MR. CONRAD:  Object to form.
23      A.  Okay.  Yes, it was actually shocking.  I would
24  say, again, even having my own experience and even with
25  him admitting some of the things that he was saying he

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Hadnagy, et al. v. Moss, et al.                          Neil Wyler

Page 120

1   the same fashion we've already discussed.  Again, I

2   don't -- at this point it's three years ago.  I don't

3   recall all the details, and I purposefully did not

4   write them down, right?  Like this was not something

5   where I was, okay, we're going to keep a record of all

6   of the things.

7          Because honestly we didn't need one.  If we

8   felt like by the time we were done with this call that

9   we had enough people who felt unwelcome or unsafe or

10  intimidated or whatever by Chris, that it warranted

11  that he should not return as a village organizer at DEF

12  CON or not return to DEF CON.  That is a decision that

13  we could make based on that without having to like

14  write down every detail of the stories.

15         So I purposefully did not write down the names

16  of the individuals who were on the call, and I didn't

17  -- and I didn't write down their stories because I

18  didn't want there to be a record of it.

19     Q.  Got it.  Do you, sitting here today, recall

20  anything else regarding the accusations made during

21  that call?

22     A.  No.  It's just the volume of them.  Like I

23  said, it was the number of people there, the volume of

24  them and the number of stories that ended with "And

25  that's why I don't come back to DEF CON" or -- and, you

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Hadnagy, et al. v. Moss, et al.                          Neil Wyler

Page 121

1  know, "Oh, I'm worried that he's going to come after me
2  if he finds out I was on this call."  You know, like
3  there was a very clear level of intimidation and just
4  general fear around Chris and his behavior and what he
5  would do if he knew that they were talking to us.
6          And I hated that for, again, multiple reasons.
7  I hated it because I was hearing stuff about somebody I
8  counted as a friend, and I hated it because they had
9  been put in this position.  And we didn't know about
10 it, and we hadn't done anything up to that point.  And
11 I -- like I mentioned before, I love DEF CON.  It is a
12 thing that I take very seriously.  Like I said, I will
13 attend until my dying breath, but -- and then to know
14 that there were people who were uncomfortable or were
15 suffering in some way and we didn't find out about it
16 previously led to no small amount of guilt for myself
17 and for the other individuals on the call.
18     Q.  Got it.  We'll take a break in a few minutes,
19 but I want to ask you a couple more questions regarding
20 this line of questioning before we do that.  Going to
21 Exhibit 4 real quick, this is the message between you
22 and Jeff.  And it's Bates labeled WYLER 191.  And you
23 say about Chris, "He's a pain in the ass as an
24 organizer, but most of my interactions with him have
25 been positive, with a few exceptions.  But that zoom

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 144

1  when this stuff starts happening.  When this happens in
2  January with this email to us with him saying that Jeff
3  refused to take a call with him, that's not true.  Jeff
4  tried to make a couple of times work.  Chris gave a
5  couple of times back.  They couldn't get them aligned.
6  At one point Jeff said, "How about this time?"  They
7  couldn't get on a phone call because it didn't work for
8  Ryan, who also wanted to be on the call.
9          And then finally Chris had said like in like
10 December or something, "You know what?  Forget it.  We
11 just won't do it.  I'll take my village somewhere else
12 where they will appreciate me."  He never says that
13 publicly.  What he says is "DEF CON has refused to
14 speak to me" or "I have spoken to no one at DEF CON,"
15 which, again, is untrue on multiple fronts.  It's
16 untrue because he spoke to me, and it's untrue because
17 Jeff did try to get on phone calls with him.  And Chris
18 at a certain point said, "You know what?  Never mind.
19 I don't need to get on a call with you.  I'll take my
20 ball and go home."
21     Q.  Understood.  Going back to Exhibit 7, page
22 DEFCON 133, the next paragraph says, "They reached out
23 to Stephanie Carruthers."  Is that Snow?
24     A.  That's Snow, yeah.
25     Q.  And it goes on to say, "Stephanie won a black

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Page 145

1  badge at my contest, then overnight became a competitor
2  and then became a hater because we had to remove JC
3  (her husband) from the competition."
4        Do you see that?
5     A.  I do.
6     Q.  So I want to stop there and kind of break that
7  down.
8     A.  Sure.
9     Q.  So the Black Badge, you said that's the
10  highest award you can get at DEF CON?
11     A.  Correct.
12     Q.  And then Chris saw her overnight as becoming a
13  competitor because she won the Black Badge award?
14     A.  Yes.  And that is a pattern of behavior with
15  Chris is he sees the winners of the Black Badge as
16  competitors and will often put them down like publicly
17  after the fact.  It's a really interesting -- I guess
18  I'm just going -- now I'm just going to go off on a
19  tangent, but it is an interesting thing to see somebody
20  put so much stock in the value of that award, but
21  then -- and that he was like, "What do I need to do to
22  make sure I get it every year?  What does my contest
23  have to do?  What do I have to change?  What do you
24  want me to do?  Do I have to make it more difficult?
25  Do I have to have them do whatever?"

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 148

1    banning other people based on his code of conduct, but

2    he is not fine with DEF CON doing the same based on

3    ours.

4        Q.  Do you have any personal knowledge regarding

5    this whole banning of Snow's husband?

6        A.  Not really.  I just know that it was like that

7    he had gone against some rule that Chris had.  I'm not

8    familiar with the details of it because I wasn't there.

9    But, yeah, that -- he started to see Snow as

10   competition fairly quickly and then, you know, began to

11   target her to a point that it involved also her Black

12   Hat training.  And I had to go talk to him about it,

13   again, as a member of the Black Hat review board.

14       Q.  Can you tell me about that?

15       A.  Sure.  So Stephanie had submitted a social

16   engineering class, so she started a company called

17   Snowfensive.  And she submitted a social engineering

18   class for her company.  It was reviewed by the training

19   review board and selected for trainings at Black Hat.

20            And when Chris found out that there was

21   another social engineering class, he got really upset

22   about that.  He complained to Sarah and to Cody, who

23   were the two training leads at Black Hat.  He

24   complained to myself as well saying, "Like, Dude,

25   what's going on here?  Like I'm the social engineering

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 149

1    expert.  Like why are you -- why did you choose to have
2    Snow's class?"
3            And the reality is is that we -- it was about
4    choice, right?  Like giving attendees a choice on what
5    type of class they wanted to take and who they wanted
6    to take it from.  And so if there was somebody who was
7    a social engineering specialist, they really only had
8    Chris' class to choose from at that point.  And so it
9    gave us the ability to have them have another option.
10           And we do that for all disciplines, right?  So
11   there are multiple defensive classes.  There are
12   multiple offensive classes.  There are multiple
13   hardware hacking classes and ones on writing policy.
14   There are -- there's variety for each one.  And so this
15   allowed for a variety and choice for the attendees
16   around a social engineering class.  And Chris did not
17   like that competition.  It was clear.  And he was like
18   she should not be training.  And he took great offense
19   to that.
20           And I told him like, look, man, we have eight
21   offensive security classes all competing with each
22   other.  Competition is fine.  And what ended up
23   happening was at the end of Snow's class, she told her
24   students who had come to the class, if they hadn't
25   taken Chris Hadnagy's class that they should take his

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Hadnagy, et al. v. Moss, et al.                          Neil Wyler

Page 150

1   class next year, right?  Because it's a really good
2   class, and he's like written several books and blah,
3   blah, blah.  So she was like kind of like doing a plug
4   for Chris at the end of her class.  Like if you like
5   this class, take Chris' class.
6          But the opposite happened in Chris' class,
7   which was -- like one of the students who I was friends
8   with came to me and said like, "Dude, at the end of his
9   class, he said, 'Don't take the Snowfensive security
10  class.  They're teaching people things that are
11  unethical and illegal.  And if you take that class and
12  you try to do those things, you will go to jail.'"
13         Like -- and so like the level of like going
14  after somebody that you saw as competition where you're
15  telling -- instead of saying like, "Hey, if you enjoyed
16  my class, next year take Snow's" the way that Snow did
17  for him, he chose to go the other direction and was
18  like, "If you take her class, you will go to jail."
19  Like, you know, it was just like crazy.
20         But, yeah, and so I went and talked to him
21  about that and said like, "Hey, man, like you can't say
22  stuff like that to your students.  Like you can't tell
23  them that they shouldn't go take, you know, another
24  person's class just because it's competition."
25         And he was like, "Well, she's not teaching the

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 151

1   right things, and I don't like what she's doing" and
2   da-da-da-da.  And I'm like, "Yeah, but you can't say
3   that she's teaching illegal things.  Nothing about what
4   she's teaching is illegal."
5           And he was like, "Well, if you do this, then
6   you're" -- "like they're going to end up getting
7   arrested or whatever."  And I'm like, "You just can't
8   do it."
9       Q.  Going to Exhibit 7, that's essentially what
10  Chris told you and Jeff in this bottom paragraph on
11  page 133, right?
12      A.  Correct.
13      Q.  So to make sure I've got the timeframe right,
14  so Snow won the Black Badge contest?
15      A.  Yes.
16      Q.  And then after that the next -- overnight
17  Chris saw her as a competitor?
18      A.  Correct.
19          MR. CONRAD:  Object to form.
20      Q.  After that, Chris then banned Snow's husband
21  from a competition saying that there was a code of
22  ethics violation?
23      A.  Correct.
24          MR. CONRAD:  Object to form.
25      Q.  And then from there, Chris made a complaint to

Hadnagy, et al. v. Moss, et al.                                    Neil Wyler

Page 316

1                         REPORTER'S CERTIFICATE

2

3          I, LORRIE R. CHINN, the undersigned Certified Court

4    Reporter, pursuant to RCW 5.28.010 authorized to administer

5    oaths and affirmations in and for the State of Washington, do

6    hereby certify:

7          That the sworn testimony and/or remote proceedings, a

8    transcript of which is attached, was given before me at the

9    time and place stated therein; that any and/or all witness(es)

10   were duly sworn remotely to testify to the truth; that the

11   sworn testimony and/or remote proceedings were by me

12   stenographically recorded and transcribed under my

13   supervision, to the best of my ability; that the foregoing

14   transcript contains a full, true, and accurate record of all

15   the sworn testimony and/or remote proceedings given and

16   occurring at the time and place stated in the transcript; that

17   a review of which was not requested; that I am in no way

18   related to any party to the matter, nor to any counsel, nor do

19   I have any financial interest in the event of the cause.

20         WITNESS MY HAND AND DIGITAL SIGNATURE this 25th day

21   of November, 2024.

22

23   _____
     LORRIE R. CHINN, RPR, CCR
24   Washington State Certified Court Reporter No. 1902
     Oregon State Certified Court Reporter No. 97-0337
25   lorrie@buellrealtime.com

3d977942-8f9e-446a-b1dc-cfb2ff91445f

# Exhibit 14

11.14.2024
Wyler
**D3**
Buell Realtime Reporting





WYLER00000023



WYLER00000024



CONFIDENTIAL

WYLER00000025



CONFIDENTIAL

WYLER00000026



WYLER00000027



CONFIDENTIAL

WYLER00000028



CONFIDENTIAL

WYLER00000029



WYLER00000030



WYLER00000031







WYLER00000034





13:27

**Chris Hadnagy** ✆

I know you were n  Feb 24, 2022  ut you also know that this is crap and it's based on lies and the silence. When everyone that knows that is almost as bad as the fault accusations
15:44

I don't even run Villages anymore. And haven't for years. The statement was made by DEF CON as an organization. I was asked to act as a mediator for everything in the beginning and I told you pretty early on, when it was clear nothing was going to stop, that I was going to back away and let you have at each other.

And that's what I did. 15:45

Yep you were defcon's mediator and I'm assuming that you spoke to this group of people with their accusations and know exactly what those accusations are and know that they have absolutely nothing to do with defcon
15:46

It's super shitty. I absolutely agree. And I think that maybe more context would've been good to stop the rumor mill from running wild. But it's not my decision and never was. 15:46

Jeff has not met with me even though he said he did, which is an utter lie. He is not responded to me no matter how many

+ Message ▢ ◎ ⊙



CONFIDENTIAL

WYLER00000037



WYLER00000038



13:27

**Chris Hadnagy** ☺

Feb 24, 2022

computer and Ryan texted her saying "Good luck ...es" or something. I don't recall the exact wording. And that was it. The gloves came off.

She knew there were other people with their own stories because she had seen them.

And once she started asking around more and more stories came out.

And then it was too late. Even if she wanted to walk away later, people were talking.

And they were going to BH and DC saying "What are you going to do about this?"

They couldn't do nothing.    16:00

Hahaha. That is a very twisted version of the truth bro but ok
16:02

Twisted how?    16:03

We locked Maxie out of a corporate machine because she would not delete data from federal government jobs. It was a legal for her to hold that data after she left the company. Any company. I can't imagine any company that you have worked for would not have done the same thing. So saying we locked her out of her machine is a twisted version of the truth.

Message





WYLER00000041



WYLER00000042



CONFIDENTIAL

WYLER00000043



WYLER00000044



WYLER00000045





WYLER00000047



CONFIDENTIAL

WYLER00000048



WYLER00000049



13:28

**Chris Hadnagy** ⓐ

Feb new site, twitter launches
Feb he appts pppl    Apr 5, 2022
Feb-March - insiders telling me DC crew
laughing at how this went down on me
nothing to do with maxies laptop          10:09

Well I don't know who your insider is, but
they obviously don't know the whole story.
I have absolutely advocated for you. To the
point that people got upset with me for
"protecting you". But I have been pissed at
some things if I'm honest. I didn't like that
you said no one from Defcon spoke to you.
You just said I'm the closest to Jeff
yourself and we've talked at length for
hours. About accusations and potential fall
out. So that pissed me the hell off. I don't
think that's fair or honest. But I kept my
mouth shut. If you notice, I haven't said a
damn word. But it's exhausting to be part
of this and have people want me to choose
sides. I side with what's right. And you did
do some wrong here and we talked about
that. But holy shit, this isn't a grand
conspiracy.                                10:10

dude you told me, and i can find the tweet
that you are NOT coming to me as def co

def con

soryr text   10:11

I don't speak for Defcon   10:11

Message



WYLER00000051



WYLER00000052



CONFIDENTIAL

WYLER00000053



WYLER00000054



 WYLER00000055



pissed when she would say no to something and then you'd go around her to Jeff to get what you wanted. No one likes that.

When you're trying to run a conference and people go around you to get what they want when you're trying to balance space and resources it can certainly piss you off.

I've been there. 10:26

Dude been told by many she hates me. But ok 10:28

Apr 26, 2024

Your safety number with Chris Hadnagy has changed.

Learn More

Message

WYLER00000056

# Exhibit 15



13:38

**Jeff Moss** @
⊘ Verified

Aug 25, 2021

When you're awake I have something pressing I need to discuss. I have had multiple people reach out to me today to talk about a Village and Contest organizer that's threatening and harassing a former employee. It's Chris Hadnagy. Those people also told her I was someone she could trust to talk to. So she called me and I confirmed the harassment with her. She doesn't want to go public with it and just wants it to stop. I asked her what she wants and she said she just wants it to stop. She didn't know where to turn and so she wanted to talk to a trusted person in the community. She says she took a job with him because she met him in the SE Village and he offered her a job. I have more details, but we should probably chat.

I'll be awake for the next 8 or so hours so call me whenever you can.

I just don't want to see anything like "DEF CON Village Organizer Harasses Female Employee" all over social media or actual media.

So hit me up and I'll fill you in.    16:41

Ok I can free in 1/2 hour or so if that works?
17:05

Message

WYLER_0178



WYLER_0179

# Exhibit 16



# Exhibit 17

**From:** ▮▮▮▮▮@gmail.com [▮▮▮▮@gmail.com]
**Sent:** 9/2/2021 4:06:31 PM
**To:** 'Maxie Reynolds' [hello@maxiereynolds.com]; villages@defcon.org
**CC:** grifter@defcon.org; DT@defcon.org
**Subject:** RE: Code of Conduct Violations


Maxie,

    This is just an email to let you know we recieved your email.

    I am currently working on contacting DC leadership to figure out our course of action and we will get back to you very quickly.

Zantdoit
Villages Dept Lead

-----Original Message-----
From: Maxie Reynolds <hello@maxiereynolds.com>
Sent: Thursday, September 02, 2021 6:01 PM
To: villages@defcon.org
Subject: Code of Conduct Violations

Hello,

I am contacting you about an individual that is heavily associated with DC and routinely has village at the conference.

Over the course of his career he has mistreated a number of individuals, including myself. Some of his actions have taken place while he employed some of these people and some after employees left. Some of the actions he has taken have been quite egregious — one person sought therapy, as an example, whilst another won an harassment case against him.

I have a list of 15 people all willing to come forward and tell their stories. However, they are not willing to do it in writing, at least not without talking to the DC powers that be first.

Do you think it's possible to set up a video call with all willing participants so that you can hear these grievances so people don't have to (at least initially) put in writing what they have experienced. To note, most people have expressed to me that they fear his retaliation if there emails were shown to him.


Regards,
Maxie Reynolds

# Exhibit 18

Jeff Moss
July 31, 2024

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

CHRISTOPHER J. HADNAGY, an          )
individual; and SOCIAL-ENGINEER,    )
LLC, a Pennsylvania limited         )
liability company,                  )
                                    ) No. 2:23-cv-01932-BAT
                  Plaintiffs,       )
                                    )
        vs.                         )
                                    )
JEFF MOSS, an individual; DEF CON   )
COMMUNICATIONS, INC., a Washington  )
corporation; and DOES 1-10; and     )
ROE ENTITIES 1-10,                  )
                                    )
                  Defendants.       )
_____

VIDEO-RECORDED DEPOSITION OF JEFF MOSS

July 31, 2024

Seattle, Washington

Reporter:  John M. S. Botelho, CCR, RPR

Jeff Moss
July 31, 2024

```
 1                    APPEARANCES

 2
     For the Plaintiffs:
 3
                    MARK R. CONRAD
 4                  Frey Buck
                    1200 Fifth Avenue
 5                  Suite 1900
                    Seattle, Washington 98101-3135
 6                  206.486.8000
                    206.902.9660 Fax
 7                  mconrad@freybuck.com

 8                  KRISTOFER RIKLIS
                    Riklis Law
 9                  401 Wilshire Boulevard
                    Floor 12
10                  Santa Monica, California 90401-1456
                    310.994.5959
11                  kristofer@riklislaw.com

12
     For Defendant DEF CON communications, Inc.:
13
                    MATTHEW J. MERTENS
14                  Perkins Coie
                    1120 Northwest Couch Street
15                  10th Floor
                    Portland, Oregon 97209-4128
16                  503.727.2000
                    503.727.2222 Fax
17                  mmertens@perkinscoie.com

18
     Also Present: Steve Crandall, videographer
19
                    Christopher Hadnagy
20

21

22

23

24

25
```

Jeff Moss
July 31, 2024

1                              BE IT REMEMBERED that on Wednesday,

2    July 31, 2024, at 1201 Third Avenue, Suite 4900,

3    Seattle, Washington, at 9:04 a.m., before JOHN M.S.

4    BOTELHO, Certified Court Reporter, appeared JEFF

5    MOSS, the witness herein;

6                              WHEREUPON, the following

7    proceedings were had, to wit:

8

9                              <<<<<< >>>>>>

10

11                             THE VIDEOGRAPHER:  We are going on

12   the record at 9:04 a.m. on July 31st, 2024.

13       This is Volume 1, Media Unit 1, of the video-

14   recorded deposition of Jeff Moss in the matter of

15   Hadnagy vs. Moss filed in the United States District

16   Court, Western District of Washington, at Seattle.

17   Case No. 2:23-cv-01932-BAT.

18       This deposition is being held at 1201 Third

19   Avenue, Suite 4900, Seattle, Washington 98101.  The

20   videographer is Steve Crandall from U.S. Legal

21   Support.  The court reporter is John Botelho from

22   U.S. Legal Support.

23       Will counsel and all present please note their

24   appearances and affiliations for the record.

25                             MR. CONRAD:  Sure.  I can start.

Jeff Moss
July 31, 2024

1    My name's Mark Conrad.  I work with the firm Frey Buck,

2    on behalf of plaintiffs.

3                        MR. RIKLIS:  My name's Kris Riklis,

4    on behalf of plaintiffs, with Riklis Law.

5                        MR. MERTENS:  Matt Mertens with

6    Perkins Coie, LLP, with defendant DEF CON.

7                        THE WITNESS:  Jeff Moss with

8    defendant DEF CON.

9                        THE VIDEOGRAPHER:  Thank you.

10       Will the court reporter please swear the witness.

11

12    JEFF MOSS,                    having been first duly sworn

13                                  by the Certified Court

14                                  Reporter, deposed and

15                                  testified as follows:

16

17                        EXAMINATION

18    BY MR. CONRAD:

19  Q  All righty.  So, Jeff, you and I met just briefly off

20    the record, but we're on the record now.  Just

21    introduce myself again.  Mark Conrad.

22       And you said it's okay if I refer to you as "Jeff"

23    throughout the deposition?

24  A  Yeah.

25  Q  Okay.  Kind of based on some of our conversation

Jeff Moss
July 31, 2024

1    I remember happening is we -- Maxie had come forward.

2    Things continued to spiral out of control.  Chris, her

3    laptop gets bricked.  Things are clearly not going to

4    go their separate ways.  And Maxie offers to introduce

5    us to other women and men with complaints about Chris.

6         And we were, like, Okay.  Well, if other people

7    have complaints, we want to hear them.  If you're not

8    the only one, sure.  Let's -- let's hear what people

9    have to say.

10        And so a phone call was organized not too many

11   days later.  It seemed like it happened really quickly.

12   It kind of went from Maxie and Chris into, like, this

13   whole group, you know, quickly.  And on that call,

14   there were probably 13 to 15 people with complaints.

15        And I remember we set up this call.  We had an

16   hour-long call for it set up, and the call lasted,

17   like, more than two hours.  And it was just story after

18   story after terrible story about Chris's behavior with

19   them.

20        And there were -- these were all firsthand

21   accounts from people that had direct interactions with

22   Chris.  There wasn't, like, third-party relaying of a

23   story I once heard.  It was, I worked for Chris for six

24   years, and this is what happened.  I worked for Chris

25   for two and a half years, and he berated me.  He yelled

Jeff Moss
July 31, 2024

1  Q  And any other record or documentation of what took

2     place on the phone call?

3  A  The closest I can imagine -- I didn't sit and take

4     notes during the call.  I was in listen mode, listening

5     to all their stories.  Like, this incredible sense of

6     dread washing over me as I keep hearing thing after

7     thing.  But I didn't record it.  I think the closest

8     was what we turned over in the Basecamp thread where

9     we're discussing the -- the situation.

10 Q  And who else was on the call from DEF CON?

11 A  Darington.

12        So I guess I'll make the distinction.  When you

13     say "from DEF CON," as an employee, full-time employee,

14     it would have been Darington.  And then I believe CJ

15     was on the call, Melanie was on the call.  I think that

16     was about it.

17        Basically, the people that you see in our Basecamp

18     conversation, I think they were all invited, and I

19     believe they all attended.

20 Q  Was Neil on the call?

21 A  Oh, yeah.  He was probably on the call.  Yeah, he was

22     on the call.  'Cause he was sort of the trusted person

23     that Maxie had gone to.

24 Q  So Darington was on the phone call.  Marc Rogers was on

25     the phone call.  Melanie --

Jeff Moss
July 31, 2024

1          What's her last name again?

2    A    Ensign.

3    Q    -- Ensign was on the phone call.  And Neil Wyler was on

4         the phone call?

5    A    Right.  So we all heard all the stories together.

6    Q    And those are all the individuals from the DEF CON side

7         of things?

8    A    Correct.

9    Q    Do you know if any of those individuals took any notes

10        or have any records regarding the phone call?

11   A    I don't -- I don't know -- I don't remember anybody

12        saying, "I took great notes."  I don't -- I don't

13        remember anybody saying that.

14   Q    Did you ever ask?

15   A    I don't know.

16          I don't know.  It probably would have been to our

17        advantage to have detailed notes, but -- but we don't

18        have detailed notes, so probably nobody took them, or

19        else we'd have them.

20   Q    Why do you think it would be to your advantage to have

21        detailed notes?

22   A    Because they're terrible fucking stories about Chris's

23        behavior, and I would love to have them documented.

24   Q    Are they documented anywhere?

25   A    Yes.

Jeff Moss
July 31, 2024

1  Q  -- do you remember what information Cat Murdock had

2     relayed to you that would have been code of conduct

3     violations involving Christopher Hadnagy?

4  A  Not unless I review our interrogatory response.  I -- I

5     would risk assigning her statements to someone else or

6     someone else to her.

7        Sorry.  It was just -- it was just a long time

8     ago, and a lot has happened, and I don't have perfect

9     recall.

10 Q  So you mentioned Michele Fincher, Maxie Reynolds,

11    Catherine Murdock.

12       Any other people --

13 A  The Bryan person, the gentleman.  I'm sorry for

14    interrupting.

15 Q  It's okay.

16       Bryan is another individual that was on the call?

17 A  I believe it was in the interrogatory response, there

18    were two gentlemen mentioned, and I believe they were

19    both on the call.

20 Q  And were you aware of what their names were at the time

21    that you made this post February 9th, 2022?

22 A  Yes.  'Cause they identified themselves as working

23    either as a volunteer for Chris at ILF.

24 Q  And what steps did you take after this phone call to

25    further determine whether there were code of conduct

Jeff Moss
July 31, 2024

```
 1    violations?

 2  A  You mean above and beyond what was just revealed to us

 3     in the phone call?

 4  Q  Correct.

 5  A  Like, seeking more code of conduct violations?  Like, I

 6     felt at that call, we had more than enough to ban

 7     Chris.  And so I didn't feel like I had to go spend a

 8     lot of time getting even more code of conduct violation

 9     reports.  Like, we had more than enough.

10        But after this was reported, after this was

11     published, sure enough, more people came forward online

12     with their own stories.

13  Q  What did you do to determine the veracity of this --

14     allegations that were made to you against Christopher

15     Hadnagy on the phone call?

16  A  Can you rephrase that?  Like -- I and the employees

17     listened to these firsthand accounts of all these

18     terrible stories of people that worked for Chris or

19     previously worked for Chris.  All the stories supported

20     each other.

21        When Grifter talked to Chris, like, you can see it

22     in the text messages with Grifter.  The very first

23     thing in their text messages, Grifter says to Chris,

24     Hey, I need to talk to you about some- -- I'm

25     paraphrasing.  But, Hey, I need to talk to you about
```

Jeff Moss
July 31, 2024

 1   something.  And Chris's immediate response is, What are

 2   you going to do with this information?  What are you

 3   and Black Hat going to do with this information?

 4        It's, like, Whoa, we haven't even -- like, we

 5   haven't even said "hello" -- Grifter hasn't even said

 6   "hello" yet.

 7                     THE REPORTER:  Slow down --

 8                     THE WITNESS:  Sorry.

 9                     THE REPORTER:  -- please.

10                     THE WITNESS:  Hasn't even said

11   "hello" yet.  And Chris is behaving like he knows

12   there's this big problem coming.  And then in the

13   conversation with Neil, he immediately starts naming

14   four or five women.  Is it this person?  Is it this

15   person?  Is it this person?

16        It's, like, Well, you know there's a problem,

17   because you're naming four or five women right off the

18   bat.

19        So Chris's behavior, he never accepted any

20   responsibility for anything.  He never said, Oh, that

21   was a misunderstanding.  Here's my e-mail exchange.

22   You know, like, I'll apologi- -- whatever it was, it

23   was always, Yes, but they deserved it because.  Yes,

24   but because.  It's a conspiracy.  They're all out to

25   get me.  Everybody is lying.

Jeff Moss
July 31, 2024

1          In Chris's communication with me, it starts off

2     with him saying, I've been brainwashed, and there's

3     this group of liars all coming with some coordinated

4     concoction.

5          And then I get supporting documentation from

6     Maxie.  I get other people telling similar stories.

7     There's nothing on Chris's side.  There's no, I had to

8     file this lawsuit.  I had to get the police involved.

9     Here's me owning the laptop.

10         Chris admits to the behavior with Maxie.  So there

11    was plenty of supporting information, we felt,

12    justifying our action.  I'm not sure how much more we

13    needed.  We didn't need any more.  We actually didn't

14    even need this much.

15   Q  So the -- if I'm understanding you correctly, you had

16    the communications between Neil Wyler and Chris,

17    correct?

18   A  Correct.

19   Q  And you had seen those at the time that you made this

20    post February 9th, 2022?

21   A  No, I got -- I got all of those messages after Chris

22    sued us.

23   Q  Okay.  So you'd never seen those previous?

24   A  What was happening was I would talk with Grifter, and

25    he would on the phone tell me what had been going on.

Jeff Moss
July 31, 2024

 1   Q   So Grifter was -- Neil Wyler was telling you about his

 2       conversations with Chris?

 3   A   Correct.

 4   Q   You then had the phone call with these individuals that

 5       we've talked about?

 6   A   Correct.

 7   Q   And then you got the Apple receipts from Maxie

 8       Reynolds?

 9   A   Correct.

10   Q   And that is the information that you had that supported

11       your publishing of this February 9 --

12   A   Well, we also had --

13   Q   -- 2022, report?

14                        MR. MERTENS:  Let him finish --

15                        THE WITNESS:  Yeah.

16                        MR. MERTENS:  -- finish his

17       questions.

18                        THE WITNESS:  Yeah.

19                        MR. MERTENS:  Object to the form.

20          Go ahead.

21                        THE WITNESS:  Okay.

22          Don't forget we also had Neil Grifter's personal

23       account of his being called a pedophile by Chris.  So

24       we had this prior experience from one of Chris's good

25       friends relaying the story as well.

Jeff Moss
July 31, 2024

```
 1   STATE OF WASHINGTON )      I, John M. S. Botelho, CCR, RPR,
                         ) ss  a certified court reporter
 2   County of Pierce    )      in the State of Washington, do
                                hereby certify:
 3


 4
          That the foregoing deposition of JEFF MOSS was taken
 5   before me and completed on July 31, 2024, and thereafter was
     transcribed under my direction; that the deposition is a
 6   full, true and complete transcript of the testimony of said
     witness, including all questions, answers, objections,
 7   motions and exceptions;

 8        That the witness, before examination, was by me duly
     sworn to testify the truth, the whole truth, and nothing but
 9   the truth, and that the witness reserved the right of
     signature;
10
          That I am not a relative, employee, attorney or counsel
11   of any party to this action or relative or employee of any
     such attorney or counsel and that I am not financially
12   interested in the said action or the outcome thereof;

13        IN WITNESS WHEREOF, I have hereunto set my hand
     this 12th day of August, 2024.
14

15

16

17

18   John M. S. Botelho, CCR, RPR
     Certified Court Reporter No. 2976
19   (Certification expires 5/26/2025.)

20

21

22

23

24

25
```

# Exhibit 19

 **Will Leonard** @  

8 Sep 2021

Me too. It's goddamn Hadnagy destroying my whole day.

A four hour call, just finishing it now.

12:01

Lucille is having sleep regression. We've been getting almost no sleep.

4 hours, that's unreal! 12:01

Brutal stories, supper bully vengeful cult abusive controlling creepy etc.

12:18

Hopefully, people we come forward and tell theirs stories to the public.

22:18

DEFCON00000463

# Exhibit 20

Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

----------------------------------------------------------
                              )
CHRISTOPHER J. HADNAGY;       )
SOCIAL-ENGINEER,              )
                              )
            Plaintiffs,       )
                              )
    vs.                       )   No. 2:23-cv-01932-BAT
                              )
JEFF MOSS; and DEF CON        )
COMMUNICATIONS, INC.,         )
                              )
            Defendants.       )
                              )
----------------------------------------------------------

VIDEOTAPED VIDEOCONFERENCE DEPOSITION UPON ORAL
                    EXAMINATION

                        OF

                 MICHELE FINCHER

----------------------------------------------------------

                 Bothell, Washington

DATE:   October 14, 2024

REPORTED REMOTELY BY:  Douglas Armstrong, RPR
                       Washington CCR No. 3444

Michele Fincher                                     October 14, 2024

Page 2

```
 1                    A P P E A R A N C E S

 2

 3    For the Plaintiffs:

 4            MARK R. CONRAD
              Frey Buck, P.S.
 5            1200 Fifth Avenue, Suite 1900
              Seattle, Washington 98101
 6            (206) 486-8000
              mconrad@freybuck.com
 7            (Via Videoconference)

 8            KRISTOFER Z. RIKLIS
              Riklis Law, LLC
 9            401 Wilshire Boulevard, Floor 12
              Santa Monica, California 90401
10            (310) 895-2497
              kristofer@riklislaw.com
11            (Via Videoconference)

12

      For the Defendants:
13
              JAKE DEAN
14            Perkins Coie
              1888 Century Park East, Suite 1700
15            Los Angeles, California 90067
              (310) 788-3289
16            jacobdean@perkinscoie.com
              (Via Videoconference)
17

18    Also Present:

19            PATRICK NORTON
              Videographer
20            (Via Videoconference)

21            LAUREN ENGLISH
              Frey Buck
22            (Via Videoconference)

23            CHRIS HADNAGY
              (Via Videoconference)
24

25
```

Michele Fincher                                          October 14, 2024

                                                              Page 4

 1       Bothell, Washington    Monday, October 14, 2024

 2                        9:04 a.m.

 3       ------------------------------------

 4            THE VIDEOGRAPHER:  We are on the record at

 5   9:04 a.m. on October 14, 2024.  This is the

 6   video-recorded deposition of Michele Fincher in the

 7   matter of Chris J. Hadnagy vs. Jeff Moss, et al.,

 8   Number 2:23-cv-01932-BAT in the United States District

 9   Court for the Western District of Washington.  This

10   deposition is being held virtually and was noticed by

11   defendant.

12            Counsel, please introduce yourselves and

13   state whom you represent.

14            ATTORNEY DEAN:  Good morning.  Jake Dean on

15   behalf of defendants.

16            ATTORNEY CONRAD:  Mark Conrad on behalf of

17   plaintiffs.

18            THE VIDEOGRAPHER:  My name is Patrick Norton,

19   and I am the legal videographer.  The court reporter is

20   Doug Armstrong.  We are with Seattle Deposition

21   Reporters.

22            Would the reporter please swear in the

23   witness.

24   \\\

25   \\\

Michele Fincher                                          October 14, 2024

                                                              Page 5

 1    MICHELE FINCHER,          witness herein, having been

 2                             duly sworn by the Certified

 3                             Court Reporter, testified as

 4                             follows:

 5

 6                    E X A M I N A T I O N

 7    BY ATTORNEY DEAN:

 8         Q.   Good morning, Ms. Fincher.  How's it going?

 9         A.   Fine.  How are you doing, Jake?

10         Q.   Not bad.

11              So, you know, you're here today for your

12    deposition.  I'm going to try to be as efficient as I

13    can, try and make sure we have a clean record, and get

14    you in and out.  With that said, I want to go through

15    what we call the admonitions or the ground rules to

16    make sure that we have a nice, clean record today and a

17    nice, smooth, and efficient deposition, okay?

18         A.   Yes.  Understood.

19         Q.   Perfect.

20              So the oath that you just took is the same

21    oath that you would take if this case were to go to

22    trial, and it carries with it the same obligation to

23    testify truthfully under the penalty of perjury.

24              Do you understand that?

25         A.   Yes, I do.

Michele Fincher                                    October 14, 2024

Page 12

1    with clients or training clients or education.

2              And at that point in time, I moved up to the

3    State of Washington, was introduced to Chris, and

4    originally went to work for Chris in a contractor

5    status.  And he hired me as soon as he was able to gain

6    his first major contract with a major customer.

7         Q.   And when was that, when you first started

8    working with Chris full-time and not as a contractor?

9         A.   Full-time, it would have been 2013.  I

10   believe it was January.

11        Q.   And how did you first meet Chris?

12             And I guess, for the record, when you're

13   saying Chris, you're referring to the plaintiff here,

14   Chris Hadnagy?

15        A.   To Mr. Hadnagy, yes.

16             I met -- I was introduced to Chris through a

17   mutual professional acquaintance.

18        Q.   And you said you started working with him as

19   a contractor.  What did that entail?

20        A.   Initially, it was to do marketing for a

21   course that he wanted to start teaching, and then I was

22   brought on with additional responsibilities.  A lot of

23   it was in marketing.  And when Chris determined that I

24   had a pretty deep background in both instruction and

25   course development, I think his idea was to help bring

Michele Fincher                                    October 14, 2024

Page 15

1   two months of my employment where we had the really

2   serious talk about me being really angry about that

3   particular post.

4           And I really had a talk with my spouse at the

5   time on whether or not this was a good position for me

6   and talked to Chris about it.  And we said, "Well, if

7   this isn't what you want to do, you know, you kind of

8   have to do what you need to do."  And I thought that

9   was very fair, and I thought about it and decided to at

10  least stick around a little longer to see if I could

11  make it work.

12          But every day after that, it was one -- you

13  know, I guess, at the time, I justified it as

14  misunderstanding after another.  But I can honestly say

15  that there was almost never a day in my entire four

16  years working for Mr. Hadnagy that I was not either

17  enraged or embarrassed due to something happening in

18  the company or my interactions with him.

19      Q.   You mentioned earlier personality

20  differences.  What did you mean by that?

21      A.   I think it's fair to say that you don't

22  necessarily get along with everyone that you work with.

23          Chris and I got along extremely well in

24  person.  And I think it's much easier to not have

25  misunderstandings about meaning and emotional content,

Michele Fincher                                    October 14, 2024

Page 18

1    activity slide until we started picking up additional

2    employees.  And this kind of behavior spread to the

3    additional employees, and employees came to me.  And,

4    honestly, I stayed on with the company as long as I did

5    because -- because I felt like I'd be abandoning them

6    if I left.

7         Q.    Absolutely.  I want to kind of take a step

8    back and kind of dig into what you were saying.

9              You said that there were a lot of comments

10   about your appearance that are not PC; is that correct?

11        A.    Yes.

12             ATTORNEY CONRAD:  Object.  Form.

13        Q.    (By Attorney Dean) And by "PC," you mean

14   "politically correct"?

15        A.    Correct.

16        Q.    Okay.  What comments do you recall were made

17   about your appearance by Mr. Hadnagy while you were at

18   Social-Engineer?

19        A.    I think -- and this can probably

20   corroborated -- be corroborated by a number of people.

21   Being referred to as "hot" and "Asian" would not be

22   considered politically correct in any professional

23   environment.  The legs, my legs, and what I was wearing

24   on my legs and my high heels, I don't think should be

25   the scope -- within the scope of anything, any

Michele Fincher                                        October 14, 2024

Page 19

1    discussion that I have with an employer unless it is in
2    the context of a kind of job that we were doing.
3              And, honestly, the kinds of job that we were
4    doing, playing to stereotypes and playing to human
5    weakness and allow -- allowed the company at the time
6    to test within acceptable limits what people will or
7    will not be willing to allow you to have access to
8    within the security of a company based on how they feel
9    about you.  So it is important to distinguish that part
10   of it had to do with engagements with customers.  And I
11   do want to be very clear about that, but it should not
12   have been a part of daily conversation and locker room
13   talk in terms of his buddies saying this about me or
14   students saying that about me.
15             And like I said, it was only impactful to me
16   because I was aware that it was inappropriate.  It
17   wasn't something that I was threatened by.  I know what
18   my qualifications are.  I know what I'm qualified to do
19   and not to.  But I would not wish for that sort of
20   behavior to persist with other employees, whether it's
21   sexual in nature, appearance-based in nature, or, you
22   know, anything that's personal in nature that doesn't
23   impact the position.
24        Q.   Understood.
25             So to kind of back up a little bit there,

Michele Fincher                                    October 14, 2024

Page 20

1    Mr. Hadnagy called you a "hot Asian"?

2              ATTORNEY CONRAD:  Object.  Form.

3        A.    On numerous occasions, yes.

4        Q.    (By Attorney Dean) Okay.  And did you think

5    that was appropriate or inappropriate for your boss to

6    call you a "hot Asian"?

7        A.    Certainly not within the vast -- certainly

8    not in the vast number of professional instances.

9    Correct.

10       Q.    So that would be inappropriate for your boss

11   to call you a "hot Asian"; is that correct?

12       A.    Yes.

13             ATTORNEY CONRAD:  Object.  Form.

14       A.    I wouldn't expect that.

15       Q.    (By Attorney Dean) And I know you said you

16   have thick skin, but being called a "hot Asian" by your

17   boss at work, did that make you feel comfortable or

18   uncomfortable?

19             ATTORNEY CONRAD:  Object.  Form.

20       A.    It -- excuse me.  Was that --

21       Q.    (By Attorney Dean) You can answer.  He's

22   just --

23       A.    Oh, okay.

24       Q.    -- objecting for the record.

25             ATTORNEY CONRAD:  Doug, are you getting my

Michele Fincher                                    October 14, 2024

Page 21

1    objections in?  I'm not sure.  I'm trying to get them
2    in here, but --
3              THE COURT REPORTER:  I am.
4              Ms. Fincher, if you could pause just a moment
5    before you answer each question, that would be helpful.
6              THE WITNESS:  My apologies.
7              THE COURT REPORTER:  No problem.  Thank you.
8              ATTORNEY CONRAD:  Thank you.
9        Q.    (By Attorney Dean) Yeah.  So I'm sure you
10   probably lost the question through all that.
11             So my question was being called a "hot Asian"
12   by your boss at work, even though you had thick skin,
13   did that make you feel comfortable or uncomfortable?
14       A.    I find it uncomfortable and extremely
15   annoying because it is not cogent to my job
16   performance.
17       Q.    Absolutely.
18             You were also talking about how Mr. Hadnagy
19   made comments about your legs and what you were wearing
20   on your legs.  Can you give me a few examples of what
21   you mean by that?
22       A.    We had a student in particular.  I remember
23   this was Detroit.  And at the time, I was wearing
24   skirts to teach courses in, which I don't believe is
25   uncommon in women, and I had hose to accompany those

Michele Fincher                                      October 14, 2024

Page 23

1    with that kind of behavior off and on to varying

2    degrees.  And I think it can be impactful on

3    performance and mental health and is not -- again, not

4    relevant to job performance.

5            Q.   And --

6            A.   And so I was very concerned about women that

7    would be hired with the company subsequent to my

8    position.

9            Q.   Did you personally observe Mr. Hadnagy act

10   inappropriately with other women at Social-Engineer,

11   like he did with yourself?

12           A.   I -- mostly, what I observed had less to do

13   with that and more to do with general bullying behavior

14   and intimidation.

15           Q.   Okay.  So you personally observed Mr. Hadnagy

16   bully or intimidate your coworkers?

17                ATTORNEY CONRAD:  Object.  Form.

18           A.   Yes, I did.

19           Q.   (By Attorney Dean) Okay.  Can you tell me

20   what you personally observed with respect to bullying

21   and intimidation?

22           A.   We were a remote company.  So most of our

23   interactions were done electronically, either via

24   email, phone call, or on group chat.  We had,

25   essentially -- I don't know if you're familiar.  Most

Michele Fincher                                    October 14, 2024

Page 24

1    of you are probably at this point familiar with Slack.

2              Slack has a number of channels.  He did have

3    channels set up with individuals.  He had channels set

4    up with the executive staff, which I was a part of at

5    that time, but he also had a company-wide Slack

6    channel.

7              And as people would do, they made mistakes,

8    or they were late, or things happened, and I believe

9    those are things that a direct manager should probably

10   deal with privately.  But Mr. Hadnagy was in the habit

11   of pretty publicly berating and shaming people for

12   various infractions, real or imagined, to the point

13   where people were afraid to take a bathroom during --

14   breaks during the day, which, to me, was appalling for

15   adults working for you.  And people would literally

16   say, "I've got to take a bio break, or I've got to get

17   up and walk around, or I've got to eat."  And I don't

18   feel those are things that need -- that people need to

19   ask permission for.

20   Q.    Why do you believe that people were scared or

21   afraid to take bathroom breaks?

22              ATTORNEY CONRAD:  Object.  Form.

23   A.    Primarily, because of the consequences that

24   they suffered, I think, socially and professionally

25   within the context of the company, people were just

Michele Fincher                                    October 14, 2024

Page 25

1   afraid of him.  And I had several people come to me,
2   and I would just say, "Well" -- I would do my best to
3   support Chris and support the company and support the
4   individual.  And it put me in a really, really
5   difficult position because there's some kinds of
6   behavior that really aren't defensible in terms of how
7   you treat people.
8           The course that we taught and the company
9   motto was always feel -- "always make people feel
10  better for having met them," and it was certainly not
11  how our company, in particular, operated on a daily
12  basis.
13          Q.   (By Attorney Dean) Got it.
14          A.   And so we -- I spent a lot of time with
15  individuals, kind of talking people off the ledge.
16  And, frankly, our head count and our turnover was
17  astronomical, some of it due to just people being
18  released, as happens in companies, but a lot of it just
19  had to do with people having major blowups with
20  Mr. Hadnagy and leaving the company as a result.
21          Q.   So I want to dig into the bathroom issue a
22  little bit more because I'm not fully understanding.
23  So, you know, for example, if I wanted to go to the
24  bathroom, I could just get up from my office, go to the
25  bathroom, grab something to drink, come back, keep

Michele Fincher                                                    October 14, 2024

Page 26

1    writing emails, and no one would say anything to me.

2            So what were you personally observing with

3    respect to people going to the bathroom that would make

4    them scared to go to the bathroom, if that makes sense?

5        A.    Yeah.  I think -- I think what would happen

6    is that he would either try to get ahold of someone

7    over Slack or would see that someone's status went

8    inactive on Slack or -- Slack or I don't remember the

9    chat, exactly, what we were using at the time.  So, for

10   instance, if I took a break and was gone for ten

11   minutes, my activity would show as inactive on the

12   channel itself.

13           And then he would type, "Michele," and then

14   send it, and then, about a second later, "Michele,

15   Michele, Michele, Michele, Michele."  And he would do

16   this sort of like, you know, in a string of comments,

17   where you could just see it.

18           Or he would just say, "Well, I don't know

19   where so-and-so is.  They're MIA."  And it's like, well

20   they've been -- they've been making phone calls for

21   the -- for the last, you know, hour.  They probably

22   need to take a -- take a break or walk around the

23   neighborhood, eat something, get something to drink.

24           And so instead of trusting people that they

25   were doing their full eight, it really became a

Michele Fincher                                      October 14, 2024

Page 27

1   sense -- you know, he's the CEO of the company.  It

2   wasn't his position to know what people were doing

3   every single minute of every single day simply because

4   if they were doing their jobs, I think that kind of

5   speaks for itself.  And there's a certain level of

6   trust that you're going to place in an individual.

7           And if there are problems, then that should

8   be handled privately with the -- with the individual

9   given a chance to improve performance.  And then, you

10  know, you let someone go if they're unable to do that,

11  but I don't think public humiliation and public

12  attention being drawn to someone, either making a

13  mistake or simply needing a few minutes or being upset

14  by something that was said or done and needing to walk

15  away for a minute -- I think that's okay.  And is that

16  a difference in management style?  Sure.  But I can say

17  that it was pervasive through the company at the time

18  of my tenure.

19      Q.    Got it.

20            And did you see Mr. Hadnagy personally call

21  anyone out publicly on Slack channels?

22      A.    Yes.  He did it to me certainly, and he did

23  it to others.

24      Q.    Got it.

25            And did you personally observe people say to

Michele Fincher                                    October 14, 2024

Page 28

1    you, "I'm scared to go to the bathroom because I don't

2    want to be publicly called out"?

3         A.    "I'm scared to take breaks.  I feel like I've

4    always got to be there to answer my Slack channel."

5         Q.    Do you --

6         A.    "I'm afraid he's going to call, and I'm not

7    going to be there, and he's going to yell at me."

8         Q.    And did you feel like that was an

9    inappropriate way to treat your coworkers?

10              ATTORNEY CONRAD:  Object.  Form.

11        A.    I did.  I certainly wouldn't treat my

12   employees that way.  And, yes, you could argue a

13   difference in management style, but I don't think

14   people should be afraid when they come to work.

15        Q.    (By Attorney Dean) Understood.

16              You said you ultimately left after working

17   for about four years at Social-Engineer; is that right?

18        A.    That's correct.

19        Q.    Why did you leave?

20        A.    Because I had reached a point that I,

21   personally -- I had reached my personal limit with it.

22   And I had been looking for a really, really, really

23   long time.  Actually, I'd been looking for years.  I

24   needed the right position.  I needed the income.  I can

25   honestly say I would not have stayed if I had found a

Michele Fincher                                October 14, 2024

Page 29

1   better-paying job sooner.

2           But there was a particular incident.  There
3   were actually two particular incidents that -- I guess
4   there were three particular incidents that caused me to
5   really buckle down and ultimately take a position that
6   didn't pay more, but got me out of there.  And it took
7   me a long time to reconcile feeling really guilty about
8   leaving everybody else, but I -- my husband finally sat
9   me down, honestly, and said, "This is bad for you.
10  It's a bad job for you.  You're bad and stressed all
11  the time.  It's just -- it's horrible for you, mental
12  healthwise.  It might be okay for you professionally,
13  but you can do better than this."  So --

14      Q.   And what were those three incidents that
15  ultimately forced you to leave the company?

16      A.   The Def Con conference that year.  So it
17  would have been -- I guess it was 2017.  I don't know
18  what number Def Con that was.  Maybe it was 25.

19           We were in the habit of selecting contestants
20  for contests that we ran.  And we sponsored what is
21  known as SEVillage, Social Engineering Village, where
22  attendees at the conference can come and learn
23  different things that are not related to technical
24  hacking and technical security.  It has more to do with
25  human being responses and how you can get someone to --

Michele Fincher                                  October 14, 2024

Page 30

1  you know, how you can get the security guard to break a

2  rule if you're a big pregnant lady carrying a bunch of

3  boxes, for example.  So it was -- it was meant to be

4  educational.

5           And one of our main contests was a call-in

6  contest where individuals would call companies to see

7  how many what we call flags to be -- that they could

8  obtain over the course of -- I think it was 15 or 20

9  minutes.  So it was, you know, how many people in your

10 company.  It was nothing that would damage the company

11 outright, but it was company -- it was information that

12 was potentially sensitive, when put together, could

13 create a situation.  So we never asked for Social

14 Security numbers.  We never asked for financial

15 details, but it was just a demonstration of how

16 vulnerable companies could be to simply phone

17 manipulation over the phone.

18           So in the last couple of years, we had asked

19 contestants to send in videos.  And as a company, there

20 were about eight to ten of us in the company at the

21 time.  We would look at the applications months prior.

22 We would view the videos.  And then we had a public

23 Excel spreadsheet where we selected the top, you know,

24 ten or so contestants that we felt would be the best

25 for the contest, you know, whether that was somebody

Michele Fincher                                    October 14, 2024

Page 31

1   that was very experienced in the field or someone that

2   was a veterinarian, you know.  They just wanted to

3   participate.  So it was -- it was very sort of -- we

4   tried to pick a varied group of individuals that we

5   felt would be good contestants.

6           And I remember a young lady in particular

7   whose application wasn't particularly strong.  Her

8   video was -- unfortunately, she might have been

9   nervous.  She didn't have a lot of -- there was no good

10  reason to select her as a contestant that would be both

11  educational and a good illustration to the crowd.  And

12  I don't think there was anyone who really thought she

13  would be -- I don't remember anyone thinking or voting

14  for her.

15          And Chris looked at her video and said,

16  "She's hot, and she's Asian.  She's in."

17          And I, honestly, at the time, was about the

18  only person that was willing to argue with him because

19  at that point, I was just willing -- I was just willing

20  to lose my job, honestly.  I was so sick of the

21  situation.  And I just said, "That's a ridiculous

22  reason."  I was furious about it.

23          And he said, "I'm the boss.  It's my company.

24  She's in."  And so she was a contestant that year, and,

25  frankly, she was terrible.  And not -- you know, not a

Michele Fincher                                          October 14, 2024

Page 32

1    terrible person, a very nice person, but not a great

2    contestant.  I don't know that she -- excuse me.  I

3    don't know that she obtained any of the flags at all.

4            And, you know, it kind of comes down to,

5    well, was it good or was it not?  In my opinion, she

6    wasn't prepared.  In my opinion, she was a terrible

7    contestant.  In my opinion, she was selected because of

8    her appearance.

9        Q.    And did you think it was appropriate for

10   Mr. Hadnagy to comment about this person being a "hot

11   Asian"?

12       A.    No.

13             ATTORNEY CONRAD:  Object.  Form.

14       Q.    (By Attorney Dean) Did you believe that it

15   was appropriate for Mr. Hadnagy to choose someone to be

16   part of the SEVillage because they're a "hot Asian"?

17             ATTORNEY CONRAD:  Object.  Form.

18       A.    No.

19       Q.    (By Attorney Dean) And did that make you feel

20   uncomfortable that he was commenting on a contestant

21   being a "hot Asian"?

22       A.    Yes.  Not for myself, but more for her.  She

23   was very young, and it really made me furious.

24       Q.    This is the second time you've brought up

25   Mr. Hadnagy referring to someone as a "hot Asian."

Michele Fincher                                    October 14, 2024

Page 33

1          Did he make those comments a lot?

2     A.    Yes, fairly regularly.

3     Q.    Do you recall him making those comments about

4  anyone other than you and this one contestant being

5  "hot" and "Asian"?

6     A.    Sure.  His wife.

7     Q.    His wife?  Anyone other than you three?

8     A.    I'll make a comment in general about the

9  information security field.  It tends to be -- it tends

10 to have a fascination with women of my ethnic

11 background.  I don't know, but it's pretty well known,

12 at the time, anyway.  I don't know what it's like now,

13 but it's always been one of those things that you hear

14 quite often and quite regularly.

15    Q.    Got it.

16          So going back, you said there were three

17 incidents that caused you to leave.  The first was

18 Mr. Hadnagy's selection of a contestant because she was

19 a "hot Asian."

20          What were the other two incidents?

21          ATTORNEY CONRAD:  Object.  Form.

22    A.    The second was -- I think you could argue

23 that this was definitely a difference of opinion in

24 terms of the direction of the company.  But that year,

25 Chris gave a talk about his -- at the time, it was a

Michele Fincher                                    October 14, 2024

Page 38

1    the CEO to talk about so-and-so is not doing this.

2    We're not doing that.  We need to correct this.  I

3    think that's okay, but I think essentially screaming at

4    someone over chat in a venue that the entire company

5    can see is pretty inappropriate.

6         There were several individuals that came to

7    me.  One even suggested -- one of our contractors even

8    suggested perhaps to him, from what he told me,

9    executive coaching forum to perhaps help him become a

10   better leader for the company.  So it was, again, so

11   numerous and regular that it's really hard for me to

12   pinpoint.

13        But the final incident that caused me to

14   really just leave was we had an individual that had a

15   difficult time with the company, had a difficult time,

16   personality-wise, handling Chris' personality, tended

17   to take the blame.  He was readily -- he readily

18   accepted blame for everything that happened, whether or

19   not it was within his control or not, whether he had

20   anything to do with it.

21        And, essentially, Chris bullied him into -- I

22   think I can -- I can say with confidence that Chris

23   essentially bullied him into resigning, into him

24   saying, "Well, I'm sorry.  I'm just -- I'm just not cut

25   out for this company.  I feel really bad.  I've let

Michele Fincher                                    October 14, 2024

Page 39

1    everybody down.  I'll leave."

2            And that is my opinion.  That is my opinion

3    because, ultimately, that employee did leave, but that

4    employee, subsequent to his employment at

5    Social-Engineer, has been very successful in the rest

6    of his career.  So having had seen the interactions,

7    that is what I felt happened.  And, again, I was really

8    furious about that.

9            But I think this is my long way of saying I

10   cannot think of any day where I was happy to log on to

11   work and wasn't at some point in time really angry that

12   day, and I felt it to be a very unhealthy environment.

13       Q.   Understood.

14            So you mentioned a few times that Chris

15   berated or Mr. Hadnagy berated employees on a public

16   Slack channel.

17            Did you ever see Mr. Hadnagy harass employees

18   on the public Slack channel, or is there no difference

19   between those two to you?

20            ATTORNEY CONRAD:  Object.  Form.

21       A.   I guess I'm curious if you define a

22   difference between harassment and bullying, because if

23   you're the CEO, I think it -- I guess, in my view --

24       Q.   (By Attorney Dean) I'll chime in here.

25       A.   Okay.

Michele Fincher                                           October 14, 2024

Page 42

1          But in the meantime, I want to switch over to
2    Black Hat.  Have you ever heard of Black Hat before?
3          A.    Yes.
4          Q.    What is Black Hat?
5          A.    Black Hat is a professional conference for
6    information security professionals.
7          Q.    Have you ever attended a Black Hat
8    conference?
9          A.    For decades, yes.
10         Q.    Did you ever attend a Black Hat conference
11   with Mr. Hadnagy?
12         A.    Yes, I did.
13         Q.    Can you tell me about your experience or
14   experiences attending the Black Hat conference with
15   Mr. Hadnagy?
16         A.    We -- Black Hat conference and training is
17   comprised of training courses prior to actual
18   presentations done by various speakers.  So it is a
19   conference that is held just prior to Def Con, late
20   July, typically, early August time frame of each year.
21              In my tenure there, we taught a class there
22   and then stayed throughout that time frame and then had
23   our SEVillage at Def Con.  So we did training, we
24   stayed through the conference, and then we did the
25   training at Def Con.

Michele Fincher                                    October 14, 2024

Page 43

1        Q.    And did you ever see any instances of

2   Mr. Hadnagy making anyone feel uncomfortable during any

3   of these Black Hat conferences?

4        A.    Yes, I did.

5        Q.    Can you tell me what you saw?

6        A.    It primarily had to do with the context of

7   the training itself.  It was, again, a training course

8   that he had developed prior to my hire at the company,

9   and it was comprised of social engineering principles.

10  There was an entire day spent on psychology principles,

11  influence, manipulation, decision-making, and the

12  capstone event.

13            And there were exercises done after class in

14  the evenings.  So we split the class up by various

15  groups.  And then there were sets of exercises that

16  were done, and then there was a capstone exercise done

17  on the last day that was practical in nature.

18            I'm sorry.  I need to shut off my space

19  heater, if you'll hang on just one second.

20       Q.    No problem.

21       A.    Okay.  Sorry about that.

22            So the actual training, the coursework

23  training, was relatively nondescript.  You know, we

24  tried to make it fun.  It was -- it was meant to be an

25  educational course, but, certainly, we kept it -- I

Michele Fincher                                    October 14, 2024

Page 44

1    kept a lot of it light in nature.

2              But there was -- there was a lot of research

3    that was brought in on a lot of psychological concepts.

4    I contributed to the edit of a lot of those, updated

5    some of the -- some of the research associated with it.

6    But, generally speaking, the course was in place when I

7    started to help him train in 2013.

8              The exercise that I had -- that I took most

9    issue with was one that it is likely that has had some

10   infamy in that there were separate questions for men

11   and women in the class.  Everyone had the same sort of

12   questions that they could pick and choose where,

13   essentially, the exercise was for them to interact with

14   complete strangers and see what kind of information

15   that they could elicit, again, to sort of illustrate

16   how we're not careful about the information that we

17   possess, how it can lead to a financial breach, for

18   instance, a security breach within a company.

19             And it was really designed to help students

20   overcome their discomfort in some cases.  You know,

21   some people are fine with speaking to strangers and

22   just making small talk, but a lot of people aren't.

23   And so we -- the exercises were designed to kind of

24   help people over that hump, you know, and get them used

25   to asking these kinds of questions to do this sort of

Michele Fincher                                    October 14, 2024

Page 45

1    work for their companies, to make their companies more

2    secure, to make their families more secure.

3            Some of the questions, I thought, were too

4    personal in nature and, also, potentially were unsafe

5    in nature.  And he and I had numerous bitter, bitter

6    arguments about whether or not -- whether or not to

7    keep those questions in.  And, ultimately, he decided

8    to keep those in.

9        Q.    What questions did you think were unsafe?

10       A.    I thought it was unsafe for women to approach

11   men that they did not know to determine whether or not

12   they were circumcised or uncircumcised.

13       Q.    So -- oh, go ahead.

14       A.    And because these exercises were done

15   primarily after class in the evenings.  And for Black

16   Hat, in particular, this was in Las Vegas.  And if any

17   of you have ever been to Las Vegas, you know what the

18   environment is like.  Everyone's drinking.  There's

19   just a lot of activity that you wouldn't want your

20   underaged children to see.  You know, it's just -- it's

21   not a great environment.  And it's -- and it's not a

22   great sort of -- if you're going to go after-hours to

23   ask those kinds of questions, you're going to end up in

24   a restaurant or probably a bar where people are

25   drinking.

Michele Fincher                                          October 14, 2024

Page 46

1              And I felt that it could lead to issues,

2    misunderstandings, and potentially unsafe situations.

3    And if you have daughters, significant others who are

4    female, I imagine that you can think that you wouldn't

5    want your loved one or friend to participate in

6    something like that without a lot of assistance.

7              And, granted, there -- it wasn't primarily --

8    it wasn't mandatory that it was group work.  So,

9    potentially, a woman could go to a bar by herself.  A

10   student could go to a bar by herself and ask these

11   questions just to get the exercise done.

12             For the men, they were to go up to a strange

13   woman and determine bra cup size, feminine hygiene

14   products, stuff like that.  That kind of stuff, you

15   could probably say, "Okay.  You know, that's

16   embarrassing."  And you could think of more questions,

17   in my opinion, that were more along those lines, where

18   it's embarrassing, it's personal, but it doesn't place

19   either the student or the person being asked those

20   questions in any kind of really unsafe-feeling

21   position.

22             So Chris' argument was, well, breasts and

23   penises aren't inherently sexual.  And, well, it's

24   true, but within our culture, within American culture,

25   in particular, breasts and penises are -- you cannot

Michele Fincher                                    October 14, 2024

Page 47

1    take social context away from parts that are used for

2    reproduction and/or are sexualized in some way.  It's

3    just -- and if you can do it, congratulations to you.

4    In my opinion, you cannot.

5          Q.    So --

6          A.    And I --

7          Q.    Go ahead.  Sorry.

8          A.    I was very uncomfortable telling female

9    students for this class, for this exercise, we are

10   asking you to ask these questions, approach a complete

11   stranger, ask these questions to determine the answers.

12         And it got to the point where I was so

13   uncomfortable with it that I -- prior to that evening,

14   I would go around to all the female students and say,

15   "If you are uncomfortable with this question, you don't

16   have to do it.  Just don't.  If you feel unsafe, don't

17   do it."

18         Q.    Got it.

19         So Mr. Hadnagy did not think it was

20   inappropriate for women to approach strangers and ask

21   about whether their penis was circumcised because

22   penises are not sexual in nature?

23         A.    Correct.

24         ATTORNEY CONRAD:  Object.  Form.

25         Q.    (By Attorney Dean) And Mr. Hadnagy did not

Michele Fincher                                    October 14, 2024

Page 48

1    think it was inappropriate for men to approach women

2    who were strangers and ask about the size of their

3    breasts because breasts are not sexual in nature?

4         A.    Correct.

5              ATTORNEY CONRAD:  Object.  Form.

6         Q.    (By Attorney Dean) And you disagreed with

7    him?

8         A.    I disagreed because I think it is impossible

9    to take social context away from physiology that is

10   very typically associated with sexual activity and

11   harassment.  Can you do it in ways that have nothing to

12   do with sex?  Absolutely.  However, I think the way

13   it's done is difficult.

14              And even if you do it perfectly, if you do it

15   in an environment where there's people and drinking and

16   impairment, even in a hotel bar, you know, even in a

17   restaurant, if someone's had a few drinks, I think it

18   is potentially problematic.  And I felt uncomfortable

19   placing our students in that kind of a situation.

20        Q.    And the students approached you and told you

21   they felt uncomfortable with this, correct?

22              ATTORNEY CONRAD:  Object.  Form.

23        A.    I had students approach me and tell me.  And

24   it had happened so commonly that in my later times of

25   teaching this course, I would just kind of preempt that

Michele Fincher                                October 14, 2024

Page 49

1    by going around to the female students and actually
2    going around to the groups, because I remember there
3    was a group in particular of Muslim men that were
4    uncomfortable speaking with women because that was
5    their religious objection.  And that is the only time
6    that I remember Chris making an exception to those
7    kinds of questions and kind of thinking of
8    alternatives, you know, that they could ask men that
9    they didn't know about whatever, you know.
10          But it was very -- it was a major point of
11    contention with respect to that class, and that was the
12    class that we taught at Black Hat.
13      Q.   (By Attorney Dean) You mentioned that a lot
14    of women expressed their discomfort with these type of
15    questions.
16          Approximately how many of the women students
17    expressed their discomfort about these questions about
18    penises and whether they were circumcised?
19          ATTORNEY CONRAD:  Object.  Form.
20      A.   Probably, we typically had -- I don't know --
21    between 12 and 15 students in a class, and we would
22    probably have usually one or two women.  And I would
23    hear about it almost every class, and I taught a number
24    of classes in the four years that I was there.
25      Q.   (By Attorney Dean) And you approached

Michele Fincher                                    October 14, 2024

Page 50

1   Mr. Hadnagy about these questions?

2        A.   Numerous times, yes.

3        Q.   And Mr. Hadnagy refused to remove them from

4   the course?

5        A.   Correct.  He had developed this course with a

6   professional friend and acquaintance of his who he felt

7   had more experience in this area and, I think, trusted

8   that individual's judgment, which was his prerogative.

9   It was his course.

10       Q.   Understood.

11            You mentioned a few times the Def Con

12  conference.  Do you recall that?

13       A.   Yes.

14       Q.   Did you ever attend any Def Con conferences

15  with Chris?

16       A.   Yes.

17       Q.   Did you ever observe Mr. Hadnagy making

18  anyone feel uncomfortable or intimidated or anything

19  for any students or staff at any of these conferences?

20       A.   Yes.  I would not -- I would not call it --

21  you know, a lot of the harassment that we've spoken

22  about is, you know, sort of what we would call

23  inappropriate harassment associated with gender, but

24  this has more to do with general treatment of

25  individuals.

Michele Fincher                                    October 14, 2024

Page 51

1            And I think it just -- when Mr. Hadnagy is

2    fatigued, which he would -- he would push himself very

3    hard at these conferences and not eating.  He would

4    push the rest of the staff as hard as he would, and so

5    there would be a lot of yelling.  It was just one of

6    those typical boss that screams and yells.

7            And he would often talk about how they didn't

8    need Def Con.  Def Con needed him because our village

9    was so big.  And our village was very, very big.  It

10   was very well attended, but he was of the argument

11   that, you know, the conference needed us way more, so

12   we deserved a bigger space every year.  He would

13   complain to staff pretty vocally.

14           And the staff at Def Con, just like, you

15   know, the staff at SECOM and the other villages, are

16   largely volunteer.  So it's a very large conference.  I

17   think upwards of 20, 25 thousand people attend in sort

18   of a three-, four-day period.  So you can imagine how

19   many people they're trying to support, how many

20   vendors, how many presentations with a limited staff.

21   And they're working within, you know, the hotel

22   constraints as well, how big of a room can we obtain.

23           So it was just -- Chris, every year, felt

24   that we weren't given the treatment that we deserved,

25   you know, that we, quote/unquote, deserved, that they

Michele Fincher                                    October 14, 2024

Page 52

1  needed us more, and they weren't giving us enough

2  attention.  They weren't giving us enough resources.

3  And every year, it was -- I struggled with really

4  feeling embarrassed because I was representing the

5  company, and to have a CEO treating staff and

6  volunteers and people who were there because they loved

7  the conference -- I don't ever recall him treating

8  guests in that fashion.  It had to do more with staff

9  and volunteers at both Def Con and within our company.

10      Q.    Got it.  And that was one point of

11  clarification that I had.

12            When you're saying he's yelling at staff, are

13  you referring to Def Con staff, SEVillage staff, or

14  both?

15      A.    Both.

16      Q.    And did you believe that that was appropriate

17  or inappropriate?

18      A.    I think it was inappropriate because I

19  believe disagreements should be handled professionally,

20  even when you're really tired and angry and hungry.

21      Q.    Do you recall any specific examples of

22  Mr. Hadnagy yelling at the staff at these Def Con

23  conventions?

24      A.    Specifically, no, because, again, it was --

25  it was a fairly regular occurrence.  I can't honestly

Michele Fincher                                          October 14, 2024

Page 54

1           And I think he did come back.  He did come
2    back, but it was probably 10, 15 minutes.  And perhaps
3    that is a better choice than sitting and blowing up at
4    the company, but I just think if you're the CEO of a
5    company, you can handle your anger a little -- a little
6    more appropriately.  And so that was something that
7    happened to the company as a whole in real time.
8           Q.    And did you observe Mr. Hadnagy having
9    difficulties controlling his anger while you were at
10   Social-Engineer?
11          A.    Oh, yes.  Absolutely.
12          Q.    And did you observe a lot of outbursts by
13   Mr. Hadnagy --
14          A.    Yes.
15          Q.    -- as well during that time?
16          A.    Yes.
17          Q.    Was it fairly common to observe these
18   outbursts?
19          A.    Yes.
20          Q.    You also mentioned that sometimes Chris would
21   be a lot of fun too; is that right?
22          A.    Sure.
23          Q.    Would you kind of say it's like a Dr. Jekyll
24   and Mr. Hyde type of situation, or how would you
25   describe, you know, the fun and the outbursts?

Michele Fincher                                    October 14, 2024

Page 81

1      A.    Four years full-time and then, prior to that,
2  a couple months as a contractor.
3      Q.    And in your line of work, do you try and
4  document kind of --
5            ATTORNEY CONRAD:  Well, strike that.
6      Q.    (By Attorney Conrad) What was your role or
7  title at Social-Engineer?
8      A.    Initially, I was called the chief influencing
9  agent because we didn't have very serious business
10 titles when the company was brand new.  I think, as we
11 matured, I was the chief operating officer.  I don't
12 know when that title transitioned.
13     Q.    I'm going to reverse for one second before we
14 talk about Social-Engineer.
15           You mentioned that Ms. Reynolds had reached
16 out to you with Cat Fincher; is that right?  Sorry.
17     A.    Cat Murdock.
18     Q.    Cat Murdock?
19     A.    Correct.
20     Q.    About when did Ms. Reynolds first reach out
21 to you?
22     A.    It would have been prior to that group call,
23 and it was more to see if I would be willing to be one
24 of the people that spoke to Def Con about the
25 occurrences.  And so I imagine it was probably around

```
1                   C E R T I F I C A T E

2       UNITED STATES      )
                           )
3       DISTRICT COURT     )

4
                I, a Reporter and Washington Certified Court
5       Reporter, hereby certify that the foregoing videotaped
        videoconference deposition upon oral examination of
6       Michele Fincher was taken stenographically before me on
        October 14, 2024, and transcribed under my direction;

7
                That the witness was duly sworn by me
8       pursuant to RCW 5.28.010 to testify truthfully; that
        the transcript of the deposition is a full, true and
9       correct transcript to the best of my ability; that I am
        neither attorney for nor a relative or employee of any
10      of the parties to the action or any attorney or counsel
        employed by the parties hereto nor financially
11      interested in its outcome.

12              I further certify that in accordance with
        Washington Court Rule 30(e) the witness is given the
13      opportunity to examine, read and sign the deposition
        within thirty days upon its completion and submission
14      unless waiver of signature was indicated in the record.

15              IN WITNESS WHEREOF, I have hereunto set my
        hand this 18th day of October, 2024.

16

17

18      Douglas Armstrong, RPR

19      _____

20      Washington Certified Court Reporter No. 3444
        License expires 11/26/2025

21

22

23

24

25
```

# Exhibit 21

THE HONORABLE BRIAN A. TSUCHIDA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHRISTOPHER J. HADNAGY, an
individual; and SOCIAL-ENGINEER,
LLC, a Pennsylvania limited liability
company,

                Plaintiffs,

     v.

JEFF MOSS, an individual; DEF CON
COMMUNICATIONS, INC., a Washington
corporation; and DOES 1-10; and ROE
ENTITIES 1-10, inclusive,

                Defendants.

No. 2:23-cv-01932-BAT

**PLAINTIFFS' RESPONSES TO
DEFENDANT DEF CON
COMMUNICATIONS, INC.'S FIRST SET
OF DISCOVERY**

TO:      Jeff Moss and Def Con Communications, Inc., Defendants; and

AND TO:     David A. Perez, Matthew J. Mertens, Lauren A. Trambley, and Perkins Coie LLP,

Defendants' Attorneys; and

### GENERAL OBJECTIONS

     1.     Plaintiffs object to any definitions and instructions to the extent they are vague,

ambiguous, overly broad, unduly burdensome, or exceed the usual and ordinary meaning of the

words defined therein or are beyond the permissible scope of discovery as set forth in the

applicable Federal Rules of Civil Procedure.

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 1

**FREY BUCK**
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

1    2.    Plaintiffs object generally to the term "relating to" as overly broad, vague,

2  ambiguous, not reasonably calculated to the lead to the discovery of admissible evidence, and to

3  the extent its interpretation would require subjective judgment on the part of Plaintiffs or a

4  conclusion or opinion of counsel in violation of the attorney work product doctrine.

5    3.    Plaintiffs object to each discovery request to the extent it seeks information

6  protected from discovery by the attorney-client privilege or attorney work product doctrine,

7  information protected from discovery by any other applicable privileges, or information which is

8  otherwise immune from discovery.

9    4.    Plaintiffs object to each discovery request to the extent that it is not limited to a

10  relevant or reasonable period of time or the time period at issue on the grounds that it is overly

11  broad, unduly burdensome, vague, ambiguous and harassing, in that it is neither relevant nor

12  reasonably calculated to lead to the discovery of admissible evidence.

13    5.    Plaintiffs object to each discovery request to the extent it seeks information already

14  in the public domain, already in Defendant's possession, custody or control, or equally available

15  to Defendant.

16    6.    Plaintiffs object to each discovery request to the extent it seeks information either

17  irrelevant to this action or not reasonably calculated to lead to the discovery of admissible

18  evidence.

19    7.    Plaintiffs object to each discovery request, or portion thereof, that is overly broad,

20  vague, ambiguous, unduly burdensome, harassing, unreasonably cumulative or duplicative, or that

21  may be obtained from some other source that is more convenient, less burdensome, or less

22  expensive.

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 2

FREY BUCK
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL  206.486.8000  FAX  206.902.9660

8.    Plaintiffs object to each discovery request to the extent it seeks documents regarding the identity of facts known or opinions held by non-testifying experts retained by Plaintiffs in anticipation of litigation in violation of the applicable Rules of Civil Procedure.

9.    Each of these general objections are hereby specifically incorporated into each of the specific answers set forth below.

DISCOVERY REQUESTS

**REQUESTS FOR ADMISSION**

**REQUEST FOR ADMISSION NO. 1:**  Admit that DEF CON can decide, as a private actor, to disinvite any PERSON from the annual DEF CON conference.

**RESPONSE:** Plaintiffs admit that Def Con can, within the strictures of the law, choose persons to invite or disinvite to the annual Def Con conference.

**REQUEST FOR ADMISSION NO. 2:**  Admit that YOU have no contract with DEF CON.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 3:** Admit that YOU have no legal or contractual right to attend the annual DEF CON conference.

**RESPONSE:** Plaintiffs object that this request for admission is vague and ambiguous as to the terms "legal or contractual right." Subject to and without waiving the foregoing objects, Plaintiffs admit that Def Con can, within the strictures of the law, choose persons to invite or disinvite to the annual Def Con conference.

**REQUEST FOR ADMISSION NO. 4:** Admit that the TRANSPARENCY REPORT does not contain statements RELATING TO sexual misconduct.

**RESPONSE:** Plaintiffs object to this request for admission on the grounds that the terms "sexual misconduct" and "relating to" are vague and ambiguous. Subject to and without waiving these objections, Plaintiffs cannot admit or deny whether Def Con's transparency report relates to

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 3

FREY BUCK
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL  206.486.8000   FAX  206.902.9660

1  sexual misconduct because Def Con has not fully responded to Plaintiffs' discovery requests and

2  has not fully informed Plaintiffs of the nature and extent of the allegations that led to the

3  transparency report. Furthermore, given the manner and circumstances in which Defendants

4  posted the transparency report, they certainly presented it as if it related to sexual misconduct, as

5  evidenced by numerous reactions to the report.

6  **REQUEST FOR ADMISSION NO. 5:** Admit that YOU violated DEF CON's Code of

7  Conduct by making offensive, threatening, harassing and/or disparaging remarks to PERSONS.

8  **RESPONSE:** Plaintiffs object to this request for admission as vague and ambiguous.

9  Subject to and without waiving the foregoing objects, Plaintiffs deny.

10  **REQUEST FOR ADMISSION NO. 6:** Admit that YOUR materials for an advanced

11  social engineering seminar required male participants to elicit information from women

12  regarding pubic hair.

13  **RESPONSE:** Deny.

14  **REQUEST FOR ADMISSION NO. 7:** Admit that YOUR materials for an advanced

15  social engineering seminar required female participants to elicit information from men regarding

16  penis size and circumcision.

17  **RESPONSE:** Plaintiffs admit the following: Plaintiff Social Engineer is hired by

18  companies to uncover vulnerabilities from outside attackers, define risks, and provide education

19  and remediation. Threats to information security often focus on a company's employees.

20  Plaintiffs are hired to test the integrity of a company's security systems by attempting to obtain

21  private and sensitive information such as SSNs, DOBs, and passwords from employees, and then

22  provide feedback and remedial steps to the company. Plaintiffs also offer courses and seminars,

23  in conjunction with an FBI agent, on how a potential attacker might elicit private information

24  from a subject in a nonthreatening and unassuming manner. These courses and seminars have

25  been taught to US SOCOM, US Army, Navy, Air Force, MI5, MI6, SAS, GCHQ, the HUMINT

26  sector of the Swedish Military, and US embassies worldwide via the State Department. One such

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 4

**FREY BUCK**
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

course, now called Foundational Application of Social Engineering (formerly Advanced Practical Social Engineering), is designed to teach participants how to use the art of elicitation to obtain sensitive details without using sexual, threatening, or damaging pretexts, while maintaining a high code of ethics. This class was first launched in 2010.

Within this context, Plaintiffs admit that female students of the course were asked to try to gain a subject's private information on numerous topics, including thoughts on circumcision, boxers or briefs, weight control products, birth control choices, and salary. For example, a student would start a conversation by mentioning a recent argument with their significant other about whether to circumcise their child. The student would then ask the subject how to resolve the argument and their thoughts on circumcision, thereby illustrating how someone might inadvertently provide private information to an attacker. Plaintiffs did not require female participants to elicit information about penis size.

**REQUEST FOR ADMISSION NO. 8:** Admit that YOU selected a PERSON to compete in a social engineering challenge at YOUR VILLAGE because "she's Asian, she's hot, she's in."

**RESPONSE:** Deny.

**REQUEST FOR ADMISSION NO. 9:** Admit that YOU called Neil Wyler a "pedophile" at the DEF CON event.

**RESPONSE:** Deny.

**REQUEST FOR ADMISSION NO. 10:** Admit that YOU made derogatory comments about women's appearances during YOUR VILLAGE at the DEF CON event.

**RESPONSE:** Plaintiffs object to this request for admission on the grounds that it is vague and ambiguous as to the term "derogatory comment." Without waving this objection, Plaintiffs deny.

**REQUEST FOR ADMISSION NO. 11:** Admit that YOU refused to use a PERSON's correct pronouns during a seminar.

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 5

**FREY BUCK**
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

1    **RESPONSE:** Deny.

2    **REQUEST FOR ADMISSION NO. 12:** Admit that YOU threw a cellphone at an

3    employee of SOCIAL ENGINEER.

4    **RESPONSE:** Deny.

5    **REQUEST FOR ADMISSION NO. 13:** Admit that on or about March 2021, YOU sent

6    a pornographic image of an underage girl to REYNOLDS and asked REYNOLDS how old she

7    thought the girl was.

8    **RESPONSE:** Deny.

9    **REQUEST FOR ADMISSION NO. 14:** Admit that on or about July 2021,

10   REYNOLDS took two weeks of unpaid leave from SOCIAL-ENGINEER to take care of her

11   ailing father in Scotland.

12   **RESPONSE:** Deny.

13   **REQUEST FOR ADMISSION NO. 15:** Admit that after REYNOLDS left SOCIAL-

14   ENGINEER on August 5, 2021, YOU contacted REYNOLDS's father in Scotland to ask him if

15   he was sick and if REYNOLDS had been taking care of him during her unpaid leave.

16   **RESPONSE:** Deny.

17   **REQUEST FOR ADMISSION NO. 16:** Admit that on or about August 10, 2021, YOU

18   contacted Jack Rhysder from the Darknet Diaries to cancel the podcast episode recorded with

19   REYNOLDS regarding the BOOK.

20   **RESPONSE:** Plaintiffs admit to contacting Jack Rhysder after discovering that Reynolds

21   had illegally used a photograph from an active FBI investigation in her book. Plaintiffs deny the

22   remainder of this request.

23   **REQUEST FOR ADMISSION NO. 17:** Admit that on or about August 11, 2021, YOU

24   contacted a television producer who had expressed interest in optioning the BOOK to prevent the

25   optioning of the BOOK.

26

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 6

**FREY BUCK**
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

1    **RESPONSE:** Plaintiffs admit to contacting a television producer after discovering that

2    Reynolds had illegally used a photograph from an active FBI investigation in her book and

3    breached her employment contract. Plaintiffs deny the remainder of this request.

4    **REQUEST FOR ADMISSION NO. 18:** Admit that on or about August 23, 2021, you

5    contacted the BOOK's publisher to attempt to prevent the BOOK's publication.

6    **RESPONSE:** Plaintiffs admit that on or about August 23, 2021, Hadnagy contacted the

7    book publisher to inform them that an illegal picture was in the book which needed to be

8    removed because it was part of an ongoing criminal federal investigation and case. Plaintiffs

9    otherwise deny this request.

10    **REQUEST FOR ADMISSION NO. 19:** Admit that on or about August 26, 2021, YOU

11    had a telephone conversation with Neil Wyler in which YOU confirmed YOUR behavior

12    towards REYNOLDS in Requests For Admission Nos. 15-19 and told Wyler YOU would leave

13    REYNOLDS alone.

14    **RESPONSE:** Plaintiffs admit that in August 2021, Plaintiff Hadnagy had a telephone

15    conversation with Neil Wyler but denies the reminder of the request.

16    **REQUEST FOR ADMISSION NO. 20:** Admit that on or about August 30, 2021,

17    SOCIAL-ENGINEER remotely locked REYNOLDS's personal computer that she had purchased

18    with her personal funds.

19    **RESPONSE:** Plaintiffs admit that they locked a computer that was in Reynolds

20    possession because Plaintiffs had purchased the laptop from Reynolds as a condition of

21    Reynold's employment and the computer contained confidential corporate data thereon which

22    Reynold's refused to erase or return. Plaintiffs deny the reminder of the request.

23    **REQUEST FOR ADMISSION NO. 21:** Admit that on or about September 2021,

24    SOCIAL-ENGINEER threatened to report REYNOLDS to the FBI.

25

26

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 7

FREY BUCK
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

1    **RESPONSE:** Plaintiffs admit that they considered reporting Reynolds to the FBI

2    because she possessed illegal photographs which were part of an FBI investigation and refused to

3    remove them from her book. Plaintiffs deny the reminder of the request.

4        **REQUEST FOR ADMISSION NO. 22:** Admit that YOU told PERSONS in the

5    information security community that REYNOLDS stole intellectual property from YOU.

6        **RESPONSE:** Plaintiffs admit that they told persons that they had pulled all support for

7    Reynold's book because she tried to steal intellectual property, clients, and illegally use

8    photographs. Plaintiffs deny the reminder of the request.

9        **REQUEST FOR ADMISSION NO. 23:** Admit that YOU told PERSONS in the

10   information security community that REYNOLDS stole clients from YOU.

11       **RESPONSE:** Plaintiffs admit that they told persons that Reynold tried to steal clients.

12       **REQUEST FOR ADMISSION NO. 24:** Admit that YOU did not commence any civil,

13   regulatory, or criminal action against REYNOLDS for her alleged theft from YOU and/or

14   SOCIAL-ENGINEER.

15       **RESPONSE:** Plaintiffs admit that they did not commence any civil, regulatory, or

16   criminal action against Reynolds because she was unsuccessful in her attempts.

17       **REQUEST FOR ADMISSION NO. 25:** Admit that on or about January 7, 2022, YOU

18   contacted DEF CON and told DEF CON that YOU would not provide the VILLAGE at Def Con

19   30.

20       **RESPONSE:** Admit.

21       **REQUEST FOR ADMISSION NO. 26:** Admit that Neil Wyler told YOU that YOUR

22   behavior towards REYNOLDS was not acceptable before the TRANSPARENCY REPORT was

23   posted.

24       **RESPONSE:** Plaintiffs object that this request for admission is vague and ambiguous as

25   to the terms "not acceptable." Subject to and without waiving this objection, Plaintiffs deny this

26   request.

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 8

**FREY BUCK**
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

1   **REQUEST FOR ADMISSION NO. 27:** Admit that YOU told Neil Wyler that YOU

2   would leave REYNOLDS alone but YOUR behavior toward REYNOLDS did not stop.

3   **RESPONSE:** Plaintiffs object that this request for admission is vague and ambiguous as

4   to the term "behavior." Subject to and without waiving this objection, Plaintiffs deny this

5   request.

6   **REQUEST FOR ADMISSION NO. 28:** Admit that DEF CON tried to set up a phone

7   call with YOU before the TRANSPARENCY REPORT was posted.

8   **RESPONSE:** Admit.

9   **REQUEST FOR ADMISSION NO. 29:** Admit that YOU declined DEF CON's

10  invitation for a phone call before the TRANSPARENCY REPORT was posted.

11  **RESPONSE:** Plaintiffs admit that Jeff Moss invited Plaintiffs for a phone call before the

12  transparency report was posted. Plaintiffs deny that they "declined" Def Con's invitation.

13  **REQUEST FOR ADMISSION NO. 30:** Admit that YOU did not allow employees of

14  SOCIAL-ENGINEER to take bathroom breaks at the DEF CON event.

15  **RESPONSE:** Deny.

16  **REQUEST FOR ADMISSION NO. 31:** Admit that YOU shouted at employees of

17  SOCIAL-ENGINEER at the DEF CON event.

18  **RESPONSE:** Plaintiffs object to the term "shouted" as vague and ambiguous.  Plaintiffs

19  admit that Hadnagy may have raised his voice to employees during the Def Con event.

20  **REQUEST FOR ADMISSION NO. 32:** Admit that YOU threatened to fire employees

21  of SOCIAL-ENGINEER at the DEF CON event.

22  **RESPONSE:** Deny.

23  **REQUEST FOR ADMISSION NO. 33:** Admit that YOU publicly denied the Holocaust

24  occurred.

25  **RESPONSE:** Deny.

26
PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 9

1    **REQUEST FOR ADMISSION NO. 34**: Admit that on or about October 2021, YOU

2    told a female Innocent Lives Foundation ("ILF") volunteer that her "figure has really filled out"

3    and she "finally looks her age" while on a one-on-one work trip.

4    **RESPONSE**: Deny.

5    **REQUEST FOR ADMISSION NO. 35**: Admit that on or about October 2021, YOU

6    told the same female ILF volunteer referenced in Request for Admission ("RFA") No. 34 that

7    YOU allowed REYNOLDS to take family-related leave in July 2021 because REYNOLDS "is

8    so hot when she cries."

9    **RESPONSE**: Deny.

10    **REQUEST FOR ADMISSION NO. 36**: Admit that on or about October 2021, YOU

11    kissed the same female ILF volunteer referenced in RFA No. 34 on her forehead outside her

12    hotel room door without consent.

13    **RESPONSE**: Deny.

14    **REQUEST FOR ADMISSION NO. 37**: Admit that YOU planned an ostensible child

15    sex predator sting with the same female ILF volunteer referenced in RFA No. 34 in which you

16    asked her to pose for nude or near-nude photographs.

17    **RESPONSE**: Deny.

18    **REQUEST FOR ADMISSION NO. 38**: Admit that as part of the ostensible child sex

19    predator sting referred to in RFA No. 37, YOU sent the same female ILF volunteer referenced in

20    RFA No. 34 a Google document asking her (1) when she first got her period; (2) when she first

21    started getting pubic hair; (3) when she first started shaving her pubic hair; (4) what her cup size

22    was; and (5) when she first started developing breasts.

23    **RESPONSE**: Plaintiffs admit that, as part of an operation against child sex predators

24    called "Operation Unicorn," they were required to answer general questions related to female

25    development to gain access to a pedophile support community, enabling ILF to gather leads for

26    building cases for law enforcement. ILF partners with law enforcement to geo-locate individuals

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 10

**FREY BUCK**
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

1  who traffic children and create child abuse material. The document referenced in this request is

2  attached in response to RFP 46. Plaintiffs deny the remainder of this request.

3  **REQUEST FOR ADMISSION NO. 39:** Admit that as part of the ostensible child sex

4  predator sting referred to in RFA No. 37, YOU asked the same female ILF volunteer referenced

5  in RFA No. 34 to go shopping for items to buy and wear to look underage.

6  **RESPONSE:** Deny.

7  **REQUEST FOR ADMISSION NO. 40:** Admit that after engaging in the behaviors

8  described in RFA Nos. 37-39, the ostensible child sex predator sting never happened.

9  **RESPONSE:** Plaintiffs admit that Operation Unicorn did not move forward. Plaintiffs

10  deny the reminder of this request.

11  **REQUEST FOR ADMISSION NO. 41:** Admit that YOU used ILF volunteers and

12  resources to investigate REYNOLDS.

13  **RESPONSE:** Deny.

14  **REQUEST FOR ADMISSION NO. 42:** Admit that YOU gave Michele Fincher the

15  nickname "Sultry Asian."

16  **RESPONSE:** Deny.

17  **REQUEST FOR ADMISSION NO. 43:** Admit that YOU and/or SOCIAL ENGINEER

18  did not host a village at DEF CON in 2020, also known as "Def Con 28."

19  **RESPONSE:** Deny.

20

21

22

23

24

25

26

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 11

## **INTERROGATORIES**

**INTERROGATORY NO. 1:**  IDENTIFY each statement by DEF CON that YOU contend defamed YOU or was libelous. In YOUR response, please identify the speaker for each alleged defamatory statement, the date on which the statement was made, and the forum through which it was made.

**RESPONSE:** Plaintiffs also invokes FRCP 33(d) and refers Defendants to the documents produced in response to RFP 5.  Additionally, Def Con posted a defamatory transparency report on or about February 9, 2022, and then again on or about January 13, 2023. However, Defendants have not produced all responsive documents or answers to Plaintiffs' discovery requests, therefore, the extent to which Defendants continued to spread false and defamatory statements is unknown. Discovery is ongoing and this response may be supplemented.

**INTERROGATORY NO. 2:**  IDENTIFY each statement by MOSS that YOU contend defamed YOU or was libelous. In YOUR response, please identify the speaker for each alleged defamatory statement, the date on which the statement was made, and the forum through which it was made.

**RESPONSE:** See Plaintiffs' response to ROG 1. Plaintiffs also invokes FRCP 33(d) and refers Defendants to the documents produced in response to RFP 5.  Moss has also continued to spread the defamatory statements through posts Reddit:

https://www.reddit.com/r/Defcon/comments/18x80ic/chris_hadnagy_sues_def_con_again_lawsuit_update/

However, the extent to which Moss has continued to spread these false statements is unknown because Moss failed to produce all responsive documents and complete answers in response to Plaintiffs' discovery requests which specifically sought this type of information. Discovery is ongoing and this response may be supplemented.

**INTERROGATORY NO. 3:**  IDENTIFY each PERSON that you allege cancelled or terminated a contract with YOU as a result of any allegedly defamatory or libelous comments

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 12

FREY BUCK
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

from DEF CON or MOSS.  In YOUR response, IDENTIFY the person, date of contract formation, and the date of termination.

**RESPONSE:**

Plaintiffs designate this response as CONFIDENTIAL and subject to the parties' protective order, and respond as follows:



**INTERROGATORY NO. 4:**  IDENTIFY each PERSON that cancelled or terminated a contract with SOCIAL-ENGINEER as a result of any allegedly defamatory or libelous comments from DEF CON or MOSS. In YOUR response, IDENTIFY the person, date of contract formation, and the date of termination.

**RESPONSE:** Plaintiffs designate this response as CONFIDENTIAL and subject to the parties' protective order and respond as follows:  See Plaintiffs' response to ROG 3.

**INTERROGATORY NO. 5:**  IDENTIFY each contract YOU expected to execute that supports YOUR allegations in Paragraphs 114–158 of YOUR COMPLAINT.

**RESPONSE:**

Plaintiffs designate this response as CONFIDENTIAL and subject to the parties' protective order, and respond as follows:

PLAINT
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 13



**INTERROGATORY NO. 6:** IDENTIFY each PERSON with whom YOU talked regarding the TRANSPARENCY REPORT.

**RESPONSE:** Plaintiffs objects to this Interrogatory because it seeks attorney client privileged information and/or information protected by work product, is overbroad and not likely to lead to the discovery of relevant information. Subject to and without waiving the foregoing objection, Plaintiffs identify the following people: Neil Wyler, Ryan MacDougall, Shane McCombs, Wayne Ronaldson, Natasha Coy, Areesa Hadnagy, Colin Hadnagy, Amaya Hadnagy, Kaz Nishi, Jason Kozak, Rosa Rowles, Shelby Dacko, Amanda Marchuck, Karen Bender, Abbie Marono, Carter Zupancich, Josten Pena, Shane McCombs, John M McCombs, Erin Maloney, Samantha Gamble, Mandy Cox, Dr. Lydia Kostopoulos Friend, Dave Kennedy. Discovery is still ongoing, and Plaintiffs reserve the right to amend or supplemental its response.

**INTERROGATORY NO. 7:** IDENTIFY each username, handle, screen name, account name, profile name, or any other online persona that YOU have used to post statements on the Internet, whether posted publicly or sent privately, and whether YOU created the account or not, from January 1, 2015, through the date of YOUR written response. In YOUR answer, please link each username with the forum on which you posted (e.g., Facebook, LinkedIn, X (formerly Twitter), Instagram, etc.).

**RESPONSE:** Plaintiffs object to this Interrogatory on the grounds that it is overbroad and not reasonably tailored to Def Con's legitimate discovery needs, seeking discovery that is neither relevant to the subject matter involved in this action nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further object that the temporal scope of this

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 14

**FREY BUCK**
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000   FAX 206.902.9660

1    Interrogatory is overbroad. Subject to and without waiving the foregoing objection, Plaintiffs
2    identify the following account information:

3      •    https://x.com/humanhacker
4      •    https://www.linkedin.com/in/christopherhadnagy/
5      •    https://www.facebook.com/chris.hsomething
6      •    https://www.youtube.com/SocialEngineerOrg
7      •    https://www.instagram.com/socialengineerllc/
8      •    https://www.linkedin.com/company/2819532/admin/feed/posts/
9      •    https://twitter.com/SocEngineerInc
10     •    https://www.facebook.com/socialengineerllc

11         Discovery is still ongoing, and Plaintiffs reserve its right to amend or supplemental its
12    response.

13         **INTERROGATORY NO. 8:** Do YOU contend that YOU have a right or entitlement to
14    attend the DEF CON event? If so, identify the basis for YOUR contention.

15         **RESPONSE:** Plaintiffs object to this Interrogatory on the grounds that it is overbroad
16    and not reasonably tailored to Def Con's legitimate discovery needs, seeking discovery that is
17    neither relevant to the subject matter involved in this action nor reasonably calculated to lead to
18    the discovery of admissible evidence. Plaintiffs further object that the phrase "have the right or
19    entitlement" is vague and ambiguous. Subject to and without waiving the foregoing objection,
20    Plaintiffs respond as follows: Plaintiffs does not contend that they had the "right or entitlement to
21    attend Def Con" but they do have the right to be free from defamatory statements made and
22    published by Defendants.

23         **INTERROGATORY NO. 9:**  IDENTIFY each PERSON that YOU allege "banned" or
24    "blacklisted" YOU because of DEF CON's alleged wrongful conduct.

25         **RESPONSE:** Plaintiffs object that his request is vague and ambiguous. Without waiving
26    the foregoing objection, Plaintiffs respond as follows: See Plaintiffs' responses to ROG 3, 4, and

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 15

FREY BUCK
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

1   5. Further, Plaintiffs are still determining the extent to which they were injured by Defendants

2   defamatory statements. For example, Plaintiffs are still being told by people that they cannot be

3   associated with Plaintiffs because of Defendants' defamatory statements. Discovery is ongoing

4   and Plaintiffs will supplemental this response.

5

6       **INTERROGATORY NO. 10:**  From 2015 to the present, IDENTIFY whether YOU

7   have sought and/or received medical diagnosis, treatment, or any other services for any mental or

8   emotional illness or condition, addiction to a controlled substance, and/or emotional distress

9   from any medical provider or other health care provider, and identify those providers by name,

10  the date(s) when YOU sought and/or received such treatment(s), and the physician and/or health

11  care provider who rendered an opinion respecting the nature and extent of the injuries,

12  conditions, and disabilities; and describe the opinion, diagnosis and/or treatment rendered by

13  such health care provider.

14      **RESPONSE:**  Plaintiffs object to this Interrogatory on the grounds that it is overbroad

15  and not reasonably tailored to Def Con's legitimate discovery needs, seeking discovery that is

16  neither relevant to the subject matter involved in this action nor reasonably calculated to lead to

17  the discovery of admissible evidence. Plaintiffs further object that the temporal scope of this

18  Interrogatory is overbroad. Without waiving the foregoing objection, Plaintiffs designate this

19  response as CONFIDENTIAL and subject to the parties' protective order and respond as

20  follows: ███████████████████████████████████████

21  ████████████████████████████████████████████

22  ████████████████████████████████████████████

23  █████████████████████████████████████████████

24  ████████████████████████████████████████████

25  ████████████████████████████████████████████

26

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 16

**FREY BUCK**
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

1  ████████████████████████████████████████████████████

2  ██████

3  **INTERROGATORY NO. 11:** Describe with particularity YOUR work history and

4  sources of income over the past five years, including current employers, customers, clients, or

5  contractees. In YOUR answer, please identify the employer, customers, clients, or contractee, the

6  dates of employment or contracts, the reasons for departure or termination of the relationship,

7  and include salary and compensation history for each job or contract.

8  **RESPONSE:**  Plaintiffs object to this Interrogatory on the grounds that it is overbroad.

9  Without waiving the foregoing objection, Plaintiffs designate this response as CONFIDENTIAL

10  and subject to the parties' protective order, and respond follows:

11  Plaintiff Hadnagy has worked for Social-Engineer, LLC since 2010. His salary for the

12  past five years is as follows:

13  • 2019: ████

14  • 2020: █████

15  • 2021: █████

16  • 2022: ████

17  • 2023: ████

18  Plaintiff Hadnagy also began teaching as an adjunct Professor of Social Engineering at

19  the University of Arizona in 2021, earning ████ per semester. He has not taught in 2024.

20  Additionally, since 2010, Plaintiff Hadnagy has written books every 2-3 years and given

21  paid speeches on those book topics. His income for this work is as follows:

22  • ████████████████

23  ▌ ████████████████████████

24  ▌ ███████████████████████████

25  ▌ ███████████████████████████

26  • 2023: Wiley: $24,794.06 Harpers Collins: $0

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 17

1    **INTERROGATORY NO. 12:** IDENTIFY each PERSON by name, e-mail address, and

2    phone number, whom YOU have sued or threatened to sue since January 2014.  If a lawsuit was

3    filed, please also include the case number and the jurisdiction.

4    **RESPONSE:**  Plaintiffs object to this Interrogatory on the grounds that it is overbroad

5    and not reasonably tailored to Def Con's legitimate discovery needs, seeking discovery that is

6    neither relevant to the subject matter involved in this action nor reasonably calculated to lead to

7    the discovery of admissible evidence. Plaintiffs further object that the temporal scope of this

8    Interrogatory is overbroad. Subject to and without waiving the foregoing objection, Plaintiffs

9    respond as follows: Jeff Moss, Def Con. Plaintiffs further response that it wrote a cease-and-

10   desist letter to Constance Murdock.

11   **INTERROGATORY NO. 13:**  Explain the basis for any answer to a Request for

12   Admission propounded on YOU in this litigation that is not an unequivocal admission.

13   **RESPONSE:**  Plaintiffs object to this Interrogatory on the grounds that it is overbroad

14   and not reasonably tailored to Def Con's legitimate discovery needs, seeking discovery that is

15   neither relevant to the subject matter involved in this action nor reasonably calculated to lead to

16   the discovery of admissible evidence. Subject to and without waiving the foregoing objection,

17   Plaintiffs respond as follows: Plaintiffs denied an RFA because it did not contain true statements,

18   and the substance of the request was false. Plaintiffs qualified an admission of an RFA because

19   only part of the request was accurate. Plaintiffs then articulated the accurate portions while

20   denying the remainder as false or inaccurate.

21   **INTERROGATORY NO. 14:** IDENTIFY each and every source of YOUR and/or

22   SOCIAL-ENGINEER's alleged damages, including the specific contracts breached, the specific

23   business opportunities lost, the specific harms to YOUR and/or SOCIAL-ENGINEER's

24   reputations, the specific amounts of damages you are seeking under Paragraph 118 and 119 of

25   YOUR COMPLAINT, and the documents that YOU and/or SOCIAL-ENGINEER contend

26   support these alleged damages.

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 18

**FREY BUCK**
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

**RESPONSE:** Plaintiffs object to this Interrogatory as compound and to the extent that it seeks attorney client privileged information and/or information protected by work product. See Plaintiffs' response to ROG 3, 4, and 5. Plaintiffs will supplemental this response and provide expert witness opinions on the extent of damages at the time and in the format required by any case management order that may be entered.

**INTERROGATORY NO. 15:** IDENTIFY every PERSON that has complained about YOU at a conference, including without limitation, the DEF CON event, Derby Con, and Black Hat.

**RESPONSE:**  Plaintiffs object that the term "complained" is vague and ambiguous. Plaintiffs also object to this Interrogatory on the grounds that it is overbroad and not reasonably tailored to Def Con's legitimate discovery needs, seeking discovery that is neither relevant to the subject matter involved in this action nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further object that the temporal scope of this Interrogatory is overbroad. Subject to and without waiving the foregoing objection, Plaintiffs respond as follows: In 2018, Plaintiffs were informed, during the Black Hat conference, about an anonymous complaint from someone who overheard a homework assignment, which requested personal information and found it upsetting. In response, Plaintiffs changed the homework assignment. Plaintiffs are also aware of allegations of discrimination based on either race, disability, and/or gender. However, neither the names of the complainants nor the specifics of the allegations were ever shared with Plaintiffs. Based on the nature and timing of these allegations and comments from Black Hat representatives, Plaintiffs reasonably believe that Black Hat received these allegations from Def Con and/or Jeff Moss.

**INTERROGATORY NO. 16:** IDENTIFY every PERSON that has complained about YOU at a training or seminar, including without limitation, information security trainings and/or seminars offered by SOCIAL-ENGINEER.

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 19

**FREY BUCK**
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

1       **RESPONSE:** Plaintiffs object that the term "complained" is vague and ambiguous.

2 Plaintiffs also object to this Interrogatory on the grounds that it is overbroad and not reasonably

3 tailored to Def Con's legitimate discovery needs, seeking discovery that is neither relevant to the

4 subject matter involved in this action nor reasonably calculated to lead to the discovery of

5 admissible evidence. Plaintiffs further object that the temporal scope of this Interrogatory is

6 overbroad. Subject to and without waiving the foregoing objection, Plaintiffs respond as follows:

7       Plaintiffs are aware that Shaf Patel, who is blind or visually impaired, complained about

8 the training in Bristol, UK, alleging that the seminar was not accommodating to individuals with

9 visual impairments. The seminar includes instruction on facial expressions and body language,

10 which is not suitable for someone who cannot see. Despite this, Plaintiffs made every attempt to

11 accommodate Mr. Patel during the course and eventually refunded his money for the seminar.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 20

**FREY BUCK**
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL  206.486.8000   FAX  206.902.9660

1          **REQUESTS FOR PRODUCTION OF DOCUMENTS**

2          **REQUEST FOR PRODUCTION NO. 1:** All DOCUMENTS and

3   COMMUNICATIONS between YOU and DEF CON from January 1, 2019, to the present

4   RELATING TO the DEF CON conference.

5          **RESPONSE:** See SE_000001 – 000109.

6          **REQUEST FOR PRODUCTION NO. 2:** All DOCUMENTS and

7   COMMUNICATIONS between YOU and JEFF MOSS from January 1, 2019, to the present

8   regarding the DEF CON conference.

9          **RESPONSE:** See response to RFP 1.

10          **REQUEST FOR PRODUCTION NO. 3:** All DOCUMENTS and

11   COMMUNICATIONS between YOU and BLACK HAT regarding (1) YOUR and/or SOCIAL-

12   ENGINEER's contracts with BLACK HAT; and (2) BLACK HAT's investigation of YOU.

13          **RESPONSE:** See SE_000110 – 000119.

14          **REQUEST FOR PRODUCTION NO. 4:** All DOCUMENTS and

15   COMMUNICATIONS between YOU and NEIL WYLER from January 1, 2019, to the present

16   RELATING TO (1) the DEF CON conference; and (2) REYNOLDS.

17          **RESPONSE:** See SE_000120 – 000139.

18          **REQUEST FOR PRODUCTION NO. 5:** All DOCUMENTS and

19   COMMUNICATIONS RELATING TO YOUR claim of defamation or libel.

20          **RESPONSE:** Plaintiffs objects to this Request on the grounds that it is vague,

21   ambiguous, seeks information protected by attorney client or work product privilege, overbroad,

22   and unduly burdensome. Subject to and without waiving the foregoing objection, see SE_000140

23   - 000146. Discovery is ongoing. Plaintiffs will supplement this response and produce responsive,

24   non-privileged documents in their possession, custody, or control that are located after

25   continuing to conduct a diligent search and reasonable inquiry.

26

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 21

**FREY BUCK**
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

Error! Unknown document property name.

1   **REQUEST FOR PRODUCTION NO. 6:** All DOCUMENTS and
2   COMMUNICATIONS RELATING TO YOUR alleged damages.

3   **RESPONSE:** Plaintiffs objects to this Request to the extent that it seeks attorney client
4   or work product information. Subject to and without waiving the forgoing objection, see
5   $SE\_000147 - 000297$. Discovery is ongoing. Plaintiffs will supplement this response and
6   produce responsive, non-privileged documents in their possession, custody, or control that are
7   located after continuing to conduct a diligent search and reasonable inquiry.

8   **REQUEST FOR PRODUCTION NO. 7:** All DOCUMENTS and
9   COMMUNICATIONS RELATING TO YOUR allegation that "certain high-profile clientele . . .
10  have refused to do business with" YOU.

11  **RESPONSE:** See response to RFP 6.

12  **REQUEST FOR PRODUCTION NO. 8:** All DOCUMENTS and
13  COMMUNICATIONS RELATING TO YOUR allegation that YOU were "made aware that
14  Defendant Moss was considering false and disparaging allegations level against" YOU "by a third
15  party."

16  **RESPONSE:** See response to RFP 1, 2 & 4.

17  **REQUEST FOR PRODUCTION NO. 9:** All DOCUMENTS and
18  COMMUNICATIONS RELATING TO YOUR allegation that YOU "attempted to schedule a
19  meeting to discuss said false allegations with Defendant Moss via text message; however,
20  Defendant Moss never granted" YOU.

21  **RESPONSE:** See response to RFP 1.

22  **REQUEST FOR PRODUCTION NO. 10:** All DOCUMENTS and
23  COMMUNICATIONS RELATING TO YOUR allegation that YOU "continued to attempt to
24  confer with Defendant Moss via text message regarding the false allegations up through January
25  of 2022; however, Defendant Moss never held a meeting with [YOU] regarding the false
26  allegations."

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 22

**FREY BUCK**
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

1    **RESPONSE:** See response to RFP 1.

2    **REQUEST FOR PRODUCTION NO. 11:** All DOCUMENTS and

3    COMMUNICATIONS RELATING TO YOUR allegation that YOU "continued to attempt to

4    confer with Defendant Moss via text message regarding the false allegations up through January

5    of 2022; however, Defendant Moss never held a meeting with [YOU] regarding the false

6    allegations."

7    **RESPONSE:** See response to RFP 1.

8    **REQUEST FOR PRODUCTION NO. 12:** All DOCUMENTS and

9    COMMUNICATIONS RELATING TO YOUR allegation that "Defendants informed [YOU] that

10   neither [YOU] nor Plaintiff Social-Engineer could attend, contribute to, or participate in the Event

11   moving forward."

12   **RESPONSE:** See response to RFP 1 and SE_000298.

13   **REQUEST FOR PRODUCTION NO. 13:** All DOCUMENTS and

14   COMMUNICATIONS RELATING TO the February 9, 2022, Transparency Report.

15   **RESPONSE:** Plaintiffs objects to this Request on the grounds that it is vague,

16   ambiguous, seeks information protected by attorney client or work product privilege, overbroad,

17   and unduly burdensome. Subject to and without waiving the foregoing objection, See response to

18   RFP 5.

19   **REQUEST FOR PRODUCTION NO. 14:** All DOCUMENTS and

20   COMMUNICATIONS RELATING TO YOUR allegation that "Defendants never provided any

21   support or explanation of the allegations to Plaintiffs regarding their abrupt termination of

22   Plaintiffs' attendance, contribution, and participation in the Event."

23   **RESPONSE:** See response to RFP 1 and 3. Discovery is ongoing. Plaintiffs will

24   supplement this response and produce responsive, non-privileged documents in their possession,

25   custody, or control that are located after continuing to conduct a diligent search and reasonable

26   inquiry.

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 23

**FREY BUCK**
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

1  **REQUEST FOR PRODUCTION NO. 15**: All DOCUMENTS and

2  COMMUNICATIONS RELATING TO "the post credited to Defendant Moss on Defendant Def

3  Con's website" that "intimates that Plaintiff Hadnagy was a repeat perpetrator of egregious

4  violations of the Code of Conduct that were potentially criminal in nature."

5  **RESPONSE:** See SE_000299 – 000325.

6  **REQUEST FOR PRODUCTION NO. 16**: All DOCUMENTS and

7  COMMUNICATIONS RELATING TO YOUR allegation that YOU were "being accused of

8  sexual misconduct."

9  **RESPONSE:** See response to RFP 15.

10  **REQUEST FOR PRODUCTION NO. 17**: All DOCUMENTS and

11  COMMUNICATIONS RELATING TO YOUR allegation that PERSONS assumed that YOU

12  were a "sexual predator," as alleged in Paragraph 66 of YOUR COMPLAINT.

13  **RESPONSE:** See response to RFP 15.

14  **REQUEST FOR PRODUCTION NO. 18**: All DOCUMENTS and

15  COMMUNICATIONS RELATING TO YOUR allegation that "Defendants did not care about the

16  truth, nor did they attempt to investigate the allegations in question."

17  **RESPONSE:** Plaintiffs objects to this Request on the grounds that it is vague,

18  ambiguous, seeks information protected by attorney client or work product privilege, overbroad,

19  and unduly burdensome. Subject to and without waiving the foregoing objection, see Plaintiffs'

20  response to RFP 4, 5, & 15. Plaintiffs reserve the right to supplement this answer as discovery

21  progresses.

22  **REQUEST FOR PRODUCTION NO. 19**: All DOCUMENTS and

23  COMMUNICATIONS RELATING TO YOUR allegation that "Defendants became willing

24  participants in a scheme to enrich itself and to damage Plaintiffs' reputations, wrongly interference

25  with Plaintiffs' contractual relations, and prevent Plaintiffs from expanding their business and

26  social engineering conference and/or taking the SEVillage to a different conference."

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 24

**FREY BUCK**
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

1    **RESPONSE:** See RFPs 4, 5, & 15. Discovery is ongoing. Plaintiffs will supplement this

2    response and produce responsive, non-privileged documents in their possession, custody, or

3    control that are located after continuing to conduct a diligent search and reasonable inquiry.

4    **REQUEST    FOR    PRODUCTION    NO.    20:**    All    DOCUMENTS    and

5    COMMUNICATIONS RELATING TO YOUR allegation that YOU were trying to expand YOUR

6    business.

7    **RESPONSE:** Plaintiffs object to this Request on the grounds that it is vague, and

8    overbroad. Subject to and without waiving the foregoing objection, see Plaintiffs' response to

9    RFP 6. Plaintiffs reserve the right to supplement this answer as discovery progresses.

10    **REQUEST    FOR    PRODUCTION    NO.    21:**    All    DOCUMENTS    and

11    COMMUNICATIONS RELATING TO YOUR allegation that Defendants banned YOU to harm

12    YOUR reputation or business.

13    **RESPONSE:** Plaintiffs objects to this Request on the grounds that it is vague,

14    ambiguous, seeks information protected by attorney client or work product privilege, overbroad,

15    and unduly burdensome. Subject to and without waiving the foregoing objection, see response to

16    RFP 4. Plaintiffs reserve the right to supplement this answer as discovery progresses.

17    **REQUEST    FOR    PRODUCTION    NO.    22:**    All    DOCUMENTS    and

18    COMMUNICATIONS RELATING TO YOUR allegation that YOUR ban was "unmerited."

19    **RESPONSE:** Plaintiffs objects to this Request on the grounds that it is vague,

20    ambiguous, seeks information protected by attorney client or work product privilege. Subject to

21    and without waiving the foregoing objection, See RFP 33. Plaintiffs also reserve the right to

22    supplement this answer as discovery progresses.

23    **REQUEST    FOR    PRODUCTION    NO.    23:**    All    DOCUMENTS    and

24    COMMUNICATIONS RELATING TO YOUR allegation that "Defendants had only ever named

25    sexual predators in publications of lifetime banks similar to the 'Transparency Report.'"

26

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 25

**FREY BUCK**
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

1   **RESPONSE:** Plaintiffs respond that these documents and information are in the

2   possession of Defendants, as Defendants issued the publications or bans. Furthermore, Plaintiffs

3   specifically requested this information from Defendants in discovery. However, Defendants have

4   failed to provide any responsive records or information to Plaintiffs' request.

5   **REQUEST FOR PRODUCTION NO. 24:** All DOCUMENTS and

6   COMMUNICATIONS RELATING TO YOUR allegation that "various false rumors spread

7   rampantly across public forums and social media pages alleging that [YOU] had committed the

8   worst of sexual crimes individually and in conjunction with [YOUR] operation of Plaintiff Social-

9   Engineer."

10   **RESPONSE:** See response to RFP 15.

11   **REQUEST FOR PRODUCTION NO. 25:** All DOCUMENTS and

12   COMMUNICATIONS RELATING TO YOUR allegation that the Transparency Report contained

13   "false representations" about YOU.

14   **RESPONSE:** Plaintiffs objects to this Request to the extent that it seeks attorney client

15   or work product information. Subject to and without waiving the forgoing objection, See

16   response to RFP 4, 5, & 15. Plaintiffs reserve the right to supplement this answer as discovery

17   progresses.

18   **REQUEST FOR PRODUCTION NO. 26:** All DOCUMENTS and

19   COMMUNICATIONS RELATING TO YOUR allegation that websites, including but not limited

20   to TechTarget.com, published articles about YOU.

21   **RESPONSE:** See the following website and articles:

22   • **https://en.wikipedia.org/wiki/Christopher_Hadnagy**

23   • **https://www.google.com/url?sa=t&source=web&rct=j&opi=89978449&url=**

24   • **https://www.techtarget.com/searchsecurity/news/252529227/Judge-dismisses-Chris-**

25   **Hadnagy-lawsuit-against-DEF-CON**

26

**FREY BUCK**
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

- **https://www.google.com/url?sa=t&source=web&rct=j&opi=89978449&url=https://www.theverge.com/2022/8/18/23311573/chris-hadnagy-social-engineering-def-con-ban-lawsuit-jeff-moss**
- **https://www.google.com/url?sa=t&source=web&rct=j&opi=89978449&url=https://www.linkedin.com/posts/def-con_hadnagy-v-moss-223-cv-01345-courtlistenercom-activity-7148132005803610113--VUi**
- **https://www.google.com/url?sa=t&source=web&rct=j&opi=89978449&url=https://news.ycombinator.com/item%3Fid%3D30338492**
- **https://www.google.com/url?sa=t&source=web&rct=j&opi=89978449&url=https://yro.slashdot.org/story/22/08/18/1943202/def-con-banned-a-social-engineering-star---now-hes-suing**
- **https://www.google.com/url?sa=t&source=web&rct=j&opi=89978449&url=https://brian.carnell.com/articles/2022/def-con-bans-chris-hadnagy/**
- **https://www.google.com/url?sa=t&source=web&rct=j&opi=89978449&url=https://www.itpro.com/security/cyber-security/368327/security-bsides-conference-diversity-after-speaker-backlash**
- **https://www.google.com/url?sa=t&source=web&rct=j&opi=89978449&url=https://fortune.com/2022/08/19/christopher-hadnagy-sues-def-con-jeff-moss-over-permanent-ban/**

**REQUEST FOR PRODUCTION NO. 27:** All DOCUMENTS and COMMUNICATIONS RELATING TO YOUR allegation that "clients of Plaintiffs began to terminate their relationships and contracts with Plaintiffs, specifically citing the 'Transparency Report' published by Defendants."

**RESPONSE:** See response to RFP 6.

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 27

FREY BUCK
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000   FAX 206.902.9660

1    **REQUEST    FOR    PRODUCTION    NO.    28:**    All    DOCUMENTS    and

2    COMMUNICATIONS RELATING TO YOUR allegation that "clients and potential clients have

3    refused to do business with Plaintiffs since the defamatory statements were published."

4    **RESPONSE:** See response to RFP 6.

5    **REQUEST    FOR    PRODUCTION    NO.    29:**    All    DOCUMENTS    and

6    COMMUNICATIONS RELATING TO YOUR allegation that "Plaintiffs were regular

7    participants in the Black Hat's conference."

8    **RESPONSE:** See SE_000326 − 000347.

9    **REQUEST    FOR    PRODUCTION    NO.    30:**    All    DOCUMENTS    and

10   COMMUNICATIONS RELATING TO YOUR allegation that "Black Hat's representatives

11   issued a ban of Plaintiffs from Black Hat's conference, specifically in light of Defendants'

12   publishing of the 'Transparency Report' and the online aftermath."

13   **RESPONSE:** Plaintiffs objects to this Request on the grounds that it is vague,

14   ambiguous, seeks information protected by attorney client or work product privilege, overbroad,

15   and unduly burdensome. Discovery is ongoing. Plaintiffs will supplement this response and

16   produce responsive, non-privileged documents in their possession, custody, or control that are

17   located after continuing to conduct a diligent search and reasonable inquiry.

18   **REQUEST    FOR    PRODUCTION    NO.    31:**    All    DOCUMENTS    and

19   COMMUNICATIONS RELATING TO YOUR allegation that "Defendant Moss published the

20   defamatory statements to representatives of Black Hat in order to convince them to institute and

21   maintain a ban on Plaintiffs, and to exact further damage on Plaintiffs' business and personal

22   reputations."

23   **RESPONSE:** Discovery is ongoing. Plaintiffs will supplement this response and

24   produce responsive, non-privileged documents in their possession, custody, or control that are

25   located after continuing to conduct a diligent search and reasonable inquiry.

26

**FREY BUCK**
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

1  **REQUEST FOR PRODUCTION NO. 32:** All DOCUMENTS and

2  COMMUNICATIONS RELATING TO YOUR allegation that YOU were defamed.

3  **RESPONSE:** Plaintiffs objects to this Request to the extent that it seeks attorney client

4  or work product information. Subject to and without waiving the forgoing objection, see

5  responses to RFPs 6, 7, 15, 23, & 26.

6  **REQUEST FOR PRODUCTION NO. 33:** All DOCUMENTS and

7  COMMUNICATIONS between YOU and REYNOLDS from January 1, 2019, to the present.

8  **RESPONSE:** Plaintiffs objects to this Request on the grounds that it is vague,

9  ambiguous, seeks information protected by attorney client or work product privilege, overbroad,

10 and unduly burdensome. Subject to and without waiving the foregoing objection, see SE_000348

11 - 000401.

12 **REQUEST FOR PRODUCTION NO. 34:** All DOCUMENTS and

13 COMMUNICATIONS between YOU and Jake Williams January 1, 2019, to the present.

14 **RESPONSE:** Plaintiffs object to this Request on the grounds that it is overbroad and not

15 reasonably tailored to Def Con's legitimate discovery needs, seeking discovery that is neither

16 relevant to the subject matter involved in this action nor reasonably calculated to lead to the

17 discovery of admissible evidence. Subject to and without waiving the foregoing objection, see

18 SE_000403 - 000409.

19 **REQUEST FOR PRODUCTION NO. 35:** All DOCUMENTS and

20 COMMUNICATIONS between YOU and Dave Kennedy RELATING TO DEF CON or the

21 TRANSPARENCY REPORT from January 1, 2019, to the present.

22 **RESPONSE:** See SE_000427 − 000445.

23 **REQUEST FOR PRODUCTION NO. 36:** All DOCUMENTS and

24 COMMUNICATIONS between YOU and Michele Fincher from January 1, 2019, to the present.

25 **RESPONSE:** Plaintiffs object to this Request on the grounds that it is overbroad and not

26 reasonably tailored to Def Con's legitimate discovery needs, seeking discovery that is neither

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY − 29

**FREY BUCK**
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

1    relevant to the subject matter involved in this action nor reasonably calculated to lead to the

2    discovery of admissible evidence. After a diligent search, no relevant documents exist. Plaintiffs

3    reserves the right to supplement this answer as discovery progresses.

4    **REQUEST FOR PRODUCTION NO. 37:** All DOCUMENTS and

5    COMMUNICATIONS between YOU and Cat Murdock from January 1, 2019, to the present.

6    **RESPONSE:** Plaintiffs objects to this Request because it seeks attorney client privileged

7    information and/or information protected by work product. Further Plaintiffs object to this

8    Request on the grounds that it is overbroad and not reasonably tailored to Def Con's legitimate

9    discovery needs, seeking discovery that is neither relevant to the subject matter involved in this

10   action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and

11   without waiving the foregoing objection, Plaintiffs responds as follows: See SE_000410 -

12   000425.

13   **REQUEST FOR PRODUCTION NO. 38:** ALL DOCUMENTS and

14   COMMUNICATIONS between YOU and Bank of America regarding the legal action YOU

15   threatened against Cat Murdock.

16   **RESPONSE:** Plaintiffs objects to this Request because it seeks attorney client privileged

17   information and/or information protected by work product. Further, Plaintiffs objects to this

18   Request on the grounds that it is overbroad and not reasonably tailored to Def Con's legitimate

19   discovery needs, seeking discovery that is neither relevant to the subject matter involved in this

20   action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and

21   without waiving the foregoing objection, Plaintiffs responds as follows: Discovery is ongoing.

22   Plaintiffs will supplement this response and produce responsive, non-privileged documents in

23   their possession, custody, or control that are located after continuing to conduct a diligent search

24   and reasonable inquiry.

25

26

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 30

FREY BUCK
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

1    **REQUEST FOR PRODUCTION NO. 39**: The Google document referred to in Request

2    For Admission No. 38 and the shopping list referred to in Request For Admission No. 39.

3    **RESPONSE:** See SE_000426. After a diligent search, no "shopping list" exists.

4    Plaintiffs reserve the right to supplement this answer as discovery progresses.

5    **REQUEST FOR PRODUCTION NO. 40:** All DOCUMENTS RELATING TO

6    complaints against YOU from January 2014 to the present.

7    **RESPONSE:** Plaintiffs objects to this Request because it seeks attorney client privileged

8    information and/or information protected by work product. Further, Plaintiffs objects to this

9    Request on the grounds that it is overbroad and not reasonably tailored to Def Con's legitimate

10   discovery needs, seeking discovery that is neither relevant to the subject matter involved in this

11   action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and

12   without waiving the foregoing objection, Plaintiffs responds as follows: *See* Plaintiffs response

13   to RFP 1, 2, 4, 5, 15. Plaintiffs reserve the right to supplement this answer as discovery

14   progresses.

15   **REQUEST FOR PRODUCTION NO. 41:** All DOCUMENTS and

16   COMMUNICATIONS RELATING TO YOUR statements about the Holocaust.

17   **RESPONSE:** Plaintiffs objects to this request on the grounds that it is vague, ambiguous,

18   overbroad, and is seeking discovery that is neither relevant to the subject matter involved in this

19   action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and

20   without waiving the foregoing objection, after a diligent search, no relevant documents exist.

21   Plaintiffs reserve the right to supplement this answer as discovery progresses.

22   **REQUEST FOR PRODUCTION NO. 42:** All DOCUMENTS and

23   COMMUNICATIONS RELATING TO YOUR and/or SOCIAL-ENGINEER's references to

24   genitalia in training or seminar materials.

25   **RESPONSE:** Plaintiffs objects to this request on the grounds that it is vague, ambiguous,

26   and overbroad. Subject to and without waiving the foregoing objection, after a diligent search, no

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 31

**FREY BUCK**
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

1   relevant documents exist. Plaintiffs reserve the right to supplement this answer as discovery

2   progresses.

3   **REQUEST FOR PRODUCTION NO. 43:** All DOCUMENTS and

4   COMMUNICATIONS RELATING TO the training or seminar that had male participants elicit

5   information from women regarding pubic hair.

6   **RESPONSE:** Plaintiffs object to this request on the grounds that it is vague, ambiguous,

7   and overbroad. Subject to and without waiving the foregoing objection, after a diligent search, no

8   relevant documents exist.

9   **REQUEST FOR PRODUCTION NO. 44:** All DOCUMENTS and

10  COMMUNICATIONS RELATING TO the training or seminar that had female participants elicit

11  information from men regarding penis size and circumcision.

12  **RESPONSE:** Plaintiff objects to this request is vague, ambiguous, and overbroad.

13  Plaintiffs incorporate by reference its response to RFA 7. Furthermore, discovery is ongoing.

14  Plaintiffs will supplement this response and produce responsive, non-privileged documents in

15  their possession, custody, or control that are located after continuing to conduct a diligent search

16  and reasonable inquiry.

17  **REQUEST FOR PRODUCTION NO. 45:** All DOCUMENTS and

18  COMMUNICATIONS RELATING TO the female ILF volunteer referred to in RFA No. 34.

19  **RESPONSE:** Plaintiffs objects to this request on the grounds that it is vague, ambiguous,

20  overbroad, and is seeking discovery that is neither relevant to the subject matter involved in this

21  action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and

22  without waiving the foregoing objection, see Plaintiffs' response to RFP 39. Plaintiffs reserve the

23  right to supplement this answer as discovery progresses.

24  **REQUEST FOR PRODUCTION NO. 46:** All DOCUMENTS and

25  COMMUNICATIONS RELATING TO the ostensible child sex predator sting referred to in RFA

26  No. 37.

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 32

**FREY BUCK**
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

1    **RESPONSE:** Plaintiffs object to this Request on the grounds that it is vague, ambiguous,

2    Plaintiffs objects that this request for production is compound as it seeks documents and

3    communications to each Request for Admission that did not contain an unequivocal admission.

4    Subject to and without waiving the foregoing objection, Plaintiffs respond as follows see

5    response to RFP 39. Plaintiffs reserve the right to supplement this answer as discovery

6    progresses.

7    **REQUEST FOR PRODUCTION NO. 47:** All DOCUMENTS and

8    COMMUNICATIONS RELATING TO YOUR comments on the physical appearance of women,

9    including the female body.

10    **RESPONSE:** Plaintiffs object to this Request on the grounds that it is vague, ambiguous,

11    overbroad, and unduly burdensome. After a diligent search, no relevant documents exist.

12    Plaintiffs reserve the right to supplement this answer as discovery progresses.

13

14    DATED this 20th day of June 2024.

15    FREY BUCK

16    By: _T D Buck_

17    Ted Buck, WSBA #22029
      Frey Buck

18    1200 5th Avenue, Suite 1900
      Seattle, Washington 98101

19    Telephone: (206) 486-8000
      Email: tbuck@freybuck.com

20

21    Mark Conrad, WSBA #48135
      Frey Buck

22    1200 5th Avenue, Suite 1900
      Seattle, Washington 98101

23    Telephone: (206) 486-8000
      Email: mconrad@freybuck.com

24

25    *Attorneys for Plaintiffs Christopher*
      *Hadnagy and Social-Engineer, LLC*

26

**FREY BUCK**
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

1

## CERTIFICATE OF SERVICE

2      The undersigned certifies under the penalty of perjury according to the laws of the United

3  States and the State of Washington that on this date I caused to be served in the manner noted

4  below a copy of this document entitled **PLAINTIFFS' RESPONSES TO DEFENDANT DEF**

5  **CON COMMUNICATIONS, INC.'S FIRST SET OF DISCOVERY** on the following

6  individuals:

7
   David Perez, WSBA #43959
8  Matthew J. Mertens (Pro Hac Vice)
   Lauren A. Trambley (Pro Hac Vice)
9  Perkins Coie LLP
   1201 Third Avenue, Suite 4900
10 Seattle, Washington 98101
   dperez@perkinscoie.com
11 mmertens@perkinscoie.com
   ltrambley@perkinscoie.com
12

13 [  ]    Via USPS
   [X]    Via Electronic Mail
14 [  ]    Via Electronic Filing (CM/ECF)

15

16      DATED this 20th day of June 2024 at Seattle, Washington.

17

18      Amber Holmes, Legal Assistant

19

20

21

22

23

24

25

26

PLAINTIFFS' RESPONSES TO DEFENDANT DEF
CON COMMUNICATIONS, INC.'S FIRST SET OF
DISCOVERY – 34

**FREY BUCK**
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

# Exhibit 22

Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

--------------------------------------------------------
                              )
CHRISTOPHER J. HADNAGY;       )
SOCIAL-ENGINEER,              )
                              )
            Plaintiffs,       )
                              )
    vs.                       )   No. 2:23-cv-01932-BAT
                              )
JEFF MOSS; and DEF CON        )
COMMUNICATIONS, INC.,         )
                              )
            Defendants.       )
                              )
--------------------------------------------------------

VIDEOTAPED VIDEOCONFERENCE DEPOSITION UPON ORAL
                    EXAMINATION

                       OF

                  CAT MURDOCK

--------------------------------------------------------

                    Via Zoom

DATE:   October 24, 2024

REPORTED REMOTELY BY:  Douglas Armstrong, RPR
                       Washington CCR No. 3444

Cat Murdock                                        October 24, 2024

Page 2

```
 1                    A P P E A R A N C E S

 2

 3    For the Plaintiffs:

 4         MARK R. CONRAD
           Frey Buck, P.S.
 5         1200 Fifth Avenue, Suite 1900
           Seattle, Washington 98101
 6         (206) 486-8000
           mconrad@freybuck.com
 7         (Via Videoconference)

 8         KRISTOFER Z. RIKLIS
           Riklis Law, LLC
 9         401 Wilshire Boulevard, Floor 12
           Santa Monica, California 90401
10         (310) 895-2497
           kristofer@riklislaw.com
11         (Via Videoconference)

12

      For the Defendants:
13
           LAUREN TRAMBLEY
14         Perkins Coie
           505 Howard Street, Suite 1000
15         San Francisco, California 94105
           (415) 344-7062
16         ltrambley@perkinscoie.com
           (Via Videoconference)
17
           MATTHEW J. MERTENS
18         Perkins Coie, LLP
           1120 Northwest Couch, 10th Floor
19         Portland, Oregon 97209
           (503) 727-2199
20         mmertens@perkinscoie.com
           (Via Videoconference)
21

22

23

24

25
```

Cat Murdock                                    October 24, 2024

Page 3

```
 1              A P P E A R A N C E S (Continued)

 2

 3    Also Present:

 4          PATRICK NORTON
            Videographer
 5          (Via Videoconference)

 6          LAUREN ENGLISH
            Frey Buck
 7          (Via Videoconference)

 8          CHRIS HADNAGY
            (Via Videoconference)
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Cat Murdock                                          October 24, 2024

Page 6

```
 1          Via Zoom      Thursday, October 24, 2024

 2                        9:02 a.m. PDT

 3          ------------------------------------

 4          THE VIDEOGRAPHER:  We are on the record at

 5   9:02 a.m. on October 24, 2024.  This is the

 6   video-recorded deposition of Cat Murdock in the matter

 7   of Christopher J. Hadnagy vs. Jeff Moss, et al.,

 8   Number 2:23-cv-01932-BAT in the United States District

 9   Court for the Western District of Washington.  This

10   deposition is being held virtually and was noticed by

11   defendant.

12          Counsel, please introduce yourselves and

13   state whom you represent.

14          ATTORNEY TRAMBLEY:  Good morning.

15   Lauren Trambley on behalf of defendants.

16          ATTORNEY CONRAD:  Mark Conrad on behalf of

17   plaintiffs.

18          THE VIDEOGRAPHER:  My name is Patrick Norton,

19   and I am the legal videographer.  The court reporter is

20   Doug Armstrong.  We are with Seattle Deposition

21   Reporters.

22          Would the reporter please swear in the

23   witness.

24   \\\

25   \\\
```

Cat Murdock                                          October 24, 2024

Page 7

 1   CAT MURDOCK,              witness herein, having been

 2                            duly sworn by the Certified

 3                            Court Reporter, testified as

 4                            follows:

 5

 6                 E X A M I N A T I O N

 7   BY ATTORNEY TRAMBLEY:

 8        Q.   Good morning, Ms. Murdock.  How are you?

 9        A.   I'm okay.  How are you?

10        Q.   I know we have met before, but for the

11   record, I'll reintroduce myself.  My name is

12   Lauren Trambley, and I'm an attorney at Perkins Coie.

13   We represent defendants Def Con Communications, Inc.,

14   and Jeff Moss.

15             To begin, can you please state your full name

16   for the record?

17        A.   Constance Caitlin Crumpler Murdock.

18        Q.   Have you ever been deposed before?

19        A.   No.

20        Q.   Okay.  I'll go over some basic ground rules

21   before we get started.

22             So you understand that you are giving sworn

23   testimony under oath today as if you were sitting in a

24   courtroom?

25        A.   I do.

Cat Murdock                                    October 24, 2024

Page 13

1   Suites didn't have their security policy and security

2   tight.  So I did that.

3           And then I decided that it would be awesome

4   to get into offensive security, which is, you know, not

5   the policy side.  It is the offensive attacker side,

6   the threat actor side.  That's when I learned of

7   Chris Hadnagy and Michele Fincher and the company,

8   Social-Engineer.  I met them at Def Con in 2017,

9   thought that going through kind of the, like, security

10  education, slash, offensive mindset route could be a

11  good way in for me.  I tend to have a good read of

12  people, usually.  So I applied for a job with them.

13          I did their SECTF, their capture the flag

14  competition at DerbyCon in early October of 2017.  My

15  research, like, component came in first, like top

16  scorer, and then I came in second overall.  And they

17  hired me to start in October of that year at

18  Social-Engineer after I did an interview.  And then I

19  worked at Social-Engineer until 2019, when I quit in

20  March.

21          And then, after that, I was not employed for

22  a couple of months.  And in June of 2019, I got a role

23  as a security consultant doing threat and attack

24  simulation, like technical threat and attack

25  simulation, not really the phishing side of it or the

Cat Murdock                                          October 24, 2024

Page 26

1    the mass and the ganging up, then you sort of feel like

2    you have a better opportunity to become the anointed

3    one.

4              So it was just, like, a -- sure.  Maybe it

5    was a family feeling, but it wasn't a functional family

6    feeling.  And I think -- really sadly, I think a lot of

7    the employees, like, were familiar with the dysfunction

8    of family like that.  So I think that it was something

9    that did feel comfortable but wasn't healthy to be in.

10        Q.   Okay.  And --

11        A.   Also, he would -- yeah.  Yeah.  Keep going.

12        Q.   No.  Go ahead.

13        A.   He was just, like, a very large and -- like,

14   he has an intimidating presence, like, with his

15   gregarity.  He is also, like -- like, he is an imposing

16   individual.

17             So there would be, you know, like, jokes made

18   that were -- felt like jokes, but it was one of those

19   situations where, like, you laugh because that's the

20   social expectation.  So, like, he would joke about,

21   like, shanking a lot and, like, punching someone.

22   Throat-punching was a really big one that he would joke

23   about a lot.

24             Because it was a family feel, we, like, got

25   to know things that, like, I now recognize if I knew

Cat Murdock                                          October 24, 2024

Page 27

1    this about a boss, it would be, like, really wrong, you

2    know, like his, like, sexual preferences for Asian

3    women.  And then there was almost always an Asian woman

4    on staff.

5            So it was, like, stuff like that, where at

6    that time, the feeling was like you should laugh in the

7    group, but in retrospect, it was probably an

8    inappropriate stacking of those relationships.

9        Q.    Did it make you comfortable or uncomfortable

10   that you had a boss who made jokes about

11   throat-punching?

12       A.    It was definitely uncomfortable.  It was not

13   comfortable.  You would look around the room, and, you

14   know, if it was like a training, I always kind of

15   wondered who was bothered by it because someone's going

16   to be.  Like, that's -- but it was wielded in such a

17   way that it felt like an inside joke.

18            You know, so it framed.  Like, social

19   engineering is all about framing, you know.  It's

20   "Let's frame the narrative," which, ironically, is also

21   like a court case.  And Hadnagy would, like, teach

22   about framing and how, you know, all the words you use

23   make the frame.  That's, like, in his book.

24            So when you have somebody who's joking about

25   throat-punching and shanking, it is making a frame, and

Cat Murdock                                      October 24, 2024

Page 28

1    it's a frame of, like, "I am holding the power."

2           It's also a frame that speaks to, like, a

3    defensive and protective nature.  So you sort of are

4    framed into this idea of, "Oh, well, I'm on the inside.

5    I'm not going to get shanked, right?  Right?"  Well,

6    you don't know that, I guess.  So, again, at the time,

7    you're kind of like, "Oh, ha.  LOL.  Weird joke."

8           And -- but, like, yeah.  It was a lot.  It

9    was -- it was a decision to do that publicly.  And it

10   absolutely colored the interactions, and it definitely

11   painted a frame of the balance of power in the

12   interactions.

13       Q.   And what do you recall about Mr. Hadnagy

14   making jokes about punching people in the throat?

15       A.   Well, honestly, I don't -- it kind of goes

16   back to the idea of deciding who's anointed and who's

17   not.  You know, if you pick somebody to joke about,

18   like, injuring, then even if it's presented like a

19   joke, you're still choosing one person in the room in a

20   group, like, in the mini community you have to target,

21   essentially.  And I had been, you know, kind of --

22   like, I was definitely the butt of those jokes

23   sometimes.

24           But because the company had a following, you

25   would always have one or two people who would

Cat Murdock                                          October 24, 2024

Page 32

1    pleaser.  So, like, it was kind of a double-edged

2    sword.  So I definitely didn't love it directed at me.

3            The shanking was just so outlandish, that

4    you're like -- but in person, he would get a

5    switchblade, and, like, it has the sound.  It's a whole

6    sensory experience.

7            And so, like, yes, the first time it happened

8    was -- -- it definitely stuck out in my brain.  We were

9    in, like, a small, like, closet conference room having

10   whiskey before I was hired.  And he did it to Colin, I

11   believe, which probably -- it should have been a red

12   flag, but whatever.  It wasn't, apparently, or it was,

13   and I was willing to ignore it.

14           And then I was really aghast.  I really,

15   truly was.  I was absolutely too afraid to say

16   anything, but very aghast that he would do it to paying

17   people in trainings.  That was really bonkers to me.

18       Q.   When did Mr. Hadnagy pull out his knife and

19   make the joke about shanking you?

20       A.   He's done it on a Zoom call.  He's done it at

21   Black Hat, I believe, if I recall.  He's done it --

22   it's almost -- it was so regular.  Like, it was

23   literally -- somebody brought it up to me that it was

24   really traumatizing to them.  And then I had to unpack

25   it with my therapist because my therapist was like,

Cat Murdock                                                    October 24, 2024

Page 33

1    "Oh, yeah.  That's not normal."

2              So it happened more often than not, almost.

3    Like, it was every other phone call.  50 percent of all

4    interactions involved some physical threat, at least.

5         Q.    Okay.

6         A.    Shanking or throat-punching.

7         Q.    And he also made this threat in person where

8    he would pull out the knife?

9         A.    Oh, yeah.  For sure.

10        Q.    And were you intimidated when he would pull

11   out his knife?

12        A.    It's impossible not to be.  The part of your

13   brain goes, "Hah.  Surely, this is so -- like, we live

14   in a society where I'm not going to get shanked right

15   now.  So I guess this is okay, question mark."

16             But yeah.  I mean, he's like six-foot-four,

17   and at the time, he was a really large man, like,

18   easily the size of two of us combined, like, at any

19   time.  And I'm not a small person.  So, yeah, it was

20   intimidating.

21        Q.    Would you say you were afraid when he pulled

22   out his knife?

23        A.    The hilarious thing is every time one of

24   these questions is asked, I think back to some of the

25   training lines he would use.

Cat Murdock                                          October 24, 2024

Page 34

1          Fear is an instant reaction.  Like, it's --
2    your amygdala makes a choice on is this a threat.  And,
3    like, yes, a knife being brandished is a threat.  Your
4    rational mind, like I was just describing, would then
5    come in and say, "Surely, it can't be given we're in a
6    casino with cameras."
7          But yeah.  Like, it's absolutely scary to
8    have a six-foot-four, 300-plus-pound dude pop a
9    switchblade at you.
10        Q.   And I believe you said he would do this to
11   people paying for the training.  So --
12        A.   Yeah.  He would do it in the training.  He
13   always carried that knife in his pocket.
14        Q.   And did he also do this to other employees at
15   Social-Engineer?
16        A.   For sure.
17        Q.   And did you ever see him pull out his knife
18   at Def Con?
19        A.   For sure.  Especially, like -- like, I don't
20   remember a time that he did it, like, during the SECTF
21   when the room was packed.
22        I know he would do it when it was just staff
23   and volunteers.  I think he did it when, you know, he
24   had a little bit more time to be social.  Like, when
25   the room was packed and the calls were going, like, I

Cat Murdock                                          October 24, 2024

Page 35

 1  don't -- I don't recall a specific time, but maybe.  It
 2  was pretty -- it was a very common occurrence.
 3        Q.   Okay.  And earlier you said that Mr. Hadnagy
 4  would make it known that he had sexual preferences for
 5  Asian women.
 6              Did he tell you that he had a sexual
 7  preference for Asian women?
 8        A.   Yes.  Yeah.
 9        Q.   And did he tell other employees at
10  Social-Engineer that he had a sexual preference for
11  Asian women?
12        A.   Yes.  Like, he would -- I mean, I don't know
13  if it was, like, obviously.
14              Sorry.  I realized I just sped up.
15              You don't go up to somebody and say, "Hey, my
16  sexual preference is XYZ," but the comments were made.
17  You knew, and lots of people knew.  People knew well
18  enough to make jokes.  Like, his kids would make jokes,
19  like, Amaya and Colin.
20              I'm so sorry.  Can I pause real quick?  I've
21  had the same number call me like eight times.
22        Q.   Do you want to take, like, a quick,
23  five-minute break?
24        A.   That would be great.  Yeah.
25              ATTORNEY TRAMBLEY:  Okay.

Cat Murdock                                          October 24, 2024

Page 36

 1              THE VIDEOGRAPHER:  We're going off the record

 2    at 9:44 a.m.

 3              (Recess.)

 4              THE VIDEOGRAPHER:  We're back on the record

 5    at 9:53 a.m.

 6        Q.    (By Attorney Trambley) Thank you.

 7              Ms. Murdock, before we took the break, you

 8    testified that Mr. Hadnagy definitely made comments

 9    about his sexual preference for Asian women.

10              What do you recall about that?

11        A.    I remember it as, like, he would

12    definitely -- he would highlight nationalities, you

13    know, his wife being Thai.

14              And at one point, we had, like, a Japanese

15    girl in -- woman in training.  And he, after hours,

16    like, after the training, would talk about how, like --

17    I don't remember the words he used exactly, but, like,

18    you knew that he thought Tomomi was, like, very cute

19    even though, you know, he was married.  And he would

20    never do anything because he's devout, and it doesn't

21    mean it wasn't uncomfortable to know.  So he would just

22    make comments that you knew, like, Asian women were his

23    thing.

24        Q.    And do you think it was appropriate or

25    inappropriate that your boss would make comments about

Cat Murdock                                    October 24, 2024

Page 37

1   Asian women?

2        A.    For sure inappropriate.  Like, for sure -- I

3   don't know.  I feel for his wife.  Like, she should

4   kind of be the Asian woman of his desire and, you know,

5   the woman in general.

6             I, you know, was uncomfortable for Michele in

7   retrospect because she was Asian.  And I'm, like -- and

8   then I was uncomfortable for my friend Allie who joined

9   the company, and she was Asian.  But at some point, a

10  comment was made where we knew that, like, she wasn't

11  his Asian type, which is also a weird thing because

12  that's, like, offensive and fetishizing.  Like, it

13  just -- like, it was -- it was all the little comments.

14  It was the behaviors.

15            But, yeah, 100 percent, he made it very well

16  known that Asian women were his preference.

17       Q.    And did he make comments about women's

18  appearances?

19       A.    Yes, for sure.  And he had a very traditional

20  view of how women should dress and how women should

21  look when presenting his company, the company.

22            And it was weird.  Even at the time I

23  red-flagged this thought I had.  I was, like, "Oh,

24  well" -- saying it out loud, it's so wrong.  I was

25  like -- it was a relief to, like, not be his type.

Cat Murdock                                          October 24, 2024

Page 38

1  Like, that was a thing because at least I didn't have

2  to figure out how to respond to comments made about me.

3          But then, at the same time, it's weird that I

4  knew I wasn't his type, you know, like that.  Like,

5  there's part of you that's like, "Oh, should I feel

6  rejected?"  And then you're like, "No.  That would be

7  even -- that would probably be weirder."  So -- and

8  then you're like, "Oh, well.  I'm not his type.  So I'm

9  just going to shelve all those problems in my brain,

10 like, and not address them."

11          So I don't actually remember the exact

12 question.  So, hopefully, I've answered it.

13     Q.   Who would he make comments about their

14 appearance to?

15     A.   Ryan a lot.  Anyone who was, like,

16 buddy-buddy in the moment.  I heard them directly.

17 Like, I was -- I don't know -- a cool kid,

18 quote/unquote, for Doug's record.  So I -- you know,

19 jokes were made to me as, like, an in-crowd

20 participant.

21          I don't know.  I don't -- I think, in

22 retrospect, I wish I had called him out.  I worry he

23 sits back and is like, "Oh, she -- you know, like, she

24 didn't care at the time," but that's not true.  You

25 just don't know when you're the only woman there how to

Cat Murdock                                          October 24, 2024

Page 39

1    say something and not just get dismissed or, you know,

2    lose your seat at the table.

3         Q.    And you said he would make comments to Ryan.

4    Were these --

5         A.    Uh-huh.

6         Q.    -- comments about women at Social-Engineer?

7         A.    They could be.

8              He would also make comments to me, like, you

9    know, like, "You can choose a dress like Michele.

10   Michele looked really good in her dress.  She always

11   looked professional and clean, but Laurie," and then he

12   would contrast to, like, Laurie's appearance.

13             And to some extent, people can make hygiene

14   choices, but then, also, some people just have thin

15   hair.  Like, they're just -- your appearance is your

16   appearance.  And short of making sure you don't smell

17   bad, you know, you don't -- people express themselves

18   through clothing differently.  So it was pretty cruel

19   to be so physically demanding of people, especially

20   women.

21             I mean, that theme presented itself multiple

22   times in, like, how to dress to represent the company,

23   in, like, even how trainees would go out and do

24   homework.  You know, like, their physical -- how the

25   world perceived them physically, how Hadnagy really

Cat Murdock                                    October 24, 2024

Page 40

1    perceived.

2              When I say Hadnagy, I mean Chris Hadnagy.  I

3    just -- my husband's name is also Chris.  So I have

4    a -- I'm accustomed to calling Hadnagy by his last

5    name.

6              So, like, you know, like, he had gendered

7    homework assignments, and that meant that, just kind of

8    in general, people had to fit into two genders.  He

9    even at one point said -- like, on his SEVillage

10   website for Def Con, when he announced the CTF, I think

11   he made some comment about how any man or woman was

12   invited to apply.

13             But the -- like, Def Con has a really big

14   queer community.  And so people who didn't identify as

15   either man or woman, like, were really bothered by

16   that.  I think it was -- actually, that particular

17   phrasing was taken as a point of issue on Twitter at

18   one point of, like, he's being closed-minded.  That

19   was, like, a public kerfuffle even before I joined the

20   company.

21             But, anyway, if you didn't fit into, like, a

22   traditionally pretty woman's body, it was hard to dress

23   to impress.  And he made that pretty clear.

24        Q.   Okay.  I'm going to unpack a few things that

25   you just mentioned.  So --

Cat Murdock                                          October 24, 2024

Page 44

1    are tons of people who are genderfluid and, at a

2    minimum, a genderfluid ally.  So it is divisive to pick

3    that for homework.

4              So the last night, anyway, girls went out and

5    asked me.  Like, the big trigger questions were like

6    "Are you circumcised or uncircumcised?" and your

7    income.  And then, for women, it was, like, anti --

8    maybe it was both genders could be antifungal cream.

9    Women were "What's your bra size?" and maybe, like,

10   feminine hygiene products, I think, was the other one.

11   And so men would go out and ask that, and the whole

12   point is you have to do it and not come off as a

13   threat.

14             So people did that.  People were -- that was

15   also a spectrum.  Like, some of the people who went out

16   were of a social caliber where it was probably making

17   someone uncomfortable.  Like, their social skills were

18   not going to be in a place where they were ever going

19   to make someone comfortable feeling being asked their

20   bra size.

21             And I remember it was actually, also, like,

22   not just a gender issue, but sometimes it was a

23   religious one because, like, Muslim populations would

24   come.  Like, a Muslim man could come to APSE, and

25   they're just like, "I'm not supposed to interact with

Cat Murdock                                                    October 24, 2024

Page 45

1  women like that."

2          So there were just a lot of moments that

3  weren't respectful of other individuals and their

4  backgrounds, who they are, their beliefs.  And

5  minorities, women, genderqueer, LGBTQA, people of

6  color, different religions, like, they all kind of

7  got -- any of those minorities would often get the

8  short end of the stick, so to speak.

9      Q.    Did anyone ever raise this problem with

10  Mr. Hadnagy about the gendered homework assignments?

11      A.    Definitely, trainees did.  He would always

12  lean on the fact that it's really beneficial homework.

13          And I am pretty sure some employees also

14  said.  I didn't.  I did have trouble with the person

15  who identified as, like, not male being put in the male

16  group.

17          And then, when we were, like, employees just

18  by ourselves, Hadnagy made, like, a joke or something

19  about, like, "Man, I just -- you know, he tore it up.

20  Like, I didn't see that coming" or something like that.

21          And I was like, "Right, but, like, they

22  identify not as a man."  So it wasn't hard.

23          And then, like, I do know Hadnagy's religious

24  leanings, and they are probably -- they probably

25  influence his interaction with people who don't fit

Cat Murdock                                    October 24, 2024

Page 46

1   into the religion's approved boxes.

2            So, yeah, like, I mentioned it in the one

3   person's case.  I didn't -- I wasn't courageous enough

4   to take it all on.

5            I did, also, at one point, like, defend a

6   Muslim man or an Islam -- like, he was from Egypt, I

7   think.  Anyway, a Middle Eastern man's, like, name.

8   Hadnagy would, like, not get it right.  And then he,

9   like, gave me the silent treatment and then ripped me a

10  new one about defending it.  Like, you -- like, it

11  would be more respectful if you used the man's proper

12  name.

13           And Hadnagy was, like, scary to me.  Like,

14  that was one of the moments where, like, he didn't

15  necessarily pull out the shanking joke, but if he had,

16  I would have actually feared for my life because he was

17  so mad that I was defending this guy's name that I was

18  afraid.  And he told me to, like, get away physically

19  from him because he didn't know what he would do.

20           I was like, "All right."  I definitely --

21  like, I remember crying in a bathroom in a casino that

22  day, which I hate admitting while he's on the call, but

23  I guess he could read the transcript later.

24           Because at the end of the day, I'm a person

25  who really wants to do -- like, I'll go out of my way,

Cat Murdock                                          October 24, 2024

Page 47

1   really far out of my way to find common ground with

2   anyone, which is a big point in social engineering.

3   APSE had a whole slide on it.  And if it makes someone

4   else feel better in their skin, in their world, for me

5   to change my language, something that's passive --

6   like, it doesn't even really affect my day-to-day to

7   just respect names, respect pronouns, respect word

8   choice.  Like, if I could make someone else feel more

9   welcomed by using the syllables they want, I'm going to

10  do that.

11          So it was really very bizarre to me to get

12  threatened just because I was like, "Just say the man's

13  name right."  And after that, I was like, "Well, I'm

14  not going to give any additional feedback on topics

15  that might rock the boat," like the gender question.

16      Q.   Okay.  Let's drill down on a few of these

17  things.

18          So there was a person who was transitioning

19  genders --

20      A.   Uh-huh.

21      Q.   -- correct?

22      A.   Correct.

23      Q.   Did Mr. Hadnagy acknowledge that they were

24  transitioning?

25      A.   I do not recall that he would acknowledge

Cat Murdock                                                    October 24, 2024

Page 48

1   that.  He absolutely referred to them as "he/him."

2         Q.   So Mr. Hadnagy would not use their --

3         A.   "They/them," yeah.  I mean, Chris did not

4   believe in pronouns.  So, you know, like, I think the

5   person said their pronouns and then, again, isn't going

6   to belabor the point necessarily when you're alone in a

7   room.  So they said it.  Hadnagy definitely didn't

8   respect it.  And the person didn't harp on it, which I

9   had sympathy for.  Yeah.

10        Q.   Did it make you comfortable or uncomfortable

11  that your boss would not acknowledge another person's

12  preferred pronouns?

13              ATTORNEY CONRAD:  Object.  Form.

14        A.   It definitely made me uncomfortable.

15        Q.   (By Attorney Trambley) Do you think that it

16  made for a welcoming or unwelcoming environment at the

17  seminar that Mr. Hadnagy would not use preferred

18  pronouns?

19              ATTORNEY CONRAD:  Object.  Form.

20        A.   I believe it makes an unwelcoming

21  environment.

22        Q.   (By Attorney Trambley) Okay.  And I heard you

23  mention that Mr. Hadnagy was deliberately

24  mispronouncing somebody's name.  Who was that person?

25        A.   His name was Khaled.

Cat Murdock                                          October 24, 2024

Page 49

1          And he -- and Hadnagy kept saying "Kha-leed."
2    And, I mean, I can't say if it was deliberate.  I'll be
3    honest.  Like, but he, at a minimum, wasn't making an
4    effort to correct himself to do it right.
5          If I were in that position and I knew I
6    was -- had a propensity to say it incorrectly, I would
7    take the time to say, "Remind me again how to pronounce
8    the syllables."  And I know I would do this because one
9    of my best friends is Armenian, and her mom's name is
10   quite challenging for me.
11         But after a couple of times, the guy said
12   Hadnagy could just let it go, and that's, you know,
13   later.  That's when I brought up, like, "I think it was
14   really disrespectful that you didn't try."
15         And that's when he got quite scary and was
16   like, "I need physical space because I don't know what
17   I will do.  You're frustrating me or pissing me off," I
18   think is what he actually said.
19         And so that's kind of where that landed.  I
20   don't know that it was deliberate, but he for sure did
21   not try.
22         And I do think -- I actually remember.  Maybe
23   he did admit in an email or out loud, like, he started
24   doing it more to piss me off.  If I recall, like, he
25   did deliberately do it, not deliberate to the guy, but

Cat Murdock                                                        October 24, 2024

Page 50

1    deliberate because it bothered me, which is just wild.

2    Like, I guess, like, "I can hurt two people at once

3    better."  I don't know.  I don't know why somebody

4    would do that.  It's, at best, childish.

5         Q.    And when you raised the mispronouncing the

6    name to Mr. Hadnagy, did he get angry with you?

7         A.    Yes, very much so.  I can, like, still see

8    his facial expression in my head.  It was that -- it

9    was that scary.  He told me not to sit with him at

10   lunch with a very deep glare, because I asked.  He was

11   giving me the silent treatment and walking really fast.

12   And I was like, "Are you mad at me?"  And he just told

13   me to give him space.  I was like, "Oh, okay.  I'm

14   going to do that."

15             But he was absolutely angry.  He made it very

16   clear with his words, his actions, and his expressions.

17        Q.    Where were you when Mr. Hadnagy asked you to

18   give him physical space?

19        A.    We were at lunch when Black Hat provided

20   lunch.

21        Q.    Okay.  And did Mr. Hadnagy yell at you?

22        A.    It was actually like the stone-cold monotone

23   rather than pure yelling.  Like, I've seen him yell.

24   It was past that.  That's why it was so scary, quite

25   honestly, because it didn't seem like an issue that

Cat Murdock                                          October 24, 2024

Page 51

1    should be that triggering, and yet he was beyond
2    yelling angry.
3         Q.    And apologies for making you repeat it, but
4    did you cry in the bathroom after he got angry with
5    you?
6         A.    I did.  I did.  I did, in fact, cry in the
7    casino bathroom.
8         Q.    Did you --
9         A.    Super classy of me.
10        Q.    Apologies.
11              Did you feel as if your opinion was respected
12   when you raised this issue of mispronunciation with
13   Mr. Hadnagy?
14              ATTORNEY CONRAD:  Object.  Form.
15        A.    I feel like I actually know when he's going
16   to say it now.
17              I definitely did not feel like my opinion or
18   perspective was respected.  And, ironically, I don't
19   know why.  I shouldn't have been surprised because the
20   whole point at issue was what I perceived to be a lack
21   of respect of our trainee.  I guess I assumed, and
22   potentially incorrectly, that he would care more about
23   catering to, like, a client or customer than me, and
24   that's, I think, why I harped on it.
25              And again, it was, like, a day of the lesson

Cat Murdock                                          October 24, 2024

Page 59

1    noticed that talking slower is making me sadder.  So I,

2    like, don't want to, but I'm trying.

3         Q.    (By Attorney Trambley) We appreciate it.

4               So I want to take these in two steps.  So you

5    talked about Mr. Hadnagy throwing a phone at you.

6               Where --

7         A.    Uh-huh.

8         Q.    -- did that happen?

9         A.    That happened in his house in Florida while

10   we were -- during the week of an Advanced Practical

11   Social Engineering course, while we were preparing for

12   the master-level SE course the next week or in the next

13   couple weeks.

14        Q.    And was that in 2019?

15        A.    Yes.  Yeah.  I want to say February of 2019.

16        Q.    And he threw the phone at you because you

17   challenged his belief of iPhone versus Android usage by

18   men and women?

19              ATTORNEY CONRAD:  Object.  Form.

20        A.    That was --

21              THE WITNESS:  Sorry, buddy.

22        A.    That was the last thing he had said out loud

23   was that with an expression of frustration, and then he

24   threw the phone --

25        Q.    (By Attorney Trambley) Have you ever

Cat Murdock                                          October 24, 2024

Page 60

1    thought --

2          A.    -- across the table at me.

3          Q.    Sorry.

4                Have you ever had another boss throw a phone

5    at you?

6          A.    I have never had another boss throw any

7    object at me.

8          Q.    Do you think it's appropriate or

9    inappropriate that your boss threw a phone at you?

10         A.    I found it to be inappropriate.

11         Q.    Did you find it intimidating that he threw a

12   phone at you?

13               ATTORNEY CONRAD:  Object.  Form.

14         A.    I find it intimidating that a large man threw

15   an object at me across a table, yes, like, with force.

16   And the fact that it was a phone with corners didn't

17   feel great.  It definitely felt intimidating.

18         Q.    (By Attorney Trambley) Did the phone hit you?

19         A.    I think I caught it, so yes and no.  Like, it

20   would have hit my throat.  Like, it was coming

21   somewhere like here.  It wasn't like "Let me lob this

22   at your hand," but I was able to catch it.  It was a

23   short distance.  So it wasn't, like, super -- it was a

24   lot of variability.  I protected my face.

25         Q.    Was Mr. Hadnagy angry in that moment when he

Cat Murdock                                          October 24, 2024

Page 71

1    onboarding documentation, like "Here are the rules."  I
2    should have known better, you know, in a professional
3    sense, but I sent an email with a report attached to it
4    to Michele, I think, to quality-assure.  And I
5    shouldn't have put it in an email because it shouldn't
6    be in email servers.
7              And Chris -- like, it was the first time I
8    cried.  He kind of ripped me a new one about he's never
9    going to find new processes.  He'll find new people,
10   and we need to not share client information via email.
11             It's true.  We shouldn't.  I shouldn't have
12   done that.  The response is the first time that I got
13   yelled at and really remember the, like, sad feelings
14   of how making someone angry publicly come out.
15        Q.   How often did Mr. Hadnagy yell at you?
16        A.   I don't know how often he yelled at me
17   specifically, but he yelled a lot.  Like, his avatar in
18   Teams chat was the Hulk because it was such a joke that
19   he could turn on a dime and get that angry.
20        Q.   So it was known through the company that
21   Mr. Hadnagy had a temper?
22        A.   Yeah.  Yes.  And I'm sure -- I don't know of
23   all the documents that have been collected, but I would
24   be confident that somewhere in there, you can find a
25   picture of his Hulk icon, like.

Cat Murdock                                      October 24, 2024

Page 72

1    Q.    Was it common for Mr. Hadnagy to call other
2    people "stupid" at Social-Engineer?
3    A.    Yeah.  I mean, yeah.  He would call, like,
4    belittling names of others, and "stupid" was a common
5    one.  Like, I -- he said it enough that, like, I can
6    hear his voice saying, like, "freaking stupid" in my
7    head.  Like, it's, like, a patented phrase, almost.  I
8    don't know that he knows it is, but he said it enough
9    that it's, like, very much lodged in my brain in his
10   cadence.
11   Q.    Do you recall any other instances or words
12   that Mr. Hadnagy would use when belittling you or other
13   employees at Social-Engineer?
14   A.    He used "crap" a lot.  He'd used "freaking" a
15   couple -- like, he'd used words for emphasis.  Like, he
16   would hilariously claim he doesn't curse, but he
17   definitely cursed a few times.  And then it doesn't
18   really matter if you're cursing if the intention of the
19   word you choose to replace the curse word still exists.
20           So "freaking" was a really big one as a
21   modifier for things like "stupid," "dumb," or he would
22   say "moron" a lot.  That was a favorite.  Those are
23   kind of the ones that, like, stick out.
24           He definitely -- like, a couple of days
25   before he asked me if I was so "freaking stupid," he

Cat Murdock                                          October 24, 2024

Page 74

1      Q.    And did it make you feel welcome or
2  unwelcome?
3      A.    Definitely unwelcome except for the brief
4  rose-colored glasses at the beginning where it felt
5  like you were in on a joke, which is actually much
6  worse, and I'm very ashamed of that.
7      Q.    And when Mr. Hadnagy belittled you or other
8  employees at Social-Engineer, did it make you feel
9  respected or disrespected?
10     A.    For sure disrespected.
11     Q.    Okay.  And earlier in your testimony, you
12  said that you saw Mr. Hadnagy yell at other employees.
13           Who did he yell at?
14     A.    For sure Jenn Pickus.  She was the secretary
15  the year I went to Def Con.  For sure Colin.  I mean,
16  he yelled at Ryan the time Ryan lost the computer,
17  "lost," put it someplace that he didn't recall.  He
18  yelled at Erin O'Rourke.  She was employed there for a
19  bit.  He yelled at his brother, Mike.  I kind of forgot
20  about Mike working there.
21           He yelled -- I think -- I think everybody got
22  yelled at at some point.  I can't think of a single
23  person who didn't ever get yelled at.
24     Q.    And what were their reactions when Mr. --
25     A.    Laurie definitely got yelled at.  Sorry.

Cat Murdock                                    October 24, 2024

Page 78

1           So tons of reasons, big and small, from
2   layouts of pages to rumors from actors that you left
3   the car running to his wife trying to clean the
4   house -- she got yelled at -- to Ryan misplacing a
5   computer to Hadnagy's assumption that Ryan would never
6   do that.  Like, you got yelled at for his assumptions
7   of you.
8       Q.   Can you --
9       A.   To trying to defend Khaled's name.  Like, I
10  got yelled at for that, so...
11      Q.   So just speaking in broad terms, would you
12  describe the atmosphere at Social-Engineer as walking
13  on eggshells around Mr. Hadnagy?
14           ATTORNEY CONRAD:  Object.  Form.
15      A.   I would absolutely say that walking on
16  eggshells could be an accurate description of how we
17  operated around Hadnagy as employees.
18      Q.   (By Attorney Trambley) And that fits into
19  this persona of the Hulk where any little thing could
20  potentially blow up into a big incident?
21      A.   Yeah.
22           ATTORNEY CONRAD:  Object.  Form.
23      A.   I would agree with that, and I would agree
24  that he knew it because he had his avatar set as that.
25  Like, it was a -- it was something he owned.

Cat Murdock                                          October 24, 2024

Page 79

1     Q.    (By Attorney Trambley) And so any little
2     thing could potentially set off Mr. Hadnagy's temper?
3     A.    Yes, any little thing, anything.  Anything
4     could set off his temper.
5     Q.    Okay.
6     A.    DoorDashing him the wrong thing could set off
7     his temper, like.
8     Q.    And earlier you had started talking about Def
9     Con.
10          Did you attend Def Con with Mr. Hadnagy as an
11    employee of Social-Engineer?
12    A.    In 2018, yes.
13    Q.    Okay.  And how did Mr. Hadnagy treat his
14    employees at Def Con?
15    A.    Somebody cried every day at Def Con that
16    year.  We were all stressed.  No one had approved off
17    time.  You were -- if he was stressed, everyone should
18    be stressed.
19          At some point, I think there was, like, a
20    20-person group chat of all the employees and
21    volunteers, and a couple people started joking.  And
22    Chris got mad and left the group chat, like, left the
23    coordination chat of everybody trying to fulfill his
24    hopes and dreams.  Like, Chris Hadnagy has left the
25    chat, period.

Cat Murdock                                     October 24, 2024

Page 82

1   this place of, like, oh, well, we should all give our

2   every ounce of existence to this initiative, which is

3   not healthy and not where I should have been.

4          And so when he would say, like, "Oh, I'm mad

5   at this person.  I don't know where they are," it was

6   really easy to, like, become part of the "Yeah.  Like,

7   I don't know where they are either.  Like, oh, at

8   least, you know, it's not me.  I'm not the one who's

9   F-ing up.  Like, let's -- yeah.  Like, it's that

10  person.  That person is the problem child."

11         Anyway, that might be more my reflection, but

12  I don't know that I showed up in a way that I'm proud

13  of in retrospect because if you weren't the target of

14  ire, it was really easy to listen to his anger and be

15  like, "Yeah, totally justified."  But then, when you

16  read it yourself or it was directed at you, you were

17  like, "Oh, no.  This feels bad.  It feels big.  It

18  feels bigger than whatever went wrong.  It feels like

19  someone else could have stepped in to help solve this."

20      Q.    Do you recall Mr. Hadnagy yelling at you at

21  Def Con?

22      A.    I'm trying to -- I do recall getting yelled

23  at.  I'm trying to remember why I got yelled at.  I

24  remember we were in, like, his suite with all of the

25  food.  I think it was, like, Indian night, and I don't

Cat Murdock                                        October 24, 2024

Page 83

1    know why I got yelled at.

2           Jenn definitely got yelled at in the, like,

3    room during prep time.  She got yelled at after the

4    kids' event.  I don't remember what she allegedly

5    messed up, but that was, like, publicly done.  She got

6    yelled at when she was late.

7           Oh, Erin O'Rourke got yelled at.  I forgot

8    she was there that year.  She showed up late, I think.

9    And, like, sure, we can all argue that showing up late

10   is unprofessional, but it's also unprofessional to

11   respond to that by yelling at the person in front of a

12   whole group.

13       Q.    And did it --

14       A.    Those are my recollections.  It's -- I was

15   sleep-deprived.  It was all pretty hazy.

16       Q.    Okay.  And did it make you feel comfortable

17   or uncomfortable when Mr. Hadnagy yelled at you at Def

18   Con?

19           ATTORNEY CONRAD:  Object.  Form.

20       A.    It makes me uncomfortable when anyone gets

21   yelled at in a professional setting.  I think there are

22   better ways to communicate.  And, yes, it made me

23   uncomfortable, specifically.

24       Q.    (By Attorney Trambley) Did it make you feel

25   welcome or unwelcome when Mr. Hadnagy yelled at you at

Cat Murdock                                          October 24, 2024

Page 84

1    Def Con?

2        A.    It made me feel unwelcome.  It made for an
3    unwelcoming environment.

4        Q.    And were you afraid when Mr. Hadnagy yelled
5    at you at Def Con?

6        A.    Yes, asterisk, my response was more -- like,
7    you were -- I was more afraid to be the one to get
8    yelled at, you know.  Like, once you were getting
9    yelled at, you were almost resigned to your fate, but I
10   was very afraid to be the one chosen to get yelled at.

11       Q.    Okay.  And you mentioned that Mr. Hadnagy had
12   yelled at other employees?

13       A.    Uh-huh.

14       Q.    Did it make you feel comfortable or
15   uncomfortable that Mr. Hadnagy yelled at other
16   employees at Def Con?

17            ATTORNEY CONRAD:  Object.  Form.

18       A.    It made me feel uncomfortable.  It also made
19   me feel extra uncomfortable because he was much meaner
20   to the employees than to the volunteers.

21            Like, if he had -- and to some extent, like,
22   the whole fear of being the one to be selected to get
23   yelled at was because of the Hulk idea.  Like, if he
24   was stressed, he would find someone as an outlet for
25   his emotions.  That's what it seemed like.

Cat Murdock                                    October 24, 2024

Page 85

1          The volunteers, because he didn't pay them,
2    therefore, they, I guess, like, didn't owe him
3    anything.  They wouldn't get yelled at.  It was just
4    people he paid.
5          And bear in mind we weren't technically paid
6    for Def Con because it was through SEVillage, which is
7    a 501(c)(3), and it was on a weekend.  So we weren't
8    technically employees, but, like, our treatment was
9    that of people that, like, were his as opposed to
10   people who were helping him, if that delineation makes
11   sense.
12        Q.    (By Attorney Trambley) It makes sense.
13        So did you see Mr. Hadnagy yell at other
14   individuals, such as attendees or folks working at Def
15   Con?
16        A.    Yes.  I've definitely seen him yell, like, at
17   goons, who were the Def Con, like, security squad
18   gofers.  Like, they're, like, the Def Con helpers.
19   Staff.  I guess "staff" is the word I'm looking for.
20   Sorry.
21        But -- so yeah.  Like, his yelling wasn't
22   completely reserved for employees, but we were a higher
23   percentage of it.
24        It sort of makes me wonder, like, how did he
25   treat his family when we also weren't around, you know,

Cat Murdock                                    October 24, 2024

Page 86

1   because, like, they're even more his.  It seemed like

2   the more his you were, the bigger risk there was of

3   being targeted.

4       Q.    Do you recall why Mr. Hadnagy yelled at the

5   Def Con staff?

6       A.    He didn't -- like, I remember some general

7   complaints, and it could have been any of these.  The

8   room wasn't big enough.  The projector wasn't in the

9   right place.  There weren't enough chairs.  The layout

10  wasn't right.  Like, these were all things that were

11  frustrating to him.  I don't remember who he yelled at

12  who exactly for.

13          The kids's event wasn't in the right place.

14  Like, it's too far away.  It's just, like, any number

15  of things.

16      Q.    And did it make you feel comfortable or

17  uncomfortable when Mr. Hadnagy yelled at the Def Con

18  staff?

19          ATTORNEY CONRAD:  Object.  Form.

20      A.    For sure uncomfortable.  Like, everyone's

21  working hard.  We don't need to be mean.

22      Q.    (By Attorney Trambley) And did it make you

23  feel welcome or unwelcome when Mr. Hadnagy yelled at

24  the Def Con staff?

25          ATTORNEY CONRAD:  Object.  Form.

Cat Murdock                                          October 24, 2024

Page 87

1      A.    Definitely uncomfortable.  Again, like, it
2 should have been fostering a welcome environment, not
3 just fostering a welcoming environment when people were
4 looking or when enough people were looking.
5      Q.    (By Attorney Trambley) Okay.  And I'd like to
6 circle back to something we discussed earlier in your
7 testimony.
8           You had said that Mr. Hadnagy had pulled out
9 a knife at Def Con, correct?
10     A.    Yes.
11     Q.    And --
12     A.    A switchblade.
13     Q.    And this was a real knife?  It was not a toy
14 knife?
15     A.    Oh, yeah.  It's a real knife.  It's, like,
16 illegal in some states and countries because it's,
17 like, the one you press the button, and the knife,
18 like, pops up.  Like, if you, like, pushed it against
19 someone's skin and pressed the button, it would go in
20 the person's skin, like, into their bodies.  Like,
21 it's, like, an illegal knife in many states.  I don't
22 remember which states, but it is.
23     Q.    And --
24     A.    So, yeah, 100 percent.
25     Q.    And Mr. Hadnagy would pull this out of his

Cat Murdock                                          October 24, 2024

Page 88

1   pocket when he got angry?

2        A.   Yes.  Let me go back and say, again, I

3   actually did -- I don't -- I don't know that.

4             He would pull it out of his pocket and use it

5   when he was pre-anger, when it was a joke.  I can't

6   say -- I think he had the wherewithal that when he was

7   really raging, I don't remember him -- I don't remember

8   it being like an "I'm going to call the police.  This

9   man is assaulting me."  Like, I think he knew where to

10  stop it before that.

11            So his Hulk-like wrath I don't remember being

12  paired with the shanking joke.  The shanking joke was

13  like a "How could you be so stupid?  LOL."  And then,

14  if you actually did the thing again, the shanking joke

15  wasn't there.  Or if you did the thing that, like,

16  inconvenienced him, he wouldn't draw the knife on you,

17  but then he would be, like, visibly angry.

18        Q.   Okay.

19        A.   I don't think -- I don't -- I think he's

20  smart enough and socially aware enough.  Like, the

21  whole company is a social company.  Like, he's socially

22  aware enough that he's not trying to get arrested on

23  the regular.

24        Q.   But Mr. Hadnagy would pull out a real knife

25  at Def Con?

Cat Murdock                                           October 24, 2024

Page 89

1      A.    Yes.

2      Q.    And did it make you feel comfortable or

3  uncomfortable when he would pull his knife out at Def

4  Con?

5            ATTORNEY CONRAD:  Objection.  Form.

6      A.    Uncomfortable when he would pull his knife

7  out anywhere, and definitely Def Con because you're in

8  person.  Like, it's there.  It's physically next to

9  you.

10     Q.    (By Attorney Trambley) And did it make you

11 feel intimidated or scared when Mr. Hadnagy would pull

12 out a knife at Def Con?

13           ATTORNEY CONRAD:  Objection.  Form.

14     A.    Yeah.  Yeah, for sure.  And, also, like, it

15 would manifest in your brain, being like -- pardon my

16 French -- "Oh, shit.  I can't believe he just did

17 that."  And then you're like, "Do I laugh now?  I guess

18 I laugh now."

19     Q.    (By Attorney Trambley) And would Mr. Hadnagy

20 gesture towards stabbing people when he pulled out the

21 knife?  Like, what would he do with the knife when he

22 pulled --

23     A.    For sure.  He would be like (descriptive

24 sound), like that.

25     Q.    And did he ever gesture with the knife toward

Cat Murdock                                    October 24, 2024

Page 91

1    increasing in severity.

2        Q.   Okay.  And it was common for Mr. Hadnagy to

3    pull out his knife and pretend to shank people at Def

4    Con?

5             ATTORNEY CONRAD:  Objection.  Form.

6        A.   It was very common, yeah.

7             THE WITNESS:  Oops.  Sorry, buddy.  Sorry.

8        A.   Yes.  It was very common for him to pull out

9    the knife and joke about shanking people.

10            ATTORNEY TRAMBLEY:  Okay.  I think we could

11   take a 15-minute break, Mark, unless you have any

12   objections to that.

13            ATTORNEY CONRAD:  No objections.

14            ATTORNEY TRAMBLEY:  Okay.

15            THE VIDEOGRAPHER:  We're going off the record

16   at 11:16 a.m.

17            (Recess.)

18            THE VIDEOGRAPHER:  We're back on the record

19   at 11:32 a.m.

20       Q.   (By Attorney Trambley) Ms. Murdock, shifting

21   gears a little bit, let's discuss why you left

22   Social-Engineer.

23            So why did you quit your job at

24   Social-Engineer?

25       A.   I quit because it was the week of MLSE, and

Cat Murdock                                          October 24, 2024

Page 113

1    Like, if he wants to -- like, he's made so many -- he's

2    tried so many times to, like, do my career harm.  If he

3    had actual proof, I think he would have loved nothing

4    more.  Like, I could be wrong, but it feels like he

5    would have, like, run with that, skipping.

6          Q.    (By Attorney Trambley) And jumping back a

7    little bit, your employment agreement with

8    Social-Engineer contained a noncompete clause, right?

9          A.    It did.

10         Q.    What was the duration of that noncompete

11   clause?

12         A.    I believe it was 12 months from termination

13   in an agreement that, verbatim, stated "This agreement

14   expires in 12 months unless it is signed to continue."

15         Q.    And when did you stop working at

16   Social-Engineer?

17         A.    March of 2019.

18         Q.    And when did you start working for Bank of

19   America?

20         A.    September of 2020.

21         Q.    So it was one year after you left

22   Social-Engineer?

23         A.    Correct.

24         Q.    And yet Mr. Hadnagy still sent a cease and

25   desist letter to Bank of America?

Cat Murdock                                    October 24, 2024

Page 114

1           ATTORNEY CONRAD:  Object.  Form.

2      A.    Correct.  He did.

3           And, also, it wouldn't have applied to the

4   noncompete anyway because it was don't take clients,

5   and I was working for somebody who was once a client.

6   That's different, but that's maybe splitting hairs.

7      Q.    (By Attorney Trambley) So you think Bank of

8   America was a client and not a competitor of

9   Social-Engineer, and, therefore, the noncompete did not

10  apply?

11     A.    Absolutely.  Because I'm working on an

12  internal red team, I don't serve clients other than the

13  bank's lines of business.  Like, I only work internally

14  to the bank doing a function that Social-Engineer could

15  never perform for the bank.  So, yeah, even if it had

16  been within the time frame of a valid contract, I still

17  would not have been in violation of the agreement.

18     Q.    So even though the one year had elapsed and

19  you were working for a client and not a competitor,

20  Mr. Hadnagy still sent you a cease and desist letter?

21     A.    Technically, he sent the bank the cease and

22  desist, who then had to tell my boss, who then had to

23  call me to be, like, "Is this for real?"  It was a

24  memorable conversation.

25     Q.    Do you think Mr. Hadnagy was trying to get

Cat Murdock                                        October 24, 2024

Page 115

1    you fired from your new job at Bank of America?

2            ATTORNEY CONRAD:  Objection.  Form.

3        A.    I think he hoped that would happen.

4        Q.    (By Attorney Trambley) Did you find it --

5        A.    It seemed so far removed from something

6    that's actually possible.  Like, I don't know, but, I

7    think, like, I have to imagine that's what he was going

8    for.

9        Q.    Did you find it intimidating that Mr. Hadnagy

10   was sending you multiple cease and desist letters?

11           ATTORNEY CONRAD:  Objection.  Form.

12       A.    It was for sure intimidating that more than a

13   year after I quit, he's still following my career

14   enough to want to negatively affect it.  That's super

15   scary.

16           It's the main reason that -- like, I know he

17   can research.  He can task someone else to research,

18   like, where I am, but, like, he makes me so

19   uncomfortable, I didn't want to tell Doug where I'm

20   currently located.  Like, that's the reality of this.

21           When things happen, like, I know he's

22   watching me from afar, whether that's, like, updating

23   my LinkedIn or somebody commenting me on Twitter.

24   Like, even though he blocked me -- which is so asinine

25   because he has a public account.  Like, he was -- even

Cat Murdock                                    October 24, 2024

Page 116

1    though he does it, like, I know you're checking up on
2    me because he takes actions like trying to sue my
3    employer or referencing my career in a blog post.  And
4    that's freaking creepy.
5         Q.   (By Attorney Trambley) And so Mr. Hadnagy
6    monitoring you after you left your employment makes you
7    feel uncomfortable?
8              ATTORNEY CONRAD:  Objection.  Form.
9         A.   Yes.  A former boss, an employer, monitoring
10   and taking negative action.  That's the real thing.
11   Like, plenty of people want to stay in touch with,
12   like, prior employees.  He made it very clear that's
13   not the goal here.  So it's not "Let me support you and
14   cheer you on from the sidelines and watch what
15   happens."  It's "Let me scrutinize your actions to see
16   if I can harass you more."
17        Q.   (By Attorney Trambley) Has Mr. Hadnagy done
18   this to others that have left his employment at
19   Social-Engineer?
20             ATTORNEY CONRAD:  Objection.  Form.
21        A.   I mean, I don't have, like, other people's
22   receipts, colloquially, but I've heard, yes, for sure.
23   I know that he has no problem speaking ill of people.
24             I think, you know, there's always the chance
25   that people who parted ways with him earlier, when

Cat Murdock                                          October 24, 2024

Page 121

```
1                 ATTORNEY TRAMBLEY:  I'd like to pull up
2      Defendant's Exhibit 3, which is Bates-labeled
3      SE_001146.  And this is the article that Mr. Hadnagy
4      published on LinkedIn called "Be Water, My Friend," on
5      September 17, 2020.
6                 (Exhibit No. Defense 3 marked for
7                  identification.)
8          Q.    (By Attorney Trambley) Ms. Murdock, I'm only
9      going to ask you a few questions about this.  So I
10     don't think you need to review the entire thing.
11                Let me -- are you familiar with this article?
12         A.    I am familiar, yes, this article.
13         Q.    Let me move down.  So how about you review
14     this page, and let me know when you are done with that,
15     and I'll ask you a few questions.
16         A.    Okay.
17         Q.    Okay.  Ms. Murdock, remind me again.  When
18     did you start working at Bank of America?
19         A.    September 2020.
20         Q.    Okay.  And this article was published on
21     September 17, 2020, correct?
22         A.    It seems so.  Weird timing, right?
23         Q.    So this article was posted around the time
24     that you started working at Bank of America?
25         A.    Correct.
```

Cat Murdock                                    October 24, 2024

Page 122

1    Q.    Okay.  And it says, in the fourth paragraph
2    down, "We had this employee depart from
3    Social-Engineer, and it was not amicable.  This person
4    was malicious and stole our intellectual property,
5    breached their employment contract multiple times, and
6    then slandered us.  This person even went as far as to
7    try and hurt the nonprofit, the Innocent Lives
8    Foundation, I started to help save children from the
9    horrors of child abuse."
10          Do you believe that Mr. Hadnagy was talking
11   about you when he made this comment?
12          ATTORNEY CONRAD:  Object.  Form.
13   A.    I believe he was talking about me.  And
14   enough people thought he was talking about me that it
15   was sent to me, like, 15, 20 times.
16   Q.    (By Attorney Trambley) And do you find this
17   statement to be defamatory?
18          ATTORNEY CONRAD:  Object.  Form.
19   A.    Yeah.  I absolutely believe that this is
20   making -- it is making somebody intentionally look very
21   bad, and it's not true.
22   Q.    (By Attorney Trambley) And then Mr. Hadnagy
23   goes on to write just below that.  And, unfortunately,
24   it's cut off right here, but I'll read it aloud.
25          "I was so angry, I wanted to lash out.  I

Cat Murdock                                    October 24, 2024

Page 123

1   want to ruin their career and to call this person out

2   publicly."  And let me scroll here.

3           Was this the statement that you were

4   referring to where you were afraid that he would ruin

5   your career?

6       A.    Yes.  This is the statement that stuck out in

7   my head.  And I will actually say that what also stuck

8   out is the change in tense, that he was angry.

9   Everything is in past tense except for the "I want to

10  ruin their career."

11      Q.    Did this statement make you feel intimidated?

12      A.    Absolutely.  I thought -- I was like, "Can he

13  cause me to lose my job?"  My job was like -- it

14  started at like 160K.  Like, that's a huge shift.

15  Like, I would have lost the raise I got from leaving

16  GuidePoint and the salary I was making before I

17  accepted the bank job.  Like, of course, that's

18  intimidating.

19          ATTORNEY CONRAD:  I'm going to object to form

20  on that.  Sorry.  I wasn't able to get that in before

21  she started answering.

22          THE WITNESS:  Apologies.  It's on me.  Sorry.

23      Q.   (By Attorney Trambley) Were you concerned for

24  your reputation after this article was published?

25          ATTORNEY CONRAD:  Objection.  Form.

Cat Murdock                                          October 24, 2024

Page 124

1     A.    I was concerned after.  I was concerned

2  before.  I remain concerned that Hadnagy tries his

3  hardest to damage my reputation, and I can only hope

4  that I have handled myself with grace and aplomb to the

5  point that nobody would believe him.  I'm sure some

6  people do, though.

7          ATTORNEY TRAMBLEY:  Okay.  And I'm going to

8  pull up another exhibit, which I will mark as

9  Defendant's Exhibit 4.  And it is Bates-labeled

10  SE_001127.  Let me share my screen.  This is an email

11  from Mr. Hadnagy to Laurie Segall, who is a journalist,

12  on March -- or May 10, 2022.

13          (Exhibit No. Defense 4 marked for

14           identification.)

15     Q.    (By Attorney Trambley) And, Ms. Murdock, I'm

16  only going to ask you about this top portion.  So if

17  you could review this and let me know when you're done.

18     A.    All right.

19     Q.    Okay.

20     A.    Hold on.  Just to clarify, this is to a

21  journalist?

22     Q.    Yes, it is.

23          ATTORNEY CONRAD:  I'm going to object.  Form.

24     Q.    (By Attorney Trambley) And do you find it

25  concerning that Mr. Hadnagy sent this email to a

Cat Murdock                                            October 24, 2024

Page 125

1   journalist?

2           ATTORNEY CONRAD:  Object.  Form.

3       A.    Yeah.  It also is, like, kind of vindicating.

4   I'm not going to lie, because it is very clear that

5   he -- like, it's no longer a "Oh, I have this weird

6   sneaky suspicion, and enough people have said that he's

7   talking badly about me."  Like, he's talking badly

8   about me to the media.

9       Q.    (By Attorney Trambley) And about middle of

10  the paragraph down, he says, "Full disclosure:  She

11  screwed up a massive project and lost my crap.  I

12  chewed her out bad."

13          Do you think he's referring to the 2019 MLSE

14  event?

15      A.    I would assume so.

16          ATTORNEY CONRAD:  Object.  Form.

17      Q.    (By Attorney Trambley) And --

18      A.    Yeah.  I would assume so given that's the

19  only thing that he's ever claimed I messed up, largely.

20      Q.    (By Attorney Trambley) And --

21      A.    I mean, at the time.

22      Q.    Sorry.

23          Is Mr. Hadnagy acknowledging that he yelled

24  at you at that event?

25          ATTORNEY CONRAD:  Object.  Form.

Cat Murdock                                          October 24, 2024

Page 126

1      A.    It appears he is acknowledging that he chewed

2  me out bad, which would, yes, seem like he's

3  acknowledging his behavior.

4      Q.    (By Attorney Trambley) Okay.  And further

5  down in the email, he says, "But within a month,

6  started a company that sold our products.  We shut her

7  down.  She went to get a job with a competitor, which

8  was a breach of her contract.  We didn't stop her.  I

9  should have.  Then she went on to work for a client of

10  ours she serviced.  Also a breach, but I didn't stop

11  her.  She tried to damage ILF and called out our agents

12  at Def Con.  Was a major problem and almost ruined ILF.

13  She is a terrible person."

14          How does it make you feel that Mr. Hadnagy is

15  sending an email to a journalist calling you a terrible

16  person?

17          ATTORNEY CONRAD:  Object.  Form.

18      A.    Not great.  Like, I'll be -- in this -- in

19  the spirit of honesty, since I'm under sworn oath, it's

20  almost a relief to see it written for real, like,

21  because it has been a, like, really awful cloud.

22          Like, again, let's -- like, to recap, I

23  joined -- I wanted to join his company and him because

24  I truly believed the motto "Leave others feeling better

25  for having met you."  So to leave because I knew he

Cat Murdock                                          October 24, 2024

Page 127

1   wasn't doing that and then to have him call me a
2   terrible person, it's both gloriously ironic and, yeah,
3   really -- it definitely hurts.  And I really dislike
4   being lied about.  So you can think I'm a terrible
5   person all you want, but to tell the media lies and
6   then to act like he did me a favor but not issuing more
7   legal action, well, it makes me sad.
8           The dark humor part of me is like that's kind
9   of hilarious because my understanding is Def Con is
10  like, "He harasses prior employees," and he's literally
11  telling a journalist he's bummed out that he didn't
12  harass me more.  So on the one hand, it hurts, and on
13  the other, it's -- it's just nice, kind of nice to know
14  it's not me having -- like, that my fears and thoughts
15  weren't unfounded.  Like, it's real.
16  Q.    (By Attorney Trambley) And bringing this back
17  to the prior exhibit, Exhibit 3, the article "Be Water,
18  My Friend," where he says that, you know, this employee
19  tried to damage ILF, and she had stolen information and
20  gone to a competitor.
21          Does this email support your belief that that
22  article was about you?
23          ATTORNEY CONRAD:  Object.  Form.
24  A.    Yes.  This absolutely supports my belief.
25  It's my name and then him saying -- at the top, it

Cat Murdock                                    October 24, 2024

Page 128

1  says, like "These can ruin my life if used wrong."  So

2  he's owning that it's terrible, that he shouldn't have

3  said it or done it.  And then the description matches

4  perfectly with the public statement.  So, yeah, I think

5  it's confirmation that that article is about me.

6       Q.    (By Attorney Trambley) Okay.  And do you find

7  it ironic that Mr. Hadnagy is suing for defamation in

8  this lawsuit when he sent this email to a journalist

9  about you?

10           ATTORNEY CONRAD:  Object.  Form.

11      A.    It is gloriously ironic.  Yes, I agree.

12      Q.    (By Attorney Trambley) And do you feel afraid

13 because Mr. Hadnagy has made disparaging comments about

14 you to third parties in the information security

15 industry?

16           ATTORNEY CONRAD:  Object.  Form.

17      A.    I feel afraid for my career.  I feel afraid

18 for my reputation.  I feel sad.  I feel less afraid the

19 more he quadruples down on his behavior, but I know

20 that some people always believe him.  So, yeah, I will

21 always be afraid.

22      Q.    (By Attorney Trambley) Going --

23      A.    It might be a win for him.  So there you go,

24 buddy.  You can have that win.

25      Q.    Ms. Murdock, shifting gears, let's discuss

Cat Murdock                                          October 24, 2024

Page 131

1    saying that.

2              Jess Levine was open about it, and she was

3    not there, but she had prepared a letter that she asked

4    me to read.  So I read that because, ironically, while

5    we had never been in touch before, we did get in touch

6    after our shared experience.  I mean, we had been in

7    touch at the one DerbyCon, but she and I didn't keep up

8    to conspire or whatever.  We literally didn't talk

9    until all this came to light.

10             There were some other people, but I don't --

11   I don't want to out anybody.

12        Q.   Do you remember who led the call?

13        A.   I mean, I don't know that I want to -- I

14   wouldn't say like a leader.  I think that I would call

15   Grifter a moderator.  I think Jeff was in Singapore at

16   the time and wasn't as, like, socially connected.  And

17   so Grifter had been a safe space for a lot of people

18   and then, therefore, was, like, the moderator between

19   the negatively affected group and Def Con on the call.

20        Q.   Do you believe Grifter was acting on behalf

21   of Def Con on this call?

22        A.   Yeah.  My understanding was that --

23             ATTORNEY CONRAD:  Object.  Form.

24        A.   Yeah.  My understanding was that he was there

25   as, like, a representative to get Def Con the whole

1                    C E R T I F I C A T E

2        UNITED STATES        )
                              )
3        DISTRICT COURT       )

4

5              I, a Reporter and Washington Certified Court
         Reporter, hereby certify that the foregoing videotaped
         videoconference deposition upon oral examination of
6        Cat Murdock was taken stenographically before me on
         October 24, 2024, and transcribed under my direction;

7

8              That the witness was duly sworn by me
         pursuant to RCW 5.28.010 to testify truthfully; that
         the transcript of the deposition is a full, true and
9        correct transcript to the best of my ability; that I am
         neither attorney for nor a relative or employee of any
10       of the parties to the action or any attorney or counsel
         employed by the parties hereto nor financially
11       interested in its outcome.

12             I further certify that in accordance with
         Washington Court Rule 30(e) the witness is given the
13       opportunity to examine, read and sign the deposition
         within thirty days upon its completion and submission
14       unless waiver of signature was indicated in the record.

15             IN WITNESS WHEREOF, I have hereunto set my
         hand this 28th day of October, 2024.

16

17

18       Douglas Armstrong, RPR

19       _____

20       Washington Certified Court Reporter No. 3444
         License expires 11/26/2025

21

22

23

24

25

# Exhibit 23

Jessica Levine                                    September 19, 2024

Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

---------------------------------------------------------
                               )
CHRISTOPHER J. HADNAGY;        )
SOCIAL-ENGINEER,               )
                               )
             Plaintiffs,       )
                               )
     vs.                       )   No. 2:23-cv-01932-BAT
                               )
JEFF MOSS; and DEF CON         )
COMMUNICATIONS, INC.,          )
                               )
             Defendants.       )
                               )
---------------------------------------------------------

VIDEOTAPED VIDEOCONFERENCE DEPOSITION UPON ORAL
EXAMINATION

OF

JESSICA LEVINE

***CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER***

---------------------------------------------------------

Round Rock, Texas (Via Zoom)

DATE:   September 19, 2024

REPORTED REMOTELY BY:  Douglas Armstrong, RPR
                       Washington CCR No. 3444

Jessica Levine                                      September 19, 2024

Page 2

```
 1                   A P P E A R A N C E S

 2

 3     For the Plaintiffs:

 4            MARK R. CONRAD
              Frey Buck, P.S.
 5            1200 Fifth Avenue, Suite 1900
              Seattle, Washington 98101
 6            (206) 486-8000
              mconrad@freybuck.com
 7            (Via Videoconference)

 8            KRISTOFER Z. RIKLIS
              Riklis Law, LLC
 9            401 Wilshire Boulevard, Floor 12
              Santa Monica, California 90401
10            (310) 895-2497
              kristofer@riklislaw.com
11            (Via Videoconference)

12     For the Defendants:

13
              MATTHEW J. MERTENS
14            Perkins Coie, LLP
              1120 Northwest Couch, 10th Floor
15            Portland, Oregon 97209
              (503) 727-2199
16            mmertens@perkinscoie.com
              (Via Videoconference)

17

18     Also Present:

19
              LINDSAY HITCHCOCK
20            Videographer
              (Via Videoconference)

21
              LAUREN ENGLISH
22            Frey Buck
              (Via Videoconference)

23
              CHRISTOPHER HADNAGY
24            (Via Videoconference)

25
```

Jessica Levine                                    September 19, 2024

Page 5

1    Round Rock, Texas        Thursday, September 19, 2024

2                         9:00 a.m. PDT

3         ------------------------------------

4         THE VIDEOGRAPHER:  We are on the record.

5    Today's date is September 19, 2024, and the time is

6    9:00 a.m.  This is the video-recorded deposition of

7    Jessica Levine in the matter of Hadnagy, et al., vs.

8    Moss, et al., Case Number 2:23-cv-01932-BAT in the

9    United States District Court for the Western District

10   of Washington.

11         This deposition is being held via

12   videoconference.  The reporter's name is

13   Doug Armstrong.  My name is Lindsay Hitchcock.  I'm the

14   legal videographer.  We are with Seattle Deposition

15   Reporters.

16         At this time, Counsel, would you please

17   identify yourselves for the record, after which the

18   witness may be sworn in.

19         ATTORNEY CONRAD:  Mark Conrad for plaintiff.

20         ATTORNEY MERTENS:  And Matt Mertens for

21   defendants Def Con Communications and Jeff Moss.

22

23   JESSICA LEVINE,        witness herein, having been

24                          duly sworn by the Certified

25                          Court Reporter, testified as

Jessica Levine                                    September 19, 2024

Page 6

```
 1                  follows:

 2

 3                E X A M I N A T I O N

 4   BY ATTORNEY MERTENS:

 5       Q.   Good morning, Ms. Levine.  We've met off the

 6   record, but I'm Matt Mertens, and I'm an attorney for

 7   Jeff Moss and Def Con Communications in the lawsuit

 8   that Chris Hadnagy and Social-Engineer have filed

 9   against Mr. Moss and Def Con Communications.

10             Have you ever been deposed before?

11       A.   No.  This is the first time.

12       Q.   Okay.  So you understand that the oath that

13   Mr. Armstrong has just administered to you is the same

14   oath that would be administered to you if you were

15   sitting in a courtroom?

16       A.   Yes, I understand.

17       Q.   And you are sworn to tell the truth today to

18   the best of your ability.

19             Do you understand that?

20       A.   I understand.

21       Q.   So let me just give you a few ground rules

22   for this deposition because you've never been deposed

23   before.

24             Mr. Armstrong is a very talented court

25   reporter, but he can only write down the words of one
```

Jessica Levine                                    September 19, 2024

Page 14

1        A.    Yes.

2        Q.    Did you attend a get-together in

3    Mr. Hadnagy's hotel suite at the Def Con conference in

4    2017?

5        A.    I did, yes.

6        Q.    And how did it come to pass that you attended

7    a get-together in Mr. Hadnagy's hotel suite at Def Con

8    in 2017?

9        A.    Yeah.  So I was speaking with Toby, and he

10   said that there was something going on.  He let Chris

11   know that I was young and interested and I didn't know

12   much about security, and Chris invited me to come up

13   there.

14       Q.    I called it a get-together.  That's my word.

15             What word would you use to describe this

16   gathering so that we can be on the same page?

17       A.    It was a hotel suite gathering.  There were a

18   few people there from the village, and they were all

19   just drinking and sitting on the couches in the hotel

20   suite, talking.

21       Q.    What do you remember about this gathering in

22   Mr. Hadnagy's hotel suite at Def Con in 2017?

23       A.    One thing that I remember probably the most

24   was that he was playing with a knife the whole time,

25   which was a bit alarming to me, but everyone was

Jessica Levine                                     September 19, 2024

Page 15

1    laughing about it.  So I thought that maybe that was

2    normal.

3                There were a lot of jokes about manipulating

4    people and tricking people, which I wasn't aware if

5    that was normal or not.  But those were the things that

6    stuck out the most about that event.

7        Q.    Do you recall if Mr. Hadnagy was intoxicated

8    at this event?

9        A.    Yes, most definitely.

10       Q.    And what makes you say he was most definitely

11   intoxicated at this event?

12       A.    He was stumbling, slurring his words.  Yeah.

13   He was talking about whiskey quite a bit, and that

14   seemed to be a popular topic in the village was

15   whiskey.

16       Q.    And he was playing with his knife --

17       A.    He was.

18       Q.    -- at this party while he was intoxicated?

19       A.    Yes.

20       Q.    Did he threaten to cut other attendees at

21   this gathering?

22       A.    Yes.  He --

23                ATTORNEY CONRAD:  Object.  Form.

24                ATTORNEY MERTENS:  Sorry, Mark.  I didn't

25   hear the objection.

Jessica Levine                                    September 19, 2024

Page 16

1           ATTORNEY CONRAD:  I objected to form.

2           ATTORNEY MERTENS:   Thank you.

3      Q.   (By Attorney Mertens) You can answer,

4  Ms. Levine.

5      A.   Yes.  It was jokingly, but yes.  He would

6  make jokes about cutting people, yeah.

7      Q.   Did you witness Mr. Hadnagy stab his knife

8  into a hotel table at this gathering?

9           ATTORNEY CONRAD:  I'm going to object.  Form.

10     A.   I don't recall if it was at this party or at

11  other parties, but I have seen him do that a couple of

12  times.

13     Q.   (By Attorney Mertens) So you don't know if it

14  was at this particular party at Def Con in 2017, but

15  you have seen Mr. Hadnagy stab his knife into a table

16  on a couple other occasions?

17     A.   Yes.  And that --

18           ATTORNEY CONRAD:  Object.  Form.

19     A.   Am I okay to continue?

20     Q.   (By Attorney Mertens) Yes.

21     A.   Okay.  Yes.  I am not sure if it was at Def

22  Con that this happened or later on in the year in 2017

23  when I went to DerbyCon with him.

24     Q.   Were there any other occasions at the Def Con

25  conference in 2017 where you saw Mr. Hadnagy

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com    206.622.6661 * 800.657.1110   FAX: 206.622.6236

Jessica Levine                                    September 19, 2024

Page 17

1    brandishing his knife?

2        A.    Yes.  He had it the majority of the time in

3    the village, would constantly make jokes about cutting

4    people.  That seemed to be the running joke.  Around

5    the -- I believe he even had it out when he was doing a

6    panel.  I recall that.

7        Q.    Do you have an approximation for the number

8    of times in the Def Con conference in 2017 when you saw

9    Mr. Hadnagy brandishing his knife and jokingly saying

10   he was going to cut people?

11       A.    Over the three days that I attended the

12   conference, maybe 10 to 15 times.

13       Q.    Was there a separate --

14             ATTORNEY MERTENS:  Strike that.

15       Q.    (By Attorney Mertens) Separate and apart from

16   the gathering you described in Mr. Hadnagy's suite at

17   the Def Con village -- excuse me -- the Def Con

18   conference in 2017, was there a separate party at the

19   SEVillage --

20       A.    Yes.

21       Q.    -- in 2017?

22       A.    Yes, there was.

23       Q.    Did you attend the separate party in the

24   SEVillage in 2017?

25       A.    I did, yes.

Jessica Levine                                    September 19, 2024

Page 21

1    I recall, after it closed, there were some people that
2    looked upset after they were yelled at, but I couldn't
3    hear what was being said because I was on the opposite
4    side of the room.  I just heard yelling.
5         Q.   Did you know any of the individuals at whom
6    Mr. Hadnagy was yelling?
7         A.   Somewhat because we were working in the
8    village together, but I wouldn't say that we were
9    acquainted outside of that context.
10        Q.   Did you hear Mr. Hadnagy yelling at these
11   individuals?
12        A.   Yes.
13        Q.   Could you make out the words of what
14   Mr. Hadnagy was saying to these individuals?
15        A.   No.
16        Q.   If you have a recollection, what was the
17   tenor of how Mr. Hadnagy was yelling at these
18   individuals?
19        A.   As in -- could you rephrase that question?
20        Q.   It was a poor question, and I'll try again.
21             One can yell at individuals in a variety of
22   ways:  in an angry way, in a happy way, in a joking
23   way.  The ways are infinite.
24             How would you describe, if you have a
25   recollection, the way in which you witnessed

Jessica Levine                                    September 19, 2024

Page 22

1    Mr. Hadnagy yelling at individuals at the SEVillage

2    events where you were volunteering from 2017 to 2019?

3         A.    I would say angry or frustrated.  Angry.

4         Q.    And why do you say angry yelling?

5         A.    The tone of the voice and the volume.  I felt

6    scared, and I didn't even hear the words.

7         Q.    So even though the yelling was not directed

8    at you, it was still sufficient to make you feel

9    scared?

10        A.    Yes.

11        Q.    Ms. Levine, you were eventually hired at

12   Social-Engineer; is that correct?

13        A.    That's correct.

14        Q.    And do you recall approximately when that

15   was?

16        A.    That was in December, December or November of

17   2020.

18        Q.    And do you recall earlier in this deposition,

19   Ms. Levine, we talked about your employment and

20   education history up until about 2017?

21        A.    Yes.

22        Q.    Can you please fill in the gaps from 2017,

23   where we left off, to November 2020, when you were

24   hired at Social-Engineer?

25        A.    Yes.  I went back to school for computer

Jessica Levine                                    September 19, 2024

Page 34

1        Q.    Do you recall approximately when the first

2    call you're describing happened?

3        A.    A month prior.  I only worked there for three

4    months.

5        Q.    Did you ever see Mr. Hadnagy brandishing his

6    knife on video calls during your employment at

7    Social-Engineer?

8        A.    Yes, I did.

9        Q.    Can you elaborate on the instances when you

10   saw Mr. Hadnagy brandishing his knife on video calls

11   during your employment at Social-Engineer?

12       A.    So there were only three calls that he --

13   that included me on.  His statement was that CEOs don't

14   need to communicate with -- anyway, he would play with

15   it, open and close it, shake it at the camera, and then

16   laugh, wave it around.

17       Q.    Did you ever witness Mr. Hadnagy stab a table

18   with his knife during a video call during your

19   employment with Social-Engineer?

20       A.    Yes.  Yes, I did.

21       Q.    What do you recall about witnessing

22   Mr. Hadnagy stab a table with his knife during your

23   employment with Social-Engineer?

24       A.    I recall this being during the call where I

25   was asking for a title change, and I recall him being

Jessica Levine                                    September 19, 2024

Page 35

 1    very angry that I was trying to trick him and being
 2    really -- he was playing with the knife the majority of
 3    the time and angrily stabbed it into the desk.
 4         Q.   Is this the same call that you testified
 5    about earlier where you recounted Mr. Hadnagy throwing
 6    approximately --
 7              ATTORNEY CONRAD:  Sorry.  Go ahead.
 8         Q.   (By Attorney Mertens) Is this the same call
 9    that you recall earlier -- sorry.  I lost my train of
10    thought.  Let me reformulate that.
11              You testified earlier, Ms. Levine, that you
12    had a call with Mr. Hadnagy where he threw
13    approximately five items --
14         A.   Yes.
15         Q.   -- in anger during the course of that call.
16              Do you recall that?
17         A.   Yes, I do.
18         Q.   And you've just testified about a call in
19    which you witnessed Mr. Hadnagy stabbing his knife into
20    a table.
21              My question for you is did the knife stabbing
22    into the table happen in the same call that you
23    testified about where Mr. Hadnagy threw five items in
24    anger?
25         A.   Yes.

Jessica Levine                                September 19, 2024

Page 36

1       Q.    Okay.  Did Mr. Hadnagy ever make you cry at
2   work?
3       A.    Yes, multiple times.
4       Q.    Can you please tell me what you recall about
5   the instances where Mr. Hadnagy made you cry at work?
6       A.    During the conversation that we were just
7   referencing where I was saying that I was
8   underqualified to do the tasks assigned to me, I was
9   called worthless.  I was told that I was a waste of
10  money, that I was being paid too much, that I had taken
11  advantage of his kindness, and that I am a liar, a
12  tricker.  And that really hurt me, and I cried.
13      Q.    So is it your testimony that Mr. Hadnagy
14  called you worthless?
15            Sorry, Ms. Levine.  I saw your lips move, but
16  I didn't hear the answer.
17      A.    Yes.
18      Q.    That was the word that he used?  He said,
19  "You are worthless"?
20      A.    I don't recall if he said, "You are
21  worthless," but I do recall the word "worthless" being
22  used.
23      Q.    That's one instance you've described, and you
24  testified earlier that he made you cry at work several
25  times.

Jessica Levine                                September 19, 2024

Page 45

1    serious until later on in my employment when I realized

2    he wasn't joking.

3         Q.    You testified, Ms. Levine, that you saw

4    Mr. Hadnagy or experienced Mr. Hadnagy yelling at you

5    on video calls?

6         A.    Yes.

7         Q.    You testified that on two occasions, you

8    witnessed Mr. Hadnagy throwing things in anger on video

9    calls?

10        A.    Yes.

11              ATTORNEY CONRAD:  Object.  Form.

12        Q.    (By Attorney Mertens) You testified that on a

13   video call, you witnessed Mr. Hadnagy pull out his

14   knife and stab his table angrily during a video call?

15              ATTORNEY CONRAD:  Object.  Form.

16        A.    He had already had it in his hand playing

17   with it, but yes.

18        Q.    (By Attorney Mertens) How did those actions

19   make you feel?

20        A.    Scared.  Scared.  I have a history of trauma,

21   which Chris knew about, and I was scared and oftentimes

22   angry because I didn't understand why I wasn't being

23   listened to or why I had been set up to fail with the

24   extreme expectations.

25        Q.    Did you feel intimidated?

Jessica Levine                                    September 19, 2024

Page 46

1        A.    Yes.

2              ATTORNEY CONRAD:  Objection.  Form.

3        Q.    (By Attorney Mertens) Ms. Levine, we've been

4    going for about an hour.  Do you want to take a quick

5    break?

6        A.    I'm okay.  I'm just going to have some water.

7        Q.    Okay.

8              THE COURT REPORTER:  I would appreciate a

9    quick one, Counsel, if that's okay.

10             ATTORNEY MERTENS:  Absolutely.  Yeah.  Let's

11   go off the record.

12             THE VIDEOGRAPHER:  Going off the record at

13   10:00 a.m.

14             (Recess.)

15             THE ARBITRATOR:  Back on the record at 10:12.

16       Q.    (By Attorney Mertens) Welcome back,

17   Ms. Levine.

18             You understand that you're still under oath?

19       A.    I understand.

20   ███ ██████████████████████████████████████

21   ████████████████████████████████████████████████

22   ████████████████████████████████████████████████

23   ███████████████████████████████████

24        ██████████████████████████████████████

25   █████████████████

Jessica Levine                                    September 19, 2024

Page 53

1    excuse me -- wrongful termination lawsuit against

2    Mr. Hadnagy?

3         A.    No.  I hadn't spoken to Cat Murdock since, I

4    guess, the dinner that we had that I don't remember

5    having.

6         Q.    All right.  So the timeline here, Ms. Levine,

7    is -- we'll call it Day Zero, you post the tweet about

8    mental health in the workplace.  Day One, you get an

9    email from Mr. Hadnagy about that tweet that you found

10   very upsetting.

16              And Day Three, Mr. Hadnagy fires you from

17   Social-Engineer?

18        A.    I think it -- it was either Day Four or Five.

19        Q.    Okay.  So approximately three to four days

20   ████████████████████████████, Mr. Hadnagy fired you from

21   Social-Engineer?

22        A.    I believe so.  I don't remember exactly.

23        Q.    Fair enough.  And I'm just asking for your

24   best approximation.

25              How did it make you feel that Mr. Hadnagy had

Jessica Levine                                    September 19, 2024

Page 57

1    give it because I had violated my contract.

2         Q.    So I just want to make sure I understand your

3    testimony.  Your testimony is that Mr. Hadnagy told you

4    you had violated your employment contract and deleted

5    and stole company data, and for those reasons, he was

6    not going to send you your final paycheck?

7         A.    Yes.

8               ATTORNEY CONRAD:  Object.  Form.

9         Q.    (By Attorney Mertens) Had you actually

10   deleted company data?

11        A.    No, I had not.  It was all up in a Git

12   repository.

13        Q.    And can you please explain to the ladies and

14   gentlemen of the jury who are not quite as tech savvy

15   as you might be what a Git repository is?

16              ATTORNEY CONRAD:  Object.  Form.

17        A.    A Git repository is a version control for

18   software.  So every change that you make is documented,

19   and you can have a tested sense in a production

20   instance.  You can have tests of the product or the

21   program that doesn't go into the main branch.  That's

22   what they call it.  So any and every edit that is done

23   is fully documented and viewable and can be rolled back

24   to.

25              I made a Git repository for them from Gitea

Jessica Levine                                    September 19, 2024

Page 58

1   from scratch and had everything in there and had

2   trained Ryan how to -- how to use it.

3        Q.   Did you tell Mr. Hadnagy that you had backed

4   up all the data from your personal laptop to the Git

5   repository that you just described?

6        A.   Yes.

7        Q.   And did that make a difference in whether

8   Mr. Hadnagy was willing to release your final paycheck

9   to you?

10       A.   No.

11       Q.   He did not say, for example, "My bad; here's

12  your final paycheck, Ms. Levine"?

13       A.   No.

14            ATTORNEY CONRAD:  Object.  Form.

15       A.   No, he did not.  I had to file a complaint

16  with the North Carolina Department of Labor.

17       Q.   (By Attorney Mertens) What -- can you

18  describe in more detail the complaint you had to file

19  with the North Carolina Department of Labor?

20       A.   I sent in my complaint.  I was assigned an

21  agent.  I don't know if that's the correct term.  I was

22  assigned an individual to help take care of my case,

23  and they communicated with Chris from there on.  And it

24  was my understanding through the communications that

25  Chris was very, very difficult with that individual and

Jessica Levine                                    September 19, 2024

Page 60

1    deleting them as they came in.  Four or five emails

2    before I blocked him.

3         Q.   You were deleting them?  You testified you

4    were deleting them as they came in?

5         A.   Yes.  I shouldn't have, but I was.

6         Q.   And why do you -- why were you deleting them

7    as they came in?

8         A.   They were frightening and disturbing and

9    making me very upset, and I kept going back to them and

10   reopening them and reading them.  And my therapist

11   suggested that I not ruminate on that and just go ahead

12   and delete them.

13        Q.   And Mr. Hadnagy was sending you these emails

14   approximately two weeks after █████████████████

15   ███████?

16        A.   Yes.

17        Q.   Does Mr. Hadnagy have a son?

18        A.   He does.

19        Q.   What is Mr. Hadnagy's son's name?

20        A.   Colin.

21        Q.   Is Colin's last name also Hadnagy?

22        A.   It is, yes.

23        Q.   Okay.  And how do you know Colin Hadnagy?

24        A.   I met Colin the same day that I met Chris at

25   Def Con in 2017.  Colin and I became friends and played

Jessica Levine                                    September 19, 2024

Page 61

1   video games together for years and years.  We also

2   worked together at Social-Engineer and in the villages

3   when I was volunteering there.

4        Q.    Did Colin Hadnagy ever confide in you about

5   his relationship with his father, Chris Hadnagy?

6        A.    Yes.

7        Q.    And what did Colin Hadnagy tell you, if you

8   recall, about his relationship with his father, Chris?

9        A.    He was often upset about degrading comments

10  that his father made about his self-worth.  Colin had

11  some mental health issues that he was working through

12  that his father was very harsh to him about and very

13  negative regarding his worth as a human.  He called him

14  an idiot and incompetent.

15       Q.    Did Colin ever describe Mr. Hadnagy's

16  treatment of him as abusive?

17       A.    He never used that word, but there's really

18  no other word to use.

19       Q.    And about how many times did you and Colin

20  talk about Mr. Hadnagy's -- the degrading comments that

21  Colin said Mr. Hadnagy had made to him?

22             ATTORNEY CONRAD:  Object.  Form.

23       A.    Over the course -- over the course of about

24  four years, may 20 times, ish, give or take.

25       Q.    (By Attorney Mertens) Was Colin -- how was

Jessica Levine                                    September 19, 2024

Page 62

1    Colin's demeanor during these conversations you had

2    with him about the comments that Mr. Hadnagy had made

3    to Colin?

4         A.   He would be either upset -- there was a

5    couple of instances where he was in tears or nearly in

6    tears.  There were times where he seemed frustrated,

7    sad.  He would be distant at times and not want to talk

8    and just sit in the channel with us, the voice channel.

9    Excuse me.  And -- yeah.

10        Q.   Did you ever see Mr. Hadnagy making these

11   kinds of comments to his son, Colin, firsthand?

12        A.   I did.  I did at DerbyCon and Def Con.

13        Q.   And can you please elaborate on what you

14   witnessed Mr. Hadnagy saying to his son, Colin, at

15   DerbyCon and Def Con?

16        A.   I witnessed him calling him a "retard," an

17   "idiot," "stupid," and other similar things.

18        Q.   And on approximately how many occasions did

19   you witness Mr. Hadnagy calling his son, Colin, a

20   "retard," "idiot," "stupid," and other similar things?

21        A.   Three or four.

22        Q.   Do you recall any of the --

23        A.   Maybe more.

24        Q.   I'm sorry.  I didn't mean to interrupt you.

25        A.   Sorry.  Maybe more than that.  I -- maybe

Jessica Levine                                September 19, 2024

Page 63

1    more than that.  Maybe closer to -- maybe closer to

2    eight, nine, or ten.  Probably closer to eight, nine,

3    or ten.

4         Q.   And what, if anything, do you recall about

5    the specifics of the instances where you saw

6    Mr. Hadnagy calling his son, Colin, a "retard," an

7    "idiot," and other similar epithets?

8         A.   I recall Colin being really upset and kind of

9    really shutting down, or he would go and sit by himself

10   or leave the room.

11        Q.   How would you describe Mr. Hadnagy's demeanor

12   when he was making these sorts of comments that you

13   witnessed towards his son, Colin?

14        A.   Oftentimes, annoyed, irritated.

15        Q.   But not joking?

16        A.   I never --

17             ATTORNEY CONRAD:  Object.  Form.

18        A.   I never thought he was joking.  It was always

19   very awkward.

20        Q.   (By Attorney Mertens) Ms. Levine, this is

21   another challenging area of questioning, and so I just

22   want to flag that for you now and then tell you again

23   that if you want to take a break at some point during

24   these questions, you absolutely can, okay?

25        A.   Okay.

Jessica Levine                                    September 19, 2024

Page 70

1    What would you be looking at in order to make that

2    determination?

3         A.   I'm actually not sure that I even have the

4    ability to check because it was through Signal.  I --

5    I'm not sure.  I would have to ask someone what day it

6    was exactly.

7         Q.   So how were you first contacted by Def Con?

8         A.   So I, along with several others, contacted

9    Def Con to let them know about our complaints of what

10   was going on.  And when the lawsuit came about, the

11   first lawsuit came about, I recall there was an

12   intermediary, I guess, who got me in touch with one of

13   the goons at Def Con.  And I spoke to them about it

14   along with -- I don't know his actual, real name, but

15   Grifter is his hacker name.  I don't know what his

16   actual name is.  Sorry.

17        Q.   Okay.  So it sounds like you were -- you

18   first contacted Def Con; is that right?

19        A.   I provided my statement to a group of other

20   people that were making statements to present to Def

21   Con, and, unfortunately, I was not able to verbally

22   give it myself.  I had written it down in a Signal

23   message, and it was read by one of the other women on

24   the call because I was on an airplane.  So I suppose I

25   could try and find that flight to see when that

Jessica Levine                                    September 19, 2024

Page 126

1      A.   Yes.

2      Q.   You also said that you attended a gathering

3  at a suite --

4      A.   Uh-huh.

5      Q.   -- where there was drinking involved, and

6  Mr. Hadnagy was, again, playing with the knife --

7      A.   Uh-huh.

8      Q.   -- on that occasion?

9      A.   Yes.

10     Q.   And that also made you uncomfortable; is that

11 right?

12     A.   Yes.  But my focus was getting into the

13 industry.

14     Q.   And you obviously knew all this information

15 leading up to your decision to go work for

16 Social-Engineer as well, right?

17     A.   Yes.  I believed Chris to be my friend and

18 mentor.

19     Q.   So despite seeing all of these events and

20 having all of these concerns, you still felt that you

21 wanted to go work for Chris Hadnagy?

22     A.   Yeah.  I mean, I hate to say it, but I've

23 seen worse, much worse.

24     Q.   So did you ever report what you had seen with

25 the knife, with the knife incidents, or with Chris

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
202

1                    C E R T I F I C A T E

2       UNITED STATES      )
                           )
3       DISTRICT COURT     )

4

5              I, a Reporter and Washington Certified Court
        Reporter, hereby certify that the foregoing videotaped
        videoconference deposition upon oral examination of
6       Jessica Levine was taken stenographically before me on
        September 19, 2024, and transcribed under my direction;

7

8              That the witness was duly sworn by me
        pursuant to RCW 5.28.010 to testify truthfully; that
        the transcript of the deposition is a full, true and
9       correct transcript to the best of my ability; that I am
        neither attorney for nor a relative or employee of any
10      of the parties to the action or any attorney or counsel
        employed by the parties hereto nor financially
11      interested in its outcome.

12             I further certify that in accordance with
        Washington Court Rule 30(e) the witness is given the
13      opportunity to examine, read and sign the deposition
        within thirty days upon its completion and submission
14      unless waiver of signature was indicated in the record.

15             IN WITNESS WHEREOF, I have hereunto set my
        hand this 27th day of September, 2024.

16

17

18      Douglas Armstrong, RPR

19      _____

20      Washington Certified Court Reporter No. 3444
        License expires 11/26/2024

21

22

23

24

25

# Exhibit 24

From:        Christopher Hadnagy [chris@social-engineer.com]
Sent:        3/11/2019 12:46:53 PM
To:          Cat Murdock [cat@social-engineer.com]
CC:          Kazuyuki Nishi [kaz@social-engineer.com]
Subject:     Moving Forward

Cat,

Kaz told me he spoke to you about the next two weeks. I also look forward to a smooth transition. I have to speak to the team to see how we break up tasks and who can take what.

I will certainly miss working with you on the many varied projects we have worked on and built over the last 1.5 years or so. Some really fun times, crazy stories and epic adventures we had over the short time you were here.

I want to say I am truly sorry for creating an environment where you did not feel comfortable coming to speak to me about how you were feeling. Hopefully I will be able to learn and grow from this for future employees. I had truly felt that the close bond we shared via all the time we spent together at work, ILF and just talking, created a more open environment. But I am learning this is called a "should" statement. Which is what I perceived would occur based on unspoken expectations. So for that I am also very sorry.

I wish we could have resolved this without you having to leave. For certain, I never foresaw this day coming, not without a conversation and not after only such a short time here. I hope that the things you learned here and the training you received will make your next career choice even better and more of what you want out of your work.

I want to explain one thing about MLSE but not as an excuse. I can certainly understand my language and words were very strong and very harsh. And I did not sufficiently communicate in that week to anyone what was going on.

Just so you can understand where my head was. Monday's appt problem was a huge problem. I had students, the actors/Brittany all calling me at one time saying they were upset. I had to figure out how to keep the students from seeing through the veil on Monday. Usually they do by Thursday/Friday, but by then we have them already hooked but Monday was too early. Then I had two students call me out in class that this was all "fake" and "potentially illegal" so I went into super D mode to try and see how we fix it, keep the veil and realign the class. At that moment, Ryan and I lost control of the class. No joke, we had 3 students go rogue and just step out of the pentest to prove where we went wrong.

At the same time on Monday, I got a call from AJ very upset, near tears. Her director chewed her out cause we went public with Omaze publicity without first speaking to the network. The network came down on her and she came down on me. She left a few messages and I couldn't ignore. So I had many meetings while dealing with the MLSE debacle. By the end of Monday I wanted to cancel the course and refund every person there. I was near tears and ready to throw it in. But I stayed up with Amanda and worked through the problems. I did that purposefully because I was angry and didn't want to say anything mean to you.

Tuesday AM I was so tired I could barely drive straight. Omaze/CBS/AJ/Aisha continued to call throughout the day to tell me how bad things sucked. And we worked hard on finding a fix. The main woman at Omaze that we were all dealing with had a vacation planned and handed the "case" over to a co-worker…. Creating more stress. I was working with them well into the evening, as well as MLSE stuff.

Wednesday when I freaked out on you, I was truly at my end. This is by far NOT an excuse to treat another person poorly…..not at all, I just wanted you to know. If we had a chance to talk it through I would have given you all these details and let you know where I was at and why my reaction was so poor and most importantly, apologized. I want you to know this cause I am truly so sorry I made you feel hurt, berated, or any other negative emotion. It is so important

Confidential                                                                    MURDOCK00000045

that the people I work with understand the stress levels but we can still work together in an open, amicable environment.

I will send an email to your personal email (cat@murdock.org) about equipment return and what items we need back and where.

Thank you for sticking out the two weeks, as this week would be impossible with Ryan gone.


Christopher Hadnagy
Chief Human Hacker
Social-Engineer, LLC.
570.234.3734 ext 200
www.social-engineer.com

Have you seen my TedX Talk on how we are being hacked daily? https://www.youtube.com/watch?v=9e6k_PtEXdM

Confidential

# Exhibit 25

PLACEHOLDER

This document was produced natively

SE_62671

Potential titles:

1. Beyond the Implications: Lessons from the Front Lines of Insider Threat and Cancel Culture
2. The Unseen Assault: A Journey Through Insider Threats and the Maze of Cancel Culture
3. Shadow Battles: Surviving Insider Threats and the Ripple Effects of Cancel Culture
4. Cancelled but Not Conquered: Defying Insider Threats and the Specter of Cancel Culture
5. When Silence Speaks: Countering Insider Threats and the Unseen Forces of Cancel Culture
6. In the Eye of the Storm: Understanding Insider Threats and Surviving Cancel Culture
7. Cancelled but Not Conquered: Lessons from the Frontlines of Insider Threat and Cancel Culture
8. Cancelled but Not Conquered: Lessons from the Frontlines of Insider Threat and Cancel Power
9. Cancel Culture and something for the normal person
10. **"Canceled but Unbroken: Stories of Resilience in the Face of Cancel Culture"**
11. **"Rising Above: Lessons in Resilience from the Cancel Culture Era"**
12. **"Uncanceled: Navigating the Trials of Modern Cancel Culture"**
13. **"Against the Tide: Surviving and Thriving in the Age of Cancel Culture"**
14. **"Resilience Redefined: Overcoming Cancel Culture Challenges"**
15. Cancelled but Not Conquered: Navigating the Trials of Modern Cancel Culture

## Preface

- Introduction to my background and expertise.
- Brief overview of the event that sparked the book's creation.
- The book's objectives and who it aims to help.

## Chapter 1: The Unseen Insider Threat

- Introduction to insider threats: definitions and types.
- Personal story of betrayal by an employee with malicious intent.
- The psychological and emotional impact of betrayal.

## Chapter 2: The Ripple Effect

- Detailed account of how the betrayal unfolded.
- Exploration of the wider financial/brand/revenue impact on the company and employees. (use percentage not #'s)

## Chapter 3: The Anatomy of Cancel Culture

- Defining cancel culture and its relevance in today's society.
- Analyzing how cancel culture operates: mechanisms and motivations. (You can't cancel without cancel power) (think of this being a whole chapter)

- o  Power and its role in this (Jeff's power) (the email asking for help when he rejected helping, using cancel power properly) Abuse of cancel power
- The intersection of insider threats (Maxie) and cancel culture. (Jeff/Def Con)

## Chapter 4: The Aftermath

- Personal and professional consequences of being targeted by cancel culture. Professional solitary confinement and prison
- How 2 sentences cost me over 10 million $ and almost my life
- Emotional and psychological toll on the author and those close to them.
- Reflections on public perception and the struggle for redemption.

## Chapter 5: Lessons Learned

- Key insights gained from the experience with insider threats.
- Understanding the importance of organizational culture and employee engagement.
- Strategies for preventing and detecting insider threats.

## Chapter 6: Building Resilience

- Developing personal, professional and organizational resilience in the face of challenges.
- Techniques for managing stress and maintaining mental health.
- The role of support networks and seeking professional help.

## Chapter 7: Navigating Cancel Culture

- Strategies for responding to cancel culture and managing its impact.
- The importance of risk assessment of those with cancel power over you, communication, transparency, and accountability.

## Chapter 8: Legal and Ethical Considerations

- Overview of legal protections against defamation and false accusations.
- Ethical considerations in addressing insider threats and cancel culture.

## Chapter 9: The Path Forward

- Turning adversity into opportunity: personal growth and professional development.
- Rebuilding reputation and career after being targeted by cancel culture.
- Future outlook on insider threats and cancel culture, with recommendations for individuals and organizations.

## Chapter 10: Conclusion

- Recap of the key messages and lessons from the book.
- Final thoughts on overcoming adversity and the importance of resilience.
- The courage to return.
- Call to action for readers to apply the lessons learned in their own lives and organizations. Outline to analyze those with cancel power in your life.

Reach out to academics about cancel culture

**Preface**

- Introduction to my background and expertise.

- Brief overview of the event that sparked the book's creation.

- The book's objectives and who it aims to help.

My name is Christopher Hadnagy, I would imagine most people reading this book have no clue who I am.  This is why I want to start off telling you a bit about my history.  I do not want to go into all the "gory" details my childhood, but I think some will help you understand this story more so. My childhood was an interesting one. Both of my parents had been abused as children, and sadly carried on the family legacy with their four children. My mom had a particular need to have babies around, so we were a foster family that had over 127 kids in and out of the house before I moved out at 18. To say the house was chaotic, would be an understatement.

One time I had to share my room with a kid that liked to take his feces out of the toilet to write on the wall. Another time, we had a baby addicted to crack in the house. Another was a child who was the victim of childhood rape. It never was the same, and each time it was a new trauma. Despite it all, my family of origin was violent and brutal too.

I remember the first time I had a realization that not every house gives out daily beatings or yelling before bed, I was 12 and went to a friend's house for a sleep over. His dad came in and

pleasantly said, "Love you good night".... When he left, I turned and said, "That's it? He doesn't yell? No one gets hit?" He looked straight at me and said, "What's wrong with you, weirdo?"

I didn't sleep much that night, because up until then I thought it was a normal part of every household, so I just laid there thinking about it.

I can probably write a whole book about my childhood, but suffice it to say, for this book you just need to know that being raised in a volatile family meant I had to learn some interesting survival skills, ones that would inevitably help me with what was coming in my life. The rest of my teenage and young adult years left me trying to understand and navigate truly sick and abused people.

Growing up I experimented with lots of alcohol and some drugs, but my passion was violence. I loved fighting, I loved punching things and people. Oddly enough, I didn't even mind losing a fight. I would often find myself out at night looking for a fight, even for money, and didn't matter to me if I lost.

I remember one night in particular, I had drunk over 70 oz. of vodka, smoked a lot of weed, and slit my wrists with a cut beer can, before jumping in a lake to wrestle an alligator. That resulted in my best friend having to knock me unconscious with a 2x4 to save my life. I woke up the next morning in my room, bloody, muddy, and disgusting. My mother walked in and said, "what the hell happened to you?"

I quickly retorted, "I feel walking in the porch."

She said, "Be careful and get cleaned up."

This was my teenage years summed up.

Nineteen-year-old me met the woman who would become my wife, my best friend and the woman who helped me change for the better.... Or maybe better yet, who allowed me the freedom to change into the man she wanted.  She had a son from a previous marriage, who I fell in love with. I had to work hard to not duplicate my parent's lessons on discipline. I was not

always perfect at that, fortunately Colin and are close and we worked through any mistakes, and he has turned into an amazing man.

When he was twelve, we had a surprise, my beautiful daughter Amaya was born.  The day I found out Areesa was pregnant was the best day of my life. I was so excited, and so ready to be a dad again.

Right away I committed to being the dad I never had. I read to her belly every night, I played games with Amaya when she would push her hand up I would push it back.  The day was here, she was going to be born.  But as she came out, she choked herself to death on her umbilical cord. My world was shattered, I couldn't understand how this could happen.  The nurses and doctors worked on her for what seemed like an eternity.  I went over to her tiny blue body, and I leaned down and I said, "Baby, its daddy, you have to wake up so we can play our game and I can read to you." No lie, she opened her eyes and reached her tiny hand up to grab my finger.

That story still fills my eyes with tears. But having these two kids has changed my life. I became someone who doesn't love violence, I found peace in getting to know God, and having an amazing life partner that happens to be my best friend that I can laugh with and stare at with amazement and excitement even after 3 decades of marriage. So, let me back up to tell the story more fully.

When I was in my late twenties early 30's I found myself unemployed. I was depressed, sitting at home, and I started to gain a lot of weight. I became pretty much lethargic.

I finally found a career in information security working for an amazing company that was on the cutting edge of hacking, education and understanding threats. We got paid to hack into companies, all legally, to show them their vulnerabilities and how to patch them.  I fell in love with this job.

It didn't help my health. I found myself staying up all hours of the night, sometimes 2-3-4 am, hacking into clients or writing exploits, researching. But I loved my job. As much as I loved it, there was something always nagging me telling me that I wasn't so good at the coding part. I started to practice something called social engineering. It became famous with a very special

hacker named Kevin Mitnick. He used it to steal phone plans and to infiltrate the FBI and evade them for years.  When he was finally caught, he was sent to prison. Upon his release, he reformed and became a champion in the industry to teach people hacking. We eventually became close friends. Sadly, only in his 50's Kevin passed away recently, but he left behind him a legacy that made my job possible.

In reading his books I wanted to practice these things legally, so we would ask clients if we can include phishing emails, or phishing calls and even physically breaking into their buildings. Every time we did, we succeeded. Then one day a client asked me, "Ok so you did it, how do I fix it?"

Blank stare…. "I don't know."

He said something that changed my life, "If I went to my auto mechanic and asked, 'what is this sound?' and he said 'your brakes' then I said 'please fix it' and he said 'I don't know how', I would never use that mechanic again."

And he was 100% correct. That ignited a passion in me, I wanted to learn all I could. I started to consume books on nonverbals, persuasion, influence, body language, neuroscience, decision making, communications and any topic to do with human decision making. I would document the things I read and speak to others who had more knowledge. In about ten months I had a framework for what I felt made up social engineering.

In doing so, I realized that the world's definition of social engineering, "….the manipulation of individuals or groups into divulging confidential information, performing actions, or providing access to restricted areas, typically through psychological manipulation rather than technical means. It involves exploiting human psychology, trust, and social interactions to deceive people.", really didn't fit my research, so I redefined it. It was now, "Any act that influences a person to take an action that may or may not be in their best interest." I felt that encompassed the positive and negative aspects of this tool.

I bought a domain, www.social-engineer.org and I built a website to put this out there. I thought to myself, "well, if one person can use this, let's do it."

I also enjoyed the research I did so much I started a podcast, I was going to interview people in different fields about an aspect of this framework and how they use it and how we can learn. I had agents, magicians, psychologists, teachers, CEO's and all sorts of people on the show.

A few months after the framework was released, I get a call from Kevin Mitnick's publisher, and she is asking me to write a book on the framework I put out. I told her I was a nobody and didn't think anyone would care. It took some convincing, but I wrote that book, "Social Engineering: The Art of Human Hacking" and it was released in 2010. (I encourage you to NOT read it….I'll explain later)

That book took the infosec world by storm. I was being called by global large companies to consult and work with them on social engineering. Companies that wanted me to help in crafting and attacking hundreds of thousands of people at once.  I quickly realized I needed to develop methodologies and systems that had never been created before. The reason was, I took this thing that was being used by malicious people and added ethics and morals to it, so we can use it as an industry to test. I was serious about this and wanted people to be able to understand and use this skill properly.

In this work is when I realized I promoted some things in that first book that were not scientifically based, so that is why I say "don't read it". My fourth book is re-write of that one with all the science in tact.

It was around this time (2009-2010) I had been attending a massive hacker conference called DEF CON.  One year they had a social engineering competition and thanks to the notoriety I had gotten I was asked to be a guest judge. But I was appalled at what was happening. In this open room people were making random calls to people and getting their private info and even credit card numbers and it was all being broadcast over the speakers.  I tried to get it to stop, and when they wouldn't I walked out. I went right up to the owner of the conference, Jeff Moss, and told him, "What is happening in there is illegal and immoral, it can't continue" He said, "Well then come up with something better and you can do it next year."

A little bit heated I said, "No problems I will."

**BITING OFF MORE THAN I CAN CHEW**

I went back to the office and started to think of ideas, and every idea I had seemed too unrealistic.  I reached out to the EFF (https://www.eff.org/) , and organization that gives legal advice to people in my industry and ran my idea through them. Once I knew I was above board in the legal department I began developing the world's first Social Engineering Capture the Flag. I presented to Jeff, and he granted me to run what I called "The Social Engineering Village" or SEVillage.

My idea I developed was a series of "flags" (bits of information) that a contestant would have to try and find first through OSINT and then through a series of 20-25 min phone calls. Those who wrote the best report, got the most points, and followed all the rules – and there were a ton – would win. They would sit in a soundproof booth, I would control all the calls so if someone broke a rule we can cut them off.  And then we would assign contestants companies they had to use as their targets.

Year one, we were given a tiny room, maybe a couple hundred square feet. But the room was packed for all three days. It was floor filled, walls filled, it was amazing to see how many people were interested in this.

DEF CON has a very coveted prize called "the black badge" and it grants the winner of a competition free access to come to the conference for the rest of their lives. It is kind of legendary.  It is never awarded to a first-time competition in year one, but that year due to our success we were awarded it. We were the first competition in DEF CON history to be given a black badge in year one.

That turned the SECTF and the SEV into a new staple. Each year the competition grew and grew, eventually I helped start a kid's competition, then a teen's competition,  then a few other events that kicked off. We made international news, and we were bringing awareness to this threat in a way that no one got harmed. As a matter of fact, my business that I started was growing due to it. Many companies would send their security staff to our village to listen and learn and if they were a target they would hand me a card and ask to talk. One of few things I

loved about the SEVillage was I got to bring my wife and two kids, and they worked with me, and some of closest friends from around the globe came and we got to hang out, talk, eat and drink.

One more important fact before I tell you why this book must exist, is around 2017 I decided to start a non-profit that would use the greatest minds from infosec to hunt, geolocate and find people who traffic children and create child abuse material, The Innocent Lives Foundation. The work we do there saves lives, and I am so proud to have that has part of my legacy. (www.innocentlivesfoundation.org)

This is important, because I launched it at DEF CON and made my announcement there. I sat in the hallway of DEF CON with grown men crying on my shoulder telling me how they were raped as a child and didn't have anyone to fight for them and they wanted to help. It was one of the most moving movements of my life.

I am going to stop my story there, because this is where I want to take some time to tell you why this book is so important, in case right now you are thinking, "So what?"

**THE REASON THIS BOOK EXISTS**

My company has employed dozens of people over the years. I know I am not the perfect boss, sheez, I have said some things I certainly regret.  I also am a very hard worker and demand the same from my people. But even though I can be a giant jerk at times I treat my people well. I pay good, have excellent benefits, am very lenient and I share everything with them. I mentor, teach and give my soul to them. It is not uncommon for employees to gather at my house, while I cook for them. This is important as I reveal the story to you that led us here.

I had an ex-employee that wanted to use her MacBook but we are a Windows shop. She offered to sell us her Mac for $1, and then install our corp control software on it, allowing us to own the machine. The understanding was, that we would own it, and if we fired her or she quit, we would wipe the machine and give her the hardware back, but the data is ours. She accepted in writing.

So, she sold us her laptop for $1 so she can use it at work. She agreed in writing via email. After agreeing in writing, we had her install our control software and informed her this was now a corporate machine so to be cautious with what is on it.

During the peak of COVID she told us her father was dying and she needed some time off to care for family matters. We gave over two months of paid leave. I was also in the middle of a book deal with her to help her career. We were told the stress of the family illness has made her depressed and she couldn't work anymore.  She quit her job, we told her to mail her laptop back, we would take off our data and send it back to her.  She said, "this week".

This is the email I received with her resignation:



From: Maxie Reynolds <maxie@social-engineer.com>
Sent: Thu, 5 Aug 2021 22:52:37 +0000
To: "Ryan MacDougall" <ryan@social-engineer.com>; "Christopher Hadnagy" <chris@social-engineer.com>
Subject: Resignation

Hey there Chris, Ryan

After a lot of back and forth and a tough few months, I've decided to take a different route and step back from social engineering as an industry. I just can't fathom coming back to work — I'm so mentally drained just now that returning seems unwise.

I've not made the decision lightly, but I am certain about it. Plus, with my dad's surgery being pushed and the Delta strain affecting travel, I can't commit to return dates and I think this departure is best for the team given your last email. My attention and focus will not be there and I will not do as good as job as I can for you guys or them.

So, with sadness, this is my official resignation. I will miss working with you and I will deeply miss the whole SE team. I hope we all remain friendly and I am thankful and appreciate all I've learned from you both, our laughs and even (some of) our fights.

I will send all of the items back to Spencer's address this coming week and again, I'm so sorry we are parting ways. My personal email is ▮▮▮▮▮▮▮▮ I'll look out for mail there from you from now on.

Regards,
Maxie

We wished her well with her family and told her to stay in touch. One, Two, three weeks went by, and the excuses piled up as to why the laptop was not shipped and then finally, we were told it was. But it never showed up, so we remotely locked the laptop.

That is when we realized shipping the laptop was a lie.  The book I had worked on with her was printed and I got my copy, in one chapter she used pictures from an active case from my nonprofit of how we geolocated a predator that was grooming a 13-year-old girl.

I went nuts, she could have killed this case. I texted, called, emailed, nothing, she was not budging. I called the publisher and told him those pictures could be considered a federal crime since the case was now in the hands of federal law enforcement.

I will give you more details throughout this book, but suffice it to say we found evidence that she has been lying, trying to subvert business and even signing contracts that she was not allowed to. She had tried to get Apple to unlock her laptop, which they couldn't, and the drive got wiped.

Also learning about her methods I pulled all my support from all the marketing, podcasts and media we had planned for her book launch.

She was so angry she went and gathered many of my ex-employees that didn't like me, and took them to Jeff Moss, the owner of DEF CON, and told them that he had empowered me to become a tyrant over women in infosec and I subjugate them and harass them when they want to leave.

I know all this because Neil Wylie, a person who I thought was my friend and a very close employee of Jeff at DEF CON, called me and told me that Maxie had brought this horde to DEF CON and demanded my head.

This was August of 2021 when it all started. I explained everything I said above to Neil, who is also in security, so I couldn't understand why he wasn't getting it. It seemed so odd to me. After trying to meet and speak with Jeff about these allegations from August to December and being told that he had already given my village to a couple folks who have hated me for years, I wrote an email telling him I was leaving DEF CON and taking my SEVillage elsewhere.  That was in Dec 2021.

In Feb of 2022, I get an email from Jeff stating I am being banned from DEF CON. That next day he posts, "We received multiple CoC violation reports about a DEF CON Village leader, Chris Hadnagy of the SE Village. After conversations with the reporting parties and Chris, we are confident the severity of the transgressions merits a lifetime ban from DEF CON." (This is

actually not the first post, it was much more severe but he changed it so this is what is there now)

These two sentences would cause a ripple effect in the industry and in my life that I was not prepared for.  Since the previous named banned people from DEF CON only were named for sexual misconduct people assumed I had sexually assaulted someone in my company or at DEF CON. As a matter of fact, on the DEF CON website they state, "In cases where we feel the banned party poises a continual and imminent threat to the community, we will name them."

The backlash from this community that once loved me was unbelievable. I was called things like "serial sexual predator", "the Harvey Weinstein of infosec", "rapist", "child abuser", "thief", amongst other things I won't list in this book.  People who I thought were my closest friends ran from me like I had leprosy.

That is why this book must exist. All the people, men, and women, who will be or have been falsely accused, cancelled and destroyed. They may not have had the means to fight back, or the will, so they gave in and either ended their own lives or slithered off into nothingness. This book is for you.

Do you want to understand the profound and utter nature of cancel culture and insider threat? This book is for you.

Do you want to understand how human vulnerability can lead to insider threat that can ruin a life and a company? This book is for you.

Are you just curious to see how this all turned out? This book is for you.

**What do I hope to accomplish and do with this book**

My career has been centered around helping other people. No, I am not perfect, and I have made a TON of mistakes, that is for sure. But my overarching theme of life, is helping others. (despite my imperfection) The question that remains, someone who loves their God, loves their family, loves their employees, loves their industry, creates jobs for people, creates a nonprofit to save kids – and they can get cancelled to the point they are a pariah, literally hated by the

same people who lined up to take pics and sign books with them…. What can you do about it? How do you deal with it? How can you cope and manage?

I want to share with you the raw, unadulterated details of what I did wrong and right in coping.

I don't know if this will help, but I want to believe there is one person out there going through what I did and this guide can help you deal with insider threat and can help you deal with the aftermath of being cancelled, and how to come back from it, if there is even a way.

That is what I hope to accomplish in the pages of this book. With that let's dive right in.

**Chapter 1: The Unseen Insider Threat**

**Insider Threat and What is It Really?**

Insider thereat can be broken down into seven different categories in my opinion, Malicious, Negligent, Infiltrators, Exploited, Colluding, Third-Party, and Departing. Each of these has a different motive and reason for their reasons and it is important to understand. Some are controllable and some are not. Let's dive into each.


1.    **Malicious Insiders**: These are individuals who intentionally harm the organization through theft, sabotage, espionage, or fraud. They might steal proprietary information, intentionally leak sensitive data, or sabotage organizational systems. Their motivations can vary from financial gain to personal grievances against the organization.

This type of threat doesn't seem to care about the harm they cause or who they ruin in the path, they are just out to get revenge or a real or perceived offense. This was Maxie.

2.    **Negligent Insiders**: These individuals inadvertently cause harm to the organization through carelessness or lack of awareness. This can include falling prey to phishing attacks, mismanaging data, using unsecured networks, or mishandling credentials. Though there's no malintent, their actions can still lead to significant security breaches.

There can be different reasons for this type of threat. Maybe the company is not doing enough to educate, so the employees are a threat. Or maybe the company is not using a positive reinforcement model, so employees are not motivated to report, due to fear. Or maybe the employee is just lazy and doesn't care. Any of these reasons are serious enough to make negligent threats a real problem.

3.     **Infiltrators**: These are external actors who gain inside access through deceptive means, such as identity theft or by obtaining employment with the sole purpose of conducting espionage or sabotage. Unlike traditional insiders, infiltrators enter the organization with the explicit intention of becoming an insider threat.

These types of threats are truly malicious, from the beginning they have a goal to destroy. Their only motive is to get in to hurt and take, these types of insider threats can be hard to detect depending on their skill and your company's needs/size. We will talk a lot about this kind of threat. This is also Maxie.

4.     **Exploited Insiders:** These insiders become threats because external attackers compromise their credentials or systems. The compromised insider might not even be aware that their access is being used maliciously. This category can overlap with negligent insiders, especially if the compromise was due to careless security practices.

Sometimes it is poor security practices, sometimes it is low pay, sometimes it is both… either way, these threats can be exploited by attackers to work with threat actors to compromise a company.

5.     **Colluding Insiders:** This involves two or more individuals within the organization conspiring to carry out an attack or leak information. This type can be especially difficult to detect and prevent, as the colluders can work together to bypass security measures and checks.

Kind of like the above insiders, these are similar but even worse. They are willingly working with the attackers to take your company down.

6.    **Third-party Insiders:** These are individuals from third-party organizations (vendors, contractors, partners) who have been granted access to the organization's systems and data. They can pose a threat due to the combination of having inside access and potentially less oversight and loyalty to the organization.

Now-a-days, we are seeing endless supply chain breaches, so this is a very important topic. Knowing if the vendors who have access to your network and breachable is very important.

7.    **Departing Insiders**: Employees who are leaving the organization but still have access to its resources can become insider threats if they decide to misuse that access before they go, either out of malice or in an attempt to take proprietary or sensitive information with them.

I read a report that there were 250,000 layoffs in infosec in 2023... that number is huge. Many with very little solid reasoning. Every time this happens there a chance of creating a departing insider threat.

**Back to my story....**

So here I am reading this resume from a person who seems fake. Her LinkedIn said not only was she a social engineer, but had a degree in quantum computing, was a stunt driver, and also had the elusive OSCP certification, and on top of that she looked like a super model. In my head I said, "this is a catfish" (a popular attack where a beautiful looking woman is used to attract men into a conversation and get them to expose information.

I replied to her request for mentorship with something like, "Maybe next time you try, make your resume not so fake..."

Her reply took me by shock, "I am sorry, should I clarify something. If I offended you let me know."

Hrrrmmmmm that is not what I expected.

I continued to engage to the point where, still thinking she was fake, I said, "well I would interview you if you were in Orlando but you are in LA."

She said, "I can be in Orlando Wednesday…."

"Hrm, this is interesting, ok let me see if this catfish will go through", I thought. I told her I would pick her up at the airport and we would interview at a local Starbucks then she could meet my wife and kids and go to dinner.

Arriving at MCO airport, she was there, and she looked just like her picture. That is not what I expected. We did the interview, and she was amazing. Not what I had expected. I took her to meet my wife and daughter and they loved her. Not what I expected. All of it checked out.

None of it made sense in my head, and that was the problem. Logic said, "run away" but everything she said checked out. I ignored the blaring alarm in my head.

One year into employment, when she told us that her father was dying. It was during the time of COVID and traveling back to Scotland was going to be very hard. My wife, who is one of most giving people on earth, made her a care package of things from Scotland (her home country) and sent a card saying, "I know you can't get home so we sent home to you."

Part of that package was a beautiful cashmere shawl from the Scottish Highlands. When she was at the height of attack, she posted a picture of her dog tearing that shawl to pieces with a laughing emoji. It crushed my wife's heart.

A piece I haven't mentioned yet, as this is the first lesson for this book. When Maxie approached me, she asked me to mentor her in starting a social engineering company. I rejected that and said if she was good, I would hire her.

She got hired but, it seems her intent was to just use us to accomplish her goal. What threat does this make her?

For sure she is a Malicious or Infiltrator insider threat. To recap

**Malicious Insiders**: These are individuals who intentionally harm the organization through theft, sabotage, espionage, or fraud. They might steal proprietary information, intentionally leak sensitive data, or sabotage organizational systems. Their motivations can vary from financial gain to personal grievances against the organization.

This type of threat doesn't seem to care about the harm they cause or who they ruin in the path, they are just out to get revenge or a real or perceived offense.

OR

**Infiltrators**: These are external actors who gain inside access through deceptive means, such as identity theft or by obtaining employment with the sole purpose of conducting espionage or sabotage. Unlike traditional insiders, infiltrators enter the organization with the explicit intention of becoming an insider threat.

These types of threats are truly malicious, from the beginning they have a goal to destroy. Their only motive is to get in to hurt and take, these types of insider threats can be hard to detect depending on their skill and your company's needs/size. We will talk a lot about this kind of threat.

Maybe she fits both, either way, I fell for it. AND This is what I do for a living and I 100% fell for it.

Maybe it was halo effect, maybe it was confirmation bias, maybe it was something else. But either way I fell for it, and it cost me dearly.

**SIDE BAR:**

**Halo Effect - The halo effect is a type of cognitive bias in which our overall impression of a person influences how we feel and think about their character. Essentially, your overall impression of a person ("He is nice!") impacts your evaluations of that person's specific traits ("He is also smart!").**

**Confirmation Bias - The tendency to favor information that conforms to your existing beliefs and discounting evidence that is contradictory.**

**The Emotional Impact of Betrayal**

I remember the day I opened the book Maxie wrote and saw a picture from my nonprofits work in there, I had this pain in the pit of my stomach. I couldn't understand why anyone would do this. We were saving a 13-year-old girl, why would anyone risk that for fame or a name?

My emotions were anger, disappointment, disbelief, and disgust.

I remember the day Jeff announced my cancellation and I saw people calling me a rapist and sexual predator. A man I had worked with for close to 20 years and he knew me well.

My emotions were fear, sadness, anger, disgust and contempt.

I remember when I realized that Neil Wylie had become a threat to me and lied about or misrepresented everything I told him.

My emotions were fear, anger, contempt, betrayal.

I remember when I saw the announcement that Stephanie and JC were taking over the village and they claimed to find out in Dec but I knew that they knew in July/Augst. I was shocked by the blatant lying from people who I thought were in the same community.

My emotions were anger, disgust, contempt, and complete disbelief.

When one of my best friends in the industry had a chance to support me, he knew me ( so I thought) better than most, but instead of support he tweeted, "I pulled my talk because it was the right thing to do … after discussing with other speakers at the event, the organizers should have at a minimum announced the speaker well ahead of the conference and published clearly on site for folks to make their own decision."

He was one of the organizers of that event, so it was all bullcrap. I ate dinner and worked out with him the night before that speech. What a joke. He knew what I was asking.


My emotions where intense pain, betrayal, disgust, and a complete disbelief that this was real.

I could literally go on for hundreds of pages of the people who physically or verbally spat in my face and how I felt, but I think you get the point. This taught me who were real my friends and who was here just because I was popular.

At that time, I didn't understand how powerful betrayal was, and it became an area of research for me.

**The Psychology and Emotional Impact of Betrayal**

The psychology of betrayal delves into the emotional and psychological ramifications of being betrayed, which is a complex process that can significantly impact individuals' mental health and interpersonal relationships. A betrayal occurs when there's a violation of the implicit or explicit trust between individuals, leading to emotional distress for the betrayed party.

Research and theories on betrayal highlight its basis, where trust and cooperation are fundamental to human relationships. Betrayal disrupts these bonds, leading to significant emotional and sometimes physical consequences. According to a model presented at the Heterodox Psychology Conference, the aftermath of betrayal involves a process that could lead to forgiveness, depending on several factors including the betrayed individual's response to the betrayal (outrage), the betrayer's response (guilt or lack thereof), and the eventual possibility of forgiveness. This model underscores the rationale behind our responses to betrayal, suggesting that moral emotions, such as outrage and guilt, have developed to manage the repercussions of betrayal and maintain social cohesion ([Psychology Today](Psychology Today)).

Betrayal can significantly impact any kind of relationship, be it friendships, family ties, or romantic partnerships. The intensity of the betrayal often correlates with the depth of the relationship, where deeper relationships can lead to more profound feelings of betrayal and emotional stress. Trust is a cornerstone of all relationships, and its violation can lead to a wide range of emotional responses, from disappointment and grief to severe trust issues and avoidance of future emotional harm. People who have been betrayed might build emotional walls to protect themselves from future pain, but this can also isolate them and prevent the formation of new, meaningful relationships ([Psychology Today](Psychology Today)).

Betrayal trauma specifically refers to the psychological distress that arises from betrayal, especially in contexts where the betrayed individual is dependent on the betrayer for emotional support or safety. This can include infidelity in romantic relationships, abuse by caregivers, or even institutional betrayals where organizations fail to protect or support their members. The impact of betrayal trauma can be profound, leading to issues like hypervigilance, a lack of foundational trust, and even generational trauma. Healing from betrayal trauma often involves acknowledging the hurt, accessing therapeutic support like cognitive behavioral therapy (CBT) or eye movement desensitization and reprocessing (EMDR), and, where appropriate, relational healing or building new support systems ([MindBodyGreen](https://www.mindbodygreen.com)).

I think it is important as part of our discussion to understand this, or we can't really grasp the depth the emotions involved.

**Personal Story of Betrayal**

I want to go back to my employee, there are some important facts. When I started this company, I quickly realized that women would be better at this field, and I am insanely in love with my wife. I never wanted her to feel insecure, so I told her before we hired any woman, she can meet her and if she didn't like her, we would not hire her.

This process stays the same till this day. If I interview a woman who I may travel and be with alone with, my wife meets her and approves before I offer her a job. I care less about my company than I do my marriage, and this has kept my marriage strong, my wife has a veto vote in hiring. Going 30+ years strong!

I think that is what makes this particular account so painful. When Maxie flew in that day, she proved she was real, but I want to be honest, she is truly a beautiful woman. I felt really uncomfortable. I asked her if I could take her back to meet my wife and go to dinner with my family, she readily agreed.

The dinner was nice, we spoke, laughed, talked and set plans in motion for a future of world domination. It all sounded perfect.

I felt this sense of calm. Never did I suspect this was the first stage of the attack.

I quickly offered her a job. For our company, soon as someone is hired, we try to get them into a training class so they can get certified. It was only a few weeks later in 2020 she was scheduled to be in my class. I found it odd that all of a sudden, her ex-husband is in Orlando and sitting with us at dinner. It was very odd, and felt like we were being manipulated, but I ignored it. This is a classic action taken by someone who will later be a victim of insider threat. Ignoring clear signs of danger to say, everything is ok. That is a story for another chapter….. but the reality is there was clear signs, I ignored because of bias.

**Chapter 2: The Ripple Effect**

When I was a kid my brother and I tried to compete to skip rocks across ponds or rivers. For some reason he always won. Maybe because he was stronger, five years older or just better than me. Either way, he always beat me.

I remember when we moved from NY to PA, there was so many lakes in PA where we lived. Everyone swam in them, even though they couldn't see the bottom. I was scared, but the crowd did it so I would.

I remember this one day, after a long bike ride, I was so overheated, I just wanted to cool down. This lake looked like a sheet of glass. It was so calm, so serene. I sat on the dock and was marveling at how beautiful it was. The water was like a mirror, I could see the reflection of the early summer leaves on the trees. It seems almost surreal, magical.

As I was wandering into a mystical land, this rock went skipping by me on the pond… seemingly forever. When the rock finally sunk in, there was this amazing ripple that spread throughout the whole pond. It was a small flat rock, nothing major. Not a boulder, just a perfect rock for skipping, but when it sunk the lake was not a mirror anymore. There was a ripple that looked like a heart attack on a cardiogram. It was beautiful chaos.

As beautiful as that image is, when that same "beautiful chaos" is your life, it is not so pretty anymore. I think this is the time for you to hear the whole story in all its detail. Buckle up, this is going to sound crazy.....

**DETAILED ACCOUNT OF BETRAYAL**

You have a clear picture of the scene, I get that email that seems like a cat phish. I meet Maxie in a Starbucks, my family and I are all duped and think she is an amazing human being. And in reality, she was at first, at least what she showed us. I had a blast working with her. She was smart, witty, funny, adventurous, risk taking and everything I wanted to hand my mantle of SE to when I was ready to retire. In my head I thought, "I found the one!"

Like some Neo type of Matrix prophecy, I thought we had found each other, and she would take over my kingdom and rule it in the same way I had. I explained all my enemies, told her about ex-employees in full honesty and what they did, I offered her proof of their misdeeds, so she didn't have to take my word. Then I began to mentor, teach and get her ready.

I quickly made her my co-trainer, and she was surprisingly good. She could wing it, talk for hours and entertain and actually teach. I was impressed. I thought, "WE FOUND THE ONE!"

**IGNORING THE SIGNS**

At some point, as Natasha (if you haven't caught on, my therapist) tells me, people will SHOW you who they are regardless of what they tell you.

There is this bias called "confirmation bias" that can be defined as "The tendency to favor information that conforms to your existing beliefs and discounting evidence that is contradictory. "

This is the trap I set for myself. I liked her, she was good, she was funny, she was entertaining, she was friendly, the team loved her (so I thought), my family loved her, and we can't ignore

the truth because that is what this book is about, she is beautiful... so all the signs pointed to GO.... I ignored any signs that were glowing red due to this bias.

This really is a great lesson for any business owner. You may truly love and connect with the employee but if there are red flags it is at least worth a second opinion.

As a side note, when this was all over, I found out the "team" did not love her, they found her shifty and annoying. They thought she was selfish and hard to deal with, but they stayed quiet cause she was their "boss".  A great lesson for me, I needed to empower my people more to talk to me and not fear retribution.

Ok back to the story...... It is time for my conference in 2020. We hold it and I wanted her to give speech to help set her up as the queen of SE. I worked with her, mentored her, and gave her a main stage.

It was not good. But I ignored that. I said to her, "we will work in the nonverbals and help you fix the problems, its ok."

When in reality what was being screamed at me is that "SHE DOESN'T HAVE THE EXPERIENCE SHE IS TELLING YOU BRO!!"

I ignored those signs. (BIAS)

A week after the conference the world announces COVID 19, March 2020. What a time on earth. We had heard it was bad, but we had this contract to go and break into 9 buildings.

Everything was planned, we had 6 team members set.  The week we are supposed to fly I get so sick I cannot leave within 5 feet of a bathroom.

Lying in bed, with what I would later find out was early stages COVID-19, my team goes to the break in. My trusty second in command, Ryan is running the team. I so badly wanted to be there, but later this was a blessing in disguise, as I was never really traveling with her at all.

The job goes amazing, everyone had success and a learning opportunity. But with it, there were, again, signs, that she did not have the skills or experience she said she had. I ignored them all for the bias.

The very next week is the Foundational Application of Social Engineering Class in Orlando, where her ex-husband oddly shows up and is staying with her. Later on, it looks like I was being made a mark, but it is hard to say.

It is after this all the things start to get really weird.

**COVID-19 Social Engineering**

The world changed in an instant. We couldn't travel, we couldn't go onsite, we couldn't train like we used to. We had to adapt and come up with new methods of engaging to keep the business afloat.

None of this was scary, we adapted quickly, kept clients happy and seemed to move forward.

We found out that one of our ex-employees, Cat, who had tried to steal a brand of ours upon quitting, then went to work for a competitor (breaking her employment contract that we never fought), was now working for our largest banking client. I got scared, knowing she was vengeful and resentful, and reached out to my POC to express my concern.  I was not about to sue a HUGE bank, so I just expressed my concern and left it.

Maxie knew all this, and this is pivotal knowledge for the rest of the story.

That year, 2020, DEF CON went virtual due to COVID, and we ran our village virtually. We couldn't do all we did, but we ran an amazing kids event, 6-8 speeches and some Q&A. It was a great year.

I had landed Maxie a book deal with my publisher, Wiley, to help make her the new queen of social engineering. She had so much promise, and she had a great idea for a book on attacker mindset.

It was quickly picked up and we started working on it.

Somewhere in 2021, Maxie told us her dad was deathly ill and she needed to go back to Scottland to care for family matters. We are a very family first company so told her to go, even though travel would be so hard due to government restrictions.

One month went by, and we saw her Twitter announcing she went to a training program in DC not to Scottland. When we asked her, she had a reasonable excuse, that she cancelled that class she paid for when she came to work for us, so she took it now to not cost the company money… sounded perfect. So, I believed it.

Month two went by, and we wanted to meet but there was a car accident, mental health issues etc.

Month three and we desperately needed an answer… the answer came with her resignation. To be honest, the first time she resigned we talked her out of it. Told her we would keep her on the insurance, help her and support her we just wanted her part of the team.

When she finally quit, it was about three weeks before book launch. But there was no way to talk her out of it, Ryan was rightfully telling me to let her go. It was costing us too much.

We did, we asked her to mail her laptop back and we would wipe company data and then send her the machine. According to our email agreement upon termination she would own the machine, not the data. We don't use Mac, so she could have it, we just need to ensure the clean removal of the data.

We were told it would be shipped that day.

Week one, two , three… and the laptop never showed up. When the book was released and saw the pictures of the ILF case, I told Ryan, "LOCK IT NOW". That is when it all went to hell.

**THE ROAD TO HELL**

Maxie went ballistic with what she considered her personal laptop to be locked. She demanded the release of it, which I many times told her that I would release it once I knew the data was cleared. We have government and large clients that I could not risk a breach of data.

There was no clear acceptable path, she wanted something I couldn't give without opening a massive lawsuit for my company. And I wanted something she was uncomfortable in giving. I told her many times, I didn't understand the request. I could see all her data in our backups that she agreed to, so there was nothing to hide. I did not look through it, all I needed was to ensure the client data was deleted, but she was unbending.

Eventually she tried to hire a lawyer to sue me, and there was no case from what I understand. It went nowhere. It was at that moment she told an employee she was still communicating with, "Chris is about to have a very bad day"

**A VERY BAD DAY**

I could not understand how true those words were, and how serious that threat was. As I shrugged it off, I never thought it could be this bad.

Maxie got many of my ex-employees I told her about in confidence, the people who hated me at SEVillage DEF CON, and gathered them together and offered them fame and glory if they helped take me down. How do I know this? Two people who had this offer came to me and told me they refused to play along, Alethe Denis and Patrick Laverty. They both came and told me what was happening, and they would not be party to it.

Shortly after, Neil Wylie called me to tell me, "Maxie is about to ruin your life, make it go away."

Here are a few pages of how that conversation went:





At some point in the convo Neil says he wasn't sure why he was even involved:



At one point Neil clearly states:



When the announcement was made that ruined my life, I went back to Neil begging him for

help as the things I was being called were horrible. His reply





I read this and wonder if I am reading a fantasy novel sometimes and not my life.

After my daughter and my family suffered, I sent one last message begging for help….



Nothing but silence. Jeff Didn't care. Neil didn't care. Maxie didn't care. No one cared – they got what they wanted, my demise to lead to their success. Regardless of what it meant for my family and my personal life.

**THE IMPACT**

It didn't take long for this news to start affecting business. Companies that once flocked to us are now scared if they are supporting a 'rapist' or 'sexual predator'.  Many who even said to my face, "We do not think this is real, but the board doesn't want the heat." And then walked away from us.

With in month, we lost 25% of our business, then within a year we lost 50% of our business. I was totally baffled. We had the same product, the same team, the same quality, all we had was a two-sentence notice from DEF CON and mob calling me horrible things – and that ruined my reputation.

This happened in Feb of 2021, normally October, which is Cyber Security Awareness Month, is a massive month for SECOM. I would give 20-40 speeches and make the company a lot of money this month. This year I would get scheduled, the company would promote my name, and it seems they would get contacted saying things like "you hired a rapist" or "did you see the DEF CON news" and shortly after contract signing, I would have the contract cancelled.

It got to the point that eventually in meetings we would start off by saying, "if you are looking to hire Chris here is what will happen".. which would lead to the client running the other way.

With in that year, we lost 56% of our revenue. I was shocked. How could this little announcement ruin my good name, my work, my effort, all the things I built? I spent my life helping people and now I was a pariah, I didn't understand how much worse it would get.

**THE SECOND STAGES OF HELL**

I didn't understand how much these people hated me. My life meant nothing to them, my family meant nothing to them, my business and employees meant nothing to them.

The new SE Village run by IBM XForce Red Team Lead, Stephanie Carruthers had a game that was "Chris Hadnagy's Predator iPhone" to hack. They set up a device with that name and let people try to hack it.

I was called, "The Harvey Weinstein of infosec" and a "serial sexual predator"…..

These things just amazed me.  Stephanie doesn't even have a career without my competition, and her husband is the only person to ever be banned from SEVillage for breaking our moral code.. and I am the pariah?

At one point someone called the Orlando FBI office and reported me for "bragging about the ability to look at child porn as part of ILF"…. I was nearly investigated for the possession of child pornography thanks to this mob. Fortunately, I was able to avoid that.

All of this seemed surreal, at the least. I felt like I was in a movie, watching the main characters life being shattered to a million tiny pieces. This made me really want to understand cancel culture.

**THE ORIGIN OF CANCEL CULTURE**

I started to read books and articles on cancel culture.

The idea of "cancelling" someone for transgressions against society is not new, this has been around since humans developed communities. Churches may call is excommunication, or

disfellowshipping. It is meant to save the majority from the effects of people who are bad association or have moral problems.

Groups of people, whether women or people of color had no voice and often were mistreated to get ahead in film, media or entertainment or just life in general. The power of the person to determine their success, meant they could demand crazy things... maybe sexual things, anything that represented power. And that is how this culture developed, when people wanted to take their power back, they decided to request the cancellation of people who used that power to make success happen. They would "out" them by making public their transgressions, which in the days of social media, led to the jury of the internet determining someone's future.

The origins of cancel culture can be traced back to various historical movements and phenomena. One precursor is the concept of "calling out," which emerged during the Civil Rights Movement here in the United States. Activists would publicly expose individuals or institutions promoting racist or discriminatory beliefs or practices.

In the 2010s, cancel culture gained prominence with the widespread use of social media platforms like Twitter, Instagram, and Facebook. These platforms provided a space for individuals to voice their opinions and hold public figures accountable for their actions.

Cancel culture often involves public shaming, boycotting, and demanding accountability from individuals or organizations. It operates on the principle that individuals or entities should face consequences for their actions or statements that are considered offensive, harmful, or morally objectionable.

While cancel culture has been credited with holding powerful figures accountable and bringing attention to various social issues, it has also faced criticism for its potential to be excessive, leading to the silencing of diverse perspectives or stifling of free speech. I have read arguments

that it can create a toxic online environment driven by mob mentality and can result in disproportionate consequences for individuals.

People like Harvey Weinstein deserved to be cancelled. He did abuse his power to get sexual favors. Someone like that is disgusting and deserved the power this movement brought about.

I am 100% in support of this. Anyone who can use their power to demand sexual favors to ensure success, should be cancelled. Anyone who can subjugate others just to get ahead SHOULD be cancelled. Sadly, the majority of those using this power were middle aged white men, as is often the case.

When the accusation that I was subjugating women, harassing them, hurting their careers for my success came about, it sadly made all the sense on earth with the present conditions. The hard part is, where were the double checks, the critical thinking, the verification of facts before someone's life gets cancelled? They existed in a twisted conversation, lies told by Neil and zero verification of any facts.  Their argument was that "because so many people said the same thing, it must be true."

Sadly, none of that existed. It was guilty because I said so, and innocence was impossible to prove. Even trying was met with "sock puppet", "woman hater", "lover of rape" and many other titles that are too horrific to mention here. If anyone not even related to me, asked a critical question they were met with such hate, such abuse they often went silent to avoid the mob's wrath. When I realized that not even well-meaning people could defend me, and that even true friends could not stand up to defend, is when I realized the true power of the mob that Jeff created.

And it was at this moment I started to see the effect it had on my company.

**The Effect on Financial and Brand Revenue**

Social-Engineer, LLC is not a mega-company. We are not backed by investors, and I boot strapped everything I did. I worked hard to succeed and never took anything for granted. There are many years, still present, that I am NOT the highest paid person in the company, even though I am the CEO. I can live, I am happy, but I decided I wanted my people to feel valued so if that means I make less, that is ok, as long as my family doesn't suffer. To me, the success barometer was not money, it was happiness.

One year we got approached to get bought by a huge group.  They offered me MILLIONS of personal dollars, that sounded amazing. But I asked two questions:

1. Every year I take 3-4 weeks off with my family and travel in a foreign country and disconnect. Can I still do this if I say yes.
2. My people are able to flex their schedules to fit their families needs, is that going to stay the same?

The answer that came back, "we will need to discuss this"… I walked away from millions of dollars because the answer just plain ol'sucked. I am not sad. Freedom is worth more than money. If I make 1 million dollars this year but I can't spend it, who cares.

I walked away from that deal with no regrets.

The point to this is, we didn't have an investor to fall back on, we were basically self-funded. So when Jeff's announcement started to affect our business, it hurt. It was the perfect attack. I was the marketing too. I was the face. I was the voice. I was the sales pitch… and now, I was the woman hating, abusive, pariah…. It sent Social-Engineer, LLC into a downward spiral that didn't make sense.

Companies would say to us, "I have worked with Chris, and I know he is safe, but we can't deal with the public backlash, our board says back away."

Client after client ran the other way to self-preserve, to the tune of over 68% of lost business. WOW. Even typing that out now doesn't really make sense to me.

I remember one incident where I was hired to give a speech, a very routine event for us,

I personally met with the team, we laughed, we bonded, it was perfect.

Everything was great, until they put on "Twitter/X" they hired me. The next day they contacted us and said, "We are going a different direction, and we no longer need Chris."

This happened so many times that eventually we decided if someone hired us for me we would tell them, "hey this is gonna happen, if you can't deal with it, don't even hire chris."

So many companies ran the other way out of fear, and I get it. What if I was a bad man? What if I had hurt a woman? Do you want to be associated with this person?

I don't.

They ran the other way, and it makes sense. I don't judge them, I actually understand it. I might have done the same. (I personally hope not, but I don't know)

Understanding wasn't paying the bills though. We were quickly losing revenue.  By the end of the first year of attack I lost 100% of my speaking business, 100% of my trainings were cancelled, and as a whole the company lost 52% of its revenue. Things looked bleak for sure. I started to panic and wonder how I could fix the sinking ship.

Team meetings turned to series of sad announcements creating waves of fear and anxiety for all employees. By the middle of year two, we were still losing almost 100% of my speaking business, my publishers told me they couldn't sell another book from me till this was cleared, a potential media show I was going to do with a mentor was paused, my conference had to be cancelled, the business was down another 25%. On top of all this, Patrick, one of my good friends and employees, his podcast and conference were cancelled all because of association with me.

It became time to start laying people off. This was one of the hardest things I had to do, and I didn't want to even think about it. Month previous, I tried to save their jobs by not taking a paycheck. But by month 11 of that, my savings was not looking too hot anymore.  I had to make the hard decision.

We let two people good, it gave us a little reprieve, but sadly not enough. The controller was telling me things like, "You will need to close in 60 days if you don't find X funds".

Both of my lines of credit were almost tapped out, when the final straw felt like it broke my back. Patrick came to me and told me he had to quit. He couldn't deal with the impending closing date over his head. He is a single dad, and had to care for his family. I understood as much as it hurt to see him go.  It was only a couple weeks later that Ryan told me he was also leaving. My heart literally broke. I sat in my office and cried. Ryan was and still is, one of my closest friends. But more than that, we were the dynamic duo together. I would come up with CRAZY ideas and he would make them come to life.

Who would be my implementor? Who would the one to balance me out? How would I run the company without him? And the sad reality was that with both Patrick and Ryan leaving I had the runway now to buy a couple months to fix the problem.

The brand was teetering, the company was held together by band-aids, but the remaining team was still with me and we were communicating better than ever before. By the end of two and half years, the company had lost over 60% of its revenue and my speaking career only saw a 2-3% increase from the 0 it was at.

I often sat and pondered, "How could all of this happen because of one conference owner? How much power does he have? Are the people who I viewed as some of the most critical thinkers really such sheeple that they can't even think for themselves and see this is a personal vendetta and nothing to do with sexual assault?"

Yet at the same time, I could see how the narrative was so easy to follow, middle aged white male, in a powerful position, with minor level celebrity status in his industry, with many beautiful women working for him.

## Chapter 3: The Anatomy of Cancel Culture

Let's be honest, cancel culture needed to happen people like Harvey Weinstein was using his power to rape women. Black people had and continue to be treated so poorly they have to

have the "talk" with their sons on how to get pulled over and not get shot. Workplace questions during interviews for women had such strong sexual or misogynistic overtones, it is cringe worthy.

Cancel culture had to happen. But sadly it was also weaponized. And this is not the first time in history, think about it. There was a time in society that if someone just accused another person of being a witch, they would burn them alive, or drown them. Horrific forms of punishment just because someone would make an accusation with no proof.

In today's society in western culture, we don't really use these forms of punishment anymore, but cancel culture is just as harmful, when weaponized. Let's take a moment to really look at how this works and why it is such a devastating tool.

**CANCEL POWER**

For cancel culture to be successful as a weapon you need a few things in the equation.

A target with a plausible accusation + a community of people that will believe the accusation and act on it + (most importantly) a person with cancel power = The Perfect Weaponization of Cancel Culture

Let's think about each of these parts of the equation.

A target with a plausible accusation: If they had said I ran around DEF CON punching people, that would be easy to disprove. If Jeff clearly stated, "He sexually assaulted a DEF CON attendee", that would easy to disprove. But by making a vague statement that my errors were "egregious", actually so egregious it deserved a lifetime ban, then put my name on a list of known and proven sex offenders (1 child molester and 3 sexual assaulters) it allowed the accusation to be plausible. Additionally, I did have power, infosec celebrity status and access to lots of beautiful people and people who looked to me for mentorship or a paycheck.

A community of people who will believe and act on it: If the people with power and voice in the community demanded real answers from Jeff, without naming names, just outlining what I supposedly did, this could have all been over. Instead, the fans of DEF CON as well as those who hated me were able to band together and unitedly present a death wall of attack that was so effective, well you read above the results. The mob also controlled that narrative, as the few who did ask the questions were quickly stalled or quieted.

A person with cancel power: The idea of cancel power is something I came up with in a discussion with a good friend of mine, Dr. Lydia. I could go out into my living community and spread rumors about a guy named Tom Johnson and some awful things I say he did. But 1) no one knows who the heck Tom Johnson is and 2) my cancel power in this community doesn't exist. If anything, I would like a whiner, not a victim or protector.

Cancel power means the person who is doing the cancelling must have the power to do so in the community they need to perform the cancelling. When looking at the threat actors here, Maxie didn't have cancel power. If she tried to broadcast her story, we could have easily refuted and she would have been the one cancelled. Stephanie has zero cancel power, she and her husband have been jealous haters for years. If they tried, they would have been labelled as such.  This is why for years these groups sat in their hotel rooms at conferences just talking bad about me. They were powerless to actually take me down.

But Jeff, he has the community at his fingertips, so when the rest of them join him, they are all give a transference of cancel power through him and through the DEF CON platform.  In some ways it's like Twitter(X), using that platform to broadcast the accusations against me on an account that has 1 user, who cares. No one will see it. But when DEF CON and the other folks who all wanted to see me drown screamed it from the rooftop of Twitter, it spread the accusations globally.

On this note, the cancel power that Jeff had was devastating, only after a few weeks of the attacks, I had received violent threats, explicit phone calls, lost business and a damaged nonprofit.  I sent this email to him:



Jeff,

I hope you make time to read this email. I am begging you to take the time to consider what I am asking. You have known me for almost 2 decades. You met me because of my desire to remove something unethical and bring about morals and ethics. You watched me grow up in the industry and help so many people and so many careers. And you worked with me at ICANN, knowing the type of work I do and people I employ.

Your statement, if it just hurt me, would be bad enough, but it is hurting my employees, my nonprofit and most of all my family.

SECOM has lost clients over your statement and that is making it hard to keep all of my people employed. The last thing we want to do is remove jobs from this industry

ILF has lost 3 volunteers and a handful of donors as well as the trust from the community.

My wife and my children and scared and worried as we have received threats, vulgar phone calls and accusations of heinous things.

I am sure you did not intend any of this to occur when you made that statement, but the consequences are dire for many people.

I am imploring you to please reconsider your statement. I am begging you to work with me on fixing this for the sake of my employees, my nonprofit and my family. I cannot imagine you believe any accusations to be true, you know me better than that. Even if it means we bring SEV back to DEF CON.

Can you please consider this? Please?

Chris

I waited a few days and when I heard nothing in reply, I went back to Neil to beg him for help.



The result of this text was the same, nothing. I was told Jeff had no interest in fixing or clarifying his statement. I was left to the action of the mob and however they wanted to abuse me.

What I found amazingly ironic in all of this was Jeff's own code of conduct that he claimed I broke, states:

> We do not condone harassment against any participant, for any reason. Harassment includes deliberate intimidation and targeting individuals in a manner that makes them feel uncomfortable, unwelcome, or afraid.
>
> Participants asked to stop any harassing behavior are expected to comply immediately. We reserve the right to respond to harassment in the manner we deem appropriate, including but not limited to expulsion without refund and referral to the relevant authorities.

But what he was doing to me was exactly that, he launched a campaign of harassment against me that most definitely made me feel "targeted", "uncomfortable, unwelcome and afraid."

**The intersection of insider threats and cancel culture**

What I find particularly fascinating about my case is the way that an insider threat worked so perfectly with the cancel power to create a literal perfect attack.  I spend most of my days either helping clients learn from human vulnerabilities to try and keep their companies safe. This involves looking for and getting rid of insider threats. Or I am hunting some of the worst predators on earth at my nonprofit, again many of them insider threats.

You would think a guy who spends that much time looking at, studying and defending against insider threat should be less of an easy mark. For me I think this is one of the lessons, I spent so much time blaming myself, and thinking I had failed my craft. But then my good friend and mentor Joe Navarro said something to me, well he actually asked me, "Are you human Chris?"

The answer is obvious, "yes."

"So stop beating yourself up, you are human and fell for a human attack. Its ok."

Those words were like a millstone around my neck. It was heavy, it hurt, and at first it dragged me down. I wanted to blame myself, but he was right. I was just human, I trusted someone who I thought had good intentions. I trusted someone who I thought was honest. I trust someone who gave me all the cues of being good.

Insider threat is a very interesting concept. In the sense that insider threat that is not created due to environmental issues, but someone who is just malicious, like what happened to me. This person just wants to destroy for the purpose of destroying. In all my work, insider threats like this can be truly devastating, but when you blend it with someone with true cancel power, you have a superhero level of strength to truly create destruction in the path.

In chapter one I outlined the different kinds of insider threat, but I want to focus on just one for this section. The malicious insider.

To recap:

**Malicious Insiders**: These are individuals who intentionally harm the organization through theft, sabotage, espionage, or fraud. They might steal proprietary information, intentionally leak sensitive data, or sabotage organizational systems. Their motivations can vary from financial gain to personal grievances against the organization.

Fortunately for our company, I had Ryan. He instituted such strong policies that this kind of threat was not fully empowered to completely destroy us. Once we locked the laptop, had the data wiped, and recovered the backups to see what she was up to – we had a full picture of what was going on. She hired a lawyer to try and sue us, but he walked away from the case. All we knew is he said, "I no longer represent Ms. Reynolds" and that was it.

Left with a ton of anger, the desire to destroy and no power the logically step is to seek out those who want and can destroy. What I found out through this process, is she reached out to those who she knew were enemies. An ex-employee, Cat, who tried to steal our product, then went to work for a client breaking her employee contract. Stephanie, a known and sworn enemy, who hated me because we banned her husband from the SEVillage for being an unapologetic unethical person. As well as others who had something to profit from my demise.

How do I know this to be true? Again, I have two people who told me they were contacted and offered attractive things if they sided with them, they both called me and reported to me. I guess two out of 9 isn't bad (insert sarcasm).

Once armed with a mob who has motive, intent and power, they took their "pleas for help" to Jeff. When I was first contacted in August 2021 about this, I never in a million years would have imagined that this would turn into what it is right now. Afterall, I made Jeff a LOT of money. Between Black Hat and DEF CON, I raked in a lot of money for him and his organizations. So even if I wasn't his favorite person, I figured we had that. Plus, I ran a village at DEF CON for close to a decade and a half that, as he said, "Didn't need any policing because of well we ran it." I figured this would fizzle out.

I reached out to him via text and Twitter DM, the way we normally communicated. Starting in August till about November of 2021 every opportunity I asked to jump on a call he was either busy, in a flight, in Singapore so the time zones where terrible and he never had time to discuss.

At this point, I knew it was Maxie and the people she collected, and knew she was saying things about how I was a terrible, subjugating white male that treated women bad, but I didn't know the exact accusations.

On January 12, 2022 myself and my two COO's (SECOM and ILF) meant with a team of three people from the organization that runs Black Hat to go over accusations they were given. Finally, I would get answers, or so I thought.

We get into the meeting with them and here are the four accusations I was given:

1. There is a written email somewhere that shows I discriminated against black people.
   FACTS:  No one could produce this email, mainly because it doesn't exist. I asked Steve from Black Hat, how does one prove a negative? How can I prove I am not racist? Is saying, "I have black friends" mean I am not racist? No, so if you cannot produce the email, then this is a rumor and something that should be ignored.

2. I discriminated against a trans or nonbinary person at Black Hat and DEF CON.
   FACTS:  Also untrue.  In the rules to my competition, I had a sentence that said, "Must be male or female of the human race." This is now going back 2014, someone Tweets at me and says, "What if I don't identify as either."  Now full disclosure, I had no clue there are people who do not identify as male or female. I am a product of the 70's and don't really spend time as a happily married man listening to the news or present culture. I know, it's a poor excuse, but it is the facts. My response was something like, "Drop your pants and tell me what you see" with a smiley face. Well that went over like a lead balloon. Jeff gets a hold

of me and explains to me what nonbinary is, tells me to fix it or I am getting dropped. IMMEDIATELY I went to Twitter and explain it was ignorance not malice. I directly mentioned the person I offended and invited them to come as my guest to DEF CON and I would apologize to them face to face as an Internet apology was not sufficient. We did that, and it was smoothed over.

3. I discriminated against a blind person at Black Hat.

   FACTS: I had a visually impaired person who asked to come to my class in Bristol UK, not Black Hat, he asked if I would have the book produced in Braile, I got the cost and it was well over $1500, so I told him if he wanted to pay for it he could but I strongly suggested the class was not good as we focused a lot on nonverbals. But he was determined. He came to the class, and as expected he hated it. He told me he hated it, so I gave him a full refund.  He then went and wrote a scathing review on the Internet about how horrible I was. We found out through some folks at HOPE, that this was his MO. He not only used his impairment to get free things but also was kicked out a conference for groping women saying he didn't see what he was grabbing. There was no discrimination just a bad review.

   I also asked them to think back to the 17 years I had trained for Black Hat, in all 17 years has any person of any color, any sexual preference, any identification, or disability ever filed a complaint against me, and the answer was no. We had one complaint in all the years and that was from someone who was NOT a student, who overheard one of homework assignments and took offense. Never related to discrimination or hatred.

4. At a Black Hat class I joked that Maxie only got her job because she was beautiful.

   FACTS: During COVID Maxie and I taught the class together at Black Hat, and she made that joke about herself. The end of class, I told her that was inappropriate

and said the next day she had to fix it, which she did apologize to the class and correct herself.

After explaining all of this, I thought, there is no way Black Hat would kick me out. These accusations are ridiculous, easy to disprove, completely illogical and easy to show how they were fabricated or blown out of proportion.

I was angry, because I figured if this is what Jeff had he knew most of these stories, why was he unwilling to meet?

I was so angry that on Jan 16, 2022 I wrote this email to him:



That image is hard to read so here is the email text:

"With your time zone difference, it seems like meeting is going to be very difficult.  I was able to get a meeting with Steve, Steve and Sarah from Black Hat, and I assume these ridiculous accusations are the same.

So I can answer for each here and then if we need to talk we can try to get a time that works.  The next few weeks I have some training classes that will make 4 out of 5 days really hard for a few weeks.

Accusation 1: There is a written email where I discriminated against a black person, at Black Hat, not def con.  This is 100% false and ridiculous.  You have known me for over 15 years and in all that time I have

never ever been accused of racism. We have had people of every gender, ethnicity, race and religion at SEV and at my BH classes.  My BH classes are generally filled with more nonwhite folks than white folks. When I asked if this supposed email was produced, of course it was not.

Accusation 2: I discriminated against a trans person at Black Hat and DEF CON.  This is also not true. But Jeff you are aware of the situation they are referencing and it was over 8 years ago. When the rules of SECTF used to say "Must be male or female of the human race" and someone took offense to it. It was quickly fixed. I apologized publicly for being calloused, and I invited the one person was offended personally by me as my guest to DEF CON. We hugged it out and it has NEVER been brought up again, in 8 freaking years.

Accusation 3: I discriminated against a blind person at BLACK HAT. This is also false. We had a blind person who was very angry at a class in the UK, I did not have my book translated to braile.  He asked if I would and I got the cost and it was thousands of dollars so I told him if he would like it he could pay for it and I would allow it. He came to the class, sat through all 5 days, did all the homework, passed the class and then wrote a scathing review how much he didn't get out of it since he was blind.  We refunded 100% of his money and he went on his way. This was over 6 years ago and has nothing to do with BH or DC.

Accusation 4: At a BH class, not DC, I said that an employee only got the job she had due to her being beautiful.  This is an outright lie.  Maxie is the one who made that joke, Ryan can attest to this because we spoke to her after class and I said that the community was sensitive and asked to fix her statement, which she did the next day.

Here is the bottom line.  Maxie doesn't work here because she stole from us, lied about her dad dying, took 3 months paid leave and then stole content from SECOM and ILF.  Upon doing so we locked her work computer and made sure any contracts she tried to take from us were squashed. She then reached out to Cat Murdock who quit 3 years ago and immediately tried to sell some of our services as her own, then went to work for a competitor and then went to work for our client.  We never sued either of them.

They reached out to Stephanie Carruthers. Who won a black badge at my contest, then overnight became a competitor and then became a hater because we had to remove JC (her husband) from the competition. He called and broke our code of ethics and threated to fire someone acting as the boss. We called her back, told her it was a prank, apologized and then removed him from stage.  To get back at us for the embarrassment he took a young man under his wing and trained him to do the same thing the next year.  When we found out we banned him and his entourage from SEV forever.

Stephanie then decided to write a competitive SE class which somehow got into BH and she tried to duplicate our homework idea but had students committing fraud, we reported her to BH and unlike all these people we did NOT do so anonymously.

Since then they have been a path to try and take me down.  Maxie as ringleader is now having backing from Cat and Stephanie, but I truly doubt there is 15 others. Maybe 4-5.

If you want 3rd party verification of this, this group has reached out to a number of people – Patrick Laverty from Layer8 and asked him to side with them to take me down.  Also Alethe Denis, and they offered her a spot on a tv show in exchange for taking me out.

So if you want to investigate code of conduct violations you should be strongly looking at that group. Lying, fabricating stories and trying to create a coup for what?

We are not angry, we are disappointed. And we will make it easy on you. We are going to leave DEF CON and take SEVillage to another conference this year.  It truly saddens me that knowing me for 15 years+ you guys couldn't see through this.  Funny all these accusations are years old but they only come up 1 month after Maxie is fired?

For those years I ran a village that was ethical and moral. I had no porn, no cursing and you yourself even said that we were one village that rarely needed goons. I helped start DEF CON KIDS, and had the first kids event at def con, was the first and only contest to get a Black Badge in my first year, and helped start over 12 careers – all with little to no support or help.

These accusations are ludicris. Again, I am not upset, just really sad it is going the way it is.

I hope you are well and healthy.  I would truly avoid giving whatever name you will call this village to stephanie, trust me Jeff. She is terrible, unethical and a liar. You, of course have to make the decisions in the end but I hope as far back as we go you will trust me to help you pick a successor.  "

This email received absolutely no response. At all. Till Jan 26, 2022 Jeff DM'ed me:



I replied, as you can imagine, quite angry:



These DM's were never replied to.

On Feb 9, 2022 I received an email from Jeff saying that I was not being invited back to DEF CON and he then admitted in email, even though the accusations did not happen at DEF CON he is using activities outside of the convention space in making his decisions…

"Chris,

As a Village organizer at DEF CON you and your village are accountable to our Code of Conduct, and we expect organizers to act as an example of acceptable behavior in the community. Because of this, we consider activities outside of the convention space when deciding who we want to associate with, support, and promote."

Lets just pause for a moment and reflect on that. A conference is now saying they will review what people do outside their 4-walls when deciding who is allowed? They are now the judge, jury and executioner of peoples lives, businesses and relationships? Bold move.

On Feb 10, 2022 I received an email from Black Hat saying I was not only being removed from the advisory board but also was not being invited back to train.

WHAT?

I was confused, but not nearly as shocked when the very next morning DEF CON posted the statement, I showed you in earlier chapters.

"We received multiple CoC violation reports about a DEF CON Village leader, Chris Hadnagy of the SE Village. After conversations with the reporting parties and Chris, we are confident the severity of the transgressions merits a lifetime ban from DEF CON."

This was the beginning of a very dark end for me and Social-Engineer, LLC and The Innocent Lives Foundation.

## Chapter 4: The Aftermath

My good friend Kevin Mitnick, when in prison spent eight and half months out of his five years in prison in solitary confinement. When we would talk about that, I often would say, "I have no clue how you did that for 8.5 months." To me it seems like even a couple days would be torture, but 8.5 months?

Never did I imagine I would experience something similar.

People I looked up and thought were my closest friends treated me like a pariah. People who I helped form their careers abandoned me. I was getting harassing phone calls filled with violent threats, and cursing, I was being called a rapist, a sexual predator, the "Harvey Weinstein of Infosec", a child molester, a thief, liar, abuser of women, as well as many other things.

The daily barrage was overwhelming. I quickly did two things.

1. I hired a Crisis PR consultant.
2. I hired a Diversity, Ethics and Inclusivity consulting company to come and do a thorough investigation of my company to see if they could see a problem with me or the company I didn't see.

The Crisis PR consultant was the worst of my ideas. He didn't understand the InfoSec community. Normally I would have done what I did in the past, apologized for anything I did wrong and put the whole story out there. But his advice was to stay silent, say nothing, not to fight back.

The DEI Consultant was a great hire. They went through both SECOM and ILF and came back with a few conclusions, "Everyone loves their jobs and sometimes Chris can be really hard to work for. Sometimes Chris doesn't listen to complaints. He can be harsh when he is angry."

It was great, it was true and fair. And uncovered no sexual harassment, no abuse of power, nothing that would merit the hate I was getting. Yet employees were stressed and quitting, ILF volunteers were leaving, board members were quitting,

As the month's past, and as I saw clients quitting us, potential contracts that would literally run the other way and any speech I had was cancelled I became something I didn't know I could ever become, afraid. I crawled into a depressive shell. I locked myself in professional solitary confinement prison and fear was my prison guard. Every time my name was mentioned in a post, names like "rapist", "sexual predator" or others would be thrown out and I would get cancelled from an event or speech.  I was asked by the president of B-Sides to avoid all conferences of theirs till my name was cleared. As I mentioned before, my publishers wouldn't take another book from me due to the attacks.

I felt myself slipping into a deep depression.  There are some things I want to say here that are very hard to admit. And will truly not be flattering for me, but I think in the end they will help anyone dealing with this.

I was part of a fitness club that was very tied into my industry, when this happened, I noticed I became less important and less cared for in the group. This made me doubt my worth, I literally thought to myself, "if my community and even my trainer think I suck maybe I do."

I started to rely on alcohol as a solution. It felt like if I could just drink enough, I didn't worry at night. And it turned into a habit. I convinced myself that I could sleep better if I drank myself into forgetfulness. I wasn't getting drunk, I was just relying on it to deaden the feelings of despair.

Eventually, I stopped caring about check ins with my trainer, but the crazy part is, he didn't care either. Where there would be constant calls or pings when I missed, it just didn't matter anymore. I would miss for a week or two and hear nothing from him, but he would be all over me when it was time to pay. This fed the delusion that I was terrible and awful and not worth the effort.

For the first time in two years my training slipped. I felt myself giving up. I literally thought to myself that all the effort I had put in was wasted. It was around this time a picture my daughter made for me, which was me 2 years prior and me then next to each other popped up. When I saw that, I said, "I never want to be fat Chris again."

I remember my trainer talking about a person he looked up to. I reached out to him, Helmi. I also reached out to a woman I have been following on IG that was offering coaching. I said to myself, "whomever answers first and gives me the best answers I will go with."  Sadly, that woman never answered. And I tried like 5 times. But Helmi answered. I told him my struggles and I was honest how I found him. He said to me, "I am on a different path than X, so you just need to decide if you can trust me."

I didn't know. I was so hurt, I was so raw and emotional, I needed help. But I knew I didn't want to give up.  I said to him, "Listen, I need a trainer who cares about me, who wants to invest in me, as a person… I don't know if that is you, but I hope it is."

Helmi Dneni has been the best move I have ever made in my fitness journey. This man is half my age, with maybe three times the wisdom. He is just amazing. He has EQ out of this world, he has a true understanding of human nature, and he really does want to help. I feel like I got lucky meeting him.

I know I am jumping all over but in the 1.5 years I have worked with him so far I have:

- Been severely depressed.
- Abused alcohol.
- My wife got breast cancer
- I was sleeping 2 hours a night
- My diet went to hell
- I have ignored all the advice he gave me
- I have listened to all the advice he gave me
- I have grown and lost in the same month.

Yet every month Helmi just talks to me like a true man, empathizes, deals with my loses and my wins and truly has my best intentions in his heart. With out him I don't know if I would be alive.

Wayne would check on me sometimes daily to just make sure I was ok.

Nick was constantly making sure I was breathing and alive.

Between those three men and my therapist, Natasha, who I lovingly call Dr. Molotov, I am alive and well. Natasha earned that nickname because in many sessions we would go the full hour and at minute 58 she would say, "let me ask you this….." then she would  propose a thought or question that was so profound it was as if she walked up, dropped a Molotov cocktail in my lap and walked away.

She got the loving nickname, Dr. Molotov. But it fits.

During the attacks I found myself not able to deal with the intense emotions of guilt, shame, anger, anxiety. I felt so weak. But eventually I had a friend say to me, "Have you asked your therapist about medication?"

Quickly I retorted, "I don't need medication! I have had been a horrible childhood and never needed medication, I don't need it now!"

She was right, I needed it. I spoke to Natasha after a few more weeks of suffering and lack of sleep and a couple really bad panic attacks. I was put on Prozac. With in 3 weeks, I couldn't believe the difference mentally, but it affected me sexually. I just could not climax. Which of course made my wife feel like she was failing. This was giving me more anxiety, more panic. I didn't want to fail her; she IS the best thing in my life.

The doc then prescribed me Wellbutrin, which I guess together combat this. So here I am, a person who never had to use medication to exist through years of abuse, now on two major anti-depressants just to get through a day. I am going to be truly honest here, I felt like a complete failure.  Even though they were helping, I was not sure I was a "real man" because I had to rely on these things to think, be happy and function physically/sexually.

Thankfully Natasha was there for me during this time, my wonderful wife was there for me, my friend who recommended the meds, and Helmi was there for me.

Between Dr. Molotov and Helmi I felt hope, I could make it. Some months, I didn't know how, but I felt like, "Ok Chris just do what they say, and you will live."

**REFLECTION**

When I sit back and look at the last few years of my life, I asked one question that just doesn't seem to have an answer…..

How can two sentences from Jeff Moss cost me close to $10 million dollars as well as my reputation and my mental health? How can his two shallow, meaningless sentences lead to death threats, lead to loss business, loss reputation, loss of name and worth?

I don't know if I have the answer beyond what I said in previous chapters, Jeff has Cancel Power. He is popular enough that his opinion means something in the world, and if he says I am awful, then well, "I must be awful…"

I remember at the very beginning of the attacks; I called a family meeting. Now understand, my son was 30 and my daughter was 18, not little kids. I wanted to tell them what was going on and give them a chance to ask me questions in case they had doubts.  My son, who has rarely showed strong emotion, started crying.  To this day I can't even type that sentence without choking up. He was so angry, so upset he couldn't deal with it.

My daughter, who sadly, is much like me, wanted revenge. She wanted to attack all these people. She was asking, "but we ate dinner with this one, how could she say this?" and "She was at our house and called you her fill in dad, how could she say this?" It was brutal. I tried so hard to just answer their questions as I could and comfort them, but inside I have to admit, I was filled with hate and rage. The man that could cause my family to feel this way, I wanted him to suffer.

Somewhere deep inside me, I knew I had the ability. I was the world's best social engineer. That may sound arrogant, but I was, I understood this better than anyone, and I could locate him, find him and make him suffer. I felt this righteous vindication to make it reality, when I had my weekly session with Natasha.  We made it weekly because I was not good mentally and she wanted to make sure I was ok.

I told her I wanted him to suffer, I wanted him to feel the pain I felt. In normal Natasha fashion, she just listened then she calmly asked me, "How does that fit the moral structure you have built for who you are?"

Screw you, doc. That is what I was thinking, SCREW YOU. I do not want you to talk reason into me, can't you just for once say, "yes go do this thing, your family deserves vengeance!"?

But no, her question followed by silence that was like a 200lb dumbbell on my chest, just sat there. She looked at me, as if we were going to battle who would answer first. I knew I wouldn't win… so I might have eeked out the answer, "I know what you mean, but he deserves it, he is a piece of crap."

She said something like, "That may be true, but does lowering yourself to his standards fit the person you want to be?"

She might as well be delivering Bruce Lee's famous 1 inch punch to my sternum, my breath was gone… she was right. NO, I DON'T WANT HER TO BE RIGHT. But she was. I built my career around being honest. She knew this.

One day, one of our clients a large organization with 70,000 employees, who we were conducting monthly phishing campaigns for, had an issue. The email sent was causing some real-world problems. Upon investigation, it was my employee that made a mistake, and the issue was our fault. I called an emergency meeting and asked, "what happened and what do we do?"

The answers that came back, which made sense, were very honest but also involved us lessening the blame on us, and not being fully honest. As I listened to each person talk, I didn't feel comfortable with what I heard. But this client represented hundreds of thousands of dollars a year.

When we were done, I said to the team, "Ok guys, thank you for all your input, but here is what we will do. I will own the mistake to them and tell them what we did was wrong. I will offer them a free month of service to make up for the month we messed up, and if we get fired it is what it is, but at least we were honest and can say we never lied."

That client meeting, I was so nervous I could have vomited. But as the words came out, I felt confident, assured, and ready. When I was done, there was a dead silence. I thought to myself, "this is it, ok 'Chris no matter what they say just take it'!"

I shut up and let the silence sit. Eventually the lead POC said, "I don't think we have ever had a vendor own up to a mistake like this, why would you do this?"

"Our motto here is to leave everyone better for having met us, and we messed up, so we will own that and hope you will let us make it better."

They are still a client today. We made the right choice, and Natasha was reminding me of that. She was telling me that if I abandoned my moral structure now, I would change all the good decisions I made in the past when it was really hard.

She was 1000000% correct. Still, it was hard to try and swallow the pain of my family watching me being called all these things I was not. I don't think we ever experienced this level of injustice, and it was at this moment I started to feel intense guilt.

**GUILT TO THE RESCUE**

That may sound odd, but at this moment I started to feel like a faker and an imposter. As a middle-aged white male who had an easy life, I was finally feeling injustice at a scale that I never thought possible. The anger, the resentment, the total disbelief was something that drove me to depression, over drinking, sleepless nights and turmoil… but all I could think is, "how many black people, women, or others of color have felt this for decades or longer, why am I special?"

That guilt plagued me and made me bury my feelings deep, convincing myself that maybe my suffering would offer reparations to those disenfranchised in the past. The pain did not abate the guilt, sadly, I almost wish it did, but it didn't. But it did help me with empathy, I began to understand the intense anger that eventually led to more realistic understanding for all my black friends.

I remember once in Pennsylvania, one of my closest friends came from Maryland to help me with some plumbing. He was a very skilled, young, plumber, who happened to be black. We needed some parts, so we went to a store. As we walked in, I felt some weird vibes, but didn't understand. We walked up to the counter and the man came and looked right at me and said, "how can I help you?"

I replied, "Oh I am not the talent, he is the plumber…"

Without breaking a sweat the man said, "Have your BOY tell you what he needs, and you tell me…"

MY BOY?? MY BOY??? My mind went into rage. I was ready to jump over the counter and pound his face, I think Josh saw my anger and clenched fists, but he grabbed my arm and said, "we need x, y and z just get those parts"… I said, "We won't buy a damn thing from this dick!"

He said, "Chris, nothing is open, if we don't then you don't have heat, just get it, its ok."

As I felt like Judas as I ordered those parts, vowing to never go back there again. (PS I never did)

When we walked out, I said, "How can you just accept that? Why don't you fight?"

I realize now how terrible my line of questioning was, but he looked at me and said, "What will it do? I fight, you don't get your parts and I go to prison or maybe shot."

That answer hit me like a Mike Tyson punch. I hated it. I wanted to hurt everyone. "This can't be the answer to society, can it?" I thought to myself.

Now, years later I am facing injustice and realizing what Josh had to deal with, and why he chose the path he chose. Not so empowered, I took the same path as him. If you're reading this, Thank you Josh for teaching me that lesson, even if it is painful to admit due to my "whiteness".

Guilt seemed to be the order of the day, everything I did was ruled by guilt. It was not healthy, and I knew it, but wouldn't admit it. Natasha saw it and tried to help me, but I fought her. She talked to me about something called, Adaptive Child Response (ACR).

ACR is the response you learn as a child to make you feel safe in a stress or trauma circumstance, and it can become habit.  Mine was "save/rescue". This is a story for another time, but it from a very traumatic episode in my teen years. The resultant was that I was now, in the height of my worst time of life "mentoring, helping and teaching" the most amount of people I have ever taken on in my whole career. While working about 12 hours a day for SECOM, 4-6 for ILF, 1+ hour in the gym, and saying "yes" to everyone. I was leaving about 3-4 hours a night for sleep.

It seemed if someone reached out and asked for help, I said "yes" without even thinking. I found myself spending 5, 10, 15 hours a week helping folks and mentoring people with career choices or education choices.

It was a way I was trying to make myself feel useful, and worth something. Even though Nastaha kept telling me it was not real, I had the hardest time seeing it, I needed this to help me feel whole.

Then about year two and a half, my wife is diagnosed with breast cancer. I honestly sat in my house and broke. How much more could we take? I had to be strong for her, for my kids, but alone I just sat there and started to drink my pain away, maybe getting 3-4 hours of horrible sleep a night. But my wife, how could I do this without her? Will she make it? Will she be ok? She was scared, I was scared, we didn't know what to do or how to manage it, neither of us have ever been sick.

There was not a future with out Areesa in my mind. She was my world, my universe, my everything. Thinking that this could be the end of our life together crushed my desire to live and fight. But at the same time, I had to be strong for my kids and for her. So I buried the pain, I buried the anxiety and told myself I didn't matter.

This was not healthy, of course, and lead to a path of some more serious gaps in self-care. In addition, it was at this time we started to get documents from the opposing counsel that helped me see the things they thought I was guilty of, and that was truly disturbing.

There was so many misrepresentations, so many lies, so many outright false statements, I was appalled and shocked. But again it was their word against mine. I asked my lawyers desperately, "How can they state this when it is a blatant lie?"

They calmly told me, "They can state anything so it is up to prove them wrong."

My first glimpse into how biased and disgusting our justice system is. There is no punishment for them stating completely bogus garbage, it is up to me to prove they said things that are untrue. My lawyers were unwilling to play "dirty" so they did want to do the same thing that Jeff and his lawyers would do. In the end, I appreciated that, but at the time, I will admit, I wanted him to suffer like I was.

It was time I sat back and started to reflect, or I was going to get stuck in an endless loop of pain and suffering.

**REFLECTION**

I won't lie, I had so many people I trusted and loved, tell me I was awful there were many days I started to think, "Maybe you are just a terrible person, Chris, and you are lying to yourself."

I had people who helped me start SECOM, who helped my career, who changed my life, who saved my physical health – all of them turned and treated me like a garbage – so I started to think, "maybe you are not the man you think, and you deserve this to an extent."

I have to admit, this was the hardest. I had some amazing friends I can mention – Wayne, Matt, Nick, Layne, Domini – there are more but they were telling me to not listen to these haters. But it was so hard to ignore what I felt.

The hardest thing for me was the feeling that I needed redemption.

*noun*

noun: **redemption**; plural noun: **redemptions**

1. the action of saving or being saved from sin, error, or evil.
2. the action of regaining or gaining possession of something in exchange for payment, or clearing a debt.

Ahhhh redemption… I wanted to be saved from this, I wanted to feel I was clearing any debt, even though I knew I had no debt here. Why was I expecting to clear I debt I didn't have?

Sigh – the human brain and guilt/shame was such an amazing thing.

It was about this time, a good friend of mine, Dr. Abbie Marono gave a TedX talk about shame and guilt. Her talk, maybe had one of the most profound effects on me. I knew the story, but this speech rocked my world.

https://youtu.be/ptvCTuct4GE?si=HQsCVUjJ4PXcrI_L

She sent me the speech to watch, as I watched it, I broke down in tears. I would never tell her this, she will read this now and know, but her speech rocked my soul. I felt shame, guilt, and such sadness. Her speech helped me reconnect with …. ME.

It helped me see that I am not the sum of my "accomplishments" but I am just a person that did these things, some are good, some are not, but its ok. Dr. Abbie, at 25 years old, taught me lessons I needed to hear as a 50-year-old man. (PS thank you Dr. Abbie)

I tried to hide my emotion, but her speech hit me to the core. We did not experience the same trauma, but we experienced the same feelings. How is this possible? I don't know but I will just accept it.

I am the man that wrote a book about the psychology of phishing. I am the man that created the social engineering framework. I am the man that made the first social engineering podcast and newsletter. I wrote five books on this topic and now am a professor of social engineering at an NSA school of excellence… how could I be the victim of this? No, it is not possible! (right?)

Between her, my family, friends and Natasha, I said it was time to start healing. My wife and my family needed me. This is when I decided I needed to start listing the lessons I have learned from this experience so I can help others.

**Chapter 5: Lessons Learned**

One of the things I learned from my mentor, Dr. Paul Ekman, was that when you fail, use it to learn. Even if that failure is not your fault, look at what you could learn from it. This reminded me of a really good friend I had when I was younger, Tom McIntosh, he was a famous jazz musician. One of the world's best, and he was one of the humblest men I ever met. I asked him once, "How did you become one of the world's greatest?"

His answer is something that stuck with me forever, "Ever person I met I asked them for a lesson, to teach me something they learned."
I retorted, "But Tom what if they are worse that you, not as talented?"

He said quickly, "Then I learned what NOT to do, and I still thanked them."

WOW, my tiny little mind was blown.

When Dr. Ekman said those words to me, it reminded me of Tom. Ok so how can I apply this all right now in my life?

I want to break down these learning lessons into three categories. Lessons I learned from having a true insider threat, lessons I learned from being cancelled, and finally why your culture is so important (company, family, friends)

**Lessons I learned from have a true insider threat**

I feel like this experience has given me a unique opportunity to understand insider threats and how they affect us mentally, physically and from a business perspective.  I want to talk about this and define it to help those dealing with it.

When I first realized that someone I trusted, someone I cared for and someone I called a friend was able to look me in the face and lie, steal and cheat I felt a lot of embarrassment and shame. I did a lot of self-blaming and self-doubt.

I guess this where I can reflect on my first lesson, those feelings of shame and self-doubt held me back from seeking the help I needed at that time. I needed support, I needed to tell people I was weak, scared, hurt, and I didn't. By blaming myself for not seeing her, not catching her, not noticing the signs, I was in essence saying "Chris, you deserved what you got."

No one deserves this, so that lesson hit hard with me and took longer than I want to admit, to accept. It was NOT my fault. I did not deserve this. I did not blindly or stupidly "allow" myself to become a victim.

At the same time, I did make a few dumb decisions. Soon as she quit, I should have locked the laptop and enforced her sending it back. But I allowed what I thought was a friendship of trust, to make a bad business decision. If she had leaked client data or stole information from clients, I would be facing a breach lawsuit. The lesson here, even if they are your best friend, you have to follow the process and procedures to keep yourself safe.

The legal system is there for a reason, and when I found out that she illegally used a picture from The Innocent Lives Foundation and she was trying to divert clients away from us, and took a paycheck under false pretenses, I should have sued her. If I had taken her to court, we would have won, and any claims she made could have been squashed due that. The same with the woman before Maxie, Cat, who tried to steal our product SERA and sell it as her own. We sent a cease and desist letter, but she broke her employment contract by doing that and by going to work for a competitor and then a client. I should have used the law to set these people straight, a lawsuit would have given me the proof I needed to shut them down quickly.

And I think a really big lesson I learned, is when all of this was going down, I should have taken a break from social media, blocked her, and stopped following her. By allowing her to still be in

my mind, and renting space in my life, I gave her an avenue to continually hurt me, my wife and my family.

We also had an employee that continued to communicate with her, even as these attacks were going on, I should have fired him on the spot. Instead, I thought he could be convinced and "saved".  The negativity he brought to the team was extreme.

These are just some of the lessons that I think are important from insider threat, which leads me to the part where I was cancelled.

 **Lessons from being cancelled**

I am going to make an assumption that if you are reading this you understand that what I am talking about is someone is unjustly cancelled, like I was. If the person who was cancelled, deserved it because he or she did assault, hurt, fraud, etc someone else, I have no advice for except to own up to it and try to make reparations.

If you were unjustly cancelled, I think some of the lessons I learned can really help you.

To Speak or not to speak. With in the day of my cancelling I hired a crisis PR person. His advice was to issue a legal statement that said, "I did nothing wrong, no further statement." And then sit back and shut up, say nothing. Herein lies my biggest lesson, do NOT stay silent. If you have truly done nothing wrong, then force your accusers to prove the allegations, stand up for yourself, put out all the details you have known.  Do it respectfully, calmly and with provocation. You don't need to resort to name calling or immature acts, even if your attackers are, really. State the facts, stay respectful and work to clear your name. I can't express enough how you have to stay calm and respectful, or it feeds the narrative.

Get rid of toxic people fast. Sadly, there were many with in my work and community circles, that even having known me for years and having spent countless hours with me started to fall into the narrative that I was a bad person. I had two problems, one, I thought I could keep those people and convince them they know me and remember the person they know. I spent so

much mental energy trying to fix something that was only broken because of them, it exhausted me.  Second, I was acting in fear mode. If I let people go, or exited volunteers from my nonprofit, would they join the hate group? I convinced myself and let me COO's convince me that it was best to not part ways with those people.

Let me tell you, the lesson I can see now, that was the wrong move. As year one, turned to year two, to year three and we slowly weeded out those people, the resultant was my company was happy, my nonprofit was happy, and the culture returned. Instead of fighting every day in and out, we were focused on what was important, our missions. If I could go back I would tell myself, "Just part ways with them friendly, but fast." Seeing the affect, it has on me and my people mentally once we did part ways, convinced me, I should have done that much sooner.

Social Media. I spent countless hours not just reading the things being said about me, but re-reading them over and over and over. It got to the point that it was in my dreams. Every time someone I thought was a friend spewed hatred it was like another strike of the whip. There was some things I had to do to collect the evidence we would need for the lawsuit, but I spent too much time reading all of it. At one point someone actually told me to committ suicide and live stream it so the community could watch it. The same people that would stand in line for hours to get into my DEF CON village now wanted to watch me hang myself on live stream. Spending so many hours every night, with a drink in hand, reading these comments was one of the worst things I could have done to my mental health.

Draw your family/friend group closer. I fell into the trap of isolating myself and I almost had myself convinced that NO ONE could support or love me anymore, I was truly a pariah. But the facts are I had some amazing people in my corner. My amazing wife, Areesa and my kids, my local group of friends we call "the family", Layne, Joy, Dave and Allie, my ILF Core Team, Michael, Tim, Ryan, Patrick, the team left here at SECOM, Devan, Lydia, Mark, Mary, Neil, Kimberly, Kevin, Tim, Jess, Jessica, Chris, Ali, Stephanie, Kathie, Helmi, Erin, Pablo, Rachel, Domini, Matt C, Robert, Jamison, Bjorn, Daniel, Dylan, Doug, Natasha, Natasja, Nick, Claire and Wayne.  This list is probably not all of the people. But here is how I qualified them on this list,

they never let me stop remembering who I was, my morals, my ethics and that I was loved. I want to single out two people to just tell you how important it was to draw closer to this group. Nick, he has been my brother through thick and thin for many years. He never let me slip into that old demon of self-hatred.

Wayne, I met Wayne at the very start of the DEF CON village. Wayne and I became friends instantly and we stayed friends. Wayne came every year to hang out with me all the way from Australia. Wayne and I stuck it out when he almost died from a medical problem, when many of his friends left. And when I was going through this, he flew over to come to my house and he never let me talk bad about myself. Wayne reminded me why I do what I do, so my lesson – find your Wayne or your Nick and do not reject them, draw them closer.

Get a therapist. I do not view therapy as a sign of weakness. I have been seeing a therapist since I was 15 (thanks Mom and Dad) and I won't stop. You need a safe place to get your feelings out and a person who cares for you mentally to give good coping mechanisms.  Natasha was a heaven-sent angel for me. Can I tell you what this amazing woman did? When I was in PA I met her and I bonded with her as a therapist. She got me and more than that, we had amazing conversations and she actually helped me through so much.  When we decided to move, I figured she could just continue remotely. When I went in to tell her we are selling the house and moving she said, "I am not licensed in Florida, I won't be able to be your therapist."

No! No! This is not the answer I need to hear. I need Natasha in my life. She has helped me through so much and do you know hard it is to find a therapist you can bond with that closely? She saw my panic… she went on her own dime and got licensed in Florida so she can stay my therapist!  WHAT!!! And thank God she did, without her I would have not made it through this.

Watch that adaptive child response.  I discussed what this was in the last chapter, but my ACR is save/rescue/help. This makes a lot of sense when we uncovered this, my life I have taken on so many mentees, I started ILF and make no money from it to just help, etc etc. When my nonprofit was failing, my company was losing millions of dollars, my family was depressed, my

career was dying in front of me, my 15-year-old dog who was our family best friend died and my wife was diagnosed with breast cancer I found myself offering mentorship to everyone I could. If I could help one more person, maybe I can convince myself I am not a disgusting. If I can help one more person with their career maybe it will make me successful again.

Areesa getting cancer was the slap in my face I needed. All my focus went to her.  It was the year of our 30th marriage and as odd as this will sound, we reconnected in a way that I think we drew closer than we had been in 30 years. We went for walks almost every day so we could talk. We would sit outside with a drink and talked. Lay in bed and talked. We talked so much about everything. I found myself sharing things with her, I never thought I could. The trauma and damage of my childhood I held in, the work at ILF and things I know are happening, my true feelings about everything. In turn she talked to me about her fears, feelings, everything in her heart and mind.  The connection between us grew.

I was shocked when friends would tell us when they got cancer it pushed the couple apart leading to divorce.  For Areesa and I, it made us an impenetrable force to be reckoned with. I also helped me to see I need to focus on sleep and my health a little more.

Take care of your health. Thankfully one of the things I had established before the cancelation was a great fitness routine. During all of this I rarely if ever missed a work out. If what you are doing is boring or stagnant, then change. I needed to change to Helmi. This man is more than a trainer, truly, he actually cares. Some days he calls to just see how I am, checks on Areesa, etc. He brought back my motivation.

But when I say health, I mean more than this. Yes, your physical health is important. But sleep is essential, and to be honest, I am still not great at that. Prioritizing down time to have a hobby, to rest your mind, to read, to veg, whatever it is. It is important. The mental drain of living in a cancelled state will not be understood by those who never experience it.

 Don't become calloused. Pre-cancellation I was the kind of person that if a woman said anything I 100% believed without even thinking. When this happened, I sadly went the other

direction for a bit. Everyone was now a suspect until they prove they were wronged. I found there needs to be a balance. I learned this lesson thanks to Natasha…. One of her Molotov moments.  In a session I said, "When this is all over, I am never going back to infosec, screw them, they are dead to me. That industry is a cesspool."

Normal Natasha fashion, she listens, and when she takes this certain type of breath, I can tell it's the Molotov moment, "Let me ask you a question, before all this happened did you think you held value in the infosec community?"

"yes, I do"

"Ok, do you think your experience and your knowledge helped new ones, young ones or others get meaningful careers and opportunities and knowledge?" She asked.

"Yes, I do" now nervous as I can't clearly see what direction the Molotov is coming from.

"Has DEF CON and Jeff changed that? Are you now not possessing that knowledge, or that experience and no longer have value….?", she asks this question and it trails off to let me ponder.

At this point I cannot even look her in the eye, "I hate when you use solid logic on me, but of course DEF CON cancelling me did not take away my value."

Here is comes, the wick is lit, the bottle is in midair about to hit its target, "One thing I have known about it in all the years we worked together is that you are brave, quitting would be the opposite of brave. But the courageous thing to do would be to return and help those you can even after this." BULLSEYE, she hit me square with the full cocktail.

I quickly retort, "You might be right, but I am never going back to def con, that place is a cesspool and Jeff will never make a cent off me again."

"Oh hell no, that place is dead to you." She said.

And I will take that small victory. But the lesson is that it takes courage to not lose yourself, your morals, your structure and your strength.

**The Importance of Culture**

I learned a few other good lessons going through this. A company is NOT a family, it can be a gang, a tribe, a clique, but it is NOT a family. When we compare it to that, it makes it odd when you have to let someone go, or they leave.  I can't fire my daughter, but I can let any employee go.

Our culture here was one of openness, fun, laughter, we do a hard job but it had to be centered on empathy. I worked hard to make sure the culture here was strong, but along the way it got lost, and I didn't correct it.

Empathy wasn't present in everyone. A lot of the employees viewed me as so busy they didn't feel comfortable coming to me when there were problems. We laughed less and focused more on getting things done.

I needed to hire a couple people and during the interview I could tell they were not really inline with our culture. Meeting them, they were not like the people we had here already, but I moved forward. It ended up taking valuable money and time away.

Additionally, it was important to focus on the family dynamic. Avoiding people who wanted to live in the drama and be with people who truly cared about us.

I can't stress enough when we finally got back to our core and realized the mistake we made and started to correct it I saw the light come back to my fellow employees faces. I saw relaxation and openness, the culture of empathy and communication was back. It felt like the company I tried to build over a decade and half ago.

The lesson I want to share, under stress I thought I needed to ignore the basics and just focus on mission, but doing that changed a core principle for us and hurt us as a company.

I started scheduling weekly 30-minute meetings with every member of the OPS team, not to discuss work, but to talk about their life. I started to make sure the team meetings were fun and light. In interviews I brought more people to meet candidates to get feedback so we hired people we all get along with. I went back to my roots.

Don't let stress change who you are and the decisions you make. "There is wisdom in a multitude of counselors." Don't be shy to ask for advice or feedback from those in your trusted circle.

After reflecting on these lessons, a question that came up in my mind was, could I have avoided this? Is there a way to build a resilience to these challenges?

**Chapter 6: Building Resilience**

**Resilience** is the ability to recover from or adjust easily to adversity or change. This includes handling stress, uncertainty, and potential threats without being overwhelmed. In the context of insider threats and cancel culture, resilience involves maintaining mental health, making sound decisions under pressure, and upholding ethical standards despite external threats or criticisms.

Whereas the last chapter I talked about lessons I learned in reflecting in events that already occurred now I want to focus on things you and I can do to help build up our "immune" systems to help in case you find yourself in this situation. I have broken this chapter down into six different subheadings, each is similar to some of the lessons above, but let's discuss how, like taking vitamins before you are sick, makes it easier to fight off the sickness.

**Self-Awareness and Emotional Intelligence**

Understanding our own emotional and physical responses to stress before we are in the stressful circumstance can make it so much easier to recognize negative patterns before they do damage. It can help us and those we trust to recognize those signs early and help in managing them.

For example, I know that when I am under extreme stress, I focus more on task and less on people. What that means if I become more blunt, more direct, and less caring about feelings. Knowing this in advance means that as stress rises I can use emotional intelligence to say, "Hey Chris, be extra careful to what you say and especially HOW you say it." I implemented this where I would send Ryan an email I wanted to send to have him read it and say, "Bro, cut out these sentences and lessen the anger here." It saved me from a lot of headache.

It is also important to develop skills to manage emotions and prevent reactive decision-making. Some of the things Natasha had me to:

- Recognize and feel the feelings, do not bury them, do not ignore them. Allow yourself to feel it, do not let it control you.
- Breathing tactics to help calm down during high stress moments.
- Negative thoughts should be challenged - literally as they pop up say to yourself, prove it. A lot of times those negative thoughts like, "I don't do anything right" or "everyone hates me" or "I am a bad person" when challenged quickly can be dispelled.
- If you are physically active don't stop, if you are not, start, even just walking, anything can help.
- Be assertive not aggressive. It is ok to stand your ground, to defend when you feel attacked but do it with assertive language not aggressive language.
- Manage my time better. Prioritize things that keep me alive longer and that must get done.
- Journaling. Both Natasha and Helmi keep telling me to do this, I am not a good example, but it is something that can help.
- Seek feedback. Ask those who will be honest for honest feedback about your emotional responses.

This is not an exhaustive list, but for sure these things helped me stay a live during this ordeal. If I had the habit of doing this before, it might have been easier.

**Building a Support Network**

Be very cautious here, it is not uncommon to go on the Internet and seek a group there that is a sounding board for you. Sadly those siloed types of groups do not really help but create an environment where you just told the things you want to hear. That really doesn't help anyone. Have you ever met a

adult that as a child they were told everything they did was perfect, they could do no wrong, they never lost or came in second?

I am sure you have and that person is really hard to work with, they can't take constructive criticism or counsel or advice.

A good support network should include colleagues, mentors, your therapist and other professionals who guide you, who you trust and who have your best interests at heart. They love you enough to look at you and say, "Hey Chris, don't be a dumb ass." (I am quoting Ryan here)

**Mindfulness and Mental Practices**

More than the deep breathing I spoke about above, this is more like a cognitive restricting.

You ever try to dig a hole at the beach? It can be an impossible task if you don't plan properly.  You dig and dig and dig, and sand keeps falling in the hole, filling it in.  If you don't find a way to support and replace the removed sand with structure, you won't get far.

Learning to identify destructive thought patterns and then challenge those patterns. Once challenge learn to replace them with more constructive ones. Just like digging that hole, if you don't find a replacement you will return to old habits.

My pattern is, "I am not good enough", it has been one of the driving forces through my life. Being told as a child that I was never good enough, I now believe it. I have learning to, when I start to feel that old friend of  "not good enough" come knocking, to not answer the door. But even take it step further, not just to hide when he knocks but to challenge that feeling. "Am I really not good enough?" Then to ask other questions like, "Did I make a mistake here?"  Even if the answer is yes, "Is that mistake unfixable? Does it mean I am worthless"

By challenging those thoughts and finding replacements I am working past this. Now, don't get me wrong, the replacement is not, "YAY Chris you are wonderful!" I hate toxic positivity. (more on that soon). The replacement is, "Ok Chris you were overtired and stressed and when your kids did that thing you yelled and said something stupid and mean."  It is not "I AM STUPID AND MEAN", no "I said SOMETHING that was stupid and mean."

Well what can we do now? Apologize. "Hey kids, this is not an excuse for my behavior, but I reacted like a moron a few minutes ago. I let my stress react to you in a way that was mean and rude. I am very sorry. If you want to talk about it, I will listen."

Cognitive restructuring for the win!

**Realistic Optimism**

At some point during my trials when I slipped into depression and a serious bout of negativity, I remember saying to Natasha, "I am not being negative, I am a realist." It was me trying to convince myself.

At the same time, someone told me, "You have to wish positive things into existence, if you manifest it, it will happen." UGH. This kind of toxic positivity doesn't help anyone. What do you think I have been doing, I have been sitting here for 3 years wishing, praying and manifesting and IT DIDN'T WORK???? The universe hates me? God hates me? I have failed at manifestation? No, if you could wish good things in to your life no one would have problems.

No, the truth is that "time and unforeseen occurrence befall us all" and that fact is a universal truth. Balance is important, is what this means. We can be positive by looking at the good things in your life. Even in my darkest moments, I have a wife that truly loves me, I have two wonderful children that love me, I have a friend group that will not leave my side, I have a nice home, I have food, etc. None of this is to minimize the pain, it is to say "thank you" for the things I have.

I remember once Nick asked me, after I went on a 20-minute rant about how my business is most likely shutting down, "So what is your plan B?"

A long pause, "There is no plan B, there is nothing."

Nick asks, "So if you shut down SECOM you go live in a box, go on welfare, what do you do?"

Irritated, only because he is right, "No of course not Nick, I would have to go get a job."

Nick, finally getting me to where he wanted me, "Yah, so have you considered putting a few feelers out there to determine if the worst case happens you are not jobless for months?"

That was realistic, I needed to plan and not rely on "no plan B". Which is a perfect segway to the next point.

**Flexible Thinking**

One of the few things I will compliment myself on is I am very quick on my feet, mentally. I can think of pretexts, or things to say on the fly. I can adapt in most circumstances with no effort. But during the years of the attacks, I found that ability seemed to have disappeared.

For my work as a social engineer one of the things I would do with team members is discuss the pretext they want to use, then in a form of role-play say, "What do you say/do if X happens? Or Y? Or Z?"

This makes them think 4-5 moves ahead in the chess game.

Why did I stop doing that for life in the biggest moments of stress in my life? I encourage all to engage in regular scenario planning while anticipating potential challenges and rehearse responses. When you rehearse responses, you build "muscle" memory on how to react when or if it really happens.

These kinds of exercises can make your natural response not to react to the stress but to react with the practice, mindful, flexible responses.

**Purpose and Values**

Understanding who you are as a person, what are your values, what is your purpose, what is your foundation, way before you enter one of these stressful circumstances can truly be a life-saving practice.

Sadly, I didn't do this, but Natasha did it for me, well more pointedly she helped me reflect on what those things are for me.

I had to answer some questions:

- What are my professional goals?
- What are my personal goals?
- What are my values? (not in the stress moments but before)
- What ethical line will I not cross?

- What are my ethics?
- What is my foundation?

This may sound like a lot, but let me show you how it works.  This is a basic one for me.

- What are my professional goals?

  I want to be the best science based social engineer on earth. I want to help people get a meaningful career in this space. I want to enhance education in this space, motivation the next generation and inspire those who think they can't do it. I want to keep my nonprofit afloat and help stop child predators.

- What are my personal goals?

  I want to never lose site of my family. I want to stay healthy. I want to be an amazing home chef. I want to learn all I can about flowers and bee keeping. I want to buy a house in Italy and have a small vineyard.

- What are my values? (not in the stress moments but before)

  I believe in empathy first. I love helping others. I trust too fast because I love people. I value my belief in God. I value truth above all else. I hate things based in lies (odd for my job right?)

- What ethical line will I not cross?

  I have not ever killed anyone, and as angry as I get I never want to do that. I never want to use my skills to hurt someone. I never want to use my skills to get what I want costing the person something serious and personal to them.

- What are my ethics?

  Love. Empathy. Kindness. Fairness. Try to be nonjudgmental. Open to discuss anything.

- What is my foundation?

  My foundation is God, family and friends first. Career and things come after that. I want to love my life regardless if I am rich, poor or in between. I want to be happy.

Having this clearly defined makes it easy to see what I will not to do to save myself out of the cancel culture or insider threat attacks. If I start deviating from this, this is where your network comes in to pull you back inline.

Following these steps can really help you build a strong resilience. Of course, I truly hope you never have to go through this. But this can work not just for being cancelled, this can work got any stressor meant to take you out.

**Chapter 7: Navigating Cancel Culture**

I want to make this clear again, this section is not for people who truly deserved to be cancelled because they did some horrible things to other people. Those people, my advice is to admit it, own it, fix it and make retributions.

If you are, one of the few who had weaponized cancel power used against you, then this chapter is for you. I have spent considerable time trying to dissect, during and after the attacks, what I can learn from navigating cancel culture from an attack perspective. I have come up with ten points I think can help anyone going through this. These are not meant to be an equation, as in 1+2+3=6…. But look at each step as its own subject. Decide if you need it, how to apply it and what to do to make it your own.

**Understand the Dynamics of Cancel Culture**

Sometimes culture is a hard thing to understand. I had a friend from Uganda. In Uganda when two men are talking it is custom for the men to hold hands. This tells bystanders, "we are in a conversation, please don't interrupt."

As a very strong Italian American male, when he reached across and grabbed my hand to hold it, I reeled back. "Hey bro, whats up?"

"Oh, I am sorry, this just tells everyone we are in a conversation."

Once I understood its meaning, we sat for a good hour holding hands and talking.

Understanding culture is very important in most circumstances.

As hard as it will be, you need to stay current with the trends on social media regarding cancel culture. During my "cancelling" it was common for the Internet mob to be empowered via anonymity and also group think. This helped me understand that when I saw large groups seemingly following a "leader" off a cliff, I understood why. They are sheeple, not able to think for themselves. I don't have empathy for their lack of thought, but it helped me understand why it was happening.

When I saw powerful people with a "celebrity" status turn their back on me, or publicly say things like this:



This is from a person who mentored, advised and helped me. Understanding the hive mind of cancel culture helped me see why someone who I viewed as a critical thinker could actually fall for the lies of the few he thinks he knew.

I took the time to truly understand the dynamics of cancel culture:

- The person with cancel power will run the narrative

- If he has the mob behind him, he wins

- Those with the loudest voice often win the fight, not those who are right

- An accusation is guilty till proven innocent

- If you are able to prove innocence that will be on the back page, where your "guilt" was on the front page

- It will take 3-5 times longer than you think to fix it, accept it

- You will lose a lot of "friends" and supporters along the way, its ok, you didn't need them

Understanding the dynamics as you enter this problem can truly help you see what is real and what is just part of the "culture".

**Proactive Communication**

I said this before but this is one of my areas of failure I will regret forever. Communication needs to be transparent and consistent.

Transparent: you need to be open about your values, decisions and reasons you took the actions you took. Be clear so you can preempt any misunderstandings.

Consistency: Ensure that your public statements don't sound like a lawyer wrote them but that they are consistent with your voice and you're your personality. (this is an area I failed at)

By being proactive in the beginning, you may derail many of the attacks that come later. It makes me think of when Ronald Regan was running for his second term as president of the United States, the argument was "he is too old", "He can't run a country at his age"

Instead of attacking his attackers he was seen starting speeches like this,

"I can remember the time when a hot story broke and they said, stop the chisels."

Or

"President Washington began this tradition in 1790 after reminding the Nation that the destiny of self-government and the ``preservation of the sacred fire of liberty'' is finally staked on the experiment entrusted to the hands of the American people.'' For our friends in the press, who place a high premium on accuracy, let me say: I did not actually hear George Washington say that.  But it is a matter of historic record. "

Being proactive under attack is a great way to stop the accusers in their tracks.

**Build and Maintain a Positive Reputation**

One of the things I learned, that I don't know if I can honestly say I knew I learned till the end, is that if you keep who you are through trial it can really help you.

One of the things that defined me through my career was mentorship. I benefited so much from some very key mentors in my life. So, when I had my career going, I said I would mentor younger folks like I got mentored to help them.

When I was being cancelled, amazingly, some folks reached out to me to ask for mentorship. Thankfully to Natasha, I saw I still had value to offer.

It was hard to believe this, but I still had a few mentees during this time that prospered and excelled, showing me I did have that value that Natasha spoke about.

One of the most important lessons I learned is to do constant analysis of the people who have cancel power over you, and risk assess how badly they can hurt you and what you need to do about it. And as a human we can never be 100% at this task, so this was a very scary time for me and my family.

Every new relationship, every new mentee, every new contact was a potential threat. Maybe they were reaching out to trap me, or to get me to slip up, or to get info, or to be completely honest. It was truly exhausting to try and analyze this constantly.

Here is where my lesson for this section comes in, I knew who I was and what my morals where. I never wanted to lose that, so I had to keep who I was despite all the problems.

Thankfully to some of those closest to me, I was able to keep focused and realize that I still have value and I can still help others, and the things that those in the community who hated me said about me was not true.

I want to reiterate; it was not easy. Some of the people who hated me are people I revered, looked up to and looked at as mentors. When those people told me I was disgusting or bad, it was hard to not see myself that way. But it was at this very time that I had to sit back and ask myself a few questions.

Q:  Did I actually hurt anyone maliciously?

A:  No, I did not. I protected my company from people who wanted to hurt it. I protected my clients from people who where dishonest. I protected my employees from being hurt. And I kept saving kids despite what people said about me. So no, I never intentionally hurt anyone.

Q:  Even if it was not intentional, did I do something to someone that I should be punished for?

A:  This is harder one. I was harsh with Cat, I truly was. I did joke with another employee too much. I did get too direct with some people. I was harsh in times of stress. So yeah, this was a harder answer, but when I sat back and spoke to Natasha and others about this... could I be called a jerk, yes. An abuser, no.

Q:  What could I do differently if this were to happen again?

A:  First of all, happen again? YIKES. Please no. I can never deal with this again. But it was a legitimate question as I had to really think about the way I would deal with this.  First, I would be much more open from the beginning. Hiding behind a legal statement when I am truly innocent, that was stupid. If I had some fear of something I did, then I get it, but I didn't. Second, calling out all those involved. I hid, I was afraid, I became an imposter. But if I had called out Stephanie, JC, Anshul, Chris, Cat, Maxie, Neil, Jeff for all the things they did and what i knew, I could have ended this sooner. Also, because I have so much proof. I wasn't just slinging mud like they were, I have people willing to testify, I have emails, I have proof of the things they did to try and destroy me. I should have used it.

These lessons were very hard for me to learn, and it took me a bit to really let them sink in.

The fight I had ahead of me was no small feat. I needed help, legally, but being in the financial condition I was in, was going to make that hard.

**Chapter 8: Legal and Ethical Considerations**

When this first happened, and I felt this intense sense of injustice, I actually didn't know what I could even do about it. I spoke to my business lawyer and he suggested we may have a defamation suit if there is no actually sexual assault that can be proven.

Since there was not, I was ok with pursuing this. But his next words knocked the wind out me, "These suits can take years and cost 100's of 1000's of dollars."

I stopped paying myself and I am living off a small savings account, I don't make that kind of money. Then Tim said, "There are some lawyers who will see the payout and take a case on contingency."  Contingency means they waive all fees and take like 50% of the winnings.

I didn't care about the money, I needed my name back. I can make the money, but not with out my name being cleared.

Tim helped me find a couple lawyers in the state I was incorporated in, Pennsylvania, and we filed our first lawsuit.

This is a good lesson for anyone reading, you have things you can do to fight back. I will give one warning, be prepared, nothing is fast, and nothing seems fair. People like Jeff who have endless sources of money, can drag this out and file motion after motion after motion. Making this so painful.

Think about this, Jeff was charging 440$ per person and there was 38,000 people there they claimed. That is just shy of 17 million dollars a year. We did research into the two lawyers who represented him, and we can estimate he was paying close to $1600 per hour for them combined. The community was good to him for sure.

Even when those with cancel power try to use the legal system against you, don't give up. I found this amazing lawyer in Nevada, Kris Riklis, he read all the paperwork and he saw the injustice. He devoted 2+ years to this case for $0. Not kidding, he had no expectation that he would get anything. But he worked hard, supported me and was an amazing source of encouragement. It took me a long time to find him, but I never gave up and I did.

Maybe that is one of the lessons, my persistence and refusal to lay down and take it is why I was able to find the people to help that I did.

Don't let the bullies convince you that are not worth the effort.

I want to preface this next section with the fact I am NOT a lawyer and I am NOT giving legal advice, I am merely telling you some things I learned along the way, you should consult a legal advisor for your case.

**Legal Protections for Defamation**

**The Defense of Truth:** If you are 100% assured that what you are saying is true, this is the strongest defense against defamation. The law really dislikes people who cling to false statements. In my case, I knew what Jeff did was dirty, and I was clean, so that motivated me to fight even when it was past my means.

**Opinion:** So yes, it is true that defamation law protects people from having their opinions count as defamation, but you can't just say whatever you want and claim "your rights to speak your mind" and it is your opinion and get away with it. Jeff tried this, saying they are allowed to decide who they can associate with and who they can have at the conference. That is 100% true, but to put a person they don't want there in a list of sexual predators is not with in their freedom.

**Statue of Limitations:** realize that defamation cases have an expiration date, so only have a certain number of months to file. This is different per jurisdiction but find out what yours is so you don't lose out due to a timing issue.

**Some other steps:** Document everything, I took screenshots, saved every text, every email, nothing got erased. I knew I would need it. And consult with a lawyer to make sure you can use these pieces of evidence properly. For me, this was crucial. Having all the evidence that Neil was literally a joke when it came to talking to me, that Jeff did not reply once, that Marc Rogers lied on Facebook, all of this is going to help me win the case.

All of this is the legal protections, which is less important to me than worrying about the ethical considerations.

**The Ethical Concerns in Addressing Cancel Culture and Insider Threat**

I can break these concerns for Insider threat into five categories:

1. Privacy vs. Security

- Ethical Dilemma: Balancing the need to protect organizational assets and sensitive information with respecting employees' privacy rights.

- Best Practices: Implement monitoring in a transparent and proportionate manner, informing employees about the types of monitoring in place and the reasons for it.

We did this, every employee, including Maxie who sold us her person laptop, was informed we did daily backups, monitored the systems and can lock machines at will.

## 2. Fairness and Non-Discrimination

- Ethical Dilemma: Ensuring that measures to detect and mitigate insider threats do not unfairly target specific individuals or groups.
- Best Practices: Apply security protocols uniformly across the organization and avoid profiling based on personal characteristics unrelated to the risk.

Thankfully Ryan did this, even me as the CEO was not excluded. I can't tell you how many times an email would be stopped and I would say, "Ryan why can't I send this file to myself?"

"umm because the rule stopped you from sending this file due to sensitive information."

Thanks Ryan.

## 3. Due Process

- Ethical Dilemma: Ensuring that employees accused of being insider threats receive a fair investigation and the opportunity to respond to allegations.
- Best Practices: Establish clear procedures for investigations, maintain confidentiality, and provide avenues for employees to contest findings.

We always did this after the fact, so once it was "fact" they were, but this a great point. I had an employee who was committing time theft, getting paid for 40 hours and giving me 10 (not kidding). They were not an "insider threat" they were just lazy. So be careful how you label folks.

## 4. Psychological Impact

- Ethical Dilemma: The potential negative impact on employee morale and trust within the organization due to perceived surveillance.
- Best Practices: Foster an open and supportive organizational culture where security measures are seen as protective rather than punitive.

This was a big lesson for me, I found out after my people did not feel comfortable circumventing the hierarchy to tell me they felt in danger. That is on me, not them. Also the DEI consultants we hired told me I needed to be way more open with the team, telling about our finances, struggles and problems. This was a big lesson and helped me "fix" the company.

At the end of the day, no one can handle insider threat and cancel culture perfectly. I believe that, there is too much emotion involved to be perfect. But with some tips and guidelines you can navigate this better than I did in my attacks.  I hope this helps.

It is not over yet, now you navigated it, but you have to move forward, past the cancellation and continue. But how?

**Chapter 9: The Path Forward**

At one point during all of this a friend asked me, "What is the lesson you will take away from all of this?"

At first, I have to admit, I was little offended. I am suffering, why would you ask that. But she was right, there is a lesson in all of this and that lesson can me move forward past this experience. I need to figure out how can turn this adversity into opportunity.

Here are a few lessons I pulled out from this, that I hope can help you.

**Remove the chaff.**

In ancient times when people who grind wheat, they would put all the grindings on this "sails" and if they tossed them in the air, the wheat skins "chaff" were so light even the lightest wind would carry them away. What was left was pure wheat they can make flour from.

I learned that, even the people I thought I needed, if they were "chaff" it is better to let the winds of adversity carry them away and leave with those who actually do love me.

That was surprisingly a hard lesson. I so desperately wanted to hold on to these people, but eventually when I realized their toxicity, it saved me.

**Empathy**

I think one of the main lessons for me was to empathize with people who felt a complete lack of justice in their lives. Truly I don't know how they dealt with it for so many years. Just three years and I was going crazy.

This experience taught me that groups who have gone through systematic repression are so much stronger than we give them credit for.

Additionally, don't let the suffering and injustice allow you to alter your natural kindness or whatever you have built as your personality make up. Don't lose that. For me it was empathy, and I found myself losing that at some points, but thanks to the help I had, I was brought back in line.

**Communication**

If I learned one thing in all of this, do not break your communication profile, it is super important. Sure anger, sadness, depression can all change how you feel and communicate, but what I am saying is the moral structure you have based your life on that drives your communication, do not let that get altered by your attackers. If you do, you will look back with regret.  There will be enough to feel bad about, don't let them change who you are.

**Its not as big as it feels**

When the attacks started to happen it was the center of my universe. It felt like everyone on earth was going to see my problems. I was amazed when I called a friend and started the conversation with, "Let me explain so you can understand what is happening."

He, sounding very confused, "Do you want to back up, what are you talking about?"

He had not heard about it, it did not come up on his Twitter, it did not come up on his socials at all.  To me it was the center of the Universe, but most of the people and companies who ran the other way only did so after the researched my company and name and saw the accusation and drama.

It made me realize, way later, that although it felt like it was the largest mass I could see over or around, to most of the world I was not important enough to even know what was going on. I had friends who went to DEF CON the year I was cancelled and texted me saying, "Dude where

are you, there is some really lame SE Village here that is not yours?" They did not even know I was cancelled and not there.

Good lesson, I wish I learned earlier.

**Don't be afraid to block**

When this all started on my personal accounts I started to block people who were nasty and said horrible things. But I allowed a few folks talk me out of doing that on all my accounts, especially ILF and my corp. That was a huge mistake, I regret not sticking to my decision and enforcing what I wanted.

The attackers do not deserve rented time in your head, they do not deserve time to attack on your feed. Blocking people quicker would have stopped a lot of my people from having to read the comments, deal with the attack and deal with the anger, injustice and depression that came with it.

**Never EVER give them your platform**

This is a huge lesson. Many of the attackers did not want to use their personal accounts to call me a rapist, so they would start sock puppet or brand new accounts with no real identifier. On Twitter I have around 40,000 followers, that new account has 1, 4, maybe 10. If I were to reply to them, argue with them, mention them, I have now given this new account with no followers MY PLATFORM of 40,000. Even if the account is large, answering or arguing gives the attacker your platform and access to your followers. This is a big mistake, but one that is easy to make. When people are lying, saying horrible things, our natural inclination is to want to defend, correct, scream back. Doing so online gives the sheeple the attention they so desperately need to feel justified.

Think about it, why would a person, any normal person, call someone a rapist, child molester, thief, sexual predator, etc with not even one ounce of proof? And be willing to do it in front of

millions of people? That is a bold move, motivated by the anonymity of the Internet and the mob mentality of the cancel culture gang.

Don't give them more power than they deserve.

These are some of the strongest lessons I have learned during this. The work doesn't stop there, because now, I have to apply those lessons so there can be personal and professional growth.

**Personal Growth and Professional Development**

This section really I need to cover both the personal and professional development steps I took during this process, as it was such a learning experience, I am not sure I can fully explain it on paper. I will try.

I feel like the more I think about this the more lessons I can come up with, but let me see if I can boil these down to core lessons that can help you and me.

It is probably no surprise that many of these lessons came from Natasha, (aka Dr. Molotov) and my times with her.  She is a profound woman with deep wisdom that makes me think deeply. Here are a few notes of my sessions with her during this time.

**You have panic and anxiety**

No I don't, I might have said that a million times. I don't have panic attacks, I don't have anxiety disorders. I see my friends and my kids go through this, that is not me. But she helped me see that I did, just experiencing it differently.

The lesson for me was to be much more empathetic, and to also realize that suffering in the same name can look so different per person. This first lesson was a big one for me.

**Fear makes me micromanage**

Ok, I feel like I am posting nude photos here and asking you to judge me, but really I need to do this. She told me on one session, that when I get afraid, I micromanage the things around me to control them more. I HATED THIS.

But I hated it because it was true, damn her. But there is a profound lesson in this. If I know my fear response, and I am aware of it, I can be more able to control another problem by micromanaging someone who doesn't need it.

Dang you Natasha... I didn't want it to be simple, but it was. Self-awareness to the rescue. So it was a hard pill to swallow but I needed it.

One year, when Amaya was little we went to Tennessee together, she came to a hacker conference with me. My sister lives in TN and asked if Amaya can spend time with her, Amaya wanted to, so she did. The night she went, I was out with the guys, eating, having a few drinks.

I got back to my hotel room and had to take some of my meds. I put this pill in my mouth and when I tried to swallow it, it got stuck in my throat. I couldn't move it, I had no water in the room. I thought, this is where I die. I literally sat on the edge of the bed, grabbed my phone and typed a message to my daughter telling her I loved her. (By the way, I have not told this story to anyone, so now they will all know it.)

I felt it all going away, and I started to cough, my stomach forced something up, which dislodged the pill, and I could breathe. It was an amazing feeling at the same time gross.

As graphic as this is, I felt the same when Natasha popped this on me.

**My Adaptive Child Response of rescuing needs boundaries**

Ok so in an effort to help me feel whole, to feel useful, to feel like the man I want to be, I put 100% of myself into helping others. But even at the cost of my own health. One of my deep lessons was that, this trade off is not equal. To sacrifice my health and life to help others is not really a good balance.

This should not be a shock to me, for ILF I have always said to volunteers, "You cannot hurt yourself or your family to save a child, that balance is not fair."

But when it came to ME, I didn't apply the same rules. I would sacrifice my health, my happiness, my peace to make sure someone else was ok.

I am going to be honest, I still do. So it is a lesson I know, but I am working on it.

**Disassociation disorder sucks**

There was a time I thought to myself, that the fact I can't remember all the abuse from my childhood is a blessing. When I hear the memories of my siblings that seem fake to me, I feel blessed I actually can't remember many of them.

But this comes at a cost. There are years of my life that don't exist. I do not remember my youngest sister till I was 19, there is only 5 years different, so there are 14 years of her life she doesn't exist in my head.

Additionally, when my brain decided to say, "Chris, you don't need to remember this." It just doesn't, and I can't stop it. And sometimes I think I need to remember that, but nope, I have no say.

The lesson for me, with all the pain and all the suffering, remembering allows me to make decisions and to figure a path forward. Just ignoring it, whether on purpose or by my brains decision, doesn't really help find a solution.

**Needing help is NOT weakness**

I am probably not alone in this, but I felt like asking for help was weakness. And being weak was bad. So maybe it is weak, but being weak at times is ok. I learned this the hard way.

During the 2.5 year mark of the attacks, my business was failing, Ryan left… Patrick left. I saw no hope. It looked like we were closing and I had no plan B.

I didn't think it could get any worse.

Until I sat in a doctors office and heard this words, "Mrs. Hadnagy you have breast cancer."

I didn't understand. I led a good life, I didn't hurt people, like I was being accused. My wife is maybe of the most amazing people on earth. She is so forgiving, so kind, so empathetic, I often joke that she would say, "well you know Satan, he is quite persistent."

And here we are at the height of our lives ending and she gets cancer?

We left that appointment and we went to the car and I just wanted to cry, but I looked at her and said, "I am going to call X"

A friend who I knew who would support us. She said, "Really, you want to do that?"

"Yes, we can't do this alone, we need help."

It felt empowering to tell someone we needed help, not what I expected. I told Vince, then I told Nick, then Wayne, then the "family" and before you knew it, I had people checking on her and me daily. This lesson was huge, I needed help, and if I could humble myself and ask, I got what I needed.

**I might not know my limits**

I remember vividly, my wife got cancer. I thought, "It can't get worse."

Patrick asks for a meeting and says, "I am a single dad, I can't tell my daughter that she can't go to college cause this company closes, I found a new job and I have to go."

It was kind, it was respectful, but it was also very realistic. I couldn't be mad, I was just so sad that I was not able to give him stability.

Two week later, Ryan comes to me, "I tried to change everything I could, but I need to change the one thing in my control, my job. I am leaving."

My heart tore in two. I thought we would retire together on a beach as two 80 year old hackers laughing about the youngin's.

All of that was dashed to pieces. But I understood, Ryan sacrificed so much for SECOM during the attacks. He gave his blood, sweat and so many tears – that is not just symbolic.

Here we are, Patrick, our team leader is gone. Then in one fell swoop my COO, sys admin and main implementer is gone. I am not sure how I will exist.

We hired this amazing young man, Carter, who can fill in some of the gaps. I now have the job as CEO, COO, team lead, client manager, sales assist, as well as my ILF duties. I relied on my team, people I trusted and my experience and I did things I haven't done in years.

Here is the thing – we made it, we did it. It worked. So the lesson, I guess in times like this, I can do more than I thought.

**Don't Accept Less Than I Deserve.**

I will admit, I felt so low about myself and so worthless, if anyone I thought had value would show me attention I would take it. Almost like I had to work for their affection because I was so gross and disgusting.

Natasha's session where she asked me those thought-provoking questions,

"Did DEF CON take away your worthiness to the community?"

Really made me think deeply. Since the answer was a resounding "no", then the logic center asks, "If you have value Chris, should you let those around you treat you like second class?"

This was a really hard lesson for me, and really hard personal growth session. I have a few people I viewed as really close to me, I thought they valued me, but in the end they would routinely say things like, "I will call at X" and never do. Or "Lets meet and discuss on Y" and never follow up. Or "I want to meet and talk about Z" but never hear from them again. One

person I was even in the same city as her, texted her and told her that I was here and wanted to meet… "Yes, we should do this."  Ok so I thought, this is my chance to show my worth, "I am available at these times, let me know when you can meet."

I never heard back, not even till this day. That tells me how valuable I am to that person. This person, literally the day I told them about a person who stabbed me in the back and betrayed me, they had that very person on their show the next day with the excuse, "It was convenient."

I had to start realizing that some people will value their own needs WAY above me, that is ok, for them, not for me. I do not need to keep helping those people. I supported this person for years with her endeavors whenever she needed me, but when I needed her, absent.

Learning to not accept less than I deserve was a huge lesson for me.

These are a few of the personal lessons I learned, but there are some more focused on the professional side of my life, that are equally as important.

**Not All Advice is Good Advice**

I have a lot of very well-meaning friends, and they actually really do care about me and want what is best. But that doesn't mean their advice is always good. And this is not to say they had bad intentions, the reality is we give advice based on OUR experience, but each person's experience is so different.

I asked ChatGPT to define "advice", here is what it said, "**Advice** is guidance or recommendations offered to someone about what they should do in a particular situation. It typically comes from someone with experience or knowledge on the subject and aims to help the recipient make informed decisions or solve problems."

Just as I was saying, we give advice based on our previous experiences, but not every experience is equal, is it?

I had a very dear friend who had to give up his business who kept encouraging me to think about just shutting the door and walking away. The difference was his business closed because he was NOT paid by a client. If I followed his advice I would have been sued by globally huge companies for contract breach.

I had another friend that said, get the best lawyer and just use credit cards to pay for it, that is what credit is for. But if I did that, I had no clue this would be a three year fight. I would have had to go bankrupt.

None of this is saying my friends had bad intentions, but one of those lessons I really learned is to take advice with a grain of salt. Listen, really listen, thank them for caring, then take time to see if that advice works for your circumstance. If not, discard and move on.

My "advice" is to not reject any advice of those who truly care about you, but don't be too quick to implement any of it with out careful consideration. One thing I noticed about myself, in the height of the attacks, I was not really able to exercise critical thinking at all.

That means every idea sounded like "sound advice" at first, and I found myself being mentally pulled in 50 directions.  All by well-meaning friends who loved me and wanted to help but didn't fully understand my exact situation.

This came to a full understanding for me when I was attending a brief class on how to help people who are grieving after they lose someone in death. The person teaching it said something profound, he asked, "Let's say you are sitting with Beth and she just lost her mother, and you lost your mother a few years ago, is it ok to say, 'I lost my mother, I know what you are going through'?"

My immediate answer in my head was, "yes of course." But as he continued it set me straight. "No, that would be the wrong answer. Everyone's relationship with their parents is different, everyone's emotional make up is different, everyone's tolerance is different. For that reason we can never truly understand what someone is going through. Instead, it might be better to say

something like, 'A couple years ago I lost my mother. I was so ridden with grief and what I found is no one really understood my feelings. So I will just sit here and listen or cry with you if you want.'"

That was a great lesson, and it applies here. Just because you had a failing business, a bad employee or two, or even got cancelled doesn't mean you and I felt the same.

**Do Not Lose Sight Of Who You Are**

One of the things I struggled with, and probably I can openly admit, still do, is allowing this situation to truly change who I am. Let me clarify, yes, I hope that this situation has changed me into being a little more cautious, critical thinking, planning, professional, etc. But I don't want this to change the core tenants of what make up… Chris Hadnagy.

What I mean is that I have based most of my life on helping others, being kind, being filled with empathy, education, giving even when I had little to give, not looking for credit. At the height of these attacks I remember telling Natasha things like, "If I heard Maxie died I wouldn't even be sad." Or "If I could have 5 minutes alone with Jeff in a room, I would show him how much I suffered." Or "I will never trust anyone again." Or "Whats the point of helping other people if they just crap on you in the end?"

Every time I said something like this, Natasha would say something like, "This doesn't sound like the man I have grown to know over the years we have worked together." Or "Be careful to not let this change who you are internally for the worse."

The coup de grace was one conversation where I was saying I was never going to help anyone in infosec ever again, they can all "go to hell", and she thought silently for a minute then said, "That is not very brave is it? And the man I know has always been brave."

I was filled with anger. Rage even. "I AM NOT BRAVE? WHAT HAVE I BEEN THROUGH?"

Calmly she asked, "Where you helpful to infosec before Jeff cancelled you?"

"yes"

"Did you help young ones before DEF CON tried to ruin you?"

"Yes"

"Do you feel you had the knowledge and the right to do so before all this?"

"yes"

"Did that now change since DEF CON said you are worthless?"

I hated that I had to answer, sheepishly I said, "no, of course not."

"So bravery would be to return to your old path even after someone else told you that you are not worth it, when you know you are."

Quickly I said, "NO I AM NEVER GOING BACK TO DEF CON!"

Quickly she said, "F*** no, F**** them, but they don't represent infosec do they?"

HAHHAHA, I hate it but she is right. I can't let this change who I am. And neither can you, look deep at your core and hold on to it tight, and find those who anchor you there.

**YOUR TEAM**

By "team", I mean those you chose to surround yourself with during this time. There will be ambulance chasers, fair weather friends, those who will only be interested in themselves, those who only need you and don't want to help you.  Here is my strict advice, as hard as it is – get rid of all those people RIGHT AWAY.

Now I am not saying to rudely kick them all out, but quickly and swiftly start silencing them in your life. They don't deserve your time. I remember when at the beginning of all this I was getting texts and calls from a friend named Dave. He was so supportive, he was so amazing.

Told me he knew me, he supported me, he knew I was innocent. He knew this was all bull crap. He even went as far as to tell me "Screw DEF CON, I hate that place it is a crap hole."

It was all the validation I needed, and he was a big name in the community so I felt really good. But it was only a short time later I was watching his very popular fitness podcast and I saw a neon "DEF CON" sign hanging behind him.

I felt like I had been punched in the gut, but here is the crazy part. When my SECOM team came to me and told me how upset they were, I DEFENDED him. I was so convinced he was my friend that I defended him when all signs said he was definitely not on my side.

This was one of the many lessons where I had to learn that I needed to put myself deep in the center of people that really had my back and stop wasting time with those who were only out for themselves. I wish I could tell you I learned this lesson fast and everything went great after this, but sadly, "old chris" was always there and I made excuses for people who I really loved and thought it was ok. "He didn't mean it that way, he was just tired." Or "She didn't mean to ignore you for 4 weeks, she was just busy." Or "He didn't want to ruin his reputation with associating with you, he has a business."

When I had a team of people screaming in my face they loved me and wanted to support me.

So this is the lesson, find that epicenter, find that group that loves you and wants to be in your camp, find that group that isn't just blind sheep but knows who you are and wants to support. You don't want "yes men" you want true friends.

I think of Ryan, when I mention this. Ryan would seriously give a limb for me. I believe that. The man gave up a paycheck to save the team from getting laid off. Who does that for nothing?

But he would also look at me square in the eye and say, "Chris you are being a jerk and need to stop."  We all need friends like that. I KNOW Ryan loved me, which is why when he said I was being a jerk I could hear him and listen.

Wayne is another. I would sometimes fall into a trap if saying, "Maybe they are right, maybe I am a bad person." Wayne would quickly say, "Mate, please don't talk about my friend that way! I DON'T WANT TO HEAR IT."

Find your Ryan's, find your Wayne's and don't let go. I mean it, latch on and make them your foundation during this time. You need them to be supportive but also brutal honesty.

**THE WHEAT**

Just like I mentioned before, when you are done sifting out all the chaff, what you are left with is a pure, usable, wheat that can be turned into so many useful things. When you sift out all that chaff in your life, you get rid of all the people, the things and the thoughts that don't help you. You continue to build strong processes to fortify healthy prospects, in addition to more healthy thoughts.

I will honestly admit this is not easy. Even now as I review some of the texts from "friends" I feel a tinge of guilt. "Maybe Dave really meant what he said?", "Maybe John just was confused?", "Maybe HD was lied to?"

But then I have to remind myself that a critical thinker would have asked questions, had a conversation and based their decisions on years of experience not a few uncorroborated stories. They are the chaff… not worth my time and will produce nothing good in my life, so let the wind carry them away.

I am sure there are many more lessons I can glean out but I want say these are the main ones. Which I think is a fitting way to lead to our final chapter.

**Chapter 10: Conclusion: The End is Not The End**

What I am saying here is that, the end of this book is not the end of the story, for me or for you. There is so much more to accomplish, and I won't let this stop me.

Here is the reality that I had to learn the hard way, just because the trial ended doesn't mean the "pain" ends. When Areesa breast cancer her biopsy, her surgery and even her radiation seemed to be next to painless. Minor pain but nothing major. When it was all over, her last day of radiation is when the pain started. Now her body pushing out all that poison, her underarm turned black, her breast was burning, red and in pain. It was all over, but it wasn't over just yet.

Reflecting on that helped me see that this is the same in the situation we were in here, even though years had passed I sat on a video call with a person 3 years after the cancellation and was told, "We just won't be doing business with you until you clear this up." This is from a massive bank, but they were being controlled by two sentences and an internet mob, with not one ounce of verifiable information.

**How Do You Want To Live?**

Empathy is so important, I will admit a few times during this, I lost my vision of it. I wanted to see these people hurt and suffering so bad. I even said, "I wouldn't shed a tear if I saw a report that 'so and so' died."

That is not who I am at my core. Yes, what this group did to me was awful, but by wishing harm or even death to them I was allowing their bad actions to influence my personality. I had to sit back at one point and determine that even if so many people failed at showing me kindness and empathy, that doesn't mean I have to be like them.

Is it that easy? Heck no. I struggled (struggle) with this immensely. I would see people who basically stole every idea I made famous announce their new village, and I would filled with anger. I would see an interview with the thief who started all this, and I would see rage. I would see another post from the person who I thought had my back and did help change my life, and I would overcome with sadness.

Been then I went back to the statement from Dr. Abbie. "Feel the emotions, fake the actions." So I did. I went to the gym, I smiled, I joked with my employees, I mentored people, I cooked for my family… I did everything except crawl in a ball and cry.

Eventually it did get easier to return to who I am. It felt good to see that old Chris come back and recognize he was much happier not dwelling on the hate of others.

**There IS More Happiness In Giving Than Receiving**

I do love getting gifts, who doesn't. But this ancient biblical principle has a lot of wisdom packed into it. But not just wisdom, it has science behind it also. Research has found that when we give something away (a gift, time, knowledge) a series of great things happens to us.

1. We get a dopamine release. We activate a reward system for doing the good thing. Which leads to endorphins being released too, reducing stress and giving us a sense of well-being.
2. Increased activity in the prefrontal cortex, and since that is the area involved in decision making, we get to evaluate how our gift has affected others and it reinforces the positive feelings.
3. A release of oxytocin, this can enhance trust, empathy and social connection.
4. We activate the mesolimbic pathway, this is linked to feelings of joy and satisfaction.
5. A reduction in stress and anxiety.

Wait what? I can reduce my stress and anxiety by giving things to people? And this is what kept me helping young ones, giving speeches at schools and colleges, teaching the next generation and mentoring those who really wanted it.

And every time I did, I felt self-worth coming back and feeling of peace. It was truly an amazing experience.

**Where Do You Want To Focus**

When the attacks first started, I spent an inordinate amount of time reading the posts, looking at the comments, pondering the things people where saying and replaying every mistake over and over and over in my head. I was spiraling and it seemed there was nothing to stop me.

When Areesa's cancer diagnosis came in, all of a sudden nothing seemed to matter but her and my family. I spent time reading about cancer, reading all the literature the doctors gave, learning how to support her.

The resultant of this was that I changed my focus, and unknowingly, fixed a massive problem I wasn't clearly seeing.  I stopped spiraling and began to regain control. Now I am not saying I never got negative, after all I am clinically depressed thanks to all this, but I am able to know when I am losing focus and remind myself to return to a better baseline.

**The Courage To Return**

This next one was a massive lesson for me, a real-life changer.  Do you remember the story I told you in chapter five?

I was so angry one session with my therapist, so mad, so fed up. One of my employees was going to apply to speak at a B-Sides and she asked me if I could be there to support her. I can't, I was asked to avoid all B-Sides till this was cleared up.

I was in a session with Natasha and I said, "I hate this community, I am never going back to a infosec conference they can all burn in hell, worthless lot of them!!!"

Natasha, slowly took a breath (the indicator that I am about to get a Molotov in the face), "That doesn't sound very courageous."

Her explaining to me that true courage would be able to see that Jeff Moss didn't change my worth, the haters, the mob, didn't take away my years of experience, knowledge and ability to help others. The only person who can take that away is …. ME.

Will I truly punish all the folks I can help because Jeff Moss and a few people decided I was a bad person for some unknown reason? Will you do the same? Will you give up your value because someone else determined you have no value?

This is the question I had to ponder. And after a lot of thought the answer was a clear – NO. I will not let others dictate my value, that is purely up to me, not them.

I know I can help others; I know I still offer value. Now, please know, this was not easy. So many days I looked in the mirror and literally said to the reflection, "you are worthless"… so this was a work in progress, but I got there.

And to be honest I still need to fight this battle daily. Even now as I write this, I am wondering, "Why would anyone want to hear this from me?"

I am going to tell you something kind of ridiculous. As I was writing this paragraph my email notified me that someone had sent me a message. I was feeling a little lost in my words so I sighed and said, "let me go read this email…."

Here is what I was greeted with,

"Mr. Hadnagy,

I am sure you are very busy, and I am so sorry for taking your time but I wanted to know if you could give me even five minutes of your time this week to help me think through some really bid decisions on my career? I read your book, and I am very interested in this field but I am not sure what to do next. I am sorry if this is too forward, I hope you will reply."

Literally, as I write this chapter someone confirms that I still have value. I answered,

"Kim (name changed),

I want you to know that your email came at a time when I was doubting my worth and hit me with a virtual hug of reassurance. Thank you. I would be honored to chat with you this week and see if any of my experiences can help you. Here are my available times….."

I want to ask you, who determines your value? It cannot be other people, other events, other organizations? Your value can only be determined by you. This is a hard one, especially if you are battling depression and low self-worth. I don't say this lightly.

I understand, you may be battling right now. But like Natasha did for me, I want you to truly ask yourself these questions…

"Has this situation changed the value I added to others in the past?"

"Has this situation changed the fact that I felt I added value to this industry in the past?"

"Has this situation changed the knowledge I have, making me less valuable to this industry?"

I am sure in the end, like me you will see that one person or even a mob of people, can't change the value you added.

**Example in the real world**

On March 27, 2022 an event happened that would change a person life for quite some time. During the 94th Academy Awards Chris Rock was making fun of Will Smith's wife, Jada Smith. Will got up from his seat, walked on stage in a live performance and slapped him so hard we all felt the reverb.

The Academy of Motion Picture Arts and Sciences barred Will Smith from attending the Oscars for 10 years. This caused Will to resign from the Academy as a member.  It started a number of discussions arounf comedy and the way it may affect those targeted.

Now, get this, from that one incident, major studios had to make decisions.

- Bad Boys 4 was delayed and put on hold this passed over.
- Fast and Loose a Netflix project was put on hold till this passed.
- Emancipation, which was set for release, had to delay its promotion and it got poor reviews just die to this incident.

- Pole to Pole – a National Geographic series was put on hold till this passed.
- This is just a few of the projects Will had that was put on hold due to this incident.

Now I want to use this one because I had the amazing privilege of meeting Will Smith many years ago. We sat in the hallways of DEF CON discussing his son's career, and bring our kid into our fields. I found him genuine and fascinating. When I saw all this happening, maybe because I had a personal attachment to him, I felt sorry for him. Someone made fun of his wife and he defended her honor. If someone mocked Areesa, I think a slap would be the least of their worries.

But why is this story so important? As of this date, June 2024, when searching what Will Smith is involved in:

- Bad Boys 4
- Fast and Loose
- Emancipation
- Planes, Trains & Automobiles Remake
- I am Legend 2
- Brillance
- The Council

Ok so in 2022 he was "cancelled" but who determined his value? Not the media, not the world, no Will said he still had a lot to offer and he is.

So channel your inner Will Smith, and determine that your value is not tied to what your work community deems as truth, but what you feel?

**Reclaim Your Identity**

You just spent the last few days/weeks/months/hours reading about my life and the horrors I endured. But why? Did you do it for morbid curiosity? Are you going through something

similar? Do know someone suffering similarly? Whatever the reason there is a lesson we can learn together here. I let my identity get tied up in my career. Who I was in my job defined who I was as a person.

I cannot tell you how toxic that was for me. I am not the sum of my work, my work is part of who I am. But what makes me up as a person is my work, my being a father, a husband, a friend, a spiritual counsellor, an employer, a mentor, an author, an educator, and so many more titles. All of these make up who "Chris Hadnagy" truly is, not just one or two of these.

Trying to limit this to just a couple is where I made a mistake. But the success I had in my business seemed to define me and who I was, or at least I let that happen, sadly. I found myself overcompensating in all my other work to "prove my worth." This led me to overworking, over stressing, over… everything.

It is hard to not see ourselves as the sum of our accomplishments, so I won't sit here and tell you not to, as I did. I will just acknowledge that we all do this, and knowing this what can we do then with the resultant emotions that come from viewing our accomplishments as "us"?

I wish I had a true, clear-cut answers, but I am going to give you my thoughts. I did see myself as my company, as my career, as my books, as my fans, etc. When that dried up, I did see myself as worth less than I was previously.

I wish I could give you the answer on how to avoid this, but I can't. Even as I sit here today, I am struggling to not see myself as the net worth of what I have produced. The thought of losing that due to a group of people who hated me and one person with true cancel power still makes me afraid.

Something my trainer, Helmi said to me keeps ringing in my ears. "Even after you win the lawsuit these people will go on and live their lives as if nothing happens. People who wish death on others and send out so much hate in the world, you cannot be annoyed at them for their actions, you should feel sorry for them. Feel sorry that they chose to live their lives like that."

A powerful statement indeed. I had to realize that their hate of me, their negativity of me is not a true reflection of who I am. Did I sexually assault someone?  No. Did I harass Maxie or the other accusers? No. What I did do is defend my company, defend the nonprofit, defend my family, defend the truth. For that, I was punished. I can't control what they do, only how I handle it.

And I choose to reclaim who I was and stand up and not allow them to spend more time in my head, ruining my life and telling me I am something I am not.

That sounds easy, I will be honest here, it is not. Some days I still sit here and think about all those people I looked up to, all those people I would consider my examples who said things like, "Just go die already" or "The unnamed speaker should have been mentioned" etc etc. I think about those things and wonder if I am a bad person. So I won't tell you right now there was a moment where I woke up and heard the Rocky theme song and had an epiphany and never thought negatively again.

I will battle this, probably for the rest of my life. BUT, I will not let it dictate what I do and how I do it. I will own my future and I will work hard to stay the person I am. Helping, mentoring, caring and filled with empathy.

**A Call To Action**

Ideas:

CALL TO ACTION

What is it?

- Call to action for readers to apply the lessons learned in their own lives and organizations. Outline to analyze those with cancel power in your life.

- Future outlook on insider threats and cancel culture, with recommendations for individuals and organizations.

# Exhibit 26

| From: | Christopher Hadnagy[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=55615E7A8341469FB8917CC35F D13009-CHRIS] |
|---|---|
| Sent: | Tue 5/10/2022 2:53:30 AM (UTC) |
| To: | Laurie Segall[███████@gmail.com] |
| Cc: | Laurie Segall[laurie@dotdotdotmedia.com] |
| Subject: | Details |
| Attachment: | DEFCON-TIMELINE.docx |

Laurie,

I am so sorry for hijacking our time today with the crap of my life.

Let me just say this: these details I am sharing with you, have never been shared outside the company. Please protect these. These can ruin my life if used wrong.

Anyhow, there is a lot to give you for details and not sure of the best way to do it…

I have included a DEF CON timeline

But here is some other details

Employee 1:

Cat Murrdock

Came in with zero experience. I trained her, helped her, excelled her. She went from no one to a trainer, podcaster, and leader in a year. With in 9 months she got a 20,000 raise and her statement to me was, "I thought it would be more."

That should have been my sign.

Full disclosure. She screwed up a massive project and lost my crap. I chewed her out bad. Not due to her gender but her failure, but should have handled it better, She quit that night. Said she was gonna go back to education.

But with in a month started a company that sold our products. We shut her down

She went to get a job with a competitor, which was a breach of her contract, we didn't stop her. I should have.

Then she went on to work for a client of ours she serviced, also a breach, but I didn't stop her.

She tried to damage ILF and called out our agents at DEF CON. Was a major problem and almost ruined ILF.

She is a terrible person.

Employee 2

Maxie Reynolds.

So much data on her, she is a con artist. Her and her "ex" are known for scamming people and stealing money then disappearing. She is pretty terrible. Lied about her dad dying. Started a company while on "sick leave" with her ex to compete with us, used corp email to divert contracts and sign contracts she had no right to sigh. Actively tried to sabotage employees here, female employees at that, they will testify to it. She, and this is no joke, is a psychopath. Joe Navarro has help me diagnose her. It will be an amazing book. She reported me for being into Child Porn. She illegally used pics from an ILF case in her book that I helped her write. She left SECOM 3 days before launch and removed my name from the book completely.

She is the one behind the attacks.

Her, Cat and Stephanie Carruthers. Stephanie or "snow" are the ring leaders. Rachel Tobac is in on it. They tried to recruit Alethe Denis but she refused as well as many others.

I am sure there are about 50000 questions – so ask



Cat Murdock
10/24/2024

Defense 4

Douglas Armstrong, RPR

But take a look and let me know

Christopher Hadnagy

Chief Human Hacker

Social-Engineer, LLC.

570.234.3734

www.social-engineer.com

Grab a copy of my new book *Human Hacking: Win Friends, Influence People, and Leave Them Better Off for Having Met You* HERE!

Have you seen my TedX Talk on how we are being hacked daily?

https://www.youtube.com/watch?v=9e6k_PtEXdM

**From:** Laurie Segall [redacted] @gmail.com>

**Sent:** Monday, May 2, 2022 10:55 AM

**To:** Christopher Hadnagy <chris@social-engineer.com>

**Cc:** Nick Covell <nick@dotdotdotmedia.com>; Laurie Segall <laurie@dotdotdotmedia.com>

**Subject:** Re: Story Idea

Also, wow... Chris ... these stories are horrible. Excited to chat. I am very interested in the web3 angle, crypto angle for some of the way things are being weaponized.

On Mon, May 2, 2022 at 10:36 AM Christopher Hadnagy <chris@social-engineer.com> wrote:

Please do – send it over ASAP so I don't double book

Thanks

**From:** Nick Covell <nick@dotdotdotmedia.com>

**Sent:** Monday, May 2, 2022 10:33 AM

**To:** Christopher Hadnagy <chris@social-engineer.com>

**Cc:** Laurie Segall <laurie@dotdotdotmedia.com>; Laurie Segall [redacted] @gmail.com>

**Subject:** Re: Story Idea

Hi Christopher,

Nice to meet you! Laurie is available to chat Mon, May 9th at 1p EST, so we can lock that in. I'll send over a calendar invite!

Best,

Nick

On Sat, Apr 30, 2022 at 11:09 AM Christopher Hadnagy <chris@social-engineer.com> wrote:

It is horrible but also a story that needs to be talked about.

Here are a few considerations for a story or two

Right there is a massive increase in self-produced child abuse images. Groomers getting kids to take the images then send them in. They then exploit kids to hand off their crypto to not spread the images.

So the kids either have to buy crypto or give up crypto they own.

Also – we found a guy who was selling accounts of girls he owned that anyone can now sexploit. It is disturbing – but crypto. Oof.

Lots to discuss. Also I want to get you on the podcast.

Next week I am teaching all week so can we do the week after?

9th 1pm EST

10th 3:30pm EST

12th 4pm EST

Any of those work for our convo?

Christopher Hadnagy

Chief Human Hacker

Social-Engineer, LLC.

570.234.3734
www.social-engineer.com
Grab a copy of my new book *Human Hacking: Win Friends, Influence People, and Leave Them Better Off for Having Met You* HERE!
Have you seen my TedX Talk on how we are being hacked daily?
https://www.youtube.com/watch?v=9e6k_PtEXdM

**From:** Laurie Segall <laurie@dotdotdotmedia.com>
**Sent:** Friday, April 29, 2022 6:48 AM
**To:** Christopher Hadnagy <chris@social-engineer.com>
**Cc:** Laurie Segall █████████@gmail.com>; Nick Covell <nick@dotdotdotmedia.com>
**Subject:** Re: Story Idea

Wow. This is horrible (and really interesting)..
First of all - yes! Want to come on podcast! And let'd find time to chat through below?? Next week?
Sent from my iPhone

> On Apr 28, 2022, at 11:59 PM, Christopher Hadnagy <chris@social-engineer.com> wrote:
>
>
> Hey there Laurie,
> Seems like your book took off! Congrats. I hope you are well.
> I have a few story ideas I am tossing to a couple places but you are always my first stop.
>> 1. Crypto is being used in child exploitation now more than ever. BTC and Monero are the biggest. WE have seen a HUGE increase in CSAM as well as (ugh) self made child abuse material. The pervs are getting the kids to take the images of themselves and then upload them. It is an epidemic. Going for big money.
>> 2. Disinformation campaigns. Russia is using these intensely. Over 70% of all the worlds ransomware is linked to Russia… holy crap. It is going to get worse.
>
> I have a few other ideas but just wanted to float these and see if we can make one work for one of your shows.
> Let me know. Also REALLY want to get you on the podcast for your book.
> Thoughts?
> Christopher Hadnagy
> Chief Human Hacker
> Social-Engineer, LLC.
> 570.234.3734
> www.social-engineer.com
> Grab a copy of my new book *Human Hacking: Win Friends, Influence People, and Leave Them Better Off for Having Met You* HERE!
> Have you seen my TedX Talk on how we are being hacked daily?
> https://www.youtube.com/watch?v=9e6k_PtEXdM
> All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended

recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

--
Nick Covell
Production Coordinator
Dot Dot Dot Media

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

# Exhibit 27



**Chris Hadnagy**

Flights. Hotels. Storage units. Prizes.
Guests. Food. Etc    Sep 10, 2021  2:59 PM

Chris Hadnagy
I don't think anyone knows what it costs. Or
takes. I spend between 30-50k a year for SE...

I don't doubt that at all

I had talked to Cat about OSINT during the
prep to compete the second time.

I went to her talk at Defcon in crypto village
and we were just texting and sharing family
stuff.                                    1:00 PM

I am so sorry. Really. That sucks. I was
going thru some stuff and Cat took me for
a.loop. I thought I was gonna lose ILF and
my business was hurt. I just shut down
emotionally                              1:00 PM

She definitely said some things but she
never shared any specifics about what
happened and I never asked her to.
                                         1:00 PM

Full honesty. Cat had gotten me really
angry many times and I was harsh with her.
Never abusive or sexual. But a bit of an
AHole a few times                        1:01 PM

I absolutely knew you were stressed abo
something.

Message

Confidential                                    DENIS00000049

# Exhibit 28



5:15

**Chris Hadnagy**

ugh sorry. Yah she has round me guilty I
guess                           Feb 19, 2022      2:01 PM

Fairly certain Alyssa is involved in the
complainers

Frankly Chris - Ryan and I have our own
views and tried to be equally supportive of
everyone regardless of all the things - but
they aren't making this easy. There's no
love lost between me, Ryan or any of these
people.                                         2:02 PM

I am sorry it's such a mess on my behalf. I
promise you I've never sexually harassed
anyone. I've been a jerk alot but never that
                                                2:03 PM

The shit people have said to me and that I
let go ... I could have MANY people banned
from defcon lol 😂 but I choose to pick my
battles. And it's not worth destroying lives
over

(You and your teams lives is what I am
referencing)                                    2:04 PM

Yah. We may lose a couple clients.

Marcus just quit ilf

And we lost 2 pit    2:04 PM

I heard he separa

Message

# Exhibit 29



**Chris Hadnagy**

Mar 4, 2022

I have a friend who calls me She-Hulk

When I get pissed I like just move a 400lbs chicken coop on my own.    4:38 PM

Hahaha we are related    4:38 PM

People think I'm super chill and "nice" and that's the plan 100%    4:39 PM

Hahaha. I wish I had that

Most know I am aggro    4:39 PM

Yeah but I know I'm at the center there is kindness.

*Yeah but I know at the center there is kindness.    4:43 PM

Yes. I try    4:43 PM

Most of these people have never owned anything let alone a business. Ryan and I are bitter and cynical lol 😂 We have been through a lot and empathize more than you know. Customer and family have treated us like shit - and we know this will pass. Despite the awfulness and the fact that that's not much comfort now.

Message

DENIS00000290

# Exhibit 30

| | |
|---|---|
| **From:** | Gary, David L |
| **Sent:** | Thursday, March 25, 2021 1:44 PM |
| **To:** | Christopher Hadnagy |
| **Subject:** | Case# 116416 |
| **Attachments:** | CITATION REPORT.pdf; Quick Reference Guide 2021.pdf; CASE CLOSURE LETTER TO EMPLOYER.pdf |

Mr. Hadnagy,

This is David Gary with the North Carolina Department of Labor Wage and Hour Bureau. Per our conversation this afternoon about case# 116416 complaint made by Ms. Jessica Lavine against Social-Engineer, LLC. I have attached a case closure letter, citation report and a reference guide. If you have any additional questions, please contact me at the number listed below.

Thanks,


David Gary
Wage and Hour Investigator
NC Department of Labor Wage and Hour Bureau



NOTICE: Email correspondence to and from this sender may be subject to the North Carolina Public Records Law and may be disclosed to third parties. In addition, e-mail correspondence to and from this sender is not encrypted. Therefore, transmitting via e-mail personal identifying information and other confidential information including, but not limited to, social security numbers, employer taxpayer identification numbers, checking account numbers, savings account numbers, credit card numbers, debit card numbers, and any other numbers or information that can be used to access a person's financial resources is discouraged.

**David Gary Wage and Hour Investigator | North Carolina Department of Labor | Wage and Hour Bureau**

**1101 Mail Service Center, Raleigh NC 27699-1101 | Phone: 980-402-4843 |Fax: 888-733-9389**

**For more information please visit www.labor.nc.gov**



# North Carolina Department of Labor
## Wage and Hour Bureau
# CITATION REPORT

**Case Identification Number:** 116416

**Employer:**

| | |
|---|---|
| Name: | SOCIAL-ENGINEER, LLC |
| d/b/a Name: | SOCIAL-ENGINEER |
| Mailing Address: | 3956 Town Center Boulevard #171 |
| City/State/Zip Code: | Orlando, FL 32837 |

**Report Date:** Mar 25, 2021

**Investigator:** David Gary

**Received By:** Christopher Hadnagy via chris@social-dashengineer.com

A NORTH CAROLINA WAGE AND HOUR INVESTIGATION OF YOUR ESTABLISHMENT/ENTERPRISE REVEALED THE FOLLOWING CORRECTIONS, WHICH WILL BE NECESSARY TO BRING YOU INTO COMPLIANCE. FAILURE TO COMPLY WITH THESE STATUTES MAY RESULT IN COURT ACTION.

| NR. | NCGS |
|---|---|
| 1 | 95-25.7 Failure to pay former employee(s) all wages due on or before the next regular payday after separation. |

# Exhibit 31



**Christopher Hadnagy**

Apr 7, 2021, 10:10 AM

Jeff looks like we need to have a serious convo

I think you are being manipulated

Sep 8, 2021, 11:29 AM

Anyhow, instead of just taking just one side of the story lets talk Jeff, if you want.

Sep 8, 2021, 11:41 AM

I definitely want to talk for sure, thanks for reaching out. I'm about to fly to Singapore, once back let's schedule a call.

Sep 8, 2021, 12:17 PM

yah bro. let me know when you are free. This is a flipping mess bro.

Sep 8, 2021, 12:18 PM

let me know when you are settled

Sep 13, 2021, 10:41 AM

Hey just pinging again?

Sep 16, 2021, 2:58 PM

Hey Chris, sorry for delay. Let's try and set up a call for next week. Black Hat wants to also be on it so everyone can have a conversation at once instead of doing them one at a time.

I'll get days and times from them and then propose to you what works for us and you pick what's best for you.

Sep 16, 2021, 7:12 PM

This is just black hat and you and me? Not this mob of manipulators right?

Sep 16, 2021, 7:20 PM

Yes, DEF CON side of things and BH side of things.

Sep 16, 2021, 7:34 PM

yep lets set it up bro. quick [↓ New messages] nis the better

Start a new message

DEFCON00000149

**Christopher Hadnagy**

> Yes, DEF CON side of things and BH side of things.
>
> Sep 16, 2021, 7:34 PM

yep lets set it up bro, quicker we can move past this the better.

Sep 16, 2021, 7:39 PM

what's the plan Jeff?

Sep 22, 2021, 5:18 AM

Jeff been about 2 weeks, in the mean time I have a team of people attacking me - can we talk?

Sep 28, 2021, 7:24 AM

> I had a call with BH (at last) and we would like to aim for a call this Friday evening Pacific time if that works?
>
> Sep 28, 2021, 9:34 PM

Depends on the time. What time you thinking. I'm in est.

Sep 29, 2021, 4:28 AM

> I'm in Singapore so my mornings start at your 8pm, and my evenings end at about your 10am
>
> Sep 29, 2021, 5:40 AM

8pm EST?

Sep 29, 2021, 5:44 AM

> Looks like we got out time zones all mixed up, how does Monday look for you?
>
> Sep 29, 2021, 5:20 PM

Monday Oct 4th I am open at 12:15pm EST, 330pm EST, 4pm EST, 6pm EST

Sep 29, 2021, 5:38 PM

Should I submit for SEVillage at DC30?

Oct 3, 2021, 6:12 AM

↓ New messages

if we are supposed to submit before Oct Friday need to

☐ ☐ ☺ Start a new message ▷

DEFCON00000150



**Christopher Hadnagy**

if we are supposed to submit before Oct i kinda need to know bro?

Oct 4, 2021, 6:32 PM

We are doing open wing the call for villages earlier to not be so rushed.

I'd have to see what the deadline is but it's in a while.

Oct 6, 2021, 10:04 AM

Ok I thought it was end of Oct. i saw in the thing, let me know. I am not sure why we can't get a time to chat i would like this to be over.

Oct 6, 2021, 10:11 AM

Hey Chris we are finally ready to talk with you, when is a good date or time?

Dec 16, 2021, 4:42 PM

How is this week looking?

Jan 4, 2022, 1:47 PM

you open friday

Jan 4, 2022, 3:04 PM

I might be in the air that day, Thursday is better, or Monday?

Jan 4, 2022, 10:28 PM

Thursday is solid. Monday I can do early afternoon is open

Jan 5, 2022, 6:25 AM

Ok coordinating with Sniffer

Jan 5, 2022, 7:24 PM

I had to fly. How does Monday or Tuesday look for you around 9am EST?

Jan 7, 2022, 1:07 PM

neither day is good for tha...    ↓ New messages    ...an
anytime after 11am?

Start a new message

DEFCON00000151



**Christopher Hadnagy**

neither day is good for that time. Too early for Ryan anytime after 11am?

Jan 7, 2022, 2:03 PM

Let's see, Grifter says after 7pm EST works for him most days. How's that?

Jan 9, 2022, 5:02 AM

Jeff, what do we need to discuss? You guys got told an accusation by a group of disgruntled ex employees and one person who we had to kick out of SEV. I've worked with DC for almost 15 years, mentored countless women and men, ran a village with zero porn, violence or problems, run a nonprofit for free that fingers crimes against children, and never had an accusation like this. Instead of defending me or trying to find out of this was true I was told to make it go away. I'm not sure what we need to discuss. If she had any legit claims why not go to police or a lawyer why would she go to BH and DC? Because all she wanted to do was hurt the Same way she did when she stole from secom and left.

I will ask Ryan but that's kinda late. We are not angry. Just disappointed. And we are really busy. We have decided to bring SEV to another conference this year. So I'm not sure what else to discuss. I didn't want to do this in writing after devoting so many years to def con. But it seems we just won't be able to make the time work. Between family, travel, work and time zones it seems like it's impossible

Jan 9, 2022, 6:11 AM

We just want to talk to you before we decide on what to do about the CoC violations that were reported to us.

Jan 10, 2022, 7:30 AM

Ok. Well let's pick a time that works

But business hours would be best for Ryan and I

Also can list what violations were reported? And by whom?

Jan 10, 2022, 7:32 AM

We won't share the names of those that have requested anonymity to prevent retaliation.

↓ **New messages**

I'm _____ _____ _____ _hat works for you EST during

⊠  ☺  ☺    Start a new message

DEFCON00000152

# Exhibit 32

| From: | Christopher Hadnagy [chris@social-engineer.com] |
|---|---|
| Sent: | 1/16/2022 11:33:49 AM |
| To: | Grifter [          @gmail.com]; jm@defcon.org |
| CC: | Ryan MacDougall [ryan@social-engineer.com]; Shane McCombs [shane.m@innocentlivesfoundation.org] |
| Subject: | Meeting Times |

With your time zone difference it seems like meeting is going to be very difficult. I was able to get a meeting with Steve, Steve and Sarah from Black Hat, and I assume these ridiculous accusations are the same.

So I can answer for each here and then if we need to talk we can try to get a time that works. The next few weeks I have some training classes that will make 4 out of 5 days really hard for a few weeks.

Accusation 1: There is a written email where I discriminated against a black person, at Black Hat, not def con. This is 100% false and ridiculous. You have known me for over 15 years and in all that time I have never ever been accused of racism. We have had people of every gender, ethnicity, race and religion at SEV and at my BH classes. My BH classes are generally filled with more nonwhite folks than white folks. When I asked if this supposed email was produced, of course it was not.

Accusation 2: I discriminated against a trans person at Black Hat and DEF CON. This is also not true. But Jeff you are aware of the situation they are referencing and it was over 8 years ago. When the rules of SECTF used to say "Must be male or female of the human race" and someone took offense to it. It was quickly fixed. I apologized publicly for being calloused, and I invited the one person who was offended personally by me as my guest to DEF CON. We hugged it out and it has NEVER been brought up again, in 8 freaking years.

Accusation 3: I discriminated against a blind person at BLACK HAT. This is also false. We had a blind person who was very angry at a class in the UK, I did not have my book translated to braile. He asked if I would and I got the cost and it was thousands of dollars so I told him if he would like it he could pay for it and I would allow it. He came to the class, sat through all 5 days, did all the homework, passed the class and then wrote a scathing review how much he didn't get out of it since he was blind. We refunded 100% of his money and he went on his way. This was over 6 years ago and has nothing to do with BH or DC.

Accusation 4: At a BH class, not DC, I said that an employee only got the job she had due to her being beautiful. This is an outright lie. Maxie is the one who made that joke, Ryan can attest to this because we spoke to her after class and I said that the community was sensitive and asked to fix her statement, which she did the next day.

Here is the bottom line. Maxie doesn't work here because she stole from us, lied about her dad dying, took 3 months paid leave and then stole content from SECOM and ILF. Upon doing so we locked her work computer and made sure any contracts she tried to take from us were squashed. She then reached out to Cat Murdock who quit 3 years ago and immediately tried to sell some of our services as her own, then went to work for a competitor and then went to work for our client. We never sued either of them.

They reached out to Stephanie Carruthers. Who won a black badge at my contest, then overnight became a competitor and then became a hater because we had to remove JC (her husband) from the competition. He called and broke our code of ethics and threatened to fire someone acting as the boss. We called her back, told her it was a prank, apologized and then removed him from stage. To get back at us for the embarrassment he took a young man under his wing and trained him to do the same thing the next year. When we found out we banned him and his entourage from SEV forever.

Stephanie then decided to write a competitive SE class which somehow got into BH and she tried to duplicate our homework idea but had students committing fraud, we reported her to BH and unlike all these people we did NOT do so anonymously.

DEFCON00000133

Since then they have been a path to try and take me down. Maxie as ringleader is now having backing from Cat and Stephanie, but I truly doubt there is 15 others. Maybe 4-5.

If you want 3rd party verification of this, this group has reached out to a number of people – Patrick Laverty from Layer8 and asked him to side with them to take me down. Also Alethe Denis, and they offered her a spot on a tv show in exchange for taking me out.

So if you want to investigate code of conduct violations you should be strongly looking at that group. Lying, fabricating stories and trying to create a coup for what?

We are not angry, we are disappointed. And we will make it easy on you. We are going to leave DEF CON and take SEVillage to another conference this year.  It truly saddens me that knowing me for 15 years+ you guys couldn't see through this.  Funny all these accusations are years old but they only come up 1 month after Maxie is fired?

For those years I ran a village that was ethical and moral. I had no porn, no cursing and you yourself even said that we were one village that rarely needed goons. I helped start DEF CON KIDS, and had the first kids event at def con, was the first and only contest to get a Black Badge in my first year, and helped start over 12 careers – all with little to no support or help.

These accusations are ludicris. Again, I am not upset, just really sad it is going the way it is.

I hope you are well and healthy.  I would truly avoid giving whatever name you will call this village to stephanie, trust me Jeff. She is terrible, unethical and a liar. You, of course have to make the decisions in the end but I hope as far back as we go you will trust me to help you pick a successor.


Christopher Hadnagy
Chief Human Hacker
Social-Engineer, LLC.
570.234.3734
www.social-engineer.com

Are you interested in becoming the best version of YOU? Check out the Human Behavior Conference to learn how you can understand the fullness, totality and exquisite nature of human behavior. www.humanbehaviorcon.com

Grab a copy of my new book *Human Hacking: Win Friends, Influence People, and Leave Them Better Off for Having Met You* HERE!

Have you seen my TedX Talk on how we are being hacked daily? https://www.youtube.com/watch?v=9e6k_PtEXdM

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

# Exhibit 33



SE_000526

# Exhibit 34

# PLACEHOLDER

This document was produced natively

SE_015066

**From:**      Offensive Security Order & Registration[orders@offensive-security.com]
**Sent:**      Sun 2/13/2022 8:01:49 AM (UTC)
**To:**        Christopher Hadnagy[chris@social-engineer.com]
**Subject:**   Re: New submission from Contact Multi Logic Questions

##- Please type your reply above this line -##

This is an automated email from Offensive Security Support regarding your support ticket.
-----------
Hi Christopher,

Since we have not heard from you regarding this issue, we will be closing it at this time. The full comment thread is below. If you reply the ticket will re-open and we will continue to assist.

---

**Order & Registration Services** (Offensive Security)

Feb 10, 2022, 7:57 UTC

Hello Christopher,

Thank you for your reply.

We need 2 information from the student to avoid giving the wrong information.
There are quite a number of students whose names are also the same as Maxie Reynolds and we can't just validate it based on the given name.

Hope you understand. You may ask Ms Maxie Reynolds to get the OSID or even email she used in registering for our course.

Keep us updated should you need further assistance.
Sincerely,
The Offensive Security Team

---

**Christopher Hadnagy**

Feb 10, 2022, 7:36 UTC

All we were told was her name, we do not know her email or id – and we want to confirm if she has the cert as she claims she does.

Not sure where to go from here. Sorry

Christopher Hadnagy
Chief Human Hacker
Social-Engineer, LLC.
570.234.3734
www.social-engineer.com<http://www.social-engineer.com>

Are you interested in becoming the best version of YOU? Check out the Human Behavior Conference to learn how you can understand the fullness, totality and exquisite nature of human behavior. www.humanbehaviorcon.com<http://www.humanbehaviorcon.com/>

Grab a copy of my new book Human Hacking: Win Friends, Influence People, and Leave Them Better Off for Having Met You HERE<https://humanhackingbook.com/>!

Have you seen my TedX Talk on how we are being hacked daily? https://www.youtube.com/watch?v=9e6k_PtEXdM

From: Offensive Security Order & Registration <orders@offensive-security.com>
Date: Wednesday, February 9, 2022 at 10:28 PM
To: Christopher Hadnagy <chris@social-engineer.com>
Subject: [Offensive Security] Re: New submission from Contact Multi Logic Questions
You don't often get email from orders@offensive-security.com. Learn why this is important<http://aka.ms/LearnAboutSenderIdentification>

---

**Order & Registration Services** (Offensive Security)

Feb 10, 2022, 3:28 UTC

Hello Christopher,

Thank you for contacting us.

Quite sadly, Offensive Security is not able to confirm the validity of the information you have provided.

We need to have the student's full name +OSID **or** Full name + email address, **or** Full name + Cert ID.

Please confirm if we can close this ticket or let us know if you require any additional assistance.
Sincerely,
The Offensive Security Team

---

**Christopher Hadnagy**

Feb 9, 2022, 8:40 UTC

Hello, we do nt kow her ID but her name is Maxie Reynolds

Thank you,

Christopher Hadnagy
Chief Human Hacker
Social-Engineer, LLC.
570.234.3734
www.social-engineer.com<http://www.social-engineer.com>

Are you interested in becoming the best version of YOU? Check out the Human Behavior Conference to learn how you can understand the fullness, totality and exquisite nature of human behavior. www.humanbehaviorcon.com<http://www.humanbehaviorcon.com/>

Grab a copy of my new book Human Hacking: Win Friends, Influence People, and Leave Them Better Off for Having Met You HERE<https://humanhackingbook.com/>!

Have you seen my TedX Talk on how we are being hacked daily? https://www.youtube.com/watch?v=9e6k_PtEXdM

From: Offensive Security Order & Registration <orders@offensive-security.com>
Date: Wednesday, February 9, 2022 at 1:44 AM
To: Christopher Hadnagy <chris@social-engineer.com>
Subject: [Offensive Security] Re: New submission from Contact Multi Logic Questions
You don't often get email from orders@offensive-security.com. Learn why this is important<http://aka.ms/LearnAboutSenderIdentification>

**Order & Registration Services** (Offensive Security)

Feb 9, 2022, 6:44 UTC

Hello Christopher,

Thank you for contacting us.

Absolutely! Please provide us with the student's first and last name.

Also, please provide us with an Offensive Security ID number for any individual whose certification you would like to verify; an Offensive Security ID number can easily be obtained simply by asking the candidate who claims to be an alumnus of Offensive Security. The OSID number is unique to each student and is comprised of four to five digits (i.e., OS–XXXX).

Once we have received this information from you, we will proceed to contact each student in order to obtain his or her approval of the release of their certification status.

If the student authorizes the release of the information, we will then contact you in order to verify their certification.

Should you have any other questions, feel free to contact us.
Sincerely,
The Offensive Security Team

---

**Christopher Hadnagy**

Feb 9, 2022, 5:10 UTC

Inquiry: Other
Name: Chris H
Email: Chris@social–engineer.com
OS–ID: Na
Tel: 5705108488

Message: I want to verify if a student actually has the OSCP for employment verification. Can you do that off of a first and last name? Thank you!

IP Address: 97.101.6.12
User-Agent: Mozilla/5.0 (Linux; Android 12; Pixel 6 Pro) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.87 Mobile Safari/537.36
Referrer: https://www.offensive-security.com/contact-us/
UTC Date/Time: 2022-02-09 05:10:39

This email is a service from Offensive Security. Delivered by **Zendesk**

# Exhibit 35

| From: | |
|---|---|
| Date: | March 14, 2022 5:45:08 PM (-05) |
| To: | "Christopher Hadnagy" <chris@social-engineer.com> |
| Cc: | |
| Subject: | **RE: Information you need** |

Attachments:

Mr. Hadnagy,

My understanding is that we complied with the contract's terms when terminating the parties' agreement and we have no further obligations to your organization.

Sincerely,



Senior Counsel

The information contained in this e-mail (including attachments) is only for the personal and confidential use of the sender and recipient named above. If the reader is not the intended recipient, you are notified that you have received this message in error and that any review, dissemination, copying or distribution is prohibited. If you have received this communication in error, please notify the sender immediately by e-mail and delete or destroy the original message and all copies.
Thank you.

**From:** Christopher Hadnagy <chris@social-engineer.com>
**Sent:** Monday, March 14, 2022 2:36 PM
**To:**
**Subject:** Re: Information you need

Good afternoon  ,

I was wondering if there is a case we can get an explanation for the sudden cancellation and if it was due to the announcement or why this happened?

Christopher Hadnagy
Chief Human Hacker
Social-Engineer, LLC.
570.234.3734
www.social-engineer.com

Grab a copy of my new book *Human Hacking: Win Friends, Influence People, and Leave Them Better Off for Having Met You* HERE!

Have you seen my TedX Talk on how we are being hacked daily? https://www.youtube.com/watch?v=9e6k_PtEXdM

**From:** Christopher Hadnagy <chris@social-engineer.com>
**Date:** Thursday, March 10, 2022 at 5:04 PM
**To:**
**Cc:**
**Subject:** Re: Information you need

Thank you ▮▮▮▮▮. Yes ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as mentioned, ▮▮▮▮▮ some ▮▮▮▮▮▮ ▮▮▮▮▮ about ▮▮▮▮▮▮▮ ▮▮▮ contract is cancelled we are told why. So even if the reasons are due to the DEF CON announcement can we please have an explanation as to why the contract was terminated so hastily?

Thank you

Christopher Hadnagy
Chief Human Hacker
Social-Engineer, LLC.
570.234.3734
www.social-engineer.com

Grab a copy of my new book *Human Hacking: Win Friends, Influence People, and Leave Them Better Off for Having Met You* HERE!

Have you seen my TedX Talk on how we are being hacked daily? https://www.youtube.com/watch?v=9e6k_PtEXdM

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Date:** Thursday, March 10, 2022 at 4:40 PM
**To:** Christopher Hadnagy <chris@social-engineer.com>
**Cc:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** RE: Information you need

Hi Chris,

I am fully aware of the decision to terminate our contract. The allegations you have included in your email to ▮▮▮▮▮▮▮▮▮, and additional details you have provide to me, are not taken lightly. I can assure you we are following up on them.

At time this, I respectfully ask that you stop contacting any and all ▮▮▮▮▮▮▮▮ associates or employees regarding our decision to terminate our contract with you. I have copied our legal counsel on this email, in the event you have any further need for communication.

Thank you.

▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**From:** Christopher Hadnagy <chris@social-engineer.com>
**Sent:** Thursday, March 10, 2022 11:58 AM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Cc:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** Re: Information you need

External: This email originated from outside of ▮▮▮▮▮▮▮. Don't open attachments or click on links unless this email was expected.

▮▮▮▮,

Thank you for finally responding.
▮▮▮▮, Nice to meet you.

I want to make this clear. We lose clients, it happens. 100% of the time it is not a surprise. We are met with professionally and told there was budget cuts, or they are bringing the work internal or they are not getting what they need.

But as you can see from what I included here, I have direct texts from Marcus in Feb stating the CISO approved increasing the budgets and expanding the work. Then a newly signed SOW for work from now till June. To have no communication from anyone at ▮▮▮▮▮▮▮ and to receive a certified letter stating the contract is cancelled for no reason is shocking to us. Considering the events my team and I saw with Marcus at ILF and his relationship with Maxie we have reason to believe this poses a threat for ▮▮▮▮▮▮.

Of course, losing the work is also a huge blow as we hired people to support the contracts you signed with us, we brought on extra staff to support the increased work and we spent time in education. Now there is a risk some will lose their employment. That I do take seriously and fight for.

CONFIDENTIAL

I have included the statement from one willing to help me that she felt during the meetings with Maxie and Marcus.

If I can provide any more detail please let me know, if we can talk about this or revisit the contracts I would greatly appreciate it.

Thank you

Christopher Hadnagy
Chief Human Hacker
Social-Engineer, LLC.
570.234.3734
www.social-engineer.com

Grab a copy of my new book *Human Hacking: Win Friends, Influence People, and Leave Them Better Off for Having Met You* HERE!

Have you seen my TedX Talk on how we are being hacked daily? https://www.youtube.com/watch?v=9e6k_PtEXdM

---

**From:** ████████████████████ >
**Date:** Wednesday, March 9, 2022 at 7:18 PM
**To:** Christopher Hadnagy <chris@social-engineer.com>
**Cc:** ████████████████ >
**Subject:** RE: Information you need

Chris,

Thank you for your email. We take these matters at ████████ very seriously. Someone at ██ will look into the events and allegations you have noted in your email below.

If you have any further information on these matters, please provide them to my Manager, ████████████, who is cc'd on this email.

██

---

**From:** Christopher Hadnagy <chris@social-engineer.com>
**Sent:** Monday, March 7, 2022 5:01 PM
**To:** ████████████████████████
**Subject:** Information you need
**Importance:** High

External: This email originated from outside of ████████ Don't open attachments or click on links unless this email was expected.

We met many times and as a student in my classes you have a unique perspective of me and know me better than most. I know it was way back in 2014 but still. So I hope you can receive this message in the way I am intending it, trying to understand what is going on.

CONFIDENTIAL

SE_015436

We have worked with [redacted] the [redacted] complaint [redacted] were told the contract was increasing to include more work since you were seeing large benefits of our services.

As you know, Marcus was our POC. He also was a volunteer for ILF. There is no easy way to say the things I am going to say, but I can provide proof of it all.

In both of companies ILF and SECOM I have had employees complain to me that Marcus and Maxie were VERY flirtatious with each other during professional meetings, to one point that one of my other female employees mentioned how uncomfortable she was. Then as things unfolded with Maxie as she stole some items from ILF and SECOM, we had to take legal action. We notified both clients and ILF volunteers that this might effect things and gave them as much detail as we could.

It came as a shock to us when Marcus quit the ILF all of a sudden. But the day he did we noticed the inside information that was constantly being leaked during team meetings stopped. That made us very sad.

But then to receive the email that our contract was cancelled and for no reason, considering the glowing praise, the good work and how secure we were making [redacted]

I feel compelled to tell you and anyone else that will listen at [redacted] that these actions put you at risk. Cancelling a contract that was making your company safer, better and more resilient because he is attached to a woman? If we were failing or not doing our duty I would expect there to be conversations around what we need to improve. If it was a cost thing, I would not have emails about expanding our services and increasing the contract.

I am truly distraught over this and asking you to please make time to talk with me. Please. If you want to hear from my employees that can attest to these items above they are more than willing to speak to legal counsel or whomever.

Please make time for our conversation.

Christopher Hadnagy
Chief Human Hacker
Social-Engineer, LLC.
570.234.3734
www.social-engineer.com

Grab a copy of my new book *Human Hacking: Win Friends, Influence People, and Leave Them Better Off for Having Met You* HERE!

Have you seen my TedX Talk on how we are being hacked daily? https://www.youtube.com/watch?v=9e6k_PtEXdM

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

Your privacy and security are important to us. See our privacy policy (Canada, Europe & Asia, United States).

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

Your privacy and security are important to us. See our privacy policy (Canada, Europe & Asia, United States).

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

Your privacy and security are important to us. See our privacy policy (Canada, Europe & Asia, United States).

# Exhibit 36



5:05

**Chris Hadnagy**

I don't want [Dec 28, 2021] ith her. I don't want to have to work with her directly (though it sounds like she's ghosted them). And I don't want to be someone who looks like they are just seeking fame out of all this. 8:02 PM

she is poison 8:02 PM

👍

so listen, you can't help the fame thing

i am fighting it

but you are 1) really amazing at SE 2) have an amazing story and whether you believe this or not 3) you are ridiculpusly beautiful

so you will make it far if you let yourself 8:03 PM

From the very beginning I told them that I was not on camera talent type material. I do not have that Hollywood look or appeal and from previous castings I knew what I was up against with the girls that are down there in that area and that it was silly to even consider it for me. Especially if Maxie was going to be on camera I knew that it would not be an option for me and that I would prefer to contribute as a consultant behind the scenes. 8:03 PM

ALETHE!!!!

Message

Confidential                                          DENIS00000107

# Exhibit 37



5:09

**Chris Hadnagy**

let Maxie have her ...

Jan 14, 2022

Yeah I can see feeling that way

The reputation management is the most important thing.  11:52 AM

i just want it to end and get back to doing amazing things and saving kids  11:52 AM

❤️

Yup. I would too.

I'm so frustrated for you and if you need anything - please let me know.  11:54 AM

do you know any hit man  11:57 AM

I mean - I'm sure I could find one.  12:06 PM

I just don't get how BH can't see this for what it is but I get it. They want to transfer the problem to you and remain in business.  12:19 PM

cause it was 15 ppl somehow  12:20 PM

I thought it was 30? (Rolls eyes)  12:25 PM

BH told me 15  12:26 PM

Message

# Exhibit 38

| From: | david@mgenyc.com[david@mgenyc.com] |
|---|---|
| Sent: | Mon 5/2/2022 12:33:56 PM (UTC) |
| To: | Christopher Hadnagy[chris@social-engineer.com]; Allie[allie@mgenyc.com] |
| Subject: | RE: HUBE : My Thoughts |

Morning!
Personally, I'd suggest to make that statement about half-as-long and leave off "details". Basically, invite DEFCON to arbitration and imply that you "know something that they don't think you know". Right now, you're basically giving them "discovery" (I watch lawyer shows... haha).
Unless those people from DEFCON gave you absolute specifics, which may be another matter.
ALLIE and I are on shoots all this week, but let's revisit this shortly.
Your Humble Narrator.

D

www.mygoodeyevisuals.com | www.davidsbrodsky.com | www.mgenyc.com |
www.facebook.com/mygoodeye | https://www.facebook.com/mygoodeyenyc
O: 212-791-2777
C: 917-497-6279
SKYPE : mygoodeye232

Want to make an appointment? Click here -> Calendly.com/davidbrodsky
**From:** Christopher Hadnagy <chris@social-engineer.com>
**Sent:** Saturday, April 30, 2022 11:37 AM
**To:** Dave Brodsky <david@mgenyc.com>; Allie <allie@mgenyc.com>
**Subject:** RE: HUBE : My Thoughts
Easy stuff first,
If you think Ryan and Rosa are not warm enough we will work on that and if we have to reshoot we will either give them another shot or find better options. I am open. I will be nice, but this is about best product not their feelings.
Abbie is not in Florida yet, another month we think it will all work out.
Now for the DEF CON statement I am thinking of this:
"In my previous statement I promised you all that I would be open as I found out more information and be willing to share what I can in regards to the announcement and ban made by Jeff Moss at DEF CON of me. Recently, two people who represent DEF CON and are higher up in the organization have given me information regarding the accusations that lead to the ban of me from the DEF CON conference.
The facts are really disturbing and a very serious nature for DEF CON. They will also uncover how many that are involved in the new Social Engineering Community Village are a part of this attack. I have been thinking how I could live up to my promise to be open and forthcoming as there are still a few things I hold to:
    1.  Any real victims should have the choice if they want to be named or spoken about.
    2.  If the accusation involve any legal ramifications from either side, the way the information is relayed needs to be thought about to protect the ability for those legal proceedings to take place.
    3.  And in this particular case it involves some actions that were taken to protect the identity of a 13 year old victim that ILF worked on which is now a federal case and we MUST not do

anything that will jeopardize her safety and identity.

4.  A real investigation is not done by a biased party but it done in a way that gives all sides the ability to have a say and speak their part if they so wish.

With that said, the accusatory nature of DEF CON's statement has done untold damage to my name, my company and my nonprofit. The work I have done over the last 20 years has come into question and I must defend myself so all that work is not ruined.

For this reason here is my offer, I will not release the facts to any DEF CON investigator or any Social-Engineer, LLC investigator as the bias in both cases is too strong. If DEF CON will agree, both they and SECOM can choose a legal arbitrator that can review any evidence that DEF CON says they have as well as all of the evidence I have. This will include:

• logged and saved communications I have with the DEF CON representatives

• all internal SECOM communications and logs that had to be handled to protect intellectual property, data theft or other legal business matters

• all internal ILF communications and logs that had to be handled to protect the identity of the 13 year old victim that was in danger – we will NOT release any details about her, her family or her case even to the arbitrator as it is no longer a case we can speak about publicly

• witnesses that will testify under oath to matters that were told to them about this attack on me and the motives behind it

• clear evidence of the time line of how all this came about and how deep this goes

I would have loved nothing more than to let this go and move on with life, sadly, as I mentioned above the damage done to my family, myself, Social-Engineer, LLC, and The Innocent Lives Foundation and all employees and volunteers for both has been more extensive that you can imagine and for that reason it cannot be ignored responsibly.

I am making this public statement and sending the same message unaltered to both Jeff Moss, DEF CON representatives as well as Black Hat representatives. I will give this message 7 days to be replied to and then will update with another statement as to what happens next.

Let's all hope that Jeff Moss will take this seriously as I have and lets work out a solution.

Thank you all for your patience as I work this out."

Anyhow, I am sure it needs some tweaks but this is what I want to put out there.

More soon.

Christopher Hadnagy

Chief Human Hacker

Social-Engineer, LLC.

570.234.3734

www.social-engineer.com

Grab a copy of my new book *Human Hacking: Win Friends, Influence People, and Leave Them Better Off for Having Met You* HERE!

Have you seen my TedX Talk on how we are being hacked daily?

https://www.youtube.com/watch?v=9e6k_PtEXdM

**From:** david@mgenyc.com <david@mgenyc.com>

**Sent:** Saturday, April 30, 2022 11:10 AM

**To:** Christopher Hadnagy <chris@social-engineer.com>; Allie <allie@mgenyc.com>

**Subject:** RE: HUBE : My Thoughts

DMAIL! HA. Love it. And I'm honored.

The below all sounds like a reasonable plan; although I'd proof-read that statement a bit.

OSINT : Not to bum you out, but now try just typing CHRIS HADNAGY into Duckduckgo. My guess is

that a reasonable slice of your potential clientele lean towards these more "privacy centric" platforms... nevertheless, we all agree that in the absence of striking it from the internet, the headlines should read more like "Chris Hadnagy Wins Arbitration Against Def-Con in $50M defamation settlement".



TIM : Great minds! Like I said, if you are "right" and this issue was caused by a vindictive ex-employee (which you can prove, it seems), then why take the punishment? Nobody but nobody would think less of you for protecting the well-being of a 13-year-old rape victim... ah, but they will think less of the person that attempted to exploit that 13-year-old for her own personal gain.

Drop the bomb right around Def-Con, but do not be fooled into thinking that'll be the end of it. Dole it all out in digestible nuggets of information rather than a DMAIL-level-info-drop. And, don't show you're whole hand in the first salvo. Do to them what they did to you. Let them squirm this time. And hopefully you impact their bottom line.

ARBITRATION : I like that.

You have a few months to determine whether to bother. If you can weather this downturn by, say, JUNE, maybe you don't have to bother. MAXI is poking the bear to get you to respond negatively to the "poor, poor victimized woman" and I'd level a bet that she's going to talk-shit to anyone that will listen. I wonder, is she a good manipulator or just an attractive one? Both?

This is going to sound terrible, but you have the "Amber Heard" matter on your side. A very high profile, attractive woman being shown to be the abuser... it certainly pokes holes in the "believe all women" mantra. Now, if only we'd seen the Ghislane Maxwell trial, eh? 😊

My opinions:

I'll defer to TIM on the matter of timing, but (as mentioned), better to put the heat on them while they're ramping up to the convention. Give them something to worry about. Be very careful not to appear unhinged; check your spelling and lay-off speculative preacher lines like this:

"If they will not, it will show you, the community they do not want this to be resolved – we do."

Lines like that will backfire on you if DEFCON does agree to arbitration. If they take you up on it, then you look the fool.

Do not imply that they are malicious or incompetent in your first salvo. You are level-headed, righteously upset, and honestly confused. Let them hang themselves. Or let their silence speak volumes.

Do not explain that their investigator is a clown. Just put it out there: 3rd party arbitration so we can be assured of an unbiased decision. Only "answer" with things like "their investigation appeared biased" when asked. Do not write : "unskilled and unprofessional"; maybe more like "we don't feel

their investigation was comprehensive".

Project a calm demeanor. I'm not the expert so I don't know what it's called, but I think you should project the type of behavior that indicates a knowledge of being correct, a respectful self-awareness, a slight indignation at having been wrongly accused, and (importantly) the idea that you know something – big – that they don't. Take a page from Joe Navarro's demeanor. He's the kind of guy that you want to keep happy, and takes no shit.

If they remain silent, then go ahead drop some lines about "them not wanting to get to the bottom of it"…

… but as with every chess-match, try to anticipate what they're going to say to that, if anything. And if you can live with (and defend against) what they might say.

If they do not agree, perhaps follow up with suing them (if you have cause). And then, perhaps, drop the "I will not apologize for protecting a 13-year-old rape victim" thing.

**And, by the way, have someone on your side attend the new SE "room" at DEFCON, if possible. If they talk shit, you may have something actionable.**

QUESTION : Aside from the obvious (clearing your name, vengeance), what is it that you want from all this? If DEFCON agreed, would you return? Do you think the clients that bailed would return? Do you think that if you left well enough alone, it'd eventually go away?

JOE/ABBIE/CHRIS SHOW: Is she in Florida? And yes, you should. Maybe wait to spend the money until some dust settles on DEFCON? I have to think on that, but in the abstract, the idea of a "well-produced" show (not necessarily Zoom windows) sounds like a winner. My initial thought would be to do "fireside chat" episodes in-studio with the 3 of you interacting. Maybe one a month if the subject matter isn't "timely" we could record 12 in a sitting. Then "interstitials" done in the Zoom-window-style/podcast (as a matter of practicality) based on more current events. Let's discuss.

ISE/ABBIE : On it, as you saw in the other thread.

You, me and Allie: You and Patricia came off as warm and natural. Ryan and Rosa less so (all the love in the world to them both). We should rehearse them far more than we did.

I have not watched these videos since we shot them, but my thinking might be to add some more "natural" presenters. Off the top of my head, CURT is an actor and can probably deliver. SHELBY is young and articulate and might jibe with the ISE market.

Long enough?

Your Humble Narrator.


D

www.mygoodeyevisuals.com | www.davidsbrodsky.com | www.mgenyc.com |
www.facebook.com/mygoodeye | https://www.facebook.com/mygoodeyenyc
O: 212-791-2777
C: 917-497-6279
SKYPE : mygoodeye232

Want to make an appointment? Click here -> Calendly.com/davidbrodsky
**From:** Christopher Hadnagy <chris@social-engineer.com>
**Sent:** Wednesday, April 27, 2022 10:10 PM
**To:** Dave Brodsky <david@mgenyc.com>; Allie <allie@mgenyc.com>
**Subject:** RE: HUBE : My Thoughts
Hey broski….
(see what I did there)
Ok so this is gonna be a Dave level email… otherwise known as a DMAIL

LOL

Short version – I cannot argue with anything you have said here. I really can't. I have many thoughts/feelings/meanderings

I have done numerous levels of OSINT on me, and yes you are right. If you search for Chris Hadnagy and DEFCON you find it, but not if you just search for CHRIS HADNAGY

That is not an argument. Cause this week (not public)… that awful psycho bitch Maxie called Michelle Ward to "check in"… she didn't take the call

2 days later a sponsor pulled all their financial support for being linked with me. So now she has to quit ILF.

UGH

The woman wants me dead – so for this reason alone I agree – we cannot continue with HUBE till we can put this in the rearview mirror.

Side bar – I spoke to Tim about the idea of a defensive attack on def con and … LO AN BEHOLD he is not opposed to it. Wow

So the idea for now – July

Post something like this (more eloquent)

Due to comments from 2 DEF CON representatives directly to me in posts we now have enough proof to defend tese ridiculous allegations. We still DO NOT want to out any victims or cause any harm. For that reason we are willinging opening a discussion with a legal arbator if DEF CON agrees. We refuse to use a DEF CON investigator as they are biased, unskilled and unprofessional. Additionally, we will not allow an SECOM investigator to be involved as they are biased. So we will pay for a 3rd party DEF CON approved arbriation if they will respiond and agree. We want the truth to come out, we want to expose what we have found, but we want to do it ethically, morally and with any potnetial victim in mind.

Then we see what happens. My expectation is that they will do nothing and not respond. But maybe the community will force them to. We will see.

Ok so now for the rest…

Wired PAUSED (not pulled) after the def con news. Like everyone, they are scared. Am I running around raping people acting like I a good guy? Hell Jeff Damher was known to be one of the best neighbors. So people are scared,. I get it.

In the meantime, we have lost 1 million in business as of now. OUCH. Can you believe that number? I cannot. Honeslty as I sip my whiskey right now I cannot believe I typed that number. WOW

All because of a conference.

Now, I agree we need to spend some money to do a joe, abbie chris show, get some women there and pump the piss out of it on youtube.

Long plan – I need to get you with Abbie. She needs to see if the video you have will work.

The ones that will great.

Then we need to redo some others.

During that shoot we need to get you to film Joe and I and a woman… and we promote that.

I am also working on some HuBe light promotions.

I get that 2023 may be a bad idea – I can't committt to that just yet, but I get it.

Sigh

I am workign with a speaking consultant to get my personal brand out there… and I can use your help for sure.

I am (for the first time) working on an SBA loan to cover marketing and some money to help growth.

What else?

What do you think?

Christopher Hadnagy

Chief Human Hacker
Social-Engineer, LLC.
570.234.3734
www.social-engineer.com
Grab a copy of my new book *Human Hacking: Win Friends, Influence People, and Leave Them Better Off for Having Met You* HERE!
Have you seen my TedX Talk on how we are being hacked daily?
https://www.youtube.com/watch?v=9e6k_PtEXdM

**From:** david@mgenyc.com <david@mgenyc.com>
**Sent:** Wednesday, April 27, 2022 9:46 AM
**To:** Christopher Hadnagy <chris@social-engineer.com>; Allie <allie@mgenyc.com>
**Subject:** HUBE : My Thoughts

Heya! I'll speak for myself and let ALLIE chime in with her thoughts if they differ from mine…

… but since you asked: I don't think you should focus on HUBE as a "whole" just yet. I agree with RYAN and JASON, you've got a lot of plates spinning, let's not add another – for now.

I'm unconvinced that you have enough juice to fill a conference right now. When searching "Chris Hadnagy" on DuckDuckGo, the DEFCON stuff is still first page; starting at result number 6. And your WIKIPEDIA page indicates that you were banned from DEF CON as well (you should strike that). Someone is obviously f*cking with you, 'cause they couldn't bother to get your name right, yet that doesn't matter. "Perception = reality" as the saying goes. Right now, in some circles, right or wrong, the "conversation" will be DEFCON.

This is bad. Someone unaware of this DEFCON issue can be easily made aware of it with zero effort expended beyond scrolling a mouse wheel. That, in turn, could dissuade the potential attendee and you'd never know it.

Until you come-out-on-top of this DEFCON crap; or you put it so squarely in the rear-view that it doesn't show until page 3. DEFCON simply can't be a large part of the conversation. If you come out the "hero", then attendees will be far easier to secure. Not that the entire purpose of defending yourself against DEFCON should be HUBE, but it wouldn't hurt.

Moving on…

… we should focus on rebuilding (and, as you mentioned, redirecting) SECOM. Rebuild the reputation and redevelop business relationships in both the InfoSec and "corporate" spaces. THIS is where you should spend your money.

As part of that "rebuild", obviously ISE can play a big part. ISE stands to bring you an entirely different audience of people hungry for knowledge. They'd be a perfect audience for HUBE24. Who knows? Maybe you have ISECON24? Spend money on an ISE awareness campaign.

I'd also suggest building you – as a brand - publicly. We've discussed BEHAVIOR PANEL several times – and I know you'd prefer to have more science – but due to their public presence they are now able to (presumably) have a little "convention" of their own, as well as completely eschewing DEFCON. It sounds a whole lot like what HHC was, but just featuring the four of them (https://behavior-panel.mykajabi.com/las-vegas-event). By my count, their costs are significantly lower than what you were aiming for with HUBE; they are openly selling all of their merchandise; and I'd bet each of them will walk away with (at least) $25K for the weekend… all while developing their brand and solidifying clientele. Not bad.

(I'm quite curious to go, just to see how it goes for them. I'd say that at least CHASE and MARK would recognize Allie and I, so it really couldn't be covert; and I'm not so curious as to want to spend $5K… still…)

What happened with the JOE NAVARRO/ANNE-MARTJE thing? That would be a great way to develop awareness of you, SECOM, ISE and HUBE. Or, a great way to develop your "alternative Behavior

Panel".
Along the way, I suggest HUBE "pop-ups". Specifics I don't know, but in the abstract :
- HUBE at small conventions – both in the "hacker" space and otherwise;
- HUBE "section" as part of each and every one of your talks (ie: "okay class, let's talk about Human Behavior" and we use the HUBE logo on those slides, and the slides of anyone presenting on SECOM's behalf (Shelby?));
- HUBE-centric podcast episodes;
- HUBE speaking engagements (ie: promote "human behavior specific" talks and presentations).

In other words, let's look at developing HUBE in a more subtle and organic way. Once the DEFCON crap has faded away (or, in the alternative, you go scorched earth as we discussed and become a hero) and you're working with a new group of clients, that's the point I think you can offer HUBE (at a corporate discount) to your clients, as well as approach a broader audience.
From a financial perspective, I never could figure out the profit on it based on the offering price and the max attendees. Given that I think you spent far more than you think you did on HUBE22 - and you've mentioned the loss of SECOM business - I'd also suggest rebuilding your coffers before entering what could become a costly endeavor. You heard PING, there is a ton of money that needs to be spent on awareness alone; unless you already have sufficient awareness of your brand to draw attendees, that is.
I know HUBE is something of a passion-project for you, but I think it unwise to decimate your passion for it by attempting to force the issue right now. Yes, yes, we can charge forward with righteous fury and perhaps do well, yet I think that's something to think about next month...
I think we look at your "status" monthly; each time evaluating whether HUBE is something that should become a conference, is affordable, and can be viable from pragmatic standpoints.
And there you have it, my opinion!
Let's discuss as you like.
Your Humble Narrator.

D

www.mygoodeyevisuals.com | www.davidsbrodsky.com | www.mgenyc.com | www.facebook.com/mygoodeye | https://www.facebook.com/mygoodeyenyc
O: 212-791-2777
C: 917-497-6279
SKYPE : mygoodeye232

Want to make an appointment? Click here -> Calendly.com/davidbrodsky
All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.
All information transmitted hereby is intended only for the use of the addressee(s) named above and

may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

# Exhibit 39

**From:**        Laurie Segall[laurie@dotdotdotmedia.com]
**Sent:**        Wed 5/11/2022 4:41:34 PM (UTC)
**To:**          Christopher Hadnagy[chris@social-engineer.com]
**Subject:**     Re: Details

Hey there,
No need to apologize. That's really tough.. and definitely sounds like a tough ordeal :( I'm going to review and loop back!

L

On Mon, May 9, 2022 at 10:53 PM Christopher Hadnagy <chris@social-engineer.com> wrote:

    Laurie,

    I am so sorry for hijacking our time today with the crap of my life.

    Let me just say this: these details I am sharing with you, have never been shared outside the company. Please protect these. These can ruin my life if used wrong.

    Anyhow, there is a lot to give you for details and not sure of the best way to do it…

    I have included a DEF CON timeline

    But here is some other details

    Employee 1:

    Cat Murrdock

    Came in with zero experience. I trained her, helped her, excelled her. She went from no one to a trainer, podcaster, and leader in a year. With in 9 months she got a 20,000 raise and her statement to me was, "I thought it would be more."

    That should have been my sign.

Full disclosure. She screwed up a massive project and lost my crap. I chewed her out bad. Not due to her gender but her failure, but should have handled it better, She quit that night. Said she was gonna go back to education.

But with in a month started a company that sold our products. We shut her down

She went to get a job with a competitor, which was a breach of her contract, we didn't stop her. I should have.

Then she went on to work for a client of ours she serviced, also a breach, but I didn't stop her.

She tried to damage ILF and called out our agents at DEF CON. Was a major problem and almost ruined ILF.

She is a terrible person.


Employee 2

Maxie Reynolds.

So much data on her, she is a con artist. Her and her "ex" are known for scamming people and stealing money then disappearing. She is pretty terrible. Lied about her dad dying. Started a company while on "sick leave" with her ex to compete with us, used corp email to divert contracts and sign contracts she had no right to sigh. Actively tried to sabotage employees here, female employees at that, they will testify to it. She, and this is no joke, is a psychopath. Joe Navarro has help me diagnose her. It will be an amazing book. She reported me for being into Child Porn. She illegally used pics from an ILF case in her book that I helped her write. She left SECOM 3 days before launch and removed my name from the book completely.


She is the one behind the attacks.

Her, Cat and Stephanie Carruthers. Stephanie or "snow" are the ring leaders. Rachel Tobac is in on it. They tried to recruit Alethe Denis but she refused as well as many others.


I am sure there are about 50000 questions – so ask

But take a look and let me know

Christopher Hadnagy

Chief Human Hacker

Social-Engineer, LLC.

570.234.3734

www.social-engineer.com

Grab a copy of my new book *Human Hacking: Win Friends, Influence People, and Leave Them Better Off for Having Met You* HERE!

Have you seen my TedX Talk on how we are being hacked daily? https://www.youtube.com/watch?v=9e6k_PtEXdM

**From:** Laurie Segall ▮▮▮▮▮▮▮▮ @gmail.com>
**Sent:** Monday, May 2, 2022 10:55 AM
**To:** Christopher Hadnagy <chris@social-engineer.com>
**Cc:** Nick Covell <nick@dotdotdotmedia.com>; Laurie Segall <laurie@dotdotdotmedia.com>
**Subject:** Re: Story Idea

Also, wow... Chris ... these stories are horrible. Excited to chat. I am very interested in the web3 angle, crypto angle for some of the way things are being weaponized.

On Mon, May 2, 2022 at 10:36 AM Christopher Hadnagy <chris@social-engineer.com> wrote:

Please do – send it over ASAP so I don't double book

Thanks

**From:** Nick Covell <nick@dotdotdotmedia.com>
**Sent:** Monday, May 2, 2022 10:33 AM
**To:** Christopher Hadnagy <chris@social-engineer.com>
**Cc:** Laurie Segall <laurie@dotdotdotmedia.com>; Laurie Segall
█████████ @gmail.com
**Subject:** Re: Story Idea

Hi Christopher,

Nice to meet you! Laurie is available to chat Mon, May 9th at 1p EST, so we can lock that in. I'll send over a calendar invite!

Best,

Nick

On Sat, Apr 30, 2022 at 11:09 AM Christopher Hadnagy <chris@social-engineer.com> wrote:

It is horrible but also a story that needs to be talked about.

Here are a few considerations for a story or two

Right there is a massive increase in self-produced child abuse images. Groomers getting kids to take the images then send them in.  They then exploit kids to hand off their crypto to not spread the images.

So the kids either have to buy crypto or give up crypto they own.

Also – we found a guy who was selling accounts of girls he owned that anyone can now sexploit. It is disturbing – but crypto. Oof.

Lots to discuss.  Also I want to get you on the podcast.

Next week I am teaching all week so can we do the week after?

9th 1pm EST

10th 3:30pm EST

12th 4pm EST

Any of those work for our convo?

Christopher Hadnagy

Chief Human Hacker

Social-Engineer, LLC.

570.234.3734

www.social-engineer.com

Grab a copy of my new book *Human Hacking: Win Friends, Influence People, and Leave Them Better Off for Having Met You* HERE!

Have you seen my TedX Talk on how we are being hacked daily? https://www.youtube.com/watch?v=9e6k_PtEXdM

**From:** Laurie Segall   laurie@dotdotdotmedia.com

**Sent:** Friday, April 29, 2022 6:48 AM
**To:** Christopher Hadnagy   chris@social-engineer.com
**Cc:** Laurie Segall ▮▮▮▮▮▮▮ @gmail.com>; Nick Covell <nick@dotdotdotmedia.com>
**Subject:** Re: Story Idea

Wow. This is horrible (and really interesting)..

First of all - yes! Want to come on podcast! And let'd find time to chat through below?? Next week?

Sent from my iPhone

> On Apr 28, 2022, at 11:59 PM, Christopher Hadnagy <chris@social-engineer.com> wrote:

> Hey there Laurie,

> Seems like your book took off! Congrats.  I hope you are well.

> I have a few story ideas I am tossing to a couple places but you are always my first stop.

>> 1.  Crypto is being used in child exploitation now more than ever. BTC and Monero are the biggest. WE have seen a HUGE increase in CSAM as well as (ugh) self made child abuse material. The pervs are getting the kids to take the images of themselves and then upload them. It is an epidemic. Going for big money.
>> 2.  Disinformation campaigns. Russia is using these intensely. Over 70% of all the worlds ransomware is linked to Russia… holy crap. It is going to get worse.

I have a few other ideas but just wanted to float these and see if we can make one work for one of your shows.

Let me know. Also REALLY want to get you on the podcast for your book.

Thoughts?

Christopher Hadnagy

Chief Human Hacker

Social-Engineer, LLC.

570.234.3734

www.social-engineer.com

Grab a copy of my new book *Human Hacking: Win Friends, Influence People, and Leave Them Better Off for Having Met You* HERE!

Have you seen my TedX Talk on how we are being hacked daily? https://www.youtube.com/watch?v=9e6k_PtEXdM

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

--

Nick Covell

Production Coordinator

Dot Dot Dot Media

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

--

**Laurie Segall**

Founder & Executive Producer
Dot Dot Dot Media

# Exhibit 40

Hadnagy, et al. v. Moss, et al.                    Samantha Gamble

Page 1

THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____
                              )
CHRISTOPHER J. HADNAGY, an     )
individual; and SOCIAL-ENGINEER, )
LLC, a Pennsylvania limited    )
liability company,             )
                              )
                Plaintiffs,    )
        v.                     ) No. 2:23-cv-01932-BAT
                              )
JEFF MOSS, an individual; DEF  )
CON COMMUNICATIONS, INC., a    )
Washington corporation; and DOES )
1-10; and ROE ENTITIES 1-10,   )
inclusive,                     )
                              )
                Defendants.    )
_____

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION

OF

SAMANTHA GAMBLE

_____

Witness located in Boise, Idaho

(All participants appeared via videoconference.)

DATE TAKEN:   January 15, 2025
REPORTED BY:  Nicole A. Bulldis, RPR, FCRR, WA CCR 3384
              AZ CR 50955 | CA CSR 14441 | OR CSR 24-0130

Hadnagy, et al. v. Moss, et al.                    Samantha Gamble

Page 2

```
1                    A P P E A R A N C E S

2

3    FOR PLAINTIFFS:

4      (via Zoom)          MARK R. CONRAD
                           Frey Buck P.S.
5                          1200 5th Avenue, Suite 1900
                           Seattle, WA 98101
6                          (206) 486-8000
                           mconrad@freybuck.com
7

8      (via Zoom)          KRISTOFER Z. RIKLIS
                           Riklis Law, PLLC
9                          871 Coronado Center Drive, Suite 200
                           Henderson, NV 89052
10                         (702) 720-6471
                           kristofer@riklislaw.com
11

12   FOR DEFENDANTS:

13
       (via Zoom)          LAUREN A. TRAMBLEY
14                         Perkins Coie LLP
                           505 Howard Street, Suite 1000
15                         San Francisco, CA 94105
                           (415) 344-7000
16                         ltrambley@perkinscoie.com

17

18   THE VIDEOGRAPHER:

19     (via Zoom)          BROOK YOUNG
                           Buell Realtime Reporting
20

21   ALSO PRESENT:

22     (via Zoom)          CHRISTOPHER HADNAGY, Plaintiff

23

24                         --o0o--

25
```

Hadnagy, et al. v. Moss, et al.                    Samantha Gamble

Page 4

1          REPORTED REMOTELY FROM CLARK COUNTY, WASHINGTON

2              Wednesday, January 15, 2025; 11:03 a.m.

3                          --o0o--

4

5              THE VIDEOGRAPHER:  This is the deposition

6    of Samantha Gamble, in the -- in the matter of Hadnagy, et

7    al., versus Moss, et al., Cause No. 2:23-cv-01932-BAT, in

8    the United States District Court, Western District of

9    Washington at Seattle, and was noticed by Lauren Trambley.

10              The time now is approximately 11:03 a.m. on

11   this 15th day of January 2025, and we are appearing via

12   videoconference.  My name is Brook Young from Buell

13   Realtime Reporting, LLC, located at 1325 Fourth Avenue,

14   Suite No. 1840, in Seattle, Washington 98101.

15              Will counsel and all present please

16   identify themselves for the record?

17              MS. TRAMBLEY:  Lauren Trambley appearing on

18   behalf of defendants.

19              MR. CONRAD:  Mark Conrad on behalf of

20   plaintiffs.

21              THE VIDEOGRAPHER:  The court reporter may

22   now swear in the witness.

23   //

24   //

25   //

e25c7f56-340a-4fc0-bf3b-de5cfa0fe1f0

Hadnagy, et al. v. Moss, et al.                          Samantha Gamble

Page 5

1   SAMANTHA GAMBLE,                witness herein, having been

2                                   first duly sworn on oath,

3                                   was examined and testified

4                                   as follows:

5

6              E X A M I N A T I O N

7   BY MS. TRAMBLEY

8       Q.   All right.  Good afternoon, Ms. Gamble.  I know

9   we've met before, but for the record, I will reintroduce

10  myself.  My name is Lauren Trambley, and I'm an attorney

11  at Perkins Coie and we represent the defendants, DEF CON

12  Communications, Inc. and Jeff Moss.

13          To begin, can you please state your full name

14  for the record?

15      A.   Yeah.  My full name is Samantha Rose Gamble.

16      Q.   And have you ever been deposed before?

17      A.   No.

18      Q.   Okay.  Then we'll go over some of the ground

19  rules for today.  You understand that you were just sworn

20  in and that you're giving sworn testimony under oath today

21  as if you were sitting in a courtroom?

22      A.   Yes.

23      Q.   And you understand that you're sworn to tell the

24  truth to the best of your ability?

25      A.   Yes.

Hadnagy, et al. v. Moss, et al.                     Samantha Gamble

Page 9

1   following May.

2        Q.    Okay.  And when you say you joined ILF in

3   December, was that in a volunteer position?

4        A.    Yes.

5        Q.    Okay.

6        A.    Sorry, yes.

7        Q.    And that was -- sorry.

8              And that was in December 2018?

9        A.    Yes.

10       Q.    And then you started working at ILF in May 2019?

11       A.    Correct.

12       Q.    Okay.  And when did you stop working at ILF?

13       A.    June 30, 2022.

14       Q.    Okay.  And just for the record, when I refer to

15   "ILF," I'm referring to Innocent Lives Foundation just to

16   be clear.

17             So you worked at ILF for approximately three

18   years?

19       A.    Sounds about right.  A little over three years,

20   I believe.

21       Q.    And when you started working at ILF, that was

22   your first job in information security?

23       A.    Yes, and especially in the counter-exploitation

24   industry.

25       Q.    Okay.  And was Mr. Hadnagy aware that this was

e25c7f56-340a-4fc0-bf3b-de5cfa0fe1f0

Hadnagy, et al. v. Moss, et al.                                    Samantha Gamble

Page 19

1        A.    That's right.

2               MR. CONRAD:  Object to form.

3               THE DEPONENT:  Yes.

4        Q.   (By Ms. Trambley)  Okay.  And during your

5    employment at ILF, did you see Mr. Hadnagy yell at other

6    employees?

7        A.    No.

8               MR. CONRAD:  Object to form.

9        Q.   (By Ms. Trambley)  Did you see Mr. Hadnagy

10   belittle other employees?

11       A.    Yes.  I'm trying to think of examples, but there

12   was -- there was often jokes or even making comments

13   about, like, people's looks or -- yeah.  I have seen that,

14   yes.

15       Q.    While you were employed at ILF, did Mr. Hadnagy

16   make comments about women's appearances?

17       A.    Yes.

18       Q.    What kind of comments would he make?

19       A.    There were a couple that definitely stick out in

20   my mind.  One of them was on a business trip that we were

21   traveling together, and he said that Maxie was so hot when

22   she cried, and that's why he was taken advantage of or

23   social engineered in his perspective.  There was another

24   time that made me uncomfortable when we were talking about

25   doing a potential sting operation, and we had talked about

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

e25c7f56-340a-4fc0-bf3b-de5cfa0fe1f0

Hadnagy, et al. v. Moss, et al.                    Samantha Gamble

Page 20

1    using another girl on the team, and he said, like, "Her
2    boobs are way too big."  He's made comments to another
3    very good friend and team member of mine saying, "I don't
4    know why she's so nervous.  She's so pretty," things like
5    that.
6        Q.    Okay.  And when Mr. Hadnagy made the comment
7    about Ms. Reynolds being so hot when she cried, how did
8    that make you feel?
9        A.    Incredibly uncomfortable.
10        Q.    And do you think it was appropriate or
11    inappropriate for Mr. Hadnagy to make this comment about
12    Ms. Reynolds' appearance?
13        A.    It's --
14              MR. CONRAD:  Object to form.
15              THE DEPONENT:  I do, and I think it's very
16    inappropriate to say anybody -- making that comment about
17    anybody, especially when they're crying or about them
18    crying.
19        Q.    (By Ms. Trambley) And how often did Mr. Hadnagy
20    make comments about women's appearances?
21        A.    I don't really have a number.  It was fairly
22    often, though, especially when people would be in person
23    and drinking together.
24        Q.    And while you were employed at ILF, did
25    Mr. Hadnagy make comments about your appearance?

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

e25c7f56-340a-4fc0-bf3b-de5cfa0fe1f0

Hadnagy, et al. v. Moss, et al.                          Samantha Gamble

Page 21

1      A.    Yes, yeah.

2      Q.    What types of comments would he make?

3      A.    Like being pretty or -- I think I even -- I may

4   still have the card talking about like growing up is --

5   like, watching me grow up is like drinking a fine wine.

6   He would constantly make jokes about -- I was a lot

7   skinnier back then, so there was a lot of jokes about me

8   being very lightweight and small even when I would say

9   that I'm not comfortable with those jokes ████████  ████████

10  ████████████████████████████████████████

11      Q.    And do you think it was appropriate or

12  inappropriate that your boss was making comments about

13  your appearance?

14            MR. CONRAD:  Object to form.

15            THE DEPONENT:  Inappropriate.

16                 (Defendants Exhibit No. 1 introduced.)

17      Q.    (By Ms. Trambley) Okay.  And I'm going to pull up

18  my first exhibit, so I'd like to introduce Defendants'

19  Exhibit 2, which is Bates labeled MAXIE_00084.

20            MR. CONRAD:  Sorry, Lauren.  Did you say

21  Defendants' Exhibit 2?

22            MS. TRAMBLEY:  Sorry, Defendants'

23  Exhibit 1.

24            MR. CONRAD:  Okay.

25            MS. TRAMBLEY:  Thanks for catching that.

e25c7f56-340a-4fc0-bf3b-de5cfa0fe1f0

Hadnagy, et al. v. Moss, et al.                              Samantha Gamble

Page 22

1      Q.   (By Ms. Trambley) So, Ms. Gamble, this is a text
2   message conversation between you and Mrs. Reynolds, which
3   she produced in this litigation.  Do you have any reason
4   to believe this is not a true and accurate copy of your
5   text conversation?
6      A.   No, that's it.
7      Q.   Okay.  And, Ms. Gamble, can you please read the
8   first paragraph of your text message sent at 7:18 p.m. at
9   the top of the screen?
10     A.   "I gained weight because I was unstressed enough
11  to manage food better and he commented about how I filled
12  out and finally looked my age."
13     Q.   And when you say "he" in this text message, are
14  you referring to Mr. Hadnagy?
15     A.   Yeah.
16     Q.   And Mr. Hadnagy made this comment to you about
17  your appearance?
18     A.   Yes.
19     Q.   When did he make this comment?
20     A.   I think when we traveled to Baltimore together,
21  which was the October before the ban.
22     Q.   Okay.
23     A.   I believe.  I don't 100 percent remember, but I
24  believe it's when we were in Baltimore.
25     Q.   Did Mr. Hadnagy's comment about your appearance

e25c7f56-340a-4fc0-bf3b-de5cfa0fe1f0

Hadnagy, et al. v. Moss, et al.                    Samantha Gamble

Page 23

1   make you feel comfortable or uncomfortable?

2               MR. CONRAD:  Object to form.

3               THE DEPONENT:  Uncomfortable.

4       Q.  (By Ms. Trambley) Do you think Mr. Hadnagy's

5   comment about your appearance was appropriate or

6   inappropriate given he was your boss and superior at the

7   time?

8               MR. CONRAD:  Object to form.

9               THE DEPONENT:  Inappropriate, and I would

10  be uncomfortable if anyone were to make that comment to

11  me.

12      Q.  (By Ms. Trambley) Okay.  And I'm going to stop

13  sharing my screen.

14          Ms. Gamble, did Mr. Hadnagy make comments about

15  Asian women?

16      A.   I don't 100 percent remember, but I believe so.

17  I don't 100 percent remember.

18      Q.   So shifting gears a little bit, let's discuss

19  your interactions with Mr. Hadnagy on business trips.  Did

20  you attend business trips with Mr. Hadnagy as an employee

21  at ILF?

22      A.   Yes.

23      Q.   Do you recall how many times you went on

24  business trips with him?

25      A.   I know there was the two times where it was just

Hadnagy, et al. v. Moss, et al.                    Samantha Gamble

Page 25

1    often busy, or it was also busy, but we would have dinners

2    afterwards.  And that was, again, filled with copious

3    amounts of alcohol and people making not the most

4    professional jokes.

5           And then the biggest one that was very

6    uncomfortable with me was our trip to Baltimore together

7    where he did make those comments about my body or how --

8    like, how he doesn't understand how, like, the abusers

9    that we look into or like pornography, like how people

10   want to fold women into pretzel positions, like, and how

11   he doesn't have sex with his wife like that.  And, yeah,

12   there's -- yeah.  It dras- -- it started to gradually just

13   become more and more inappropriate the closer it seemed we

14   got.

15      Q.    Okay.  And I'm going to pull up the exhibit that

16   I've previously shared.  So, again, this is Defendants'

17   Exhibit 1, which is Bates labeled MAXIE_00084.

18           And can you please read the second paragraph of

19   your text message at 7:18 p.m.?

20      A.    "Or discovering he was a boob guy or how he

21   doesn't understand how men like to fold women into

22   pretzels.  He told me all kinds of shit about Areesa and

23   her body."

24      Q.    Okay.  So on this business trip, Mr. Hadnagy

25   told you that he was a boob guy?

Hadnagy, et al. v. Moss, et al.                          Samantha Gamble

Page 26

1      A.   Yes.

2      Q.   And who is Areesa?

3      A.   Areesa's his wife.

4      Q.   So Mr. Hadnagy discussed his sexual relationship

5  with his wife with you?

6      A.   Yes.

7      Q.   And do you believe Mr. Hadnagy's comments about

8  being a boob guy and his wife were appropriate or

9  inappropriate?

10          MR. CONRAD:  Object to form.

11          THE DEPONENT:  Inappropriate.

12     Q.  (By Ms. Trambley) Do you think Mr. Hadnagy's

13  comments about being a boob guy and his wife were

14  appropriate or inappropriate for an employer to speak to

15  his employee about?

16          MR. CONRAD:  Object to form.

17          THE DEPONENT:  Yes.

18     Q.  (By Ms. Trambley) And did Mr. Hadnagy's comments

19  make you feel comfortable or uncomfortable?

20          MR. CONRAD:  Object to form.

21          THE DEPONENT:  Uncomfortable.

22     Q.  (By Ms. Trambley) Okay.  Ms. Gamble, during this

23  business trip, did Mr. Hadnagy kiss your forehead outside

24  your hotel room?

25     A.   Yes.

e25c7f56-340a-4fc0-bf3b-de5cfa0fe1f0

Hadnagy, et al. v. Moss, et al.                    Samantha Gamble

Page 27

1    Q.    And Mr. Hadnagy was your employer at the time?

2    A.    Yes.

3    Q.    Do you think it's appropriate or inappropriate

4    for an employer to kiss his employee's forehead?

5              MR. CONRAD:   Object to form.

6              THE DEPONENT:   Inappropriate.

7    Q.    (By Ms. Trambley) Okay.  And did Mr. Hadnagy

8    kissing your forehead make you feel comfortable or

9    uncomfortable?

10             MR. CONRAD:   I'm going to object to form.

11             THE DEPONENT:   Uncomfortable.

12   Q.    (By Ms. Trambley) Okay.  Ms. Gamble, let's

13   discuss some of the work that you did at ILF.  Does ILF

14   assist law enforcement in sex sting operations?

15   A.    Can you clarify on sex sting operations?  Like,

16   sexting --

17   Q.    Maybe I --

18   A.    Sorry.  Sex sting, or sexting like phone

19   sexting?

20   Q.    Thanks for clarifying.  So I'm talking about

21   sting operations that are run by law enforcement to catch

22   predators.  And if there is other terminology that's used,

23   please let me know.

24   A.    We were not permitted to conduct sting

25   operations.  We were actively told not to by law

e25c7f56-340a-4fc0-bf3b-de5cfa0fe1f0

Hadnagy, et al. v. Moss, et al.                    Samantha Gamble

Page 31

1          And now I'd like to introduce Defendants'

2    Exhibit 3, which is Bates labeled SE_000426.  This

3    document was produced by Mr. Hadnagy in this litigation.

4          Ms. Gamble, is this the shared doc that you were

5    referring to in the prior exhibit in your conversation

6    with Ms. Reynolds?

7               MR. CONRAD:  Object to form.

8               THE DEPONENT:  Yes.  I believe that is.  We

9    would actually be in the document at the same time talking

10   to each other, though, and then delete it afterwards.

11        Q.   (By Ms. Trambley) So it was a living document

12   that got edited --

13        A.   Yes.

14        Q.   -- frequently?

15        A.   Yes.  We would be in the document at the same

16   time because he had made a comment.  I believe it started

17   in Google Hangouts, and he would act embarrassed like,

18   "Jeez, I don't even ask my wife these questions."  And we

19   ended up moving to the document so we could type out the

20   questions and I could answer them and then we could delete

21   them and build a list of a potential operation.

22        Q.   And Mr. Hadnagy was your employer at this time;

23   correct?

24        A.   Yes.

25        Q.   And Mr. Hadnagy was asking you questions about

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

e25c7f56-340a-4fc0-bf3b-de5cfa0fe1f0

Hadnagy, et al. v. Moss, et al.                    Samantha Gamble

Page 32

1    your bra size, underwear, pubic hair, and shaving?

2        A.    Correct.

3                MR. CONRAD:  Object to form.

4        Q.  (By Ms. Trambley) Did Mr. Hadnagy's questions

5    make you feel comfortable or uncomfortable?

6                MR. CONRAD:  I'm going to object to form.

7                THE DEPONENT:  They made me uncomfortable,

8    but at the time, I was very excited to be able to kind of

9    get into all of this.  I had always wanted to do child

10   exploitation investigations, and this was like a giant

11   shiny object.  And it was, like, okay, if this is what law

12   enforcement wants and needs, then I'm okay with answering

13   them regardless of uncomfortability, which is -- most of

14   this job is uncomfortability.  And once I discussed later

15   with law enforcement and grew more in my career, I

16   realized none of those questions would be asked.

17       Q.  (By Ms. Trambley) And Mr. Hadnagy told you that

18   you had to answer these questions for the sting operation?

19               MR. CONRAD:  Object to form.

20               THE DEPONENT:  He did not say that I had

21   to.  He said something along the lines of, basically, if

22   we -- he didn't direct me to, but he did say, "These are

23   the questions that need to be answered," and he said that

24   it came directly from a law enforcement agent who does

25   sting operations.

Hadnagy, et al. v. Moss, et al.                    Samantha Gamble

Page 33

1    Q.  (By Ms. Trambley) And did you later learn that
2    these questions are not part of standard procedure for
3    sting operations with law enforcement?
4                    MR. CONRAD:  Object to form.
5                    THE DEPONENT:  Correct, yes.
6    Q.  (By Ms. Trambley) Okay.  Do you feel like
7    Mr. Hadnagy took advantage of you because you were new to
8    ILF and new to this type of work?
9                    MR. CONRAD:  Object to form.
10                    THE DEPONENT:  Yes, I do.  And I feel like
11   he also knew a lot about history and how compliant I am
12   and how I struggle with a fawning response as a trauma
13   response.
14   Q.  (By Ms. Trambley) And did the sting operation
15   ever happen?
16   A.   Nope.  And I asked him why, and he said,
17   "Because you have tattoos," but I had always had those
18   tattoos.  He has always known that I had those.
19   Q.   Did you learn from other ILF employees that
20   Mr. Hadnagy had given a different reason for why the sting
21   operation was not going forward?
22                    MR. CONRAD:  Object to form.
23                    THE DEPONENT:  I can't recall directly if
24   Max and I had talked about it, like, long after everything
25   had happened and I wasn't with ILF anymore, but, no, I

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

Hadnagy, et al. v. Moss, et al.                    Samantha Gamble

Page 40

1   after-parties or if you were in person with him.

2          But aside from that, I -- at conferences at the

3   after-party, I still didn't really interact with him as

4   much.  I was more focused on interacting with the team,

5   and he was busy more so with, like, the other executives

6   essentially of the company, regardless if it's a small

7   company.  And they were combined parties with ILF and

8   SECOM.

9          Q.    Okay.  And you mentioned you -- Mr. Hadnagy

10  would pull out a knife.  Did Mr. Hadnagy pull out a knife

11  at DEF CON?

12         A.    Probably more than once, yeah.

13         Q.    And did he pull out a knife during your

14  employment at ILF --

15         A.    Yes.

16         Q.    -- not at conferences?

17         A.    Yes, multiple times.  It was kind of part of his

18  personality.

19         Q.    And when would he pull out the knife?

20         A.    I don't know if there were specific, like, cues.

21  It wasn't like if you like upset him and he would threaten

22  you with it.  It's a lot times if you made, like, a quick

23  joke or called him out on something in a joking manner

24  or -- it's oftentimes followed by somebody making a joke

25  and him being, like, "Hey, I'm going to shank you," and

Hadnagy, et al. v. Moss, et al.                    Samantha Gamble

Page 41

1    that happened fairly often.

2        Q.   And this was a real knife?  It was not a toy

3    knife?

4        A.   No, it was a knife.  I can't remember if it was

5    just one or two, but, yeah, he always carries it on him.

6        Q.   And did you find it appropriate or inappropriate

7    that your employer would regularly pull out a knife?

8               MR. CONRAD:  Object to form.

9               THE DEPONENT:  Admittedly, at the time, I

10   thought it was kind of funny.  Like, yeah, there was,

11   like, I can't believe that this is happening, but then the

12   other part of me was arguing because we were not a normal

13   environment.  We don't have an HR.  We do a lot of things

14   that no company would do, especially if they did have an

15   HR, such as researching CSAM or looking at potentially

16   pornographic material.  So at the time, to me, I just kind

17   of brushed it off.  And then the more I've worked with

18   other companies and the more I've learned, like, this is

19   what a real workplace should look like, then I became

20   uncomfortable with it.

21       Q.   (By Ms. Trambley) Okay.  So is Mr. Hadnagy the

22   only boss you've ever had where you've seen them pull out

23   a knife at a work event?

24       A.   Yes.  Yeah.

25       Q.   And did Mr. Hadnagy pulling out a knife make you

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Hadnagy, et al. v. Moss, et al.                          Samantha Gamble

Page 42

1    feel comfortable or uncomfortable?

2                    MR. CONRAD:  Object to form.

3                    THE DEPONENT:  Is neither an appropriate

4    answer?  It just kind of --

5        Q.  (By Ms. Trambley) Yeah.  It's whatever you're --

6                    (Unreportable simultaneous crosstalk.)

7        Q.  (By Ms. Trambley) Yeah.  Whatever your truthful

8    account is is totally fine.

9            And how often would you say Mr. Hadnagy pulled

10   out a knife at conferences?

11       A.   Multiple times throughout the day, easy.  I

12   definitely don't have a number, but it was a common

13   occurrence.  Like I said, it's kind of part of his

14   personality.

15       Q.   Okay.  And you mentioned that you attended

16   trainings that were run by Mr. Hadnagy.  Do you recall

17   what the materials for those trainings were like?

18       A.   I do.  I actually even still have the booklet.

19       Q.   And did Mr. Hadnagy's training materials ask

20   women to ask men who they did not know about whether they

21   were circumcised?

22                   MR. CONRAD:  Object to form.

23                   THE DEPONENT:  Yes.  That was -- that was a

24   very uncomfortable task, and then the men would have to

25   try to elicit, like, bra size and what kind of birth

Hadnagy, et al. v. Moss, et al.                        Samantha Gamble

Page 43

1    control that they used.  Whereas, as a woman, I would have
2    to see if they're circumcised, if they use condoms or not.
3    I can't remember all of the questions, but those were
4    definitely the two big questions.  That was the last day,
5    I believe, of the class, and that was, like, the last
6    assignment, and it was very uncomfortable.
7        Q.  (By Ms. Trambley) And did you find Mr. Hadnagy's
8    training materials to be appropriate or inappropriate?
9             MR. CONRAD:  Object to form.
10            THE DEPONENT:  I found them -- I found the
11   beginning of them appropriate.  I found the last stages
12   inappropriate because I believe that there are a lot of
13   other ways to elicit uncomfortable material that does not
14   have to be related to somebody's body or sex life.
15       Q.  (By Ms. Trambley) And did the training materials
16   that required men and women to elicit this type of
17   information make you feel comfortable or uncomfortable?
18       A.   Highly uncomfortable.
19            MR. CONRAD:  Object to form.
20       Q.  (By Ms. Trambley) And did Mr. Hadnagy's training
21   materials that required men and women to ask these
22   sensitive questions make you feel safe or unsafe?
23            MR. CONRAD:  Object to form.
24            THE DEPONENT:  Unsafe.  You were paired
25   with somebody typically.  You could pair with somebody.

Page 44

1  You didn't have to -- you were part of an actual team, but
2  all of you had to get your own individual flags.  Getting
3  those flags alone, especially as a small girl and you're
4  doing your assignments at night is definitely a little
5  intimidating.  Thankfully, somebody did end up partnering
6  with me, but both of us were still uncomfortable asking
7  those questions.
8         Q.   (By Ms. Trambley) Okay.
9         A.   It felt very invasive and unsafe.  I don't know
10  what -- I don't know what could potentially happen if you
11  ask the wrong person these types of questions.
12         Q.   Right.
13              So that made you feel unsafe to ask men who you
14  did not know these sensitive questions?
15         A.   Correct.
16         Q.   Okay.  So shifting gears a little bit, let's
17  talk about Mr. Hadnagy's behavior after the DEF CON ban
18  was announced.  So after DEF CON announced its ban of
19  Mr. Hadnagy, did he hold a meeting at ILF?
20         A.   Yes.  He actually held one before as well, and
21  advised us that this is a potential that is going to
22  happen and said that we should not put anything in writing
23  and we should not go and talk to anybody about things.
24         Q.   So before the ban was announced, Mr. Hadnagy was
25  aware that he was being investigated by DEF CON?

Hadnagy, et al. v. Moss, et al.                    Samantha Gamble

Page 58

1   or best practices definitely can be a range of things,

2   especially because we are a nonprofit environment.

3   However, regardless of if you're a nonprofit or not,

4   that -- and the fact that we were actively told not to do

5   that by law enforcement, that does not align with what I

6   imagine is best practices.

7                    And then we did have practices within ILF,

8   and specifically anybody who conducted research, and he

9   did not align with best practices for that such as using

10  the virtual machine that contained the blur tool and

11  proper precautions in place.  He actively did not use

12  that.  But when it comes to actual material, I do not know

13  directly on that, because there is a difference between

14  the links and the material itself.

15      Q.   (By Ms. Trambley) Okay.  So to be clear, law

16  enforcement explicitly stated, "Do not take these links

17  and do not use a USB drive to take them"?

18      A.   Yes.

19                   MR. CONRAD:  Object to form.

20      Q.   (By Ms. Trambley) Okay.  Ms. Gamble, shifting

21  gears a little bit, let's talk about how Mr. Hadnagy

22  treated you after you left ILF.

23                   What happened after you left your employment at

24  ILF?

25      A.   The first thing that happened was he had

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hadnagy, et al. v. Moss, et al.                          Samantha Gamble

Page 59

1    called -- I was supposed to give a talk at the National
2    Child Protection Task Force Conference, and they contacted
3    the organizers to cancel my talk and said that I will not
4    be coming and to not talk to me basically.  Luckily, those
5    organizers did reach out to me privately and I did end up
6    going.  But aside from that, I didn't really hear from
7    him.
8            I don't know if -- I did get some weird log-in
9    attempts on my Google accounts.  I don't know if that was
10   him or not.  It was just directly after I had gotten -- or
11   gotten unemployed, I guess, by them.  And they aligned
12   with some attempts that Maxie had seen, but this could, of
13   course, be coincidental as well, but we haven't spoken
14   since.
15       Q.   And so Mr. Hadnagy contacted conference
16   organizers to try and get your talk canceled?
17       A.   Yes.
18            MR. CONRAD:  Object to form.
19            (Defendants Exhibit No. 6 introduced.)
20       Q.   (By Ms. Trambley) Okay.  I'm going to pull up
21   another exhibit.  This will be Defendants' Exhibit 6, and
22   it is Bates labeled SE_54307.  And I'm going to scroll to
23   the bottom of this email exchange, which this is an email
24   between Mr. Hadnagy and Ms. Cynthia Hetherington in
25   September 2022.

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hadnagy, et al. v. Moss, et al.                         Samantha Gamble

Page 60

1        Ms. Gamble, I'm going to give you a second to
2   look this over since I believe you haven't seen this
3   before.  And my apologies, I misspoke.  This is an email
4   exchange in August 2022.
5        A.    Hmm.  So...
6        Q.    Ms. Gamble, do you go by sudofed online?
7        A.    Thesudofed, but, yes, I do.  And Benjamin Spence
8   is previously one of our volunteers and somebody who also
9   actively called Chris out during this situation and was
10  hence removed.
11       Q.    Okay.  And were you aware that Mr. Hadnagy was
12  telling conference organizers in August 2022 not to have
13  you speak at their conferences?
14       A.    I was not.
15             MR. CONRAD:  Object to form.
16             THE DEPONENT:  I was not aware of that at
17  all, no.  But, luckily, that did not work because I am
18  pretty good friends with Cynthia Hetherington and have
19  gone to her conferences since then, so...
20       Q.    (By Ms. Trambley) And is this a different
21  instance than the instance you were talking about earlier
22  where Mr. Hadnagy called conference organizers to try and
23  get your talk canceled?
24       A.    It is, yes.  The conference that I'm talking
25  about included somebody named Kevin Metcalf and

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hadnagy, et al. v. Moss, et al.                    Samantha Gamble

Page 61

1   Griffin Glynn, and they are part of the National Child

2   Protection Task Force Conference.

3        Q.   Okay.

4        A.   NCPTF for short.

5        Q.   So Mr. Hadnagy called conference org -- strike

6   that.

7             So Mr. Hadnagy contacted at least two conference

8   organizers to try and get you -- your talk canceled?

9             MR. CONRAD:  Object to form.

10            THE DEPONENT:  I did -- I did not have a

11  talk planned at OSMOSISCon.  I think I was wanting to, and

12  my team was actively -- that's right.  My team was

13  nominating me for OSINT Rising Star of the Year, and I had

14  asked Chris and Shane, my other boss, to also nominate me

15  because I wanted to speak there eventually and receive the

16  award, which -- that was right around this time.

17       Q.   (By Ms. Trambley) Okay.  So after you left ILF,

18  Mr. Hadnagy contacted this conference organizer,

19  Cynthia Hetherington, to try to stop you from attending a

20  conference?

21       A.   August 31st?

22            MR. CONRAD:  Object to form.

23            THE DEPONENT:  Yes.  Yup.

24       Q.   (By Ms. Trambley) Okay.  And were you aware that

25  Mr. Hadnagy was telling conference organizers that you are

e25c7f56-340a-4fc0-bf3b-de5cfa0fe1f0

Hadnagy, et al. v. Moss, et al.                    Samantha Gamble

Page 62

1   trash?

2                    MR. CONRAD:  Object to form.

3                    THE DEPONENT:  I was not aware of that.

4       Q.   (By Ms. Trambley) Okay.  And does it make you

5   feel comfortable or uncomfortable that Mr. Hadnagy was

6   reaching out to individuals within the industry to stop

7   you from speaking at conferences?

8                    MR. CONRAD:  Object to form.

9                    THE DEPONENT:  I am highly uncomfortable,

10  but it does not surprise me because that has been his

11  pattern of behavior from what I've seen.

12      Q.   (By Ms. Trambley) Okay.  And here we see Cynthia

13  responding with a question mark.  And then Chris's

14  response, "Those replacements are filth."

15           Do you know what Mr. Hadnagy was referring to

16  here?

17      A.   He was supposed to speak at OSMOSIS, and I

18  believe his talk got canceled and so people online were

19  saying that me or other -- somebody suggested me.  I

20  believe Benjamin Spence is actually who recommended me on

21  one of OSMOSISCon's promotion threads for like a call for

22  speakers.  I don't recall exactly, but that is how I

23  remember that happening and people recommended that I

24  replace him or that I do a call for papers with

25  OSMOSISCon.

Hadnagy, et al. v. Moss, et al.                    Samantha Gamble

Page 75

1      Q.   And talk to me about some of the things that he

2   did for you when you were working for ILF.

3      A.   One of the bigger -- he did a lot of nice things

4   when I was working at ILF, whether it was, of course, like

5   professional promotions, actively inviting me to come

6   speak with him like as a subspeaker with him, getting me

7   into conferences that I was interested in.  And then,

8   personally, when my significant other's mother died, he --

9   that was one of the reasons I couldn't be a speaker at DEF

10  CON, which is one of the virtual ones.  I think it was the

11  last one that he ran the virtual SE Village in.  He

12  actually bought plane tickets and wanted to help any --

13  like, any financial means when my significant other's mom

14  died who was like a second mom to me.  So it was a lot of

15  things like that.  And then just praise here and there

16  about how well I'm growing up and doing within the space

17  and how much potential I have.

18      Q.   And I think you said that you were 21 years old

19  when you first started at ILF; is that right?

20      A.   I was either 21 or freshly 22.

21      Q.   And you had previously not had any experience

22  within that industry; is that right?

23      A.   Correct.

24      Q.   And you didn't have a college degree.

25      A.   No.

e25c7f56-340a-4fc0-bf3b-de5cfa0fe1f0

Hadnagy, et al. v. Moss, et al.                    Samantha Gamble

Page 167

1                        C E R T I F I C A T E

2

3   STATE OF WASHINGTON )
                        ) ss
4   COUNTY OF CLARK     )

5

6           I, Nicole A. Bulldis, RPR, a Certified Court
    Reporter, do hereby certify under the laws of the State of
7   Washington:

8           That the foregoing videotaped deposition upon oral
    examination of Samantha Gamble was taken stenographically by
9   me on January 15, 2025, and transcribed under my direction;

10          That the witness was duly sworn by me to testify
    truthfully, and that the transcript of the deposition is
11  full, true, and correct to the best of my ability;

12          That I am not a relative, employee, or counsel of
    any party to this action or relative or employee of such
13  counsel, and that I am not financially interested in the
    said action or the outcome thereof.

14          IN WITNESS WHEREOF, I have hereunto set my hand

15  this 28th day of January 2025.

16

17

18

19

20

21

22  _____

23  Nicole A. Bulldis, RPR

24  WA CCR No. 3384

25

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

e25c7f56-340a-4fc0-bf3b-de5cfa0fe1f0

# Exhibit 41

18:12

01.15.2025
Gamble
**D-1**
Buell Realtime Reporting

← **Samantha Gamble**    ...    📹    ☆

**Samantha Gamble** · 7:18 pm

I gained weight because I was unstressed enough to manage food better and he commented how I filled out and finally look my age.

Or discovering he was a boob guy. Or how he doesn't understand how men like to fold women into pretzels. Told me all kinds of shit about Areesa and her body.

What sucks is when I first started with him they were going to use me as bait so he asked me all types of things about my breast size, shaving, periods, etc, but under the frame of being for predator investigations.

....guess what never happened...

**Max Reynolds** · 7:19 pm

He told me a different version of that final story ✓

And he told me the same shit about Areesa and hating porn and... ✓

Boy that cried wolf ✓

**Samantha Gamble** · 7:19 pm

📎    Write a message...    🎤

# Exhibit 42

# PLACEHOLDER

This document was produced natively

SE_000426

Bra size: 30C (though sometimes wear 32B since 30 is so hard to find)
Shirt size: XXS
Pant size: 0/00
Underwear size: S/XS
Shoe Size (if applicable): 7.5 (Same as I had at 13)
Weight (if applicable): 98lbs
Height (if applicable): 5'2"
pubic hair age: 11/12
Consider Shaving: Young as 13

THINGS I'D LIKE (to make) A LIST OF:
     *potential questions a predator may ask (Have I ever kissed a boy? Tried drugs or alcohol?)
     *potential responses (ex: excuses why I can't video chat or something)
     *If possible, to view dialogue or visit with someone who has done this
     *Things to absolutely NOT say
     *Making list of supplies for this project- since this not only is operation but also a demonstration to LE, I am willing to purchase things if ILF cannot (Wigs are kinda pricey)
     Q: Do predators pick up on conversation patterns? (spelling, keywords kids use or certain way a kid from that area would talk?)
     Q: Will I need to chat with them at night, avoid "texting" during school hours, do phone calls?

POTENTIAL PRETEXTS:
     Name- Emma Lynn Miller
     Age: TBD
     State: CA
     City: San Leandro
     SCHOOL: John Muir Middle school
          https://www.sanleandro.k12.ca.us/muir
          IF WE EVER WANT SCHOOL SHIRT: Click Here For School Merch
     PERSONALITY:
          *Favorite band: Panic! At The Disco,
          *TV show: Doesn't really watch TV- really into youtube (Logan Paul & YT Stars that do "nothing")
          *Things I Do For Fun: Watch TikTok videos, likes to play online games but mostly just to use the chat to talk with people, go to Manor Park
          *Has a couple friends, but not a ton (isolated, has alot of time alone)

     Mom:  *Name: Renee
          *Occupation: Works at UPS in warehouse,
          *Qualities: Alcoholic,  Multiple boyfriends

     Father: *Name:

*Occupation: Worked on cars, but i s in prison since Emma was 5
    Sann Quentin, I think for drugs but idk my mom doesn't like to talk
    about him much. She says I cant see him but when he gets out
    i'ma go see him anyway
*Qualities: Emma doesn't really know much about him since he left so young

Chris Pretext:
Name: Ashley Walker
Age: 12 Oct 3, 2006, gonna be 13 soon
Location:  Sarasota Florida
Hobbies/Likes:
    *TV show: Doesn't really watch TV- really into youtube (Logan Paul & YT Stars
        that do "nothing").
    Spends a lot of time on IG
    *Things I Do For Fun: Watch TikTok videos.
    I have only few friends in school, cause the boys make fun of me

Dad:
    I don't really know him. He comes around once in a while but i don't like him
    much.  Name Michael.

Mom:
    Works as a teller at a bank. She is often out at 7am and not home till after 6pm
    and has to work two Saturdays. She goes out one Saturday night with her GF's
    clubbing.

    She has had multiple boyfriends. I never liked any of them. One was super
    creepy and used to ask me to sit on his lap all the time.

I go to Booker Middle School, 7th grade
https://www2.sarasotacountyschools.net/schools/bookermiddle/

PICS NEEDED:
Clothed in a bathroom mirror
Clothed in a full length mirror
Clothed Selfie on couch or bed

All of those locations with you moved, as proof
Pic of body parts, shoulder, foot (non tatoo), leg…
Selfie that has you not fully covered BUT nothing sexual (tee shirt etc)

IDEAS FOR ROOM/BACKGROUND/CHARACTER
Panic! At The Disco poster
Justin Bieber Poster
Pikachu Stuffed Animal
Pokemon Stuffed Animal
Wig (Need to get sized in store)
Would like to get oversized school Tshirt (like a PE shirt)
Fake Braces (Can also make them)


QUESTIOOONS:

Will a predator ask me about if I have had sex before? How do I properly answer without
baiting?
If they ever start to back out and say they shouldn't be doing it, is it bait by saying "You don't
want to talk to me anymore???"
If they ask to meet me, do I just make some generic excuse or act too nervous for it? (is it
baiting to say things like "One day lol" or something?)
Will they ask for a picture of any bra or underwear? (Not on me)
Should we make TikTok vids?
What platforms will we primarily use (especially now that Kik is gone/closing?)

# Exhibit 43

PLACEHOLDER

This document was produced natively

SE_17966

| | |
|---|---|
| **From:** | Chris "loganWHD" Hadnagy[logan@social-engineer.org] |
| **Sent:** | Fri 7/19/2013 8:01:25 PM (UTC) |
| **To:** | Ping Look███████@gmail.com] |
| **Cc:** | David Kennedy[david.kennedy@trustedsec.com]; Jordan Harbinger (888.413.7177)[jordan@theartofcharm.com]; Nick Hitchcock[nick8ch@social-engineer.org]; Jim Manley████████@gmail.com]; Michele Fincher[michele@social-engineer.com]; Amanda Marchuck[amanda@social-engineer.com] |
| **Subject:** | Re: Show... |

Commie or not
they are hot
;)

--
Chris "l0gan"
http://twitter.com/humanhacker/
http://www.social-engineer.org

On Jul 19, 2013, at 3:57 PM, Ping Look ███████@gmail.com> wrote:

> I didnt. Until it was confirmed at this moment.
>
> Besides...Asia is now the new SuperPower. Well...at least China. Damn Commie Bastards.
>
> On Jul 19, 2013, at 12:56 PM, "Chris \"loganWHD\" Hadnagy" <logan@social-engineer.org> wrote:
>
>> Ping ping ping
>>
>> EVERYONE knows that
>> ;)
>>
>> --
>> Chris "l0gan"
>> http://twitter.com/humanhacker/
>> http://www.social-engineer.org
>>
>> On Jul 19, 2013, at 3:55 PM, Ping Look ████████@gmail.com> wrote:
>>
>>> I KNEW you had Asian FEVER

On Jul 19, 2013, at 12:54 PM, "Chris \"loganWHD\" Hadnagy" <logan@social-engineer.org> wrote:

Because you are white and I hate white people

--
Chris "l0gan"
http://twitter.com/humanhacker/
http://www.social-engineer.org

On Jul 19, 2013, at 3:51 PM, David Kennedy <david.kennedy@trustedsec.com> wrote:

Why am I being singled out? Racist.

From: loganWHD Chris Hadnagy <logan@social-engineer.org>
Date: Friday, July 19, 2013 3:51 PM
To: Ping Look ███████@gmail.com>, "Jordan Harbinger (888.413.7177)" <jordan@theartofcharm.com>, David Kennedy <David.Kennedy@TrustedSec.com>, Nick Hitchcock <nick8ch@social-engineer.org>, Jim Manley ███████@gmail.com>, Michele Fincher <michele@social-engineer.com>, Amanda White <amanda@social-engineer.com>
Subject: Show...

Hey guys / gals and Dave….

The show idea went away.

Sorry, but we got a really nice invite from our last podcast guest to be his guests at a show, but the times he had open just didn't fit as it was mid-day.

Sorry.  We can still plan something but I will gracefully bow out and if someone else wants to plan fine, if not… i am cool with that too.

Thanks

--
Chris "l0gan"
http://twitter.com/humanhacker/
http://www.social-engineer.org

# Exhibit 44

# PLACEHOLDER

This document was produced natively

SE_30867

| | |
|---|---|
| **From:** | Christopher Hadnagy[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=55615E7A8341469FB8917CC35F D13009-CHRIS] |
| **Sent:** | Tue 5/7/2019 8:19:27 PM (UTC) |
| **To:** | Shayna Welton[shayna@social-engineer.com]; Allie Hansen[allie@social-engineer.com] |

aren't you an adorable little asian teapot

# Exhibit 45

# PLACEHOLDER

This document was produced natively

SE_21768

| From: | Christopher Hadnagy[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=55615E7A8341469FB8917CC35F D13009-CHRIS] |
|---|---|
| Sent: | Wed 2/17/2016 2:53:03 AM (UTC) |
| To: | JW Manley█████████@gmail.com] |
| Subject: | Re: DEF CON meeting |

HAHAHA true dat

yes the teenage one, that is tiny and small and really cute


Christopher Hadnagy
Chief Human Hacker
Social-Engineer, Inc.
570.234.3734 ext 200
www.social-engineer.com

All information transmitted hereby is intended only for the use of the
addressee(s) named above and may contain confidential and privileged
information. Any unauthorized review, use, disclosure or distribution of
confidential and privileged information is prohibited. If the reader of
this message is not the intended recipient(s) or the employee or agent
responsible for delivering the message to the intended recipient, you
are hereby notified that you must not read this transmission and that
disclosure, copying, printing, distribution or use of any of the
information contained in or attached to this transmission is STRICTLY
PROHIBITED. If you have received this transmission in error, please
immediately notify the sender by return e-mail and delete the original
transmission and its attachments without reading or saving in any
manner. Thank you.
On 16 Feb 2016, at 21:49, JW Manley wrote:

> Okay. Like that's a real clue.  How many adorable little Asian girls
> have I ever met around you?
>
> The Kids CTF winner?
>
>
>> On Feb 16, 2016, at 8:47 PM, Christopher J. Hadnagy
>> <chris@social-engineer.com> wrote:
>>
>> The adorable little asian girl
>>
>>
>> Christopher Hadnagy
>> Chief Human Hacker
>> Social-Engineer, Inc.
>> 570.234.3734 ext 200
>> www.social-engineer.com
>>
>> All information transmitted hereby is intended only for the use of
>> the addressee(s) named above and may contain confidential and

>> privileged information. Any unauthorized review, use, disclosure or
>> distribution of confidential and privileged information is
>> prohibited. If the reader of this message is not the intended
>> recipient(s) or the employee or agent responsible for delivering the
>> message to the intended recipient, you are hereby notified that you
>> must not read this transmission and that disclosure, copying,
>> printing, distribution or use of any of the information contained in
>> or attached to this transmission is STRICTLY PROHIBITED. If you have
>> received this transmission in error, please immediately notify the
>> sender by return e-mail and delete the original transmission and its
>> attachments without reading or saving in any manner. Thank you.
>> On 16 Feb 2016, at 21:44, Jim Manley wrote:
>>
>>> Have I met Ashley?
>>>
>>> Sent from my iPhone so who knows what Siri typed
>>>
>>>> On Feb 16, 2016, at 20:31, Christopher J. Hadnagy
>>>> <chris@social-engineer.com> wrote:
>>>>
>>>> dear lord
>>>> i would drink that
>>>> with a muzzle
>>>> but alas… its not here
>>>>
>>>>
>>>> Christopher Hadnagy
>>>> Chief Human Hacker
>>>> Social-Engineer, Inc.
>>>> 570.234.3734 ext 200
>>>> www.social-engineer.com
>>>>
>>>> All information transmitted hereby is intended only for the use of
>>>> the addressee(s) named above and may contain confidential and
>>>> privileged information. Any unauthorized review, use, disclosure or
>>>> distribution of confidential and privileged information is
>>>> prohibited. If the reader of this message is not the intended
>>>> recipient(s) or the employee or agent responsible for delivering
>>>> the message to the intended recipient, you are hereby notified that
>>>> you must not read this transmission and that disclosure, copying,
>>>> printing, distribution or use of any of the information contained
>>>> in or attached to this transmission is STRICTLY PROHIBITED. If you
>>>> have received this transmission in error, please immediately notify
>>>> the sender by return e-mail and delete the original transmission
>>>> and its attachments without reading or saving in any manner. Thank
>>>> you.
>>>>> On 16 Feb 2016, at 21:26, Jim Manley wrote:
>>>>>
>>>>> What a guy. I take back all those things I said about you.
>>>>>
>>>>> Have a drink on me.
>>>>>
>>>>>
>>>>>
>>>>> Sent from my iPhone so who knows what Siri typed
>>>>>

>>>>>> On Feb 16, 2016, at 20:13, Christopher J. Hadnagy
>>>>>> <chris@social-engineer.com> wrote:
>>>>>>
>>>>>> I will set up a phone bridge to make it easy on you all
>>>>>>
>>>>>>
>>>>>> Christopher Hadnagy
>>>>>> Chief Human Hacker
>>>>>> Social-Engineer, Inc.
>>>>>> 570.234.3734 ext 200
>>>>>> www.social-engineer.com
>>>>>>
>>>>>> All information transmitted hereby is intended only for the use
>>>>>> of the addressee(s) named above and may contain confidential and
>>>>>> privileged information. Any unauthorized review, use, disclosure
>>>>>> or distribution of confidential and privileged information is
>>>>>> prohibited. If the reader of this message is not the intended
>>>>>> recipient(s) or the employee or agent responsible for delivering
>>>>>> the message to the intended recipient, you are hereby notified
>>>>>> that you must not read this transmission and that disclosure,
>>>>>> copying, printing, distribution or use of any of the information
>>>>>> contained in or attached to this transmission is STRICTLY
>>>>>> PROHIBITED. If you have received this transmission in error,
>>>>>> please immediately notify the sender by return e-mail and delete
>>>>>> the original transmission and its attachments without reading or
>>>>>> saving in any manner. Thank you.
>>>>>>> On 16 Feb 2016, at 21:11, Jim Manley wrote:
>>>>>>>
>>>>>>> Are you going to set up a phone bridge or Skype or what? Need to
>>>>>>> know so I can be at home or if I can be in the office.
>>>>>>>
>>>>>>> Sent from my iPhone so who knows what Siri typed
>>>>>>>
>>>>>>>> On Feb 16, 2016, at 18:54, Christopher J. Hadnagy
>>>>>>>> <chris@social-engineer.com> wrote:
>>>>>>>>
>>>>>>>> Ok so the core group us here
>>>>>>>>
>>>>>>>> Can you do Thursday Feb 25th at 4pm to 5pm EST?
>>>>>>>>
>>>>>>>>
>>>>>>>> Christopher Hadnagy
>>>>>>>> Chief Human Hacker
>>>>>>>> Social-Engineer, Inc.
>>>>>>>> 570.234.3734 ext 200
>>>>>>>> www.social-engineer.com
>>>>>>>>
>>>>>>>> All information transmitted hereby is intended only for the use
>>>>>>>> of the addressee(s) named above and may contain confidential
>>>>>>>> and privileged information. Any unauthorized review, use,
>>>>>>>> disclosure or distribution of confidential and privileged
>>>>>>>> information is prohibited. If the reader of this message is not
>>>>>>>> the intended recipient(s) or the employee or agent responsible
>>>>>>>> for delivering the message to the intended recipient, you are
>>>>>>>> hereby notified that you must not read this transmission and
>>>>>>>> that disclosure, copying, printing, distribution or use of any

>>>>>>>> of the information contained in or attached to this
>>>>>>>> transmission is STRICTLY PROHIBITED. If you have received this
>>>>>>>> transmission in error, please immediately notify the sender by
>>>>>>>> return e-mail and delete the original transmission and its
>>>>>>>> attachments without reading or saving in any manner. Thank you.

# Exhibit 46

# PLACEHOLDER

This document was produced natively

SE_18515

| | |
|---|---|
| **From:** | Michelle "Mikka" Bosch[mikka@social-engineer.com] |
| **Sent:** | Fri 4/4/2014 7:39:31 PM (UTC) |
| **To:** | Christopher Hadnagy[chris@social-engineer.com] |
| **Cc:** | Michele Fincher[michele@social-engineer.com]; Amanda Marchuck[amanda@social-engineer.com]; Tamara Kaufman[tamara@social-engineer.com] |
| **Subject:** | Re: Cool Chick - Not Work Related |

This girl is so cool - would love to hang with her for a evening, ha!
awesome.


**Michelle "Mikka" Bosch**
Chief Business Stimulator
Social-Engineer, Inc.
214.725.6062
www.social-engineer.com

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

On Apr 4, 2014, at 2:05 PM, Chris Hadnagy <chris@social-engineer.com> wrote:

Dang don't see too many women using beat boxing at all
pretty cool

helps that she is a hot asian
;)


Christopher Hadnagy
Chief Human Hacker
Social-Engineer, Inc.
570.510.8488
www.social-engineer.com

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.


On Apr 4, 2014, at 5:07 AM, Michele Fincher <michele@social-engineer.com> wrote:

http://www.esquire.com/blogs/culture/one-woman-band-heart-shaped-box-cover

--
Michele Fincher
Chief Influencing Agent
Social-Engineer, Inc
425.777.0448
www.social-engineer.com

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

# Exhibit 47



5:25

**Chris Hadnagy**

Whitney is epically more attractive and much sw    Mar 4, 2022    8:21PM

but you... "stay away"

Whitney was another

but sorry, not being weird, you are about 150% hotter than whitney    8:21PM

Ryan thought you hated us or at least him.    8:21PM

NOOOOOOOO

i was so burned at that time    8:22PM

This was really early on    8:22PM

i was nervous

Rachel had been screwing me

Stephanie was bad mouthing me    8:22PM

She must have told you this like 15 seconds before we talked with you about me doing this professionally    8:22PM

when you won i just assumed you would join them    8:22PM

Ugh    8:22PM

Message

DENIS00000339

# Exhibit 48

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

---------------------------------------------------------
)
CHRISTOPHER J. HADNAGY;      )
SOCIAL-ENGINEER,             )
                             )
          Plaintiffs,        )
                             )
   vs.                       )  No. 2:23-cv-01932-BAT
                             )
JEFF MOSS; and DEF CON       )
COMMUNICATIONS, INC.,        )
                             )
          Defendants.        )
                             )
---------------------------------------------------------

VIDEOTAPED VIDEOCONFERENCE DEPOSITION UPON ORAL
EXAMINATION

OF

ALETHE DENIS

---------------------------------------------------------

Turlock, California (Via Zoom)

DATE:   September 24, 2024

REPORTED REMOTELY BY:  Douglas Armstrong, RPR
                       Washington CCR No. 3444

Alethe Denis                                    September 24, 2024

Page 2

```
 1                    A P P E A R A N C E S

 2

 3    For the Plaintiffs:

 4          MARK R. CONRAD
            Frey Buck, P.S.
 5          1200 Fifth Avenue, Suite 1900
            Seattle, Washington 98101
 6          (206) 486-8000
            mconrad@freybuck.com
 7          (Via Videoconference)

 8          KRISTOFER Z. RIKLIS
            Riklis Law, LLC
 9          401 Wilshire Boulevard, Floor 12
            Santa Monica, California 90401
10          (310) 895-2497
            kristofer@riklislaw.com
11          (Via Videoconference)

12
      For the Defendants:
13
            MATTHEW J. MERTENS
14          Perkins Coie, LLP
            1120 Northwest Couch, 10th Floor
15          Portland, Oregon 97209
            (503) 727-2199
16          mmertens@perkinscoie.com
            (Via Videoconference)
17

18    Also Present:

19          PATRICK NORTON
            Videographer
20          (Via Videoconference)

21          LAUREN ENGLISH
            Frey Buck
22          (Via Videoconference)

23          CHRIS HADNAGY
            (Via Videoconference)
24

25
```

Alethe Denis                                          September 24, 2024

Page 6

```
 1      Turlock, California    Tuesday, September 24, 2024

 2                        9:01 a.m.

 3      ------------------------------------

 4           THE VIDEOGRAPHER:  We are on the record at

 5      9:01 a.m. on September 24, 2024.  This is the

 6      video-recorded deposition of Alethe Denis in the matter

 7      of Christopher J. Hadnagy vs. Jeff Moss, et al.,

 8      Number 2:23-cv-01932-BAT in the United States District

 9      Court for the Western District of Washington.  This

10      deposition is being held virtually and was noticed by

11      defendant.

12           Counsel, please introduce yourselves and

13      state whom you represent.

14           ATTORNEY CONRAD:  This is Mark Conrad for

15      plaintiffs.

16           ATTORNEY MERTENS:  And Matt Mertens for the

17      defendants.

18           THE VIDEOGRAPHER:  My name is Patrick Norton,

19      and I am the legal videographer.  The court reporter is

20      Doug Armstrong.  We are with Seattle Deposition

21      Reporters.  Would the reporter please swear in the

22      witness.

23

24      ALETHE DENIS,        witness herein, having been

25                           duly sworn by the Certified
```

Alethe Denis                                    September 24, 2024

Page 7

 1                   Court Reporter, testified as

 2                   follows:

 3

 4                E X A M I N A T I O N

 5   BY ATTORNEY MERTENS:

 6       Q.   Good morning, Ms. Denis.  We've met before

 7   off the record, but for the purposes of the record,

 8   I'll introduce myself again.  I'm Matt Mertens.  I am

 9   one of the attorneys representing Jeff Moss and Def Con

10   Communications in the defamation lawsuit that

11   Mr. Hadnagy and his business have filed against the

12   defendants.

13           Ms. Denis, have you ever been deposed before?

14       A.   No.

15       Q.   Do you understand that you are giving sworn

16   testimony under oath just as though you were sitting in

17   a courtroom?

18       A.   I do.

19       Q.   And do you understand that your oath

20   obligates you to tell the truth to the best of your

21   ability in this deposition today?

22       A.   I do.

23       Q.   Okay.  So because you've never been deposed

24   before, I'm just going to give you a few quick ground

25   rules.

Alethe Denis                                    September 24, 2024

Page 97

1          (Exhibit No. Defense 17 marked for

2            identification.)

3      Q.   And let's start with Mr. Hadnagy's message at

4  8:21 p.m.  He writes, "But sorry.  Not being weird.

5  You are about 150 percent hotter than Whitney."

6          Who is Whitney?

7      A.   Whitney is Whitney Maxwell.  She was a

8  contestant the first year that I competed in the Social

9  Engineering Capture the Flag.  She won that competition

10  that year.

11      Q.   Mr. Hadnagy is indicating here his belief

12  that you are about 150 percent hotter than Whitney.

13          Did you and Mr. Hadnagy otherwise discuss

14  Ms. Maxwell's appearance beyond what's reflected in

15  Mr. Hadnagy's 8:21 p.m. text message on March 4, 2022?

16      A.   No, we did not.

17      Q.   This is Defense Exhibit 18, Bates

18  Number ending in 383 from the Denis production, a

19  screenshot now dated March 16, 2022.

20          (Exhibit No. Defense 18 marked for

21            identification.)

22      Q.   And I want to direct your attention to

23  Mr. Hadnagy's messages starting at 8:18 p.m. on this

24  screenshot.  He writes, "Oh, my God.  This video of"

25  what appears to be a misspelling of Rachel "is awful.

Alethe Denis                                    September 24, 2024

Page 98

1    She is just a complete joke."

2            Who is Rachel in this message, if you know?

3        A.    I believe Mr. Hadnagy is referring to

4    Rachel Tobac.

5        Q.    And who is Rachel Tobac?

6        A.    Rachel Tobac is a woman who competed in the

7    Social Engineering Capture the Flag competition and

8    achieved a second-place finish in 2017 -- or sorry --

9    2016, 2017, and 2018.

10       Q.    Mr. Hadnagy calls Ms. Tobac here a "complete

11   joke."  Did he ever expound on the basis for his belief

12   that Ms. Tobac was a complete joke?

13       A.    Yes.  I believe we discuss it also in this

14   thread.  Essentially, Chris Hadnagy and I share the

15   common belief that Rachel used her second-place wins to

16   create her company, SocialProof Security, and launch a

17   career as a professed -- self-professed hacker, and

18   that she shares some wildly inaccurate information

19   about social engineering and human behavior.

20           And in this video that we're discussing, she,

21   I believe, perpetrated a hack of some kind against a

22   media personality.  And she's achieved a modicum of

23   fame in the information security space, leveraging her

24   experience in the contests and using that as a basis

25   for her establishing of her positioning herself as an

Alethe Denis                                    September 24, 2024

Page 99

1    expert.

2        Q.    And let's go to the next document, which is

3    Defense Exhibit 19, Bates ending in 384, from your

4    production, Ms. Denis.

5              (Exhibit No. Defense 19 marked for

6               identification.)

7        Q.    This is a continuation of the Defense

8    Exhibit 18 we were just looking at.  March 16, 2022,

9    Mr. Hadnagy writes, at 8:18 p.m., "Not being a dick,

10   but, I mean, she's not even as hot as Maxie."

11             Do you see that there?

12             ATTORNEY CONRAD:  Objection.  Form.

13       A.    I do see that.

14       Q.    (By Attorney Mertens) And "she" here is

15   referring to who?

16       A.    I believe he's referring to Rachel Tobac.

17       Q.    And why is Ms. Tobac's hotness or lack

18   thereof relevant here?

19       A.    To be frank, I am not sure.

20       Q.    And do you see, at the bottom of this

21   exhibit, Defense Exhibit 19, Mr. Hadnagy writes, "And,

22   literally, Maxie is so hot, it's dumb"?

23       A.    I do see that, yes.

24       Q.    Do you think a female employee should be able

25   to go work for a male employer without worrying that

Alethe Denis                                    September 24, 2024

Page 105

1          (Exhibit No. Defense 21 marked for
2            identification.)
3       Q.   (By Attorney Mertens) It's a continuation,
4    Ms. Denis, of the same conversation we've been looking
5    at, dated March 16, 2022.  I want to direct your
6    attention to Mr. Hadnagy's messages at 8:22 p.m.,
7    "Rachel is just not, and Stephanie is just not."
8            What did you understand Mr. Hadnagy to mean
9    with these two messages?
10      A.   I believe that Chris Hadnagy was saying that
11   Rachel is not attractive and that Stephanie -- and I
12   believe he's referring to Stephanie Carruthers, also
13   known as Snow, is also not attractive.
14      Q.   So, Ms. Denis, you've testified that
15   Mr. Hadnagy, in these text messages, opined on the
16   attractiveness or lack thereof of you, Ms. Reynolds,
17   Ms. Tobac, Ms. Maxwell, and Ms. Carruthers.
18           Are there any other women who's
19   attractiveness Mr. Hadnagy has opined on to you?
20           ATTORNEY CONRAD:  Objection.  Form.
21      A.   Not outside of the text message thread and
22   not that I'm aware of or recall.
23      Q.   (By Attorney Mertens) Have you ever heard
24   Mr. Hadnagy talk about if he finds Asian women
25   particularly attractive?

Alethe Denis                                         September 24, 2024

Page 110

1          A.    Yes.

2          Q.    And when he writes, "One of the worst

3    person" -- persons -- "in the community," you

4    understood him to be referring to Nikita Kronenberg?

5          A.    Yes.  That's correct.

6          Q.    Did you ever have a conversation with

7    Mr. Hadnagy about the basis for his belief that

8    Nikita Kronenberg is raw evil and one of the worst

9    people in the community?

10         A.    No.  We never discussed her outside of this

11   thread of messages.

12         Q.    Let's go to the next document.  This is

13   Defense Exhibit 23, Denis production ending in 372,

14   March 16, 2022, Signal messages between you and

15   Mr. Hadnagy.

16               (Exhibit No. Defense 23 marked for

17                identification.)

18         Q.    Your message at 4:41 p.m. is talking about a

19   hack that one Rachel is conducting.

20               Are you referring here to Rachel Tobac?

21         A.    Yes, I am referring to Rachel Tobac.  In the

22   linked video, Rachel Tobac appears in the video.

23         Q.    And you describe Ms. Tobac, at 4:43 p.m., as

24   "a piece of shit."  And Mr. Hadnagy --

25         A.    Yes, I do.

Alethe Denis                                    September 24, 2024

Page 111

1       Q.    Mr. Hadnagy responds, "So much.  It's
2    amazing."
3            Did you understand Mr. Hadnagy to be agreeing
4    with your assertion that Ms. Tobac is a piece of shit?
5       A.    Yes.  I understood that remark to be in
6    agreement with my assertion that and my belief that
7    Rachel Tobac is a piece of shit.
8       Q.    And then Defense Exhibit 23 is Denis ending
9    in Bates 373.  It's a continuation, Ms. Denis, of the
10   conversation we were just looking at.  You can see
11   Mr. Hadnagy's response -- "So much.  It's amazing" --
12   at the top of this thread, which was at the bottom of
13   the last one.
14            THE COURT REPORTER:  And, Counsel, just for
15   the record, this will be 24.
16            ATTORNEY MERTENS:  Thank you.  Darn it.  I
17   was doing so well.  23.  This is 24.  Thank you, Doug.
18            (Exhibit No. Defense 24 marked for
19             identification.)
20       Q.    (By Attorney Mertens) And Mr. Hadnagy states,
21   "She is awful," at 4:45 p.m., twice.
22            Who do you understand Mr. Hadnagy to be
23   referring to when he writes, "She is awful," twice in
24   these texts?
25       A.    He is saying she is awful in reference to my

Alethe Denis                                    September 24, 2024

Page 112

1   statement in the above message, saying, "She is awful,"

2   in reference to Rachel Tobac.

3        Q.   Are there any other disparaging comments you

4   recall Mr. Hadnagy making about Ms. Tobac?

5        A.   None that I'm aware of outside this messaging

6   thread between the two of us where I have said she is

7   awful, and he has agreed.

8        Q.   And then, setting aside this Signal message

9   thread between you and Mr. Hadnagy that you have

10  produced to us in toto, do you recall Mr. Hadnagy

11  making disparaging comments about any of the

12  individuals who you knew approached Def Con with their

13  concerns about Mr. Hadnagy?

14       A.   I would like to state that the only person

15  that I know has approached Def Con is Maxie Reynolds.

16  But all of the individuals that we have discussed, I

17  don't recall any time where Chris Hadnagy has made

18  disparaging comments about them with me present or that

19  I have heard outside of this thread.

20       Q.   Okay.  This is Defense Exhibit 25, Denis

21  Bates ending in 441, messages dated May 18, 2022.

22            (Exhibit No. Defense 25 marked for

23             identification.)

24       Q.   And Mr. Hadnagy writes, "I have already

25  hatched an evil plan.  It is so good, but it cannot be

```
 1                    C E R T I F I C A T E

 2       UNITED STATES      )
                            )
 3       DISTRICT COURT     )

 4

 5            I, a Reporter and Washington Certified Court

 6       Reporter, hereby certify that the foregoing videotaped

 7       videoconference deposition upon oral examination of

 8       Alethe Denis was taken stenographically before me on

 9       September 24, 2024, and transcribed under my direction;

10            That the witness was duly sworn by me

11       pursuant to RCW 5.28.010 to testify truthfully; that

12       the transcript of the deposition is a full, true and

13       correct transcript to the best of my ability; that I am

14       neither attorney for nor a relative or employee of any

15       of the parties to the action or any attorney or counsel

16       employed by the parties hereto nor financially

17       interested in its outcome.

18            IN WITNESS WHEREOF, I have hereunto set my

19       hand this 28th day of September, 2024.

20

21       Douglas Armstrong, RPR

22       _____

23       Washington Certified Court Reporter No. 3444
         License expires 11/26/2024

24

25
```

# Exhibit 49



Confidential

DENIS00000384

# Exhibit 50

PLACEHOLDER

This document was produced natively

SE_54307

| | |
|---|---|
| **From:** | Cynthia Hetherington[ch@hetheringtongroup.com] |
| **Sent:** | Thur 9/1/2022 1:32:02 AM (UTC) |
| **To:** | Christopher Hadnagy[chris@social-engineer.com] |
| **Subject:** | Re: Speakers |

Only 75k?  You could have reached for more. Considering the loss of business.  This is so fresh though.  It's going to take a while to play out.

Regards,
Cynthia

**Cynthia Hetherington** MLS, MSM, CFE, CII
President



**Office** 973.706.7525 | **E** ch@hetheringtongroup.com | **W** www.hetheringtongroup.com
**A** 593 Ringwood Avenue, Wanaque, NJ 07465-2015| **LinkedIn** Connect with me!

**LEARN OSMOSISCon 2022** *October 16-18, 2022* – www.osmosiscon.com

***CONFIDENTIALITY NOTICE****: Emails from this firm may contain confidential and privileged material and are for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items. Please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments, and any copies thereof.*



---

**From:** Christopher Hadnagy <chris@social-engineer.com>
**Sent:** Wednesday, August 31, 2022 9:02:43 PM
**To:** Cynthia Hetherington <ch@hetheringtongroup.com>
**Subject:** RE: Speakers

I would love to see what they found

The lawsuit made national news, ended on Forbes

My statement I am allowed to say

My company and I consistently deny and continue to deny any and all allegations of misconduct. Actually, I have commenced a civil lawsuit in the US District Court for the Eastern District of Pennsylvania. To address these false accusations, defamatory statements and innuendos I have filed a

lawsuit against both DEF CON Communications and Jeff Moss, it is Case # 2-22-cv-03060-WB.  All further questions should be directed towards our legal counsel.

Christopher Hadnagy
Chief Human Hacker
Social-Engineer, LLC.
570.234.3734
www.social-engineer.com

Grab a copy of my new book *Human Hacking: Win Friends, Influence People, and Leave Them Better Off for Having Met You* HERE!

Have you seen my TedX Talk on how we are being hacked daily? https://www.youtube.com/watch?v=9e6k_PtEXdM

**From:** Cynthia Hetherington <ch@hetheringtongroup.com>
**Sent:** Wednesday, August 31, 2022 8:31 PM
**To:** Christopher Hadnagy <chris@social-engineer.com>
**Subject:** Re: Speakers

It's ok.  If I let twitter enter my life I'd be lost. Though I have OSINT super fans who tracked down the trolls and have been sending me bios. Lol. It's a a good exercise for them.

I'm sorry for you. Did you file in federal court?  Maybe post the case number? Your official statement would be heard.

Regards,

Cynthia

Cynthia Hetherington
President

T:973.706.7525|F:973.706.7526|E:ch@hetheringtongroup.com|W:HetheringtonGroup.com
LEARN:OSMOSIS Conference- October2022 – Tampa, FL -
www.osmosiscon.com #piratehunter

Sent from my iPhone

**From:** Christopher Hadnagy <chris@social-engineer.com>
**Sent:** Wednesday, August 31, 2022 8:28:33 PM
**To:** Cynthia Hetherington <ch@hetheringtongroup.com>
**Subject:** Re: Speakers

Lol. Good.
Again I'm so sorry this is at your feet.

Christopher Hadnagy
Chief Human Hacker
Social-Engineer, LLC.
570.234.3734
www.social-engineer.com

Grab a copy of my new book *Human Hacking: Win Friends, Influence People, and Leave Them Better Off for Having Met You* HERE!

Have you seen my TedX Talk on how we are being hacked daily? https://www.youtube.com/watch?v=9e6k_PtEXdM

---

**From:** Cynthia Hetherington <ch@hetheringtongroup.com>
**Sent:** Wednesday, August 31, 2022 8:25:13 PM
**To:** Christopher Hadnagy <chris@social-engineer.com>
**Subject:** Re: Speakers

Look at that! Lol. We sold out today! I had to pull tables out of the room for stadium seating to add chairs.

Regards,

Cynthia

Cynthia Hetherington
President

T:973.706.7525|F:973.706.7526|E:ch@hetheringtongroup.com|W:HetheringtonGroup.com
LEARN:OSMOSIS Conference- October2022 – Tampa, FL - www.osmosiscon.com #piratehunter

Sent from my iPhone

---

**From:** Christopher Hadnagy <chris@social-engineer.com>
**Sent:** Wednesday, August 31, 2022 8:21:08 PM
**To:** Cynthia Hetherington <ch@hetheringtongroup.com>
**Subject:** Re: Speakers


Christopher Hadnagy
Chief Human Hacker
Social-Engineer, LLC.

570.234.3734
www.social-engineer.com

Grab a copy of my new book *Human Hacking: Win Friends, Influence People, and Leave Them Better Off for Having Met You* HERE!

Have you seen my TedX Talk on how we are being hacked daily? https://www.youtube.com/watch?v=9e6k_PtEXdM

---

**From:** Cynthia Hetherington <ch@hetheringtongroup.com>
**Sent:** Wednesday, August 31, 2022 8:18:05 PM
**To:** Christopher Hadnagy <chris@social-engineer.com>
**Subject:** Re: Speakers

Was that recent? I stopped looking.
Speakers aren't selected from their nifty twitter handles. Lol

Regards,

Cynthia

Cynthia Hetherington
President

T:973.706.7525|F:973.706.7526|E:ch@hetheringtongroup.com|W:HetheringtonGroup.com
LEARN:OSMOSIS Conference- October2022 – Tampa, FL -
www.osmosiscon.com #piratehunter

Sent from my iPhone

---

**From:** Christopher Hadnagy <chris@social-engineer.com>
**Sent:** Wednesday, August 31, 2022 8:06:43 PM
**To:** Cynthia Hetherington <ch@hetheringtongroup.com>
**Subject:** Re: Speakers

The Twitter thread attacking you they suggested replacements for me
Those replacements are filth. I don't say that lightly

Christopher Hadnagy
Chief Human Hacker
Social-Engineer, LLC.
570.234.3734
www.social-engineer.com

Grab a copy of my new book *Human Hacking: Win Friends, Influence People, and Leave Them Better Off for Having Met You* HERE!

Have you seen my TedX Talk on how we are being hacked daily? https://www.youtube.com/watch?v=9e6k_PtEXdM

---

**From:** Cynthia Hetherington <ch@hetheringtongroup.com>
**Sent:** Wednesday, August 31, 2022 7:58:42 PM
**To:** Christopher Hadnagy <chris@social-engineer.com>
**Subject:** Re: Speakers

?

Regards,

Cynthia

Cynthia Hetherington
President

T:973.706.7525|F:973.706.7526|E:ch@hetheringtongroup.com|W:HetheringtonGroup.com
LEARN:OSMOSIS Conference- October2022 – Tampa, FL -
www.osmosiscon.com #piratehunter

Sent from my iPhone

---

**From:** Christopher Hadnagy <chris@social-engineer.com>
**Sent:** Wednesday, August 31, 2022 7:33:03 PM
**To:** Cynthia Hetherington <ch@hetheringtongroup.com>
**Subject:** Speakers

Please dont take Sam (sudofed) or bejamin Spence or deviant. They are trash

Christopher Hadnagy
Chief Human Hacker
Social-Engineer, LLC.
570.234.3734
www.social-engineer.com

Grab a copy of my new book *Human Hacking: Win Friends, Influence People, and Leave Them Better Off for Having Met You* HERE!

Have you seen my TedX Talk on how we are being hacked daily? https://www.youtube.com/watch?v=9e6k_PtEXdM
All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the

intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

# Exhibit 51



5:29

**Chris Hadnagy**

abuser she was with                    5:18 PM

Mar 16, 2022

I will take a man on a conference call who directly doubts my expertise and disparages me in favor of listening to the men on the call over a woman who agrees with me on the phone and pretends to support me and then talks shit behind my back any day of the week          5:18 PM

It was awful. But I love that kid

He's MY son

So even in the bad is some good    5:18 PM

❤️

OMG this video of racehl is awful

she is just a complete joke    8:18 PM

Right!?    8:18 PM

wow

its literally bull crap

i dont undersnad how she is so popular
                                8:18 PM

Ryan was like. That isn't even either of their actual computers. This is ALLL staged like an infomercial    8:18 PM

Message

Alethe Denis
9/24/2024

**Defense 18**

Douglas Armstrong, RPR

DENIS00000383

# Exhibit 52



5:28

**Chris Hadnagy**

Mar 16, 2022

😭

2:56 PM

I know. 🥺 3:00 PM

Have you seen this?

https://youtu.be/LSnFuXaIgwc

The slick video of the hack. It's clear that the target is so uncomfortable and Rachel just won't stop. Like he calls her malicious and she is like PLEASED with herself. Sickening. 4:41 PM

I haven't I'll watch it later after I start drinking and damn 4:42 PM

She looks pregnant. And like a cocker spaniel- you got this. 4:42 PM

Literally following everything I do I was the first hacker at sxsw. Lol

Hahahah 4:43 PM

She's such a piece of shit 😁 4:43 PM

So much. It's amazing 4:43 PM

Message

Alethe Denis
9/24/2024

**Defense 23**

Douglas Armstrong, RPR

DENIS00000372

# Exhibit 53



5:28

**Chris Hadnagy**

She's su̶ ⬛⬛ shit 😂  4:43 PM

Mar 16, 2022

So much. It's amazing  4:43 PM

Like just stating facts here. She is an awful person. But I have faith it will come back around. She will reap what she sows.  4:44 PM

Sometimes people do

But she is awful  4:45 PM

Agreed. Sent the "hack" in a LinkedIn message cause I don't want anyone to view her page  4:47 PM

Ugh

She is awful

But great at marketing  4:48 PM

Also agreed.

It's tough for me to get tf over the fact that I can be exceptional at this and NOT receive recognition and be okay with that. Having a client call me Cruella Deville and "malicious" would break my heart though. She enjoys it. That's sick.  4:49 PM

Yah know what. They can have def con and

Message

Alethe Denis
9/24/2024
**Defense 24**
Douglas Armstrong, RPR

# Exhibit 54

| From: | |
|---|---|
| Date: | February 17, 2015 2:11:14 PM (-06) |
| To: | "'Chris Hadnagy'" <chris@social-engineer.com> |
| Subject: | **RE: Gov Customers** |

Attachments:

██████████

(my cell)

---

**From:** Chris Hadnagy [mailto:chris@social-engineer.com]
**Sent:** Tuesday, February 17, 2015 15:09
**To:** ██████████
**Subject:** Re: Gov Customers

HA love your sales pitch
yes
where do i call?

Christopher Hadnagy
Chief Human Hacker
Social-Engineer, Inc.
570.510.8488
www.social-engineer.com

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

On Feb 17, 2015, at 3:08 PM, ███████████████████████ wrote:

Do you have a few minutes for an unpleasant phone call?

---

**From:** Chris Hadnagy [mailto:chris@social-engineer.com]
**Sent:** Tuesday, February 17, 2015 14:48
**To:** ██████████
**Subject:** Re: Gov Customers

Thanks ████  I enjoyed last week too.  Tiring, long and hard - but in the end it was a great class.

I hope we can find a way to work together too...
I really have been thinking a lot about how we can help you with phishing.  So I don't want that to die.  I would like to discuss how we can roll out a ████ awareness program for phishing.

Christopher Hadnagy
Chief Human Hacker
Social-Engineer, Inc.
570.510.8488
www.social-engineer.com

CONFIDENTIAL

SE_20143

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

On Feb 17, 2015, at 2:45 PM, ███████████ wrote:

Agreed on all points.

It really was a pleasure working with you and your team last week, and I hope we find a way to do more of it in the future. I'll let you know if any of us end up at DEFCON, and if you are in the DC area my offer for enhanced training/free labor still stands.

---

**From:** Chris Hadnagy [mailto:chris@social-engineer.com]
**Sent:** Tuesday, February 17, 2015 14:42
**To:** ███████
**Subject:** Re: Gov Customers

This is a great reply.

Well if we ever get to train with you again, maybe we can screen the students better telling them they will have to engage in awkward situations (not to give away too much) and discuss taboo topics. If they are uncomfortable to not come to the class.

I would assume this person is not cut out for the job you have at hand.
personal opinion.

Christopher Hadnagy
Chief Human Hacker
Social-Engineer, Inc.
570.510.8488
www.social-engineer.com

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

On Feb 17, 2015, at 2:39 PM, ███████████ wrote:

In case it is ever needed, here is what my official reply was earlier:

Summary of what happened:
Numerous members of the ███████ were in Social Engineering training last week. The course was the same as what is offered to other ███████ throughout the country, and no modifications were made to the standard curriculum. The course is designed in a progressive nature to encourage students to engage in difficult and socially awkward discussions. The challenge level of the homework assignments culminated in addressing taboo topics. This encouraged the students to plan ways to address these topics in a non-confrontational fashion. In keeping with the rules of every assignment, we were prohibited from engage in anything sexual or anything intimidating.

During the last homework assignment, we were asked to select from a list of possible pieces of information, and some of the options could be

considered taboo. The instructors were available at all times to discuss and assist if anyone had concerns. In addition I stopped class and made it very clear that if anyone had concerns or didn't feel comfortable proceeding then they should talk to me so we could find a path ahead.

very clear that if anyone had concerns or didn't feel comfortable proceeding then they should talk to me so we could find a path ahead.

Two staff members did come talk to me, and I explained to them that there was no requirement for them to do things they were uncomfortable with.

Suggestions for what should happen next:
I will support any decisions made by my chain of command.  That said, I am currently unsure if there is a need for anything further.  We spent many hours talking about the ethical consequences of social engineering last week, and we also explicitly talked about why understanding the tactics used by the adversaries is critical to ensuring our own as well as the Postal Services security.

---

**From:** Chris Hadnagy [mailto:chris@social-engineer.com]
**Sent:** Tuesday, February 17, 2015 14:35
**To:** ▮▮▮▮▮▮▮
**Subject:** Re: Gov Customers

RE: Michelle, no worries and thanks

RE: this issue… i do worry. Like you I make waves so I am not worried about that but I am worried that it will adversely affect you and your future and the way the ▮▮▮▮ may view us as professionals.

Final RE:  Sexually explicit is not a bra size nor circumcision.  "sexually explicit" is defined as explicitly (or strictly) about sexual matters.  We made a rule that is it must be obtained via non-sexual and non threatening means.

Sorry again

Christopher Hadnagy
Chief Human Hacker
Social-Engineer, Inc.
570.510.8488
www.social-engineer.com

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

On Feb 17, 2015, at 2:31 PM, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ wrote:

I don't think this counts as your first complaint, as it was directly targeted at me.  Forcing a subordinate to engage in sexually explicit conversation while at work, and not upholding the federal government standards for appropriateness.  Or something like that.

To minimize the ability for whistleblower retaliation, I am unable to know who, or what, exactly the complaint included.

The reason why I wanted to know other agencies is because my defense included a statement that this was accepted training that has been utilized across the government, and my boss wanted supporting information listing where it has been utilized.  What you provided was exactly what I needed.

Please don't let this concern you, as this sort of pettiness really isn't worth your time.  People have complained about something or another my entire career, and I write it off as social punishment inflicted on government employees that do amazing things.  If I stayed docile and colored within the lines then everyone would forget I exist, but instances like this show that I am making waves and getting things done, which is exactly the change inducing mindset I am striving for.

--

Yes, you can reach out to ▮▮▮▮ (or anyone on my staff) at any time you like.  Please understand that she is not authorized to broker deals on behalf

CONFIDENTIAL

SE_20145

of the government, nor is she authorized to make payment for services.

▮▮▮▮▮▮▮

**From:** Chris Hadnagy [mailto:chris@social-engineer.com]
**Sent:** Tuesday, February 17, 2015 14:16
**To:** ▮▮▮▮▮▮
**Subject:** Re: Gov Customers

A couple things

What is her complaint?  I mean literally what could she complain about?
Why would it matter if I trained other gov agencies or not?

In addition to gov agencies around the Western World, I have also have 200+ students from fortune 500's and larger around the globe come to the class and this will be my first complaint.
:)

Separate more positive note:

1)      I am working on the proposal for the BAA, will take a short bit
2)      ▮▮▮▮▮ (your's) said she wanted to talk about some SE work... can I reach to her and if so what is her email?

Thanks


Christopher Hadnagy
Chief Human Hacker
Social-Engineer, Inc.
570.510.8488
www.social-engineer.com

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.


On Feb 17, 2015, at 2:06 PM, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ wrote:

Thank you for the quick response.  I don't think there is anything else needed, and hopefully this will all blow over soon.

The class was awesome, I think that the student complaining just solidifies how intense and influential it was.


**From:** Chris Hadnagy [mailto:chris@social-engineer.com]
**Sent:** Tuesday, February 17, 2015 13:58
**To:** ▮▮▮▮▮
**Subject:** Re: Gov Customers

sigh
:)

Sorry this may be overlap

Overseas I did one specially for ▮ and ▮
the list just keeps going…

can i help with anything else?


Christopher Hadnagy
Chief Human Hacker
Social-Engineer, Inc.
570.510.8488
www.social-engineer.com

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.



On Feb 17, 2015, at 1:53 PM, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ wrote:

Chris,

Can you please provide a few ▮▮▮▮▮▮▮▮ organizations that have send students to you?

No need for individual references, I just want to be able to say something along the lines of, "This course is acceptable in many areas of the Gov, to include ……"

You will likely be correct if you guess what flavor of lameness is requiring this inquiry.

# Exhibit 55

PLACEHOLDER

This document was produced natively

SE_28851

**From:**    Christopher Hadnagy[/O=EXCHANGELABS/OU=EXCHANGE
             ADMINISTRATIVE GROUP
             (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=55615E7A8341469FB8917CC35F
             D13009-CHRIS]

**Sent:**    Wed 8/22/2018 9:06:12 PM (UTC)

**To:**      Christopher Hadnagy[chris@social-engineer.com]

**Subject:** A quick favor

Hello students,

There are only a few of you in this email and I wanted to ask your opinion of something and then see
if I can get your help.

Someone, not a student, that overheard our homework assignments in the lunch room filed a code of
conduct complaint at Black Hat against our company.  I am presently fighting a small battle trying to
help them understand that asking for bra size, circumcision, etc is not sexual as long as you don't
make it that way.  I wanted to ask two or three things if I can….

If you are willing to be contacted, can you send me a brief email with your feelings on the homework,
especially the final night, list your name, title, email and if you felt at any time you or your targets felt
harassed or sexually uncomfortable?

If you cannot use your name or do not want to be contacted that is perfectly fine – it really is.  If you
have feedback for me about this at all – I am all ears.

Thank you so much for your help.

Christopher Hadnagy
Chief Human Hacker
Social-Engineer, LLC.
570.234.3734 ext 200
www.social-engineer.com

# Exhibit 56

# PLACEHOLDER

This document was produced natively

SE_48478

| | |
|---|---|
| **From:** | Christopher Hadnagy[/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=55615e7a8341469fb8917cc35fd13009-chris] |
| **Sent:** | Tue 12/28/2021 8:30:48 PM (UTC) |
| **To:** | David C.[drcaviness@protonmail.com] |
| **Subject:** | Re: RE: SE Class Questions |

First of all – WOW. Thank you so much.  This is amazing validation. And when someone goes on to achieve all these things it makes me so happy.  This is awesome.

I removed the underwear homework, too many snowflakes got upset and called me out for being sexually abusive. Go figure.  The very nature of the homework is to avoid thinking like that. Sigh.  Like you said, sometimes the infosec community is made up of babies and primo donnas.

So who is the old boss? I don't remember.

Congrats on what you are doing, I can't wait to see the trailer.

Also, I might have helped you on your journey, but you took the steps, you made it happen….
Congrats bro.


Christopher Hadnagy
Chief Human Hacker
Social-Engineer, LLC.
570.234.3734
www.social-engineer.com

Are you interested in becoming the best version of YOU? Check out the Human Behavior Conference to learn how you can understand the fullness, totality and exquisite nature of human behavior.
www.humanbehaviorcon.com

Grab a copy of my new book *Human Hacking: Win Friends, Influence People, and Leave Them Better Off for Having Met You* HERE!

Have you seen my TedX Talk on how we are being hacked daily?
https://www.youtube.com/watch?v=9e6k_PtEXdM


**From:** David C. <drcaviness@protonmail.com>
**Date:** Tuesday, December 28, 2021 at 9:30 AM
**To:** Christopher Hadnagy <chris@social-engineer.com>
**Subject:** Re: RE: SE Class Questions

You don't often get email from drcaviness@protonmail.com. Learn why this is important

Last thing, I promise.

I am an auteur now. I make movies. First one is scheduled to wrap before New Year's Day.

Couldn't be happier.

Should you ever have need of videography, I would happily offer you my services at a steep discount. My business is Night Land Productions LTD.

Here at NLPLTD, we believe Christopher Hadnagy is an influencer, an iconoclast, and Friend to the denizens of the darklands.

That's worth…I dunno…50 percent off or something.

Once I cut a trailer for the project I'm doing now, I can demonstrate whether I am worth hiring for such an enterprise.

Just letting you know - for you I would strike a unique bargain, because you are part of the reason I am here now,

Sent from ProtonMail Mobile

On Tue, Dec 28, 2021 at 7:01 AM, David C. <drcaviness@protonmail.com> wrote:
    Just wanted to add it also occurred in a place that represents the death of my cybersecurity "career" boondoggle.

    Love hacking/phreaking/cracking, always will, but a career amongst such people is not for me. Good riddance.

    I went further though. Sailed to a new island, ordered the ships to be burned.

    You helped me Escape From The Prison Planet! Neil Fallon would be proud.

    Watch out for my former boss. He literally has refused to speak a single word to me for one-two? years straight. He's very childish, you see. No idea how this affected his illustrious career.

    I doubt he got the "pat on the back" he is accustomed to for that sad fucking spectacle.

    Me? None the wiser, 0 shits given. I'm living free!

    Sent from ProtonMail Mobile

    On Tue, Dec 28, 2021 at 6:44 AM, David C. <drcaviness@protonmail.com> wrote:
        Chris,

        Hope you're doing well.

Do you still do the "ask about undergarments" SE class assignment?

I wanted to reach out and thank you for that. It was literally one of the worst things I've ever done, won't ever live it down. I don't say shit like that to strangers, it makes me want to vomit.

As it happens…my participation in this ended up being my ticket out of the beige-coated slave galley I was trapped in.

Now I am fully in charge, in control of my own life. Your assignment made it possible. Almost easy. Almost.

Thanks brother,

David Caviness

Sent from ProtonMail Mobile


On Thu, Jul 4, 2019 at 6:05 AM, David C. <drcaviness@protonmail.com> wrote:
>
> Chris,
>
> So sorry man...I thought I had replied to your questions, turns out the e-mail never sent. I figured you were too busy to respond but finally remembered this morning how long it's been.
>
> Anyway, if you're still interested, I'll briefly answer all of these...
>
> CJH>> My nephew is on the spectrum. When I found out he was struggling I spoke to Dr. E and asked what if anything I can do.  He told me that people with Autism and Asperger's benefit greatly from learning to read nonverbals. I spent a lot of time with Owen (my nephew) teaching him. The crazy part is that you CAN do it and it will help you it will just take more pain and effort. Forcing yourself out of your comfort zone into this field…. I will introduce you to Ryan ONLY if you want. But before you say yes, watch his speech and tell me if it resonates:
> https://www.youtube.com/watch?v=CHv3HwVMRg8
>
> His speech indeed resonates. My struggles all seem to boil down to communication, forming bonds, maintaining relationships, etc. Some of it is trust, most of it is a long history of social ineptitude that culminated in a coping or

defensive strategy of avoidance. I have my family, I love them dearly, for the most part that's enough...I need very little from anyone else, period. But I don't enjoy this dynamic because I do actually like people in spite of my solitary and misanthropic ways.

I would definitely like to speak to him, just a brief convo or something.

CJH>> Nothing extra special maybe just make sure you spend time each week/month in the Ekman stuff and practice it. You will see how much it helps you.  Personal question – are your kids on the spectrum?  How old are your kids?

I think I answered this before maybe, they're 8 and 11, girl and boy respectively. I think my daughter might be on the spectrum or at least neurodiverse. My son is relatively normal compared to how I was at his age. They both have lots of friends. I always had my older brother and maybe one or two other kids I hung out with.

I think what they inherited from me was balanced by positive qualities from their mother.

CJH>> Personally story – one day we wake up and my wife's face is falling off her skull. I rush her to the hospital thinking she had a stroke…. Cat scans, tests etc…. they cant find anything. I call my acupuncturist. She says "ask about Bells Palsy"… doc says "yep that is it" I took her for Acupuncture and Shiatsu massage for 2 weeks every day… I mean 14 days straight. Cured her 100% no joke. Just my story and it is because he caught it the day of…. Anyhow… onward.

How crazy...most people have never heard of it or think I'm talking about cerebral palsy. I am aware of the healing power of acupuncture. My stepdad had colon cancer, then surgery, got hepatitis from that, and suffered an array of health problems from being in Desert Storm. He swore by acupuncture and I know how sick he got at times.

I have this weird thing where I really admire asymmetry, minor flaws, imperfections, etc. So I have no motivation to do anything about it. But I would if it was impacting how others might perceive me or receive my communications.

CJH>>So I use what I got.  I know it is not the same as you but we can work with this…. Maybe not in this email but lets plan to work on this. Ok?

Yeah, absolutely. Really I'd just like the opportunity to work with you or your business on anything. I really enjoyed that training and it's clear that you're the kind of person that can motivate and inform at the same time. It's hard to find those two qualities working in harmony.

I'll list out my personal info here if you ever want to reach out. I know you're busy, so don't worry about replying in a timely manner...

David Caviness
███████████ (it's on permanent DnD so I have to add you as a contact)
drcaviness@protonmail.com
No Facebook (yay)
@dyingculture on Twitter

Hope everything is going great for you and I also hope your family is in good health and spirits.

Thanks.


Sent with ProtonMail Secure Email.

------- Original Message -------
On Sunday, March 31, 2019 6:43 AM, David C. <drcaviness@protonmail.com> wrote:

> Man...you just continue to impress. How are you so good at this!?
>
> Thanks for these responses, so much more than I expected. Short answer to all of it is yes/agree (except my kids haven't been tested). I was actually 90% nonverbal when I started school, they put me in special ed because of it. Wouldn't even tell them my real name. Had to prove myself before they threw me into the general population.
>
> My kids seem to be crushing this whole school thing at every level, including socially, so I don't push testing. My daughter is definitely neurodiverse but it's dyslexia or some other input processing issue. We do get her help for that. My son is 11 and my girl is 8.

Anyway, I want to answer all of your questions right now but a couple require thought and I have to take the OSCE tomorrow too.

I will get back to you and I'd like to keep working with you and your people as much as I can. Professional SE sounds so much fun but stuff like this can help me to just live without chaos and constant anxiety.

Thanks.

Sent from ProtonMail Mobile

On Thu, Mar 28, 2019 at 10:09 PM, Christopher Hadnagy <chris@social-engineer.com> wrote:

> Dave I am going to answer you inline but I want to say upfront if you were you going for "one of the most validating and uplifting emails of the year" award you might have won. THANK YOU!!
>
> To trust me with this level of confidence and to compliment me with this level of kindness is more than I deserve.
>
> Please see INLINE next to CJH>>
>
> Christopher Hadnagy
>
> Chief Human Hacker
>
> Social-Engineer, LLC.

570.234.3734 ext 200

[www.social-engineer.com](www.social-engineer.com)

**From:** David C.
<drcaviness@protonmail.com>
**Sent:** Thursday, March 28, 2019
10:27 PM
**To:** Christopher Hadnagy
<chris@social-engineer.com>
**Subject:** SE Class Questions

Chris,

This is David from your current SE class...hope you're having a good night.

Just wanted to say I'm really digging the class and even though I'm exhausted it's been a lot of fun. I am in awe of your ability to engage a room of people the way you do. It's super impressive. I totally get why you're in the SE business. Kevin Mitnick used to be my main SE hero, not because of what he did (although that's a whole discussion) but because of his ingenuity. His FBI donuts story is one of the greatest things I've ever read.

CJH>> Like I said in the class, Mitnick is a friend and I am not as harsh on him as the community cause I think he got a sucky end of the stick. Plus I do think Kevin is a really good person, he is not a jerk. He just has to be guarded like most celebrities. I truly am humbled you put me on his level.  Thank you.

Also, as a kid I lived on hacking/phreaking/cracking BBSes. And this was right when the Free Kevin movement was gaining major steam. So I'm not one of those people who sees him as a god or something, it was just a big part of my formative teenage years. I do strongly believe he is a decent person and always was. He deserved some level of punishment, as he himself admits and understood back then. But he knew the feds wanted more than that, they wanted retaliation. They got it.

CJH>> I agree. He deserved jail time, but solitary is not for people like Kevin. He was not a danger to other humans.  I am like you, I saw him as this amazing person, not worship but I certainly looked up to him… or maybe his skill

Sorry for that tangent. All that just to point out you've risen to Mitnick's level in my mind. But you turned it into a profession and a valuable service instead of becoming a fugitive.

CJH>> Thank you – this is truly validating. This is EXACTLY what I wanted. I wanted to do what he did but not get arrested and make it a business.

I wanted to ask a couple of questions too, because I think your opinion on these things could possibly help guide me. I don't really want to talk about these things at the office in earshot of anyone, that's why I'm emailing you.

It's not super sensitive, I just don't talk about these things at the office. They're heavily related to what we're doing here.

CJH>> I completely understand.

I have Asperger's. They don't call it that anymore, it's Autism Spectrum Disorder now. But I am a stereotypical aspie, I don't really care for this new-fangled terminology.

Since you work in infosec and have such a close relationship with Dr. Ekman and his work, I would bet you don't need me to explain what ASD is or how it relates to social engineering.

CJH>> My nephew is on the spectrum. When I found out he was struggling I spoke to Dr. E and asked what if anything I can do.  He told me that people with Autism and Asperger's benefit greatly from learning to read nonverbals. I spent a lot of time with Owen (my nephew) teaching him. The crazy part is that you CAN do it and it will help you it will just take more pain and effort. Forcing yourself out of your comfort zone into this field…. I will introduce you to Ryan ONLY if you want. But before you say yes, watch his speech and tell me if it resonates: https://www.youtube.com/watch?v=CHv3HwVMRg8

So...I learned how to mask and fake it at an early age. Because I had to. But I don't really interpret body language the same way you or the others in the class do. My brain just doesn't process it the same way. I talk about body language about once a week with a therapist. Today's lesson was

really weird, it was like being in my doctor's office.

CJH>> I actually understand this. Only because my nephew and I have a group of parents who follow me with autistic kids that use my second book to teach their kids.

Do you have any advice on this? Like, should I be doing extra work or maybe some training not geared toward neurotypicals?

CJH>> Nothing extra special maybe just make sure you spend time each week/month in the Ekman stuff and practice it. You will see how much it helps you. Personal question – are your kids on the spectrum? How old are your kids?

Question two, this one is just out of curiosity...

When I lived in Johannesburg I came down with Bell's Palsy. Long story short exactly one half of my face was completely paralyzed for about three/four months. I couldn't even blink, I had to use eyedrops to keep my eye from drying out on me.

Bell's Palsy is like this extreme response to a prior infection. The doctors in Africa were completely confused, i had to do two CAT scans and was interrogated about head injuries several times. Eventually one doctor figured it out.

CJH>> Personally story – one day we wake up and my wife's face is falling off her skull. I rush her to the hospital thinking she had a stroke…. Cat scans, tests etc…. they cant find anything. I call my acupuncturist. She says "ask about Bells Palsy"… doc says "yep that is it" I took her for Acupuncture and Shiatsu massage for 2 weeks every day… I mean 14 days straight. Cured her 100% no joke. Just my story and it is because he caught it the day of…. Anyhow… onward.

Although I did regain muscle control, it was never 100% and never will be.  So how does that affect interpretation of my facial gestures? I have a strong side and a weak side. I very often make gestures with only the strong side and I can promise you it's not contempt...but do people see it that way? I'm kind of freaked out about it.

CJH>> so it is possible that you

will be misinterpreted due to this. YES.  Don't freak out. This is nature. 13 years ago I had malignant melanoma. I had my face filleted open. There is a scar on the right side of my face you can see tomorrow.  It makes me scientifically impossible to be attractive. Science says symmetry is attractive and I can no longer be symmetrical …. So I use what I got.  I know it is not the same as you but we can work with this…. Maybe not in this email but lets plan to work on this. Ok?

Sorry for the novel. I only avoid talking about being an aspie at work because I never told any of them because at 99% of companies they don't really give a fuck. Which is weird because it used to be a pretty common thing in IT. And still is I would assume. But no one seems to get it. Or they think we're like Dustin Hoffman in Rain Man. Or Sheldon from Big Bang Theory. They don't understand and it's either infuriating or really depressing to hear what they think about it.

CJH>> Never apologize for sharing your soul with me. I consider this a true honor to have you trust me after only 4 days with this depth. This must have been very hard for you to

share with me and I am honored. Truly honored and touched.

I told one employer, once. Not doing that again. It's not a disability and I don't need any special assistance so I don't feel obligated to disclose it.

I would like to know what you think about it though. And the Bell's Palsy thing. If you have the time, I know you're really busy and probably can't wait to get back home to your family.

CJH>> I would love to work with you on this…. Imagine if we find something that works? We can change so many lives……

Thanks, have a good night.

Sent from ProtonMail Mobile

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended

recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission IS STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

# Exhibit 57



MRW Consulting Group International, LLC

*Transformative Human Resources Solutions and Management Consulting*

# SOCIAL-ENGINEER – INNOCENT LIVES FOUNDATION

## DIVERSITY, EQUITY AND INCLUSION ORGANIZATIONAL ASSESSMENT

### REPORT ON FINDINGS

#### SUBMITTED MAY 9, 2022

www.mrwconsulting.com

SE_50401



MRW Consulting Group
International, LLC

*Transformative Human Resources Solutions and Management Consulting*

PAGE 2

## TABLE OF CONTENTS

| SECTION | PAGE |
| --- | --- |
| Background | 2 |
| Our Approach and Methodology | 3 |
| Our Report Description | 3 |
| Part 1 – Key Findings - Areas of Strength | 4 |
| Part 2 – Key Findings - Improvement Opportunities and Recommendations | 5 |
| APPENDIX | |
| Project Team Bios | 12 |
| Internal Interviews Guide | 17 |
| MRW Consulting Group International DEI Collective Business Case© | 19 |
| Full survey results | 20 |

### BACKGROUND

Social-Engineer (aka SEcom) is an organization founded by Chris Hadnagy over 10 years ago and currently employing approximately 15 staff members. Among its services, Social-Engineer's staff impersonates malicious attackers to uncover vulnerabilities and remediate preventive and contingency mitigation steps, typically for insurance and banking clients.

Innocent Lives Foundation (ILF) is a separate non-profit entity also founded by Chris Hadnagy. ILF identifies, profiles, and reports alleged child predators to law enforcement to prevent further crimes and bring them to justice. ILF has a board of directors chaired by Chris Hadnagy, staff of about 6, and some 30-50 volunteers. It relies on fundraising from donors for financial survival.

MRW Consulting Group International, L.L.C. (MRWCGI) was brought in by Chris Hadnagy to conduct an organizational assessment in order to understand the employee experience, particularly through the lens of gender, diversity, equity and inclusion (DEI). The review of the organization presented an opportunity to understand the tone set by the leadership and the resulting impact on workplace culture, workplace practices and ultimately current and prospective clients and donors or sponsors.



*Transformative Human Resources Solutions and Management Consulting*

PAGE 3

### OUR APPROACH & METHODOLOGY

Our process started with data intake in order to understand the organization's "current state" related to DEI. We reviewed organization background materials - structure, website, etc., developed the situation appraisal and background, including the DEF CON conference incident that has adversely affected Social-Engineer/ILF's for profit and non-profit professional reputations.

MRWCGI's consultant team conducted in-depth interviews with 17 people - 2 members of the Board, 2 members of leadership, 12 staff members, and 1 former staff member. Of the interviewees, 10 were female, 7 were male. An in-depth interview guide was used to structure the conversations with staff. See appendix.

Independently, informed by initial findings, a confidential survey instrument was developed to uncover other findings not gathered in the one-on-one conversations, as well as to confirm and add insight into initial interview findings and conclusions.

Our aim was to gain insights into the organization(s) - their missions, leaderships and operations - in order to find patterns and trends as to how they and their leadership teams are perceived both within and outside from a DEI perspective. We explored the employee work experience and employee perceptions of the organization's reputations, cultures, ways of working.

MRWCGI has compiled, analyzed and summarized findings and observations in this report. Leveraging our extensive expertise and knowledge of best practices in Organizational Development, DEI and Human Resources, contained in this report are proposed actionable recommendations to achieve a more harmonious, inclusive, diverse and "enduring" culture, resulting in higher staff satisfaction, engagement, retention, and productivity.

### OUR REPORT

This report is organized into two sections: 1) Key Findings around strengths and 2) Key Findings around opportunities for improvements and Recommendations.

In reviewing the themes, it is important to acknowledge that ***"perception is reality"*** -- comments reflect views, perspectives, and observations of interviewees. Therefore, there may be inaccuracies that nevertheless reflect impressions and beliefs of individuals.

Additionally, it is important to keep in mind that discussions like this tend to focus most on areas for improvement. As a result, the feedback tends to skew more negative and is not fully reflective of many of the positive aspects of working for the organizations.

Finally, this report reflects the information gathered during the data intake phase of the engagement.

SE_50403



*Transformative Human Resources Solutions and Management Consulting*

PAGE 4

## PART 1 -- KEY FINDINGS

### AREAS OF STRENGTH

- Subject Matter Expertise
- Commitment to Mission(s)
- Belief in Female Abilities
- Appreciation for Chris Hadnagy
- Welcoming Environment
- Relationships with law enforcement
- Associations with highly-regarded people in the industry

#### SUBJECT MATTER EXPERTISE

As a company, SEcom has secured itself a place in the security industry through its certification training classes and specialized team providing services impersonating malicious attackers to uncover vulnerabilities and remediate preventive or contingency mitigation steps. These have allowed SEcom to earn the business of large insurance companies & banks. The company has earned a reputation/positioning in the industry as a leader in social engineering. Chris has a record of publications, speeches, including podcast, book, blog, as well as teaching. Affectionately, SEcom is described similar to the 1992 movie "Sneakers" with Robert Redford and Sidney Poitier. Similarly, ILF enjoys subject matter expertise that allows it to advance its highly regarded mission.

#### COMMITMENT TO MISSION

ILF staff and volunteers demonstrate passion and commitment to its mission of identifying and reporting child predators to law enforcement, generating 150-175 referrals in 2021, of which 65 were active cases in 2022. This likely contributes to ILF's ability to attract significant numbers of volunteers, estimated at 50+ as of the time of this report. Although some estimated 30 active volunteers, where possibly 10 left or have taken a break after the DEF CON situation.

#### BELIEF IN FEMALE TALENT

Staff mentioned that Chris has expressed many times his belief that females have great ability to succeed in the security industry – and, with a 70% female population in the workforce, SEcom company demographics demonstrate a commitment to that belief. Some mentioned Chris' track record of mentoring and helping advance females wanting to pursue a career in security.

#### RELATIONSHIPS WITH LAW ENFORCEMENT

Staff mentioned the apparent relationship with FBI and law enforcement as a valuable asset to ILF. This allows ILF to refer child predators for review and necessary action by law enforcement, ultimately leading to fulfill the Foundation's mission.

SE_50404

**MRW Consulting Group International, LLC**

*Transformative Human Resources Solutions and Management Consulting*

PAGE 5

### APPRECIATION FOR CHRIS HADNAGY

Chris Hadnagy is admired by most SEcom and ILF staff and is seen by most as decent, caring, having a big heart, and being well-intentioned. Staff mentioned that Chris has extended himself personally to assist staff on personal matters. All felt public shaming was undeserved and unfair.

### WELCOMING ENVIRONMENT

Staff described SEcom's organizational culture as open, friendly, informal, flexible, sharing, supportive, "like family," great team, very motivated, easy to work with, diverse to some extent. Staff described ILF's organizational culture as fun and light-hearted. ILF promotes a culture of caring by, for example, providing therapist services while staff and volunteers do work for ILF. However, for those employees who reported difficult interactions with Chris, their experience is impacted by the effects of those interactions.

The survey confirmed that, at SEcom and ILF alike, respondents feel their peers treat them with honesty, respect, and civility. See detailed survey results at the end of this report.

### ASSOCIATIONS WITH HIGHLY-REGARDED PEOPLE IN THE INDUSTRY

Associations with people highly-regarded in the industry are evidenced, for example, on ILF's board of directors, on which currently sit at least two published authors regarded as authorities and experts in their fields (although one of them has been mostly inactive from Board service).

### PART 2 -- KEY FINDINGS

### IMPROVEMENT OPPORTUNITIES AND RECOMMENDATIONS

### LEADERSHIP FOCUS, COMMUNICATION, RESPECTFUL TREATMENT

The DEF CON situation caused reputational harm, lost business to SEcom, lost or delayed donations and sponsorships to ILF.

It is still unclear to staff what the alleged code of conduct violations were. They assume that the alleged misconduct violations were of a sexual nature and do not believe Chris to have done any wrongdoing of that nature.

On the other hand, some at ILF have expressed losing confidence in Chris and his leadership and have asked for him to step down from his ILF CEO role. They were told that Chris could not step down because of paperwork and they don't quite understand what is meant by this.

Most staff believe that the allegations might have been vindictive and orchestrated by a former employee.

SE_50405



*Transformative Human Resources Solutions and Management Consulting*

PAGE 6

Some staff expressed that they have felt offended by Chris' communication style and that it has led them to decide that they do not want to work at the organization because they do not feel respected or appreciated. The survey confirmed these views: At SEcom employees were far less likely than those at ILF to agree with the statement "My manager demonstrates respect toward me, even under situations of stress." Yet SEcom respondents felt to a greater extent that managers show a genuine interest in employees' wellbeing.

Overall, satisfaction with the organization skewed slightly lower in SEcom than ILF.

Some write-in comments from the survey were:
- "Lack of communication and calm direction often leads to misunderstandings and hurt feelings." – SEcom employee
- "I feel that sometimes the intention behind a message/direction can be lost by how that message was communicated (rushed and/or direct)." – SEcom employee
- "Upper management tends to be hijacked by their emotions, and inappropriately take it out on personnel who are under them." – SEcom employee
- "The company's statement 'leave others feeling better' should be applied within the company, from the CEO down when communicating whether in email, message, or in-person." – SEcom employee

Staff noted that interpersonal improvement is needed; and they mentioned that Chris has written blogposts on which he has admitted needing personal development. Chris seems self-aware and has made noticeable efforts to improve, but more is needed.

Staff believe that Chris' communication is more effective verbally and/or in person, but pointed out that Chris' communication is less effective via email. It has been mostly via email communication that female staff have reported being offended. Staff commented that the offensive email communication tends to happen when Chris is stressed and in emails that Chris has sent late at night. Interviewees relayed finding it unacceptable and unsustainable to work with the offensive treatment in the long-term. Team members asserted that Chris' communication is most problematic with his Executive Assistants. SEcom has experienced significant turnover among Executive Assistants in the last 3 years. Separately, 4 female team members have left in the last 2 months.

Some referred to Chris as a "micro-manager," as being "too busy" to lead ILF effectively, stating that sometimes his email responses were delayed by 3 days. Others said "he has not worked in a professional corporate environment" implying that he didn't understand the respect and civility expected in a corporate work environment. Email communication between Chris and a staff member was described as "it was aggression meeting aggression." In another statement, it was said "he has never respected" a particular employee. Male employees didn't report receiving such treatment.

It was also mentioned that jokes of a sexual nature had been heard in the workplace as well as commentary on employee appearance.

SE_50406



*Transformative Human Resources Solutions and Management Consulting*

PAGE 7

Dave and Ali, videography vendors to SEcom, were mentioned as being involved in conflict and communicating with staff in disrespectful ways. They are seen as friends of Chris (FOC) that weren't held accountable to meeting deadlines. Staff expressed that, in their perception, Chris supported Dave and Ali and did not offer support to staff when staff raised issues about Dave's and Ali's disrespectful communication and failures to deliver. In a similar vein, it was said that "Chris would call (his Executive Assistants) out in front of clients" via email. These are examples of employees feeling unsupported by leadership.

**Recommendations:**
1. Be aware that these staff perceptions could lead to allegations of hostile work environment and harassment, which could have a significant negative impact on the company, its ability to survive, attract new employees, clients, and vendors.
2. Communicate to the organizations the results of this report and intended action items to address the improvement areas. This could be done in a chart format: with a column about the finding from the report and another column indicating the intended action item
3. We recommend Chris implement behavioral changes reflecting a significant break from past behavior. When under stress, refrain from speaking critically to staff, take time to provide balanced feedback. It is important to praise in public, criticize in private - choosing the appropriate time and place to offer critique. Pay special attention to written communication. Consider using a tool like the Grammarly app, especially its function to help with tone of email communication. Double check all e-mail or written communications, looking for triggers that could offend. It might be helpful to have someone edit/filter communications at least for a while. Try to avoid after hours e-mails except when critical.
4. Chris may find it helpful to hire the services of an executive coach with whom to develop an ongoing relationship to discuss the development of new skills, implementation of action plans, and the progress of behavioral modifications.
5. Evaluate Chris' involvement in projects. Prioritize. Withdraw from unnecessary commitments. Delegate to his direct reports tasks of communicating with staff about those projects. By doing this, Chris would empower his people managers to be responsible for that communication and Chris can focus on managing managers rather than staff. This would have the impact of reducing Chris' workload, making it more manageable, and minimize direct contact with employees who report to senior leaders.
6. Agree among the leadership team to focus messages in the following way: (a) Chris to share messages of strategic, high-level nature, (b) people managers to communicate to employees "what does it mean for you?" messages that are more tactical in nature. The leadership team may find it helpful to have change management communications training to get clear on this.
7. Communicate renewed commitment to adhering to healthy policies of respect at work, including a clear statement about acceptable/unacceptable communications in the work environment.
8. Set expectations of respectful treatment across the organizations, including vendors. Hold all accountable.

### HUMAN RESOURCES, HIRING, FEEDBACK, STANDARD PROCESSES & TRAINING

Both SEcom and ILF have never had someone in an official HR role. Missing is someone who is seen as an independent HR person who advises leadership, advocates for employees, handles

SE_50407



*Transformative Human Resources Solutions and Management Consulting*

PAGE 8

employee relations, facilitates conflict resolution or advises on progressive discipline. SEcom's and ILF's Chief Operating Officers (COOs) to a certain extent have played an HR role, however, staff members have expressed reluctance to go to either one.  It would be best to have an independent HR consultant available to handle a range of employee relations matters.

This is supported by a comment on the survey:

- "Need for a source we can go to voice concerns that isn't direct management." – SEcom employee

Some expressed optimism about the recent HR consultant hired. Others expressed seeing the external HR consultant as a coach to leadership versus a resource to staff.

Staff describes themselves as either being a "friend of Chris" (FOC) or not, based on the relationship they had with Chris prior to volunteering or being employed by the organizations. Non-FOC staff described themselves as such and, to a certain extent, implied that they were at a disadvantage compared to those who were FOC prior to becoming employees. We observe sub-groups at the organization along these lines. Non-FOCs are most impacted by negative communication from Chris, while FOCs did not report negative interactions with Chris.

It seems to us that the FOC/non-FOC distinction among staff has led to what is called "fault lines" in management theory.  It is acknowledged that "fault lines" are bound to appear in human groups.  However, when an "us versus them" mentality shows up, it can result in conflict impacting team dynamics.

In our interviews, one of the interviewees expressed concern about the organization's ability to survive financially. This sentiment is likely known and shared by others across the organization.

It was said that DISC profiles are used to inform hiring decisions. While the DISC profile may be helpful and often used as part of the hiring and onboarding process, their use is not recommended for pre-employment screening.  It was said that many Cs are hired for executive assistants.  Given the turnover among executive assistants in recent years, it was asked whether hiring Cs is working for the organization.

It was mentioned that training is limited at SEcom and that high expectations are placed on team members who haven't had proper training.

**Recommendations:**
1. It is important for Chris and his people managers to demonstrate stress tolerance when staff makes mistakes, and communicate feedback in a compassionate way in order to make it a learning moment.  Some situations could also be prevented by providing more upfront guidance to employees.  As people leaders, it will be important to ensure self-care that enhances the ability to deal with stress on the job.  Specific behavioral changes may include:  avoid providing feedback when tired or when it is late at night. We also recommend that Chris delegate feedback and performance management conversations to his people leaders.

SE_50408



*Transformative Human Resources Solutions and Management Consulting*

2. The book "Discipline without Punishment" by author Dick Grote can serve as a resource to Chris and people managers. The leadership team may find it helpful to have training on the topics of effective delegation, delivering feedback and having performance conversations.

3. Discuss company's financial concerns openly with staff and seek to rally staff behind the organization, encouraging them to generate and express ideas, listening to their ideas and incorporating them into company plans.

4. Provide leadership development training to senior and mid-level leaders and people managers.

5. Retain a part-time Human Resources professional or service. They could be assigned to (a) review and update company policies about harassment and hostile work environment, (b) review use of DISC and hiring effectiveness and turnover of administrative staff, (c) ensure standard background check and assessment procedures are followed for all employees, (d) establish HR processes such as onboarding, new hire training, company policies such as sick time, etc. (For example, it was requested on the survey to provide clear guidance on sick days for part time employees.)

6. In order to address "fault lines," Chris could ensure that similar opportunities to socialize and have access to him are made available to all staff.

7. Conduct a learning needs analysis to ascertain what staff wants and needs to know. Follow up the learning needs analysis by providing training as necessary.

8. Provide victim awareness training regarding child abuse, victim advocacy training to ILF senior leadership, staff, volunteers.

Recommendation #8 is supported by several, including comments on the survey:

- "One recommendation would be trauma/sensitivity training for the team (employees and management)." Similarly, another ILF employee suggested "Annually required victim advocacy training for the board of directors and all employees."

### GROUPTHINK

Messaging from the top is widely accepted throughout the organization, leading to groupthink. We heard employees repeating themes about the reasons why women at the organization are not holding leadership positions ("women have not advanced to leadership because they work part-time"), on what basis are hiring decisions made ("we hire the most qualified people"), and opinions about the diversity of the industry ("there are no people of color in the industry").

**Recommendations:**

1. We recommend unconscious bias training for all staff to build awareness of the biases that may be impacting the organization.

2. We recommend SEcom and ILF management interact with staff and volunteers openly and directly, encouraging and requesting them to express contrary viewpoints. This can be an important first step towards creating psychological safety, that is, the belief that you won't be punished or humiliated for speaking up with ideas, questions, concerns, or mistakes.

SE_50409



*Transformative Human Resources Solutions and Management Consulting*

PAGE 10

### DIVERSITY, EQUITY, AND INCLUSION

There is limited diversity at SEcom. There are no persons of color on ILF's board, although Chris mentioned that a new board member who is Black is expected to join soon. It was pointed out by staff that no board members bring a background of being victims of abuse or somehow represent the victims that the Foundation advocates for. DEI is a significant area of opportunity.

Some comments from the survey were:

- "The company is so white, and management is all men. I have also only seen 1 queer person employed here since I started." – SEcom employee
- "I feel that having more women on the board would be excellent for our diversity and direction." – ILF employee
- "My perception as an outsider is that there is a need for representation from more underrepresented groups (race, nationality, and ethnicity type demographics rather than gender related demographics) on both teams. However, I trust that both organizations are selecting the right skills for the job and would advocate for the importance of skills over diversity metrics." – ILF volunteer

A recommendation made on the survey was:

- "Explore participation in groups like women in tech, black professionals networking groups, etc. Anything to help bring in diversity and share the mission." – ILF volunteer

In our session about preliminary findings with Chris, Chris mentioned that the current headhunter "only brings white candidates." When asked about diverse representation at the company, staff repeatedly said "we hire the most qualified people," which could indicate a widespread underlying bias that people of color are not likely to be qualified candidates. Published books on diversity, equity, and inclusion have made a link between the thought  See appendix section of this document for business case for diversity, equity, inclusion. (DEI).

**Recommendations:**

1. Ensure engagement with a headhunter adept in finding diverse talent. Request and hold headhunter accountable to present a slate of diverse candidates for open positions.
2. Seek and attract Board members that could reflect the experience, appearance, and views of victims at ILF or the prospective and current client demographics.
3. The organization has an opportunity to create a culture that values diversity and that recognizes that diversity goes beyond gender to include age, race, ethnicity, religion, disability, sexual orientation, education, and national origin.
4. Be aware that increasing diversity at the company will require additional work to be done. You will want to pay attention to organizational culture and how it needs to be tweaked in order to create a welcoming environment.
5. Leveraging its reputation and standing as an organization that has provided inclusion opportunities for women, SEcom could establish a program to attract more diversity to the industry.

SE_50410



*Transformative Human Resources Solutions and Management Consulting*

PAGE 11

**Additional resource:** McKinsey & Company's articles on how to build an inclusive workplace may be insightful for Social-Engineer and ILF Foundation staff and leadership to more deeply immerse in DEI – Inclusion doesn't happen by accident. Inclusive workplaces focus on management practices that matter.

https://www.mckinsey.com/featured-insights/themes/how-to-build-an-inclusive-workplace

### WEAK GOVERNANCE, SLOW CRISIS MANAGEMENT

Perceptions of weak governance at ILF were shared with us, pointing at FOC Robin, Tim, and Neil, all 3 white males somewhat active on ILF's Board. On the other hand, a female Board member has been inactive, participating in only 1 of the last 8 quarterly or emergency Board calls. A Black executive is set to join the Board soon, but it is likely that staff's concerns that the Board has no representation of abuse victims will continue. With most abuse victims being female, staff and volunteers would like to see more females on ILF's Board.

ILF's Board was seen as taking too long to respond to DEF CON's ban and public shaming. Chris was perceived as not taking attorney and staff advice, whereas the response should have been faster and to the point.

This point showed up on the survey, with a recommendation to create:

- "A strong plan of action for future crisis scenarios that will allow us to issue a response within 1 business day" – ILF employee

Chris currently occupies 2 roles at ILF, CEO and Board member. Chris is potentially pulled in too many different directions - speaking, publishing, teaching, training, "head of state" (face of the company), but recent reputation issues present a distraction, stalling donors and sponsors.

**Recommendations:**

1. Evaluate Board roles and how roles and responsibilities can be assigned resulting in a stronger governance, delegation, and empowerment at ILF. Options include separating the CEO and Board member roles (i.e., Chris choosing one or the other, but avoiding holding both.
2. Seek Board members who bring experience in ILF's field of work, persons of color and women representation on the Board

### CHALLENGES OF OPERATING AS A REMOTE TEAM

Virtual office is a challenge with staff dispersed, although both organizational cultures are described as friendly, "like family," open and fun.

**Recommendations:**

1. The teams could benefit from training on how to work together effectively in a remote environment.

SE_50411



*Transformative Human Resources Solutions and Management Consulting*

## APPENDIX

### PROJECT TEAM BIOS

#### PROJECT LEAD CONSULTANT -- MURIEL R. WATKINS, MSILR



Muriel is Founder & President of MRW Consulting Group International, LLC, an HR consulting organization dedicated to capability building with corporate and private foundations, government, educational and nonprofit institutions. She has 20+ years of experience as a corporate executive, consultant and leadership advisor. The consistent theme in her work is building strong leaders and more capable organizations through practical solutions. A former C-Suite executive, she understands the issues and business challenges facing senior leaders. Her focus is on facilitating transformative change, collaborating to create solutions that are effective and practical to implement given the complex, dynamic nature of organizations today.

Prior to MRW Consulting, she was HR VP of The New York Times Media Group, where she was responsible for driving organizational change initiatives, including print/digital integration, increasing workforce diversity within middle/senior leader ranks, and directing workforce restructurings. For New York Times Digital, a start-up internet venture, she designed the HR infrastructure to support rapid growth, including recruitment and talent selection, designing competitive compensation and total rewards programs and launching retention strategies to engage a highly mobile workforce. Prior to The New York Times, Muriel held senior HR roles with Reader's Digest, Avon Products and Drexel Burnham Lambert. Leaving the corporate environment to offer her expertise within the realm of human capital consulting, she brings a unique blend of experience as an internal practitioner and leader to a diverse collection of clients.

Muriel holds an M.S. in HR management, industrial and labor relations from Baruch College/Cornell University. She founded HR Professionals Network, is a member of Executive Leadership Council, member of Human Capital Media Network and a Partner in Education for NYC Department of Education. Muriel is a certified coach, qualified to interpret various assessment instruments, including Myers Briggs®, FIRO™ and FIRO-B®, CPI 260®, Strong Interest Inventory®, TKI Conflict Mode assessments and Neethling Brain Instrument™.

Muriel has worked internationally. She conducted a "Women in Leadership" program for high-potential female leaders in Morocco. She designed and delivered a senior leader program for a microbank in Papua New Guinea. She collaborated with Women's World Banking to design the kick-off of its inaugural "Leadership and Diversity for Innovation Program", an initiative targeting senior leaders from 14 women-focused global financial institutions. Muriel also conducted a gender and HR organizational assessment for Lead Foundation, a microfinance institution based in Egypt.

SE_50412

**MRW Consulting Group International, LLC**

*Transformative Human Resources Solutions and Management Consulting*

PAGE 13

## SENIOR PROJECT CONSULTANT – LANCE M. GOULBOURNE

Lance is Co-Founder and Vice President/Partner of MRW Consulting Group International. He has over twenty years of experience in executive recruitment, recruitment research, organizational assessments, competitive intelligence and business development in the United States and Australia. He brings a particular expertise in diversity recruitment and retention strategies.

Prior to co-founding MRW Consulting Group International, Lance was both the Founder & the President of Milo Research, a retainer-based search firm. He has built his career working with organizations within the for-profit and not-for-profit sectors, across multiple industries, including health and social services, consumer products, financial services, publishing and education. Additionally, he has provided career transition coaching to individuals and support to organizations during workforce restructurings.

Lance has a proven track record conducting retained searches, recruitment research, providing competitive intelligence and developing new business opportunities, working with organizations in various industries. He has successfully placed candidates across a broad range of levels, from C-suite executives to middle management levels. Lance has conducted executive search and recruitment research for numerous organizations such as Services for the UnderServed, VillageCare of New York, American Federation of Teachers, Consumer Reports, Time Inc., The New York Times Company, Colgate-Palmolive, Scholastic Inc., New York District Council of Carpenters and, Mystic Seaport Museum.

Additionally, Lance has conducted numerous organizational assessments for clients. Most recently, he conducted an organizational assessment for a managed care organization dealing with significant industry transformation; conducted in-depth internal interviews and external benchmarking regarding organizational design and structure, reviewed job descriptions and functional interrelationships and interdependencies, developed a set of recommendations and an implementation plan for organizational changes.

Lance is a graduate of the University of Michigan. He is certified to use the Neethling Brain Instrument™ assessment and uses it in one-on-one coaching with clients. He is also certified in Team Diagnostic Survey and uses this in work with leadership teams.

SE_50413



*Transformative Human Resources Solutions and Management Consulting*

## SENIOR PROJECT CONSULTANT – CHUCK M. PECK, MBA



Charles (Chuck) is a Senior Consultant with MRW Consulting Group International, LLC. He specializes in Management Consulting, Organizational Development, Education & Training for global clients.

Chuck has had a distinguished career that includes significant operational experience in technology businesses as the CEO of two global public companies, one that had a record-setting IPO. He has also served as President and SVP of two Private Equity companies and as COO for AICPA (American Institute of Certified Public Accountants). While consulting at Booz Allen & Hamilton, he worked on engagements in auto, tech and manufacturing industries, but was also responsible for Professional Development in their Commercial sector that included Europe.

Chuck's career in organizational consulting, training and facilitation began with Xerox Learning Systems. Chuck then served as a Corporate International Director of Organizational Development for Levi Strauss where he implemented a broad range of programs and HR talent management systems. He later served as a Director of the Pepsi Cola Management Institute (PCMI), a profit center to franchise bottlers.

As an external senior consultant, his assignments have been with leading brand marketers, technology, financial & legal services, education & training industries. He has also been involved with facilitating executives involved with a variety of human, technical, and financial issues in mergers, divestitures, restructurings and turnarounds.

Chuck also has specialized expertise in implementing organizational succession, replacement & developmental programs, and is a certified master facilitator in programs on Problem Solving and Decision Making, Strategy Formulation, Front Line Supervision, Customer Focus, Building High Performance Teams, and many other programs.

Chuck received his MBA in Finance and BS in Economics from the State University at Albany and is a former U.S. Marine.

SE_50414

MRW **C**onsulting Group
International, LLC

*Transformative Human Resources Solutions and Management Consulting*

PAGE 15

## SENIOR PROJECT CONSULTANT - CARMEN L. BONILLA

Carmen L Bonilla is a Senior Consultant with MRW Consulting Group International, LLC. She specializes in Leadership Development, Executive Coaching, and Organizational Development.

She is a former Assistant Professor of Management and Business Strategy at Rutgers Business School, part of the state university of New Jersey.

Carmen brings 20 years of corporate experience through which she led operations teams to elevate productivity, client teams to service corporate clients, and global teams to deliver business and technology projects of impact to the business. She is also experienced at building and delivering learning and development programs in corporate settings.

As a consultant, she brings an ability to quickly identify business challenges and recommend solutions. As a facilitator, Carmen teaches topics such as building high performing teams, coaching skills for managers, leading and engaging staff, managing change in the workplace, communicating in a diverse environment, retaining and developing diverse talent, and others.

Carmen is an Organization Development Certified Professional, Prosci Change Management Practitioner, Coach by the Hendricks Institute, and past holder of the Project Management Professional designation.

She holds a Magna Cum Laude bachelor degree in organizational studies from University of Puerto Rico in Mayaguez where she earned the Faculty's Award to its Most Outstanding Student and an MBA in General Management from New York University, Stern School of Business.

SE_50415



*Transformative Human Resources Solutions and Management Consulting*

PAGE 16

## PROJECT RESEARCH ASSOCIATE – NATALIA PARDO



Natalia Pardo's experience includes as Program Coordinator at The Global Impact Investing Network and a consultancy at the United Nations Development Programme.

At the Regional Bureau for Latin America and the Caribbean, she contributed to a qualitative analysis project with the end product of a regional report on the perception of progress.  Natalia has additional experience in a diverse range of non-profit and for-profit organizations in the U.S and abroad:  American Federation of Labor and Congress of Industrial Organizations (AFL-CIO), NYC Department of Citywide Administrative Services (DCAS) and Mensajeros de la Paz in Buenos Aires, Argentina.

Natalia has a Master's in Development Studies from the Graduate Institute of International and Development Studies and received a Bachelor of Arts in Human Rights and Modern Languages and Culture from Baruch College.

As a certified student trainer in Atlas.ti, she has mastered the use of this software while training others.

She is fluent in Spanish with knowledge in French, Italian and Mandarin.

SE_50416



*Transformative Human Resources Solutions and Management Consulting*

## SEcom-ILF Interview Guide

<u>Reminder to interviewees:</u> All answers shared will remain confidential. Summarized findings, conclusions and recommendations to be made.

<u>Objectives of Interview:</u>
- Gain a deeper understanding of Social Engineer Diversity, Equity and Inclusiveness organizational readiness, including gender, tone-at-the-top and supporting culture between, staff and partners.
- Explore attitudes and beliefs, including unconscious biases, impacting the employee experience and engagement.
- Identify the barriers to how SE may become a more DEI inclusive team, culture with strategy to recruit, retain and develop a more representative staff of persons of color.
- Identification of critical issues, unmet needs or opportunities.

<u>Role clarification:</u>
- What is your role and function in the SE/ILF org?
- How long have you been with SE/ILF in what capacities?
- Prior background, how you came to SE/ILF, what attracted you here? Is it what you expected or different and how different?

<u>Background:</u>
- How does SE/ILF define diversity?
- How would you describe the culture of SE/ILF? Is it inclusive?
- What has led to the current SE/ILF demographics? (i.e., mostly white staff, 70% are women with no women in leadership).
- Have you had any DEI awareness, skill, knowledge or policies training? Was it effective, reinforced in any way?
- Is the "tone-at-the-top" supportive of diversity, equity and inclusion?
- Are there specific and/or unique challenges for women in the organization?
- Why do you think DEF CON banned SE/ILF from attending your largest annual conference? (Did this impact ILF?) Justified? What precipitated this?
- Does SE/ILF run into the employee who set up a competing org.?
- What would you like to see changed?
- What benefits might that bring to SE/ILF?
- What metrics are used to measure success at SE/ILF? Are goals and objectives set and measured fairly? Do measurements include DEI goals?
- What has led employees to leave the organization in recent years?



*Transformative Human Resources Solutions and Management Consulting*

PAGE 18

Mission & top Goals of Social-Engineer:
- What is the mission & top Goals of SE/ILF; are they known and shared?
- Are SE/ILF values aligned with Diversity, Equity and Inclusiveness or lip service?
- What are the critical success factors/threats/risks etc. & potential problems/obstacles in excelling?

How Does Social-Engineer Operate? How is it structured?
- Is there a strategic and/or operating plan and does it include DEI goals?
- Are there incentives for meeting DEI goals, if set?
- Are functions operated with the right people? Do they have the skills, knowledge and resources to do their jobs? Are development needs known, supported and planned for staff?
- How would you describe the tone-at-the-top, support and commitment to DEI?  Gender diversity?
- What diversity is included with client facing teams and is input from staff, including women and persons of color, invited and valued?

Culture:
- What are the things that make you or others here want, or not want, to achieve your goals? Pay, benefits, culture/climate, work, teamwork etc.
- Are team meetings held? Effective? Inclusive?
- Have employee and/or client surveys been conducted and findings conveyed to staff with plans to remedy shortcomings?
- Has recruiting been effective in getting the right talent with a more diverse and inclusive culture? If not, why not?
- How would you describe performance management practices or lack thereof, including training & development, diversity & inclusion initiatives, progressive discipline practices and how performance issues dealt with.
- How are problems solved, conflicts managed?
- Has SE been training the right people to do the right things? Has training been effective, sufficient, helpful etc.
- What are the norms of behavior here?

Critical Issues/Concerns/Success Factors:
- How could SE/ILF be more effective? Where might SE/ILF improve?
- What can SE/ILF do to introduce more diversity into leadership roles?  Women?  People of Color?
- Anything else?

SE_50418


**MRW Consulting Group International, LLC**

*Transformative Human Resources Solutions and Management Consulting*

PAGE 19

*Created October, 2020*

## MRW Consulting Group International DEI Collective Business Case©

### The Business Case for DEI includes but is not limited to:

- **Improved Profitability:** Affect greater racial, cultural, ethnic, equality & inclusion diversity where earnings and profitability among top-quartile companies outperform less diverse companies/organizations. McKinsey, "Diversity Wins."

- **Reduced Economic/Opportunity Losses:** Reverse a trend of US Economy losses of $16 Trillion over the last 20 years in discriminatory wage growth, education access (US ranks #1 in quality universities, but #91 in quality education), home ownership and minority owned business lending; instead achieve $5 Trillion in next 5 years in addressing such inequalities. Citicorp Research.

- **Positive Impact on Social Progress:** Reverse a devolving US social progress index where of 163 countries among 50 metrics of well-being the US was the worst among only three since the index began in 2011, despite the US immense wealth and military might the US slipped to #28 from #19 in 2011 when the Advisory Panel for Social Index, led by Michael Porter began.

*MRW Consulting Group International, LLC achieves results with a full range of services and products to assess readiness; measure attitudes; audit practices, policies and procedures; plan DEI strategic action plans; establish balanced leadership tone; drive cultural sensitivity and awareness trainings; create internal and external brand marketing and communications plans; and offering professional creative expression through award winning films and performers who produce and perform socially conscious, standard or customized music and artistic pieces to engage, raise awareness and calls to action.*

*Aspirational outcomes sought are helping build capabilities at leadership, management & individual levels with "high touch" customized solutions for a more diverse, collaborative, inclusive and productive culture that attracts and retains clients and internal talent to increase revenues, profit, market share & brand recognition.*

www.mrwconsulting.com



*Transformative Human Resources Solutions and Management Consulting*

## SEcom AND ILF SURVEY RESULTS

**Summarized reactions:**

Overall satisfaction in both organizations is good, slightly better for IFL than SECom. The overall mission and vision are clearer at IFL than SECom. However, only 47% feel management holds staff to consistent and fair standards. But, honesty, respect and civility are experienced among peers. Managers show a genuine interest in employee's well-being, encourage collaboration with interest in developing skills and knowledge to enhance performance.

- Board diversity recurring theme.
- White male management needs some female representation.
- Upper management "hijacked by emotions" and inappropriately take it out on subordinates.
- Chris delegate more and less involved in day-to-day.
- Increase input by staff in decision making.
- Need for independent outside representation than just management, as well as underrepresented groups as well as a board that represents the communities both organizations should represent.
- Clear senior unemotional calm direction is needed as too often expectations are not clearly defined.
- Better crisis management planning is needed with 1 day response time for the future.
- Written standard policies should be revisited that apply to all, such as sick time for part time staff.
- Trauma sensitivity training recommended, as well as victim advocacy for Board and staff.

Detailed survey results follow:
Part 1 – Social-Engineer, Part 2 – Innocent Lives Foundation

SE_50420

**MRW Consulting Group International, LLC**

*Transformative Human Resources Solutions and Management Consulting*

PAGE 21

## Part 1 - Social Engineer

The purpose of this survey was to gain a better understanding of staff perspectives and experiences related to working at Social Engineer.

### Demographics

15 employees responded to the survey.

- 5 serve in management positions 10 do not.
- 7 males and 8 females
- 3 have worked less than 1 year, 6 have worked 1-3 years, 3 have worked 3-5 years, and 4 have worked there more than 5 years

On a scale of 1-5, with 1 being low and 5 being high, how would you rate your overall satisfaction working at Social Engineer/Innocent Lives Foundation?



### Organizational Mission & Vision

To what extent do you agree with the following statements?

1. There is a clear organizational mission and vision.



2. There is an organizational commitment to diversity, equity, and inclusion.

SE_50421

MRW Consulting Group International, LLC

*Transformative Human Resources Solutions and Management Consulting*

PAGE 22



3.  There is a shared understanding or definition of diversity, equity, and inclusion.



**Culture and Growth**
To what extent do you agree with the following statements?

4.  My peers treat me with honesty, respect, and civility.



5.  My manager demonstrates respect toward me, even under situations of stress.

www.mrwconsulting.com

SE_50422



*Transformative Human Resources Solutions and Management Consulting*

PAGE 23



6.  Management shows a genuine interest in employees' wellbeing.



7.  My manager appreciates my contributions and talents.



8.  I feel safe and comfortable in raising my points of view at work.



SE_50423



*Transformative Human Resources Solutions and Management Consulting*

**PAGE 24**

9. This is a work environment in which I can see myself thriving.



10. I feel inspired to do my best at work.



11. Cooperation and collaboration among team members is encouraged.



12. Management holds everyone to consistent and fair standards.

SE_50424



*Transformative Human Resources Solutions and Management Consulting*

PAGE 25



13. I have a clear understanding of the results expected of me.



14. Employees are given opportunities to enhance their performance and develop their skills.



## Narrative Comments

Please share your top concerns about the culture and experience of working at Social Engineer/Innocent Lives Foundation.

- Work is feast or famine. In times of famine, we are expected to find things to do to fill our days, in times of feast we are expected to work longer to get everything done. Upper management tends to be hijacked by their emotions, and inappropriately take it out on personnel who are under them.
- Lack of communication and calm direction often leads to misunderstandings and hurt feelings.
- Lack of organization and structure.
- Chris' management skills and style are unacceptable in any business environment.

www.mrwconsulting.com

**MRW Consulting Group International, LLC**

*Transformative Human Resources Solutions and Management Consulting*

PAGE 26

- I feel that sometimes the intention behind a message/direction can be lost by how that message was communicated (rushed and/or direct).
- Management availability/attention is limited. Expectations are not clearly defined.
- Top concern is the long-term welfare of all the employees, since the announcement by DEF CON has impacted business.
- I have no internal concerns. My only concerns are how we are treated by the external community and potential clients.
- The company's statement "leave others feeling better." should be applied within the company, from the CEO down when communicating whether in email, message, or in-person.

## What are the areas that you feel are most important to address in terms of diversity, equity, and inclusion?
- We need diversity in management.
- To continue looking for a female social engineer who can be a leader (i.e., management, trainer, team lead, etc.) in this company.
- All individuals are treated in the same manner with regard to respect and expectation.
- Ensuring all voices are heard and respected specifically when the topic is related to their job responsibilities Taking the time to dress up direct requests
- Everyone needs to feel free to voice concerns and feelings
- The company is so white, and management is all men. I have also only seen 1 queer person employed here since I started.

## What ideas and recommendations do you have that, if implemented, you believe would result in positive and desired change?
- Clear guidance on sick days for part time employees
- The recommendations I had, were already implemented recently.
- More focus on the primary business. Regular meetings with staff to discuss direction and expectations. Decisions should be made with more input from staff where appropriate.
- Greater time and opportunity to be social as a group, not just a work meeting but a regular tea and chat meeting
- Always remembering to consider that when we are in a high-pressure situation, we must make an effort to ensure that the task/direction/message given will be read/interpreted/received in a positive way.
- Chris needs to be minimally involved in the minutiae of the company's workings.
- Better communication. To set clear tasks for employees and specific deadlines.
- Clear direction from management A source we can go to voice concerns that isn't direct management.
- Better communication
- Tasks completion instead of hours worked mindset Some anger management up at the top I have no idea how to diversify the staff, but there is something needed there.

SE_50426



*Transformative Human Resources Solutions and Management Consulting*

PAGE 27

## Part 2 -- Innocent Lives Foundation

The purpose of this survey was to gain a better understanding of staff perspectives and experiences related to working at the Innocent Lives Foundation.

### Demographics

27 individuals responded to the survey.

- 6 are employees, 20 volunteers and one board member.
- 3 of which serve in management positions.
- 17 males and 9 females
- 6 have worked less than 1 year, 17 have worked 1-3 years, and 4 have worked 3-5 years

On a scale of 1-5, with 1 being low and 5 being high, how would you rate your overall satisfaction working at Social Engineer/Innocent Lives Foundation?



### Organizational Mission & Vision

To what extent do you agree with the following statements?

15. There is a clear organizational mission and vision.



16. There is an organizational commitment to diversity, equity, and inclusion.

SE_50427



*Transformative Human Resources Solutions and Management Consulting*

PAGE 28



17. There is a shared understanding or definition of diversity, equity, and inclusion.



## Culture and Growth
To what extent do you agree with the following statements?

18. My peers treat me with honesty, respect, and civility.



19. My manager demonstrates respect toward me, even under situations of stress.

www.mrwconsulting.com



*Transformative Human Resources Solutions and Management Consulting*



20. Management shows a genuine interest in employees' wellbeing.



21. My manager appreciates my contributions and talents.



22. I feel safe and comfortable in raising my points of view at work.



SE_50429



*Transformative Human Resources Solutions and Management Consulting*

23. This is a work environment in which I can see myself thriving.



24. I feel inspired to do my best at work.



25. Cooperation and collaboration among team members is encouraged.



26. Management holds everyone to consistent and fair standards.

SE_50430

**MRW Consulting Group International, LLC**

*Transformative Human Resources Solutions and Management Consulting*

PAGE 31



27. I have a clear understanding of the results expected of me.



28. Employees are given opportunities to enhance their performance and develop their skills.



**Narrative Comments**

Please share your top concerns about the culture and experience of working at Social Engineer/Innocent Lives Foundation.

- The ILF has an incredible team of employees and volunteers who, often through great personal sacrifice, endeavor to advance the mission, capture predators, and save children without monetary compensation or public recognition. As a volunteer, we were told during onboarding that we may be released from service should any of our actions outside of the ILF reflect poorly on the organization as the mission is more important than any one person. I agree and everyone seemed to be on the same page when, prior to Chris's PR incident, he discussed internally that he would temporarily step down as CEO should the expected backlash impact the ILF. During the incident, as the ILF came under fire for not

SE_50431



*Transformative Human Resources Solutions and Management Consulting*

PAGE 32

only our association with Chris but also allowing him to use his position in the ILF as his vehicle to interact with the public, it become evident that Chris would not step down and that he deemed the impact to his personal reputation to be too great even if it would further drag the ILF into his personal affairs. When the question to have Chris temporarily step down as CEO was put to the board, they demonstrated to many that their loyalty was to their fellow board member and not the best interests of the organization. I work with an amazing team of people and know that our actions are having a positive impact on the lives of many children, but I fear the leadership of the organization is more caught up in the Cult of Personality of Chris and the needs and interests of the organization are second to it.

- ILF culture is very collaborative and supportive.
- *Poor and mixed communication between leadership and staff Lack of trauma informed response or any victim awareness amongst leadership*
- Ambassadors lack a clear leader, and the ambassador program needs a more organized and structured program with some sort of measured metrics for participants to remain ambassadors. People tend to sign up and then lose interested and still claim the title just for resume reasons. Ambassadors should be contributing to the mission or moving on.
- The preparation of incident management at ILF. Recent concerns were known they could arise and no prep work was done to ensure a statement was ready. We lost a lot of good volunteers who could not risk the negative image.
- None, other than the recent issues with social media, where the response could have been better, however that is known and addressed
- There is too much Grab Ass and not enough work
- *My concern only came up a few months ago when there was a clear change in the dynamics of the team.*
- *My primary concern is the volunteers losing faith in the leadership, mainly the board.*
- While I have not had any direct unpleasant dealings, I have heard from multiple peers about unfair treatment.
- Rogue posts on social media causing issues for the volunteers. Social engineer problems bleeding over into ILF.
- no major concerns at this time.
- *I think the culture of the ILF is very diverse. All inclusive. As of right now there are no concerns on my end.*
- I don't have any concerns about working the company, I enjoy the people, work and environment.
- I don't have time to be fully engaged on Slack and there's a lot of back and forth on there between volunteers and workers. My only concern is feeling out on the fringe of the group, but I could remedy that by making time to dive in more fully, it's just a bit overwhelming.
- I am concerned about the finances, what is the cost per case so high?
- My concerns before this event didn't exist. Now, I am concerned that there is potentially an environment with a few individuals that are challenged with sharing their observations constructively.
- *Some believe people come before the mission. I don't believe that to be true. If someone gets in the way of the mission, they're a threat to the organization. There is also a high turnover rate with volunteers, which I think is improving with our intake process. But more people leave on bad terms than I'd like.*
- The neutrality statement vs how we act on it is not always like for like. The statement



*Transformative Human Resources Solutions and Management Consulting*

seems to be based on or derived from a religious neutrality statement held to by some members of the founding party which holds inherent biases that can clash with activities for the betterment of the mission.

- *Even though we are recovering from a very challenging time due to the DEF CON announcement the culture has been fantastic, we work hard to keep it upbeat despite the nature of our work. We even have slack channels dedicated to fun things and many on the team associate outside of work. My greatest concern lies with employees, Samantha and Mandy and the ripple effect it can have on the volunteer base. They have both shown a remarkable lack of empathy and balance regarding Chris. They seem to have this idea that a good leader must be superman able to handle absolutely any crisis without being affected by human emotion. During this whole process, they were unhappy that Chris was not catering to their needs. With experience, they will become good leaders, but they need more time and a fundamental understanding of what it means to be a professional. Being highly talented in an area does not equal professionalism and reading books on leadership does not make you a leader.*

What are the areas that you feel are most important to address in terms of diversity, equity, and inclusion?

- Leadership needs to hold itself to the same principals and policies applied to everyone else regardless of title of C-level or Board Member. They need also to understand the difference between hearing their team and listening to their team.
- I can't speak to the employee or hiring practice, but volunteers from any path of life are welcome.
- The inclusion of women is strong within ILF but I'm not sure about SECOM as I have no involvement there. My perception as an outsider is that there is a need for representation from more underrepresented groups (race, nationality, and ethnicity type demographics rather than gender related demographics) on both teams. However, I trust that both organizations are selecting the right skills for the job and would advocate for the importance of skills over diversity metrics.
- This is not an issue - The ILF seems very "woke" maybe too much so IMHO
- *The board is the area that I feel could use the most diversity, equity and inclusion, as in increasing the board members.*
- *I feel that having more women on the board would be excellent for our diversity and direction.*
- ILF relies heavily on a single point of failure to succeed. The organization could grow exponentially with an expansion in leadership.
- Overall, the team seems pretty diverse and I have not noticed any issues with DEI
- *The ILF is pretty small when it comes to actually workers and board members. That makes it hard to be diverse. That being said most of them are white. Again, nothing wrong with that but I hope that as we grow we can gain some more diversity, especially from a board perspective. I don't even see that being a problem just a matter of time.*
- From my experience I have seen everyone invited, included and welcome.
- We have always been more focused on operations as a board rather than diversity. We have always been aware of it, but as volunteers with limited time we have tended to focus on mission and haven't necessarily tied the importance of diversity into the mission.
- *Board diversity. The board should reflect the community the organization should*

**MRW Consulting Group International, LLC**

*Transformative Human Resources Solutions and Management Consulting*

PAGE 34

represent, not just be friends with someone from the organization and preferably not related to infosec.

- Ensuring that members of the team are respected regardless of race, pronouns, etc. and that everyone is held to the same standards for base respect.
- *The ILF team is incredibly diverse. We have people from all walks of life and socioeconomic backgrounds. We have a high degree of neurodiversity. There is a wide range of religious thoughts, ages, and gender identities. I am looking forward to hearing others' thoughts on this question. The ILF is by far the most diverse team I have ever worked on.*

## What ideas and recommendations do you have that, if implemented, you believe would result in positive and desired change?

- Clear guidance on sick days for part time employees
- 1. Diversity of leadership. Currently, the board and C-levels were selected by Chris and have a personal affinity for Chris. We need leadership who prioritize the organization and its mission over any individual. 2. Written standard policy that applies to all levels equally. Written so that decisions are made systematically and without personal emotions.
- Explore participation in groups like women in tech, black professionals networking groups, etc. Anything to help bring in diversity and share the mission of ILF.
- *It would help to have a more diverse board. Not necessarily race/gender/religion, but perspective and background. Having someone on the board who will be active, passionate, and specializes in ethics. Alternatively, or additionally, someone who is a survivor or victims advocate. Succession planning and policy building so that ILF lives beyond any board member, leadership, or staff.*
- Advertise open positions in more countries and territories of the United States, if remote work is an option. Outsource some recruiting capabilities to a staffing company that is focused on DEI as a priority. Do the final interviews with the team that person would work with, then the manager and finally the CEO regardless of how "entry level" or "small" the role may seem to ensure that the candidate will be a company culture fit. Keep up the good work.
- Expand support to other communities outside of Cyber Security. Have an incident management plan. All actions of ILF are to support the mission of ILF - Social Engineering is a separate entity / company and should be treated like a separate entity. Social Engineering press should stay with Social Engineering and ILF Press stays with ILF Press.
- Implementation of the case management software More supervision More accountability
- *One recommendation would be trauma/sensitivity training for the team (employees and management). Another recommendation are policies (and they are being developed).*
- *1. A strong plan of action for future crisis scenarios that will allow us to issue a response within 1 business day. 2. More diversity on the board. 3. More board involvement*
- More empowerment for employees to be independent. Define a clear and actionable vision for fundraising. Utilize personnel resources to expand operational capability.
- Splitting the focus from Chris as the leader and single point of attack so the functionality of the entire ORG is not dependent on who is happy/mad at him
- I think it's a fantastic organization and a great cause and I don't have any need to change the great works they are doing at this time.
- To keep Slack less overwhelming, encouraging people to reply in threads instead of as a

SE_50434

MRW Consulting Group
International, LLC

*Transformative Human Resources Solutions and Management Consulting*

separate message would lessen the overwhelm.
- The ILF needs to be run more like a business and less like a club.
- Include diversity discussion in action items for each board meeting.
- *Annually required victim advocacy training for the board of directors and all employees.*
- Unbiased review of neutrality statement from an outside party. Written documentation on the handling and access of social media platforms, including posting, liking, etc. activities. Actively engaging with a diverse group of potential supporters.
- *Chris needs to consistently do small things to rebuild trust with some on the team. Nothing earth-shattering but small and consistent. Show up on time for meetings. Attend the weekly employee huddle as he promised. When communicating with individuals, do not multitask but give full attention. He has a tendency to want to solve the problem and move on to the next task, slowing down and thinking thru a decision to the outcome before acting would help. It would help a great deal if he took the time to engage with the team as a whole on slack. He typically uses it when HE needs something and then he is gone, relationships are a two-way street. Chris is VERY trusting and overshares with people who have not proven they are trustworthy enough to know sensitive information. He is also kind and forgiving, then doesn't understand when people aren't the same way as him. I would like to see Chris behave in a way that others feel heard (he is making great steps towards this BTW) - On the flip side, Samantha and Mandy need to learn to respect a leadership decision they do not agree with or have all the facts on (they are also showing improvement in this area). Erin, John Mitchell, and Cardell are excellent at expressing concern over a decision, then doing their best to support it, even if they don't fully understand or agree.*

SE_50435

# Exhibit 58

# PLACEHOLDER

This document was produced natively

SE_67966

| **From:** | Tracey McLaughlin[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=9C8398068CD446249212E0653A DF2149-TRACEY] |
|---|---|
| **Sent:** | Wed 3/9/2022 5:54:01 PM (UTC) |
| **To:** | Christopher Hadnagy[chris@social-engineer.com] |
| **Cc:** | Ryan MacDougall[ryan@social-engineer.com] |
| **Subject:** | RE: SECOM Culture |

A few things off the bat.
1. You sent this on International Women's Day lol.
2. You're assuming that, because Patricia said she talked to women, women are the only ones that feel that way.
3. The likelihood that women who feel they've been mistreated or abused telling the person they hold responsible how they feel?  Practically nil.

That being said, I've tried to be fairly upfront about how I've felt on occasion.  Your Hulk avi is 100% accurate – you are a great guy who would give someone the shirt off your back and a complete raging jerk in the same body.  When the bad side comes out, it absolutely qualifies as abusive in the business world.  As an employee, spending every day wondering which version of you will show up is the definition of a toxic environment.

A few suggestions:

  • Have the consultant talk to all of your staff, not just the women.  Even then, they may not feel safe talking freely so bear that in mind.
  • Also have the consultant talk to some former employees like Patricia, Susan, and Elsa if they're willing.
  • Hire an HR person!  They'll be more up-to-date on laws regarding employees and can likely save you from potential lawsuits and things like the Maxie situation.
  • I know it's hard for you, but try not to be so involved in the minutiae of the company.  It frustrates you and makes your staff feel undervalued since they have little autonomy.
  • You're not helping your case by calling Patricia out by name.  No one will be honest with you if they're afraid you're going to tell everyone not only what they said but who said it.


This may seem harsh, but you can't improve things if no one tells you the truth of what's going on.

Tracey McLaughlin
Department Assistant
Social-Engineer, LLC.
570.234.3734 ext 201
www.social-engineer.com

---

**From:** Christopher Hadnagy <chris@social-engineer.com>
**Sent:** Tuesday, March 8, 2022 5:30 PM

**To:** Rosa Rowles <rosa@social-engineer.com>; Shelby Dacko <shelby@social-engineer.com>; Amanda Marchuck <amanda@social-engineer.com>; Tracey McLaughlin <tracey@social-engineer.com>; Lauren Robinson <lauren@social-engineer.com>; Sammi Pena <sammi@social-engineer.com>
**Cc:** Ryan MacDougall <ryan@social-engineer.com>
**Subject:** SECOM Culture

Good evening ladies,

I need to ask a question. In her exit Patricia told Ryan that she had a few conversations with some of the women here and they used the phrase "toxic environment". As you know, we are trying our hardest to find and solve any problems in our company now as we are trying to get ready to grow. As we start to work with the consultant and make things better I wanted to ask – if any of you truly feel that, or said that can you please reach out to Ryan and I? We would love to talk, to hear from you why you feel that way, hear what we can do to improve, and find any solutions.

There is no way for us to improve if we don't ask. Please do not worry that we are angry, we aren't. We want to make this a fun, amazing place to work.  If you can please reply to this email, but just to Ryan and I.  We want to be open and listen.

Thank you all!


Christopher Hadnagy
Chief Human Hacker
Social-Engineer, LLC.
570.234.3734
www.social-engineer.com

Grab a copy of my new book *Human Hacking: Win Friends, Influence People, and Leave Them Better Off for Having Met You* HERE!

Have you seen my TedX Talk on how we are being hacked daily?
https://www.youtube.com/watch?v=9e6k_PtEXdM

# Exhibit 59

# PLACEHOLDER

This document was produced natively

SE_21610

| | |
|---|---|
| **From:** | Kazuyuki Nishi[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=52BB8789E90D4CB99328F911B 27CA31F-KAZ] |
| **Sent:** | Thur 12/10/2015 7:01:25 PM (UTC) |
| **To:** | Christopher Hadnagy[chris@social-engineer.com] |
| **Subject:** | Re: Chat room comments |

Chris,

Though we joke about it at times, all the asian comments that come through aren't the best. It would be a "human resources" issue in other companies. Not just that though, we have to remember we have a mix of people, which looks to keep growing. We have to get out of the "we're all friends" mindset.

Just so you know, Michele had a side bar with me. She told me, that sometimes she feels like name-calling back at people... And you wouldn't want that, she laughed.

I feel that some of the joking around is inappropriate in the work place. We don't have to be boring, but we need to be professional.

Thanks man.


Regards,


**Kazuyuki Nishi**
Chief Operations Officer
**SOCiAL-ENGiNEER, LLC**
570-234-3734
www.social-engineer.com


All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Your compliance is appreciated.


On Dec 10, 2015, at 1:56 PM, Christopher J. Hadnagy <chris@social-engineer.com> wrote:

Yes you do have that permission

What comments are you referring to

Christopher Hadnagy
Chief Human Hacker
Social-Engineer, Inc.
570.234.3734 ext 200
www.social-engineer.com

  All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.
  On 10 Dec 2015, at 11:49, Kazuyuki Nishi wrote:


        Hey Chris,

        I'm just checking to see if it is within my authority to bring some comments within the chatroom more
        in line for a business environment.

        I don't mind occasional jokes, and you know I have a good sense of humor, but some employees
        emotions can be hurt or at the very least uncomfortable by some comments.

        I wanted to speak to everyone one-on-one about this, but I needed to run it past you to make sure I
        wasn't stepping over my bounds in your company.

        Please, let me know.


        Regards,


        Kazuyuki Nishi
        Chief Operations Officer
        SOCiAL-ENGiNEER, LLC
        570-234-3734
        www.social-engineer.com <http://www.social-engineer.com/>


        All information transmitted hereby is intended only for the use of the addressee(s) named above and
        may contain confidential and privileged information.  Any unauthorized review, use, disclosure or
        distribution of confidential and privileged information is prohibited.  If the reader of this message is not
        the intended recipient(s) or the employee or agent responsible for delivering the message to the
        intended recipient, you are hereby notified that you must not read this transmission and that disclosure,
        copying, printing, distribution or use of any of the information contained in or attached to this
        transmission is STRICTLY PROHIBITED.  If you have received this transmission in error, please
        immediately notify the sender by return e-mail and delete the original transmission and its attachments
        without reading or saving in any manner. Your compliance is appreciated.