The Honorable Brian A. Tsuchida

1

2

3

4

5

6

7 UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
8 AT SEATTLE

9 CHRISTOPHER J. HADNAGY, an individual;
and SOCIAL-ENGINEER, LLC, a Pennsylvania
10 limited liability company,

                        Plaintiffs,

            v.

JEFF MOSS, an individual; DEF CON
COMMUNICATIONS, INC., a Washington
corporation; and DOES 1-10; and ROE
ENTITIES 1-10, inclusive,

                    Defendants.

NO.    2:23-cv-01932-BAT

PLAINTIFFS' RESPONSE TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

ORAL ARGUMENT REQUESTED

Noted for Consideration: March 21, 2025

## I.    INTRODUCTION

Defendant Def Con Communications ("Def Con") and Jeff Moss ("Moss," a.k.a. "The Dark Tangent") engaged in a coordinated campaign to spread defamatory statements and damage the reputation of Plaintiffs Christopher Hadnagy ("Hadnagy") and Social-Engineer, LLC ("Social-Engineer"). This campaign began with Def Con's February 9, 2022, public Transparency Report and continued well beyond that date. Defendants' motion ignores the full context and ongoing nature of its defamatory statements.

At the outset, Def Con did not merely ban Plaintiffs from its event—it publicly named and permanently banned Hadnagy and Social-Engineer. Def Con publicly stated that it imposed permanent bans only on "repeat offenders" who have committed "more egregious offenses" and pose an "ongoing risk to the community" to prevent them from "quietly find[ing] new and unsuspecting victims."

Under these criteria, Def Con publicly stated it had "received multiple Code of Conduct violations about Def Con Village Leader Chris Hadnagy of the SE Village. After conversations with the reporting parties and Chris, we are confident the severity of the transgressions merits a ban from Def Con." This level of punishment had until then been reserved exclusively for individuals accused of repeated sexual abuse. Predictably, there was an immediate assumption that Plaintiffs were banned for sexual misconduct, which Defendants knew:



However, instead of clarifying, Def Con then published an "update" claiming it had "spoken directly with Mr. Hadnagy about his violations of our Code of Conduct" and that he "confirmed his behavior and agreed to stop. Unfortunately the behavior did not stop." This Court previously noted the significance of Def Con's Update- "the plain implication" is "that Plaintiff Hadnagy confirmed and admitted to committing acts that were so egregious, he had to be banned from the Event for the rest of his life." *See* Dkt. 44 (Court's 3/28/24 Order), pg. 15:10-13. However, the facts demonstrate that Def Con never communicated with Hadnagy, let alone obtained any admission of egregious conduct warranting a lifetime ban. Any claim to the

PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT- 2
2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

1   contrary is a "transparent" attempt to rewrite history. These statements are materially false and,

2   standing alone, warrant denial of summary judgment.

3       Def Con continued to defame Hadnagy, as its Director of Sales and Sponsorship, Kevin

4   Sugihara ("Sugihara," a.k.a. "Sugitime"), publicly called Hadnagy the "industry's Weinstein."

5   Declaration of Christopher Hadnagy ("Hadnagy Decl.") ¶20 Ex. 3 (SE_000622). When posts

6   questioned Def Con's decision, Sugihara made his false statements even more explicit, stating:



**sugitime** · 2y ago

Yeah dude you sound like you're defending a serial sexual predator. It's a pretty bad look, just saying.

10   *Id*. Defendant Moss was fully aware of Sugihara's defamatory statements as "moderator"

11   of the social media site. In fact, he approved of it, as private Def Con Weekly Call

12   communications between Sugihara and Moss reveal Moss gave a "thumbs up" in response to

13   Sugihara's Weinstein comment. Conrad Decl. Ex. 2 (SE_000276).

14       Def Con's Transparency Report asserts that it received reports before February 9, 2022,

15   and spoke with the reporting parties. Yet, rather than providing contemporaneous evidence to

16   support these claims, Def Con now attempts to justify its actions through a post hoc investigation

17   and 'after-acquired' evidence—soliciting statements from disgruntled former Social-Engineer

18   employees and sifting through Hadnagy's decade-old emails and messages to retroactively

19   validate its statements. However, defamation law does not permit a 'shoot first, justify later'

20   approach. As explained below, this evidence must be disregarded, and even if considered, none

21   of it remotely justifies likening Hadnagy to Harvey Weinstein or labeling him a serial sexual

22   predator.

23       At its core, the evidence establishes that Defendants made multiple statements capable of

defamatory meaning: first, that Hadnagy was banned for sexual misconduct; and second, that he

PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT- 3
2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

admitted to the alleged misconduct, agreed to stop, and failed to do so. When viewed in the light most favorable to Plaintiffs, as required at this stage, the record reveals numerous material factual disputes—each of which must be resolved by a jury.

## II.    FACTS

### A.    DEF CON "The Hacking Conference," The Dark Tangent and his Goons.

Def Con, founded by Jeff Moss, is the world's largest security and hacking conference, held annually in Las Vegas. Hadnagy Decl. ¶6. The event is organized into specialized "villages," each focused on a distinct aspect of cybersecurity, hacking, or social engineering, and featuring discussions, hands-on challenges, and live demonstrations. Conrad Decl. Ex. 3 ("Moss Dep. Vol. I") 68:17-69:7; Hadnagy Decl. ¶10.

Def Con is widely recognized for its unique environment, which presents notable security risks—earning its reputation as hosting "the world's most hostile network." Hadnagy Decl. ¶11. The conference has also been historically known for its vibrant and, at times, notorious social events, including "epic parties." *Id.*; Conrad Decl. Ex. 5 ("Moss Dep. Vol. II") 276:23-18; Ex. 3 ("Moss Dep. Vol. I") 79:19-82:21; and Ex. 8 ("Hadnagy Dep.") 109:25-110:12; 192:18-23; Declaration of Ryan MacDougall ("MacDougall Decl.").

Def Con also fosters a culture in which individuals—including Def Con leadership and staff—frequently operate under their online "handles" rather than their real names. Hadnagy Decl. ¶7. This practice extends to Def Con's founder, Jeff Moss, a cybersecurity expert and hacker widely known by his alias, "The Dark Tangent." *Id.* Def Con embraced anonymity to such an extent that, until only a few years ago, attendees could purchase tickets exclusively with cash, leaving no digital trace of their participation. Hadnagy Decl. ¶8 The conference attracts upwards of 30,000 people in attendance with a ticket price of $460 in 2024. Hadnagy Decl. ¶6.

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

The organizations corporate structure is such that there are numerous internal "departments" that are run by various "department leads." Conrad Decl. Ex. 3 ("Moss Dep. Vol. I") 44:22-47:19, 51:23-25; and Ex. 6 (DEFCON00000785). Many department leads work year round preparing for the conference, attending  weekly calls, and are active participants in the community serving as the public face of Def Con in many ways. Hadnagy Decl. ¶12; Conrad Decl. Ex. 7 ("Wyler Dep.") 306:8-308:1; and Ex. 3 ("Moss Dep. Vol. I") 53:4-25. Some of Def Con's department leads, including Moss, routinely monitor social media, engage in online discussions and chat via their handles, give podcast interviews, and contribute to articles discussing security concerns and conference logistics. Hadnagy Decl. ¶12. Their presence is widely recognized, and within the community, their ranks, handles, and affiliations with Def Con are well known. Id.

