THE HONORABLE BRIAN A. TSUCHIDA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CHRISTOPHER J. HADNAGY, an individual; and SOCIAL-ENGINEER, LLC, a Pennsylvania limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>JEFF MOSS, an individual; DEF CON COMMUNICATIONS, INC., a Washington corporation; and DOES 1-10; and ROE ENTITIES 1-10, inclusive,<br><br>Defendants. | No. 2:23-cv-01932-BAT<br><br>DECLARATION OF RYAN MACDOUGALL IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

I, Ryan MacDougall, declare under penalty of perjury under the laws of Washington State as follows:

1. I am over the age of 18, and competent to testify to the matters set forth herein; and make this declaration of my own personal knowledge.

2. I have been in the information technology industry for 27 years, with the last 11 in information security specifically. I was hired by Chris Hadnagy to Social-Engineer, LLC (SECOM) in Oct of 2017 as a Senior Penetration Tester. Within a year of my employment, I was promoted to Chief Operating Officer, which was a position previously held by Michele Fincher. My responsibilities in that role consisted of managing the operational team that performed our managed services, high level project management of ongoing contracts, Sales Engineer duties,

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

working with the company CPA and controller consultant for financial forecasting and budgeting, managerial input into marketing activities, high level system administration and system architecture of SECOM infrastructure, training instructor for multiple training offerings, managing staff at public events and conferences, and public speaking at existing clients, conferences, and prospective clients.

3. I resigned from Social-Engineer as of January 31, 2024 primarily due to general financial stability concerns of the company. I have a young family and the stress of possible closure for almost 2 years was impacting my physical and mental health. I did not want to be in a position of having to start the search for new employment after the closure of the company, as I require stable insurance and income, as I am the sole financial provider for my family. I made the difficult decision to seek new employment before being put in that position. It was difficult for me because I still firmly believe in the quality and uniqueness of the service offerings of SECOM and I made many close friendships with the employees, and I did not want my departure to be viewed as a negative view of or abandonment of the company and the people associated.

<u>DEFCON as an event, the vibe and atmosphere</u>

4. During my time just before working at SECOM and during that time, I was able to attend the annual DEFCON conference in Las Vegas in person, both as a standard attendee then as a village manager (SE Village). My experience with the conference was a generally positive one, but there were concerns about data and personal information safety that were associated with the conference that were well advertised by attendees over the years. Advice was often given to not utilize common telecommunications services and mobile technologies while at the conference as it was commonplace for fraudulent and malicious wireless access points to be set-up by attendees in an effort to steal personal data and credentials of attendees. One such example was

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

the "Wall of Sheep" which was an authorized room at the conference that displayed attendees captured login credentials on the available mobile networks. While acting as an Event Runner at the conference (SE Village with associated contests) I was often approached by attendees and thanked for providing a safe haven within the conference that was seen as a safe place for families to attend the conference but not expose their children to some of the "adult-only" elements of the conference. Many times, we would have families stay their entire time in our room to enjoy the all ages activities we had planned. Also, the conference security team (referred to as "Goons", or "red-shirts") rarely patrolled our village location, as we were told that we were proficient at managing the security of our location effectively enough to not warrant their presence regularly.

<u>Def Con interviewed me during this litigation.</u>

5. I think it’s also important to note that Def Con’s defense counsel in this case did not depose me, but did interview me during the discovery process, which is when I relayed much of the information in this declaration to them directly with a series of questions and answers as part of that dialog.

<u>Blackhat interactions</u>

6. I attended the meeting with 4 Blackhat representatives shortly after the DEFCON transparency report was published. We (Chris and I) assumed the issues they were going to raise related to the allegations DEFCON was referring to. To our surprise, they directly stated "We do not know what the DEFCON allegations are and we are not concerned with what happens at other conferences." So they presented 3 specific allegations they wanted more information about. Each of those allegations were stated and were addressed, and in fact they were all resolved with both affected parties in each case, well before I had even met Chris, meaning many years before they

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

were raised as a concern. At the end of the meeting the four Blackhat representatives seemed satisfied with the explanations and the meeting ended on a positive note. So it was very surprising that a ban was then issued, not publicly at the time, but shortly thereafter. It is unclear whether Mr. Moss was at all responsible for this development, but at the time he was known to have a strong influence over the committee responsible for issuing the ban.

