THE HONORABLE BRIAN A. TSUCHIDA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CHRISTOPHER J. HADNAGY, an individual; and SOCIAL-ENGINEER, LLC, a Pennsylvania limited liability company,<br><br>Plaintiffs,<br>v.<br><br>JEFF MOSS, an individual; DEF CON COMMUNICATIONS, INC., a Washington corporation; and DOES 1-10; and ROE ENTITIES 1-10, inclusive,<br><br>Defendants. | No. 2:23-cv-01932-BAT<br><br>DECLARATION OF MARK CONRAD IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

I, Mark Conrad, declare under penalty of perjury under the laws of Washington State as follows:

1. I am one of the attorneys representing Plaintiffs Christopher Hadnagy and Social-Engineer, LLC.

2. I am over the age of 18, and competent to testify to the matters set forth herein; and make this declaration of my own personal knowledge.

3. Attached hereto as **Exhibit 1** is a true and correct copy of Case 2:22-cv-03060-WB, Dkt. 15, filed September, 7, 2022, the joint report.

4. Attached hereto as **Exhibit 2** is a true and correct copy of DEFCON00000275 –

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

DEFCON00000277, a signal conversation titled 'DEF CON Weekly Call', including Jeff Moss and Kevin Sugihara.

5. Attached hereto as **Exhibit 3** is a true and correct copy of the deposition transcript of Jeff Moss, dated July 31, 2024.

6. Attached hereto as **Exhibit 4** is a true and correct copy of DEFCON000161 – DEFCON00000181, a signal conversation between Jeff Moss and Maxie Reynolds.

7. Attached hereto as **Exhibit 5** is a true and correct copy of the deposition transcript of Jeff Moss, dated January 3, 2025.

8. Attached hereto as **Exhibit 6** is a true and correct copy of DEFCON00000785, Def Con's organization chart.

9. Attached hereto as **Exhibit 7** is a true and correct copy of the deposition transcript of Neil Wyler, dated November 14, 2024.

10. Attached hereto as **Exhibit 8** is a true and correct copy of the deposition transcript of Christopher Hadnagy, dated January 28, 2025.

11. Attached hereto as **Exhibit 9** is a true and correct copy of the deposition transcript of Maxie Reynolds, dated September 27, 2024.

12. Attached hereto as **Exhibit 10** is a true and correct copy of SE_001469 – SE_001482, Maxie Reynolds' Employment Agreement with Social-Engineer, LLC .

13. Attached hereto as **Exhibit 11** is a true and correct copy of SE_000348, an email with the subject line 'Re_Computer Setup'. Maxie Reynolds offers to sell her laptop to the company for $1.

14. Attached hereto as **Exhibit 12** is a true and correct copy of Plaintiffs' Exhibit 15 of Reynolds' deposition, an email with the title 'Re: Wouldn't'.

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

15. Attached hereto as **Exhibit 13** is a true and correct copy of Plaintiffs' Exhibit 17 of Reynolds' deposition, an email with the title 'Re: Untitled Mindful Scammer Project'. This email includes an attachment, SE_001072, titled 'MR_Untitled Mindful Scammer_053021.pdf'.

16. Attached hereto as **Exhibit 14** is a true and correct copy of SE_000402, an email with the title 'Re: Resignation'.

17. Attached hereto as **Exhibit 15** is a true and correct copy of Plaintiffs' Exhibit 23 of Reynolds' deposition, an email with the title 'Re: Return of Company Equipment'.

18. Attached hereto as **Exhibit 16** is a true and correct copy of, SE_000120-SE_000139, a text message conversation between Christopher Hadnagy and Neil Wyler.

19. Attached hereto as **Exhibit 17** is a true and correct copy of DEFCON00000160, Plaintiffs' Exhibit 22 of Reynolds' deposition, an email with the title 'Re: Code of Conduct Violations'.

20. Defendants have never produced any Def Con policies or procedures related to investigations, in discovery.

21. Attached hereto as **Exhibit 18** is a true and correct copy of Defendants' Initial Rule 26 Disclosures, dated November 21, 2023.

22. Attached hereto as **Exhibit 19** is a true and correct copy of FINCHER000001 – 0000011, a signal conversation between Michele Fincher and Jeff Moss.

23. Attached hereto as **Exhibit 20** is a true and correct copy of a letter from Perkins Coie re objections to the Michele Fincher subpoena, dated November 14, 2024.

24. Attached hereto as **Exhibit 21** is a true and correct copy of the deposition transcript of Cat Murdock, dated October 24, 2024.

25. Attached hereto as **Exhibit 22** is a true and correct copy of DEFCON0000251 -

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

DEFCON00000262, a signal conversation between Jeff Moss and Cat Murdock.

26. Attached hereto as **Exhibit 23** is a true and correct copy of the deposition transcript of Alethe Denis, dated September 19, 2024.

27. Attached hereto as **Exhibit 24** is a true and correct copy of the deposition transcript of Jessica Levine, dated September 24, 2024.

28. There has been no statement written by Jessica Levine, produced in discovery.

29. Attached hereto as **Exhibit 25** is a true and correct copy of the deposition transcript of Samanatha Gamble, dated January 15, 2025.

30. Attached hereto as **Exhibit 26** is a true and correct copy of SE_000657 – SE_000662, Def Con's Transparency report, banning Hadnagy, as well as previous notable bans.

31. Attached hereto as **Exhibit 27** is a true and correct copy of DEFCON00000001 – DEFCON00000067, Jeff Moss' basecamp communications.

32. Attached hereto as **Exhibit 28** is a true and correct copy of DEFCON000346 - DEFCON00000383, a signal conversation between Jeff Moss and Neil Wyer.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT.

DATED this 14th day of March 2025 in Seattle, Washington.

FREY BUCK,

By: ____________________

Mark Conrad, WSBA #48135

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

**CERTIFICATE OF SERVICE**

The undersigned certifies under the penalty of perjury according to the laws of the United States and the State of Washington that on this date I caused to be served in the manner noted below a copy of this document entitled **DECLARATION OF MARK CONRAD IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT** on the following individuals:

David Perez, WSBA #43959
Matthew J. Mertens (Pro Hac Vice)
Lauren A. Trambley (Pro Hac Vice)
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
dperez@perkinscoie.com
mmertens@perkinscoie.com
ltrambley@perkinscoie.com

[ ] Via USPS
[X] Via Electronic Mail
[X] Via Electronic Filing (CM/ECF)

DATED this 14th day of March 2025 at Seattle, Washington.

Amber S Holmes
Amber Holmes, Legal Assistant

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CHRISTOPHER J. HADNAGY, individually and on behalf of SOCIAL-ENGINEER, LLC,<br><br>Plaintiff,<br><br>v.<br><br>JEFF MOSS, and DEF CON COMMUNICATIONS, INC.,<br><br>Defendants. | 2:22-cv-03060-WB |

**JOINT REPORT OF RULE 26(f) MEETING AND PROPOSED DISCOVERY PLAN**

In accordance with Federal Rule of Civil Procedure 26(f) and the Court's September 2, 2022 Notice of Preliminary Pretrial Conference (Dkt. 14), counsel for the parties conferred on September 7, 2022, and submit to Chambers the following report of their meeting for the Court's consideration.[1]

**1. Discussion of Claims, Defenses, and Relevant Issues.**

- **Factual background relevant to Plaintiff's claims.**

In short, Plaintiff Christopher J. Hadnagy is the founder and CEO of Plaintiff Social-Engineer, LLC, a Pennsylvania Limited Liability Company. As set forth at length in their Complaint, suddenly and without warning, in or around January of 2022, Defendants Jeff Moss and DEF CON COMMUNICATIONS, INC., informed Plaintiff Hadnagy that neither he nor Plaintiff Social-Engineer could attend, contribute to, or participate at Defendants' annual hacker conference in Las

[1] As a threshold issue, Defendants Jeff Moss and Def Con Communications dispute that personal jurisdiction is appropriate over them in the Eastern District of Pennsylvania; intend to move to dismiss the Complaint based on, among other things, lack of personal jurisdiction; and reserve all rights to challenge personal jurisdiction over Defendants notwithstanding the submission of this Rule 26(f) report as required by the Court's September 2 Notice.

Vegas, Nevada, (hereinafter referred to as "the Event") despite a longstanding positive history.

This ban on Plaintiffs' attendance, contribution, and participation was based on alleged violations of Defendant DEF CON's Code of Conduct (COC), and effectively excluded Plaintiffs from the Event indefinitely. Defendants provided no evidentiary support or explanation regarding their abrupt termination of Plaintiffs' participation at the Event, and it is Plaintiffs' position that Defendant Moss, individually and acting on behalf of Defendant DEF CON, with knowledge and intent, falsely alleged that Plaintiffs violated the Code of Conduct to replace Plaintiffs' SEVillage at the Event with another "village" targeted to similar topics but organized and hosted by others. It is believed and therefore averred that these "others" included a disgruntled former employee of Plaintiffs, who played a key role in the orchestration of Plaintiffs' takedown.

After the ban, Defendants disseminated via the DEF CON website a vague Transparency Report referencing alleged violations of the COC. Due to the vague but troubling statements made by Defendants, many have assumed that Plaintiff Hadnagy perpetrated some sort of sexual assault and/or sexual harassment, thus leading to the ban. Plaintiffs have alleged that certain high-profile clientele received Defendants' false statements, innuendo, and implications concerning Plaintiffs in the Eastern District and understood them to be harmful to Plaintiffs' reputation(s).

- **Factual background relevant to Defendants' defenses.**

Each year, Defendant Def Con Communications ("Def Con") hosts one of the largest and most influential information and computer security conferences in the country. The event, known as Def Con, is the preeminent industry gathering of "hackers" and draws tens of thousands of attendees annually. Defendants are standard-bearers in the hacking community.

In late 2021, an ex-employee of Plaintiff Social-Engineer LLC ("Social-Engineer") approached Defendant Def Con through a third party. The ex-employee described to the third party a campaign of abusive, harassing, and controlling behavior by Plaintiff Chris Hadnagy

precipitated by her decision to leave Social-Engineer. The third party reached out to Plaintiff Hadnagy, who corroborated the ex-employee's assertions in key respects but offered post-hoc and factually unsatisfactory explanations for his conduct. Defendant DEF CON then connected with at least half a dozen other members of the hacking community who described similar inappropriate conduct by Plaintiff Hadnagy.

Plaintiff Hadnagy's misconduct gravely concerned Defendant DEF CON, especially since (among other things) Plaintiff Hadnagy had personally confirmed the ex-employee's allegations. Defendant Def Con took seriously, and continues to take seriously, its position as the host of the preeminent event in the hacking industry. Defendant Def Con did not want to provide a platform to an individual engaging in the kind of behavior in which Plaintiff Hadnagy had admittedly and unapologetically engaged. Accordingly, on February 9, 2022, Defendant Def Con released the following statement announcing Plaintiff Hadnagy's ban from subsequent Def Con conferences, which constitutes the entirety of the alleged defamation in this case:

> We received multiple [code of conduct] violation reports about a DEF CON Village leader, Chris Hadnagy of the SE Village. After conversations with the reporting parties and Chris, we are confident the severity of the transgressions merits a ban from DEF CON.

The statement above is true and, as discovery and motion practice will demonstrate, cannot support Plaintiffs' defamation-related and tortious-interference-related causes of action.

- **Plaintiffs' primary issues, threshold issues, and issues on which to conduct discovery.**

From Plaintiffs' perspective, as a threshold issue, Plaintiffs presume (and have been informed by opposing counsel) that Defendants intend to dispute, *inter alia*, personal jurisdiction. Plaintiffs disagree with regard to an alleged lack of personal jurisdiction and reserve the right to oppose any and all arguments to the same set forth in Defendants' anticipated Motion(s) to Dismiss Plaintiffs' Complaint.

Plaintiffs' primary issues are those set forth in Counts I through V of Plaintiffs' Complaint, and include, but are not limited to, the following:

- Whether or not Defendants published false statements with knowledge of their falsity, and/or reckless disregard for the truth, and did so intentionally and/or recklessly, willfully, and with actual malice and in blatant disregard of Plaintiffs' rights, to portray Plaintiff Hadnagy, specifically, including to falsely accuse him of what could only be despicable conduct, in order to harm his reputation and cause him and Plaintiff Social-Engineer other harms.
- Whether or not Plaintiffs have suffered severe and irreversible harm as a direct and proximate result of Defendants' defamatory statements and their publication of the same.
- Whether or not Defendants intentionally interfered with Plaintiffs' contractual relationships with actual and prospective clientele.
- Whether or not Defendants tortiously interfered with Plaintiffs' contractual relationships with actual and prospective clientele.
- Whether or not Defendants' statements have been widely publicized to the tech community as well as the general public, and as such, Defendants placed Plaintiffs before the public in a false light.
- Whether or not Defendants' conduct to date has been both extreme and outrageous.
- Whether or not Plaintiff Hadnagy has suffered emotional and psychological distress as a direct and proximate result of Defendants' conduct.

Plaintiffs intend to conduct written discovery on the following issues: Information and documentation pertaining to the alleged COC violations, including but not limited to instances of alleged harassment, that led to Plaintiffs' ban from the Event, i.e. Defendants' allegation that they are insulated from liability as "truth" is their defense; Identities of any and all fact witnesses with information regarding the alleged COC violations that led to Plaintiffs' ban from the Event so that relevant deposition testimony can be conducted; Information regarding the publication of February 9, 2022 Transparency Report including author, source of information set forth in Report, method of dissemination, and its intended recipients; Information re: solicitation of participants in Event; Information and/or documentation regarding the corporate formalities, if any, exercised by Defendant DEF CON; Communications exchanged by and between Plaintiffs and Defendants at all times relevant hereto; etc.

Plaintiffs also intend to conduct depositions, including the deposition of Defendant Moss, subsequent to receipt and review of Defendants' responses to Plaintiffs' Interrogatories and Requests for Production of Documents. Additional witnesses may be identified throughout the course of written discovery and subsequently noticed.

- **Defendants' primary issues, threshold issues, and issues on which to conduct discovery.**

The first threshold issue is the lack of personal jurisdiction over Defendants in the Eastern District of Pennsylvania. Plaintiffs' conclusory jurisdictional allegations in Paragraphs 22 and 23 of the Complaint lack legal and factual merit and are insufficient to establish personal jurisdiction over Defendants, who are residents of Washington with very limited contact with the Eastern District of Pennsylvania.

The second threshold issue is that Plaintiffs' alter ego allegations against Defendant Jeff Moss in his individual capacity lack merit, are conclusory, and cannot support claims against Defendant Moss separate and apart from the claims against Defendant DEF CON.

Even if the Court moves beyond the threshold issues, Plaintiff's claim still fails because (1) every part of the allegedly defamatory statement is true; (2) Plaintiffs' tortious inference claim lacks merit because, among other reasons, Defendants lacked any intent to interfere with any of Plaintiffs' contracts, and any interference with Plaintiffs' contracts was not improper; and (3) even accepting Plaintiffs' allegations as true, no reasonable factfinder could conclude that Defendants' conduct meets the extremely high bar in Pennsylvania for intentional infliction of emotional distress.

Turning to discovery, this case should not reach the discovery stage, as there is not personal jurisdiction over Defendants in the Eastern District of Pennsylvania and Plaintiffs' claims are not colorable.  However, if Defendants' forthcoming motion to dismiss is not granted, Defendants

intend to conduct discovery on, among other topics, Plaintiff Hadnagy's conduct towards the ex-employee who sought help from the third party to stop Plaintiff Hadnagy's campaign of harassment against her; Plaintiff Hadnagy's conduct towards other ex-employees; Plaintiff Hadnagy's conduct towards others in the hacking industry; and Plaintiffs' alleged damages. Defendants will need this information in discovery to prepare motion(s) for summary judgment and demonstrate, among other things, that (1) there is no genuine issue of material fact as to the truth of Defendant DEF CON's February 9, 2022, statement about Plaintiff Hadnagy, and (2) Plaintiffs' damages claims are not colorable.

- **Plaintiffs' likely motions and their timing.**

None at this time. Plaintiffs reserve the right to file any and all motions reasonable and necessary throughout litigation without creating an undue delay to the parties and the Court.

- **Defendants' likely motions and their timing.**

As alluded to above, Defendants intend to file a motion to dismiss on October 11, 2022, challenging personal jurisdiction and the legal sufficiency of Plaintiffs' claims. If this motion is denied, Defendants intend to file a motion for summary judgment at the close of discovery.

**2. Initial and Informal Disclosures.**

The parties agree that, in light of the jurisdictional issue and privacy concerns raised by certain non-party witnesses, initial disclosures should wait until after the Court decides the jurisdictional issue. Counsel for Plaintiffs and Defendants therefore request to postpone the exchange of initial disclosures until seven (7) business days of the Court's Order ruling on Defendants' Motion(s) to Dismiss.

**3. Formal Discovery.**

The parties have discussed the scope of discovery and scale of this case and we do not foresee the need to go beyond the maximum number of Interrogatories and depositions prescribed

by the Federal Rules of Civil Procedure.

That being said, the parties have discussed and agree that factual discovery (including written discovery and depositions) can be completed within one hundred and forty-five (145) days from receipt of an Order ruling on Defendants' Motion(s) to Dismiss. The parties have further agreed that any and all dispositive motions should be filed within thirty (30) days of the factual discovery deadline, with responses due twenty (20) days thereafter. Furthermore, Defendants request thirty (30) days after Plaintiffs' expert witness report deadline in which to file Defendants' expert witness report(s), if any.

**4.      Electronic Discovery.**

Counsel for Plaintiffs is in receipt of Defendants' standard e-discovery/electronically stored information (ESI) protocols and is in the process of reviewing the same. Counsel intend to reach an agreement as to how they will conduct e-discovery, if necessary, prior to the Rule 16 Conference, and shall advise the Court of that agreement at said Conference.

**5.      Expert Witness Disclosures.**

Defendants do not believe expert witness testimony is necessary or appropriate in this matter.

Plaintiffs may require expert witness testimony, i.e. regarding Plaintiffs' purported damages, and will provide opposing counsel with information regarding any such expert witness, as well as a copy of any report(s) to be admitted, on or before Plaintiffs' expert report deadline as established by this Honorable Court.

**6.      Early Settlement or Resolution.**

Defendants do not see any prospect of settlement at this time given the procedural and substantive issues with the Complaint.  Defendants will reassess the prospect of early resolution after the Court's ruling on Defendants' forthcoming motion to dismiss challenging (among other things)

the lack of personal jurisdiction over Defendants.

Plaintiffs are open to settlement discussions now and in the future.

**7. Trial Date.**

Both Plaintiffs and Defendants can be ready for trial within three hundred (300) days after receipt of an Order ruling on Defendants' Motion(s) to Dismiss.

**8. Other.**

N/A.

**Date: September 7, 2022**

**Respectfully Submitted:**

By: */s/ Ashley A. Zingaretti*
Ashley A. Zingaretti
**COMITZ LAW FIRM, LLC**
46 Public Square
Wilkes-Barre, PA 18701
570-829-1111
azingaretti@comitzlaw.com

*Counsel for Plaintiff, Christopher J. Hadnagy, Individually and on behalf of Social-Engineer, LLC*

By: */s/ Jonathan L. Cochran*
Jonathan L. Cochran
John S. Stapleton
**LeVAN STAPLETON SEGAL COCHRAN LLC**
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
215.261.5210
jcochran@levanstapleton.com

David Perez (admitted PHV)
**PERKINS COIE LLP**
1201 Third Avenue
Suite 4900
Seattle, Washington 98101-3099
206.359.6767
DPerez@perkinscoie.com

Matthew Mertens (admitted PHV)
**PERKINS COIE LLP**
1120 NW Couch Street, 10th Floor
Portland, Oregon 97209-4128
503.727.2199
MMertens@perkinscoie.com

*Counsel for Defendants Jeff Moss and DEF CON Communications, Inc.*

# Exhibit 2

DEF CON Weekly Call
BC
Read More
Edited 04:34
Fri, Mar 29
The Washington State court just ruled on our Hadnagy lawsuit, dismissing a bunch of claims, but leaving a few pending amendments. Over all very good for us.
Now we can finally move along to the actual merits of the case.
https://www.courtlistener.com/docket/68094183/hadnagy-v-moss/
@Darington Forbes Lets get a lawsuit update post ready next week.
15:20
Kevin Sugihara
Hadnagy's counsel also withdrew? am i reading that right?
KS
15:23
No he had some local council covering for him until his out of state lawyer could get permission to practice in Wa
15:23

DEF CON Weekly Call

Kevin Sugihara
ah okay 15:23

Fri, Mar 29

His ability to collect legal fees should he prevail disappeared with that ruling. 👍 15:25

Kevin Sugihara
very nice. hopefully this just goes away soon 15:26

Oh no it is going to get spicy with discovery, but now that we know what we are actually arguing over we can start planning. He has until the 22nd of next month to amend those three causes with facts or they go away. 15:28

Kevin Sugihara
"and he was likened to the 'Harvey Weinstein' of the information security industry in a public post" 15:31
👍

this is fun document lol. well best of luck with it, hopefully it can at least be handled now. 15:32

  DEF CON Weekly Call

Sat, Mar 30

Darington Forbes

You

The Washington State court just ruled on our Hadnagy lawsuit, dismi...

Interesting read. Gives a lot of insight into the story Hadnagy is telling himself and his counsel. It's gotten pretty Earth2 over there.

05:43

# Exhibit 3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

CHRISTOPHER J. HADNAGY, an individual; and SOCIAL-ENGINEER, LLC, a Pennsylvania limited liability company,

Plaintiffs,

vs.

JEFF MOSS, an individual; DEF CON COMMUNICATIONS, INC., a Washington corporation; and DOES 1-10; and ROE ENTITIES 1-10,

Defendants.

No. 2:23-cv-01932-BAT

VIDEO-RECORDED DEPOSITION OF JEFF MOSS

July 31, 2024

Seattle, Washington

Reporter: John M. S. Botelho, CCR, RPR

So, for example, when we're at Caesars Entertainment, there would be a lot of people walking around in Goon shirts that actually were representing interests of the event space or the hotel or the food service vendor or the network provider. But to fit in with the conference and to be able to move around, we essentially badge them. You know, we made them look like us so they could move around the conference.

There would be Goons that are more senior. They have more years of experience. They have more responsibility. And then there might be some Goons that are -- never helped out before at all, right? They're starting their very first time, and they -- they just want to help with the conference.

So there's a spectrum.

Q How does one become a Goon?

A I still don't know. It's largely word of mouth. Some of these departments -- well, departments are largely responsible for their own hiring and firing -- or not hiring and firing, but, you know, like, attracting talent, attracting the Goons, managing who can work, who can't work, and then submitting their -- their list of who's going to work in their department that year.

Q What do you mean "departments"?

A So inside DEF CON, we probably have 30 -- maybe 30

departments that exist during -- well, they exist year-round, but their sole focus is to be responsible for a certain part of the conference.

Q And so if they -- so if there's a department that is putting on part of the conference, they can set forth a list of individuals that they want named as Goons?

A Correct.

Q And then how does DEF CON go about making them Goons?

A Well, ultimately, it's the responsibility of the department leader. So -- so, for example, I'll just pick human registration.

When -- when a person comes to pick up their badge to enter the conference, the human registration department is responsible. So they'll have a giant stack of badges. They'll have a large group of temporary workers handing out the badges.

And so the department leader would say, Okay. I think I'm going to handle 20,000 people over X number of days. I don't want the line to be longer than half an hour. I'm going to need 20 temps. I'm going to need eight Goons. I'm going to need two shifts. I'm going to need -- and they do the math, and they say, Okay. I'm going to need 30 people, or whatever. Whatever it is they come up with. And I might need a bunch of temporary helpers, and I'm going to need --

you know.

So my team, my department's going to need, you know, five hotel room nights to put them in the hotel room. And I'm going to need 30 Goon packs. You know, Goon badges, shirts, food credits, hotel room nights, whatever.

And then that goes in a spreadsheet. And we say, Okay. That department's allocated 30.

Q So you mention the human registration department.

A Mm-hmm.

Q Who heads up that department for DEF CON?

A I'm trying to remember. It's changed around a little bit. I can see his face, but I can't see his name.

"CStone" is his handle. I want to say it's CStone.

Q You're saying "CStone"?

A Letter "C," S-t-o-n-e.

Q And so CStone is the head of the human registration department?

A He might be the head of the inhuman registration, but I think it's human registration.

Q And what's his affiliation with DEF CON?

A He's the head of human registration.

Q Is he -- does DEF CON contract with him to take on that role?

A I'm not -- I'm trying to think. Like -- so -- so DEF CON's a for-profit corporation, so we cannot accept volunteers. If you have a volunteer at your conference that you're not paying and you're a for-profit company, you're violating IRS tax code, right? That's illegal.

So everybody that works at DEF CON as a Goon is, under the tax code, I think it's called an in-kind barter something or other. It's whatever the tax code category is for what we do. But it's not a volunteer, 'cause that would not be legal.

So as part of that, we -- we don't have a contract signed with -- it's not like a musician where you'll perform these three duties and show up at 9:00, right? It's much more you agree to follow our code of conduct. We have a Goon code of conduct. You'll follow our rules and, you know, and run your department.

And so that's basically how it goes.

Q So each of the Goons is an in-kind barter --

A Whatever the tax code.

MR. MERTENS: Let him finish his question.

THE WITNESS: Sorry. Sorry.

THE REPORTER: "In-kind barter..." Mr. Conrad.

MR. CONRAD: Well, okay. Strike

Does that make sense?

A Yeah, if I understand your question, the answer is, Goon departments self-generate. But there's a long history of, say, you Goon in the network department and you do that for two or three years, and you might say, Oh, this is interesting, but I want to go help out with registration.

So they might go to registration, say, Hey, I'm getting tired of the networking team. Do you have any openings in your human registration team?

Or the head of human registration might say, Hey, three of my -- my people are retiring this year or they can't do it next year. I need three more people. Anybody want to come to my department?

So we might have Goons that have worked at DEF CON for 20 years, but they might have been in six, seven different departments. So while they might have started in one and got nominated and brought into one, as long as they have a good work ethic and there's, you know, no complaints and they -- they do what they say they're going to do, other departments are happy to take them or move them around.

Q And are there people that are supervising the Goons?

A The department leaders are responsible for their department.

predict when something might come up or why it might change, so we -- we have to be really flexible, and we have to be really accommodating.

Q So some of these department leads, it's not just that they're working day of conference, but they're doing a bunch of work leading up to the conference year-round?

A Some might. Most don't. Most get really busy in the month before. But say, for example, I mention the arts and entertainment and getting these artists. They know that they have to put the call out for artists four months in advance, right? So they might put the call out. Then they might just sit around for a month, waiting for the things to come in. Then they might spend some time reviewing them, and then they sit around for a while. They don't really get busy, you know, until the event, but there's things they have to do in advance to get ready.

Department leaders are in-kind, whatever, barter, but they also get paid an additional fee. So, for example, a department leader might get, say, $2,000 for being the number one. And their number two might get a thousand dollars or something. And this is primarily to help them with their costs at the show.

You know, departments also get a budget to -- let's say they want to create a thank-you gift for all

basically -- like, my best use of time at the conference is to be available to help put out a fire. So if there's a fire going on, that's what I'm focused on.

If there's not a fire going on, I'm maybe introducing speakers, meeting with department leaders, meeting with the hotel or the property. Maybe I'm reviewing what happened in the previous day. Normal kind of, you know, see and be seen by all the different departments. Say "hi." Make sure everything's working. And then be available for any kind of emergency approval of spend of money or an extension of hours of -- let's say the temporary workers need to extend their hours by -- you know, that has a big financial impact, and that needs to be kind of approved. So...

Q And one of the things that I wanted to ask about is, I've seen the term "villages" used.

A Mm-hmm.

Q And then you've been using the term "departments."

A Mm-hmm.

Q Are those the same thing?

A Two different things.

Q Can you explain it to me?

A So on the operational side, the side of DEF CON that --

the structures that facilitate the operation of the conference, that would be departments. On the side of those who create content, things that attendees will see, experience, that's sort of on the content side. So villages would be on the content side.

Q And how does DEF CON determine what the differing villages are?

A Well, they largely self-select villages. Just like I described to you how there might be a call for artists to perform music, it'd be a call to who wants to run a village, right? Or someone might come to us and say, We want to do a village on physical security.

And so we have an application process. People submit all their ideas. We review them. We look at how much space we have. We look at how much cost there is. You know, there's a bunch of factors we weigh, and in the end, we allocate space and accept or reject villages.

Q Do they have to pay?

A Who?

Q Villages.

A No.

Q Are they paid?

A No.

Q And the screening process that you're kind of talking

know you broke into the computer and read that file. 'Cause that's the only way you would know what's in that file.

So that might score you some points. You've captured that flag. That flag's worth ten points. And over the duration of the contest, teams would score points. And then the best teams would win: First, second, and third.

This concept of a Capture the Flag contest originated at DEF CON. Now it's worldwide. There's national contests. There's an unlimited number of Capture the Flag contests. But it all originally started at DEF CON. And so we're considered sort of the originator. We might not have the most technically awesome contest on a specific area, but we are the most prestigious because we were the originators. Because we want the best competitors to play, they get the most number of black badges.

Q One of the other kind of terms that I've seen is the Wall of Sheep?

A Mm-hmm.

Q Can you tell me about that?

A It's one of the villages. I think they go by the name "Packet Hacking." The Packet Hacking Village now. But in the early days, they went -- they were the Wall of

Sheep. They -- they're one of the oldest groups. And they predate the concept, I think, of villages. We didn't invent this villages idea till after they'd been around.

So when they were around originally, what they did is they -- so this is the early days of the Internet and early days of security. And a lot of wireless network activity was not protected, in the sense that you could monitor what people were doing online.

And so to raise awareness, they had this Wall of Sheep where they would monitor the network for what they could hear. And if they determined that you were doing something insecurely, they would write on, like, a -- they had a paper, like, plate like you find at a picnic. Picnic plate. And they'd write -- they obfuscate it so they didn't reveal any personal information, but they'd reveal something like -- like, somebody's logging in to Microsoft. Somebody's logging in to whatever. And they'd put it up on a wall.

And then people would walk by the wall and look at it and be, like, Oh, look. Somebody insecurely tried to connect to Microsoft, for example. Somebody did whatever. And it was sort of this tongue-in-cheek name and shame: Oh, let's see who's making security mistakes. And then they'd get written up.

And as the years progressed and networks got more and more secure, Wall of Sheep -- there was much less defined. And so it wasn't really interesting anymore. So they pivoted from Wall of Sheep to Packet Hacking Village. And so they turned to more about teaching people how to monitor the network and look for problems and find malware or -- but people love that. It was like a visual representation, and it captured the imagination of a lot of people.

Q Are they still projecting kind of people who are doing things unsecured on the network?

MR. MERTENS: Object to the form.

THE WITNESS: I don't know. I know they want to. And I know, every year, they complain there's less and less to find. 'Cause everything's encrypted nowadays. So...

Q (By Mr. Conrad) What are some of the biggest security threats that occur at DEF CON?

MR. MERTENS: Object to the form.

THE WITNESS: What -- you have to try to clarify that.

Security threats to who, to what?

Q (By Mr. Conrad) To attendees.

MR. MERTENS: Object to the form.

Q (By Mr. Conrad) In terms of vulnerabilities to let's

say criminal hacking. Is that a significant threat at DEF CON?

A I mean, it's a -- it's a big conference in Las Vegas. So you have all the normal threats of people going to Las Vegas for conferences, right? From scam taxi drivers to bartenders overcharging and underpouring. Locals roofie'ing people at the locals -- you know, it's, like, normal conference problems.

Is that kind of what you were getting at?

Q Sure.

I guess what I'm getting at also is, you know, some of -- when I'm looking up information about DEF CON, some of what I've seen talks about turning your phone --

A Oh.

Q -- Bluetooth off or your Wi-Fi off and things of that nature.

A Right. Right. Yeah. Network hygiene stuff. Yeah. I'm aware there's a lot of older articles talking about all the things you have to do to protect yourself at DEF CON.

Q Why do you say "older articles"?

A So you know that example I gave you about Wall of Sheep, about how just the products got better, the phone system got better, wireless got better, just

Sorry to interrupt you.
Q It's okay.
A Yeah.
Q So is there any policy or procedure about documenting an investigation into what actually occurred there?
A Yes.
Q Can you tell me about what that policy or procedure is?
A So I'm going from memory. I don't have it memorized. But the SOC collects incident reports for everything that happens on shift every day. So, for example, if there was a drunk and disorderly and the hotel had to walk someone back to their room, if the SOC was involved in that, they might say, Drunk and disorderly, you know, at 1 in the morning at the music concert. We called the hotel. Hotel walked the guy back to the room.

And so we would have it documented of incidents. And we do that largely to understand what are the trends. Are there a lot of dunk and disorderlies? Well, then maybe we need to figure out a way to have less of those. Are they always happening in one area or one time of day? Well, then maybe something's wrong with that room or whatever.
Q And the incident reports, the SOC department members fill those out?

A I'm trying to think where I would even go.

The types of complaints I heard were mostly just around how difficult it was to work with Chris, not -- like -- like what I said, overly aggressive lobbying for more resources. But, I mean, he's not the only village organizer that aggressively tries to get more resources.

Q So nothing else that was reported to you that --

A That I can recall.

Sorry for interrupting.

Q It's okay.

Prior to 2021, there was nothing reported to you regarding Chris that would have potentially been a code of conduct violation?

A No, not that comes to mind.

Q Does DEF CON encourage people to make reports in a timely fashion?

MR. MERTENS: Object to the form.

THE WITNESS: I don't know. Define "timely."

We encourage people to make reports.

Q (By Mr. Conrad) At or around the time that an incident occurs?

A Just any time.

I mean, ideally it's right then when it happens.

A -- keep going.
Q Sure.
So who is this individual that you're talking about involved in Project Unicorn?
A I don't want to get her name wrong, but it was in documents we provided you.
Q Documents. DEF CON documents?
A Documents that my counsel forwarded to you in discovery. Or no?
MR. MERTENS: I got to clarify --
THE WITNESS: Yeah, I'm getting --
MR. MERTENS: -- that --
THE WITNESS: -- it wrong.
MR. MERTENS: -- he -- he's talking about our interrogatory response.
MR. CONRAD: Okay.
Q (By Mr. Conrad) So do you have any idea of the name of this individual?
A I would have to look it up in our interrogatory response. Otherwise, I'm just going to recall one of five names, and it could be wrong.
Q So this phone call that was organized, is there any documentation of the phone call?
A Besides the time that it happened? No.
Q What do you mean, "Besides the time that it happened"?

A Well, I mean, we created a dial-in account, so we probably have the record of when we created a dial-in for the meeting. There's probably a record of that somewhere. But that was -- that was just one. If you want to hear the others, I can tell you more.
Q Yeah, we'll get there.
A Okay.
Q So the dial-in account, you think that there might be a record of that?
A Of the dialing? I think so.
Q What system did you use for that?
A I cannot remember.
Years ago, we used a voice-only company. We -- we stopped using them, and now we've moved to, I think, Zoom. So I think we stopped using that platform, like, two years ago. So I don't even know if our account is still active. But I'm betting that was our system.
Q So it was a phone call, not a Zoom call?
A Correct.
Q And how was the phone number for the dial-in account given to the people that were supposed to dial in?
A It was given to Maxie.
Q Who gave the phone number to Maxie?
A I did. Or I don't know if I -- I don't know if I did or Neil did, Grifter did, or -- but I know -- I

shouldn't say I know. I'm pretty confident that we generated the dial-in information and it was shared with Maxie. I don't specifically remember. It might be in some message. But we shared it with Maxie, and then Maxie distributed it to whatever the group was that she said had stories. And...

Q And the dial-in number, you believe that this was given to Maxie in written form?

A In a text message. I mean, it had to have been copy and pasted.

Q Whose text message?

A I don't recall. But I'm guessing, as I said earlier, mine or Neil. I don't know who else would have -- I mean, I couldn't recall who else might have shared it with her, so...

Q So you said that you had Signal messages with her.

Do you also have text messages with Maxie Reynolds?

A No.

Q So you wouldn't have shared the dial-in through text message with Maxie Reynolds?

A Correct.

Q Would it have been shared in the Signal messages with her?

A The dial-in? That's the only place I can ima- -- if I

What's her last name again?
A Ensign.
Q -- Ensign was on the phone call. And Neil Wyler was on the phone call?
A Right. So we all heard all the stories together.
Q And those are all the individuals from the DEF CON side of things?
A Correct.
Q Do you know if any of those individuals took any notes or have any records regarding the phone call?
A I don't -- I don't know -- I don't remember anybody saying, "I took great notes." I don't -- I don't remember anybody saying that.
Q Did you ever ask?
A I don't know.
I don't know. It probably would have been to our advantage to have detailed notes, but -- but we don't have detailed notes, so probably nobody took them, or else we'd have them.
Q Why do you think it would be to your advantage to have detailed notes?
A Because they're terrible fucking stories about Chris's behavior, and I would love to have them documented.
Q Are they documented anywhere?
A Yes.

Q Where?

A You have to ask my counsel.

Q Are you aware if DEF CON has any records that document the stories that took place in that phone call?

A Our counsel has records. I do not.

Does that make sense? Did I say that correctly? I'm not sure the correct...

MR. MERTENS: Can we go off the record for just a second?

MR. CONRAD: Sure.

THE VIDEOGRAPHER: Please stand by. We're going off the record. The time is 1:35 p.m.

(Pause in proceedings.)

THE VIDEOGRAPHER: We are back on the record. The time is 1:37 p.m.

Q (By Mr. Conrad) So just for purpose of the record, we had a discussion off the record clarifying that when I'm asking about documentation, that I'm not talking about DEF CON's discovery responses to interrogatories. I'm requesting and asking about any records that DEF CON may have that evidence the phone call that took place that we're discussing.

So with that clarification in mind, Jeff, does DEF CON have any record that evidences the phone call that

you're describing that took place?
A Just what I've previously stated.
Q Which is what?
A The -- there's probably a record somewhere of the dial-in.
Q Other than that, there's no other record?
A Well, there's -- I mean, the recollections of all the employees and the people that were on the call. And whether any of those people took notes, I'm unaware.
Q Do you think at this point in litigation, that you would be aware of whether they took notes or not?
A My employees --
MR. MERTENS: Object to the form. Go ahead.
THE WITNESS: My employees, I would know. We'd ask them to give us all the information.
MR. CONRAD: And --
THE WITNESS: But if somebody else on the call took notes, I'm unaware.
Q (By Mr. Conrad) And have you ever had any discussions with Marc Rogers or Neil Wyler or Darington or Melanie about whether they took notes?
A No.
Q And, in fact, you turned over Neil Wyler's text messages with my client?

A So I believe I said Michele Fincher, Maxie, Cat Murdock. And I believe there's one other.
Q And what did Michele Fincher report to you?
A Report to me. You mean on the call?
Q On the call.
A I believe on the call, she didn't talk a lot. What she did was provided support for the others who had worked for Chris who were talking. So it felt like she was giving them space, and much like she must have done when she worked with Chris, like letting them know that she was there for them. She was vested in the outcome of this. She wanted us to believe them and to listen to them, for them to be heard. And then she would speak up every once in a while to, like, back up what somebody said or maybe mention about the years that somebody worked there or not.
So someone of her credibility and her experience, in my personal interactions with her, essentially vouching for everybody on that call, was really powerful.
Q Did she report to you any code of conduct violations on the phone call?
A Not on the phone call, no.
Q And you mentioned Cat Murdock.
A Mm-hmm.

Q So she was another person on the phone call; is that right?
A Correct.
Q And did Cat Murdock report any code of conduct violations on the phone call?
A She reported plenty of things that would be a violation of the code of conduct.
Q And what were they?
A I would have to look at our interrogatory response. 'Cause otherwise, I'm going to just misremember somebody else's code of conduct violation statements.
Q But the information -- is it fair to say that the information that's contained in your interrogatory responses is information that you've also gathered after this post was made?
A I'd say --
MR. MERTENS: Object to the form. Go ahead.
THE WITNESS: It's probably a combination. Like a synthesis.
Q (By Mr. Conrad) So you don't remember what information you had -- strike that.
At -- at the time that this post was made on February 9th, 2022 --
A Mm-hmm.

Q So Grifter was -- Neil Wyler was telling you about his conversations with Chris?
A Correct.
Q You then had the phone call with these individuals that we've talked about?
A Correct.
Q And then you got the Apple receipts from Maxie Reynolds?
A Correct.
Q And that is the information that you had that supported your publishing of this February 9 --
A Well, we also had --
Q -- 2022, report?
MR. MERTENS: Let him finish --
THE WITNESS: Yeah.
MR. MERTENS: -- finish his questions.
THE WITNESS: Yeah.
MR. MERTENS: Object to the form.
Go ahead.
THE WITNESS: Okay.
Don't forget we also had Neil Grifter's personal account of his being called a pedophile by Chris. So we had this prior experience from one of Chris's good friends relaying the story as well.

Q (By Mr. Conrad) Okay. Anything else?
A I think that's mostly it.
Q So the -- the ban says that "after conversations with the reporting parties," and that's the Signal messages that you've had with Maxie Reynolds?
A That would be her e-mail maybe as a code of conduct violation report. She e-mailed in the conversations Maxie had with Grifter. And then the conversations that we had on the group call with other people beyond Maxie.
Q Okay. So the conversations. So when you're saying "after conversations with the reporting parties," you're including Neil's conversations that he's had with Maxie in that?
A I think we were trying to capture in here the totality of all of our conversations. Like, in our experience, all the information we've gathered, here, based on this information, we've come to this conclusion.
Q And in making that determination, you are considering Neil Wyler as DEF CON in terms of what his communications are?
MR. MERTENS: Object to the form. Go ahead.
THE WITNESS: I don't -- I don't know what that means. I believe --

MR. CONRAD: Well --

THE WITNESS: I believe Neil. Neil told a credible story, and I believe him because of his long history with Chris. I don't know what particular hat he was wearing at that moment.

Q (By Mr. Conrad) Well, it says, "We received multiple code of conduct violation" --

A Right.

Q -- "reports," right?

A Correct.

Q So who from DEF CON received those reports?

A Darington, myself, Melanie, Neil, CJ, when we were on the group call. We all heard things that were violations of the code of conduct report.

Q Okay. So --

A Or code of conduct.

Q So all those people are DEF CON?

MR. MERTENS: Object to the form.

THE WITNESS: All what people?

Q (By Mr. Conrad) The people you've just listed.

A Are DEF CON. Well, I mean, like, Melanie is a contractor. Darington's a full-time employee.

But I guess the way I thought of it was like we have people on our side, the DEF CON side, trying to figure out what to do, and then there are these sort of

reporting parties that were trying to tell us their story and their experiences with Chris, and those were kind of the two sides on that call.

Q And you said after conversations with the reporting parties and Chris.

A Mm-hmm.

Q Who from DEF CON had conversations with Chris about the alleged code of conduct violations?

A You have the text messages from Neil.

Q And did Neil know that he was representing DEF CON in those conversations with Chris?

MR. MERTENS: Object to the form.

THE WITNESS: I believe so. Because the very beginning of his conversation, when he's talking with Chris -- I believe it was when he was talking with Chris -- it was that he was contacted by Maxie because of his affiliation with DEF CON, and he could speak with DEF CON.

So from the very beginning, I believe Maxie approached him because of his DEF CON and Black Hat connections. So when Neil received that communication, he absolutely believed that he was carrying a message for DEF CON, because that's why he was approached.

Q (By Mr. Conrad) And you -- you named Chris in this transparency report.

Chris violated. The reason we created a transparency report is to try to hold ourselves accountable to that code of conduct. If we didn't have a transparency report, how would the community ever know if we're following up on any of our commitments?

So absolutely we had to name him, because we had to show that we were living up to our commitments under this code of conduct.

Q Why couldn't you have banned him without naming him?

A We could have, but we decided not to.

Q How many other people have you named when you've banned them from DEF CON?

A On the transparency report, there's, I believe, three others. But before the transparency report existed, I couldn't tell you how many. But since the transparency report existed, it's these three.

Q And who are the three?

A If I remember correctly, it's Captain Crunch, Morgan -- I'm pronou- -- I -- I don't -- cannot pronounce his last name -- and Jake Appelbaum.

Q So the three people that you have previously banned are Jake Appelbaum, A-p-p-l-e-b-a-u-m; John Draper, D-r-a-p-e-r, aka Captain Crunch; and Morgan M-a-r-q-u-i-s B-o-i-r-e, Marquis Boire?

A I think so.

Q Those are the three people you've named now?
A Correct.
Q And the three people that you've previously named, each one of them had allegations of sexual misconduct against them; is that true?
MR. MERTENS: Object to the form.
THE WITNESS: Among other things, yes.
Q (By Mr. Conrad) But that -- the allegations of sexual abuse or sexual misconduct were the most prevalent reasons for banning them, right?
MR. MERTENS: Object to the form.
THE WITNESS: Maybe. I think it was the totality of their behavior, the reports that were coming -- well, each one's a different case. But the totality of the reporting combined with the nature of the accusations was more than enough. But there was a number of accusations.
Q (By Mr. Conrad) Jake Appelbaum had allegations that he was sexually abusing people, right?
A I believe so.
Q And that was the reason that DEF CON banned him?
A I think we banned him -- yeah, I mean, absolutely when those came to light. Yes, we don't want him at DEF CON. Absolutely. But there's more behavior than just

in the speculation that it was sexual in nature by indicating that it was not sexual in nature, right?

A No. Incorrect.

Q What's incorrect about that?

A I was speculating should we. I wasn't saying it would be a good idea to do. So I was asking the group should we add something. And what I was thinking about at the time was, I believe some people were speculating about rape. We never got any complaint about rape. But we did get complaints about unwanted kissing, weird pubic hair stuff, getting people to reveal when they had their menstruation, men approaching underage women in Victoria's Secrets and asking bra sizes. Like, that's sexual, and that's weird. But that's not rape.

That's something -- and so there's a reason why we didn't pursue this and we don't go any further on this idea. Because we quickly realized we're not experts on necessarily the various "degrations" of what's sexual and what's not. And if we make a statement that says it wasn't sexual in nature and the person that was unwantingly kissed by Chris on the forehead says, "No, that's sexual," okay, we're not going to get into that argument.

So we -- we thought about this briefly and then realized, like, no, if Chris wants to make a statement,

in nature, and we just left it at that. And if people want to speculate, they can speculate.

Q (By Mr. Conrad) You mentioned that someone had accused Chris of kissing them on the forehead?

A Correct.

Q When did you get that accusation?

A I believe the inappropriate behavior was -- I couldn't tell you if it was on the call or if it was after the fact.

I want to say it was on the call, but I'm not a hundred percent sure.

It was a work trip that Mr. Hadnagy had with an employee. But on that group call, there were a lot of, you know, ex-employees telling stories about Mr. Hadnagy on work trips, and so I might have them conflated.

Q So you're not sure?

A Yeah. It's mentioned in that third interrogatory response.

Q Do you remember who made that allegation?

A I would have to look at the response.

Q Well, in response to this suggestion --

A Mm-hmm.

Q -- Melanie also says that you should all wait a bit, right?

A Yes.
Q And that if Chris wants to clear the record about his violation, he's welcome to do so. We've had -- we have said nothing to imply it was sexual in nature. The code of conduct covers a lot of different possibilities.
A Correct.
Q You go on to say on February 10th, "Good point. If Chris wants to say something to clarify it, he could say it wasn't sexual, and we wouldn't contradict him."
Is that what you said?
A Correct.
If he wanted to make a clarifying statement and if the statement was factual, we wouldn't contradict him. If he made an inaccurate statement, then we would correct him.
Q So if Chris had made a clarifying statement saying, "Hey, infosec community, just know that my ban was not for anything that was sexual in nature," you would not have contradicted him on that?
A I don't know about that. Had he said, "My ban was not for raping or sexual abuse," sure. We wouldn't have contradicted him on that.
Q But your February 10th post prior to that has in quotes "a not-sexual in nature code of conduct violation."

of my management techniques is I ask this group or any group a lot of questions, and this is me prompting them to explore this question. And if you look below, they responded, and we explored this question. And in the end, we didn't do it.

Q (By Mr. Conrad) One of the things in this follow-up post that you say, though, is that if Chris wants to say something to clarify, he could say it wasn't sexual, is what you said, right?

A Correct.

I should have -- in hindsight, I should have used more words and specified, if he said something that was factual around it not being sexual abuse or assault or rape, then we wouldn't correct him. But I guess I was thinking in shorthand at that time.

The intention was, at any moment, Chris could say something, and if it was factual, we wouldn't contradict him. That would probably have been a better way for me to say it.

Q Can you flip to Page 53.

You see your post from February 25th.

A Yep.

Q And you're asking Grifter, Marc, Wednesday if anyone's talking with --

A I think it's pronounced "Alethe."

Q And in it you say, "During our investigation, we spoke directly with Mr. Hadnagy about claims of his violations of our code of conduct. He confirmed his behavior and agreed to stop. Unfortunately, the behavior did not stop."
A Correct.
Q When did you speak directly with Mr. Hadnagy about the claims of his violations of code of conduct?
A I believe that was second day Grifter was talking to him in text messages -- you can see that -- where Chris says they'll stop. Maxie was happy. They're going to go their separate ways. And then it did not stop.
Q And did you speak with Chris about all of the allegations or just the ones involving Maxie?
A You would have to ask Grifter specifically what he covered. I'm only aware of what was in the text message thread and Neil relaying that there was so many people on the call with complaints and that Chris was already guessing four or five of them, like he was somehow aware that there was this large number of people with allegations against him.

MR. MERTENS: Mark, can you hold your questions for ten seconds?

MR. CONRAD: Sure.

MR. MERTENS: Thanks. We don't need

Errata Sheet

NAME OF CASE: Hadnagy vs Moss

DATE OF DEPOSITION: 07/31/2024

NAME OF WITNESS: Jeff Moss

Reason Codes:

1. To clarify the record.

2. To conform to the facts.

3. To correct transcription errors.

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

John M.S. Botelho

_______________________

# Exhibit 4

8 Feb 2022

Hey Maxie it's Jeff Moss, I got this number from Grifter. 17:24

Hey Jeff

How you going? 17:35

Doing OK! I wanted to catch you up and also ask you for a copy or some proof that you own your laptop. Chris has said his company owns it and that seems easy to verify. 17:41

No problem at all — I've got the receipt for the laptop among some other documentation. It'll take me about an hour and a half to get that to you as I'm not home right now. But will send tonight.

In the meantime, here's the letter I sent to him. The first paragraph deals with the laptop issue

signal-2022-02-08-174555.docx
1.6 MB

17:45

8 Feb 2022

That looks good enough. Are you free for a quick call? 17:48

Yep — go ahead 17:55

Ok hang on. 17:59

Outgoing voice call · 18:03

I'm going through a bit of a poor reception area — do you mind if I call you back in 5? 18:19

Sure

Can I can you back after talking with Mel? 18:20

Even better! 18:21



8 Feb 2022
7:02
13 Messages
Back Follow up on your let...
Chris claimed this was not at Black Hat, but rather at a conference in the UK. Person asked Chris to translate the class to brail, Chris priced it out and it was about $2K, person did the class but was unhappy and offered a full refund.
#4 Student had an issue with how Chris treated an employee at Black Hat. Made light jokes against her appearance and that she had gotten her job by virtue of her looks.
Chris says the person was the one joking about this, but is aware of the student who was made uncomfortable
Based on the generally horrible behavior part, we are going to take action. We're working on a formal response to Chris now. But fully appreciate if you want to move on from this personally.
Regards,
Steve
Information Classification: General
See More
19:02
Items to be Picked Up
Available Jan 9.
We'll notify you when these items are ready.
16-inch MacBook Pro - Space Gray
With the following configuration:
2.4GHz 8-core 9th-generation Intel Core i9 processor, Turbo Boost up to 5.0GHz
64GB 2666MHz DDR4 memory
AMD Radeon Pro 5500M with 4GB of GDDR6 memory
1TB SSD storage
Billing Address:
Subtotal $3,805.00
Free Shipping $0.00
Estimated Tax $360.91
Order Total $4,165.91
Gray
With the following configuration:
2.4GHz 8-core 9th-generation Intel Core i9 processor, Turbo Boost up to 5.0GHz
AMD Radeon Pro 5500M with 4GB of GDDR6 memory
64GB 2666MHz DDR4 memory
1TB SSD storage
16-inch Retina display with True Tone
Four Thunderbolt 3 ports
Touch Bar and Touch ID
Backlit Keyboard - US English
Accessory Kit
Qty 1
It doesn't quite prove it because there's no serial number but I'm working on finding a more concrete record of the transaction 👍
20:19

Store. Below is a copy of your service record.

Apple Third Street Promenade

ius Bar Work Authorization

**Product Information**

Warranty Status: Out of Warranty (OW)
Model: MacBook Pro (16-inch, 2019)
Date of Purchase: Dec 30, 2019
Serial No: C02ZWA27MD6T

ter working with apple support because the computer is locked.

chine it shows passcode.
k screen.
he camera, minor scratches on the enclosure
that because of the firmware lock we will need:

he informations above

| | Price | Amount Due | Customer KBB |
|---|---|---|---|
| /EL 1 | $ 0.00 | $ 0.00 | |
| **Total (Tax not included)** | **$ 0.00** | **$ 0.00** | |

licable taxes. Taxes will be calculated at the time of payment.

reverse side of this page will apply to the service of the product identified

as a result of the service it is my responsibility to make a backup copy of my for service;

orruption of the data on my product during service; and

w or equivalent to new in reliability and performance.

8 Feb 2022

20:36

Got it, thank you! 20:42

Apple are sending me an email now (on phone with them). I'll send it when I get it. Thanks again! 20:44



9 Feb 2022
INVOICE RECEIPT
Dear Apple Customer,
Thank you for shopping at the Apple Store!
If you have already paid for your purchase, please retain this invoice receipt for your records.
If you need to send payment to Apple, please reference Apple's Invoice Number on your remittance. After remitting payment, please retain this invoice receipt for your records.
Invoice Number: AB24564463
Invoice Date: 12/26/19
Web Order Number: W743921312
Reference Date: 12/26/19
Amount Due: .00
Customer P.O. Number: 3103592312
Sales Order Number: 2947942522
Customer Number: 900004
Terms: Credit Card
Sold To: Matthew Miller
USA
Ship To: Maxie Reynolds
Apple Century City
Item Product Number | Product Description | Total Ordered | Total Shipped | Unit Price | Extended Price
001 Z0Y0 MBP 16.0 SPACE GRAY 1 1 3,799.00 3,799.00
SerialNo.: ( C02ZMA27MD6T )
Recycle Fee
1 6.00 6.00
Subtotal 3,805.00
Tax 360.91
Shipping Charges
TOTAL USD 4,165.91
Questions? Call - - or visit https://www.apple.com/contact/
Salesperson Contact Entry Date Ship Date Routing
12/21/19 12/26/19 UPS
Your American Express XXXX has been charged $ 4,165.91
For a total of*********$ 4,165.91
Sales & Returns Policies: http://www.apple.com/shop/open/salespolicies
07:50
All done. Now to wait and see. 20:56
Post DEF CON 29
(Updates between DC 29 and DC 30) Transparency Report
We received multiple CoC violation reports about a DEF CON Village leader Chris Hadnagy of the SE Village. After conversations with the reporting parties and Chris, we are confident the severity of the transgressions merits a ban from DEF CON.
We have also taken the rare action to disband the DEF CON Group DCG414 Code of Conduct violations by the group's primary Point of Contact and subsequent mishandling of the event left us without confidence in the group's leadership.
This is what is public:
Let me know if you have any questions. I emailed Chris a response so everything is complete on our end. Sorry it took so long for us to investigate and conclude. 21:09

11 Feb 2022

I'd say that announcement is pretty insane. 13:58

Chris claims are crazy.

Christopher Hadnagy
@humanhacker FOLLOWS YOU

Obviously many of you have questions – as do I and my team. The problem is someone has made accusations about me, but DEF CON has NOT me told what they are or presented any evidence to support them. DEF CON's code of conduct addresses harassment and discrimination,... 1/3

12 Feb 2022 at 05:47 via Twitter Web App

7 4 12 36

Christopher Hadnagy @hu... 12/2/22, 05:47
and I can say with 100% certainty that no one has ever come to me with accusations of harassment or discrimination – not a single person. We will continue to try and get information and release it as we can. 2/3

Christopher Hadnagy @hu... 12/2/22, 05:47
All we can ask is that you wait for details and facts before jumping to conclusions. Thank you. 3/3

Hard to talk to someone in bad faith. 18:20

12 Feb 2022

DC couldn't have handled it better. Chris couldn't have handled it worse. 07:13

It's pretty crazy the master SE came across so DARVO 07:13

Especially when his original statement was from an organization meant to help victims without question... 07:14

How has it been from your end or what you are hearing? I'm not connected to the same networks you are. 07:16

I have not heard news of any lawsuits. I have heard he had a large meeting with the IFL and some of his social engineer teammates. He is saying he was not informed and that I tricked Grifter ... Currently I think he is putting some of this on Grifter and me. I don't think he can mention you and remain credible.

12 Feb 2022

how are you? Do you feel anxious or righteous or anything...? 07:22

I mean from the network of other people who came forward for our call. I've seen many mentions or allusion to things we were not aware of. I hope it encourages others to come forward.

We expect legal action from Chris so have our legal team all spun up just waiting for it arrive. 07:24

Network — nothing new 07:26

It's lame to try and put it on Grifter but he needs a scapegoat.

I was surprised about the amount of support we got from the community, I was expecting more 50/50 both sideism 07:28

It blew me away. 07:31

I think it has calmed down I'm not seeing much anymore. 07:32

25 Feb 2022

Not sure if this is news to you or important but:

11:34
Althe
Okay so. I checked. And this is rubbish.
@deviantollam @DAkacki @RegGBlinker @cillic @defcon Thought I'd share, I have heard from credible sources that investigators @InnocentOrg have been asked to investigate/OSINT the people @humanhacker suspects of being a complainant. THIS IS STALKING AND HARASSMENT OF VICTIMS
BruceHornsbysBigToe
twitter.com
They aren't. And that's from an an extremely credible source.
I've decided it's time to put distance between me and them but I'm doing so slowly and quietly.
Their lack of response damages me and my reputation and since I can't influence a response they are really leaving me not much choice.
I was also told by a source inside DC that Jeff was the only person who got all the victim statements and Jeff made this decision and wrote the announcement himself after Chris said he was leaving DC and would not return this year following the allegations. And that's like nothing you heard from me hahaha but that's the truth as best I understand it. Jeff is solely responsible for the decision presented as defcons and it happens after Chris said he would voluntarily leave DC and take SEV elsewhere.
That's what I've been sitting on for weeks so massive frieNDA there. But I'm frustrated on all sides of this shit show. Frustrated is an understatement
Message

That's a screenshot of a screenshot.

No need to reply. 08:41

That's Althe making stuff up? 08:42

No idea. I don't speak with her. But I believe she is close to chris 08:44

Alethe

Okay so. I checked. And this is rubbish.

@deviantollam @DAkacki @RegGBlinker @cillic @defcon Thought I'd share, I have heard from credible sources that investigators @InnocentOrg have been asked to investigate/OSINT the people @humanhacker suspects of being a complainant. THIS IS STALKING AND HARASSMENT OF VICTIMS

**BruceHornsbysBigToe**
twitter.com

They aren't. And that's from an an extremely credible source.

I've decided it's time to put distance between me and them but I'm doing so slowly and quietly.

Their lack of response damages me and my reputation and since I can't influence a response they are really leaving me not much choice.

I was also told by a source inside DC that Jeff was the only person who got all the victim statements and Jeff made this decision and wrote the announcement himself after Chris said he was leaving DC and would not return this year following the allegations. And that's like nothing you heard from me hahaha but that's the truth as best I understand it. Jeff is solely responsible for the decision presented as defcons and it happens after Chris said he would voluntarily leave DC and take SEV elsewhere.

That's what I've been sitting on for weeks so massive frieNDA there. But I'm frustrated on all sides of this shit show. Frustrated is an understatement

25 Feb 2022

Thanks for the heads up as you know we have quite a team on this, but in a sense, yes, as the CEO I do make the final decision. If you don't mind, what audience was she speaking to?

08:47

She was talking one on one to another woman that Chris had bullied (the one he wrote the LinkedIn article about).

08:52

Ok I missed his LinkedIn article.

10:07

It would have benefitted him to release this sooner because it's not shit, it's also not true, but when has that mattered.

If a response from you is necessary, I hope you've got people of sound judgment around you.

23:33

I think our only response would be to restate in light of Chris's statement that we stand by our original assessment.

23:35

25 Feb 2022

He wants to ignore the Black Hat removal and draw us into a point for point battle he confuse people with, but it doesn't change the facts of what he has done.

Curious on your advice.                23:41

26 Feb 2022

— you've taken action and will not reverse it.

— He is gaslighting you.

— Giving a statement will lead to more short term noise and, frankly speaking, chaos for both sides (DC and Chris — none of us—"the victims"—have been outed yet).

The long term probable outcome of doing nothing on your side will likely lead to speculation and ultimately a dent in your (DC's) reputation, as the collective ire and imagination of the internet is truly, astoundingly corrupt. Your silence this week will be what ILF's...



Your silence this [26 Feb 2022] what ILF's was last week — a breeding ground for speculation.

I would seek to make a statement with BH.

Your silence allows him to control the narrative and he is capitalizing on that — I think his confidence is rebuilding. He's rewriting history in his head again and pushing it forward as fact. 00:08

BH didn't want to make a statement at the onset so I don't expect they would want to now. Nothing has changed for them so while that would be a great move I don't see it happening unless something changes.

Good observations, the gravity is always to feed the monsters and Sat more on social media.

We will be thinking through things once people have slept, always appreciate your thoughts 00:17

28 Feb 2022

Hey Maxie do you think the reason there are no stories is because no one knows a reporter to trust? Or there is no desire to get their stories out?
11:04

I think there's a huge desire to bet the stories out. No one is the group seems willing to trust reporters AND they can't let go of the fear that if chris finds out they've talked to the press, he'll retaliate.

I've talked to two reporters, but don't have any information on a story! 11:11

OK if you need advice on what reporters are trustworthy we have interactions with many over the years. We want to respond to Chris but don't want to give him anything to spin so silence is the best option currently. If anything were published from someone else's voice that gives us something to point to.

Our ban is a ban and he can't talk us out of that, it's more about not letting him spin his lies. 11:15

28 Feb 2022

Alright, let's see what happens in the press 11:29

👍

I believe we know a trustworthy reporter who reached out to us willing to talk to people on background if that helps some people. 11:32

Can I screen shot just ☝️ that message to send to the group — I think, maybe, coming from you it holds weight? 11:51

Ok let me get specifics from Melanie first. Hang on. 11:59

Excellent. 11:59

Let's set up a call for this Sunday evening and we can explain to everyone you want to invite what our strategy is, that protecting them is our #1 priority and answer any questions. That should help reduce any speculation. 13:21

I'll pass it on. Thanks. 13:21

morning in Singapore. We'll get a
conferenc 28 Feb 2022 t up and I'll get
you details later this week. 13:23
3 Mar 2022
It will be Sunday 16:00 Pacific Time Zone 17:30
5 Mar 2022
Will someone send a link or number tomorrow? 15:53
I'll send it to you in just a moment, sorry a bit behind. 16:35
Conference dial-in number:
1-206-858-8066 code 999664
21:59
6 Mar 2022
Just getting ready to start call 16:01
You're cutting in and out. And I can't get off mute to tell you. 16:29
Thanks for pulling the group togeth
for the call.
17:02

 7:02

13 Messages

Back **Follow up on your let...**

training course

*Chris claimed this was not at Black Hat, but rather at a conference in the UK. Person asked Chris to translate the class to brail, Chris priced it out and it was about $2K, person did the class but was unhappy and offered a full refund.*

#4 Student had an issue with how Chris treated an employee at Black Hat. Made light jokes against her appearance and that she had gotten her job by virtue of her looks.

*Chris says the person was the one joking about this, but is aware of the student who was made uncomfortable*

Based on the generally horrible behavior part, we are going to take action. We're working on a formal response to Chris now. But fully appreciate if you want to move on from this personally.

Regards,
Steve

Information Classification: General

See More

# Exhibit 5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

CHRISTOPHER J. HADNAGY, an individual; and SOCIAL-ENGINEER, LLC, a Pennsylvania limited liability company,

Plaintiffs,

vs.

JEFF MOSS, an individual; DEF CON COMMUNICATIONS, INC., a Washington corporation; and DOES 1-10; and ROE ENTITIES 1-10,

Defendants.

No. 2:23-CV-01932-BAT

VIDEO-RECORDED DEPOSITION OF JEFF MOSS, VOLUME II

1201 Third Avenue, Suite 4900

Seattle, Washington

January 3, 2025

10:04 a.m.

Reporter: Eva P. Jankovits, CCR
CCR No.: 1915

Q. Well, what do you consider an employee of Def Con?

ATTORNEY MERTENS: Object to form.

A. Whatever the IRS tells me an employee is.

Q. (By Attorney Conrad) Is there anyone else that you --

A. Yeah. So we also -- I think there's some people missing here. Let me see. It doesn't seem right. One, two, three, four, five -- well, scratch Tom.

Neil, Nikita. Oh, Darrington you don't have on here.

Q. No, Darrington was the first one I listed.

A. Oh, sorry.

Q. It's okay.

A. And right around that time -- I'd have to look -- there was also Cot, who does the servers, but -- and then we have some contractors that we use year after year, but they're not -- they're not employees.

Q. Okay. And out of employees of DEF CON, who would be most knowledgeable about the reports of code of conduct violations related to Chris Hadnagy?

ATTORNEY MERTENS: Object to form.

A. Say it again.

Q. (By Attorney Conrad) So out of the --

A. Out of these.

Q. Out of DEF CON's --

A. Mm-hm.

Q. -- employees, including yourself, who would be most knowledgeable about the reports of code of conduct violations related to Chris Hadnagy?

ATTORNEY MERTENS: Object to form.

A. It would be me.

Q. (By Mr. Conrad) And at the time that the transparency report was posted in February of 2022 --

A. Mm-hm.

Q. -- what were the conferences that DEF CON was operating?

A. Well, conferences would be -- 2022, it would be just Las Vegas, but we were trying to operate training, a training side business.

Q. Sounds like that hadn't been up and running at the time of the transparency report; is that right?

A. No. Let me see. '22, '23, '24. It would have -- might have just started that year or the year after. It might have started the year after. We might have been planning it that year. I'd have to go back and look at the calendar because I think this is our third year of trying the training.

Q. And Chris Hadnagy and Social Engineer, they

pretty wild. And so it would not surprise me if there were strippers at them, but it wasn't in the event space.

Q. Got it. So it was -- it was an area that DEF CON had rented from Caesars?

A. Well, back then it was pre-Caesars, but right. It would have been -- you get a bundle of space. You're buying out all the space, and so then you try to figure out how do we use all the space. And so if we had something that could be used for a party at night, we would go to the community and say, "Anybody want to throw a party in here?"

Q. And the party would be coordinated with DEF CON?

A. Well, we would say this is the space you get. And the rules were from the event spaces, obviously no under age alcohol drinking, no drugs. And the way that was all maintained is the hotel, or whoever, their bartenders, their licensed bartenders would be in the room selling. So it wouldn't be our liability if there was drinking there. It would be all on the -- on the venue and the licensed bartenders.

Q. And when's the last time a party where strippers were allowed took place?

ATTORNEY MERTENS: Object to form.

A. I wouldn't say "allowed" because they never -- parties never came to us and say we want to have a stripper party and we said great. It was more like a party got out of control, and somebody in the room called strippers, and they showed up and they're performing. And the last time that happened, I think -- I'm trying to remember, because I remember getting a call about it and we -- we had to shut it all down because it got too rowdy. It was like -- you know, it was like in the decades ago, but I'm trying to think like -- probably 20 years ago. It was a long time ago because it at a Caesars property, I don't believe. I believe it was at, like -- I -- I don't know. Maybe -- maybe -- I can't remember. But it was a long time ago.

Q. (By Attorney Conrad) This is space that DEF CON had the ability to control who was allowed to use it?

A. Right.

Q. Was there any -- ever any action taken against any individuals that allowed women or men or whatever gender they identify with to take off their clothes at DEF CON?

A. I -- you mean like if somebody wants to walk in from the pool with their shirt off or something?

Q. No. Like in this instance that we're talking

Errata Sheet

NAME OF CASE: Hadnagy vs Moss

DATE OF DEPOSITION: 01/03/2025

NAME OF WITNESS: 2 Transcript

Reason Codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

_______________________

# Exhibit 6

Cot
Infrastructure
Riverside
Discord DEVOPS Lead
Fox
Discord DEVOPS Second
Mar
Art Director
Tom
Project Manager
Will
Director of Special Projects
Neil
Design and Defacement
Medic
Defacement Lead
Adam_915
DCG Lead
Darington
Social Media
Silk
Video Lead
Brian
SMERCH Lead
Daria
SMERCH Second
Dani
Vendor Lead
Hannah
Vendor Second
Janet
Director of Finance
ostone
Human Reg Lead
Mark
Human Reg Second
Major
QM Lead
Buttersnatcher
QM Second
Log
Parties Lead
Kevin
Sales & Sponsorships, Director
Polybius
Exhibitors Lead
Jeff
CEO
ANullValue
Hacker Tracker Lead
j2wke
Hacker Tracker Second
Aster
Inhuman Reg Lead
Estaban
Inhuman Reg Second
Cannibal
Photo Lead
ASTCell
Photo Second
Krisz Klink
A&E Second
ChrisAM
A&E Lead
Zebbler Studios
A&E Content Creator
Ada Zebra
SOC Hotline Lead
Deelo
SOC Chief of Staff
CJ
SOC Lead
tacitus
SOC Second
Wham
SOC Floor Operations Lead
Heisenberg
Demo Labs Lead
Harold
Demo Labs Second
Grifter
C&E Lead
Secove
C&E Second
Kaybz
C&E Third
Nikita
Director of Content & Coordination
Eric/Bia Lewis
DC NextGen Lead
Jeff M.
Legal
Hony
Villages/Communities Lead
Paydreaux
Villages/Communities Second
Delchi
HDA Lead
Matt
Policy Lead
RoRo
Policy Lead
Katie
Policy Second
Mark
Dispatch Lead
Joel
Dispatch Second
Archangel
Dispatch Third
LittleBruzer
NFO Lead
LittleRoo
NFO Second
Monika
Press Lead
Wednesday
Press Second
PWCrack
Speaker Ops Lead
Pasties
Speaker Ops Second
PWCrack
CFP Lead
Shaggy
CFP Second
Alex
CFP Submissions Lead
Sinderz
Workshops Lead
Binarybuddah
Workshops Second
Sparky
NOC Lead
Mac
NOC Second
Videoman
DCTV Lead
skw33k
DCTV Second

# Exhibit 7

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

---

CHRISTOPHER J. HADNAGY, an individual; and SOCIAL-ENGINEER, LLC, a Pennsylvania limited liability company,

Plaintiffs,

vs. ) No. 2:23-cv-01932-BAT

JEFF MOSS, an individual; DEF CON COMMUNICATIONS, INC., a Washington corporation; and DOES 1-10; and ROE ENTITIES 1-10, inclusive,

Defendants.

---

VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION OF

NEIL WYLER

---

9:03 a.m. (Pacific Time)

KAYSVILLE, UTAH

(All participants appeared via videoconference.)

DATE TAKEN: NOVEMBER 14, 2024

REPORTED BY: LORRIE R. CHINN, RPR,
Washington Certified Court Reporter No. 1902
Oregon Certified Court Reporter No. 97-0337

3d977942-8f9e-446a-b1dc-cfb2ff91445f

allegations?

A. Well, I talked to him and I said like, "Look, Dude, she just wants this to stop. Like she said she's not going to go like, you know, after you or try to gather a bunch of people together." And he's like, "Well, that -- I don't believe that. Like I don't believe her."

And I was like, "She just wants this to stop, so like stop." And he was like, "Well, I'm in the right here, you know." And I think -- so between that -- between the call with -- I didn't know Maxie, had never met her before. I had never spoken with her before. So between the call with her and with Chris like I Googled her to see like, you know, who she was.

And I said to Chris on the call, I said like, "Look, Dude, from an optics standpoint alone, you are admitting that you're harassing this woman. And you are a 50-year-old man who, you know, is six-foot plus, 270 pounds. And she is a 30-year-old girl who looks like she stepped out of a magazine. You're going to lose." Like I was like, "You're going to lose." I was like, "There's just no scenario where I feel like you come out winning here."

And he said, "I don't give a shit." He was like, "I'm not doing anything wrong." And he was like,

like it's weird to know like that your boss is a boob guy or that -- and that he's made comments about it to -- you know, to staff, which is --

Q. Did those individuals say whether it made them feel uncomfortable?

A. Yeah, they were clearly made uncomfortable by it.

Q. Did anyone complain that Chris would tell women that he was in to Asians?

MR. CONRAD: Object to form.

A. I didn't hear anything specific -- or I don't recall anything specific in that regard. I mean, I will say like, you know, obviously so you mentioned like Michele. Like Michele worked with Chris for years. And like she didn't have a handle, so Chris gave her a handle. And her handle was Sultry Asian, which I thought it was kind of a weird choice, but all right.

But, yeah, I think that was kind of one of the things that was -- I don't know -- a theme with Chris was that he was always like, "Oh, when it comes to social engineering" -- and this is something he said in his classes, and I heard him saying in it the villages and on podcasts and different stuff like that where he says, "When you're doing social engineering, you should

never use intimidation or sex to complete your, you know, objective."

But he says those things, but then has an odd habit of hiring attractive women to work for his company, right? And it's like, okay, if you're not using sex, then why are you choosing these like attractive women always to go out and do these engagements?

And so it's just like -- again, it's just not true, right, the statement that you shouldn't do it. And I've done several panels with Chris or podcasts with Chris where like to liked to have me come on a panel with him or whatever whenever we talked about like the ethics of social engineering or red teaming really.

And he liked it because he would play the card of like, "Well, you should be ethical in this way, this way, this way." And I disagree. When you're on a red team exercise, I believe that you should do anything that's necessary to reach your goal, including using sex or intimidation. And I don't mean having sex with somebody when I say that. I mean, like flirting with or like using your looks to try to get like if I am -- to get past security or whatever.

So if I'm doing a job for a company and they

hire me and they want to see if I can break into their data center and I know that the security guard at the data center loves brunettes, well, then I'm sending a brunette, right? Like I just -- like I just think that's just smart. That's part of the job. Like we're going to go, and we've got this pretty brunette. And we're going to send her, and she's going to say, "Hi, I forgot my badge" or blah, blah, blah or whatever it is and try to get through whatever it is.

And I -- and I know that at least at some level Chris believes that too, but he always took the position publicly that he didn't, that you shouldn't do things like that. But then it's like, you know, then you hire like, you know, attractive women to go and send them on these engagements. And it's like, oh, they just happen to be very good looking. They just happen to be above average looks or, you know, exceptionally good looking, and that's who you're hiring, you know.

And so -- but I did enjoy those -- those ethical debates with Chris because he was very adamant that you shouldn't do those things, and I was like, you know, no, you 100 percent should. Because if you are coming up and against an attacker and especially an advanced attacker or a Nation-state attacker, they're

going to send the attractive brunette because they have a job to do.

So if you're not doing that, I'm of the opinion that you're not doing a full, complete job for your customer. But, like I say, Chris was very adamant that that was not a thing you should use. And then he had questions in his classes that dealt with sex. He had attractive women who worked for him. He gave them names like Sultry Asian. Like he told them how good they looked in their clothes. Like he, you know, made comments about whether he was a boob or butt guy. He like, you know, did all of these things, but then said like, oh, but when you're doing these things, you need to be ethical about this, that, or whatever. And it's just like, well, you can't say one thing and then do another thing and then just claim that that's not -- again, I just don't think that's very honest. It's not -- yeah.

Q. Got it. Did anyone share stories about Chris yelling or screaming at people during villages at DEF CON?

A. So there were several people who said as volunteers that they had been -- or as former employees or whatever that at the village or that they would -- that he had yelled at them or come unglued kind of in

A. But did I -- I'll ask you a question in return then. At any point during today in my statement about Chris and our disagreement at DEF CON 20, did I say that he violated a code of conduct with me in having that conversation? I did not. Did I say that Chris was banned or it was considered as part of the DEF CON ban for Chris because of the interaction that I had with Chris at DEF CON 20? I did not.

What I said was when somebody said that they had an interaction with Chris where he shouted at them, screamed profanity at them, that I had had my own experience like that with Chris that took place at DEF CON 20. But I didn't say that Chris' behavior at DEF CON 20 was a factor in the ban that took place, you know, a little less than three years ago.

So you're misconstruing those two things and trying to combine timelines there, and that's not what happened. What I said was I believed them because I had experienced it in the past, not I believed them because it had happened last month.

Q. So when you brought up the DEF CON 20 incident, that wasn't something that you were reporting to DEF CON that was part of the reports to DEF CON --

A. It was never --

Q. -- as part of the code of conduct?

A. It was never reported to DEF CON. It was never a code of conduct violation. Chris and I had a conversation, like I said, 90 minutes after it happened. We gave each other a hug. I told him I loved him and that I would break his jaw. Like it was -- like it was totally -- like we put it behind us. Like we hugged it out. We laughed about it for years. It was not something that was ever a consideration about the code of conduct. I forgave Chris for that, and I still forgive Chris for that. I do not forget that it happened.

MR. DEAN: Lorrie, a belated objection. Misstates testimony. Lacks foundation. I didn't want to interrupt you, Neil. Go ahead.

A. Yeah.

Q. Well, you saw Mr. Dean showing you requests for admission where DEF CON is asking Mr. Hadnagy to admit those things in this lawsuit, right?

A. Admit what things?

Q. Admit that he called you a pedophile on this date, right?

A. Sure, yeah. Yeah. Oh, sorry. Yes, Lorrie. Yes.

Q. Yeah. So why are those things getting brought up now from DEF CON 20?

other -- you go on and you say, "Roger that. I know I've said it before but I still think we should update the transparency report to say it wasn't anything sexual in nature and that it was bullying and harassment of a non-sexual nature," period?

A. Right.

Q. "Because all of the rumor mill stuff is making it seem like it was sexual. Which if he points to that and says Defcon wasn't clear, might actually give him a leg to stand on in terms of defamation," period.

Did I read that correctly?

A. You did, yes, correct.

Q. And then you also put in there "Or that he was only targeting women." What --

A. Correct.

Q. -- do you mean by that last comment, "Or that he was only targeting women"? Was that that he was or wasn't doing that?

A. Because that's kind of -- again, that was the -- like where I say there, "The rumor mill stuff is making it sound like this was like sexual," right? And I wanted it to be clear that there was no sexual assault that took place here. Like he wasn't touching anybody. Like you just mentioned, was there like inappropriate touching, anything like that, or that

this was something where it was like he was targeting women, like that this was something where it was women.

Because that wasn't the case. We had had a call with, you know, again, the 16 people and plus the people who weren't -- who were on the call but not on the screen. And there were men there, right? And so this wasn't something where I felt like this is a thing where Chris targets women.

Again, if you want to go all the way back to DEF CON 20 and the situation that I had with Chris, I am also not a woman, right? But it did happen. And so my thing was I was like I don't want this to be something that like people think like Chris was like predatory like towards women or had sexually assaulted or touched somebody inappropriately or anything like that.

And so you can see a little further down, I think it's starting to peek out. It's says -- like, well -- Jeff is like, well, "It's tricky because what if a sexual allegation comes out? I've heard about a lot of touchy touchy."

So I hadn't heard those things, and so I don't have any evidence of Chris, you know, touching anyone. And if somebody had said those things to Jeff, then they said them to Jeff, but they didn't say them to me.

And so maybe like -- I don't know. They're like, oh, there was a lingering hug. I don't know. We're a very huggy group. Hackers all hug each other when we see each other. And so maybe somebody didn't like that.

But, again, in my experience with Chris -- and I was around him quite a bit -- I just -- I didn't see inappropriate touching. I didn't -- I never saw anything that would in any way show that he would attempt to sexually assault somebody. I just -- I feel as strongly about that as I do the comments about like the accusations of like racism and like trans phobia, those types of things. I just never -- and never saw that thing. Like he never even made a joke to me about something like that.

Like -- and we were friends for a really long time, so I think, you know -- yeah, I just -- I think I would have had some indication. I just never had. And so that was the thing that was troubling to me. I wanted it to be clear because, again, this is somebody that I cared about who was now getting dragged on the internet. And he had done wrong. There were things that he had done wrong. And he should have made amends for those things, and he should have taken accountability for them.

And he didn't, and I was disappointed in him

3d977942-8f9e-446a-b1dc-cfb2ff91445f

because of that. And I didn't like the dishonesty, but I also -- I didn't think that he should take -- he should take it on the chin for stuff he didn't do, right? And so when people were accusing him of things he didn't do and that I don't think he had the capacity to do as a person, that bothered me. And so I wanted it to be clear, and it just wasn't. It wasn't made clear.

Q. On the phone call that DEF CON had with the accusers --

A. Yeah.

Q. -- in September, there was never an allegation brought up in that phone call regarding inappropriate touching?

A. Not that I can recall. I think it would have stuck out to me if somebody would have said something like that. And I just -- not that I can recall.

Q. And there was nothing suggested in that phone call that Chris was violent towards someone?

A. No. No. With words, but not with physicality, right?

Q. What about with a knife or anything like that?

A. With a knife? I don't recall. I don't know. Yeah, I don't recall any conversation about a knife. I mean, if it happened, I would have saw something shiny

3d977942-8f9e-446a-b1dc-cfb2ff91445f

and wasn't paying attention, but not to my recollection.

Q. Were you paying --

A. That was three years ago, and I purposefully didn't write it down. Like I purposefully was like I don't -- it was not hard to hear these things about your friend, right, so...

Q. Is that something you think you would have remembered?

A. I imagine I would have. Like the only -- I think the only thing I can say is that like if people want to say, oh, touchy touchy; oh, he did this; oh, blah, blah, blah, blah, I think if you wanted to look at that and try to paint it with a brush of malice, then you could, right? Like Chris is kind of a touchy person, but with people that he's comfortable with and as a friend. He's just like a -- he's just that way. Like I say, big hugs. You know, when we're having a conversation and we're disagreeing and laughing, like he'll give you a shove and be like "Get out of here," blah, blah, blah.

And if you were somebody who didn't like to be touched, maybe that would be off-putting to you. It was never off-putting to me. I always knew it was like out of, you know, love and out of jest and like humor.

funny. But it's -- not everybody has the same sense of humor. So what is funny to one person may be threatening or inappropriate to another. And you really have to know where the right place to do that is and isn't.

Q. So the phone call that you had in September with the accusers, you don't remember anyone raising any issues or concerns about him having a knife and threatening someone with it?

A. You're really focused on this knife, Mark. And I don't -- again, I've said it countless times at this point. I don't have any recollection of him ever having a knife or threatening somebody with a knife. I've never seen Chris actually violent. I've never ever seen Chris like violent. I don't believe it's in his nature.

Q. Did --

A. And so like you can ask me about the knife 30 other ways, and every time I'm going to say I don't have any recollection of a knife thing. I could see him making a joke about it because that's the kind of sense of humor he had, but it would have been a joke.

Q. And in terms of the phone call with the accusers, did you ever hear any allegations that he had thrown a phone at anyone?

3d977942-8f9e-446a-b1dc-cfb2ff91445f

Q. And then the people who were making accusations, Maxie Reynolds?

A. Again, I didn't write down all of their names on purpose, so I don't have a list of names for you.

Q. Okay. Do you remember any names?

A. Again, I mentioned Snow was there. I mentioned that Michele was there. There were folks that Jake already mentioned. Like I don't have a list of names for you. I'm sorry.

Q. Do you know if Cat Murdock was there?

A. I believe she was.

Q. Do you remember if someone named Jessica Levine was there?

A. I don't know who that is, so...

Q. So that was not someone that you remember getting a report of a code of conduct violation for?

A. I just don't know who it is. So if she was there, I wouldn't have recognized her. And if she didn't put her name underneath her screen, I wouldn't know who she was by sight. So I can't tell you that. It doesn't mean she wasn't there. It just means that I don't know who she is, and so I couldn't pick her out if you put her in front of me.

Q. Do you remember if Samantha Gamble was there?

A. I don't recall. And I didn't know her at the

3d977942-8f9e-446a-b1dc-cfb2ff91445f

less than a week kind of tells you the scope of what we were dealing with here.

Q. Is there a goon code of conduct?

A. A goon -- yeah, it's the code of conduct. It's on the website, yeah.

Q. There's not a separate one for goons?

A. No.

Q. And what's your pay like with DEF CON for all of the work that you do for them?

A. So goons are volunteers. The only people who are paid by DEF CON is department heads, and department heads get -- I think it's $2500 or $2000 like for basically just like a thank you. Like Jeff used to send it at Christmas like with a Christmas card, but I think it just was easier to hand them to people in Las Vegas. And so it just became like here's your thing.

But, yeah, but that's it. And it's only department heads. So of the hundreds of staff that are there, it's like a small stipend basically for helping out. Because we put in -- if you were to tally it up, that would probably be a dollar an hour or something ridiculous because we put in hundreds of hours into the creation of DEF CON.

We start planning it immediately following the last one. And, yeah, it's an ongoing thing all year

3d977942-8f9e-446a-b1dc-cfb2ff91445f

long. We have planning calls fairly frequently, including with the creators, village organizers, and stuff where now we're having them weekly every Friday. We have a call with the DEF CON staff and the DEF CON creators just to kind of catch them up on where things are and how things are going.

And then it's just kind of a lot of administrative work. Like it's a lot of time spent organizing what people need, as far as like when they get on-site, how many projectors will they need? How many tables and chairs and table drapes? Like the dumbest stuff like to run what is a highly technical conference, you have to get into some pretty dumb things, like how many water coolers need to be in the contest area and how far they need to be spaced and do we have enough -- you know, what are the heights for the pipe and drape that need to be in there? Are we getting the right type, and how will that affect the sound?

Like all of those things take a significant, significant amount of time. Every year there are multiple of us, and I'm one of them who I'm like, "This is going to be my last year," right? Like you say, "It's too much work. This is going to be my last year."

And then you go to the conference, and you see the attendees having a really great time, and you see the fun that they're having as they compete in the contests or when you see somebody pick a lock for the first time and that like look on their face when they do it. And you're like, "Damn it. I'm going to do this forever," right? Like it's a great thing to be a part of, and I love it.

Q. Because it brings in a good amount of revenue every year, right?

A. Yeah.

MR. DEAN: Object to form.

A. I would say it does. It's an expensive conference to run. You know, Jake ain't cheap. But beyond legal costs, there's also significant, significant insurance costs, the cost of the venue itself, food and beverage costs that we have to meet minimums for, all of the different artwork, the different equipment. We bring in truckload after truckload after truckload of equipment, and that has to be rotated out and replaced.

A fair amount is broken, you know, from year to year, so there's -- it's a very expensive conference to put on. I actually think because of the short timeline that it took us to move to the Las Vegas

REPORTER'S CERTIFICATE

I, LORRIE R. CHINN, the undersigned Certified Court Reporter, pursuant to RCW 5.28.010 authorized to administer oaths and affirmations in and for the State of Washington, do hereby certify:

That the sworn testimony and/or remote proceedings, a transcript of which is attached, was given before me at the time and place stated therein; that any and/or all witness(es) were duly sworn remotely to testify to the truth; that the sworn testimony and/or remote proceedings were by me stenographically recorded and transcribed under my supervision, to the best of my ability; that the foregoing transcript contains a full, true, and accurate record of all the sworn testimony and/or remote proceedings given and occurring at the time and place stated in the transcript; that a review of which was not requested; that I am in no way related to any party to the matter, nor to any counsel, nor do I have any financial interest in the event of the cause.

WITNESS MY HAND AND DIGITAL SIGNATURE this 25th day of November, 2024.

NDTCA · Signed Electronic Transcript

LORRIE R. CHINN, RPR, CCR
Washington State Certified Court Reporter No. 1902
Oregon State Certified Court Reporter No. 97-0337
lorrie@buellrealtime.com

# Exhibit 8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHRISTOPHER J. HADNAGY, an individual; and SOCIAL-ENGINEER, LLC, a Pennsylvania limited liability company,
Plaintiffs,
v. NO. 2:23-cv-01932-BAT
JEFF MOSS, an individual, DEFCON COMMUNICATIONS, INC., a Washington corporation; and DOES 1-10; and ROE ENTITIES 1-10, inclusive,
Defendants.
___________________________________/

VIDEOTAPED DEPOSITION OF CHRISTOPHER HADNAGY

* PORTIONS OF TESTIMONY ARE DESIGNATED CONFIDENTIAL AND ARE SEALED UNDER SEPARATE COVER. *

DATE TAKEN: January 28, 2025

TIME: 10:03 a.m. to 5:39 p.m.

PLACE: Legal Realtime Reporting
1640 East Livingston Street
Orlando, Florida 32803

REPORTED BY: TARA K. SLOCUM, RPR, CRR, CSR, and Notary Public State of FL

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

about an hour.
Q Did you meet with anyone else?
A I did not.
Q Did you discuss this deposition with anyone else?
A I discussed it with my other two lawyers, Tim Mallony and Chris Riklas.
Q Understood.
We have heard some about your background, what you do. I know you work for Social Engineer. But I keep seeing in emails you refer to yourself as a human hacker. What is a human hacker?
A We audit companies for the human side of security. So we test their employees' susceptibility to things like phishing e-mails, phishing phone calls, phishing text messages, and then come up with educational processes to help them defend against that.
Q I have heard the term that human hackers are professional liars. Do you agree or disagree with that statement?
A I would disagree with that statement.
Q Why?
A From -- well, from a professional side, our goal is not to lie to people, but to audit their

comments until you showed them, Mr. Dean. So they didn't know those comments. So there is no reason why that would draw them to go make complaints about me because they did not know those comments existed, so I will not agree to that statement.

Q (By Mr. Dean) Exhibit 17 Mr. Nishi told you it was inappropriate to make Asian references in the workplace, correct?

A In 2015, yes.

Q And you could at least understand conceptually why Asian people like Ms. Fincher might make a complaint, or make her experiences known to you during a meeting with DEFCON regarding the comments you made about Asian people?

MR. CONRAD: Object, form.

A So in 2015 to 2022, you are telling me she had no complaints, and all of a sudden you want me to agree that something that was brought up in 2015 that we spoke about she is now bringing to a conference?

Q (By Mr. Dean) You don't see how that could be -- that could affect your reputation making Asian comments in the workplace?

A I already agreed to that one.

Q Yeah. You can see how someone might want

to make a complaint about that?

MR. CONRAD: Object, form.

A I can see if someone wanted to make a complaint, that they should definitely do it to the appropriate place. All of these things you brought up, what do they have to do with DEFCON? What does a workplace dispute have to do with a conference that runs the world's largest hacker conference where people run around in mohawks, and getting drunk, and doing drugs, and going to stripper parties, what do my workplace conflicts have to do with DEFCON.

Q (By Mr. Dean) So you can't understand how your workplace conflicts might give you a bad reputation?

MR. CONRAD: Object, form.

A I do understand how workplace conflicts can give someone a bad reputation.

Q (By Mr. Dean) And you can't understand how 15 people might have claims or complaints they want to make about you based on how they were treated while you were employed with them?

MR. CONRAD: Object, form.

A Absolutely not. Having sat through all the depositions, every one of them either lied or

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

misrepresented the truth. So, no, I will not agree to that.

Q (By Mr. Dean) You can't understand that people who had a negative experience with your conference and your homework assignments would come forward and make a code of conduct violation?

MR. CONRAD: Object, form.

A In 2016, he did make a complaint, from my understanding. And we -- he also came to me and personally talked to me about his feelings about the inappropriate language in the class. I apologized to him, which he also noted in that e-mail that I apologized to him. And then it was over from 2016 to 2022 when he came out of the woodwork again because the mob on the Internet went wild.

Q (By Mr. Dean) So, yeah, I am not talking about Mr. Vaughan. I am talking about how other individuals -- you can't understand how other individuals -- let me back up.

Is Mr. Vaughan the only person to attend your training?

A No, I did anywhere from five to eight trainings a year from 2010 until 2022.

Q And we've already seen two people who have complained about those trainings, right, the

case. Then I know there were more e-mails back-and-forth in the subsequent days.

Q So you said there were more e-mails back-and-forth after the subsequent days. What do you recall happening next after you essentially wished her well?

A It was the laptop coming back, the promise of that. She promised she mailed it to Spencer that week. It never came. We kept asking her for the tracking number so we could track it if it got lost. We were worried if it got lost with UPS. She kept promising to provide the tracking number, and didn't. Then and after the third time of her promising that it was getting mailed back, her book was released, a book that I worked with her on, The Art of the Attack. And in that book, were pictures from an active federal case with ILF that would have made that case nullified. We would have lost justice for a 13-year-old girl. So I did freak out at that point, and I asked Ryan to lock her laptop because it was a corporate laptop with corporate software on it. So we locked it. And that is when e-mail exchanges got more heated because -- and 100 percent I could be missing little pieces in there. We are talking about 2021 here. So I could

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

be missing little tidbits of pieces. And I don't have the timeline right in front of me.

And then we were e-mailing back-and-forth about, you know, the picture. I pulled my support from all of her media that I had gotten her. I canceled all her interviews that I set up for her. I had notified any conferences that we had recommended her at that I was pulling my recommendation. And I threatened to report her because she had Government data on her computer, which was now stolen property since she no longer worked for Social Engineer.

Q Threatened to report her to who?

A The client is [REDACTED], a Federal Government client. And she had over 1,200 e-mail addresses and phone numbers and names of the targets that we were asked to audit on her desktop.

Q Got it. I want to kind of take this piece-by-piece.

So your testimony is that you essentially wished Ms. Reynolds well, and asked for her to return her laptop?

A Yes.

Q And then Ms. Reynolds said she would?

A Yes.

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

Q And you followed up and said, hey, where is the laptop?
A Yes.
Q And she said I will send it to you?
A Yes.
Q You followed up again saying give me the tracking number, so that would be the third time?
A Yes.
Q And then she still didn't give it to you?
A Correct.
Q And then a couple days later her book was released?
A A book was released.
Q And the book contained a picture from an ongoing investigation?
A From an investigation that we had handed into the FBI. So it wasn't ongoing, but not our case, it was now a Federal case.
Q Okay. So let's kind of pause there. I want to talk about the book.
Did you help edit or review Ms. Reynolds' book prior to it being released?
A I did. I helped her get the contract. I helped her with the ideas, a little bit of the writing, and I was her editor.

don't recall.

What do you recall about this first conversation with Grifter on August 26th, 2021?

A That he told me he was coming to me as a friend because Maxie had gathered some ex-employees to go to Black Hat and to DEFCON with complaints about bullying and harassment.

Q So your testimony that you said earlier is that Grifter told you verbally on this call that he does not represent DEFCON in any of those?

A Yes, and he also typed it.

Q Again, I disagree with you on that. But my question is pointed to just verbally in this call.

Your testimony is Grifter told you he does not verbally represent DEFCON for this conversation?

A Yes.

Q You heard Mr. Wyler or Grifter's testimony regarding this conversation?

A I did.

Q And do you agree or disagree with his narrative of the conversation?

MR. CONRAD: Object, form.

A I cannot remember it all. So you would have to give me specific.

Q (By Mr. Dean) Sitting here today, is there anything you recall about Mr. Grifter's testimony that you believe was mistaken regarding this August 26 call?

MR. CONRAD: Object, form.

A Yes.

Q (By Mr. Dean) What?

A Multiple things. One, he claims that I admitted fault to whatever these claims are. He claims that he did represent DEFCON, even though he clearly stated multiple times that he did not. He stated that -- Grifter may be one of the most solid security people I know in this industry. It's shocking to me that he can't wrap his head around the idea that a corporate laptop needs to be locked when an employee has not returned it with data on it. That to me has been maybe the shocking thing to hear him talk about it, that it was not -- like he didn't get that. That's just common practice in any industry. I am sure if that is a corporate laptop, if you left Perkins and Coie, they are not going to let you walk away with it. So that's just common practice. So those things that I do remember from his testimony I disagree with.

And I also disagree with his recollection

of the events when he was setting up a stripper party in my children's CTF room.

Q When you called him a pedophile, that example?

A I never called him a pedophile.

Q What happened?

A We had our kids' event, and we had games that we were setting up for the next morning because it was going to start off really early. So we had all these little paper games and bags and stuff around the room. And Grifter comes in and tells me that DEFCON has designated my room to hold the DEFCON stripper party at night. And I told him, look, my thing is already set up for kids. And he said it's not my call. It's DEFCON's call. They own the room. The can use it however they want. And I said the only person that would want to hold a stripper party in a room where children are going to be crawling on the floor the next day is a pedophile.

Q So who is it that you were referring to a pedophile? If it wasn't Grifter, was it Geoff Moss?

A I wasn't referring to anyone. I was making a general comment that anybody who would agree with that, I would classify as someone who is

inappropriate?

MR. CONRAD: Object, form.

A At the time moment, I was upset. So I think we all say some dumb things when we are emotional. I mean, right now in a calmer state of mind, it wasn't the best usage of words. But Grifter came up to me maybe an hour later, pulled me aside, told me he didn't appreciate me yelling at him, and we hugged it out, and I apologized. And that was in, gees, 2016, '17 maybe. And it never came up again ever until all of this stuff. So he obviously had forgiven and forgot about it.

Q (By Mr. Dean) Do you think it was professional or unprofessional to act like that in response to Neil telling you there was an event that night?

MR. CONRAD: Object, form.

A If you have ever been to DEFCON, DEFCON is not a professional environment. So I don't even know if that question fits. Because there was not. DEFCON is not a professional conference. Very little professional things happen at DEFCON. It's Sodom and Gomorrah.

Q (By Mr. Dean) So you don't hold yourself out to be professional no matter what environment

This is over a dozen. You just volunteered multiple names yourself. So you know this is an issue. Do you recall that conversation? It was only a couple days into us talking; do you see that?

A Yes.

Q And then you responded, I know people who are making false accusations, yes, none at DEFCON, just in business and life; do you see that?

A Yes.

Q So I want to know, does that refresh your recollection regarding the initial conversations that you had with Grifter regarding allegations that were being made?

A I wish I can say it brought everything back to memory. But from what it sounds like, is that he was telling me that there was a dozen people that were anonymous coming to DEFCON with complaints about me.

Q Do you recall asking Neil or Grifter, was it this person, or this person, or that person?

A Yes, I mean, I think like most people in industries that have a name, I had enemies.

Q And who were you asking Grifter if it was?

A If it was Maxie and Cat. I believe Rachel Tobac was one I asked, Stephanie Carruthers for

0fcc1447-58be-45ef-a78e-c2fd62a9fc81

sure, and her husband JC. I think those were the people I mentioned at that time.

Q Did you offer your opinion on what had happened in those situations, and why you felt like there was nothing wrong?

A Yes.

Q What did you say with respect to Maxie?

A I told him that Maxie wanted to use her personal laptop. Big mistake on our part by saying yes. But we had to own it, according to her employment contract. She can only use a machine that we own. She sold us her machine for one dollar. And then she willingly installed our corporate software on it, allowing us to control that laptop. And that's all written in e-mail, all that you were given.

Then I explained that she told us she was going to Scotland to take care of her ailing father; that ended up being a lie. She signed multiple contracts that broke her employment contract. She then stole a Federal property picture from ILF using it in her book. And when she took her laptop to Apple, it got erased. So I explained to him the truth behind all the things that she had misconstrued.

Q Did you tell Grifter about how you canceled -- about how you got pod casts canceled, book deals canceled -- not book deals -- publishing deals, and television production deals canceled, or tried to get them canceled?

A I told him -- I didn't get the publishing deal canceled. It was paused until she rewrote it. But I did tell him that I pulled all of my support. Even though two pod casts didn't cancel her, I pulled my personal support. I had my name removed from her book. I had my company and my nonprofit removed from her book. And that I had -- yeah, that I stopped supporting her on the pod casts and other things like that.

Q When you say I stopped supporting her, does that mean that you told Grifter that you reached out to the pod cast people to say I am pulling my support, don't have her on the pod cast?

A I think -- I think we did talk about that, if I recall, because I think I mentioned I had a conversation with Jack Rhysider, who is the owner of Dark Net Diaries. I do -- I do think I recall telling him specifics that I had reached out to the people that I had introduced her to, and pulled my support verbally with them.

Q You also mentioned Rachel Tobar (sic) was discussed on that conversation. What did you say to Mr. Wyler about Ms. Tobar?

A Tobac.

Q Tobac.

A T-o-b-a-c.

Rachel is a very opportunistic person. So if you are riding high, she's right next to you riding your tailcoat. And when you are in the gutter, she's willing to throw dirt on you. So I had made an assumption that if Maxie gathered a bunch of people to go against me, that she might be part of that group. That was a wrong assumption from what I understand from all these depositions that she was not part of the group that Maxie got.

Q And what did you say about Rachel Tobac to Grifter?

A Oh, I don't recall. Probably what I just told you. But I don't actually remember my exact words. I think in this particular instance, I just named people that I had assumed were part of the enemy group. So I didn't say anything about them. I just named them saying, did Maxie get Cat? Did Maxie get Stephanie? JC? Rachel? Those kind -- that was the list of people that I thought would be

part of the group that she could get to.

Q You keep calling them the enemy group. Why do you keep calling them the enemy group?

A Have you seen what has happened to my life? That's the group of friends.

Q Yeah, I have. And I think everything that was published was exactly true. So if you want to ask my opinions on that, you are not going to like my answers. But the best part is I don't have to answer questions in depositions. You do.

A That's great.

Q So what I want to know is why you keep referring to them as the enemy group?

MR. CONRAD: Object, form.

A Once again, what has happened to my life would not make them friendlies. They have ruined my nonprofit. They have ruined my career. They have ruined my business. I have had people tell me to commit suicide and live stream it because of a conference banning. These people are -- I don't know how else to refer to them. They are the enemy group. They have single handedly gone out and tried to destroy my life, not just from a business stance.

Q (By Mr. Dean) So these people are the enemy group because they made complaints about the

A Yes.

Q You say, so I can answer for each here. And if we need to talk, we can try to get a time that works; is that right?

A Correct.

Q So the purpose of this e-mail was to kind of give your version of the events of the complaints -- or some of the complaint that you were aware of, correct?

A Yeah, I had not been told by DEFCON what the complaints were at all. The only one I knew was Maxie from Grifter. I didn't know what all the rest of them were. But Black Hat was able to schedule a call with Ryan, Shane and myself. And during that call, they didn't bring up Maxie at all. They brought up these four accusations that you see here in this e-mail. So I had made an assumption that these are the same stories that were being told to Black Hat -- or I am sorry -- to DEFCON, and that's what they were basing their decisions on.

Q And you wanted to address some of the accusations that you believed or assumed were the same, right?

A Correct.

Q This is kind of your version of those

C E R T I F I C A T E

STATE OF FLORIDA:

COUNTY OF ORANGE:

I, TARA K. SLOCUM, CRR, RPR, CSR No. 8587 and Notary Public, certify that I was authorized to and did stenographically report the deposition of CHRISTOPHER HADNAGY; that a review of the transcript was requested, and that the foregoing transcript is a true and accurate record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 20th day of February 2025.

Tara Slocum

_________________________

TARA K. SLOCUM

Certified Realtime Reporter

Registered Professional Reporter

California Certified Shorthand Reporter

# Exhibit 9

Maxie Reynolds September 27, 2024

Page 1

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

CHRISTOPHER J. HADNAGY; SOCIAL-ENGINEER,

Plaintiffs,

vs.

JEFF MOSS; and DEF CON COMMUNICATIONS, INC.,

Defendants.

No. 2:23-cv-01932-BAT

VIDEOTAPED VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION

OF

MAXIE REYNOLDS

Los Angeles, California (Via Zoom)

DATE: September 27, 2024

REPORTED REMOTELY BY: Douglas Armstrong, RPR
Washington CCR No. 3444

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com 206.622.6661 * 800.657.1110 FAX: 206.622.6236

uncomfortable?

ATTORNEY CONRAD: Object. Form.

A. They made me feel way more than uncomfortable. They made me feel extremely anxious and nervous and like boxed in. So it made me feel more than uncomfortable.

Q. (By Attorney Mertens) Did you feel afraid?

A. Yeah.

ATTORNEY CONRAD: Form.

A. I did feel afraid. I think he has a pattern of intimidation, and people who were once good employees are bad people, not just employees, bad people as soon as they've left. So, yeah, I did.

Q. (By Attorney Mertens) Who is Neil Wyler?

A. He is a well-known individual within the cybersecurity industry. I think he's mainly on the defensive side of security.

Q. And at some point in late August or early September of 2021, did you reach out to Mr. Wyler regarding Mr. Hadnagy's behavior towards you?

A. I did.

Q. Why?

A. I'd heard that Neil or Grifter was fair and professional and nice, and I found those things to be true. And I went to him because of those things, and

he has or had, at least, a personal relationship with Chris. So I went to him to try to sort of find a way to, like, calm Chris down. I didn't really know how else to do that.

I wasn't going to call Chris and say, like, "You need to lay off me a little bit," and I didn't know who else to call. I couldn't call Ryan, who I actually think is really fair and responsible too, because he was very much under Chris' influence. So I was given Grifter or Neil as a person who might be able to do that, and I went to him.

Q. (By Attorney Mertens) Who, for the record, is Ryan, Ms. Reynolds?

A. Ryan MacDougall was Chris' COO at the company for some amount of time.

Q. And did you eventually have a conversation with Mr. Wyler about Mr. Hadnagy's actions towards you?

A. Yes.

Q. Can you tell me -- well, let's start with this.

What form was that conversation in? Was it face-to-face? Was it a phone call? A video call? Message exchange? How did that conversation take place?

A. It was a phone call.

Q. Ms. Reynolds, you've quoted yourself as one of your generation's most accomplished social engineers; is that true?

ATTORNEY MERTENS: Object to form.

A. Is it true that I have said that, or is it -- or is it true?

Q. (By Attorney Conrad) Have you said that?

A. I believe that is written someplace, yes. I'm laughing not because it's funny, but because it's embarrassing.

Q. And part of social engineering is your ability to manipulate people in order to benefit yourself at their detriment; is that right?

ATTORNEY MERTENS: Object to form.

A. No. I don't think that is right.

Q. (By Attorney Conrad) What's not right about that?

A. Social engineering isn't about manipulating someone for an outcome. It is simply about how you present yourself. It doesn't have to be a negative outcome.

Q. Part of what you're trained on is to be able to expertly manipulate people?

A. No. There's no -- what do you mean by "manipulate people"?

around January 2022; is that right?

A. Yeah.

Q. And, in fact, your employment agreement is dated January 2020, but it doesn't have an exact date on it?

A. Yeah. I think that's right.

Q. And the employment agreement, I'm going to mark this as Plaintiff's Exhibit 13. It's SE 1469.

(Exhibit No. Plaintiff 13 marked for identification.)

Q. I believe you were previously shown this document, Ms. Reynolds, but this is the employment agreement that you signed with Social-Engineer; is that right?

A. Yes. It looks that way.

Q. Did you read it?

ATTORNEY MERTENS: Object to form.

A. At the time, did I read it? Now or at the time?

Q. (By Attorney Conrad) At the time.

A. At the time of signing, yes, I did.

Q. And, in fact, you did sign it. You signed it Maxie -- is it Lowden?

A. Yeah.

Q. So you're familiar with its terms?

A. Yes.

Q. And when you first began at Social-Engineer, there was some discussion about the equipment that you would be using in terms of what type of computer and when and how you would use it, headsets, things to that extent, correct?

ATTORNEY MERTENS: Object to form.

A. Are you saying that that is part of the contract, or are you just saying, "Here's your contract, and, also, did you have these discussions?"

Q. (By Attorney Conrad) I'm saying here's your contract, and you're having these discussions?

A. Can you be -- can you reword that for me?

Q. Well, you previously testified about this issue regarding originally a computer was given to you by Social-Engineer; is that right?

ATTORNEY MERTENS: Object to form.

A. Yeah.

Q. (By Attorney Conrad) And do you remember what type of computer that was?

A. I think it was a Windows machine. I don't know if it was like Lenovo. I'm not sure. I just know it wasn't a Mac.

Q. You didn't enjoy that machine; is that right?

A. Correct. Yeah.

from you to Ryan MacDougall dated January 10, 2020, at the very bottom here. And in it, you say, "Hi, Ryan. Well, I just completely re-set up my computer this week, and we can work through the rest together on Friday if we aren't chock-a-block? Also, will I just email you and Chris acknowledging that for as long as I work for SECOM, it is not considered my personal computer, and I forgo the option of using it as such? Do you want to buy it from me for a dollar with the caveat that I can buy it back in the event of termination?"

Do you see that?

A. No, I don't. I can only see -- I remember it as such, but I can't see that on my screen for some reason.

Q. Weird.

A. Okay. And then if you scroll, then, yes, I can see that second -- like, "Well, I just completely re-set up." I can see that.

Q. Okay. Well, take a look at it, and let me know if I read that accurately.

A. Yes.

Q. Okay. So you had initially introduced the idea that while you worked for SECOM, this would not be your personal computer, and you would forgo the option

of using it as such; is that right?

A. Yes.

Q. How are you able to draw on --

A. I don't know. I have no idea.

Q. Am I being hacked?

A. Yes.

Q. But, really, you don't know how you just were able to --

A. I don't know how. I don't, but that's really odd.

Q. This has been a concern about taking this case on. I'll say that. All right. So weird.

So, I mean, you initially suggested the idea of SECOM essentially buying the computer from you and it not being your personal computer back in August of 2020?

A. Yeah.

Q. And you're saying that there was never any follow-up with Chris about how this would be handled?

A. No.

Q. And then, ultimately, you did re-set up your computer and download the SECOM software?

A. Yes.

Q. Okay. I'm going to stop sharing my screen.

You talked with Mr. Mertens about what I

A. Yeah.
Q. (By Attorney Conrad) And that is a totally separate potential TV opportunity or movie opportunity from Netflix.
Is that your testimony?
A. Yeah, completely.
Q. So it was not related or was not going to be pitched to Netflix or anything like that?
A. I don't know who he was going to pitch it to, but it just -- the conversation was simply about Harris making a TV show about social engineering. It was not connected to my book.
Q. And had you ever discussed with Chris Hadnagy or anyone at Social-Engineer your desire to pursue an opportunity with Harris Fishman?
A. I don't think so.
Q. And you were doing that while you worked at Social-Engineer; is that right?
A. Yeah.
Q. And did you ever sign anything with Harris Fishman?
A. No.
Q. You never signed any type of nondisclosure agreement or contractual agreement with him?
A. There was definitely no contract. I may have

signed an NDA, but I can't tell you for sure. It would be, you know, common practice, but I don't know if I did.

Q. I'm going to share with you my screen again. We'll mark this as Exhibit 14.

THE COURT REPORTER: 15, Counsel.

ATTORNEY CONRAD: 15. Sorry. 15. I was so good for a while.

ATTORNEY MERTENS: Mark, do you have the Bates on this one?

ATTORNEY CONRAD: Yeah. 1071, SE 1071.

ATTORNEY MERTENS: Thank you.

(Exhibit No. Plaintiff 15 marked for identification.)

Q. (By Attorney Conrad) Ms. Reynolds, can you see this?

A. Yeah.

Q. And this is an email chain between you on your Social-Engineer email with Harris Fishman from SBC Global.

Do you see that?

A. I do.

Q. And in it, you -- there's an attachment entitled "MR United Mindful Scammer"?

A. Yeah.

Q. And was this because of your father falling ill?

A. I don't think I've said that in there. If you see it, then please point it out.

Q. Do you remember why you took a leave of absence or short-term disability in May of 2021 from Social-Engineer?

A. No. I don't recall the specifics.

Q. But in terms of timeline, we previously established that you signed the agreement with Harris Fishman May 3, 2021, right?

A. Yeah.

Q. And then it looks like May 20th, about 17 days later, you're taking a leave of absence from Social-Engineer?

A. Is that a question?

Q. Is that accurate?

A. Yes. Those dates are accurate.

Q. And you don't remember why you were taking a leave of absence in May of 2021?

A. I don't recall the exact specifics, no.

Q. Okay. Do you remember how long your leave of absence was at Social-Engineer?

A. No, I don't. I don't recall if I ever went back after the leave of absence. I'm really hazy

Q. "If I am due back salary payments, let me know. I don't know if we are paid in advance."

Did I read that correctly?

A. Yes.

Q. So in terms of timeline, you signed the Netflix deal -- sorry.

You signed an agreement with Harris Fishman, May 3, 2021. Then, about 17 days later, we have an email indicating that you're taking short-term disability.

A. Uh-huh.

Q. Is that right?

A. Yeah.

Q. And that you -- then the disability discussions continue on to June 4, 2021, as well; is that right?

A. Yeah.

Q. And then, later in June, on the 13th, you offer your resignation.

Is that timeline accurate?

A. Yeah.

Q. And when you offered your resignation, you also understood that you were going to ship back all items, including your computer, headset, your card, et cetera?

A. No. So before -- I'm going to preemptively strike here. The computer is the laptop I was originally sent. We're not going back to whose computer it was. It's my computer.

The headset, yes. The card, I think I was given -- I'm either talking about, like, business cards, or maybe I had a SECOM, like, expense card. I don't remember.

Q. Okay. So the computer that you're talking about is the first computer that Social-Engineer had given you?

A. Yeah.

Q. And where are you headed?

A. I think I say in this that I'm going -- that I'm going home to Scotland.

Q. And do you remember why you were going home to Scotland?

A. I wanted to go home because my dad was, like, on his second heart attack.

Q. Did you end up making that trip?

A. No.

Q. You did not?

A. No.

Q. Why not?

A. There were certain things at the time that

made that not possible.

Q. What were the things at the time that made that not possible?

A. Logistics.

Q. What does that mean?

A. It means I was unable to travel at the time to go home as I, like, wanted to, to see my dad. I wasn't able to make it.

Q. Did you ever represent that you were in Scotland?

A. To who?

Q. To Chris Hadnagy or Ryan MacDougall.

A. Well, hadn't I -- isn't this the same email where I leave? So would I have been in communication with them?

Q. Well, I'm sorry. Let me show you.

After you send your resignation, June 13, 2021, there's a follow-up email from Ryan MacDougall dated June 14, 2021.

Do you see that?

A. I do.

Q. Okay. And this is a follow-up message to some phone conversation that you've had --

A. Yeah. Okay.

Q. -- in which you're going to continue to take

a leave of absence from Social-Engineer. They will then cease your ongoing salary and benefits --

A. Uh-huh.

Q. -- at this point for an undetermined amount of time?

A. Yeah.

Q. And that you're going to check in periodically with them to let them know about what your status is; is that right?

A. Yes.

Q. That this will allow you to handle any family matters --

A. Uh-huh.

Q. -- you're planning on without expectation of performing your positional job functions?

A. Can you highlight that?

Q. Yeah.

A. Yeah.

Q. So, ultimately, it looks like you and Social-Engineer were able to work out some type of agreement that would allow you to take time to handle your personal matters while taking a leave of absence from the company for that period of time; is that right?

A. Yes.

Q. And do you remember whether you had been paid up until this date and time by Social-Engineer?

A. I don't remember, but, you know, your client most certainly will.

Q. And because you had been, at least it appears, on short-term disability from May 20, 2021, up until this email dated June 14th -- is the last emails back and forth on this -- well, sorry. June 15th, the last emails back and forth about you taking a leave of absence.

Is that accurate?

ATTORNEY MERTENS: Object to form.

A. Yeah. Sorry. I'm -- can you reword that?

Q. (By Attorney Conrad) Sure. So I'm trying to establish the timeline in which you had -- we at least know that you had been on short-term disability and now up until the period of time that you are taking an official leave of absence.

A. Okay.

Q. And we looked at an email dated May 20, 2021, entitled "Short-Term Disability," where you're discussing your efforts to try and get insurance and go on short-term disability?

A. Uh-huh.

Q. And now we're looking at an email -- that's

May 20, 2021. And now we're looking at an email, June, that at least spans up until June 15, 2021, in which you're taking a leave. You're changing from disability to leave of absence?

ATTORNEY MERTENS: Object to form.

A. Okay.

Q. (By Attorney Conrad) Is that accurate?

ATTORNEY MERTENS: Object to form.

A. Yes.

Q. (By Attorney Conrad) Okay. And do you know whether you were paid during this period of time by Social-Engineer?

A. I don't.

Q. Do you know whether you were performing any work for Social-Engineer during this period of time?

A. I'm pretty sure I was not.

Q. And you indicated within this email that we're looking at that you were headed to Scotland to go be with your family --

A. Yeah.

Q. -- correct?

A. Uh-huh.

Q. And you've indicated to me that you ended up actually not leaving for Scotland because of logistical issues?

A. Correct.

Q. The next email I want to show you, this will be Plaintiff's Exhibit 21. It's SE 402.

(Exhibit No. Plaintiff 21 marked for identification.)

Q. So, Maxie, this is Plaintiff's Exhibit 21. It's an email that starts out on August 5, 2021, subject "Resignation"?

A. Uh-huh.

Q. And this is a different email than the previous email we looked at what was also entitled "Resignation"; is that true?

A. Yes.

Q. And in it, you say, "Hey there, Chris, comma, Ryan. After a lot of back and forth and a tough few months, I've decided to take a different route and step back from social engineering as an industry. I just can't fathom coming back to work. I'm so mentally drained just now that returning seems unwise. I've not made the decision lightly, but I am certain about it. Plus, with my dad's surgery being pushed and the Delta strain affecting travel, I can't commit to return dates, and I think this departure is best for the team given your last email. My attention and focus will be not -- will not be there, and I will -- and I will not

do as good as job [sic] as I can for you guys or them.

"So, with sadness, this is my official resignation. I will miss working with you, and I will deeply miss the whole SE team. I hope we will remain friendly, and I am thankful and appreciative all that I've learned from you -- all that I've learned from you both, our laughs, and even some of our fights.

"I will send all items back to Spencer's address this upcoming -- this coming week. Again, I'm so sorry we are parting ways. My personal email is maxie@zed-one.com. I'll look out for mail there from you from now on."

Did I read that accurately?

A. Yes.

Q. So August 5, 2021, you offer your resignation again to Social-Engineer?

A. Uh-huh.

Q. And in it, you -- in this August 5, 2021, email, you indicate that you are thankful and appreciative of everything you've learned from Chris and Ryan; is that accurate?

A. Uh-huh. Yes.

ATTORNEY MERTENS: Hey, Max, one quick thing. Mark is a deliberate reader, and he'll pause sometimes when he's reading things. And you're interjecting

"yeses" and "uh-huhs," and "mm-hmms," and it makes it tough for Doug. So just wait for Mark to finish doing what he's doing, and then let him ask his question, and then you answer, okay?

THE WITNESS: Okay.

ATTORNEY CONRAD: Thanks, Matt.

Q. (By Attorney Conrad) So what were you appreciative learning from both Chris and Ryan?

A. I have no idea now. I could have been just being very polite, and I could have meant it at the time. I have no idea.

Q. And you see that Ryan responds and gives you Spencer's current address to ship the company equipment?

A. Yes.

Q. Did you ever ship the company equipment?

A. I don't know. I can't remember.

Q. Did you ever indicate that you were going to ship the computer back to them?

A. I don't know. I'm not sure. If I did, it would be an email because I didn't phone Chris or Ryan after that. So...

Q. So that email is dated August 5, 2021, and I want to ask you about something that you turned over in response to the subpoenas. Oh, you know what? I have

C E R T I F I C A T E

UNITED STATES )
)
DISTRICT COURT )

I, a Reporter and Washington Certified Court Reporter, hereby certify that the foregoing videotaped videoconference deposition upon oral examination of Maxie Reynolds was taken stenographically before me on September 27, 2024, and transcribed under my direction;

That the witness was duly sworn by me pursuant to RCW 5.28.010 to testify truthfully; that the transcript of the deposition is a full, true and correct transcript to the best of my ability; that I am neither attorney for nor a relative or employee of any of the parties to the action or any attorney or counsel employed by the parties hereto nor financially interested in its outcome.

I further certify that in accordance with Washington Court Rule 30(e) the witness is given the opportunity to examine, read and sign the deposition within thirty days upon its completion and submission unless waiver of signature was indicated in the record.

IN WITNESS WHEREOF, I have hereunto set my hand this 3rd day of October, 2024.

Douglas Armstrong, RPR

___________________________________________

Washington Certified Court Reporter No. 3444
License expires 11/26/2025

# Exhibit 10




**EMPLOYMENT AGREEMENT**

THIS EMPLOYMENT AGREEMENT (this "***Agreement***") is effective as of the ______ day of January, 2020 (the "***Effective Date***"), by and between SOCIAL-ENGINEER, LLC, a Pennsylvania limited liability company, (the "***Company***"), and MAXIE LOWDEN, an adult individual ("***Employee***").

WITNESSETH:

**WHEREAS**, the Company desires to employ Employee in the position of Social Engineer Consultant and Pentester for the Company and Employee desires to accept the position of Social Engineer Consultant and Pentester for the Company; and

**WHEREAS**, the parties desire to set forth the terms and conditions of Employee's employment.

**NOW, THEREFORE**, in consideration of the foregoing recitals and the mutual promises, covenants, and agreements contained herein, the adequacy and receipt of which is hereby acknowledged by each of the parties to this Agreement, and intending to be legally bound hereby, the Employee and the Company hereby agree as follows:

**1. Position**. During the Term (as hereinafter defined), Company shall employ Employee as a Social Engineer Consultant and Pentester for the Company, and Employee hereby accepts such employment, subject to the terms and conditions set forth in this Agreement.

**2. Term**. The term of employment under this Agreement (the "***Term***") shall commence on the Effective Date and shall continue until either the Company or the Employee terminates this Agreement in accordance with the terms and conditions of this Agreement.

**3. Duties**. In exchange for the Salary and Incentive Compensation (each as described below), subject to, and under the direction and oversight of the President of the Company (the "***President***"), the Employee shall have the following full-time duties during the Term:

**a.** faithfully exercise such authority and perform such duties on behalf of the Company as are normally associated with her title and position as Social Engineer Consultant and Pentester, as well as such other duties or positions as the President shall determine, provided, however, that Employee hereby acknowledges and agrees that she shall not have the authority to enter into any contract or agreement on behalf of the Company, and that she shall not bind the Company to any contract or agreement in any way without the prior written consent of the President of the Company. The Employee shall report directly to the President;

**b.** adhere to any and all policies and procedures of the Company which apply to the Company's employees in general or to the Employee's position with the Company in particular;



**c.** adhere to the fiduciary duties, including, without limitation, the duty of loyalty, that the Employee owes to the Company as an employee of the Company, to act exclusively to further the best interests of the Company, and to avoid any conflict of interest that might cause the Employee to breach or otherwise violate any of those fiduciary duties; and

**d.** perform the foregoing duties on behalf of the Company efficiently and in compliance with all applicable rules, regulations, and laws.

**4. Non-Business Activities**. Employee shall render services to the Company on a full-time basis, and be available to work as needed and when necessary as determined by the Company, and shall devote her full business time, attention and efforts to the business affairs of the Company, so as to fulfill her duties hereunder and to advance the business, profit, benefit and advantage of the Company, and shall not, during the course of her employment hereunder, engage in any other employment or business activity, without the express written consent of the Company.

**5. Salary**. As compensation for the services to be rendered by Employee under this Agreement, the Company agrees to pay, or cause to be paid, and Employee agrees to accept, a salary equal to Eighty Thousand ($80,000.00) Dollars per year, less applicable payroll deductions, which shall be payable in accordance with the payroll practices employed by the Company ("***Salary***").

**6. Incentive Compensation**.

**a.** As additional compensation for the services to be rendered by Employee under this Agreement, the Company agrees to pay, or cause to be paid the following "***Incentive Compensation***" to Employee:

**i.** Ten (10%) percent of Originated Sales (as hereinafter defined) to any New Clients (as hereinafter defined) of the Company that are identified on the list of Portable Clients attached hereto as Exhibit A.

**ii.** Five (5%) percent of Originated Sales to New Clients.

**iii.** Five (5%) percent of the total gross dollar amount collected by the Company from sales of the Company's products and/or services to any New Client that Employee works on with the President, as determined by the President in his sole discretion.

**iv.** Five (5%) percent of Originated Sales of new products and/or services (i.e. products or services that have never been purchased by such client prior to the Originated Sale) to an existing client of the Company.

**b.** "***Originated Sales***" shall mean the total gross dollar amount collected by the Company from sales of the Company's products and/or services made by and/or directly attributable to Employee during the applicable year.



      **c.** "***New Clients***" shall mean any client that has no existing connection to or relationship with the Company and that has never, either directly or indirectly, through any affiliated entity or individual or otherwise, purchased any product or service from the Company at any time.

**d.** Incentive Compensation shall be paid by the Company on a quarterly basis within forty-five (45) days after the last day of each business quarter (i.e. March 31, June 30, September 30 and December 31).

**e.** Employee shall in no event have any right to receive any Incentive Compensation at any time following the termination of this Agreement for any reason, whether with or without cause.

**7. Bonus Compensation**. Employee shall also be eligible for bonus compensation as determined by the President at his sole discretion from time to time. Any bonus compensation payable to the Employee shall be payable in accordance with the bonus payment practices employed by the Company.

**8. Expenses**. The Company shall reimburse Employee or cause Employee to be reimbursed, upon presentment of suitable vouchers, for reasonable business expenses which may be incurred or paid by Employee in connection with her employment hereunder, provided, that Employee complies with any policies established by the Company regarding expense reimbursement, including, without limitation, any restrictions or record keeping requirements imposed by the Company for the purpose of meeting the requirements of the Internal Revenue Code of 1986, as amended from time to time, and regulations promulgated thereunder.

**9. Other Benefits**. Upon completion of her first Ninety (90) days of employment with the Company, during the Term, the Employee shall be entitled to receive and/or participate in, subject to any eligibility requirements, any benefit plans and programs that the Company provides to its employees at Employee's level (including retirement plans, health insurance plans, vision and dental insurance plans, disability and life insurance plans that may be offered by the Company) as determined by the President in his sole discretion from time to time; and Employee shall be entitled to fifteen (15) days of paid vacation time per annum; provided, however, that the Company may modify such benefits from time to time, subject only to any restrictions imposed on the Company by the applicable law and/or the provisions of any documents governing the benefits the Company provides to such employees.

**10. Maintenance of Health Insurance**. During the Term, Employee shall either accept and enroll in the group health insurance plan(s) offered by the Company, if any, or shall obtain and maintain in full force and effect a policy or policies of health insurance sufficient to satisfy minimum standards of coverage as set forth below. Employee shall provide proof of such health insurance policy or policies to the Company upon request. The minimum standards of coverage for such health insurance policy or policies shall include:

**a.** Inpatient Coverage. Coverage for hospitalization including: room and board, physician visits and surgeon services, imaging and lab, and miscellaneous services. Coverage for all medically necessary inpatient care.




**b.** Outpatient Coverage. Coverage for all medically necessary outpatient care including both physician services for treatment of emergencies, illness, accident or injury, and imaging and lab services.

**11. Equipment and Data Access**. Employee hereby acknowledges and agrees that, in conjunction with her employment with the Company, she has been provided with certain supplies, Equipment, and services, and that such Equipment may be exchanged, upgraded and/or replaced from time to time at the sole discretion of the Company (the "***Equipment***"). Employee further acknowledges and agrees that she is only authorized to use the Equipment in a manner, and for such purposes, as are consistent and in accordance with Company policy. Without limiting the foregoing, Employee also expressly understands and agrees that her use of the Equipment is not intended to create, and does not create, any: (a) Employee ownership interest whatsoever in the Equipment, or in any electronic files or other data stored on the Equipment; or (b) right of privacy with respect to the use of such Equipment. Accordingly, the parties agree that: (y) the Equipment and all data stored on the Equipment are, and shall at all times remain, the sole and exclusive property of the Company; and (z) the Equipment is subject to inspection, including but not limited to a review of Employee's use of the Equipment, at any time upon the demand of the Company. Consistent with the provisions of this Section, Employee hereby agrees to immediately return all Equipment and any other property containing Company information or used by Employee in the course of her employment by the Company, to the Company upon her separation from employment for any reason, or upon demand by the Company at any time.

**12. Termination**. Employee's employment under this Agreement is "at will" and may be terminated as follows:

**a.** By Either Party Without Cause. Either party may terminate the employment relationship hereunder without Cause (as defined below) at any time by giving the other party thirty (30) days' written notice.

**b.** By Company for Cause. The Company may terminate Employee's employment hereunder immediately for "***Cause***" which shall mean and be limited to the following instances:

**i.** If Employee engages in fraud, dishonesty, disloyalty, or other conduct which, in the reasonable judgment of the President, adversely affects the Company;

**ii.** If Employee refuses or unreasonably fails to perform any of the duties required of her under this Agreement;

**iii.** If Employee engages in conduct in violation of this Agreement;

**iv.** If Employee fails or refuses to perform any lawful directions related to her employment and communicated to Employee by the President;

**v.** If Employee is convicted of any crime or offense that constitutes a felony under the jurisdiction in which such crime or offense took place;




    **vi.** If Employee makes any unauthorized disclosure of any Company Information (as hereinafter defined);

**vii.** If Employee willfully performs any act that would tend to materially harm the reputation or interests of the Company;

**viii.** If Employee attempts to assign Employee's rights or obligations under this Agreement without the Company's prior approval;

**ix.** If Employee uses illegal drugs, or illegally uses prescription medication; or

**x.** If Employee's use of alcohol or other substances impairs her ability to perform the essential functions of her position, and such impairment interferes with the accomplishment of her job duties, in accordance with law.

**c.** By the Company Upon Employee's Death or Disability. The Company may terminate Employee's employment hereunder for Disability. "***Disability***" shall mean Employee's physical and/or mental condition, which, for a period of one hundred eighty (180) consecutive days or one hundred eighty (180) days in the aggregate during any consecutive twelve (12) month period, renders her unable to perform the services required of her under this Agreement with or without reasonable accommodation, in accordance with applicable law. Employee's employment hereunder shall terminate immediately upon her death.

**d.** Payment Upon Termination. Upon termination of this Agreement in accordance with any of the provisions set forth in this Section 12, and upon the return and satisfactory inspection of all Equipment issued to Employee by the Company, the Company shall pay to Employee, or in the event of the death of Employee during the Term, to the estate of Employee, within thirty (30) days of such termination, any earned but unpaid Salary to which Employee is entitled pursuant to the applicable policies of the Company, if at all, up to the date of termination, provided however that the Company shall be entitled in its sole discretion to offset any cost or expense it incurs in repairing or replacing any Equipment that is not returned in satisfactory condition to the Company, including any costs or expenses (including legal fees) incurred by the Company in seeking the return of the Equipment. Employee shall not be paid nor shall she be entitled to receive any Incentive Compensation whatsoever, regardless of when such Incentive Compensation may have been earned or otherwise payable, after the termination of Employee's employment with the Company for any reason whatsoever. The parties hereby acknowledge and agree that Employee is entitled to only the payments under this Subsection 12.d. upon termination of this Agreement.

**13. Non-Competition; Non-Solicitation**. Employee agrees that during the Term, and for a period of twelve (12) months following the termination of this Agreement for any reason, Employee shall not directly or indirectly:

**a.** own, control, manage or participate in the ownership, control or management of, or render services or advice to, or have a material financial interest in, or lend her name to, any




business engaged in, or that is undertaking to become engaged in, in whole or in part, Social Engineering Training and Services ("***Business***"), or for services and products and/or related services and products of the Business that are the same or similar to or a reasonable substitute for any such services, products or related services or products sold by the Business as of the date hereof;

**b.** solicit, or assist in the solicitation of, any Person engaged in the delivery of Social Engineering Training and Services and/or related services or products to the Business and to whom Company either sold, provided or solicited to sell or provide any service or product offered by and/or related services to the Business, for the purpose of selling, providing or soliciting to sell or provide any such service or product that is the same or similar to or a reasonable substitute for any such service or product sold by the Business as of the date hereof;

**c.** solicit, or assist in the solicitation of, any hired employee or other person employed or engaged by Company as of the Effective Date in any capacity (as an employee, independent contractor or otherwise) to terminate such employment or other engagement, whether or not such employment or engagement is pursuant to a contract and whether or not such employment or engagement is at will;

**d.** knowingly or intentionally damage or destroy the goodwill and esteem of Company or the Business with its suppliers, employees, patrons, customers, and any others who may at any time have or have had business relations with Company or the Business.

**e.** In addition to the foregoing, the phrase "directly or indirectly" shall include, among others, employment by or rendering of any service to any person, partnership, association, limited liability company, or corporation, whether as an individual employee, partner, shareholder, director, member, officer, principal, manager, agent, trustee, consultant, investor, single proprietor, or pursuant to any other relationship or capacity.

**f.** The parties hereto agree that should a court of competent jurisdiction determine that any provision of this Section 13 is unenforceable by reason of being too broad in either term or scope, then in that event, the court may on its own accord and discretion modify either the term or scope of such provision taking into consideration the intentions of the parties as herein expressed and the nature of the business conducted by the Company and enforce such provision as so modified, or if the court shall not be empowered by applicable law to make such modifications and/or enforce the modified covenant, then the parties intend that the other covenants which are enforceable be deemed to be separate covenants and that such other covenants be enforced.

THE PARTIES TO THIS AGREEMENT HEREBY ACKNOWLEDGE AND AGREE THAT THE COMPANY SHALL HAVE THE RIGHT TO ASSIGN ANY OR ALL OF THE COVENANTS INCLUDING, WITHOUT LIMITATION, THE COVENANT NOT TO COMPETE SET FORTH IN THIS SECTION 13, TO ANY OF ITS AFFILIATES, SUCCESSORS OR ASSIGNS.




The period of time during which the Employee is prohibited from engaging in the specific activities contemplated by this Section 13 and its subsections shall be extended by the length of time during which the Employee is found to be in breach of any or all of the covenants contained in this Section 13 and its subsections by a court of competent jurisdiction.

**14. Non-Disclosure**. As a material inducement to the Company to disclose Confidential Information (as hereinafter defined) to Employee, Employee hereby agrees, both during and after the Term, to maintain the Confidential Information in confidence. Without limiting the generality of the foregoing, Employee further promises and agrees, both during and after the Term:

**a.** to hold in trust and confidence and preserve as confidential all Confidential Information which Employee receives or gains access to during the course of Employee's employment with the Company;

**b.** not to, directly or indirectly, in any way, divulge, disclose, publish, disseminate, or transfer Confidential Information to any person or entity other than the Company or provide any person or entity other than the Company access to any Confidential Information, except as expressly authorized by the Company;

**c.** to use Confidential Information only as necessary in connection with Employee's job duties and for no other purpose;

**d.** to protect and safeguard Confidential Information against unauthorized use, transfer, publication, or disclosure by others; and

**e.** to comply with any other security measures requested by the Company.

The phrase "***Confidential Information***" shall mean (i) any and all information contained in any document marked by the Company as "confidential," "proprietary," or other similar marking, and (ii) whether or not such information is reduced to writing or is marked as "confidential," "proprietary," or similar marking, all information concerning (a) the procedures employed in the operations of the Company and the business affairs of the Company, (b) the identity of the suppliers, customers, prospective customers, business partners, prospective business partners, work subjects or sources, prospective work subjects or sources, or vendors of the Company, and the nature and extent of the Company's business relationship with such persons and entities; (c) the Company's financial condition, results of operation, business plans, prospects, projections, strategies, budgets, practices, techniques, trade secrets, employees, employee lists, management, investors, products, know-how, formulae, specifications, strategic and development plans, financial matters, marketing information, marketing programs, pricing information, price lists, co-developer identities, data, business records, customer lists, project records, reports, drawings, designs, work product, services, policies, procedures, proposals, contracts, leases, rental agreements, memoranda, notes, training material, files, correspondence, data stored on any Company owned computer disks and data storage devices or services (including but not limited to any cloud storage systems or agreements), information relating to processes, technologies, theories, research, development, computer programs or manufacturing, and all other technical or



PDF-XChange Editor Click to BUY NOW! www.tracker-software.com

business information of the Company; (d) the developments, ideas, and inventions which derive in any manner from Confidential Information or are produced during the course of Employee's employment with the Company, including, but not limited to, the Discoveries (as hereinafter defined); and (e) all other information of the Company that may be disclosed by the Company or to which Employee may be provided access by the Company or others, or which is generated as a result of or in connection with the Company's business purposes, whether in whole or in part by Employee or others. The parties acknowledge and agree that all references to the Company in the definition of "***Confidential Information***" in this Section shall include the Company and any of its Affiliates.

Employee's promise not to disclose, except as may be required by law, any Confidential Information as specified in this Section 14 shall survive the termination or expiration of this Agreement.

At the end of Employee's employment with the Company, without regard to the reason Employee's employment shall end, Employee shall return all Company property, including, without limitation, all Company Information in whatever form or medium and all copies of Company Information in Employee's possession, custody, or control.

**15. Ownership of Discoveries**. Employee hereby agrees that any and all inventions, discoveries, designs, developments, improvements, processes, documentation, data, techniques, know-how, and any other work product that Employee makes, conceives, or otherwise develops that are related to Social Engineering Training and Services and/or Penetration Testing Products or Services, or based upon or are related to Employee's employment with the Company, either alone or jointly with another person or persons, or that is specifically requested by the President of the Company, or are developed in collaboration, cooperation, consultation, or partnership with the Company (hereinafter collectively referred to as the "***Discoveries***" and individually referred to as a "***Discovery***"), whether or not such Discoveries are patentable or otherwise able to be protected as intellectual property, will immediately become the sole and absolute property of the Company. In addition, if Employee develops a Discovery within six (6) months after the expiration or termination of Employee's employment with the Company, such Discovery will immediately become the sole and absolute property of the Company if such Discovery was based upon information obtained by Employee during her employment with the Company or is otherwise in any way attributable to Employee's employment with the Company. Employee hereby assigns to the Company any rights that Employee may have or acquire in the Discoveries and any rights resulting from the Discoveries. Furthermore, Employee hereby agrees that all of her duties to be performed hereunder were specifically ordered or commissioned by the Company, that the works resulting therefrom constitute and shall constitute "works-made-for-hire" as defined in the United States Copyright Act of 1976, that the Company is and shall be the author of said works-made-for-hire, and that the Company shall have the right to make such changes therein and such uses thereof as it may deem necessary or desirable. To the extent that any such work is not recognized as a "work-made-for-hire," Employee hereby assigns, transfers and conveys to the Company, without reservation, all of Employee's right, title and interest in and to the work, including, without limitation, all rights of copyright and copyright renewal in said work or any part thereof. Employee further agrees to immediately communicate to the Company, without delay, all available information relating to Discoveries at the time that such Discoveries are made, conceived, and/or

 
otherwise developed. In addition, Employee agrees, upon the Company's request at any time during or after Employee's employment with the Company, to sign all documents the Company may reasonably require to allow the Company to apply for, obtain, and vest in the name of the Company, patents and/or other intellectual property rights in the Discoveries and/or to evidence the Company's ownership of the Discoveries and any rights resulting from the Discoveries. If the Company is unable, after reasonable efforts, to secure Employee's signature on any such documents, Employee hereby irrevocably designates and appoints the Company as Employee's attorney-in-fact, to act for and on Employee's behalf to execute and file those documents and/or to do all other lawfully permitted acts to assist the Company in obtaining, renewing, restoring, and/or defending patent and/or other intellectual property rights in the Discoveries and/or to evidence the Company's ownership of the Discoveries or any rights resulting from the Discoveries.

**16. Injunctive Relief; No Adequate Remedy at Law**. Recognizing that any breach by Employee of the covenants contained in Sections 13 or 14 of this Agreement would result in irreparable injury to the Company for which money damages could not adequately compensate the Company, in the event of any such violation or breach, the Company shall be entitled, in addition to any other rights and remedies which it may have at law and equity, or hereunder, to have an immediately effective permanent injunction issued by any competent court of law or equity enjoining and restraining Employee and any other person involved therein from continuing such breach and have such injunctive relief issued without proof of actual damages or the posting of bond. The existence of any claim or cause of action under this Agreement or otherwise, which Employee or such other person or entity involved may have against the Company shall not constitute a defense or bar to the enforcement of the covenants contained in Sections 13 or 14 of this Agreement. The period of time during which Employee is prohibited from engaging in the specific activities contemplated by Sections 13 or 14 of this Agreement shall be extended by the length of time during which Employee is found to be in breach of any or all of the covenants contained in Sections 13 or 14 of this Agreement by a court of competent jurisdiction. In the event that a competent court of law or equity finds that Employee breached any or all of the covenants contained in Sections 13 or 14 of this Agreement, this Section 16 shall prevent Employee from contesting the Company's right to have an immediately effective permanent injunction issued by such court enjoining and restraining Employee and any other person involved therein from continuing such breach and have such injunctive relief issued without proof of actual damages or the posting of bond. Employee further agrees that in the event the Company seeks relief in court and the court shall grant permanent injunctive relief and/or damages in an action for damages, Employee shall be responsible for all attorney's fees and costs incurred by the Company in enforcing its rights under said covenants.

**17. Representations and Warranties of Employee**. With the express understanding that the Company shall be entitled to rely on the representations and warranties of Employee contained in this Agreement, Employee hereby represents and warrants to the Company that Employee is not a party to any agreement restricting or limiting Employee's right to perform Employee's job responsibilities for the Company or compete freely with any former employer of Employee, that all information provided by Employee in connection with Employee's engagement of employment has been true, accurate, and complete, and that Employee has not omitted any material fact which would make any statement made or information provided by Employee misleading.




**18. Background Check**. Employee agrees to complete and execute the Company's Background Check Consent Form attached hereto as Exhibit B.

**19. Publicity**. Employee hereby consents to any and all uses and displays, by the Company and its agents, of the Employee's name, voice, likeness, image, appearance and biographical information in, on or in connection with any proposal, offering memorandum or similar documents or presentations, pictures, photographs, audio and video recordings, digital images, websites, television programs and advertising, other advertising, sales and marketing brochures, books, magazines, other publications, CDs, DVDs, tapes and all other printed and electronic forms and media throughout the world, at any time during or after the period of her employment by the Company, for all legitimate business purposes of the Company ("***Permitted Uses***"). Employee hereby forever releases the Company and its members, managers, directors, officers, employees and agents from any and all claims, actions, damages, losses, costs, expenses and liability of any kind, arising under any legal or equitable theory whatsoever at any time during or after the period of her employment by the Company, in connection with any Permitted Use.

**20. Non-Disparagement**. Each party agrees that both during the Term and after termination of this Agreement, she or it shall not make any statement, either in writing or orally, that is communicated publicly or is reasonably likely to be communicated publicly (including, but not limited to, on any social media platform), and that is reasonably likely to disparage or otherwise harm the business or reputation of (or induce or encourage others to do so) the other party and/or any of such party's Affiliates, or their respective owners, members, managers, officers, or employees. As used herein, the term "disparage" shall mean any statement that adversely affects in any manner, or is reasonably likely to adversely affect in any manner, a party's and/or an Affiliate's professional or commercial reputation.

**21. Assignment**. The rights and obligations of the Company under this Agreement, including, without limitation, the Company's rights under Section 13 above, may be transferred, and all covenants and agreements hereunder shall inure to the benefit of, and be enforceable by, the Company's successors or assigns. Neither the rights nor the obligations of Employee shall be assignable without the express prior written consent of the Company, which consent may be withheld in the Company's sole discretion. No right of or benefit to Employee under this Agreement shall be subject to anticipation, alienation, sale, assignment, pledge, encumbrance, or charge and any attempt to do so shall be void. No right of or benefit to Employee under this Agreement shall in any manner be liable for or subject to the debts, contracts, liabilities, or torts of Employee. If Employee shall become bankrupt or attempts to anticipate, alienate, sell, assign, pledge, encumber, or charge any right or benefit under this Agreement, then such right or benefit shall, in the sole discretion of the Company, cease and determine in such proportion as the Company may deem proper.

**22. Severability**. The invalidity or unenforceability of any particular provision of this Agreement shall not affect its other provisions. If any provision of this Agreement is determined by a court to be unenforceable, such provision shall be deemed severable, and this Agreement may be enforced with such provision severed or as modified by any court. If, in any judicial proceeding, a court shall refuse to enforce any covenant deemed included in this Agreement, the covenant may



PDF-XChange Editor Click to BUY NOW! www.tracker-software.com

be modified by the court for the purpose of those proceedings to the extent necessary to permit it to be enforced.

**23. <u>Counterparts</u>**. This Agreement may be executed in separate counterparts (including by means of facsimile, e-mail or other electronic means), each of which is deemed to be an original and all of which taken together constitute one and the same Agreement.

**24. <u>Independent Counsel</u>**. Employee acknowledges that Employee has been provided with the opportunity to consult with independent counsel regarding Employee's rights and obligations under this Agreement, and that Employee is not relying in any way on the Company or its counsel in connection therewith. Accordingly, any covenant of Employee under this Agreement shall be deemed knowing, intelligent, and voluntary, and enforceable by the Company against Employee.

**25. <u>Waiver</u>**. Any delay or failure to exercise any right or remedies hereunder shall not: (a) impair such right or remedy, (b) be construed as a waiver thereof or an acquiescence in the breach of this Agreement, or (c) constitute a waiver of future enforcement of that provision or of any other provision hereunder by that party or any other party. Any single or partial exercise of any right or remedy shall not preclude any other or further exercise thereof or the exercise of any other right or remedy.

**26. <u>Notices</u>**. All notices, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given (a) when delivered by hand (with written confirmation of receipt), or (b) when received by the addressee, if sent by a nationally recognized overnight delivery service or by registered mail, charges or postage prepaid, return receipt requested, in each case, to the addresses set forth on the signature page of this Agreement (or to such other addresses, as either party may designate by like notice to the other party).

**27. <u>Entire Agreement</u>**. This Agreement contains the entire agreement and understanding by and between Employee and the Company with respect to the employment of Employee, and no representations, promises, agreements, or understandings, written or oral, relating to the subject matter hereof not contained herein shall be of any force or effect. This Agreement may not be amended or modified except in a writing signed by each of the parties hereto or as otherwise expressly provided in this Agreement.

**28. <u>Headings</u>**. The headings contained in this Agreement are for reference purposes only and will not affect the meaning or interpretation of any provision.

**29. <u>Governing Law</u>**. This Agreement has been delivered and executed in the Commonwealth of Pennsylvania and shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, without reference to conflicts of law principles.

[***Remainder of Page Intentionally Left Blank;***
***Signature Pages Follow***]



IN WITNESS WHEREOF, and intending to be legally bound thereby, the parties hereto have executed this Agreement as of the date and year first above written.

**SOCIAL-ENGINEER, LLC**:

By:________________________________
Name: Christopher Hadnagy
Title: President

Address: Social-Engineer, LLC

EMPLOYEE:

________________________________
**Maxie Lowden**

Address:

407 LINCOLN ROAD, Miami Beach, FL, USA, 33139

407 LINCOLN ROAD, Miami Beach, FL, USA, 33139



# EXHIBIT A

## PORTABLE CLIENTS

SE_001481




# EXHIBIT B

## SOCIAL-ENGINEER, LLC
## CONSENT TO PERFORM CRIMINAL, CREDIT HISTORY & BACKGROUND CHECK

I, Maxie Lowden, hereby authorize Social Engineer, LLC (the "Company") and its members, managers, directors, officers, employees, agents and representatives to conduct a comprehensive review of my background, including, but not limited to, causing a consumer report and/or an investigative consumer report to be generated for employment purposes as of the date hereof and at any time during my employment by, or affiliation with, the Company. I understand that the scope of the consumer report/ investigative consumer report may include, but is not limited to the following areas: obtaining verification of employment eligibility in the United States (IRS Form I-9 attached); social security number; credit reports; current and previous residences; employment history; education background; character references; character and personal reputation; drug testing, civil and criminal history records from any criminal justice agency in any or all federal, state, county jurisdictions for at least, but not limited to, the past ten (10) years; driving records; birth records; and any other public or private records.

I further authorize any individual, company, firm, corporation, educational institution, social networking site, public agency, private institution, law enforcement/criminal justice agency, city, state, county and federal court, state motor vehicle bureau and any other person, to divulge any and all information, verbal or written, pertaining to me, to the Company its members, managers, directors, officers, employees, agents and representatives. I further authorize the complete release of any records or data pertaining to me which the individual, company, firm, corporation, or public agency may have, to include information or data received from other sources. The Company, its members, managers, directors, officers, employees, agents and representatives and representatives shall maintain all information received from this authorization in a confidential manner in order to protect personal information, including, but not limited to, addresses, social security numbers, and dates of birth.

Pursuant to the Fair Credit Reporting Act, I have been advised that, upon written request to the Company, I will be provided the name, address and telephone number of any reporting agency as well as the nature, substance, source and a copy of all such information and/or reports.

I hereby release and hold harmless the Company, its members, managers, directors, officers, employees, agents and representatives, and all parties involved in conducting any background check or providing information to the Company, its members, managers, directors, officers, employees, agents and representatives from any and all liability for damages arising from requesting, procuring or furnishing the requested information except with respect to a violation of the Fair Credit Reporting Act.

_______________________________________ Date: 01/24/2020

**Employee Signature**

Print Full Name (include any maiden name, former, alias): Maxie LOWDEN

Social Security Number: [redacted] Date of Birth: [redacted]

Address: [redacted]

# Exhibit 11

| | |
|---|---|
| From: | </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=15857B33BD854924B7474BBC7F67D366-RYAN> |
| Date: | August 10, 2020 7:11:06 PM (-05) |
| To: | Maxie Reynolds |
| Subject: | **Re: Computer Setup** |
| Attachments: | |

Yes when you have it reinstalled and ready let me know and we can work through it to completion.

Ryan MacDougall
Chief Operating Officer
Social-Engineer, LLC.
570.234.3734 ext 215
www.social-engineer.com

---

**From:** Maxie Reynolds <maxie@social-engineer.com>
**Sent:** Monday, August 10, 2020 5:29:25 PM
**To:** Ryan MacDougall <ryan@social-engineer.com>
**Subject:** Re: Computer Setup
And this:

Will I just completely re-setup my computer this week and we can work through the rest together on Friday if we aren't chocka-block?

Regards,
Maxie Reynolds

On Aug 10, 2020, at 4:28 PM, Ryan MacDougall <ryan@social-engineer.com> wrote:

All money convos need to be sent to Chris.

Ryan MacDougall
Chief Operating Officer
Social-Engineer, LLC.
570.234.3734 ext 215
www.social-engineer.com

---

**From:** Maxie Reynolds <maxie@social-engineer.com>
**Sent:** Monday, August 10, 2020 5:02:11 PM
**To:** Ryan MacDougall <ryan@social-engineer.com>
**Subject:** Computer Setup
Hey Ryan,
Will I just completely re-setup my computer this week and we can work through the rest together on Friday if we aren't chocka-block?
Also, will I just email you and Chris acknowledging that, for as long as I work for SECOM, it is not considered my personal computer and I forgo the option of using it as such? Do you wanna buy it from me for $1 with the caveat that I can buy it back in the event of termination?
Best regards,
Maxie Reynolds
Technical Team Lead
570 234 3734 ext. 221
www.social-engineer.com

# Exhibit 12

From: "Maxie Reynolds" <maxie@social-engineer.com>
To: "Christopher Hadnagy" <chris@social-engineer.com>
Date: 5/27/2021 1:56:54 AM
Subject: Re: Wouldn't

I actually consulted with my own lawyer and Netflix's legal team over this as my contract with SECOM was a concern — given we are a family as you so often say They have assured me am not in breach of your contract specifically with this project.

I have a $250,000 retainer with my current lawyer so it is no trouble at all for me to put them in touch with your lawyer if you would like Tim to be able to review this contract to make sure. However, it won't be sent to you. I am unsure if Tim can send it to you or not (I don't have that legal knowledge).

Your feelings on this are a separate matter of course. I apologize if you feel upset. That was never my intention.

Regards,
Maxie Reynolds

> On May 26, 2021, at 6:37 PM, Christopher Hadnagy <chris@social-engineer.com> wrote:
>
> Additionally I am not sure how many times I can really point this out but your employment agreement with SECOM comes before any other agreement you make. This "contract" you made violates your employment agreement. Its upsetting to find these things out through social media when other people ping me to ask questions or via our slack.
>
> To say this least these feels a little blind sided.
>
> Christopher Hadnagy
> Chief Human Hacker
> Social-Engineer, LLC.
> 570.234.3734
> www.social-engineer.com
>
> Grab a copy of my new book *Human Hacking: Win Friends, Influence People, and Leave Them Better Off for Having Met You* HERE!
>
> Have you seen my TedX Talk on how we are being hacked daily? https://www.youtube.com/watch?v=9e6k_PtEXdM
>
> ---
>
> From: Ryan MacDougall <ryan@social-engineer.com>
> Date: Wednesday, May 26, 2021 at 9:34 PM
> To: Christopher Hadnagy <chris@social-engineer.com>, Maxie Reynolds <maxie@social-engineer.com>
> Subject: Re: Wouldn't
>
> Yes please , I have sooo many questions.
>
> Many of which revolve around your availability and the impact this will have on the team.

Maxie Reynolds
9/27/2024
Plaintiff 17
Douglas Armstrong, RPR

Ryan MacDougall
Chief Operating Officer
Social-Engineer, LLC.
570.234.3734 ext 215
www.social-engineer.com

---

From: Maxie Reynolds <maxie@social-engineer.com>
Sent: Wednesday, May 26, 2021 5:28:01 PM
To: Christopher Hadnagy <chris@social-engineer.com>
Cc: Ryan MacDougall <ryan@social-engineer.com>
Subject: Re: Wouldn't

Ha!

Yeah, I was under contract not to say and honestly didn't think much of it until I got a call today.

Happy to talk about it whenever you're both free.

Regards,
Maxie Reynolds

> On May 26, 2021, at 2:40 PM, Christopher Hadnagy <chris@social-engineer.com> wrote:
>
> Maybe if you ping her on social media she will answer
>
> Christopher Hadnagy
> Chief Human Hacker
> Social-Engineer, LLC.
> 570.234.3734
> www.social-engineer.com
>
> Grab a copy of my new book *Human Hacking: Win Friends, Influence People, and Leave Them Better Off for Having Met You* HERE!
>
> Have you seen my TedX Talk on how we are being hacked daily? https://www.youtube.com/watch?v=9e6k_PtEXdM
>
> ---
>
> From: Ryan MacDougall <ryan@social-engineer.com>
> Date: Wednesday, May 26, 2021 at 4:00 PM
> To: Christopher Hadnagy <chris@social-engineer.com>, Maxie Reynolds <maxie@social-engineer.com>
> Subject: RE: Wouldn't
>
> Why do you hate us so much Maxie?
>
> Ryan MacDougall
> Chief Operating Officer
> Social-Engineer, LLC.
> 570.234.3734 ext 215

www.social-engineer.com

---

From: Christopher Hadnagy <chris@social-engineer.com>
Sent: Wednesday, May 26, 2021 12:57 PM
To: Maxie Reynolds <maxie@social-engineer.com>; Ryan MacDougall <ryan@social-engineer.com>
Subject: Wouldn't

Wouldn't it have been nice as your employer to be included in this before finding out on social media

https://www.linkedin.com/posts/maxiereynolds_attackermindset-mindset-netflix-activity-6803359132436041728-NXO8

Christopher Hadnagy
Chief Human Hacker
Social-Engineer, LLC.
570.234.3734
www.social-engineer.com

# Exhibit 13

From: "Maxie Reynolds"
To: "Harris Fishman" <[redacted]>
Date: 5/4/2021 7:10:05 AM
Subject: Re: Untitled Mindful Scammer Project
Attachments: MR_Untitled Mindful Scammer_053021.pdf

---

Hello,

Apologies — I'm having to do it on my phone! Should be good now.

Regards,
Maxie Reynolds

> On May 3, 2021, at 6:42 PM, Harris Fishman <[redacted]> wrote:

> \u-257 ?
> Please date it and out N/A in the other spaces. And initialize the first page? The I will send to paul. Thanks H
>
> > Begin forwarded message:
> >
> > From: Maxie Reynolds <maxie@social-engineer.com>
> > Subject: Re: Untitled Mindful Scammer Project
> > Date: May 3, 2021 at 12:12:59 PM PDT
> > To: Harris Fishman <[redacted]>
>
> <MR_Untitled Mindful Scammer_053021.pdf>

Maxie Reynolds
9/27/2024
Plaintiff 15
Douglas Armstrong, RPR

April 30, 2021

Ms. Maxie Reynolds
[redacted]

**RE:** **"Mindful Scammer" (Working Title)**

Dear Ms. Maxie Reynolds:

This will set forth the agreement ("Agreement") between Harris Fishman and R. Paul Wilson ("Producer") and Maxie Reynolds ("Artist'), in connection with the proposed reality based social experiment television series tentatively entitled "Mindful Scammer" (the "Series"), being developed by Producer and featuring Maxie Reynolds and potentially her expert "ethical hacking" colleagues as on-camera talent and/or consulting producers in a Series where real people will be taught and tested on utilizing social engineering techniques for mindful purposes. The parties hereby agree as follows:

1. Artist hereby grants permission to Producer to pitch the Series with Artist and Artists "expert colleagues" attached, in all forms and media for a period of twelve (12) months from the date of full execution of this Agreement (the "Term"). Producer will use good faith efforts to secure interest from production companies, executive producers, financiers, potential networks, broadcasters, syndicators and distributors (each a "Network") in the Series. If Producer enters into negotiation with a Network for financing, development, production, or distribution of a Production (as defined below) before the expiration of the Term, then the Term will be automatically extended for up to sixty (60) days. Artist agrees that Artist will not become involved with any other similar television project during the Term.

2. If a Network to whom Producer submits the Series during the Term commits to develop, finance, produce or distribute a pilot, presentation, or the Series (collectively, a "Production"), Producer will be engaged as executive producers on the production.

3. If Producer produces the Series, Artist and her representatives will negotiate in good faith with the Network and/or the Producer the terms of an agreement for Artists on-camera services or consulting producer servives; provided however if such Network has a policy that production companies are required to negotiate talent agreements and/or conuslting producer's agreemement, then Artist's and her representatives will negotiate such agreement(s) directly with Producer in lieu of the Network. If Producer produces the Series and Artist enters into agreements with the Network for Artist's on-camera and/or consulting producers services then Producer will obtain separate releases from Artists "expert colleagues" in connection with their participation in the Series, and Artist agrees to use her best efforts to assist Producer in obtaining such releases.

4. Producer may develop the Series, including, without limitation, creating sizzle reels, presentations and other development materials (all of the foregoing being collectively referred to as "Development Materials"). During the Term, Artist agrees: (a) to render on-camera services, (b) to provide Producer with access to additional personal material and the right to record in connection with the Development Materials as may be reasonably required by Producer. In connection therewith, Artist acknowledges and agrees that all of the results and proceeds will constitute a work specially ordered or commissioned by Producer for use as part of a motion picture or other audiovisual work and are intended

MR



by Artist and Producer to be a "work-made-for-hire" by Producer (as defined by the U.S. Copyright Act of 1976, as amended), with Producer being deemed the author and copyright owner thereof. If any results and proceeds or contributions are determined not to be "work(s) made for hire," Artist is hereby deemed to have assigned same to Producer for use in all manner and media now known or hereafter devised, throughout the universe in perpetuity. For the avoidance of doubt, all rights in and to the intellectual property owned or controlled by the Artist will be reserved to Artist, and Artist hereby grants to Producer on a non-exclusive, worldwide, perpetual, transferable license to use such intellectual property for the purposes provided in this agreement. Notwithstanding the foregoing, all Development Materials created by Producer or commissioned by Producer will be owned by Producer. In addition, Producer acknowledges and agrees that until a more formal agreement is entered into in connection with the Series, nothing herein shall be deemed to grant Artist's life story rights to Producer.

5. This Agreement sets forth the entire understanding between the parties and cannot be modified except by a writing signed by both parties. This Agreement will be construed in accordance with the laws of the State of California applicable to agreements entered into and performed in that state. The parties hereby submit to the exclusive jurisdiction of the courts located in Los Angeles, California. In entering into this Agreement, the parties have not relied upon any representation or promise, written or oral, not contained herein. Producer and any subsequent assignee may assign this Agreement and grant its rights hereunder, in whole or in part, to any party; provided, however, such assignment shall not occur until a Network orders a Production. Artist may not assign this Agreement or any of the obligations hereunder.

If the foregoing is acceptable to you, please sign in the space provided below. Paul and I look forward to working with you.

Best regards,

Harris Fishman, R. Paul Wilson

Dated and signed by Harris Fishman:______________________
Dated and signed by R. Paul Wilson:______________________

**Accepted and Agreed To:**

M. Reynolds
______________________
Maxie Reynolds

By:______________________
Its:______________________
Dated: 5/3/21

# Exhibit 14

| | |
|---|---|
| From: | </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=15857B33BD854924B7474BBC7F67D366-RYAN> |
| Date: | August 16, 2021 2:08:04 PM (-05) |
| To: | [REDACTED] |
| Cc: | Christopher Hadnagy |
| Subject: | **RE: Resignation** |
| Attachments: | |

Maxie,

In the event you do not have Spencer's current address to ship the company equipment here it is:

Spencer Scott
[REDACTED]
[REDACTED]

Please reply with a tracking number when you have one.

Thank you,

Ryan MacDougall
Chief Operating Officer
Social-Engineer, LLC.
570.234.3734 ext 215
www.social-engineer.com

-----Original Message-----
From: Maxie Reynolds <maxie@social-engineer.com>
Sent: Thursday, August 5, 2021 4:53 PM
To: Ryan MacDougall <ryan@social-engineer.com>; Christopher Hadnagy <chris@social-engineer.com>
Subject: Resignation

Hey there Chris, Ryan

After a lot of back and forth and a tough few months, I've decided to take a different route and step back from social engineering as an industry. I just can't fathom coming back to work — I'm so mentally drained just now that returning seems unwise.

I've not made the decision lightly, but I am certain about it. Plus, with my dad's surgery being pushed and the Delta strain affecting travel, I can't commit to return dates and I think this departure is best for the team given your last email. My attention and focus will not be there and I will not do as good as job as I can for you guys or them.

So, with sadness, this is my official resignation. I will miss working with you and I will deeply miss the whole SE team. I hope we all remain friendly and I am thankful and appreciate all I've learned from you both, our laughs and even (some of) our fights.

I will send all of the items back to Spencer's address this coming week and again, I'm so sorry we are parting ways. My personal email is [REDACTED] I'll look out for mail there from you from now on.

Regards,
Maxie

# Exhibit 15

From: "Ryan MacDougall" <ryan@social-engineer.com>

To: "Maxie Reynolds" <[redacted]>

Date: 9/8/2021 5:03:52 PM

Subject: RE: Return of Company Equipment

---

Maxie,

Thank you for the quick response.

Based on your reply, if we do not have the machine in hand or a tracking number with an explicit delivery date by 5PM PDT on Friday, we will take that as a refusal of our request and proceed with our reporting steps.

Ryan MacDougall
Chief Operating Officer
Social-Engineer, LLC.
570.234.3734 ext 215
www.social-engineer.com

---

From: Maxie Reynolds <[redacted]
Sent: Tuesday, September 7, 2021 2:40 PM
To: Ryan MacDougall <ryan@social-engineer.com>
Cc: Christopher Hadnagy <chris@social-engineer.com>; Kazuyuki Nishi <kaz@social-engineer.com>
Subject: RE: Return of Company Equipment

Ryan and company,

I am not in Los Angeles at the moment, but will return there on Friday. I have already sent the computer to you (sent on Saturday) but don't have the number with me.

If it's not with Spencer by Friday, I'll send the number. If you could let me know on Friday if you've not received it, it would be much obliged.

Ps Ryan, please refrain from sending me signal messages. I find them threatening and intimidating.

Maxie

On Tue, Sep 7, 2021 at 1:26 PM, Ryan MacDougall <ryan@social-engineer.com> wrote:

> Maxie,
>
> As you know, SECOM performs regular backups on all machines that have corporate data on them. Considering that we were not given the opportunity to wipe the MacBook you used for work after your departure, that machine was still backing up to our servers up until the day it was remotely locked.
>
> We checked the last full disk backup which was completed 45 mins before we locked the machine, and in that backup we can see you had [redacted] data on the desktop.
>
> Per our contracts if we are unable to recover the machine you used for work, to properly wipe the data, we are obligated to report that you are in illegal possession of US Federal Government data and are not complying with our requests to recover that data.
>
> Reporting this data as stolen, would include your name, all other personal information we have on record, and show the repeated attempts to recover that data.
> We will not respond to any other emails, requests, comments or threats.
> We will wait an additional 24 hours from the sending of this email to hear back on your decision.
> If we do not receive an appropriate response within that 24 hours we will take that as another refusal of our request.
> Please send the tracking number when you have that available.
>
> Ryan MacDougall

Maxie Reynolds
9/27/2024
Plaintiff 23
Douglas Armstrong, RPR

Chief Operating Officer
Social-Engineer, LLC.
570.234.3734 ext 215
www.social-engineer.com

---

From: Maxie Reynolds <[redacted]
Sent: Friday, September 3, 2021 6:18 PM
To: Kazuyuki Nishi <kaz@social-engineer.com>
Cc: Christopher Hadnagy <chris@social-engineer.com>; Ryan MacDougall <ryan@social-engineer.com>
Subject: RE: Return of Company Equipment

Hello,

If you would like to organize a meeting with DC and BH to go through my claims one by one, I would be willing to do that.

Having heard the accusations used against me to counter those claims, I would be further inclined to set that up.

You're welcome to acknowledge this email and we can each take action to set that up, or not.

On Fri, Sep 3, 2021 at 11:50 AM, Kazuyuki Nishi <kaz@social-engineer.com> wrote:

Maxie,

Though you may feel you are being treated unfairly, our policy for company/client data applies to all employees, even when leaving their employment. Aside from yourself, all former employees have returned their equipment.

It is true that this situation is unique, in that you gave us ownership of your personal machine to comply with our policy and willfully installed the security software. Even so, the policy still holds.

Please understand, we would be glad to return your computer to you once it is wiped. We are not interested in keeping it The only reason for our request is because the most recent back-up from the computer shows evidence of corporate/client data still existing on that machine. Therefore, we must ensure that this data (which is not yours) is completely removed. As a professional in the security industry, I am sure you can appreciate the importance of this matter, and why we have been requesting this of you.

This is our final request. The computer will remain locked until we receive it. We hope you will comply and provide us with the tracking number for the shipment.

As a side note, we also wanted to assure you that based on your threats at Black Hat and DEF CON, we have dropped the other legal arguments with you and are not pursuing them any further.

Best regards,
Kazuyuki Nishi

**SOCiAL-ENGiNEER, LLC**
*Chief Administrative Officer*
570-234-3734 x206
www.social-engineer.com

---

From: Maxie Reynolds <[redacted]
Sent: Thursday, September 2, 2021 6:49 PM
To: Kazuyuki Nishi <kaz@social-engineer.com>
Cc: Christopher Hadnagy <chris@social-engineer.com>; Ryan MacDougall <ryan@social-engineer.com>
Subject: RE: Return of Company Equipment

You're so welcome for the prompt replies.

The number of request actually does matter. As an esteemed company representative, you said you'd come to me four times. And I'm asking you to prove those four times, because I feel that if I had been approached four times by someone asking for their property, that I would've liked to oblige. I would of course have noted that there is a major difference between someone else's property on my own. My computer, that I purchased, being my own. And of course, you started out by stating that so, I think what you're saying now is that that was a false statement?

Yes, I am no longer in SECOM's employment so, per definition, my computer does not belong to that entity.

And if it is the case that when I install software on my devices it then belongs to SECOM, why are you not requesting my phone as well? Out of curiosity.

I am sorry I cannot be more helpful, it's just I feel I am being unfairly treated.

Regards,
Maxie

On Thu, Sep 2, 2021 at 3:38 PM, Kazuyuki Nishi <kaz@social-engineer.com> wrote:

Maxie,

I appreciate your prompt replies. The number of requests do not really matter. What does matter is that we are making the request, even now.

Your email (Re: Computer Setup) suggested that, "for as long as I work for SECOM, it is not considered my personal computer and I forgo the option of using it as such". You can refer to my previous email for the complete attached message.

When you willfully installed the security software (another SECOM employee did not install it for you), you were in agreement with the computer and all that it contains becoming SECOM property. I will again refer to the previous email's screenshot which shows the laptop's serial number.

In the end, we need to protect our corporate and client information. Therefore, when you return the laptop and headset to us, we will wipe the computer data and send the machine back to you. Please, do so as soon as possible and send us a copy of the tracking information.

I appreciate your cooperation and look forward to your reply.

Best regards,
Kazuyuki Nishi

**SOCiAL-ENGiNEER, LLC**
*Chief Administrative Officer*
570-234-3734 x206
www.social-engineer.com

---

From: Maxie Reynolds <[redacted]
Sent: Thursday, September 2, 2021 6:03 PM
To: Kazuyuki Nishi <kaz@social-engineer.com>
Subject: RE: Return of Company Equipment

Again, please show me the four times the company contacted me about it. And please show me you, the company, own my computer – proof of purchase and serial number. Not the data on it, but the computer.

On Thu, Sep 2, 2021 at 2:58 PM, Kazuyuki Nishi <kaz@social-engineer.com> wrote:

Maxie,

In your resignation email (RE Resignation .msg) to Chris on 8/5/2021, you said, "I will send all of the items back to Spencer's address this coming week".

"All of the items" would include the laptop. In the attached email (Re: Computer Setup.msg), you will see that you discussed converting your computer to a corporate machine (8/10/2020). Then, you accepted and complied by installing the security software (note "management name" and "Enrolled by" below) on 1/26/2021.



Therefore, since the laptop has not been returned to us it has been locked, as specified in our company policies (which you wrote, and very well I may add) section 18 Mobile Computing and/or BYOD policy.

> 18.3 Mobile Devices
>
> 18.3.1 Any Social-Engineer data stored on a mobile device must be saved to an encrypted file system using Social-Engineer-approved software. Social-Engineer shall also employ remote wipe technology to remotely disable and delete any data stored on a Social-Engineer laptop, PDA or cell phone which is reported lost or stolen or after employee termination.

When you return the laptop and headset, we will wipe the machine and then return it to you.

Best regards,
Kazuyuki Nishi

SOCiAL-ENGiNEER, LLC
*Chief Administrative Officer*
570-234-3734 x206
www.social-engineer.com

---

From: Maxie Reynolds <[redacted]
Sent: Thursday, September 2, 2021 1:55 PM
To: Kazuyuki Nishi <kaz@social-engineer.com>; [redacted] [redacted]
Cc: Christopher Hadnagy <chris@social-engineer.com>; Ryan MacDougall <ryan@social-engineer.com>
Subject: Re: Return of Company Equipment

Kaz and company,

Please also provide proof of purchase for each computer used for company purposes along with the serial number for each.

Thank you,
Maxie Reynolds.

On Thu, Sep 2, 2021 at 10:51 AM, Kazuyuki Nishi <kaz@social-engineer.com> wrote:

Maxie,

I am reaching out and asking you to please return the laptop and headset which SECOM provided you in compliance with our company policy. This is the fourth time you have been contacted on this matter.

For security reasons, the company computer has been locked. However, we still need to ensure it is wiped clean of any company/client information. If you wish to have it returned to you for personal use after it is wiped and restored to factory settings, we can accommodate that. Aside from the headset, any other equipment you were provided is yours to keep.

Please, ensure that the laptop and headset are packaged well/safely. Then, ship them via FedEx Ground or UPS Ground to:

Spencer Scott
[redacted]

Finally, please provide us with the tracking number.

If you have any questions in regard to returning these items, please let us know.

Best regards,
Kazuyuki Nishi

**SOCiAL-ENGiNEER, LLC**
*Chief Administrative Officer*
570-234-3734 x206
www.social-engineer.com

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

All information transmitted hereby is intended only for the use of the addressee(s) named above and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of confidential and privileged information is prohibited. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you must not read this transmission and that disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

Exhibit 16



9:55
87%
Neil "Grifter"
Aug 26, 2021
Hey, I've got something we should probably discuss. It concerns you and a former employee. Getting a lot of messages about it and want to get your side of the story. Are you free to chat? 10:37 am
i can call tyou in 5 11:19 am
Sounds good. Talk to you soon. 11:20 am
What I will need to know is what is BH and DC plan with this info? 6:50 pm
I'm out running some errands, I can chat in about 30 minutes. You available then? 7:10 pm
Sorry just saw this. And yes 8:01 pm
Bit I am available now if that 30 mins was from when you sent 8:05 pm
Word 8:05 pm
Neil "Grifter" called you · 8:06 pm
3
I talked to her. She is happy to put
Signal message



9:55
87%
Neil "Grifter"
I talked to her. She is happy to put everything to bed. Just so you know she also said she isn't going to be doing the company of her own so there is no threat of competition or poaching customers.
She really does sound like she just wants this to be over and she's happy that you have both agreed to step back from things and go your separate ways. 9:21 pm
thanks. I know thats not true. she has the website already set up.
i hope you are right. myself, ilf and all my people have been conn'ed for the last 2 years. so i hope you are right. we shall see 9:22 pm
I hope I'm right too 9:22 pm
best case scenario 9:22 pm
Truth!
Have a good night, brother. 9:23 pm
u too. and thanks 9:23 pm
No problem ❤️❤️❤️ 9:23 pm
3
<3
Signal message



9:55
87%
Neil "Grifter"
Aug 29, 2021
i know its laid to bed but i do have new info just in case it blows up again 11:16 am
Okay. Do you want to fill me in, or just hold it just in case? 1:30 pm
I don't mind. Wanna chat? 1:36 pm
Sure 1:41 pm
You called · 1:42 pm
Aug 30, 2021
Dude. Ryan is reaching out to her sending text messages calling her a liar and now she's somehow been locked out of her laptop? That's not letting it die. 7:57 pm
what??
that is not possible Ryan woudl enver do that
I dont know what you are talking about, literally? i will call Ryan right now and get info but that is out of character for ANYONE who knows ryan
4
Signal message



9:56
87%
Neil "Grifter"
he is the least aggressive person i have ever met
7:59 pm
"It must be so hard living so many different lies. I hope you find true joy someday."
That's the text.
8:00 pm
i just texted him we are going to speak in 5 mins. i will give you info soon as i have it.
this is the first i am hearing of any of this
8:01 pm
She said she's locked out of her machine and when she talked to Apple they said that someone called them and reported the laptop stolen.
8:02 pm
i dont know anything about it
but i cannot believe anyone would call apple from SECOM
i have to talk to my network admin guy
give me a few
8:03 pm
It's just a coincidence?
8:03 pm
ugh
4
i have no clue man
Signal message



9:56
87%
Neil "Grifter"
i really dont
i am hearing this from you
i am sure Ryan will have answers for me
8:03 pm
I hope he does
This is not great 8:04 pm
he manages the people here who handle our infrastructure
so i am sure he does
i need to chat with him and spencer its only 2-3 people so its not a very big dept
lol 8:04 pm
Roger that. 8:05 pm
ok... i got the info
first i am again sorry you somehow are the SECOM corp mediator.
When maxie quit her last email was "ill send the machine back to spencer tomorrow"
she never did. I guess they emailed her three times asking when the machine was coming back. it is ours and has our corp
Signal message



9:56
87%
Neil "Grifter"
When maxie quit her last email was "ill send the machine back to spencer tomorrow"

she never did. I guess they emailed her three times asking when the machine was coming back. it is ours and has our corp data on it. Our corp policies is that if the ex employee doesn't send it back after 2-3 days they are supposed to lock it. we have that on all machines. they waited 2 weeks - which is a whole another set a problems that i have to deal with here. that they waited so long. but anyhow, she never replied to any email or request for updates ont he machine. so it had to be locked.

I am sure as a security guy you understand that we cannot allow a machine with corp data to just float out there.
no one called Apple, at all. It is not stolen. If anyone here was going to report a laptop as stolen it would be to the police not to apple. so not sure where she is getting that.
and yes, Ryan did send a text. that is completley out of character for him. but i guess he had a human moment, but the text you sent me was confirmed that is what he sent. He did not, as you can read, call her a liar. He merely said how hard it would be keep all the lies straight. i know its semantics, but he didnt attack her, her wished she found joy and left us alone.
8:41 pm
4
Signal message



9:57
87%
Neil "Grifter"
Sorry. Eating dinner. 8:55 pm
okie, well read it when you are done. 8:55 pm
She said the laptop is her personal laptop that she owned prior to starting with you. 8:55 pm
well that is partial truth, and if i need to prove it to you - i can show you the email thread where she gave it SECOM so we can install our software on it and allow her to use it for corp work
since her leaving she has had corp data from some of the worlds largest banks and healthcare clients on it
she refused to answer any emails, she also said she would mail it back and did not.
if she wants it, she can mail it back we will wipe it and send it back to her
that will appease our clients 8:58 pm
I don't know how I became the mediator either. But I think I'm gonna call it good and step away from this. You guys can tear each other apart. I was hoping it would die, but that doesn't seem possible unfortunately. And this likely won't be the last thing. So I'm just gonna slowly back out of the room and
5
Signal message



9:57
87%
Neil "Grifter"
I don't know how I became the mediator either. But I think I'm gonna call it good and step away from this. You guys can tear each other apart. I was hoping it would die, but that doesn't seem possible unfortunately. And this likely won't be the last thing. So I'm just gonna slowly back out of the room and let you guys have at it.
I love you, boo!!
Godspeed!!
8:58 pm
also with you not sure how you got stuck with this job and sorry
but, as i told you, i dropped it. no law suits, no letters, nothing
but if you, BH, def con or her think we can let her keep a machine with corp data on it i am in the wrong industry
9:00 pm
I was recommended by multiple people in the community as someone who could be trusted to mediate.
That's all I know
9:00 pm
5
ha
Signal message

9:57
87%
Neil "Grifter"
ha
well you are now the mediator for all problems 9:00 pm
So it is written. 9:00 pm
lol
really sorry bro 9:01 pm
No worries
Miss your face! 9:02 pm
you too man.
hopefully you will still love me 9:03 pm
Always.
9:04 pm
lol 9:04 pm
Sep 8, 2021
5
Signal message

9:57
87%
Neil "Grifter"
Interesting how i hear through the grapevine about these huge meetings you all are having with the enemy group.
bro, 15 years busting my ass and money for DEF CON and that amounts to jack?
12:42 pm
This isn't my show man. I told you I was stepping away from this and letting you two have at each other if that was your choice. If I'm invited to weigh in on something I do. If not, I'm great with that too. I'm already more involved than I ever wanted to be.
3:58 pm
yah amen bro
4:14 pm
Sep 22, 2021
Hey you hear from Jeff at all?
he requested a meeting but then went dark
7:31 pm
I haven't.
I know he's back in Singapore.
But I'm at Disneyland with the family and been mostly off grid.
7:32 pm
5
NICE!!!
Signal message

9:58
87%
Neil "Grifter"
NICE!!!
Land or world? 7:33 pm
Haven't heard anything new from either side
Land 7:33 pm
awww
if it was world i would come see you 7:33 pm
They do Halloween better. 7:33 pm
lol 7:33 pm
We did Universal out here too, and it's so much better in Orlando
This was like Universal Lite 7:34 pm
its weird.... but Florida is a mess now
so prolly safer in Cali 7:34 pm
Everywhere is a mess 🤷‍♂️ 7:34 pm
amen brother
i know how much you love disney so enjoy that. i havent been in a while but i miss it
6
Signal message

9:58
87%
Neil "Grifter"
Thu, Feb 24
Please get Jeff to read and respond to that email
1:49 pm
Just read it. I'll send him a message.
I've wanted to reach out a few times just to check in but wasn't sure you'd want to hear from me at all.
3:33 pm
I just don't know if you guys understand what you did with that message. I'm losing business. Business I'm losing employees. My family is being attacked by non-profit is suffering and all for what? I haven't done anything but protect my business in my intellectual property from thieves and liars. I've never abused anyone and if anything I've only made DEFCON better
3:40 pm
There is no "you guys". I am not DEF CON. If you noticed I haven't said a freaking word.
3:42 pm
I know you were not DEFCON but you also know that this is crap and it's based on lies and the silence. When everyone that knows that is almost as bad as the fault accusations
3:44 pm
7
I don't even run Villages anymore. And
Signal message

9:59
87%
Neil "Grifter"
I don't even run Villages anymore. And haven't for years. The statement was made by DEF CON as an organization. I was asked to act as a mediator for everything in the beginning and I told you pretty early on, when it was clear nothing was going to stop, that I was going to back away and let you have at each other.
And that's what I did. 3:45 pm
Yep you were defcon's mediator and I'm assuming that you spoke to this group of people with their accusations and know exactly what those accusations are and know that they have absolutely nothing to do with defcon 3:46 pm
It's super shitty. I absolutely agree. And I think that maybe more context would've been good to stop the rumor mill from running wild. But it's not my decision and never was. 3:46 pm
Jeff has not met with me even though he said he did, which is an utter lie. He is not responded to me no matter how many times I've asked to meet with him and he's not even responded to my lawyers who are now preparing a lawsuit for defamation and loss of business
7
I know this rest only on Jeff 3:47 pm
Signal message



9:59
87%
Neil "Grifter"
I thought he tried to set a few meetings but you guys couldn't match up times that worked so you said "don't worry about it we're not coming back to DEF CON" or something. I'm paraphrasing of course.
3:48 pm
He gave us times that were like 5:00 in the morning which was the middle of the night for Ryan. So yes, he gave me one time and we couldn't make it and then I told him we'll make it easy on him and we just won't come back to defcon. So you are right that was not licensed to then do what he did online. He could have just let it drop and we would have went on our ways and he would have got what he wanted and I would have got what I wanted
And there is no organization at defcon. It is just Jeff
3:50 pm
It sucks, man. And I won't even try to pretend that I know what you're going through. But there were a lot of people that came forward with accusations. You and I discussed it. You said "Was it this person, or this person, or this person, or this person?" And I said "Chris, I don't know any specific names and I don't want to know, but if it was 1 or 2 people that would be one thing. This is over a dozen. You just volunteered multiple names yourself so you know this is an issue."
7
Signal message



9:59
86%
Neil "Grifter"
Do you recall that conversation?
It was only a couple days into us talking.
3:54 pm
I know if people who are making false accusations
Yes
None at defcon just in business and life
3:57 pm
It also sucks because this never had to happen. Maxie was willing to go separate ways and not push this as far as it went, but then you locked her out of her computer and Ryan texted her saying "Good luck with all your lies" or something. I don't recall the exact wording. And that was it. The gloves came off.
She knew there were other people with their own stories because she had seen them.
And once she started asking around more and more stories came out.
And then it was too late. Even if she wanted to walk away later, people were talking.
And they were going to BH and DC saying "What are you going to do about this?"
They couldn't do nothing. 4:00 pm
7
Signal message



10:00
86%
Neil "Grifter"
Hahaha. That is a very twisted version of the truth bro but ok
4:02 pm
Twisted how? 4:03 pm
We locked Maxie out of a corporate machine because she would not delete data from federal government jobs. It was a legal for her to hold that data after she left the company. Any company. I can't imagine any company that you have worked for would not have done the same thing. So saying we locked her out of her machine is a twisted version of the truth. So if she has other exemployees and have similar stories, you're damn right? There are other people who tried to steal things from us and we stop them. I don't know how that constitutes anything to do with this community or with DEFCON or with you or with Jeff or anybody
4:04 pm
Was it not her personal computer?
She did use it for work but she bought it with her own money prior to working for you?
4:05 pm
It was not. She brought the computer to the company. She asked to use it as a corporate computer. We told her we had to own it and put our DLP software on it. Due to the
7
Signal message



10:00
86%
Neil "Grifter"
It was not. She brought the computer to the company. She asked to use it as a corporate computer. We told her we had to own it and put our DLP software on it. Due to the regulations from the government clients that we service. She agreed to that and it became SECOM property
And again I repeat. How is this any business of defcon?
4:05 pm
It's not
But a fair number of the other stories were.
4:06 pm
And that's the problem. So she brought a legal business matter to you and to Jeff and you guys sided with her and then Jeff made a decision to publicly cancel me in a vague way through his"" transparency reports.... and none of those stories ever made it to me
So Def con's due process is listen to accusers, decide for yourself and then ruin someone's business non-profit and personal life. That's awesome
4:06 pm
That's not entirely accurate. I shared multiple accusations with you and you even shared a few with me saying they were things that would likely be brought up.
7
Signal message



10:00
86%
Neil "Grifter"
I feel like you're getting upset with me personally 4:08 pm
Yes bad reviews non defcon. And Stephanie being unethical
I am not upset with you personally. I am just very confused. I am over tired and I am extremely stressed 4:08 pm
I did nothing but try to talk to you about this stuff and I was never rude or accusatory toward you. 4:08 pm
If defcon truly had any transparency in their report, they can list the accusations without outing the quote-" victims 4:08 pm
I have always considered you a friend.
I still do. 4:09 pm
Same here 4:09 pm
I agree with you 4:09 pm
So get Jeff to fix it 4:09 pm
There should've been more transparency to the transparency report.
8
Signal message



10:00
86%
Neil "Grifter"
I've already talked to him about it several times.
4:10 pm
And I'm sorry but it was personal because in the same report this the DC-414 group that got this banded had basically nothing but with mine. He called out my name and he said it was so serious and there was so many of them that there was no choice
Well, if you can't get him to change then I guess I have no other option but a lawsuit of defamation
If there were any legitimate complaints they can get the law involved
4:11 pm
I said "He's getting dragged here. People are assuming it's sexual or sexual harassment related and it's not. DEF CON should clarify that it's not."
4:11 pm
I appreciate that but it is obvious he doesn't care
4:12 pm
I think he's confused as well. Have you already mentioned a lawsuit to him? Because if so then of course he's not going to say anything and then just let lawyers deal with it.
4:13 pm
9
Signal message



10:01
86%
Neil "Grifter"
Okay. Then hopefully he sees your email and responds. I'll send him a message asking him to.
4:13 pm
At least they would prolly answer
I hope he listens to you
I'm not hopeful
4:14 pm
I'll always respond.
Im sorry that you feel ignored.
4:15 pm
Dude his can't I. Jeff will but reply but he holds all the power
He took one sided action
With no due process
And is ruining two businesses and my family
My daughter had to witness seeing her dad get called a woman abuser a thief and a liar
4:16 pm
I'll talk to him again about clarifying the message. I don't hold the keys to the kingdom, but I will try.
4:17 pm
11
Thanks
Signal message

# Exhibit 17

**From**: Kevin Sugihara [REDACTED]
**Sent**: 9/2/2021 3:16:53 PM
**To**: Maxie Reynolds [REDACTED]
**CC**: Villages [villages@defcon.org]
**Subject**: Re: Code of Conduct Violations

Hi Maxie,

Let me start by saying that we take situations such as you described incredibly seriously. Our goal is to ensure DEF CON is a safe place for everyone, and want ensure we handle your concerns with the care and respect it deserves.

That said, let me say that I've received this and I'll be working to find the right person for you to talk to.

Hold tight and you should hear from someone shortly.

Thanks,
Kevin

On Thu, Sep 2, 2021 at 3:07 PM Maxie Reynolds <[REDACTED]> wrote:

> Hello,
>
> I am contacting you about an individual that is heavily associated with DC and routinely has village at the conference.
>
> Over the course of his career he has mistreated a number of individuals, including myself. Some of his actions have taken place while he employed some of these people and some after employees left. Some of the actions he has taken have been quite egregious — one person sought therapy, as an example, whilst another won an harassment case against him.
>
> I have a list of 15 people all willing to come forward and tell their stories. However, they are not willing to do it in writing, at least not without talking to the DC powers that be first.
>
> Do you think it's possible to set up a video call with all willing participants so that you can hear these grievances so people don't have to (at least initially) put in writing what they have experienced. To note, most people have expressed to me that they fear his retaliation if there emails were shown to him.
>
> Regards,
> Maxie Reynolds

Maxie Reynolds
9/27/2024
Plaintiff 22
Douglas Armstrong, RPR

# Exhibit 18

Robert J. Cassity (9779)
Erica C. Medley (13959)
**HOLLAND & HART LLP**
Phone:
Fax:
bcassity@hollandhart.com
ecmedley@hollandhart.com

David A. Perez (*Pro Hac Vice*)
**PERKINS COIE LLP**
Phone:
Fax:
dperez@perkinscoie.com

Matthew J. Mertens (*Pro Hac Vice*)
**PERKINS COIE LLP**
Phone:
Fax
mmertens@perkinscoie.com

*Attorneys for Defendants*
*Jeff Moss and DEF CON Communications, Inc.*

HOLLAND & HART LLP

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| CHRISTOPHER J. HADNAGY, an individual; and SOCIAL-ENGINEER, LLC, a Pennsylvania limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>JEFF MOSS, an individual; DEF CON COMMUNICATIONS, INC., a Washington corporation; and DOES 1-10; and ROE ENTITIES 1-10, inclusive,<br><br>Defendants. | Case No.: 2:23-cv-01345-CDS-BNW<br><br>**INITIAL RULE 26 DISCLOSURES OF DEFENDANTS JEFF MOSS AND DEF CON COMMUNICATIONS, INC.** |

Defendants Jeff Moss and Def Con Communications, Inc. ("Def Con," and collectively, "Defendants") submit the following initial disclosure statement in accordance with Federal Rule of Civil Procedure 26(a)(1). This statement is submitted without the benefit of complete discovery or having yet received an initial disclosure statement from Plaintiffs Chris Hadnagy and Social-

Engineer, LLC ("S-E LLC," and collectively "Plaintiffs"). Accordingly, Defendants reserve the right to disclose additional information or otherwise supplement these disclosures under Federal Rule 26(e)(1) following discovery in this action and/or receipt of Plaintiffs' initial disclosure statement.

These initial disclosures are submitted to comply with Rule 26(a)(1) of the Federal Rules of Civil Procedure. They are made without waiver of Defendants' arguments in their Motion to Dismiss, including their arguments regarding the lack of personal jurisdiction over them in the District of Nevada.

**I. Fed. R. Civ. P. 26(a)(1)(A)(i) - Individuals likely to have discoverable information.**

Discovery has just begun, and Defendants' investigation continues. Defendants reserve the right to supplement this category as new and/or additional information comes to light. Defendants also disclose and reserve the right to call as witnesses any and all individuals disclosed or identified by any party to this action; rebuttal witnesses; and witnesses necessary to authenticate documents introduced as evidence at trial. Defendants preliminarily identify the following individuals pursuant to Rule 26(a)(1)(A):

**1. Jeff Moss c/o Perkins Coie LLP ("Perkins Coie").**

Mr. Moss has discoverable information regarding his relationship with Mr. Hadnagy, Def Con's investigation of Mr. Hadnagy's conduct, Def Con's decision to ban Plaintiffs from future Def Con conferences, and his factual and legal defenses to Plaintiffs' claims. Mr. Moss can be contacted telephonically through Perkins Coie at [REDACTED] or [REDACTED] and he can receive mail through Perkins Coie at the following address: Attention: Matt Mertens, [REDACTED]

**2. Melanie Ensign c/o Perkins Coie.**

Ms. Ensign has discoverable information regarding Def Con's decision to ban Plaintiffs from future Def Con conferences and the development of the February 2022 statement that allegedly defamed Plaintiffs. Ms. Ensign can be contacted telephonically through Perkins Coie at [REDACTED] or [REDACTED] and she can receive mail through Perkins Coie at the following address: Attention: Matt Mertens, [REDACTED]

HOLLAND & HART LLP

**3. Neil Wyler.**

Neil Wyler has discoverable information regarding his relationship with Mr. Hadnagy, Def Con's investigation of Mr. Hadnagy's conduct, and Def Con's decision to ban Plaintiffs from future Def Con conferences. Mr. Wyler's telephone number is [redacted]

**4. Maxie Reynolds.**

Maxie Reynolds has discoverable information regarding her relationship with Mr. Hadnagy, her prior employment with S-E LLC, Mr. Hadnagy's conduct toward her after she left S-E LLC, and Def Con's investigation of Mr. Hadnagy's conduct.

**5. Christopher Hadnagy.**

Mr. Hadnagy has discoverable information regarding his relationship with Def Con, his conduct giving rise to Def Con's investigation, and the facts and circumstances relating to Plaintiffs' factual allegations and claims asserted in this action and Defendants' defenses. Defendants believe Mr. Hadnagy can be contacted through counsel: Kristofer Z. Riklis, Esq., RIKLIS LAW, PLLC, [redacted]

**6. Unknown current and former employees of Plaintiffs.**

These individuals are likely to have discoverable information regarding their relationships with Mr. Hadnagy and Mr. Hadnagy's conduct towards them in connection with Def Con's allegedly defamatory February 2022 statement banning Plaintiffs from future Def Con conferences.

**II. Fed. R. Civ. P. 26(a)(1)(A)(ii) – Categories and locations of documents in Defendants' possession or control that they may use to support their claims or defenses.**

Under Rule 26(a)(1)(B), Defendants describe the following categories of documents in their possession that support their defenses in this action. Disclosure of these documents does not constitute an admission that such documents are admissible under the Federal Rules of Evidence or discoverable within the meaning of Rule 26. Defendants reserve the right to object to the production or admissibility of particular documents included within this disclosure on the basis of all applicable privileges and legal doctrines. Discovery has just begun, and Defendants reserve the

HOLLAND & HART LLP

right to supplement this category as new or additional documents come to light. The categories of documents identified are in Defendants' possession, custody, or control at Def Con's offices in Seattle, WA, or are stored on the cloud: (1) email correspondence; (2) project management files related to the Def Con conference; (3) correspondence on ephemeral messaging applications such as Signal.

**III. Fed. R. Civ. P. 26(a)(1)(A)(iii) – Damages.**

Defendants have not yet filed a responsive pleading in this case. Defendants reserve their right to supplement this disclosure with damage categorization and calculations pursuant to FRCP 26(e). Defendants reserve the right to petition the Court to award its attorneys' fees and costs incurred in this action.

**IV. Fed. R. Civ. P. 26(a)(1)(A)(iv) – Insurance Agreements**.

Defendants are not aware of the existence of any insurance agreements pursuant to Rule 26(a)(1)(A)(iv). Should Defendants determine that any such insurance agreement exists, Defendants will supplement this disclosure accordingly.

DATED this 21st day of November 2023.

**HOLLAND & HART LLP**

*/s/ Robert J. Cassity*
Robert J. Cassity
Erica C. Medley

David A. Perez
**PERKINS COIE LLP**

Matthew J. Mertens
**PERKINS COIE LLP**

*Attorneys for Defendants*
*Jeff Moss and DEF CON Communications, Inc.*

HOLLAND & HART LLP

**CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of November, 2023, a true and correct copy of the foregoing **INITIAL RULE 26 DISCLOSURES OF DEFENDANTS JEFF MOSS AND DEF CON COMMUNICATIONS, INC.** was served by the following method(s):

☒ Email: By e-mailing a true copy thereof to the following person(s) at the following e-mail addresses:

Kristofer Z. Riklis, Esq.
**RIKLIS LAW, PLLC**
[redacted]
Email: Kristofer@riklislaw.com

*Attorneys for Plaintiffs*
*Christopher J. Hadnagy*
*and Social-Engineer, LLC*

*/s/ Kristina R. Cole*
An Employee of Holland & Hart LLP

30936394_v1

HOLLAND & HART LLP
[redacted]

# Exhibit 19



Jeff Moss
President of DEF CON Communications, Inc.
Jeff Moss (He/Him) · 1st
President of DEF CON Communications, Inc.
SEP 27, 2022
Jeff Moss (He/Him) • 9:55 PM
Hey Michele, I'd like to talk as a follow up on the Chris thing. I'm on Signal at +
Thank you!

CONFIDENTIAL FINCHER00000001



Jeff Moss
Jeff Moss >
Sep 27, 2022
Hola Jeff, this is Michele Fincher. Got your message, what's up? 22:56
Hey Michele, we are in the discovery phase of figuring out who to talk to about the Chris lawsuit. I was hoping we could talk and you could possibly Point us in the right direction? 22:58
Sure. When would you like to speak? 22:59
Ideally it would be with Matt Mertens from our legal team, that way you don't have to repeat everything twice. We are trying to sort who knows what do help decide who we talk to next. 23:00
Signal message

CONFIDENTIAL FINCHER00000002



Jeff Moss
I'm on Singapore time so 12 hours opposite EST 23:07
I don't mind speaking to Matt, but since I don't know him, I'd prefer you be on the call as well. Is that doable? I'm in WA. 23:24
Sure, totally makes sense.
He is in Portland
So my mornings are your evenings if that works? 23:25
Sure. 23:25
What days work well for you? 23:25
I will be on biz travel Oct 2-4, but can accommodate just about any other date. 23:27
Ok let me ask Matt what works, he can be super flexible. 23:28
Sounds fine. 23:29
I'm guessing it would be 5 or 6pm your time 23:29
Signal message

CONFIDENTIAL FINCHER00000003



Jeff Moss
Yep no problem 23:29
Thank you! 23:29
Oct 3, 2022
How is the evening of the 5th for you? 17:23
Hi Jeff, should be fine. 17:24
Ok thanks I'll get a time sorted out. Is 5 or 6pm better for you? 17:56
Either is fine, thanks. 18:01
Oct 4, 2022
Sorry for the switch up. There is a schedule conflict now, can you do Thursday 8:30pm Pacific Time? 16:57
I can, Jeff. 20:15
Oct 6, 2022
Ok the dial in info for the call in 1/2 hour
Signal message



Jeff Moss
Ok the dial in info for the call in 1/2 hour is:
+1-206-207-1700 19:59
Got it 19:59
25962045847## 19:59
Apr 2, 2024
Hey, Michele. I wanted to give you an update on Chris Hadnagy's lawsuit against DEF CON. Do you have availability for a short call in the next couple of weeks? 17:19
Sure Jeff, I'm on PST, but other than that, at your convenience. 17:25
Thank you! 17:26
Apr 7, 2024
Hey would April 10th at 8PM Eastern / 8AM Singapore work for you? 17:07
Sure 19:06
Apr 8, 2024
Signal message



Jeff Moss
Apr 8, 2024
Whoops I got the date wrong. Sorry. How does Friday the 12th work instead?
01:33
I can do that. 06:27
Apr 12, 2024
Jeff, are we still chatting today?
17:06
I'm sorry for the mix up!
Matts son had a hospital broken bone emergency and I thought they contacted you for reschedule. I should have followed up.
Any times next week good for you?
20:11
Yep, it's the freedom of unemployment, although I prefer afternoons. 21:13
Afternoons can work but I can't be on the call until 4:30-5pm PT due to getting daughter in school. I don't have to be there for the update, whatever you want
21:23
Signal message

CONFIDENTIAL FINCHER00000006



                                    Jeff Moss
5pm PT works just fine 21:37
Apr 15, 2024
OK looks like they are available, I'm getting dial in info for a call at 5pm 15:45
What date? 15:45
Today if that works? 70 min from now 15:51
Okie dokie 15:52
Matt Mertens is inviting you to a scheduled Zoom meeting.
Join Zoom Meeting
One tap mobile: US: +12532050468,,82586012208#,,,,*38928544# or +12532158782,,82586012208#,,,,*38928544#
Meeting URL: https://perkinscoie.zoom.us/j/82586012208?pwd=UkVwMkZkcWVHckdYSmZzMXRJSFZkQ
Signal message

CONFIDENTIAL FINCHER00000007



Jeff Moss
Matt Mertens is inviting you to a scheduled Zoom meeting.
Join Zoom Meeting
One tap mobile: US: +12532050468,,82586012208#,,,,*38928544# or +12532158782,,82586012208#,,,,*38928544#
Meeting URL: https://perkinscoie.zoom.us/j/82586012208?pwd=UkVwMkZkcWVHckdYSmZzMXRJSFZkQT09
Meeting ID: 825 8601 2208
Passcode: 38928544
Join by Telephone
For higher quality, dial a number based on your current location.
Dial: +1 253 205 0468 US
+1 253 215 8782 US (Tacoma)
+1 346 248 7799 US (Houston)
+1 669 444 9171 US
+1 669 900 6833 US (San Jose)
+1 719 359 4580 US
+1 360 209 5623 US
+1 386 347 5053 US
+1 507 473 4847 US
+1 564 217 2000 US
Signal message



Jeff Moss
833 548 0276 US Toll-free
833 548 0282 US Toll-free
833 928 4608 US Toll-free
833 928 4609 US Toll-free
833 928 4610 US Toll-free
877 853 5247 US Toll-free
888 788 0099 US Toll-free
Meeting... Read More
15:54
Wed, Aug 7
Hi Jeff. I just received a request from Frey Buck law firm in Washington. Apparently they're representing Chris in the lawsuit with Def Con. Am I required to speak to these people? Should I assume he knows I've been speaking to you?
14:21
Yes we did my deposition last Wednesday and they asked about everyone. I will let Matt Mertins know, I think the plan is we defend your deposition if it gets that far.
14:24
So I don't need to respond for the time being?
14:27
Don't do anything you don't want to do, but no rush, I'm waiting to hear what my lawyers explain what is going on
14:32
Signal message



Jeff Moss
Ok, thanks. I'm not planning on a response at this time since there's no legal obligation. 14:33
Did you see the latest judges ruling from about a week and a half ago? 14:36
I did not. 14:37
Oh it's 🔥 14:38
I'm trying to find it Edited 14:42
pdf
ORDER_Denying_Pla...
194.1 kB
A good read 14:46
Ha ha holy shit, I especially like "futility alone is enough to refuse amendment" 15:06
It made me smile! 15:06
I'll let you know if I hear anything else. Thanks, Jeff. 15:12
Perkins says they will reach out to you.
Signal message
GIF



Jeff Moss

alone is enough to refuse amendment" 15:06

It made me smile! 15:06

I'll let you know if I hear anything else. Thanks, Jeff. 15:12

Perkins says they will reach out to you. Anything we message is potentially discoverable. 15:19

Tue, Aug 13

Just got this from my law firm:
"Hi Jeff, can you please confirm that [redacted] is the correct email address for contacting Michelle?" 13:06

Tue, Aug 20

Nope, it's [redacted]. Also, I received an email from Lauren Trambley at Perkins Cole. Legit? 13:05

Yes, she is on our team. Thanks for checking. 13:06

Signal message

# Exhibit 20

Perkins Coie

Perkins Coie LLP
1201 Third Avenue
Suite 4900
Seattle, WA 98101-3099

T. +1.206.359.8000
F. +1.206.359.9000
perkinscoie.com

November 14, 2024

David A. Perez
DPerez@perkinscoie.com
D. +1.206.359.6767
F. +1.206.359.7767

**VIA EMAIL**

Ted Buck
Mark Conrad
FREY BUCK
1200 5th Avenue, Suite 1900
Seattle, Washington 98101
tbuck@freybuck.com
mconrad@freybuck.com

**Re: *Hadnagy et al. v. Def Con Communications Inc. et al.*, case no. 2:23-cv-01932-BAT | Michele Fincher's Objections and Responses to Subpoena from Plaintiffs Christopher Hadnagy and Social-Engineer, LLC**

Counsel:

We represent Michele Fincher in connection with the documents subpoena (the "***Subpoena***") in the above-captioned litigation ("***Litigation***") that Plaintiffs Christopher Hadnagy and Social-Engineer, LLC (collectively, "***Plaintiffs***") served on October 29, 2024. This letter sets forth Ms. Fincher's objections and responses to the Subpoena.

**Objections**

Ms. Fincher objects that the Subpoena is overbroad, unduly burdensome, vague and ambiguous, and seeks information that is not relevant to any claim or defense in the Litigation, nor proportional to the needs of the Litigation, and not within Ms. Fincher's possession, custody, or control. Ms. Fincher does not and will not agree to undertake an unduly burdensome search for documents. Ms. Fincher will produce responsive, non-privileged documents that are within her possession, custody, or control that is commensurate with Ms. Fincher's non-party status and that is proportional to the needs of the Litigation. Ms. Fincher's general and specific objections to the Subpoena are described below.

***Overbroad and Unduly Burdensome.*** Ms. Fincher objects to the Subpoena as overbroad and imposing an undue burden on a non-party. *See* Fed. R. Civ. P. 45(d)(1) ("A party or an attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena"). For example, each request of the Subpoena lacks a temporal scope. Given Ms. Fincher's long history with Mr. Hadnagy, her employment at Social-Engineer, and her involvement at conferences in the industry, the lack of a temporal scope renders each request impermissibly overbroad and unduly burdensome. Asking non-party Ms. Fincher to search for and produce materials spanning over a decade is unreasonably overbroad and imposes an undue and heavy burden on a non-party.

Ms. Fincher further objects to the scope of requested information in the Subpoena is unduly burdensome. The Subpoena contains 18 separate requests for documents. Additionally, most of the requests are individually overbroad and unduly burdensome.

***Improperly Seeks Information Available from a Party to the Litigation***. Ms. Fincher objects to the Subpoena as unduly burdensome to the extent that it seeks documents, information, or communications readily available from parties to the Litigation or public sources. For example, Request No. 2 seeks "[a]ny documents or communications, including but not limited to emails (with attachments), text messages, voicemails, social media posts or messages, notes, drafts, or any other record otherwise memorialized with Jeff Moss, (aka "The Dark Tangent"), related to Chris Hadnagy or Social-Engineer, LLC." These documents can be (and have been) obtained through the parties to the Litigation without posing any burden on non-party Ms. Fincher.

***Duplicative***. Ms. Fincher objects to each request in the Subpoena to the extent that they are duplicative of other requests served on Ms. Fincher in this Litigation by other parties. Specifically, Request Nos. 1–18 are duplicative of Request Nos. 1, 2, 4, 5, 6, 7, 10, and 11 contained in a subpoena served on Ms. Fincher by Defendant Def Con Communications, Inc., for which she has already responded.

***Relevance***. Ms. Fincher further objects to each request in the Subpoena to the extent that it is not relevant to the Litigation. The requests seek all documents relating to Mr. Hadnagy or Social-Engineer, with no temporal scope, or limitation to the claims or defenses at issue in the Litigation.

***Not in Ms. Fincher's Possession, Custody, or Control***. Ms. Fincher objects to each request in the Subpoena to the extent it seeks information that is not in her possession, custody, or control; that is not known or reasonably available to Ms. Fincher; that is not ascertainable by means of a reasonably diligent search; or that is no longer maintained or accessible by Ms. Fincher.

***Privilege or Work Product***. Ms. Fincher objects to each request in the Subpoena to the extent it seeks information protected from disclosure by the attorney-client privilege, the work product doctrine, or other applicable privileges or immunities. Specifically, Ms. Fincher objects to Request No. 18 to the extent that it seeks communications with Perkins Coie that occurred *after* Perkins Coie was retained in response to this Subpoena.

***Inaccessible ESI***. Ms. Fincher objects to the Subpoena to the extent it seeks electronically stored information and/or documents concerning electronically stored information that are not reasonably accessible due to undue burden and/or cost in violation of Fed. R. Civ. P. 45(e)(1)(D). To the extent Ms. Fincher agrees to search for documents and subject to Fed. R. Civ. P. 26(b)'s proportionality factors, Ms. Fincher will search document sources (including ESI sources) that she reasonably believes hosts responsive documents.

***Third-Party Information***. Ms. Fincher objects to the extent the Subpoena requests third-party confidential information without the consent of the third party.

**Responses**

Subject to and without waiving the foregoing objections, Ms. Fincher responds as follows: Ms. Fincher will produce responsive, non-privileged documents that are identified after a reasonable search and diligent inquiry for Request Nos. 2, 7, 9, 10, 13, 15, and 18. After a reasonable search and diligent inquiry, Ms. Fincher does not have any responsive documents in her possession, custody, or control for Request Nos. 1, 3, 4, 5, 6, 8, 11, 12, 14, 16, and 17, because the documents either do not exist or are no longer in her possession, custody, or control.

* * *

Ms. Fincher reserves all rights to amend or supplement its objections to the Subpoena. This letter and Ms. Fincher's responses to the Subpoena are designated at "CONFIDENTIAL" per the Protective Order in this Litigation. Please restrict accordingly.

Sincerely,

David A. Perez

cc: Michele Fincher
Jeff Moss
Matt Mertens
Jacob Dean
Lauren Trambley

# Exhibit 21

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

---

| | |
|---|---|
| CHRISTOPHER J. HADNAGY; SOCIAL-ENGINEER, Plaintiffs, | ) |
| vs. | ) No. 2:23-cv-01932-BAT |
| JEFF MOSS; and DEF CON COMMUNICATIONS, INC., Defendants. | ) |

---

VIDEOTAPED VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION

OF

CAT MURDOCK

---

Via Zoom

DATE: October 24, 2024

REPORTED REMOTELY BY: Douglas Armstrong, RPR
Washington CCR No. 3444

pivots to Dr. Green.

Q. 155 is still a screenshot of your communications with Chris Hadnagy on Teams?

A. Right.

Q. 156 is another communication that you're having with Chris Hadnagy on Teams?

A. It's a continuation of the conversation we've been discussing.

Q. Sure. Still conversations, communications that you're having with him on Teams?

A. Sure.

Q. 157, it's a continuation of the communications that you're having with Chris Hadnagy on Teams, right?

A. Uh-huh.

Q. 158, continuation of the conversation that you're having with Chris Hadnagy on Teams, right?

A. Uh-huh.

Q. 159, continuation of the conversation that you're having with Chris Hadnagy on Teams, correct?

A. Yep.

Q. 160, continuation of the conversation that you're having with Chris Hadnagy on Teams, correct?

A. Okay.

Q. 161, continuation of the conversation that

you're having with Chris Hadnagy on Teams, correct?

A. Sure.

Q. 162, continuation of the conversation that you're having with Chris Hadnagy on Teams, correct?

A. Sure.

Q. 163, continuation of the conversation that you're having with Chris Hadnagy and multiple other people on Teams?

A. Sure.

Q. You're screenshotting every page of this within this conversation that you're having and in order to document it, right?

A. Maybe.

Q. 164, continuation of the conversation that you're having with Chris Hadnagy on Teams?

A. Yeah.

Q. You're screenshotting this and sending it to yourself?

A. No. I think I just screenshotted it. Corporate communications are handled on personal devices. There is no BYOB policy or BYOM, "bring your own mobile device."

Q. So this is something that you screenshotted on your mobile device?

A. Uh-huh.

ended up participating in it?
ATTORNEY TRAMBLEY: Object to form.
A. I don't know if I was the first person to reach out or not, but, like, Michele and I talked about it.
Q. (By Attorney Conrad) Michele Fincher?
A. Yep.
Q. And you talked about the -- you said there were about 20 people on the phone call; is that right?
A. That's what I remember, give or take. I didn't count.
Q. Was Michele Fincher on the phone call?
A. Yes.
Q. Was Maxie Reynolds on the phone call?
A. Yes.
Q. Jess Levine. You said you read a statement from Jess Levine?
A. Correct.
Q. Do you still have that statement?
A. I didn't see it. I honestly have no idea. I don't think so. I'm pretty sure she sent it to me on Twitter, but I didn't see it when I searched.
Q. Was Alethe Denis on the phone call?
A. I genuinely do not remember.
Q. Anyone else that you remember that was on the

C E R T I F I C A T E

UNITED STATES )
)
DISTRICT COURT )

I, a Reporter and Washington Certified Court Reporter, hereby certify that the foregoing videotaped videoconference deposition upon oral examination of Cat Murdock was taken stenographically before me on October 24, 2024, and transcribed under my direction;

That the witness was duly sworn by me pursuant to RCW 5.28.010 to testify truthfully; that the transcript of the deposition is a full, true and correct transcript to the best of my ability; that I am neither attorney for nor a relative or employee of any of the parties to the action or any attorney or counsel employed by the parties hereto nor financially interested in its outcome.

I further certify that in accordance with Washington Court Rule 30(e) the witness is given the opportunity to examine, read and sign the deposition within thirty days upon its completion and submission unless waiver of signature was indicated in the record.

IN WITNESS WHEREOF, I have hereunto set my hand this 28th day of October, 2024.

Douglas Armstrong, RPR

_______________________________________

Washington Certified Court Reporter No. 3444
License expires 11/26/2025

# Exhibit 22

CM Cat Murdock

8 Oct 2022

Hey Cat it's Jeff Moss, sorry for the late message, I got got your contact info from Grifter. I hope that is OK.

We are at a point in the Chris Hadnagy lawsuit where we are talking to people with experiences that could help our defense. Your name has come up a few times and I'm hoping you would be willing to talk with our legal team?

12:26

9 Oct 2022

Heya, no worries on the time! We have company this weekend so I'm a bit distracted, but yeah I can probably be convinced.

03:41

I appreciate that, thank you. So next week then, whatever day works best for you. I'm in Singapore so my mornings are your evenings in the States.

08:59

12 Oct 2022

Let me know what does work best an[illegible] I'll make it happen.

08:34

CM Cat Murdock

13 Oct 2022

Hey, so sorry. I got my booster and flu shot and it leveled me.

Anytime tomorrow or next Monday works for me 00:55

I'm in Singapore so the time zones are a bit confusing. Tomorrow for you is Thursday? 06:30

Yep! Today is Thursday

Just give me 2-3 times that work for your lawyers and I'll sign up for one? Lol

ill be honest I'm a little nervous just bc I know im not protected by your lawyers 22:10

14 Oct 2022

That's totally normal and what everyone else we talk with feels. You aren't alone and we can explain at the beginning the conversation and you can decide what you want to do. 07:19

Sounds good 07:28



CM
Cat Murdock
Sounds good 07:
14 Oct 2022
I think your Monday will work best. Can do between 5-7pm PST, the earlier the better. 07:51
K. We can do 5 pst. 08:26
Perfect thank you! 08:30
I can do earlier too if it works
I'm in ct so earlier the better
But I get that at some point it's too early for you lol 08:31
Yeah I drop my daughter off at 07:30 so 08:00 is the earliest I can do. 08:32
Yeah no worries 08:32
I can do late my time but then it is too early PST 08:33
Mine will probably be joining us lol
5pt seems like the secret sauce. No worries! 08:33
1

Cat Murdock

worries. 08:33

14 Oct 2022

Totally. My daughter likes to say hello to all my friends

Ok 5 it is! 08:33

[redacted] is a good email if you need one for an invite 08:34

17 Oct 2022

Getting dial in info for the call in 15 min 07:47

Whoops I'm a day early! 07:53

HAHA I was just running to shower bc I was like "fuck. I really botched this."

I threw my husband the baby and was like "Wellp. 3 minute shower."

Ok whew 07:56

Sorry!! 08:42

18 Oct 2022

Here we go on the correct d



Cat Murdock
+1 346 248 7799 US (Houston)
+1 719
18 Oct 2022
Read More
07:45
Thanks! See you in 10 07:48
JP
Jenn Pikus
Add to Contacts
EO
Erin O'rourke
Add to Contacts
Not sure if those are still their numbers
19:06
Thank you! 19:15
Oh yeah. He once threw cell phones at me. I forgot about that.
He also berated his wife for cleaning the house (in front of multiple team members. She cried.) which caused him to lose a laptop that had a badge printer driver on it (because clearly you're a technical wizard if you can't find a printer driver online...). I
1

  

Thank you! 19:15

18 Oct 2022

Oh yeah. He once threw cell phones at me. I forgot about that.

He also berated his wife for cleaning the house (in front of multiple team members. She cried.) which caused him to lose a laptop that had a badge printer driver on it (because clearly you're a technical wizard if you can't find a printer driver online...). I suggested some places to check and be swore the male employee last in charge of the computer would never have put it there. I checked anyway. The laptop was there. He was grudgingly like "I guess I have to get mad at <the male employee> now."

I went through a lot of my decompression notes when my husband was like "you have definitely blacked out some of the more egregious stuff" lololol

Cat Murdock

egregious stuff" lololol

18 Oct 2022

He physically threw the cell phones at me because he wanted to assign the available iPhones to women and android phones to men because "all women use iPhones." I said maybe we shouldn't have such binary thinking which resulted in the throwing.

Some of this is hilarious in its f'd'ness

> Cat Murdock
> Oh yeah. He once threw cell phones at me. I forgot about that. ...

I was like "why do we need to get mad at anyone for just making a mistake?" 19:19

What a mess. 19:20

Yeah. It's 🤯🤯🤯

https://twitter.com/cygcygnus

This is the lovely human I accidentally got fired 19:22

CM
Cat Murdock

Wed, Apr 3

Hey, Cat. I wanted to give you an update on Chris Hadnagy's lawsuit against DEF CON. Do you have availability for a short call in the next couple of weeks? 08:20

Fri, Apr 5

Oh boi, lol. I saw your Reddit post but somehow totally missed this text. So sorry!

I can make time tomorrow; I think any time except for 1-4 CT, or next week any day but Monday with varying degrees of availability. What works for you? 10:43

Let me check, next week would be best. Thanks for seeing this! 16:52



CM Cat Murdock
Tue, Apr 9
Lauren Trambley
No groups in common. Review requests carefully.
Safety Tips
New Messages
Hi Cat, I hope you're doing well. My name is Lauren Trambley and I'm an attorney at Perkins Coie, representing Jeff Moss and Def Con in the lawsuit filed by Chris Hadnagy. I know Jeff reached out to you, we'd like to schedule a call to give a brief update on the case. Are you available during any of the following times: Wednesday, April 10th between 4:00 p.m. and 6:00 p.m. PDT, Tuesday, April 16 between 4:00 p.m. and 6:00 p.m. PDT, or Wednesday, April 17 between 3:00 p.m. and 5:00 p.m. PDT? Please let us know your availability. Thanks!
10m
Let Unknown message you and share your name and photo with them? They won't know you've seen their message until you accept.
Block
Report...
Accept
Heya, is this legit?
Tap to Scan
23178 66784 82447 22121
39200 87496 26901 29330
07396 47624 98348 69321
To verify end-to-end encryption with Lauren Trambley, compare the numbers above with their device. You can also scan the code on their device. Learn More
mute
search
Disappearing Messages
Off
Chat Color & Wallpaper
Sounds & Notifications
View Safety Number
No Groups in Common
Add to a Group
08:02
Yes, that's our law firm, looks like they sent you direct instead of going through me due to time zone issues.
1

Confidential DEFCON00000259



CM Cat Murdock
08:33
Tue, Apr 9
That's fine. Obviously Im leery Lolol
08:43
The unknown can be stressful, thank you for doing this.
08:45
Yeah. "Update" gives hopeful vibes but I'm skeptical lol
08:46
Thu, Aug 8
Your safety number with Cat Murdock has changed.
Learn More
Lauren English 5:21 PM
to cat@murdock.org, Mark, Amber
Good afternoon Ms. Murdock,
My name is Lauren English, I am a paralegal with Frey Buck in Seattle, WA. Copied on this email is Mark Conrad attorney with Frey Buck. Mr. Conrad currently represents Christopher Hadnagy in the case of Christopher Hadnagy; Social-Engineer, LLC v Jeff Moss; Def Con Communications, Inc.
Mr. Conrad and I would like to set up a time with you to discuss your previous role at Social-Engineer, and your interactions/relationship with Mr. Hadnagy. We
1

CM Cat Murdock

Thu, Aug 8

Mr. Conrad and I would like to set up a time with you to discuss your previous role at Social-Engineer, and your interactions/relationship with Mr. Hadnagy. We are flexible with regards to the conversation occurring virtually or in person, depending on your comfort and

The man is nothing if not predictable; the zombie of Hadnagy arises on DefCon eve 😹🫠 08:29

I'll let our legal team know, they will reach out to you. You don't have to respond unless subpoenaed 08:31

Just wanted to loop you in if it's of any help. I plan on ignoring and having my 8/8 DefCon baby tomorrow Lolol.

Hope you have an amazing weekend, despite jackasses who gon' jackass. Sad to not be in Vegas with everyone!

Correct 08:31

Did you read the last ruling from the judge two weeks ago? 08:32

Yeah. "Why did you bitch about this and then totally not do your homework"

1



CM Cat Murdock
Hope you have an amazing weekend, despite jackasse Thu, Aug 8 jackass. Sad to not be in Vegas with everyone!
Correct 08:31
Did you read the last ruling from the judge two weeks ago? 08:32
Yeah. "Why did you bitch about this and then totally not do your homework"
My nosey side def wanted to know what happened in that 7/31 meeting 08:33
Unfortunately whatever we message could be discoverable 08:33
lol yeah my nosey side is patient these days. She's super mature now 😹 08:35
That's wonderful! More girls! 08:40
New Messages
I mean she'll totally take a black badge as a "hello world" 😹 08:43

# Exhibit 23

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

---

CHRISTOPHER J. HADNAGY; SOCIAL-ENGINEER,

Plaintiffs,

vs. No. 2:23-cv-01932-BAT

JEFF MOSS; and DEF CON COMMUNICATIONS, INC.,

Defendants.

---

VIDEOTAPED VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION

OF

ALETHE DENIS

---

Turlock, California (Via Zoom)

DATE: September 24, 2024

REPORTED REMOTELY BY: Douglas Armstrong, RPR
Washington CCR No. 3444

understanding of what Ms. Murdock's allegations were against Mr. Hadnagy that she was bringing to Def Con?

A. No. And Ms. Murdock and I have never discussed those.

Q. You testified -- and I don't intend to mischaracterize your testimony; tell me if I'm getting this wrong -- that any instance of negative behavior that others had described to you about --

A. Uh-huh.

Q. -- Mr. Hadnagy was secondhand or thirdhand and something that you had not personally seen or witnessed.

Is that a fair summation of your testimony?

ATTORNEY CONRAD: Objection. Form.

A. Yes. That is accurate, and let me clarify.

Ms. Murdock and I have discussed her experiences as an employee, former employee of Chris Hadnagy's. She has shared with me her perspective on her employment, and she's advised me to tread carefully if I were ever offered a job by Mr. Hadnagy, based on her experience.

However, she has never told me that she has brought her own claims to Def Con. In fact, she told me that she was not a party to this and that she had more important matters to attend to in her own life and

that she was not a party to this at all and, at one point, completely misled me to believe that she was not engaged with this action at all. And at that point, she and I -- that dishonesty impacted our friendship.

Q. (By Attorney Mertens) When you testified, Ms. Denis, that she misled you about her involvement with approaching Def Con, can you elaborate on that, please?

A. Yes. Cat and I became very friendly with each other when she was still employed by Chris Hadnagy. Between the time that I first competed and the time that I competed in 2019, she and I became great friends. And we talked about a variety of things, but I mostly talked to her about dogs, kids. She was having her first child.

And I approached her for some advice about open-source intelligence gathering when I was competing in the first competition. And so, when it came time for me to compete in the second competition, I approached her again asking if she would be at the conference because I wanted to meet up with her again and see her and say hello and again for advice on how best to strategize my plan for competing a second time.

And at that point, she let me know she had left her employ -- employment with Chris and that she

gain access to buildings and other secure or employee-only areas of client buildings.

They also offer training for individuals who would like to perform the same types of services, whether they go on to work for Social-Engineer or on a red team or other team within a company doing similar job tasks, using social engineering skills in the context of their own job or job responsibilities in a completely different industry. Sometimes people will go and do certifications through Social-Engineer because they want to be better executives, but, ultimately, they are learning social engineering skills through Social-Engineer, which offers certification in social engineering skills.

Q. And you've mentioned the Innocent Lives Foundations. Can you tell me a little bit about what the foundation's goals are and what they do?

A. Yes. The Innocent Lives Foundation is a nonprofit that was founded by Chris Hadnagy with the intent to unmask or reveal the identities of online predators who target children on the internet and exploit them in a number of very disgusting ways. And whether that be cases that are referred to the Innocent Lives Foundation by victims or through other means, those cases, once the Innocent Lives Foundation has

enough evidence, are collected and referred to law enforcement, who then pursues any resulting legal action or law enforcement-type activities that come as a result of whatever activity that predator or online predator is perpetrating. It is a group that merely hopes to source enough information to build the case rather than take any action as a result of that collected information.

Q. And you mentioned that after the Def Con transparency report was published, that there were attacks on the Innocent Lives Foundation; is that accurate?

A. Yes. That is correct.

Q. And can you describe to me what you mean by attacks on the Innocent Lives Foundation?

A. The way that the Def Con transparency report was phrased, it was extremely vague. It stated only that Chris had been banned from Def Con for violating the code of conduct. The code of conduct for the conference, Def Con, at large is also quite vague. It basically says that you can't harass other people. I mean, that's kind of it at the core.

And so from this, of course, people in the community were trying to determine what the crime that Chris must have committed in order to be banned from

the conference must have been. And they were attempting to pull from past banned conference participants to then extrapolate what Chris must have done to merit a ban because it typically takes a very egregious act for someone to be banned from Def Con.

This conference, while -- while it has changed a lot over the last 32, nearly 33 years, it has a pretty colorful past. And so for people to be banned from this conference in the past, they have perpetrated some pretty hideous crimes against other conference participants, one such person being Captain Crunch. That was his handle, and he had sexually assaulted women for years.

And so when the ban was announced, people were making all sorts of guesses as to what Chris must have done; hence, the messages that I was receiving and had mentioned previously where people were assuming that he had done awful things to me and other people.

And so at this time, people were claiming that he had done awful things like collect money for the Innocent Lives Foundation, but use it for himself certainly. They were asserting that perhaps he had used the Innocent Lives Foundation to cover up the fact that he, himself, was an online predator, and he preyed upon children. They had made claims that the Innocent

Lives Foundation was just a cover for all sorts of nefarious things and were trying to label Chris with a myriad of potential terrible things.

And so, at the time, they were attacking the Innocent Lives Foundation by essentially saying that it was a front for either collection of money that was being misappropriated or a mask for Chris to use to hide the fact that he was a terrible person, and this was just a cover story.

ATTORNEY MERTENS: Object to that response as nonresponsive.

Q. (By Attorney Conrad) It sounds like you were contacted by multiple people who had this impression from the transparency report; is that true?

ATTORNEY MERTENS: Object to form.

A. I was contacted by a bunch of people who, from the announcement and the transparency report that Chris had been banned, wanted to know what Chris had done to me specifically because they made the assumption that I was a victim in whatever matter was being referred to as a code of conduct violation perpetrated by Chris that resulted in his being banned.

I also read many comments made publicly on Twitter and across social media claiming that Chris must have perpetrated a variety of awful crimes as

people made guesses as to what could have been the code of conduct violation or violations that resulted in Chris being banned.

Q. (By Attorney Conrad) and you mentioned, also, that you had taken screenshots from some of the attacks on ILF; is that right?

ATTORNEY MERTENS: Object to form.

A. Yes. I likely have a great deal, a lot of screenshots from around that time. Some of those likely contain items from that time frame where I was capturing what people were saying about the Innocent Lives Foundation and about Chris.

Q. (By Attorney Conrad) Do you believe you still have those?

A. Yes. I believe I likely still have those.

Q. And given your work with Def Con and the conference over the years, it sounds like you're familiar with their code of conduct; is that right?

A. I am familiar with it, but couldn't recite it verbatim, no.

Q. I want to read to you a portion of the Def Con code of conduct. It reads "We also respond to reports throughout the year and publish updates for the community about major incidents that occur between events. Repeat offenders and those who commit more

top of my head, as previously shared, is Captain Crunch, and I don't know his real name until now.

Q. (By Attorney Conrad) And are you aware of who Jake Appelbaum is and why he was banned?

A. I am not.

Q. And what about Morgan Marquis-Boire?

A. I am not aware of who that was or why he was banned.

Q. Would it surprise you if all three of those individuals that were previously banned and named were also -- were involved in allegations of some type of sexual impropriety or assault or predatory sexual behavior?

A. It does not surprise me.

Q. Do you believe that given the fact that multiple individuals reached out to you and the effect on ILF --

ATTORNEY CONRAD: Well, strike that.

Q. (By Attorney Conrad) Do you think given that Chris Hadnagy was named publicly in the information that Def Con provides about why they publicly name people and the people they previously publicly named, it was foreseeable that people who read that transparency report would interpret it to mean that Mr. Hadnagy had done something involving sexual

misconduct or sexual predatory behavior?

ATTORNEY MERTENS: Object to form.

A. I believe not only was it a natural conclusion for people to come to, but that I have evidence that that's the conclusion that people came to from the messages that I received around that time frame.

Q. (By Attorney Conrad) And you saw that that impacted the Innocent Lives Foundation and the goal of protecting children from predators as well?

ATTORNEY MERTENS: Object to form.

A. Yes, because I saw many volunteers remove themselves from the organization, which impacts the organization's ability to continue to function. And we saw a lot of negative messaging connected to the Innocent Lives Foundation, especially on Twitter, discouraging people from contributing money, and that impacted donations to the Innocent Lives Foundation significantly.

Q. (By Attorney Conrad) Did you ever witness the impact that it had on Chris Hadnagy after it was published?

A. I was witness to Chris' emotional and mental state following the announcement of the ban, and he shared with me in confidence how he was feeling during

included on their website. Prior to that, she told me that she was simply helping someone else collect a list of names for people that may be willing to go to Def Con and file a complaint.

Q. I want to talk about Maxie Reynolds as well. You indicated that you believe Maxie Reynolds came to you in an attempt to try and manipulate you; is that right?

A. Yes. That's correct.

Q. She did that through trying to offer you this opportunity to work on a television show?

A. Yes.

Q. And you-all were not friendly with each other prior to her approaching you in that fashion?

A. Correct. Prior to that, while she was working for Chris, I had appeared on -- I believe it was an Instagram live stream or an Instagram live in support of Social-Engineer as a guest, like a podcast guest, but it was Instagram live. And Maxie had been the cohost with Chris as the main hosts.

And during their banter -- I am extremely sensitive to other people's perception of me and their treatment and their feelings towards me. That is why I do what I do because I can feel the temperature in the room change by a degree. And while we were doing this

would find this message not funny.

Q. (By Attorney Mertens) You testified that Ms. Reynolds tried to manipulate you into joining a campaign she had against Mr. Hadnagy?

A. That's correct.

Q. You further testified that her attempts to manipulate you were unsuccessful, so she moved on to manipulating others into joining her campaign against Mr. Hadnagy?

A. That's true.

Q. You testified, also, that you don't know who any of those people are?

A. Def Con has been very protective of the names of the claimants. Maxie Reynolds told me that she was involved, and Cat Murdock never told me she was involved. No other people have stated to me that they have made claims.

Q. And are you unaware of the details of the allegations that have been leveled against Mr. Hadnagy?

A. That's correct. I am unaware of any of the claims that have been made to Def Con outside of what was shared with me by Chris in the thread of messages, but I have no direct knowledge of what the claims were that were submitted to Def Con. Def Con has not shared those with me. The people who made the claims have not

shared those with me.

Q. You adopted your prior statements regarding Mr. Hadnagy in Plaintiff's Exhibit 1 in a lengthy direct message you sent to Grifter, aka Neil Wyler, in September of 2021. In a relevant part, you said, "Chris may be a classic entrepreneur" -- and I'm skipping a couple things -- "but he has never made me feel uncomfortable, let alone said or done anything disrespectful to me, let alone abusive, harassing, or even distasteful."

And I want to ask you, Ms. Denis, are the comments that Mr. Hadnagy -- are you testifying that the comments that Mr. Hadnagy made about, among others, Ms. Maxwell, Ms. Reynolds, Rachel -- whose last name, I apologize I'm forgetting -- and the other women about whom Mr. Hadnagy commented, those comments were not disrespectful, abusive, harassing, or distasteful?

A. At the time that I made the statement, those comments had not been made. Can we agree on that?

Q. Yes.

A. So at the time that I made the statement, I agree that I felt that way, and I agree that I still feel that he has never done anything towards me of that nature.

I would agree now that those comments

regarding those other people are in poor taste. I similarly agree that I made comments about those people in poor taste. I also agree that I still don't like those people.

Q. Fair enough, Ms. Denis.

And are you aware of any personal benefit that has accrued to Ms. Reynolds from raising her concerns about Mr. Hadnagy's conduct to Def Con?

A. I have not talked to Maxie Reynolds since she and I agreed to allow bygones to be bygones; therefore, I am not aware of any positive outcomes that have resulted for her as a consequence of her bringing these claims to Def Con.

ATTORNEY MERTENS: Two minutes, Mark. That's all I need.

Q. (By Attorney Mertens) Are you aware that Ms. Reynolds is not even in the social engineering space anymore?

A. I am aware that Maxie Reynolds has appeared in Social Engineering Village at Def Con the past two years; however, I understand that Maxie Reynolds operates a business called Subsea Cloud or something of that nature, and they do data centers under water.

Q. Mr. Conrad asked you about your prep sessions with, among others, me.

C E R T I F I C A T E

UNITED STATES )
)
DISTRICT COURT )

I, a Reporter and Washington Certified Court Reporter, hereby certify that the foregoing videotaped videoconference deposition upon oral examination of Alethe Denis was taken stenographically before me on September 24, 2024, and transcribed under my direction;

That the witness was duly sworn by me pursuant to RCW 5.28.010 to testify truthfully; that the transcript of the deposition is a full, true and correct transcript to the best of my ability; that I am neither attorney for nor a relative or employee of any of the parties to the action or any attorney or counsel employed by the parties hereto nor financially interested in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 28th day of September, 2024.

Douglas Armstrong, RPR

_______________________________________
Washington Certified Court Reporter No. 3444
License expires 11/26/2024

# Exhibit 24

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

CHRISTOPHER J. HADNAGY; SOCIAL-ENGINEER,

Plaintiffs,

vs.

JEFF MOSS; and DEF CON COMMUNICATIONS, INC.,

Defendants.

No. 2:23-cv-01932-BAT

VIDEOTAPED VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION

OF

JESSICA LEVINE

***CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER***

Round Rock, Texas (Via Zoom)

DATE: September 19, 2024

REPORTED REMOTELY BY: Douglas Armstrong, RPR
Washington CCR No. 3444

What would you be looking at in order to make that determination?

A. I'm actually not sure that I even have the ability to check because it was through Signal. I -- I'm not sure. I would have to ask someone what day it was exactly.

Q. So how were you first contacted by Def Con?

A. So I, along with several others, contacted Def Con to let them know about our complaints of what was going on. And when the lawsuit came about, the first lawsuit came about, I recall there was an intermediary, I guess, who got me in touch with one of the goons at Def Con. And I spoke to them about it along with -- I don't know his actual, real name, but Grifter is his hacker name. I don't know what his actual name is. Sorry.

Q. Okay. So it sounds like you were -- you first contacted Def Con; is that right?

A. I provided my statement to a group of other people that were making statements to present to Def Con, and, unfortunately, I was not able to verbally give it myself. I had written it down in a Signal message, and it was read by one of the other women on the call because I was on an airplane. So I suppose I could try and find that flight to see when that

happened.

Q. And do you still have the Signal messages?

A. I wish I did, but as soon as you get a new phone or anything, those messages are gone. Signal's not the best for retaining information.

Q. So do you have a Signal account?

A. I do.

Q. So when you have a new phone and you have the Signal app again, when you log in to your account, it doesn't have your old messages in there?

A. No.

Q. And who did you send the Signal message to?

A. There was a group chat started. There were several people. Are you asking for some of the names of the people in the group chat?

Q. Yes, please.

A. Maxie Reynolds, Cat Murdock, Allie. I don't remember her last name.

Q. Any others?

A. Yes, but I don't know. I don't remember. I don't mean to be rude, but I don't remember their names. Sorry.

Q. Do you have a ballpark idea of when you sent a Signal message to them with your statement?

A. I don't want to say because I don't know

exactly. Not off the top of my head, no. I would have to -- I would have to see if I could figure out when that flight was because that was -- I sent it, and then I got on the airplane. And you can't use video calling while you're on an airplane, so I wasn't able to be a part of the call.

Q. And how did you -- how did it come that you were part of this group chat?

A. I actually don't remember exactly the specifics of that. I believe I was talking to some people about when I was fired and how I had a bad experience, and other people were talking about bad experiences. And they invited me to a Signal group chat, but I don't remember exactly the details of what message led up to that. I'm sorry. I don't remember exactly how it happened.

Q. So you don't remember who first reached out to you about being part of the group chat?

A. I don't think it happened as though someone was reaching out randomly to invite me to it. I think it was more we were talking.

And I don't remember if I was talking to Allie. I think -- I think it -- well, I don't want to -- I don't want to say officially that I was talking to Allie because I don't remember if I was talking to

Signal-messaged you, they provided a date and time that the phone call would take place?

A. No. It was "It's happening now. Do you want to be a part of it?"

Q. And so you had answered yes; is that right?

A. Yeah.

Q. And then received a Signal call at that moment and partook in a conversation with Grifter on the phone call and Jeff Moss on the phone call?

A. Yes, and others, but I don't know who else. I didn't recognize anyone else's -- there were other people. I don't know who they were.

Q. And how long did this phone call take place?

A. I think I was only on it for maybe ten minutes. I don't know how long they were on it, but I was on. I introduced myself, I said what happened, and that was the end of the call for me.

Q. Were you ever asked to provide any further information supporting your story and experiences?

A. Yes.

Q. And tell me about that, then.

A. So I was asked to provide some proof, documents, and so yeah.

Q. And that was requested of you during this phone call as well?

hotline number." Just a really genuinely good person, and he gave me the little Barbie hacker sticker. That was our interaction.

Q. Got it.

And it sounds like at a certain point as well, obviously, you got in contact with attorneys from Perkins Coie, Mr. Mertens, as well; is that right?

A. Yes. But I would have to look at the email to see when exactly that happened because I don't remember the exact date.

Q. And so was that first done through email?

A. Email. I provided Jeff with my email through Signal.

Q. So did Jeff reach out to you and ask you for your email?

A. Uh-huh. Yeah.

Q. And when did he do that?

A. Again, I don't remember the exact date. It was this year. I know I'm not very helpful with the dates. I apologize. And I don't still have the message because it was set to disappearing messages. So I don't remember.

Q. What do you mean, "set to disappearing messages"? I don't have Signal, so --

A. Signal is a privacy-based message app. It

has a feature that you can set messages to disappear after an allotted amount of time. You can pick 30 seconds, a minute, five minutes, a day, a month, a week, et cetera, et cetera, onward. And then the message, literally, it disappears. It looks like there's no message there. I mean, that's the thing that information security people/hackers like about Signal is that it has that feature.

Q. And when did Jeff first reach out to you? Do you know? Like, it was this year that he first reached out to you about this lawsuit?

A. About this lawsuit, yes.

Q. Well, when did he first reach out to you about Christopher Hadnagy other than the phone calls that you had with him and already discussed?

A. Just the phone calls and then -- yeah. I mean, Maxie had asked me if it came down to it, if I would talk to Jeff and his legal team, and I said yeah. And they didn't need me to.

And then, this year, Jeff sent me a message saying, "Would you be willing to?" And I said yes, and I gave my email address, and here we are.

Q. So Maxie originally reached out to you and asked if she could share your information with Jeff Moss; is that right?

A. Initially, yes.

Q. And you said that was fine and provided your contact information?

A. I guess it was closer to, "Hey, Jess, would you like to join a group chat with Jeff and I?" And I said sure, and so she made a group chat with Jeff and I.

Q. And when was that? When did that take place?

A. This year. I don't recall, exactly, the date. Earlier this year.

From there, Jeff and I moved to a private chat without Maxie, and he asked me for my information and if I wanted to participate.

Q. And you mentioned, obviously, the disappearing messages.

Were all your messages with Jeff disappearing messages?

A. I keep that on. It's just something that I've always done. So it may have been him. It may have been me. There's -- I don't know how to really tell if it was me that had it on or if he had it on or if we both had it on. It just showed as on.

Q. So -- and I was going to ask about that function.

If you have it set to disappearing, does that

make it disappear for everyone or just for you?
A. For everyone, yeah.
Q. So you had it set to disappearing, and so it would have -- well, do you have any of your communications anymore with Jeff Moss?
A. I do not.
Q. Do you have any of your communications anymore with Maxie Reynolds?
A. I don't.
Q. So all those communications that you've been having this year regarding this lawsuit between Maxie and Jeff Moss have been deleted?
ATTORNEY MERTENS: Object to form.
A. I -- they have not been deleted. "Deleted" implies that I actively went and removed them. I did not.
Q. (By Attorney Conrad) They don't exist anymore?
A. They no longer exist, but not because I have made them no longer exist, but because that's the function of the app.
Q. And how does that function get set?
A. You can either set it for that message that you're in, if you want something faster or longer, or you can set it in your general settings. And while I

your concerns regarding the same?

A. Yes.

Q. Do you have --

A. Through Signal.

Q. Go ahead. Through Signal?

A. Through Signal, disappearing messages because he didn't want his father to know. And I honestly didn't want -- you know, if he wanted to be private, if he wanted to keep it private, then I wanted to respect his privacy and, you know, to talk about things in a private manner also. So we used Signal and disappearing messages.

Q. So you don't have any record of that either?

A. No, I do not.

Q. And the tweet that you sent out that you believe resulted in you being fired, was that regarding your experiences at Social-Engineer?

A. No.

Q. So the tweet actually didn't have anything to do with Social-Engineer?

A. No, it didn't. No. It was part of my normal mental health tweeting, talking about information security. And, again, I was involved in Mental Health Hackers. That was -- well, trying to be involved in Mental Health Hackers. That was something that I was

C E R T I F I C A T E

UNITED STATES )
)
DISTRICT COURT )

I, a Reporter and Washington Certified Court Reporter, hereby certify that the foregoing videotaped videoconference deposition upon oral examination of Jessica Levine was taken stenographically before me on September 19, 2024, and transcribed under my direction;

That the witness was duly sworn by me pursuant to RCW 5.28.010 to testify truthfully; that the transcript of the deposition is a full, true and correct transcript to the best of my ability; that I am neither attorney for nor a relative or employee of any of the parties to the action or any attorney or counsel employed by the parties hereto nor financially interested in its outcome.

I further certify that in accordance with Washington Court Rule 30(e) the witness is given the opportunity to examine, read and sign the deposition within thirty days upon its completion and submission unless waiver of signature was indicated in the record.

IN WITNESS WHEREOF, I have hereunto set my hand this 27th day of September, 2024.

Douglas Armstrong, RPR

_______________________________________

Washington Certified Court Reporter No. 3444
License expires 11/26/2024

# Exhibit 25

THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

---

CHRISTOPHER J. HADNAGY, an individual; and SOCIAL-ENGINEER, LLC, a Pennsylvania limited liability company,

Plaintiffs,

v.

JEFF MOSS, an individual; DEF CON COMMUNICATIONS, INC., a Washington corporation; and DOES 1-10; and ROE ENTITIES 1-10, inclusive,

Defendants.

No. 2:23-cv-01932-BAT

---

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION

OF

SAMANTHA GAMBLE

---

Witness located in Boise, Idaho

(All participants appeared via videoconference.)

DATE TAKEN: January 15, 2025
REPORTED BY: Nicole A. Bulldis, RPR, FCRR, WA CCR 3384
AZ CR 50955 | CA CSR 14441 | OR CSR 24-0130

quick for me, Lauren, so I don't have to go mark something and we can all get out here? And I'll just --

MS. TRAMBLEY: Yeah.

MR. CONRAD: -- we'll use one exhibit for it. Thank you.

MS. TRAMBLEY: And just so you know, it's just the transparency report announcement.

MR. CONRAD: Yeah.

MS. TRAMBLEY: Okay.

MR. CONRAD: And this is Defendants'?

MS. TRAMBLEY: Exhibit 8.

MR. CONRAD: Exhibit 8.

E X A M I N A T I O N

BY MR. CONRAD

Q. Okay. So, Ms. Gamble, you're looking at Defendants' Exhibit 8, and the -- this is the DEF CON transparency report that was posted on February 9, 2022, and I want the walk through it really quickly with you.

A. Okay.

Q. It reads, "We received multiple code of conduct violation reports about DEF CON Village leader, Chris Hadnagy of the SE Village."

Did I read that correctly?

A. Yes.

Q. And the multiple code of conduct violation reports that DEF CON is indicating it received, none of those were code of conduct violation reports that you had made to DEF CON --

MS. TRAMBLEY: Object to form.

Q. (By Mr. Conrad) -- by February 9, 2022; correct?

A. Correct. Yeah. No, none of those. I was not a part of that whatsoever. I was fervently on the side of Chris and the ILF.

Q. And it says, "After conversations with the reporting parties and Chris." By February 9, 2022, you had not had any conversations with DEF CON at that point; right?

A. I had not, no.

Q. So the severity of the transgressions merits a ban from DEF CON, that had nothing to do with anything that you're testifying about today; right?

MS. TRAMBLEY: Object to form.

THE DEPONENT: No.

Q. (By Mr. Conrad) Is that correct?

A. I said no. Yeah. No, none of my experiences had anything to do with DEF CON or DEF CON's report.

Q. And the employees or ex-employees -- sorry, strike that.

The people that you know that were involved,

C E R T I F I C A T E

STATE OF WASHINGTON )
) ss
COUNTY OF CLARK )

I, Nicole A. Bulldis, RPR, a Certified Court Reporter, do hereby certify under the laws of the State of Washington:

That the foregoing videotaped deposition upon oral examination of Samantha Gamble was taken stenographically by me on January 15, 2025, and transcribed under my direction;

That the witness was duly sworn by me to testify truthfully, and that the transcript of the deposition is full, true, and correct to the best of my ability;

That I am not a relative, employee, or counsel of any party to this action or relative or employee of such counsel, and that I am not financially interested in the said action or the outcome thereof.

IN WITNESS WHEREOF, I have hereunto set my hand this 28th day of January 2025.

Nicole A. Bulldis, RPR

WA CCR No. 3384

e25c7f56-340a-4fc0-bf3b-de5cfa0fe1f0

# Exhibit 26

# TRANSPARENCY REPORT

Home
Recent News
Archives »
About »
Community »
Resources »
SUBMIT! »

POLICY HOME TRANSPARENCY REPORT WARRANT CANARY REPORT PRIVACY POLICY CODE OF CONDUCT BLACK BADGE POLICY CFP PRIVACY POLICY DMCA INFORMATION SPONSOR FAQ VILLAGE FAQ HACKERS WITH DISABILITITES INFORMATION

## DEF CON Conference Transparency Report

Since DEF CON 25, we have started to share a summary of incidents we are aware of that happened at the convention for a given year.

My hope is that by doing this DEF CON will encourage other conventions to duplicate this reporting and share their data so collectivly we can shed some light on the challenge we face in creating more safe and inclusive events.

*- The Dark Tangent*

Pre DEF CON 30

(Updates before DC 30) Transparency Report

**(2022 July 28)**
It has been a surreal and humbling experience to literally grow up with the community of hackers that developed over the last 30 years. It started with an inclusive call for hackers, lawyers, artists, feds, #hack, #phreak, basically everyone interested, to attend the first, small, DEF CON. As I grew up IRL, so did the convention. I learned to accept some hard truths such as "You can't please all people all of the time" and "Do what you can, when you can." I have always tried to stay true to the core of DEF CON and the Hacker Ethos, even when change is not comfortable or convenient.

In 2015, we introduced a formal Code of Conduct and in 2017, we began publishing post-event transparency reports with statistics about the incidents we are aware of. In 2018, we launched a hotline for attendees to anonymously report behavior violating our Code of Conduct or to connect with a trained and empathic ear. All of this has been a team effort made possible by incredibly smart, compassionate, and capable staff, volunteers, and community supporters.

## DEF CON Sites

Forums

Groups

Media Server

InfoCon.org

## The Goods

SHOP.
DEFCON.
ORG
Official Swag

Source of Knowledge
Conference Recordings

## Past Media

Torrents Page

DEF CON Media Server

InfoCon.org

https://defcon.org/html/links/dc-transparency.html

As we prepare to celebrate three decades of DEF CON, we're constantly learning what it means to effectively support an evolving community with transparency and empathy. So today, we're publishing details about our escalation process when we receive reports of Code of Conduct violations.

## What does DEF CON do with Code of Conduct violation reports?

In the past, individual community members shouldered too much of the burden to protect each other using whatever means they could. We, the event organizers, must be better.

Our code of conduct is simple: "We do not condone harassment against any participant, for any reason. Harassment includes deliberate intimidation and targeting individuals in a manner that makes them feel uncomfortable, unwelcome, or afraid."

To be clear, the term "harassment" encompasses any behavior that makes others feel uncomfortable or unsafe.

When we receive a report of a Code of Conduct violation, our leadership team representing multiple functions and departments, conducts a review of the substance in consultation with our attorney as needed. This usually involves speaking with parties named in the report including potential witnesses, alleged offender(s), and victim(s).

We then review all the evidence available to us through community reports, news media, and internal investigations to determine whether the allegations are substantiated. Most of the reports we receive are for minor violations that result in a warning, but severe allegations may require a referral to hotel security and/or law enforcement, especially if the report includes claims of criminal behavior.

Please remember all DEF CON attendees are guests of both the conference and the hosting property, which has its own Code of Conduct and rules. The property will remove anyone that breaks their rules and will prevent you from attending the conference in the future.

## Does DEF CON publish report details?

Our transparency report includes the number and category of incidents that are reported during the DEF CON conference each year. We also respond to reports through the year and publish updates for the community about major incidents that occur between events. Repeat offenders and those who commit more egregious offenses are permanently banned from our events. In the case of the most troubling offenses or those who we feel may represent an ongoing risk to the community, we take the extra step of naming them publicly. We believe we have an obligation to the community not to provide cover for these individuals to quietly find new and unsuspecting victims elsewhere. When we disclose this information, we do so to protect the DEF CON community, not to act as a public trial.

If the report of harassment presents a risk of immediate or future retaliation, or at the request of the reporting individual, we will take measures to protect their identity and/or details of the accusations. We've adopted these safeguards based on recommendations from the National Network to End Domestic Violence and the Violence Against Women Office at the US Department of Justice.

When affected individuals feel safe and comfortable doing so, they may approach alleged offenders about inappropriate behavior and ask them to stop. However, disparity in power or status, fear of retaliation, or the nature of

the behavior may make direct confrontation difficult, and therefore there is no requirement for such action to be taken before DEF CON begins our investigation. In fact, retaliation is itself a violation of our Code of Conduct, which states:

*"We do not condone harassment against any participant, for any reason. Harassment includes deliberate intimidation and targeting individuals in a manner that makes them feel uncomfortable, unwelcome, or afraid."*

As a private event and organization, we reserve the right to prioritize protecting the privacy of reporting individuals and victims of abusive behavior above other potential interests. Additionally, as private property, the hotel can trespass individuals permanently banned from DEF CON, creating a criminal and physical barrier between those individuals and the conference areas.

Anyone can report harassment. If you are at DEF CON and are being harassed, notice that someone else is being harassed, or have any other concerns, you can let us know by contacting any Goon, registration desk, or info booth, as well as by calling or texting the hotline at **725-222-0934**. As a reminder, you can also contact the hotline during the con if you just need someone supportive to talk to.

You can also file a report year-round by contacting **safety@defcon.org**. We encourage individuals to report CoC violations as soon as they're able to so we can begin our investigation before evidence is lost or destroyed, but it's never too late to make a report.

*- The Dark Tangent*

## Post DEF CON 29

(Updates between DC 29 and DC 30) Transparency Report

**(2022 Feb 9)**

1. We received multiple CoC violation reports about a DEF CON Village leader, Chris Hadnagy of the SE Village. After conversations with the reporting parties and Chris, we are confident the severity of the transgressions merits a ban from DEF CON.
2. We have also taken the rare action to disband the DEF CON Group DCG414. Code of Conduct violations by the group's primary Point of Contact and subsequent mishandling of the event left us without confidence in the group's leadership.

## DEF CON 29

(2021 August 5-8) Transparency Report
From our [closing ceremony] transparency report announcement:

### DEF CON 29 - Virtual

Of 95,562+ total messages the moderation team deleted 127 (0.13%)
We received 30 reports via "Report-a-violation feature."

Across the 34,321+ accounts on the DEF CON Discord, the moderation team:
* Warned 45 users (0.05%)
* Temporarily Muted 50 users (0.05%)
* Kicked 7 users (0.02%)
* Banned 6 users (0.017%)

## DEF CON 29 - Physical

**Medical & Health:**
7 medical emergencies 4 requiring EMTs
4 mental health issues requiring specialist support
[we noticed a significant number of attendees struggling this year and asked the community to have each others backs]

**Menstrual Products**
Now Provided in all convention area restrooms, regardless of gender.
Estimated 850+ of these were distributed

**Policy & Conduct**
1 lost passport
3 photo policy violations
3 suspicious packages
2 people removed for not masking
Approx 25 turned away for not being vaccinated
2 removed by security from Vaccination check

x

## DEF CON 27

Estimated number of people : 30k+
Announced at closing ceremonies August 11, 2019

| # | Description |
|---|---|
| 6 | Harassment |
| 1 | Sexual Assault |
| 2 | Theft/Loss |
| 3 | Bans/Trespasses |
| 2 | Falling Ceiling |
| 2 | Foiled Attacks on Casino |
| 1 | Biblical Grasshopper Plague |
| 2 | Warnings Issued to Our Staff |
| 1 | Staff Member Dismissed |
| 5 | Drunk and Disorderly |
| 5 | Photo Policy Complaints |
| 1 | Media Company Ejected |
| 1 | Hotel Safety-Security Issue |
| 1 | Failed Troll Attempt/ Self Own |

**Support Line Stats**
Available each day of the conference rom 0800-0400
Completely anonymous
Trained community volunteers

| # | Description |
|---|---|
| 29 | Total Calls |
| 12 | Code of Conduct Reports |
| 5 | Referrals to Para-Professional Counseling |
| 1 | Legal Issue |
| 1 | Person Trapped Back of House |

## DEF CON 26

Estimated number of people: 28,000+
Announced at closing ceremonies August 12th, 2018

```
# Description
3 Harassment
7 Sexual Harassment
1 Sexual Assault

7 Medical Incidents
2 Theft
3 Vandalism
1 Tresspassing
1 Falling Ceiling
1 Badge Makers Exonerated
1 Attacks On Casino Foiled
1 Dust Storms / Flash Flood
1 Other Event's Attendees Claiming We Hacked Them
1 Warnings Issued To Our Staff
```

**Support Line Stats**
Available each day of the conference from 08:00 to 04:00
Completely anonymous
Trained community volunteers

```
# Description
62 Total Calls
42 General Information Calls
3 Harassment Calls
5 Sexual Harassment Calls
1 Medical Help Calls
1 Concern Over Drink Tampering
```

## DEF CON 25

Estimated number of people: 25,000+
Announced at closing ceremonies July 30th 2017

```
# Description
7 Harassment reports (Code of Conduct violations)
including:
2 People banned for life due to harassing women
1 Person banned for life for harassing hotel staff
1 Person fled before we could identify and ban them for
harassing a woman

9 Medical incidents leading to 4 hospital transports
3 Thefts
1 Vicious Dog report
3 Adorable Dog reports
3 Vandalism to DEF CON or hotel property
2 Trespass on hotel property
2 People un-banned for life by the hotel
```

**Notes:**
A DEF CON ban is a prohibition against a person or group from attending future conventions due to bad behavior. DEF CON conveys the information to the hotel and if a banned person returns they will be "trespassed" by hotel security and possibly prosecuted.

A hotel ban is a ban instituted by the hotel for bad behavior against the hotel or its interests and is outside of our control. You anger the hotel, you deal with the hotel.

**Other notable bans:**
DEF CON also monitors news reports and community forums for potential

bad actors to exclude from our conventions, like we did with Jake
Applebaum, John Draper aka Captain Crunch, and Morgan Marquis-Boire,
who have all been banned.

© 1992-2022 DEF CON Communications, Inc. All Rights Reserved | DEF CON Policies | DMCA Information

# Exhibit 27



# DRAFT: DEF CON Comms Plam

Wednesday (Melanie Ensign) · Sep 8, 2021

*This is just a draft, so please feel free to comment or make suggestions before we start writing any official statements for DEF CON.*

**PR Objectives**

- Protect the privacy & safety of the people who were hurt
- Focus DC's role in the narrative by limiting public comments to *how* we reacted to the reports we received, using DC's code of conduct as our north star (if specific individuals decide to share more details about their experiences on their own, that's their choice, not ours)
- Avoid participating in public debates beyond our official statement (we don't want to fuel rumors or runaway press cycles. There could be legal consequences too, so the less we say as individuals, the better. Some people may disagree with our decision, not knowing all the facts, and we'll need to resist the urge to try to convert them to our position b/c it will not end well for the victims we're trying to protect)
- **Coordinate with Black Hat for consistency & visibility in protecting the community & the victims**

**Proactive Strategy**

- ~~Announce an~~ **Include an update** when DC publishes its DC29 Transparency Report with a ban for Chris ~~the removal of the SE village~~ due to violations of the CoC by him specifically, **along with other updates we plan to share e.g. reports of positive COVID cases we're aware** of ~~village leadership~~
    - Puts the announcement in context of all of the previously-announced actions DC took for community safety & transparency, **and ongoing updates post-con such as the reported COVID cases**
    - Emphasizes the importance of these reports as the official way DC communicates with the community about important issues
    - Exemplifies how DC will address issues reported outside of Vegas & how we will hold ourselves accountable to the community between conferences
    - Supports the precedent that specific details about individual incidents will not be shared publicly (expelling a longtime village will create a lot of pressure for DC to share more details, so this precedent is important to protect the victims)
- Within the **update** ~~announcement~~:
    - **Explain why we're naming Chris when we don't share details of other incidents reported in the Transparency Report**

URL
https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654
Timestamp
Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

the community about important issues

- Exemplifies how DC will address issues reported outside of Vegas & how we will hold ourselves accountable to the community between conferences
- Supports the precedent that specific details about individual incidents will not be shared publicly (expelling a longtime village will create a lot of pressure for DC to share more details, so this precedent is important to protect the victims)

- Within the **update** ~~announcement~~:
  - **Explain why we're naming Chris when we don't share details of other incidents reported in the Transparency Report**
  - **Limit comments to Chris' behavior that violated our CoC, no mention of his company or SE Village as a whole**
  - ~~Acknowledge the contributions of the broader SE community to DC & commit to continuing to support them moving forward~~
  - ~~Point to DC30 Call for Villages as an opportunity for folks to submit their ideas~~
- **Following the update, when we open the Call for Villages, SE Village will not be pre-approved**

**Reactive Assets (for press)**

- On background only (e.g. "DEF CON confirmed" but not a quoted statement):
  - The behavior Chris confirmed was enough to expel him
  - We received corroborating reports from more than a dozen individuals
  - **We still want a SE Village and will accept applications during the Call for Villages**

~~**Outstanding questions from Melanie**~~

- ~~Will he be banned from attending DEF CON or just from running a village?~~

**Assets needed & proposed timeline (WIP):** [https://docs.google.com/document/d/1-hmAIjNtlUsoPfWcMsVC95ZdMgF7i-I0Fx1pF7yBxA4/edit?usp=sharing](https://docs.google.com/document/d/1-hmAIjNtlUsoPfWcMsVC95ZdMgF7i-I0Fx1pF7yBxA4/edit?usp=sharing) (this doc is locked, so please request access if you need it)

---

Sep 8, 2021

**Marc Cjunky**

Some thoughts. Im concerned that using a vague identifier of "village leadership" and avoiding calling him out could cause us problems.

1. In the past we have taken the extraordinary measure of naming and banning individuals who have harmed the community. E.g [https://www.buzzfeednews.com/article/kevincollier/hacker-hero-is-said-to-have-used-cyber-conferences-to](https://www.buzzfeednews.com/article/kevincollier/hacker-hero-is-said-to-have-used-cyber-conferences-to)

Do we feel that this does not meet that threshold? If we do not, then we will likely be asked to explain why not - and I think that getting into any debate like that will end badly.

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

Do we feel that this does not meet that threshold? If we do not, then we will likely be asked to explain why not - and I think that getting into any debate like that will end badly.

2. By not naming anyone it appears we are deliberately casting a wider net. That leaves wiggle room that can be exploited. The village isn't to blame. This is not a leadership issue, this is not politics, this is bullying by an individual. IMHO It should be identified as such.

The wording also makes it feel like a DEFCON thing when it really isnt.

We are taking action on behalf of members of the community - even though many of the incidents did not happen during DEFCON. I think thats fine but we should make sure its clear thats whats going on. Otherwise this looks personal when it isn't.

IMHO the clearer and more concise we are, the less wiggle room we leave and the more we reduce our attack surface.

Last to answer your question about banning, my vote is yes he should be banned. This person caused so much harm that the conference became an unsafe place for his victims. To me that warrants removal.

Further do we honestly believe that once this ignites he will leave his victims alone if we simply take his village away?

Edited Sep 8, 2021

**Wednesday (Melanie Ensign),** Press Department Lead
I have no issues naming him. I can update the plan to reflect that.

I fully expect he will become even more aggressive toward his victims since the ban could impact his business & reputation. For that reason, I'm OK banning him from attending as well.

Please update

Sep 8, 2021

**Marc Cjunky**
Completely agree. He reached out to jeff today. I think he knows whats going on. We can probably expect him to be nice up until he thinks its out of his hands and then he will likely start being really nasty.

Sep 14, 2021

**Jeff Moss,** Organizer
I've just had a call with Black Hat and would like to catch everyone up and plan next steps. What times are good for everyone?

I'm in the Singapore time zone again.

Sep 14, 2021

**Jeff Moss,** Organizer

**URL**
https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654
**Timestamp**
Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

I'm in the Singapore time zone again.

Sep 14, 2021

**Jeff Moss,** Organizer

Basically:

- Black Hat wants to coordinate a response with us so it happens at the same time.
- We should all be on the call with Chris when we talk with him about the issue.
- We should not do the call until we are coordinated between us and have a plan for if he goes crazy after the call.
- Do we ban Chris from the conferences but let SE still operate? If we are saying it is about Chris and not the company what happens if Chris says "OK, I won't attend, but my training and village can still operate without me?"
- The less we say the better.
- Keep it focused on CoC violations that happened at our events.
- BH would ideally like those with complaints to help enumerate what CoC violations happened at (BH, DC) that we can base the decision on instead of things happening outside the event if possible.
-

Sep 15, 2021

**Wednesday (Melanie Ensign),** Press Department Lead

Comms plan above has been updated with changes tracked for your convenience. Additions are in **bold & purple**, deletions are show with ~~strikethrough~~. Once changes are accepted, I'll remove the formatting.

Jeff -- per our last conversation, I've included a recommended check list of needed assets & a proposed timeline for the group's consideration. There aren't any dates on the timeline yet, but once we know when we need to publish the Transparency Report, we can schedule everything else around that date.

Sep 15, 2021

**Marc Cjunky**

Wednesday updated plan looks good to me.

Sep 15, 2021

**Marc Cjunky**

Jeff

- Do we ban Chris from the conferences but let SE still operate? If we are saying it is about Chris and not the company what happens if Chris says "OK, I won't attend, but my training and village can still operate without me?"

Yes, I think thats right. We should be clear about who we are punishing and why. We shouldn't allow wiggle room, filuzziness or collateral damage that gives him an opportunity to say it was anything but his behavior.

URL

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

Timestamp

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

about Chris and not the company what happens if Chris says "OK, I won't attend, but my training and village can still operate without me?"

Yes, I think thats right. We should be clear about who we are punishing and why. We shouldn't allow wiggle room, filuzziness or collateral damage that gives him an opportunity to say it was anything but his behavior.

The company side is problematic but as its Chris's behavior I think taking action on the company specifically draws other people into the crosshairs. We almost certainly need to monitor them and maybe warn them that if we see any sign of Chris operating through them to harass people we will take further action.

As for them operating a village IMHO it is entirely normal for a company who's senior staff misbehave to lose a contract etc. Doing this by saying we are going to invite change with a new call for villages and training is a fair way to do that IMHO.

- The less we say the better.

I think we should be clear and concise. I like the plan Wednesday has made above.

- Make it clear its Chris's behaviour
- Make it clear that like the other handful specifically toxic or harmful people that are threats to the community this is why we are naming him.
- Make it clear that it was direct conduct that violated COC and nothing else.
- Make it clear what we are doing.
- Avoid debates, victim discussions or any other traps.

- Keep it focused on CoC violations that happened at our events.

Completely agree.

Sep 15, 2021

**Marc Cjunky**
Also the coordination with Blackhat is great. It moves the focus off ys to the behavior and provides validation without needlessly exposing the victims more to "justify" when Chris does the obvious and starts a scorched earth denial campaign.

Sep 15, 2021

**Marc Cjunky**
Call -
I can do this evening 5pm - 10pm PT
I can do Thursday 6pm - 10pm PT
I can do Friday evening - 5pm - 8pm PT
I can do evenings this weekend.

Let me know.

Sep 16, 2021

**Jeff Moss,** Organizer

**URL**
https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**
Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)



IMG_2034.PNG · 303 KB · View full-size · Download

Sep 16, 2021 **Jeff Moss,** Organizer

IMG_2036.PNG · 162 KB · View full-size · Download

Sep 17, 2021  **Grifter,** Contests & Events Lead

I'm of the opinion that we can't allow his company to continue to run the SE Village. If it does he will still have full control over who will be allowed to compete in the SECTF, speak in the Village, or other decisions related to the Village. He also personally profits

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

Sep ...  **Chiver,** Contests & Events Lead

I'm of the opinion that we can't allow his company to continue to run the SE Village. If it does he will still have full control over who will be allowed to compete in the SECTF, speak in the Village, or other decisions related to the Village. He also personally profits from his company running it. So to say, "Well you can't come but you can make money off of it and still make decisions for it on the back end" isn't really a ban. It just allows decisions to be made remotely. And his people will do EXACTLY what they're told or they'll be berated or fired. We all heard that.

It's like putting a mobster in jail for racketeering and then allowing him to still run his operations over the phone from his cell. It doesn't make sense.

Edited Sep 17, 2021  **Marc Cjunky** •••

I agree, I just think we do so by making it about Chris. Ban and remove Chris and tell the company they are gone because of his behavior, then bring in a new team.

That way he cant make it about business, politics, leadership. Its squarely on him and his shitty behavior.

Sep 17, 2021  **Wednesday (Melanie Ensign),** Press Department Lead •••

If we remove SE Village from the pre-approved list, they can still submit a proposal like everyone else, which we simply don't have to select.

Truth

Sep 17, 2021  **Jeff Moss,** Organizer •••

We'll add a question to the Call for Villages where we ask if a village is primarily operated by a company and how do they plan to keep the companies interests neutral from the village / community interest. Or something like that. I would like more transparency in what villages are fully supported by a company. It's not necessarily bad but we do want to know.

Sep 24, 2021 **Wednesday (Melanie Ensign),** Press Department Lead •••

Jeff — have we discussed a date yet with BH?

Sep 28, 2021  **Jeff Moss,** Organizer •••

They kind of disappeared last week, but I have call with them tomorrow. On that call I'll get a date for all of us to have a DEF CON / Black Hat call before we do the call with Chris. I'd like to get through this!

Thx

Sep 30, 2021  **Jeff Moss,** Organizer •••

This next call with BH is to come up with a plan. They are stuck on no one coming forward to them at all. It is hard for them to claim a CoC violation if they have no report.

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

Sep 30, 2021

**Jeff Moss,** Organizer

This next call with BH is to come up with a plan. They are stuck on no one coming forward to them at all. It is hard for them to claim a CoC violation if they have no report.

Nov 4, 2021

**Wednesday (Melanie Ensign),** Press Department Lead

Any updates from BH on their readiness or timing for public comment? The longer DC waits to say anything, the worse it will be since we've known this long & haven't told the community.

Nov 29, 2021

**Wednesday (Melanie Ensign),** Press Department Lead

Jeff — any updates from BH yet? I'm now really personally uncomfortable with how long I've known about this situation without being able to take action. Are we going to be able to align with BH or should we make plans to move forward without them?

+1

Nov 30, 2021

**Jeff Moss,** Organizer

Yeah me too.

Last I heard is that Maxie wrote a letter to BH with a complaint, and I've asked BH yesterday if the latter is going to change any of their plans.

If it doesn't then we need to announce on our side.

If it does then we take the announcement timing into account.

I'll post the current version of the transparency report next. Marc Grifter Wednesday can you comment on anything we should add?

Nov 30, 2021

**Jeff Moss,** Organizer

Current draft of transparency report based on what was said at closing:

DEF CON 29 – Virtual
Of 95,562+ total messages the moderation team deleted 127 (0.13%)
We received direct 30 reports via "Report-a-violation feature."
Across the 34,321+ accounts on the Discord, the moderation team:
* Warned 45 users (0.05%)
* Temporarily Muted 50 users (0.05%)
* Kicked 7 users (0.02%)
* Banned 6 users (0.017%)

DEF CON 29 - Physical
Medical & Health:
7 medical emergencies 4 requiring EMTs
4 mental health issues requiring specialist support
[we noticed a significant number of attendees struggling this year and ask the

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

DEF CON 29 - Physical

Medical & Health:
7 medical emergencies 4 requiring EMTs
4 mental health issues requiring specialist support
[we noticed a significant number of attendees struggling this year and ask the community to have each others backs]
Menstrual Products
Now Provided in all convention area restrooms, regardless of gender.
1,224 Items ordered total
800 Tampons
296 Pads
128 Panty Liners
Estimated 850+ of these were distributed
Policy & Conduct
1 lost passport
3 photo policy violations
3 suspicious packages
2 people removed for not masking
Approx 25 turned away for not being vaccinated
2 removed by security from Vaccination check

Nov 30, 2021

**Wednesday (Melanie Ensign),** Press Department Lead
I suggest reporting the menstrual products under a category of new programs launched or something similar. It's important for the community to know we're making these items available moving forward, but we don't need to report how many tampons are used each year.

Nov 30, 2021

**Marc Cjunky**
Agree with Wednesday on the menstrual products it was good to give detail at closing but we can summarize for the permanent report.

Question about incidents after an event like this one. Do we want to create a new section covering post event updates? It doesn't seem quite right to attach it to the event itself.

Nov 30, 2021

**Wednesday (Melanie Ensign),** Press Department Lead
Perhaps in the preamble we can note that this update is to disclose things that have been reported since the close of the con & remind folks that we care about what happens in our community year round, not only for the few days of the event. It's an important demonstration of trust & respect that we take action on issues throughout the year — and a good reminder for folks who may not be comfortable reporting right away that we'll listen whenever they're ready.

Dec 1, 2021

**Jeff Moss,** Organizer
Anyone want to suggest language, or I can take a crack at it tomorrow?

Dec 1, 2021

**Wednesday (Melanie Ensign),** Press Department Lead

**URL**
https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654
**Timestamp**
Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

 Dec 1, 2021  **Jeff Moss,** Organizer
Anyone want to suggest language, or I can take a crack at it tomorrow?

Dec 1, 2021 **Wednesday (Melanie Ensign),** Press Department Lead
Suggestion to start from:

We began sharing an annual transparency report during closing ceremonies at DEF CON 25. It started as a summary of incidents we're aware of that happened at the convention.

Today, we're expanding those efforts with our first post-con update. This update includes a summary of incidents we became aware of after closing ceremonies at DEF CON 29. Moving forward, we expect to provide post-con updates as often as needed based on reports we receive throughout the year.

This post-con transparency is important for a few reasons. First, there are some things we won't know until after the end of a convention, such as reports of COVID-19 related issues that are discovered as people return home. Second, some people may not feel comfortable reporting certain violations right away and ongoing updates provide a consistent way for us to disclose what we can to the community year-round.

Dec 2, 2021  **Jeff Moss,** Organizer
OK let's split it into two.

One is the normal transparency report we did at closing ceremonies

The Second will be this new category of in between / post con updates.

Edited Dec 4, 2021  **Jeff Moss,** Organizer

DEF CON 29 (2021 August 5-8) Transparency Report
From our [closing ceremony]<-PROVIDE LINK transparency report announcement:

DEF CON 29 – Virtual
Of 95,562+ total messages the moderation team deleted 127 (0.13%)
We received 30 reports via "Report-a-violation feature."
Across the 34,321+ accounts on the DEF CON Discord, the moderation team:
* Warned 45 users (0.05%)
* Temporarily Muted 50 users (0.05%)
* Kicked 7 users (0.02%)
* Banned 6 users (0.017%)

DEF CON 29 - Physical
Medical & Health:
7 medical emergencies 4 requiring EMTs
4 mental health issues requiring specialist support
[we noticed a significant number of attendees struggling this year and ask the community to have each others backs]

**URL**
https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654
**Timestamp**
Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

DEF CON 29 - Physical

Medical & Health:

7 medical emergencies 4 requiring EMTs

4 mental health issues requiring specialist support

[we noticed a significant number of attendees struggling this year and ask the community to have each others backs]

Menstrual Products

Now Provided in all convention area restrooms, regardless of gender.

Estimated 850+ of these were distributed

Policy & Conduct

1 lost passport

3 photo policy violations

3 suspicious packages

2 people removed for not masking

Approx 25 turned away for not being vaccinated

2 removed by security from Vaccination check

----------------------------------------------------

We began sharing an annual transparency report during closing ceremonies at DEF CON 25. It started as a summary of incidents we were aware of that happened during the convention and we hoped other conferences would start the practice as well. Today, we're expanding those efforts with our first post-con update to cover the time in-between conventions.

There are things we won't know until after the end of a convention, such as reports of COVID-19 related issues that are discovered as people return home. Some people may not feel comfortable reporting CoC violations right away, and ongoing CoC violation investigations take time to complete.

This update includes a summary of incidents after closing ceremonies at DEF CON 29.

- In the weeks immediately following the conference we identified or had reported to us a total of 3 cases of COVID-19. None of these required hospitalization. This is not a comprehensive measurement of all attendees, only those cases we're aware of.

- Multiple reports of inappropriate behavior [This is where we need to add language for Chris Marc Wednesday]

- Multiple reports of inappropriate behavior by DEF CON Group xxx led to their [removal? What should we say here Darington?]

- WHAT DO WE ADD DOWN HERE?

Dec 3, 2021

**Wednesday (Melanie Ensign),** Press Department Lead

Chris + positive Covid cases (if we're still planning to report those).

Anything else happen since Vegas?

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)



Dec 3, 2021 Wednesday (Melanie Ensign), Press Department Lead
Chris + positive Covid cases (if we're still planning to report those).

Anything else happen since Vegas?

Dec 3, 2021 **Jeff Moss,** Organizer
Marc Can you write a couple sentences on the COVID numbers you were tweeting about?

Any others things to include besides Chris?

The heart of the matter: Let's word the Chris bit.

Dec 3, 2021 **Marc Cjunky**
Sure, my gut says we probably want to avoid shaming BH especially as we are looking for unity with them over Chris. So we should probably avoid drawing attention to how much worse their covid numbers were which just leaves us with:
"In the weeks immediately following the conference we identified or had reported to us a total of 3 cases of COVID. None of these required hospitalization."

Dec 3, 2021 **Wednesday (Melanie Ensign),** Press Department Lead
I would add something at the end of that to reiterate the obvious for kids in the back: "this is not a comprehensive measurement of all attendees, only those cases we're aware of."

+1

Dec 4, 2021 **Jeff Moss,** Organizer
I've updated the draft above with comments and ask for help.

Dec 4, 2021 **Darington,** media director
something like:

DEF CON doesn't include names or details of the Code of Conduct violations in the Transparency Report. The exception to this rule is transgressions perpetrated by people with leadership roles at the DEF CON Conference.

This year, we received more than a dozen reports of threats, intimidation and retaliation by a DEF CON Village leader, Chris Hadnagy. After meeting with the accusers and the accused, we are satisfied that the conduct merits a ban from DEF CON.

perhaps?

+1

Dec 4, 2021 Wednesday (Melanie Ensign), Press Department Lead

**URL**
https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654
**Timestamp**
Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)


perhaps?

 +1

Dec 4, 2021

**Wednesday (Melanie Ensign),** Press Department Lead

We've named non-leaders like Captain Crunch. Would it be true to say we share names when people are permanently banned?

Except for that detail, I like the proposed language.

Dec 4, 2021

**Marc Cjunky**

Thought - in the past we justified the rare cases of naming as a step taken to protect the community.

Perhaps thats the best language here also? Not that we are naming him as a former leader of a defcon community, but naming him to in order to protect the community.

Dec 4, 2021

**Darington,** media director

I think in the case of predators like Draper, the language of 'protecting the community' fits a little better. I'm hoping that we can name Chris in a way that's clear and definite without being unduly provocative. If we make him sound like he's preying on the community at large, rather than his staff and coworkers it might lead us into more litigious territory.

I think it's a good thing that we're holding a leader accountable, and I think that's a big reason why we're making this announcement.

Maybe change 'The exception to this rule' to 'One exception to this rule'?

Dec 4, 2021

**Darington,** media director

DEF CON doesn't include names or details of the Code of Conduct violations in the Transparency Report. One exception to this rule is transgressions perpetrated by people with leadership roles at the DEF CON Conference.

This year, we received more than a dozen reports of threats, intimidation and retaliation by a DEF CON Village leader, Chris Hadnagy. After meeting with the accusers and the accused, we are satisfied that the conduct merits a ban from DEF CON.

Dec 4, 2021

**Wednesday (Melanie Ensign),** Press Department Lead

"One exception" is perfect!

Dec 4, 2021

**Marc Cjunky**

Isn't he though? We have had complaints of abuse from throughout the community. Complaints from people who have taken his course, complaints that he has preyed on literally every black SE badge winner, even his own staff.

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

Dec 4, 2021

**Marc Cjunky**

Isn't he though? We have had complaints of abuse from throughout the community. Complaints from people who have taken his course, complaints that he has preyed on literally every black SE badge winner, even his own staff.

I don't think there is any way we can name him and not "be provocative".

That said, im ok with your latest version because it avoids us looking inconsistent.

---

Dec 4, 2021

**Wednesday (Melanie Ensign),** Press Department Lead

FYI — heard from Maxie that she's talking to BH on Monday. Sounds like they're only going to remove him from training & the board, but we should know more after their conversation.

My professional opinion is they'll be forced to follow DC's lead by public pressure if they don't enforce a permanent ban right away. But that's they're call.

---

Dec 5, 2021

**Jeff Moss,** Organizer

Darington

Can you provide some text about the DEF CON Group we had to put on notice? To show that we also have to discipline our DCGs

---

Dec 6, 2021

**Marc Cjunky**

Q: is it worth releasing our update well ahead of time to BH? Maybe we can persuade them to lean in the direction of taking more action that way?

---

Dec 6, 2021

**Darington,** media director

I'm not certain the DCG issue fits in as well here. It's not related to the con proper and it takes an additional layer of explanation. The most boiled down version would be something like:

"We've also taken the rare action to disband a DEF CON Group in the USA for Code of Conduct violations by the group's primary Point of Contact."

---

Dec 7, 2021

**Jeff Moss,** Organizer

Darington Yeah, something like that I think is plenty good. It would be included in the "in-between cons" transparency update like we plan to include Chris and the COVID numbers in. To give some balance and show that we also nuke DCGs for violations as well.

+1

---

Dec 8, 2021

**Jeff Moss,** Organizer

My attempt to simplify Darington text for Chris:

DEF CON doesn't include names or details of Code of Conduct violations in the

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

 Dec 9, 2021 **Jeff Moss,** Organizer

My attempt to simplify Darington text for Chris:

DEF CON doesn't include names or details of Code of Conduct violations in the Transparency Report. One exception to this rule is transgressions perpetrated by people with leadership roles at the DEF CON Conference.

We received multiple CoC violation reports by a DEF CON Village leader, Chris Hadnagy of the SE Village. After meeting with the accusers and the accused, we have decided the behavior merits a ban from DEF CON.

---------

Still not totally happy with this but it is getting closer. I've also updated the above draft.

Dec 9, 2021  **Jeff Moss,** Organizer

Our base transparency report is live, just leaving this follow up.

DEF CON® Hacking Conference - Transparency Report

Dec 9, 2021  **Wednesday (Melanie Ensign),** Press Department Lead

Suggested revision:

DEF CON typically doesn't include individual's names in the Transparency Report. One exception to this is when someone in a DEF CON Conference leadership role violates our Code of Conduct. Because they are in positions of power, they are accountable to the entire community.

We received multiple reports of CoC violations by a DEF CON Village leader, Chris Hadnagy of the SE Village. After meeting with the accusers and the accused, we decided Chris' behavior merits a permanent ban from the DEF CON conference.

Dec 9, 2021  **Marc Cjunky**

I like this version. One niggle. Do we want to use the word "accusers". I know its factually correct, but would it be better to say something more neutral like "all concerned parties" so it sounds less like he was persecuted?

Dec 9, 2021  **Wednesday (Melanie Ensign),** Press Department Lead

How about, "after conversations with the reporting parties & Chris, we're confident the behavior merits...."?

Dec 9, 2021  **Darington,** media director

i like 'reporting parties' better than 'all concerned', fwiw.

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

Dec 9, 2021

**Darington,** media director
i like 'reporting parties' better than 'all concerned', fwiw.

Dec 9, 2021

**Marc Cjunky**
Looks good to me!

Dec 10, 2021

**Jeff Moss,** Organizer
Draft 2021 12 10

We began sharing an annual transparency report during closing ceremonies at DEF CON 25. It started as a summary of incidents we were aware of that happened during the convention and we hoped other conferences would start the practice as well. Today, we're expanding those efforts with our first post-con update to cover the time in-between conventions.

There are things we won't know until after the end of a convention, such as reports of COVID-19 related issues that are discovered as people return home. Some people may not feel comfortable reporting CoC violations right away, and ongoing CoC violation investigations take time to complete.

This update includes a summary of incidents after closing ceremonies at DEF CON 29.

- In the weeks immediately following the conference we identified or had reported to us a total of 3 cases of COVID-19. None of these required hospitalization. This is not a comprehensive measurement of all attendees, only those cases we're aware of.

DEF CON doesn't include names or details of Code of Conduct violations in the Transparency Report. One exception to this rule is violations perpetrated by people with leadership roles at the DEF CON Conference.

- We received multiple CoC violation reports by a DEF CON Village leader, Chris Hadnagy of the SE Village. After conversations with the reporting parties & Chris, we're confident the behavior merits a ban from DEF CON.

- We have taken the rare action to disband a DEF CON Group in the USA for Code of Conduct violations by the group's primary Point of Contact." <- Should we name the contact?

Dec 10, 2021

**Jeff Moss,** Organizer
The reason I ask about naming the DCG contact is we just wrote about why we are naming someone above. If we don't name a DCG point of contact we should explain why it is different.

Dec 10, 2021

**Wednesday (Melanie Ensign),** Press Department Lead
Can we put the DCG update after the COVID numbers so that it doesn't need a name?

**URL**
https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**
Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

why it is different.

Dec 10, 2021  **Wednesday (Melanie Ensign),** Press Department Lead

Can we put the DCG update after the COVID numbers so that it doesn't need a name?

Dec 10, 2021  **Jeff Moss,** Organizer

Darington What do you and the DCG team think? We have named groups in the past, should we name the group and / or the point of contact?

Dec 10, 2021  **Darington,** media director

It's my inclination not to name the POC - i don't mind naming the group. I'd rather not reignite the mostly unhelpful conversation around the recent event because it takes more explaining than Lucknow and social media is a bad room for nuance. Bringing the POC's name into it just makes that reopening more likely.

I will ask the DCG board for their input.

Do we have an update on the meeting with BH?

Dec 11, 2021  **Marc Cjunky**

Suggest you add "we have ALSO" to the DCG section to clearly separate it from the Chris ban section. Otherwise they bleed into each other.

Dec 11, 2021  **Marc Cjunky**

Or Wednesday's suggestion achieves the same.

Dec 14, 2021  **Wednesday (Melanie Ensign),** Press Department Lead

Any reason we can't post the update before Friday? I'd like to avoid the misperception that we're trying to bury this by posting during the holidays.

Dec 14, 2021  **Jeff Moss,** Organizer

We still need to talk with Chris so he can't say we didn't.

How do you want to plan that call? I'd like at least someone else on the call with me so it doesn't turn into a he said / he said situation.

Dec 14, 2021  **Jeff Moss,** Organizer

Darington Let me know about naming the group, that might be good enough to not look like we are singling out Chris by name.

Dec 15, 2021 **Darington,** media director

I think naming the group will be ok.

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

Dec 15, 2021  **Darington,** media director

I think naming the group will be ok.

Dec 15, 2021  **Grifter,** Contests & Events Lead

Naming the group will be enough because people will just look up the point of contact in the way back machine. Just a thought.

Dec 18, 2021  **Jeff Moss,** Organizer

I sent a DM to Chris three days ago asking to set up a time to talk with him, no response yet. I'll see if I can find his mobile number.

In the meantime Darington can you lock in the DCG text you are happy with?

Edited Dec 20, 2021  **Darington,** media director

We received multiple reports of intimidation and retaliation by a DEF CON Village leader, Chris Hadnagy of the SE Village. After conversations with the reporting parties & Chris, we're confident the behavior violates our CoC and the severity of the transgressions merits a ban from DEF CON.

We have also taken the rare action to disband DCG414. Code of Conduct violations by the group's primary Point of Contact and subsequent mishandling of the event left us without confidence in the group's leadership.

Something more like that, maybe?

Dec 20, 2021  **Marc Cjunky**

I'd change to "We have also" for the second paragraph so it's clear the two things aren't linked.

Dec 20, 2021  **Darington,** media director

fair point. editing. :)

Dec 21, 2021 **Jeff Moss,** Organizer

I got a hold of Chris on Signal, he is upset we want to talk now after BH and us avoided him.

He says his COO Ryan is back on Jan 3rd so I suggested we schedule a call for the week of the 4th.

  

Jan 13  **Wednesday (Melanie Ensign),** Press Department Lead

Jeff — have we connected with Chris yet? Concerns are now circulating among the reporting individuals that we're not taking this seriously & that the risk they took in

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

Jan 13

**Wednesday (Melanie Ensign),** Press Department Lead

Jeff — have we connected with Chris yet? Concerns are now circulating among the reporting individuals that we're not taking this seriously & that the risk they took in coming forward isn't worth it.

Jan 13

**Jeff Moss,** Organizer

Let me get everyone caught up on my Twitter DMs with Chris. You can see he is going to want to know who is causing him and every little detail of what are CoC violations so he can argue them.

We need to do a call and decide how we will answer him, he is available work hours EST, not being very flexible.

Jan 13

**Jeff Moss,** Organizer

IMG_2531.PNG

IMG_2532.PNG

IMG_2533.PNG

Jan 14

**Wednesday (Melanie Ensign),** Press Department Lead

Nice guy.

Is there an alternative in case scheduling a call proves impossible? Could we consider an official letter or notification? I know that's not ideal, but I also doubt Chris would want to make it public if it stated we have half a dozen reports & which behaviors we consider coc violations. A few sentences should be sufficient, eg:

- unfortunately we've been unable to schedule a call with you
- we received multiple reports from several people
- while all the reports were disturbing, the behavior you admitted to (describe) alone is a serious violation of our coc and you will not be welcomed back at DC as a volunteer or attendee.

The shorter it is, the less content he has to cherry-pick.

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

- while all the reports were disturbing, the behavior you admitted to (describe) alone is a serious violation of our coc and you will not be welcomed back at DC as a volunteer or attendee.

The shorter it is, the less content he has to cherry-pick.

All that said, this is a communications strategy & I'd run it by a lawyer first.

Jan 17

**Jeff Moss,** Organizer
Chris is sending me something in writing, he asked for my best email address. I'll let everyone know what it is.

Jan 18

**Jeff Moss,** Organizer

Here it is, please discuss Grifter Marc Wednesday Darington

---

With your time zone difference it seems like meeting is going to be very difficult. I was able to get a meeting with Steve, Steve and Sarah from Black Hat, and I assume these ridiculous accusations are the same.

So I can answer for each here and then if we need to talk we can try to get a time that works. The next few weeks I have some training classes that will make 4 out of 5 days really hard for a few weeks.

Accusation 1: There is a written email where I discriminated against a black person, at Black Hat, not def con. This is 100% false and ridiculous. You have known me for over 15 years and in all that time I have never ever been accused of racism. We have had people of every gender, ethnicity, race and religion at SEV and at my BH classes. My BH classes are generally filled with more nonwhite folks than white folks. When I asked if this supposed email was produced, of course it was not.

Accusation 2: I discriminated against a trans person at Black Hat and DEF CON. This is also not true. But Jeff you are aware of the situation they are referencing and it was over 8 years ago. When the rules of SECTF used to say "Must be male or female of the human race" and someone took offense to it. It was quickly fixed. I apologized publicly for being calloused, and I invited the one person was offended personally by me as my guest to DEF CON. We hugged it out and it has NEVER been brought up again, in 8 freaking years.

Accusation 3: I discriminated against a blind person at BLACK HAT. This is also false. We had a blind person who was very angry at a class in the UK, I did not have my book translated to braile. He asked if I would and I got the cost and it was thousands of dollars so I told him if he would like it he could pay for it and I would allow it. He came to the class, sat through all 5 days, did all the homework, passed the class and then wrote a scathing review how much he didn't get out of it since he was blind. We refunded 100% of his money and he went on his way. This was over 6 years ago and has nothing to do with BH or DC.

Accusation 4: At a BH class, not DC, I said that an employee only got the job she had due to her being beautiful. This is an outright lie. Maxie is the one who made that joke

**URL**
https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654
**Timestamp**
Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

wrote a scathing review how much he didn't get out of it since he was blind. We refunded [illegible]% of his money and he went on his way. This was over [illegible] years ago and has nothing to do with BH or DC.

Accusation 4: At a BH class, not DC, I said that an employee only got the job she had due to her being beautiful. This is an outright lie. Maxie is the one who made that joke, Ryan can attest to this because we spoke to her after class and I said that the community was sensitive and asked to fix her statement, which she did the next day.

Here is the bottom line. Maxie doesn't work here because she stole from us, lied about her dad dying, took 3 months paid leave and then stole content from SECOM and ILF. Upon doing so we locked her work computer and made sure any contracts she tried to take from us were squashed. She then reached out to Cat Murdock who quit 3 years ago and immediately tried to sell some of our services as her own, then went to work for a competitor and then went to work for our client. We never sued either of them.

They reached out to Stephanie Carruthers. Who won a black badge at my contest, then overnight became a competitor and then became a hater because we had to remove JC (her husband) from the competition. He called and broke our code of ethics and threated to fire someone acting as the boss. We called her back, told her it was a prank, apologized and then removed him from stage. To get back at us for the embarrassment he took a young man under his wing and trained him to do the same thing the next year. When we found out we banned him and his entourage from SEV forever.

Stephanie then decided to write a competitive SE class which somehow got into BH and she tried to duplicate our homework idea but had students committing fraud, we reported her to BH and unlike all these people we did NOT do so anonymously.

Since then they have been a path to try and take me down. Maxie as ringleader is now having backing from Cat and Stephanie, but I truly doubt there is 15 others. Maybe 4-5.

If you want 3rd party verification of this, this group has reached out to a number of people – Patrick Laverty from Layer8 and asked him to side with them to take me down. Also Alethe Denis, and they offered her a spot on a tv show in exchange for taking me out.

So if you want to investigate code of conduct violations you should be strongly looking at that group. Lying, fabricating stories and trying to create a coup for what?

We are not angry, we are disappointed. And we will make it easy on you. We are going to leave DEF CON and take SEVillage to another conference this year. It truly saddens me that knowing me for 15 years+ you guys couldn't see through this. Funny all these accusations are years old but they only come up 1 month after Maxie is fired?

For those years I ran a village that was ethical and moral. I had no porn, no cursing and you yourself even said that we were one village that rarely needed goons. I helped start DEF CON KIDS, and had the first kids event at def con, was the first and only contest to get a Black Badge in my first year, and helped start over 12 careers – all with little to no support or help.

These accusations are ludicris. Again, I am not upset, just really sad it is going the way it

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

DEF CON KIDS, and had the first kids event at def con, was the first and only contest to get a black badge in my first year, and helped start over 12 careers - and with little to no support or help.

These accusations are ludicris. Again, I am not upset, just really sad it is going the way it is.

I hope you are well and healthy. I would truly avoid giving whatever name you will call this village to stephanie, trust me Jeff. She is terrible, unethical and a liar. You, of course have to make the decisions in the end but I hope as far back as we go you will trust me to help you pick a successor.

Jan 18

**Marc Cjunky**

My first though is this is classic DARVO:

"**DARVO** refers to a reaction perpetrators of wrong doing, particularly sexual offenders, may display in response to being held accountable for their behavior. DARVO stands for "Deny, Attack, and Reverse Victim and Offender." The perpetrator or offender may Deny the behavior, Attack the individual doing the confronting, and Reverse the roles of Victim and Offender such that the perpetrator assumes the victim role and turns the true victim -- or the whistle blower -- into an alleged offender. This occurs, for instance, when an actually guilty perpetrator assumes the role of "falsely accused" and attacks the accuser's credibility and blames the accuser of being the perpetrator of a false accusation."

Its also exactly what I thought he might do regardless - I mean he's made a career out of teaching people to deceive and gaslight. I would return some of his same accusations back to him? Where are his reports of conduct violation or abuse? If he was victimised or the subject of criminal activity, where are his police reports. He's narrative is mirroring the weaknesses in whatever was presented to him. Whats also clear is "X person got angry so I showed why it wasn't my problem" rather than "someone with a disability/ felt uncomfortable / needed support, so I made accommodations to help them to the best of my ability. Its all offensive defense.

The fact that he is cutting and running is also telling. He's offering a "peaceful" exit so that this goes no further. IMHO we should make some show of reaching out to other parties especially ones who can be seen as impartial. However I see nothing given what Grifter said, what the numerous witnesses said to change our course of action.

Its important though that we are seen to take the high road because he WIlLL use it against us and use it to support the crusade narrative he's clearly building. A narrative which sadly will only victimise further and divide the community.

Jan 18

**Marc Cjunky**

Tl;dr The DARVO tactics and behaviour are not unexpected. We should act but while acting, continue to build the evidence to strengthen this for the victims sake.

Whats Blackhats position now he has found time to talk to them? Can we unify and take coordinated action?

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

Tl;dr The DARVO tactics and behaviour are not unexpected. We should act but while acting continue to build the evidence to strengthen this for the victims sake.

Whats Blackhats position now he has found time to talk to them? Can we unify and take coordinated action?

Jan 18

**Darington,** media director

Am I correct that these are mostly justifications for accusations we haven't made?

 +1

Jan 18

**Jeff Moss,** Organizer

Grifter You talked with him the most, what's new in his email?

Jan 20

**Wednesday (Melanie Ensign),** Press Department Lead

I have the same question. In order for us to honestly say he knows why he was banned, we need to tell him. He doesn't need to agree with us, but what he's listed here is really about BH, not DC coc violations.

Jan 20

**Grifter,** Contests & Events Lead

I think it's best to still deliver him a formal communication outlying why he's being asked to step away from DEF CON. This is a "you can't fire me, I quit" tactic. That's fine, but we need to make it clear that DEF CON took a stand against toxic behavior, met with 15+ accusers, heard their stories, and acted.

I don't see anything new in this e-mail other than the same justifications he was making from the start. To CJ's point, we have had no evidence provided to us of wrongdoing perpetrated against him. To my knowledge he's no longer harassing Maxie though he still points to her as the main aggressor. I wasn't familiar with DARVO, but this sounds like exactly that, and he unfortunately may learn nothing from this.

Jan 20

**Wednesday (Melanie Ensign),** Press Department Lead

I suggest being as specific as possible about what we considered toxic behavior without implicated the individuals who reported it. If we're vague, I have no doubt he will publish it with a woe is me context. The more specific we can be, the less likely he'll want that document to see the light of day but we'll have it if we need it legally.

Jan 21

**Jeff Moss,** Organizer

I'm thinking of a draft that tries to accomplish everything we want.

It would be helpful if people could contribute bulletpoints of what we want to include or not include. For example:

- Do not mention specificis.
- Include a statement about how Villages are held to a higher standard because they represent DEF CON
- Don't name names

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

not include. For example:

- Do not mention specificis.
- Include a statement about how Villages are held to a higher standard because they represent DEF CON
- Don't name names
- Assume it will be public so link to our CoC
- Etc.

I'll start writing bits and pieces but would love for everyone to also write bits and pieces I could incorporate.

Jan 24

**Jeff Moss,** Organizer

Here are my half finished thoughts. I could really use some help in formulating a clear direction. It is easy to just keep writing and writing, but that won't help us.

--

The DEF CON Code of Conduct exists to explain what behaviors are unacceptable for attendees, organizers and Goons.

As a Village organizer at DEF CON you and your village are held to a high standard of conduct. You are representing not just yourself and those of your village but the larger community who you attract. Organizers act as an example of the kind of behavior that is acceptable. Because of this we consider activities outside of the convention space when deciding what kind of people we want to associate with, support, and promote.

Based on your email from January xxx 2022 and combined with the voice conversations you had with Grifter it provides us enough information to come to a conclusion on how to handle the CoC violation reports we have received.

----------------

Half finished thoughts, need help.

[Do we start to enumerate everything from Maxie and others? Or?

We received an initial CoC violation report about harassment and retaliatory behavior by you towards a previous employee. The report sounded very unprofessional and when Grifter asked you about it you admitted to the behaviors but had excuses why they deserved what you did to them. You describe those who have come forward as a "group of losers that have no proof and a vendetta." We have seen supporting materials that contradict what you have said and written. You are welcome to supply your own supporting documents, but so far have not

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

by you towards a previous employee. The report sounded very unprofessional and when Grifter asked you about it you admitted to the behaviors but had explained why they deserved what you did to them. You describe those who have come forward as a "group of losers that have no proof and a vendetta." We have seen supporting materials that contradict what you have said and written. You are welcome to supply your own supporting documents, but so far have not.

- You gathered enough details about an ex-employee's personal laptop that you contacted Apple and claimed she had stolen it and asked them to lock it. It took her days to unlock it by showing her sales receipt to Apple. In your email you claim the laptop belongs to you, but on the phone admitted to Grifter that it did not.

-

Your letter to us, providing your justifications for

At no point in your conversation or letter have you

- Accusing Grifter of being a

We have not looked into the Black Hat specific accusations, we have focused on the ones where you have admitted to Grifter your actions or where the C

and in the course of investigating discovered

That led to five other people coming forward with their stories, and then 11 and then 15. We believe there are more such stories out there, we just haven't heard them yet.

---

Jan 25

**Grifter,** Contests & Events Lead

The only issue I see with it is that it mentions me more than it mentions the people who actually accused him so it makes it look like I'm the one who accused him and that I'm the one driving this forward. I was just the guy that Maxie reached out to because she knew I could talk to the people who could make a difference.

I think it's fair to say "You confirmed to Grifter that you had done the things you were being accused of but gave justifications for each of them."

I don't think it needs to have my name in there 5 times so far. Haha. When I read this even I think I'm the one going after him and am the reason he's being asked to leave DEF CON. We had a meeting with 15 people who told stories about the horrible things he has said and done to them, at work, at Black Hat, and at DEF CON. That should be enough.

---

Jan 25

**Jeff Moss,** Organizer

Grifter I got you down to four mentions! We are not mentioning peoples names so I am pretty limited. Any advise in how to deal with that? It's a draft and I need help drafting, please suggest language or changes.

Here is the current version:

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

Grifter I got you down to four mentions! We are not mentioning peoples names so I am pretty limited. Any advise in how to deal with that? It's a draft and I need help drafting, please suggest language or changes.

Here is the current version:

---

The DEF CON Code of Conduct exists to explain what behaviors are unacceptable for attendees, organizers and Goons.

As a Village organizer at DEF CON you and your village are held to a high standard of conduct. You are representing not just yourself and those of your village but the larger community who you attract. Organizers act as an example of the kind of behavior that is acceptable. Because of this we consider activities outside of the convention space when deciding what kind of people we want to associate with, support, and promote.

Based on your email from January xxx 2022 and combined with the voice conversations you had with Grifter it provides us enough information to come to a conclusion on how to handle the CoC violation reports we have received: We are not inviting you and the SE Village back to DEF CON. We surmise you guessed this was going to happen and was why in your letter to us decided not to return with the SE Village this year.

We received an initial CoC violation report about harassing and retaliatory behavior by you towards a previous female employee. The report described several behaviors that are unprofessional, inappropriate, and on-going. When Grifter asked you to stop the behavior you said you would, but just days later you continued by gathering enough details about the personal laptop she used while working for you and then contacted Apple and claimed she had stolen it, getting Apple to remotely lock it. It took her days to unlock it by showing Apple her sales receipt. When Grifter asked you to explain yourself you admitted to the behaviors but had excuses why they deserved what you did to them.

In the past at DEF CON you called Grifter a child molester in front of your SE Village staff because the SE Village space was going to be used for a party in the evening and you didn't like it. So it was not much of a surprise that soon after the first CoC violation report we were aware of other issues, at one point on a conference call with 15 people with stories to tell.

You describe those who have come forward as a "group of losers that have no proof and a vendetta." We have seen supporting materials that contradict what you have said and written. You are welcome to supply your own supporting documents, but so far have not.

----------------

Half finished thoughts, need help.

[Do we start to enumerate everything from Maxie and others? Or?

- In your email you claim the laptop belongs to you, but on the phone admitted to Grifter that it did not.

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

[Do we start to enumerate everything from Maxie and others? Or?

- In your email you claim the laptop belongs to you, but on the phone admitted to Grifter that it did not.

-

Your letter to us, providing your justifications for

At no point in your conversation or letter have you

- Accusing Grifter of being a

We have not looked into the Black Hat specific accusations, we have focused on the ones where you have admitted to Grifter your actions or where the C

---

Jan 25

**Wednesday (Melanie Ensign),** Press Department Lead

I'll spend time on this today. Thanks for getting things started!

---

Feb 3

**Wednesday (Melanie Ensign),** Press Department Lead

Here's a suggested revision -- of note, I've removed Grifter's name to prevent targeted pile-ons, or the perception that Grifter made this decision alone. I also removed the date of his letter as a motivator for our decision, as we had made our decision prior to receiving that correspondence & I don't want the reporting individuals to misinterpret that.

-----------

As a Village organizer at DEF CON you and your village are accountable to our Code of Conduct, and we expect organizers to act as an example of acceptable behavior in the community. Because of this, we consider activities outside of the convention space when deciding who we want to associate with, support, and promote.

Your email correspondence combined with voice conversations held with members of our team, provides us enough information to confirm several CoC violation reports we have received. Subsequently, we are not inviting you or the SE Village back to DEF CON. Based on our communications with you, we suspect this does not come as a surprise and that this situation factored into your decision to leave DEF CON before we can inform the broader community.

You've describe those coming forward as a "group of losers that have no proof and a vendetta." Yet, we have seen supporting materials that contradict this statement.

The initial CoC violation report we received detailed harassing and retaliatory behavior, which you confirmed to our team when confronted about the allegations. In our due diligence to investigate these claims, we spoke with more than a dozen individuals with corroborating examples that demonstrate a repeated pattern of behavior.

To be clear, we have not looked into allegations reported to other conferences. Our decision is based strictly on our own Code of Conduct and the violations reported directly to DEF CON

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

diligence to investigate these claims, we spoke with more than a dozen individuals with corroborating examples that demonstrate a repeated pattern of behavior.

To be clear, we have not looked into allegations reported to other conferences. Our decision is based strictly on our own Code of Conduct and the violations reported directly to DEF CON.

---

Feb 4

**Jeff Moss,** Organizer

I like it Wednesday thank you for simplifying it and preventing me from going down rabbit holes.

One observation is by removing specific examples of bad behavior Chris risks very little by sharing our letter. I know we were alternating between this approach and being specific and factual with enough allegations that Chris would not want to make the letter public. I'm OK either way, curious on why the more general approach? It does hint at more first should people dig and doesn't give him much to gram on legally so that is all good.

I should catch you up on a call I had with BH and their experience in talking with Chris and his COO and someone from this charity. Basically they micro refuted every possible allegation while never acknowledging any possible responsibility for the situation. The only answer why so many people are hating on Chris is because of the on-stage issue a contestant and his wife had (he talks about this in his letter) and it is their vengeance coordinating this vast attack against him.

I caught them up on how Chris already backed out of DEF CON, and how we are still sending him something to explain why.

He missed the deadline to submit training to BH, turning in late, and because of that and the ongoing CoC issues looks like they will drop his training and remove him from the advisory board. I'll see what their timing looks like after we send Chris our letter.

---

Feb 4

**Wednesday (Melanie Ensign),** Press Department Lead

Jeff — I was concerned that in the earlier draft, we only talk about the specific allegations from 1 individual, which singles her out in a way that could cause more retaliation. If we can include details from some of the other folks we talked to, then I think we could more safely accomplish our goal.

For example, "we received and confirmed reports of repeated harassment and retaliation against former employees, and abusive behavior towards volunteers in the SE Village."

What do you think?

---

Feb 4

**Jeff Moss,** Organizer

There is one thing we could try.

In Chris's email he says he he shut down her work laptop. Maxie says it is her personal laptop and has receipts to prove it.

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)


Feb 4 Jeff Moss, Organizer
There is one thing we could try.

In Chris's email he says he he shut down her work laptop. Maxie says it is her personal laptop and has receipts to prove it.

I could ask Chris for receipts to show it was a company asset, and if he can not then it is a blow to the credibility of everything he may be saying.

We could get a copy first from Maxie and if she shares it then we ask Chris and see what happens?

Edited Feb 4  **Wednesday (Melanie Ensign),** Press Department Lead
Does either answer violate our coc? I suggest we focus on the allegations that clearly violate our policy to avoid the perception that we're deviating from the norm or making exceptions.

Agree.

Feb 4  **Jeff Moss,** Organizer
If Chris is lying about that then we can point to his answers being unreliable.

By asking Chris he would know we are on to him, not sure if that makes him go after us less or more?

Feb 4  **Wednesday (Melanie Ensign),** Press Department Lead
I think it's worth having in our back pocket if/when we need it, especially if this gets ugly, but it doesn't change the outcome of our decision, thus I think it's a confusing/distracting element to include in this particular correspondence.

+1

Feb 5  **Jeff Moss,** Organizer
Ok, makes sense.

Grifter Can you ask Maxie for her proof it's her laptop so we have it ready?

Everyone else Darington Marc Wednesday any suggested edits? If not I'll get it ready to email him.

Feb 5  **Wednesday (Melanie Ensign),** Press Department Lead
Nothing more from me unless others want further discussion.

Feb 6  **Marc Cjunky**
Looks good to me. I like the fact its clear concise and doesn't put undue pressure on any of the victims. It also doesn't give him easy footholds to challenge.

**URL**
https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654
**Timestamp**
Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

Nothing more from me unless others want further discussion.

Feb 6 **Marc Cjunky**
Looks good to me. I like the fact its clear concise and doesn't put undue pressure on any of the victims. It also doesn't give him easy footholds to challenge.

Feb 6 **Grifter,** Contests & Events Lead
Same here. I think it looks good.

Feb 6 **Darington,** media director
It's solid. If I had any adjustment to suggest it would be putting the info from the last paragraph into the first paragraph. We take events outside of the convention space into account, but we are not responding to any allegations made at other conventions.

Other than that organizational note, I think it makes the statement that's needed and doesn't leave unnecessary attack surface. Chef's kiss.

Feb 6 **Jeff Moss,** Organizer
Ok so now a procedural question:

I email Chris this, and I'll share it confidently with Black Hat so they know what we have done. Then what?

I was planning to:
- Remove SEV from Basecamp
- Remove SEV from Discord

But do we update our transparency report? This is our communication to Chris, do we make one that is public?

Feb 6 **Wednesday (Melanie Ensign),** Press Department Lead
I would do everything as simultaneously as possible. We drafted language for the transparency report update above in this thread.

Agreed.

Feb 6 **Jeff Moss,** Organizer
With how it has gone are we still good with that transparency language everyone?

Sorry for keep asking for everyone's input but once I do this we can't undo anything.

Feb 7 **Marc Cjunky**
To save everyone scrolling this is the CoC language we landed on for Chris and DCG414:

"We received multiple reports of intimidation and retaliation by a DEF CON Village leader, Chris Hadnagy of the SE Village. After conversations with the reporting parties &

**URL**
https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**
Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

 To save everyone scrolling this is the CoC language we landed on for Chris and DCG414:

"We received multiple reports of intimidation and retaliation by a DEF CON Village leader, Chris Hadnagy of the SE Village. After conversations with the reporting parties & Chris, we're confident the behavior violates our CoC and the severity of the transgressions merits a ban from DEF CON.

We have also taken the rare action to disband DCG414. Code of Conduct violations by the group's primary Point of Contact and subsequent mishandling of the event left us without confidence in the group's leadership."

From my perspective its fine and lines up with everything else.

Agreed

---

Feb 9

**Jeff Moss,** Organizer

I've been going over my messages with Chris and looks like I didn't remember his actual quotes.

Here are what we have to choose from to include in the letter:

"Yah I guess try and think who you believe. Someone you know for 15+ years and a proven track record that has run a successful village for that long, or a bunch of disgruntled ex employees with a penchant for drama and a lack of ethics."

"Sorry you got duped and couldn't see your way through it."

"Ask these ridiculous liars for one shred of proof, I can give you hundreds of people and 20+ years of proof."

What should we use? I suggest:

**You've told us to "Ask these ridiculous liars for one shred of proof." We have, and now have supporting materials that contradict what you have written to us in your statement.**

---

Feb 9

**Wednesday (Melanie Ensign),** Press Department Lead

SGTM

---

Feb 9

**Marc Cjunky**

Looks fine to me but we don't need ro get any further into a back and forth as it makes us sound defensive. All he really need to know is:

"We conducted a thorough review of all the witnesses and evidence. After that review we were left with no doubt that the accusations were both substantial and factual. This leaves us no choice but to......"

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

"We conducted a thorough review of all the witnesses and evidence. After that review we were left with no doubt that the accusations were both substantial and factual. This leaves us no choice but to......"

For example.

Feb 9

**Jeff Moss,** Organizer

Do you suggest dropping the paragraph to stay focused?

Feb 9

**Marc Cjunky**

I don't think its a massive need, but personally I like to keep these clinical and factual. Replying to him validates him. Something neutral that says we performed thorough due diligence avoids answering him while neutralising any accusations we just listened to hearsay.

Feb 9

**Jeff Moss,** Organizer

Here is where we are:

This is what I will **email** to Chris:

As a Village organizer at DEF CON you and your village are accountable to our Code of Conduct, and we expect organizers to act as an example of acceptable behavior in the community. Because of this, we consider activities outside of the convention space when deciding who we want to associate with, support, and promote.

To be clear, we have not looked into allegations reported to other conferences. Our decision is based strictly on our own Code of Conduct and the violations reported directly to DEF CON.

Your email correspondence combined with voice conversations held with members of our team, provides us enough information to confirm several CoC violation reports we have received. Subsequently, we are not inviting you or the SE Village back to DEF CON. Based on our communications with you, we suspect this does not come as a surprise and that this situation factored into your decision to leave DEF CON before we can inform the broader community.

The initial CoC violation report we received detailed harassing and retaliatory behavior, which you confirmed to our team when confronted about the allegations. In our due diligence to investigate these claims, we spoke with more than a dozen individuals with corroborating examples that demonstrate a repeated pattern of behavior.

Jeff Moss
DEF CON

---

Here is what we will post in the **Code of Conduct** update: NOTE MY EDITS AND PLEASE

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

Jeff Moss
DEF CON

---

Here is what we will post in the **Code of Conduct** update: NOTE MY EDITS AND PLEASE COMMENT IF YOU ARE OK Darington Grifter Marc Wednesday

"We received multiple CoC violation reports by a DEF CON Village leader, Chris Hadnagy of the SE Village. After conversations with the reporting parties and Chris, we are confident the severity of the transgressions merits a ban from DEF CON.

We have also taken the rare action to disband the DEF CON Group DCG414. Code of Conduct violations by the group's primary Point of Contact and subsequent mishandling of the event left us without confidence in the group's leadership."

---

Here is what I will post to the **department leaders** so they have a heads up:

Feb 9

**Wednesday (Melanie Ensign),** Press Department Lead

Jeff — Below is suggested language to share with dept leads when you publish the transparency report update. It is intentionally brief & devoid of details in case it's shared beyond the original distribution.

---

Today, we published an update to our transparency report based on reports we received after closing ceremonies in August. Of note, former SE Village lead Chris Hadnagy received a permanent ban from DEF CON for confirmed Code of Conduct violations. To protect all of the individuals who took significant personal risk to report this behavior, we are not publishing further information.

We hope you will also respect their privacy by not fueling rumors or speculation. Anything you say can be attributed to someone associated with DEF CON & we don't want to discourage anyone from reporting violations to us in the future.

Feb 9

**Jeff Moss,** Organizer

How is this?

---

Announcement Heads Up:

Today we published an update to our transparency report based on reports we received after closing ceremonies in August. Of note, former SE Village lead Chris Hadnagy received a permanent ban from DEF CON for confirmed Code of Conduct violations. To protect all of the individuals who took significant personal risk to report this behavior we are not publishing further information - they are not our stories to share.

We hope you will also respect their privacy by not fueling rumors or speculation

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

after closing ceremonies in August. Of note, former SE Village lead Chris Hadnagy received a permanent ban from DEF CON for [illegible] of Code of Conduct violations. To protect all of the individuals who took significant personal risk to report this behavior we are not publishing further information - they are not our stories to share.

We hope you will also respect their privacy by not fueling rumors or speculation. Anything you or your department Goons say can be attributed to someone associated with DEF CON. We don't want to discourage anyone from reporting violations in the future because we were speculating about it online.

If you or your team are asked for a comment please just point whoever is asking to the transparency report or to press@defcon.org ( Wednesday )

Thank you!
Jeff

---

Feb 9

**Darington,** media director
I think both are ready to go.

---

Feb 9

**Jeff Moss,** Organizer
OK, here we go everyone Darington Grifter Marc Wednesday

The Transparency Report has been posted:
https://defcon.org/html/links/dc-transparency.html

Department Leads notified

Email Sent to Chris

SEV archived and Chris removed from our Creators Base Camp project.

👍

---

Feb 10

**Jeff Moss,** Organizer
The online crazy is starting with speculation around if it was sexual in nature. Should we add something to the transparency report to reign that in, like "a not-sexual in nature CoC violation" or go to the bullying and harassment?

I worry about making any additional statements.

Chris tweeted that he has a huge announcement coming in the next couple days so that sounds like legal action.

---

Feb 10

**Wednesday (Melanie Ensign),** Press Department Lead
I suggest waiting a bit. If Chris wants to clear the record about his violations, he's welcome to do so. We have said nothing to imply it was sexual in nature. The coc covers a lot of different possibilities.

**URL**
https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654
**Timestamp**
Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

Feb 10 **Wednesday (Melanie Ensign),** Press Department Lead
I suggest waiting a bit. If Chris wants to clear the record about his violations, he's welcome to do so. We have said nothing to imply it was sexual in nature. The coc covers a lot of different possibilities.

  Agree

Feb 10  **Jeff Moss,** Organizer
Good point. If Chris wants to say something to clarify it, he could say it wasn't sexual and we wouldn't contradict him.

Feb 10  **Darington,** media director
I have some trepidation about adding to the statement as well. I don't like people speculating about the violation, but I have some concern that being too specific just increases the attack surface for his inevitable clap back. There probably isn't a frictionless way through this.

Feb 10  **Jeff Moss,** Organizer
I agree. Chris can make statements as to the nature.

I have to sleep so can everyone here watch over it and I've asked Mel to be in charge while I'm out of it.

I'll be up in 6 hours and after school drop off will be ready.

 

Feb 10  **Wednesday (Melanie Ensign),** Press Department Lead
**Brief & boring update**: News of the ban is spreading through the community & the reaction is predominantly supportive of DEF CON's decision. Some victims stories are vaguely making their way to the community either directly or through trusted proxies, but not many details at this point. I've also seen a few comments from people thinking they deserve to know all the nitty gritty details of someone else's experience, but nothing worth entertaining.

I know a lot of journalists have seen this DC's update posted in some privacy chats/forums that I'm in, but none of them have asked DEF CON about it & I'm not expecting any press coverage at this time.

I will let you know if I see or hear anything that changes my current recommendations of staying calm & quiet.

Feel free to flag any concerns or insights that I might be missing.

Feb 10  **Wednesday (Melanie Ensign),** Press Department Lead
Spoke too soon — we just received an inquiry from a staff writer at Motherboard (not one of the security reporters who attends DC) asking for more details. I am not going to

**URL**
https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654
**Timestamp**
Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

Feel free to flag any concerns or insights that I might be missing.

Feb 10 **Wednesday (Melanie Ensign),** Press Department Lead
Spoke too soon — we just received an inquiry from a staff writer at Motherboard (not one of the security reporters who attends DC) asking for more details. I am not going to respond.

Feb 10 **Darington,** media director
Thanks for the update. I'm pleasantly surprised by the strong support so far.

Feb 10 **Grifter,** Contests & Events Lead
Lots of DEF CON support, so that's great. However, there's so much speculation that I hope it doesn't muddy things up.

I will say there are a lot of "I'm not surprised" or "I could see that coming" type comments. I think more stories are going to come out of this.

Feb 10 **Marc Cjunky**
Had someone come forward with an incident from Derbycon. Explained its outside our remit but that Inwas sorry it happened and hoped this brought them some closure.

Feb 10 **Marc Cjunky**
Also a few folks who referred people to the SE village or to the contest wondering if this was going to blow back on them. I explained this was about one person's behavior that were investigated before action was taken. Expect a few of these - either out of genuine concern or fishing for details.

Feb 10 **Marc Cjunky**
Btw while most of what he did wasn't overtly sexual in nature. Sending people into adult/lingerie stores with a mission objective of stalking members of the opposite sex to ask them intimate questions most certainly was.

Gross

Feb 10 **Darington,** media director
GrrCon's Twitter account DMed for information - I pointed them to press@defcon.

Thx!

Feb 10 **Jeff Moss,** Organizer
I'm just awake starting to get functional but we did get another story about Derby:

01:08
Messages
Geoffrey Vaughan

**URL**
https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**
Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

Feb 10 **Jeff Moss,** Organizer

I'm just awake starting to get functional but we did get another story about Derby:

IMG_2712.PNG · 808 KB · View full-size · Download

IMG_2713.PNG · 654 KB · View full-size · Download

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)



IMG_2713.PNG · 654 KB · View full-size · Download

IMG_2714.PNG · 644 KB · View full-size · Download

Edited Feb 10

**Wednesday (Melanie Ensign),** Press Department Lead

A lot of people know about DEF CON's past mistakes bc we're the biggest, but I will never go to Derby after the stories I've heard & the way the organizers seemingly encourage this behavior on social media. I'm glad we made our decision public so that other cons might rethink their position.

One of the things I've been thinking about today as I read all the comments, is just how long it took for us to become aware of Chris' behavior because we, as a group, weren't trusted enough to be clued in to the concerns already circulating through whisper networks for several years. I hope today's announcement helps encourage more people to report abusive behavior to DEF CON, knowing we will take them seriously & action on their concerns.

I've also been reading a lot of comments from other people in positions of power in the community who claim to have known about this behavior, yet never reported it to anyone ever. How many victims could have been spared the pain & hurt if other people who knew just spoke up? I have no tolerance for these assholes.

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)



I've also been reading a lot of comments from other people in positions of power in the [illegible] who cla[illegible] about [illegible] never [illegible] to anyone ever. How many victims could have been spared the pain & hurt if other people who knew just spoke up? I have no tolerance for these assholes.

Feb 10 **Marc Cjunky**
Jeff look like that makes two then because the person who reached out is female. Wonder how many stories are going to surface now.

Feb 10 **Jeff Moss,** Organizer
Black Hat just told me he is off their review board and no longer training with them. I don't think that is public yet.

Feb 10 **Jeff Moss,** Organizer
Can people please capture any messages or anything that point to other abuses or issues? Chris has threatened lawyers and if it goes that way I'd like a pile of other issues that have come to light.

Roger

Feb 10 **Darington,** media director
does Chris know he's out of Black Hat?

Feb 10 **Jeff Moss,** Organizer
Yes

Feb 10 **Jeff Moss,** Organizer

**URL**
https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654
**Timestamp**
Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)



IMG_2719.PNG · 894 KB · View full-size · Download

Feb 10 **Wednesday (Melanie Ensign),** Press Department Lead
No additional press inquiries today.

Feb 10 **Jeff Moss,** Organizer
I saw a short piece by https://techtarget.com/

Feb 10 **Jeff Moss,** Organizer
We forgot to remove the SEV from Discord, so we just completed that.

Chris banned from our Discord, all the other SEV members were removed from the "village" role but otherwise not impacted. SEV on discord is now waiting to be repurposed by whatever the community comes up with as a replacement.

Feb 11 **Jeff Moss,** Organizer
We await a cease and desist from Chris, let's see what it says.

Feb 11 **Wednesday (Melanie Ensign),** Press Department Lead
Jeff Darington
FYI https://twitter.com/engineered_sass/status/1491944676630450182?s=21

I don't think this is a big deal, but something we didn't think about before.

Feb 11 **Marc Cjunky**

Chris Hadnagy <chris.h@innocentlivesfoundation.org>
Fri 2/11/2022

I am writing to address a situation regarding my involvement with DEF CON. I have been advised that I have been banned from DEF CON due to a violation of their code of conduct (https://defcon.org/html/links/dc-code-of-conduct.html). The problem is someone has made accusations about me, but DEF CON has not told me what they are or presented any evidence to support them.

Let me say this directly: whatever these accusations are, I believe they are false. I'm proud of my organization, and I have always been committed to creating an open, accepting environment for our team members.

DEF CON's code of conduct addresses harassment and discrimination, and I can say with 100% certainty that no one has ever come to me with accusations of harassment or discrimination – not a single person – since I founded the company in 2008. I'm proud of that record.

We value our long-standing relationship with DEF CON and are continuing to communicate with their

**URL**
https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654
**Timestamp**
Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)



Let me say this directly: whatever these accusations are, I believe they are false. I'm proud of my organization, and I have always been committed to creating an open/accepting environment for our team members.

DEF CON's code of conduct addresses harassment and discrimination, and I can say with 100% certainty that no one has ever come to me with accusations of harassment or discrimination – not a single person – since I founded the company in 2008. I'm proud of that record.

We value our long-standing relationship with DEF CON and are continuing to communicate with their leadership with the hope of reaching an agreement. This is a hurtful situation, but I thank you for your support and will keep you updated as this moves forward.

IMG_5189.JPG · 155 KB · View full-size · Download

Feb 11

**Marc Cjunky**

Thats what he blasted to the whole ILF list.

Feb 11

**Marc Cjunky**

Now on twitter. He's going full DARVO. He's the victim, this came out of the blue with no communication from DEFCON. In other groups he's also saying its due to false allegations from an ex employee who stole data.

IMG_5190.PNG · 371 KB · View full-size · Download

Feb 11

**Wednesday (Melanie Ensign),** Press Department Lead

He knows much of this is untrue, but I suggest we avoid going tit or tat with him unless he pushes us to court. We don't need to debate it publicly or provide any more correspondence with him privately that he can twist to suit his interest.

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)



Feb 11

**Wednesday (Melanie Ensign),** Press Department Lead

He knows much of this is untrue, but I suggest we avoid going tit or tat with him unless he pushes us to court. We don't need to debate it publicly or provide any more correspondence with him privately that he can twist to suit his interest.

Feb 11

**Marc Cjunky**

Back
Detail
Trev
@TrevorGiffen
My name is Trevor.
I have a moral obligation to speak up, since not all victims can, and I will not stand to watch a professional peer lie to you.
I have personally seen a case of @HumanHacker abusing someone, while he was fully informed. There are multiple victims, he knows.
10:41 PM - 11 Feb 22 via Twitter Web App
Reply
Retweet
More

IMG_5191.PNG · 403 KB · View full-size · Download

Feb 11

**Darington,** media director

As far as I'm concerned, this isn't a twitter poll. DEF CON has no compelling interest in inviting the internet to litigate the ban, or to harass the accusers.

It's especially useless to trade blows with him if he's going to argue in bad faith. He has been contacted. He does know what he's accused of. He does know there are multiple accusers, not one disgruntled employee. He further has been let go by Black Hat in even more explicit terms than ours. He's presenting himself as a blindsided victim of secret accusers, so engaging him is a waste of everyone's time.

We met with the accusers. We found them credible. The accused acknowledged several of the incidents. We acted in exactly the manner our CoC requires, and the stakeholders in the action are aware of our reasoning. It's honestly only because of our long relationship that we took as long as we did to make a statement.

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

in the action are aware of our reasoning. It's honestly only because of our long relationship that we took as long as we did to make a statement.

Feb 11

**Jeff Moss,** Organizer

Marc too bad Trevor has a locked account, doesn't really help us unless we get to a deposition phase.

We should think about saying something simple and review our options:

- Don't respond and let him drive the narrative
- Release our email to him?
- Release details from his email to us where he reveals his knowledge of complaints?
- something else?

Feb 11

**Jeff Moss,** Organizer

Darington Thats almost a perfect statement to make if we were to do so.

Feb 11

**Jeff Moss,** Organizer

Sorry for all the messages, just getting up to speed if what happened over night.

We could ask Grifter to say something short like "Dude I to you for hours several times" or whatever is accurate. It wouldn't come from the DEF CON account but would show some push back.

Feb 11

**Grifter,** Contests & Events Lead

Oh, I wanted to do that, believe me. But it's not my place. If we have any next move it's a screenshot of his communication to DEF CON so everyone knows that he is lying to them.

Feb 11

**Jeff Moss,** Organizer

What do you make of his "we are
Talking with DEF CON leadership"?

Feb 11

**Jeff Moss,** Organizer

FYI Looks like Panadero just rage quit over DEF CON not providing enough details, and if it didn't happen at con it isn't our problem. I've removed him from BC projects.

Feb 11

**Darington,** media director

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

6:55

Reader

@MalwareJake

Transparency reports at conferences were never intended to be transcripts for "the community" to draw their own conclusions about an event.

Their purpose is to provide accountability so the con can't just ignore abuse reports. This has definitely happened at some cons. 1/

The reports also help outsiders evaluate whether they want to attend a given con by understanding the frequency (and sometimes types) of issues experienced historically. If you want to claim a transparency report is deficient, explain why (in that context). 2/

IMG_7412.PNG

6:55

Every complaint I've seen in the last 48 hours has been some variation of "but I don't know specifics, how do I know this is fair?"

If this is your concern, YOU ARE NOT THE INTENDED BENEFICIARY OF THE REPORT. The report is intended to show that complaints are not ignored. 3/

I've also seen whining about "but if I don't know what happened, how do I avoid a similar fate?" The answer is simple my friends:

Don't be an asshat. Period.

If you're worried how close to a "permanent ban" line you are, the conference probably doesn't want you there. 4/

But in this particular case, it's not some rando getting cancelled. It's the person who founded and runs

IMG_7413.PNG

6:55

you there. 4/

But in this particular case, it's not some rando getting cancelled. It's the person who founded and runs the biggest village at the conference. Their CTF winner is awarded a black badge every year.

Do you REALLY think organizers didn't do their due diligence? SERIOUSLY? 5/

I applaud @defcon for both taking action AND protecting victim details. Let's not pretend that revealing details won't lead to unmasking victims - and whose interests exactly does that serve?

Take the report at face value or don't, but nobody owes you an explanation. /FIN

Aa

IMG_7414.PNG

Feb 11

**Darington,** media director

Has Chris reached out to you? I read his comment as a stall tactic, but it's a weird one.

Feb 12

**Jeff Moss,** Organizer

No reach out that I know of. Just saying they are sending over a cease and desist from his lawyers.

Feb 12

**Jeff Moss,** Organizer

Two thoughts:

- We have our legal team spinning up and should be ready end of Monday. If they send us a C&D would we mention that? What I'm getting at is if this is a dual battle, legal and social, let's think through our moves. Obviously we will follow legal advice but not sure staying silent forever is viable long term. We will know more once we read his complaint.

- If Chris starts to fund raise for a lawsuit against us do we have a response or do we start our own defense fund?

Feb 12

**Darington,** media director

I would defer to the attorneys about what legal actions we should make public. I imagine it depends a bit on exactly what he wants us to cease or desist.

If it's talking about him, fine. We don't have a reason to talk about him beyond what we've already made public.

We can start working on a minimal clarifying statement for some future point, but my sense is that doing that in advance of knowing the nature of his complaint is

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

If it's talking about him, fine. We don't have a reason to talk about him beyond what we've already made public.

We can start working on a minimal clarifying statement for some future point, but my sense is that doing that in advance of knowing the nature of his complaint is negotiating against ourselves.

  

Feb 12

**Jeff Moss,** Organizer

Here is his email:

> Jeff,
>
> The decision to exclude me from this year's DEF CON conference is absurd, insulting and wrong. I am a committed member of this community and have been for nearly two decades. Baseless, unfounded accusations have been made against me without a single shred of evidence – not a single shred. What's worse, I was never given the opportunity to defend myself.
>
> Here's what I can say: these accusations are absolutely false. I'm proud of our company and am committed to creating an open, accepting environment for our team members. No one has ever been accused of harassment or discrimination – not me, not a single person – since I founded it in 2008. I'm proud of that record.
>
> We value our long-standing relationship with DEF CON and would like to continue our partnership. This is a hurtful situation, but I am hopeful that we can continue to work together. I look forward to having a conversation with you and directly addressing any questions you may have.
>
> Christopher Hadnagy

Edited Feb 12

**Darington,** media director

It's more conciliatory than I was expecting. I don't know why he's sticking to the story about being blindsided, but it's a better posture than threats.

I also don't know what shreds of evidence he's looking for beyond a dozen or so members of our community reporting that he mistreated them. We're not arraigning him, we're kicking him out of a party we throw.

And lastly, I don't know how he can say they accusations are categorically false when he's already acknowledged some. Hard to tell exactly where his head's at.

Feb 12

**Marc Cjunky**

Jeff trevor's account wasn't locked when I posted those. He also posted another case

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

Feb 12

**Marc Cjunky**

Jeff trevor's account wasn't locked when I posted those. He also posted another case of harassment against a blind trainee. Ill post the screenshot below.

I'm fairly confident he would be cooperative for the right reasons, he just doesn't want to engage in the dama back and forth.

TrevorGiffen
Detail
Trev
@TrevorGiffen
Finally, I was asked to share these two links, without context:
1. linkedin.com/pulse/water-my...
2. shafpatel.wordpress.com/2015/05/21/hel...
I wish good luck and good health to anyone affected by him.
This will be my final statement on the matter, I will not be replying to anyone.
10:44 PM - 11 Feb 22 via Twitter Web App
47 likes 7 retweets
Reply
Retweet
More

IMG_5193.PNG · 507 KB · View full-size · Download

Feb 12

**Marc Cjunky**

Darington its surprising to me too. He seems to be navigating the path of a wholly innocent victim. Which is probably his least defensible option given all that went on.

I wonder if he was backed into a corner or something? Its a far cry from the defiant "they deserved it" attitude he gave to Grifter.

Jeff for now personally I would continue staying out of it. Public opinion has most definitely turned against him. The obviously transparent lies he's told aren't sticking. What we really need is more advocates to stand up and say something instead. Trevor's statement last night did the most damage out of any single statement.

Maybe one of the respected community members who knew / had heard something like Deviant?

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

statement last night did the most damage out of any single statement.

Maybe one of the respected community members who knew / had heard something like Deviant?

Anything we say risks dragging us into the back and forth or damaging the position we are being congratulated for.

Feb 12

**Jeff Moss,** Organizer

The Black Hat removal Deviant pointed out hasn't seemed to catch on much yet, but it is another front in his battle that could flare up. I'm not sure what his angle is.

One email he is saying the lawyers are sending over a C&D and the next is this wanting to sort it out.

I'll wait a couple days and see if a C&D shows up while we get our legal team up to speed on all these exchanges. They were briefed when we were planning, but now that we have gone live and stuff is happening I want to make sure before we make any big moves that they can provide us advice.

Feb 12

**Wednesday (Melanie Ensign),** Press Department Lead

Completely agree with the suggestion to stay out of it for now. There's no reason to even respond to Chris at this point, IMO. Everything he's doing right now is performative with no indication of remorse or concern for others. It's a good idea to get the lawyers ready, but from a PR perspective, there's no reason for us to change course atm. It's only been 2 days & the community is stepping up more than we expected. Remember, our goal is not to establish peace with Chris, it's to protect the community, including his victims, & we can do that best by not engaging.

Agree

Feb 12

**Wednesday (Melanie Ensign),** Press Department Lead

Here's another example of Chris bullying someone: https://twitter.com/infosecsherpa/status/1492282845779398664?s=21

Feb 12

**Jeff Moss,** Organizer

Based on what I have heard I expect some are talking to reporters, once (if?) those stories are told things might heat up again.

Feb 12

**Wednesday (Melanie Ensign),** Press Department Lead

Very possible. Let's see who (if any) reporters come to us for comment & we'll determine whether we need to say anything else at that time. If victims are speaking to media, I don't want DEF CON to take over the focus. As we've said all along, these are not our stories to tell.

Additionally, not participating in press coverage provides additional protection against claims that we're proactively going after anyone.

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

media, I don't want DEF CON to take over the focus. As we've said all along, these are not our stories to tell.

Additionally, not participating in press coverage provides additional protection against claims that we're proactively going after anyone.

Feb 12

**Marc Cjunky**

Honestly im proud of the community response. Other than a few trolls most get it and more importantly they get why we did it this way.

Agree

Feb 12

**Marc Cjunky**

Looks like someone has put up a twitter account to call him out. Each of the tweets so far is a challenge against his statements.

http://twitter.com/TwitFit5/status/1492530336508661760

Feb 13

**Marc Cjunky**

On a related tangent, there have been a lot of folks decrying the transparency report for "not being transparent enough". I disagree with them, I think it achieves what it is supposed to.

That said, once this all cools down and legally we think we are on safe ground, I think there may be an opportunity for a blogpost walking people through the CoC and actions we take or have taken (without specifics obviously).

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)



But they aren't know. And that's a problem.
@ErrataRob
The world is full of jerks that a conference like DEF CON would not want. There's definitely too few bans rather than too many. It's just that non-transparent process will eventually mete out punishment based not on guilt but politics.
7:04 AM - 13 Feb 22 via Twitter Web App

IMG_5195.PNG · 1.11 MB · View full-size · Download

Feb 13

**Jeff Moss,** Organizer
Hopefully if stories are told through reporters we will have less explaining to do.

Feb 13

**Jeff Moss,** Organizer
I was thinking, are there links to some resources around abuse and education we could include on the transparency report or elsewhere? It feels like the people who know a bit about abuse are doing a lot of explaining, it would be good to point to some expert well respected guides or explainers.

Feb 13

**Marc Cjunky**
Theres quite a few. We can also seek advice from peers who work in the field to help curate the list. Katelyn Bowden for example. Happy to kick that of and report back to you.

Feb 13

**Jeff Moss,** Organizer
Yes please. Then we can build a mini FAQ for the Transparency Report that can help explain why we do what we do.

- Why do you not publicly identify those who file a CoC complaint?

- Why do you not give every detail to the person accused of violating the CoC?

- Why is it wrong to expect people to publicly relive their experiences to "be transparent"?

- How do you perform an investigation if there is bad faith by a party?

Things like that which will be useful now and for future incidents.

Will do.

Feb 13

Jeff Moss, Organizer
Wednesday

Messages
Shaun Nichols

**URL**
https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**
Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)





IMG_2810.PNG · 288 KB · View full-size · Download

Looks like he writes for @ SearchSecurity

Edited Feb 13

**Jeff Moss,** Organizer

Marc Can you reach out to them and see if they would file a report?

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

Hello! While I'm (@ivydigital / @ivydigitalstorm) looking at this one count of sexual assault at DEFCON 25 by Joel Klein against a female member of the Hacker Women team was reported to me and Sophia Fadli in 2016. That happened at DEFCON. Thanks for your time.
2h

IMG_2811.PNG · 368 KB · View full-size · Download

They seem to be a bit odd in their sentence structure and way they phrase things:

Mentions
Search Mentions
Hacker Women @HackerWo... 13/2/22, 18:31
Yes, @humanhacker is one statistic, the one in question; however: In a world of shifting goalposts it is critical to be able to validate the integrity of the reporting mechanism despite the changes.
The reporting mechanism here is @defcon, the reporting party is: [insert code]
Hacker Women @HackerWo... 13/2/22, 17:59
At @defcon this comes to question DC's ability to provide transparency, or, therefore prove how @humanhacker violated Code/ Policies of the #defcon CoC according to each report of violation that was received.
Hacker Women @HackerWo... 13/2/22, 17:51
For Folks looking - Per this @defcon Transparency Report: defcon.org/html/links/ dc-...

IMG_2812.PNG · 737 KB · View full-size · Download

Insert code?

Feb 13

**Wednesday (Melanie Ensign),** Press Department Lead

Jeff — Shaun hasn't sent anything to press@. His article implies he's been reaching out to your email directly.
https://www.techtarget.com/searchsecurity/news/252513274/DEF-CON-bans-social-engineering-expert-Chris-Hadnagy

Any response at this point could fuel another update/headline from him, so I'd just ignore it for now, but I am monitoring his comments on Twitter.

**URL**
https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654
**Timestamp**
Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

Any response at this point could fuel another update/headline from him, so I'd just ignore it for now, but I am monitoring his comments on Twitter.

Feb 13  **Jeff Moss,** Organizer
OK when if he responds to me I'll point him to press@defcon

Feb 13  **Wednesday (Melanie Ensign),** Press Department Lead
Marc I wouldn't suggest Katelyn. She's also a common character in the whisper network of grifters & abusers (including police reports). There are many others to choose from.

Feb 13  **Wednesday (Melanie Ensign),** Press Department Lead
Jeff Marc — what a lot of folks are missing since we obviously can't say this, is that we were less detailed with Chris' behavior because several of the reports were specifically about retaliatory behavior & he know he has both the ability & pattern of behavior to do even more harm to the reporting individuals. He knows what he did, but he doesn't know the names of everyone who reported it (some of who were victims & others were witnesses). This could be a good point to make in the FAQ.

Feb 13 **Wednesday (Melanie Ensign),** Press Department Lead
Marc I would suggest a mix of experts from our community, survivor advocates, & former/current LE. This way we're including some of our own, but also signally the value of outside perspectives. Too often our community assumes we're flying by the seat of our pants, which they perceive as justification to pretend they have equal qualifications to judge.

I'm happy to share any of my contacts I have if you want.

Completely agree

Feb 13  **Jeff Moss,** Organizer
Are there some good guides from national abuse support groups? Sort of like how we work with Kick The Darkness to help with our on-site hotline?

Feb 13  **Wednesday (Melanie Ensign),** Press Department Lead
Checking.....

Feb 18  **Jeff Moss,** Organizer
I haven't heard any more from Chris, all is quiet. Anyone hearing anything?

Feb 18  **Wednesday (Melanie Ensign),** Press Department Lead
Nothing on my end for the past few days.

**URL**
https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654
**Timestamp**
Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

I haven't heard any more from Chris, all is quiet. Anyone hearing anything?

Feb 18

**Wednesday (Melanie Ensign),** Press Department Lead

Nothing on my end for the past few days.

Feb 25

**Jeff Moss,** Organizer

Is anyone Grifter Marc Wednesday talking with Alethe? She is saying incorrect stuff based on sekret DEF CON sources.

IMG_2880.JPG · 274 KB · View full-size · Download

Feb 25

**Marc Cjunky**

Nope, also tbh doesn't sound like anyone in this small group based on the inconsistencies - like you writing the statement, only you hearing the statements etc.

Feb 25

**Jeff Moss,** Organizer

Yeah, it's kinda weird like why inject herself with wrong info?

Feb 25

**Marc Cjunky**

Seems like someone is claiming to be "super sekret inner circle" and is making shit up to prove it.

Feb 25

**Jeff Moss,** Organizer

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

Feb 25 **Marc Cjunky**
Seems like someone is claiming to be "super sekret inner circle" and is making shit up to prove it.

Feb 25 **Jeff Moss,** Organizer
We got another email from Chris, waiting for legal feedback. Needless to say he acknowledges no responsibility.

Feb 25 **Wednesday (Melanie Ensign),** Press Department Lead
I haven't said anything & highly doubt she's talking to anyone with actual knowledge of this group. Whoever is talking to her (if anyone) must know this is untrue since everyone who actually knows (us here) would never put this all on Jeff. Jeez.

In fact, the way it's spun to say that the decision was made only after Chris decided to leave makes me think she's talking to Chris himself or one of his close supporters.

Feb 25 **Wednesday (Melanie Ensign),** Press Department Lead
Perhaps these lies are what Shane is telling people in these 1x1 calls?

https://twitter.com/reggblinker/status/1496879197020901377?s=21

Feb 25 **Jeff Moss,** Organizer
Please note: No one should talk to or respond to Chris, he is seeking to get us to make admissions he could use in a lawsuit.

💯

Feb 25 **Jeff Moss,** Organizer
Chris has posted publicly

https://www.social-engineer.org/general-blog/chris-hadnagys-official-statement/

I'm not sure if he is trying to box us into responding or not.

Feb 25 **Jeff Moss,** Organizer

I'm sure you already saw, but just in case: https://twitter.com/humanhacker/status/1497402381256077314?s=21
12m
Is he delusional? What's your take?
5m

**URL**
https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**
Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)



Is he delusional? What's your take?
5m
He is not delusional, he is attempting to mastermind this situation. He believes that he can undermine your credibility by denying any evidence.
4m
It's insidious and he knows exactly what he's doing, he's playing the victim and employing DARVO. 3m

IMG_2887.PNG · 463 KB · View full-size · Download

Edited Feb 26

**Darington,** media director

Frustrating. Admitting he has communicated with you while claiming he never 'talked' to you is some s-tier hairsplitting. So is pretending that talking to Grifter at length doesn't count as talking to DEF CON.

But this isn't a court filing. We don't owe him an adversarial trial and a vigorous defense. You can 'talk' to him if you want, but he has no valid reason to think we'd reinstate him if he offers a good enough excuse. He wants something to pick apart. He wants the chance to claim the complainants deserved it, or can't be trusted. We are not obligated to indulge him.

Feb 25

**Wednesday (Melanie Ensign),** Press Department Lead

I think he's simply trying to get something out there that he can point his business contacts to while most folks are thoroughly distracted, on a Friday, while everyone is focused on Ukraine.

Our #1 objective is still to protect his victims & other reporting parties. Nothing he says changes that & commenting would only make out objective harder.

From a DEF CON PR perspective, even with the lies & spin of words in his post, I'm not concerned that this will have any lasting or negative impact on the organization's reputation with the communities we care about.

Truth

Feb 25

**Grifter,** Contests & Events Lead

Alethe seems pretty off base there. She's smart, so someone fed her the wrong info and

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)



Truth

Feb 25

**Grifter,** Contests & Events Lead

Alethe seems pretty off base there. She's smart, so someone fed her the wrong info and she's upset. But someone fed Panadero the wrong info and he got upset too. There are people who think they know what's going on and those people are talking, but it doesn't sound like any of us. There's just too many errors.

I can say that people are starting to wonder why DEF CON is being so quiet. We are losing some public support because of the silence. I've seen several things on group chats or Discords. I'm of the opinion that we HAVE to say something. Anything. The silence allows him to control the narrative and he is playing chess. He is lying without challenge and it's working.

Is it frowned upon to make a post that says "We are aware of the statements being made by Mr Hadnagy, however due to the overwhelming evidence against him we stand by our decision. We remain silent not because we believe we're making a mistake, but to protect the parties involved. We're confident in our decision and we're confident as time progresses we will be shown to have stood on the side of what was good and right. That being said, Mr Hadnagy has indicated he is seeking legal action against DEF CON and so unfortunately we can't comment further at this time. Thank you all for your support."

It still doesn't address some of the details, which I think we should actually do, but it does get the point across that we're not silent out of fear or regret.

I'd love to go further and say "As clarification has been requested, the allegations brought against Mr Hadnagy are of a bullying and general harassment nature, they took place at DEF CON, and outside of DEF CON. But please understand our Code of Conduct extends beyond 4 days in Las Vegas. We do not condone bullying, harassment, or intimidation, even if they were limited to the other 361 days of the year. DEF CON doesn't end when we leave the conference, for many of us it's part of who we are and we will stand up for our values regardless of when and where those values are threatened."

Just my $0.02.

Feb 25

**Grifter,** Contests & Events Lead

I'll also throw something else out there. He desperately wants to talk to Jeff. I think we should give him the opportunity to have the call he initially refused to take due to time zone issues. Give him another shot to talk to us. To say his piece and hear what we have to say. I'm willing to be on that call. Then the "They refuse to talk to me." has to stop.

Also, he hasn't mentioned anything about being removed from the Black Hat Review Board and no longer training this summer. Black Hat did have a call with him and decided to cut ties. So he heard their side and I'm sure they heard his but they still stepped away. There's no mention of that anywhere.

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

Board and no longer training this summer. Black Hat did have a call with him and decided to cut ties. So he heard their side and I'm sure they heard his but they still stepped away. There's no mention of that anywhere.

Feb 26

**Jeff Moss,** Organizer

I like the idea of your reiteration and acknowledgment statement.

If we did clarify we could add something like "as of today there have been no sexual allegations we are aware of."

I wonder if victims will see his post and respond? Or if articles get written? In either or both scenarios does reiterating hurt? Wednesday

Feb 26

**Jeff Moss,** Organizer

More feedback:

— you've taken action and will not reverse it.

— He is gaslighting you.

— Giving a statement will lead to more short term noise and, frankly speaking, chaos for both sides (DC and Chris — none of us—"the victims"—have been outed yet).

The long term probable outcome of doing nothing on your side will likely lead to speculation and ultimately a dent in your (DC's) reputation, as the collective ire and imagination of the internet is truly, astoundingly corrupt. Your silence this week will be what ILF's was last week — a breeding ground for speculation.

I would seek to make a statement with BH.

Your silence allows him to control the narrative and he is capitalizing on that — I think his confidence is rebuilding. He's rewriting history in his head again and pushing it forward as fact. Now

IMG_2891.PNG · 673 KB · View full-size · Download

Edited Feb 26

**Wednesday (Melanie Ensign),** Press Department Lead

It's my professional opinion that another formal statement adds fuel to the fire here & sets an unhealthy precedent of getting bullied into crossing our own boundaries. Our discomfort at some of the comments & speculation is short term & most of the community has already accepted our decision & moved on.

Giving Chris (& his lawyers) more words to dissect & twist apart doesn't help us or his

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

It's my professional opinion that another formal statement adds fuel to the fire here & sets an unhealthy precedent of getting bullied into crossing our own boundaries. Our discomfort at some of the comments & speculation is short term & most of the community has already accepted our decision & moved on.

Giving Chris (& his lawyers) more words to dissect & twist apart doesn't help us or his victims. The reason BH isn't getting mentioned in anything is because they're mot saying anything. We knew making our decision public would raise eyebrows, but we did it to protect others.

That said, if we simply cannot live with a minority of the community believing they deserve more details, I suggest we wait until next week to see if the weekend changes anything. Then, if we must, I can engage with the reporter from TechTarget who expressed interest early on — he was willing to talk on background, so we can get some important points clarified without direct quotes.

If we go this route (which I'm only recommending over issuing another statement, my best advice is to sit tight), here's what I suggest we emphasize with the reporter:

- we received more than a dozen independent reports about Chris' behavior
- DEF CON did not receive any reports of a sexual nature, but of harassing and abusive behavior
- many of the reports include also instances of retaliatory behavior from Chris so we are not sharing any details that would help identify them by Chris or his team
- DEF CON's leadership team made this decision together, unanimously
- Chris has talked to other members of this team where he confirmed enough of the reported behavior to warrant a ban
- he was informed of our decision late last year so we are surprised that he's acting surprised now
- our #1 objective is to protect his victims & we're willing to take heat for that

Feb 26

**Marc Cjunky**

Im not sure about the wisdom of this either. To provide more details now erodes the position we took amd could backfire. "If they were happy to share details now, why not earlier".

We have never provided "further justification" and I don't think we should start now.

Also Chris is deliberately leaving a vacuum IMHO. That doesn't mean we have to fill it and give him more words to twist. Instead if we do anything we should consider alternatives.

For example can we persuade some of the victims to use their voice? Its their story, they are the only ones with a right to tell it. For example of there was a piece written with stories from some of the training class victims and some of the harassment victims that would end further discussion.

Another option is to write a blog about how we handle these situations. How the fact are weighed, what the process looks like and the threshold we have to reach in order to make different levels of decision. This would boost transparency without back peddling on not revealing more details.

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

would end further discussion.

Another option is to write a blog about how we handle these situations. How the fact are weighed, what the process looks like and the threshold we have to reach in order to make different levels of decision. This would boost transparency without back peddling on not revealing more details.

Feb 26

**Marc Cjunky**

Also Wednesday I would not say "we didn't receive reports of a sexual nature". We technically did. Sending people to harass shoppers with intimate questions in lingerie stores as a "training mission", harassing people about sexual preferences and intimate information all fall into the umbrella of sexual harassment in my books.

Fair

Feb 26

**Marc Cjunky**

Thinking out loud, do we have a friendly reporter who we know would handle this sensitively? If so, prepping them and giving them transparency could be a good way to achieve both. Although I still think a blog on our process is needed both for this and any future incidents. It was a fair call-out from many of our supporters that anonymous metrics are weak when the process itself is opaque.

Feb 26

**Wednesday (Melanie Ensign),** Press Department Lead

Transparency on the process makes sense — my concern is the timing. If we publish a blog post now, it will be seen as a response to Chris' statement. I'd suggest waiting until closer to DC30 so we can publish as a preparatory action based on several years of experience with the transparency report versus a reaction to any specific individual.

Feb 26

**Marc Cjunky**

Or if we do decide to support a journalist we can use that to provide details and then following up with a blog post would feel natural and unconnected to Chris's comments?

Feb 26

**Wednesday (Melanie Ensign),** Press Department Lead

Not if we do it now. The current context is still Chris & even for a trusted journalist, the situation with Chris is what makes it a story they can sell to an editor. I can't see a reporter caring about our process unless there's adequate conflict.

Fair

Feb 26

**Jeff Moss,** Organizer

This thread on twitter: Doesn't seem to have gotten much attention yet but Bart seems accurate in everything he said.

mantisek @mantisek 26/2/22, 05:28

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

Feb 26 **Jeff Moss** Organizer

This thread on twitter: Doesn't seem to have gotten much attention yet but Bart seems accurate in everything he said.

IMG_2892.PNG · 1.27 MB · View full-size · Download

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)



IMG_2893.PNG · 1.05 MB · View full-size · Download

IMG_2894.PNG · 1.02 MB · View full-size · Download

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

mantisek @mantisek 2/26/22
@theStump3r @humanhacker @defcon @thedarktangent Okay, thank you. That was the straight answer I was looking for.

IMG_2895.PNG · 569 KB · View full-size · Download

---

Feb 26

**Grifter,** Contests & Events Lead

I think expecting the victims to come forward with their stories is off the mark. They came to DEF CON because they were scared and wanted us to give them a sense that they did have leverage, backing, and someone that would stand for them. They are looking at us to be their voice and we're being silent. We may be doing the "right thing" from a legal or PR standpoint. But staying silent isn't doing the right thing by them. I have now gotten several messages from victims asking when/if we'll respond and saying they hope we will. They do want to speak, they do want to be heard, but they're scared. They don't have the weight DEF CON has. Chris can crush them, but he can't crush DEF CON.

He's playing a game here. Publicly asking us to speak while privately threatening with lawyers to silence us. This is what he has done to these victims and now he's doing it to us. I can't be the only one that sees that.

---

Feb 26

**Marc Cjunky**

> He's playing a game here. Publicly asking us to speak while privately threatening with lawyers to silence us. This is what he has done to these victims and now he's doing it to us. I can't be the only one that sees that.

I completely agree. This has his MO written all over it.

However I think our position is more complicated than just speaking up for the victims. He is almost certainly also hoping that we will defend our position so he can twist those words. The more we allow him to put us on the defensive, the more we give him.

I don't like not responding any more than you do. I just don't see any upside. Those that are defending him won't be swayed by a few more anonymous facts amd the moment we go into details we identify victims.

I also agree that we shouldn't put any pressure on the victims to come forward. Thats why I was hypothesising about a "me too" style article with a friendly journalist. However Wednesday has shown where the risks are there.

Im open to other ideas personally. I hate biting my tongue in the face of this.

---

Feb 26

**Wednesday (Melanie Ensign),** Press Department Lead

I'm not sure why we're so uncomfortable with people who don't respect victim privacy saying shitty things about us. This is the very behavior we're trying to eradicate. Doing the right thing is often hard & uncomfortable, but months ago we anticipated Chris

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

Feb 26

**Wednesday (Melanie Ensign),** Press Department Lead

I'm not sure why we're so uncomfortable with people who don't respect victim privacy saying shitty things about us. This is the very behavior we're trying to eradicate. Doing the right thing is often hard & uncomfortable, but months ago we anticipated Chris would make this into a shit show & we still came to the same conclusion & approach because of the individuals who came forward. I truly don't think this is something that will hurt DEF CON long term, in fact, I think our resolve makes vulnerable people feel safer & the comments we've seen in support of our position are a 180 pivot from what people said about us after we banned CC.

However, I do agree with the need previously mentioned for some community education down the road on our process & the basics of protecting victims....maybe in a month or two. Something like, "there have been questions in the past about how all this works & as we look to DC30, let's be clear about what everyone can expect..." & include info about how we investigate & make the call as a team, & a few links to external resources from advocacy groups (I'm working on gathering those now).

I will also note that at this particular moment in time, official statements from US organizations about anything other than the deadly situation in Ukraine are coming across publicly as tone deaf & insensitive.

Feb 26

**Jeff Moss,** Organizer

I just spent time with our lawyer and the feeling is we still stay quiet. From a legal standpoint he has nothing and we can only aid him as he tries to get us to make unnecessary admissions.

We could do a statement that we stand by our original post (basically nothing new in it for us to get drawn into) but the benefit from that may not be worth the extra news churn.

We have not gotten any legal communication from him yet, just his demands to "cease and desist" and to stop slandering him. Both of those make no sense from a legal standpoint so he would have to cook up something else. We don't want to give him any ideas.

Feb 26

**Jeff Moss,** Organizer

For the records, a thing from 2015

https://shafpatel.wordpress.com/2015/05/21/hello-world/

Feb 26

**Grifter,** Contests & Events Lead

I'm sorry, but this is not just for people who are on Hadnagy's side. People are starting to say that this looks bad on DEF CON for staying silent and for not being clear in the transparency reports. These are well known people in the community. DEF CON Goons, Speakers, Contest and Village Organizers, and long time attendees. I don't know how much everyone is surrounded by the chatter, but I'm deep in it and the messages are that our silence is bad. We are not talking about laying out the specific allegations,

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

I'm sorry, but this is not just for people who are on Hadnagy's side. People are starting to say that this looks bad on DEF CON for staying silent and for not being clear in the transparency reports. These are well known people in the community. DEF CON Goons, Speakers, Contest and Village Organizers, and long time attendees. I don't know how much everyone is surrounded by the chatter, but I'm deep in it and the messages are that our silence is bad. We are not talking about laying out the specific allegations, we're talking about standing by our statement and choice.

Our continued silence will only communicate to future victims that DEF CON will hear them, may even act, but they won't back them up while their attacker continues to deny any wrongdoing.

I will once again state, we should release this statement:

"We are aware of the statements being made by Mr Hadnagy, however due to the overwhelming evidence against him we stand by our decision. We remain silent not because we believe we're making a mistake, but to protect the parties involved. We're confident in our decision and we're confident as time progresses we will be shown to have stood on the side of what was good and right.

As clarification has been requested, the allegations brought against Mr Hadnagy are of a bullying and general harassment nature, they took place at DEF CON, and outside of DEF CON. But please understand our Code of Conduct extends beyond 4 days in Las Vegas. We do not condone bullying, harassment, or intimidation, even if they were limited to the other 361 days of the year. DEF CON doesn't end when we leave the conference, for many of us it's part of who we are and we will stand up for our values regardless of when and where those values are threatened.

That being said, Mr Hadnagy has indicated he is seeking legal action against DEF CON and so unfortunately we can't comment further at this time. Thank you all for your support."

I have been involved in this more than I wanted to be. I've been there since the first call and these people are still contacting me asking us to act.

I've been asked to remain silent and I'll do so, but I've never disagreed with DEF CON more.

---

Feb 26

**Jeff Moss,** Organizer

I'll noodle on an edit to your statement. I think if we have to release something it should also mention that protecting victims is goal #1.

Chris wants something he can debate with us. Black Hat took the cowards way out by not mentioning their actions - he needs victims to remain silent so he can control the story.

He wants something to grapple with and our silence is driving him crazy at the same time protecting us legally. Anything we say can't give him anything to use beyond what we have now.

So that leaves is with:

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

He wants something to grapple with and our silence is driving him crazy at the same time protecting us legally. Anything we say can't give him anything to use beyond what we have now.

So that leaves is with:
- a Grifter style restatement
- a statement about our process
- statements about abuse and abuse resources that once people read they can pick up on why we are behaving the way we are, protecting victims and not asking them to relive the abuse.
- ?

Feb 26

**Grifter,** Contests & Events Lead

A statement about abuse and abuse resources should be done, but doesn't address the matter at hand. That should be tabled for now.

The statement I drafted doesn't give him anything to pick apart beyond "But you still won't talk to me!" But we address that in the final line about the fact that he has threatened legal action.

It also addresses our silence by saying "We remain silent not because we believe we're making a mistake, but to protect the parties involved." It shows who we side with and that we stand with and for them.

It also addresses his claims that this is none of DEF CON's business because it happened outside of DEF CON. It sends a message to all abusers that their actions matter every day. Regardless of time and location.

Feb 26

**Jeff Moss,** Organizer

Draft Noodle on a possible statement if we need one:

Grifter Darington Marc Wednesday - Thoughts?

---

We are aware of the statements being made by Mr. Hadnagy. Our #1 priority is the protection of those brave enough to report abuse that violates our CoC. The quantity and quality of evidence against him, combined with his own admissions to us, mean we stand by our decision.

We expect the organizers of events at DEF CON to act as an example of acceptable behavior to others in the community. Because of this we consider activities outside of the convention space when deciding who we want to associate with, support, and promote.

[Thank you to everyone in understanding...] ?
[Links to resources] ?

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

the convention space when deciding who we want to associate with, support, and promote.

[Thank you to everyone in understanding...] ?
[Links to resources] ?

Feb 26

**Grifter,** Contests & Events Lead

I think that actually gives him something to argue. He'll say he never got a chance to talk to us and never admitted anything.

The way the "We consider outside actions" statement is worded he will say "See! I never did anything at DEF CON! I told you! And if that's true then other things I'm saying are likely true as well!"

Also, it lacks feeling. Too robotic. His statement tugs on heartstrings. Concern for employees. Concern for his family. If we don't respond in a similar manner we will lose.

My statement is designed to evoke emotion in the reader. We're dealing with a practiced Social Engineer here, and we need to respond accordingly.

Feb 26

**Jeff Moss,** Organizer

Possible statement Draft #2 - A bit more aggressive and less robot.

Feedback please Darington Grifter Marc Wednesday

We are aware of the statements being made by Mr. Hadnagy to try and control the narrative around our decision to ban him and remove the SE Village.

Let me be clear. Our #1 priority is the safety of our community and this includes protecting anyone who comes forward with reports of behavior that violates our Code of Conduct. We expect the organizers of events at DEF CON to act as an example of acceptable behavior to others in the community and because of this we consider activities both inside and outside of DEF CON when deciding who we want to associate with, support, and promote. Credible reports of bullying, harassment, intimidation, and DARVO gaslighting from multiple parties triggered his ban. **[Do we articulate these and possibly have a debate?]**

We remain silent on specifics not because we believe we're making a mistake, but to protect the parties involved. Their stories are not ours to tell and we stand by our decision. Our legal team is ready to defend it.

Edited Feb 26

**Wednesday (Melanie Ensign),** Press Department Lead

If we must, below is my suggested revision. But it's still my professional opinion as a reputation management expert that we not make another statement at this time.

"Our #1 priority is to protect the more than a dozen brave individuals who reported multiple violations of our CoC by Mr. Hadnagy. Due to the quantity and quality of evidence demonstrating a pattern of abusive behavior, including his own admissions,

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

reputation management expert that we not make another statement at this time.

"Our #1 priority is to protect the more than a dozen brave individuals who reported multiple violations of our CoC by Mr. Hadnagy. Due to the quantity and quality of evidence demonstrating a pattern of abusive behavior, including his own admissions, we stand by our decision and our legal team is prepared to defend it."

Comments are closed on this message.

**Subscribers**

Since comments are closed, subscribers won't receive notifications.

MM
Add/remove people...

**You're not subscribed**

Since comments are closed, you won't receive notifications.

Subscribe me

Back to top

**URL**

https://3.basecamp.com/3566641/buckets/29534797/messages/5378926654

**Timestamp**

Tue Oct 11 2022 12:39:22 GMT-0500 (Central Daylight Time)

# Exhibit 28



Neil Wyler
6 Jan 2022
Hey man are you free tomorrow or Monday to do a joint call with myself and Hadnagy (+someone else on his side)? We could add a third. I want to get the conversation over with him and you are the only one who has the complete history so you'll know if he is changing his story
04:22
I'm free tomorrow after 2:30pm MT.
06:58
👍 Who else from our side? Melanie? CJ?
06:59
Zant and Melanie would be my first thought. But if it's Me, You, CJ, Zant, and Melanie, is he gonna feel like we're hanging up on him?
Ganging
07:00
Yeah and Zant hasn't participated in any of the calls, so he would be at zero starting point.
He will have his COO or something with him.



Neil Wyler
07:01
6 Jan 2022
Was he not on the first call? 07:01
I think he was actually.
I'm thinking about people that will have to deal with the aftermath of him going crazy online and that's not Zant
07:04
True dat 07:04
7 Jan 2022
Bummer today fell apart. How does your Monday look? 09:25
Right now I'm open on Monday except for 2-3pm MST. If you get me a time quick I can block it out on my calendar so no one tries to book me. 10:37
I'll be back in Singapore then so my times will be early or late your time and I'll have to coordinate with Chris EST. What works best for you? 14:28
8 Jan 2022
Later in the day then 05:34



Neil Wyler
11 Jan 2022
Any plan? 06:41
Not yet, I'm going to jump on base camp in a bit and update everyone. He wants to do the call during office hours EST if possible and wants to know who made the complaints and what they are specifically 09:27
20 Jan 2022
Hey can you please comment on the Hadnagy email on base camp? 09:59
21 Jan 2022
I'll take a look 05:34
Thanks. I'd love to respond with our statement to him, if you have any points you want included.
Do you know what BH is doing? 06:49
I haven't talked to them about it in weeks. I'll follow up with them. 09:12



Neil Wyler
getting bigger, faster.
14:14
8 Feb 2022
How crazy do you think Chris will go?
Yeah, for sure. They need to outlive us.
14:15
Probably not as crazy as he would've in October. He's had time to sit on this and he's already played the "You can't fire me, I quit" card. He's still going to launch a counter campaign, and it'll be well done. He is a social engineer after all. He knows how to play people.
When we select the new Village leads he'll have stuff to say.
When DEF CON happens he'll have things to say.
He's not going to take it lightly and he seems to have a problem letting things go. But overall it just has to be done. It's sad. I like Chris. He's a pain in the ass as an organizer, but most of my interactions with him have been positive, with a few exceptions. But that zoom call...damn.
There's no doubt he has done the things he's accused of. He doesn't even try to deny them.

Neil Wyler

even try to deny them

8 Feb 2022

He just feels justified in his actions for a variety of reasons. And honestly, that's the saddest part. I'd there's no remorse, change isn't possible. So he won't change.

If* 14:20

And not even a " I did that but I apologized" or "that was both our faults" nope. Always 100% the other person. 14:20

Right. No ownership. None. No room for improvement or growth. It wasn't me, it was them. Period.

We're doing the right thing, even if it's hard, and even if we don't really want to. 14:21

Yeah that was the clincher for me. I've got women DMing me saying good job thanks for standing up for us, he harassed me too. - Women not on our radar so it has to be pretty wide. 14:22

Neil Wyler

14:23

8 Feb 2022

I'll make that edit D suggested then get it all ready to go. After I verify the laptop receipt we will be ready.

Hey do you know Leslie Carheart?
14:28

It's good to be thorough, but he told me it wasn't his laptop and it was her personal laptop but that she used it for work and if we thought he was just going to let her walk around with his companies information on it then he was in the wrong industry because it meant that you and I didn't actually support security.
14:28

Ah, ok. Still I'd like to have something we're we say "we saw the receipt of ownership but you told us in writing you owned it. That casts everything you say as untrustworthy " or something like that. More for twitter than for us to decide.
14:30



Neil Wyler
12 Feb 2022
Panadero went on a big rant and quit def con (again?) over the Hadnagy decision. Was he coming back for 30, or should I remove him from all the base camp projects? Can you talk to him? 10:19
I removed him from BC for now unless something changes. 10:22
He's coming back to Goon, just not as a 2nd.
I didn't see him go off. Where was that? 10:37
He just quit apparently
About how we handled the Hadnagy violations
Nikita saw it on some socials someplace.
303 mailing list 10:39
Oh, well there's nothing we can do there. He doesn't know the whole story, and I'm not talking. It's not my place. 10:40



Neil Wyler
11:24
12 Feb 2022
Someone noticed he is gone from the Black Hat Review Board page. So that should be interesting. 11:25
Ah! I'll check the twitters. 11:27
Ah. It was Deviant.
https://twitter.com/deviantollam/status/1492313536114008064?s=21
11:28
25 Feb 2022
Hadnagy texted me. He wants to make sure you read the email he sent to you and I and asked you to please respond. I told him I would pass on the message.
He is still denying any wrongdoing
Then when I pressed him on things he said that they didn't happen at Defcon so it shouldn't matter to Defcon. 10:47
When did he send the email? 10:47
Probably 8 hours or so ago. Let me look.



Neil Wyler
10 hours 10:48
25 Feb 2022
Ok I'll check and send it to lawyers. 10:48
jm@defcon.org 10:48
Ok thanks. Try not to get into a conversation with him that he could mis characterize 10:52
Too late. I did. But I chose my words carefully.
I told him I wished we could clarify things to say they weren't sexual in nature but that we can't post details of the claims because it exposes the victims.
He tried to deny any wrongdoing repeatedly
I pointed out details of the conversations we had and said "Do you remember that conversation?"
So he couldn't back completely out of responsibility

Neil Wyler

responsibility

25 Feb 2022

He ended up agreeing but said we were wrong because we shouldn't have been involved what happened outside of Defcon

I also pointed out that none of this had to happen. That all he had to do was stop the behavior and he chose not to.

He got upset at that.

Again because it was about things that weren't any of defcons business. 10:57

I've had conversations with our legal team and we should really not communicate since he invoked legal

I'll what this email says. 10:57

Roger that. 10:57

We'll need to to talk to our legal team and go through the conversation. Please write down what you remember. 10:57

I'm not going to ignore him. But I'll keep my mouth shut in public and won't discuss details with him. 10:58



16:48
LTE 84
Neil Wyler
won't discuss details with him. 10:58
25 Feb 2022
Then we can see what they recommend 10:58
Roger that.
I know I've said it before but I still think we should update the transparency report to say it wasn't anything sexual in nature and that it was bullying and harassment of a non-sexual nature.
Because all of the rumor mill stuff is making it seem like it was sexual. Which if he points to that and says Defcon wasn't clear, might actually give him a leg to stand on in terms of defamation.
Or that he was only targeting women. 11:01
It's tricky because what if a sexual allegation comes out? I've heard about a lot of touchy touchy 11:01
I haven't heard any of that. 11:01
He can say it wasn't sexual at any time.



Neil Wyler
time.
25 Feb 2022
I heard some of those stories from Deviant who has some extra insight.
11:02
He's claiming he doesn't know what ANY of the allegations are and that you refuse to tell him.
He's also upset that when he said he wasn't coming back to Defcon that you didn't just drop it.
He did say that 11:03
Which is a lie, in that you spoke to him about it and Black Hat did as well. It's hard when you can't have a good faith conversation
11:03
That you could've just gone your separate ways
Agreed.
I told him that 11:03
Yeah he wanted to dodge responsibility
11:03
I said that I talked to him extensively

 Neil Wyler

25 Feb 2022

I said that I talke[...]ensively

That he volunteered things

So he knows what type of allegations these are

But he is set on wanting to hear it from you.

I told him you have him several opportunities to meet and discuss but that he didn't like the times and said don't worry about it. I quit.

Gave* 11:05

Once he invoked legal threats we stopped talking and are awaiting his legal communication. 11:05

He claimed you only gave him one time and it was at 5am

I know that's not true

I asked him if he threatened legal action and he said no 11:06



Neil Wyler
25 Feb 2022
Whatever. He wanted to only communicate during east coast business east hours. But at that point it didn't matter much because of all the other information we gathered. Then his email sealed the deal. 11:07
I feel you
He isn't being honest 11:07
I'll go back to the email where he mentioned his lawyer and wanted our info. 11:07
It's hard to have a conversation with someone who isn't being honest
But I will die on the hill that we should clarify the statement on the transparency report.
I see and respect your reasons. It I do see his side as well.
But* 11:08
At any time he can make a statement. If we start making adjustments and he keeps saying he has done nothing it looks out of balance. But I'll read his



Neil Wyler
But 11:08
25 Feb 2022
At any time he can make a statement. If we start making adjustments and he keeps saying he has done nothing it looks out of balance. But I'll read his email and we can decide a response. 11:10
Sounds good, brother. I've got your back whatever you decide. 11:11
I appreciate it! 11:12
Hadnagy's daughter deleted her social profile the moment it hit. 11:13
That's rough 11:13
Yeah. Deviant was in Maxie's class he Chris screwed her laptop. 11:14
He really really thinks that he's in the right there. 11:14
So crazy. Never once has he said "you know I should apologize for that" or "I could see how we both contributed to a bad outcome" but it's always him 100% not at fault. 11:15

Neil Wyler
25 Feb 2022
know I sho[...]e for that" or "I could see [...] contributed to a bad outcome" but it's always him 100% not at fault. 11:15
Absolutely. He is 100% in the right here. He truly believes he is.
No introspection. 11:17
Or he knows he needs a big lie because to admit anything is to admit it all. 11:17
That's fair. It may be part of a broader strategy.
Or even admitting fault to yourself may be too much. 11:17
And people that have worked with him have told me he is trying to SE his way out of it, that he used to ask "Why is everyone e always complaining about me?" 11:17
Tis a mystery! 🤣 11:18
Totally. That's why it's hard to have a good faith conversation with him. 11:19

 Neil Wyler

11:19

25 Feb 2022

I wouldn't let him wiggle out though. And then he said "But that's in my business or my life. It's not Defcon's business."

That's the final defense

It didn't happen at Defcon so we should ignore it

Which isn't the whole truth either

There are several instances that happened at Defcon 11:21

Yeah, and we explained in our letter that he is representing the con with his behavior so we have to take it into consideration 11:22

Agreed

If you're a complete bastard outside of the con but only nice for four days out of the year, we're still going to factor in the other 361. 11:23

Totally.

Neil Wyler

Totally.

25 Feb 2022

After reading this I think we could maybe negotiate a joint statement where we clarify in return for him taking responsibility. That's a legal discussion but curious if would consider it. 11:26

An interesting proposal 11:26

Yeah we can't make things better for him with him not taking any responsibility 11:27

I think that's fair 11:27

26 Feb 2022

Let me know when you send the email over, initial legal response is that the more you talk to Chris because of your involvement in both BH and DC increases the risk of a business interference lawsuit. I'm waiting on a more complete review once we get your conversation notes. 02:10

Neil Wyler

Totally.

25 Feb 2022

After reading this I think we could maybe negotiate a joint statement where we clarify in return for him taking responsibility. That's a legal discussion but curious if would consider it. 11:26

An interesting proposal 11:26

Yeah we can't make things better for him with him not taking any responsibility 11:27

I think that's fair 11:27

26 Feb 2022

Let me know when you send the email over, initial legal response is that the more you talk to Chris because of your involvement in both BH and DC increases the risk of a business interference lawsuit. I'm waiting on a more complete review once we get your conversation notes. 02:10



Neil Wyler
your conversation notes. 02:10
26 Feb 2022
He is trying to get admissions out of you he can use for damages and provide him free discovery for a potential antitrust claim.
Please stop talking to him, he is an adverse party trying to get admissions. 03:28
You got it.
Thanks for the additional context. I appreciate it. 04:00
Cool beans. Sorry for the scary tone. 04:02
Haha. No worries, man. 04:04
https://twitter.com/humanhacker/status/1497402381256077314?s=21
He made a public statement 12:29
DEF CON is losing some public support because of the silence. I've seen several things on group chats or Discords. People do not like the silence. 12:35



Neil Wyler
silence.
12:35
26 Feb 2022
Yeah he is trying to box us in.
We will have to decide what to do.
12:37
Is it frowned upon to make a post that says "We are aware of the statements being made by Mr Hadnagy but due to the overwhelming evidence against him we stand by our decision. Mr Hadnagy has indicated he is seeking legal action against DEF CON and so unfortunately we can't comment further at this time."
12:37
I'm sure you already saw, but just in case: https://twitter.com/humanhacker/status/1497402381256077314?s=21
12m
Is he delusional? What's your take?
5m
He is not delusional, he is attempting to mastermind this situation. He believes that he can undermine your credibility by denying any evidence.
4m
It's insidious and he knows exactly what he's doing, he's playing the victim and employing DARVO.
3m



Neil Wyler
victim and employing DARVO. 3m
26 Feb 2022
Yeah something like that. Tomorrow we have a legal call. 12:38
You have to say "something". He's controlling the narrative and making it look like he has no idea what's happening. And claims he can only recall things from 2015 and 2017. Not September.
I look forward to seeing something
Keep me posted
He also makes his posts late on Friday nights. This is twice now. Not a coincidence. 12:40
I wonder how much it poses of those he has abused? 12:44
How do you mean? 12:44
But yeah let's move this to BC so everyone can participate. 12:44
Roger that 12:44
If they see him lying again they will g pissed. 12:44

 Neil Wyler

Roger that 12:44

26 Feb 2022

If they see him lying again they will get pissed. 12:44

Can you repeat your concerns on BC please? 12:56

Doing that now. 12:57

👍



Neil Wyler
18 Aug 2022
"It's come to my attention that Chris Hadnagy has filed a defamation lawsuit against Jeff Moss and DEF CON Communications Inc regarding his ban from the conference. We intend to report on the lawsuit in The Verge tomorrow (as well as the broader context of the ban), and I'd like to give Mr Moss and/or other DEF CON representatives the chance to comment.
Specifically, in the suit Mr Hadnagy alleges that code of conduct violations he was accused of were falsified, in order to replace him as the organizer of the SEVillage."
6m
Heads up!
I'll post something to Dept leads.
06:08
Where'd that come from?
06:09
Wednesday is going to reach out to SECV and Victims.
From a Verge reporter. Chris has leaked it.
06:09
That was a mistake
06:09



Neil Wyler
That was a mistake 06:09
18 Aug 2022
Yeah tomorrow and the rest of the week will be crazy. 06:10
Weeee 06:10
It's out
https://twitter.com/SteveD3/status/1560025494594224133 06:25
Fuckin hell
He really wanted this public?
Ugh
He will not come out looking good here 06:28

Confidential DEFCON00000370



Neil Wyler
5 Oct 2022
Can you comment on the Grifter statement thread? Want to work on that while figuring out a release strategy
08:13
Yes! I'll do that tonight. Thanks for the poke.
08:16
6 Oct 2022
08:59

Confidential DEFCON00000371

Neil Wyler
26 Jan 2023
Just saw this:
https://www.techtarget.com/searchsecurity/news/252529227/Judge-dismisses-Chris-Hadnagy-lawsuit-against-DEF-CON 14:47
Let me look 14:47
Looks like Chris is saying a bunch of stuff about you without naming you.
It's a couple days old 14:48
Yeah. He's not telling the truth again. 14:50
He can't help himself 14:50
Yeah. He lied several times in that. 14:51
AFAIK we were not asked for comment 14:51
Neither was I
But it says they couldn't corroborate the information so they removed my name.



Neil Wyler
31 Jan 2023
07:14
LTE
6 Messages
Back
Media Inquiry regardi...
Found in DEF CON DT Inbox
RW
Robert Wright
Friday
To: Jeff Moss
No worries, Jeff. I'll make sure contact the press address in the future. I appreciate the response and will update the article with your comment.
In the meantime, can you clarify what role, if any, Neil Wyler played in this matter? Was he acting on behalf of Def Con or, as Hadnagy claimed, merely contacting him as a friend?
Got this from the reporter on Friday, I'm guessing he will be updating his story, not sure if he made contact.
07:16
Did you respond to that yet?
07:51
No
Not sure what to say so I'm ignoring it for the moment.
08:14

 Neil Wyler

for the moment. 08:14

31 Jan 2023

I think it's fair to say that I went to Chris as a friend but also, by his own choice of words, a mediator. It's because we were friends that I was cleared to speak to him. By both you and the Steve's.

It's possible to be both. 08:14

My initial reaction was to say they are not mutually exclusive. 08:14

Exactly

He asks me to give messages to you. He tells me to tell you to read the emails he sent. He calls me a mediator several times. 08:15

Grifter has been with DEF CON for xx years, Black Hat for xx years, and been friends with Chris for xx years. 08:15

22 years, 21 years, 15 years

And those are just years Gooning and as part of staff.

Not including years as an attendee.

Neil Wyler

Not including ye[...]ttendee.

31 Jan 2023

It's fair to say I've been around a minute. 08:16

When the code of conduct violat was reported he reached out on behalf of def con to investigate what was going on and try to get Chris to stop his behavior.

He had all the relationships to understand the context of what was going on.

Something like that.

But man our lawyers read his comments on the article.

And it is like Chris just handed us three crates of ammunition 08:18

I would say, "as a friend, but also as someone who has a close and longstanding relationship with myself and DEF CON as an organization. He was a natural mediator."

Yeah. I'm sure the lawyers are like "He just admitted X, Y, and Z! 08:19

Neil Wyler
08:19
31 Jan 2023
I'd stick to basic facts even. Like "The person who made the initial report reached out to Grover because they knew he had longstanding connections to BH and DC. They also knew he had a relationship with Chris and were OK with that.

Grifter contacted DC and BH about the complaint and DC asked him to investigate." Or like that.

That's all true and people can conclude what they want about what hat you were wearing. What we want them to focus on is his behavior not his word games. 08:22
Let me
Get opinion from Melanie if we should respond or not 08:26
That works for me 08:27
Her feeling is not to reply and give it more oxygen. 08:43
But if you ignore his question then you lend credence to his narrative that you

 Neil Wyler

31 Jan 2023

But if you ignore his question then you lend credence to his narrative that you don't respond.

Just a thought. 08:44

If it doesn't help us or the victims but only helps TechTarget get clicks I'm not sure why we would.

If we were going to respond it would be after it becomes a thing on social media or we want to put out our own statement

By Chris saying all those half truths on the record he really screwed himself. 08:47

I'm saying a response of "These things are not mutually exclusive. Unfortunately I can't say more than that at this time." means that he doesn't post "DEF CON did not respond to additional questions."

But it's all good.

I'm just thinking about optics

Neil Wyler
31 Jan 2023
Or just send him this gif...
Hahaha 08:49
Check this out:
Back
Media Inquiry regardi...
From: dtangent@defcon.org
<dtangent@defcon.org>
Sent: Thursday, January 26, 2023 4:54 AM
To: Wright, Robert
<rwright@techtarget.com>
Subject: RE: Media Inquiry regarding Chris Hadnagy
Robert,
Sorry it took so long to reply, I just saw this now. I understand the article has already run, but if he sues us again I'm guessing it might end up in the news again.
FYI: If you compare what Chris has said here with what his previous public statements were you will discover all kinds of contradictions.
In the future please use the press@defcon.org address for time sensitive issues.
Thank you,
Jeff



Neil Wyler
Back
Media inquiry regardi...
31 Jan 2023
Robert Wright
Friday
To: Jeff Moss
No worries, Jeff. I'll make sure contact the press address in the future. I appreciate the response and will update the article with your comment.
In the meantime, can you clarify what role, if any, Neil Wyler played in this matter? Was he acting on behalf of Def Con or, as Hadnagy claimed, merely contacting him as a friend?
I never meant that to be a comment, just giving him an FYI in case he wants to dig further. But he clearly Wants to stir the pot and added it as a comment. So not feeling like trusting him.
08:53
Roger that
08:54
7 Mar 2023
Hey got some time to chat this week (your evenings)? I need your advice on DEF CON Training. I think I'll need someone new to run it and I'm looking for suggestions.
11:25



Neil Wyler
11 Aug 2023
Heads up Chris is suing us again
03:49
What impeccable timing.
That's really petty.
We're gonna have a fun weekend anyway.
05:06
Totally. I'll catch you up when we meet
05:21
Sounds great. Miss your face. See you soon.
05:25

DEFCON00000380



Neil Wyler
Wed, Apr 3
Hey man. I wanted to give you an update on Chris Hadnagy's lawsuit against DEF CON. Do you have availability for a short call in the next couple of weeks? 16:14
Of course. Or I'll be in Singapore next Friday and we can talk about it over dinner. 16:15
OK, cool. It would be god to do it with the lawyers so maybe before you travel? 16:51
Ok, how about this Friday? 16:51
I think that could work, it would have to be around 5pm pacific if that is good? 16:52
That should be fine 16:52
Ok cool, I'll try and schedule it now. 16:52
Thanks 16:52



Neil Wyler
Wed, Apr 24
Hey man are you free this Friday your time for a call with our legal team? I'll be in Vegas so can do any time during business hours just let me know when you are up. 17:58
I can do 11PT if that works for you. 22:09
Thu, Apr 25
OK checking! 09:23
Fri, Apr 26
We are good for tomorrow 11am! 05:21
Do you have a dial in? Or we could use my work WebEx? 05:22
I'll get a dial in from them and Signal it to you 05:33
Word 05:33
Sat, Apr 27
Any update? We doin' this? 01:33

 Neil Wyler

Wed, Jul 31

Tomorrow is my deposition and Chris will be there. Let's see if your prediction that he can't keep it under control the whole time is true 08:02

We're gonna find out!!

Let me know, I'll be thinking about it. 08:02

PDF

ORDER_Denying...hida.__SNP_.pdf
194 KB

If you want some good reading this happened. It's public but no one has noticed yet. 08:03

Ooooo 08:04

This never happens and it's really rare the Judge would spend so much time e on it. Plus the bombshell in there the Judge added on their own. 08:05

Finally got to sit down and read it. That's wild. So thorough! 12:48