1

2

THE HONORABLE BRIAN A. TSUCHIDA

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

CHRISTOPHER J. HADNAGY, an individual;
and SOCIAL-ENGINEER, LLC, a
Pennsylvania limited liability company,

No. 2:23-cv-01932-BAT

9

10

            Plaintiffs,

11

v.

DECLARATION OF MARK CONRAD IN
SUPPORT OF PLAINTIFFS' RESPONSE
TO DEFENDANTS' MOTION TO SEAL

12

JEFF MOSS, an individual; DEF CON
COMMUNICATIONS, INC., a Washington
corporation; and DOES 1-10; and ROE
ENTITIES 1-10, inclusive,

13

14

            Defendants.

15

        I, Mark Conrad, declare under penalty of perjury under the laws of Washington State as

16

follows:

17

        1.    I am one of the attorneys representing Plaintiffs Christopher Hadnagy and Social-

18

Engineer, LLC.

19

        2.    I am over the age of 18, and competent to testify to the matters set forth herein; and

20

make this declaration of my own personal knowledge.

21

        3.    Attached hereto as **Exhibit A** is a true and correct copy of a redacted version of

22

Dkt. 91-2—"Defendants' Exhibit B, an excerpt from Ben Thomas's deposition transcript." The

23

redactions are limited to references to Social-Engineer's client names, as well as financial and

DECLARATION OF MARK CONRAD IN SUPPORT OF
PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION TO SEAL - Page 1
CASE NO.: 2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

salary information.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT.

DATED this 21st day of March 2025 in Seattle, Washington.

FREY BUCK,

By: _____

Mark Conrad, WSBA #48135

DECLARATION OF MARK CONRAD IN SUPPORT OF
PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION TO SEAL - Page 2
CASE NO.: 2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

1

2

## CERTIFICATE OF SERVICE

The undersigned certifies under the penalty of perjury according to the laws of the United States and the State of Washington that on this date I caused to be served in the manner noted below a copy of this document entitled **DECLARATION OF MARK CONRAD IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO SEAL** on the following individuals:

David Perez, WSBA #43959
Matthew J. Mertens (Pro Hac Vice)
Lauren A. Trambley (Pro Hac Vice)
Jacob Dean (Pro Hac Vice)
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
dperez@perkinscoie.com
mmertens@perkinscoie.com
ltrambley@perkinscoie.com
jacobdean@perkinscoie.com

[   ]    Via USPS
[X]     Via Electronic Mail
[X]     Via Electronic Filing (CM/ECF)

DATED this 21st day of March 2025 at Seattle, Washington.

_____
Amber Holmes, Legal Assistant

DECLARATION OF MARK CONRAD IN SUPPORT OF
PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION TO SEAL - Page 3
CASE NO.: 2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

**Exhibit A** to Conrad Declaration in Support of Plaintiffs' Response to Defendants' Motion to Seal

# Exhibit B

Filed Under Seal

Hadnagy, et al. v. Moss, et al                   Benjamin Thomas, CPA, CFE

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____
                                   )
CHRISTOPHER J. HADNAGY, an          )
individual; and SOCIAL-ENGINEERING, )
LLC, a Pennsylvania limited         )
liability company,                  )
                                    )
               Plaintiffs,          )
         v.                         )  No. 2:23-cv-01932-BAT
                                    )
JEFF MOSS, an individual; DEF CON   )
COMMUNICATIONS, INC., a Washington  )
corporation; and DOES 1-10; and ROE )
ENTITIES 1-10, inclusive,           )
                                    )
               Defendants.          )
_____


VIDEOTAPED VIDEOCONFERENCE

DEPOSITION UPON ORAL EXAMINATION

OF

BENJAMIN THOMAS, CPA, CFE

_____


Witness located in Seattle, Washington

(All participants appeared via videoconference.)




DATE TAKEN:   November 4, 2024
REPORTED BY:  Nicole A. Bulldis, RPR, FCRR
              AZ No. 50955 | CA No. 14441 | WA No. 3384

BUELL REALTIME REPORTING, LLC
206.287.9066 | 800.846.6989

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 2

1                    A P P E A R A N C E S

2

3    FOR PLAINTIFFS:

4      (via Zoom)          KRISTOFER Z. RIKLIS
                           Riklis Law, PLLC
5                          871 Colorado Center Drive, Suite 200
                           Henderson, NV 89052
6                          (702) 720-6471
                           kristofer@riklislaw.com
7

8      (via Zoom)          TED A. BUCK
                           Frey Buck PS
9                          1200 Fifth Avenue, Suite 1900
                           Seattle, WA 98101
10                         (206) 486-8000
                           tbuck@freybuck.com
11

12   FOR DEFENDANTS:

13     (via Zoom)          JACOB A. DEAN
                           Perkins Coie LLP
14                         700 13th Street NW, Suite 800
                           Washington, DC 20005
15                         (202) 654-6200
                           jacobdean@perkinscoie.com
16

17   VIDEOGRAPHER:

18     (via Zoom)          SEAN LYKKEN, CLVS

19

20   ALSO PRESENT:

21     (via Zoom)          LAUREN ENGLISH

22                         MIKE ST. MARTIN

23

24                        --o0o--

25

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 4

1        REPORTED REMOTELY FROM MARICOPA COUNTY, ARIZONA

2            Monday, November 4, 2024; 9:03 a.m.

3                        --o0o--

4

5            THE VIDEOGRAPHER:  This is the deposition

6    of Ben Thomas in the matter of Hadnagy, et al., versus

7    Moss, et al.  Cause No. 2:23-cv-01932-BAT, in the U.S.

8    District Court, Western District of Washington at Seattle,

9    noticed by David Perez.

