The Honorable Brian A. Tsuchida

1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9   CHRISTOPHER J. HADNAGY, an individual;          NO.  2:23-cv-01932-BAT
    and SOCIAL-ENGINEER, LLC, a Pennsylvania
10  limited liability company,

11              Plaintiffs,                          PLAINTIFFS'OPPOSITION AND
                                                     RESPONSE TO DEFENDANTS'
                                                     MOTION TO EXCLUDE
12         v.                                        PLAINTIFFS' EXPERT WITNESS
                                                     BENJAMIN P. THOMAS, CPA,
13  JEFF MOSS, an individual; DEF CON                CFE
    COMMUNICATIONS, INC., a Washington
14  corporation; and DOES 1-10; and ROE             NOTED FOR CONSIDERATION:
    ENTITIES 1-10, inclusive,                        APRIL 4, 2024

15
                Defendants.
16

17              I.      INTRODUCTION AND RELIEF REQUESTED

18         Pursuant to FRCP 26(A)(2)(D), Plaintiffs Christopher Hadnagy ("Hadnagy") and Social-

19  Engineer, LLC ("Social-Engineer") designated Certified Public Accountant and Fraud Examiner,

20  Benjamin P. Thomas, CPA, CFE, as their expert witness. Contrary to Def Con Communication's

21  ("Def Con") and Jeff Moss' ("Moss," a.k.a. "The Dark Tangent") assertion that Mr. Thomas'

22  report fails the *Daubert* test, he is more than qualified to provide the expert testimony on economic

23  loss. Moreover, his methodology of calculating future loss, the market method, is sound and

PLAINTIFFS' RESPONSE TO MOTION TO DISQUALIFY
PLAINTIFFS' EXPERT WITNESS - 1
CASE NO.: 2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

1    accepted by all business valuation standards. Unfortunately, Defendants' motion mischaracterizes

2    Mr. Thomas' expert report, his testimony, and takes snippets of testimony to assert conclusions

3    that Mr. Thomas never made. Importantly, Mr. Thomas' methodologies align with widely accepted

4    forensic accounting principles, even those contended by Defendants. In making their shotgun of

5    arguments against Mr. Thomas, Defendants also fail to apply applicable law to underlie their off-

6    the-cuff claims, and end up applying distinguishable case law. As such, Plaintiffs respectfully

7    request that the Court deny Defendants' motion, as Mr. Thomas meets the *Daubert* threshold and

8    should be allowed to testify as to his expert findings.

9                    **II.     AUTHORITY AND ARGUMENT**

10            Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by

11    knowledge, skill, experience, training or education may testify in the form of an opinion or

12    otherwise" if their expertise "will help the trier of fact to understand the evidence or determine a

13    fact in issue," the proffered testimony "is based on sufficient facts or data" and "is the product of

14    reliable principles and methods," and "the expert has reliably applied the principles and methods

15    to the facts of the case." The party seeking to offer expert testimony "has the burden of showing

16    the admissibility of the testimony by a preponderance of the evidence." *Spearman Corp.*

17    *Marysville Div. v. Boeing Co.*, 2022 WL 11823467, at *1 (W.D. Wash. Oct. 21, 2022).

18            The Court's role is to act as a gatekeeper, "ensur[ing] the reliability and relevancy of expert

19    testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). "The test for reliability,

20    however, 'is not the correctness of the expert's conclusions but the soundness of his methodology.'

21    And, reliable testimony must nevertheless be helpful." *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d

22    1187, 1192 (9th Cir. 2007) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318

23    (9th Cir. 1995)). The Ninth Circuit has cautioned district courts from weighing expert "conclusions

PLAINTIFFS' RESPONSE TO MOTION TO DISQUALIFY
PLAINTIFFS' EXPERT WITNESS - 2
CASE NO.: 2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

1   or assum[ing] a factfinding role." *Elosu v. Middlefork Ranch, Inc.*, 26 F.4th 1017, 1020 (9th Cir.

2   2022). The Court "is not tasked with deciding whether the expert is right or wrong, just whether

3   [the] testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc. v.*

4   *Avis Budget Grp., Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013).

### A. <u>Mr. Thomas is more than qualified to testify as an economic loss expert.</u>

6   A person is qualified to testify as an expert if he or she has sufficient "knowledge, skill,

7   experience, training or education" on the subject to which their testimony relates. *Fed. R. Evid.*

8   702. The district court is "a gatekeeper, not a fact finder." *Elosu*, 26 F.4th at

9   1024 (quoting *Primiano v. Cook*, 598 F.3d 558, 568 (9th Cir. 2010)). "[FRE] 702 does not license

10  a court to engage in freeform factfinding, to select between competing versions of the evidence,

11  or to determine the veracity of the expert's conclusions at the admissibility stage." *Id.* at 1026.

12  "Accordingly, 'the district court is not tasked with deciding whether the expert is right or wrong,

13  just whether his testimony has substance such that it would be helpful to a

14  jury.' " *Id.* (quoting *Alaska Rent-A-Car, Inc.*, 738 F.3d at 969–70) (cleaned up); *see also* Fed. R.

