THE HONORABLE BRIAN A. TSUCHIDA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHRISTOPHER J. HADNAGY, an individual;
and SOCIAL-ENGINEER, LLC, a
Pennsylvania limited liability company,

            Plaintiffs,

v.

JEFF MOSS, an individual; DEF CON
COMMUNICATIONS, INC., a Washington
corporation; and DOES 1-10; and ROE
ENTITIES 1-10, inclusive,

            Defendants.

No. 2:23-cv-01932-BAT

DECLARATION OF KRISTOFER RIKLIS
IN SUPPORT OF PLAINTIFFS'
RESPONSE TO DEFENDANTS' MOTION
TO SEAL

I, Kristofer Riklis, declare under penalty of perjury under the laws of Washington State

as follows:

      1.      I am one of the attorneys representing Plaintiffs Christopher Hadnagy and Social-

Engineer, LLC.

      2.      I am over the age of 18, and competent to testify to the matters set forth herein; and

make this declaration of my own personal knowledge.

      3.      Attached hereto as **Exhibit A** is a true and correct copy of the deposition transcript

of Ben Thomas, dated November 4, 2024 with redactions. An unredacted copy of Exhibit A will

be filed under seal in conjunction with this declaration, with the redacted portions of the transcript

DECLARATION OF KRISTOFER RIKLIS IN SUPPORT
OF PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION TO EXCLUDE EXPERT BEN THOMAS - Page
1
CASE NO.: 2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

1    clearly highlighted.

2        4.      Attached hereto as **Exhibit B** is a true and correct copy of SE_001997, the deal

3    stats report, and SE_001998, the guideline transaction summary which were provided to

4    Defendants' counsel on October 11, 2024 in native format (excel and PDF).

5

6    I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF

7    WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT.

8

9            DATED this 28th day of March 2025 in Los Angeles, CA.

10                       RIKLIS LAW

11

12                       By:    /s/ Kristofer Riklis
                              Kris Riklis

13

14

15

16

17

18

19

20

21

22

23

DECLARATION OF KRISTOFER RIKLIS IN SUPPORT
OF PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION TO EXCLUDE EXPERT BEN THOMAS - Page
2
CASE NO.: 2:23-cv-01932-BAT

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

1

2

## CERTIFICATE OF SERVICE

The undersigned certifies under the penalty of perjury according to the laws of the United

States and the State of Washington that on this date I caused to be served in the manner noted

below a copy of this document entitled **DECLARATION OF KRISTOFER RIKLIS IN**

**SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE**

**EXPERT BEN THOMAS** on the following individuals:

David Perez, WSBA #43959
Matthew J. Mertens (Pro Hac Vice)
Lauren A. Trambley (Pro Hac Vice)
Jacob Dean (Pro Hac Vice)
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
dperez@perkinscoie.com
mmertens@perkinscoie.com
ltrambley@perkinscoie.com
jacobdean@perkinscoie.com

[  ]    Via USPS
[X]    Via Electronic Mail
[X]    Via Electronic Filing (CM/ECF)

DATED this 28th day of March 2025 at Seattle, Washington.

_____
Amber Holmes, Legal Assistant

# Exhibit A

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

———————————————————————————————
                                 )
CHRISTOPHER J. HADNAGY, an       )
individual; and SOCIAL-ENGINEERING,)
LLC, a Pennsylvania limited      )
liability company,               )
                                 )
                Plaintiffs,      )
        v.                       ) No. 2:23-cv-01932-BAT
                                 )
JEFF MOSS, an individual; DEF CON )
COMMUNICATIONS, INC., a Washington )
corporation; and DOES 1-10; and ROE)
ENTITIES 1-10, inclusive,        )
                                 )
                Defendants.      )
———————————————————————————————


VIDEOTAPED VIDEOCONFERENCE

DEPOSITION UPON ORAL EXAMINATION

OF

BENJAMIN THOMAS, CPA, CFE

———————————————————————————————


Witness located in Seattle, Washington

(All participants appeared via videoconference.)


DATE TAKEN:   November 4, 2024
REPORTED BY:  Nicole A. Bulldis, RPR, FCRR
              AZ No. 50955 | CA No. 14441 | WA No. 3384

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 10

1          A.    I -- yes, I have been and I am.

2          Q.    And what is the American Institute of Certified

3    Public Accountants?

4          A.    It's one of the governing bodies that helps with

5    the licensing and the credential for the CPA license, but

6    each state has their own board and I'm technically

7    underneath the Washington State Board of CPAs.

8          Q.    Got it.

9                And do you consider yourself to be an expert?

10         A.    I do.

11         Q.    What fields do you consider yourself to be an

12   expert in?

13         A.    Primarily, in economic damages and in business

14   valuation.

15         Q.    And do you consider yourself to be an expert in

16   the security industry, in the information security

17   industry?

18         A.    No.

19         Q.    Other than this case, have you ever dealt with

20   social engineering or any of this type of security

21   industry?

22         A.    Yes.  I've dealt with cybersecurity, information

23   security on a number of other projects.

24         Q.    Approximately, how many?

25         A.    It's more than a dozen.

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 11

1      Q.   You also mentioned that you consider yourself an
2  expert in business valuation; is that correct?
3      A.   Yes.
4      Q.   What experience do you have in performing expert
5  testimony in business valuation cases?
6      A.   Go to my CV.  I can share a number of cases that
7  involved business valuation.  Most of them involved either
8  business valuation or economic damages.
9      Q.   Approximately, how many of the cases you have
10  dealt with dealt with business valuation?
11     A.   That I've testified on, probably more than 20.
12     Q.   Have you ever performed a damages analysis for a
13  defamation claim prior to this case?
14     A.   I have dealt with employment disputes where
15  reputation has been at issue.
16     Q.   So when you say reputation has been an issue,
17  was there a defamation claim in that case, or was the
18  damage solely reputational damage?
19     A.   I think -- I think it was both.  One -- yeah.
20  The one in particular would've been the Clark County case,
21  and that involved both reputational harm and defamation to
22  the plaintiffs for their whistleblowing activities.
23     Q.   And when I ask you about defamation cases, you
24  responded by saying you've dealt with reputation damages.
25  Why did you say reputation damages when I asked you about

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 15

1     Q.   Got it.

2          And you did not use that methodology for this

3     case; correct?

4     A.   I did not look at corrective -- I didn't deal

5     with it specifically as corrective advertisement.  I've

6     seen that there were PR expenses that were incurred that

7     did not appear to have improved the financial performance

8     of the business.

9     Q.   And you also mentioned -- I think it was the

10    last one -- the methodology is the diminution in value.

11    What is diminution in value?

12    A.   Right.  It can be either complete loss or a

13    component of your revenue stream and your profit stream

14    that has been diminished and you can calculate that as a

15    lost value component.

16    Q.   And you did not use that methodology in this

17    case; correct?

18    A.   No, I did.  That's -- that's the second part of

19    the calculation here where we're looking at the lost

20    value.  You know, the business, as I see it, has performed

21    poorly in 2022 and 2023 post-event, and, you know, there's

22    a potential that the future economic damages could be --

23    it's a complete loss of business income.

24    Q.   Got it.

25         So you used the diminution of value methodology

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 20

1      A.    Correct.

2      Q.    So your damage analysis starts from

3  February 9, 2022, and goes through, I believe, end of

4  2024; is that right?

5      A.    Through the end of 2023 --

6      Q.    Yeah, 2023.

7      A.    -- for lost earnings component.  And then lost

8  value would be assuming -- under the assumption that the

9  business can no longer be a going to concern and looking

10  at the lost business value as well.

11      Q.    Got it.

12          So your analysis does not include any damages

13  from January 1st to February 9, 2022; correct?

14      A.    Sorry.  January 1st, say that again?

15      Q.    Your damages analysis that you provided in this

16  report does not include damages from January 1st to

17  February 9, 2022; correct?

18      A.    Correct, yes.  That first period, right.

19      Q.    Because damages during that time frame would be

20  improper; right?

21      A.    It would've been prior to the issuance of the

22  February 9, 2022, report.

23      Q.    Got it.

24          Were you instructed by counsel to make any

25  assumptions when preparing this report?

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 21

1      A.    No.

2      Q.    Okay.  Did you make any assumptions when

3   preparing this report?

4      A.    The only assumption, which is typical for an

5   expert to make, is assuming the liability.

6      Q.    And what do you mean by assuming liability?

7      A.    My report and the calculations in my report and

8   my schedules are based on the premise that liability would

9   be found against the defendants and that has caused the

10  economic harm.

11     Q.    Okay.  Did you do any independent analysis to

12  determine whether any of the alleged conduct actually did

13  cause harm to Mr. Hadnagy?

14     A.    Right.  So that's where -- as a financial

15  expert, it's not my role to determine the liability in a

16  case, but I can see from -- that there is a link between

17  the time -- the time frame of when the events occurred and

18  the negative financial performance of the business.

19     Q.    What do you mean by that?

20     A.    So we have the events of February 9, 2022, the

21  release of the transparency report, as well as the

22  subsequent update in January 13, 2023.  And prior to that,

23  prior to those two periods, 2022 and 2023, the business

24  was profitable.  Mr. Hadnagy had income.  After that,

25  those two events in 2022 and 2023, the business was not

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 22

1  profitable and Mr. Hadnagy did not have income.

2       Q.    Okay.  So prior to February 9, 2022, you just

3  looked at the numbers for Mr. Hadnagy's businesses;

4  correct?

5       A.    For his business as well as his personal tax

6  return.

7       Q.    You didn't review any of Mr. Hadnagy's contracts

8  or potential contracts prior to 2022; correct?

9       A.    I have a list of contracts that allegedly have

10  been impacted by the events, and some of them start prior

11  to February 2022.

12      Q.    Well, my question is different.  My question

13  wasn't whether you had a list of alleged contracts.  My

14  question is whether prior to February 9, 2022, you,

15  yourself, analyzed any contracts or potential contracts

16  Mr. Hadnagy had or Social-Engineering had with respect to

17  his business.

18      A.    Again, I've reviewed that spreadsheet that

19  details out certain contracts and certain contracts that

20  were impacted, and those contracts began prior to

21  February 2022.  And so I can see from -- or I can glean

22  from that, that, you know, there's contracts that come in

23  and go out on an annual basis.  And so I -- from that

24  perspective, I have analyzed the contracts, but I haven't

25  reviewed specific contracts.

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 28

1   increase from ███████████ in 2018, up to ███████████
2   in 2021.
3       Q.   Do those contracts tell you how many contract --
4   or, let me rephrase that question.
5           Do those numbers that you just referenced tell
6   you how many contracts were gained or lost that year?
7       A.   Not specifically, no.
8       Q.   Do those -- do those numbers tell you why
9   contracts were gained or lost?
10      A.   I can see that the business was growing during
11  that pre-loss event period.
12      Q.   That wasn't my question.  My question was:  Do
13  the numbers tell you why a contract was gained or lost
14  during those periods?
15          MR. RIKLIS:  Object to form.
16          THE DEPONENT:  It doesn't tell me
17  specifically why they are gained or lost, but I can tell
18  overall that the company was growing from 2018
19  through 2021.
20      Q.   (By Mr. Dean) And sitting here today, you don't
21  know why Mr. Hadnagy or Social-Engineering gained or lost
22  contracts from 2017 to 2024; correct?
23          MR. RIKLIS:  Objection to form.
24          THE DEPONENT:  Again, I have the review of
25  the historical financial performance of the business where

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 29

1    it is a growing business prior to the -- what I'm going to

2    call the loss event.

