1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7
8
9
10
11
12
13
14

| | |
|---|---|
| CHRISTOPHER J. HADNAGY, an individual; and SOCIAL-ENGINEER, LLC, a Pennsylvania limited liability company, | CASE NO. 2:23-cv-01932-BAT |
| Plaintiffs, | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| JEFF MOSS; an individual; DEF CON COMMUNICATIONS, INC., a Washington corporation; and DOES 1-10; and ROE ENTITIES 1-10, inclusive, | |
| Defendants. | |

15      Defendants Jeff Moss ("Moss") and Def Con Communications, Inc. (collectively, "Def

16  Con") move for summary judgment on the defamation claim of Plaintiffs Christopher J. Hadnagy

17  and Social-Engineer LLC ("Social-Engineer") (collectively, "Hadnagy"). Dkt. 79. Def Con

18  argues the Court should grant judgment in their favor because any inference flowing from the

19  publications at issue are true, and Hadnagy has thus failed to establish the falsity or fault

20  elements of a defamation claim. Hadnagy contends Def Con's motion should be denied because

21  Def Con's truth defense largely relies upon evidence discovered after it issued its Transparency

22  Reports, and such evidence cannot form the basis of a truth defense.

23

The Court having considered the parties' pleadings and the record, **GRANTS** Def Con's motion for summary judgment **DISMISSES** this case with prejudice for the reasons below.

## INTRODUCTION

This case involves a defamation claim brought by Plaintiff, a past participant of the Def Con annual cybersecurity and hacking conference, against Defendant, the Def Con conference organizer. Plaintiff Hadnagy hosted a social-engineering village called SEVillage at the Def Con conference. Def Con's Code of Conduct prohibits "harassment," which includes "deliberate intimidation and targeting individuals in a manner that makes them feel uncomfortable, unwelcome, or afraid" and Def Con reserves the right to expel participants for harassment. Def Con permanently bans "repeat offenders and those who commit more egregious offenses."

Based on a report of retaliation by Hadnagy made by a former employee and a Zoom call in which others complained of Hadnagy's conduct, Def Con banned Hadnagy from its conferences and on February 9, 2022, issued the following "Transparency Statement":

> We received multiple CoC [Code of Conduct] violation reports about a DEF CON village leader, Chris Hadnagy of the SE Village. After conversations with the reporting parties and Chris, we are confident that the severity of the transgressions merits a ban from Def Con.

Hadnagy alleges in his lawsuit that this statement led to wide-spread speculation the transgressions were sexual in nature.

On July 28, 2022, Def Con posted another Transparency Report clarifying the significance of the lifetime ban by stating: "[i]n the case of the most troubling offenses or those who we feel may represent on ongoing risk to the community, we take the extra step of naming them publicly" so as not "to provide cover for these individuals to quietly find new and unsuspecting victims elsewhere." On January 13, 2023, Def Con posted the following "Transparency Update:"

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 2

1    During our investigation we spoke directly with Mr. Hadnagy about claims of his
2    violations of our Code of Conduct. He confirmed his behavior and agreed to stop.
     Unfortunately, the behavior did not stop.

3         Hadnagy contends there are factual disputes that Def Con spoke directly with him and

4    whether he "confirmed his behavior and agreed to stop." Hadnagy bears the burden of proving

5    the challenged statements are false or left a false impression by omitted facts and in publishing

6    the statements, Def Con knew or in the exercise of reasonable care, should have known the

7    statements were false.

8                                 **SUMMARY JUDGMENT STANDARD**

9         The Court must grant summary judgment when "there is no genuine dispute as to any

10   material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

11   "Where the non-moving party bears the burden of proof at trial, the moving party need only

12   prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle*

13   *Corp. Sec. Litig*., 627 F.3d 376, 387 (9th Cir. 2010). "[T]he burden then shifts to the non-moving

14   party to designate specific facts demonstrating the existence of genuine issues for trial." *Id*. "This

15   burden is not a light one." *Id*. A mere "scintilla of evidence in support of the [non-movant's]

16   position" is not sufficient, *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252, 266 (1986);

17   neither is "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v.*

18   *Zenith Radio Corp*., 475 U.S. 574, 586, (1986). "Where the record taken as a whole could not

19   lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."

20   *Matsushita*, 475 U.S. at 587 (cleaned up).

21        "[S]ummary judgment plays a particularly important role in defamation actions." *Mohr v.*

22   *Grant*, 153 Wash. 2d 812, 821, 108 P.3d 768 (2005). "Serious problems regarding the exercise of

23   free speech and free press guaranteed by the First Amendment are raised if unwarranted lawsuits

1   are allowed to proceed to trial. The chilling effect of the pendency of such litigation can itself be

2   sufficient to curtail the exercise of these freedoms." *Mark v. Seattle Times*, 96 Wash.2d 473, 486,

3   635 P.2d 1081 (1981) (cleaned up).

## PROCEDURAL HISTORY

5       In August 2022, Hadnagy filed suit in the Eastern District of Pennsylvania. Dkt. 44 at 4.

6   After the suit was dismissed for lack of personal jurisdiction, Hadnagy refiled in Nevada state

7   court. *Id*. Def Con removed the action to the District of Nevada and then moved to transfer venue

8   to this district. *Id*. at 4–5. In January 2024, Def Con filed a motion to dismiss. The Court granted

9   the motion on all claims except the claim for defamation based on the Transparency Report and

10  Transparency Update (*id.* at 12–15, 23) and gave Hadnagy leave to replead certain claims, but

11  Hadnagy chose not to do so. *Id*. at 15–16, 23; *see also* Dkt. 53 at 2–3.

12       In June 2024, Hadnagy's motion to amend the complaint to add claims of defamation by

13  implication and invasion of privacy by false light (Dkt. 49) was denied. Dkt. 53.

## STATEMENT OF MATERIAL FACTS

15       At the summary judgment stage, the evidence of the non-movant is to be believed, and all

16  justifiable inferences are to be drawn in their favor. Thus, for purposes of this motion, the Court

17  adopts Hadnagy's view of the facts to the extent they support his defamation claim. The Court

18  declines to address each point and counterpoint as this would result in comparing different

19  versions of the truth – an exercise not appropriate at summary judgment. *Anderson*, 477 U.S. at

20  255 ("credibility determinations, the weighing of the evidence, and the drawing of legitimate

21  inferences from the facts are jury functions, not those of a judge, whether he is ruling on a

22  motion for summary judgment or for a directed verdict.").

