1

The Honorable Brian A. Tsuchida

2

3

4

5

6

7        UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF WASHINGTON
8                    AT SEATTLE

9   CHRISTOPHER J. HADNAGY, an               No. 2:23-cv-01932-BAT
    individual; and SOCIAL-ENGINEER, LLC,
10  a Pennsylvania limited liability company,  **PLAINTIFFS' CHRISTOPHER**
                                               **HADNAGY AND SOCIAL-ENGINEER,**
11                  Plaintiffs,                **LLC'S NOTICE OF APPEAL TO THE**
                                               **UNITED STATES COURT OF**
12           v.                                **APPEALS FOR THE NINTH CIRCUIT**

13  JEFF MOSS, an individual; DEF CON
    COMMUNICATIONS, INC., a Washington
14  corporation; and DOES 1-10; and ROE
    ENTITIES 1-10, inclusive,
15
                    Defendants.
16

17        NOTICE IS HEREBY GIVEN that Plaintiffs Christopher J. Hadnagy and Social-Engineer,

18  LLC hereby appeal to the United States Court of Appeals for the Ninth Circuit from the final

19  judgment entered in this action on May 13, 2025, as well as all interlocutory orders and rulings that

20  merge into that judgment, including but not limited to:

21      • The Court's Order Granting Defendants' Motion for Summary Judgment (Dkt. 119) entered
          on May 13, 2025.
22
        • The Court's Order Denying Plaintiffs' Motion for Leave to Amend (Dkt. 53) entered on
23        July 24, 2024.

NOTICE OF APPEAL TO UNITED STATES COURT OF                    FREY BUCK
APPEALS FOR THE NINTH CIRCUIT  - 1
                                                       1200 FIFTH AVENUE, SUITE 1900
                                                            SEATTLE, WA 98101
                                                      P: (206) 486-8000 F: (206) 902-9660

1

- The Court's Order Granting In Part and Denying In Part Plaintiffs' Motion for Reconsideration (Dkt. 56) entered on August 9, 2024.

2

3

- The Court's Order Granting In Part and Denying In Part Defendants' Motion to Dismiss (Dkt. 44) on March 28, 2024.

4       A copy of the above-referenced orders and judgment from which this appeal is made is

5   attached to this notice.

6

7       DATED this 11th day of June, 2025.

8

9                               FREY BUCK

10                              By: _____

11                                  Mark Conrad, WSBA #48135
                                    *Attorney for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

NOTICE OF APPEAL TO UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT  - 2

Certificate of Service

The undersigned certifies under the penalty of perjury according to the laws of the United States and the State of Washington that on this date I caused to be served in the manner noted below a copy of this document entitled **PLAINTIFFS CHRISTOPHER HADNAGY AND SOCIAL-ENGINEER, LLC'S NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT** on the following individuals:

*Attorneys for Defendants*
David Perez, WSBA #43959
Matthew J. Mertens (Pro Hac Vice)
Lauren A. Trambley (Pro Hac Vice)
Jacob Dean (Pro Hac Vice)
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
dperez@perkinscoie.com
mmertens@perkinscoie.com
ltrambley@perkinscoie.com
jacobdean@perkinscoie.com

DATED this 11th day of June, 2025 at Seattle, Washington.

_Amber S Holmes_

Amber Holmes, Legal Assistant

NOTICE OF APPEAL TO UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT  - 3

FREY BUCK
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CHRISTOPHER J. HADNAGY, an individual; and SOCIAL-ENGINEER, LLC, a Pennsylvania limited liability company, <br><br>                 Plaintiffs, <br><br>     v. <br><br> JEFF MOSS; an individual; DEF CON COMMUNICATIONS, INC., a Washington corporation; and DOES 1-10; and ROE ENTITIES 1-10, inclusive, <br><br>                 Defendants. | CASE NO. 2:23-cv-01932-BAT <br><br> **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Defendants Jeff Moss ("Moss") and Def Con Communications, Inc. (collectively, "Def Con") move for summary judgment on the defamation claim of Plaintiffs Christopher J. Hadnagy and Social-Engineer LLC ("Social-Engineer") (collectively, "Hadnagy"). Dkt. 79. Def Con argues the Court should grant judgment in their favor because any inference flowing from the publications at issue are true, and Hadnagy has thus failed to establish the falsity or fault elements of a defamation claim. Hadnagy contends Def Con's motion should be denied because Def Con's truth defense largely relies upon evidence discovered after it issued its Transparency Reports, and such evidence cannot form the basis of a truth defense.

1    The Court having considered the parties' pleadings and the record, **GRANTS** Def Con's

2    motion for summary judgment **DISMISSES** this case with prejudice for the reasons below.

3                                    **INTRODUCTION**

4    This case involves a defamation claim brought by Plaintiff, a past participant of the Def

5    Con annual cybersecurity and hacking conference, against Defendant, the Def Con conference

6    organizer. Plaintiff Hadnagy hosted a social-engineering village called SEVillage at the Def Con

7    conference. Def Con's Code of Conduct prohibits "harassment," which includes "deliberate

8    intimidation and targeting individuals in a manner that makes them feel uncomfortable,

9    unwelcome, or afraid" and Def Con reserves the right to expel participants for harassment. Def

10   Con permanently bans "repeat offenders and those who commit more egregious offenses."

11   Based on a report of retaliation by Hadnagy made by a former employee and a Zoom call

12   in which others complained of Hadnagy's conduct, Def Con banned Hadnagy from its

13   conferences and on February 9, 2022, issued the following "Transparency Statement":

14   > We received multiple CoC [Code of Conduct] violation reports about a DEF CON
   > village leader, Chris Hadnagy of the SE Village. After conversations with the
15   > reporting parties and Chris, we are confident that the severity of the transgressions
   > merits a ban from Def Con.
16
17   Hadnagy alleges in his lawsuit that this statement led to wide-spread speculation the

18   transgressions were sexual in nature.

19   On July 28, 2022, Def Con posted another Transparency Report clarifying the

20   significance of the lifetime ban by stating: "[i]n the case of the most troubling offenses or those

21   who we feel may represent on ongoing risk to the community, we take the extra step of naming

22   them publicly" so as not "to provide cover for these individuals to quietly find new and

23   unsuspecting victims elsewhere." On January 13, 2023, Def Con posted the following

"Transparency Update:"

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 2

During our investigation we spoke directly with Mr. Hadnagy about claims of his violations of our Code of Conduct. He confirmed his behavior and agreed to stop. Unfortunately, the behavior did not stop.

Hadnagy contends there are factual disputes that Def Con spoke directly with him and whether he "confirmed his behavior and agreed to stop." Hadnagy bears the burden of proving the challenged statements are false or left a false impression by omitted facts and in publishing the statements, Def Con knew or in the exercise of reasonable care, should have known the statements were false.

## SUMMARY JUDGMENT STANDARD

The Court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). "[T]he burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial." *Id*. "This burden is not a light one." *Id*. A mere "scintilla of evidence in support of the [non-movant's] position" is not sufficient, *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252, 266 (1986); neither is "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586, (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (cleaned up).

"[S]ummary judgment plays a particularly important role in defamation actions." *Mohr v. Grant*, 153 Wash. 2d 812, 821, 108 P.3d 768 (2005). "Serious problems regarding the exercise of free speech and free press guaranteed by the First Amendment are raised if unwarranted lawsuits

1    are allowed to proceed to trial. The chilling effect of the pendency of such litigation can itself be

2    sufficient to curtail the exercise of these freedoms." *Mark v. Seattle Times*, 96 Wash.2d 473, 486,

3    635 P.2d 1081 (1981) (cleaned up).

## PROCEDURAL HISTORY

5        In August 2022, Hadnagy filed suit in the Eastern District of Pennsylvania. Dkt. 44 at 4.

6    After the suit was dismissed for lack of personal jurisdiction, Hadnagy refiled in Nevada state

7    court. *Id*. Def Con removed the action to the District of Nevada and then moved to transfer venue

8    to this district. *Id*. at 4–5. In January 2024, Def Con filed a motion to dismiss. The Court granted

9    the motion on all claims except the claim for defamation based on the Transparency Report and

10   Transparency Update (*id.* at 12–15, 23) and gave Hadnagy leave to replead certain claims, but

11   Hadnagy chose not to do so. *Id*. at 15–16, 23; *see also* Dkt. 53 at 2–3.

12       In June 2024, Hadnagy's motion to amend the complaint to add claims of defamation by

13   implication and invasion of privacy by false light (Dkt. 49) was denied. Dkt. 53.

## STATEMENT OF MATERIAL FACTS

15       At the summary judgment stage, the evidence of the non-movant is to be believed, and all

16   justifiable inferences are to be drawn in their favor. Thus, for purposes of this motion, the Court

17   adopts Hadnagy's view of the facts to the extent they support his defamation claim. The Court

18   declines to address each point and counterpoint as this would result in comparing different

19   versions of the truth – an exercise not appropriate at summary judgment. *Anderson*, 477 U.S. at

20   255 ("credibility determinations, the weighing of the evidence, and the drawing of legitimate

21   inferences from the facts are jury functions, not those of a judge, whether he is ruling on a

22   motion for summary judgment or for a directed verdict.").

23

The facts before the Court can be broken into the information known to Def Con at the time of the publication of the Transparency Reports and the information Def Con subsequently obtained after publication during the course of the litigation herein. At the time the Transparency Reports were published, the following facts were known.

**A.      Christopher Hadnagy**

Christopher Hadnagy is the founder of Social-Engineer, a company focused on the "social-engineering" tactics, *i.e.*, manipulation, influence, and deception, that can be used to gain access to a victim's computer system or personal data. Compl. ¶ 42. Hadnagy formerly hosted a social-engineering village at Def Con called "SEVillage." *Id*. ¶¶ 45–46. Hadnagy is also the founder of the Innocent Lives Foundation ("ILF"), a nonprofit organization involved in identifying child predators online. Dkt. 81, Mertens Decl. Exhibit 4.

Social-Engineer provides specialized security consulting services, assisting companies and government agencies in identifying vulnerabilities, assessing risks, and implementing security training and remediation measures. Dkt. 99, Hadnagy Decl. ¶3; Dkt. 101, Conrad Decl. Ex. 8 ("Hadnagy Dep.") 8:13-18. The company focuses on the human element of cybersecurity (or "social-engineering"), as threats often target employees rather than technical systems. Hadnagy Decl. ¶3. Social-Engineer is frequently hired to test corporate security by attempting to obtain sensitive information from employees. *Id*.

Social-Engineer also offers courses and seminars designed in conjunction with former FBI agents, on how attackers elicit private information in a non-threatening and unassuming manner. Dkt. 99, Hadnagy Decl. ¶4. These courses have been taught to various entities, including government entities. *Id*. Social-Engineer's training and strategies often extend beyond conventional norms. Dkt. 101, Conrad Decl. Ex. 7 ("Wyler Dep.") 116:8-119:18.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 5

1    Since 2010, Social-Engineer has operated a dedicated "village," known as the SE-

2    Village, at the Def Con Conference. Dkt. 99, Hadnagy Decl. ¶5. The SE-Village was one of the

3    conference's most popular attractions, offering specialized training and contests. *Id*. Prior to

4    2021, no complaints had ever been made against Hadnagy or the SE-Village that would have

5    warranted any action by Def Con. Dkt. 101, Conrad Decl. Ex. 3 ("Moss Dep. Vol. I") 125:11-15;

6    and Ex. 8 ("Hadnagy Dep.") 109:25-110:12.

7    **B.    Def Con and Jeff Moss**

8    Def Con, founded by Jeff Moss, is the world's largest security and hacking conference,

9    held annually in Las Vegas. Dkt. 99, Hadnagy Decl. ¶6. The event is organized into specialized

10   "villages," each focused on a distinct aspect of cybersecurity, hacking, or social engineering, and

11   featuring discussions, hands-on challenges, and live demonstrations. Dkt. 101, Conrad Decl. Ex.

12   3 ("Moss Dep. Vol. I") 68:17-69:7; Hadnagy Decl. ¶10. Def Con is widely recognized for its

13   unique environment, which presents notable security risks—earning its reputation as hosting "the

14   world's most hostile network." Hadnagy Decl. ¶11. The conference has also been historically

15   known for its vibrant and, at times, notorious social events, including "epic parties." *Id*.; Dkt.

16   101, Conrad Decl. Ex. 5 ("Moss Dep. Vol. II") 276:23-18; Ex. 3 ("Moss Dep. Vol. I") 79:19-

17   82:21; and Ex. 8 ("Hadnagy Dep.") 109:25-110:12; 192:18-23; Dkt. 100, MacDougall Decl.

18   Def Con leadership and staff frequently operate under their online "handles" rather than

19   their real names. Dkt. 99, Hadnagy Decl. ¶7. Def Con's founder, Jeff Moss, a cybersecurity

20   expert and hacker, is widely known by his alias, "The Dark Tangent." *Id*. Def Con embraced

21   anonymity to such an extent that, until only a few years ago, attendees could purchase tickets

22   exclusively with cash, leaving no digital trace of their participation. Hadnagy Decl. ¶8 The

23

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 6

1    conference attracts upwards of 30,000 people in attendance with a ticket price of $460 in 2024.

2    Hadnagy Decl. ¶6.

3        Def Con has numerous internal departments run by department leads. Conrad Decl. Ex. 3

4    ("Moss Dep. Vol. I") 44:22-47:19, 51:23-25; and Ex. 6 (DEF CON00000785). Many department

5    leads work year-round preparing for the conference, attending weekly calls, and are active

6    participants in the community serving as the public face of Def Con in many ways. Dkt. 99,

7    Hadnagy Decl. ¶12; Conrad Decl. Ex. 7 ("Wyler Dep.") 306:8-308:1; and Ex. 3 ("Moss Dep.

8    Vol. I") 53:4-25. Some of Def Con's department leads, including Moss, routinely monitor social

9    media, engage in online discussions and chat via their handles, give podcast interviews, and

10    contribute to articles discussing security concerns and conference logistics. Hadnagy Decl. ¶12.

11    **C.    Def Con's Code of Conduct**

12        In 2015, Def Con introduced a formal Code of Conduct, which prohibits "harassment,"

13    described as "deliberate intimidation and targeting individuals in a manner that makes them feel

14    uncomfortable, unwelcome, or afraid." Dkt. 81, Mertens Decl. Exhibit 3. Def Con reserves the

15    "right to respond to harassment in the manner [it] deem[s] appropriate, including but not limited

16    to expulsion without refund and referral to the to the relevant authorities." *Id.* In the case of those

17    determined by Def Con to be "repeat offenders and those who commit more egregious offenses,"

18    Def Con permanently bans them from its events. Def Con's July 28, 2022 Transparency Report

19    further clarifies the significance of the lifetime ban by stating: "[i]n the case of the most

20    troubling offenses or those who we feel may represent on ongoing risk to the community, we

21    take the extra step of naming them publicly" so as not "to provide cover for these individuals to

22    quietly find new and unsuspecting victims elsewhere.

23

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 7

In 2017, Def Con began to publish transparency reports, *i.e.*, summaries of incidents that had occurred at the yearly conferences "with the goal to discourage inappropriate behavior and to encourage other conventions to duplicate this reporting and share their data so collectively we can shed some light on the challenge we face in creating more safe and inclusive events." *Id*.

Publications on Def Con's website are "refreshed" and repeated with each later publication. Thus, previous transparency reports are repeated in subsequent transparency reports and can, and conceivably were, read together. Dkt. 37, Ex. 1 at 4-6.