**B.  Christopher Hadnagy, Innocent Lives Foundation,  and Social-Engineer LLC.**

Hadnagy is the founder and CEO of Social-Engineer, LLC and the Innocent Lives Foundation (ILF). Hadnagy Decl. ¶2. ILF is a nonprofit organization dedicated to identifying anonymous child predators through open-source intelligence, compiling conclusive reports, and providing them to law enforcement to aid in bringing predators to justice. *Id*.

Plaintiff Social-Engineer provides specialized security consulting services, assisting companies and government agencies in identifying vulnerabilities, assessing risks, and implementing security training and remediation measures. Hadnagy Decl. ¶3; Conrad Decl. Ex. 8 ("Hadnagy Dep.") 8:13-18. The company focuses on the human element of cybersecurity (or "social-engineering"), as threats often target employees rather than technical systems. Hadnagy Decl. ¶3. Social-Engineer is frequently hired to test corporate security by attempting to obtain sensitive information from employees. *Id*.

PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT- 5
2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

1    Social-Engineer also offers courses and seminars, that were designed in conjunction with

2  former FBI agents, on how attackers elicit private information in a non-threatening and

3  unassuming manner. Hadnagy Decl. ¶4. These courses have been taught to various entities,

4  including government entities. *Id*. Social-Engineer's training and strategies often extend beyond

5  conventional norms. Conrad Decl. Ex. 7 ("Wyler Dep.") 116:8-119:18.

6    Since 2010, Social-Engineer has operated a dedicated "village," known as the SE-

7  Village, at the Def Con Conference. Hadnagy Decl. ¶5. The SE-Village was one of the

8  conference's most popular attractions, offering specialized training and contests. *Id*. Prior to

9  2021, no complaints had ever been made against Hadnagy or the SE-Village that would have

10  warranted any action by Def Con. Conrad Decl. Ex. 3 ("Moss Dep. Vol. I") 125:11-15; and Ex. 8

11  ("Hadnagy Dep.") 109:25-110:12.

12  **C. Maxie Reynolds' turbulent employment and departure from Social-Engineer.**

13    Given the nature of Social-Engineer's work it hires people that are expert "social

14  engineers." Hadnagy Decl. ¶5. One such employee was Maxie Reynolds, who has described

15  herself as one of her generation's "most accomplished social engineers" and authored the book

16  "The Art of the Attack," discussing the critical skills used to "manipulate" people to obtain

17  information. Conrad Decl. Ex. 9 ("Reynolds Dep.") 193:1-10.

18    Reynolds was hired by Social-Engineer in January 2020. Conrad Decl. Ex. 10

19  (SE_001469). At the time of her hiring, and like every other Social-Engineer employee, she

20  signed an employment agreement and was familiar with its terms. Conrad Decl. Ex. 9

21  ("Reynolds Dep.") 198:7-199:1. The agreement explicitly prohibited her from performing other

22  work while employed at Social-Engineer and required her to return company equipment and data

23  upon termination of employment. Conrad Decl. Ex. 10 (SE_001469).

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

In August 2020, Reynolds specifically requested authorization to use her personal laptop for company business, offering:

> For as long as I work for SECOM, it is not considered my personal computer, and I forgo the option of using it as such. Do you wanna buy it from me for $1 with the caveat that I can buy it back in the event of termination?

Conrad Decl. Ex. 11 (SE_000348) and Ex. 9 ("Reynolds Dep.") 205:23-2. Social-Engineer accepted this arrangement. Conrad Decl. Ex. 8 ("Hadnagy Dep.") 196:7-25. Reynolds then downloaded Social-Engineer's software and agreed that "the device would be managed and monitored like every other corporate device in use for business purposes." MacDougall Decl.; Conrad Decl. Ex. 9 ("Reynolds Dep.") 206:20-23.

In May 2021, Social-Engineer discovered that Reynolds had violated her employment agreement by engaging in outside business activities- a contract for a potential TV series involving social engineering- while working for Social-Engineer—even using her Social-Engineer email account to exchange and sign contracts with other companies. Conrad Decl. Ex. 12 (Plaintiffs' Ex. 15 of "Reynolds Dep.") and Ex. 13 (Plaintiffs' Ex. 17 of "Reynolds Dep."). While under oath, Reynolds initially denied doing this until being confronted with her own emails. Conrad Decl. Ex. 9 ("Reynolds Dep.") 208:20-22; 209:18-19.

When Social-Engineer discovered Reynolds was engaging in other work, her engagement with Social-Engineer began to deteriorate. Approximately two weeks after the discovery, she took a "short-term disability" leave of absence, she then claimed she was traveling to Scotland to visit her father, representing— "I leave LATE tomorrow" — a trip she never took. Conrad Decl. Ex. 9 ("Reynolds Dep.") 226:9-18; 231:16-238:25. On August 5, 2021, Reynolds then submitted her resignation via email, stating:

> So, with sadness, this is my official resignation. **I will miss working with you, and I will deeply miss the whole SE team.**

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

Conrad Decl. Ex. 14 (SE_000402) (emphasis added); MacDougall Decl.

Pursuant to her employment agreement, Reynolds was instructed to return all company equipment, including the computer she had been using, so that it could be wiped clean and returned to her as originally agreed upon. Conrad Decl. Ex. 15 (Plaintiffs' Ex. 23 of "Reynolds Dep.") and Ex. 8 ("Hadnagy Dep.") 119:7-121:18. This was essential because the installed software, Microsoft Intune, lacked the capability to remotely wipe iOS devices and could only lock them. MacDougall Decl.

Up until that point, Hadnagy had been assisting Reynolds in publishing her book. Conrad Decl. Ex. 8 Hadnagy Dep. 119:7-121:18. He discovered that the book contained unauthorized photographs from an ILF operation. *Id*. Additionally, Social-Engineer determined that, during her employment, Reynolds had been attempting to divert company business to competitors. *Id*. In light of these findings, Hadnagy notified the publisher of the unauthorized photographs, withdrew his support for the book, and rescinded his endorsements of multiple podcasts he had arranged for Reynolds on behalf of Social-Engineer. *Id*.

### D.  Neil Wyler (AKA "Grifter") acted as a "mediator" between Reynolds and Hadnagy.

In late August and September 2021, Reynolds, upset with Social-Engineer's actions, reached out to Neil Wyler (A.K.A. "Grifter") due to his "personal relationship with Chris," rather than any affiliation with Def Con. Conrad Decl. Ex. 9 ("Reynolds Dep.") 77:14-78:11. At the time, Wyler acknowledged that he was acting as a "mediator" between Reynolds and Hadnagy. Conrad Decl. Ex. 16 (SE_000127 and SE_000132). He engaged in discussions with both parties in an effort to resolve their dispute, and at one point, it appeared that an amicable resolution was possible—described as an opportunity to "put everything to bed." *Id*.

PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT- 8
2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

However, Reynolds subsequently refused to return the laptop she had used for company business, despite Social-Engineer's repeated requests to wipe and return it in accordance with her employment agreement. Conrad Decl. Ex. 8 ("Hadnagy Dep.") 119:7-121:18. At one point, Reynolds claimed to have already sent it back, stating, "I have already sent the computer to you (sent on Saturday) but don't have the number with me." Conrad Decl. Ex. 15 (Plaintiffs' Ex. 23 of "Reynolds Dep."). However, the device never arrived. MacDougall Decl. After several unsuccessful attempts to recover the laptop, Social-Engineer was ultimately forced to issue a remote lock. *Id.*

As the dispute continued, Wyler, Hadnagy, and Reynolds engaged in further discussions surrounding these escalated events. Conrad Decl. Ex. 16 (SE 122-126). During these conversations, Hadnagy repeatedly emphasized the seriousness of Reynolds' actions and explained the reasons for Social-Engineer's response. *Id.*; Ex. 8 ("Hadnagy Dep.") 189:1-190:2. At no point did Hadnagy admit to any behavior that would violate Def Con's Code of Conduct, let alone any behavior that could endanger the Def Con community. ("Hadnagy Dep.") 189:1-190:2;195:14-199:1. Moreover, during these conversations, Wyler never specifically raised any other complaints with Hadnagy nor requested any supporting documentation regarding such matters. *Id.*; Conrad Decl. Ex. 3 ("Moss Dep. Vol. I") 219:7-21.

Despite his involvement, Wyler himself expressed uncertainty about his role in the situation, stating, "I don't know how I became the mediator either. But I think I'm going to call it good and step away from this." Conrad Decl. Ex. 16 (SE_000127). Wyler also claims he cautioned Hadnagy, stating, "You are a 50-year-old man who, you know, is six-foot plus, 270 pounds. And she is a 30-year-old girl who looks like she stepped out of a magazine. You're going to lose." Conrad Decl. Ex. 7 ("Wyler Dep.") 64:18-23.

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

Then, on September 2, 2021, Reynolds sent an email to Def Con alleging misconduct involving other ex-employees of Social Engineer and claiming to have a list of some 15 individuals willing to come forward. Conrad Decl. Ex. 17 (DEFCON0000160 – Plaintiffs' Exhibit 22 of "Reynolds Dep."). Notably, Def Con's Director of Sales and Sponsorship, Kevin Sugihara—who also falsely stated that Hadnagy was a "serial sexual predator"—responded to this email on behalf of Def Con, stating, "We take situations such as you described incredibly seriously." *Id*.

**E. There are a multitude of material factual issues regarding Def Con's supposed "phone call" and the information Def Con knew prior to the ban announcement.**

Def Con asserts that it held a Zoom call with approximately 15 people on September 7, 2021, prior to announcing Hadnagy's ban.[1] However, Moss testified that no Zoom call took place. Instead, he stated:

> Q· So it was a phone call, not a Zoom call?
> A· Correct.
> Q· And how was the phone number for the dial-in account given to the people that were supposed to dial in?
> A· It was given to Maxie.
> …
> Q  And the dial – in number, you believe that this was given to Maxie in written form?
> A  In a text message. I mean it had to have been copy and pasted.

Conrad Decl. Ex. 3 ("Moss Dep. Vol. I") 140:18-22; 141:7-10.

Moss further confirmed:

> Q. Out of DEF CON's employees, including yourself, who would be most knowledgeable about the reports of code of conduct violations related to Chris Hadnagy?
> A. It would be me.

---

[1] Defendants Joint Report to the Court alleges- "half a dozen."

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

1    Conrad Decl. Ex. 5 ("Moss Dep. Vol. II") 260:20-261:8. Yet, the only dial-in number produced

2    by Def Con is dated March 5, 2022—nearly a month after the ban announcement.



Conrad Decl. Ex. 4 (DEFCON00000176). Moss further admitted:

> Q. So this phone call that was organized, is there any documentation of the phone
> call?
> A. Besides the time that it happened? No.

Conrad Decl. Ex. 3 ("Moss Dep. Vol. I") 139:22-24, 145:5-147:19. Moss further acknowledged,

"It probably would have been to our advantage to have detailed notes, but we don't have detailed

notes, so probably nobody took them, or else we'd have them." Conrad Decl. Ex. 3 ("Moss Dep.

Vol. I") 145:16-19. Additionally, Moss testified that Def Con had policies and procedures for

documenting investigations, yet no such policy or procedure has ever been produced by Def Con.

Conrad Decl. Ex. 3 ("Moss Dep. Vol. I") 93:4-8; Conrad Decl. ¶20.

There are multiple inconsistencies regarding what Def Con actually knew at the time of

the ban versus what it now claims to have known based on a post hoc investigation conducted by

its law firm, Perkins Coie. Moss himself acknowledged this discrepancy in his deposition,

stating, "I couldn't tell you if it was on the call or if it was after the fact." Conrad. Decl. Ex. 3

("Moss Dep. Vol. I") 203:6-19. He further admitted that the information he has now is a

"synthesis" of facts gathered after the ban was announced. *Id.* Ex. 3 ("Moss Dep. Vol. I") 166:6-

PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT- 11
2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

25; 205:6-19.

For starters, Def Con's Initial Disclosure under Rule 26 makes no mention of any "reporting parties" other than Maxie Reynolds—not even by initial or reference—indicating that Def Con either did not possess this information at the time or violated F.R.C.P. 26. Conrad Decl., Ex. 18 (Defendants' Initial Rule 26 Disclosures).

Def Con's motion claims it relied on accusations made by former employee Michele Fincher. However, Moss admitted in his deposition that she never reported any Code of Conduct violations during their phone call:

> Q. Did she report to you any code of conduct violations on the phone call?
> A. Not on the phone call, no.

Conrad Decl. Ex. 3 ("Moss Dep. Vol. I") 165:21-23.

Moreover, in Moss's messages with Fincher after the ban, he stated: "We are in the discovery phase of figuring out who to talk to about the Chris lawsuit," and then directed her to his legal team. Conrad Decl. Ex. 19 (Fincher 00001-11). Particularly concerning is that Def Con's law firm, Perkins Coie, began representing Fincher in this matter, objected to, and refused to produce responsive documents in response to Plaintiffs' subpoenas. Conrad Decl. Ex. 20 (Perkins Letter, dated 11/14/2024).