7. As far as the competing social engineering class run by Stephanie Carruthers, a complaint was made to the training review board due to a situation where a student of another class approached Chris and was angry about a certain homework assignment his class was supposedly issuing. After the student explained the assignment, it became clear that the class issuing that assignment was in fact Ms. Carruthers' class, and the student apologized and walked off. The homework assignment in question was that students of Ms. Carruthers' class were told to approach strangers and social engineer them to go to an ATM and withdraw $20 and give that money to the student, as proof that they are capable of social engineering targets. The targets in this case had no association with the class and were innocent bystanders to this possible act of fraud and theft.

8. To add additional context to the relationship between Ms. Carruthers and Chris as I understand it, before I knew Chris, Ms. Carruthers' husband JC was a contestant in the SE Village flagship contest at DEFCON. He was disqualified by breaking an ethics rule "You cannot threaten the employment of any targets during the competition." After he was disqualified he then went on to coach another less experienced contestant to do the same thing, which also resulted in a disqualification. At that point JC was banned from the village. This is mentioned because 7 months prior to the DEFCON transparency report was published, an SECOM employee was approached by Ms. Carruthers in an attempt to recruit them to the previously unknown "new" SE Village that was being put together to replace Chris and SECOM's SE Village. This was also 3 months before

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

SECOM even knew there were allegations being communicated to DEFCON.

Maxie Reynolds' employment and the events surrounding her resignation

9. I was not directly involved in the hiring of Maxie Reynolds by Social-Engineer, but I was tasked with being her manager once she was hired. We worked closely together managing the operational team when she was promoted to a Team Lead position and writing policies and procedures for the company during a transition from a start-up feel to a more formal corporate structure. We had many business and personal discussions during her time with the company where it appeared as though we were establishing a friendship, much like it was with many of the other employees. At one point she was tasked with performing a network penetration test for a client, based on her assumed certification (Offensive Security Certified Professional or OSCP) in that area of expertise. After waiting the full duration of the allotted time frame to complete the test, she communicated she had not performed any testing at all and was declining to do so, as she didn't know what was to be done. That raised a concern that she may not have actually been certified as she had claimed since the certification was education on exactly the necessary activities that were requested of her. The certification also required that an applicant pass a final exam commonly known to be difficult even for seasoned security professionals. I was then pulled off of another project and tasked with performing the test for the client in a shortened amount of time than was initially offered. In the final six months or so of her employment, Ms. Reynolds communicated personal issues that would take her away from the company. After many discussions we as executive management elected to provide her with extended paid leave to help support her in her personal commitments. The story we were told was that her father was gravely ill in Scotland and that she would have to travel there to be with him for an unknown amount of time. It became clear after a number of discussions with her and others that were speaking with her, as well as monitoring

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

of corporate communications, that the story she was conveying to us was likely not true and she was actively working against the company by redirecting potential business away from SECOM to another company. These activities would be considered a violation of her signed employment agreement. Maxie then resigned, which required us to request she send her corporate laptop back to us, which was typical for any terminated employee of any position. The difference with this situation was that she had requested many months before her personal issues occurred that she use a personal laptop for corporate usage. We (executive management) granted this request under the condition that Microsoft Intune (MDM software) and CrashPlan (backup software) be installed and that the device would be managed and monitored like every other corporate device in use for business purposes. We also stated that after the corporate data was removed, the device would be shipped back to her. After numerous weeks of her committing to sending the device to me, but not providing shipping details, we (executive management) elected to perform a remote lock on the device to prevent client and corporate data loss from occurring. The software we had installed did not allow for remote wiping, only remote locking for the specific operating system in use. Again, had the device been shipped as requested and indicated by her, the software lock would be removed and the corporate and client data removed, the device was to be shipped back to her to remain a personal device. Once the device successfully locked, Ms. Reynolds contacted us via a lawyer to demand the software lock be removed, insinuating all data on the device was owned exclusively by her, which was clearly false as we could see corporate and client data on the disk via the backup software copies. After a number of conversations with her lawyer, her counsel communicated to us that they had dropped her as a client as she had no viable claim to the data based on her signed employment contract. Ms. Reynolds then took the laptop to an Apple store and had the laptop wiped. I spoke to the technician at the store that performed the wipe to ensure that no backups of