10               The time now is approximately 9:03 on this

11   4th day of November 2024, and we are convening remotely.

12   My name is Sean Lykken from Buell Realtime Reporting, LLC,

13   located at 1325 Fourth Avenue, Suite 1840, Seattle,

14   Washington 98101.

15               Will counsel and all present please

16   identify themselves for the record, starting with the

17   plaintiff.

18               MR. BUCK:  Ted Buck on behalf of the

19   plaintiff.

20               MR. RIKLIS:  Kristofer Riklis on behalf of

21   plaintiff.

22               MR. DEAN:  Jake Dean on behalf of

23   defendants.

24               THE DEPONENT:  Benjamin Thomas.

25

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 5

1  BENJAMIN THOMAS,                witness herein, having been

2                                  first duly sworn on oath,

3                                  was examined and testified

4                                  as follows:

5

6  BY MR. DEAN

7       Q.   Good morning, Mr. Thomas.  I'm assuming you've

8  been deposed before.

9       A.   I have.

10       Q.   Approximately, how many times?

11       A.   25, 30 times, somewhere in there.

12       Q.   Is that as an expert, fact witness, or something

13  in between?

14       A.   As an expert witness.

15       Q.   When was the last time you were deposed?

16       A.   It would've been in October, middle of October.

17       Q.   Got it.  So I don't want to bore us all with the

18  admonitions since you seem to be a pro, but there are a

19  few I want to go over with you.

20            The oath you just took is the same oath that you

21  would take in court and it requires you to testify

22  truthfully under the penalty of perjury.  Do you

23  understand that?

24       A.   I do.

25       Q.   Do you intend to do so today?

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 20

1       A.   Correct.

2       Q.   So your damage analysis starts from

3  February 9, 2022, and goes through, I believe, end of

4  2024; is that right?

5       A.   Through the end of 2023 --

6       Q.   Yeah, 2023.

7       A.   -- for lost earnings component.  And then lost

8  value would be assuming -- under the assumption that the

9  business can no longer be a going to concern and looking

10  at the lost business value as well.

11       Q.   Got it.

12            So your analysis does not include any damages

13  from January 1st to February 9, 2022; correct?

14       A.   Sorry.  January 1st, say that again?

15       Q.   Your damages analysis that you provided in this

16  report does not include damages from January 1st to

17  February 9, 2022; correct?

18       A.   Correct, yes.  That first period, right.

19       Q.   Because damages during that time frame would be

20  improper; right?

21       A.   It would've been prior to the issuance of the

22  February 9, 2022, report.

23       Q.   Got it.

24            Were you instructed by counsel to make any

25  assumptions when preparing this report?

Hadnagy, et al. v. Moss, et al                     Benjamin Thomas, CPA, CFE

Page 21

1      A.    No.

2      Q.    Okay.  Did you make any assumptions when

3  preparing this report?

4      A.    The only assumption, which is typical for an

5  expert to make, is assuming the liability.

6      Q.    And what do you mean by assuming liability?

7      A.    My report and the calculations in my report and

8  my schedules are based on the premise that liability would

9  be found against the defendants and that has caused the

10  economic harm.

11      Q.    Okay.  Did you do any independent analysis to

12  determine whether any of the alleged conduct actually did

13  cause harm to Mr. Hadnagy?

14      A.    Right.  So that's where -- as a financial

15  expert, it's not my role to determine the liability in a

16  case, but I can see from -- that there is a link between

17  the time -- the time frame of when the events occurred and

18  the negative financial performance of the business.

19      Q.    What do you mean by that?

20      A.    So we have the events of February 9, 2022, the

21  release of the transparency report, as well as the

22  subsequent update in January 13, 2023.  And prior to that,

23  prior to those two periods, 2022 and 2023, the business

24  was profitable.  Mr. Hadnagy had income.  After that,

25  those two events in 2022 and 2023, the business was not

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 22

1    profitable and Mr. Hadnagy did not have income.

2        Q.    Okay.  So prior to February 9, 2022, you just

3    looked at the numbers for Mr. Hadnagy's businesses;

4    correct?

5        A.    For his business as well as his personal tax

6    return.

7        Q.    You didn't review any of Mr. Hadnagy's contracts

8    or potential contracts prior to 2022; correct?

9        A.    I have a list of contracts that allegedly have

10   been impacted by the events, and some of them start prior

11   to February 2022.

12       Q.    Well, my question is different.  My question

13   wasn't whether you had a list of alleged contracts.  My

14   question is whether prior to February 9, 2022, you,

15   yourself, analyzed any contracts or potential contracts

16   Mr. Hadnagy had or Social-Engineering had with respect to

17   his business.

18       A.    Again, I've reviewed that spreadsheet that

19   details out certain contracts and certain contracts that

20   were impacted, and those contracts began prior to

21   February 2022.  And so I can see from -- or I can glean

22   from that, that, you know, there's contracts that come in

23   and go out on an annual basis.  And so I -- from that

24   perspective, I have analyzed the contracts, but I haven't

25   reviewed specific contracts.

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 23

1      Q.    Yeah.  My question is different.  It's pretty
2  straightforward.
3           Have you, yourself, Mr. Thomas, reviewed any
4  contracts with Mr. Hadnagy or his business
5  Social-Engineering prior to February 9, 2022?  And I
6  don't --
7                MR. RIKLIS:  Objection.
8      Q.  (By Mr. Dean) -- mean the list of contracts.  I
9  mean the actual contracts themselves.
10               MR. RIKLIS:  Objection.  Form.
11               THE DEPONENT:  Right.  Again, I've reviewed
12 that spreadsheet that has them.  I haven't reviewed actual
13 contracts --
14     Q.  (By Mr. Dean) Got it.
15     A.    -- the details of them.  But I can see, again,
16 that there are contracts that were prior to February 2022
17 and they would -- and they would come in and go on an
18 annual basis.
19               (Exhibit No. 8 introduced.)
20               MR. DEAN:  I'm going to introduce Exhibit 8
21 if you give me a second.
22                    (Pause in the proceedings.)
23     Q.  (By Mr. Dean) Okay.  It should be there and I
24 will share it on my screen in just a second.
25     A.    Give me a second to download this one.