15  Evid. 702, advisory committee note 1 to 2023 amendment ("Applying a higher standard than

16  helpfulness to otherwise reliable expert testimony is unnecessarily strict."). The Ninth Circuit has

17  emphasized *Daubert*'s guidance that Rule 702 "should be applied with a 'liberal thrust' favoring

18  admission." *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir.

19  2014) (citing *Daubert*, 509 U.S. at 588).

20  The party seeking to submit expert testimony bears the burden of proving

21  admissibility. *Lust ex rel. Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

22  "[P]roponents 'do not have to demonstrate to the judge by a preponderance of the evidence that

23  the assessments of their experts are correct, they only have to demonstrate by a preponderance of

PLAINTIFFS' RESPONSE TO MOTION TO DISQUALIFY
PLAINTIFFS' EXPERT WITNESS - 3
CASE NO.: 2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

1   evidence that their opinions are reliable.' " Fed. R. Evid. 702, advisory committee note 1 to 2023

2   amendment (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)). The

3   question is whether Mr. Thomas has any special knowledge, skill, experience, training or education

4   sufficient to qualify him as an expert on Plaintiffs' economic loss in the wake of Defendants'

5   defamatory statements about Plaintiffs.

6        Mr. Thomas is a Certified Public Accountant (CPA) and a Certified Fraud Examiner (CFE)

7   with extensive experience serving as an expert witness in providing calculations of economic

8   damages. *See* Dkt. 92 ("Ben Thomas Expert Report."). Mr. Thomas currently serves as Senior

9   Director at Alvarez & Marsal Valuation Services, LLC, a global consulting firm that employs over

10  10,000 individuals; Mr. Thomas has more than 15 years in accounting experience. Ben Thomas

11  Expert Report, ¶ 1-2 (Exhibit 1 to Expert Report, at pp. 1-5).  Throughout these 15 years, he has

12  been involved in complex business evaluations in various industries that include, but are not

13  limited to, information technology. *Id.* He has conducted economic damages evaluations in

14  hundreds of engagements, [1] on behalf of insurance carriers and private litigants; more than 12 of

15  these have involved claims arising within the cybersecurity industry. *Id.*; Declaration of Kristofer

16  Riklis ("Riklis Decl."). Ex. A (Thomas Deposition transcript) at 10:19-25. Moreover, Mr. Thomas

17  has testified as an economic damages expert in more than 20 cases, some of which included

18  defamation claims and those considering reputational harm. Thomas Dep. at 11:1-22. Throughout

19  his career, Mr. Thomas has been published and spoken publicly at various organizations including

20  K&L Gates, Alliance, Clear Law Institute, The University of Washington, and King County Bar

21  Association. Id, (Exhibit 1 at pg. 5).

22

23

---

[1] Notably, Perkins Coie LLP has recognized Mr. Thomas as an expert in the field of economic damages, forensic accounting, and business valuation, as he has been retained numerous times as their named expert.

PLAINTIFFS' RESPONSE TO MOTION TO DISQUALIFY
PLAINTIFFS' EXPERT WITNESS - 4
CASE NO.: 2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

Mr. Thomas is sufficiently qualified to provide expert testimony on the subject of Plaintiffs' economic and business loss. Defendants arguments are unsupported and the Motion should be denied.

**B. Mr. Thomas' lost business valuation is based on "market approach" which is widely accepted methodology for determining loss of future business value.**

Mr. Thomas selected a commonly utilized business valuation method, known as the market approach. Riklis Dep. Ex. A at 118:19-119:17. Mr. Thomas states that he ruled out the other main approaches, the income and the cost approach methodically after analyzing Social-Engineer's financial statements. *Id.* at 119:1-8. Mr. Thomas selected the market approach when he discovered that: 1) Social-Engineer's intangible assets (as opposed to tangible assets) generate cash flow; 2) Social-Engineer documented a historical cash flow that could be examined and extrapolated; and 3) Social-Engineer exhibited increasing revenue on a year over year trend prior to Def Con's sabotage. *Id.* at 118:19-124:24; 125:3-126:9.

Defendants make unsupported claims that there are four static methods of valuation according to THE COMPREHENSIVE GUIDE TO ECONOMIC DAMAGES (discussed below) that expressly sets forth as follows:

> Depending on the facts and circumstances of a particular case, financial experts may utilize a single methodology or a combination of the above methods to substantiate their primary analyses. For example, in developing lost profits analyses, the financial expert may look at growth rates the plaintiff experienced prior to and after the proffered damages period. In addition, the expert might compare the subject company's actual experience to other operating units of the company and/or industry guideline candidates [...] Each of the four methods listed above provides the financial expert with a framework within which to gather empirical and evidentiary support for the revenue projections of what would have happened "but for" the actions alleged against the defendant.