3         Q.   (By Mr. Dean) Yeah.  My question isn't whether

4    you're looking at numbers that say whether something is --

5    revenue is going up or down.  My question is pretty

6    pointed.

7              It's:  You don't actually know why contracts

8    were gained or lost from 2017 to 2024; correct?

9                   MR. RIKLIS:  Objection to form.

10                   THE DEPONENT:  Specifically, gained or

11    lost, correct.  I don't know the exact underpinnings of

12    why a contract is -- stays or leaves specifically, but I

13    can tell from the financial performance that they had

14    positive growth prior to the loss event.

15         Q.   (By Mr. Dean) And contracts could have been lost

16    by Mr. Hadnagy for a multitude of reasons; right?

17         A.   Hypothetically.

18         Q.    It could be because Social-Engineering or

19    Mr. Hadnagy's quality of work; correct?

20                   MR. RIKLIS:  Objection to form.

21                   THE DEPONENT:  Well, again, prior to the

22    loss event, the company had had overall growth from

23    ███████████  to about  ███████████.

24         Q.   (By Mr. Dean) So the answer was you do know or

25    you don't know?

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                     Benjamin Thomas, CPA, CFE

Page 63

1    payroll is increasing over time.

2        Q.    Did you review the emails where Mr. Hadnagy was

3    telling his employees that he's getting feedback from the

4    companies that the reports are really bad and that these

5    people should essentially be fired because of their work

6    performance?

7              MR. RIKLIS:   Objection to form.

8        Q.  (By Mr. Dean) You haven't seen those documents?

9        A.   I haven't seen anything.

10       Q.   You haven't seen those documents?

11       A.   No.

12       Q.   You should read them.  It'll definitely be in

13   our motion.

14             So you didn't -- you didn't actually investigate

15   the performance issues; correct?

16             MR. RIKLIS:   Objection.  Form.

17             THE DEPONENT:  Yeah.  I think we talked

18   about this quite a bit.  Again, I'm making the assumption

19   that --

20       Q.  (By Mr. Dean) Yeah.

21       A.    -- due to the release of the transparency

22   report, that has caused the decline in the financial

23   performance of the business.  And I can see prior to the

24   release, the company was on a growth path with

25   profitability.  And post-event, there are declining

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 64

1    revenues as well as they are incurring losses.

2        Q.    (By Mr. Dean) Got it.

3            Let's go back to your report, Exhibit 1,

4    Paragraph 7.  You say it's your opinion that economic

5    damages are about ████████, and then you break it down

6    and you say it's comprised of about ██████ for past lost

7    income and about ████████ for lost business value.  Do

8    you see that?

9        A.    I do.

10       Q.    The ██████ and ████████, are those

11   attributable to different plaintiffs here, or is it -- are

12   they being combined?  Like, how are you differentiating

13   that?

14       A.    Right.  You know, like I discussed earlier,

15   Social-Engineering and Mr. Hadnagy are intertwined, right?

16   Like, he's the owner of the business, and the business is

17   a passthrough through to him on his personal tax returns

18   so I'm viewing them as one and the same.

19       Q.    If they're one and the same, then why are you

20   doing both damages and not just one?

21       A.    Well, I think there's a component where you

22   have -- we have income that's being reported on his

23   taxable -- in his personal tax return that shows about ████

24   being derived from the business.  I can see that -- the

25   decline in the business on the Schedule C inside his

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 65

1    personal tax return as well.  And so that -- there's a
2    period of time where you can see he was making ███████,
3    about ████████ every year in 2020 and 2021, and then
4    come 2022, he has a loss of ███████ associated with
5    Social-Engineering.  And, again, in the next year, he had
6    a loss of about ███████████, related to
7    Social-Engineering.
8         Q.   So why do you get the lost business value and
9    lost income, I guess, is my question.
10        A.   Well, you have a period of time from the date of
11   the event through end of 2023 where he is incurring
12   measurable lost income that we can find here at the
13   ███████, as well as there's a potential that due to the
14   continued losses of the business this cannot go on into
15   perpetuity and be a going concern anymore and,
16   essentially, effectively he's lost his business and that's
17   the lost value component.
18        Q.   So you say he's lost his business, but you also
19   say there's a potential.  So was the business destroyed or
20   is your opinion that it might be destroyed?
21        A.   Right.  So my understanding is, you know, it's
22   still operating but at losses, you know, in 2022 and 2023.
23   I received the balance sheets, as well, after the issuance
24   of my report, and I can tell that it wasn't until after
25   the loss event that they had negative book value as well

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 66

1   as negative equity on the books.  Prior to that, they had
2   positive equity, and so it -- I think when I review it
3   from a financial perspective, there is question that this
4   will be a going concern business and, therefore, there's a
5   potential that it could be lost value.
6       Q.   So what's the year of the destroyed business
7   where you get the loss value?
8       A.   Right.  So it would be into -- that's --
9   business value is the look of the future cash flows.
10  Right?  Inability to generate those future cash flows, and
11  so we base it off of prior -- the revenue prior to the
12  event.  He was right at ███████████████, and I valued it
13  at -- at more of, like, using that metric, that financial
14  statistic of the company by a revenue multiplier to arrive
15  at the lost value.
16      Q.   All right.  I'm still not quite following.  I
17  think it will make sense when we get into the numbers as
18  we go down this report.  I think that'll be probably the
19  best way to -- to go about that.
20          You have in here an Exhibit 2 in your report
21  that lists all the documents you reviewed.  Is that all
22  the documents you reviewed in this case?
23      A.   It is, and for the issuance of the report.
24  Again, I received additional information in early October,
25  and I can tell you what those are related to balance

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 67

1  sheets from 2017 through 2023, the 2023 tax return,

2  the 2021 tax return, the '16 tax return, and '18 tax

3  return.

4           MR. DEAN:  Give me one second.

5                (Pause in the proceedings.)

6      Q.  (By Mr. Dean) Okay.  Paragraph 12, you say, "It

7  is alleged that plaintiffs have suffered economic damages

8  in the form of lost income, extra expenses related to

9  public relations and legal expenses, and lost business

10  value due to the actions of plaintiffs [sic]."

11           Do you see that?

12      A.   I do.

13      Q.   Okay.  Who had lost income?  Which plaintiffs?

14      A.   Ultimately, it's going to be Mr. Hadnagy.

15  Right?  Like, you know, the -- the profits that are

16  generated from Social-Engineering flow through to him

17  personally.

18      Q.   Got it.

19           And then you also say that there's extra

20  expenses for public relations and legal expenses.  Do you

21  see that?

22      A.   I do.

23      Q.   Are those recoverable as damages?

24           MR. RIKLIS:  Objection.  Form.

25           THE DEPONENT:  Potentially.

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 68

1      Q.   (By Mr. Dean) Okay.  So are you aware of the
2   American rule for recovery of attorneys' fees or legal
3   extensions?
4      A.   Not the specifics, no.
5      Q.   Do you know when attorneys' fees are recoverable
6   as a matter of law?
7                MR. RIKLIS:  Objection.  Form.
8                THE DEPONENT:  Again, I don't know the
9   specifics.
10      Q.   (By Mr. Dean) So you -- sitting here today, you
11   don't actually know whether legally attorneys' fees are
12   recoverable as damages; correct?
13                MR. RIKLIS:  Objection.  Form.
14                THE DEPONENT:  Again, I don't know the
15   specifics.
16      Q.   (By Mr. Dean) And you're just assuming or
17   speculating that damages for attorneys' fees or public
18   relations costs would be recoverable damages; correct?
19                MR. RIKLIS:  Objection.  Form.
20                THE DEPONENT:  I'm not necessarily saying
21   that.  I can see that, you know, they're -- an increased
22   expense is being incurred in 2022 and 2023 that weren't at
23   those levels prior.
24      Q.   (By Mr. Dean) Do you know whether Def Con sued
25   Mr. Hadnagy or had Mr. Hadnagy sued Def Con?

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 70

1              THE DEPONENT:  I can see that there's

2    increased costs for professional fees, you know, in their

3    line items on their operating expenses.

4         Q.  (By Mr. Dean) And all of the increases in

5    operating expenses, those are all tied to Def Con?

6         A.   So the way that I look at this is that, yeah,

7    the business was performing profitably prior to the

8    issuance of the releases of the transparency report and

9    the update.  And my understanding in talking to

10   Mr. Hadnagy is that, yes, they had to increase certain

11   expenses to try to maintain their business operations and

12   to continue operating as best they could given the loss of

13   contracts, the inability for extensions, as well as some

14   of their more profitable work like speeches and things

15   like that were -- he was not able to generate those

16   activities like he had been in the past.

17        Q.   Got it.

18             But you didn't do any actual analysis to

19   determine whether that was correct; right?

20        A.   I can see it in the financial performance of the

21   company.

22        Q.   Yeah.

23        A.   Historically, they were growing and then they

24   decreased afterwards and they were not profitable in '22

25   and '23.

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 71

1      Q.   Perfect.  Let's go on to Schedule 2 of your
2    report, operating expenses.  Let's go to advertising and
3    marketing.  You'll see that in 2020, he had ████, or the
4    company had ████ in advertising and marketing; correct?
5      A.   I can see that.
6      Q.   And in 2021 went down to ████?
7      A.   Yup.
8      Q.   And then 2022 went to about the same amount of
9    costs as it was in 2020; correct?
10     A.   Correct.
11     Q.   Okay.  So how, sitting here today, can you say
12   that that $████ increase was attributable to Def Con or
13   Mr. Moss?
14     A.   Well, again, you know, I look at that -- that
15   is -- as a percent of revenue is actually lower in 2022
16   than it was historically, say, 2020, at ██ percent versus
17   prior to that at ██ percent.  So, you know, I don't
18   really necessarily see that as a true increase of $████
19   as you're just going to say there are damages.  I don't
20   view it that way.
21     Q.   Got it.
22         So you're not able to say that this extra ████
23   is attributable to Def Con; is that fair?
24            MR. RIKLIS:  Objection.  Form.
25            THE DEPONENT:  Again, it's the continued

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 76

1   related to Def Con --

2        A.   That's not --

3        Q.   -- Jeff, Moss, or the release of the

4   transparency report; right?

5             MR. RIKLIS:  Objection.

6             THE DEPONENT:  That's not -- that's not

7   exactly how I view it.  Right?  I see that some of them

8   are going to be directly tied to the event, the release of

9   the transparency report and could be more easily linked

10  and identifiable to that release to that event and others

11  are going to be what appear to be more normal business

12  operating expenses but are also going to be impacted by

13  this issue as the revenues are not increasing or going

14  down as expected or not going up as expected but they're

15  actually going down.  And you have these costs that are

16  being incurred and you're not being able to generate a

17  profit.