23

1    The facts before the Court can be broken into the information known to Def Con at the

2    time of the publication of the Transparency Reports and the information Def Con subsequently

3    obtained after publication during the course of the litigation herein. At the time the Transparency

4    Reports were published, the following facts were known.

5    **A.      Christopher Hadnagy**

6    Christopher Hadnagy is the founder of Social-Engineer, a company focused on the

7    "social-engineering" tactics, *i.e.*, manipulation, influence, and deception, that can be used to gain

8    access to a victim's computer system or personal data. Compl. ¶ 42. Hadnagy formerly hosted a

9    social-engineering village at Def Con called "SEVillage." *Id*. ¶¶ 45–46. Hadnagy is also the

10   founder of the Innocent Lives Foundation ("ILF"), a nonprofit organization involved in

11   identifying child predators online. Dkt. 81, Mertens Decl. Exhibit 4.

12   Social-Engineer provides specialized security consulting services, assisting companies

13   and government agencies in identifying vulnerabilities, assessing risks, and implementing

14   security training and remediation measures. Dkt. 99, Hadnagy Decl. ¶3; Dkt. 101, Conrad Decl.

15   Ex. 8 ("Hadnagy Dep.") 8:13-18. The company focuses on the human element of cybersecurity

16   (or "social-engineering"), as threats often target employees rather than technical systems.

17   Hadnagy Decl. ¶3. Social-Engineer is frequently hired to test corporate security by attempting to

18   obtain sensitive information from employees. *Id*.

19   Social-Engineer also offers courses and seminars designed in conjunction with former

20   FBI agents, on how attackers elicit private information in a non-threatening and unassuming

21   manner. Dkt. 99, Hadnagy Decl. ¶4. These courses have been taught to various entities, including

22   government entities. *Id*. Social-Engineer's training and strategies often extend beyond

23   conventional norms. Dkt. 101, Conrad Decl. Ex. 7 ("Wyler Dep.") 116:8-119:18.

1    Since 2010, Social-Engineer has operated a dedicated "village," known as the SE-

2    Village, at the Def Con Conference. Dkt. 99, Hadnagy Decl. ¶5. The SE-Village was one of the

3    conference's most popular attractions, offering specialized training and contests. *Id*. Prior to

4    2021, no complaints had ever been made against Hadnagy or the SE-Village that would have

5    warranted any action by Def Con. Dkt. 101, Conrad Decl. Ex. 3 ("Moss Dep. Vol. I") 125:11-15;

6    and Ex. 8 ("Hadnagy Dep.") 109:25-110:12.

7    **B.    Def Con and Jeff Moss**

8    Def Con, founded by Jeff Moss, is the world's largest security and hacking conference,

9    held annually in Las Vegas. Dkt. 99, Hadnagy Decl. ¶6. The event is organized into specialized

10    "villages," each focused on a distinct aspect of cybersecurity, hacking, or social engineering, and

11    featuring discussions, hands-on challenges, and live demonstrations. Dkt. 101, Conrad Decl. Ex.

12    3 ("Moss Dep. Vol. I") 68:17-69:7; Hadnagy Decl. ¶10. Def Con is widely recognized for its

13    unique environment, which presents notable security risks—earning its reputation as hosting "the

14    world's most hostile network." Hadnagy Decl. ¶11. The conference has also been historically

15    known for its vibrant and, at times, notorious social events, including "epic parties." *Id*.; Dkt.

16    101, Conrad Decl. Ex. 5 ("Moss Dep. Vol. II") 276:23-18; Ex. 3 ("Moss Dep. Vol. I") 79:19-

17    82:21; and Ex. 8 ("Hadnagy Dep.") 109:25-110:12; 192:18-23; Dkt. 100, MacDougall Decl.

18    Def Con leadership and staff frequently operate under their online "handles" rather than

19    their real names. Dkt. 99, Hadnagy Decl. ¶7. Def Con's founder, Jeff Moss, a cybersecurity

20    expert and hacker, is widely known by his alias, "The Dark Tangent." *Id*. Def Con embraced

21    anonymity to such an extent that, until only a few years ago, attendees could purchase tickets

22    exclusively with cash, leaving no digital trace of their participation. Hadnagy Decl. ¶8 The

23

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 6

1  conference attracts upwards of 30,000 people in attendance with a ticket price of $460 in 2024.

2  Hadnagy Decl. ¶6.

3      Def Con has numerous internal departments run by department leads. Conrad Decl. Ex. 3

4  ("Moss Dep. Vol. I") 44:22-47:19, 51:23-25; and Ex. 6 (DEF CON00000785). Many department

5  leads work year-round preparing for the conference, attending weekly calls, and are active

6  participants in the community serving as the public face of Def Con in many ways. Dkt. 99,

7  Hadnagy Decl. ¶12; Conrad Decl. Ex. 7 ("Wyler Dep.") 306:8-308:1; and Ex. 3 ("Moss Dep.

8  Vol. I") 53:4-25. Some of Def Con's department leads, including Moss, routinely monitor social

9  media, engage in online discussions and chat via their handles, give podcast interviews, and

10  contribute to articles discussing security concerns and conference logistics. Hadnagy Decl. ¶12.

11  **C.    Def Con's Code of Conduct**

12      In 2015, Def Con introduced a formal Code of Conduct, which prohibits "harassment,"

13  described as "deliberate intimidation and targeting individuals in a manner that makes them feel

14  uncomfortable, unwelcome, or afraid." Dkt. 81, Mertens Decl. Exhibit 3. Def Con reserves the

15  "right to respond to harassment in the manner [it] deem[s] appropriate, including but not limited

16  to expulsion without refund and referral to the to the relevant authorities." *Id.* In the case of those

17  determined by Def Con to be "repeat offenders and those who commit more egregious offenses,"

18  Def Con permanently bans them from its events. Def Con's July 28, 2022 Transparency Report

19  further clarifies the significance of the lifetime ban by stating: "[i]n the case of the most

20  troubling offenses or those who we feel may represent on ongoing risk to the community, we

21  take the extra step of naming them publicly" so as not "to provide cover for these individuals to

22  quietly find new and unsuspecting victims elsewhere.