**D.   Reports Against Hadnagy Before Publication of the Transparency Reports**

   1.   <u>Maxie Reynolds</u>

The first report of misconduct about Hadnagy to Def Con came from a former employee, Maxie Reynolds, who alleged Hadnagy took several retaliatory steps against her after she resigned from Social-Engineer. According to Reynolds, Hadnagy claimed two images in her book were from an active ILF case and notified the FBI; pressured hosts of five prominent podcasts to cancel scheduled conversations with Reynolds and succeeded in canceling three of them; and pressured the producer of a TV show to "drop her from the show." *Id*. at 144:9–146:1. In text messages, Hadnagy told the producer Reynolds had violated her employment contract, offered one of his employees a job, and cautioned "I would run the other way with haste…she is dangerous." Dkt. 81, Mertens Decl. Exhibit 11. In a September 3, 2021 email to Jacob Williams, the individual who connected Reynolds with Hadnagy and Social-Engineer, Hadnagy told Williams that Reynolds "is a train wreck; stole intellectual property, quit, lied, started a competitive company, quit four days before the launch of her book that he had helped her write, and threatened to tell the world he abused women if he sued her." *Id*. Exhibit 6 at SE_000408. In his deposition, Hadnagy explained Reynolds had a lot of government e-mail addresses and data

from Social-Engineering clients on her laptop and stole the pictures from ILF for the book. Hadnagy also confirmed he was mistaken in claiming Reynolds had taken work from Social-Engineering and started a competing company. Hadnagy Dep. 148:7–152:17.

In late August and September 2021, Reynolds reached out to Neil Wyler (a/k/a "Grifter") due to his personal relationship with Hadnagy (not his affiliation with Def Con or Black Hat). Conrad Decl. Ex. 9 ("Reynolds Dep.") 77:14-78:11. Wyler acknowledged he was acting as a "mediator" between Reynolds and Hadnagy to help resolve their dispute. Conrad Decl. Ex. 16 (SE_000127 and SE_000132).

Reynolds was hired by Social-Engineer in January 2020 and signed an employment agreement which explicitly prohibited her from performing other work while employed at Social-Engineer and required her to return company equipment and data upon termination of employment. Dkt. 101, Conrad Decl. Ex. 10 (SE_001469). In August 2020, Reynolds requested and received authorization to use her personal laptop for company business by selling her computer to Social-Engineering for $1 with the agreement she could buy it back after terminating her employment. *Id.*, Conrad Decl. Ex. 11 (SE_000348) and Ex. 9 ("Reynolds Dep.") 205:23-2. Social-Engineer accepted this arrangement and Reynolds downloaded Social-Engineer's software and agreed "the device would be managed and monitored like every other corporate device in use for business purposes." Dkt. 101, Conrad Decl. Ex. 8 ("Hadnagy Dep.") 196:7-25, Ex. 9 ("Reynolds Dep.") 206:20-23; Dkt. 100, MacDougall Decl.

In May 2021, Social-Engineer discovered Reynolds had violated her employment agreement by entering a contract for a potential TV series involving social engineering. Reynolds had used her Social-Engineer email account to exchange and sign contracts with other companies. Dkt. 101, Conrad Decl. Ex.12 (Plaintiffs' Ex. 15 of "Reynolds Dep.") and Ex. 13

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 9

(Plaintiffs' Ex. 17 of "Reynolds Dep."); Ex. 9 ("Reynolds Dep.") 208:20-22; 209:18-19; 226:9-11. Reynolds then advised Social-Engineer she would be taking "short-term disability" leave of absence to visit her father in Scotland, but she did not take the trip. Dkt. 101, Conrad Decl. Ex. 9 ("Reynolds Dep.") 226:9-18; 231:16-238:25. On August 5, 2021, Reynolds resigned via email, stating: So, with sadness, this is my official resignation. I will miss working with you, and I will deeply miss the whole SE team. Conrad Decl. Ex. 14 (SE_000402); Dkt. 100, MacDougall Decl.

Pursuant to her employment agreement, Reynolds was instructed to return all company equipment, including the computer she had been using, so it could be wiped clean and returned to her as originally agreed. Dkt. 101, Conrad Decl. Ex. 15 (Plaintiffs' Ex. 23 of "Reynolds Dep.") and Ex. 8 ("Hadnagy Dep.") 119:7-121:18. This was essential because the installed software, Microsoft Intune, lacked the capability to remotely wipe iOS devices and could only lock them. Dkt. 100, MacDougall Decl.; Dkt. 101, Conrad Decl. Ex. 8 ("Hadnagy Dep.") 119:7-121:18. At one point, Reynolds claimed to have already sent it back, stating, "I have already sent the computer to you (sent on Saturday) but don't have the number with me." Conrad Decl. Ex. 15 (Plaintiffs' Ex. 23 of "Reynolds Dep."). However, the device never arrived. Dkt. 100, MacDougall Decl. After several unsuccessful attempts to recover the laptop, Social-Engineer issued a remote lock. *Id*.

Prior to her resignation, Hadnagy had been assisting Reynolds in publishing her book. Dkt. 100, Conrad Decl. Ex. 8 Hadnagy Dep. 119:7-121:18. After he discovered that the book contained unauthorized photographs from an ILF operation, Hadnagy called Reynolds's publisher, who removed the images, and contacted an acquaintance at the FBI. *Id*. at 125:12–127:25. Hadnagy also withdrew his support for the book and rescinded his endorsements of multiple podcasts he had arranged for Reynolds on behalf of Social-Engineer. *Id.*

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 10

As the dispute continued, Wyler, Hadnagy, and Reynolds engaged in further discussions. Dkt. 101, Conrad Decl. Ex. 16 (SE 122-126). Hadnagy repeatedly emphasized the seriousness of Reynolds' actions and explained the reasons for Social-Engineer's response. *Id.*; Ex. 8 ("Hadnagy Dep.") 189:1-190:2. Hadnagy did not admit to any behavior that would violate Def Con's Code of Conduct or any behavior that could endanger the Def Con community. ("Hadnagy Dep.") 189:1-190:2; 195:14-199:1. Wyler never raised other complaints with Hadnagy or requested any supporting documentation. *Id.*; Conrad Decl. Ex. 3 ("Moss Dep. Vol. I") 219:7-21.

As to his involvement, Wyler stated: "I don't know how I became the mediator either. But I think I'm going to call it good and step away from this." Dkt. 101, Conrad Decl. Ex. 16 (SE_000127).

### 2. September 7, 2021 Zoom Call

On September 2, 2021, Reynolds sent an email to Def Con alleging misconduct involving other ex-employees of Social Engineer and claimed to have a list of some 15 individuals willing to come forward. Dkt. 101, Conrad Decl. Ex. 17 (DEF CON0000160 – Plaintiffs' Exhibit 22 of "Reynolds Dep."). Kevin Sugihara, Def Con's Director of Sales and Sponsorship, responded to the email, stating, "We take situations such as you described incredibly seriously." *Id.*

Def Con asserts it held a Zoom Call with approximately 15 people on September 7, 2021, before announcing Hadnagy's ban. In its Joint Report, Def Con states "half a dozen" people participated in the call. Moss could not remember if this meeting took place on Zoom or on a regular telephone call, but he testified that the phone number for the dial-in was given to Maxie Reynolds in a text message, which was copied and sent to other attendees. Dkt. 101, Conrad Decl. Ex. 3 ("Moss Dep. Vol. I") 140:18-22; 141:7-10. Moss confirmed that out of Def Con's

1    employees, he would be the most knowledgeable about the reports of Code of Conduct violations

2    related to Hadnagy. Conrad Decl. Ex. 5 ("Moss Dep. Vol. II") 260:20-261:8.

3        Hadnagy contends the dial-in number produced by Def Con is dated March 5, 2022—

4    nearly a month after the February 9, 2022 Transparency Report announcing Hadnagy's ban from

5    Def Con. Dkt. 101, Conrad Decl. Ex. 4 (DEF CON00000176). However, on January 29, 2025,

6    counsel for Def Con sent counsel for Hadnagy the September 7, 2021, Zoom invitation at

7    counsel for Hadnagy's request. See Supplemental Declaration of Matt Mertens ("Supp. Mertens

8    Decl.") ¶ 2, Ex. A.

9        Moss testified there is no documentation of the call aside from the time it happened (*id.*,

10   Ex. 3 ("Moss Dep. Vol. I") 139:22-24, 145:5-147:19) and that while it would have been

11   advantageous to do so, they have no "detailed notes, so probably nobody took them, or else we'd

12   have them." *Id.*, Conrad Decl. Ex. 3 ("Moss Dep.Vol. I") 145:16-19. Additionally, Moss testified

13   that Def Con had policies and procedures for documenting investigations, but no such policy or

14   procedure has ever been produced by Def Con. *Id.*, Conrad Decl. Ex. 3 ("Moss Dep. Vol. I")

15   93:4-8; Conrad Decl. ¶20.

16       In his deposition, Moss indicated uncertainty about what was known at the time they

17   decided to ban Hadnagy and what was learned during the investigation post-litigation: "I

18   couldn't tell you if it was on the call or if it was after the fact." *Id.*, Conrad. Decl. Ex. 3 ("Moss

19   Dep. Vol. I") 203:6-19. Moss also acknowledged that the information he has now is a

20   "synthesis" of facts gathered after the ban was announced. *Id*. Ex. 3 ("Moss Dep. Vol. I") 166:6-

21   25; 205:6-19.

22       Def Con's Rule 26 Initial Disclosures makes no mention of "reporting parties" other than

23   Maxie Reynolds." Dkt. 101, Conrad Decl., Ex. 18 (Defendants' Initial Rule 26 Disclosures).

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 12

3.    <u>Michele Fincher</u>

Def Con claims it also relied on accusations made by former employee Michele Fincher prior to publishing the first Transparency Report. However, Moss testified that Fincher did not report any Code of Conduct violations during the Zoom Call. Dkt. 101, Conrad Decl. Ex. 3 ("Moss Dep. Vol. I") 165:21-23. In Moss's message with Fincher *after* the ban, he stated: "We are in the discovery phase of figuring out who to talk to about the Chris lawsuit," and then directed her to his legal team. *Id.*, Conrad Decl. Ex. 19 (Fincher 00001-11). Def Con's law firm, Perkins Coie, began representing Fincher in this matter, and objected to, and refused to produce responsive documents in response to Plaintiffs' subpoenas. Conrad Decl. Ex. 20 (Perkins Letter, dated 11/14/2024).

Fincher, Reynolds, Murdock, and Wyler testified that Fincher shared her experiences with Hadnagy on the call. Dkt. 98 at 12:6-14; ¶¶ 5-8, Ex. D at 58:17-60:13; Ex. E at 92:23-93:9, 99:15-100:16, and 107:9-22; Ex. F at 130:12-13; and Ex. G at 111:19-114:13. While Moss testified that Fincher did not report any Code of Conduct violations on the call, he also testified that these incidents were "a while ago" and he doesn't "remember specifically who said what." Id. ¶ 9, Ex. H at 136:18-24.

4.    <u>Cat Murdock</u>

Cat Murdock, another former employee of Social-Engineer, was on the Zoom Call. She testified the Zoom link for this group call was sent to her by Moss. Dkt. 101, Conrad Decl. Ex. 21 ("Murdock Dep.)" 172:19-173:5. However, Moss's first recorded exchange with Murdock took place on October 8, 2022, months after the Zoom Call, inviting her to talk with Def Con's legal team. Dkt. 101, Conrad Decl. Ex. 22 (DEF CON0000251).

Def Con Board Member Alethe Denis, testified that Murdock told her that she [Murdock] "was not a party to this and that she had more important matters to attend to in her own life." Dkt. 101, Conrad Decl. Ex. 23 ("Denis Dep.") 25:22-25. In her deposition, Denis states she warned Def Con that Reynolds was attempting to "manipulate" others, including offering spots on a TV show, to make complaints against Hadnagy. Dkt. 101, Conrad Decl. Ex. 23 ("Denis Dep.") 169:5-12; 198:2-10.

5.    Jess Levine

Jess Levine testified she was on the Zoom Call, announced herself and shared her experience. Conrad Decl. Ex. 24 ("Levine Dep.") 80:14-20. Wyler, who was also on the Zoom Call, testified he had no idea who Levine was. Conrad Decl. Ex. 7 ("Wyler Dep.") 278:12-14. Murdock testified Levine never spoke on the call but instead provided a statement to Murdock, who then read it aloud. Dkt. 21, Conrad Decl. Ex. 21 ("Murdock Dep.") 217:16-22. However, Def Con has never produced Levine's statement in response to discovery requests or subpoenas directed at Levine and Murdock. *Id.*, Conrad Decl. ¶28. Levine also repeatedly admitted to using "disappearing" messages when asked for communications in support of her claims. *Id.*, Conrad Decl. Ex. 24 ("Levine Dep.") 106-109:25; 185:3-14.

Accounts of the allegations made during the Zoom Call are also conflicting. For example, Murdock and Levine allege that Hadnagy jokingly used a knife; but Wyler testified that no such allegations involving a knife were ever discussed. Conrad Decl. Ex. 7 ("Wyler Dep.") 265:18-266:2, 269:10-23. Def Con claims there were inappropriate comments about Asian women, yet Wyler stated that he never heard any reference to Hadnagy commenting that he was attracted to Asians. Id. Ex. 7 ("Wyler Dep.") 116:8-12. Wyler also confirmed that he never personally

reported any Code of Conduct violations involving himself and Hadnagy. *Id.* Ex. 7 ("Wyler Dep.") 244:21-245:11.

      6.   <u>Sam Gamble</u>

      Def Con's motion also includes accusations by former ILF employee, Sam Gamble, but Gamble testified she had not spoken with Def Con prior to the February 9, 2022 Transparency Report:

> Q.    And the multiple code of conduct violation reports that DEF CON is indicating it received, none of those were code of conduct violation reports that you had made to DEF CON by February 9, 2022; correct?
>
> A.    Correct. Yeah. No, none of those. I was not a part of that whatsoever. I was fervently on the side of Chris and the ILF.
>
> Q.    And it says, "After conversations with the reporting parties and Chris." By February 9, 2022, you had not had any conversations with DEF CON at that point; right?
>
> A.    I had not, no.
>
> Q.    So the severity of the transgressions merits a ban from DEF CON, that had nothing to do with anything that you're testifying about today; right?
>
> THE DEPONENT: No.
>
> Q.    Is that correct?
>
> A.    I said no. Yeah. No, none of my experiences had anything to do with DEF CON or DEF CON's report.

Dkt. 21, Conrad Decl. Ex. 25 ("Gamble Dep.") 163:15-164:22.

**E.    <u>February 9, 2022 Transparency Report</u>**

      On February 9, 2022, Def Con posted a Transparency Report, stating,

> We received multiple CoC violation reports about a DEF CON Village Leader Chris Hadnagy of the SE Village. After conversations with the reporting parties and Chris, we are confident the severity of the transgressions merits a ban from DEF CON.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 15

1    Dkt. 101, Conrad Decl. Ex. 26 (SE_000659). The only individuals Def Con has ever previously

2    named and banned were those accused of sexual abuse or sexual assault. *Id*. Ex. 3 ("Moss Dep.

3    Vol. I") 176:21-177:18; and Ex. 23 ("Denis Dep.") 138:18-142:3. Def Con Board Member,

4    Alethe Denis, testified that, "for people to be banned from this conference in the past, they have

5    perpetrated some pretty hideous crimes against other conference participants, one such person

6    being Captain Crunch. That was his handle, and he had sexually assaulted women for years." *Id.*,

7    Denis Dep. 140:8-13. When asked, given the full context of Def Con's statements, whether "it

8    was foreseeable that people who read that transparency report would interpret it to mean that

9    Hadnagy had done something involving sexual misconduct or sexual predatory behavior?",

10   Denis testified:

11          A. I believe not only was it a natural conclusion for people to come to, but that I
           have evidence that that's the conclusion that people came to from the messages

12         that I received around that time frame.

13   Dkt. 101, Conrad Decl. Ex. 23 ("Denis Dep.") 144:19-145:7.

14          Two days after publishing the Transparency Report, Moss stated: "[t]he online crazy is

15   starting with speculation around if it was sexual in nature. Should we add something to the

16   transparency report to reign that in, like "a not-sexual in nature CoC violation" or to the bullying

17   and harassment?" *Id*. Ex. 27 (DEF CON00000034). He also stated: "If Chris wants to say

18   something to clarify it, he could say it wasn't sexual and we wouldn't contradict him." *Id*. Ex. 27

19   (DEF CON00000035). In a private text, Wyler also urged Moss to clarify the Transparency

20   Report:

21         I know I've said it before but I still think we should update the transparency
           report to say it wasn't anything sexual in nature and that it was bullying and

22         harassment of a non-sexual nature.