Def Con further asserts that another disgruntled ex-employee, Cat Murdock, was on this call and relayed a number of allegations. Murdock testified that the Zoom link for this group call was sent to her by Moss. Conrad Decl. Ex. 21 ("Murdock dep.") 172:19-173:5. However, Moss's first recorded exchange with Murdock took place on October 8, 2022—months after the ban. Conrad Decl. Ex. 22 (DEFCON0000251). Moss's message initiating the conversation gives the strong impression that he and Def Con had never spoken with her about Hadnagy:

PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT- 12
2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

1
2
3
4
5
6
7
8



9  *Id*. Indeed, Murdock explicitly told Alethe Denis—a board member for Def Con

10  Groups—"she was not a party to this and that she had more important matters to attend to in her

11  own life." Conrad Decl. Ex. 23 ("Denis Dep.") 25:22-25. Denis also warned Def Con that

12  Reynolds was attempting to "manipulate" others—including by offering spots on a TV show—to

13  make complaints against Hadnagy. Conrad Decl. Ex. 23 ("Denis Dep.") 169:5-12; 198:2-10.

14  Another recruit of Reynolds is yet another former Social Engineer employee, Jess Levine.

15  Levine initially testified that she announced herself on the call and shared her experience.

16  Conrad Decl. Ex. 24 ("Levine Dep.") 80:14-20. However, Wyler—who was also allegedly on the

17  call—testified that he had no idea who Levine was. Conrad Decl. Ex. 7 ("Wyler Dep.") 278:12-

18  14. According to Murdock, Levine never spoke on the call but instead provided a statement to

19  Murdock, who then read it aloud. Conrad Decl. Ex. 21 ("Murdock Dep.") 217:16-22. To date,

20  Levine's statement has never been produced in response to any discovery request or subpoena

21  directed at either Levine or Murdock. Conrad Decl. ¶28. Levine also repeatedly admitted to

22  using "disappearing" messages when asked for communications in support of her claims. Conrad

23  Decl. Ex. 24 ("Levine Dep.") 106-109:25; 185:3-14.

Each witness has also provided conflicting accounts regarding the allegations made

PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT- 13
2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

during this call. Murdock and Levine allege that Hadnagy jokingly used a knife; however, Wyler testified that no such allegations involving a knife were ever discussed. Conrad Decl. Ex. 7 ("Wyler Dep.") 265:18-266:2, 269:10-23. Def Con further claims there were inappropriate comments about Asian women, yet Wyler stated that he never heard any reference to Hadnagy commenting that he was attracted to Asians. *Id*. Ex. 7 ("Wyler Dep.") 116:8-12. Wyler also confirmed that he never personally reported any Code of Conduct violations involving himself and Hadnagy. *Id*. Ex. 7 ("Wyler Dep.") 244:21-245:11.

Def Con's motion also includes accusations by former ILF employee, Sam Gamble, but again Gamble had never spoken with Def Con prior to their ban announcement. During her deposition, Gamble explained:

> Q. It reads, "We received multiple code of conduct violation reports about DEF CON Village leader, Chris Hadnagy of the SE Village." Did I read that correctly?
>
> A. Yes.
>
> Q. And the multiple code of conduct violation reports that DEF CON is indicating it received, none of those were code of conduct violation reports that you had made to DEF CON by February 9, 2022; correct?
>
> A. **Correct. Yeah. No, none of those. I was not a part of that whatsoever. I was fervently on the side of Chris and the ILF.**
>
> Q. And it says, "After conversations with the reporting parties and Chris." By February 9, 2022, you had not had any conversations with DEF CON at that point; right?
>
> A. I had not, no.
>
> Q. So the severity of the transgressions merits a ban from DEF CON, that had nothing to do with anything that you're testifying about today; right?
>
> THE DEPONENT: No.
>
> Q. Is that correct?
>
> A. I said no. **Yeah. No, none of my experiences had anything to do with DEF**

PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT- 14
2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

**CON or DEF CON's report.**

Conrad Decl. Ex. 25 ("Gamble Dep.") 163:15-164:22 (emphasis added).

Gamble's testimony underscores the true nature of Def Con's efforts to recruit disgruntled former employees after the fact to speak negatively about Hadnagy. Def Con has gone to great lengths to scrutinize every aspect of Hadnagy's life, including decade-old emails, text messages after the fact, and trainings that did not even exist at the time of the ban, all while taking them completely out of context. Conrad Decl. Ex. 23 ("Denis Dep.") 199:18-200:4.[2]

There is no evidence suggesting Hadnagy engaged in racist, homophobic, assaultive behavior, inappropriate touching, targeting of women, or anything "sexual in nature." Conrad Decl. Ex. 3 ("Moss Dep. Vol. I") 206:8-23, 208:6-19; and Ex. 7 ("Wyler Dep.") 262:13-265:17. Def Con also never spoke directly with Chris regarding any of these allegations. *Id*. Ex. 8 ("Hadnagy Dep.") 188:8-11, 189:1-190:2; 239:6-20; and Ex. 3 ("Moss Dep. Vol. I") 171:1-172:2; 174:7-9.

**F. On February 9, 2022, Def Con's Defamatory Campaign Against Hadnagy and Social Engineer began.**

On February 9, 2022, Def Con posted a Transparency Report, stating, "We received multiple CoC violation reports about a DEF CON Village Leader Chris Hadnagy of the SE Village. After conversations with the reporting parties and Chris, we are confident the severity of the transgressions merits a ban from DEF CON." Conrad Decl. Ex. 26 (SE_000659). The only individuals Def Con has ever previously named and banned were those accused of sexual abuse or sexual assault. *Id*. Ex. 3 ("Moss Dep. Vol. I") 176:21-177:18; and Ex. 23 ("Denis Dep.") 138:18-142:3.

---

[2] Def. Ex. 46 - email from 2014; Def. Ex. 45 - email from 2016; Def. Ex. 43 - email from 2013; Def Ex. 41, 57, - hearsay within hearsay; Def. Ex. 27, 28, 29, 36, 37, 47, 48, 49, 51, 52, 53 (texts post ban announcement), Def. Ex. 54 email 2015.

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

In July 2022, Def Con escalated its efforts by updating its Transparency Reports to state that it imposes lifetime bans only on "repeat offenders" who have committed "more egregious offenses" and pose an "ongoing risk to the community" to prevent them from "quietly find[ing] new and unsuspecting victims." Conrad Decl. Ex. 26 (SE_000657-000659). Def Con further stated that it withheld details about the "reporting parties" or the accusations based on recommendations from the "Domestic Violence and the Violence Against Women Office at the Department of Justice." *Id*. That most reports are for "minor violations that result in a warning, but "severe allegations may require a referral to hotel security or law enforcement, especially if the report include claims of criminal behavior." *Id*.

Then, on January 13, 2023, after Hadnagy filed this lawsuit, Def Con continued its campaign by posting the following:

> During our investigation we spoke directly with Mr. Hadnagy about claims of his violations of code of conduct. He confirmed his behavior and agreed to stop. Unfortunately the behavior did not stop.

Conrad Decl.

However, Def Con's campaign did not stop there. Further investigation and discovery have revealed that Def Con's Director of Sales and Sponsorship, Kevin Sugihara (a.k.a. "Sugitime"), played a central role in amplifying these defamatory statements. Sugihara is a frequent contributor to Def Con's social media and media presence. Most recently, he appeared on StealthBay (EP4) Let's Talk About Def Con – Kevin Sugihara. Hadnagy Decl. ¶16

On September 8, 2022, Sugihara took to Def Con's social media subreddit, making defamatory statements, posting:

> Hadnagy is this industry's Weinstein, and it isn't a well-kept secret amongst those in the industry.

PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT- 16
2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

Hadnagy Decl. Ex 3. (DEFCON0000620)[3] When other users questioned Def Con's decision, Sugihara fired back:



**sugitime** · 2y ago
Yeah dude you sound like you're defending a serial sexual predator. It's a pretty bad look, just saying.

*Id*. Discovery also uncovered that Sugihara was directly involved in discussions with Moss about the case on Def Con Weekly Call communications. Conrad Decl. Ex. 2 (DEFCON0000276). Those communications reveal that Sugihara referenced his own public post comparing Hadnagy to Weinstein—to which Moss gave a thumbs-up in approval. *Id*.



Kevin Sugihara
"and he was likened to the 'Harvey Weinstein' of the information security industry in a public post"
15:31

Def Con is run by its department lead Goons, who work year-round on behalf of Def Con, respond on its behalf, and interact with the public as Def Con representatives. Moss and Def Con were fully aware of this conduct, as evidenced by their explicit directive to staff:

> Anything you or your department Goons say can be attributed to someone associated with DEF CON."

---

[3] Defendants were well aware of Plaintiffs' factual allegations concerning Def Con's Sugihara, yet chose to ignore them. On August 2, 2024, after uncovering this information, Plaintiffs amended their discovery responses to include these allegations.

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

Conrad Decl. Ex. 27 (DEFCON00000034).

**G. Def Con knew any allegations were "Not Sexual in Nature" and admits it never spoke with Hadnagy, who never admitted to egregious Code of Conduct violations.**

As Alethe Denis—a board member for Def Con Groups explained— "for people to be banned from this conference in the past, they have perpetrated some pretty hideous crimes against other conference participants, one such person being Captain Crunch. That was his handle, and he had sexually assaulted women for years." Denis Dep. 140:8-13. When asked, given the full context of Def Con's statements, whether "it was foreseeable that people who read that transparency report would interpret it to mean that Mr. Hadnagy had done something involving sexual misconduct or sexual predatory behavior?" She testified:

> A. I believe not only was it a natural conclusion for people to come to, but that I have evidence that that's the conclusion that people came to from the messages that I received around that time frame.

Conrad Decl. Ex. 23 ("Denis Dep.") 144:19-145:7.

Two days after the initial ban announcement, Moss even fully recognized the need to "reign" in the transparency report, stating,



**Jeff Moss,** Organizer
The online crazy is starting with speculation around if it was sexual in nature. Should we add something to the transparency report to reign that in, like "a not-sexual in nature CoC violation" or go to the bullying and harassment?

Feb 10

Id. Ex. 27 (DEFCON00000034). He also explicitly stated:



**Jeff Moss,** Organizer
Good point. If Chris wants to say something to clarify it, he could say it wasn't sexual and we wouldn't contradict him.

Feb 10

PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT- 18
2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

Conrad Decl. Ex. 27 (DEFCON0000357). Wyler even told Moss that he would "die on the hill that we should clarify the statement on the transparency report." *Id*. Ex. 28 (DEFCON0000359).

Given the backlash and implications of the ban, Hadnagy reached out to Wyler, urging him to facilitate a conversation with Def Con, as no one from Def Con had ever spoken with him about the allegations. Conrad Decl. Ex. 8 ("Hadnagy Dep.") 188:8-11; 190:2 and Ex. 16 (SE_000120). In those written messages, Wyler agreed with Hadnagy that Def Con should have provided more "context" and explicitly disclaimed any involvement, stating:



Wyler further explained: "I don't even run villages anymore. And haven't for years." "I was told to act as a mediator for everything in the beginning." *Id*. Hadnagy also testified that Wyler specifically told him he does not represent Def Con during their discussion and that he never admitted to any Code of Conduct violations. *Id*. Ex. 8 ("Hadnagy Dep.") 188:8-11, 189:1-190:2.

PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT- 19
2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

On September 7, 2022, the parties filed a joint statement in which Def Con admits a "third party reached out to Plaintiff Hadnagy." *Id.* Ex. 1 (Joint Report).

When Moss was asked who from Def Con had spoken with Hadnagy about the alleged Code of Conduct violations, he responded: "You have the text messages from Neil." Conrad Decl. Ex. 3 ("Moss Dep. Vol. I") 174:7-9. However, he also admitted: "I don't know what particular hat he [Neil] was wearing at that moment." Id. Ex. 3 ("Moss Dep. Vol. I") 172:19-173:5. Def Con's own filings confirm that Neil was acting as a "third party." Conrad Decl. Ex. 1 (Joint Report).

### III.     PROCEDURAL HISTORY

After this case was transferred to the Western District of Washington, Defendants moved to dismiss on January 18, 2024. On March 28, 2024, the Court granted the motion in part and denied it in part. In rejecting Defendants' request to dismiss Plaintiffs' defamation claims, the Court stated:

> "A defamation action consists of four elements: (1) a false statement, (2) publication, (3) fault, and (4) damages." *Duc Tan v. Le*, 177 Wash.2d 649, 300 P.3d 356, 363 (Wash. 2013). A plaintiff can allege the false statement prong by alleging facts showing that the statement is provably false or "leaves a false impression due to omitted facts." *See Yeakey v. Hearst Commc'ns, Inc*., 156 Wash.App. 787, 234 P.3d 332, 335 (Wash. Ct. App. 2010) (citing *Mohr v. Grant*, 153 Wash.2d 812, 108 P.3d 768, 773 (Wash. 2005)). "Defamation by implication occurs when 'the defendant juxtaposes a series of facts so as to imply a defamatory connection between them." *Corey v. Pierce Cty*., 154 Wash.App. 752, 225 P.3d 367, 373 (Wash. Ct. App. 2010) (quoting *Mohr*, 108 P.3d at 774). To proceed on a theory of defamation by implication, a plaintiff must allege facts supporting all the elements of a defamation claim but may support the first element by alleging that the statement is false or leaves a false impression. *See id*.; *see also U.S. Mission Corp. v. Kiro TV, Inc*., 172 Wash.App. 767, 292 P.3d 137, 141 (Wash. Ct. App. 2013)
>
> \*\*\*
>
> Defendants did not merely ban Plaintiffs from the Event based on their right to associate with anyone they choose or based on an opinion. Rather, Defendants

PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT- 20
2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

clearly state they instituted the lifetime ban after receiving reports, investigating reports, and confirming the severity of the reported transgressions. The omission of details of the evidence and nature of the transgressions also leaves a false impression, leading to the type of speculation alleged in Plaintiffs' Complaint.