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

the data existed. Shortly after that occurred is when we (SECOM) started to hear about complaints being submitted to DEFCON regarding possible code of conduct violations.

I sent a final text message to Ms. Reynolds to one of the multiple phone numbers she had provided for communications to provide myself a level of closure to the event that had occurred. I felt betrayed, but still felt it necessary to offer a message of almost forgiveness for that betrayal, by acknowledging the lies we had uncovered with evidence and hoping she could sincerely find a form of happiness in the future. Effectively washing my hands of her and wishing her well. There was no intended malice in my final communication which occurred weeks after the laptop dispute.

Cat Murdock Employment and Departure

10. I was not directly involved in the hiring of Cat Murdock, as I was myself hired shortly before her. I did know she came to the company with no prior cyber security work experience. We worked as peers for most of her tenure at SECOM, and we collaborated on many projects. The circumstances of her termination was an abrupt resignation shortly after the close of an annual training class she was a significant contributor to. Ms. Murdock was in charge of orchestrating a major component of the class which involved assigning daily tasks to a group of actors we employed as part of the class. Given the nature of the class it was imperative to structure these activities in a way to remain legal and in compliance with expectations of the company that was utilized as a target for the class activities. For this iteration of the class SECOM management gave her a level of autonomy to develop the narratives for the actors, which was a first for this class, to offer another level of realism to the students. In past years all activities were constructed with the "red team" (the trainers) and the "blue team" (administrative SECOM staff) collaborating on these activities. Ms. Murdock was given this additional responsibility to manage the "blue team" activities with no managerial oversight based on the previous quality of work she had exhibited

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

for other SECOM projects. The activities she ultimately planned were structured in a way that, had they been executed as she designed, would have been illegal and fraudulent. The trainers (Chris and myself) were put in a position to recover from this mistake in real time during the class and make changes to her designs without compromising the integrity of the class. It made for a very stressful day, as "breaking the fourth wall" in this class would have created a significantly negative experience for the students who were paying in total about $80,000 for this class. Due to this stress she was relieved of her managerial role, via MS Teams chat, and the class ultimately recovered and completed successfully. Hours after the class had ended, very late in the evening, Ms. Murdock emailed her resignation to management.

11. At no time while I was working with Ms. Murdock did she express concerns about her safety or her concerns with Chris' behavior toward employees. A couple months after her departure a website under her control began advertising services that were named exactly like those of SECOM services, meaning she was in direct competition, which violated her signed employment agreement. After a cease-and-desist letter was issued the website was decommissioned. A couple months after that encounter we were notified that Ms. Murdock became employed at an established competitor of SECOM, within the one year non-compete timeframe, which was another violation of her signed employment contract. SECOM took no action for this infraction primarily due to not wanting to inhibit her career, as we (management) were more comfortable just parting ways with her.

12. At the final in-person DEFCON conference that SECOM attended, Ms. Murdock was also in attendance and at one point publicly identified members of the FBI's child protection unit (that she worked with while she was a volunteer with ILF) that was in attendance to visit with Chris as part of his Innocent Lives Foundation work. Ms. Murdock approached these agents in

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

such a manner (advertising they should work directly with her and cease working with ILF) that the agents insisted Chris "do something to stop her from contacting them." Chris was in no position to do that, so we (management) banned her from the SE Village for the duration of the conference that year to shield these agents from her contact.