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 24

1    Q.    Can you see the document on my screen?

2    A.    I can.

3    Q.    Okay.  When you say that you looked at a list of

4    contracts that was provided to you, is this the list that

5    you were referring to?

6    A.    It is.

7    Q.    Okay.  Where in this list does it say the start

8    dates for contracts?

9    A.    Let's see here.  I have the close date.  I'm not

10   sure if that indicates when the contract was closed, as in

11   the deal was solidified, or if that's the close as if the

12   end of the contract.

13   Q.    Who prepared this document?

14   A.    My understanding, it was Mr. Hadnagy who

15   prepared this.

16   Q.    And you don't know what the term "close date"

17   means in this report; correct?

18   A.    Correct.  I'd have to review this again with

19   him.  I don't recall.

20   Q.    Have you, yourself, Mr. Thomas, reviewed any of

21   the contracts for any of the account names identified in

22   this Exhibit 8?

23          MR. RIKLIS:  Objection to form.

24          THE DEPONENT:  No.

25   Q.    (By Mr. Dean) That's a no.

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 25

1          And just for the record, Exhibit 8 is a document

2    titled "ContractsLost.xlsx" with a Bates label SE_001761.

3    Got it.

4          So just to clarify, you have not reviewed any of

5    the contracts listed in this document; correct?

6              MR. RIKLIS:  Objection to form.

7              THE DEPONENT:  Again, I have not reviewed

8    the specific contracts as of --

9     Q.  (By Mr. Dean) All that you've reviewed is this

10   document that lists contracts; correct?

11             MR. RIKLIS:  Objection to form.

12             THE DEPONENT:  Correct.  These are the

13   contracts that I have been able to get a summary of and

14   under- -- have an understanding of how contracts come in

15   and go.

16    Q.  (By Mr. Dean) Okay.  So going back to my original

17   question of your assumptions, you said that you assumed

18   liability.  Now, my understanding would be -- of liability

19   would be, you know, that the alleged statements were, in

20   fact, defamatory.

21          Now, assuming that that definition is correct,

22   if you're following me, did you make any assumptions from

23   the statement being defamatory tying it to the damages?

24    A.   Yes.  I made the assumption that those

25   statements have impacted the business negatively and

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 29

1    it is a growing business prior to the -- what I'm going to

2    call the loss event.

3         Q.   (By Mr. Dean) Yeah.  My question isn't whether

4    you're looking at numbers that say whether something is --

5    revenue is going up or down.  My question is pretty

6    pointed.

7              It's:  You don't actually know why contracts

8    were gained or lost from 2017 to 2024; correct?

9              MR. RIKLIS:  Objection to form.

10             THE DEPONENT:  Specifically, gained or

11   lost, correct.  I don't know the exact underpinnings of

12   why a contract is -- stays or leaves specifically, but I

13   can tell from the financial performance that they had

14   positive growth prior to the loss event.

15        Q.   (By Mr. Dean) And contracts could have been lost

16   by Mr. Hadnagy for a multitude of reasons; right?

17        A.   Hypothetically.

18        Q.   It could be because Social-Engineering or

19   Mr. Hadnagy's quality of work; correct?

20             MR. RIKLIS:  Objection to form.

21             THE DEPONENT:  Well, again, prior to the

22   loss event, the company had had overall growth from

23   ██████████ to about ██████████.

24        Q.   (By Mr. Dean) So the answer was you do know or

25   you don't know?

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 30

1              MR. RIKLIS:  Objection to form.

2              THE DEPONENT:  I do know that the company

3    has been growing.

4        Q.  (By Mr. Dean) My question isn't whether the

5    company is growing.  My question is:  Do you know why

6    Mr. Hadnagy has lost contracts in the past?

7              MR. RIKLIS:  Objection to form.

8              THE DEPONENT:  Again, I don't know the

9    specific underpinnings why one contract stays or leaves

10   and one comes on and rolls off, but he had the ability to

11   find new contracts, continue his business activities, and

12   grow his business.

13       Q.  (By Mr. Dean) Got it.

14            And, again, you didn't perform any independent

15   analysis to determine the cause of Mr. Hadnagy either

16   gaining or losing a contract from 2017 until 2024;

17   correct?

18             MR. RIKLIS:  Objection to form.

19             THE DEPONENT:  Again, I feel like I've

20   answered this.  I don't know the exact underpinnings of

21   why one contract's going to come and go, but I do know

22   that the company had the ability to continue operating and

23   to grow its business and increase its revenues.

24       Q.  (By Mr. Dean) Do you know who ██████████ is?

25       A.      ██████████.  I've heard a lot of ████████

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 50

1   specifics of the timing.

2        Q.   (By Mr. Dean) And you don't know the specifics of

3   the timing for any of these amounts listed in this

4   Exhibit 8; correct?

5             MR. RIKLIS:  Objection to form.

6             THE DEPONENT:  Correct.  I don't know -- I

7   don't know the specifics of the timing.

8        Q.   (By Mr. Dean) And going to the column for SOW,

9   you don't know -- you haven't reviewed any of the SOWs

10  referenced in this report; correct?

11       A.   I have not.

12       Q.   And you have not reviewed the emails that are

13  referenced in this Exhibit 8; correct?