NANCY J. FANNON AND JONATHAN M. DUNITZ, THE COMPREHENSIVE GUIDE TO ECONOMIC DAMAGES 225 (7th Ed. 2018) (emphasis added.); *See* Dkt. 91 ("Defendants' Motion to Exclude") at pg. 9:7-10. Nonetheless, Mr. Thomas utilized two of those four methods, the market model, and

PLAINTIFFS' RESPONSE TO MOTION TO DISQUALIFY
PLAINTIFFS' EXPERT WITNESS - 5
CASE NO.: 2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

1    the before-and-after method, in making his report. Both of these are indeed a method named in

2    Defendants' secondary source.

3        Significantly, Defendants appear to agree that Mr. Thomas should utilize the market

4    approach and the before-and-after method. They do not cite any case law that precludes him from

5    doing so. Given the aforementioned, it is clear that Mr. Thomas based his valuation on widely

6    accepted methodology.

7    **C.  Mr. Thomas thoroughly explained the basis for his selection of comparable**
     **transactions underpinning his application of the market approach and Plaintiffs**

8    **produced his underlying calculations and statistics.**

9        Defendants attempt to question Mr. Thomas' use of the market approach in valuing

10   Plaintiffs' future economic losses by claiming that he did not do due diligence about the

11   comparable guideline transactions used. However, Mr. Thomas explained that he used 14

12   comparable transactions from 2010 through 2023; Mr. Thomas chose the comparable transactions

13   to support his valuation of Plaintiffs' damages based upon business descriptions, revenue, size,

14   and profitability within the information security, security solutions and consulting industry. Riklis

15   Decl. Ex. A at 134:10-20. Mr. Thomas utilized NAICS codes for information technology, and:

16       "specifically for security within that, looking for transactions greater than 2010, looking
         for companies that had sales between half a million and 100 million, looking for
17       transactions that occurred within the United States, and from that, selecting the ones based
         off the descriptions that were the most comparable to [Plaintiffs][…] just in the information
18       security industry[.]" *Id.* at 134:24-135:8.

19   Mr. Thomas expressly explained that in "some industries, it doesn't matter how old you go or how

20   far back you go in time. They could always transact at one multiples […] and be more driven off

21   of the earnings[.]" *Id.* at pg. 136:10-16. It is clear that his widely acceptable guideline transaction

22   methodology is thorough and reliably applied.

23

PLAINTIFFS' RESPONSE TO MOTION TO DISQUALIFY
PLAINTIFFS' EXPERT WITNESS - 6
CASE NO.: 2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

Furthermore, Mr. Thomas explains precisely why he deselected certain transactions from the comparable transactions in his deposition. Specifically, he deselected the companies that operated in irrelevant industries; he provided examples of tanning salons, and companies related to military and offered to provide Defendants with the list of companies removed. *Id.* at pg. 135:9-136:2. Critically, many of the deselected companies had higher multipliers and Mr. Thomas took the conservative approach. Moreover, Defendants never followed up on Mr. Thomas' offer to list those deselected transactions; Defendants never expressed any interest in obtaining this list, which they now baselessly complain about.

Plaintiffs also produced all of the guideline transaction calculations to Defendants, including the a financial overview of the companies used in the market approach, along with the revenue multiplier. Specifically, on October 11, 2024, Plaintiffs provided Mr. Thomas' detailed calculations for his use of the market approach. Riklis Decl. Ex. B (Bates SE_001997-98). That same day, Plaintiffs also provided the Guideline Transaction Summary and Valuation Multiples, which details all the market comparable transactions, and includes a financial overview of the companies used in the market approach and the revenue multiplier used. *Id.*

To be sure, Mr. Thomas indeed testified regarding the exact multiplier that he used and that he merely abbreviated the revenue multiple for the sake of the report, which is a standard practice; as opposed to showing all of the decimal places. Riklis Decl. Ex. A. at pg. 136:17-137:3.[2] Mr. Thomas' Expert Report also clearly sets forth how he reached that multiple, and that he selected the more conservative multiple, which ended up being the median, as opposed to the more aggressive mean. His Expert Report states:

---

[2] Mr. Thomas clearly explained that although he abbreviated the exact multiple he used: "the revenue multiples are derived off of the equation of revenue divided by the enterprise value" Id. at pg. 137:14-16.

PLAINTIFFS' RESPONSE TO MOTION TO DISQUALIFY
PLAINTIFFS' EXPERT WITNESS - 7
CASE NO.: 2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

I selected multiples of cash-adjusted enterprise value-to-revenue as the most relevant valuation metrics, given the correlation observed in the data set. The following table displays the revenue multiples derived from the selected guideline transactions.

| | 25th Percentile | Median | Mean | 75th Percentile | High |
|---|---|---|---|---|---|
| MVIC/ Revenue | 0.7 x | 0.9 x | 1.6 x | 2.7 x | 3.9 x |

*See* Mr. Thomas' Expert Report, at para. 26. Indeed, Mr. Thomas conservatively selected the Median multiplier in his data set, as opposed to the Mean, which would have yielded a higher damages number. Just because Mr. Thomas did not insert the entire multiple into this specific presentation, it does not mean that his methods are unreliable or that he should be disqualified. To the contrary, his calculations have been set forth at length and produced and he should clearly be allowed to testify at trial.