18       Q.   (By Mr. Dean) So let me ask you something.  I'm

19  not good with numbers, you are, or at least purportedly

20  you are.  Going to net revenue up here, you'll see that it

21  says a number and above it is a growth.  If I'm reading

22  this correctly, that would mean from 2018 to 2019, there

23  was an 11 percent decrease in the growth of revenue; is

24  that right?

25       A.   I see that.

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 91

1      Q.   (By Mr. Dean) Do you understand you're still
2  under oath?
3      A.   I do.
4      Q.   Okay.  Did you look at the line items for public
5  relations and professional fees when preparing your
6  report?
7      A.   Yes, I can see those line items.
8      Q.   Did you look at the support to see what those
9  numbers were comprised of, or did you just base that off
10  of numbers provided by Mr. Hadnagy?
11      A.   Based off of the numbers that were provided and
12  the financial statements.
13      Q.   Do you know whether those professional fees -- I
14  guess let me back up.
15           Professional fees.  What do you mean by
16  professional fees?
17      A.   Right.  The way I look at that or the way that I
18  view that is those are the increased legal fees.
19      Q.   Okay.  So in 2021, there was ███ -- let's call it
20  $███████ in professional fees versus ███████.  Did -- when
21  you looked at this, did you just assume all ███████ were
22  for Mr. -- or for Mr. Moss and Def Con or did you somehow
23  portion it out to prior legal fees?
24      A.   No.  I would say that, you know, there's going
25  to be increased costs associated with professional fees

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                        Benjamin Thomas, CPA, CFE

Page 92

1   and public relations; that those total ████ for

2   professional fees in 2022, and ████ in -- for public

3   relations in 2023.

4          Historically, there has been a level of

5   professional fees that are related to operating the

6   business, and so, yes, there would be a normal continuing

7   expected level of professional fees in 2022 and in 2023.

8       Q.   But in this context, you attributed all ████

9   to Def Con and Mr. Moss; correct?

10      A.   No.

11      Q.   You did not?

12      A.   I did not.

13      Q.   Okay.  How much did you attribute to Def Con and

14  Mr. Moss when you did your but for analysis in the lost

15  income, Paragraphs 18 to 21, of your report?

16      A.   Right.  So, historically, Mr. Hadnagy has been

17  able to generate ████ from the business, which

18  includes -- which is comprised of all the expenses --

19  right? -- including some level of professional fees.  I

20  didn't look at it specifically.  Historically, they spent

21  ████ or, I mean, depending on what years you want to

22  look at, say, ████████ on average.  I didn't look at

23  it specifically that way for professional fees, but we did

24  just see and call out that there was an increase in

25  professional fees and public relations in 2022 and 2023.

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 94

1    ████  in 2021 -- that you're ultimately using in your but

2    for analysis; is that right?

3        A.   Correct.

4        Q.   Okay.  Now, I want to take 2020 as an example

5    because I want to make sure I understand how you're

6    getting Social-Engineer costs versus the total income in

7    other things that he's doing.

8            So you go up, you'll see for the total business

9    income loss line, that's where you'll see the ████.  Do

10   you see that?

11       A.   I do.

12       Q.   So is it fair to say that the income for

13   Social-Engineer in 2020 is comprised of business income

14   from Social-Engineer, LLC, and SEVillage LLC?

15       A.   Correct.

16       Q.   Okay.  And then ████, what is this number

17   comprised of for Social-Engineer -- excuse me -- LLC?

18       A.   It's comprised of the overall -- that income of

19   the business.

20       Q.   Where is that in Schedule 2 showing the net

21   income for 2020 to get that number?

22       A.   Maybe the operating income of ████.

23       Q.   I'm seeing ██.  Operating income ██ for 2020.

24   Do you see that as well?

25       A.   I do.

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 104

1    '23.

2        Q.    Is that typical to add your spouse's income for

3    reputational damages?

4        A.    I'm looking at all of the activity in the

5    economic benefit that's being generated on his personal

6    tax return from Social-Engineering.  Yeah.  Another way to

7    look at it would be just to remove it in '21, '22, and '23

8    and damages would actually go up.

9        Q.    Well, what's the correct way?

10       A.    I think the way that I did it is a correct way

11   to do it.  To go about it is to look at the total economic

12   benefit that's being generated from the business that he's

13   the owner of on his personal tax return.  Historically,

14   it's been ████████ in 2021.  It was ████████, inclusive of

15   those wages.  You know, I -- I could see it being

16   calculated the -- another way as well where you just say

17   those expenses are not his or those wages are not his, and

18   you could remove them, and, ultimately, the losses would

19   be greater in 2022 and 2023.

20       Q.    So you said, historically speaking, his wages

21   have been ████████.  But historically speaking, if you look

22   at ████████ all the way through in 2017 to the ████████

23   in 2021, and you average those, wouldn't that be $████████,

24   not $████████?

25       A.    So what years are you trying to average?

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 105

1      Q.   Yeah.  You said historically speaking, he makes
2  $█████ a year; is that fair?
3      A.   In 2020 and 2021, from -- the economic benefit
4  from Social-Engineering has been right around ███ -- so
5  █████, ██████.
6      Q.   So let's stop there, 2020 and 2021.  You -- you
7  say because he made ███ and ███ in 2020 and 2021, that he
8  makes ██████ a year for your but for analysis; right?
9      A.   Correct.
10     Q.   But you didn't average those numbers; correct?
11     A.   I did not average them, no.
12     Q.   If you averaged them, it would be about ███████;
13 fair?
14     A.   Which would round to ██████.
15     Q.   So you're kind of using, like, the -- for lack
16 of a better term, like, "thumb to the tongue, this sounds
17 about right, ███," to come up with that but for number;
18 right?
19          MR. RIKLIS:  Objection.  Form.
20          THE DEPONENT:  I'm not, no.  I mean, you're
21 right that the average is $██████.
22     Q.   (By Mr. Dean) Then why not use --
23     A.   That's approximately ██████.
24     Q.   Then why not use ██████?
25          MR. RIKLIS:  Objection.  Form.

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 106

1      THE DEPONENT:  He has -- he's been able to

2    generate ████████ in one year and ████████ in another.  The

3    business was expected to grow in 2022.  Revenues actually

4    did slightly in 2022.  I know it wasn't to the level that

5    was expected, so I -- I selected ████.

6      Q.  (By Mr. Dean) But why not the average?  Why not

7    the historical average?  Why just ████?  Is it because it

8    was a round number?

9      MR. RIKLIS:  Objection.  Form.

10      THE DEPONENT:  Again, I rounded to 250.

11      Q.  (By Mr. Dean) Got it.

12      So you used $████████ because it's a round

13    number; right?

14      MR. RIKLIS:  Objection.  Form.

15      THE DEPONENT:  If I take the average and --

16    the rounded average of those two, it's ████████

17      Q.  (By Mr. Dean) So you're not using exact numbers

18    in your damages report.  You're using rounded numbers in

19    your damages report.

20      MR. RIKLIS:  Objection.  Form.

21      THE DEPONENT:  Again, no.  I mean, I think

22    you have -- looking at the historical profitability, you

23    know, achieving roughly ████████ in 2020, ████████ in 2021,

24    the average, like you said, to ████████, I rounded it to

25    ████████

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 118

1    You said he had an actual loss of ██████, so that gives
2    you a lost income of ████; correct?
3        A.    Correct.
4        Q.    And that is essentially the ████ plus the $
5    that's the loss that gives you that ████?
6        A.    It is.
7        Q.    Okay.  So that includes damages from
8    January 1, 2022, to February 10, 2022; correct?
9        A.    I don't necessarily see it that way.  I mean,
10   it's not abnormal to say, you know, that an individual is
11   impacted at some point in 2022 and we're going to look at
12   the full year of but for earnings less actual to arrive at
13   the damages.
14       Q.    You didn't do any formula to say, Well, here's
15   what it was for the entire year.  Let's go for however
16   many days is in the year to kind of break it down from
17   that February 9th going forward?
18       A.    I did not do that.
19       Q.    Got it.
20             Going back now to the lost value -- lost
21   business value.  We were talking about Paragraph 27, and
22   you said, "Yeah.  You'd have to kind of assume that there
23   was a complete destruction."  So before we get there, I
24   want to go back through some of these preceding
25   paragraphs.

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                Benjamin Thomas, CPA, CFE

Page 119

1            Paragraph 23, you talk about the three different
2    approaches that were considered.  What were the three
3    different approaches that you actually considered for the
4    lost business value?
5        A.    Right.  So in business valuation, there's three
6    approaches that our profession has agreed upon.  You have
7    the income approach, the market approach, and the cost
8    approach, and all three of those were considered.
9        Q.    And what do you mean by they were considered?
10       A.    That -- that I considered them.  That I said,
11   hey, we -- I thought about the cost approach and said
12   that's not the appropriate measure of value.  I thought
13   about the income approach and said, you know, that -- I'm
14   going to -- I think it's better measured by the market
15   approach, in this case, given the fact that I'm going to
16   take revenue and a multiplier to derive that value that --
17   the market value of the business.
18       Q.    What is the cost approach?
19       A.    The cost approach would be taking the balance
20   sheet and marking all the assets and all liabilities to
21   market including the intangibles.  And in this case, the
22   intangibles are more valuable because they're generating
23   cash flow for the business.  That's deriving the value and
24   generating the revenue; whereas, the assets of the
25   business, say, as like cash, AR, are not necessarily

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 120

1   driving the -- the revenue or the -- the cash flow.

2        Q.    Did you review any documents when determining

3   whether you should use the cost approach?

4        A.    The cost approach would not be appropriate for a

5   professional services firm like this.

6        Q.    Why would it not be appropriate?

7        A.    I just explained that the assets that are on --

8   reported on the balance sheet for a professional services

9   firm are not the cash-generating assets of the business.

10  It's more the intangible assets, the people, the brand,

11  the reputation, the customer list, the contacts.  Those

12  items are what's creating the cash flow.

13       Q.    Did you run an analysis under this approach or

14  are you just saying, "No, cost approach doesn't work for

15  professional services"?

16       A.    In this case, we have a business that is

17  operating and generating revenue, generating historical

18  cash flows.  The cost approach in this circumstance is not

19  appropriate.

20       Q.    Do you know whether an analysis under this

21  approach would've resulted in higher or lower damages than

22  the market approach?

23       A.    It would be very hard to determine without using

24  a hybrid with an income and a market approach to value

25  those intangible components that are not shown on the

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 121

1    balance sheet.

2         Q.   And you did not do that; correct?

3         A.   I think that the way that you would even go

4    about doing that is -- is just not appropriate for this

5    type of business.

6         Q.   Yeah.  I'm just trying to understand, you know,

7    you said you considered it.  Because for me, if I consider

8    something, I'm going to go through and do an analysis of

9    each and look to see what's more accurate.  It sounds like

10   what you were saying is you considered all three

11   approaches, but you wouldn't have used the cost approach

12   because you don't use it here.  So it sounds to me like

13   your consideration is essentially:  Do I use the cost

14   approach?  No, it didn't work here.

15            And was that what you did when you considered or

16   did you do something different?