23

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 7

In 2017, Def Con began to publish transparency reports, *i.e.*, summaries of incidents that had occurred at the yearly conferences "with the goal to discourage inappropriate behavior and to encourage other conventions to duplicate this reporting and share their data so collectively we can shed some light on the challenge we face in creating more safe and inclusive events." *Id*.

Publications on Def Con's website are "refreshed" and repeated with each later publication. Thus, previous transparency reports are repeated in subsequent transparency reports and can, and conceivably were, read together. Dkt. 37, Ex. 1 at 4-6.

**D.    Reports Against Hadnagy Before Publication of the Transparency Reports**

    1.    <u>Maxie Reynolds</u>

The first report of misconduct about Hadnagy to Def Con came from a former employee, Maxie Reynolds, who alleged Hadnagy took several retaliatory steps against her after she resigned from Social-Engineer. According to Reynolds, Hadnagy claimed two images in her book were from an active ILF case and notified the FBI; pressured hosts of five prominent podcasts to cancel scheduled conversations with Reynolds and succeeded in canceling three of them; and pressured the producer of a TV show to "drop her from the show." *Id*. at 144:9–146:1. In text messages, Hadnagy told the producer Reynolds had violated her employment contract, offered one of his employees a job, and cautioned "I would run the other way with haste…she is dangerous." Dkt. 81, Mertens Decl. Exhibit 11. In a September 3, 2021 email to Jacob Williams, the individual who connected Reynolds with Hadnagy and Social-Engineer, Hadnagy told Williams that Reynolds "is a train wreck; stole intellectual property, quit, lied, started a competitive company, quit four days before the launch of her book that he had helped her write, and threatened to tell the world he abused women if he sued her." *Id*. Exhibit 6 at SE_000408. In his deposition, Hadnagy explained Reynolds had a lot of government e-mail addresses and data

1    from Social-Engineering clients on her laptop and stole the pictures from ILF for the book.

2    Hadnagy also confirmed he was mistaken in claiming Reynolds had taken work from Social-

3    Engineering and started a competing company. Hadnagy Dep. 148:7–152:17.

4        In late August and September 2021, Reynolds reached out to Neil Wyler (a/k/a "Grifter")

5    due to his personal relationship with Hadnagy (not his affiliation with Def Con or Black Hat).

6    Conrad Decl. Ex. 9 ("Reynolds Dep.") 77:14-78:11. Wyler acknowledged he was acting as a

7    "mediator" between Reynolds and Hadnagy to help resolve their dispute. Conrad Decl. Ex. 16

8    (SE_000127 and SE_000132).

9        Reynolds was hired by Social-Engineer in January 2020 and signed an employment

10   agreement which explicitly prohibited her from performing other work while employed at

11   Social-Engineer and required her to return company equipment and data upon termination of

12   employment. Dkt. 101, Conrad Decl. Ex. 10 (SE_001469). In August 2020, Reynolds requested

13   and received authorization to use her personal laptop for company business by selling her

14   computer to Social-Engineering for $1 with the agreement she could buy it back after

15   terminating her employment. *Id.*, Conrad Decl. Ex. 11 (SE_000348) and Ex. 9 ("Reynolds

16   Dep.") 205:23-2. Social-Engineer accepted this arrangement and Reynolds downloaded Social-

17   Engineer's software and agreed "the device would be managed and monitored like every other

18   corporate device in use for business purposes." Dkt. 101, Conrad Decl. Ex. 8 ("Hadnagy Dep.")

19   196:7-25, Ex. 9 ("Reynolds Dep.") 206:20-23; Dkt. 100, MacDougall Decl.

20       In May 2021, Social-Engineer discovered Reynolds had violated her employment

21   agreement by entering a contract for a potential TV series involving social engineering. Reynolds

22   had used her Social-Engineer email account to exchange and sign contracts with other

23   companies. Dkt. 101, Conrad Decl. Ex.12 (Plaintiffs' Ex. 15 of "Reynolds Dep.") and Ex. 13

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 9

1    (Plaintiffs' Ex. 17 of "Reynolds Dep."); Ex. 9 ("Reynolds Dep.") 208:20-22; 209:18-19; 226:9-

2    11. Reynolds then advised Social-Engineer she would be taking "short-term disability" leave of

3    absence to visit her father in Scotland, but she did not take the trip. Dkt. 101, Conrad Decl. Ex. 9

4    ("Reynolds Dep.") 226:9-18; 231:16-238:25. On August 5, 2021, Reynolds resigned via email,

5    stating: So, with sadness, this is my official resignation. I will miss working with you, and I will

6    deeply miss the whole SE team. Conrad Decl. Ex. 14 (SE_000402); Dkt. 100, MacDougall Decl.

7        Pursuant to her employment agreement, Reynolds was instructed to return all company

8    equipment, including the computer she had been using, so it could be wiped clean and returned

9    to her as originally agreed. Dkt. 101, Conrad Decl. Ex. 15 (Plaintiffs' Ex. 23 of "Reynolds

10   Dep.") and Ex. 8 ("Hadnagy Dep.") 119:7-121:18. This was essential because the installed

11   software, Microsoft Intune, lacked the capability to remotely wipe iOS devices and could only

12   lock them. Dkt. 100, MacDougall Decl.; Dkt. 101, Conrad Decl. Ex. 8 ("Hadnagy Dep.") 119:7-

13   121:18. At one point, Reynolds claimed to have already sent it back, stating, "I have already sent

14   the computer to you (sent on Saturday) but don't have the number with me." Conrad Decl. Ex.

15   15 (Plaintiffs' Ex. 23 of "Reynolds Dep."). However, the device never arrived. Dkt. 100,

16   MacDougall Decl. After several unsuccessful attempts to recover the laptop, Social-Engineer

17   issued a remote lock. *Id*.