23

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 16

> Because all of the rumor mill stuff is making it seem like it was sexual. Which if he points to that and says Def Con wasn't clear, might actually give him a leg to stand on in terms of defamation.

*Id.*, Conrad Decl. Ex. 27 (DEF CON0000357).

Wyler also told Moss that he would "die on the hill that we should clarify the statement on the transparency report." *Id*. Ex. 28 (DEF CON0000359).

Hadnagy then reached out to Wyler, urging him to facilitate a conversation with Def Con, as no one from Def Con had spoken with him about the allegations. Dkt. 101, Conrad Decl. Ex. 8 ("Hadnagy Dep.") 188:8-11; 190:2 and Ex. 16 (SE_000120). Wyler agreed that Def Con should have provided more "context" and disclaimed involvement, stating: "There is no 'you guys'. I am not DEF CON. If you noticed I haven't said a freaking word." Wyler further explained: "I don't even run villages anymore. And haven't for years." "I was told to act as a mediator for everything in the beginning." *Id*. Hadnagy also testified that Wyler specifically told him he does not represent Def Con during their discussion and that he [Hadnagy] never admitted to any Code of Conduct violations. *Id*. Ex. 8 ("Hadnagy Dep.") 188:8-11, 189:1-190:2.

In July 2022, Def Con updated its Transparency Reports to state that it imposes lifetime bans only on "repeat offenders" who have committed "more egregious offenses" and pose an "ongoing risk to the community" to prevent them from "quietly find[ing] new and unsuspecting victims." Dkt. 101, Conrad Decl. Ex. 26 (SE_000657-000659). Def Con further stated that it withheld details about the "reporting parties" or the accusations based on recommendations from the "Domestic Violence and the Violence Against Women Office at the Department of Justice." *Id*. That most reports are for "minor violations that result in a warning, but "severe allegations may require a referral to hotel security or law enforcement, especially if the report include claims of criminal behavior." *Id*.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 17

On September 7, 2022, the parties filed a joint statement (in Case No. 2:22-cv-03060-WB E.D. PA), in which Def Con stated a "third party reached out to Plaintiff Hadnagy." Dkt. 101, Conrad Dec., Ex. 1 (Joint Report). The evidence reflects Wyler acted as that "third party" between Hadnagy and Reynolds "in the beginning."

On September 8, 2022, Kevin Sugihara (a/k/a "Sugitime"), Def Con's Director of Sales and Sponsorship, posted the following on Def Con's social media Reddit thread:

> Hadnagy is this industry's Weinstein, and it isn't a well-kept secret amongst those in the industry. I personally know decision makers who have refused to do business with him for years because of his behavior.
>
> Now he just takes his scum baggery to an all time low by using a lawsuit to pull out the names of people accused of harassing him. What a fucking sleezeball."

Hadnagy Decl. Ex 3 (DEF CON0000620) When other users questioned Def Con's decision, Sugihara responded: "Yeah dude you sound like you're defending a serial sexual predator. It's a pretty bad look, just saying." *Id*.[1]

## F.    January 13, 2023 Transparency Update

About five months after this lawsuit was filed, Def Con posted the Transparency Update on January 13, 2023:

> During our investigation we spoke directly with Mr. Hadnagy about claims of his violations of code of conduct. He confirmed his behavior and agreed to stop. Unfortunately, the behavior did not stop.

Dkt. 81, Mertens Decl., Ex. 33.

---

[1] In discovery, it was found that Sugihara was involved in discussions with Moss about the case on Def Con Weekly Call communications. Dkt. 101, Conrad Decl. Ex. 2 (DEF CON0000276). Those communications reveal that Sugihara referenced his own public post comparing Hadnagy to Weinstein, to which a "thumbs-up" emoji was sent in reply, although it is not clear that Moss sent the reply. *Id*. Def Con contends it is not responsible for Sugihara's remarks, but this appears to be in direct contravention to Def Con's directions to Def Con staff that anything "you or your department Goons say can be attributed to someone associated with DEF CON." Conrad Decl. Ex. 27 (DEF CON00000034).

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 18

When asked who from Def Con had spoken to Hadnagy about the alleged Code of Conduct violations, Moss stated: "You have the text messages from Neil [Wyler]." Conrad Decl. Ex. 3 ("Moss Dep. Vol. I") 174:7-9. However, Moss also admitted: "I don't know what particular hat he [Neil] was wearing at that moment." *Id*. Ex. 3 ("Moss Dep. Vol. I") 172:19-173:5.

Def Con contends it tried to speak to Hadnagy but he was not available on the times provided. The email string to which Def Con refers (Dkt. 84, Ex. 31 at 578-581), indicates Hadnagy reached out to Moss expressing a desire to discuss more than "one side of the story." *Id.* at 578. Between April 7, 2021, and January 7, 2022, Hadnagy repeatedly texted Moss to setup a mutually agreeable time, and on January 9, 2022, Hadnagy texted:

> Jeff, what do we need to discuss? You guys got told an accusation by a group of disgruntled ex employees and one person who we had to kick out of SEV. I've worked with DC for almost 15 years, mentored countless women and men, ran a village with zero porn, violence, or problems, run a nonprofit for free that fingers crimes against children, and never had an accusation like this. Instead of defending me or trying to find out of this was true I was told to make it go away.

> I'm not sure what we need to discuss. If she had any legit claims why not go to the police or a lawyer why would she go to BH and DC? Because all she wanted to do was hurt the way she did when she stole from SECOM and left.

> I will ask Ryan but that's kinda late. We are not angry. Just disappointed. And we are really busy. We have decided to bring SEV to another conference this year. So I'm not sure what else to discuss. I didn't want to do this in writing after devoting so many years to def.con. But it seems we just won't be able to make the time work. Between family, travel, work and time zones it seems like it is impossible.

Dkt. 581.

In response, Moss stated "[w]e just want to talk to you before we decide on what to do about the CoC violations that were reported to us." *Id.* Hadnagy responded, "let's pick a time that works" during business hours and asked what violations were reported and by whom. *Id.* Moss declined to share names to prevent retaliation.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 19

**G.**     **Discovery After Publication of Transparency Report and Transparency Update**

Def Con has submitted evidence obtained during written and deposition discovery in this lawsuit to confirm a "pattern of retaliation and disparagement" by Hadnagy against others in the infosec community. While Hadnagy claims in a conclusory manner he has not engaged in any misconduct, he does not provide any evidence that contradicts or disputes the claims made by the individuals above. For instance, Defendant submitted additional evidence obtained in discovery that supports Defendant's claims Hadnagy engaged in conduct that included sexual misconduct. *See* Dkt. 107 at 6-8. Hadnagy has not provided evidence that disputes: (1) his fixation on Maxie Reynold's appearance or his attacks on her as a "awful psycho bitch"; (2) his repeated references to Michele Fincher as a "hot Asian," and her discomfort of his sexualized trainings or his repeatedly bullying  and screaming; (3) that he threw a phone at Cat Murdock, belittled employees, and joked about pulling out a switchblade to stab people; (4) Jess Levine's testimony she saw Hadnagy drunkenly brandish a switchblade, berated her to the point of tears and unlawfully withheld her paycheck; (5) Sam Gambles' testimony Hadnagy regularly commented on her physical appearance in a way that made her uncomfortable, made sexually explicit remarks to her in 2021, and gave her an unwanted kiss on the forehead; (6) Geoffrey Vaughan's 2016 emails regarding Hadnagy's inappropriate behavior in training sessions which included references to pornography; and (7) Hadnagy's own acknowledgment that his conduct was inappropriate or could be perceived as inappropriate.

**DISCUSSION**

In a defamation case, the plaintiff must establish four elements: (1) falsity, (2) an unprivileged communication, (3) fault, and (4) damages. *Mohr*, 153 Wash.2d at 822, 108 P.3d 768 (2005). "A defamation claim must be based on a statement that is provably false." *Wren v.*

*Whitehead*, 33 Wn.App.2d 1066 (Div. I 2025) (citing to *Schmalenberg v. Tacoma News, Inc.*, 87 Wn. App. 579, 590, 943 P.2d 350 (1997), *review denied*, 134 Wn.2d 1013 (1998)). "The prima facie case must consist of specific, material facts, rather than conclusory statements, that would allow a jury to find that each element of defamation exists." *LaMon v. Butler*, 112 Wn.2d 193, 197, 770 P.2d 1027, 1029 (Wash. 1989).

It has been observed the elements of a defamation claim generate two basic questions:

> (1) Did the defendant make a false statement that caused damage to the plaintiff's reputational or other compensable interest? (2) If so, should the defendant be held liable for the damage? The first question addresses whether the defendant engaged in wrongful conduct, and whether that conduct caused harm to the plaintiff. Its facets include, at a minimum, (a) whether the defendant uttered the statement in issue; (b) whether the statement in issue was false in whole or in part; and (c) whether the statement's falsity, if any, was a cause of damage to the plaintiff. The second question balances the plaintiff's need for a remedy against society's need not to deter free speech.

*Schmalenberg v. Tacoma News Inc.*, 87 Wn.App. at 590.

At the summary judgment stage, "a court determines only whether a communication is capable of defamatory meaning." *Amsbury v. Cowles Publ'g Co.*, 76 Wn.2d 733, 738, 458 P.2d 882, 885 (1969). Where a communication is capable of both a defamatory and non-defamatory meaning, it is for a jury—not a judge—to determine which meaning controls. *Miller v. Sawant*, 18 F.4th 328, 333 (9th Cir. 2021) (citing *Swartz v. World Publ'g Co.*, 57 Wn.2d 213, 356 P.2d 97, 98 (1960) (en banc)). "In all but extreme cases the jury should determine" whether a communication carried the meaning ascribed by the plaintiff. *Id.*

The communications at issue are not considered in a vacuum, as "[w]ords which are harmless in themselves may be defamatory in the light of surrounding circumstances." *Crossman v. Brick Tavern*, 33 Wn. App. 503, 505, 655 P.2d 1206 (1982) (citing *Ziebell v. Lumbermens*

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 21

*Printing Co.*, 14 Wn.2d 261, 268, 127 P.2d 677 (1942)). Therefore, "[i]n determining whether words are capable of a defamatory meaning, they must be considered in the context in which they were uttered or published as well as in the light of the circumstances surrounding the publication." *Getchell v. Auto Bar Sys. Northwest*, 73 Wn.2d 831, 387, 440 P.2d (1968).

Statements that "are harmless in themselves may be defamatory in the light of surrounding circumstances." *Ziebell v. Lumbermens Printing Co.*, 14 Wn.2d 261, 268, 127 P.2d 677 (1942). In those cases, it is appropriate for a court to consider extrinsic evidence that would be known to the recipients of the statements and shows the statements' peculiar applicability to the plaintiff. *Crossman v. The Brick Tavern, Inc.*, 33 Wn. App. 503, 505, 655 P.2d 1206 (1982) (quoting *Ziebell,* 14 Wn.2d at 268).

To prove falsity, "a plaintiff must prove either a statement was false or a statement left a false impression by omitted facts." *Seaquist v. Caldier*, 8 Wash. App.2d 556, 565, 438 P.3d 606, 612 (2019). A "provably false statement" is one that, as a statement of either fact or opinion, falsely expresses or implies provable facts about the plaintiff. *Schmalenberg v. Tacoma News, Inc.*, 87 Wn. App. at 590-91; *see Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 419 (Tenn. 1978) (recognizing the proper inquiry is whether the published words, as conveyed, would create a different effect on the reader than the truth would have) (cited with approval in *Mohr v. Grant*, 153 Wn.2d 812, 828, 108 P.3d 768, 776 (2005)).

As to fault, a private individual need only prove negligence; "that in publishing the statement, the defendant knew or, in the exercise of reasonable care, should have known that the statement was false, or would create a false impression in some material respect." *Taskett v. King Broad. Co.*, 86 Wn.2d 439, 445, 546 P.2d 81, 85 (1976). Negligence is generally a question of

fact for the jury and should be decided as an issue of law by the court only in rare cases. *Rhoades v. DeRosier*, 14 Wn. App. 946, 948-49, 546 P.2d 930 (1976).

The parties do not disagree over the elements of a defamation claim but sharply disagree over what evidence may be applied to Def Con's summary judgment motion and their truth defense. Def Con argues the Court should grant judgment in its favor because the allegations contained in the Transparency Reports, and the inferences Hadnagy complains of, have ultimately been proven to be true, and truth is a complete defense to a defamation claim. In support, Def Con argues Hadnagy has not and cannot dispute that before Def Con issued its first Transparency Report, Hadnagy actually had engaged in misconduct involving fixating on the bodies of females, violent temper outbursts, berating and insulting employees, sexual fetishization of Asian women, holding inappropriate sexualized trainings, and brandishing a switchblade at the Def Con conference and in the workplace.

In response, Hadnagy "challenges the sufficiency of the evidence as to two elements of the defamation claim: falsity and fault." Dkt. 98 at 23 (Response to Summary Judgment). Hadnagy's challenge focuses upon what evidence Def Con actually knew about at the time it issued its Transparency Reports. Hadnagy contends, when Def Con issued the Transparency Report and Transparency Updates, they lacked information of any impropriety of a sexual nature. Hadnagy argues while Def Con's Transparency Report "does not explicitly state the ban was related to sexual misconduct, Defendants knew of should have known the context in which it was made was 'capable of' that defamatory meaning." *Id.* at 26. Hadnagy further argues Def Con did not speak with him about the allegations, and he never admitted the allegations of sexual misconduct.

1    The crux of Hadnagy's argument is Def Con cannot rely upon information discovered

2    after the Transparency Reports were issued to show that the implications contained in the

3    Transparency Reports are true. Hadnagy makes this argument because it cannot be said with

4    certainty that Def Con knew Hadnagy had engaged in sexual misconduct when it issued the first

5    Transparency Report. Essentially, Hadnagy reasons that absent this knowledge, Def Con's

6    Transparency Reports were false and defamatory when issued, even though subsequent

7    discovery establishes the sexual misconduct implications are in fact true.

8         Although Hadnagy has not provided evidence contradicting Def Con's claims, he argues

9    in his response that none of this evidence can be used to support Def Con's truth defense. *See*

10   Dkt. 98 at 31:1-6 quoting *La Mon v. Butler*, 44 Wash. App. 654, 659, 722 P.2d 1373, 1377

11   (1986) (citing Restatement (Second) of Torts § 581A (1977)); *Point Ruston, LLC v. Pac. Nw.*

12   *Reg'l Council of the United Bhd. of Carpenters & Joiners of Am.*, No. C09-5232BHS, 2010 WL

13   3732984, at *6 (W.D. Wash. Sept. 13, 2010)). Hadnagy also cites *Page v. Oath Inc.* 270 A.3d

14   833, 847, n. 104 (Del. 2022) for the proposition that truth of a defendant's statements should be

15   judged "at the time they were published, not with the benefit of hindsight." Dkt. 98 at 31.

16        The cases on which Hadnagy relies did not involve or address the issue of whether post

17   publication evidence can or cannot be considered to determine the truth of an alleged defamatory

18   statement. That is, in both *La Mon and Page,* the courts were not confronted with deciding a

19   defense of truth in a defamation action that relied primarily upon facts adduced after publication

20   of the defamatory statement. The *La Mon* decision mentions under the restatement of torts

21   "[t]ruth, of course is a complete defense to a claim of defamation" and that the truth of a

22   defamatory statement "must be measured at the time of the defamatory publication." *La Mon*, at

23

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 24

659. Similarly, in a footnote, the *Page* decision refers to the same restatement. But neither case discusses nor resolves what "measured at the time" means.

The restatement of torts, which is cited in both *La Mon* and *Page*, focuses on whether an alleged defamatory publication was true when published. It specifically discusses how a statement that is untrue at publication cannot be defended based upon actions that occurred after publication. *See* Restatement of Torts (Second) § 581A(g) True Statements. ("Thus a statement that another has been guilty of blackmail is not met by proof of the other's subsequent acts of blackmail although the defamer had reasonable grounds, at the time of the accusation to believe that the other would commit them.").