\*\*\*

Defendants argue nothing in the Update is defamatory and because the language does not refer to sexual conduct or gender identifiers, it cannot reasonably be inferred Plaintiffs' ban from the Event was the result of sexual misconduct. This ignores Plaintiffs' allegations that the Update contains demonstrably false statements because Defendants refused to meet with Plaintiff Hadnagy and provide Plaintiff Hadnagy with information regarding the alleged "behavior"; perpetrators of rumors and online comments interpreted the ban was the result of sexual misconduct (*i.e.* referring to Plaintiff Hadnagy as the 'Harvey Weinstein of the infosec community'); and publication of the false statements damaged Plaintiffs' business dealings. **This also ignores the plain implication of the statements in the Update, *i.e.*, that Plaintiff Hadnagy confirmed and admitted to committing acts that were so egregious, he had to be banned from the Event for the rest of his life – all statements Plaintiffs allege are demonstrably false.**

Dkt. 44 at 12-14 (emphasis added).

## IV.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate under Rule 56 where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. See Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986). The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Id. The Court also notes that "if there is a

PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT- 21
2:23-cv-01932-BAT

disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed," summary judgment is not appropriate. *McSherry v. City of Long Beach*, 584 F.3d 1129, 1135 (9th Cir. 2009).

## V.   ARGUMENT

### A.  Legal Standard For Defamation.

To prevail on a claim of defamation, Plaintiffs must prove: (1) false statement; (2) publication; (3) fault; and (4) damages. *Duc Tan v. Le*, 177 Wn.2d 649, 662, 300 P.3d 356 (2013).[4]  A statement is defamatory per se if it (1) exposes a person to hatred, contempt or ridicule, to deprive him of the benefit of public confidence or social intercourse; (2) injures him in his business or trade; and (3) imputes to the claimant criminal conduct involving moral turpitude. *Maison de France, Ltd. v. Mais Oui! Inc.*, 126 Wn. App. 34, 44-45, 108 P.3d 787 (2005).

At the summary judgment stage, "a court determines only whether a communication is **capable** of defamatory meaning." *Amsbury v. Cowles Publ'g Co.*, 76 Wn.2d 733, 738, 458 P.2d 882, 885 (1969) (emphasis added). Where a communication is capable of both a defamatory and non-defamatory meaning, it is for a jury—not a judge—to determine which meaning controls. *Miller v. Sawant*, 18 F.4th 328, 333 (9th Cir. 2021) (*citing Swartz v. World Publ'g Co.*, 57 Wn.2d 213, 356 P.2d 97, 98 (1960) (en banc)). "In all but extreme cases the jury should determine" whether a communication carried the meaning ascribed by the plaintiff. *Id.*

---

[4] Washington courts recognize defamation by implication as a theory of defamation in which all the standard elements apply, but falsity can be established by proving that the statement is either false or creates a false impression. This Court recognized and affirmed that principle when it denied Defendants' motion to dismiss, explaining: "On a theory of defamation by implication, a plaintiff must allege facts supporting all the elements of a defamation claim but may support the first element by alleging that the statement is false or leaves a false impression." Dkt. 44.

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

The communications at issue are not considered in a vacuum, as "[w]ords which are harmless in themselves may be defamatory in the light of surrounding circumstances." *Crossman v. Brick Tavern*, 33 Wn. App. 503, 505, 655 P.2d 1206 (1982) (citing *Ziebell v. Lumbermens Printing Co.*, 14 Wn.2d 261, 268, 127 P.2d 677 (1942). Therefore, "[i]n determining whether words are capable of a defamatory meaning, they must be considered in the context in which they were uttered or published as well as in the light of the circumstances surrounding the publication." *Getchell v. Auto Bar Sys. Northwest*, 73 Wn.2d 831, 387, 440 P.2d (1968).

Here, Defendants challenge the sufficiency of the evidence on two defamation elements: falsity and fault. There are disputed issues of material fact precluding summary judgment on both.

**B.  There are numerous disputed issues of material fact as to falsity and fault.**

To prove falsity, "a plaintiff must prove either a statement was false or a statement left a false impression by omitted facts." *Seaquist v. Caldier*, 8 Wash. App. 2d 556, 565, 438 P.3d 606, 612 (2019). A "provably false statement" is one that, as a statement of either fact or opinion, falsely expresses or implies provable facts about the plaintiff. *Schmalenberg v. Tacoma News, Inc.*, 87 Wn. App. 579, 590-91, 943 P.2d 350 (1997); *see Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 419 (Tenn. 1978) (holding that a newspaper's report falsely implied an extramarital affair by omitting key facts that would have negated the defamatory implication; recognizing that the proper inquiry is whether the published words, as conveyed, would create a different effect on the reader than the truth would have), cited with approval in *Mohr v. Grant*, 153 Wn.2d 812, 828, 108 P.3d 768, 776 (2005).

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

1    Contrary to Defendants' argument,[5] in the falsity analysis, a plaintiff need not prove that

2    a false statement was material, as material falsity "is not a recognized element of defamation."

3    *Herron v. King Broad. Co.*, 112 Wn.2d 762, 769 n.2, 776 P.2d 98 (1989). Rather, materiality –

4    or, the "sting" of the story – is properly analyzed in terms of damages, an element Defendants do

5    not challenge. *Id.*  ("In terms of the elements of defamation, *Mark* requires the plaintiff to show

6    that the falsehood affects the "sting" of a report as part of his showing of damage."); *see also*

7    *Mark v. Seattle Times*, 96 Wn.2d 473, 493, 635 P.2d 1081 (1981); *Schmalenberg v. Tacoma*

8    *News*, 87 Wash. App. 579, 593, 943 P.2d 350, 358 (1997). Furthermore, when a statement is

9    defamatory per se, "damage is presumed." *Arnold v. Nat'l Union of Marine Cooks & Stewards*,

10   44 Wn.2d 183, 187, 265 P.2d 1051 (1954).

11   As to fault, a private individual need only prove negligence; "that in publishing the

12   statement, the defendant knew or, in the exercise of reasonable care, should have known that the

13   statement was false, or would create a false impression in some material respect." *Taskett v. King*

14   *Broad. Co.*, 86 Wn.2d 439, 445, 546 P.2d 81, 85 (1976). Negligence is generally a question of

15   fact for the jury and should be decided as an issue of law by the court only in rare cases. *Rhoades*

16   *v. DeRosier*, 14 Wn. App. 946, 948-49, 546 P.2d 930 (1976).

17   Here, Defendants' defamatory communications fall into two main categories: (1)

18   statements falsely claiming or implying that Hadnagy was banned from Def Con for repeated

19   sexual misconduct, and (2) statements falsely asserting that Hadnagy admitted to egregious

20   conduct, agreed to stop, but continued, necessitating a lifetime ban. In both instances, there are at

21   least genuine disputes of material fact regarding the falsity of these statements and Defendants'

22   fault.

23   

[5] Dkt. #83 at 26.

PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT- 24
2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

1       1.  <u>Substantial evidence supports Plaintiffs' claim that Def Con's ban was unrelated to any sexual misconduct, but that Defendants' falsely communicated to the public that it was.</u>

To begin, the evidence is clear that Defendants' did not ban Plaintiffs from Def Con for any sexual misconduct. Most notably, post-ban internal communications by Moss and Wyler clearly show the claimed violations were "not sexual in nature." Moss recognized the need to "reign" in the Transparency Report to clarify that the violation was "a not-sexual in nature CoC violation." Conrad Decl. Ex. 27 (DEFCON0000034). Moss also suggested that "[i]f Chris wants to say something to clarify it, he could say it wasn't sexual and [Def Con] wouldn't contradict him." *Id*. Wyler told Moss that Def Con "should update the transparency report to say it wasn't anything sexual in nature" and he would "die on the hill that we should clarify the statement on the transparency report." Conrad Decl. Ex. 28 (DEFCON00000359). He even recognized that given the context of the statement, it "might actually give [Hadnagy] a leg to stand on in terms of defamation." *Id*.