Jess Levine Departure

13. I was directly involved in the hiring of Jess Levine and had known her briefly before she interviewed with SECOM as she was a regular volunteer for the SE Village at DEFCON and DerbyCon for the multiple years I was a part of it. During her interview we (management) were impressed with the skillset she could offer SECOM and were excited for her to join the team. I was personally excited as the skills she advertised to us would directly benefit a project I was exclusively working on, and I was looking forward to the collaboration. Unfortunately, shortly after she started working for SECOM it became clear that Ms. Levine was not living up to her advertised work experience and a series of personnel issues arose related to her self-disclosed emotional issues. We (management) tried to support her in every way we could during her short time with the company, going so far as to offer her paid leave to seek mental health services without the stress of trying to also fulfill her employment obligations. She did not take that offer at the time, but instead publicly disclosed on social media her concerns with mental health issues and her "hypothetical" management. She was spoken to about her concerns and the unprofessional nature of her social media post, but that issue was laid to rest shortly thereafter. It was only after additional concerns about her work output after that incident did management decide to terminate her employment.

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

Chris Hadnagy

14. Two years before I was employed at Social-Engineer, I had attended one of Chris Hadnagy's classes (Advanced Practical Social Engineering) in an effort to progress in my career as a penetration tester at my current (at the time) employer. Attending that class was truly a life-changing experience. I met Chris and Michele Fincher there as they were the instructors of the class and felt immediately like I bonded in a sense with Michele, as we seemed to have similar communication styles. I learned more than I had hoped attending that class, about not only my career possibilities but about myself as an introverted person. Chris unknowingly established a connection with me via the music he played in the class.

15. As an instructor Chris always held his students to a high ethical standard even in the early days when I first met him and he was extremely respectful of all perspectives and opinions of his students whether he agreed with them or not. The high ethical standard was employed in all facets of his business, to the point where he wrote the first known Code of Ethics for professional social engineers which was widely accepted and utilized globally. This was also present in the homework assignments of the APSE class which were curated to cause the student to feel uncomfortable asking highly personal questions of strangers in the final night of the homework. It was well communicated in every class I was able to attend, both as a student and an instructor, that the nature of the questions were never to be communicated in a sexual or demeaning way and that it was up to the students to devise an ethical approach and request to obtain the requested information. If a student felt they were unable to complete the task as requested they were never forced or belittled for not completing the homework. For me personally having to come up with a manner in which to ask these questions was a real challenge and I was thankful I was able to complete the task as it taught me a new way to approach conversations which was an incredible

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

asset to have as I became a professional social engineer. Incidentally that result was the entire purpose of the exercise.

16. The following year after attending APSE I was invited to attend a new class offering titled Master's Level Social Engineering. This was the first if its kind class environment, which was also taught by both Chris and Michele. Later in my career at SECOM I became the co-instructor of that class. The nature of the class was to have students interact with actors playing a role, for which they were not aware of their involvement in the class until the final day. On that final day the actors and students were able to meet and ask questions and relay their experiences for everyone to be able to learn. This class, due to its nature, was also held to the highest of ethical standards so no one involved ever felt manipulated or abused in any way. We received high praise from both students and the actors for accomplishing that goal each year I was a part of it.

17. As a senior leader at SECOM, it was necessary for Chris and I to collaborate on employee concerns and requests. The meetings we had always revolved around how to resolve situations in the most professional way possible. The company motto of "Leave them feeling better for having met you" was the foundation in which we tried to lay in every interaction. To say it was always successful may be an exaggeration, but there were many more positive outcomes than not. Not everyone was comfortable with Chris' very direct communication style, which is where I was able to help with company-wide and individual communications to employees. Stress can be a factor in miscommunications in any interaction and that was certainly present in some of the interactions we had with employees.