14            MR. RIKLIS:  Objection to form.

15            THE DEPONENT:  Not beyond what you've shown

16  me today.

17       Q.   (By Mr. Dean) And you also said you don't know

18  what "H" means in this document; correct?

19       A.   I do not know what the H stands for.

20       Q.   Okay.  The alleged defamatory statement was made

21  February 9, 2022; correct?

22            MR. RIKLIS:  Objection.  Form.

23            THE DEPONENT:  February 9, 2022, was the

24  release of the transparency statement.

25       Q.   (By Mr. Dean) Got it.

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 59

1    somehow this event could've impacted their competitive
2    advantage, could've impacted their reputation, their
3    brand, and that could've been enough for somebody to
4    switch and go to a different competitor.
5         Q.    Or it could just be because they -- the other
6    person had a better contract; right?
7                   MR. RIKLIS:  Objection.  Form.
8                   THE DEPONENT:  Hypothetically, right.
9         Q.   (By Mr. Dean) The answer is you don't know;
10    right?
11                   MR. RIKLIS:  Objection.  Form.
12                   THE DEPONENT:  Again, you know, I'm making
13    that assumption in my analysis that the -- the release of
14    the statement has impacted the company and Mr. Hadnagy
15    negatively financially, and I can see that in the
16    financial records that were provided.
17         Q.   (By Mr. Dean) And we'll get to that in a second,
18    but your assumption and beliefs are based off Mr. Hadnagy
19    saying that he believes that they were lost; correct?
20                   MR. RIKLIS:  Objection to form.
21         Q.   (By Mr. Dean) Not Def Con?
22         A.    Again, I can see the decline in the financial
23    performance post-loss.
24         Q.    But, again, you don't know why there was a
25    decline in any performance; right?

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 68

1    Q.   (By Mr. Dean) Okay.  So are you aware of the
2    American rule for recovery of attorneys' fees or legal
3    extensions?
4        A.    Not the specifics, no.
5        Q.    Do you know when attorneys' fees are recoverable
6    as a matter of law?
7                MR. RIKLIS:  Objection.  Form.
8                THE DEPONENT:  Again, I don't know the
9    specifics.
10   Q.   (By Mr. Dean) So you -- sitting here today, you
11   don't actually know whether legally attorneys' fees are
12   recoverable as damages; correct?
13               MR. RIKLIS:  Objection.  Form.
14               THE DEPONENT:  Again, I don't know the
15   specifics.
16   Q.   (By Mr. Dean) And you're just assuming or
17   speculating that damages for attorneys' fees or public
18   relations costs would be recoverable damages; correct?
19               MR. RIKLIS:  Objection.  Form.
20               THE DEPONENT:  I'm not necessarily saying
21   that.  I can see that, you know, they're -- an increased
22   expense is being incurred in 2022 and 2023 that weren't at
23   those levels prior.
24   Q.   (By Mr. Dean) Do you know whether Def Con sued
25   Mr. Hadnagy or had Mr. Hadnagy sued Def Con?

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 70

1          THE DEPONENT:  I can see that there's

2   increased costs for professional fees, you know, in their

3   line items on their operating expenses.

4       Q.  (By Mr. Dean) And all of the increases in

5   operating expenses, those are all tied to Def Con?

6       A.   So the way that I look at this is that, yeah,

7   the business was performing profitably prior to the

8   issuance of the releases of the transparency report and

9   the update.  And my understanding in talking to

10  Mr. Hadnagy is that, yes, they had to increase certain

11  expenses to try to maintain their business operations and

12  to continue operating as best they could given the loss of

13  contracts, the inability for extensions, as well as some

14  of their more profitable work like speeches and things

15  like that were -- he was not able to generate those

16  activities like he had been in the past.

17      Q.   Got it.

18           But you didn't do any actual analysis to

19  determine whether that was correct; right?

20      A.   I can see it in the financial performance of the

21  company.

22      Q.   Yeah.

23      A.   Historically, they were growing and then they

24  decreased afterwards and they were not profitable in '22

25  and '23.

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 71

1      Q.    Perfect.  Let's go on to Schedule 2 of your
2   report, operating expenses.  Let's go to advertising and
3   marketing.  You'll see that in 2020, he had ███████, or the
4   company had ████████ in advertising and marketing; correct?
5      A.    I can see that.
6      Q.    And in 2021 went down to ██████████
7      A.    Yup.
8      Q.    And then 2022 went to about the same amount of
9   costs as it was in 2020; correct?
10     A.    Correct.
11     Q.    Okay.  So how, sitting here today, can you say
12  that that $██████ increase was attributable to Def Con or
13  Mr. Moss?
14     A.    Well, again, you know, I look at that -- that
15  is -- as a percent of revenue is actually lower in 2022
16  than it was historically, say, 2020, at ████ percent versus
17  prior to that at ████ percent.  So, you know, I don't
18  really necessarily see that as a true increase of $████████
19  as you're just going to say there are damages.  I don't
20  view it that way.
21     Q.    Got it.
22           So you're not able to say that this extra ██████████
23  is attributable to Def Con; is that fair?
24           MR. RIKLIS:  Objection.  Form.
25           THE DEPONENT:  Again, it's the continued

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 72

1    operations of the business.

2         Q.   (By Mr. Dean) Got it.

3              So going to conference supplies, there's an

4    increase from 2021 to 2022, from █████████.  Are

5    you aware of how conference supply increases are tied to

6    Def Con or Mr. Moss?

7         A.   Again, I don't -- part of -- my understanding

8    part of his business is going to Def Con and posting his

9    village there, and conference supplies might -- I would

10   believe would be related to that.