In conclusion, Mr. Thomas' market approach at valuing future business loss is sound and a widely accepted method of valuing this portion of future economic damages, as explained more thoroughly below.

**D.  Defendants Mischaracterize Mr. Thomas's Testimony Regarding Business Valuation by Ignoring Its Context and Analytical Basis.**

Defendants also attempt to muddy the waters when mischaracterizing Mr. Thomas' testimony regarding the theoretical notion that Plaintiff's business was "entirely destroyed." A plain reading of Mr. Thomas' testimony shows that this random snippet was taken completely out of context, as Mr. Thomas explained the general premise within the valuation model:

[T]hat's the second part of the calculation here where we're looking at the lost value.  You know, the business, as I see it, has performed poorly in 2022 and 2023 post-event, and, you know, there's a potential that the future economic damages could be –it's a complete loss of business income. […] Again, this is the potential loss of the business assuming there's zero value today or that it will go down at some point in the future.  And you can see that in the financial performance, that they are generating losses and the balance sheet showing for the first time that they have a negative equity position and they've taken on debt, which they historically haven't done. So I think there -- there's indications of it

1    heading that way, but, yes, I would say that it could change. And if the business
2    improves for some reason or doesn't go under, then that value could change.

3    *Id.*. at 15:18-23; 129:5-15.

4        As Mr. Thomas explained, if Social-Engineer's business improves or does not ultimately

5    fail, he will not present damages for lost business valuation at trial. It is that straightforward.

6    However, because the company continues to operate at a loss and incur debt, Mr. Thomas

7    reasonably accounted for the possibility of total business failure in his damages calculation and

8    disclosed that information to Defendants. Had Plaintiffs failed to include this scenario—and

9    Social-Engineer later ceased operations—Defendants would likely argue that any subsequently

10    disclosed opinions on valuation were inadmissible.

11        In any event, the inclusion of a potential total business loss scenario does not render Mr.

12    Thomas' testimony unreliable where, as here, the underlying assumptions and methodology are

13    supported. See *W.R. Grace & Co. v. Zotos Int'l, Inc.*, 504 F.3d 755, 762 (9th Cir. 2007). Given

14    Mr. Thomas' credentials and substantial experience with a global consulting firm, his application

15    of the market approach is well-founded.

### E. Mr. Thomas' use of the before-and-after method regarding Plaintiffs' lost income is reliable and grounded in a detailed analysis of Plaintiffs' historical profit and loss statements, tax returns, and balance sheets.

17        Federal Rule of Evidence 702 "grant[s] expert witnesses testimonial latitude unavailable

18    to other witnesses on the assumption that the expert's opinion will have a reliable basis in the

19    knowledge and experience of his discipline." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148,

20    119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (internal quotation omitted).

21        To be reliable, an expert opinion must be based on "good grounds," *i.e.*, it must be based

22    on the knowledge and experience of the expert's discipline rather than on "subjective belief or

23    unsupported speculation." *Daubert*, 509 U.S. at 590. Accordingly, it must have "sufficient factual

PLAINTIFFS' RESPONSE TO MOTION TO DISQUALIFY
PLAINTIFFS' EXPERT WITNESS - 9
CASE NO.: 2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

grounds on which to draw conclusions." *Elosu*, 26 F.4th at 1025-26. It must also be based on valid reasoning or methodology that can properly be applied to the facts in issue, and the reasoning or methodology must be adequately explained. *United States v. Valencia-Lopez*, 971 F.3d 891, 900 (9th Cir. 2020). Review of relevant materials coupled with specialized knowledge can provide a reliable basis for opinion testimony. *United States v. Vallejo*, 237 F.3d 1008, 1020 (9th Cir.), opinion amended on denial of reh'g, 246 F.3d 1150, 1020-21 (9th Cir. 2001)

Experts regularly "extrapolate from existing data," and need not base their opinions solely on firsthand observation. *Daubert*, 509 U.S. at 592. As the Ninth Circuit has emphasized, Rule 702's "sufficient facts or data" requirement demands foundation, not corroboration. *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1025 (9th Cir. 2022). Arguments that an expert relied on evidence from an interested party or that the report lacks corroborating evidence go to weight, not admissibility. *Id.* at 1028. Similarly, disputes over alternative explanations, opposing interpretations, or reliance on certain data sources should be resolved by cross-examination at trial—not by preemptively excluding expert testimony. See, e.g., *Scott v. Ross*, 140 F.3d 1275, 1286 (9th Cir. 1998); Fed. R. Evid. 705.