17                 MR. RIKLIS:  Objection.  Form.

18                 THE DEPONENT:  Again, I answered this

19   already.  The cost approach isn't appropriate for this

20   type of business.  And given the facts and circumstances

21   that we have here where we have a business that is

22   generating revenue and cash flow off of its assets, its

23   assets are not what you're going to see on the balance

24   sheet that are -- it's not going to be the cash or AR or

25   the computers even that are necessarily deriving that

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                        Benjamin Thomas, CPA, CFE

Page 122

1    value.  It's going to be more of the intangible peak
2    components.
3         Q.  (By Mr. Dean) You can say I've said this a bunch
4    of times already.  I'm still going to keep asking the
5    question because I still haven't received an answer.
6              When you say you considered the cost approach,
7    did you just consider should I do this and say, "No, I
8    shouldn't.  It's not appropriate," or did you do any type
9    of analysis to determine it was not appropriate?
10        A.   I reviewed --
11             MR. RIKLIS:  Objection.  Form.
12             THE DEPONENT:  I reviewed the income
13   statements of the business.  Again, I saw that the
14   revenues were increasing.  I was able to review the cash
15   flows of the business.  And reviewing that and considering
16   that, the cost approach is not appropriate.
17        Q.  (By Mr. Dean) Got it.
18             So you looked at the cost and the cash flow and
19   said, "Cost approach isn't appropriate here."
20             MR. RIKLIS:  Objection.  Form.
21             THE DEPONENT:  It's not appropriate here.
22        Q.  (By Mr. Dean) If you think of anything else you
23   did in considering this approach, feel free to interrupt
24   me and tell me.
25             Going on to the income approach, what is the

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 123

1    income approach?

2        A.    The income approach is going to look at the cash

3    flows of the business and its cash-generating ability and

4    it's going to arrive at a sustainable cash flow level and

5    project that out into the future and discount it at an

6    appropriate risk-adjusted discount rate; or if you're

7    looking at a single-period cash flow, you're going to use

8    a capitalization rate to derive that value.

9        Q.    What do you mean by cash flow?

10       A.    The cash flow that's being generated from the

11   business.  So it's going to be the -- I mean, an economic

12   or business evaluation practice, in theory, you're looking

13   at a Gorgon Growth Dividend Model where you're looking

14   at -- let's just say a capitalization method where you're

15   looking at historical.  He has been able to generate, say,

16   250, and profitability from the business and you say,

17   "Okay.  Well, I'm going to the risk adjust those cash

18   flows," assuming that they're going to be able to continue

19   and derive that value.

20       Q.    And did you perform that analysis here?

21       A.    I have done some of those calculations on my end

22   to look at the capitalization of earnings method.

23   Ultimately, I selected the market approach as just being a

24   method that is appropriate to use in this case.

25       Q.    When you performed your analysis under the

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 124

1   income approach, were the damages higher or lower than the

2   market approach?

3       A.   It would just depend on how you assess the risk

4   and the discounting for the discount rate.  If you're

5   using, say, a cost of equity of 15 percent, it's going to

6   be higher.  If you're using a cost of equity of, say, I

7   don't know, ████ percent, you're going to be right

8   around the ██████ mark.  So I'm thinking it just

9   depends.  Ultimately, I didn't select this method.  I

10  think that the market approach is a sufficient way to go

11  about deriving the value for this business.  Looking at

12  market transactions that are comparable and using that --

13  the multiples from those selected transactions against the

14  financial statistics that we have for Social-Engineering

15  based off of the revenue.

16      Q.   And why is the income approach not appropriate?

17      A.   I wouldn't say it's necessarily not appropriate.

18  It's just I didn't select it.  I selected the market

19  approach.

20      Q.   Did you actually perform an analysis under it,

21  or did you just do some numbers and say, "I think the

22  market approach is better"?

23           MR. RIKLIS:  Objection.  Form.

24           THE DEPONENT:  No.  I didn't necessarily

25  say it's better.  I just -- it's a -- it's a method that I

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 125

1   did select versus running a capitalization of earnings

2   method.

3        Q.   (By Mr. Dean) Did you run the capitalization of

4   earnings method with respect to Mr. Hadnagy's or

5   Social-Engineer's damages in this case?

6        A.   I haven't formalized a calculation, no.  I have

7   calculations on my end where I -- we absolutely have the

8   model set up where we can test it and see what the value

9   could be under various approaches.

10        Q.   Did you build that out for this case?

11        A.   Yes.  I have -- I have those types of

12   calculations.  I don't have anything formalized, though.

13        Q.   Did you produce those?

14        A.   I can.

15        Q.   What was the damages that you got when you

16   performed that method?

17        A.   Right.  I mean, it could be, you know, right

18   now, the one that I'm looking at if I -- it just depends

19   on how you assess the risk -- right? -- of those cash

20   flows if I -- I'm at ██████████.

21        Q.   And you said that there was different --

22   different variables or different things you can do.  You

23   ran multiple.  Can you tell me what those damages were?

24        A.   Yeah.  Absolutely.  I mean, I'm just -- you

25   know, look at the risk, the discount rate, the cost of

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 126

1   equity, and we assume a different risk profile to these

2   cash flows.  But, you know, in this case, we have a

3   business that's increasing its revenue year over year.  It

4   had ███████████████████ in profitability, so I think

5   the expectation was growth.  And so, you know, maybe a

6   capital earning wouldn't necessarily capture all that

7   growth into the future.  So if I, say, you know, risk

8   adjust to give it a ███ basis point, something like that,

9   you're down to ████████████.

10          Q.   And the last approach is the market approach,

11   and you said that you felt this was the best approach

12   here; correct?

13          A.   It was the one that was selected, yes.

14          Q.   Why did you select this approach?

15          A.   I think it's one that -- for a lot of reasons.

16   One, you know, there are comparable transactions that I

17   could go out and identify from maybe our deal status for

18   small privately held companies that are similar, have

19   similar characteristics as Social-Engineering's

20   economically as well as just the description of their

21   business.  And, you know, I had sufficient transactions,

22   14 in total, that provided a range of multiples to use,

23   and I selected the revenue multiple as being an

24   appropriate one to derive the value.

25                    MR. DEAN:  Got it.  Let's take a

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 129

1    sitting here today, is the business worth zero and he's

2    entitled to all ████ or has that changed or is that

3    fluid?  Kind of where are we with what he gets?

4                    MR. RIKLIS:  Object to the form.

5                    THE DEPONENT:  Again, this is the potential

6    loss of the business assuming there's zero value today or

7    that it will go down at some point in the future.  And you

8    can see that in the financial performance, that they are

9    generating losses and the balance sheet showing for the

10   first time that they have a negative equity position and

11   they've taken on debt, which they historically haven't

12   done.  So I think there -- there's indications of it

13   heading that way, but, yes, I would say that it could

14   change.  And if the business improves for some reason or

15   doesn't go under, then that value could change.

16        Q.  (By Mr. Dean) What's the value of the business

17   today?

18        A.   I haven't done a valuation of the business

19   today.  You know, we're assuming under this premise that

20   the value would be zero.  It would go away.  The business

21   would be lost.

22        Q.   And what's that assumption based off of?

23        A.   Again, based off of the financial performance

24   after the issuance of the transparency report where

25   they're generating losses year over year in '22 and '23.

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Page 134

1    1.6, the -- or, sorry -- the 75th percentile is 2.7, and

2    the high was 3.9 multiples.  I -- you know, based off of

3    my discussions with Mr. Hadnagy, the business is --

4    doesn't necessarily have, like, a software or like a

5    software-as-a-service-type thing, which would typically

6    increase your multiple, and they're more on the

7    traditional consulting -- information consulting side.

8    And due to that, I selected the lower -- towards the lower

9    end of the multiples.

10        Q.   And what were you using to determine the

11   multiple?  I mean, what are the comps?

12        A.   Right.  So I provided the comps.  There's 14

13   transactions from 2010 through 2017.  Sorry, 2023 would be

14   the more recent ones.  And looking at the description of

15   the businesses that were being acquired as well as looking

16   at their -- their revenue and profitability and size and

17   things like that, some were larger than we have here and

18   some were smaller.  So you have -- taking that into

19   consideration, but there's 14 within the information

20   security, security solutions, and consulting industry.

21        Q.   What parameters did you use or metrics did you

22   use to determine these comps?  And if you don't understand

23   what I mean, I can explain.

24        A.   Yeah.  No, I searched with -- inside NAICS codes

25   for information technology, searching specifically for

Page 135

1    security within that, looking for transactions greater

2    than 2010, looking for companies that had sales between

3    half a million and 100 million, looking for transactions

4    that occurred within the United States, and from that,

5    selecting the ones based off the descriptions that were

6    the most comparable to Social-Engineering, and

7    specifically, just in the information security industry

8    for a description.

9        Q.   You said that you selected those that were most

10   comparable, so does that mean that you excluded comps when

11   you ultimately decided on that 14 comps or however many

12   you said that you used?

13       A.   Yes, there were certain comps that were

14   deselected.  I would have to go specifically back into the

15   database to see which ones were deselected, but they

16   would've -- just either if there's -- when you do these

17   searches, there are some that are just totally irrelevant.

18   You know, there might be a tanning salon ends up in here

19   for whatever reason just because they have the NAICS code.

20   So things like that, just going through, making --

21   removing those particular ones.  There could be some that

22   are, you know, related to -- I don't know -- military and

23   things like that, so there are certain things like that

24   that might be removed.

25       Q.   Do you recall which companies you removed?

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 136

1      A.    I have the list of the transactions that were
2  excluded and I can absolutely find them.
3      Q.    After you excluded those entities, did you do
4  anything to find additional entities to add to the final
5  list?
6      A.    No.  The 14 that were selected were sufficient.
7      Q.    Okay.  Why did you use entities from 2010, which
8  were about 14 years ago, or I guess at the point you did
9  your math, it'd be 12 years prior?
10     A.    Yeah.  So, I mean, this is -- in my mind, yeah,
11  that's relatively recent.  I wouldn't call that a stale
12  transaction.  In some industries, it doesn't matter how
13  old you go or how far back you go in time.  They could
14  always transact at one multiples, not -- you know, and be
15  more driven off of the earnings and the revenue of a
16  company versus the multiple.
17     Q.    I am not great at math, but I did the equation
18  on Paragraph 27 of your report, 1-point -- or ████████
19  times ██, and I did not get ████.  I got ████, so what am
20  I doing wrong in my equation?
21     A.    The multiples I provided, if you -- you know, if
22  you look at them, the actual multiple is ████, and that
23  would get you there.
24     Q.    So why didn't you put ████ -- whatever it is you
25  said in your equation on Paragraph 27?

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 137

1      A.    As presentation, you know, typically, you show

2   multiples like a 1.1, 1.2, 0.9.  I absolutely could've

3   expanded it and showed more of the decimal places.

4                   (Exhibit No. 10 introduced.)

5      Q.  (By Mr. Dean) I'm looking at the guideline

6   company transaction summary, which I'm going to mark as

7   Exhibit 10.  That was provided by counsel, and I will show

8   it to you right here.

9            I see it says ███ as the median, and not ███ and

10  some other decimal.  So, again, where is that in the

11  information we've been provided that shows a number higher

12  than the ███?