18       Prior to her resignation, Hadnagy had been assisting Reynolds in publishing her book.

19   Dkt. 100, Conrad Decl. Ex. 8 Hadnagy Dep. 119:7-121:18. After he discovered that the book

20   contained unauthorized photographs from an ILF operation, Hadnagy called Reynolds's

21   publisher, who removed the images, and contacted an acquaintance at the FBI. *Id*. at 125:12–

22   127:25. Hadnagy also withdrew his support for the book and rescinded his endorsements of

23   multiple podcasts he had arranged for Reynolds on behalf of Social-Engineer. *Id.*

As the dispute continued, Wyler, Hadnagy, and Reynolds engaged in further discussions. Dkt. 101, Conrad Decl. Ex. 16 (SE 122-126). Hadnagy repeatedly emphasized the seriousness of Reynolds' actions and explained the reasons for Social-Engineer's response. *Id.*; Ex. 8 ("Hadnagy Dep.") 189:1-190:2. Hadnagy did not admit to any behavior that would violate Def Con's Code of Conduct or any behavior that could endanger the Def Con community. ("Hadnagy Dep.") 189:1-190:2; 195:14-199:1. Wyler never raised other complaints with Hadnagy or requested any supporting documentation. *Id.*; Conrad Decl. Ex. 3 ("Moss Dep. Vol. I") 219:7-21.

As to his involvement, Wyler stated: "I don't know how I became the mediator either. But I think I'm going to call it good and step away from this." Dkt. 101, Conrad Decl. Ex. 16 (SE_000127).

### 2. September 7, 2021 Zoom Call

On September 2, 2021, Reynolds sent an email to Def Con alleging misconduct involving other ex-employees of Social Engineer and claimed to have a list of some 15 individuals willing to come forward. Dkt. 101, Conrad Decl. Ex. 17 (DEF CON0000160 – Plaintiffs' Exhibit 22 of "Reynolds Dep."). Kevin Sugihara, Def Con's Director of Sales and Sponsorship, responded to the email, stating, "We take situations such as you described incredibly seriously." *Id.*

Def Con asserts it held a Zoom Call with approximately 15 people on September 7, 2021, before announcing Hadnagy's ban. In its Joint Report, Def Con states "half a dozen" people participated in the call. Moss could not remember if this meeting took place on Zoom or on a regular telephone call, but he testified that the phone number for the dial-in was given to Maxie Reynolds in a text message, which was copied and sent to other attendees. Dkt. 101, Conrad Decl. Ex. 3 ("Moss Dep. Vol. I") 140:18-22; 141:7-10. Moss confirmed that out of Def Con's

1    employees, he would be the most knowledgeable about the reports of Code of Conduct violations

2    related to Hadnagy. Conrad Decl. Ex. 5 ("Moss Dep. Vol. II") 260:20-261:8.

3            Hadnagy contends the dial-in number produced by Def Con is dated March 5, 2022—

4    nearly a month after the February 9, 2022 Transparency Report announcing Hadnagy's ban from

5    Def Con. Dkt. 101, Conrad Decl. Ex. 4 (DEF CON00000176). However, on January 29, 2025,

6    counsel for Def Con sent counsel for Hadnagy the September 7, 2021, Zoom invitation at

7    counsel for Hadnagy's request. See Supplemental Declaration of Matt Mertens ("Supp. Mertens

8    Decl.") ¶ 2, Ex. A.

9            Moss testified there is no documentation of the call aside from the time it happened (*id.*,

10   Ex. 3 ("Moss Dep. Vol. I") 139:22-24, 145:5-147:19) and that while it would have been

11   advantageous to do so, they have no "detailed notes, so probably nobody took them, or else we'd

12   have them." *Id.*, Conrad Decl. Ex. 3 ("Moss Dep.Vol. I") 145:16-19. Additionally, Moss testified

13   that Def Con had policies and procedures for documenting investigations, but no such policy or

14   procedure has ever been produced by Def Con. *Id.*, Conrad Decl. Ex. 3 ("Moss Dep. Vol. I")

15   93:4-8; Conrad Decl. ¶20.

16           In his deposition, Moss indicated uncertainty about what was known at the time they

17   decided to ban Hadnagy and what was learned during the investigation post-litigation: "I

18   couldn't tell you if it was on the call or if it was after the fact." *Id.*, Conrad. Decl. Ex. 3 ("Moss

19   Dep. Vol. I") 203:6-19. Moss also acknowledged that the information he has now is a

20   "synthesis" of facts gathered after the ban was announced. *Id.* Ex. 3 ("Moss Dep. Vol. I") 166:6-

21   25; 205:6-19.

22           Def Con's Rule 26 Initial Disclosures makes no mention of "reporting parties" other than

23   Maxie Reynolds." Dkt. 101, Conrad Decl., Ex. 18 (Defendants' Initial Rule 26 Disclosures).

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 12

### 3.    Michele Fincher

Def Con claims it also relied on accusations made by former employee Michele Fincher prior to publishing the first Transparency Report. However, Moss testified that Fincher did not report any Code of Conduct violations during the Zoom Call. Dkt. 101, Conrad Decl. Ex. 3 ("Moss Dep. Vol. I") 165:21-23. In Moss's message with Fincher *after* the ban, he stated: "We are in the discovery phase of figuring out who to talk to about the Chris lawsuit," and then directed her to his legal team. *Id.*, Conrad Decl. Ex. 19 (Fincher 00001-11). Def Con's law firm, Perkins Coie, began representing Fincher in this matter, and objected to, and refused to produce responsive documents in response to Plaintiffs' subpoenas. Conrad Decl. Ex. 20 (Perkins Letter, dated 11/14/2024).

Fincher, Reynolds, Murdock, and Wyler testified that Fincher shared her experiences with Hadnagy on the call. Dkt. 98 at 12:6-14; ¶¶ 5-8, Ex. D at 58:17-60:13; Ex. E at 92:23-93:9, 99:15-100:16, and 107:9-22; Ex. F at 130:12-13; and Ex. G at 111:19-114:13. While Moss testified that Fincher did not report any Code of Conduct violations on the call, he also testified that these incidents were "a while ago" and he doesn't "remember specifically who said what." Id. ¶ 9, Ex. H at 136:18-24.

### 4.    Cat Murdock

Cat Murdock, another former employee of Social-Engineer, was on the Zoom Call. She testified the Zoom link for this group call was sent to her by Moss. Dkt. 101, Conrad Decl. Ex. 21 ("Murdock Dep.)" 172:19-173:5. However, Moss's first recorded exchange with Murdock took place on October 8, 2022, months after the Zoom Call, inviting her to talk with Def Con's legal team. Dkt. 101, Conrad Decl. Ex. 22 (DEF CON0000251).

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 13

1    Def Con Board Member Alethe Denis, testified that Murdock told her that she [Murdock]

2    "was not a party to this and that she had more important matters to attend to in her own life."