However, the Restatement notes that "if the defamatory matter is true, it is immaterial that the person who publishes it believes it to be false; it is enough that it turns out to be true." *Id.* at § 518(h). The Restatement thus suggests it is irrelevant that Defendant Def Con did not know at the time the Transparency Reports were published whether Hadnagy had or had not engaged in sexual misconduct. Rather, if the sexual misconduct implications were in fact true at the time the Transparency Reports were published, Def Con is shielded by the truth defense. The restatement's language "if the reports ultimately are true," further suggests that evidence discovered after Def Con's Transparency Reports were published may be used in a truth defense, if that evidence sets forth acts committed by Hadnagy before the Transparency Reports were published. Hence, the Restatement of Torts undercuts Hadnagy's argument the truth of the Defendant's Reports cannot be supported by evidence that were in fact true at the time of publication, but which Def Con did not know about, and which were verified only later during discovery in this case.

1    Hadnagy also argues the *Point Ruston* decision requires the Court to apply the actual

2    malice standard, and under this standard Def Con cannot rely upon information learned after

3    publication because the 'actual malice' standard is based upon what was known at the time of

4    publication. The *Point Ruston* case is inapplicable. It addressed how a state libel/defamation

5    action is preempted by federal labor law in cases involving labor disputes, and how the actual

6    malice standard thus preempts the state negligence standard. *See Point Ruston* at * 4. The present

7    case does not involve a federal "labor" dispute and thus the state negligence standard applies.

8    Hadnagy's argument that Def Con cannot rely upon information discovered after the

9    Transparency Reports were issued to prove the statements contained in the publications are true

10    is also critical as to whether the Transparency Reports proximately caused the harm Hadnagy

11    alleges. There is no dispute the language of the Transparency Reports do not state Hadnagy

12    engaged in sexual misconduct, which is the focus of Hadnagy's claim. Hence the language of the

13    Transparency Reports alone did not proximately harm Hadnagy. The harm Hadnagy alleges

14    flows from the implication he was banned from Def Con due to sexual misconduct.  However,

15    even assuming Def Con should have known the potential defamatory impact of the Transparency

16    Reports, the fact the allegations of Hadnagy's sexual misconduct have ultimately been shown to

17    be true is a complete defense as true statements are not defamatory and thus cannot proximately

18    cause harm.

19    The Court notes that while the parties argue over whether Def Con ever spoke directly

20    with Hadnagy about the Code of Conduct violations or communicated only via text messages,

21    the roles Neil Wyler and Kevin Sugihara played, and whether Hadnagy admitted the violations,

22    these arguments do not alter the fact the implications of sexual misconduct that flowed from the

23

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 26

Transparency Reports are true and were true at the time of publication, and that truth is a

complete defense to a defamation action.

The Court accordingly, **ORDERS**:

1)      Defendants' Motion for Summary Judgment (Dkt. 79) is **GRANTED** and the

matter is **DISMISSED with prejudice**.

2)      All pending motions, including Defendants' Motion to Exclude Plaintiffs'

Damages Expert (Dkt. 89) are **denied as moot**.

DATED this 13th day of May, 2025.

_____
BRIAN A. TSUCHIDA
United States Magistrate Judge

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 27

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CHRISTOPHER J. HADNAGY, an individual; and SOCIAL-ENGINEER, LLC, a Pennsylvania limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> JEFF MOSS, an individual; DEF CON COMMUNICATIONS, INC., a Washington corporation; and DOES 1-10; and ROE ENTITIES 1-10, inclusive, <br><br> Defendants. | CASE NO. 2:23-c-v-01932-BAT <br><br> **ORDER GRANTING IN PART AND DENYING IN PART, PLAINTIFFS' MOTION FOR RECONSIDERATION** |

Before the Court is a Motion for Reconsideration filed by Plaintiffs Christopher J. Hadnagy and Social-Engineer, LLC. Dkt. 55. Plaintiffs ask the Court to reconsider its July 24, 2024 Order Denying Plaintiff's Motion to Amend. Dkt. 53 (the "Order Denying Amendment"); Dkt. 49 (Plaintiffs' Motion to Amend). The motion is granted in part and denied in part.

LEGAL STANDARD

Motions for reconsideration are disfavored and will ordinarily be denied unless there is a showing of (a) manifest error in the ruling, or (b) facts or legal authority which could not have been brought to the attention of the court earlier, through reasonable diligence. CR 7(h)(1). The term "manifest error" is "an error that is plain and indisputable, and that amounts to a complete

1   disregard of the controlling law or the credible evidence in the record." Black's Law Dictionary

2   622 (9th ed. 2009).

3       "[A] motion for reconsideration should not be granted, absent highly unusual

4   circumstances, unless the district court is presented with newly discovered evidence, committed

5   clear error, or if there is an intervening change in the controlling law." *Marlyn Natraceuticals,*

6   *Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 880 (9th Cir. 2009). A motion for

7   reconsideration should not be used to ask a court to rethink what the court had already thought

8   through — rightly or wrongly. *Defenders of Wildlife v. Browner*, 909 F.Supp. 1342, 1351 (D.

9   Ariz. 1995). Mere disagreement with a previous order is an insufficient basis for reconsideration,

10  and reconsideration may not be based on evidence and legal arguments that could have been

11  presented at the time of the challenged decision. *Haw. Stevedores, Inc. v. HT & T Co*., 363 F.

12  Supp. 2d 1253, 1269 (D. Haw. 2005). "Whether or not to grant reconsideration is committed to

13  the sound discretion of the court." *Navajo Nation v. Confederated Tribes & Bands of the Yakima*

14  *Indian Nation*, 331 F.3d 1041, 1046 (9th Cir. 2003).

15                                    <u>DISCUSSION</u>

16      Plaintiffs' Motion to Amend sought to add a new cause of action for Invasion of

17  Privacy/False Light. According to Plaintiffs, this new claim relies only on the facts on which

18  their existing defamation claim relies. Plaintiffs argue the Court committed several manifest

19  errors in denying their motion to amend, including finding Plaintiffs unduly delayed when they

20  complied with the Court's Scheduling Order; deeming Jeff Moss is no longer a party; and

21  finding the proposed amendment is futile and will prejudice Defendants. The Court has reviewed

22  Plaintiffs' argument and finds no manifest error in its ruling denying the motion to amend.

23  However, the Court erred in deeming Jeff Moss is no longer a party to this action.

ORDER GRANTING IN PART AND
DENYING IN PART, PLAINTIFFS' MOTION
FOR RECONSIDERATION - 2

A.   <u>Timeliness vs. Undue Delay</u>

Because Plaintiffs filed the motion to amend within the deadline set forth in the Court's Scheduling Order, they contend the Court committed manifest error in finding they unduly delayed in seeking leave to amend. Plaintiffs argue "[n]o further explanation should be required when the filing complies with the Court's established schedule." Dkt. 55 at 4. This argument is illogical as it ignores the Court's discretion to grant or deny a proposed amendment to a complaint based on the factors of bad faith, undue delay, prejudice, futility, and prior amendments. The Court addressed this issue at length in the Order Denying Amendment. *See* Dkt. 53 at 5-7.

While there is no question Plaintiffs' *filing* of the motion to amend was timely vis-à-vis the Scheduling Order, this does not automatically lead to the conclusion that the proposed amendment should be granted. The Court looks not merely to whether a motion is filed within the time allotted in the scheduling order, but also inquires "whether the moving party *knew or should have known* the facts and theories raised by the amendment in the original pleading." Dkt. 53 at p. 6 (emphasis added). Here, Plaintiffs insist the facts underlying their proposed claim of privacy/false light are the very same facts underlying their original defamation claim. Dkt. 55 at 6. Thus, Plaintiffs *knew* of the facts underlying their proposed "new" claim in August 2023 (in fact, Plaintiffs included a false light claim on identical facts in the initial Pennsylvania lawsuit nearly two years ago). Plaintiffs also provide no reasonable explanation for waiting over a year to bring the claim. The delay is inexcusable. *See* Dkt. 53, pp. 6-7.

B.   <u>Defendant Moss</u>

Plaintiffs are correct the Court erred in referring to Defendant Moss as having been dismissed entirely from the case.

ORDER GRANTING IN PART AND
DENYING IN PART, PLAINTIFFS' MOTION
FOR RECONSIDERATION - 3

1       On March 28, 2024, the Court dismissed Plaintiffs' claims that Defendant Moss is liable

2  "as the alter ego of Defendant DEF CON" (*see* Dkt. 1-1, Complaint at p. 6, ¶¶ 27, 29). Plaintiffs

3  also alleged Defendant Moss is personally liable for defamation because "Moss published false

4  and defamatory factual statements" including "injurious falsehoods regarding Plaintiff. *Id*. at 18.

5  The Court dismissed Plaintiff's "injurious falsehood" claims by Defendant Moss to Black Hat

6  representatives with leave to amend by April 22, 2024, to add specific facts to support these

7  claims, which Plaintiffs chose not to do. Dkt. 44.

8       However, Plaintiffs also assert a defamation claim against Defendant Moss wherein they

9  allege Defendant Moss published defamatory statements in the Transparency Report and Update.

10  Dkt. 1-1 at pp. 14-15. The defamation claim was not dismissed. Defendant Moss was not

11  dismissed for the alleged defamatory acts that he allegedly performed, and the defamation claim

12  will proceed against both Defendants as set forth in the original Complaint.

13       4.    <u>Futility of False Light/Invasion of Privacy Claim</u>[1]

14       The futility of Plaintiffs' proposed amendment was discussed in detail in the Order

15  Denying Amendment and the Court declines to revisit its analysis.

16       Plaintiffs wish the Court to consider that when "defamatory statements are publicized, an

17  individual cannot commit defamation without necessarily committing false light." Dkt. 55.

18  Plaintiffs contend this is "much like how a criminal defendant cannot commit burglary without

19  committing trespass." *Id.* at p. 9.  Plaintiff cites to Washington cases indicating defamation and

20  false light are closely related. However, false light is not a "lesser included" tort because "a

21  plaintiff does not need to be defamed in order to bring a false light claim." *Seaquist v. Caldier*, 8

22

23  [1] Plaintiffs do not contest this Court's finding that the proposed Defamation by Implication claim
is unsupported and therefore, have waived this portion of the Order Denying Amendment.

ORDER GRANTING IN PART AND
DENYING IN PART, PLAINTIFFS' MOTION
FOR RECONSIDERATION - 4

1  Wash.App.2d 556, 573 (Div. II 2019) (citing *Eastwood v. Cascade Broadcasting*, 106 Wash.2d

2  466, 471 (1986).  Rather as *Eastwood* notes, the two torts overlap "when the statement

3  complained of is both false and defamatory."

4          As this Court previously noted, the mere statement that the Transparency Report and

5  Update are highly offensive to a reasonable person is a conclusory and insufficient statement. In

6  fact, publication of the Transparency Report and Update merely led to speculation and a general

7  discussion about how no one really knows the underlying reasons for why these reports were

8  issued. Dkt. 53 at pp. 11-12. The Court also found Plaintiffs had essentially swapped the

9  Transparency Report and Update for the phrase "injurious falsehood" after ignoring the deadline

10  to add additional facts to address the dismissed injurious falsehood claim. *See* Dkt. 44. As

11  previously noted, this attempt at repackaging does not cure the deficiencies of the Complaint as

12  to the falsehood claim.

13          Also, while Plaintiffs removed from the proposed amendment the Black Hat allegations

14  and claimed to remove claims of "injurious falsehood, and tortious interference with contractual

15  and prospective business relationships," Plaintiffs then reinserted in the proposed false light

16  claim that Defendants "wrongly interfered with plaintiff's contractual relations and prevent

17  plaintiffs from expanding their business and social engineering conference." Dkt. 49 at p. 22, ¶

18  117.  The proposed amended complaint further alleges under the proposed false light claim that

19  "plaintiffs have lost money" and "harm to their reputation, emotional harm, exposure to

20  contempt, ridicule and shame and threats to their business." Dkt. 49-2 at p. 23, ¶ 121. These

21  allegations attempt to circumvent the Court's dismissal of Plaintiffs' business/contractual/unjust

22  enrichment/quantum meruit claims.

23

ORDER GRANTING IN PART AND
DENYING IN PART, PLAINTIFFS' MOTION
FOR RECONSIDERATION - 5

5.    Prejudice

Plaintiffs again argue Defendants are not prejudiced by the late inclusion of the false light

claim because Plaintiffs are not entitled to recover twice for the same elements. However, false

light differs from defamation in that it focuses on compensation for mental suffering rather than

reputation. *Corey v. Pierce County*, 154 Wash.App. 752, 761-2 (Div. II 2010). Moreover,

Plaintiffs would not be precluded from arguing that defamation and false light are in fact,

different claims, and therefore, they are entitled to aggregate losses and obtain a higher loss

amount than would be justified by prevailing on the defamation claim alone.

Accordingly, it is **ORDERED**:

1.    Plaintiffs' motion for reconsideration (Dkt. 55) is **GRANTED only** as to

Plaintiffs' claims of defamation against Defendant Moss for publishing statements in the

Transparency Report and Update.

2.    The remainder of Plaintiffs' motion for reconsideration (Dkt. 55) is **DENIED**.

DATED this 9th day of August, 2024.

BRIAN A. TSUCHIDA
United States Magistrate Judge

ORDER GRANTING IN PART AND
DENYING IN PART, PLAINTIFFS' MOTION
FOR RECONSIDERATION - 6

1
2
3
4

5                    UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF WASHINGTON
6                             AT SEATTLE

7   CHRISTOPHER J HADNAGY, SOCIAL
    ENGINEER LLC,
8                                              CASE NO. 2:23-cv-01932-BAT
                              Plaintiffs,
9                                              **ORDER GRANTING IN PART AND
            v.                                 DENYING IN PART DEFENDANTS'
10                                             MOTION TO DISMISS**

    JEFF MOSS, DEF CON
11  COMMUNICATIONS INC,

12                            Defendants.

13          Defendants Jeff Moss ("Moss") and Def Con Communications, Inc. ("Def Con") move to

14  dismiss the Complaint of Plaintiffs Christopher J. Hadnagy ("Hadnagy") and Social-Engineer

15  LLC ("Social-Engineer"). Dkt. 37. Plaintiffs assert seven causes of action against Defendants.

16  Dkt. 1-1.

17          For the reasons stated herein, the Court **grants** Defendants' motion to dismiss Plaintiffs'

18  claims of Alter Ego, Business Disparagement; Unjust Enrichment, Quantum Meruit, and

19  Injunction; **denies** Defendants' motion to dismiss Plaintiffs' Defamation claims (2/9/22

20  Transparency Report and 1/13/23 Update); and **grants** Defendants' motion to dismiss, **with

21  leave to amend**, Plaintiffs' claims of Defamation ("Injurious Falsehoods" by Defendant Moss);

22  Tortious Interference with Contractual Relations; and Prospective Business Relations.

23

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 1

FACTUAL AND PROCEDURAL BACKGROUND

A.     Plaintiffs' Allegations – Dkt. 1-1 Complaint

Defendants Moss and Def Con have held an annual hacker conference in Las Vegas, Nevada (the "Event") in August for the past thirty years. Dkt. 1-1 ¶¶ 32–36. The Event is one of the largest, is highly regarded in the industry, and is attended by members of law enforcement agencies and large corporations. *Id*. ¶¶ 37-38. In 2025, Def Con implemented an Event Code of Conduct ("Code of Conduct"). Dkt. 1-1, ¶ 60 (Dkt. 37, Ex. 1). The Code of Conduct prohibits "harassment," which includes "deliberate intimidation and targeting individuals in a manner that makes them feel uncomfortable, unwelcome, or afraid." *Id*. The Code of Conduct applies to "everyone," and Def Con reserves the "right to respond to harassment in the manner we deem appropriate, including but not limited to expulsion." *Id*. In 2017, Def Con began to publicly share a summary of incidents which occurred at the Event for a given year (the "Transparency Report").

The Event hosts a multitude of "villages," inviting smaller groups of attendees to participate in cybersecurity challenges and demonstrations related to different topics. *Id*. ¶ 40. In the past, Plaintiff Hadnagy hosted a village focused on social engineering (the "SEVillage"). *Id*. ¶¶ 45–46. In January 2022, Def Con informed Plaintiff Hadnagy that he could no longer attend the Event based on reported violations of the Code of Conduct. *Id*. ¶¶ 58–59. On February 9, 2022, Def Con published a Transparency Report announcing Plaintiffs' ban from future Events:

> We received multiple [Code of Conduct] reports about a DEF CON Village leader, Chris Hadnagy of the SE Village. After conversations with the reporting parties and Chris, we are confident the severity of the transgressions merits a ban from DEF CON.