Defendants' motion now suddenly suggests the ban was based on sexual misconduct. But Def Con failed to document any investigation into the allegation, and there is no contemporaneous evidence suggesting the ban was for sexual misconduct. Defendants reply heavily on a purported "phone call"—but there is substantial conflicting evidence about who participated, what was discussed, and what information, if any, Defendants relied on to ban Plaintiffs. Viewing the evidence in the light most favorable to Plaintiffs, if this meeting occurred, Def Con assembled a small group of disgruntled former employees—many of whom are expert social engineers—to discuss workplace disputes unrelated to Def Con's Code of Conduct in place at the time. Regardless, Defendant Moss and other Def Con personnel's own statements

PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT- 25
2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

after the ban make clear the alleged violations referred to in the transparency report were not sexual in nature.

As Plaintiffs' ban was not related to sexual misconduct, the question for this Court is whether Defendants' communications – "in the context in which they were [] published as well as in the light of the circumstances surrounding the publication"[6] – were capable of being understood to mean his ban **was** for sexual misconduct.

Defendants' first public statement about Hadnagy was its February 9, 2022, Transparency Report:

> We received multiple CoC [Code of Conduct] violations about Def Con Village Leader Chris Hadnagy of the SE Village. After conversations with the reporting parties and Chris, we are confident the severity of the transgressions merits a ban from Def Con.

While this statement, in a vacuum, does not explicitly state the ban was related to sexual misconduct, Defendants knew or should have known the context in which it was made was "capable of" that defamatory meaning.

Def Con is not an ordinary professional conference – it is well known for its "colorful past" and controversial, or sometimes "hostile" environment, including allowing event space to be used for "stripper parties." Importantly, Defendants knew that, until then, Def Con had only ever banned people for repeated accusations of sexual abuse.

Indeed, not only was the Transparency Report capable of being understood as related to sexual misconduct, evidence demonstrates Defendants knew it **was** understood that way. That is why Moss raised with his Def Con team the "crazy. . . [online] speculation around if it was sexual in nature," and why he and Wyler engaged in serious discussions about whether to clarify that the alleged violations were not sexual in nature. That is also why Alethe Denis testified "not

---

[6] *Getchell*, 73 Wn.2d at 387.

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

1    only was it a natural conclusion for people to come to, but [that she had] evidence that that's the

2    conclusion that people came to from the messages that [she] received around that time frame."

3    Conrad Decl. Ex. 23 ("Denis Dep. 144:19-145:7"). That is why Hadnagy was urgently trying to

4    get Wyler to facilitate a meeting with Def Con, and why Wyler was distancing himself from the

5    situation, telling Hadnagy, "I'm not Def Con."

6        Even though Defendants knew people in the community understood that the ban was

7    "sexual in nature," and openly contemplated a simple solution (*i.e.*, "add[ing] something to the

8    transparency report to reign that in, like 'a not sexual in nature CoC violation'"), Defendants

9    chose not to make a correction. Instead, they perpetuated their defamatory statements, publishing

10   in July 2022 an update to the Transparency Report that it only banned "repeat offenders" who

11   have committed "more egregious offenses" and pose an "ongoing risk to the community" to

12   prevent them from "quietly find[ing] new and unsuspecting victims." Def Con further stated it

13   withheld details about the "reporting parties" or the accusations to "protect the  Def Con

14   community" and based on recommendations from the "Domestic Violence and the Violence

15   Against Women Office at the Department of Justice." Defendants, of course, at this point knew

16   the defamatory meaning of their update.

17       Then, Kevin Sugihara, Def Con's Director of Sales and Sponsorship, publicly referred to

18   Hadnagy as the 'Weinstein of the infosec community' and a 'serial sexual predator.' Def Con will

19   likely argue that it bears no responsibility for Sugihara's remarks, yet Moss not only failed to

20   correct these false accusations despite being a moderator of the social media site but also

21   approved them.

22       Under Washington law, agency can be express or implied, and an organization may be

23   held responsible for the statements of its agents when made within the scope of their apparent

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA  98101
P: (206) 486-8000  F: (206) 902-9660

1    authority and related to the organization's business. *See King v. Riveland*, 125 Wn.2d 500, 507,

2    886 P.2d 160 (1994); *Codd v. Stevens Pass, Inc*., 45 Wn. App. 393, 404, 725 P.2d 1008 (1986).[7]

3    Whether a principal-agent relationship exists is generally a question of fact for the jury. *Afoa v.*

4    *Port of Seattle*, 191 Wn.2d 110, 115, 421 P.3d 903, 906 (2018).

5         Here, the evidence overwhelmingly supports Sugihara's strong and ongoing affiliation

6    with Def Con, particularly within its Def Con's Reddit community and social media presence:

7    (1) Sugihara regularly engages with and responds to social media posts on Def Con's behalf; (2)

8    Def Con publicly associates him with the organization through appearances and statements; (3)

9    Def Con knew Sugihara was making statements; (4) Moss acknowledged and approved of

10   Sugihara's attacks on Hadnagy by giving a "thumbs up"; (5) Sugihara was directly involved in

11   discussions and responding to Hadnagy's ban; (6) His comments directly related to Def Con's

12   business; (7) Moss is a moderator of the Def Con community where the posting occurred.

13        Sugihara's statements are not mere opinion but express or imply provable falsehoods

14   about Hadnagy. Labeling someone a 'serial sexual predator' conveys a factual assertion that they

15   have committed multiple sexually violent offenses and are likely to commit more. Similarly,

16   likening Hadnagy to Harvey Weinstein—who was widely known and convicted of sexual

17   crimes—implies serious and pervasive predatory behavior.

18        Def Con knew about Sugihara's statements, failed to correct them, and even signaled

19   approval. Given the facts surrounding Sugihara's role, Def Con's knowledge, and the defamatory

20   nature of these statements, this issue must be resolved by a jury.

21

22

23

---

[7] *Coombs v. R. D. Bodle Co*., 33 Wn.2d 280, 285, 205 P.2d 888 (1949) (Compensation is not required to establish agency).

PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT- 28
2:23-cv-01932-BAT

2. <u>Substantial evidence shows that Def Con never spoke with Hadnagy or obtained an admission of egregious conduct warranting a lifetime ban, yet Def Con falsely communicated otherwise.</u>

On January 13, 2023, Def Con updated its Transparency Report by posting the following:

> During our investigation we spoke directly with Mr. Hadnagy about claims of his violations of code of conduct. He confirmed his behavior and agreed to stop. Unfortunately the behavior did not stop.