18. I also volunteer for the Innocent Lives Foundation to this day and have never considered leaving the organization, as the mission is necessary and I am thankful to Chris for both establishing the ILF as well as allowing me to assist where and when I can. I have attended



FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

numerous meetings with multiple law enforcement agencies as part of my role and have spoken with the agents Chris has curated relationships with and have never heard anything but intense praise for what he and his team are able to accomplish.

Loss of business

19. For the first few years of my employment at SECOM, business was consistently growing and we were gaining new clients and additional work from existing clients at a pace where we needed to start hiring additional personnel to be able to fulfill all the work requests. We were in a unique position to be able turn away work at our discretion due to the amount of opportunity in front of us. All of this was possible without any formal marketing staff or strategy for the entire time I was employed there up until Def Con's ban announcement and subsequent statements.

Seemingly overnight after the initial transparency report was published, a noticeable vacuum of contact was seen. The initial shock of the disclosure was immediately felt on our social media accounts and we began to face a resistance to new work we had never experienced before. Nothing else had changed during this time period aside from the release of the transparency report and statements by Def Con. We also lost a number of existing and longtime clients – who specifically cited to their concerns about Def Con's statements. During this aftermath we attempted to employ numerous professional marketing and public relations contractors to overcome this new void of incoming work. That trend continued for the duration of my time at the company. There were minor upticks in business after a year or so, post transparency report publication but nothing remotely near the growth seen before the report publication. Also, all formal marketing efforts, that were previously not even necessary, failed to generate any new business.

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

20. The final years of my employment were unlike all the previous years I was able to witness the business. Prior to Def Con's statements, each year the company was profitable to the point where Chris was able to not only send end-of-year gifts to employees and client points of contact where appropriate, each employee received sizable bonuses as a sign of appreciation for the work they did. This was not possible in the final two years of my employment for the first time in the company's history. It was a notable stressor on Chris personally not being able to reward a loyal group who continued each day working hard to make ends meet. Privately at first, both Chris and I did not take income from the company for a number of months (him longer than me), being the highest paid employees, we felt it would help the employees and maintain positive morale if they were not affected by the shortcoming of the revenue drop experienced. The timing of the revenue drop was directly associated with the transparency report release, and subsequent update that was released which both were mentioned in meetings with existing clients, prospective clients and friends of the company in general. It became very hard to market and advertise our business without having to address Def Con's public statements. Both public speaking and annual training revenue dropped significantly which was never experienced before those releases. Our involvement in the Def Con conference was always an investment for new business, and a way to give back to the community in which the company was born, as we never received any compensation from the conference itself, and any sponsor income was used exclusively to fund the participation in the event and not as company revenue.

21. Experiencing a company living effectively paycheck to paycheck was extremely stressful and was never experienced prior to the final two years I was an employee. That stress was the primary reason I resigned, to find stability for my family, at a cost of not being able to help the company.

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA AND STATE OF WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

Executed at Denver, Colorado, this 13 day of March, 2025.

________________________________
Ryan MacDougall

DECLARATION OF RYAN MACDOUGALL IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - Page 14

2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

**CERTIFICATE OF SERVICE**

The undersigned certifies under the penalty of perjury according to the laws of the United States and the State of Washington that on this date I caused to be served in the manner noted below a copy of this document entitled **DECLARATION OF RYAN MACDOUGALL IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** on the following individuals:

David Perez, WSBA #43959
Matthew J. Mertens (Pro Hac Vice)
Lauren A. Trambley (Pro Hac Vice)
Jacob (Jake) Dean (Pro Hac Vice)
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
dperez@perkinscoie.com
mmertens@perkinscoie.com
ltrambley@perkinscoie.com
jacobdean@perkinscoie.com

[ ] Via USPS
[X] Via Electronic Mail
[X] Via Electronic Filing (CM/ECF)

DATED this _14_ day of _March_ 2025 at Seattle, Washington.

Amber S Holmes
Amber Holmes, Legal Assistant

DECLARATION OF RYAN MACDOUGALL IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - Page 15

2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660