11        Q.   So even though he didn't go to Def Con in 2022,

12   there was an increase in fees or costs that year?

13              MR. RIKLIS:  Objection.  Form.

14              THE DEPONENT:  I wouldn't necessarily call

15   it an increase in cost.  You're at 1.9 percent of revenue.

16   Historically, it had been 4.4, 5.9, 2.4, .9, so I think

17   you were -- we're right in line with what normal or

18   actually below what conference supplies would've been

19   historically.

20        Q.   (By Mr. Dean) Got it.

21              So what about charitable contributions?

22   In 2021, he decided to pay ██████ that he didn't pay

23   in 2021.  Is that attributable to Mr. Moss or to Def Con?

24        A.   Again, you know, that's sort of de minimis for

25   what we're looking at here.  It's right in line with what

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 73

1    they have spent historically on charitable contributions.

2    You know, they spent ███████ in '19; ███ in 2020;

3    didn't have any in 2021, and you have some in 2022.

4        Q.   And what are these consulting fees?

5        A.   I don't know the specifics behind the consulting

6    fees.

7        Q.   Okay.  So you don't know the specifics behind

8    the consulting fee, but there was a rise in the consulting

9    fees because of Mr. Moss and Def Con?

10       A.   I'd have to recall my conversations I had with

11   Mr. Hadnagy about each one of these specific line items.

12   And my recollection is that, yes, some of these expenses

13   were increasing due to the issues that they were having

14   post-release of the transparency report and the update,

15   and increased some of these costs and maybe consulting

16   fees is one of those.

17       Q.   Sitting here today, can you tell me what the

18   consulting fees are?

19       A.   Right.  Like said, I don't know -- I don't know

20   exactly what those relate to.  I'd have to refresh my

21   recollection.

22       Q.   And sitting here today, can you tell me how they

23   actually increased because of Def Con or Mr. Moss?

24       A.   Right.

25            MR. RIKLIS:  Objection.  Form.

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 74

1    THE DEPONENT:  Same answer there.  I don't
2    know the specifics of the increase.
3    Q.  (By Mr. Dean) Got it.
4    Going to meal-business, did Social-Engineer,
5    Mr. Hadnagy just get hungrier in 2022 because of Def Con
6    and Mr. Moss or what are those expenses?
7    MR. RIKLIS:  Objection.  Form.
8    THE DEPONENT:  I — I would disagree with
9    that characterization.  You know, they're 20 -- they're
10   1.2 percent of revenue in 2022, where, historically,
11   they've been 1.8, 2.2, .4, .2.  You know, this is part of
12   the normal activity of operating this business.  Nothing
13   stood out as this is an increase.
14   Q.  (By Mr. Dean) Then what are -- can you point to
15   me the increases in the Schedule 2 that are attributable
16   to Def Con or Mr. Moss?
17   A.    Yeah.  I think when you go to the bottom, you
18   have expenses that are exceeding revenue in 2022 at
19   105 percent.  We're dealing with ███ almost ████████ in
20   total operating expenses.  And, again, in 2023, you're at
21   ██████, and you're also over 100 percent of operating
22   expenses at 103.7 percent, where historically that just
23   wasn't the case.  Right?  Like, they -- they had the
24   ability to increase their revenue, have their expenses
25   increase but at a lower rate than the revenues were

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 75

1    increasing, and have profitability.

2         After the release of the transparency report, we

3    don't have that anymore.  We have an increase in expenses,

4    decreasing revenues, and negative operating performance,

5    right?  So we have an operating loss now in 2022 and 2023.

6         Q.   But why?

7         A.   Again, I'm making the assumption that it's tied

8    back to the issuance of the transparency report.

9         Q.   But how -- I guess how can you make that

10   assumption when you have all these line items that tell

11   you the increases?

12              MR. RIKLIS:  Objection.  Form.

13              THE DEPONENT:  Some of these are going to

14   be directly related to Def Con and the performance of how

15   they operated post-release of the transparency report.

16   But when you have a situation where your revenues are

17   going down or staying flat when you expected an increase

18   and you incur these costs and you're not getting the

19   economic benefit that you expected to get out of them like

20   you had historically.  And, again, I'm making that

21   assumption that that is related to the issuance of the

22   transparency report.

23        Q.   (By Mr. Dean) You said some of them are going to

24   be connected to Def Con, Jeff Moss, and the transparency

25   report, which means that some of them are not going to be

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 91

1      Q.   (By Mr. Dean) Do you understand you're still
2    under oath?
3      A.   I do.
4      Q.   Okay.  Did you look at the line items for public
5    relations and professional fees when preparing your
6    report?
7      A.   Yes, I can see those line items.
8      Q.   Did you look at the support to see what those
9    numbers were comprised of, or did you just base that off
10   of numbers provided by Mr. Hadnagy?
11     A.   Based off of the numbers that were provided and
12   the financial statements.
13     Q.   Do you know whether those professional fees -- I
14   guess let me back up.
15          Professional fees.  What do you mean by
16   professional fees?
17     A.   Right.  The way I look at that or the way that I
18   view that is those are the increased legal fees.
19     Q.   Okay.  So in 2021, there was ██ -- let's call it
20   ██████ in professional fees versus ██████.  Did -- when
21   you looked at this, did you just assume all ██████ were
22   for Mr. -- or for Mr. Moss and Def Con or did you somehow
23   portion it out to prior legal fees?
24     A.   No.  I would say that, you know, there's going
25   to be increased costs associated with professional fees

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 94

1    ███ in 2021 -- that you're ultimately using in your but

2    for analysis; is that right?

3         A.   Correct.

4         Q.   Okay.  Now, I want to take 2020 as an example

5    because I want to make sure I understand how you're

6    getting Social-Engineer costs versus the total income in

7    other things that he's doing.