Here, Mr. Thomas opines using the before-and-after method. The facts are expressly based on objective and verifiable financial documentation—including Plaintiffs' historical profit and loss statements, balance sheets, and tax returns from 2016 through 2023. Ben Thomas' Expert Report, Exhibit 2; and Riklis Decl. Ex. A at 66:16–67:3; 122:12–16. After reviewing and assessing this information, Mr. Thomas identified an unmistakable "link between the time—the time frame of when the events occurred and the negative financial performance of the business." *Id.* at 21:16–18. ***Before*** the events at issue in 2022 and 2023, "the business was profitable," and Mr. Hadnagy had regular income. *Id.* at 21:20–22:1. ***After*** those events, however, "the business was not

PLAINTIFFS' RESPONSE TO MOTION TO DISQUALIFY
PLAINTIFFS' EXPERT WITNESS - 10
CASE NO.: 2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

profitable and the business did not have income." *Id.* at 28:20–29:2; 63:20–64:1 ("prior to the release, the company was on a growth path with profitability. And post-event, there are declining revenues as well as they are incurring losses"). This is precisely the type of data experts in Mr. Thomas' field rely upon to assess lost income—by analyzing financial performance ***before and after*** the triggering events.

Mr. Thomas' opinions are also not formed in a vacuum; rather, they are directly supported by the factual record. As Ryan McDougall, Social-Engineer's Chief Operating Officer at the time, explained, prior to Def Con's actions, the company was "consistently growing and we were gaining new clients and additional work from existing clients." Dkt. 100 ¶ 19. This growth occurred without any formal marketing staff or strategy. *Id.* However, following the release of Def Con's statements, Social-Engineer experienced immediate resistance from both existing and prospective clients—many of whom explicitly referenced the Def Con statements during meetings. *Id*. McDougall confirmed that "nothing else had changed during this period of time aside from the release of the transparency report and statements by Def Con." *Id.* In his words, the aftermath of Def Con's actions marked a sharp departure from every prior year he had experienced with the business. *Id.*

Defendants' motion and deposition also devote substantial energy to a "spreadsheet" prepared by Plaintiffs. The spreadsheet identifies existing clients and those in pilot programs or pre-contractual discussions. However, Mr. Thomas did not use this spreadsheet as the foundation of his damages calculations. He did not extrapolate potential future income from these names, nor did he assume that any of these potential clients would necessarily result in future contracts or revenue. When questioned about the "spreadsheet," Mr. Thomas explained:

> "Again, I've reviewed that spreadsheet that details out certain contracts and certain contracts that were impacted, and those contracts began prior to February 2022. And so I

PLAINTIFFS' RESPONSE TO MOTION TO DISQUALIFY
PLAINTIFFS' EXPERT WITNESS - 11
CASE NO.: 2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

1  can see from – or **I can glean from that, that you know there's contracts that come in
2  and go out on an annual basis**. And so I – from that perspective, I have analyzed the
   contracts, but I haven't reviewed specific contracts."

3  *Id.* at 22:18-25 (emphasis added).

4      This context makes clear: the client spreadsheet was used only to understand the

5  operational flow of the business, not to inflate revenue or project speculative damages.

6  Defendants' suggestion that Mr. Thomas built his model around this document is unsupported and

7  inaccurate. Instead, Mr. Thomas' expert report is firmly rooted in objective financial evidence and

8  a well-accepted methodology. He relied on Plaintiffs' *actual* profit and loss statements, tax returns,

9  and balance sheets. Ben Thomas' Expert Report, Exhibit 2; and Riklis Decl. Ex. A at 65:18-67:3.

10 Defendants' arguments on this point should be dismissed.

11     Defendants motion also relies on cases like *Therasense* or *Geo. M. Martin Co.* to argue for

12 exclusion; those cases are clearly inapposite. In *Therasense*, the expert's entire opinion was based

13 on secret, undisclosed experiments that were hidden during discovery. *Therasense, Inc. v. Becton,*

14 *Dickinson & Co.*, No. C 04-02123 WHA, 2008 WL 2323856, at *3 (N.D. Cal. May 22, 2008).

15 According to the Court, "The entire foundational project was a secret clearly intended to thwart

16 discovery into the foundation. It was sprung on all opponents only after the close of fact discovery.

17 Without any foundation, Dr. Johnson's testimony would be improper." *Id.*  This is hardly

18 comparable to the case before this court in which Mr. Thomas used produced and objective

19 financial records, and in which the parties participated openly in discovery.

20     Additionally, Defendants' citation to *Geo. M Martin Co.* is clearly distinguishable. *Geo.*

21 *M. Martin Co. v. All. Mach. Sys. Int'l, LLC*, No. C 07-00692 WHA, 2008 WL 2008638, at *1 (N.D.

22 Cal. May 6, 2008). *Geo. M. Martin Co.* involved an inadmissible survey whose methodology and

23 origin were opaque and unsupported and excluded on motion in limine. *Id.* Moreover, the Court

PLAINTIFFS' RESPONSE TO MOTION TO DISQUALIFY
PLAINTIFFS' EXPERT WITNESS - 12
CASE NO.: 2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

found that "Defense counsel sandbagged plaintiffs' counsel as well by cloaking this 'survey' in a claim of privilege until after fact discovery had closed." *Id.* Here, Mr. Thomas' work was grounded in IRS-filed tax returns and company profit-and-loss statements and balance sheets. The client list Defendants take issue with was a small fraction of documents that were used to portray business flow. Ben Thomas' Expert Report, Ex. 2; and Riklis Decl. Ex. A at 66:16-67:3  Plaintiffs also never withheld evidence from Defendants, nor did they ever refuse to answer questions or provide documents.