13     A.    Well, on that spreadsheet, they're derived off

14  of multiples that are up above.  And the revenue multiples

15  are derived off of the equation of revenue divided by the

16  enterprise value, and it would not be difficult to run a

17  median -- you know, redo those calculations, run the

18  median, and find that it's not exactly ███.

19     Q.    So you used ███ just for the sake of presentation

20  when you wrote Paragraph 27?

21     A.    Correct.

22            MR. RIKLIS:  Objection.  Form.

23     Q.  (By Mr. Dean) You said correct?

24     A.    Correct.  It was for presentation.  That's

25  generally how multiples are shown.  I mean, I -- yes, we

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 149

1    A.    2019 to 2020, 32 percent.

2    Q.    And then the next year, it only grew

3 ███ percent; is that right?

4    A.    It grew five and a half percent into 2021 to

5 ███████.

6    Q.    Do you know why it only grew ██████████ versus

7 the ████████████?

8    A.    Specifically, no.  I mean, I think we've talked

9 about this a bit.  You know, this activity of the business

10 through acquiring more work, retaining the work that they

11 previously had, growing the business.

12    Q.    Did you review any projections from 2020 to 2021

13 of what Chris Hadnagy or Social-Engineer believed that the

14 company would grow?

15    A.    I have not seen projections.

16    Q.    Is it typical for companies to have years where

17 they go down 11 percent, up ████████████, down ████████████?

18    A.    Up ████████?

19    Q.    Sorry, I guess up ██████████.  So kind of like if

20 you're looking at a chart graph, it almost kind of looks

21 like, you know, someone on a monitor like an EKG where

22 it's going up and down and there's peaks and valleys?

23    A.    Well, I don't see that here.  I mean, we have --

24 we have a softening a little bit in 2019, but I wouldn't

25 call it an EKG drop.  And then you have an increase from

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Hadnagy, et al. v. Moss, et al                    Benjamin Thomas, CPA, CFE

Page 155

1                          C E R T I F I C A T E

2

3      STATE OF ARIZONA    )
                           )
4      COUNTY OF MARICOPA )

5

6              I, Nicole A. Bulldis, RPR, a Certified Court
       Reporter, do hereby certify under the laws of the State of
7      Washington:

8              That the foregoing videotaped deposition upon
       oral examination of Benjamin Thomas was taken
9      stenographically by me, via Zoom, on November 4, 2024, and
       transcribed under my direction;

10

11             That the witness was duly sworn by me to testify
       truthfully, and that the transcript of the deposition is
       full, true, and correct to the best of my ability;

12

13             That I am not a relative, employee, or counsel
       of any party to this action or relative or employee of
       such counsel, and that I am not financially interested in
14     the said action or the outcome thereof.

15             Reading and signing was not requested pursuant
       to FRCP Rule 30(e).

16

17

18             IN WITNESS WHEREOF, I have hereunto set my hand

19     this 5th day of November 2024.

20

21

22
       _____
23     Nicole A. Bulldis, RPR
       WA CCR No. 3384

24

25

e66fe3d5-12df-4dc1-aba5-202b3c032f79

Exhibit B

| Transaction ID | Target SIC General | Target SIC 1 | Target SIC 2 | Target SIC 3 |
|---|---|---|---|---|
| 32151-1 | 73 | 7371 | | |
| 45470-1 | 73 | 7372 | | |
| 16571-1 | 73 | 7372 | | |
| 58794-1 | 73 | 7373 | 7374.0 | 7379.0 |
| 50250-1 | 73 | 7373 | | |
| 34996-1 | 73 | 7373 | | |
| 18736-1 | 73 | 7374 | | |
| 37170-1 | 73 | 7379 | | |
| 30370-1 | 73 | 7379 | | |
| 56658-1 | 87 | 8748 | | |
| 52323-1 | 87 | 8748 | 5734.0 | |
| 53753-1 | 87 | 8748 | 7373.0 | |
| 38927-1 | 87 | 8748 | | |
| 17242-1 | 87 | 8748 | | |

| Target NAICS General | Target NAICS 1 | Target NAICS 2 | Target NAICS 3 | Target Name |
|---|---|---|---|---|
| 541 | 541511 | 518210.0 | | Delphis, Inc. |
| 541 | 541511 | | | AppRiver, LLC and Subsidiaries |
| 513 | 513210 | | | Red Condor, Inc. |
| 541 | 541512 | 518210.0 | 541519.0 | |
| 541 | 541512 | | | Technologyville, Inc. |
| 541 | 541512 | | | |
| 518 | 518210 | | | |
| 541 | 541519 | | | |
| 518 | 518210 | | | |
| 541 | 541690 | | | |
| 541 | 541690 | 449210.0 | | Aurora Systems Consulting, Inc. |
| 541 | 541690 | 541512.0 | | |
| 541 | 541690 | | | CynergisTek, Inc. |
| 541 | 541690 | | | Zytel Corporation |

| Target Business Description | Target Type | Target Structure | Franchise | Dev |
|---|---|---|---|---|
| ...vides Information Security Solutions, Personal Health Records, Financial Information, and Corporate Intellectual Properties Through Professional Services | Private | C Corporation | No | No |
| ...vides Email Security Solutions to Businesses | Private | C Corporation | No | No |
| ...vides Email Security Products that Eliminate Spam and Viruses | Private | C Corporation | No | No |
| ...vides Outsourced IT Services, including Cloud and Local Backups, Spam Filtering, Cyber Security, Networking and Domain Administration, and Web Management | Private | LLC | No | No |
| ...rmation Technology Support Services and Security | Private | S Corporation | No | No |
| ...work Security | Private | S Corporation | No | No |
| ...urity Software Company Primarily Serving Public and Private Schools | Private | S Corporation | No | No |
| ...ber Security | Private | S Corporation | No | No |
| ...nages Services Provider - Network Management, Cloud Security, Remote Backups, Hosting and Secure Remote Access Services | Private | C Corporation | No | No |
| ...ersecurity Consulting | Private | S Corporation | No | No |
| ...vides Cyber Security Consulting and Sells Cyber Security Hardware/Software | Private | S Corporation | No | No |
| ...rmation Technology (IT) Consulting Firm Specializing in Network Engineering and Cybersecurity | Private | LLC | No | No |
| ...rmation Technology Security Consulting Services | Private | C Corporation | No | No |
| ...ber Security and Mission Systems in Support of Critical Intelligence, Counterterrorism, and Cyber Warfare Missions | Private | C Corporation | No | No |

| Target Age | Target Employee Count | Target Country | Target City | Target State |
|---|---|---|---|---|
| 17.0 | 230.0 | United States | San Clemente | CA |
|  |  | United States | Gulf Breeze | FL |
| 29.0 | 4.0 | United States | Rohnert Park | CA |
| 15.0 |  | United States | Sacramento | CA |
|  |  | United States | Algonquin | IL |
| 9.0 | 14.0 | United States | Richmond | VA |
| 25.0 | 50.0 | United States |  | TX |
| 15.0 |  | United States | Mid Atlantic | PA |
| 15.0 | 45.0 | United States | Denver | CO |
| 20.0 |  | United States | Torrance | FL |
| 20.0 | 20.0 | United States | Washington | DC |
| 13.0 |  | United States | Austin | TX |
|  |  | United States | Ft. Meade | MD |

| Target Region | Acquirer SIC | Acquirer Type | Acquirer Name | Acquirer CIK |
|---|---|---|---|---|
| Pacific | 7389.0 | Public | Auxilio, Inc. | 1011432.0 |
| South Atlantic | 7373.0 | Public | Zix Corporation | 855612.0 |
| Pacific | 7372.0 | Public | St. Bernard Software, Inc. | 1288496.0 |
| Pacific | | Private | | |
| East North Central | 7372.0 | Public | Cerberus Cyber Sentinel Corporation | 1777319.0 |
| South Atlantic | | Private | | |
| West South Central | | Private | | |
| Mid-Atlantic | | Private | | |
| Mountain | | Private | | |
| South Atlantic | | Private | | |
| South Atlantic | | Private | | |
| Pacific | 7379.0 | Public | Plurilock Security Inc. (formerly, Libby K Industries Inc.) | |
| South Atlantic | | Private | | |
| West South Central | 7389.0 | Public | Auxilio, Inc. | 1011432.0 |
| South Atlantic | 8711.0 | Public | Global Defense Technology & Systems, Inc. | 1471038.0 |

| Acquirer Link | Acquirer Street 1 | Acquirer Street 2 | Acquirer |
|---|---|---|---|
| .sec.gov/cgi-bin/browse-edgar?company=&CIK=0001011432&filenum=&State=&SIC=&owner=include&action=getcompany | 26300 La Alameda, Suite 100 | | United S |
| .sec.gov/cgi-bin/browse-edgar?company=&CIK=&filenum=&State=&SIC=&owner=include&action=getcompany | 2711 North Haskell Avenue Suit 220 LB 36 | | United S |
| .sec.gov/cgi-bin/browse-edgar?company=&CIK=0000835612&filenum=&State=&SIC=&owner=include&action=getcompany | 15015 AVENUE OF SCIENCE | | United S |
| .sec.gov/cgi-bin/browse-edgar?company=&CIK=0001288496&filenum=&State=&SIC=&owner=include&action=getcompany | | | United S |
| .sec.gov/cgi-bin/browse-edgar?company=&CIK=0001777319&filenum=&State=&SIC=&owner=include&action=getcompany | 7333 E. Doubletree Ranch Road | Suite D270 | United S |
| ps://www.sedar.com/DisplayProfile.do?lang=EN&issuerType=03&issuerNo=00046458 | #330 - 702 Fort Street | | Canada |
| .sec.gov/cgi-bin/browse-edgar?company=&CIK=0001011432&filenum=&State=&SIC=&owner=include&action=getcompany | 27271 Las Ramblas, Suite 200 | | United S |
| .sec.gov/cgi-bin/browse-edgar?company=&CIK=0001471038&filenum=&State=&SIC=&owner=include&action=getcompany | 1501 FARM CREDIT DRIVE | SUITE 2300 | United S |

| Acquirer State | Acquirer Zip Code | Income Statement Type | Latest Full Year Income | Restated Income |
|---|---|---|---|---|
| CA | 92691 | Tax Return/P&L | Yes | No |
| TX | 75204 | Tax Return/P&L | Yes | No |
| CA | 92128 | Tax Return/P&L | Yes | No |
|  |  | Tax Return/P&L | No | Yes |
| AZ | 85258 | Tax Return/P&L | Yes | No |
|  |  | Tax Return/P&L | Yes | No |
|  |  | Tax Return/P&L | Yes | No |
|  |  | Tax Return/P&L | Yes | No |
|  |  | Tax Return/P&L | No | No |
|  |  | Tax Return/P&L | No | Yes |
| BC | V8W 1H2 | Tax Return/P&L | Yes | No |
| CA | 92691 | Tax Return/P&L | Yes | No |
| VA | 22102-5011 | Tax Return/P&L | Yes | No |