3    Dkt. 101, Conrad Decl. Ex. 23 ("Denis Dep.") 25:22-25. In her deposition, Denis states she

4    warned Def Con that Reynolds was attempting to "manipulate" others, including offering spots

5    on a TV show, to make complaints against Hadnagy. Dkt. 101, Conrad Decl. Ex. 23 ("Denis

6    Dep.") 169:5-12; 198:2-10.

7        5.    Jess Levine

8    Jess Levine testified she was on the Zoom Call, announced herself and shared her

9    experience. Conrad Decl. Ex. 24 ("Levine Dep.") 80:14-20. Wyler, who was also on the Zoom

10   Call, testified he had no idea who Levine was. Conrad Decl. Ex. 7 ("Wyler Dep.") 278:12-14.

11   Murdock testified Levine never spoke on the call but instead provided a statement to Murdock,

12   who then read it aloud. Dkt. 21, Conrad Decl. Ex. 21 ("Murdock Dep.") 217:16-22. However,

13   Def Con has never produced Levine's statement in response to discovery requests or subpoenas

14   directed at Levine and Murdock. *Id.*, Conrad Decl. ¶28. Levine also repeatedly admitted to using

15   "disappearing" messages when asked for communications in support of her claims. *Id.*, Conrad

16   Decl. Ex. 24 ("Levine Dep.") 106-109:25; 185:3-14.

17   Accounts of the allegations made during the Zoom Call are also conflicting. For example,

18   Murdock and Levine allege that Hadnagy jokingly used a knife; but Wyler testified that no such

19   allegations involving a knife were ever discussed. Conrad Decl. Ex. 7 ("Wyler Dep.") 265:18-

20   266:2, 269:10-23. Def Con claims there were inappropriate comments about Asian women, yet

21   Wyler stated that he never heard any reference to Hadnagy commenting that he was attracted to

22   Asians. Id. Ex. 7 ("Wyler Dep.") 116:8-12. Wyler also confirmed that he never personally

23

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 14

reported any Code of Conduct violations involving himself and Hadnagy. *Id*. Ex. 7 ("Wyler Dep.") 244:21-245:11.

      6.   <u>Sam Gamble</u>

     Def Con's motion also includes accusations by former ILF employee, Sam Gamble, but Gamble testified she had not spoken with Def Con prior to the February 9, 2022 Transparency Report:

> Q.    And the multiple code of conduct violation reports that DEF CON is indicating it received, none of those were code of conduct violation reports that you had made to DEF CON by February 9, 2022; correct?
>
> A.    Correct. Yeah. No, none of those. I was not a part of that whatsoever. I was fervently on the side of Chris and the ILF.
>
> Q.    And it says, "After conversations with the reporting parties and Chris." By February 9, 2022, you had not had any conversations with DEF CON at that point; right?
>
> A.    I had not, no.
>
> Q.    So the severity of the transgressions merits a ban from DEF CON, that had nothing to do with anything that you're testifying about today; right?
>
> THE DEPONENT: No.
>
> Q.    Is that correct?
>
> A.    I said no. Yeah. No, none of my experiences had anything to do with DEF CON or DEF CON's report.

Dkt. 21, Conrad Decl. Ex. 25 ("Gamble Dep.") 163:15-164:22.

**E.    <u>February 9, 2022 Transparency Report</u>**

     On February 9, 2022, Def Con posted a Transparency Report, stating,

> We received multiple CoC violation reports about a DEF CON Village Leader Chris Hadnagy of the SE Village. After conversations with the reporting parties and Chris, we are confident the severity of the transgressions merits a ban from DEF CON.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 15

Dkt. 101, Conrad Decl. Ex. 26 (SE_000659). The only individuals Def Con has ever previously named and banned were those accused of sexual abuse or sexual assault. *Id*. Ex. 3 ("Moss Dep. Vol. I") 176:21-177:18; and Ex. 23 ("Denis Dep.") 138:18-142:3. Def Con Board Member, Alethe Denis, testified that, "for people to be banned from this conference in the past, they have perpetrated some pretty hideous crimes against other conference participants, one such person being Captain Crunch. That was his handle, and he had sexually assaulted women for years." *Id*., Denis Dep. 140:8-13. When asked, given the full context of Def Con's statements, whether "it was foreseeable that people who read that transparency report would interpret it to mean that Hadnagy had done something involving sexual misconduct or sexual predatory behavior?", Denis testified:

> A.  I believe not only was it a natural conclusion for people to come to, but that I have evidence that that's the conclusion that people came to from the messages that I received around that time frame.

Dkt. 101, Conrad Decl. Ex. 23 ("Denis Dep.") 144:19-145:7.

Two days after publishing the Transparency Report, Moss stated: "[t]he online crazy is starting with speculation around if it was sexual in nature. Should we add something to the transparency report to reign that in, like "a not-sexual in nature CoC violation" or to the bullying and harassment?" *Id*. Ex. 27 (DEF CON00000034). He also stated: "If Chris wants to say something to clarify it, he could say it wasn't sexual and we wouldn't contradict him." *Id*. Ex. 27 (DEF CON00000035). In a private text, Wyler also urged Moss to clarify the Transparency Report:

> I know I've said it before but I still think we should update the transparency report to say it wasn't anything sexual in nature and that it was bullying and harassment of a non-sexual nature.

> Because all of the rumor mill stuff is making it seem like it was sexual. Which if he points to that and says Def Con wasn't clear, might actually give him a leg to stand on in terms of defamation.

*Id.*, Conrad Decl. Ex. 27 (DEF CON0000357).

Wyler also told Moss that he would "die on the hill that we should clarify the statement on the transparency report." *Id*. Ex. 28 (DEF CON0000359).

Hadnagy then reached out to Wyler, urging him to facilitate a conversation with Def Con, as no one from Def Con had spoken with him about the allegations. Dkt. 101, Conrad Decl. Ex. 8 ("Hadnagy Dep.") 188:8-11; 190:2 and Ex. 16 (SE_000120). Wyler agreed that Def Con should have provided more "context" and disclaimed involvement, stating: "There is no 'you guys'. I am not DEF CON. If you noticed I haven't said a freaking word." Wyler further explained: "I don't even run villages anymore. And haven't for years." "I was told to act as a mediator for everything in the beginning." *Id*. Hadnagy also testified that Wyler specifically told him he does not represent Def Con during their discussion and that he [Hadnagy] never admitted to any Code of Conduct violations. *Id*. Ex. 8 ("Hadnagy Dep.") 188:8-11, 189:1-190:2.