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 2

*Id*. ¶ 58 (the "2/9/22 Transparency Report").[1] On July 28, 2022, Defendants published an

Updated Transparency Report explaining treatment of Code of Conduct violations, including

meeting with parties, witnesses, and victims; reviewing evidence; and determining permanent

bans for repeat offenders and egregious offenses. Defendants based their safeguards on

recommendations from the National Network to End Domestic Violence and the Violence

Against Women Office at the US Department of Justice. Dkt. 37, Ex. 2 at 2-4 (7/28/22 Update).

Plaintiffs deny violating the Code of Conduct, meeting or discussing allegations of code

violations with Defendants, and alleges Defendant Moss ignored his attempts to meet and

provided no reason for the lifetime ban. Dkt. 1-1, ¶ 61, ¶ 62. Defendants ignited a firestorm

within the information technology and security communities across social media platforms and

prominent media outlets after posting the Transparency Report. These outlets quoted Defendants'

statements and asserted Plaintiff Hadnagy was a sexual predator. *Id*. ¶ 66-72.

Defendants were aware that presenting the Transparency Report would lead the public to

understand it in this manner as Defendants' past lifetime bans were exclusively due to extreme

sexually predatory behavior. Dkt. 1-1, Compl. ¶¶ 100-101, 103-104, 107-108. False rumors

about Plaintiff Hadnagy spread rapidly, tarnished his reputation, and he was likened to the

"Harvey Weinstein" of the information security industry in a public post. *Id*. ¶ 108.

In January 2023, Plaintiffs sued Defendants in the Eastern District of Pennsylvania.

Following dismissal of that lawsuit for lack of personal jurisdiction, Defendant Moss published

an update to Def Con's website (the "Update"):

> "During our investigation we spoke directly with Mr. Hadnagy about claims of
> his violations of our Code of Conduct. He confirmed his behavior and agreed to
> stop. Unfortunately, the behavior did not stop […] Our investigation also revealed

---

[1] Defendants refer to this publication as the Ban Announcement.

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 3

that DEF CON is not the only security conference to receive complaints about Mr.
Hadnagy's behavior. For example, Black Hat received complaints, conducted
their own investigation, and removed Mr. Hadnagy from their Review Board."

Id. ¶¶ 80, 98. Plaintiff Hadnagy denies Defendants ever spoke with him about the alleged Code

violations and he never "confirmed his behavior." *Id*. ¶¶ 61-62, 84. Most of Plaintiffs' business

associates in Las Vegas, including Black Hat, terminated their contracts with Plaintiffs based on

Defendants' statements in the Transparency Report. *Id.*, Compl. ¶¶ 42-43; ¶¶ 73-76. Defendant

Moss published these statements (and additional statements that Plaintiff's employment practices

were racially discriminatory and fostered a hostile work environment based on gender) in private

to "other industry leaders who host similar annual conventions in Las Vegas, Nevada, including

the organizers of Black Hat." *Id*. ¶ 113.

Around February of 2022, Black Hat representatives issued a ban of Plaintiffs from Black

Hat's conference, citing Defendants' Transparency Report. Dkt. 1-1, Compl. ¶¶ 73-76. Black

Hat's website lists Defendant Moss as a director of Black Hat. *Id.*, ¶ 77. Defendant Moss

continued to make disparaging and false statements to other Black Hat representatives, including

allegations that Plaintiff Hadnagy perpetrated repeated sexual harassment and admitted to these

acts. *Id*. ¶¶ 78-79. Defendant Moss intended to "entangle Plaintiffs in controversy and thwart

Plaintiffs' efforts to conduct a standalone version of the SEVillage, and benefit from Plaintiffs'

SEVillage by using a replica village (the "Social Engineering Community Village") meant to

attract the same audience and goodwill Plaintiffs had cultivated for years. *Id*. ¶¶ 94, 140.

B. Procedural History

Plaintiffs sued Defendants in the Eastern District of Pennsylvania, and on January 5,

2023, Judge Wendy Beetlestone dismissed the case for lack of personal jurisdiction. *See*

*Hadnagy v. Moss*, No. CV 22-3060, 2023 WL 114689 (E.D. Pa. Jan. 5, 2023).

On August 9, 2023, Plaintiffs filed a Complaint in the Eighth Judicial District Court, Clark County, Nevada. *See Christopher J. Hadnagy et al. v. Jeff Moss et al.*, Case No. A-23-875618-C. Defendants removed the action to the Federal District Court of Nevada on August 29, 2023 (Dkt. 1) and thereafter, filed a motion to dismiss, or in the alternative, a motion to transfer venue to the Western District of Washington. Dkt. 15. Judge Cristina D. Silva granted the motion to transfer venue to this Court and did not reach the merits of Defendants' motion to dismiss. Dkt. 21 at 1, n.1 ("Transfer Order").

## LEGAL STANDARD

Under Rule 12(b)(6), a court conducts a two-step inquiry to test the legal sufficiency of the complaint. First, well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Second, once the well-pleaded factual allegations have been isolated, the court must determine whether they are sufficient to show a "plausible claim for relief." *Id.* at 679. A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. If a motion to dismiss is granted, a court should normally grant leave to amend unless it determines the pleading cannot not possibly be cured by allegations of other facts. *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir.1990).

In deciding a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record. Courts may not consider additional facts alleged in opposition to a motion to dismiss. *See Schneider v. California Dep't of Corrections*, 151 F.3d 1194, 1197 n. 1 (9th Cir. 1998).

A court may consider a document whose contents are alleged in a complaint, so long as no party disputes its authenticity. *See Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002)." Attached to Defendants' motion to dismiss as Exhibits 1, 2, and 3 are the Code of Conduct, Transparency Reports, and Update. Neither party raises concerns about these exhibits and Plaintiffs' claims are based on these exhibits. Thus, the Court has considered the exhibits in determining this motion.

DISCUSSION

A.    Personal Jurisdiction and Applicable Law

Following a transfer under 28 U.S.C. § 1404(a), the Court would ordinarily apply the law of the transferor court. *See*, *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964). Where the transferor court lacked personal jurisdiction over the defendant, however, the transferee court must apply its own law regardless of whether the transfer is based on Section 1404(a) or Section 1406(a). *See Nelson v. Int'l Paint Co.*, 716 F.2d 640, 643–44 (9th Cir. 1983); *Intertex, Inc. v. Dri-Eaz Prod., Inc.*, No. C13-165-RSM, 2013 WL 2635028, at *2 (W.D. Wash. June 11, 2013). "While a transferor court need not have personal jurisdiction to transfer an action under § 1404(a), lack of personal jurisdiction precludes application of *Van Dusen* in the transferee court." *Jaeger v. Howmedica Osteonics Corp.*, No. 15-CV00164-HSG, 2016 WL 520985, at *7-8 (N.D. Cal. Feb. 10, 2016).

Plaintiffs contend the Nevada District Court expressly ruled that personal jurisdiction existed in Nevada. This is incorrect. The Nevada District Court ruled on Defendants' motion to transfer venue and specifically did not reach the merits of Defendants' motion to dismiss. In determining whether transfer to Washington was proper, Judge Silva weighed multiple factors,

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 6

1    including familiarity with governing law and, using the most significant relationship test,

2    concluded Nevada had the most significant relationship based primarily on the parties'

3    interaction at the Event in Nevada. *Id.* at 4-7. Judge Silva also noted, however, that this factor

4    "weighs slightly against transfer because "[t]he forums' familiarity with the governing law is

5    typically to be accorded little weight on a motion to transfer venue because federal courts are

6    deemed capable of applying the substantive law of other states." *Id.* at 7-8 (internal citations

7    omitted). Judge Silva did not address whether Nevada or Washington had personal jurisdiction

8    over Defendants.

9            Thus, this Court must "consider in the first instance whether personal jurisdiction

10   existed" in Nevada and which state's law applies.[2] *See Jaeger*, 2016 WL 520985, at *7. Plaintiff

11   is a resident of Florida and Defendants are citizens of Washington. Thus, to establish personal

12   jurisdiction in Nevada, Plaintiffs must show Defendants purposefully directed tortious action

13   toward Plaintiffs in Nevada. Plaintiffs submit allegations of their own business dealings in

14   Nevada, but it is the Defendants' "tortious actions" in Nevada that are relevant.

15           The parties agree the Ninth Circuit's "purposeful direction" test for personal jurisdiction[3]

16   requires a plaintiff to demonstrate that the defendant (1) committed an intentional act, (2)

17   expressly aimed at the forum state, (3) causing harm the defendant knows is likely to be suffered

18   in the forum state. *Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp.*, 905 F.3d 597, 605 (9th

19   Cir. 2018) (intentional torts, like defamation, are subject to the purposeful direction analysis).

20
21   [2] Defendants do not assert that Nevada has general jurisdiction over Defendants and in fact, none
     of the parties are based in Nevada.

22   [3] A purposeful availment analysis is most often used in suits sounding in contract. *See, e.g., Doe
     v. Unocal Corp.*, 248 F.3d 915, 924 (9th Cir.2001). A purposeful direction analysis, on the other
23   hand, is most often used in suits sounding in tort. *See, e.g., Dole Food Co., Inc. v. Watts*, 303
     F.3d 1104, 1111 (9th Cir.2002).

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 7

The Court concludes personal jurisdiction is lacking in Nevada because Defendants did not "expressly aim" their alleged tortious statements at Plaintiffs in Nevada.

For purposes of the personal jurisdictional analysis, an "intentional act" must be the one giving rise to the tort claims at issue. *See Schwarzenegger v. Fred Martin Motor Co*., 374 F.3d 797, 806 (9th Cir. 2004) (describing the kinds of potentially tortious "intentional acts" that satisfy the requirement). Here, the alleged tortious acts of Defendants are publishing the Transparency Reports and Update on Def Con's website. According to a recent Nevada District Court ruling, statements posted online with the intention of being globally accessible do not create personal jurisdiction in Nevada. *Wealthy, Inc. v. Cornelia*, 2023 WL 4803776 (D. Nev. July 27, 2023). Defendants rely on this case, arguing Def Con's "systemic" presence in Nevada creates personal jurisdiction in Nevada. Dkt. 19 at 12-13.

In *Wealthy*, the plaintiff (not a resident of Nevada) sued the defendant (not a resident of Nevada) for recording an allegedly defamatory YouTube video with a third person (a resident of Nevada). 2023 WL 4803776, at *3–5. The court rejected personal jurisdiction over the defendant because the video was posted online with the intention of being broadcast globally, and the defendant did not specifically intend the statements to harm the plaintiff in Nevada. *Id*. at *3. Had the plaintiff been a Nevada resident, the harm would have been felt in the state, but he was not. *Id*. at *3–4. The court declined to "exercise jurisdiction over an action where the requisite nexus was the fact that several defamatory statements had a proverbial layover in Nevada as they awaited global publishing on the internet." *Id*. at *5.

Similarly, there is no personal jurisdiction here in Nevada – non-resident plaintiffs sued non-resident defendants for statements published on a website with global access with nothing

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 8

more than an incidental connection to Nevada.[4] Plaintiff Hadnagy suggests Def Con "expressly aimed" its conduct at Nevada and points to the nature and degree of interactivity of Def Con's website and geographic scope of Def Con's economic ambitions. Dkt. 39 at 11-13. These facts are outside of Plaintiffs' complaint and moreover, are not "intentional acts" giving rise to Plaintiffs' claims.

Plaintiffs also point to Defendants' "systematic intentional acts directed at Nevada's hospitality market for over thirty consecutive years", *i.e.*, event space, insurance, and accommodations for attendees. Plaintiffs argue Defendants' website is "inextricably connected to the Event and expressly applies to attendees of the Event in Nevada." Here again, business contacts and dealings within the State of Nevada are not the type of "intentional act" giving rise to the tort claims at issue.

Plaintiff Hadnagy also relies on *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218 (9th Cir. 2011) for the proposition Defendants expressly aimed conduct at Nevada. *Mavrix* involved an alleged copyright infringement of photographs by a celebrity gossip website where the defendant made money by selling advertising space to third-party advertisers, many of which targeted California residents. 647 F.3d at 1221–22. The court concluded this was part of the defendant's "continuous and deliberate exploitation" of the California market for its website, and the website's business model was core to the defendant's profitability, which supported

---

[4] Plaintiffs allege Defendant Moss's first offending comments occurred while Plaintiff Hadnagy participated in Defcon in 2021 "virtually" (Dkt. 39, Response at 10), ostensibly while Plaintiff resided in Florida. Thereafter, Plaintiff told Defendant he would be "hosting" SEvillage at another location and not participating in Defcon. *Id*. at 11. In February 2022, Plaintiff alleges Defendant issued defamatory statements against Plaintiff even though Plaintiff "did not participate in the event [Defcon]." *Id*.  Thus, by Plaintiff's own admission, Defendant Moss's statements did not occur in Nevada and were directed towards Plaintiff while he resided in Florida.

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 9

1  jurisdiction in California. *Id*. The facts here are dissimilar to those in *Mavrix*. There is no

2  allegation or evidence the Def Con website "continuously and deliberately" exploits Nevadans

3  for commercial gain as Def Con does not sell advertising space on its website and its website

4  does not target Nevada residents with advertisements, or track visitors via IP address or

5  otherwise. Dkt. 15-1, Declaration of Jeff Moss in Support of Motion to Transfer at ¶ 6, 9.

6      Finally, Plaintiffs argue Def Con knew the harm would be caused in Nevada because it

7  "is the only place where the Event is held." Dkt. 39 at 13. The tortious activity alleged by

8  Plaintiffs is Defendants' publication of the Transparency Reports and Updates on Def Con's

9  website (and additional defamatory statements made by Defendant Moss to Black Hat

10  representatives) – which publications and statements are not alleged to have occurred in the State

11  of Nevada. Defendants' ban of Plaintiff Hadnagy and publication of the Transparency Reports is

12  presumably (although it is not entirely clear) based on Plaintiff Hadnagy's behavior at an earlier

13  Event, which presumably occurred in Nevada. However, the alleged defamation did not occur in

14  Nevada, nor was it directed at Plaintiffs in Nevada. Plaintiff Hadnagy offers no affidavit or other

15  evidence to support his claim he was harmed in Nevada. He does not identify any Nevada-

16  specific contracts with which Def Con tortiously interfered and/or that Def Con was aware of

17  any such contracts.

18      A court may exercise specific jurisdiction over a defendant only where "the defendant's

19  suit-related conduct" created a substantial connection with the forum [s]tate." *Williams v.*

20  *Yamaha Motor Co. Ltd*., 851 F.3d 1015, 1022-23 (9th Cir. 2017) (quoting *Walden v. Fiore*, 571

21  U.S. 277, 284-285 (2014). Defendants' allegedly defamatory statements on its globally

22  accessible website—were not targeted at Nevada residents, did not involve a Nevada resident,

23  did not encourage Nevada residents to read the statements, did not mention the state of Nevada,

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 10

1   and were not posted within the state of Nevada. The Court concludes there is no personal

2   jurisdiction in Nevada and therefore, applies Washington law to Plaintiffs' claims.

3   B.    Alter Ego Claims

4          Plaintiff Hadnagy alleges Mr. Moss is the alter ego of Def Con and is thus "liable for the

5   obligations, debts, and liability of Defendant DEF CON arising under this Complaint." Dkt. 1-1,

6   ¶¶ 19–29.

7          A request to pierce the corporate veil is only a means of imposing liability for an

8   underlying cause of action and not a cause of action in and of itself. *Local 159, 342, 343 & 444*

9   *v. Nor-Cal Plumbing, Inc*., 185 F.3d 978, 985 (9th Cir. 1999). The following two elements must

10  be proven before the equitable remedy of corporate-veil piercing applies: 1) the corporate form is

11  used to violate or evade a legal obligation, and 2) corporate-veil piercing is necessary to prevent

12  a loss to an innocent party. *See Chadwick Farms Owners Ass'n v. FHC, LLC*, 166 Wash.2d 178,

13  200, 207 P.3d 1251 (2009); *Meisel v. M & N Modern Hydraulic Press Co*., 97 Wash.2d 403,

14  410–11, 645 P.2d 689 (1982); *Washington v. Davies*, 176 Wash. 100, 114, 28 P.2d 322 (1934).