This Court has already recognized the false and defamatory implications of this statement, explaining that "the plain implication" is "that Plaintiff Hadnagy confirmed and admitted to committing acts that were so egregious, he had to be banned from the Event for the rest of his life." See Dkt. 44 (Court's 3/28/24 Order), pg. 15:10-13. However, Def Con never spoke directly with Hadnagy about any Code of Conduct violations, nor did he make such an admission.

*First*, Def Con's own filings confirm that no one from the organization ever spoke with Hadnagy about the allegations. Instead, as Defendants acknowledged in their Joint Report to the Court, Neil Wyler—acting as a purported "third party"—was the only individual who communicated with Hadnagy. Conrad Decl. Ex. 1 (Joint Report). Wyler himself distanced Def Con from the matter in private messages, stating: "I am not Def Con!" and "I don't even run villages anymore. And haven't for years." Conrad Decl. Ex. 16 (SE_000120). When asked who at Def Con had spoken with Hadnagy, Moss admitted he never had any such conversation. Instead, he deflected: "You have the text messages from Neil."

*Second*, Def Con also falsely asserted that Hadnagy "confirmed" his misconduct and agreed to stop. In reality, Hadnagy explicitly denied ever admitting to Def Con's claims or engaging in any wrongful conduct. Conrad Decl. Ex. 8 ("Hadnagy Dep.") 189:8-190:3. Moreover, his efforts to identify potential complainants—including individuals who never filed reports with Def Con—do not constitute an admission of wrongdoing.

Def Con's statement falsely convey certainty of guilt, unlike an accusation made without any direct conversation with the accused. A statement claiming Hadnagy admitted to egregious misconduct—particularly conduct that allegedly endangered the community—is far more damaging than a mere allegation. This Court has already recognized this distinction in its prior ruling denying Defendants' motion to dismiss.

*Third*, Defendants' conduct is even more troubling given their awareness of the widespread public narrative falsely labeling Hadnagy a sexual predator. At the time of Def Con's statements, Sugihara was actively spreading false claims, branding Hadnagy as a "serial sexual predator" and comparing him to Harvey Weinstein. Defendants knew their prior statements had already been interpreted as alleging sexual misconduct, yet they chose to publish a statement suggesting that Hadnagy admitted to misconduct, agreed to stop, and failed to do so.

In sum, Defendants' January 2023 statement contain deliberate falsehoods—falsely asserting both that Def Con spoke with Hadnagy and that he admitted to and agreed to stop conduct so egregious that it warranted a lifetime ban. Defendants also knew their statement was being interpreted as an allegation of sexual misconduct at the time of publication.

This Court has already recognized the defamatory nature of these statements. When viewed in the light most favorable to Plaintiffs, the evidence overwhelmingly supports Plaintiffs' claims. A jury must resolve these factual disputes.

**C. Def Con cannot rely on a post hoc investigation to justify its statements.**

Defendants' reliance on truth as a complete defense to defamation ignores both the timing of when truth is determined and the context of the statements at issue.

As a general rule, the truth of an alleged defamatory statement must be measured "as of the time of the defamatory publication." *La Mon v. Butler*, 44 Wash. App. 654, 659, 722 P.2d

PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT- 30
2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

1373, 1377 (1986) (citing Restatement (Second) of Torts § 581A (1977)); *Point Ruston, LLC v. Pac. Nw. Reg'l Council of the United Bhd. of Carpenters & Joiners of Am*., No. C09-5232BHS, 2010 U.S. Dist. LEXIS 95239 (W.D. Wash. Sep. 13, 2010) ("Therefore, in disputing whether any of the alleged statements are defamatory, the Carpenters cannot rely on information obtained after the fact to prove whether they believed the allegedly defamatory statements to be true when made."); *Page v. Oath Inc.*, 270 A.3d 833, 847 n.104 (Del. 2022) (also citing Restatement (Second) of Torts, stating, "We judge the truth of the allegations in an article at the time they were published, not with the benefit of hindsight.").

This principle is both legally sound and logically necessary. Otherwise, a defendant could publish defamatory statements without any factual basis, then use the discovery process to search for post hoc justifications—as Def Con has done here. This is a dangerous proposition. Allowing a defendant to make baseless accusations and later defend them with after-acquired evidence would nullify the negligence standard in defamation law, as any evidence obtained after publication could not have influenced the publisher's state of mind at the time of the statement. This is precisely why the court in *Point Ruston* rejected this argument.

Def Con cannot retroactively justify its statements—claiming it "received reports of CoC violations" and, after conversations with the reporting parties and Hadnagy, issued a ban as of February 8, 2022—with evidence obtained after publication. The testimony of former ILF employee Samantha Gamble further illustrates this point:

> Q. And it says, "After conversations with the reporting parties and Chris." By February 9, 2022, you had not had any conversations with DEF CON at that point; right?
> A. I had not, no
> Q. So the severity of the transgressions merits a ban from DEF CON, that had nothing to do with anything that you're testifying about today; right?
> A: No
> Q. Is that correct?

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

1      A. I said no. Yeah. No, none of my experiences had anything to do with DEF
2      CON or DEF CON's report.

Conrad Decl. Ex. 25 ("Gamble Dep.") 163:15-164:22 (emphasis added).

Def Con's claim that it spoke with Hadnagy and that he admitted to misconduct and agreed to stop must have been either true or false at the time of publication. There is no legal or factual basis for Defendants to retroactively manufacture justification by pointing to evidence they acquired later.

Defamation law does not permit a 'shoot first, justify later' approach. The truth of Def Con's statements must be evaluated based on the information available at the time of publication—not through post hoc discovery or investigation. This principle is especially critical given the nature of the statements at issue. Defendants' motion improperly conflates decade-old emails, post-publication text messages, and unrelated information that has no connection to their original statements. Such tactics only create further material factual disputes—issues that must be resolved by a jury.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny summary judgment.

Dated: March 17, 2025

By: _____
Ted Buck, WSBA #22029
Mark Conrad, WSBA #48135
I certify that this memorandum contains
8,994 words, in compliance with the Local
Civil Rules.

1

<u>Certificate of Service</u>

2

3    The undersigned certifies under the penalty of perjury according to the laws of the United

States and the State of Washington that on this date I caused to be served in the manner noted

4    below a copy of this document entitled **PLAINTIFFS' RESPONSE TO DEFENDANTS'**

5    **MOTION FOR SUMMARY JUDGMENT** on the following individuals:

6    David Perez, WSBA #43959
Matthew J. Mertens (Pro Hac Vice)
7    Lauren A. Trambley (Pro Hac Vice)
Jacob Dean (Pro Hac Vice)
8    Perkins Coie LLP
1201 Third Avenue, Suite 4900
9    Seattle, Washington 98101
dperez@perkinscoie.com
10   mmertens@perkinscoie.com
ltrambley@perkinscoie.com
11   jacobdean@perkinscoie.com

12

13   DATED this 17th day of March, 2025, at Seattle, Washington.

14

15   _____
Amber Holmes, Legal Assistant

16

17

18

19

20

21

22

23

PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT- 33
2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660