8              So you go up, you'll see for the total business

9    income loss line, that's where you'll see the ████.  Do

10   you see that?

11        A.   I do.

12        Q.   So is it fair to say that the income for

13   Social-Engineer in 2020 is comprised of business income

14   from Social-Engineer, LLC, and SEVillage LLC?

15        A.   Correct.

16        Q.   Okay.  And then ████, what is this number

17   comprised of for Social-Engineer -- excuse me -- LLC?

18        A.   It's comprised of the overall -- that income of

19   the business.

20        Q.   Where is that in Schedule 2 showing the net

21   income for 2020 to get that number?

22        A.   Maybe the operating income of ████.

23        Q.   I'm seeing ██.  Operating income ██ for 2020.

24   Do you see that as well?

25        A.   I do.

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 103

1    income that has been derived from the business

2    historically inclusive of the wages.

3        Q.    Can you explain that to me again?  I'm not

4    following.

5        A.    So the business generates revenue and expenses,

6    right?  This is just one line item in expenses and it's

7    getting expensed as a wage and being reported as a W-2

8    earnings on their personal tax returns.  So this is the --

9    reporting the total activity related to

10   Social-Engineering.

11       Q.    So Ms. Hadnagy's income -- or the expenses for

12   Ms. Hadnagy in running Social-Engineer also are included

13   in the income that Mr. Hadnagy makes?

14       A.    It would be the overall income that's generated

15   on his 1040, yes, from the business.

16       Q.    Got it.

17             So Mr. Hadnagy's ██████████ in income for

18   Mr. Hadnagy's reputation includes the amounts that his

19   wife makes as a salaried employee for Social-Engineer?

20       A.    Historically, they've been able to generate

21   ████████████████████████████ on average in the form of

22   wages, business income, and that has been interrupted

23   post-loss event due to the fact that they've had the

24   issuance of the transparency report and the activity level

25   inclusive of that has gone down and had losses in '22 and

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 104

1   '23.

2       Q.   Is that typical to add your spouse's income for

3   reputational damages?

4       A.   I'm looking at all of the activity in the

5   economic benefit that's being generated on his personal

6   tax return from Social-Engineering.  Yeah.  Another way to

7   look at it would be just to remove it in '21, '22, and '23

8   and damages would actually go up.

9       Q.   Well, what's the correct way?

10      A.   I think the way that I did it is a correct way

11  to do it.  To go about it is to look at the total economic

12  benefit that's being generated from the business that he's

13  the owner of on his personal tax return.  Historically,

14  it's been ▮▮▮▮▮ in 2021.  It was ▮▮▮▮▮, inclusive of

15  those wages.  You know, I -- I could see it being

16  calculated the -- another way as well where you just say

17  those expenses are not his or those wages are not his, and

18  you could remove them, and, ultimately, the losses would

19  be greater in 2022 and 2023.

20      Q.   So you said, historically speaking, his wages

21  have been ▮▮▮▮▮.  But historically speaking, if you look

22  at ▮▮▮▮▮ all the way through in 2017 to the ▮▮▮▮▮

23  in 2021, and you average those, wouldn't that be ▮▮▮▮▮,

24  not $▮▮▮▮▮?

25      A.   So what years are you trying to average?

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 105

1     Q.    Yeah.  You said historically speaking, he makes
2    ████████  a year; is that fair?
3     A.    In 2020 and 2021, from -- the economic benefit
4   from Social-Engineering has been right around ████ -- so
5   ███████████████.
6     Q.    So let's stop there, 2020 and 2021.  You -- you
7   say because he made ████ and ████ in 2020 and 2021, that he
8   makes ████████ a year for your but for analysis; right?
9     A.    Correct.
10     Q.    But you didn't average those numbers; correct?
11     A.    I did not average them, no.
12     Q.    If you averaged them, it would be about ████████;
13   fair?
14     A.    Which would round to ████████.
15     Q.    So you're kind of using, like, the -- for lack
16   of a better term, like, "thumb to the tongue, this sounds
17   about right, ████," to come up with that but for number;
18   right?
19              MR. RIKLIS:  Objection.  Form.
20              THE DEPONENT:  I'm not, no.  I mean, you're
21   right that the average is $████████.
22     Q.    (By Mr. Dean) Then why not use --
23     A.    That's approximately ████████.
24     Q.    Then why not use ████████?
25              MR. RIKLIS:  Objection.  Form.

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 106

1          THE DEPONENT:  He has -- he's been able to

2    generate        in one year and        in another.  The

3    business was expected to grow in 2022.  Revenues actually

4    did slightly in 2022.  I know it wasn't to the level that

5    was expected, so I -- I selected

6        Q.  (By Mr. Dean) But why not the average?  Why not

7    the historical average?  Why just    ?  Is it because it

8    was a round number?

9          MR. RIKLIS:  Objection.  Form.

10          THE DEPONENT:  Again, I rounded to

11        Q.  (By Mr. Dean) Got it.

12        So you used        because it's a round

13    number; right?

14          MR. RIKLIS:  Objection.  Form.

15          THE DEPONENT:  If I take the average and --

16    the rounded average of those two, it's

17        Q.  (By Mr. Dean) So you're not using exact numbers

18    in your damages report.  You're using rounded numbers in

19    your damages report.

20          MR. RIKLIS:  Objection.  Form.

21          THE DEPONENT:  Again, no.  I mean, I think

22    you have -- looking at the historical profitability, you

23    know, achieving roughly        in 2020,        in 2021,

24    the average, like you said, to        , I rounded it to

25    .