Mr. Thomas' testimony and report clearly demonstrate that he applied reliable methods grounded in a thorough review of Plaintiffs' historical financial statements and tax returns.

**F.**  **Mr. Thomas provided perfectly reasonable explanations regarding the purportedly increased operating expenses in his historical loss calculations.**

During the deposition of Mr. Thomas, and in Defendants' motion, defense counsel draws conclusions that are incongruent with Mr. Thomas' opinion or conclusion regarding various expenses incurred by Social-Engineer. Mr. Thomas clearly sets forth his theory about increased historical operating expenses in various line items, including conference supplies, charitable contributions, consulting fees, and meal-business. However, Mr. Thomas specifically addresses his analysis of the expenses, stating:

> "[T]hat's not exactly how I view it. Right? I see that some of them are going to be directly tied to the event, the release of the transparency report and could be more easily linked and identifiable to [the Defamation allegations] and others are going to be what appear to be more normal business operating expenses but are also going to be impacted by this issue as the revenues are not increasing or going down as expected or not going up as expected but they're actually going down. And you have these costs that are being incurred and you're not being able to generate a profit." *Id.* at 76:6-17; 70:4-71:20.

In one instance, he testified:

> Q. Okay. So how, sitting here today, can you say that $10,000 increase was attributable to Def Con or Mr. Moss?

PLAINTIFFS' RESPONSE TO MOTION TO DISQUALIFY
PLAINTIFFS' EXPERT WITNESS - 13
CASE NO.: 2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

A. […]I don't really necessarily see that as a true increase of $10,000 as you're just going to say there are damages. I don't view it that way." *Id.* 71:11-20.

Defendants continue this line of questioning about various expenses. *Id.* However, this line of questions misses the bigger picture: Defendants actions caused Social-Engineer's revenue to plummet to the point that they could not cover typical increased business expenses. Additionally, some of Plaintiffs' new expenses were expended only as a result of the Defamation allegations; all the while, Plaintiffs' revenue was plummeting.

In a similar vein, Defendants misconstrue Mr. Thomas' opinion in one singular instance in which Mr. Thomas opined that Plaintiff Hadnagy was capable of earning approximately $250,000. *Id.* at 105:12-106:25. Defendants take issue with this single instance of estimated earning power, because the number is removed from the exact average of Plaintiff Hadnagy's earnings by approximately $3,000 dollars. To make the sweeping assumption that Mr. Thomas "assumes round numbers" is another example of Defendants unsupported suppositions taken to an extreme that is not applicable.

Defendants may take issue with the increase in expenses during the period when Social-Engineer's revenue declined and Mr. Thomas' single use of a round number, but these are not a basis to exclude Mr. Thomas' opinions. Such challenges go to the weight of the evidence—not its admissibility—and are properly addressed through cross-examination. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993); *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013). These are appropriate topics for cross-examination—not exclusion.

///

///

PLAINTIFFS' RESPONSE TO MOTION TO DISQUALIFY
PLAINTIFFS' EXPERT WITNESS - 14
CASE NO.: 2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

1

2

**G.** **Mr. Thomas' calculations do not include either profits from the excluded time period, or any inappropriate costs and income.**

3

Defendants' bogus attempts to discredit Mr. Thomas based on the false premise that he

4

included irrelevant income streams are blatantly wrong. For example, Defendants scream that Mr.

5

Thomas included Mrs. Hadnagy's income from Plaintiff Social-Engineer. However, they fail to

6

note that Mr. Thomas specifically included Mrs. Hadnagy's lost income as a ***mitigating factor*** in

7

Mr. Hadnagy's damages. If Mr. Thomas removed Mrs. Hadnagy's income from his lost income

8

calculations, then Plaintiffs' potential loss of earnings calculations would be approximately

9

$200,000 ***more*** than what Mr. Thomas testified to.

10

Additionally, Mr. Thomas clearly testifies that he did not include the damages from January

11

1st, 2022, through February 9, 2022, and that he included professional fees such as public relations

12

fees. *Id.* at 20:15-23; 91:19-92:7. Although Mr. Thomas considered professional fees and legal

13

fees, Mr. Thomas did not testify that these were litigation costs. *Id*. at 91:13-18; 68:1-15. Mr.

14

Thomas merely concluded that there were professional public relations and legal fees expended

15

that would not have needed to be spent "but for" the defamatory statements. This is clearly within

16

the ambit of consequential damages and Defendants are welcome to dispute the nature of these

17

claims at trial.

18

To be sure, Mr. Thomas' damages calculations were based off of his review of Plaintiff

19

Hadnagy's past historical taxable income. Mr. Thomas then used these objective figures to

20

determine Mr. Hadnagy's likely income for the years that he was affected by Def Con's actions.