| Income Statement Date | Net Sales | Cost of Goods Sold | Gross Profit | Rent |
|---|---|---|---|---|
| 2013-12-31 | 916406 | 1037630 | -121224 | 32859.0 |
| 2016-12-31 | 70915132 | 35215988 | 35699144 | 1021537.0 |
| 2009-12-31 | 1659000 | 1581000 | 78000 | 218000.0 |
| 2022-12-31 | 1321778 | 828863 | 492915 | 38923.0 |
| 2019-12-31 | 2159476 | 682436 | 1477040 | |
| 2015-12-31 | 678950 | 132494 | 546456 | 17502.0 |
| 2011-12-31 | 4396414 | 919550 | 3476864 | 50700.0 |
| 2016-12-31 | 94338716 | 76560320 | 17778396 | 0.0 |
| 2012-09-01 | 2663000 | 1662000 | 1001000 | 66000.0 |
| 2020-12-31 | 4018324 | 0 | 4018324 | 168000.0 |
| 2020-12-31 | 28136389 | 26713508 | 1422881 | |
| 2019-12-31 | 13082878 | 10247954 | 2834924 | |
| 2015-12-31 | 11789988 | 5684479 | 6104509 | 87335.0 |
| 2009-12-31 | 15236000 | 10544000 | 4692000 | |

| Owner's Compensation | Other Operating Expenses | Depreciation and Amortization | Total Operating Expenses | Operating Profit |
|---|---|---|---|---|
| | | 52921.0 | 310060 | -431284 |
| | | 1131491.0 | 32303919 | 3395225 |
| | | 260000.0 | 5465000 | -5387000 |
| 0.0 | 153408.0 | 0.0 | 192331 | 300584 |
| 0.0 | | 6905.0 | 1383441 | 93599 |
| 82656.0 | 261546.0 | 10200.0 | 371904 | 174552 |
| 531133.0 | 2364205.0 | 0.0 | 2946038 | 530826 |
| 0.0 | 10346528.0 | 20000.0 | 10366528 | 7411868 |
| | 722000.0 | 119000.0 | 907000 | 94000 |
| 100000.0 | | | 3224120 | 794204 |
| | | 1690.0 | 1276380 | 146501 |
| | | 31364.0 | 977583 | 1857341 |
| | | 56137.0 | 3368461 | 2736048 |
| | | | 2361000 | 2331000 |

| Interest Expense | Interest Income | Other Non-Operating Expenses | Other Non-Operating Income | Earnings Before Taxes |
|---|---|---|---|---|
| 5760.0 | 3.0 | 0.0 | 0.0 | -437041 |
| 22177.0 | 1606.0 | 166711.0 | 40687.0 | 3248630 |
| 39000.0 | 0.0 | 1000.0 | 0.0 | -5427000 |
| 0.0 | 0.0 | 0.0 | 0.0 | 300584 |
| 14097.0 | 0.0 | 0.0 | 0.0 | 79502 |
| 755.0 | 0.0 | 0.0 | 0.0 | 173797 |
| 0.0 | | | | 530826 |
| 0.0 | 0.0 | 0.0 | 20000.0 | 7431868 |
| 51000.0 | | | | 43000 |
| 7152.0 | 0.0 | 0.0 | 0.0 | 787052 |
| | | | | 138600 |
| 0.0 | 0.0 | 0.0 | 0.0 | 1857341 |
| 496.0 | 1093.0 | 0.0 | 0.0 | 2736645 |
| 143000.0 | 3000.0 | 0.0 | 4000.0 | 2195000 |

| Tax Expense | Tax Benefit | Net Income | Net Sales FY+1 | Net Sales FY-1 |
|---|---|---|---|---|
| 8940000.0 | 0.0 | 1301000.0 | | 7992928.0 |
| 43221.0 | 0.0 | 2693424.0 | | |
| 0.0 | 0.0 | 1857341.0 | | 19085434.0 |
| 3404.0 | 0.0 | 1351196.0 | | |
| 0.0 | 0.0 | 787052.0 | | 3378288.0 |
| 0.0 | | 7431868.0 | | |
| 0.0 | 0.0 | 530826.0 | | |
| 0.0 | 0.0 | 155879.0 | | |
| 17918.0 | 0.0 | 79502.0 | | |
| 0.0 | 0.0 | 300584.0 | | 1353777.0 |
| 0.0 | 0.0 | -5427000.0 | | |
| 0.0 | 0.0 | 3248630.0 | | 6065373.0 |
| 800.0 | 0.0 | -437841.0 | | |

| | | | | | | | | | | 1189020.0 | | | | Net Sales FY-2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | Net Sales FY-3 |
| | | | | | | | | | | | | | | Net Sales FY-4 |
| | | | | | | | | | | | | | | SDE FY+1 |
| | | | | 894204.0 | 7431868.0 | 1061959.0 | 2674080.0 | | 3005584.0 | | | | | SDE |

| SDE FY-1 | SDE FY-2 | EBITDA FY+1 | EBITDA | EBITDA FY-1 |
|---|---|---|---|---|
|  |  |  | -378363.0 | 2542076.0 |
|  |  |  | 4526716.0 |  |
|  |  |  | -5127000.0 |  |
| 285457.0 | 244776.0 |  | 300584.0 |  |
|  |  |  | 100504.0 |  |
|  |  |  | 184752.0 |  |
|  |  |  | 530826.0 |  |
|  |  |  | 7431868.0 |  |
|  |  |  | 213000.0 |  |
| 509616.0 |  |  | 794204.0 | 412116.0 |
|  |  |  | 1481911.0 | 154395.0 |
|  |  |  | 1888705.0 |  |
|  |  |  | 2792185.0 | 2085990.0 |

| EBITDA FY-2 | EBITDA FY-3 | EBITDA FY-4 | EBIT | EBITDAR |
| --- | --- | --- | --- | --- |
| | | | -431284 | -345504.0 |
| | | | 3395225 | 5548253.0 |
| | | | -5387000 | -4909000.0 |
| | | | 300584 | 339507.0 |
| | | | 93599 | |
| | | | 174552 | |
| | | | 202254.0 | 581526.0 |
| | | | 530826 | |
| | | | 7411868 | 7431868.0 |
| | | | 94000 | 279000.0 |
| | | | 794204 | 962204.0 |
| | | | 146501 | |
| | | | 1857341 | |
| | | | 2736048 | 28795520.0 |
| | | | 2331000 | |

| Balance Sheet Date | Cash and Equivalents | Accounts Receivable | Inventory | Other Current Assets |
|---|---|---|---|---|
| 2014-06-30 | 5000.0 | 372000.0 | | |
| 2016-12-31 | 5612492.0 | 3217993.0 | 0.0 | 2802906.0 |
| 2010-06-30 | 145000.0 | 945000.0 | 80000.0 | 113000.0 |
| NaT | | | | |
| 2012-09-01 | 38000.0 | 393000.0 | 83000.0 | 0.0 |
| 2016-12-31 | 3633896.0 | 17909314.0 | 0.0 | 156513.0 |
| 2011-12-31 | 9271999.0 | 60842.0 | 0.0 | 82288.0 |
| NaT | | | | |
| 2020-03-31 | 33095.0 | 73161.0 | 0.0 | 0.0 |
| NaT | | | | |
| 2012-09-01 | 38000.0 | 393000.0 | 83000.0 | 0.0 |
| NaT | | | | |
| 2020-12-31 | 943855.0 | 52721145.0 | 0.0 | 85134.0 |
| 2019-12-31 | 21989963.0 | 19911660.0 | 0.0 | 163585.0 |
| 2016-09-30 | 53500.0 | 4472342.0 | 0.0 | 12200.0 |
| 2010-09-30 | 1441000.0 | 26750000.0 | 0.0 | 182000.0 |

| Total Current Assets | Fixed Assets | Real Estate | Total Intangibles | Other Noncurrent Assets |
|---|---|---|---|---|
| 377000.0 | 80000.0 | | | |
| 11633391.0 | 2470589.0 | 0.0 | 0.0 | 78336.0 |
| 1283000.0 | 320000.0 | 0.0 | | 36000.0 |
| 106256.0 | 58693.0 | 0.0 | 0.0 | 0.0 |
| 10703329.0 | 608665.0 | 0.0 | 1500000.0 | 1412268.0 |
| 21699723.0 | 650578.0 | 0.0 | 337059.0 | |
| 514000.0 | 194000.0 | 0.0 | 0.0 | 10000.0 |
| 6301134.0 | 0.0 | 0.0 | | |
| 4353714.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 4538042.0 | 116015.0 | 0.0 | 0.0 | 0.0 |
| 4298000.0 | | 0.0 | 0.0 | 0.0 |

| Total Assets | Current Liabilities | Long-Term Liabilities | Total Liabilities | Stockholder's Equity |
| --- | --- | --- | --- | --- |
| 457000.0 | 731000.0 | 0.0 | 731000.0 | -274000.0 |
| 14182316.0 | 15778473.0 | 224946.0 | 16003419.0 | -1821103.0 |
| 16390000.0 | 4201000.0 | 985000.0 | 5186000.0 | -3547000.0 |
| 22687360.0 | 19406773.0 | 0.0 | 19406773.0 | 3280587.0 |
| 718000.0 | | 328000.0 | 938000.0 | -220000.0 |
| 3320252.0 | 15885543.0 | 14218875.0 | 30104418.0 | 309834.0 |
| 164949.0 | 164782.0 | 43824.0 | 208606.0 | -43657.0 |
| 6319055.0 | 5523633.0 | 148732.0 | 5672365.0 | 646690.0 |
| 4353714.0 | 1251209.0 | 0.0 | 1251209.0 | 3102505.0 |
| 4654057.0 | 5232774.0 | 0.0 | 5232774.0 | -578717.0 |
| 4298000.0 | 2787000.0 | 0.0 | 2787000.0 | 1511000.0 |

| PPA Available | Purchase Price Allocation Date | Cash and Equivalents PPA | Accounts Receivable PPA | Inventory PPA |
|---|---|---|---|---|
| Yes | 2014-07-07 | | | |
| Yes | 2019-02-20 | | | |
| Yes | 2010-08-02 | | | |
| No | NaT | | | |
| Yes | 2020-06-30 | 65037.0 | 80289.0 | 0.0 |
| Yes | 2016-05-01 | 0.0 | 0.0 | 22000.0 |
| No | NaT | | | |
| No | 2017-03-15 | | | |
| No | NaT | | | |
| No | NaT | | | |
| No | NaT | | | |
| No | NaT | | | |
| Yes | 2017-01-13 | 754125.0 | 1726398.0 | 0.0 |
| Yes | 2010-10-01 | | | |

| Other Current Assets PPA | Total Current Assets PPA | Fixed Assets PPA | Real Estate PPA | Customer Relationships / Lists PPA |
|---|---|---|---|---|
| 377000.0 | 377000.0 | 80000.0 | 0.0 | 910000.0 |
|  | 12201000.0 | 3291000.0 | 0.0 | 0.0 |
|  | 1313000.0 | 230000.0 | 0.0 | 0.0 |
| 0.0 | 145326.0 | 58693.0 | 0.0 | 0.0 |
| 0.0 | 22000.0 | 56000.0 | 0.0 | 2150000.0 |
|  |  |  | 500000.0 |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
| 346439.0 | 2826962.0 | 110657.0 | 0.0 | 4300000.0 |