In July 2022, Def Con updated its Transparency Reports to state that it imposes lifetime bans only on "repeat offenders" who have committed "more egregious offenses" and pose an "ongoing risk to the community" to prevent them from "quietly find[ing] new and unsuspecting victims." Dkt. 101, Conrad Decl. Ex. 26 (SE_000657-000659). Def Con further stated that it withheld details about the "reporting parties" or the accusations based on recommendations from the "Domestic Violence and the Violence Against Women Office at the Department of Justice." *Id*. That most reports are for "minor violations that result in a warning, but "severe allegations may require a referral to hotel security or law enforcement, especially if the report include claims of criminal behavior." *Id*.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 17

On September 7, 2022, the parties filed a joint statement (in Case No. 2:22-cv-03060-WB E.D. PA), in which Def Con stated a "third party reached out to Plaintiff Hadnagy." Dkt. 101, Conrad Dec., Ex. 1 (Joint Report). The evidence reflects Wyler acted as that "third party" between Hadnagy and Reynolds "in the beginning."

On September 8, 2022, Kevin Sugihara (a/k/a "Sugitime"), Def Con's Director of Sales and Sponsorship, posted the following on Def Con's social media Reddit thread:

> Hadnagy is this industry's Weinstein, and it isn't a well-kept secret amongst those in the industry. I personally know decision makers who have refused to do business with him for years because of his behavior.
>
> Now he just takes his scum baggery to an all time low by using a lawsuit to pull out the names of people accused of harassing him. What a fucking sleezeball."

Hadnagy Decl. Ex 3 (DEF CON0000620) When other users questioned Def Con's decision, Sugihara responded: "Yeah dude you sound like you're defending a serial sexual predator. It's a pretty bad look, just saying." *Id*.[1]

## F.    January 13, 2023 Transparency Update

About five months after this lawsuit was filed, Def Con posted the Transparency Update on January 13, 2023:

> During our investigation we spoke directly with Mr. Hadnagy about claims of his violations of code of conduct. He confirmed his behavior and agreed to stop. Unfortunately, the behavior did not stop.

Dkt. 81, Mertens Decl., Ex. 33.

---

[1] In discovery, it was found that Sugihara was involved in discussions with Moss about the case on Def Con Weekly Call communications. Dkt. 101, Conrad Decl. Ex. 2 (DEF CON0000276). Those communications reveal that Sugihara referenced his own public post comparing Hadnagy to Weinstein, to which a "thumbs-up" emoji was sent in reply, although it is not clear that Moss sent the reply. *Id*. Def Con contends it is not responsible for Sugihara's remarks, but this appears to be in direct contravention to Def Con's directions to Def Con staff that anything "you or your department Goons say can be attributed to someone associated with DEF CON." Conrad Decl. Ex. 27 (DEF CON00000034).

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 18

When asked who from Def Con had spoken to Hadnagy about the alleged Code of Conduct violations, Moss stated: "You have the text messages from Neil [Wyler]." Conrad Decl. Ex. 3 ("Moss Dep. Vol. I") 174:7-9. However, Moss also admitted: "I don't know what particular hat he [Neil] was wearing at that moment." *Id*. Ex. 3 ("Moss Dep. Vol. I") 172:19-173:5.

Def Con contends it tried to speak to Hadnagy but he was not available on the times provided. The email string to which Def Con refers (Dkt. 84, Ex. 31 at 578-581), indicates Hadnagy reached out to Moss expressing a desire to discuss more than "one side of the story." *Id.* at 578. Between April 7, 2021, and January 7, 2022, Hadnagy repeatedly texted Moss to setup a mutually agreeable time, and on January 9, 2022, Hadnagy texted:

> Jeff, what do we need to discuss? You guys got told an accusation by a group of disgruntled ex employees and one person who we had to kick out of SEV. I've worked with DC for almost 15 years, mentored countless women and men, ran a village with zero porn, violence, or problems, run a nonprofit for free that fingers crimes against children, and never had an accusation like this. Instead of defending me or trying to find out of this was true I was told to make it go away.

> I'm not sure what we need to discuss. If she had any legit claims why not go to the police or a lawyer why would she go to BH and DC? Because all she wanted to do was hurt the way she did when she stole from SECOM and left.

> I will ask Ryan but that's kinda late. We are not angry. Just disappointed. And we are really busy. We have decided to bring SEV to another conference this year. So I'm not sure what else to discuss. I didn't want to do this in writing after devoting so many years to def.con. But it seems we just won't be able to make the time work. Between family, travel, work and time zones it seems like it is impossible.

Dkt. 581.

In response, Moss stated "[w]e just want to talk to you before we decide on what to do about the CoC violations that were reported to us." *Id.* Hadnagy responded, "let's pick a time that works" during business hours and asked what violations were reported and by whom. *Id.* Moss declined to share names to prevent retaliation.

**G.**    <u>**Discovery After Publication of Transparency Report and Transparency Update**</u>

Def Con has submitted evidence obtained during written and deposition discovery in this lawsuit to confirm a "pattern of retaliation and disparagement" by Hadnagy against others in the infosec community. While Hadnagy claims in a conclusory manner he has not engaged in any misconduct, he does not provide any evidence that contradicts or disputes the claims made by the individuals above. For instance, Defendant submitted additional evidence obtained in discovery that supports Defendant's claims Hadnagy engaged in conduct that included sexual misconduct. *See* Dkt. 107 at 6-8. Hadnagy has not provided evidence that disputes: (1) his fixation on Maxie Reynold's appearance or his attacks on her as a "awful psycho bitch"; (2) his repeated references to Michele Fincher as a "hot Asian," and her discomfort of his sexualized trainings or his repeatedly bullying  and screaming; (3) that he threw a phone at Cat Murdock, belittled employees, and joked about pulling out a switchblade to stab people; (4) Jess Levine's testimony she saw Hadnagy drunkenly brandish a switchblade, berated her to the point of tears and unlawfully withheld her paycheck; (5) Sam Gambles' testimony Hadnagy regularly commented on her physical appearance in a way that made her uncomfortable, made sexually explicit remarks to her in 2021, and gave her an unwanted kiss on the forehead; (6) Geoffrey Vaughan's 2016 emails regarding Hadnagy's inappropriate behavior in training sessions which included references to pornography; and (7) Hadnagy's own acknowledgment that his conduct was inappropriate or could be perceived as inappropriate.