15         The first element (evasion of a legal obligation) requires "an abuse of corporate form" to

16  the abuser's benefit and to the innocent party's detriment. *Meisel*, 97 Wash.2d at 410, 645 P.2d

17  689. The second element is whether corporate-veil piercing is necessary to prevent a loss to an

18  innocent party. This element focuses on whether the innocent party was harmed by the alter-ego

19  conduct, fraud, bad faith, or other legal-responsibility-evading conduct. *Meisel*, 97 Wash.2d at

20  410, 645 P.2d 689; *Morgan v. Burks*, 93 Wash.2d 580, 587, 611 P.2d 751 (1980). The corporate

21  cloak is not lightly thrown aside. *Grayson v. Nordic Const. Co*., 92 Wash. 2d 548, 553 (1979)

22  (absent fraud or manifest injustice, "the corporation's separate entity should be respected").

23

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 11

1    Because "fraud is a necessary element of the alter ego doctrine" a party pleading alter ego

2    must satisfy the heightened pleading standard of Rule 9(b). *A. Darino & Sons, Inc. v. Dist.*

3    *Council of Painters No. 33*, 869 F.2d 514, 519 (9th Cir. 1989)); *see also Ferrie v. Woodford*

4    *Rsch., LLC*, No. 3:19-CV-05798-RBL, 2020 WL 3971343, at *6 n.4, *8 (W.D. Wash. July 14,

5    2020). For such claims, "a party must state with particularity the circumstances constituting

6    fraud or mistake." Fed. R. Civ. P. 9(b).

7    Plaintiffs repeat the elements of a veil-piercing claim and associated factors on

8    "information and belief" (*see*, *e.g.*, Dkt. 1-1, ¶¶ 20-28) but fail to allege sufficient facts to state a

9    prima facie case of alter ego liability under either Rule 8(a)'s notice standard or Rule 9(b)'s

10   heightened pleading standard applicable to this claim. *See Ferrie*, 2020 WL 3971343, at *8

11   (dismissing alter ego claim where the allegations are "conclusory" and "not [an] independent

12   cause[] of action"). In opposition, Plaintiffs contend the facts of fraud are within Def Con's

13   "exclusive control." However, Plaintiffs must still state the factual basis for their belief of

14   wrongdoing. Because alter ego is not an independent cause of action, Plaintiffs' claim is

15   dismissed insofar as they assert a separate cause of action under this theory.

16   C.    <u>Defamation</u>

17   "A defamation action consists of four elements: (1) a false statement, (2) publication, (3)

18   fault, and (4) damages." *Duc Tan v. Le*, 177 Wash.2d 649, 300 P.3d 356, 363 (Wash. 2013). A

19   plaintiff can allege the false statement prong by alleging facts showing that the statement is

20   provably false or "leaves a false impression due to omitted facts." *See Yeakey v. Hearst*

21   *Commc'ns, Inc.*, 156 Wash.App. 787, 234 P.3d 332, 335 (Wash. Ct. App. 2010) (citing *Mohr v.*

22   *Grant*, 153 Wash.2d 812, 108 P.3d 768, 773 (Wash. 2005)). "Defamation by implication occurs

23   when 'the defendant juxtaposes a series of facts so as to imply a defamatory connection between

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 12

them.'" *Corey v. Pierce Cty.*, 154 Wash.App. 752, 225 P.3d 367, 373 (Wash. Ct. App. 2010) (quoting *Mohr*, 108 P.3d at 774). To proceed on a theory of defamation by implication, a plaintiff must allege facts supporting all the elements of a defamation claim but may support the first element by alleging that the statement is false or leaves a false impression. *See id.*; *see also U.S. Mission Corp. v. Kiro TV, Inc.*, 172 Wash.App. 767, 292 P.3d 137, 141 (Wash. Ct. App. 2013).

Plaintiffs' defamation claim is based on false statements published on Defendants' website in the 2/9/22 Transparency Report and the 1/13/23 Update, and additional statements made by Defendant Moss to Black Hat representatives ("Injurious Falsehoods"). The Court concludes Plaintiffs have sufficiently plead defamation as to the alleged false statements published on Defendants' website but have not done so with regard to the Injurious Falsehoods.

1.       <u>2/9/22 Transparency Report</u>.  In the 2/8/22 Transparency Report, Defendants announce Plaintiff Hadnagy's lifetime ban from the Event based on receipt of multiple code of conduct violations. Defendants state they spoke to the reporting parties and to Plaintiff Hadnagy, and thereafter concluded the severity of Plaintiff Hadnagy's "transgressions" merited a permanent ban from Def Con. Defendants argue the statements contained in this publication are mere non-actionable opinions. The Court disagrees. Defendants did not merely ban Plaintiffs from the Event based on their right to associate with anyone they choose or based on an opinion. Rather, Defendants clearly state they instituted the lifetime ban after receiving reports, investigating reports, and confirming the severity of the reported transgressions. The omission of details of the evidence and nature of the transgressions also leaves a false impression, leading to the type of speculation alleged in Plaintiffs' Complaint. Plaintiffs allege Defendants' false statements caused speculation and false rumors Plaintiff Hadnagy had committed the worst

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 13

1   sexual crimes, and that actual and potential clients began to terminate their relationships and

2   contracts with Plaintiffs following publication of the 2/9/22 Transparency Report. Plaintiffs

3   specifically point to an annual and lucrative teaching arrangement with Black Hat.

4       Plaintiffs contend the 7/28/22 Transparency Report further clarifies the defamatory

5   significance of the lifetime ban by stating: "[i]n the case of the most troubling offenses or those

6   who we feel may represent on ongoing risk to the community, we take the extra step of naming

7   them publicly." Plaintiff Hadnagy was named publicly so the logical inference is that he is an

8   "ongoing risk to the community." Defendants argue the 7/28/22 Transparency Report – which

9   was published months later – cannot be used to support a claim that the 2/9/22 Transparency

10  Report is defamatory, nor can it be considered the source of Plaintiffs' damages because it would

11  not have been considered by anyone before they cut ties with Plaintiff.

12      However, publications on Defendants' website are "refreshed" and repeated with each

13  later publication. Thus, the 2/9/22 Transparency Report is repeated in the 7/28/22 Transparency

14  Report and therefore, can, and conceivably were, read together. Dkt. 37, Ex. 1 at 4-6. Plaintiffs

15  allege both these publications exacted devasting damages on their business dealings. For

16  example, Plaintiffs allege that in February 2022, after publication of Plaintiffs' ban, Black Hat

17  also banned Plaintiffs from its conference where, Plaintiffs had received significant monetary

18  compensation for teaching classes. Plaintiff also allege they were damaged after publication of

19  the January 13, 2023 Update and that as of the filing of the Complaint, the defamatory

20  publications can still be seen on Defendants' website, which has over 400,000 followers.

21      2.      1/13/23 Update

22      In the January 13, 2023 Update, Defendants state that during their investigation, they

23  "spoke directly with Mr. Hadnagy about claims of his violations of our Code of Conduct. He

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 14

1   confirmed his behavior and agreed to stop. Unfortunately, the behavior did not stop." Dkt. 37,

2   Ex. 3.

3          Defendants argue nothing in the Update is defamatory and because the language does not

4   refer to sexual conduct or gender identifiers, it cannot reasonably be inferred Plaintiffs' ban from

5   the Event was the result of sexual misconduct. This ignores Plaintiffs' allegations that the Update

6   contains demonstrably false statements because Defendants refused to meet with Plaintiff

7   Hadnagy and provide Plaintiff Hadnagy with information regarding the alleged "behavior";

8   perpetrators of rumors and online comments interpreted the ban was the result of sexual

9   misconduct (*i.e.* referring to Plaintiff Hadnagy as the 'Harvey Weinstein of the infosec

10  community'); and publication of the false statements damaged Plaintiffs' business dealings. This

11  also ignores the plain implication of the statements in the Update, *i.e.*, that Plaintiff Hadnagy

12  confirmed and admitted to committing acts that were so egregious, he had to be banned from the

13  Event for the rest of his life – all statements Plaintiffs allege are demonstrably false.

14          3.   Allegations Regarding Black Hat

15          Plaintiffs allege they were regular participants at Black Hat's annual 6-day cybersecurity

16  conference in Las Vegas, where Plaintiffs conducted classes for "significant monetary

17  compensation, sometimes reaching into the six-figure range." Dkt. 1-1, ¶ 5. In February of 2022,

18  Black Hat issued a ban of Plaintiffs from Black Hat's conference, "specifically in light of

19  Defendants' publishing of the 'Transparency Report' and the online aftermath." *Id.* ¶76.

20          Plaintiffs further allege, on information and belief, that Defendant Moss, who is also a

21  director of Black Hat, published false and defamatory statements, purportedly based on an

22  investigation and evidence, to representatives of Black Hat to convince them to ban Plaintiffs

23  from the Black Hat conference. *Id.* ¶78. These allegedly false and defamatory statements include

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 15

that Plaintiff Hadnagy perpetrated repeated severe and repugnant sexual harassment against various victims, Plaintiff Hadnagy admitted to perpetrating this harassment, and agreed to stop. (Referred to in Plaintiffs' Complaint as "Injurious Falsehoods"). Plaintiffs allege that because of these Injurious Falsehoods, coupled with publication of the 2/9/22 Transparency Report and 1/13/23 Update, Black Hat removed Plaintiff Hadnagy from its prestigious Review Board and banned Plaintiffs from the Black Hat Convention. *Id.* ¶¶78-80.

Plaintiffs allege facts sufficient to raise an inference that Defendant Moss, through his involvement in both Def Con and Black Hat, was involved in banning Plaintiffs from both events in the same month. However, the allegations of additional Injurious Falsehoods are without plausible factual content. To proceed on a claim of defamation, Plaintiffs must plausibly plead the alleged "false and defamatory" statements, *i.e.*, to whom, when, and where these statements were made.

In conclusion, the Court concludes Plaintiffs have sufficiently stated claims of defamation based on Defendants' publications of the 2/9/22 Transparency Report and the 1/13/23 Update on Def Con's website. The Court grants Defendants' motion to dismiss Plaintiffs' claims of "Injurious Falsehoods" by Defendant Moss to Black Hat representatives but also grants Plaintiffs leave to amend the Complaint to plead additional factual allegations to support this claim.

D.    Business Disparagement Claim

Plaintiffs allege that Defendants' disparaging remarks were intended to destroy Plaintiffs' reputations, which are paramount in the information security industry. Dkt. 1-1, Compl. ¶¶ 81, 88. Plaintiffs also allege Defendant Moss spread additional false and defamatory statements to Black Hat (*i.e.*, racially discriminatory employment practices and a gender-based hostile work

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 16

environment (*See id.*, ¶ 76). As explained above as to the Injurious Falsehoods, the "additional" defamatory allegations are not properly plead as there are no facts explaining when, what, and to whom the additional defamatory statements were made.

A statement may be published in circumstances that disparage the quality of the product and at the same time imply the owner or vendor is dishonest, fraudulent, or incompetent, thus affecting the owner or vendor's business reputation. In such circumstances, an action may be brought for defamation as well as for disparagement. *Waechter v. Carnation Co.*, 5 Wash.App. 121, 126–27, 485 P.2d 1000 (1971). Here, the alleged defamatory statements are directed toward Plaintiff Hadnagy's behavior and any damage to Plaintiffs' business interests flows directly from that defamation. Although Plaintiffs believe and allege Defendants published the defamatory statements about Plaintiff Hadnagy with the intent to harm Plaintiffs' reputation, there are no allegations that Defendants disparaged the quality of Plaintiffs' products or services, *i.e.* Plaintiffs' expertise in the tech industry – human error and the threat it poses to information security as well as the application of scientifically proven methodologies to uncover vulnerabilities, define risk, and provide remediation. Dkt. 1-1, ¶ 47.

Thus, Defendants' motion to dismiss Plaintiffs' disparagement claim is granted.

E.     Tortious Interference with Contractual Relations

To establish a cause of action for intentional interference with contractual relations, a plaintiff must demonstrate: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. *MP Med. Inc. v. Wegman*, 151 Wash. App. 409, 425 (2009).

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 17

Plaintiffs allege that, prior to February 9, 2022, they had entered into several long-term agreements for the provision of cybersecurity and IT services for various large national corporations and law enforcement agencies, including Black Hat; defendants were aware of the agreements; and many clients terminated their agreements based on the "Injurious Falsehoods".

Plaintiffs fail to state a plausible claim for tortious interference with contractual relationships as they have failed to identify the existence of any valid contract in place at the time the alleged defamation occurred. For example, Plaintiffs allege they enjoyed lucrative annual contracts with Black Hat for training services at Black Hat's annual convention (Dkt. 1-1, Compl. ¶¶ 75, 136-137) but do not allege they had a valid and existing contract with Black Hat as of February 9, 2022, when the first alleged defamatory publication was made. Plaintiffs also allege that "multiple of Plaintiffs' clients" terminated their agreements with Plaintiffs and cited to the Injurious Falsehoods as the reason they were voiding the business agreements. *Id.*, ¶ 135. However, Plaintiffs do not identify any clients or any existing contracts. In addition, and to the extent Plaintiffs rely on the "Injurious Falsehoods" as the reason valid and existing contracts were terminated, Plaintiffs have failed to properly plead those "Injurious Falsehoods".

Accordingly, the Court grants Defendants' motion to dismiss Plaintiffs' claim for tortious interference with contractual relationships, with leave to amend for Plaintiffs to properly identify existing contracts breached or disrupted because of Defendants' defamatory publications.

F.  <u>Intentional Interference With Prospective Contractual Relations</u>

To maintain this tortious interference with business relations claim, Plaintiffs must establish: "(1) a prospective contractual relationship between the plaintiff and a third party; (2) the defendant's knowledge of this prospective relationship; (3) the intent to harm the plaintiff by preventing this relationship; (4) the absence of privilege or justification by the defendant; and (5)

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 18

1  actual harm to the plaintiff as a result." *Bombardier Inc. v. Mitsubishi Aircraft Corp.*, 383 F.

2  Supp. 3d 1169, 1188 (W.D. Wash. 2019) (citing *Evergreen Moneysource Mortg. Co. v. Shannon*,

3  167 Wash.App. 242, 274 P.3d 375, 383 (2012) (citing *Pleas v. City of Seattle*, 112 Wash.2d 794,

4  774 P.2d 1158, 1161 (1989)). Plaintiffs have failed to plausibly plead allegations to support this

5  claim.

6      Plaintiffs allege they had been in negotiations with "multiple corporations and

7  government organizations for prospective provision of cybersecurity and related services in

8  conjunction with business activities and operations." Dkt. 1-1, Compl. ¶ 145. Plaintiffs also

9  allege Defendants spread the "Injurious Falsehoods" to Black Hat representatives to prevent

10  Plaintiffs from continuing to negotiate their annual teaching instructor agreements at the Black

11  Hat conference.

12      As to the multiple corporations and government organizations, Plaintiffs' allegations are

13  insufficient to state a claim for tortious interference with a business expectancy as Plaintiffs do

14  not identify any third party with whom they had a prospective contractual relationship. Although

15  an enforceable contract is not required to support a tortious interference action, there must be a

16  relationship between parties contemplating a contract, with at least a reasonable expectancy of

17  fruition. *Broten v. May*, 49 Wash.App. 564, 744 P.2d 1085, 1088 (1987). As to the Black Hat

18  annual teaching instructor agreement, Plaintiffs allege Defendant Moss intentionally interfered

19  with this prospective agreement by spreading the Injurious Falsehoods, which have not been

20  properly plead.