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 117

1              THE DEPONENT:  This has been asked and
2      answered.  My assumption and my premise in this as I'm
3      operating and calculating damages is that the release of
4      the transparency report and the update have caused
5      financial harm to the business.
6         Q.  (By Mr. Dean) Understood.
7              So I want to dig back into the lost business
8      value a little bit.  I know we were talking about it
9      earlier.  We just went to the lost income.  In order for
10     you to give Mr. Hadnagy the entirety of this ███ million
11     dollars, you've got to assume that the business is worth
12     zero; right?
13        A.  On a go-forward basis, correct.  That, you know,
14     we're -- he's no longer a going to concern.  It needs to
15     shut down.  He gets to take his cash.  His cash is not
16     included in that value and hopefully that's enough to
17     satisfy the debts.  And this is what he gets -- or this is
18     what he would've been able to receive had it not been shut
19     down.
20        Q.  Got it.
21             And, actually, I'm going to come back to that in
22     a second.  I have one final question I want to ask about.
23             In 2022, going back to your chart in
24     Paragraph 20, you did but for income for the entire year,
25     January 1st to December 31, 2022.  It would've been ███.

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 118

1   You said he had an actual loss of ███, so that gives

2   you a lost income of ██; correct?

3        A.   Correct.

4        Q.   And that is essentially the ███ plus the $██

5   that's the loss that gives you that ██?

6        A.   It is.

7        Q.   Okay.  So that includes damages from

8   January 1, 2022, to February 10, 2022; correct?

9        A.   I don't necessarily see it that way.  I mean,

10  it's not abnormal to say, you know, that an individual is

11  impacted at some point in 2022 and we're going to look at

12  the full year of but for earnings less actual to arrive at

13  the damages.

14       Q.   You didn't do any formula to say, Well, here's

15  what it was for the entire year.  Let's go for however

16  many days is in the year to kind of break it down from

17  that February 9th going forward?

18       A.   I did not do that.

19       Q.   Got it.

20            Going back now to the lost value -- lost

21  business value.  We were talking about Paragraph 27, and

22  you said, "Yeah.  You'd have to kind of assume that there

23  was a complete destruction."  So before we get there, I

24  want to go back through some of these preceding

25  paragraphs.

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Page 124

1   income approach, were the damages higher or lower than the
2   market approach?
3       A.    It would just depend on how you assess the risk
4   and the discounting for the discount rate.  If you're
5   using, say, a cost of equity of 15 percent, it's going to
6   be higher.  If you're using a cost of equity of, say, I
7   don't know, 17, 18 percent, you're going to be right
8   around the                    .  So I'm thinking it just
9   depends.  Ultimately, I didn't select this method.  I
10  think that the market approach is a sufficient way to go
11  about deriving the value for this business.  Looking at
12  market transactions that are comparable and using that --
13  the multiples from those selected transactions against the
14  financial statistics that we have for Social-Engineering
15  based off of the revenue.
16      Q.    And why is the income approach not appropriate?
17      A.    I wouldn't say it's necessarily not appropriate.
18  It's just I didn't select it.  I selected the market
19  approach.
20      Q.    Did you actually perform an analysis under it,
21  or did you just do some numbers and say, "I think the
22  market approach is better"?
23               MR. RIKLIS:  Objection.  Form.
24               THE DEPONENT:  No.  I didn't necessarily
25  say it's better.  I just -- it's a -- it's a method that I

Page 125

1  did select versus running a capitalization of earnings
2  method.

3      Q.   (By Mr. Dean) Did you run the capitalization of
4  earnings method with respect to Mr. Hadnagy's or
5  Social-Engineer's damages in this case?

6      A.   I haven't formalized a calculation, no.  I have
7  calculations on my end where I -- we absolutely have the
8  model set up where we can test it and see what the value
9  could be under various approaches.

10     Q.   Did you build that out for this case?

11     A.   Yes.  I have -- I have those types of
12  calculations.  I don't have anything formalized, though.

13     Q.   Did you produce those?

14     A.   I can.

15     Q.   What was the damages that you got when you
16  performed that method?

17     A.   Right.  I mean, it could be, you know, right
18  now, the one that I'm looking at if I -- it just depends
19  on how you assess the risk -- right? -- of those cash
20  flows if I -- I'm at              .

21     Q.   And you said that there was different --
22  different variables or different things you can do.  You
23  ran multiple.  Can you tell me what those damages were?

24     A.   Yeah.  Absolutely.  I mean, I'm just -- you
25  know, look at the risk, the discount rate, the cost of

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 128

1   over the last couple years, receiving the balance sheets
2   recently that showed that they had a negative book value
3   for the first time over the review period, I think there's
4   a potential that the business is -- could no longer be a
5   going concern.
6        Q.   So can you definitively say that the business
7   sitting here today is destroyed?
8        A.   No.
9        Q.   But you perform a lost business valuation that
10  essentially states that right around February 9, 2020, the
11  business was worth approximately ████████████ or
12  $███████████; is that right?
13       A.   That's right.
14       Q.   And in assessing your damages, you essentially
15  put the value of the business today at zero to give
16  Mr. Hadnagy all ████████████; correct?
17       A.   Right.  This would be under the scenario that
18  the business does go down.
19       Q.   Okay.  What if the business doesn't go down?
20       A.   Then that number could change.
21       Q.   And what year is your analysis based on?
22       A.   It's based off of the financial performance from
23  2021 prior to the incident as being the basis for
24  establishing the value at that time.
25       Q.   And I'll ask a different question.  I guess,