21

The relevant inquiry focuses on the total income streams attributable to Mr. Hadnagy during the

22

relevant historical period—regardless of whether those streams flowed from entities or joint

23

filings—because they reflect his actual, reported earnings. Within that analysis, it is wholly

appropriate for Mr. Thomas to include income historically earned by Mr. Hadnagy through

PLAINTIFFS' RESPONSE TO MOTION TO DISQUALIFY
PLAINTIFFS' EXPERT WITNESS - 15
CASE NO.: 2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

SEVillage, as well as income reported jointly with his spouse, because the purpose of a lost income

analysis is to assess what Mr. Hadnagy personally would have earned but for Defendants' conduct.

*Id.* at 94:12-14; 104:2-8.

In any event, Defendants' attempt to mischaracterize Mr. Thomas' testimony by construing

it to support conflicting conclusions does not justify excluding his opinions. Courts have routinely

held that such disputes—particularly those involving alleged inconsistencies or competing

interpretations of an expert's testimony—are properly addressed through cross-examination, not

exclusion. See *In re Viagra Prods. Liab. Litig.*, 424 F. Supp. 3d 781, 790 (N.D. Cal. 2020)

("apparent inconsistencies" in expert opinions did "not rise to a level that would warrant excluding

the experts as unreliable" and were "properly explored through cross-examination"); *Buck v. City*

*of Sandpoint*, 2008 WL 4498806, at *20 (D. Idaho Oct. 1, 2008) (noting that "internally

inconsistent statements are not necessarily grounds for exclusion, but rather fertile content for

cross-examination"); see also *Scott v. Ross*, 140 F.3d 1275, 1286 (9th Cir. 1998). Such challenges

go to the weight and credibility of the evidence—not its admissibility.

**H. <u>Mr. Thomas does not "double dip," he merely sets forth Plaintiffs' historical economic loss as a loss of profits whereas he bases Plaintiffs' future loss on loss of business value.</u>**

Defendants accusations about double dipping are wrong; simply put, Mr. Thomas utilizes

different methods by which he calculated historical and future losses. He calculated historical loss

by adding up Plaintiffs' lost income and using the before-and-after method. Ben Thomas' Expert

Report, at ¶18-21. Mr. Thomas then calculated future loss using the market approach's guideline

transaction method, under the assumption that the business would lose its entire value at a future

point due to this devastating event. *Id.* at ¶ 22-27.

PLAINTIFFS' RESPONSE TO MOTION TO DISQUALIFY
PLAINTIFFS' EXPERT WITNESS - 16
CASE NO.: 2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

This method is (even according to sources relied upon in Defendants' motion), supported by business valuation experts across the board, and no case cited by Defendants precludes it. Mr. Thomas' methodology is set forth in depth in THE COMPREHENSIVE GUIDE TO ECONOMIC DAMAGES:

> [a] business may not recover both lost profits and the market value of the business." [*Montage Group, Ltd. v. Athle-Tech Computer Systems, Inc.*, 889 So. 2d at 193] However, this general rule is for those who would <u>attempt to recover both lost profits and lost value for the same period of loss</u>. **Lost profits and lost value may occur when the company operates for a period of time, then shuts down as a result of the defendant's damaging actions, thereby incurring a period of lost profits, followed by the destruction of the business.** As one court stated:

>> Generally, one cannot recover as damages both diminution in value of a business as well as loss of *future profits* because future profit potential is a factor utilized in calculating market value and, as such, is compensated for in the diminution of value award. However, loss of profits prior to cessation of a damaged business is properly al-lowable as an element of damages in addition to an allowance for a market value diminution because the interim profit losses experienced prior to liquidation of the business are not reflected or compensated for in the market value determination."[*Jim's Hot Shot Serv., Inc., v. Continental Western Ins. Co.*, 353 N.W.2d 279, 284 (N.D. 1984) (internal citations omitted)].

>> In other words, in such cases, the courts will not permit "double counting" in calculating a plaintiff's allowable recovery, but they will allow calculations that represent successive losses.

FANNON ET AL., THE COMPREHENSIVE GUIDE TO ECONOMIC DAMAGES AT 286 (emphasis added.).

Here, Mr. Thomas calculated the successive losses:

> "Given the financial losses incurred by Mr. Hadnagy and Social-Engineer in 2022 and 2023, potential future economic damages can be estimated by a loss in business value. The potential loss of business value can be estimated by valuing Social-Engineer prior to the Transparency Report on February 9, 2022 and/or the Update on January 13, 2023."[3]

The Defendants wrongly compare the facts at bar with cases about the cumulative nature of rewards that are inapplicable to admissibility of Expert testimony; moreover, Defendants cite

---

[3] Ben Thomas' Expert Report at ¶ 22.