| Backlog PPA | Developed / Existing Technology PPA | In-Process R&D PPA | Trade Name / Trademark PPA | Non-Compete Agreement PPA |
|---|---|---|---|---|
| 0.0 | 1321000.0 | 0.0 | 0.0 | 0.0 |
| 0.0 | 411000000.0 | 0.0 | 4400000.0 | 0.0 |
| 0.0 | 0.0 | 0.0 | 0.0 | 25000.0 |
| 0.0 | 0.0 | 0.0 | 0.0 | 250000.0 |
| 0.0 | | | 0.0 | 0.0 |
| | | | | |
| | | | | 0.0 |
| | | | | |
| 0.0 | 8150000.0 | 0.0 | 1550000.0 | 200000.0 |
| 200000.0 | 0.0 | 0.0 | 50000.0 | 0.0 |

| Other Intangibles PPA | Total Identifiable Intangibles PPA | Goodwill PPA | Total Intangibles PPA | Other Noncurrent Assets PPA |
|---|---|---|---|---|
| 0.0 | 4550000.0 | 22106000.0 | 26656000.0 | |
| 0.0 | 12050000.0 | 16416063.0 | 28466063.0 | 0.0 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| 0.0 | 25000.0 | 422000.0 | 447000.0 | 0.0 |
| 0.0 | 0.0 | 1356360.0 | 1356360.0 | 0.0 |
| 0.0 | 1321000.0 | 64000.0 | 1385000.0 | 0.0 |
| 1000000.0 | 1375000000.0 | 147220000.0 | 284720000.0 | 4550000.0 |
| 0.0 | | 2465000.0 | 2465000.0 | 0.0 |

| Total Assets PPA | Interest-Bearing Liabilities PPA | Total Liabilities PPA | Customer Relationships / Lists Life | Backlog Life |
|---|---|---|---|---|
| 2922000.0 | 464000.0 | 731000.0 | | |
| 304762000.0 | 0.0 | 284030000.0 | 8 Years | |
| 2928000.0 | | 2107000.0 | | |
| 1560379.0 | 84601.0 | 203471.0 | | |
| 525000.0 | 0.0 | 0.0 | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| 31403682.0 | 0.0 | 3073037.0 | 15 Years | 1 Year |

| Developed / Existing Technology Life | In-Process R&D Life | Trade Name / Trademark Life | Non-Compete Agreement Life | Other Intangibles Life |
|---|---|---|---|---|
|  |  |  | 5 Years |  |
|  |  |  | 5 Years | 3 Years |
|  |  | 10 Years | 5 Years |  |
|  |  |  | 2 Years |  |
|  |  |  | 2 Years |  |
|  |  |  | 5 Years |  |
|  |  |  | 5 Years |  |
|  |  |  | 5 Years |  |
|  |  |  | 3 Years |  |
|  |  |  | 5 Years |  |
|  |  | 1 Year |  |  |

| Sale Initiation Date | Sale Date | Days To Sell | Percentage Acquired | Asking Price |
|---|---|---|---|---|
| NaT | 2014-07-07 |  | 1 |  |
| NaT | 2019-02-20 |  | 1 |  |
| NaT | 2010-08-02 |  | 1 |  |
| 2022-04-04 | 2023-06-02 | 424.0 | 1 | 1300000.0 |
| NaT | 2020-05-25 |  | 1 |  |
| NaT | 2016-05-01 |  | 1 | 15000000.0 |
| 2011-01-06 | 2012-04-04 | 454.0 | 1 | 15000000.0 |
| 2017-01-03 | 2017-03-15 | 71.0 | 1 | 495000000.0 |
| NaT | 2012-09-01 |  | 1 |  |
| NaT | 2021-12-31 |  | 1 | 15000000.0 |
| NaT | 2021-03-31 |  | 1 |  |
| NaT | 2020-07-14 |  | 1 |  |
| NaT | 2017-01-13 |  | 1 |  |
| NaT | 2010-10-01 |  | 1 |  |

| MVIC Price | Pure Play MVIC | Debt Assumed | Amount Down | Transaction Costs |
|---|---|---|---|---|
| 2655000 | 2545000.0 | 464000.0 | 2191000.0 | |
| 276359000 | 288011000.0 | 0.0 | 276359000.0 | 7800000.0 |
| 1041000 | 1615000.0 | 220000.0 | 821000.0 | |
| 1100000 | 0.0 | 0.0 | | |
| 1441509 | 1415053.0 | 84601.0 | 1356908.0 | |
| 525000 | 503000.0 | 0.0 | 525000.0 | |
| 12900000 | 12900000.0 | 0.0 | 10400000.0 | |
| 49500000 | 47207050.0 | 0.0 | 49500000.0 | |
| 2127500 | 2044500.0 | 0.0 | 1795625.0 | |
| 15000000 | 0.0 | 0.0 | 15000000.0 | |
| 1274114 | 645345.0 | 0.0 | 1184114.0 | 50000.0 |
| 13340000 | 13340000.0 | | | |
| 26002645 | 26276720.0 | 0.0 | 114026450.0 | 797355.0 |
| 274470000 | 259360000.0 | 0.0 | 274470000.0 | |

| Amount Seller Financed | Acquirer Note Paid | Acquirer Personal Guarantee | Down Payment Percentage | Seller Financing Percentage |
|---|---|---|---|---|
|  | No | No | 1.0 |  |
| 0.0 | No | No | 1.0 | 0.0 |
| 0.0 | No | No | 1.0 | 0.0 |
|  | Yes | No |  |  |
| 0.0 | No | No | 1.0 | 0.0 |
| 2500000.0 | Yes | No | 0.81 | 0.19 |
| 331875.0 | Yes | No | 0.84 | 0.16 |
| 0.0 | No | No | 1.0 | 0.0 |
| 0.0 | No | No | 1.0 | 0.0 |
| 0.0 | No | No | 0.93 | 0.0 |
| 0.0 | No |  |  | 0.0 |
| 9000000.0 | Yes | No | 0.44 | 0.35 |

Deal Terms

ssued in the amount of $464,000.

nt managed by True Wind Capital that consisted of 64,914 newly issued shares of Series A Convertible Preferred Stock (1.00 par value), and 35,086 newly issued shares of Series B Convertible Preferred Stock (1.00 par value)

– fee/debt/interest in the amount to/220,000.

ssumed/84,601.

88 shares of the acquirer's common stock valued at approximately $377,400.

ck at a value of approximately $2,800,000 (the stock has piggyback registration rights), and the issuance of two promissory notes totaling $9,000,000 that bear 8% interest for 24 months with a balloon payment due on mat

| Renewal Option | Lease Length | Lease Terms | Real Estate Acquired | Rent/EBITDAR |
|---|---|---|---|---|
| No | | Month to month | No | -0.0951 |
| No | | (future minimum lease) | No | 0.1841 |
| No | | payments total $985/month | No | -0.0444 |
| No | 6.0 | and MNN is 0. Security deposit is | No | 0.1146000000000001 |
| No | | | No | |
| No | 22.0 | Lease payments of $1500 a month | No | 0.0865000000000001 |
| Yes | 40.0 | Not Disclosed | No | 0.0872 |
| No | | | Yes | 0.0 |
| Yes | 9.0 | Rent is $14,000/month. The lease expires on 09/30/2025. The | No | 0.2366 |
| No | 45.0 | | No | 0.1746 |
| No | | | No | |
| No | | It is unknown if there was an assumed | No | |
| No | | total future minimum lease commitments | No | |
| No | | through 2020 total | No | 0.0302999999999997 |
| No | | | No | |

| Rent/Sales | Sales Per Square Foot | Non-Compete Agreement | Non-Compete Length (months) | Non-Compete Description |
|---|---|---|---|---|
| 0.0359 | | No | | |
| 0.0144 | | No | | |
| 0.131400000000002 | | No | | |
| 0.0294 | 777.52 | Yes | 60.0 | 50-mile radius. |
| 0.0258 | | Yes | 24.0 | |
| 0.0115 | | Yes | 24.0 | Richmond Metropolitan Area |
| 0.0 | | Yes | 60.0 | United States |
| 0.0248 | | Yes | 60.0 | 200 mile radius |
| 0.0418 | 436.49 | Yes | 60.0 | United States |
| | 472.74 | Yes | 36.0 | 1000 mile radius |
| | | No | | |
| | | Yes | | |
| 0.0074 | | Yes | 60.0 | |
| | | No | | |

*...es-able to officers ($464,000); Net assets acquired $2,121,000.*

*...agement, information security, risk management, program development, risk assessment and remediation planning, and regulatory compliance readiness services; and network and device vulnerability and penetration...*

*...dwill $7,220,000. Current liabilities (13,532,000), Deferred revenue (10,321,000), Operating lease liabilities (4,550,000), for a total purchase price of $276,359,000.*

...000 estimated useful life between 3 to 10 years), Goodwill $16,416,063. Accounts payable and accrued expenses ($659,203), Accrued compensation ($1,035,522), Deferred revenue ($1,378,312), for a total purchase price of...

...rity maintenance development, strategic and budget planning, program development, policy and procedure development, and awareness and education program development services. The company serves healthcare, financia...

| Book Value Invested Capital | MVIC/Net Sales | MVIC/Gross Profit | MVIC/EBITDA | MVIC/EBIT |
|---|---|---|---|---|
| -274000.0 | 2.9 | | | |
| -1596157.0 | 3.9 | 7.74 | | 81.4 |
| -2562000.0 | 0.63 | 13.35 | 61.05 | |
| | 0.83 | 2.23 | 3.66 | 3.66 |
| 167.0 | 0.67 | 0.98 | 14.34 | 15.4 |
| | 0.77 | 0.96 | 2.84 | 3.01 |
| | 2.93 | 3.71 | 24.3 | 24.3 |
| 1731709.0 | 0.52 | 2.78 | 6.66 | 6.68 |
| 3280587.0 | 0.8 | 2.13 | 9.99 | 22.63 |
| 108000.0 | 3.73 | 3.73 | 18.89 | 18.89 |
| 795422.0 | 0.05 | 0.9 | 8.6 | 8.7 |
| 3102505.0 | 1.02 | 4.71 | 7.06 | 7.18 |
| -578717.0 | 2.21 | 4.26 | 9.31 | 9.5 |
| 1511000.0 | 1.8 | 5.85 | | 11.77 |

| MVIC/SDE | MVIC/BVIC | PPMVIC/Net Sales | PPMVIC/Gross Profit | PPMVIC/EBITDA |
|---|---|---|---|---|
|  | 18.16 | 1.7 | 5.53 |  |
|  | 4.3 | 2.23 | 4.3 | 9.41 |
|  | 1.6 | 1.02 | 4.71 | 7.06 |
|  |  | 0.02 | 0.45 | 4.35 |
| 16.77 | 19.7 | 0.77 | 2.04 | 9.6 |
| 6.66 | 15.09 | 0.5 | 2.66 | 6.35 |
| 12.15 | 7.45 | 2.93 | 3.71 | 24.3 |
| 1.96 |  | 0.74 | 0.92 | 2.72 |
|  | 8631.79 | 0.66 | 0.96 | 14.08 |
| 3.66 |  |  |  |  |
|  |  | 0.97 | 20.71 |  |
|  |  | 4.06 | 8.07 | 63.62 |
|  |  | 2.78 |  |  |

| PPMVIC/EBIT | PPMVIC/SDE | PPMVIC/BVIC | Sales Growth FY+1 | Sales Growth |
|---|---|---|---|---|
| 11.13 | | 17.16 | | |
| 9.6 | | | | 0.474900000000004 |
| 7.18 | | 4.3 | | |
| 4.41 | | 0.81 | | 0.4742 |
| 21.75 | | 18.93 | | 0.1895 |
| 6.37 | 6.35 | 14.39 | | |
| 24.3 | 12.15 | 7.45 | | |
| 2.88 | 1.88 | | | |
| 15.12 | | 8473.37 | | |
| | | | | -0.0236 |
| 84.83 | | | | 0.1692000000000002 |

| Sales Growth FY-1 | Sales Growth FY-2 | Sales Growth FY-3 | Net Sales 2Y CAGR | Net Sales 3Y CAGR |
|---|---|---|---|---|
| 0.1386 | | | 0.0542999999999994 | |