## DISCUSSION

In a defamation case, the plaintiff must establish four elements: (1) falsity, (2) an unprivileged communication, (3) fault, and (4) damages. *Mohr*, 153 Wash.2d at 822, 108 P.3d 768 (2005). "A defamation claim must be based on a statement that is provably false." *Wren v.*

1  *Whitehead*, 33 Wn.App.2d 1066 (Div. I 2025) (citing to *Schmalenberg v. Tacoma News, Inc.*, 87

2  Wn. App. 579, 590, 943 P.2d 350 (1997), *review denied*, 134 Wn.2d 1013 (1998)). "The prima

3  facie case must consist of specific, material facts, rather than conclusory statements, that would

4  allow a jury to find that each element of defamation exists." *LaMon v. Butler*, 112 Wn.2d 193,

5  197, 770 P.2d 1027, 1029 (Wash. 1989).

6     It has been observed the elements of a defamation claim generate two basic questions:

7     (1) Did the defendant make a false statement that caused damage
      to the plaintiff's reputational or other compensable interest? (2) If
8     so, should the defendant be held liable for the damage? The first
      question addresses whether the defendant engaged in wrongful
9     conduct, and whether that conduct caused harm to the plaintiff. Its
      facets include, at a minimum, (a) whether the defendant uttered the
10    statement in issue; (b) whether the statement in issue was false in
      whole or in part; and (c) whether the statement's falsity, if any, was
11    a cause of damage to the plaintiff. The second question balances
      the plaintiff's need for a remedy against society's need not to deter
12    free speech.

13  *Schmalenberg v. Tacoma News Inc.*, 87 Wn.App. at 590.

14     At the summary judgment stage, "a court determines only whether a communication is

15  capable of defamatory meaning." *Amsbury v. Cowles Publ'g Co.*, 76 Wn.2d 733, 738, 458 P.2d

16  882, 885 (1969). Where a communication is capable of both a defamatory and non-defamatory

17  meaning, it is for a jury—not a judge—to determine which meaning controls. *Miller v. Sawant*,

18  18 F.4th 328, 333 (9th Cir. 2021) (citing *Swartz v. World Publ'g Co.*, 57 Wn.2d 213, 356 P.2d

19  97, 98 (1960) (en banc)). "In all but extreme cases the jury should determine" whether a

20  communication carried the meaning ascribed by the plaintiff. *Id.*

21     The communications at issue are not considered in a vacuum, as "[w]ords which are

22  harmless in themselves may be defamatory in the light of surrounding circumstances." *Crossman*

23  *v. Brick Tavern*, 33 Wn. App. 503, 505, 655 P.2d 1206 (1982) (citing *Ziebell v. Lumbermens*

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 21

1   *Printing Co.*, 14 Wn.2d 261, 268, 127 P.2d 677 (1942)). Therefore, "[i]n determining whether

2   words are capable of a defamatory meaning, they must be considered in the context in which

3   they were uttered or published as well as in the light of the circumstances surrounding the

4   publication." *Getchell v. Auto Bar Sys. Northwest*, 73 Wn.2d 831, 387, 440 P.2d (1968).

5       Statements that "are harmless in themselves may be defamatory in the light of

6   surrounding circumstances." *Ziebell v. Lumbermens Printing Co.*, 14 Wn.2d 261, 268, 127 P.2d

7   677 (1942). In those cases, it is appropriate for a court to consider extrinsic evidence that would

8   be known to the recipients of the statements and shows the statements' peculiar applicability to

9   the plaintiff. *Crossman v. The Brick Tavern, Inc.*, 33 Wn. App. 503, 505, 655 P.2d 1206 (1982)

10  (quoting *Ziebell,* 14 Wn.2d at 268).

11      To prove falsity, "a plaintiff must prove either a statement was false or a statement left a

12  false impression by omitted facts." *Seaquist v. Caldier*, 8 Wash. App.2d 556, 565, 438 P.3d 606,

13  612 (2019). A "provably false statement" is one that, as a statement of either fact or opinion,

14  falsely expresses or implies provable facts about the plaintiff. *Schmalenberg v. Tacoma News*,

15  *Inc.*, 87 Wn. App. at 590-91; *see Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 419 (Tenn.

16  1978) (recognizing the proper inquiry is whether the published words, as conveyed, would create

17  a different effect on the reader than the truth would have) (cited with approval in *Mohr v. Grant*,

18  153 Wn.2d 812, 828, 108 P.3d 768, 776 (2005)).

19      As to fault, a private individual need only prove negligence; "that in publishing the

20  statement, the defendant knew or, in the exercise of reasonable care, should have known that the

21  statement was false, or would create a false impression in some material respect." *Taskett v. King*

22  *Broad. Co.*, 86 Wn.2d 439, 445, 546 P.2d 81, 85 (1976). Negligence is generally a question of

23

1   fact for the jury and should be decided as an issue of law by the court only in rare cases. *Rhoades*

2   *v. DeRosier*, 14 Wn. App. 946, 948-49, 546 P.2d 930 (1976).

3       The parties do not disagree over the elements of a defamation claim but sharply disagree

4   over what evidence may be applied to Def Con's summary judgment motion and their truth

5   defense. Def Con argues the Court should grant judgment in its favor because the allegations

6   contained in the Transparency Reports, and the inferences Hadnagy complains of, have

7   ultimately been proven to be true, and truth is a complete defense to a defamation claim. In

8   support, Def Con argues Hadnagy has not and cannot dispute that before Def Con issued its first

9   Transparency Report, Hadnagy actually had engaged in misconduct involving fixating on the

10  bodies of females, violent temper outbursts, berating and insulting employees, sexual

11  fetishization of Asian women, holding inappropriate sexualized trainings, and brandishing a

12  switchblade at the Def Con conference and in the workplace.

13      In response, Hadnagy "challenges the sufficiency of the evidence as to two elements of

14  the defamation claim: falsity and fault." Dkt. 98 at 23 (Response to Summary Judgment).