21      Plaintiffs rely on *Motogolf.com, LLC v. Top Shelf Golf, LLC*, 528 F. Supp. 3d 1168 (D.

22  Nev. 2021) for the proposition they can allege a "certain class" of prospective customers without

23  identifying them specifically. *See* Dkt. 39 at 20. In *Motogolf.com*, however, the court predicted

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS - 19

the Supreme Court of Nevada would allow a plaintiff to allege a "certain class of prospective customers without identifying them specifically" when the defendant's alleged wrongdoing had prevented those customers from learning of the plaintiff's existence. *See id*. This does not alleviate Plaintiffs' burden to identify the specific, known persons or entities with whom they were allegedly negotiating.

The Court grants Defendants' motion to dismiss Plaintiffs' claim for tortious interference with prospective business relationships, but grants Plaintiffs leave to amend their Complaint to identify the third party or parties with whom they had prospective business arrangements and allege facts supporting each element of this claim.

G.    Unjust Enrichment, Quantum Meruit, and Injunctive Relief Claims

1.    Unjust Enrichment

"Unjust enrichment is the method of recovery for the value of the benefit retained absent any contractual relationship because notions of fairness and justice require it." *Young v. Young*, 164 Wash.2d 477, 484, 191 P.3d 1258 (2008). A claim for unjust enrichment consists of three elements: (1) plaintiff conferred a benefit upon the defendant, (2) the defendant had knowledge or appreciation of the benefit, and (3) the defendant's acceptance or retention of the benefit without payment of its value is inequitable under the circumstances. *See Young*, 164 Wash.2d at 484, 191 P.3d 1258 (quoting *Bailie Commc'ns, Ltd. v. Trend Bus. Sys., Inc.*, 61 Wash.App. 151, 159–60, 810 P.2d 12, 814 P.2d 699, *review denied*, 117 Wash.2d 1029, 820 P.2d 511 (1991)).

Plaintiffs argue their claim of unjust enrichment seeks payment for allegedly growing the Event, instead of rendering services at the Event. Dkt. 39 at 21:22–23. However, for an enrichment to be inequitable to retain, the person conferring the benefit must have a reasonable expectation of payment and the circumstances are such that equity and good conscience require

payment for the conferred benefit. Plaintiffs do not allege Defendants induced them to provide the alleged benefits — the creation of the SEVillage (and associated capture-the-flag event) and "investing substantial resources" into the Event — or promised any kind of payment to Defendants for doing so. *See* Compl. ¶¶ 159–66. In fact, after Defendants rebuffed Plaintiffs' requests for payment requests in 2012, Plaintiffs continued to provide the SEVillage at the Event for years. Compare Compl. ¶¶ 50, 163 (Defendants rejected Mr. Hadnagy's requests for payment but changed Event rules in 2012 to allow Mr. Hadnagy to start accepting third-party sponsorship compensation), with *id.* ¶¶ 45, 46, 58 (Mr. Hadnagy hosted the SEVillage in person or virtually from 2010 to 2022). Therefore, Plaintiffs could have no "reasonable" expectation of payment.

Plaintiffs also allege they derived significant benefit from their involvement in the Event, including "a lot of attention, exposure, and income from Sponsorships during the operation of the SEVillage (Dkt. 1-1, ¶ 50); the generation of "a considerable portion of Plaintiffs' business agreements . . . through their operation of the SEVillage" (*id.* ¶ 133); hosting a standalone social engineering convention in 2020 due to "the overwhelmingly positive feedback over the years at SEVillage" (*id.* ¶ 52); and even procuring a personal meeting with the director of the National Security Agency (*id.* ¶ 47).

Based on these allegations, the Court concludes Plaintiffs have failed to state a plausible claim for unjust enrichment and grant Defendants' motion to dismiss this claim.

2. Quantum Meruit

Quantum meruit is a specific equitable theory that falls within the broader category of "unjust enrichment." *Young v. Young*, 164 Wash.2d 477, 486, 191 P.3d 1258 (2008). Washington law distinguishes between quantum meruit claims and unjust enrichment claims. *Young*, 164 Wash.2d at 484–85, 191 P.3d 1258. Unjust enrichment refers to a method of recovery when,

1   without any direct contractual relationship between parties, one party retains a benefit it has not

2   paid for. *Id*. at 484, 191 P.3d 1258. Quantum meruit is a more specific subcategory of unjust

3   enrichment requiring a contract implied in fact between parties: The parties must show a "mutual

4   intention ... to contract with each other." *Id*. at 485, 191 P.3d 1258. Though the two concepts

5   have slightly different labels, both refer to the same general type of relief.

6          The concept of quantum meruit arises in two contexts: contract and restitution. In an

7   action based on a contract implied-in-fact (*i.e.*, when the parties intended to contract and

8   promises were exchanged, the general obligations for which must be sufficiently clear), quantum

9   meruit may be employed as a gap filler to supply absent terms. *Aegean Mar. Petroleum S.A. v.*

10  *KAVO Platanos M/V*, 646 F. Supp. 3d 1347, 1358 (W.D. Wash. 2022). Quantum meruit may

11  also provide restitution for unjust enrichment. *Id*. In this context, quantum meruit imposes

12  liability for the market value of services as a remedy for unjust enrichment. *Id*. (citing *Certified*

13  *Fire Prot. Inc.*, 128 Nev. at 380–81). The plaintiff must establish each element of unjust

14  enrichment to demonstrate entitlement to the remedy of quantum meruit. *Id*. at 1107 n.4.

15         Plaintiffs have not plead an implied-in-fact contract. There are no allegations the parties

16  intended to contract, exchanged promises, or created sufficient clear obligations pursuant to

17  promises to contract. Further, because Plaintiffs' unjust enrichment claim fails (as discussed

18  above), quantum meruit's application as a remedy for unjust enrichment also fails.

19         3.      Injunctive Relief Claim

20         Injunctive relief is a remedy, not a separate cause of action. *Iliescu, Tr. of John Iliescu,*

21  *Jr. & Sonnia Iliescu 1992 Fam. Tr. v. Reg'l Transp. Comm'n of Washoe Cnty.*, 522 P.3d 453,

22  457 (2022) (upholding dismissal of injunctive relief as an independent cause of action and

23  collecting cases); *McKee v. Gen. Motors Co.*, 601 F. Supp. 3d 901, 910 (W.D. Wash. 2022),

aff'd, 2023 WL 7318690 (9th Cir. Nov. 7, 2023). Plaintiffs do not dispute that injunctive relief is a remedy, not a separate cause of action. Dkt. 37 at 36:5–11.

Based on the foregoing, the Court grants Defendants' motion to dismiss Plaintiffs' claims of unjust enrichment, quantum meruit, and injunctive relief.

CONCLUSION

Accordingly, it is **ORDERED**:

1.  Defendants' motion to dismiss Plaintiffs' Alter Ego, Business Disparagement; Unjust Enrichment, Quantum Meruit, and Injunction claims is **GRANTED** and these claims are **dismissed**.

2.  Defendants' motion to dismiss Plaintiffs' Defamation claims as to the 2/9/22 Transparency Report and the 1/13/23 Update is **DENIED**.

3.  Defendants' motion to dismiss Plaintiffs' Defamation Claim (as to "Injurious Falsehoods" by Defendant Moss); and Tortious Interference with Contractual Relations and Prospective Business Relations Claims is **GRANTED, with leave to amend.**

4.  Plaintiffs may file an Amended Complaint consistent with this Order **on or before April 22, 2024.**

DATED this 28th day of March, 2024.

BRIAN A. TSUCHIDA
United States Magistrate Judge

1

2

3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHRISTOPHER J. HADNAGY, an
individual; and SOCIAL-ENGINEER, LLC,
a Pennsylvania limited liability company,

                Plaintiffs,

     v.

JEFF MOSS, an individual; DEF CON
COMMUNICATIONS, INC., a Washington
corporation; and DOES 1-10; and ROE
ENTITIES 1-10, inclusive,

                Defendants.

CASE NO. 2:23-c-v-01932-BAT

**ORDER DENYING PLAINTIFFS'
MOTION TO AMEND**

       Plaintiffs Christopher J. Hadnagy and Social-Engineer, LLC request leave to file an amended complaint to add claims of defamation by implication and invasion of privacy by false light. Dkt. 49; Dkt. 49-2 (Proposed Amended Complaint). Plaintiffs also seek to join Jeff Moss, a previously dismissed defendant. Defendant Def Con opposes the motion. Dkt. 50. Plaintiffs submitted a reply. Dkt. 51. For the reasons stated herein, the motion to amend is denied.

BACKGROUND

       On August 1, 2022, Plaintiffs filed this lawsuit in the Eastern District of Pennsylvania. *See Hadnagy v. Moss*, No. 2:22-cv-03060-WB, Dkt. 1. On January 5, 2023, Judge Wendy Beetlestone dismissed the lawsuit for lack of personal jurisdiction. *Hadnagy v. Moss*, No. CV 22-3060, 2023 WL 114689, at *7 (E.D. Pa. Jan. 5, 2023). On August 9, 2023, Plaintiffs filed this lawsuit in Nevada state court, which was functionally identical to the one Judge Beetlestone

ORDER DENYING PLAINTIFFS' MOTION
TO AMEND - 1

dismissed in January 2023. On August 29, 2023, Defendants timely removed the lawsuit to the District of Nevada under the diversity and removal statutes. Dkt. 1. Defendants then filed a motion to dismiss, or in the alternative, a motion to transfer to the Western District of Washington. Dkt. 13, 15. On December 13, 2023, the District of Nevada granted Defendants' motion to transfer to the Western District of Washington but did not reach the merits of the dismissal arguments. Dkt. 21. On January 18, 2024, Defendants filed their renewed motion to dismiss. Dkt. 37. The parties fully briefed the motion to dismiss on February 22, 2024, and the matter was submitted to the Court. Dkt. 40.

On March 28, 2024, the Court granted in part and denied in part Defendants' motion to dismiss. Dkt. 44 (the "March 28, 2024 Order"). The Court dismissed Plaintiffs' alter ego, business disparagement, unjust enrichment, quantum meruit and injunction claims *without* leave to amend. *Id*. at 23. The Court also dismissed Plaintiffs' claims of defamation (based on "Injurious Falsehoods" by Defendant Moss); tortious interference with contractual relations; and prospective business relations claims *with* leave to amend **on or before April 22, 2024**." *Id*.

In granting the partial dismissal, the Court stated "the allegations of additional injurious falsehoods are without plausible factual content. To proceed on a claim of defamation, Plaintiffs must plausibly plead the alleged 'false and defamatory' statements, *i.e.* to whom, when and where these statements were made." Dkt. 44 at 16. Plaintiffs were granted leave to "to plead additional factual allegations to support this claim," *see id.*, but chose not to do so.

Thus, following the March 28, 2024 Order and Plaintiffs' failure to file an amended complaint consistent with that Order, the only surviving claim is Plaintiffs' defamation claim against Def Con based on the Transparency Report and the Update. *Id*. Def Con filed its Answer to that claim on May 6, 2024. Dkt. 46.

The Court's Scheduling Order allowed for the amendment of pleadings by June 28, 2024. Dkt. 45. However, to the extent Plaintiffs seek to amend their pleadings to include claims based on the previously dismissed claims of "Injurious Falsehoods" by Jeff Moss, and any claims for tortious interference with contractual relations and prospective business relations, the Court's Order of March 28, 2024 controls. Plaintiffs missed the Court's deadline to cure the defects in their complaint regarding those claims; they provide no explanation for missing the deadline; and, did not seek leave to extend the deadline. In addition, Plaintiffs were granted leave to provide a factual basis for the dismissed claims – they were not granted leave to file different claims based on the same conclusory allegations previously found to be legally insufficient.

Three months after the March 28, 2024 Order, Plaintiffs now seek leave to file an amended complaint "to provide clarity and specifically include a cause of action for "Invasion of Privacy by False Light." Dkt. 49. Plaintiffs assert the proposed additional cause of action is "based on the same facts as Plaintiffs' defamation claim and is brought against the same Defendants." *Id.* at 1.

<u>LEGAL STANDARD</u>

Although leave to amend should be liberally granted, "leave to amend is not to be granted automatically." *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990). It is within the Court's discretion to grant or deny leave to amend. *Acri v. Int'l Ass'n of Machinists*, 781 F.2d 1393, 1398 (9th Cir. 1986). Courts consider five factors: "(1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment; and (5) whether plaintiff has previously amended his complaint." *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990). Not all factors merit equal weight, and it prejudice to the opposing party that carries the greatest weight. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

DISCUSSION

A.    Previously Dismissed Claims

    Before considering whether the five-factor analysis supports granting Plaintiffs leave to file the Proposed Amended Complaint, the Court must determine if the proposed amendment seeks to include factual allegations, claims, and/or parties that this Court previously dismissed.

    Jeff Moss, as an agent of Def Con, posted the Transparency Report and Update to Def Con's website. The Court previously found Defendants had failed to plead factual allegations sufficient to pierce the corporate veil and hold Mr. Moss personally liable. *See* Dkt. 44 at 12 ("Plaintiffs fail to allege sufficient facts to state a prima facie case of alter ego liability under either Rule 8(a)'s notice standard or Rule 9(b)'s heightened pleading standard applicable to this claim"). As this Court previously noted, "[t]he corporate cloak is not lightly thrown aside." *Id*. (citing *Grayson v. Nordic Const. Co*., 92 Wash. 2d 548, 553 (1979) (absent fraud or manifest injustice, "the corporation's separate entity should be respected")). Despite this holding, Plaintiffs have again included Mr. Moss as an individual defendant but have failed to plead factual allegations sufficient to pierce the corporate veil.

    The Court also dismissed Plaintiffs' defamation claim based on Defendant Moss's alleged "Injurious Falsehoods" and allegations relating to Black Hat because Plaintiffs failed to allege the "whom, when, and where these statements were made." *Id*. at 15. Although the Court granted Plaintiffs leave to amend this claim by April 22, 2024, Plaintiffs failed to do so. Nonetheless, Plaintiffs' Proposed Amended Complaint contains several references to the "Injurious Falsehoods" and the Black Hat Convention. *See*, *e.g*., Dkt. 49-2 ¶¶ 66–67, 69–70, 77. In other paragraphs of the Proposed Amended Complaint, Plaintiffs simply swap the conclusory words "Injurious Falsehoods" with "Transparency Report and Update." *Id*. ¶¶ 83, 100–01. But

1 these allegations were dismissed as insufficiently pled and repackaging them as tied to the

2 Transparency Report and Update does not cure the legal deficiencies of Plaintiffs' pleading.

3 The Court also dismissed Plaintiffs' claims for contractual interference with leave to

4 amend by April 22, 2024. Dkt. 44 at 17–20. Here again, Plaintiffs failed to amend this claim by

5 the Court's deadline. Despite the dismissal, Plaintiffs' Proposed Amended Complaint contains

6 several allegations that Def Con "wrongfully interfered" with Plaintiffs' contractual relations and

7 that clients, and prospective clients, terminated contracts because of the defamation. *See*, *e.g.*,

8 Dkt. 49-2 ¶¶ 53, 61–63, 69–70, 74, 77, 79, 93, 116–17.

9 Plaintiffs were given ample opportunity to amend their complaint and cure the pleading

10 deficiencies noted in the Court's March 28, 2024 Order. They chose not to do so, and these

11 factual allegations and legal theories are no longer part of the case.

12 B.    Five Factor Analysis

13 As separate grounds for denying leave to amend, all five factors considered on a motion

14 for leave to amend weigh against granting Plaintiffs' Proposed Amended Complaint.

15 1.    Undue Delay

16 "Undue delay is a valid reason for denying leave to amend." *Contact Lumber Co. v. P.T.*

17 *Moges Shipping Co.*, 918 F.2d 1446, 1454 (9th Cir. 1990) (*affirming* district court's denial of

18 leave to amend). "[T]he Court evaluates the time that has passed between the original pleading

19 and the proposed amendment." *Abalos v. Bronchick*, No. C07-844RSL, 2008 WL 1929893, at *2

20 (W.D. Wash. Apr. 28, 2008).