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 129

1  sitting here today, is the business worth zero and he's
2  entitled to all ▊▊▊▊ or has that changed or is that
3  fluid?  Kind of where are we with what he gets?
4                   MR. RIKLIS:  Object to the form.
5                   THE DEPONENT:  Again, this is the potential
6  loss of the business assuming there's zero value today or
7  that it will go down at some point in the future.  And you
8  can see that in the financial performance, that they are
9  generating losses and the balance sheet showing for the
10  first time that they have a negative equity position and
11  they've taken on debt, which they historically haven't
12  done.  So I think there -- there's indications of it
13  heading that way, but, yes, I would say that it could
14  change.  And if the business improves for some reason or
15  doesn't go under, then that value could change.
16       Q.   (By Mr. Dean) What's the value of the business
17  today?
18       A.    I haven't done a valuation of the business
19  today.  You know, we're assuming under this premise that
20  the value would be zero.  It would go away.  The business
21  would be lost.
22       Q.   And what's that assumption based off of?
23       A.   Again, based off of the financial performance
24  after the issuance of the transparency report where
25  they're generating losses year over year in '22 and '23.

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 134

1   1.6, the -- or, sorry -- the 75th percentile is 2.7, and
2   the high was 3.9 multiples.  I -- you know, based off of
3   my discussions with Mr. Hadnagy, the business is --
4   doesn't necessarily have, like, a software or like a
5   software-as-a-service-type thing, which would typically
6   increase your multiple, and they're more on the
7   traditional consulting -- information consulting side.
8   And due to that, I selected the lower -- towards the lower
9   end of the multiples.
10       Q.    And what were you using to determine the
11  multiple?  I mean, what are the comps?
12       A.    Right.  So I provided the comps.  There's 14
13  transactions from 2010 through 2017.  Sorry, 2023 would be
14  the more recent ones.  And looking at the description of
15  the businesses that were being acquired as well as looking
16  at their -- their revenue and profitability and size and
17  things like that, some were larger than we have here and
18  some were smaller.  So you have -- taking that into
19  consideration, but there's 14 within the information
20  security, security solutions, and consulting industry.
21       Q.    What parameters did you use or metrics did you
22  use to determine these comps?  And if you don't understand
23  what I mean, I can explain.
24       A.    Yeah.  No, I searched with -- inside NAICS codes
25  for information technology, searching specifically for

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 136

1    A.    I have the list of the transactions that were
2    excluded and I can absolutely find them.
3    Q.    After you excluded those entities, did you do
4    anything to find additional entities to add to the final
5    list?
6    A.    No.  The 14 that were selected were sufficient.
7    Q.    Okay.  Why did you use entities from 2010, which
8    were about 14 years ago, or I guess at the point you did
9    your math, it'd be 12 years prior?
10    A.    Yeah.  So, I mean, this is -- in my mind, yeah,
11    that's relatively recent.  I wouldn't call that a stale
12    transaction.  In some industries, it doesn't matter how
13    old you go or how far back you go in time.  They could
14    always transact at one multiples, not -- you know, and be
15    more driven off of the earnings and the revenue of a
16    company versus the multiple.
17    Q.    I am not great at math, but I did the equation
18    on Paragraph 27 of your report, 1-point -- or
19    times     , and I did not get        .  I got      , so what am
20    I doing wrong in my equation?
21    A.    The multiples I provided, if you -- you know, if
22    you look at them, the actual multiple is         , and that
23    would get you there.
24    Q.    So why didn't you put       -- whatever it is you
25    said in your equation on Paragraph 27?

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 137

1       A.    As presentation, you know, typically, you show
2    multiples like a 1.1, 1.2, 0.9.  I absolutely could've
3    expanded it and showed more of the decimal places.
4                      (Exhibit No. 10 introduced.)
5       Q.   (By Mr. Dean) I'm looking at the guideline
6    company transaction summary, which I'm going to mark as
7    Exhibit 10.  That was provided by counsel, and I will show
8    it to you right here.
9            I see it says ▇ as the median, and not ▇ and
10   some other decimal.  So, again, where is that in the
11   information we've been provided that shows a number higher
12   than the ▇?
13      A.    Well, on that spreadsheet, they're derived off
14   of multiples that are up above.  And the revenue multiples
15   are derived off of the equation of revenue divided by the
16   enterprise value, and it would not be difficult to run a
17   median -- you know, redo those calculations, run the
18   median, and find that it's not exactly ▇.
19      Q.    So you used ▇ just for the sake of presentation
20   when you wrote Paragraph 27?
21      A.    Correct.
22            MR. RIKLIS:  Objection.  Form.
23      Q.   (By Mr. Dean) You said correct?
24      A.    Correct.  It was for presentation.  That's
25   generally how multiples are shown.  I mean, I -- yes, we

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 155

1                    C E R T I F I C A T E

2

3     STATE OF ARIZONA    )
                          )
4     COUNTY OF MARICOPA  )

5

6          I, Nicole A. Bulldis, RPR, a Certified Court
      Reporter, do hereby certify under the laws of the State of
7     Washington:

8          That the foregoing videotaped deposition upon
      oral examination of Benjamin Thomas was taken
9     stenographically by me, via Zoom, on November 4, 2024, and
      transcribed under my direction;

10

11         That the witness was duly sworn by me to testify
      truthfully, and that the transcript of the deposition is
      full, true, and correct to the best of my ability;

12

13         That I am not a relative, employee, or counsel
      of any party to this action or relative or employee of
      such counsel, and that I am not financially interested in
14    the said action or the outcome thereof.

15         Reading and signing was not requested pursuant
      to FRCP Rule 30(e).

16

17

18         IN WITNESS WHEREOF, I have hereunto set my hand

19    this 5th day of November 2024.

20

21

22    _____
      Nicole A. Bulldis, RPR
23    WA CCR No. 3384

24

25

BUELL REALTIME REPORTING, LLC
206.287.9066 | 800.846.6989