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

inapplicable law. They cited cases challenging damages awards in judgments from jury trials that have starkly different facts, and ***none*** of the cases even examine the admissibility of expert testimony pre-trial. In *Herrington*, the court examined a loss of value award regarding a parcel of property and determined that it would be cumulative for a party to recover loss of value of a piece of property *in addition* to the loss of "alleged development potential" of the property, since they are intertwined. *Herrington v. Sonoma Cnty.*, 834 F.2d 1488, 1506 (9th Cir. 1987), opinion amended on denial of reh'g sub nom. *Herrington v. Cnty. of Sonoma*, 857 F.2d 567 (9th Cir. 1988). Defendants next cite to *Johnson*, for the inapplicable proposition that the two methods of present value of all future earnings *and* market value of the business are the same methods of measuring the present damages. *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 508 (4th Cir. 1986); *See* Dkt. 90 at 19:24-20:3. Mr. Thomas' calculations are distinguished because he is measuring historical loss and future loss, separately. Finally, *Am. Anodco* discusses breach of contract damages, where the calculated damages incorrectly accounted for a three-year period of time leading up to the contractual breach, twice. *Am. Anodco, Inc. v. Reynolds Metals Co.*, 743 F.2d 417, 424 (6th Cir. 1984). Here, it is clear that Mr. Thomas' calculations are expressly split between calculations of historical and future damages. Ben Thomas' Expert Report at ¶ 18-27.

### I.   <u>Defendants' argument that Mr. Thomas did not consider other factors for causation is a red-herring.</u>

Defendants' miss the mark when comparing the case at bar to *Grasshopper* assuming that Mr. Thomas' report can be disqualified because it "does not consider alternative explanations." *Grasshopper House, LLC v. Clean & Sober Media LLC*, No. 218CV00923SVWRAO, 2019 WL 12074086, at *11 (C.D. Cal. July 1, 2019). Defendants mislead the Court because the *Grasshopper* case involved an expert witness who was provided specific facts that would have accounted for alternative explanations for the reputational decline. *Id.* The Court stated:

PLAINTIFFS' RESPONSE TO MOTION TO DISQUALIFY
PLAINTIFFS' EXPERT WITNESS - 18
CASE NO.: 2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

[D]uring deposition and *voir dire* by the Court, Dr. Williams continued to defend his regression analysis as accurate despite the presence of possible confounding or independent factors that could have reduced the ultimate figures Dr. Williams reached. Dr. Williams dismissed any individual items of bad publicity raised to his attention as statistically insignificant, despite having no expert knowledge or other qualifications to opine on the significance of bad publicity in the addiction treatment and rehabilitation facility industry. Dr. Williams merely asserted, without any comprehensible basis, that it was Cliffside's burden to present him with evidence showing the statistical significance of the particular evidence Cliffside identified, and only then would Dr. Williams' conclusions be affected.

*Id.* at *11 (C.D. Cal. July 1, 2019). Here, Defendants attempt to disqualify Mr. Thomas at deposition, without ever raising a single piece of evidence supporting another cause for Plaintiffs' economic damages. This is erroneous conjecture and unsupported by the case law. The Court's role is to act as a gatekeeper, "ensur[ing] the reliability and relevancy of expert testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000)("judges are entitled to broad discretion when discharging their gatekeeping function"). However, Mr. Thomas' solid opinions must be attacked on cross examination, not by exclusion at this stage. Even "[s]haky but admissible evidence is to be attacked by cross examination" rather than exclusion, and Mr. Thomas' opinions are grounded in his extensive experience and examination of objective documents. *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

### III.    CONCLUSION

In conclusion, Plaintiffs request that this court deny Defendants' Motion.

Dated: March 28, 2025

Mark Conrad, WSBA #48135 for
Kristofer Riklis (Pro Hac Vice)
I certify that this memorandum contains
5,888 words, in compliance with the Local
Civil Rules.

PLAINTIFFS' RESPONSE TO MOTION TO DISQUALIFY
PLAINTIFFS' EXPERT WITNESS - 19
CASE NO.: 2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660

1

<u>Certificate of Service</u>

2

3        The undersigned certifies under the penalty of perjury according to the laws of the United

4   States and the State of Washington that on this date I caused to be served in the manner noted

    below a copy of this document entitled on the following individuals:

5
    David Perez, WSBA #43959
6   Matthew J. Mertens (Pro Hac Vice)
    Lauren A. Trambley (Pro Hac Vice)
7   Jacob Dean (Pro Hac Vice)
    Perkins Coie LLP
8   1201 Third Avenue, Suite 4900
    Seattle, Washington 98101
9   dperez@perkinscoie.com
    mmertens@perkinscoie.com
10  ltrambley@perkinscoie.com
    jacobdean@perkinscoie.com

11
    [  ]    Via USPS
12  [X]    Via Electronic Mail
    [X]    Via Electronic Filing (CM/ECF)

13

        DATED this 28th day of March, 2025, at Seattle, Washington.

14

15

16                                    _____
                                      Amber Holmes, Legal Assistant
17

18

19

20

21

22

23

PLAINTIFFS' RESPONSE TO MOTION TO DISQUALIFY
PLAINTIFFS' EXPERT WITNESS - 20
CASE NO.: 2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000  F: (206) 902-9660