Case 2:23-cv-01932-BAT   Document 113   Filed 03/28/25   Page 80 of 89

| Net Sales 4Y CAGR | Gross Profit Margin before Operating and Net | Operating Profit Margin | Net Profit Margin after Gross and Operating | SDE Margin FY+1 |
|---|---|---|---|---|
| | -0.1323 | -0.4706 | -0.4778 | |
| | 0.5034000000000001 | 0.0479 | 0.0458 | |
| | 0.047 | -3.247099999999997 | -3.2712 | |
| | 0.3729 | 0.2274 | 0.2274 | |
| | 0.684 | 0.0433 | 0.0368 | |
| | 0.8049 | 0.2571 | 0.2296 | |
| | 0.7908 | 0.1207 | 0.1207 | |
| | 0.1885 | 0.0786 | 0.0788 | |
| | 0.3759 | 0.0353 | | |
| | 1.0 | 0.19760000000000003 | 0.1959 | |
| | 0.0506 | 0.0052 | 0.0048 | |
| | 0.2167 | 0.142 | 0.142 | |
| | 0.5178 | 0.2321 | 0.2285 | |
| 0.308 | | 0.153 | 0.0853999999999999 | |

| SDE Margin | SDE Margin FY-1 | SDE Margin FY-2 | EBITDA Margin FY+1 | EBITDA Margin |
|---|---|---|---|---|
| 0.2225 | 0.1509 | | | 0.2368 |
| 0.0788 | | | | 0.1444 |
| 0.2416 | | | | 0.0053 |
| 0.3939000000000003 | | | | 0.19760000000000003 |
| | | | | 0.08 |
| | | | | 0.0788 |
| | | | | 0.1207 |
| | | | | 0.2721 |
| | | | | 0.0465000000000001 |
| 0.2274 | 0.2109 | 0.2059 | | 0.2274 |
| | | | | -3.0904000000000003 |
| | | | | 0.0638 |
| | | | | -0.4129 |

| EBITDA Margin FY-1 | EBITDA Margin FY-2 | EBITDA Margin FY-3 | EBITDA Margin FY-4 | Return on Assets |
|---|---|---|---|---|
| 0.261 | | | | 0.302699999999997 |
| | | | | 0.5787 |
| 0.00810000000000001 | | | | 0.4266 |
| 0.122 | | | | 0.0214000000000002 |
| | | | | 0.3276 |
| | | | | 0.159600000000001 |
| | | | | 0.482000000000004 |
| | | | | -3.3112 |
| 0.0419000000000001 | | | | 0.2291 |
| | | | | -0.958100000000001 |

| Return on Equity | Current Ratio | Quick Ratio | Fixed Charge Coverage | Long-Term Liabilities to Assets |
|---|---|---|---|---|
| 1.598 | 0.52 | | -74.88 | 0.0 |
| -1.7839999999999998 | 0.74 | 0.74 | 153.1 | 0.0159 |
| 1.53 | 0.31 | 0.29 | -138.13 | 0.601 |
| -1.8211000000000002 | 0.64 | 0.64 | 231.19 | 0.2657 |
| 1.7133 | 0.67 | 0.67 | | 0.4282 |
| 2.2654 | 1.12 | 1.12 | | 0.0 |
| | | | 1.84 | 0.4568 |
| 0.2091 | 1.14 | 1.14 | 111.05 | 0.0235 |
| 0.5987 | 3.48 | 3.48 | | 0.0 |
| -4.65410000000001 | 0.87 | 0.87 | 5516.23 | 0.0 |
| 0.861 | 1.54 | 1.54 | 16.3 | 0.0 |

| Long-Term Liabilities to Equity | Total Asset Turnover | Fixed Asset Turnover | Inventory Turnover | Live Date |
|---|---|---|---|---|
| 0.0 | 2.01 | 11.46 | | 2018-08-14 |
| -0.1235 | 5.0 | 28.7 | | 2019-09-10 |
| -0.2777 | 1.01 | 5.18 | 20.74 | 2018-08-14 |
| -1.00038 | 13.09 | 36.79 | | 2020-08-19 |
| | | | | 2023-06-09 |
| -1.49090000000001 | 3.71 | 13.73 | 32.08 | 2018-08-14 |
| 0.0 | 4.16 | 145.01 | | 2018-08-14 |
| 4.5892 | 1.32 | 7.22 | | 2018-08-14 |
| | | | | 2022-09-19 |
| 0.23 | 4.45 | | | 2021-06-01 |
| 0.0 | 3.01 | | | 2022-07-11 |
| 0.0 | 2.53 | 101.62 | | 2018-08-14 |
| 0.0 | 3.54 | | | 2018-08-14 |

| Filing Date 8-K | Filing Date 8-K/A | Other Filing Type | Other Filing Date | Source |
|---|---|---|---|---|
| 2014-07-08 | 2014-09-11 | 10-Q | 2014-08-14 | SEC |
| 2019-02-22 | 2019-05-09 | 10-Q | 2019-05-09 | SEC |
| 2010-08-03 | 2010-10-13 | | NaT | SEC |
| NaT | NaT | | NaT | Other |
| 2020-05-29 | 2020-08-10 | | NaT | SEC |
| NaT | NaT | | NaT | IBBA |
| NaT | NaT | | NaT | IBBA |
| NaT | NaT | | NaT | Other |
| NaT | NaT | | NaT | AM&AA |
| NaT | NaT | | NaT | BBF |
| NaT | NaT | Business Acquisition Report | 2021-04-09 | SEDAR |
| NaT | NaT | | NaT | M&A Source |
| 2017-01-17 | 2017-03-31 | 10-Q | 2017-05-10 | SEC |
| 2010-10-07 | 2011-03-04 | | NaT | SEC |

| Contributor ID | Contributor Company | Contributor Name | Contributor City | Contributor State |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | BTI Group | | | |
| 1273.0 | Business Research Group, LLC | Mitchell, Michael | Richmond | VA |
| | | | | |
| 795.0 | Forbes Business Investments, Inc. | Forbes, Bob | Englewood | CO |
| 12.0 | Business Brokers of Florida | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| In Canadian Dollars | SBA/Bank Loan | SBA/Bank Loan Amount | SBA/Bank Loan % of Amount Down | E-Commerce |
| --- | --- | --- | --- | --- |
| No | | | | No |
| No | | | | No |
| No | | | | No |
| No | | | | No |
| No | | | | No |
| No | | | | No |
| No | | | | No |
| No | | | | No |
| No | | | | No |
| No | Yes | 780000.0 | | No |
| No | | | | No |
| No | | | | No |
| No | | | | No |

Social-Engineer, LLC
US$ in 000s

CONFIDENTIAL

Workpaper
Guideline Company Transaction Summary

## Guideline Transaction Summary & Valuation Multiples

| Close Date | Target Company Description | Enterprise Value | Revenue | EBITDA | Enterprise Value-to-Revenue |
|---|---|---|---|---|---|
| Jul 7, 2014 | Provides Information Security Solutions, Personal Health Records, Financial Information, and Corporate Intellectual Properties Through Professional Services | $ 2,655 | 916 | (378) | 2.9 x |
| Feb 20, 2019 | Provides Email Security Solutions to Businesses | $ 276,359 | 70,915 | 4,527 | 3.9 x |
| Aug 2, 2010 | Provides Email Security Products that Eliminate Spam and Viruses | $ 1,041 | 1,659 | (5,127) | 0.6 x |
| Jun 2, 2023 | Provides Outsourced IT Services, including Cloud and Local Backups, Spam Filtering, Cyber Security, Networking and Domain Administration, and Web Management | $ 1,100 | 1,322 | 301 | 0.8 x |
| May 25, 2020 | Information Technology Support Services and Security | $ 1,442 | 2,159 | 101 | 0.7 x |
| May 1, 2016 | Network Security | $ 525 | 679 | 185 | 0.8 x |
| Apr 4, 2012 | Security Software Company Primarily Serving Public and Private Schools | $ 12,900 | 4,396 | 531 | 2.9 x |
| Mar 15, 2017 | Cyber Security | $ 49,500 | 94,339 | 7,432 | 0.5 x |
| Sep 1, 2012 | Managed Services Provider - Network Management, Cloud Security, Remote Backups, Hosting and Secure Remote Access Services | $ 2,128 | 2,663 | 213 | 0.8 x |
| Dec 31, 2021 | Cybersecurity Consulting | $ 15,000 | 4,018 | 794 | 3.7 x |
| Mar 31, 2021 | Provides Cyber Security Consulting and Sells Cyber Security Hardware/Software | $ 1,274 | 28,136 | 148 | 0.0 x |
| Jul 14, 2020 | Information Technology (IT) Consulting Firm Specializing in Network Engineering and Cybersecurity | $ 13,340 | 13,083 | 1,889 | 1.0 x |
| Jan 13, 2017 | Information Technology Security Consulting Services | $ 26,003 | 11,789 | 2,792 | 2.2 x |
| Oct 1, 2010 | Cyber Security and Mission Systems in Support of Critical Intelligence, Counterterrorism, and Cyber Warfare Missions | $ 27,447 | 15,236 | | 1.8 x |

### Summary Statistics

| | Enterprise Value | Revenue | EBITDA | Enterprise Value-to-Revenue |
|---|---|---|---|---|
| High | $ 276,359 | $ 94,339 | $ 7,432 | 3.9 x |
| 75th Percentile | $ 23,252 | $ 14,698 | $ 1,889 | 2.7 x |
| Mean | $ 30,765 | $ 17,951 | $ 1,031 | 1.6 x |
| Median | $ 7,778 | $ 4,207 | $ 301 | 0.9 x |
| 25th Percentile | $ 1,316 | $ 1,784 | $ 148 | 0.7 x |
| Low | $ 525 | $ 679 | $ (5,127) | 0.0 x |
| CoV | 2.34 | 1.61 | 2.81 | 0.79 |

M&A

SE_001998