15  Hadnagy's challenge focuses upon what evidence Def Con actually knew about at the time it

16  issued its Transparency Reports. Hadnagy contends, when Def Con issued the Transparency

17  Report and Transparency Updates, they lacked information of any impropriety of a sexual

18  nature. Hadnagy argues while Def Con's Transparency Report "does not explicitly state the ban

19  was related to sexual misconduct, Defendants knew of should have known the context in which it

20  was made was 'capable of' that defamatory meaning." *Id.* at 26. Hadnagy further argues Def Con

21  did not speak with him about the allegations, and he never admitted the allegations of sexual

22  misconduct.

23

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 23

1   The crux of Hadnagy's argument is Def Con cannot rely upon information discovered

2 after the Transparency Reports were issued to show that the implications contained in the

3 Transparency Reports are true. Hadnagy makes this argument because it cannot be said with

4 certainty that Def Con knew Hadnagy had engaged in sexual misconduct when it issued the first

5 Transparency Report. Essentially, Hadnagy reasons that absent this knowledge, Def Con's

6 Transparency Reports were false and defamatory when issued, even though subsequent

7 discovery establishes the sexual misconduct implications are in fact true.

8   Although Hadnagy has not provided evidence contradicting Def Con's claims, he argues

9 in his response that none of this evidence can be used to support Def Con's truth defense. *See*

10 Dkt. 98 at 31:1-6 quoting *La Mon v. Butler*, 44 Wash. App. 654, 659, 722 P.2d 1373, 1377

11 (1986) (citing Restatement (Second) of Torts § 581A (1977)); *Point Ruston, LLC v. Pac. Nw.*

12 *Reg'l Council of the United Bhd. of Carpenters & Joiners of Am.*, No. C09-5232BHS, 2010 WL

13 3732984, at *6 (W.D. Wash. Sept. 13, 2010)). Hadnagy also cites *Page v. Oath Inc.* 270 A.3d

14 833, 847, n. 104 (Del. 2022) for the proposition that truth of a defendant's statements should be

15 judged "at the time they were published, not with the benefit of hindsight." Dkt. 98 at 31.

16   The cases on which Hadnagy relies did not involve or address the issue of whether post

17 publication evidence can or cannot be considered to determine the truth of an alleged defamatory

18 statement. That is, in both *La Mon and Page,* the courts were not confronted with deciding a

19 defense of truth in a defamation action that relied primarily upon facts adduced after publication

20 of the defamatory statement. The *La Mon* decision mentions under the restatement of torts

21 "[t]ruth, of course is a complete defense to a claim of defamation" and that the truth of a

22 defamatory statement "must be measured at the time of the defamatory publication." *La Mon*, at

23

1   659. Similarly, in a footnote, the *Page* decision refers to the same restatement. But neither case

2   discusses nor resolves what "measured at the time" means.

3         The restatement of torts, which is cited in both *La Mon* and *Page*, focuses on whether an

4   alleged defamatory publication was true when published. It specifically discusses how a

5   statement that is untrue at publication cannot be defended based upon actions that occurred after

6   publication. *See* Restatement of Torts (Second) § 581A(g) True Statements. ("Thus a statement

7   that another has been guilty of blackmail is not met by proof of the other's subsequent acts of

8   blackmail although the defamer had reasonable grounds, at the time of the accusation to believe

9   that the other would commit them.").

10        However, the Restatement notes that "if the defamatory matter is true, it is immaterial

11  that the person who publishes it believes it to be false; it is enough that it turns out to be true." *Id.*

12  at § 518(h). The Restatement thus suggests it is irrelevant that Defendant Def Con did not know

13  at the time the Transparency Reports were published whether Hadnagy had or had not engaged

14  in sexual misconduct. Rather, if the sexual misconduct implications were in fact true at the time

15  the Transparency Reports were published, Def Con is shielded by the truth defense. The

16  restatement's language "if the reports ultimately are true," further suggests that evidence

17  discovered after Def Con's Transparency Reports were published may be used in a truth defense,

18  if that evidence sets forth acts committed by Hadnagy before the Transparency Reports were

19  published. Hence, the Restatement of Torts undercuts Hadnagy's argument the truth of the

20  Defendant's Reports cannot be supported by evidence that were in fact true at the time of

21  publication, but which Def Con did not know about, and which were verified only later during

22  discovery in this case.

23

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 25

1    Hadnagy also argues the *Point Ruston* decision requires the Court to apply the actual

2    malice standard, and under this standard Def Con cannot rely upon information learned after

3    publication because the 'actual malice' standard is based upon what was known at the time of

4    publication. The *Point Ruston* case is inapplicable. It addressed how a state libel/defamation

5    action is preempted by federal labor law in cases involving labor disputes, and how the actual

6    malice standard thus preempts the state negligence standard. *See Point Ruston* at * 4. The present

7    case does not involve a federal "labor" dispute and thus the state negligence standard applies.

8    Hadnagy's argument that Def Con cannot rely upon information discovered after the

9    Transparency Reports were issued to prove the statements contained in the publications are true

10   is also critical as to whether the Transparency Reports proximately caused the harm Hadnagy

11   alleges. There is no dispute the language of the Transparency Reports do not state Hadnagy

12   engaged in sexual misconduct, which is the focus of Hadnagy's claim. Hence the language of the

13   Transparency Reports alone did not proximately harm Hadnagy. The harm Hadnagy alleges

14   flows from the implication he was banned from Def Con due to sexual misconduct.  However,

15   even assuming Def Con should have known the potential defamatory impact of the Transparency

16   Reports, the fact the allegations of Hadnagy's sexual misconduct have ultimately been shown to

17   be true is a complete defense as true statements are not defamatory and thus cannot proximately

18   cause harm.

19   The Court notes that while the parties argue over whether Def Con ever spoke directly

20   with Hadnagy about the Code of Conduct violations or communicated only via text messages,

21   the roles Neil Wyler and Kevin Sugihara played, and whether Hadnagy admitted the violations,

22   these arguments do not alter the fact the implications of sexual misconduct that flowed from the

23

Transparency Reports are true and were true at the time of publication, and that truth is a complete defense to a defamation action.

The Court accordingly, **ORDERS**:

1)    Defendants' Motion for Summary Judgment (Dkt. 79) is **GRANTED** and the matter is **DISMISSED with prejudice**.

2)    All pending motions, including Defendants' Motion to Exclude Plaintiffs' Damages Expert (Dkt. 89) are **denied as moot**.

DATED this 13th day of May, 2025.

_____
BRIAN A. TSUCHIDA
United States Magistrate Judge

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 27