21 Plaintiffs timely filed their motion to amend by the deadline set in the Court's Scheduling

22 Order. Dkt. 49. However, in assessing timeliness and undue delay, courts look not merely to

23 whether a motion was filed within the time allotted in a scheduling order. Rather, courts must

ORDER DENYING PLAINTIFFS' MOTION
TO AMEND - 5

1   also inquire "whether the moving party knew or should have known the facts and theories raised

2   by the amendment in the original pleading." *Jackson*, 902 F.2d at 1388. An eight-month delay

3   between the time of obtaining a relevant fact and seeking leave to amend is unreasonable. *See*

4   *Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 799 (9th Cir.1991) (citing *Jackson*, 902 F.2d at 1388);

5   *Abalos v. Bronchick*, 2008 WL 1929893, at *2 (W.D. Wash. Apr. 28, 2008) (denying leave to

6   amend after nine-month delay).

7         Plaintiff filed this action on August 9, 2023, but did not move to amend to add the

8   additional causes of action purportedly based on the same set of facts already set forth in the

9   original complaint until nearly one year later, on June 28, 2024. Dkt. 49. This delay is

10  unreasonable. In *Abalos*, the plaintiff did not move to amend until nine months after filing the

11  original pleading although the plaintiff had expressed an intent to file an amended complaint in

12  an earlier email to the defendant. *Abalos*, 2008 WL 1929893, at *2. Finding plaintiff had unduly

13  delayed bringing these additional claims, despite clearly intending to do so earlier, the court

14  denied leave to amend. *Id*. Similarly, Plaintiff Hadnagy "expressed [his] intent to file an

15  amended complaint to add a claim for false light" in the parties' Joint Status Report filed on

16  March 1, 2024. Dkt. 41 at 1. Yet, Plaintiffs still waited another four months to seek leave to

17  amend.

18        Of greater significance to this analysis is the fact Plaintiffs knew of these factual

19  allegations and theories when they filed their original complaint almost two years ago, on August

20  9, 2023. *Jackson*, 902 F.2d at 1388 ("Relevant to evaluating the delay issue is whether the

21  moving party knew or should have known the facts and theories raised by the amendment in the

22  original pleading."); *see also Wise v. Washington State Dep't of Corr.*, No. C05 5810 FDB/KLS,

23  2006 WL 3694442, at *1 (W.D. Wash. Dec. 13, 2006) ("Leave to amend has also been denied

ORDER DENYING PLAINTIFFS' MOTION
TO AMEND - 6

1   when the moving party knew or should have known the facts upon which the amendment is

2   based when drafting the original pleading, but did not include them in the original pleading.").

3   The facts forming the basis of Plaintiffs' proposed claims of defamation by implication and false

4   light are the very same facts forming the basis of Plaintiffs' original defamation claim. *Compare*

5   Dkt. 49-2 at ¶¶ 85–109, with *id.* ¶¶ 110–22. Thus, Plaintiffs should have brought these proposed

6   additional claims when they filed their original complaint; particularly, as Plaintiffs included a

7   false light claim on identical facts in the initial Pennsylvania lawsuit nearly two years ago.

8        Finally, a party's failure to explain the reason for its delay also militates against

9   amendment. *See Guild Mortg. Co. LLC v. CrossCountry Mortg. LLC*, No. C21-1376-JCC-MLP,

10  2022 WL 1078574, at *2 (W.D. Wash. Apr. 11, 2022) (citing *Lockheed Martin Corp. v. Network*

11  *Sols., Inc.*, 194 F.3d 980, 986 (9th Cir. 1999)).

12       Plaintiffs provide no explanation for their delay in seeking the proposed amendment.

13  Plaintiffs knew of these claims at the outset of this action; had expressed an intent to file an

14  amended complaint several months ago but did not do so; included a false light claim on

15  identical facts in the initial Pennsylvania lawsuit nearly two years ago; and failed to take

16  advantage of several opportunities over the past two years.

17       The Court finds Plaintiffs' undue delay weighs against granting leave to amend.

18       2.   Previous Amendments

19       "A district court may deny a plaintiff leave to amend if . . . the plaintiff had several

20  opportunities to amend its complaint and repeatedly failed to cure deficiencies." *Telesaurus*

21  *VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010). After granting in part and denying in

22  part the Motion to Dismiss, the Court provided Plaintiffs an opportunity to amend the complaint

23  to cure deficiencies on or before April 22, 2024. *See* Dkt. 44. Plaintiffs failed to file an amended

ORDER DENYING PLAINTIFFS' MOTION
TO AMEND - 7

complaint within the deadline, did not seek an extension of the deadline, and provide no reason for not doing so. *Id.*

The Court finds Plaintiffs' failure to file an amended complaint when previously granted leave to do so weighs against granting leave to amend.

3.  Prejudice

"Expense, delay, and wear and tear on individuals and companies count toward prejudice." *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017). The parties have been involved in this litigation for two years, during which time Defendants have vigorously defended this lawsuit and the prior lawsuit brought by Plaintiffs, which was dismissed. *See Hadnagy*, 2023 WL 114689, at *1. Defendants have incurred significant expenses relating to three motions to dismiss and a motion to transfer. *See* Dkt. 13, 15, 37; *see also Hadnagy*, 2023 WL 114689, at *1. On the other hand, Plaintiffs have had several years and lawsuits within which to bring these proposed claims.

Although Plaintiffs claim the proposed amendment will not add to the parties' litigation burden, defamation by implication and false light advance new legal theories that require proof of different facts. *See Jackson*, 902 F.2d at 1387–88 (holding that an amendment prejudices the other party when it would require additional discovery because it "advance[s] different legal theories and require[s] proof of different facts"); *see also id.* ("Putting the defendants through the time and expense of continued litigation on a new theory, with the possibility of additional discovery, would be manifestly unfair and unduly prejudicial.").

While the proposed claims are akin to defamation, Washington courts have recognized they are distinct causes of action requiring different elements and which allow for recovery of

ORDER DENYING PLAINTIFFS' MOTION
TO AMEND - 8

different damages. *Seaquist v. Caldier*, 8 Wash. App. 2d 556, 564 (2019). For instance, a claim of defamation by implication requires proof of all the elements of defamation plus "with respect to the element of falsity that the communication left a false impression that would be contradicted by the inclusion of omitted facts." *Mohr v. Grant*, 153 Wash. 2d 812, 827 (2005). And, "[f]alse light differs from defamation in that it focuses on compensation for mental suffering, rather than reputation. A false light claim arises when 'someone publicizes a matter that places another in a false light if (a) the false light would be highly offensive to a reasonable person and (b) the actor knew of or recklessly disregarded the falsity of the publication and the false light in which the other would be placed.'" *Corey v. Pierce Cnty.*, 154 Wash. App. 752, 762 (2010) (citation omitted).

Thus, the Proposed Amended Complaint seeks to add claims comprised of different elements, requiring proof of different facts, relying on different legal theories (harm to reputation versus mental suffering) and allowing for recovery of different damages. Defendants report the parties are already engaged in discovery focused on the surviving claim of defamation and the deposition of Def Con is scheduled for July 31, 2024. If Plaintiff intends to question Def Con on these claims or seek a second deposition if these claims are added, Def Con will be prejudiced.

The Court finds prejudice to Defendants with the addition of the proposed claims weighs against granting leave to amend.

### 4. Futility of Proposed Amendment

"Leave to amend should not be granted when amendment would be futile, and futility alone is enough to refuse amendment." *BP W. Coast Prod. LLC v. SKR Inc.*, 989 F. Supp. 2d 1109, 1116 (W.D. Wash. 2013) (citing *United States v. SmithKline Beecham Clinical Labs.*, 245 F.3d 1048, 1052 (9th Cir. 2001)).

ORDER DENYING PLAINTIFFS' MOTION
TO AMEND - 9

"Defamation by implication occurs when "defendant juxtaposes a series of facts so as to imply a defamatory connection between them or creates a defamatory implication by omitting facts." *Corey*, 154 Wash. App. at 761-62 (quoting *Mohr*, 153 Wash. 2d at 823). "However, a statement does not imply false facts merely because someone might draw a negative conclusion from it. 'Merely omitting facts favorable to the plaintiff or facts that the plaintiff thinks should have been included does not make a publication false.'" *Jha v. Khan*, 24 Wash. App. 2d 377, 394 (2022), *review denied*, 530 P.3d 182 (Wash. 2023) (quoting *Mohr*, 153 Wash. 2d at 827).

Moreover, courts must give words their "natural and obvious meaning and may not extend language by innuendo or by the conclusions of the pleader." *Yeakey v. Hearst Commc'ns, Inc.*, 156 Wash. App. 787, 792 (2010) (reversing court's denial of motion to dismiss on defamation by implication claim and remanding for dismissal). "And the 'defamatory character of the language must be apparent from the words themselves.'" *Id.*

The Transparency Report and Update stated individuals had reported Code of Conduct violations about Plaintiff Hadnagy to Def Con, and Def Con believed those reports merited a ban from Def Con. Dkt. 49-2 ¶ 46, 68. Plaintiffs allege the Transparency Report and Update are defamatory by implication because third parties on social media "interpreted them to mean that there were despicable facts underlying the ban and Plaintiff Hadnagy was a sexual predator of the worst order" and made "assumptions that Plaintiff Hadnagy was a sexual predator." Dkt. 49-2 ¶¶ 54, 96. But the fact third parties drew a negative conclusion (*i.e.*, that Hadnagy is a sexual predator) from Def Con's ban cannot establish a defamation by implication claim as a matter of law. Nor can Plaintiffs' belief that Def Con should have included additional facts (*i.e.*, clarified that the Code of Conduct violations were not sexual in nature) establish a defamation by implication claim. *Id.* ¶¶ 52, 54; *see also Mohr*, 153 Wash. 2d at 827.

The alleged "defamatory" statement states:

> We received multiple CoC violation reports about a DEF CON Village leader, Chris Hadnagy of the SE Village. After conversations with the reporting parties and Chris, we are confident the severity of the transgressions merits a ban from DEF CON.

Dkt. 49-2 at 14 (Proposed Amended Complaint). The Update states:

> During our investigation we spoke directly with Mr. Hadnagy about claims of his violations of our Code of Conduct. He confirmed his behavior and agreed to stop. Unfortunately, the behavior did not stop […] Our investigation also revealed that DEF CON is not the only security onference to receive complaints about Mr. Hadnagy's behavior. For example, Black Hat received complaints, conducted their own investigation, and removed Mr. Hadnagy from their Review Board.

*Id.* at 18.

Nothing in the Transparency Report or Update references or implies sexual misconduct. Therefore, "assumptions" by third parties or Plaintiffs' own "conclusions as the pleader" about the Transparency Report and Update are insufficient to plead a defamation by implication or false light claim. Plaintiffs argue these statements led to speculation in the anti-hacking community that Plaintiff Hadnagy "was a repeat perpetrator of egregious violations that were potentially criminal," and "despite the foreseeable and not unreasonable reaction and interpretation of those in the infosec industry that plaintiff was being accused of sexual misconduct as was the case when other individuals had been named in previous transparency reports." *Id.* at 10-11. In support of this proposed defamation by implication claim, Plaintiffs attach Twitter traffic following the posting of the Transparency Report and Update.

Essentially, the Twitter traffic indicates no one knows why Plaintiffs were banned. One person said as a "theoretical question," if people in the past were banned for sexual misconduct, wouldn't you think [Plaintiff Hadnagy] was banned for the same reason?  But this was a theoretical question, and the Twitter traffic does not indicate anyone believed Plaintiff Hagnagy

1    was banned for sexual misconduct. Rather, the individuals who posted stated: 1) we don't know

2    why [Plaintiff] was banned; 2) the transparency report is worthless because it doesn't tell you

3    why [Plaintiff] was banned; 3) [Plaintiff] might know why he was banned shouldn't he tell us: 4)

4    [Plaintiff] responded that he would inform people later; 5) I think it involved an employee of

5    [Plaintiff] who complained about [Plaintiff]; 6) Is a workplace problem a basis for a ban? 7)

6    when I was at Defcon there was a fight and maybe [Plaintiff's] ban is related; 8) [Plaintiff] said

7    he was banned because defendant wants somebody else running that particular village; 9) this is

8    all about our community which has lots of people that don't like rules and won't follow rules;

9    10) I "heard he called people the N-word and was banned." *See*, Dkt. 50-1, Supplemental Conrad

10   Decl., Ex. B.

11          Plaintiff appears to believe that, because the Court denied dismissal of the defamation

12   claim, the two statements released by Defendants are defamatory and "highly offensive" and thus

13   he should be allowed to go forward with a false light claim. However, to plead a prima facie

14   claim for false light, Plaintiffs must demonstrate Def Con "publicized a statement placing

15   [him/them] in a false light, so long as '(a) the false light would be highly offensive to a

16   reasonable person and (b) the actor knew of or recklessly disregarded the falsity of the

17   publication and the false light in which the other would be placed.'" *Jha*, 24 Wash. App. 2d at

18   391. While Plaintiffs claim the Transparency Report and Update was "highly offensive in

19   nature," mimicking the elements in a conclusory manner without factual support, because it

20   implied that he was "guilty of predatory conduct," nowhere in the Transparency Report and

21   Update is there an implication of sexual misconduct. Dkt. 49-2 ¶¶ 46, 68, 114. Again, regardless

22   of third parties' "assumptions" about Plaintiff Hadnagy, the Transparency Report and Update are

23   not "highly offensive to a reasonable person." *Id*. ¶¶ 52, 54; *Jha*, 24 Wash. App. 2d at 391.

The futility of the addition of the proposed claims weighs against granting the motion to amend.

5.   Bad Faith

"In the context of a motion for leave to amend, 'bad faith' means acting with intent to deceive, harass, mislead, delay, or disrupt." *Wizards of the Coast LLC v. Cryptozoic Ent. LLC*, 309 F.R.D. 645, 651 (W.D. Wash. 2015). Plaintiffs' addition of factual allegations, claims, and parties that were dismissed by this Court is troublesome. Particularly, as the Court provided Plaintiffs with an opportunity to file an amended complaint consistent with its Order of March 28, 2024, and Plaintiffs chose not to do so.

As previously noted, Mr. Moss is no longer a party to this action in his individual capacity because this Court dismissed the alter ego claim, holding that Plaintiffs "fail[ed] to allege sufficient facts to establish a prima facie case of alter ego liability." *Id*. at 12:8–9. Despite this, Defendants seek to add Mr. Moss back in as a defendant based on the same legally insufficient facts.

The Court also dismissed the "Injurious Falsehoods" defamation claim alleged against Mr. Moss relating to the Black Hat Convention because Plaintiffs failed to allege the "whom, when, and where these statements were made." *Id*. at 16:11–16. And while the Court granted Plaintiffs leave to amend "to plead additional factual allegations to support this claim" by April 22, 2024, Plaintiffs did not. *Id*. at 16:17–18. Therefore, this claim is no longer part of this case. Yet, in their Proposed Amended Complaint, Plaintiffs again include the same previously dismissed and legally insufficient allegations by simply changing "Injurious Falsehoods" to "Transparency Report and Update" or by continuing to refer to "Injurious Falsehoods" and Black Hat. *See*, *e.g*., Dkt. 49-2 ¶¶ 66–67, 69–70, 77, 83, 100–01.

1    The Court also dismissed Plaintiffs' contractual interference claim with leave to amend

2    by April 22, 2024. Dkt. 44 at 17–20. Plaintiffs did not file an amended complaint to cure the

3    deficiencies and therefore, this claim is no longer part of this case. Yet, Plaintiffs' Proposed

4    Amended Complaint includes allegations that Def Con "wrongfully interfere[d] with Plaintiffs'

5    contractual relations" and that "[s]everal of Plaintiffs' longstanding clients . . . terminated their

6    contract(s)." *See*, *e.g.*, Dkt. 49-2 ¶¶ 53, 61–63, 69–70, 74, 77, 79, 93, 116–17.

7    Based on the foregoing, the Court concludes Plaintiffs' Proposed Amended Complaint

8    has been brought in bad faith as it has further delayed this action unnecessarily. This factor

9    weighs against granting the motion to amend.

10   Accordingly, the Court **DENIES** Plaintiffs' Motion to Amend (Dkt. 49). The Clerk is

11   directed to send a copy of this Order to all parties.

12   DATED this 24th day of July, 2024.

13

14   _____

     BRIAN A. TSUCHIDA

15   United States Magistrate Judge

16

17

18

19

20

21

22

23

ORDER DENYING PLAINTIFFS' MOTION
TO AMEND - 14